# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

THE STATE OF LOUISIANA
By and through its Attorney General,
Elizabeth B. Murrill;

LOUISIANA DEPARTMENT OF EDUCATION;

THE STATE OF MISSISSIPPI
By and through its Attorney General, Lynn
Fitch;

THE STATE OF MONTANA
By and through its Attorney General, Austin
Knudsen;

THE STATE OF IDAHO
By and through its Attorney General, Raúl
Labrador,

PLAINTIFFS,

v.

U.S. DEPARTMENT OF EDUCATION;

MIGUEL CARDONA, in his official capacity as
Secretary of Education;

U.S. DEPARTMENT OF EDUCATION'S OFFICE
FOR CIVIL RIGHTS;

CATHERINE LHAMON, in her official capacity
as the Assistant Secretary for Civil Rights;

U.S. DEPARTMENT OF JUSTICE;

MERRICK B. GARLAND, in his official capacity
as the Attorney General of the United States,

DEFENDANTS.

CIVIL ACTION NO. _____

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Plaintiffs the State of Louisiana; the Louisiana Department of Education; the State of Mississippi; the State of Montana; and the State of Idaho (collectively, "Plaintiffs") bring this action against defendants the U.S. Department of Education; Miguel Cardona, in his official capacity as Secretary of Education; the U.S. Department of Education's Office for Civil Rights; Catherine Lhamon, in her official capacity as Assistant Secretary for Civil Rights, U.S. Department of Education; the U.S. Department of Justice; and Merrick B. Garland, in his official capacity as the Attorney General of the United States (collectively, "Defendants") for declaratory and injunctive relief and allege as follows:

## INTRODUCTION

1.     Today, the U.S. Department of Education—by the stroke of a pen and over 400 Federal Register pages drafted in Washington, D.C. conference rooms—published new Title IX regulations intended to transform the classrooms, lunchrooms, bathrooms, and locker rooms of American schools. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (the "Rule" or "Final Rule"), Ex. A. There is normal federal government overreach—and then there is the Final Rule: a naked attempt to strong-arm our schools into molding our children in the current federal government's preferred image of how a child should think, act, and speak. The Final Rule is an affront to the dignity of families and school administrators everywhere, and it is nowhere close to legal.

2.     Title IX prohibits educational institutions that receive federal funding from discriminating on the basis of sex in educational programs and activities. That prohibition promotes equal opportunity, dignity, and respect for both sexes—while at the same time recognizing (as both Title IX and longstanding regulations recognize) that equality and dignity occasionally demand differentiation between the two sexes to promote respect for both. Such differentiation is not unlawful discrimination: It furthers the precise goals, and protects the precise values, that undergird Title IX.

1

And over the past 50 years, that basic understanding has driven remarkable progress and countless opportunities—in particular for women and girls—in American education.

3.      The Final Rule drives a dagger through the heart of Title IX's mandate. The central feature of the Final Rule is the Department's extraordinary move to transform Title IX's prohibition of discrimination based on "sex" to include discrimination based on "gender identity"—a wildly ambiguous term that itself is never fully defined in the Final Rule but that the Department describes as a student's subjective and internal "sense" of his or her gender. And based on that key move, the Department sets out to remake our educational system and our children.

4.      To take just a few examples: The Final Rule prohibits single-sex bathrooms and locker rooms. The Final Rule likewise compels school officials both to use pronouns associated with a student's claimed "gender identity" and to force students to do so as well. And school officials should be careful about requesting documentation to verify the sincerity of a person's claimed gender identity, the Department ominously warns, because that *itself* might violate the Final Rule. Moreover, although the Department tries to downplay the Rule's impact on athletics—because the Department knows that extending its radical theory to athletics would be political suicide in an election year—the Rule cannot help but sound the death knell for female sports.

5.      The consequences will be shocking and severe. Boys and girls will be forced to share bathrooms, locker rooms, and perhaps even lodging on overnight field trips with members of the opposite sex. Adding insult to injury, they will be forced to use "preferred pronouns" or else face punishment, which raises distinct Free Speech and Free Exercise problems. And that's just the students. Consider parents who, for example, may never hear about so-called "gender affirming" counseling that their children receive because the Final Rule allowed a school to conceal that information. Consider also teachers and other school administrators who will be forced to create and carry out employee training programs on the 423-page Rule, change school policies, and likely begin

costly construction projects to modify school bathrooms and locker rooms. And even that will not be enough because they will still be exposed to agency investigations and private litigation when, inevitably, Rule objectors (*e.g.*, parents and students) sue them because of their compliance and Rule proponents file complaints with the Department and sue them for failure to adequately comply. Finally, if States, education agencies, and schools consider resisting the Rule, they will run straight into the Department's awesome coercive power to withhold billions of dollars in federal funding. The Rule is lose-lose-lose across the board.

6.      Through all these mandates and many others, the Rule does extraordinary violence to Title IX. Forcing a young girl to change clothes in front of a boy or man in a locker room is entirely antithetical to the dignity and respect that Title IX was intended to preserve and advance. So, too, is forcing children of opposite sexes to share adjoining stalls in the traditionally private space of a bathroom. These are not close questions. And if the Final Rule stands, it will gut the very essence of Title IX and destroy decades of advances in equal educational opportunities, especially for women and girls.

7.      This lawsuit is intended to save Title IX and protect the myriad interests threatened by the Final Rule. By any measure, the Final Rule is unlawful. Plaintiffs thus respectfully urge the Court to (a) postpone the Rule's August 1, 2024, effective date, stay the Rule, or grant injunctive relief against the Rule's enforcement; (b) grant declaratory relief stating the Rule is unlawful; (c) vacate and set aside the Rule; and (d) award them all other relief requested herein.

## JURISDICTION AND VENUE

8.      This action arises under Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–88, and the Administrative Procedure Act (the "APA"), 5 U.S.C. §§ 553, 701–06. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331.

9.      This Court has authority to issue declaratory, injunctive, and other relief pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, and the APA, 5 U.S.C. §§ 702, 705–706.

10.     Venue is proper in this district under 28 U.S.C. § 1391(e)(1). Defendants are United States agencies or officers sued in their official capacities. Plaintiff State of Louisiana is a resident of this District, and substantial harm giving rise to this Complaint occurred and will continue to occur within this District.

## THE PARTIES

11.     Plaintiff Louisiana is a sovereign State of the United States. This action is brought on behalf of Louisiana by Attorney General Elizabeth B. Murrill, who is legally authorized to sue on its behalf. Her offices are located at 1885 North Third Street, Baton Rouge, Louisiana 70802.

12.     Plaintiff Louisiana Department of Education is an agency of the State of Louisiana, which has the Louisiana State Superintendent of Education as its administrative head. La. Rev. Stat. § 17:24(A). The Louisiana Department of Education "administer[s] and distribute[s] all federal funds received" and implements the State's policies and guidelines for Louisiana's public elementary and secondary schools. *Id.* § 17:24(C). The Louisiana Department of Education is located at 1201 North Third Street, Baton Rouge, Louisiana 70802.

13.     Plaintiff Mississippi is a sovereign State of the United States. This action is brought on behalf of Mississippi by Attorney General Lynn Fitch, who is legally authorized to sue on its behalf. Her offices are located at 550 High Street, Jackson, Mississippi 39201.

14.     Plaintiff Montana is a sovereign State of the United States. This action is brought on behalf of Montana by Attorney General Austin Knudsen, who is legally authorized to sue on its behalf. His offices are located at 215 North Sanders Street, Helena, Montana 59601.

4

15.     Plaintiff Idaho is a sovereign State of the United States. This action is brought on behalf of Idaho by Attorney General Raúl Labrador, who is legally authorized to sue on its behalf. His offices are located at 700 W. Jefferson Street, Suite 210, Boise, Idaho 83720.

16.     Defendant U.S. Department of Education (the "Department") is an executive agency of the United States with its principal address located at 400 Maryland Avenue, SW, Washington, District of Columbia 20202. The Department issued the Rule that is challenged in this suit.

17.     Defendant Miguel Cardona is Secretary of the Department and is sued in his official capacity. His principal address is 400 Maryland Avenue, SW, Washington, District of Columbia 20202. Defendant Cardona is responsible for carrying out the duties of the Department under federal law, including Title IX. Defendant Cardona signed the Rule that is challenged in this suit.

18.     Defendant Office for Civil Rights ("OCR") is an office of the Department. Its principal address is 400 Maryland Avenue, SW, Washington, District of Columbia 20202. OCR is responsible for carrying out its duties under federal law, including Title IX.

19.     Defendant Catherine Lhamon is the Assistant Secretary for Civil Rights and is sued in her official capacity. Her principal address is 400 Maryland Avenue, SW, Washington, District of Columbia 20202. Defendant Lhamon is responsible for carrying out the duties of OCR under federal law, including Title IX.

20.     Defendant U.S. Department of Justice is a federal agency of the United States with its principal office at 950 Pennsylvania Ave., NW, Washington, District of Columbia 20530. Through its Civil Rights Division, the U.S. Department of Justice litigates violations of Title IX under 42 U.S.C. § 2000d-1.

21.     Defendant Merrick B. Garland is the Attorney General of the United States and the head of the U.S. Department of Justice. His principal address is 950 Pennsylvania Ave., NW, Washington, District of Columbia 20530. Defendant Garland has responsibilities related to the

implementation and enforcement of Title IX. *See* Exec. Order, No. 12,250, 45 Fed. Reg. 72,995 (Nov. 2, 1980).

## STATEMENT OF FACTS

**I.     STATUTORY AND REGULATORY HISTORY**

**A. Congress Enacted Title IX of the Education Amendments of 1972 to Promote Equal Opportunities in Education for Both Sexes by Imposing Conditions on Federal Funding.**

22.     In 1969, President Richard Nixon created a task force to study the status of women in American society and to consider federal policies that could improve their opportunities. The task force's findings were disheartening: "So widespread and pervasive are discriminatory practices against women that they have come to be regarded, more often than not, as normal." PRESIDENT'S TASK FORCE ON WOMEN'S RTS. & RESPS., A MATTER OF SIMPLE JUSTICE III (1970).

23.     The task force identified education as an avenue for improving equal opportunities for women and recommended that Congress "authorize the Attorney General to aid women and parents of minor girls in suits seeking equal access to public education, and to require the Office of Education to make a survey concerning the lack of equal educational opportunities for individuals by reason of sex." *Id.* at IV.

24.     Representative Patsy Mink, who played a vital role in Title IX's adoption, echoed the task force's concerns about the "insidious" discrimination against women in education that deprived women "of the opportunity for an equal chance" and urged the U.S. House to take action. Testimony by Rep. Mink in Support of Elimination of Discrimination against Women in Higher Education, during Hearing before the Special Subcomm. on Educ. of the H. Comm. on Educ. and Labor (June 24, 1970), available at https://www.loc.gov/item/mss8495700102?loclr=blogtea.

25.     In 1972, Congress finally acted. It passed Title IX to remedy "one of the great failings of the American educational system"—"the continuation of corrosive and unjustified discrimination

against women" that "reaches into all facets of education," 118 Cong. Rec. 5803 (Feb. 28, 1972) (statement of Sen. Birch Bayh)—and to "guarantee that women, too, enjoy the educational opportunity every American deserves," 117 Cong. Rec. 32,476 (Sept. 20, 1971) (statement of Sen. Birch Bayh); *see N. Haven Bd. of Ed. v. Bell*, 456 U.S. 512, 526–27 (1982) (noting that Senator Bayh was "the sponsor of the language ultimately enacted"). President Nixon signed Title IX into law on June 23, 1972. *See* Pub. L. No. 92-318, Title IX, 86 Stat. 235, 373–75 (codified at 20 U.S.C. §§ 1681, *et seq.*).

26.     Title IX's text provides: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance [with certain statutory exceptions.]" 20 U.S.C. § 1681(a).

27.     At the time of Title IX's enactment, the term "sex" meant a person's biological sex—male or female—which "is an immutable characteristic determined" at "birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.); *see, e.g., Sex, Webster's Third New International Dictionary* 2081 (1966) ("one of the two divisions of organic esp. human beings respectively designated male or female"); *Sex, Webster's New World Dictionary* (1972) ("[E]ither of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions."); *Sex, American Heritage Dictionary* (1969) ("a. The property or quality by which organisms are classified according to their reproduction functions. b. Either of two divisions, designated *male* and *female*, of this classification.").

28.     The statute uses this ordinary meaning of "sex." *See, e.g., Neese v. Becerra*, No. 2:21-cv-163, 2022 WL 1265925, at *12 (N.D. Tex. Apr. 26, 2022) ("Title IX presumes sexual dimorphism in section after section, requiring equal treatment for each 'sex.'"); 20 U.S.C. §§ 1681(a)(2) (discussing institutions that were "changing from being an institution which admits only students of one sex to

being an institution which admits students of both sexes"); 1681(a)(8) (referring to "students of one sex" and "students of the other sex").

29.     Title IX thus promotes equal educational opportunities—and dignity and respect for men and women—by generally prohibiting recipients of federal funds from discriminating against a person based on his or her biological sex. At the same time, Title IX respected the biological differences between men and women that occasionally demand differentiation between the two sexes to promote respect for both. Title IX instructs, for example, that "nothing contained herein shall be construed to prohibit" institutions receiving federal funds "from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. This reflects the congressional understanding that separating the sexes "where personal privacy must be preserved" was not discrimination. *See* 118 Cong. Rec. 3937 (Feb. 15, 1972) (Statement of Sen. Birch Bayh) (explaining Title IX "permit[s] differential treatment by sex" when necessary, such as "in sport facilities or other instances where personal privacy must be preserved").

30.     Title IX also allows a subset of institutions and programs, such as traditional single-sex schools and certain religious schools, to remain limited to "one sex." 20 U.S.C. § 1681(a)(3), (5). Similarly, it authorizes certain groups and activities to remain limited to one sex, such as sororities, fraternities, Girl Scouts, Boy Scouts, Girls State conference, and Boys State conference. *Id.* § 1681(a)(6)–(7). Title IX additionally permits single-sex activities like "father-son or mother-daughter activities at an educational institution" as long as "opportunities for reasonably comparable activities" are "provided for students of the other sex." *Id.* § 1681(a)(6)-(7), (8).

31.     Implementing regulations, including the earliest ones (and those still in effect today), likewise understood that Title IX did not ban all differential treatment based on sex. To the contrary, regulations recognized that differential treatment was sometimes necessary to afford equal opportunities due to biological differences.

**B. As Mandated by Statute, the Department's Predecessor Issued Regulations Implementing Title IX.**

32.     Following Title IX's passage, Congress recognized that more guidance was necessary. Congress therefore passed what is known as the "Javits Amendment" in 1974. That amendment required the Department's predecessor to promulgate regulations to effectuate Title IX, including regulations "with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." Pub. L. No. 93-380, Title VIII, Part D, § 844, 88 Stat. 612.[1]

33.     In compliance with that statutory mandate, the Department's predecessor published regulations implementing Title IX (the "1975 Regulations") on June 4, 1975. *See* U.S. Dep't of Health, Educ., & Welfare, *Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities*, 40 Fed. Reg. 24,128 (Jun. 4, 1975) (codified at 45 C.F.R. pt. 86).

34.     Congress subjected the 1975 Regulations to a statutory "laying before" provision, under which Congress could disapprove them by resolution within 45 days if it found them inconsistent with Title IX. *See* General Education Provisions Act, Pub. L. 93-380, 88 Stat. 567.

35.     During that time period for congressional review, "[r]esolutions of disapproval were introduced in both Houses of Congress" and discussed. *N. Haven*, 456 U.S. at 532 & n.22. One House subcommittee "held six days of hearings to determine whether the [1975 Regulations] were 'consistent with the law and with the intent of the Congress in enacting the law.'" *Id.* at 532. Ultimately, the resolutions failed, and the 1975 Regulations went into effect. *Id.* at 533.

36.     Given the special congressional scrutiny that the 1975 Regulations endured, the Supreme Court has repeatedly "recognized the probative value" of the 1975 Regulations in light of "Title IX's unique post enactment history." *Grove City Coll. v. Bell*, 465 U.S. 555, 567 (1984).

---

[1] The Department was created in 1979 through the Department of Education Organization Act, and it formally adopted and recodified the 1975 Regulations without substantive changes when it began operations in 1980. 45 Fed. Reg. 30,802, 30,955–65 (May 9, 1980) (codified at 34 C.F.R. pt. 106).

37.     The 1975 Regulations provide that, "[e]xcept as provided elsewhere . . . no person shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance." 40 Fed. Reg. at 24,140 (now 34 C.F.R. § 106.31(a)) (emphasis added).

38.     Provisions throughout the 1975 Regulations emphasize three key aspects of Title IX's general prohibition on discrimination based on sex in education programs and activities.

39.     *First*, the 1975 Regulations demonstrate that sex discrimination means discrimination against someone based on his or her sex as a male or female. The 1975 Regulations thus referred to "women and men" and "male and female teams," *id.* at 24,132, 24,135, contrasted payment rates between "one sex" and the "opposite sex," *id.* at 24,135, and prohibited discrimination "against members of either sex," *id.* at 24,134.

40.     *Second*, the 1975 Regulations underscore that not all differential treatment based on sex is prohibited discrimination. That is why the 1975 Regulations permit funding recipients to "separate toilet, locker room, and shower facilities on the basis of sex" as long as "such facilities provided for students of one sex" are "comparable to such facilities provided for students of the other sex." *Id.* at 24,141. That is also why the regulations allow the "separation of students by sex within physical education classes or activities during participation in wrestling, boxing, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact." *Id.* And it is why they allow "[p]ortions of classes in elementary and secondary schools which deal exclusively with human sexuality" to be "conducted in separate sessions for boys and girls." *Id.*

41.     *Third*, the 1975 Regulations show that sometimes biological differences make differential treatment based on sex necessary to provide equal opportunities. That is why the 1975 Regulations "requir[e] the use of standards for measuring skill . . . in physical education which do not

impact adversely on members of one sex." *Id.* at 24,132; *see id.* (explaining this requirement is necessary because certain standards "may be virtually out-of-reach for many more women than men because of the difference in strength between the average person of each sex"); *see also id.* at 24,141 (now 34 C.F.R. § 106.43) ("Where use of a single standard of measuring skill or progress in a physical education class has an adverse effect on members of one sex, the recipient shall use appropriate standards which do not have such effect.").

42.     Subsequent interpretations and regulations likewise carry forward these three features of Title IX. *See, e.g.*, Dep't of Health, Educ., & Welfare, *Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics*, 44 Fed. Reg. 71,413, 71,414 (Dec. 11, 1979) ("athletic interests and abilities of male and female students must be equally effectively accommodated"); *id.* (explaining that most institutions would be obligated to develop "athletic programs that substantially expand opportunities for women to participate and compete at all levels"); *id.* at 71,415 ("Some aspects of athletic programs may not be equivalent for men and women because of unique aspects of particular sports or athletic activities."); Dep't of Educ., *Establishment of Title and Chapters*, 45 Fed. Reg. 30,802, 30,960 (May 9, 1980) (discussing "[h]ousing provided by a recipient to students of one sex, when compared to that provided to students of the other sex").

43.     Title IX and the early implementing regulations, not to mention current regulations,[2] thus evince Congress's policy decision to promote equal educational opportunities for both sexes while not disregarding biological differences or mandating identical treatment of males and females in all circumstances—a decision that has proven enormously successful as (among many other things) female college attendance and participation in athletics has skyrocketed. *See, e.g.*, *Adams v. Sch. Bd. of*

---

[2] *See, e.g.*, 34 C.F.R. § 106.41(b)-(c) (allowing single-sex teams and requiring recipients to provide "equal athletic opportunity for members of both sexes").

*St. Johns Cnty.*, 57 F.4th 791, 818–19 (11th Cir. 2022) (Lagoa, J., concurring) (describing the "remarkable impact Title IX has had on girls and women in sports").

## II.    ENFORCEMENT AND APPLICATION OF TITLE IX

### A. Title IX Is Enforced Through Administrative Enforcement Proceedings and Litigation.

44.    Through OCR, the Department enforces Title IX and regulations by, among other things, investigating discrimination complaints and seeking voluntary measures to cure violations. Investigations impose costs and burdens on funding recipients, as do compliance measures.

45.    If a recipient of federal funds fails or refuses to comply with Title IX or Title IX regulations, Defendants can pursue administrative enforcement proceedings or refer the matter to the U.S. Department of Justice for litigation. *See* Title IX Legal Manual, V. Federal Funding Agency Methods to Enforce Compliance, Civil Rights Division, U.S. Dep't of Justice, available at https://tinyurl.com/byjsscde. Both impose costs and can culminate in the termination of federal funding. *See id.*

46.    The threat of terminating federal funding is a powerful tool because the Department provides funding to public K-12 schools, colleges, and universities, as well as most private higher educational institutions.

47.    In addition to Defendants' enforcement options, private individuals can also enforce Title IX and regulations through private litigation. *See Cannon v. Univ. of Chicago*, 441 U.S. 677, 680 (1979) (holding Title IX contains an implied private right of action and a woman could sue medical schools for denying her admission due to her sex).

### B. The Department and the Supreme Court Find that Harassment Can Violate Title IX When It Is Based on Sex and Effectively Bars Access to Educational Opportunities.

48.    Since the 1980s, the Department has taken the position that sexual harassment can be a form of sex discrimination prohibited by Title IX. *See* U.S. Dep't of Educ., Office for Civil Rights,

Policy Mem., Antonio J. Califa, Director for Litigation Enforcement and Policy Services (Aug. 31, 1981).

49.    The Department stated that sexual harassment can severely interfere with a student's education, not to mention general well-being, and emphasized the importance of ensuring "nondiscriminatory, safe environments in which students can learn." *Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties*, 62 Fed. Reg. 12,034, 12,034 (Mar. 13, 1997).

50.    While acknowledging the seriousness of sexual harassment and attempting to remedy that discrimination, the Department also recognized the danger to Free Speech rights if recipients did not properly distinguish between prohibited conduct and protected free speech. It therefore issued guidance stating that "Title IX is intended to protect students from sex discrimination, not to regulate the content of speech." *Id.* at 12,045. It also admonished schools to "formulate, interpret, and apply [Title IX's] rules so as to protect academic freedom and free speech rights." *Id.*

51.    The Supreme Court has also concluded that sexual harassment of a student can be discrimination based on sex in education programs and activities that violates Title IX (and creates liability in private damages suits) in certain circumstances. *See Franklin v. Gwinnett Cty. Pub. Sch.*, 503 U.S. 60, 63–64, 75 (1992) (describing a teacher's sexual harassment of a student on school property). It has clarified that funding recipients violate Title IX when they have "actual knowledge" of a teacher's sexual harassment of a student and respond with "deliberate indifference" to that discrimination. *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 290 (1998).

52.    When it comes to student-on-student sexual harassment, a recipient violates Title IX when that harassment "is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit" and "the funding recipient acts with deliberate indifference to known acts of harassment in its programs or activities." *Davis v. Monroe*

*County Board of Education*, 526 U.S. 629, 633 (1999). The Supreme Court explained that liability is limited "to circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs," otherwise it cannot be said that the recipient caused the victim to undergo the sex-based harassment "'under' the recipient's programs." *Id.* at 645.

53.     The discriminatory conduct in *Davis* involved more than verbal conduct, so the majority opinion did not need to address First Amendment concerns. *See id.* at 653. The dissent in *Davis*, however, noted that attempts to curb allegedly harassing speech could run afoul of the First Amendment. *See id.* at 667 (Kennedy, J., dissenting) (collecting cases).

## III.     RECENT EXECUTIVE AND REGULATORY ACTIONS

### A.   In 2016, the Department Unsuccessfully Attempted to Change the Meaning of "Sex" in Title IX.

54.     Recently, the Department dramatically departed from the plain meaning of Title IX, its own longstanding positions, and decades of precedent.

55.     In May 2016, OCR and the Civil Rights Division of the U.S. Department of Justice issued a "Dear Colleague" letter that adopted a radical definition of the term "sex" in Title IX. U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter, May 13, 2016, at 1, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201605-title-ix-transgender.pdf ("2016 Dear Colleague Letter").

56.     That letter instructed schools and universities that the Department would "treat a student's gender identity as the student's sex for purposes of Title IX and its implementing regulations" and referred to gender identity as an "internal sense of gender" that "may be different from or the same as the person's sex assigned at birth." *Id.* at 1–2. That instruction had dramatic ramifications. To retain federal funding under the 2016 Dear Colleague Letter, State recipients would have to allow males who claim that they are female to use women's restrooms and locker rooms, play on women's teams, and participate in the girls-only sex-education classes. *Id.* at 3–4.

57.     For obvious reasons, 22 States, including Louisiana, filed lawsuits to block the Department and other federal defendants from implementing and enforcing the 2016 Dear Colleague Letter. *See* Compl., *Texas et al. v. United States et al.*, No. 7:16-cv-00051 (N.D. Tex. May 25, 2016); Compl., *Nebraska et al. v. United States et al.*, No. 4:16-cv-03117 (D. Neb. July 8, 2016).

58.     A district court promptly enjoined enforcement of the 2016 Dear Colleague Letter, *Texas v. United States*, 201 F. Supp. 3d 810, 836 (N.D. Tex. 2016), and the Department (under a new Administration) rescinded the 2016 Dear Colleague Letter shortly thereafter, *see* U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter, Feb. 22, 2017, https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201702-title-ix.pdf.

**B.  In 2020, the Department Issued Title IX Regulations Addressing Sexual Harassment and Grievance Procedures.**

59.     On May 19, 2020, the Department published Title IX regulations primarily focused on sexual harassment and grievance procedures. *See* U.S. Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) ("2020 Regulations").

60.     The 2020 Regulations were designed to "obligate recipients to respond promptly and supportively to persons alleged to be victimized by sexual harassment, resolve allegations of sexual harassment promptly and accurately under a predictable, fair grievance process that provides due process protections to alleged victims and alleged perpetrators of sexual harassment, and effectively implement remedies for victims." *Id.*

61.     Recognizing that alleged sexual harassment can involve verbal and expressive conduct that raises potential First Amendment concerns, the 2020 Regulations adopted the *Davis* formulation of sexual harassment for "purely verbal harassment." *Id.* at 30,142. Accordingly, it considered verbal harassment to constitute sex discrimination for Title IX purposes when it "is so severe, pervasive, and

objectively offensive that it effectively denies a person equal access to education." *Id.* at 30,141; *see id.* at 30,033. The 2020 Regulations also defined sexual harassment to expressly include "quid pro quo harassment and Clery Act/[Violence Against Women Act] sex offenses." *Id.* at 30,033. For quid pro quo sexual harassment and sexual assault, the 2020 Regulations imposed no similar severe, pervasive, and objectively offensive requirement, reasoning that "prohibiting such conduct presents no First Amendment concerns" and "such serious misconduct causes denial of equal educational access." *Id.*

62.     The 2020 Rule also tracked Supreme Court precedent in other ways, including by recognizing that recipients violate Title IX only when they have "actual knowledge" of sexual harassment and are deliberately indifferent to it. *Id.* at 30,033–34.

**C.  In 2021, the Department Again Unsuccessfully Attempted to Change the Meaning of "Sex" in Title IX.**

63.     After the Supreme Court's decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), the Department (under the Biden Administration) again tried to redefine the meaning of "sex" for purposes of Title IX.

64.     In January 2021, President Biden issued an executive order citing *Bostock* and declaring that Title IX likely "prohibit[s] discrimination on the basis of gender identity or sexual orientation" unless it "contain[s] sufficient indications to the contrary." Executive Order 13988, *Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation,* 86 Fed. Reg. 7023, 7023 (Jan. 25, 2021). The order declared that "[i]t is the policy of [the Biden] Administration to prevent and combat discrimination on the basis of gender identity or sexual orientation" and that agency heads should take action to implement that policy. *Id.* at 7023–24.

65.     In March 2021, President Biden issued another executive order that reaffirmed his Administration's policy regarding discrimination on the basis of sexual orientation or gender identity. *See* Executive Order 14021, *Guaranteeing an Educational Environment Free from Discrimination on the Basis of*

*Sex, Including Sexual Orientation or Gender Identity*, 86 Fed. Reg. 13,803, 13,803 (Mar. 11, 2021). The order also instructed the Secretary of Education specifically to take action to implement that policy. *See id.*

66.    Just a few months later, Defendants advanced a new interpretation of Title IX.

67.    On June 22, 2021, the Department issued a notice of "interpretation" of Title IX. *See* U.S. Dep't of Educ., *Enforcement of Title IX of the Education Amendments of 1972 with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of Bostock v. Clayton County*, 86 Fed. Reg. 32,637 (June 22, 2021) ("2021 Interpretation").

68.    In the 2021 Interpretation, the Department announced that it now "interprets Title IX's prohibition on discrimination 'on the basis of sex' to encompass discrimination on the basis of sexual orientation and gender identity." *Id.* at 32,637. It further announced that OCR would "fully enforce Title IX to prohibit discrimination based on sexual orientation and gender identity." *Id.* at 32,639.

69.    The very next day, on June 23, 2021, the Department released a "Dear Educator" letter notifying educators of the 2021 Interpretation and its plans to "fully enforce" its new interpretation. *See* U.S. Dep't of Educ., Office for Civil Rights, Dear Educator Letter, Jun. 23, 2021, https://www2.ed.gov/about/offices/list/ocr/correspondence/stakeholders/educator-202106-tix.pdf. The letter also provided links to new guidance documents from OCR and the Department of Justice that "provide examples of the kind of incidents" that the Department can investigate. *See id.* at 2. The examples demonstrated that Defendants would investigate recipients for a Title IX violation based on students' refusal to use a classmate's "preferred pronouns." *See* U.S. Dep't of Justice & U.S. Dep't of Educ., *Confronting Anti-LGBTQI+ Harassment in Schools: A Resource for Students and Families*, available at https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-tix-202106.pdf.

70.    Once again, States, including Louisiana, Mississippi, Montana, and Idaho, sued to challenge the Department's unlawful rewriting of Title IX. *See* Complaint, *State of Tenn., et al. v. U.S.*

*Dep't of Educ.*, Case No. 3:21-cv-00308 (E.D. Tenn. Aug. 30, 2021). And, once again, the States secured an injunction that prevented Defendants from enforcing their erroneous interpretation of Title IX against the States. *See Tennessee v. U.S. Dep't of Educ.*, 615 F. Supp. 3d 807, 842 (E.D. Tenn. 2022).

### D. In 2022, the Department Issued a Proposed Rule that Would Redefine "Sex" and When Harassment Constitutes Sex Discrimination under Title IX.

71. On July 12, 2022, the Department published a proposed rule that preceded the Final Rule that is challenged in this lawsuit. *See* U.S. Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 87 Fed. Reg. 41,390 (July 12, 2022) ("Proposed Rule").

72. In the Proposed Rule, the Department rejected the longstanding, ordinary meaning of "sex" and proposed to redefine discrimination "on the basis of sex" to mean "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." *Id.* at 41,571.

73. Where "Title IX or the regulations permit different treatment or separation on the basis of sex," the Department proposed to prohibit recipients from doing so in a manner that "subject[s] a person to more than de minimis harm, unless otherwise permitted." *Id.* at 41,571. The Proposed Rule declares that "[a]dopting a policy or engaging in a policy that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex." *Id.* at 41,571.

74. In other words, the Department proposed, among other things, prohibiting single-sex bathrooms and locker rooms. That is because a recipient would be required to allow a male who claims to be a female to use girls' bathrooms and locker rooms—otherwise the recipient would subject that student to "more than de minimis harm" that constitutes sex discrimination under the Proposed Rule. *See id.* at 41,534.

75.     These provisions of the Proposed Rule have implications for the fate of girls' and women's teams at any schools that receive federal funding: Under the logic of the Proposed Rule, women's and girls' sports teams will cease. That reality—and the political fallout of that result—is why the Proposed Rule purports to defer the question of athletics to a separate rulemaking. *See id.* at 41,537.

76.     The Department also proposed to jettison the 2020 Regulations' definition of sexual harassment that drew from the Supreme Court's decision in *Davis*, failing to properly account for the differences between verbal and physical conduct. *See id.* at 41,569. This, combined with the Proposed Rule's redefinition of "sex," would require schools to police and curtail a whole host of protected free speech.

77.     What is more, the Proposed Rule creates additional constitutional problems, departs from the statute in other ways, and would have serious detrimental harm on recipients, teachers, students, and society at large.

78.     Given all the Proposed Rule's flaws, it is no surprise that the Department received 240,203 comments about the Proposed Rule.

**E.  The Department Proposed a Title IX Rule Specifically Related to Athletics in 2023.**

79.     In April 2023, the Department issued a proposed rule regarding its regulation of sex-separated athletic teams under Title IX. *See* U.S. Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams*, 88 Fed. Reg. 22,860 (Apr. 13, 2023) ("Proposed Athletics Rule").

80.     The Department stated that "the purpose of this regulatory action . . . is to propose a regulatory standard under Title IX that would govern a recipient's adoption or application of sex-related criteria that would limit or deny a student's eligibility to participate on a male or female athletic team consistent with their gender identity." *Id.* at 22,860.

81.     It then proposed amending Title IX regulations to impose burdens on recipients that desire to maintain girls-only and boys-only athletic teams and would require recipients to (1) allow boys who claim to be girls to play on some girls' teams and (2) allow girls who claim to be boys to play on some boys' teams. Specifically, the Proposed Athletics Rule provides:

> If a recipient adopts or applies sex-related criteria that would limit or deny a student's eligibility to participate on a male or female athletic team consistent with their gender identity, those criteria must, for each sport, level of competition, and grade or education level:
> (i)     be substantially related to the achievement of an important educational objective, and
> (ii)    minimize harms to students whose opportunity to participate on a male or female team consistent with their gender identity would be limited or denied.

*Id.* at 22,891.

82.     Despite the significance of the Proposed Athletics Rule and the incredibly damaging impact it would likely have on women's sports and female participation in athletics, the Department provided only a month for the public to comment. *Id.* at 22,860.

## IV.    THE FINAL RULE

83.     Fast forward to today: On April 29, 2024, the Department published the Final Rule, which redefines "sex" in Title IX to embrace "gender identity" (and other concepts that are distinct from sex) and still purports to leave the politically nuclear topic of sports—and whether single-sex teams are permissible—for another day. *See* 89 Fed. Reg. at 33,886.

84.     The Department cites "its authority to issue rules effectuating [Title IX's] prohibition on sex discrimination consistent with the objectives of the statute." *Id.* at 33,476 (citing 20 U.S.C. § 1682). Yet the Rule upends the entire Title IX framework, beginning with redefining what Title IX's general prohibition against discrimination on the basis of "sex" means.

85.     Although 20 U.S.C. § 1681 prohibits funding recipients from subjecting a person "to discrimination under any education program or activity" based on "sex," the Rule expands Title IX to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related

conditions, sexual orientation, and gender identity." *Id.* These other grounds are not interchangeable with sex. A recipient that treats a person differently based on some of these grounds does not always discriminate against that person based on sex. And, as explained above, Title IX at times warrants and even demands recognizing and respecting differences between the sexes. Disregarding the differences between "sex" and, for example, "gender identity" (whatever that means) thus creates particular problems and inconsistencies within Title IX and the Rule itself.

86.     The Rule fails to define "gender identity," but the Department "understands" it to mean "an individual's sense of their gender, which may or may not be different from their sex assigned at birth." *Id.* at 33,809. Couched in those capacious terms, discrimination based on gender identity is necessarily different than discrimination based on sex.

87.     Nevertheless, the Rule treats gender identity as synonymous with sex in certain scenarios. For example, the Rule requires recipients of federal funds to allow persons to use whichever single-sex bathroom or locker room corresponds with their claimed gender identity at that time. *See id.* at 33,818 (denying "a transgender student access to a sex-separate facility or activity consistent with that student's gender identity . . . would violate Title IX's general nondiscrimination mandate"); *id.* at 33,818 (agreeing that "students experience sex-based harm that violates Title IX when a recipient bars them from accessing sex-separate facilities or activities consistent with their gender identity"); *id.* ("a recipient must provide access to sex-separate facilities, including bathrooms, in a manner that does not cause more than de minimis harm"); *id.* at 33,887 (providing that failing to treat a person "consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex").[3] So under the Rule, every elementary school, middle school, high school, and university

---

[3] The Rule provides no meaningful guidance on how to deal with persons who do not identify with either the male or female sex. *See id.* at 33,818 (noting the Rule does "not specify how a recipient must provide access to sex-separate facilities for students who do not identify as male or female" and suggesting a recipient may "coordinate with the student . . . to best provide the student with safe and

that receives federal funding is prohibited from having single-sex bathrooms and locker rooms. This, of course, conflicts with Title IX and the earliest regulations that recognized having single-sex facilities like bathrooms, locker rooms, and dormitories is not prohibited sex discrimination.

88.     The Rule gives recipients—along with students and staff—no measures to prevent this requirement (that people be treated consistently with their claimed gender identity) from being abused. Indeed, the Rule suggests recipients cannot impose documentation requirements, such as requiring a diagnosis of gender dysphoria (previously referred to as gender identity disorder), without causing prohibited "more than de minimis harm." *Id.* at 33,819. And the Rule warns that persons cannot be harassed based on gender identity when "access[ing] sex-separate facilities." *Id.* at 33,818; *see id.* at 33,516 ("unwelcome conduct based on gender identity can create a hostile environment when it otherwise satisfies the definition of sex-based harassment"); *id.* at 33,884 (defining sex-based harassment to include "other harassment on the basis of sex, including on the bases described [in the expanded scope of Title IX discrimination in § 106.10]").

89.     The Rule issues that warning because even comments questioning whether a person belongs in a certain bathroom could be prohibited harassment under the Rule. *See, e.g., id.* at 33,516 ("harassing a student—including acts of verbal . . . aggression, intimidation, or hostility based on the student's nonconformity with stereotypical notions of masculinity and femininity or gender identity—

---

nondiscriminatory access to facilities"). But to the extent the Rule treats "sex" and "gender identity" as synonymous, a recipient may violate the Rule if it provides single-sex bathrooms for males and females but declines to provide a single-sex bathroom that corresponds specifically with a multitude of gender identities. *See id.* at 33,816 (noting that "there are stigmatic injuries, associated with treating individuals differently on the basis of sex, and in such circumstances, no additional showing of a more 'material' harm is required under Title IX"); *What Are the 72 Other Genders?*, MedicineNet (medically reviewed on Feb. 9, 2024), https://www.medicinenet.com/what_are_the_72_other_genders/article.htm (explaining that there are 72 other genders "[b]eside male and female," and "[t]he idea is to make everyone feel comfortable in their skin regardless of what gender they were assigned at birth").

can constitute discrimination on the basis of sex under Title IX in certain circumstances"); *id.* ("a one-off remark . . . alone may not be severe or pervasive enough to create a hostile environment, but if multiple peers repeatedly call the student 'girly,' that same treatment may create a hostile environment for that student").

90.     Such questioning is prohibited under the Rule because, along with redefining what "sex" means in Title IX, the Rule dramatically expands the 2020 Regulations' "sexual harassment" definition (which it terms "sex-based harassment") beyond what the text of Title IX can bear. *Id.* at 33,884.

91.     Under the Rule, "sex-based harassment" is harassment based on any of the "bases described in § 106.10," *id.* at 33,884—that is, "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," *id.* at 33,886—and is "a form of sex discrimination" that includes "hostile environment harassment." *Id.* at 33,884. The Rule then defines hostile environment harassment as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.,* creates a hostile environment)." *Id.*

92.     In other words, speech expressing critical views about the concept of gender identity—including views that are mainstream, widely shared, and legitimate—could be prohibited sex-based harassment under the Rule even if it is not "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit." *Davis*, 526 U.S. at 633.

93.     Even comments not directed toward a person can give rise to "a complaint of sex-based harassment" under the Rule. *See* 89 Fed. Reg. at 33,654 ("[A] person who witnesses an incident that creates a hostile environment for them may make a complaint on their own behalf."). And much protected First Amendment speech would be viewed as sex-based harassment under the Rule. *See, e.g.,*

23

*id.* at 33,570 ("academic discourse of students or teachers *generally* would not meet this standard" (emphasis added)); *id.* at 33,516 (discussing "unwelcome conduct based on gender identity" and citing U.S. Equal Emp. Opportunity Comm'n, *Sexual Orientation and Gender Identity (SOGI) Discrimination,* *https://www.eeoc.gov/sexualorientation-and-gender-identity-sogidiscrimination* ("SOGI Guidance")); *see also* SOGI Guidance ("Harassment can also include, for example, offensive or derogatory remarks about a person's transgender status or gender transition. Although accidental misuse of a transgender employee's name and pronouns does not violate Title VII, intentionally and repeatedly using the wrong name and pronouns to refer to a transgender employee could contribute to an unlawful hostile work environment.").

94.     Indeed, the Rule would compel students and teachers to use whatever pronouns a person demands, *see, e.g.,* 89 Fed. Reg. at 33,516, which creates conflicts with Free Speech and Free Exercise rights, *see, e.g., Meriwether v. Hartop,* 992 F.3d 492, 511–12 (6th Cir. 2021).

95.     Similarly, the Rule will lead to the infringement of parental rights and will create Due Process concerns. *See, e.g.,* 89 Fed. Reg. at 33,596–97 (noting that even where the Title IX coordinator defers to the parent about whether to file a complaint, "the Title IX Coordinator may still be required to, as necessary, take other steps," such as training about harassment); *id.* at 33,821–22 (refusing to answer "whether a recipient should comply with a request by a minor student to change their name or pronouns used at school if their parent opposes the change"); *id.* at 33,597 (allowing a Title IX Coordinator to override a parent's wishes "with respect to that parent's child" based on the coordinator's judgment about potential harm); *id.* at 33,537 (emphasizing that, "[t]o the extent that a conflict exists between a recipient's obligations under Title IX and under FERPA [the Family Educational Rights and Privacy Act], § 106.6(e) [of the Rule] expressly states that the obligation to comply with the Title IX regulations is not obviated or alleviated by the FERPA statute or regulations" and "that a recipient must not use FERPA as a shield from compliance with Title IX"); *id.* at 33,893

(requiring recipients to use a "preponderance of the evidence standard of proof to determine whether sex discrimination occurred, unless the recipient uses the clear and convincing evidence standard of proof in all other comparable proceedings").

96.     The Rule accordingly makes it impossible for recipients to avoid liability. If recipients comply with the Rule, they will face private lawsuits alleging they violated constitutional rights. And, if they fail to comply with the Rule or inadequately comply with the Rule, recipients will face Title IX investigations and enforcement actions and private lawsuits alleging Title IX violations.

97.     The Rule's redefinition of "sex" and dramatic expansion of what constitutes prohibited discrimination thus not only departs from Title IX's text and purpose, but it also substantially increases a funding recipient's liability risk and Title IX obligations. *See, e.g.*, *id.* at 33,563 ("the recipient need not have incontrovertible proof that conduct violates Title IX for it to have an obligation to respond," but rather "if the conduct reasonably *may* be sex discrimination, the recipient must respond in accordance with § 106.44" (emphasis added)).

98.     Other aspects of the Rule also increase a recipient's obligations and potential liability, either independently or in conjunction with other portions of the Rule, in a way that is contrary to Title IX and arbitrary and capricious. *See, e.g.*, *id.* at 33,888 (requiring all non-confidential employees at elementary or secondary schools "to notify the Title IX Coordinator when the employee has information about conduct that reasonably may constitute sex discrimination" under the Rule); *id.* at 33,548 (imposing extensive training requirements and acknowledging that the Rule "will require recipients' time and effort to update training materials and conduct additional training"); *id.* at 33,563 ("Some of the recipient's duties under § 106.44 arise when the Title IX Coordinator has knowledge of conduct that reasonably may constitute sex discrimination, but the recipient also has duties before such an occurrence."); *id.* at 33,567 (noting that "the obligation to monitor for barriers to reporting is not triggered only when a concern is raised over barriers to reporting," but rather "[t]he Title IX

Coordinator must monitor for barriers regardless of whether a concern has been raised about such barriers"); *id.* at 33,598 ("When the Title IX Coordinator is notified of conduct that reasonably may constitute sex discrimination and does not initiate a complaint, the Title IX Coordinator must take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity."); *id.* at 33,682 ("Conduct that occurs under a recipient's education program or activity includes but is not limited to conduct that occurs in a building owned or controlled by a student organization that is officially recognized by a postsecondary institution and conduct that is subject to the recipient's disciplinary authority."); *id.* at 33,869 ("In some instances, such as when an alleged incident occurred outside of the United States and may have contributed to a sex-based hostile environment under the recipient's education program or activity domestically, the Department acknowledges that the resulting investigation may be more time consuming.").

99.     Finally, the Rule pretends that its dramatic overhaul of Title IX will have no impact on whether it is permissible for schools to have separate athletic teams for women and girls. *See id.* at 33,817 ("Until the [Proposed Athletic Rule] is finalized and issued, the current regulations on athletics continue to apply."). But that cannot be right since the Rule takes the position that treating someone consistent with his or her biological sex when they claim to be of the opposite sex constitutes more than de minimis harm and sex discrimination. *See, e.g.*, *id.* at 33,815, 33,887. That logic means that, in at least some circumstances, recipients would be required to allow males to play on female-only teams to comply with the Rule's interpretation of Title IX's prohibition on sex discrimination. And that position is entirely unsurprising because it is the same position this Administration has urged federal courts to adopt. *See also* Brief of U.S. Dep't of Justice, Civil Rights Division, *B.P.J. v. West Va. State Bd. of Educ.*, No. 23-1078, ECF No. 68-1 at 12–13 (4th Cir. Apr. 3, 2023) (arguing that categorically prohibiting boys who claim a female gender identity from "participating on girls' sports teams because

their sex assigned at birth was male ... discriminates on the basis of sex"); *id.* at 21–29. The Department's attempt to run away from the topic of sports now can thus be explained only by the reality that the Department understands its position—if expressly promulgated in the Federal Register—would be political suicide in an election year.

100.     The Rule is contrary to law, exceeds Defendants' statutory authority, and is arbitrary and capricious under the Administrative Procedure Act ("APA"). The Rule also imposes conditions in violation of the Spending Clause and is an unlawful exercise of legislative power. What is more, Defendants violated the APA's procedural requirements by not providing a meaningful opportunity to comment on the Rule.

## V.     THE DETRIMENTAL IMPACT OF THE FINAL RULE

101.     Because the Rule disregards and effectively rewrites the statutory text, its issuance undermines our Nation's constitutional structure and flouts the democratic will of the people as reflected in Title IX and duly enacted state laws that conflict with the Rule.

102.     In addition, the Rule subverts Title IX's purpose and will particularly harm the precise population that Title IX was meant to help most—women and girls, who will now face increased threats to privacy and safety, not to mention will lose spots on sports teams and podiums. *See Adams*, 57 F.4th at 819–21 (Lagoa, J., concurring).

103.     If that were not enough, the Rule will trample Free Speech and Free Exercise rights of students and teachers, "prescrib[ing] what shall be orthodox" and "forc[ing] citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943). Under the Rule, a funding recipient would risk Title IX enforcement proceedings or private liability if it failed to take action when a student or teacher fails to use biologically inaccurate pronouns or expresses a belief that Genesis 1:27 is true. *See* 89 Fed. Reg. at 33,516; SOGI Guidance (characterizing "misuse" of pronouns as an example of harassment).

104.     The Rule also causes direct, immediate, and ongoing irreparable harm to Plaintiffs, including by subjecting them to increased regulatory burdens, exposing them to litigation risks, and overriding state laws on matters of traditional state authority.

105.     Because each Plaintiff State and its elementary schools, secondary schools, and postgraduate schools receive federal funding from the Department, Plaintiff States are subject to the Rule. And the Rule itself recognizes this: "[A]ll 50 States have accepted Federal funding for educational programs or activities and are subject to Title IX as to those programs and activities," and the Rule "appl[ies] to all recipients of Federal financial assistance," including "State educational agencies." 89 Fed. Reg. at 33,490, 33,541; 33,634.

106.     That means each Plaintiff is "an object of [the] regulation" and suffers an "increased regulatory burden" as a direct result of the Rule. *See Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015); *see also Career Colleges & Sch. of Tex. v. United States Dep't of Educ.*, 98 F.4th 220, 234 (5th Cir. 2024).

107.     Indeed, the Rule even concedes "all regulated entities will experience an increased recordkeeping burden under the final regulations," acknowledges "recipients would be required to address more complaints," projects "a 10 percent increase in the number of investigations conducted annually," and admits it "could result in increased costs to recipients." 89 Fed. Reg. at 33,881, 33,492, 33,850, 33,877.

108.     Even putting increased costs to one side, the Rule injures States and their educational agencies by forcing them into a lose-lose situation: (1) comply with an unlawful bureaucratic rewrite of Title IX with which they do not wish to comply or (2) lose billions of dollars of federal funding for their students.

109.     Louisiana and its local programs received at least $2,425,330,125 of funding from the Department last year and is projected to receive at least $ 2,545,336,326 this year. *See Funds for State*

28

*Formula-Allocated    and    Selected    Student    Aid    Programs,    by    State*, available at https://www2.ed.gov/about/overview/budget/statetables/index.html; *see also* U.S. Dep't of Educ., *Fiscal    Years    2023-2025    State    Tables    of    the    U.S.    Dep't    of    Educ.*, https://www2.ed.gov/about/overview/budget/statetables/index.html (noting the tables "do not reflect all department funds that a State receives").

110.    Mississippi and its local programs received at least $1,592,288,396 of funding from the Department last year and is projected to receive at least $ 1,678,255,514 this year. *See Funds for State Formula-Allocated    and    Selected    Student    Aid    Programs,    by    State*, available at https://www2.ed.gov/about/overview/budget/statetables/index.html.

111.    Montana and its local programs received at least $496,757,925 of funding from the Department last year and is projected to receive at least $513,671,547 this year. *See id.*

112.    Idaho and its local programs received at least $688,106,682 of funding from the Department last year and is projected to receive at least $734,895,238 this year. *See id.*

113.    The Rule accordingly could deprive Plaintiff States and their educational systems of billions of dollars of federal funding.

114.    The Rule also harms the Louisiana Department of Education specifically. The Louisiana Department is often the direct recipient of federal funds and retains a portion of the federal funds for administrative costs. But in order to receive the funds, the Louisiana Department must sign an assurance that it will comply with Title IX and regulations issued under Title IX.

115.    In addition to hurting the Plaintiffs' financial interests, the Rule also harms the Plaintiff States' sovereign interests, including by interfering with their authority over education in their State, their democratically enacted laws, and their future ability to legislate. *See Abbott v. Perez*, 585 U.S. 579, 603 n.17 (2018) (explaining a State's "inability to enforce its duly enacted plans clearly inflicts irreparable harm"); *Arizona v. Yellen*, 34 F.4th 841, 845 (9th Cir. 2022) (concluding a State had standing

where it alleged "infringement on its authority to set tax policy and its interest in being free from coercion impacting its tax policy"); *W. Virginia v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1149 (11th Cir. 2023) (concluding States "suffered irreparable harm" where a statutory provision allegedly "affected the States' sovereign authority to tax"); *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021) ("The States, too, have an interest in seeing their constitutionally reserved police power over public health policy defended from federal overreach."); *Tennessee v. Dep't of Educ.*, 615 F. Supp. 3d 807, 841 (E.D. Tenn. 2022) (concluding States "have sovereign interests in enforcing their duly enacted state laws" and plaintiff States "suffered an immediate injury" when the federal government issued guidance that conflicted with state law).

116.    Louisiana enacted the Fairness in Women's Sports Act "to promote sex equality" by "providing opportunities for female athletes to demonstrate their skill, strength, and athletic abilities while also providing them with opportunities to obtain recognition, accolades, scholarships, better physical and mental health, and the numerous other long-term benefits that flow from success in athletic endeavors." La. Rev. Stat. § 4:442(9). It accomplishes these goals, in part, by mandating that state-funded schools' "[a]thletic teams or sporting events designated for females, girls, or women shall not be open to students who are not biologically female." *Id.* § 4:444(B).

117.    Mississippi law promotes sex equality by requiring all state "public primary" and "secondary school[s]," and all state schools that are "a member of the Mississippi State High School Activities Association," "a public institution of higher learning," or a "higher education institution that is a member of the NCAA, NAIA, or NJCCA," to "expressly designate[]" their "[i]nterscholastic or intramural athletic teams" and "sports" "based on biological sex." Miss. Code Ann. § 37-97-1(1). Mississippi law prohibits "[a]thletic teams or sports designated for 'females,' 'women' or 'girls'" from allowing participation by "students of the male sex." *Id.* § 37-97-1(2); *see id.* § 37-97-1(1)(a)-(c) (designations). In addition, all "government entit[ies]," "licensing or accrediting organization[s]," and

"athletic association[s] or organization[s]" are prohibited from "entertain[ing] a complaint, open[ing] an investigation, or tak[ing] any other adverse action against a primary or secondary school or institution of higher education for maintaining separate interscholastic or intramural athletic teams or sports for students of the female sex." *Id.* § 37-97-3.

118.    Montana law defines the term "sex" as biological sex and specifically excludes the concept of gender identity from the definition:

> [T]he organization of the body parts and gametes for reproduction in human beings and other organisms. In human beings, there are exactly two sexes, male and female, with two corresponding types of gametes. The sexes are determined by the biological and genetic indication of male or female, including sex chromosomes, naturally occurring sex chromosomes, gonads, and nonambiguous internal and external genitalia present at birth, without regard to an individual's psychological, behavioral, social, chosen, or subjective experience of gender.

Mont Code. Ann. § 1-1-201(1)(f).

119.    In 2021, Montana enacted the "Save Women's Sports Act." *See* Mont. Code Ann. § 20-7-1306. That act requires athletic teams "sponsored by a public elementary or high school . . . or any school or institution whose students or teams compete against a public school" to be "designated . . . based on biological sex." *Id.* § 1306(1). The Save Women's Sports Act provides that "[a]thletic teams or sports designated for females, women, or girls may not be open to students of the male sex." *Id.* § 1306(2). The Save Women's Sports Act defines "female," "male," and "sex" pursuant to Mont. Code. Ann. § 1-1-201(1)(f).

120.    Montana's parental involvement in education law protects the rights of students and teachers who refuse to use biologically inaccurate pronouns. Montana requires that a parent "shall provide written consent before the parent's child uses a pronoun that does not align with the child's sex." Mont. Code. Ann. § 40-6-704(1)(f). "If a parent provides written consent . . . a person may not be compelled to use pronouns that do not align with the child's sex." *Id.*

121.    Idaho statutorily defines "sex" as "an individual's biological sex, either male or female." Idaho Code § 74-114(2)(n). That definition applies to all of Idaho's laws "unless otherwise apparent from the context." *Id.* § 74-114(2).

122.    Finding that there are "inherent differences between men and women" and that those differences "remain cause for celebration," Idaho enacted the Fairness in Women's Sports Act. The Act ensures "sex equality" by protecting "opportunities for female athletes to demonstrate their skill, strength, and athletic abilities while also providing them with opportunities to obtain recognition, accolades, scholarships, better physical and mental health, and the numerous other long-term benefits that flow from success in athletic endeavors." Idaho Code §§ 33-6201–6203. The Act requires that state-funded school "[a]thletic teams or sports designated for females, women, or girls shall not be open to students of the male sex." *Id.* § 33-6203. Although Idaho's Fairness in Women's Sports Act is currently enjoined, Idaho continues to defend the law and is appealing the injunction.

123.    Because "[e]very person has a natural right to privacy and safety in restrooms and changing facilities," Idaho also passed the Protecting the Privacy and Safety of Students in Public Schools Act to ensure that public school restrooms, locker rooms, and overnight accommodations continue to respect sex designations. Idaho Code §§ 33-6701–6707. Idaho Code § 33-6703 is presently enjoined on appeal, but Idaho continues to defend the law.

124.    The Rule conflicts with all of the above laws, hampering Plaintiff States' "ability to enforce their conflicting state laws" and placing "substantial pressure" on them to change their laws. *Tennessee*, 615 F. Supp. 3d at 821; *see* 89 Fed. Reg. at 33,885 ("The obligation to comply with Title IX and this part is not obviated or alleviated by any State or local law or other requirement that conflicts with Title IX or this part.").

125.     The Rule also harms Plaintiff States by impeding their ability to enact and enforce future laws, including laws that are designed to safeguard women and girls and to safeguard parental rights.

126.     Indeed, the Rule conflicts with at least two such bills—the Women's Safety and Protection Act and the Given Name Act—that are currently making their way through the Louisiana State Legislature. *See* H.B. 610, 2024 Leg. Reg. Sess. (La. 2024); H.B. 121, 2024 Leg. Reg. Sess. (La. 2024).

127.     The Rule similarly conflicts with at least two Mississippi bills—the Women's Bill of Rights and the SAFER Act—that are currently making their way through the state legislature. *See* H.B. 1607, 2024 Leg. Reg. Sess. (Miss. 2024); S.B. 2753, 2024 Leg. Reg. Sess. (Miss. 2024).

## CLAIMS FOR RELIEF

### COUNT ONE
### The Rule Is Contrary to Law.
### (5 U.S.C. § 706; 20 U.S.C. § 1681, *et seq.*)

128.     Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

129.     Under the APA, a court must "hold unlawful and set aside agency action" that is "not in accordance with law" or is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C).

130.     Defendants may exercise only authority conferred by statute. *See Nat'l Fed'n of Indep. Bus. v. OSHA*, 142 S. Ct. 661, 665 (2022) ("Administrative agencies are creatures of statute. They accordingly possess only the authority that Congress has provided.").

131.     Title IX gives Defendants no authority to: (a) redefine terms like "sex" to include separate concepts, such as "gender identity"; (b) prohibit protected speech based on an unsupportable definition of hostile environment harassment; (c) compel speech and commandeer recipients to police

employee and student's pronoun usage; or (d) override Title IX's text in the myriad of ways the Rule does. And that is especially true in light of other statutory provisions that limit the Department's ability to interfere with the rights of States and local governments on education. *See* 20 U.S.C. § 3403(a)–(b).

132.   Defendants thus exceeded their statutory authority by issuing the Rule, which is contrary to the text and structure of Title IX, is otherwise not in accordance with law, and is antithetical to the advancement of equal educational opportunities and the promotion of equal dignity and respect for the two sexes that Title IX aims to promote.

133.   Indeed, the Rule would flip Title IX on its head by likely *causing* discrimination against women rather than prohibiting it: Among other things, women (a) will be deprived of equal athletic opportunities, (b) will be forced to accept claims about what makes a person a women that often rely on sex stereotypes, and (c) will likely suffer increased sexual violence as a result of the Rule's failure to provide any safeguards against sexual predators who will exploit the defects in the Rule by claiming a female gender identity even if they do not suffer from gender dysphoria so that they can access women's bathrooms, locker rooms, and showers.

134.   Defendants issued the Rule pursuant to 20 U.S.C. § 1682, which gives them no authority to adopt regulations that subvert Title IX.

135.   What is more, Defendants would need to point to clear authority to issue the Rule because it decides major questions—including whether to treat claimed gender identity as biological sex—that must be decided by "Congress itself" or, at the very least, by "an agency acting pursuant to a clear delegation from that representative body." *West Virginia v. EPA*, 597 U.S. 697, 735 (2022).

136.   The Rule answers major questions that belong to Congress or require a clear authorization for at least four reasons. *First*, the Rule has enormous social and political significance. *See id.* at 721. *Second*, the Rule has significant economic consequences. *Third*, the Rule is "novel" and "transformative," and Congress "has consistently rejected proposals" to expand Title IX to prohibit

discrimination based on sexual orientation and gender identity. *See id.* at 716, 725, 731–32. And *fourth*, the Rule intrudes on areas of traditional state authority. *See id.* at 744 (Gorsuch, J., concurring).

137. Accordingly, the Department's inability to point to *clear* congressional authority is yet another reason the Rule is unlawful and must be set aside.

COUNT TWO
**Spending Clause Violation**
**(U.S. Constitution, Article I, § 8, cl. 1)**

138. Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

139. The Constitution grants Congress the power to "to pay the Debts and provide for the common Defense and general Welfare of the United States." U.S. Const., art. I, § 8, cl. 1.

140. Incident to this power, "Congress may attach conditions on the receipt of federal funds." *South Dakota v. Dole*, 483 U.S. 203, 206 (1987). But the Supreme Court has recognized several restrictions on this use of the Spending Clause power, including that: (1) conditions must be "unambiguous[]" so States can "exercise their choice knowingly, cognizant of the consequences of their participation," (2) conditions must be related to the "federal interest in the project," (3) spending must not "induce the States to engage in activities that would themselves be unconstitutional," and (4) spending must not "be so coercive as to pass the point at which pressure turns into compulsion." *Id.* at 207–11.

141. Because Title IX was passed under Congress's power to impose conditions on federal funds, *see Davis*, 526 U.S. at 640, the conditions that it and its implementing regulations impose must comply with each restriction on the use of the Spending Clause power. The Rule's conditions, however, flunk each of the four requirements described above. The Rule imposes conditions that: (1) are not "unambiguously" clear in Title IX, *see B.P.J. v. W. Va. State Bd. of Educ.*, No. 23-1078, 2024 WL 1627008, at *21–22 (4th Cir. Apr. 16, 2024) (Agee, J., dissenting); (2) are unrelated, if not contrary

35

to, the federal interest; (3) will induce recipients to violate the constitutional rights of students, employees, and parents; and (4) impermissibly coerce Plaintiff States, violating their sovereignty, *see NFIB*, 567 U.S. at 577–78, 582; *id.* at 589 (Scalia, J., dissenting).

142.    Finally, even if the Rule accurately reflected Title IX (it does not), Plaintiffs have been deprived of their right to "voluntarily and knowingly accept[] the terms of the 'contract.'" *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Plaintiffs did not know that they would be forced to accept the obligations, liabilities, and other conditions the Rule imposes, *see supra* Part IV, when they accepted federal funds and agreed not to discriminate in their education programs and activities based on biological sex (with certain statutory exceptions).

**COUNT THREE**
**Violation of Article I**
**(U.S. Constitution, Article I, § 1)**

143.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

144.    The Constitution vests "[*a*]*ll* legislative Powers herein granted" to Congress. U.S. Const. art. I, § 1 (emphasis added). *See, e.g.*, *Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 228 (5th Cir. 2019) ("The Constitution, after all, vests lawmaking power in Congress. How much lawmaking power? 'All,' declares the Constitution's first substantive word."); Philip Hamburger, *Nondelegation Blues*, 91 Geo. Wash. L. Rev. 1083, 1141–42 (2023); Jed Handelsman Shugerman, *Vesting*, 74 Stanford L. Rev. 1479, 1506, 1550–51 (2022).

145.    Congress thus may not "abdicate or . . . transfer to others the essential legislative functions with which it is thus vested." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 529 (1935). Or, at the very least, Congress must provide "an intelligible principle" so it can be said that "the agency exercises only executive power." *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023).

146.     If Congress delegated the authority to issue the Rule to Defendants—which it did not—that delegation violates Article I and separation-of-powers principles. The Rule embodies major policy decisions that are "the very essence of legislative authority under our system" and "must be made by the elected representatives of the people." *Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring).

147.     Furthermore, if the directive that the Department effectuate Title IX's "prohibition on sex discrimination consistent with the objectives of the statute," 89 Fed. Reg. at 33,476, allows it to issue the Rule, which subverts the primary purpose of Title IX and undermines the consistency of the statutory scheme, then that directive is not a true "intelligible principle." *See Jarkesy*, 34 F.4th at 461.

148.     The Rule, if authorized by statute, is therefore an impermissible exercise of legislative power.

## COUNT FOUR
### The Rule is Arbitrary, Capricious, and an Abuse of Discretion.
### (5 U.S.C. § 706)

149.     Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

150.     The APA provides that courts must "hold unlawful and set aside" agency action that is "arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

151.     This means if an agency action is not "reasonable and reasonably explained," it must be set aside. *Wages & White Lion Investments, L.L.C. v. FDA*, 16 F.4th 1130, 1136 (5th Cir. 2021) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)); *see Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 224 (2016) ("[A] lack of reasoned explication for a regulation that is inconsistent with the Department's longstanding earlier position results in a rule that cannot carry the force of law.").

152.    An "agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). When an agency changes its position, the agency must "recognize[] the change, reason[] through it without factual or legal error, and balance[], all relevant interests affected by the change." *Louisiana v. U.S. Dep't of Energy*, 90 F.4th 461, 469 (5th Cir. 2024).

153.    Moreover, an agency cannot "offer[] an explanation for its decision that runs counter to the evidence before the agency," nor can it "fail[] to consider an important aspect of the problem." *Motor Vehicle Mfrs.*, 463 U.S. at 43. And "bare acknowledgement" of a concern "is no substitute for reasoned consideration." *Louisiana*, 90 F.4th at 473. Arbitrary-and-capricious review thus "has 'serious bite.'" *Id.* at 470 (quoting *Data Mktg. P'ship v. DOL*, 45 F.4th 846, 856 (5th Cir. 2022)).

154.    The Rule fails arbitrary-and-capricious review multiple times over. To summarize a few flaws, the Rule is internally inconsistent, fails to define key terms, disregards evidence submitted, makes decisions that are counter to the evidence before the Department, fails to properly balance all the relevant interests that would be affected by the Department's changed position, and routinely offers "conclusory statements" rather than real responses to valid and serious concerns submitted by commenters. *See id.* at 473.

155.    For example, the Department did not meaningfully respond to "evidence that transgender students pose a safety risk to cisgender students";[4] instead, it simply states it "does not

---

[4] Cisgender is defined by some sources as "a person whose sense of personal identity corresponds to the sex and gender assigned to him or her at birth (in contrast with *transgender*)," and the term "arose in the late 1990s." Katherine Connor Martin, *New words notes June 2015*, https://web.archive.org/web/20150814051905/http://public.oed.com/the-oed-today/recent-updates-to-the-oed/june-2015-update/new-words-notes-june-2015/.

agree." 89 Fed. Reg. at 33,820. The Department also fails to consider a related important aspect of the problem: how to protect girls and prevent predators, who are not suffering from gender dysphoria, from exploiting the Rule.

156.     To take another example, the Rule's cost-benefit analysis is wholly deficient. The Rule assumes the average time to read and understand the final, 423-page regulation will be 4 hours for a Title IX Coordinator and lawyers. *See id.* at 33,867. This assumption defies belief, especially when the Department includes relevant details about recipients' compliance obligations in the preamble. *See, e.g.,* 89 Fed. Reg. at 33,516, 33,812–13. The Rule's other cost-and-benefit assumptions are equally absurd, including its failure to include any construction costs based on Defendants' refusal to acknowledge the Rule will require schools to modify bathrooms and locker rooms. *See, e.g.,* 89 Fed. Reg. at 33,876.

157.     The Rule's pretense of leaving the athletics regulations undisturbed even though those regulations conflict with the Rule's stated interpretation of Title IX likewise demonstrates the Rule is not a product of reasoned decisionmaking. So too is the Rule's refusal to provide any specific examples of how the new sex-based harassment standard would apply in relation to a student's insistence that his or her classmate use inaccurate pronouns—or insistence that classmates use "neopronouns" like "xe/xir/xirs, ze/zir/zirs, and fae/faer/faers." *See Understanding Neopronouns*, Human Rights Campaign (last updated May 18, 2022), https://www.hrc.org/resources/understanding-neopronouns.

158.     These examples are emblematic of the problems that run throughout the entire Rule.

159.     It also shows the Rule's outcome was improperly pre-determined and tainted by bias, which is further demonstrated by the 2021 Interpretation and Defendant Lhamon's involvement in the rulemaking process. *See* J. Dillon and S. Taylor Jr., *Ending due process: Reinstating Catherine Lhamon at the Dept. of Education is a mistake*, USA Today (June 14, 2021), https://www.usatoday.com/story/opinion/2021/06/14/catherine-lhamons-history-dept-education-title-ix-rape-sexual-assault/7675799002/.

COUNT FIVE
Without Observance of Procedure Required by Law
(5 U.S.C. § 706)

160.    Plaintiffs repeat and incorporate by reference each of the Complaint's allegations stated above.

161.    The APA provides that courts must "hold unlawful and set aside agency action" that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(D).

162.    The APA requires agencies to publish notice of all proposed rulemakings in a manner that "give[s] interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments." *Id.* § 553(c).

163.    Because the Department did not provide the public with an opportunity to understand and comment on Proposed Rule in light of the subsequently issued Proposed Athletics Rule, it deprived the public of a meaningful opportunity to comment on these inseparable issues in defiance of APA requirements.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter an order and judgment that grants the following relief, which it is authorized to do under 5 U.S.C. §§ 702, 705, 28 U.S.C. § 2201, and Federal Rules of Civil Procedure 57 and 65:

a.   Declare that the Rule is contrary to law and in excess of statutory authority under the APA;

b.   Declare that the Rule violates Article I, § 8, clause 1 of the U.S. Constitution;

c.   Declare that the Rule is an unlawful exercise of legislative power under Article I of the Constitution;

d.   Declare that the Rule is arbitrary and capricious and an abuse of discretion;

e.   Declare that the Rule was issued in violation of the procedural requirements of the APA;

f.   Vacate the Rule as unlawful;

40

g.   Postpone the effective date of the Rule and stay the Rule under 5 U.S.C. § 705;

h.   Preliminarily and permanently enjoin, without bond, Defendants from enforcing the Rule or Title IX in accordance with the erroneous interpretation of Title IX reflected in the Rule;

i.   Grant all other relief to which Plaintiffs are entitled, including but not limited to attorneys' fees and costs.

Dated: April 29, 2024

Respectfully submitted,

**ELIZABETH B. MURRILL**
**Attorney General of Louisiana**

/s/ Donald A. Daugherty, Jr.
Donald A. Daugherty, Jr.*
 *Senior Counsel, Litigation*
Paul Zimmerman*
 *Policy Counsel*
Martha A. Astor*
 *Associate Counsel*
DEFENSE OF FREEDOM INSTITUTE FOR
POLICY STUDIES
1455 Pennsylvania Avenue, NW, Suite 400
Washington, DC 20004
(414) 559-6902
Don.Daugherty@dfipolicy.org
Paul.Zimmerman@dfipolicy.org
Martha.Astor@dfipolicy.org

*Counsel for Plaintiff States*

/s/ Tracy Short
J. Benjamin Aguiñaga*
 *Solicitor General*
Tracy Short (La # 23940)
 *Assistant Chief Deputy Attorney General*
Autumn Hamit Patterson*
 *Special Assistant Solicitor General*
OFFICE OF THE LOUISIANA ATTORNEY GENERAL
1885 North Third Street
Baton Rouge, Louisiana 70802
(225) 326-6766
aguinagab@ag.louisiana.gov
shortt@ag.louisiana.gov

*Counsel for Plaintiffs State of Louisiana and Louisiana Department of Education*

LYNN FITCH
**Attorney General of Mississippi**
Scott G. Stewart*
  *Solicitor General*
Justin L. Matheny*
  *Deputy Solicitor General*
MISSISSIPPI ATTORNEY GENERAL'S OFFICE
P.O. Box 220
Jackson, Mississippi 39205
(601) 359-3680
scott.stewart@ago.ms.gov
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

AUSTIN KNUDSEN
**Attorney General of Montana**
Christian B. Corrigan*
  *Solicitor General*
Peter Torstensen*
  *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
Christian.Corrigan@mt.gov
Peter.Torstensen@mt.gov

*Counsel for Plaintiff State of Montana*

RAÚL LABRADOR
**Attorney General of Idaho**
Alan Hurst*
  *Solicitor General*
Josh Turner*
  *Chief of Constitutional Litigation and Policy*
OFFICE OF THE ATTORNEY GENERAL OF
IDAHO
700 W. Jefferson Street, Suite 201
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
Alan.Hurst@ag.idaho.gov
Josh.Turner@ago.idaho.gov

*Counsel for Plaintiff State of Idaho*

*Pro Hac Vice admission application forthcoming*