# EXHIBIT A

## DEPARTMENT OF EDUCATION

**34 CFR Part 106**

[Docket ID ED–2021–OCR–0166]

RIN 1870–AA16

**Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

**AGENCY:** Office for Civil Rights, Department of Education.

**ACTION:** Final rule.

**SUMMARY:** The U.S. Department of Education (Department) amends the regulations implementing Title IX of the Education Amendments of 1972 (Title IX). The purpose of these amendments is to better align the Title IX regulatory requirements with Title IX's nondiscrimination mandate. These amendments clarify the scope and application of Title IX and the obligations of recipients of Federal financial assistance from the Department, including elementary schools, secondary schools, postsecondary institutions, and other recipients (referred to below as "recipients" or "schools") to provide an educational environment free from discrimination on the basis of sex, including through responding to incidents of sex discrimination. These final regulations will enable all recipients to meet their obligations to comply with Title IX while providing them with appropriate discretion and flexibility to account for variations in school size, student populations, and administrative structures.

**DATES:** These final regulations are effective August 1, 2024.

**FOR FURTHER INFORMATION CONTACT:**
Randolph Wills, U.S. Department of Education, 400 Maryland Avenue SW, Fifth Floor, Washington, DC 20202. Telephone: (917) 284–1982. Email: *randolph.wills@ed.gov*. If you are deaf, hard of hearing, or have a speech disability and wish to access telecommunications relay services, please dial 7–1–1.

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

Table of Contents
Effective Date
Executive Summary
  Purpose of This Regulatory Action
  Summary of the Major Provisions of This Regulatory Action
Timing, Comments, and Changes
I. Provisions of General Applicability
  A. Personal Stories
  1. Experiences Relating to Title IX Grievance Procedures
  2. Experiences Relating to Pregnancy
  3. Experiences Relating to Sexual Orientation and Gender Identity
  B. Purpose
  1. Section 106.1 Purpose
  C. Definitions
  1. Section 106.2 Definition of "Administrative Law Judge"
  2. Section 106.2 Definition of "Complainant"
  3. Section 106.2 Definition of "Complaint"
  4. Section 106.2 Definition of "Disciplinary Sanctions"
  5. Section 106.2 Definitions of "Elementary School" and "Secondary School"
  6. Section 106.2 Definition of "Postsecondary Institution"
  7. Section 106.2 Definition of Prohibited "Sex-Based Harassment"
  8. Section 106.2 Definition of "Relevant"
  9. Section 106.2 Definition of "Remedies"
  10. Section 106.2 Definition of "Respondent"
  11. Section 106.2 Definition of "Student With a Disability"
  12. Section 106.2 Definition of "Title IX"
  D. Other Definitions (definitions that the Department did not propose to amend)
  1. Section 106.2 Definition of "Employee"
  2. Section 106.2 Definition of "Federal Financial Assistance"
  3. Section 106.2 Definition of "Program or Activity"
  4. Section 106.2 Definition of "Recipient"
  5. Section 106.2 Definition of "Student"
  6. Adding a definition of "Party"
  7. Adding a definition of "Sex Discrimination"
  E. Application
  1. Section 106.11 Application
  F. The Effect of Other Requirements and Preservation of Rights
  1. Section 106.6(e) Effect of Section 444 of General Education Provisions Act (GEPA)/Family Educational Rights and Privacy Act (FERPA) and Directed Question 1
  2. Section 106.6(g) Exercise of Rights by Parents, Guardians, or Other Authorized Legal Representatives
  3. Section 106.6(b) Preemptive Effect
II. Recipient's Obligation to Operate Its Education Program or Activity Free From Sex Discrimination
  A. Administrative Requirements
  1. Section 106.8(a) Designation of a Title IX Coordinator
  2. Section 106.8(b) and (c) Nondiscrimination Policy, Grievance Procedures, and Notice of Nondiscrimination
  3. Section 106.8(d) Training
  4. Section 106.8(e) Students with Disabilities
  5. Section 106.8(f) Recordkeeping
  B. Action by a Recipient to Operate Its Education Program or Activity Free From Sex Discrimination
  1. Section 106.44(a) General
  2. Section 106.44(b) Monitoring for Barriers
  3. Section 106.44(c) Notification Requirements
  4. Sections 106.2 and 106.44(d) "Confidential employee" requirements and definition
  5. Section 106.44(e) Public Awareness Events
  6. Section 106.44(f) Title IX Coordinator Requirements
  7. Sections 106.44(g) and 106.2 Supportive Measures and Definition of "Supportive Measures"
  8. Section 106.44(h) Emergency Removal
  9. Section 106.44(i) Administrative Leave
  10. Section 106.44(j) Prohibited Disclosures of Personally Identifiable Information
  11. Section 106.44(k) Informal Resolution Process
  C. Framework for Grievance Procedures for Complaints of Sex Discrimination
  1. General Support
  2. Due Process Generally
  3. Administrative Burdens
  4. Bifurcation of Sex-Based Harassment Complaints Between Students and Employees at a Postsecondary Institution
  5. Ability to Respond to Threats, Promptly Impose Discipline, or Address Sex Discrimination
  6. Grievance Procedures Appearing as Quasi-Judicial Proceedings
  7. Consistency with Other Civil Rights Laws that OCR Enforces
  8. Elementary Schools and Secondary Schools
  9. Employees
  10. Section 106.45 Grievance Procedures for the Prompt and Equitable Resolution of Complaints of Sex Discrimination
  11. Section 106.46 Grievance Procedures for the Prompt and Equitable Resolution of Complaints of Sex-Based Harassment Involving a Student Complainant or Student Respondent at Postsecondary Institutions
  D. Grievance Procedures for the Prompt and Equitable Resolution of Complaints of Sex Discrimination (Section 106.45)
  1. Section 106.45(a)(1) and Section 106.46(a)
  2. Section 106.45(a)(2) Who Can Make Complaint
  3. Section 106.45(b)(1) Treat Complainants and Respondents Equitably
  4. Section 106.45(b)(2) Conflicts of Interest or Bias
  5. Section 106.45(b)(3) Presumption That the Respondent Is Not Responsible for the Alleged Sex Discrimination Until a Determination Is Made at the Conclusion of the Grievance Procedures
  6. Sections 106.45(b)(4) and 106.46(e)(5) Timeframes
  7. Section 106.45(b)(5) Reasonable Limitations on Sharing of Information
  8. Section 106.45(b)(6) Objective Evaluation of All Relevant Evidence and 106.45(b)(7) Exclusion of Impermissible Evidence
  9. Section 106.45(b)(8) Procedures that Apply to Some, but Not All, Complaints
  10. Section 106.45(c) Notice of Allegations
  11. Section 106.45(d) Dismissal of a Complaint
  12. Section 106.45(e) Consolidation of Complaints
  13. Section 106.45(f) Complaint Investigations
  14. Section 106.45(f)(1) Investigative Burden on Recipients
  15. Section 106.45(f)(2) Opportunity To Present Witnesses and Other Evidence

that Are Relevant and Not Otherwise
Impermissible
16. Section 106.45(f)(3) Review and
Determination of Relevant Evidence
17. Section 106.45(f)(4) Access to the
Relevant and Not Otherwise
Impermissible Evidence
18. Section 106.45(g) Evaluating
Allegations and Assessing Credibility
19. Section 106.45(h)(1) Standard of Proof
and Directed Question 4
20. Section 106.45(h)(2) Notification of
Determination Whether Sex
Discrimination Occurred
21. Section 106.45(h)(3) Remedies to a
Complainant and Other Appropriate
Prompt and Effective Steps
22. Section 106.45(h)(4) Comply With This
Section Before Imposition of
Disciplinary Sanctions
23. Section 106.45(h)(5) Prohibition on
Discipline Based Solely on
Determination
24. Section 106.45(i) Appeals
25. Section 106.45(j) Additional Provisions
26. Section 106.45(l) Range of Supportive
Measures and Disciplinary Sanctions
and Remedies
E. Grievance Procedures for the Prompt
and Equitable Resolution of Complaints
of Sex-Based Harassment Involving a
Student Complainant or Student
Respondent at Postsecondary Institutions
1. Section 106.46(b) Student-Employees
2. Section 106.46(c) Written Notice of
Allegations
3. Section 106.46(d) Dismissal of a
Complaint
4. Section 106.46(e)(1) Notice in Advance
of Meetings
5. Section 106.46(e)(2) Role of Advisor
6. Section 106.46(e)(3) Other Persons
Present at Proceedings
7. Section 106.46(e)(4) Expert Witnesses
8. Section 106.46(e)(5) Timeframes
9. Section 106.46(e)(6) Access to Relevant
and Not Otherwise Impermissible
Evidence
10. Section 106.46(f) Evaluating
Allegations and Assessing Credibility
11. Section 106.46(g) Live Hearings
12. Section 106.46(h) Determination
Whether Sex-Based Harassment
Occurred
13. Section 106.46(i) Appeals
14. Section 106.46(j) Informal Resolution
F. Assistant Secretary Review
1. Section 106.47 Assistant Secretary
Review
III. Pregnancy and Parental Status
A. Revised Definitions
1. Section 106.2 Definition of ''Pregnancy
or Related Conditions''
2. Section 106.2 Definition of ''Parental
Status''
B. Admissions
1. Section 106.21(c) Parental, Family, or
Marital Status; Pregnancy or Related
Conditions
C. Discrimination Based on a Student's
Parental, Family, or Marital Status, or
Pregnancy or Related Conditions
1. Section 106.40 Parental, Family, or
Marital Status; Pregnancy or Related
Conditions; and Section 106.40(a) Status
Generally

2. Section 106.40(b)(1) Pregnancy or
Related Conditions—Nondiscrimination
3. Section 106.40(b)(2) Pregnancy or
Related Conditions—Responsibility to
Provide Title IX Coordinator Contact and
Other Information
4. Section 106.40(b)(3) Pregnancy or
Related Conditions—Specific Actions To
Prevent Discrimination and Ensure Equal
Access
5. Section 106.40(b)(3)(i) Pregnancy or
Related Conditions—Responsibility to
Provide Information About Recipient
Obligations
6. Section 106.40(b)(3)(ii) Pregnancy or
Related Conditions—Reasonable
Modifications
7. Sections 106.40(b)(1) and
106.40(b)(3)(iii) Pregnancy or Related
Conditions—Voluntary Access to
Separate and Comparable Portion of
Program or Activity
8. Section 106.40(b)(3)(iv) Pregnancy or
Related Conditions—Voluntary Leaves of
Absence
9. Section 106.40(b)(3)(v) Pregnancy or
Related Conditions—Lactation Space
10. Section 106.40(b)(3)(vi) Pregnancy or
Related Conditions—Limitation on
Supporting Documentation
11. Section 106.40(b)(4) Pregnancy or
Related Conditions—Comparable
Treatment to Other Temporary Medical
Conditions
12. Section 106.40(b)(5) Pregnancy or
Related Conditions—Certification To
Participate
D. Discrimination Based on an Employee's
Parental, Family, Marital Status,
Pregnancy, or Related Conditions
1. Section 106.51(b)(6) Employment—
Granting and Return from Leaves
2. Section 106.57 Parental, Family, or
Marital Status; Pregnancy or Related
Conditions
3. Section 106.57(a) Parental, Family, or
Marital Status
4. Section 106.57(b) Pregnancy or Related
Conditions
5. Section 106.57(c) Comparable Treatment
to Other Temporary Medical Conditions
6. Section 106.57(d) Voluntary Leaves of
Absence
7. Section 106.57(e) Lactation Time and
Space
8. Section 106.60 Pre-Employment
Inquiries
IV. Title IX's Coverage of Sex Discrimination
A. Section 106.10 Scope
1. General
2. Authority to Enact Regulations on
Sexual Orientation and Gender Identity
Discrimination
3. Reliance on Bostock and Title VII Case
Law
4. Sexual Orientation and Gender Identity
Discrimination Generally
5. Gender Identity
6. Sexual Orientation
7. Sex Characteristics
8. Sex Stereotypes
9. Pregnancy or Related Conditions
10. Menstruation or Related Conditions
B. Section 106.31(a) Education Programs or
Activities—General
1. De Minimis Harm Standard

2. Application
3. Participation Consistent with Gender
Identity
4. Parental Rights
5. Intersection with Health Care
6. Intersection with Individuals' Religious
Beliefs
7. Appearance Codes
8. Juvenile Justice Facilities
9. Burden on Schools
V. Retaliation
A. Section 106.71 Retaliation
1. General Support and Opposition
2. Intersection with § 106.45(h)(5)
3. Examples of Prohibited Retaliation
4. First Amendment
5. Requests to Clarify or Modify
6. Other Clarifications to Regulatory Text
B. Section 106.2 Definition of ''Retaliation''
1. Protected Activity
2. Adverse Action
3. Causal Connection
4. Other Clarifications to Regulatory Text
C. Section 106.2 Definition of ''Peer
Retaliation''
VI. Outdated Regulatory Provisions
A. Section 106.3(c) and (d) Self-Evaluation
B. Sections 106.2(s), 106.16, and 106.17
Transition Plans
C. Section 106.41(d) Adjustment Period
VII. Miscellaneous
A. General Support and Opposition
B. Parental Rights—Generally
C. Religious Exemptions
1. General Support and Opposition
2. Section 106.12(c)
3. Section 106.12(b)
4. Transparency
5. Religious Individuals
6. 34 CFR 75.500(d) and 76.500(d)
D. Rulemaking Process
E. Length of Public Comment Period and
Process for Submitting and Posting
Comments
F. Effective Date and Retroactivity
G. Prevention
H. Tenth Amendment
I. Exceeding Authority
J. Views of Assistant Secretary Lhamon
K. Regulatory Action Not Necessary
L. Need for Long-Lasting, Flexible
Regulations
M. Intersection with Other Laws
N. Family Policymaking Assessment
O. National Origin and Immigration Status
P. Coverage of Employment
Q. Funding for Compliance
R. Technical Assistance
S. Coordination
T. Terminology
U. Discipline of Student Organizations
V. Contractors
W. Data Collection and Climate Surveys
X. OCR Enforcement Practices
Y. Severability
Z. Addressing Other Issues
AA. Comments Outside the Scope of Title
IX
Regulatory Impact Analysis (RIA)
A. Comments on the Department's Model
and Baseline Assumptions
1. Regulatory Flexibility Act (Small
Business Impacts)
2. Taxpayer Costs
3. Cost Estimate
4. Definition of Sex-Based Harassment
(§ 106.2)

5. Nondiscrimination Policy and Grievance Procedures (§ 106.8)
6. Training Requirements (§ 106.8(d))
7. Recordkeeping (§ 106.8(f))
8. Application of Title IX (§ 106.11)
9. Duty to Address Sex Discrimination (§ 106.44)
10. Title IX Coordinator Obligations: Duty to Monitor (§ 106.44(b) and (f))
11. Notification Requirements (§ 106.44(c))
12. Provision of Supportive Measures (§ 106.44(f)–(g))
13. Impartial Review of Supportive Measures (§ 106.44(g)(4))
14. Grievance Procedures (§§ 106.45 and 106.46)
15. Regulatory Stability and Reliance Interests
16. Training for Decisionmakers (§ 106.46(f)(4))
17. Single-Investigator Model (§ 106.45(b)(2))
18. Pregnancy or Related Conditions (§§ 106.40 and 106.57(e))
19. Scope of Sex Discrimination (§ 106.10)
20. Menstruation or Related Conditions
21. Other
B. Regulatory Impact Analysis (RIA)
1. Need for Regulatory Action
2. Discussion of Costs, Benefits, and Transfers
3. Benefits of the Final Regulations
4. Costs of the Final Regulations
5. Regulatory Alternatives Considered
6. Accounting Statement
C. Regulatory Flexibility Act (Small Business Impacts)
1. Introduction
2. Final Regulatory Flexibility Analysis
Executive Order 12250 On Leadership And Coordination of Nondiscrimination Laws
Paperwork Reduction Act of 1995
Assessment of Educational Impact
Federalism
Accessible Format
Electronic Access to This Document

**Effective Date**

As detailed more extensively below, the Department recognizes the practical necessity of allowing recipients of Federal financial assistance time to plan for implementing these final regulations. Taking into account the need for the time to plan, as well as consideration of public comments about an effective date as explained in the discussion of Effective Date and Retroactivity (Section VII.F), the Department has determined that these final regulations are effective August 1, 2024.

**Executive Summary**

*1. Purpose of This Regulatory Action*

Enacted in 1972, Title IX states that "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," absent certain exceptions. 20 U.S.C.

1681.[1] The U.S. Department of Education (the "Department" or "we") has authority to issue rules effectuating this prohibition on sex discrimination consistent with the objectives of the statute. 20 U.S.C. 1682. The history of the Title IX regulations is described in the preamble to the 2020 amendments to the Title IX regulations. 85 FR 30026, 30028 (May 19, 2020) (hereinafter "the 2020 amendments"); *see also* 87 FR 41390, 41393–95 (July 12, 2022). The 2020 amendments specify how a recipient[2] must respond to sexual harassment, and the preamble to the 2020 amendments acknowledged that the regulations issued under the 2020 amendments represented a partial change from the way the Department had enforced Title IX with respect to recipients' duties to respond to sexual harassment prior to the 2020 amendments. 85 FR 30068.

Based on an extensive review of the 2020 amendments, information including stakeholder feedback received prior to the issuance of the notice of proposed rulemaking (the "July 2022 NPRM," 87 FR 41390 (July 12, 2022)), and consideration of public comments on the July 2022 NPRM, the Department has determined that amendments are required to fully effectuate Title IX's sex discrimination prohibition. Even if these amendments are not strictly required to effectuate the prohibition, the Department has, in the exercise of its discretion, determined that they further Title IX's prohibition on sex discrimination. The Department therefore issues these final regulations to provide greater clarity regarding: the definition of "sex-based harassment"; the scope of sex discrimination, including recipients' obligations not to discriminate based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity; and recipients' obligations to provide an educational environment free from discrimination on the basis of sex. Additionally, these regulations aim to fulfill Title IX's protection for students, teachers, and other employees in federally funded

elementary schools and secondary schools and postsecondary institutions against all forms of sex discrimination, including sex-based harassment and sexual violence. The final regulations will help to ensure that all students receive appropriate support when they experience sex discrimination and that recipients' procedures for investigating and resolving complaints of sex discrimination are fair to all involved. These final regulations also better account for the variety of recipients and education programs or activities covered by Title IX and provide discretion and flexibility for recipients to account for variations in school size, student populations, and administrative structures.

These regulations:

• Require recipients to adopt grievance procedures that provide for fair, prompt, and equitable resolution of complaints of sex discrimination and to take other necessary steps to provide an educational environment free from sex discrimination;

• Clarify that Title IX's prohibition on sex discrimination includes sex-based harassment in the form of quid pro quo harassment, hostile environment harassment, and four specific offenses (sexual assault, dating violence, domestic violence, and stalking); and

• Clarify that sex discrimination includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

*2. Summary of the Major Provisions of This Regulatory Action*

With regard to sex-based harassment, the final regulations:

• Define "sex-based harassment" as a form of sex discrimination that includes sexual harassment and harassment based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, or gender identity, that is quid pro quo harassment, hostile environment harassment, or one of four specific offenses referenced in the Jeanne Clery Disclosure of Campus Security Policy and Campus Crimes Statistics Act ("Clery Act") as amended by the Violence Against Women Reauthorization Act of 2013;

• Provide and clarify definitions of various terms related to a recipient's obligations to address sex discrimination, including sex-based harassment;

• Clarify a recipient's required response to sex discrimination, including sex-based harassment, in its education program or activity;

---

[1] The definition of the term "Federal financial assistance" under the Department's Title IX regulations is not limited to monetary assistance, but encompasses various types of in-kind assistance, such as a grant or loan of real or personal property, or provision of the services of Federal personnel. *See* 34 CFR 106.2(g). Throughout this preamble, terms such as "Federal funding," "Federal funds," and "federally funded" are used to refer to "Federal financial assistance," and are not meant to limit application of the statute or its implementing regulations to recipients of certain types of Federal financial assistance.

[2] Throughout this preamble, "recipient" is used to refer to a recipient of Federal financial assistance from the Department.

• Strengthen a recipient's obligations to provide prompt and equitable grievance procedures and to take other necessary steps when it receives a complaint of sex discrimination, including sex-based harassment; and

• Provide for additional requirements in grievance procedures at postsecondary institutions for complaints of sex-based harassment involving a student complainant (a student who is alleged to have been subjected to conduct that could constitute sex discrimination) or student respondent (a student who is alleged to have violated the recipient's prohibition on sex discrimination).

With regard to discrimination against individuals who are pregnant or parenting, the final regulations:

• Define the terms ''pregnancy or related conditions'' and ''parental status'';

• Clarify the prohibition on discrimination against students and applicants for admission and employees or applicants for employment on the basis of current, potential, or past pregnancy or related conditions; and

• Clarify a recipient's obligations to students and employees who are pregnant or experiencing pregnancy-related conditions.

In addition, the final regulations:

• Clarify and streamline administrative requirements with respect to designating a Title IX Coordinator, disseminating a nondiscrimination notice, adopting grievance procedures, and maintaining records;

• Specify that a recipient must train a range of relevant persons on the recipient's obligations under Title IX;

• Clarify that, except as permitted by certain provisions of Title IX or the regulations, a recipient must not carry out any otherwise permissible different treatment or separation on the basis of sex in a way that would cause more than de minimis harm, including by adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity; and

• Clarify a recipient's obligation to address retaliation.

**Timing, Comments, and Changes**

On July 12, 2022, the Department published the July 2022 NPRM in the **Federal Register** to amend regulations implementing Title IX. 87 FR 41390.

The Department invited the public to comment on all aspects of the proposed regulations, as well as the *Regulatory Impact Analysis.* The July 2022 NPRM also included several directed

questions. 87 FR 41544. Comments in response to directed questions are addressed in this preamble in connection with the relevant regulatory section.

In response to our invitation in the July 2022 NPRM, we received more than 240,000 comments on the proposed regulations. The final regulations contain changes from the July 2022 NPRM, and these changes are fully explained throughout the discussion in this preamble. We discuss substantive issues raised in the comments under topical headings, and by the sections of the final regulations to which they pertain, including an analysis of the public comments and changes in the final regulations since the publication of the July 2022 NPRM. Generally, we do not address technical and other minor changes (such as renumbering paragraphs, adding a word, or typographical errors).

Throughout this preamble, the Department refers to Title IX of the Education Amendments of 1972, 20 U.S.C. 1681, 1682, 1683, 1685, 1686, 1687, 1688, 1689, as amended, as ''Title IX,'' to the Individuals with Disabilities Education Act, 20 U.S.C. 1400 *et seq.,* as the ''IDEA,'' to Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 701 *et seq.,* as ''Section 504,'' to the Americans with Disabilities Act, 42 U.S.C. 12101 *et seq.,* as the ''ADA,'' to Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d *et seq.,* as ''Title VI,'' to Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.,* as ''Title VII,'' to section 444 of the General Education Provisions Act (GEPA), 20 U.S.C. 1232g, which is commonly referred to as the Family Educational Rights and Privacy Act of 1974, as ''FERPA,'' to the Health Insurance Portability and Accountability Act of 1996, 42 U.S.C. 1320d *et seq.,* as ''HIPAA,'' to the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, 20 U.S.C. 1092(f), as the ''Clery Act,'' to the Violence Against Women Reauthorization Act of 2013, Public Law 113–4 (codified as amended throughout the U.S. code), as ''VAWA 2013,'' and to the Violence Against Women Act Reauthorization Act of 2022, Public Law 117–103 (codified as amended throughout the U.S. Code), as ''VAWA 2022.'' In 2013, the Clery Act was amended by VAWA 2013. *See* Public Law 113–4. In 2014, the Department amended the Clery Act regulations at 34 CFR 668.46 to implement the statutory changes to the Clery Act made by VAWA 2013. *See* 79 FR 62752 (Oct. 20, 2014). The regulations took effect on July 1, 2015. Throughout this preamble,

references to the Clery Act mean the Clery Act as amended by VAWA 2013.

These final regulations interpret the Title IX statute consistent with the Department's authority under 20 U.S.C. 1682. Throughout the preamble, we refer to ''this part,'' meaning 34 CFR part 106. These regulations' prohibitions on sex discrimination are coextensive with the statute, and any use of ''and this part'' or ''or this part'' should be construed consistent with the fact that the final regulations interpret the statute. The Department has revised the regulatory text to clarify, as appropriate.

Throughout the preamble, the Department references statistics, data, research, and studies that commenters provided in response to the July 2022 NPRM. The Department's reference to these items, however, does not necessarily speak to their accuracy. The preamble also breaks up its discussion in several places as ''Comments,'' ''Discussion,'' and ''Changes.'' This structure is for readability, and the omission of a reference to a comment in the ''Comments'' section does not mean that a significant, relevant comment is not addressed in the ''Discussion'' section.

The final regulations define and apply the terms ''party,'' ''complainant,'' and ''respondent.'' In this preamble, ''complainant'' generally means a person who is alleged to have been subjected to conduct that could constitute sex discrimination, ''respondent'' means a person who is alleged to have violated the recipient's prohibition on sex discrimination, and ''party'' means a complainant or a respondent. *See* § 106.2. References in this preamble to a party, complainant, respondent, or other individual with respect to exercise of rights under Title IX should be understood to include situations in which a parent, guardian, or other authorized legal representative exercises a legal right to act on behalf of the individual. *See* § 106.6(g).

Many commenters referenced the impact of sex discrimination or the proposed regulations on individuals who belong to, or identify with, certain demographic groups, and used a variety of acronyms and phrases to describe such individuals. For consistency, throughout this preamble we generally use the term ''LGBTQI+'' to refer to people who are lesbian, gay, bisexual, transgender, queer, questioning, asexual, intersex, nonbinary, or describe their sex characteristics, sexual orientation, or gender identity in another similar way. When referring to some outside resources or past Department of Education, Office for Civil Rights (OCR) guidance documents,

this preamble also uses variations of the LGBTQI+ acronym to track the content of those documents, as appropriate.

In response to commenters who asked for clarification as to whether the definitions in § 106.2 apply to a term in a specific regulatory provision, some of the regulatory provisions specifically refer to a term "as defined in § 106.2" to provide additional clarity. Notwithstanding these points of additional clarification in certain regulatory provisions, the definitions in § 106.2 apply to the entirety of 34 CFR part 106. For consistency, references in this preamble are to the provisions as numbered in the final, and not the proposed, regulations. Citations to "34 CFR 106." are citations to the Department's preexisting regulations and not these final regulations.

**Analysis of Comments and Changes**

An analysis of the public comments and changes in the final regulations since the publication of the July 2022 NPRM follows.

**I. Provisions of General Applicability**

*A. Personal Stories*

Numerous commenters shared personal stories with the Department. These comments have been organized into three categories, and the discussion of all of these comments follows.

1. Experiences Relating to Title IX Grievance Procedures

*Comments:* Numerous commenters shared with the Department experiences they have had as complainants or respondents, people supporting complainants or respondents, or persons or institutions involved in Title IX grievance procedures.

Relating to complainants, such personal experiences included the following:

• A wide variety of people from many backgrounds and identities shared their stories as individuals who experienced sexual harassment and assault, whether or not the incident became the subject of a Title IX complaint. A number of personal stories generally recounted sexual harassment and assault incidents impacting undergraduate and graduate students and university faculty at public and private postsecondary institutions.

• Other commenters shared stories as individuals who knew complainants and witnessed the sexual harassment and assault, its aftermath, and the Title IX grievance procedures. These commenters included family members, friends and peers of the complainants, student advocates, faculty and administrators, and individuals

participating in the Title IX grievance procedures.

• Commenters described sexual harassment and assault by a wide variety of individuals. These included classmates, professors and faculty, student athletes, intimate partners and ex-partners, friends, and stalkers.

• Commenters described sexual harassment and assault, their decision to engage with the Title IX grievance procedures, and their experience with sexual harassment and assault from prior to and after Title IX was enacted, prior to and after the U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter: Sexual Violence (Apr. 4, 2011) (rescinded in 2017) (2011 Dear Colleague Letter on Sexual Violence); U.S. Dep't of Educ., Office for Civil Rights, Questions and Answers on Title IX and Sexual Violence (Apr. 29, 2014) (rescinded in 2017) (2014 Q&A on Sexual Violence), *https://www2.ed.gov/ about/offices/list/ocr/letters/colleague-201104.pdf;* and U.S. Dep't of Educ., Office for Civil Rights, Questions and Answers on Campus Sexual Misconduct (Sept. 2017) (rescinded in 2020) (2017 Q&A on Campus Sexual Misconduct), and prior to and after the 2020 amendments, *https://www2.ed.gov/ about/offices/list/ocr/docs/qa-title-ix-201709.pdf.*

• The Department received comments from individuals who described a range of traumatic incidents, including inappropriate and harassing behaviors, unwanted touching, stalking, incidents of rape or attempted rape, and longer-term emotionally and sexually coercive or intimidating interactions.

• The Department received comments from individuals who did not report their experiences for various reasons, including because they feared that no one would believe them, did not know whom to report to or the process for reporting, felt frustrated by a lack of response, or did not want to relive the experience.

• The Department received comments from individuals about the many detrimental effects that sexual harassment and assault can have on complainants. Individuals described the physical, emotional, and mental impacts of sexual harassment and assault, including feeling afraid to attend their postsecondary institution and suffering mental health symptoms such as post-traumatic stress disorder (PTSD) and suicidality. Individuals also described the educational impacts of sexual harassment and assault, including the inability to complete class assignments, dropping classes, changing majors or leaving areas of study, transferring schools, or leaving school altogether.

• The Department received comments from complainants who, following the Title IX grievance procedures, felt that recipients did not hold respondents accountable, or who were reprimanded or faced repercussions for openly discussing their experiences and naming the respondents.

• The Department also received stories from individuals about the dynamics of sexual assault and harassment in which individuals in positions of authority, such as professors, faculty, or staff, repeatedly harassed or assaulted individuals, sometimes with the recipient's knowledge, and without meaningful action by the recipient to prevent continued abuse or conduct investigations into wrongdoing.

• The Department received numerous comments from complainants who shared their views that the current Title IX system and its implementation by recipients is not protecting individuals from sexual harassment and assault or delivering justice for complainants and is instead perpetuating the harm. Commenters shared that they: had been failed by the system by being forced to relive their trauma through the Title IX grievance procedures, while being offered few protections; had faced a lack of resources for student complainants; and had encountered widespread systemic shortcomings and institutional negligence. Commenters stated that, in their experience, the Title IX grievance procedures put complainants in danger, disrupted their education, and allowed recipients to ignore their concerns, rather than work with complainants to address campus safety issues.

• The Department received comments from complainants about the importance of Title IX in investigating complaints of sexual assault and providing relief that may not be available in the criminal justice system, but who said the 2020 amendments failed them. Some commenters shared that the 2020 amendments fail to protect complainants because they require cross-examination for postsecondary institutions, the process can be very lengthy, and other factors, such as the definition of sexual harassment, make it harder for complainants to come forward. Other commenters shared that the Title IX grievance procedures allow for separately tracked investigations into the same individual, without complainants' knowledge, making it more difficult to show an individual's pattern of misconduct.

• The Department also received comments from complainants specific to how their schools handled the Title IX grievance procedures. Complainants

shared their experiences on interactions with Title IX offices that, they felt, were mismanaged, left them feeling alienated and silenced, and further harmed their ability to access their educational opportunities. The Department received comments about Title IX offices that did not inform complainants about available resources, interviewed complainants in an inappropriate manner, and pushed complainants toward informal resolutions, despite their stated wish to pursue a formal hearing. Some commenters shared that student and staff efforts to improve the Title IX grievance procedures on campus and enhance complainant resources were rebuffed by administrators. Some commenters shared that because of their school's handling of their Title IX investigation, they no longer felt safe or welcome in higher education and had either dropped out of college or changed their plans for graduate education or careers in academia.

• The Department received comments from complainants from student populations who already face challenges to their education, or face discrimination on campus, and about the specific burdens faced by those populations. Commenters who experience certain mental illnesses shared their particular susceptibility to coercive behaviors by their assailants, both during and after their assaults, and how their existing medical conditions made it harder both to be taken seriously by investigators and to recover enough to successfully engage in their educational experience. Other commenters, complainants who identify as LGBTQI+, shared that their Title IX investigators and school administrators did not take their complaints seriously and that the entire experience made them want to leave school.

Relating to respondents, commenters reported personal experiences that included the following:

• A variety of people shared their stories as respondents. Commenters included respondents who were postsecondary institution faculty and students, as well as friends, acquaintances, and family of respondents. The personal stories recounted the impact of Title IX investigations on the respondents when they were undergraduate and graduate students and university faculty at public and private postsecondary institutions.

• Other commenters shared the negative consequences that an allegation of sexual harassment and assault can have on respondents, whether or not they are formally disciplined or found responsible at the conclusion of the grievance procedures. Commenters

shared how such allegations can negatively impact someone's life, leave them with mental anguish and a tarnished record, and negatively impact their educational future and career opportunities.

• The Department received some comments from individuals who expressed concern that the Title IX grievance procedures were generally unfair to respondents. Some commenters were concerned that investigators in certain Title IX investigations presume that the respondent was guilty, no matter the evidence.

• The Department also received comments from individuals who expressed concern that the Title IX grievance procedures allow for false accusations. Some commenters shared that they knew multiple respondents who were involved in situations in which the complainants had originally initiated physical intimacy to start a relationship and only brought complaints when that did not materialize. Others expressed their views that complainants sometimes do not tell the truth and make up accusations to resolve personal disputes. Others expressed frustration that what they viewed as normal sexual exploration was being misconstrued as sexual assault.

• The Department received comments from respondents who were forced to leave postsecondary institution faculty positions as part of settlements for investigations that they felt were unfair and based on misconstrued or fabricated facts. Commenters who were respondents said they felt coerced into signing settlement agreements because they did not have the emotional or financial capability to continue to defend themselves.

### 2. Experiences Relating to Pregnancy

*Comments:* Several commenters shared with the Department experiences they have had with respect to pregnancy.

Some commenters shared stories of students who experienced discrimination based on pregnancy or related conditions and lactation. One commenter shared the experience of someone who was excluded from school activities due to pregnancy and was required to attend a different school farther away, without transportation. The commenter noted that if the proposed regulations had been in place, the student would have understood her rights and more could have been done to protect her right to continue her education at the original school. One commenter mentioned a student who

considered quitting school due to lack of an appropriate lactation space. The commenter referred to another student whose school denied lactation breaks entirely, causing the student to lose her milk supply. Another commenter shared a personal experience supporting a high school student whose academic honors designation was revoked because of rumors that she terminated a pregnancy. Some commenters stated that they were never informed of their rights as pregnant and parenting students under Title IX, including available supports for the healthcare needs of pregnant women. Some commenters described experiences of pregnancy-based harassment, noting that students who become pregnant are often subjected to unwanted sexual attention, shame, and even punishment. Other commenters supported strengthened protection for pregnant employees, sharing experiences of their own, or of friends or co-workers who experienced employment problems, such as a termination of employment due to difficulties related to pregnancy.

### 3. Experiences Relating to Sexual Orientation and Gender Identity

*Comments:* The Department received numerous comments in support of and in opposition to the July 2022 NPRM's clarification of the application of Title IX's prohibition on sex discrimination to discrimination based on sexual orientation and gender identity.

In support of the clarification that Title IX prohibits discrimination based on sexual orientation and gender identity, commenters shared personal experiences including the following:

• Commenters from more than 40 States in all regions of the United States and in communities across the political spectrum shared their experiences as members of the LGBTQI+ community, or as parents, teachers, and friends of LGBTQI+ individuals. They described bullying and harassment of students based on sexual orientation and gender identity that ranged from single interactions with peers to systemic concerns such as constant verbal harassment, bullying, and threats of physical violence that are often ignored or excused by recipients from early elementary school through graduate school.

○ Some parents expressed concern that recipients do not understand the importance of a safe educational environment. Other parents expressed gratitude for the life-changing impact schools that prevent and meaningfully address incidents of harassment and bullying have on LGBTQI+ students.

○ Teachers shared their experiences supporting LGBTQI+ students in educational environments that do not support or encourage all students, which they stated impacts the ability of LGBTQI+ students to thrive and academically succeed.

○ School counselors shared their experiences providing academic and mental health supports to LGBTQI+ students being bullied or experiencing harassment and discrimination. Counselors stressed that supportive adults and educational environments can save LGBTQI+ students' lives.

• LGBTQI+ students and their parents and teachers shared that harassment, bullying, and threats of physical violence leave students in constant fear, cause social anxiety and stress disorders, and too frequently result in suicidality. Some students who identify as LGBTQI+ and as part of a racial or ethnic minority group or as a student with a disability discussed feeling pressure to hide their identity, which led them to avoid reporting harassment or discrimination that occurs at school.

• A number of commenters living in districts or States where local government has discussed or enacted bills that limit the rights of LGBTQI+ people, shared how these actions negatively impact the mental well-being and academic experience of LGBTQI+ students.

• Many commenters shared experiences unique to nonbinary and transgender students.

○ Commenters who identified as nonbinary or transgender shared their experiences being threatened and physically attacked and explained the lasting anxiety and fear that those experiences cause in addition to the significant impact such experiences have on their ability to engage academically.

○ Transgender students shared being forced to use school facilities that do not align with their gender identity, feeling unsafe using the facilities, or not having access to gender neutral facilities.

○ Commenters asserted that a safe educational environment for nonbinary and transgender students is a matter of life or death. Many transgender students shared that they or their friends had attempted suicide because of the discrimination and harassment they had experienced.

○ Transgender students in school districts that they viewed as supportive shared the positive impact such schools have on their social, emotional, and academic well-being.

In opposition to clarification that Title IX prohibits discrimination based on sexual orientation and gender identity,

commenters described personal experiences including the following:

• Many commenters asked that Title IX focus only on ensuring transgender girls and women have equal access to education.

○ Two grandmothers shared their memories of being forced to fundraise for basic sports equipment and being told not to pursue certain careers because they were girls.

○ Another grandmother who worked with pregnant and parenting teens shared her experience witnessing these students face significant obstacles and prejudices. Both she and a minister who has worked with women who have experienced sex discrimination, including sexual assault, expressed concern that the proposed regulations would, in their view, harm many cisgender women and their futures.

○ Some commenters worried that the proposed regulations would negatively impact the developmental progress of their children.

• Some commenters expressed concern that the proposed regulations would negatively impact parents and families.

○ Commenters, including grandparents and parents, shared their families' experiences with different educational environments, and expressed general concern that the proposed regulations would, in their view, interfere in the personal lives of families.

○ Other commenters expressed concern that the proposed regulations would diminish the role of parents in helping children make decisions.

• Some commenters expressed concern that cisgender students experience discomfort at school when they are required to participate in activities and share facilities with transgender students.

*Discussion:* The Department appreciates the time and effort spent by commenters who shared their personal experiences. The Department thoughtfully and respectfully considered all of the personal experiences, including of the many individuals who: have experienced sex-based harassment and been complainants in Title IX grievance procedures; have been respondents in Title IX grievance procedures; have looked to their elementary schools, secondary schools, and postsecondary institutions for support following sex-based harassment and for prompt and equitable grievance procedures that are fair to all involved; have experienced pregnancy or related conditions; have worked with a parenting student; have experienced discrimination based on

sexual orientation and gender identity; have a variety of viewpoints regarding sexual orientation and gender identity; and have supported or witnessed other individuals having such personal experiences.

Many of the stories shared in the comments echo and expand upon themes that the Department heard through the June 2021 nationwide virtual public hearing on Title IX (June 2021 Title IX Public Hearing) and in listening sessions and stakeholder meetings held in 2021 and 2022. As the Department explained in the July 2022 NPRM, the overarching goal of the proposed regulations was to ensure that no person experiences sex discrimination in education programs or activities that receive Federal financial assistance. *See* 87 FR 41396. The Department prepared the July 2022 NPRM with that goal in mind to assist recipients in implementing Title IX's nondiscrimination mandate fully and fairly in their educational environments, including with procedures for responding to complaints of sex discrimination that are prompt and equitable for all participants. *See id.* As a result of the robust public comment process, including from individuals personally affected by these issues, these final regulations even better reflect this goal.

*Changes:* Specific changes made to the proposed regulations are described in the applicable sections of this preamble.

*B. Purpose*

1. Section 106.1   Purpose

*Comments:* One commenter expressed general support for proposed § 106.1. Another commenter asked the Department to consider removing "(with certain exceptions)" from proposed § 106.1 to more forcefully state the purpose of Title IX. Another commenter urged the Department not to remove "of the Education Amendments of 1972" from current § 106.1 because there are other Federal laws named "Title IX."

Another commenter objected to the language in proposed § 106.1 that states "whether or not such program or activity is offered or sponsored by an educational institution as defined in this part," arguing that this would cover conduct outside of the educational context and exceed the scope of Title IX.

*Discussion:* The Department declines the commenter's suggestion to remove the reference to Title IX's exceptions from § 106.1 because those exceptions are an important component of the statute. *See* 20 U.S.C. 1681(a)(1)–(9). The Department also declines the

commenter's suggestion to use Title IX's full name in this section. The term ''Title IX'' is defined in § 106.2 to include the original statute and subsequent amendments, which are also relevant to Title IX's purpose. Further, the risk is low that the public will confuse a reference to ''Title IX'' in the Department's Title IX regulations with another Federal law.

The Department disagrees with the commenter who objected to language in § 106.1 recognizing that Title IX applies to recipients other than educational institutions. This language has been in the purpose section of the regulations since the regulations were first issued in 1975 and reflects the fact that recipients that are not educational institutions (*e.g.*, libraries, hospitals) also offer education programs and activities, and those education programs and activities are covered by Title IX. *See* 20 U.S.C. 1681(a) (providing that Title IX's prohibition on sex discrimination applies to ''any education program or activity receiving Federal financial assistance''); 20 U.S.C. 1687 (defining ''program or activity'' to include ''a department, agency, special purpose district, or other instrumentality of a State or a local government''); *see also* U.S. Dep't of Health, Educ., & Welfare, Final Rule: Nondiscrimination on the Basis of Sex In Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 40 FR 24128, 24137 (June 4, 1975).

*Changes:* None.

## C. Definitions [3]

### 1. Section 106.2    Definition of ''Administrative Law Judge''

*Comments:* Commenters generally supported the proposed definition of ''administrative law judge'' and said it would aid in consistent and effective enforcement of Title IX. One commenter interpreted the proposed definition of ''administrative law judge'' to mean that a hearing is required as part of a recipient's grievance procedures under the proposed regulations.

*Discussion:* The Department acknowledges commenters' support for the Department's proposed definition of ''administrative law judge.'' The Department believes one commenter may have misunderstood the definition as requiring a hearing for all Title IX grievance procedures. As explained in

the July 2022 NPRM, this revised definition of ''administrative law judge'' specifically refers and applies to a hearing held under § 106.81, which pertains to the Department's efforts to secure a recipient's compliance with Title IX. *See* 87 FR 41399. A hearing under § 106.81 is distinct from a hearing that may be conducted as part of a recipient's Title IX grievance procedures under §§ 106.45 or 106.46, neither of which requires a live hearing or participation of an administrative law judge.

*Changes:* None.

### 2. Section 106.2    Definition of ''Complainant''

#### General Support

*Comments:* Commenters expressed a range of perspectives and varied reasons for supporting the proposed regulations' broadened definition of ''complainant,'' which would permit a complaint by someone who is not currently a student or employee as long as that person was participating or attempting to participate in a recipient's education program or activity at the time of the alleged discrimination. Some commenters said that the restrictions of the 2020 amendments, requiring a complainant to be participating or attempting to participate in the recipient's education program or activity at the time of filing a complaint rather than at the time of the alleged discrimination, made it more difficult for recipients to investigate, address, and stop sexual harassment, and forced recipients to dismiss Title IX complaints brought by prospective students, former students, and former employees who experienced sexual harassment under the recipient's education program or activity.

Commenters said there is no reason to exclude people from the protection of Title IX just because they left the school where the discrimination allegedly occurred. Commenters noted a variety of reasons that cause students to leave a school before filing a complaint, including to get mental or emotional support, to regain a sense of control, for fear of potential retaliation, for fear of losing support or recommendations from academic advisors, or simply because outside circumstances lead students to move in and out of educational programs over time. Commenters stated that allowing former students to make a complaint will encourage more reporting, prevent or deter future misconduct, and allow students to obtain closure and resolution and even return to school if the complaint is resolved. Commenters

also asserted that the proposed definition would fill gaps left by the 2020 amendments and ensure schools are held accountable for their responses to sexual harassment. Some commenters appreciated that the proposed definition of ''complainant'' did not include the term ''victim,'' noting that omitting stigmatizing and harmful words from the regulations will promote reporting.

One commenter said that delayed reporting is so common in sexual assault and other gender-based violence cases that the requirement to dismiss complaints from former students has prevented recipients from addressing conduct that could affect the campus environment. One commenter said that survivors need to feel validated and cited research finding that 59 percent of survivors wait to disclose, and usually disclose after first talking with family or friends. Commenters relied on multiple news stories, studies, and court decisions to illustrate that sexual harassment can cause individuals to drop out of school or transfer, and that the ability to address alleged harassment is important, both for the individuals who experience harassment and to prevent broader harm.

Several commenters generally supported the proposed definition of ''complainant,'' but suggested additional clarification or modification. One group of commenters supported the right of persons to make a complaint as long as they were participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination, but requested that the Department provide guidance and clarification regarding how a recipient should proceed in such cases, particularly because the Department proposed eliminating § 106.45(b)(3)(ii) of the 2020 amendments, which allows for the dismissal of a complaint when ''specific circumstances'' prevent the recipient from gathering evidence sufficient to reach a determination as to the formal complaint or allegations therein. Another commenter recommended that the Department add language making it clear that postdoctoral trainees, fellows, and all other individuals training under recipient institutions can be complainants, whether as a student or an employee.

One commenter suggested that the Department make this provision retroactive to the extent possible because students who leave their schools prior to the effective date of these revised regulations should have a grace period to make a Title IX complaint under the new regulations.

---

[3] Section I.C, ''Definitions,'' and Section I.D, ''Other Definitions,'' do not address all the definitions in the final regulations because certain definitions are discussed in other sections. For example, the definition of ''confidential employee'' is discussed in Section II.B as part of a broader discussion of confidential employee requirements that includes discussion of § 106.44(d).

*Discussion:* With respect to a complaint brought by a former student or employee who was participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination, the recipient should proceed just as it would with all other complaints under the recipient's grievance procedures in accordance with § 106.45, and if applicable § 106.46. If, at the time the complaint is filed, however, the respondent is no longer participating in the recipient's education program or activity or is no longer employed by the recipient, the complaint may be dismissed under § 106.45(d)(1)(ii). As explained in the July 2022 NPRM, the Department proposed to remove § 106.45(b)(3)(ii) because the term "specific circumstances" under which complaints could be dismissed was vague and undefined, and the Department determined that it would be preferable to revise the dismissal standard to instead include several defined bases for discretionary dismissal. 87 FR 41478.

The Department declines to specify in the final regulations that a postdoctoral trainee or fellow may be a complainant. We note, however, that such an individual could fall into the definition of complainant as a student, employee, or other individual participating or attempting to participate in the recipient's education program or activity, particularly if—as the commenter suggests—they are training under a recipient postsecondary institution at the time of the alleged sex discrimination.

While the Department understands commenters' desire to ensure that former students who were subjected to sex discrimination prior to the effective date of these regulations can still pursue a complaint, the Department does not intend the final regulations to be enforced retroactively, as stated in the July 2022 NPRM. 87 FR 41398. Under Federal law, agencies may only issue regulations with retroactive effect if the authorizing statute expressly grants such authority. *See* 5 U.S.C. 551(4) (Administrative Procedure Act provision defining a "rule" as an agency action with "future effect"); *see also Bowen* v. *Georgetown Univ. Hosp.,* 488 U.S. 204, 208 (1988) ("[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms."). Title IX contains no such express grant of authority. For more information about retroactivity,

see the discussion of Effective Date and Retroactivity (Section VII.F).

*Changes:* At the end of paragraph (1) of the definition of "complainant," after "Title IX," the Department added the words "or this part" for the reasons discussed in the Background/ Introduction, Executive Summary section of this preamble. For the same reasons, the Department also added "or this part" after the reference to Title IX in paragraph (2). The Department also has made a minor technical edit by replacing "when the alleged sex discrimination occurred" with "at the time of the alleged sex discrimination" in final § 106.45 (a)(2)(iv)(B).

General Opposition

*Comments:* Some commenters expressed general opposition to the definition of "complainant" in § 106.2, including on the grounds that it exceeds the Department's authority or does not align with Title IX and case law.

Some commenters asserted that the proposed definition of "complainant" was too broad, including because it applies to all sex discrimination and not just sexual harassment; because former students and employees allegedly do not face barriers to education and thus fall outside the scope of Title IX; and because including such individuals allegedly would allow them to make a complaint decades after leaving the institution, including opportunistic complaints about conduct that was not prohibited at the time it occurred. Commenters asserted that a lack of time limits for complainants would be burdensome for recipients, parties, and witnesses, result in complaints that are difficult to investigate, and likely lead to a waste of resources, abusive practices, and unfair or unsatisfactory outcomes that do not further Title IX's goal of addressing sexual harassment in education programs and activities, due in part to limitations on remedies a university can impose after a student is no longer enrolled. Some commenters questioned whether volunteers who experience sex discrimination would be able to bring a complaint subject to the grievance procedures and suggested that may inhibit the ability to recruit volunteers.

Some commenters anticipated that the volume of Title IX complaints would increase because of the proposed definition of "complainant" together with other proposed changes, such as the inclusion of discrimination based on gender identity as a form of sex discrimination, the allowance of allegations that involve off-campus conduct, the removal of the actual knowledge standard, and the

requirement that a recipient's employees report allegations to the Title IX Coordinator even when there is no complainant or the individual who experiences sex discrimination does not wish to report it. One commenter suggested that if the Department is no longer going to require a complainant to be engaged in the education program or activity at the time the complaint is filed, it should make that requirement apply only prospectively.

*Discussion:* As the Supreme Court has recognized, the Department has regulatory authority under Title IX to issue regulations that the Department determines will best effectuate the purpose of Title IX, and to require recipients to take administrative action to effectuate the nondiscrimination mandate of Title IX. *Gebser* v. *Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 292 (1998). The Department disagrees that the definition of "complainant" is too broad. As the Department explained in the July 2022 NPRM, it is appropriate to apply the same definition of "complainant" to all forms of sex discrimination, not just sex-based harassment. 87 FR 41407–08. These final regulations are intended to effectuate the purpose of Title IX, which is to eliminate any "discrimination on the basis of sex in any education program or activity receiving Federal financial assistance"—not just sex-based harassment. 34 CFR 106.1; 20 U.S.C. 1681(a); *see also* 87 FR 41393. Accordingly, consistent with the longstanding requirement that a recipient must have grievance procedures that provide for the "prompt and equitable resolution of student and employee complaints alleging any action that would be prohibited by" the Title IX regulations, 40 FR 24128, the final regulations also require a recipient to adopt grievance procedures that provide for the prompt and equitable resolution of all complaints of sex discrimination, not just sexual harassment, and to take other necessary steps to provide an educational environment free from sex discrimination, *see* 87 FR 41390. This requirement will help recipients fully and fairly implement Title IX's nondiscrimination mandate in their education programs or activities and is within the Department's authority to ensure compliance with the law.

The Department does not agree with commenters' contention that former students or employees fall outside the scope of Title IX because they no longer face barriers to participation in the recipient's education program or activity. Title IX protects all "person[s]" from sex discrimination, 20 U.S.C.

1681(a)(1), and the relief it affords is not limited to persons who are presently experiencing sex discrimination as long as the discrimination they allegedly experienced was within the scope of the statute's protections at the time it occurred. This means that former students and employees may seek relief under Title IX if they were previously "excluded from participation in," "denied the benefits of," or "subjected to discrimination under any education program or activity receiving Federal financial assistance."

Title IX also protects students, employees, and others who continue participating in the education program or activity from sex discrimination that may persist or may be remedied after the specific complainant no longer participates. Limiting a recipient's responsibility to address sex discrimination to those circumstances in which a complainant continues participating in the program or activity fails to ensure that others who continue to participate benefit from the nondiscrimination guarantee in Title IX. As other commenters noted, the revised definition of "complainant" could increase the reporting of sex discrimination because individuals struggle with the decision whether to report an incident at the time it happens or while they are still a student or employee, and the Department maintains that encouraging reporting is an important factor in ensuring that recipients can meet their Title IX nondiscrimination obligations. This definition of "complainant" is well within the scope of Title IX because it will help to ensure that a recipient operates its education program or activity free from sex discrimination.

The Department recognizes commenters' concerns that the definition of complainant together with other aspects of the final regulations, including new § 106.10 and changes to §§ 106.11 and 106.44, will likely result in an increase in Title IX complaints for some recipients and possible additional administrative costs for some recipients. However, it is the Department's position that ensuring a recipient fully addresses all sex discrimination occurring under its education program or activity, consistent with Title IX, is not optional, is of paramount importance, and properly accounts for financial costs to a recipient and for pecuniary and non-pecuniary costs to students who experience sex discrimination in a recipient's education program or activity. For more discussion of the Department's evaluation of the costs and burdens of the final regulations, see the *Regulatory Impact Analysis.*

The Department has carefully considered the commenters' concerns and disagrees that the change in the definition of "complainant" will invite new complaints decades after a student or employee has left a recipient institution alleging conduct that was not prohibited at the time it occurred. As stated in the July 2022 NPRM and in the discussion of Effective Date and Retroactivity (Section VII.F), the Department intends the final regulations to be enforced prospectively and not retroactively. 87 FR 41398. Therefore, if an individual who left a recipient institution makes a complaint requesting compliance solely with regulatory requirements that were not in effect at the time of the alleged conduct, the recipient would dismiss the complaint. Independently, a recipient may dismiss a complaint under § 106.45(d)(1)(ii) if the respondent is not participating in the education program or activity and is not employed by the recipient, or under § 106.45(d)(iv) if the allegations, even if proven, would not constitute sex discrimination under Title IX or this part.

For the reasons discussed here and above in the section on the Definition of Complainant: General Support, the Department also has determined that the benefits of allowing complaints by former students and employees who were subjected to sex discrimination while participating or attempting to participate in a recipient's education program or activity justifies the potential risk and investigative challenges of a complaint filed after someone leaves a recipient institution. As noted above, commenters reported that sex-based harassment can cause targeted students to drop out of school or transfer schools to get away from the discriminatory environment or remove themselves from a harmful or threatening situation; others may fear retaliation and thus not feel comfortable making a complaint until after they leave the institution. Commenters also noted that an employee who experiences harassment may leave their job or fear retaliation and refrain from reporting the harassment until they have taken a new job. Under such circumstances, it is important for the recipient to fulfill its Title IX obligations: to ensure that students and employees who want to return can do so free from sex discrimination; to prevent further harm and to ensure that a hostile environment does not persist for the remaining members of the school's community; and to investigate and properly address allegations of sex

discrimination in its education program or activity.

Finally, the Department disagrees with commenters who suggested that covering volunteers in the definition of "complainant" will make it more difficult for recipients to recruit and retain volunteers. Title IX protects all "person[s]" from sex discrimination under a recipient's education program or activity, 20 U.S.C. 1681(a), and ensuring that volunteers can participate free from sex discrimination should aid in recruitment and retention of such resources, not hinder it.

*Changes:* None.

Participating or Attempting To Participate

*Comments:* Some commenters expressed support for the proposed definition of "complainant," but asked the Department to define and provide examples of certain terms within the definition, including "attempting to participate" and "participating or attempting to participate in the recipient's education program or activity." One commenter suggested that "applying" would be a clearer term.

*Discussion:* Whether someone is participating or attempting to participate in a recipient's education program or activity requires a fact-specific analysis to be made on a case-by-case basis. The Department explained in the July 2022 NPRM that under the proposed definition of "complainant," someone who is not a student (or person authorized to act on behalf of a student) or an employee could still be a complainant if they were participating or attempting to participate in the recipient's education program or activity as, for example, a prospective student, or a guest speaker. 87 FR 41408. The participation requirement was added in the 2020 amendments. It is not meant to limit who can report sex discrimination or a recipient's obligation to respond promptly—such as by offering supportive measures and explaining the process for filing a complaint—but rather to prevent a recipient from being legally obligated to initiate its grievance procedures based on a complaint from a person having no relationship to the recipient. 87 FR 41409 (citing preamble to the 2020 amendments, 85 FR 30138, 30198). The definition of "complainant" in these final regulations shifts the focus of the analysis, however, from whether the participation or attempted participation occurred at the time the complaint was filed—as the 2020 amendments require—to the time of the alleged sex discrimination. *See* 87 FR 41410. The Department has concluded

that requiring participation or attempted participation at the time of the alleged discrimination is better aligned with Title IX's text and its goal of ensuring that a recipient operates its education program or activity free from sex discrimination because it addresses conduct that would have interfered with the complainant's ability to participate in the recipient's education program or activity. As the First Circuit explained in *Doe* v. *Brown University,* 896 F.3d 127, 132 & n.6, 133 (1st Cir. 2018), complainants are not limited to a university's enrolled students; they can include members of the public who "are either taking part or trying to take part of a funding recipient institution's educational program or activity" when they attend events such as campus tours, sporting events, and lectures, as long as the alleged discrimination relates to the individual's participation or attempted participation in such program or activity. The participation requirement is thus consistent with Federal appellate decisions, including one handed down since the issuance of the July 2022 NPRM, holding that the scope of Title IX's "no person" and "subject to discrimination under" language extends to persons who are not students or employees but who experience discriminatory treatment while participating, or at least attempting to participate, in a recipient's education program or activity. *See Snyder-Hill* v. *Ohio State Univ.,* 48 F.4th 686, 707–09 (6th Cir. 2022) (reversing district court's dismissal of Title IX claims by non-student plaintiffs who were allegedly subject to sexual abuse while attending or participating in sporting events, summer camp, or a tour of the school's athletics facilities), *reh'g denied,* 54 F.4th 963 (6th Cir. 2022), *cert. denied,* 143 S. Ct. 2659 (2023).

The Department does not agree that "applying" is a better way to describe "attempting to participate" because "applying" is too narrow in scope. Even someone who is not applying for admission to a recipient might be participating or attempting to participate in its education program or activity, such as a prospective student visiting a campus, a visiting student-athlete, or a guest speaker. *See* 87 FR 41408.

*Changes:* None.

Requests To Broaden Definition

*Comments:* Several commenters suggested broadening the definition of "complainant," including by removing the distinction between students, employees, and other persons and by including all campus visitors whether or

not they are participating or attempting to participate in a recipient's education program or activity at the time of the alleged sex discrimination. With respect to removing the participation requirement for visitors, commenters said that if the goal is to prevent recurrence of discrimination, a recipient still has the responsibility to address misconduct when a visitor to a recipient's campus is sexually assaulted by a student, even if the visitor may not be participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination. Commenters also proposed eliminating the participation or attempted participation requirement altogether. One commenter suggested simply covering "a student, employee, or other person alleged to have been subjected to unlawful sex discrimination under Title IX," and noted that "conduct" may not be the correct term to use because Title IX can be violated by commission of an act but also by omission, or a failure to act.

*Discussion:* The Department declines to further broaden the definition of "complainant" beyond changing the frame of reference from participation at the time of the complaint to the time of the alleged discrimination. Consistent with case law on this issue, it is appropriate to distinguish between individuals who have a clear connection to the recipient (students and employees), and other individuals. The Department purposefully limited the individuals who can be complainants to those who are participating or attempting to participate in the recipient's education program or activity at the time of the alleged discrimination because the Department does not understand Title IX as imposing a duty on a recipient to address conduct that could constitute sex discrimination when that conduct could not have "excluded" the individual from "participating in" or denied them the benefits of a recipient's education program or activity. 20 U.S.C. 1681(a). As the First Circuit has explained, this language means that a "person must suffer unjust or prejudicial treatment on the basis of sex while participating, or at least attempting to participate, in the funding recipient's education program or activity." *Brown Univ.,* 896 F.3d at 131. As discussed above, a visitor could be a complainant, but that will be a fact-based determination that will depend, for example, on the reason for the visit and what the individual was doing at the time of the alleged discrimination.

Finally, the Department agrees that Title IX can be violated not only by

commission of an act but also by a failure to act. No change is needed, though, because the phrase "conduct that could constitute sex discrimination" includes both a recipient's actions and its inaction in derogation of its Title IX obligations. *See, e.g.,* 87 FR 41423 (stating that "[t]he proposed regulations also recognize that remedies may be appropriate when the recipient's own action or inaction in response to an allegation of sex discrimination resulted in a distinct Title IX violation").

*Changes:* None.

3. Section 106.2 Definition of "Complaint"

General Support

*Comments:* Some commenters supported the proposed expansion of "complaint" to include complaints made orally or in writing and with or without a signature, and further supported removing the requirement from the 2020 amendments that a formal complaint be submitted before a recipient can investigate or offer informal resolution options. In support of removing the formal complaint requirement, some commenters pointed out the challenges it posed for certain students and their families because of age, disability, or ability to write or communicate. Some commenters asserted that the formal complaint requirement is arbitrary and overly prescriptive and allows a recipient to disregard valid complaints that do not conform exactly to the specific complaint requirements. Other commenters shared that even postsecondary students are hesitant to submit formal complaints, in part out of fear of retaliation due to the level of detail required, and stated that deterring complaints of sex-based harassment contravenes the purpose of Title IX.

Some commenters appreciated that the proposed definition of "complaint" would offer more flexibility that will streamline the complaint process, empower students, and better serve the purpose and intent of Title IX. Some commenters pointed out that the proposed definition of "complaint" will provide more opportunities for students with disabilities or who need alternative forms of communication to make complaints.

Some commenters asked for clarification on what constitutes a "request to the recipient" to initiate grievance procedures, citing the risk of confusion and liability to recipients without further clarification, and a need for more information in order to train staff and ensure that employees

understand their responsibilities. Some commenters expressed concern that a complainant may not realize they have to ask the recipient to initiate the grievance procedures, and requested clarification on whether a complainant must specifically use the phrase "initiate the recipient's grievance procedures" or whether a complainant can use alternative language to prompt the recipient to initiate the grievance procedures, such as "start an investigation" or "look into this matter of sex discrimination." One commenter asked whether only asking questions about the grievance procedures would trigger an investigation.

One commenter who commended the proposed removal of the formal complaint requirement suggested that the Department require some form of written documentation of the complaint, short of the formal complaint requirement, to commence an investigation and provide clarity for both recipients and complainants.

One commenter who supported the proposed definition of "complaint" requested that the regulations explicitly state that oral or written complaints from students with disabilities may be made through adaptive communication formats such as sign language, physical gestures, drawings, or communicating through an aide or caregiver, citing these formats as critical for non-verbal students or students with other communication challenges.

One commenter suggested that the proposed definition of complaint use the term "verbal" instead of "oral," noting that "verbal" is more precise.

*Discussion:* The Department acknowledges commenters' support for the proposed revision of the definition of "complaint." The Department shares commenters' concerns that the proposed definition might be confusing to recipients or complainants because a recipient might interpret the proposed definition to mean that, to make a complaint, the complainant must specifically ask the recipient to "initiate" its "grievance procedures" and might think the complainant needs to reference § 106.45. The Department recognizes that a complainant may not be familiar with those terms or know what they mean, even though the complainant may want the recipient to investigate and determine whether sex discrimination occurred. The Department therefore has modified the proposed definition of a Title IX "complaint" to be an oral or written communication to the recipient that objectively can be understood as a request for the recipient to investigate and make a determination about alleged

sex discrimination under Title IX and the relevant implementing regulations. Accordingly, a complainant need not use any particular "magic words"—such as the phrase "initiate the recipient's grievance procedures"—in order to trigger a recipient's obligation to investigate the matter. To be clear, by saying that a communication constitutes a complaint when it "objectively" can be understood as a request to investigate and make a determination, the Department means it can be understood as such by a reasonable person. This is a fact-specific determination, but in general amounts to more than a student's general questions about grievance procedures.

The Department also declines to require some form of written documentation of the complaint, short of the formal complaint requirement, to commence an investigation. The Department notes that § 106.8(f) of these final regulations includes recordkeeping obligations such that the recipient will have to maintain (1) for each complaint of sex discrimination, records documenting the informal resolution process or the grievance procedures and the resulting outcome, and (2) for each notification that the Title IX Coordinator receives of information about conduct that reasonably may constitute sex discrimination under Title IX or the implementing regulations, records documenting the actions the recipient took to meet its obligations under § 106.44. Exactly how to document the information the recipient receives and the steps the recipient takes in response is appropriately left up to each recipient.

The Department appreciates the suggestion to specify in the regulatory text that a recipient is required to facilitate communication with a complainant using adaptive formats as required to accommodate their needs, but the Department does not think that such a change is necessary. The phrase "oral or written" is broad enough to include complaints made using most adaptive communication formats, and it would be unreasonable for a recipient to refuse to consider a complaint made, for example, using sign language. Further, if a complainant has a disability, that individual retains full rights under Section 504 and the ADA, as applicable.

In addition, the Department declines to change the word "oral" to "verbal." The primary definition of "verbal" is relating to or consisting of words, which sometimes is understood as spoken and other times as written. In contrast, the primary definition of "oral" is uttered by the mouth or in words and is understood to be spoken. *See Verbal,*

Merriam-Webster Dictionary, *https:// www.merriam-webster.com/dictionary/ verbal* (last visited Mar. 12, 2024); *Oral,* Merriam-Webster Dictionary, *https:// www.merriam-webster.com/dictionary/ oral* (last visited Mar. 12, 2024). Therefore, the Department believes the term "oral" is more consistent with the intended meaning.

*Changes:* The Department has revised the definition of "complaint" in § 106.2 to be an oral or written request to the recipient that objectively can be understood as a request for the recipient to investigate and make a determination about alleged discrimination under Title IX and this part.

General Opposition

*Comments:* Some commenters opposed allowing oral complaints, asserting that the proposed definition of "complaint" exceeds the Department's statutory authority and is inconsistent with Title IX and case law.

Some commenters questioned the integrity of oral complaints, equated them with hearsay, and asserted that they could lead to incomplete or incorrect complaints and mishandled investigations. Some commenters argued that a written accounting of allegations requires a level of certainty regarding the nature and scope of the allegations, allows a recipient to make informed preliminary assessments on whether and how to proceed, and enables a recipient to assess the complainant's credibility and consistency over time. Some commenters asserted that the writing and signature requirements under the 2020 amendments should be retained because they require deliberation and informed action, including considering the consequences of filing a complaint.

Some commenters asserted that the proposed definition of "complaint" would contradict the definition that OCR uses for enforcement purposes, noting that OCR requires individuals submitting complaints to OCR to submit a written statement and does not consider oral allegations that are not reduced to writing to be a complaint.

*Discussion:* Contrary to commenters' assertions, the definition of "complaint" in § 106.2 does not exceed the scope of the Department's congressionally delegated authority under Title IX. Title IX states that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 28 U.S.C. 1681(a). The Supreme Court has recognized that the Department has authority under

Title IX to issue regulations that the Department determines will best effectuate the purpose of Title IX, and to require a recipient to take administrative action to effectuate the nondiscrimination mandate of Title IX. *See, e.g., Gebser,* 524 U.S. at 292. The final regulations, including the definition of "complaint" in § 106.2, govern how a recipient responds to allegations of sex discrimination in its education program or activity and were promulgated to effectuate the purposes of Title IX. They will help recipients fully and fairly implement Title IX's nondiscrimination mandate in their education programs or activities.

The Department disagrees with the assertion that the integrity of a Title IX investigation or complaint depends on whether a recipient requires the complaint to be in writing. There are a number of procedural protections built into the grievance procedure requirements in § 106.45, and if applicable § 106.46, which are designed to protect the integrity of a recipient's investigation and determination and to ensure a fair process for all parties, such as the requirements that a recipient provide the parties with an equal opportunity to access the evidence or an accurate description of the evidence (and if the recipient provides a description, the parties may request and then must receive access to the underlying evidence) and have an impartial decisionmaker resolve complaints. *See* 87 FR 41485; § 106.45(f)(4)(i), (b)(2). While a written complaint may help establish the boundaries of an investigation, it is neither necessary nor sufficient for doing so, and each recipient is responsible for following its grievance procedures and taking any additional steps it deems necessary to ensure its investigation and determination are sound. In addition, allowing complaints to be made orally is necessary for a recipient to ensure it is learning of and addressing all sex discrimination in its education program or activity, so any potentially increased burden on recipients is justified by the benefits of fulfilling Title IX's nondiscrimination mandate.

The Department also disagrees with the suggestion that a complainant will only carefully consider the consequences of making a complaint if the complaint is written. Some commenters appeared to assume that if complaints are easier to make, some would be made hastily, allegedly increasing the risk they are without merit and therefore unreasonably burdening respondents even if ultimately they are found to be baseless.

But the effectiveness of Title IX is better advanced if the requirements for making a complaint are not overly technical or difficult, and if before any disciplinary action is taken, a recipient has the obligation to investigate the conduct alleged. The Department has learned from decades of enforcing Title IX that persons who experience sex discrimination often do not bring complaints for many reasons, including the difficulty of making a complaint. These final regulations help reduce this barrier for complainants, and the Department has no reason to believe that people who make complaints—orally or in writing—will do so hastily. Therefore, the Department declines to require that all complaints of sex discrimination be made in writing.

In addition, the Department acknowledges that Section 101 of OCR's Case Processing Manual (July 18, 2022) (Case Processing Manual), *https:// www2.ed.gov/about/offices/list/ocr/ docs/ocrcpm.pdf,* specifies that complaints filed with OCR must be in writing. However, there is a distinction between an administrative complaint asking a Federal regulatory agency to investigate allegations that a recipient failed to comply with its obligations and a complaint made to a recipient to fulfill its obligation in the first instance. A complaint to OCR starts the administrative process of a Federal agency, with potentially recipient-wide financial and operational consequences, as compared to the process of addressing complaints involving individual students or employees, which may require time-sensitive responses and which recipients handle every day in a broad range of contexts, including but not limited to Title IX. In addition, students and employees have an ongoing institutional relationship with the recipient that they do not have with OCR.

*Changes:* None.

Rights of Respondents

*Comments:* Some commenters opposed allowing oral complaints, asserting that a written complaint is vital to ensuring a respondent's rights and should be required to initiate the recipient's grievance procedures and impose discipline that could take away a respondent's right to pursue their education.

Other commenters similarly argued that a formal complaint is essential to upholding respondents' due process rights. They asserted that only written complaints provide the respondent with notice of the particulars of the allegations against them as required under proposed § 106.45(c)(1), and they

asserted that oral complaints are often hard to decipher and leave a recipient unable to provide the respondent with notice sufficient to respond to the allegations against them.

*Discussion:* The Department agrees that to ensure a fair resolution of complaints, a recipient must provide a respondent with notice of the allegations against them sufficient for them to respond, which is required under these final regulations. However, the Department maintains that requiring a formal, written complaint is not essential to ensuring a respondent receives sufficient notice of the allegations. Under final § 106.45(c), whether a complaint is made orally or in writing, the recipient is responsible upon initiation of its grievance procedures for providing sufficient notice of the allegations to the parties to allow them to respond to the allegations. And for complaints of sex-based harassment involving student complainants or student respondents at postsecondary institutions, written notice is required by § 106.46(c). As discussed throughout this preamble and in the July 2022 NPRM, the requirements for grievance procedures under § 106.45 establish the basic elements of a fair process. *See, e.g.,* 87 FR 41461. They also comport with the requirements set out in *Goss* v. *Lopez,* 419 U.S. 565, 579, 581 (1975). *See* 87 FR 41473 (explaining that at a minimum, *Goss* requires a recipient to provide a student facing up to a 10-day suspension with notice of the allegations against them and an opportunity to present their account of what happened). For further explanation of how the final regulations comply with due process and fundamental fairness requirements, see the discussion of Due Process Generally (Section II.C).

*Changes:* None.

Rights of Complainants

*Comments:* Some commenters opposed removal of a written complaint requirement because they felt it could create confusion and ambiguity about when to initiate grievance procedures, leading recipients to act either prematurely or not promptly enough. Those concerned about premature action asserted that requiring written complaints supports complainant autonomy because it gives the complainant the power to decide whether to proceed, and asserted that by contrast, under the 2020 amendments, there was little chance that an overzealous Title IX Coordinator would mischaracterize a complainant's intent and respond prematurely.

Commenters concerned about a recipient's delayed response said that the proposed definition of complaint was overbroad and vague, and that allowing oral complaints might create confusion for students, families, Title IX Coordinators, and other staff about when to initiate the grievance procedures. These commenters said that a written complaint eliminates this confusion by creating a bright-line rule for initiating an investigation.

Other commenters stated that a written complaint benefits the complainant because it serves as direct evidence that a complaint was made and helps the complainant hold a recipient accountable for properly investigating and resolving allegations of sex discrimination. Some commenters similarly pointed out that a recipient could choose not to investigate an oral complaint or could deny that an oral complaint was ever made, and the complainant would be unable to prove that a complaint was made due to the lack of a written record. Some commenters requested that the Department require all recipient employees to be trained on how to document an oral report, to avoid disputes that may arise as to whether the complainant really intended to initiate the grievance procedures. Commenters indicated that a misunderstanding might harm a complainant when a recipient notifies a respondent of a complaint that the complainant never intended.

One commenter predicted that the proposed definition of "complaint" would require a complainant to watch what they say to the Title IX Coordinator or any other recipient employee to ensure that their request for advice or information is not perceived as a complaint, which would compromise the Title IX Coordinator's intended role as a trusted source to discuss allegations and supportive measures before deciding to proceed under the grievance procedures.

*Discussion:* With respect to complainant autonomy, the Department agrees with commenters that it is important for a recipient to initiate the grievance procedures when requested by a complainant, and for a recipient not to initiate the grievance procedures if a complainant is not ready or does not want to initiate them, except in the limited circumstances in which the Title IX Coordinator determines that the conduct as alleged presents an imminent and serious threat to the health or safety of a complainant or other person or prevents the recipient from ensuring equal access based on sex to its education program or activity

under § 106.44(f)(1)(v). However, the Department does not think that the answer is to require complaints to be made in writing, particularly given the benefits of the added flexibility, which many commenters acknowledged will help streamline the complaint process and better effectuate Title IX by facilitating a recipient's awareness of, and appropriate response to, sex discrimination in its education program or activity. In addition, as the Department noted in the July 2022 NPRM, during the June 2021 Title IX Public Hearing, as well as in meetings and listening sessions, several stakeholders stated that the onerous signature and writing requirements of the 2020 amendments discouraged individuals from making complaints. 87 FR 41409. Even if the writing and signature requirements of the 2020 amendments may have reduced the risk of premature or delayed action on the part of a recipient, the cost was a cumbersome process that created a barrier for potential complainants to effectively assert their rights under Title IX. The Department's view, informed by stakeholder input before the July 2022 NPRM and feedback from commenters in response, is that additional flexibility is needed for all complaints of sex discrimination to ensure that a recipient is aware of, and can respond appropriately to, sex discrimination in its education program or activity. The Department has carefully weighed the costs and benefits of including both oral and written requests in the definition of "complaint," and has determined that the benefits of including both options justify the costs.

The Department also maintains that the revised definition of "complaint," which incorporates a "reasonable person" standard, will help to mitigate commenters' concerns about the risk of misunderstanding. As explained earlier, the Department has revised the definition in the final regulations in response to commenter input and to ensure clarity. Under the revised definition of "complaint," whether oral or written, if the request can be objectively understood as a request for the recipient to investigate and make a determination about alleged sex discrimination under Title IX, then the recipient must interpret it as a request to initiate the grievance procedures. In addition, the Department notes that under § 106.44(f)(1)(iii), upon being notified of conduct that reasonably may constitute sex discrimination under Title IX, the Title IX Coordinator must notify a complainant, or the individual who reported the conduct if the

complainant is unknown, of the grievance procedures under § 106.45, and if applicable § 106.46, and the informal resolution process under § 106.44(k) if available and appropriate. The Department anticipates that during such conversations, once the Title IX Coordinator has explained the grievance procedures, they will confirm whether the individual reporting the alleged discrimination does in fact want the recipient to conduct an investigation to make a determination regarding their allegations. Whether the answer is in the affirmative or the negative, nothing in the final regulations would preclude the Title IX Coordinator from memorializing in writing the outcome of that conversation to help avoid any possible confusion about agreed upon next steps. And although these regulations do not require a complaint to be in writing, nothing in these regulations prevents a complainant from memorializing their oral complaint in writing or confirming in writing that the recipient received their complaint. Moreover, as described above, these final regulations at § 106.8(f) contain specific recordkeeping requirements for each complaint of sex discrimination and each notification the Title IX Coordinator receives regarding conduct that reasonably may constitute sex discrimination. In addition, the required procedural protections of the grievance procedures and the recordkeeping obligations in § 106.8(f) will help to ensure that a recipient has sufficient information to initiate the grievance procedures.

Regarding training for recipient employees on keeping track of oral allegations, the Department declines to specify any more than what is required by the final regulations at § 106.8(d). Section 106.8(d)(4) requires that the Title IX Coordinator and any designees be trained on a number of specific topics and receive any other training necessary to coordinate the recipient's compliance with Title IX. The latter is a matter for each recipient's discretion. Section 106.8(d) strikes the appropriate balance between requiring training on topics the Department considers necessary to promote a recipient's compliance with these final regulations, while leaving flexibility for a recipient to choose the content and substance of any additional training its employees may need.

The Department does not share the commenter's concern that allowing oral complaints will compromise a Title IX Coordinator's ability to discuss allegations and supportive measures. The Title IX Coordinator is responsible for coordinating the recipient's

compliance with its Title IX obligations, including by providing information to a complainant about the grievance procedures, and offering and coordinating supportive measures. The Title IX Coordinator's role is not to serve as a confidential advisor to the complainant or any other party. It is appropriate for a potential complainant to carefully explain to a Title IX Coordinator what they are alleging, and for the Title IX Coordinator to carefully confirm both what is being alleged and whether the complainant intends to initiate the grievance procedures.

With respect to other recipient employees, the Department notes that the final regulations require employees who are not confidential employees to notify the Title IX Coordinator of any information they have about conduct that reasonably may constitute sex discrimination under Title IX, or, as applicable, to provide a potential complainant with contact information for the Title IX Coordinator and information about how to report sex discrimination under Title IX. *See* § 106.44(c). Therefore, a potential complainant who wants confidential support has the discretion to seek out a confidential employee, if provided by the recipient. Even if the information a potential complainant provides to a non-confidential employee is reported to the Title IX Coordinator, it will only prompt a complaint without the complainant's permission if the Title IX Coordinator determines, after considering at a minimum the factors in § 106.44(f)(1)(v), that the conduct as alleged presents an imminent and serious threat to the health or safety of the potential complainant or other person or prevents the recipient from ensuring equal access based on sex to its education program or activity. The question of whether a conversation with a recipient employee who is not the Title IX Coordinator will constitute a "request to the recipient" is addressed in the discussions of § 106.44(a) and (c).

*Changes:* As noted earlier in this section, the final regulations at § 106.2 define "complaint" as an oral or written request to the recipient that objectively can be understood as a request to investigate and make a determination about alleged discrimination under Title IX and this part.

Effect on Recipients

*Comments:* Some commenters suggested that the proposed regulations should require neither "oral" nor "written" complaints and instead should give a recipient discretion as to the format of complaints it will accept under its own policies, which may

include written confirmation from the complainant that they intend to proceed with grievance procedures. One commenter said that it was unclear whether the proposed regulations would require a recipient to accept an oral complaint or whether a recipient can require a written complaint.

Some commenters asserted that the investigation of "informal" complaints is expensive and takes time away from classroom instruction, and that, for example, these costs outweigh the value of giving women equal education opportunity. One commenter asserted that the proposed definition would unreasonably increase the number of complaints and impede the ability of a recipient to address allegations expeditiously.

A group of commenters posited that the proposed definition of "complaint" could increase litigation risks for recipients. For example, they said if a complainant talks to a professor about misconduct they experienced and the professor fails to notify the Title IX Coordinator or document that the conversation occurred, and the complainant says they made a complaint but the respondent says there is no evidence of a complaint, the recipient could face legal challenges from both parties. Some commenters explained that complaints should have to be written and signed as protection for the recipient, saying, for example, that a formal signed complaint requirement can provide cover to a recipient when a complainant did not clearly request initiation of the grievance procedures and later alleged that their oral report should have been treated as a complaint.

One commenter asked the Department to confirm that under § 106.47, OCR will not deem a recipient to have violated Title IX solely because it would have reached a different determination under § 106.45, including the recipient's determination whether allegations constitute a "complaint" under § 106.2.

One commenter asserted that it is unclear what would trigger the initiation of the grievance procedures and that a recipient may have thousands of employees and a decentralized organizational structure, such that they encourage or authorize employees to respond partially or fully to perceived sex discrimination in the moment. The commenter recommended that the Department take a practical approach regarding what constitutes a complaint to preserve flexibility and allow significant discretion.

*Discussion:* The Department appreciates the variety of perspectives shared by commenters and has carefully

considered the possible effects on recipients of allowing complaints to be made orally or in writing. The Department does not think it is appropriate to grant recipients the discretion to deny a complaint because it was not submitted in writing. The goal of the revised definition of "complaint" is to provide added flexibility to the complaint process for complainants, a revision the Department adopted in response to concerns from stakeholders and commenters that the formal complaint requirements of the 2020 amendments were overly prescriptive, including the requirement that a complaint be in the form of a signed document, allowed recipients to disregard complaints based on technicalities, and discouraged complaints, contrary to the purpose and intent of Title IX.

In addition, the Department does not agree with the contention that the costs of investigating "informal" complaints outweigh the benefits of the final regulations, including the value of providing equal educational opportunities for all individuals based on sex, or with the assertion that removing the formal complaint requirement will lead to an unreasonable increase in the number of complaints and a delay in addressing the allegations expeditiously. Under Title IX, a recipient is obligated to evaluate conduct that reasonably may constitute discrimination on the basis of sex and ensure redress if it occurs because Congress required the provision of equal opportunity to anyone who wants to participate in a federally funded education program or activity. While it is likely that the overall number of sex discrimination complaints will increase somewhat once complaints no longer have to be in writing and signed, any increased burden will not be unreasonable for a number of reasons.

First, encouraging reporting and facilitating complaints of sex discrimination is a critical part of a recipient's duty to effectuate Title IX's nondiscrimination mandate. As a condition of receiving Federal funds, a recipient agrees to operate its education program or activity free from sex discrimination; doing so requires knowing about possible discrimination and investigating it to determine the need for remedy, if any. Second, a recipient already has an obligation to address sex discrimination in its education program or activity, even without a formal complaint, *see* § 106.31, and under the 2020 amendments a recipient with actual knowledge of possible sexual

harassment (which can come from oral reports) is required to offer supportive measures to a complainant, with or without a formal complaint, *see* 34 CFR 106.44(a). Third, even if there are more complaints overall, increased flexibility in the grievance procedures provided by § 106.45, and if applicable § 106.46, will help ensure that burdens on recipients are not unreasonable. For more information regarding the changes to the grievance procedures requirements, see the discussion of Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.C) and discussion of the Grievance Procedures for the Prompt and Equitable Resolution of Complaints of Sex Discrimination (Section II.D). Fourth, allowing some flexibility regarding how to make a complaint does not mean that people who have not experienced sex-based harassment or other sex discrimination will make complaints; rather, it means that those who believe they have experienced sex-based discrimination have an additional option to report it. The Department is not aware of evidence to suggest that oral complaints are more likely to be unmeritorious or even frivolous. If everyone who experienced sex discrimination did make a complaint, that would likely make it easier for recipients to redress that discrimination and prevent its recurrence. After careful consideration, the Department has decided that the benefit of improving flexibility regarding how individuals may make a complaint justifies the possibility that the number of complaints may increase. A more detailed discussion and analysis of the costs and benefits of these final regulations is included in the *Regulatory Impact Analysis.*

The Department acknowledges recipients' concerns that oral complaints will lead to increased litigation, but these concerns are speculative and the risk of increased litigation, if any, is justified because, as explained in greater detail above, mandating that complaints be made in writing discourages individuals from making complaints, in contravention of the purpose of Title IX to eliminate all discrimination on the basis of sex in any education program or activity receiving Federal financial assistance. 20 U.S.C. 1681(a); 34 CFR 106.1. While it might be helpful for employees other than the Title IX Coordinator, such as professors, to keep careful notes or commit oral allegations to writing, the Department declines to require that they do so or to mandate that all employees receive specific training on recordkeeping as explained more fully in the discussion

of § 106.8(d). These final regulations at § 106.8(f) already contain specific recordkeeping requirements for each complaint of sex discrimination and each notification the Title IX Coordinator receives of information about conduct that reasonably may constitute sex discrimination.

The Department wishes to clarify that § 106.47 applies only to determinations regarding whether sex-based harassment occurred under § 106.45, and if applicable § 106.46. It provides that the Assistant Secretary will not deem a recipient to have violated the regulations solely because the Assistant Secretary would have made a different determination than the recipient did under § 106.45, and if applicable § 106.46, based on an independent weighing of the evidence in a particular complaint alleging sex-based harassment. The Department maintains the position taken in the 2020 amendments that the intent of § 106.47 (then numbered § 106.44(b)(2)) is to convey that OCR will not substitute its judgment for the judgment of the recipient's decisionmaker regarding the weighing of relevant and not otherwise impermissible evidence in a particular case. *See* 85 FR 30221. However, nothing in § 106.47 prevents OCR from holding a recipient accountable for noncompliance with any provision of the final regulations, including its determination whether a complainant's communication with the recipient constitutes a complaint under the definition in § 106.2.

Finally, a recipient would only be required to initiate grievance procedures consistent with § 106.45 when a written or oral report meets the standards for a "complaint" in § 106.2. Thus, while the Department understands commenters' concern that § 106.45 might impede the ability of employees to address conduct in a timely manner or exercise judgment, the Department has determined that the structure of the grievance procedures under the final regulations provides a workable framework that addresses those concerns and allows a recipient to develop and implement a process for prompt and equitable response.

*Changes:* None.

4. Section 106.2   Definition of "Disciplinary Sanctions"

*Comments:* Several commenters suggested modifications to the definition of "disciplinary sanctions." One commenter asked the Department to modify the definition to clarify that it is not intended to prevent a recipient from considering a respondent's cumulative conduct history when

imposing sanctions. Another commenter requested that the Department remove the term "disciplinary" and use only "sanctions" because "disciplinary sanctions" suggests sanctions are limited to students and employees and may be misunderstood to exclude third parties. One commenter requested that the Department clarify whether there are specific requirements for disciplinary sanctions that apply to elementary schools and secondary schools.

*Discussion:* The Department appreciates commenters' suggestions regarding modifications to the definition of "disciplinary sanctions." The definition of "disciplinary sanctions" clarifies that a disciplinary sanction is a consequence imposed on a respondent only after a determination that the respondent has violated the recipient's prohibition on sex discrimination. It does not specify what consequences a recipient can or must impose on a respondent or what factors to consider when determining what disciplinary sanction to impose. As the Department explained in the 2020 amendments, the Department has determined that administrative enforcement of Title IX does not require overriding a recipient's discretion to make decisions regarding disciplinary sanctions or prescribing how a recipient should determine a disciplinary sanction. *See* 85 FR 30274. The definition of "disciplinary sanctions" focuses on ensuring that respondents are not disciplined for engaging in sex discrimination unless a fair process has determined responsibility, while respecting a recipient's discretion to make disciplinary decisions under their own policies and codes of conduct. For these reasons, the Department declines to modify the definition of "disciplinary sanctions" to state that it is not intended to prevent a recipient from considering a respondent's cumulative conduct history when imposing sanctions.

The Department also declines to remove the term "disciplinary" from "disciplinary sanctions." The regulations use "disciplinary sanctions" because of the disciplinary nature of the action taken by the recipient, and the Department has determined that this phrase is more specific and accurate than the word "sanctions." The definition of "respondent" in these final regulations, and the related discussion of the definition of "respondent" in the July 2022 NPRM, make clear that any person, including third parties, may be considered a respondent subject to disciplinary sanctions. 87 FR 41420. For more information, see the discussion in the preamble to the 2020 amendments, 85 FR 30488. A recent Federal appellate

decision in *Hall* v. *Millersville University* supports the Department's position that a ''respondent'' may include a third party. 22 F.4th 397, 405–06 (3d Cir. 2022) (finding that the university could be liable under Title IX for its deliberate indifference to a non-student's conduct).

Finally, the Department's definition of ''disciplinary sanctions'' applies to all recipients, including elementary schools and secondary schools, and does not set forth specific requirements for disciplinary sanctions at any level. The process for imposing disciplinary sanctions—for all recipients—is set forth in more detail in § 106.45(h). The Department appreciates the opportunity to clarify that ''disciplinary sanctions'' refers to consequences imposed on a respondent following a determination under Title IX that the respondent violated the recipient's prohibition on sex discrimination. Nothing in these regulations addresses conduct that does not reasonably constitute sex discrimination. For this reason, the Department has added ''under Title IX'' to the definition of ''disciplinary sanctions'' in the final regulations. These regulations also do not preclude routine classroom management or the application of separate codes of conduct, including to conduct that has been determined through grievance procedures not to be sex discrimination or to conduct that would be prohibited regardless of whether sex discrimination occurred. *See, e.g.,* 85 FR 30182.

*Changes:* The Department has added ''under Title IX'' to the definition of ''disciplinary sanctions.''

5. Section 106.2 Definitions of ''Elementary School'' and ''Secondary School''

*Comments:* Commenters generally supported the proposed definitions of ''elementary school'' and ''secondary school'' and said the definitions would clarify Title IX's coverage and aid in consistent and effective enforcement of Title IX.

*Discussion:* The Department acknowledges commenters' support for the proposed definitions of ''elementary school'' and ''secondary school.''

*Changes:* None.

6. Section 106.2 Definition of ''Postsecondary Institution''

*Comments:* Some commenters generally supported the proposed definition of ''postsecondary institution'' and said it would aid in consistent and effective enforcement of Title IX.

Other commenters, without specifying how or providing additional details,

stated that they believed the proposed definition contained unnecessary details and was an attempt to micromanage and create an extrajudicial system.

One commenter asked the Department to clarify whether the term ''postsecondary institution'' means that the proposed regulations do not apply to elementary schools and secondary schools.

*Discussion:* The Department acknowledges commenters' support for the definition of ''postsecondary institution.''

The Department disagrees with the commenters' view that the definition is too detailed. The Department's revisions help streamline and simplify the definition. As explained in the July 2022 NPRM, the Department proposed to remove the specific references to §§ 106.44 and 106.45 from the definition of ''postsecondary institution'' because the definition applies to all of part 106. *See* 87 FR 41400. As explained, the Department also made necessary revisions to clarify that the definition includes an institution of vocational education that serves postsecondary students because an institution of vocational education could serve either secondary school students or postsecondary students. *See id.*

The commenters did not specify how the definition of ''postsecondary institution'' would micromanage or create an extrajudicial system, but in any event, the definition is limited to explaining what constitutes a postsecondary institution and is intended to provide clarity for recipients. The Department also cannot conceive how these definitions would micromanage or create an extrajudicial system.

Finally, the Department clarifies that the final regulations apply to all recipients of Federal financial assistance, including elementary schools and secondary schools. Because there are certain provisions of the final regulations that explicitly only apply to postsecondary institutions (*e.g.,* § 106.46), however, the Department maintains the definition of ''postsecondary institution'' provides necessary clarification for recipients.

*Changes:* None.

7. Section 106.2 Definition of Prohibited ''Sex-Based Harassment''

General Support and Opposition

*Comments:* Commenters provided a variety of reasons for supporting the proposed definition of ''sex-based harassment,'' including that it aligns with congressional intent and ensures that Federal funds are not used to

support discrimination; it encourages students to report sex-based harassment; and it is consistent with the Department's longstanding enforcement practice. These commenters also stated that the 2020 amendments narrowed the definition of ''sexual harassment,'' making it more difficult for potential complainants to assert their rights.

One commenter asserted that the Department's rulemaking authority does not extend to the proposed definition of ''sex-based harassment,'' claiming that *Gebser* grants the Department the authority to issue only ''prophylactic rules,'' not to define discrimination.

Some commenters asserted the Department failed to justify the need to revise the definition, having previously stated that it wanted to provide recipients with consistency and simplicity in the definition of ''sexual harassment'' under Title IX.

Another commenter asked the Department to clarify that sex discrimination refers to any discrimination based on sex, whereas sex-based harassment is a subset of sex discrimination. Some commenters asked how the definition of ''sex-based harassment'' would apply in specific situations, such as to elementary school students, who often do not have the maturity or comprehension to understand what the term means, and to postsecondary institution employers in a State where there are specific requirements for workplace harassment.

*Discussion:* As explained further below, the Department is adopting a final definition that modifies the proposed definition in certain respects but retains the core elements of the proposed definition. The Department maintains that the final definition of ''sex-based harassment'' better fulfills Title IX's prohibition on sex discrimination in education programs or activities that receive Federal financial assistance, is consistent with relevant judicial precedent, accounts for the legitimate interests of recipients and parties, and aligns with congressional intent and the Department's longstanding interpretation of Title IX and resulting enforcement practice prior to the 2020 amendments.

The Department agrees with the commenter that *Gebser* is relevant for considering the distinctions between administrative enforcement and civil damages actions, but disagrees with the commenter's characterization of *Gebser* as precluding the Department from including a definition of ''sex-based harassment'' in regulations implementing Title IX. The definition of ''sex-based harassment'' establishes standards the Department and recipients

use to implement and enforce Title IX effectively, which, as explained in the discussions of §§ 106.44 and 106.45(a)(1), the Department is statutorily authorized and directed to accomplish.

Contrary to the commenter's characterization, the *Gebser* Court wrote: ''Agencies generally have authority to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate, 20 U.S.C. 1682, even if those requirements do not purport to represent a definition of discrimination under the statute.'' 524 U.S. at 292. Nothing in this statement precludes the Department from setting out a definition of ''sex-based harassment'' in the exercise of this statutory authority. We observe, moreover, that a definition of ''sexual harassment'' has been part of the Title IX regulations since 2020. The Department did not propose in the July 2022 NPRM, nor does the Department undertake now, to regulate conduct that does not constitute sex discrimination. The final regulations simply define ''sex-based harassment,'' which is a form of sex discrimination. The commenter's view would appear to disallow the definition of ''sex-based harassment'' in the final regulations or any other definition.

Consistent with Title IX's text and the Department's authority to implement the statute, as well as OCR's enforcement experience and case law interpreting the statute, the Department is providing greater clarity for recipients about steps they must take to ensure that no person is subjected to sex discrimination in their education programs and activities. Providing a clear definition of ''sex-based harassment'' in the final regulations will help recipients better identify discriminatory conduct when it occurs, and will help them better understand their obligations to address sex discrimination under the statute.

The Department has adequately justified the need for a revised definition. As explained in the July 2022 NPRM, the Department identified the need for a new definition of ''sex-based harassment'' based on an extensive review of the 2020 amendments, in addition to live and written comments received during the June 2021 Title IX Public Hearing, numerous listening sessions and meetings with stakeholders conducted by the Office for Civil Rights in 2021 and 2022, and the 2022 meetings held under Executive Order 12866. *See* 87 FR 41390, 41392. The Department heard significant feedback from students, parents, recipients, advocates, and other

concerned stakeholders that the 2020 amendments do not adequately clarify or specify the scope of sex discrimination prohibited by Title IX, and that the current definition of ''sexual harassment'' does not fully implement Title IX's mandate. *See* 87 FR 41392, 41396. The updated definition in the final regulations is intended to address those identified and well-documented gaps.

The Department clarifies that sex discrimination refers to any discrimination based on sex, including, but not limited to, sex-based harassment, and has modified the proposed definition of ''sex-based harassment'' to clearly state that sex-based harassment is a form of sex discrimination.

With respect to the comments regarding specific applications of the definition of ''sex-based harassment'' in elementary school settings or in specific States, the Department notes that the definition of ''sex-based harassment'' in the final regulations applies to all recipients and that, as stated in § 106.6(b), the obligation to comply with Title IX is not obviated or alleviated by any State or local law or other requirement that conflicts with Title IX or this part. That said, the Department maintains that State workplace harassment laws can generally be applied in ways that do not create conflicts. The Department also notes that Title IX's prohibition on sex discrimination applies to all recipients and in all States. The final regulations take into account differences in the age and maturity of students in various educational settings, allowing recipients to adapt the regulations as appropriate to fulfill their Title IX obligations. The Department will take into account these types of differences and recipient flexibility on a case-by-case basis when addressing any complaints and applying the definition of ''sex-based harassment.''

*Changes:* The Department has revised the definition of ''sex-based harassment'' to state explicitly that sex-based harassment is a form of sex discrimination.

Data Related to Sex-Based Harassment

*Comments:* Some commenters referred the Department to data and other information showing the prevalence of sex-based harassment in postsecondary institutions and elementary schools and secondary schools. For example, some commenters referenced data that they said showed the prevalence of sex-based harassment among specific populations, including Asian American and Native Hawaiian/

Pacific Islander women; LGBTQI+ students; Black women and girls; and students with disabilities. One commenter noted that individuals may experience multiple overlapping forms of discrimination, including sex-based harassment. Some commenters referred the Department to data and other information that they said showed sex-based harassment is underreported and why. Some commenters referred the Department to data and other information that they said showed the negative impact that sex-based harassment has on education, including causing survivors to drop out of school, miss class and extracurricular activities, suffer increased absences, experience decreases in GPA, lose scholarships or financial aid, have lower self-esteem, and suffer higher levels of depression and suicidality.

*Discussion:* The Department acknowledges the data and information referred to by commenters with regard to the prevalence of sex-based harassment of students and employees in postsecondary institutions and in elementary schools and secondary schools. The final regulations hold a recipient accountable for responding to sex-based harassment, including quid pro quo harassment, hostile environment harassment, sexual assault, dating violence, domestic violence, and stalking, consistent with Title IX's broad prohibition on sex discrimination.

Further, the Department acknowledges the data and information referred to by commenters regarding the impact of sex-based harassment on specific populations in significant numbers. The final regulations hold recipients accountable for responding to sex-based harassment for all populations consistent with Title IX's broad prohibition on sex discrimination. The Department agrees with commenters' observation that individuals may experience multiple and overlapping forms of discrimination. Congress has chosen to address different forms of discrimination through different statutes, and these final regulations implement only Title IX's prohibition on discrimination on the basis of sex. In addition to their obligations under Title IX, recipients have an obligation not to discriminate on numerous other grounds under the civil rights laws enforced by OCR,[4] as well as under Federal civil rights laws enforced by the U.S. Department of Justice and other

---

[4] For example, in addition to Title IX, OCR also enforces Title VI, Section 504, Title II of the ADA, the Age Discrimination Act of 1975, and the Boy Scouts of America Equal Access Act.

Federal agencies. The Department believes that an improved response to incidents of sex-based harassment benefits individuals whose experience of sex-based harassment overlaps with other forms of discrimination.

The Department shares the commenters' concerns that sex-based harassment is underreported. Title IX requires a recipient to operate its education program or activity in a manner that is free from sex discrimination, and, for the reasons described elsewhere in this preamble, the definition of "sex-based harassment" in the final regulations, among other changes, will remove certain barriers to reporting. Because sex-based harassment causes serious harm to those impacted, as several commenters discussed, the final regulations clarify that a recipient must respond to all forms of harassment on the basis of sex in a manner consistent with Title IX's broad prohibition on sex discrimination in education programs or activities that receive Federal financial assistance. *See, e.g.,* §§ 106.2 (definition of "sex-based harassment"), 106.44 (required response to sex discrimination), 106.45 (grievance procedures for the prompt and equitable resolution of sex discrimination).

*Changes:* None.

Sex-Based Harassment—Burden and Cost (§ 106.2)

*Comments:* Some commenters were concerned that the proposed definition of hostile environment sex-based harassment, as compared to the 2020 amendments, would require a recipient to address more complaints through its Title IX grievance procedures and lead to more lawsuits, which would impose a greater burden and more expenses on a recipient and take time and resources away from more serious claims. One of these commenters also noted that, especially at smaller postsecondary institutions, this would detract from efforts to address sexual assault and quid pro quo harassment, which the commenter felt should be the priority under Title IX. One commenter expressed concern about the impact the definition of "sex-based harassment" would have on Title IX Coordinators, which together with other provisions in the proposed regulations, the commenter asserted, would require Title IX Coordinators to monitor and police potentially offensive conduct, including speech.

*Discussion:* In the July 2022 NPRM, the Department acknowledged that recipients would be required to address more complaints under these final regulations and projected a 10 percent

increase in complaint investigations compared to the number conducted under the 2020 amendments. 87 FR 41550. As explained in the *Regulatory Impact Analysis,* commenters did not provide data necessitating a change to the Department's 10 percent estimate. The Department maintains that the definition of "sex-based harassment" will more fully implement Congress's nondiscrimination requirement in Title IX. The Department considered several alternatives to the final definition of "sex-based harassment," including maintaining the definition of "sexual harassment" from the 2020 amendments and different wording options for the definition of hostile environment sex-based harassment, but concluded that none captured the benefits of this final definition and state of the law. The Department also considers and explains the impact of the final regulations on small recipients, in the discussion of the *Regulatory Flexibility Act.* There the Department acknowledges commenters' concerns that the final regulations, including the definition of "sex-based harassment," likely will increase the number of Title IX cases and investigations that small entities will be required to address. Similar to the projection in the *Regulatory Impact Analysis,* the Department projects a 10 percent increase in complaints for small entities. The Department disagrees with commenters who forecast a significantly greater increase and the commenters provided no data in support of their assertion.

The Department also disagrees with the commenters' assertion that several provisions in the final regulations, including the definition of "sex-based harassment," would mean that Title IX Coordinators must monitor and limit any conduct in the form of speech that could be considered potentially offensive—even if that speech is constitutionally protected. The Title IX Coordinator requirements in § 106.44(f) do not impose an obligation on a recipient's Title IX Coordinator to respond to any conduct or speech other than that which reasonably may constitute sex discrimination. Further, as discussed elsewhere in this preamble, the final regulations do not alter § 106.6(d), which states that nothing in the Title IX regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the U.S. Constitution, including the First Amendment. We also underscore that none of the amendments to the regulations changes or is intended to

change the commitment of the Department, through these regulations and OCR's administrative enforcement, to fulfill the Department's obligations in a manner that is fully consistent with the First Amendment and other guarantees of the U.S. Constitution. For additional discussion of the First Amendment, see the Hostile Environment Sex-Based Harassment—First Amendment Considerations section below.

For all recipients, to the extent the Department's projected 10 percent increase in complaints and related increase in use of a recipient's grievance procedures results from the change in the definition of "sex-based harassment," the Department determined that the related costs from such an increase are justified by the benefits of ensuring effective implementation of a recipient's statutory obligation that its education program or activity be free from sex discrimination. The Department also notes that other changes in the regulations, such as affording recipients the discretion to use a single-investigator model and removing the requirement to hold a live hearing in all cases, *see, e.g.,* §§ 106.45(b)(2) and 106.46(f)(1), provide recipients, including small entities, with greater flexibility in conducting their grievance procedures, as some commenters have also recognized. The Department's view, therefore, is that evaluating the final regulations' changes as a whole is important for accurately assessing the extent to which, if at all, the final regulations will increase costs or burdens for recipients.

Finally, the Department disagrees with commenters' assertions that the increase in complaints of sex-based harassment will detract from recipients' efforts to address sexual assault and quid pro quo harassment, which some commenters stated should be prioritized under Title IX. The Department believes that the additional flexibility for recipients provided in the final regulations, including with respect to the grievance procedure requirements, will allow recipients to address all types of conduct covered under the definition of "sex-based harassment."

*Changes:* None.

Sex-Based Harassment—Introductory Text and Scope (§ 106.2)

*Comments:* Some commenters supported the proposed definition of "sex-based harassment" because its coverage of harassment based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity would

better align with State laws and recipient codes of conduct and eliminate confusion. Commenters stated that such harassment is no less harmful than other forms of sex-based harassment.

Some commenters suggested the Department remove the reference to § 106.10 in the introductory text to the definition of "sex-based harassment" and instead specify all of the bases identified in § 106.10 to avoid confusion. One commenter asked the Department to clarify whether the three categories of harassment (*i.e.,* quid pro quo, hostile environment, and specific offenses) were intended to modify only "other conduct on the basis of sex" or instead to modify "sexual harassment, harassment on the bases described in § 106.10, and other conduct on the basis of sex." One commenter suggested that the Department remove the reference to "sexual harassment" in the introductory sentence of the proposed definition of "sex-based harassment" or clarify what additional forms of sexual harassment would not be covered by the three categories in the proposed definition. Another commenter asked what the term "harassment" means and whether it includes nonverbal, verbal, or written actions.

One commenter expressed concern that the proposed definition of "sex-based harassment" would cover speech or conduct that was not based on sex and asserted that if harassment does not occur because of a person's sex, it is not sex-based harassment under Title IX, regardless of how offensive it is.

Several commenters posed specific examples of conduct and asked whether they would constitute sex-based harassment under the proposed definition.

*Discussion:* The Department appreciates the range of opinions expressed regarding the introductory text and scope of sex-based harassment. The Department believes that these final regulations best comport with the text of Title IX, the case law interpreting Title IX, and Title IX's nondiscrimination mandate.

The Department agrees with the commenter who asserted that conduct that falls within the definition of "sex-based harassment" must be based on sex. Adhering to the statutory language, the definition clearly states that the conduct prohibited must be "on the basis of sex," and includes sexual harassment and harassment on the bases described in § 106.10. As recognized in the preamble to the 2020 amendments, "on the basis of sex" does not require that the conduct be sexual in nature. *See* 85 FR 30146. The Department

appreciates commenters' suggestions but declines to remove the reference to § 106.10 in the definition of "sex-based harassment," as the reference refers clearly to the scope of discrimination on the basis of sex and thus is not likely to cause confusion.

As discussed in the July 2022 NPRM, Title IX's broad prohibition on sex discrimination encompasses, at a minimum, discrimination against an individual based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. *See* 87 FR 41531–32. All of these classifications depend, at least in part, on consideration of a person's sex. *See id.* The final regulations clarify the scope of harassment covered and add language to the regulatory text that was in the preamble to the 2020 amendments.

In response to comments about "other conduct on the basis of sex," some language regarding other harassment is necessary to maintain consistency with § 106.10, which—by using the word "includes"—indicates that there could be other kinds of sex discrimination besides the specific bases listed. To alleviate confusion, the Department has changed "other conduct on the basis of sex" to "other harassment on the basis of sex" and moved the language earlier in the introductory sentence to tie it more directly to § 106.10. The Department clarifies that the three categories of harassment in § 106.2 of the final regulations modify "sexual harassment and other harassment on the basis of sex, including on the bases described in § 106.10," such that to constitute prohibited sex-based harassment, the sexual harassment or harassment on the bases described in § 106.10 must satisfy one or more of the three categories (*i.e.,* quid pro quo, hostile environment, or specific offenses). The Department's position is that it is not necessary to further define the term harassment because the definition of "sex-based harassment," including the three categories of harassment, is sufficiently clear. The Department confirms that, as discussed in the July 2022 NPRM, acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex are within the purview of Title IX and may constitute sex-based harassment provided they meet the requirements of the definition. *See* 87 FR 41411, 41533. The Department has held this view for more than two decades. *See* 85 FR 30034–36, 30179; U.S. Dep't of Educ., Office for Civil Rights, Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, 62 FR 12034,

12038–39 (Mar. 13, 1997) (revised in 2001) (1997 Sexual Harassment Guidance), *https://www2.ed.gov/about/ offices/list/ocr/docs/shguide.pdf*. The Department also notes that as discussed in the section below on Hostile Environment Sex-Based Harassment— Online Harassment (§ 106.2), this covered conduct could occur online, in addition to in person.

The Department declines to remove the reference to "sexual harassment" in the introductory sentence because it is useful to explicitly state in the definition of "sex-based harassment" that it includes not only (1) sexual harassment, which is conduct of a sexual nature, but also (2) other forms of harassment that are not or may not be "sexual" but that are nonetheless based on sex, such as harassment based on pregnancy, gender identity, or sex stereotypes. The term "sexual harassment" as used in the definition refers to conduct that constitutes quid pro quo harassment, hostile environment harassment, or a specific offense listed in the definition of "sex-based harassment." As explained in prior OCR guidance, sexual harassment can include unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature. *See, e.g.,* U.S. Dep't of Educ., Office for Civil Rights, Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties, noticed at 66 FR 5512 (Jan. 19, 2001) (rescinded upon effective date of 2020 amendments, Aug. 14, 2020) (2001 Revised Sexual Harassment Guidance), *https://www2.ed.gov/about/ offices/list/ocr/docs/shguide.pdf*. Other forms of harassment that are not or may not be "sexual" can also constitute hostile environment harassment. With respect to the hypothetical sex-based harassment scenarios presented by commenters, the Department declines to make definitive statements about examples, due to the necessarily fact-specific nature of the analysis. At the same time, we note that further explanation of the content of the final regulations is provided in the discussions below.

The Department disagrees that the definition of "sex-based harassment" in the final regulations covers speech or conduct that is not based on sex. To the extent the comments raise concerns under the First Amendment, those comments are addressed in the section below dedicated to Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2).

*Changes:* The Department has revised the definition of "sex-based

harassment'' to state that sex-based harassment is a form of sex discrimination. The Department has also changed ''other conduct on the basis of sex'' to ''other harassment on the basis of sex'' and moved the language to earlier in the introductory sentence. The introductory language in the definition now states that sex-based harassment prohibited by this part ''means sexual harassment and other harassment on the basis of sex, including on the bases described in § 106.10.''

Sex-Based Harassment—Vagueness and Overbreadth (§ 106.2)

*Comments:* Some commenters opposed the proposed definition of ''sex-based harassment'' because they felt it would be too expansive and overbroad or too vague, which they believed could lead to false allegations. These commenters noted that the definition must clearly define the scope of prohibited conduct.

Other commenters specifically expressed vagueness and overbreadth concerns in the context of hostile environment sex-based harassment. For example, some commenters were concerned that key terms were undefined, which the commenters said would cause postsecondary institutions to restrict protected speech. The commenters did not state what key terms should be defined. Other commenters were concerned that the totality of the circumstances analysis in hostile environment sex-based harassment would make it difficult for students and employees to know what conduct was covered and could lead to overly broad policies.

One commenter asserted that precise definitions are required in the postsecondary education setting, even if they would not be required in a workplace setting, because of academic freedom. Another commenter argued that, although the July 2022 NPRM stated that the ''offensiveness of a particular expression as perceived by some persons, standing alone, would not be a legally sufficient basis to establish a hostile environment'' under Title IX, the preamble is vague about where the Department would draw the line between speech protected under the First Amendment and hostile environment sex-based harassment under Title IX, and thus a recipient would be incentivized to treat speech that is close to the line as a Title IX violation.

One commenter suggested that OCR's previously issued guidance on Title IX

and sexual harassment was too broad.[5] Another commenter asserted that some individuals may not know what conduct is prohibited if they are only told that objectively and subjectively offensive conduct is prohibited. Some commenters said the subjective standard's vagueness would deny respondents due process and lead to meritless investigations and inconsistent enforcement across recipients. Some commenters said that the term ''limits'' is vague and overly broad.

*Discussion:* The Department disagrees that the definition of ''sex-based harassment'' is too expansive and overbroad or too vague and does not clearly define the scope of prohibited conduct. Title IX broadly prohibits sex discrimination, and it is well-settled that harassment is a form of discrimination. *See, e.g., Davis* v. *Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 649–50 (1999) (citing *Gebser,* 524 U.S. at 281; *Franklin* v. *Gwinnett Cnty. Pub. Schs.,* 503 U.S. 60, 74–75 (1992)). While the definition differs from the standard courts apply to damages claims in private litigation, for decades prior to the 2020 amendments the Department applied a similar definition in administrative enforcement efforts to give complete effect to Title IX. *See, e.g.,* 2001 Revised Sexual Harassment Guidance. The definition also closely tracks longstanding case law defining sexual harassment, which courts have had no difficulty interpreting. *See, e.g., Harris* v. *Forklift Sys., Inc.,* 510 U.S. 17 (1993). With respect to comments regarding the purported vagueness of the definition and the lack of clearly defined conduct, the Department notes that the Eighth Circuit recently considered a ''void for vagueness'' challenge to a university sexual harassment policy with a similar definition: the policy prohibited conduct that ''create[d] a hostile environment by being sufficiently severe or pervasive and objectively offensive that it interfere[d] with, limit[ed] or denie[d] the ability of an individual to participate in or benefit from educational programs or activities.'' *Rowles* v. *Curators of Univ. of Mo.,* 983 F.3d 345, 352 (8th Cir. 2020) (quoting the policy). The Eighth Circuit rejected the plaintiff's vagueness challenge, explaining that the policy ''provide[d] adequate notice of what conduct is prohibited'' and used

language with ''common usage and understanding.'' *Id.* at 356, 358. The court specifically noted that qualifiers such as ''objective''—similar to the requirement in the final definition that conduct creating a hostile environment be ''objectively offensive,'' *see* § 106.2— ''provide adequate notice in [the] context'' of university harassment policies. *Rowles,* 983 F.3d at 356; *see also Koeppel* v. *Romano,* 252 F. Supp. 3d 1310, 1327 (M.D. Fla. 2017) (''inclusion of the objective and subjective standard'' in harassment policy made it sufficiently clear that ''a person of ordinary intelligence [could understand] what conduct [was] prohibited''), *aff'd sub nom. Doe* v. *Valencia Coll.,* 903 F.3d 1220 (11th Cir. 2018); *Vanderhurst* v. *Colo. Mountain Coll. Dist.,* 16 F. Supp. 2d 1297, 1305– 06 (D. Colo. 1998) (harassment policy's use of terms like ''considered offensive by others'' and ''unwanted sexually oriented conversation'' allowed ''ordinary people [to] understand what conduct [was] prohibited''). The case law thus supports the Department's view that the final definition is not inappropriately vague and clearly defines the scope of prohibited conduct.

The Department similarly disagrees with commenters who asserted that the proposed definition of hostile environment sex-based harassment is overbroad or vague. The Department notes that commenters did not specify which terms they wanted the Department to define but did state that it was unclear how a recipient would draw the line between speech protected under the First Amendment and sex-based harassment, and how to analyze offensiveness. As explained in the discussion below of Hostile Environment Sex-Based Harassment— First Amendment Considerations (§ 106.2), the Department has carefully defined hostile environment sex-based harassment with the First Amendment in mind by requiring that it be unwelcome, sex-based, and subjectively and objectively offensive, as well as so severe or pervasive that the conduct results in a limitation or denial of a person's ability to participate in or benefit from the recipient's education program or activity. The definition is aimed at discriminatory conduct— conduct that is unwelcome as well as sex-based, and that has an impact far greater than being bothersome or merely offensive. Moreover, even when a rule aimed at offensive conduct sweeps in speech, the rule does not necessarily become vague or overbroad. For example, as noted above in *Rowles,* the court rejected plaintiff's claim that the

---

[5] The commenter cited, for example, U.S. Dep't of Educ., Office for Civil Rights, Sexual Harassment: It's Not Academic, at 3–4 (2008), *https:// www2.ed.gov/about/offices/list/ocr/docs/ ocrshpam.pdf.*

policy at issue, which targeted offensive conduct, was "void for vagueness" as applied to his "protected 'amorous speech.' '' 983 F.3d at 357–58. The court reached a similar conclusion with respect to overbreadth. Although the policy at issue had been applied to the plaintiff's speech, it did not target speech as such; rather it "prohibit[ed] conduct" that was "defined and narrowed using language with common usage and understanding." *Id.* at 358. The plaintiff thus failed to establish that the policy had "a real and substantial effect on protected speech." *Id.*[6] *Rowles* accordingly supports the conclusion that policies that define hostile environment sex-based harassment similar to the definition of hostile environment sex-based harassment in these final regulations do not violate the First Amendment merely because they may, in some circumstances, be applied to speech.

Other case law also supports this conclusion. For example, several commenters cited *DeJohn* v. *Temple University,* 537 F.3d 301 (3d Cir. 2008), for the proposition that the definition of hostile environment sex-based harassment in the proposed regulations would be too broad or vague. And to be sure, the court in *DeJohn* did conclude that the University's specific policy was overbroad. *Id.* at 320. Yet the court also explained that, had the policy's application to conduct been appropriately narrowed, it could have survived First Amendment scrutiny. The court explained that "[a]bsent any requirement akin to a showing of severity or pervasiveness—that is, a requirement that the conduct objectively and subjectively creates a hostile environment or substantially interferes with an individual's work—the policy provides no shelter for core protected speech." *Id.* at 317–18. Likewise, "unless harassment is qualified with a standard akin to a severe or pervasive requirement, a harassment policy may suppress core protected speech." *Id.* at 320. The Department's definition of hostile environment sex-based harassment adopts exactly the

guardrails that *DeJohn* suggested are necessary—it applies only to conduct that, among other things, is "objectively and subjectively" offensive and is "severe or pervasive." And indeed, courts applying *DeJohn* have specifically concluded that the inclusion of such guardrails narrows a harassment policy sufficiently to withstand overbreadth and vagueness challenges. *See Koeppel,* 252 F. Supp. 3d at 1326 ("[The policy's] limiting language is precisely the type of language that the Third Circuit suggested would 'provide shelter for core protected speech.' Because Valencia's policy provides language that sufficiently shelters protected speech, the Court finds that the policy is not unconstitutionally overbroad." (citation omitted)); *id.* at 1327 ("Based on the inclusion of the objective and subjective standard, the Court finds that Valencia's sexual harassment policy sufficiently explains to a person of ordinary intelligence what conduct is prohibited."); *Marshall* v. *Ohio Univ.,* No. 2:15–CV–775, 2015 WL 1179955, at *6 (S.D. Ohio Mar. 13, 2015) (distinguishing *DeJohn* and rejecting vagueness and overbreadth challenges to a policy that "require[d] an individual's actions to be objectively and subjectively severe or pervasive so as to cause, or be intended to cause, an intimidating, hostile, or offensive work, academic, or living environment"). For additional discussion of the First Amendment, see the section below on Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2).

With respect to false allegations, the Department takes this concern seriously. Importantly, the final regulations incorporate safeguards against false allegations. For example, the final regulations require that a recipient evaluate complaints of sex-based harassment based on all relevant not otherwise impermissible evidence, *see* § 106.45(b)(6) and (7), require a recipient to provide each party with an equal opportunity to access the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible, or an accurate description of the evidence (and if the recipient provides a description, the parties may request and then must receive access to the underlying evidence), *see* § 106.45(f)(4), and require a recipient to provide a process to question parties and witnesses to assess the party's or witness's credibility when credibility is in dispute and relevant to evaluating one or more allegations of sex

discrimination, *see* § 106.45(g). The grievance procedures also provide steps to mitigate the harm a falsely accused respondent may experience while participating in the grievance procedures, such as requiring reasonable steps to protect the privacy of the parties and witnesses during the pendency of a recipient's grievance procedures. *See* § 106.45(b)(5). Finally, nothing in the final regulations prohibits a recipient from disciplining individuals who make false statements, provided that the discipline is not imposed based solely on the recipient's determination whether sex discrimination occurred. *See* § 106.45(h)(5).

In response to a commenter's suggestion that OCR's previously issued guidance on Title IX and sexual conduct was too broad, we note that although the definition of hostile environment sex-based harassment aligns more closely with the longstanding interpretation of Title IX in OCR's prior guidance, these final regulations, including the definition of hostile environment sex-based harassment, do not simply track the language in OCR's prior guidance. For example, the definition of hostile environment sex-based harassment in the final regulations is more specific because it explicitly requires that the unwelcome sex-based conduct be subjectively and objectively offensive and so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity, and it enumerates the factors that a recipient must, at a minimum, consider in determining whether a hostile environment has been created. Prior guidance, although similar, did not so clearly lay out specific factors to be considered. *See, e.g.,* 1997 Sexual Harassment Guidance, 2001 Revised Sexual Harassment Guidance. In addition, as discussed below in Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2), although the First Amendment may in certain circumstances constrain the manner in which a recipient responds to discriminatory harassment in the form of speech, recipients have ample other means at their disposal to remedy a hostile environment, and recipients remain free under the final regulations to determine whether discipline is the appropriate response to sex-based harassment, and if so, what form that discipline should take.

The Department disagrees that the definition of hostile environment sex-based harassment is too vague to provide adequate notice of prohibited conduct for certain individuals. The

---

[6] The court reached this conclusion even though the policy was broader than the standard for private actions for money damages for student-to-student sexual harassment that the Supreme Court articulated in *Davis,* 526 U.S. 629. *See Rowles,* 983 F.3d at 352 (policy covered "severe or pervasive" conduct that "interfere[d] with, limit[ed] or denie[d]" ability to participate). Indeed, despite this difference, the court cited *Davis* as support for the proposition that the policy was sufficiently narrow to withstand constitutional challenge. *Id.* at 358–59. The case thus supports the Department's view—described in more detail below—that the definition of sex-based harassment in the final regulations need not match the standard for private damages actions articulated in *Davis.*

subjective and objective standards have long been used by courts, as discussed in the section below on Hostile Environment Sex-based Harassment—Subjectively and Objectively Offensive (§ 106.2), and by OCR in enforcing the civil rights laws. *See* 2001 Revised Sexual Harassment Guidance, at 5; U.S. Dep't of Educ., Office for Civil Rights, Notice of Investigative Guidance, Racial Incidents and Harassment Against Students at Educational Institutions, 59 FR 11448, 11449 (Mar. 10, 1994) (1994 Racial Harassment Guidance), *https://www.govinfo.gov/content/pkg/FR-1994-03-10/pdf/FR-1994-03-10.pdf* (also available at *https://www2.ed.gov/about/offices/list/ocr/docs/race394.html*). Title IX protects all persons and recipients have an obligation to conduct their grievance procedures free from discrimination and bias. The final regulations also include provisions to ensure a recipient complies with its obligations under Title IX, Title VI, Section 504, the ADA, and the IDEA. *See, e.g.,* §§ 106.8(e), 106.44(g)(6)(i).

*Changes:* None.

Quid Pro Quo Sex-Based Harassment (§ 106.2)

*Comments:* Some commenters supported the proposed definition of quid pro quo sex-based harassment because it would return to the Department's longstanding enforcement practice that predated the 2020 amendments and include employees and other persons authorized by the recipient to provide an aid, benefit, or service, such as teaching assistants or volunteer coaches, and would include both explicit and implicit conditioning of an aid, benefit, or service on sexual conduct.

One commenter urged the Department to remove "unwelcome" from the proposed definition of quid pro quo sex-based harassment, stating that the definition should cover all situations when an education aid, benefit, or service is conditioned on sexual conduct without needing to determine whether or not the sexual conduct was unwelcome.

Other commenters asked the Department to clarify who is an "other person authorized by the recipient" in the definition of quid pro quo sex-based harassment. One commenter said that student leaders of clubs and captains of sports teams should be included as potential authorized persons. Another commenter queried whether the Department intended to limit "aid, benefit, or service" to academics. Another commenter asked the Department to clarify whether board members or other persons involved in

the recipient's governance or similar activities are "authorized" by the recipient to provide an aid, benefit, or service, regardless of whether they are paid.

One commenter urged the Department to clarify that agents and employees can engage in quid pro quo sex-based harassment regardless of whether they are actually authorized by the recipient to provide an aid, benefit, or service as part of the recipient's education program or activity. Another commenter recommended the Department clarify that a threat of detriment is covered by the proposed definition of quid pro quo sex-based harassment regardless of whether the threat is carried out.

*Discussion:* The Department acknowledges the commenters' support of the definition of quid pro quo sex-based harassment, which covers any employee, agent, or other person authorized by the recipient to provide an aid, benefit, or service under the recipient's education program or activity. The Department also acknowledges the commenter's support for the inclusion of both explicit and implied conditioning of such aid, benefit, or service on a person's participation in sexual conduct, and confirms that implied conditioning is covered by the definition of quid pro quo sex-based harassment.

The Department appreciates the commenter's suggestion to remove "unwelcome" from the proposed definition of quid pro quo sex-based harassment but declines to do so because the unwelcomeness of conduct is a well-established component of harassment law. *See, e.g., Doe* v. *Mercy Catholic Med. Ctr.,* 850 F.3d 545, 565 (3d Cir. 2017) (stating that "unwelcome sexual advances, requests for sexual favors, or other verbal or physical actions of a sexual nature constitute quid pro quo harassment" if certain conditions are met); *Koeppel,* 252 F. Supp. 3d at 1326, 1327 n.3 (policy prohibiting certain "unwelcome" advances was neither vague nor overbroad); *cf.* 29 CFR 1604.11(a) (Title VII regulations prohibiting certain "[u]nwelcome sexual advances"). The Department notes that quid pro quo sex-based harassment involves an abuse of authority that is generally unwelcome. Additionally, as explained in the July 2022 NPRM, acquiescence to the conduct or the failure to complain, resist, or object to the conduct does not mean that the conduct was welcome, and the fact that a person may have accepted the conduct does not mean they welcome it. *See* 87 FR 41411–12.

The Department acknowledges the commenters' requests for clarification

regarding who is an "other person authorized by the recipient" in the definition of quid pro quo sex-based harassment. The Department declines to list student leaders or students generally as potential authorized persons in the definition of quid pro quo sex-based harassment because students are the intended beneficiaries of aid, benefits, or services of the recipient's education program or activity. If a student did ever occupy a position as some "other person authorized by the recipient to provide an aid, benefit, or service," then the student would fall under the definition as it is in these final regulations. The Department clarifies here that the example of quid pro quo harassment provided in the July 2022 NPRM, of a graduate student who conditioned a student's grade on sexual conduct, was not intended to limit coverage of such harassment to an academic aid, benefit, or service. *See* 87 FR 41412. Title IX covers all aspects of the recipient's education program or activity, including extracurricular activities. Moreover, quid pro quo sex-based harassment covers harassment by members of a recipient's leadership, including board members, paid or unpaid, to the extent those individuals are authorized by the recipient to provide an aid, benefit, or service under the recipient's education program or activity.

The Department also clarifies that quid pro quo sex-based harassment can include situations in which an employee, agent, or other person authorized by the recipient purports to provide and condition an aid, benefit, or service under the recipient's education program or activity on a person's participation in unwelcome sexual conduct, even if that person is unable to provide that aid, benefit, or service. In addition, the threat of a detriment falls within the definition of quid pro quo sex-based harassment, whether or not the threat is actually carried out because a threat to, for example, award a poor grade unless a person participates in unwelcome sexual conduct, is a condition placed on the provision of the student's education, which is a service of the recipient.

*Changes:* None.

Hostile Environment Sex-Based Harassment—General (§ 106.2)

*Comments:* A number of commenters supported the proposed definition of hostile environment sex-based harassment because it would align with definitions of sexual and other forms of harassment in other Federal and State civil rights laws, including Title VII. The commenters believed this would

reduce confusion and provide consistency for students and employees.

Some commenters supported the proposed definition of hostile environment sex-based harassment because it would empower survivors to seek supportive measures and report sex-based harassment, reduce the stigma around reporting and seeking assistance, and provide greater clarity to students and administrators. Some commenters stated that, by contrast, the definition of "sexual harassment" in the 2020 amendments has deterred complainants from reporting sexual harassment because it sets a high standard that is viewed as difficult to meet.[7]

One commenter asked the Department to explain why the proposed definition of hostile environment sex-based harassment is consistent with the statutory authority granted to the Department under Title IX and should be granted deference.

*Discussion:* The Department agrees that the definition of "sexual harassment" in the 2020 amendments failed to fully effectuate Title IX's prohibition on sex discrimination. The Department believes the final definition will allow the Department to more fully enforce Title IX's nondiscrimination mandate because the definition covers a range of sex-based misconduct consistent with Title IX's broad language, will better align with the definitions of harassment in other civil rights laws, and will reduce confusion.

The Department also disagrees with the commenters' characterizations of OCR's prior guidance and underscores that prior guidance made clear OCR's commitment to interpreting Title IX consistent with the First Amendment. "OCR has consistently maintained that the statutes that it enforces are intended to protect students from invidious discrimination, not to regulate the content of speech." U.S. Dep't of Educ., Office for Civil Rights, First Amendment Dear Colleague Letter (July 28, 2003) (2003 First Amendment Dear Colleague Letter), *https://www2.ed.gov/about/offices/list/ocr/firstamend.html; see also* 2001 Revised Sexual Harassment Guidance, at 22–23; 2014 Q&A on Sexual Violence, at 43–44. As discussed more fully in the July 2022 NPRM,

nothing in the Title IX regulations requires a recipient to restrict any rights otherwise protected by the First Amendment, and OCR has expressed this view repeatedly in prior guidance. *See* 87 FR 41415. For additional discussion of the First Amendment, see the below discussion of Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2).

With respect to the Department's authority to adopt a definition of hostile environment sex-based harassment, we refer to our extensive explanation in the July 2022 NPRM. 87 FR 41393–94, 41410, 41413–14. The Department further notes that Congress empowered and directed the Department, and other Federal agencies, to issue regulations that effectuate Title IX. 20 U.S.C. 1682. The Department also observes that when Congress enacted Title IX in 1972, it imposed a broad prohibition on discrimination based on sex in education programs and activities that receive Federal financial assistance and since then has declined on multiple occasions to limit the scope of Title IX.[8] Title IX's plain language prohibits any discrimination on the basis of sex in a recipient's education program or activity and the Department maintains that, in the administrative enforcement context, Title IX must function as a strong and comprehensive measure to effectively address sex discrimination. *See generally* 118 Cong. Rec. 5803–58 (1972) (statement of Sen. Bayh); *see also N. Haven Bd. of Educ.* v. *Bell,* 456 U.S. 512, 521 (1982) ("There is no doubt that 'if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language.' ").

We further discuss the Department's authority to define "sex-based harassment" in the below section on Hostile Environment Sex-Based Harassment—the *Davis* standard.

*Changes:* None.

### Hostile Environment Sex-Based Harassment—the *Davis* Standard (§ 106.2)

*Background:* In *Davis,* the Supreme Court held that a private action under Title IX for money damages against a school for student-to-student harassment will lie only if the harassment is "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."

526 U.S. at 633. For purposes of this subsection, the Department refers to the requirement that harassment be so "severe, pervasive, and objectively offensive" that it effectively bars access to an educational opportunity or benefit as the "*Davis* standard."

*Comments:* A group of commenters supported the Department's proposed definition of hostile environment sex-based harassment as compatible with *Davis.* Citing *Gebser,* 524 U.S. at 286–87, 292, these commenters further noted that the Supreme Court has recognized the Department's regulatory authority to implement Title IX's nondiscrimination mandate, even if the resulting regulations do not use the same legal standards that give rise to a claim for money damages in private actions.

Some commenters opposed the proposed definition of hostile environment sex-based harassment because it deviates from the *Davis* standard. Some commenters stated that the Department failed to specifically address either how the proposed definition of hostile environment sex-based harassment is consistent with *Davis* or adequately explain why the Department departed from the *Davis* standard. In addition, a group of commenters argued that the Department should not depart from the *Davis* standard because the Supreme Court held that Title IX covers misconduct by recipients, not teachers or students. As well, this group of commenters stated that courts have used the *Davis* standard to award (or evaluate) injunctive relief, not merely damages, in private party suits.

One commenter stated that OCR has previously rejected the idea that a different definition for harassment applies in private lawsuits for monetary damages as compared to OCR's administrative enforcement in the 2001 Revised Sexual Harassment Guidance.

One commenter argued that requiring a recipient to apply the Title VII workplace standard to students in administrative enforcement of Title IX would burden the recipient, create conflicts between Title IX's application in the courts compared to the administrative context, and lead to unpredictable applications of the law. Some commenters urged the Department to maintain the definition of "sexual harassment" in the 2020 amendments, including the reference to unwelcome conduct that is both severe and pervasive.

Other commenters stated that the proposed regulations would allow a recipient to benefit from the *Davis* standard if it was sued for monetary damages under Title IX but would

---

[7] The commenters cited Heather Hollingsworth, *Campus Sex Assault Rules Fall Short, Prompting Overhaul Call* Associated Press, June 16, 2022, *https://apnews.com/article/politics-sports-donald-trump-education-5ae8d4c03863cf98072e810c5de37048* (the University of Michigan reported that their number of Title IX complaints dropped from over 1,300 in 2019 to 56 in 2021 and Title IX complaints at the University of Nevada, Las Vegas dropped from 204 in 2019 to 12 in 2021 and the number of cases that met the criteria for formal investigation fell from 27 to 0).

[8] For example, Congress passed the Civil Rights Restoration Act in 1987, 20 U.S.C. 1687, to clarify the definition of "program or activity" in Title IX, and Congress has also rejected multiple amendments to exempt revenue producing sports from Title IX.

subject individual students and employees to what they asserted is a lower standard. The commenters further asserted that the potential loss of Federal funding in the context of administrative enforcement would put more pressure on administrators to punish student expression than the threat of losing a lawsuit. Additionally, a group of commenters asserted that, in light of the differences in ages of the students and the purposes of education across institutions, and because it would be reasonable for a school to refrain from disciplinary action that school officials believe would violate the Constitution, a recipient should have flexibility to make its own disciplinary decisions.

One commenter maintained that the *Davis* standard adequately protects survivors of student-to-student harassment and stated that plaintiffs have successfully used the *Davis* standard to hold a recipient liable for its deliberate indifference to student-to-student harassment.

*Discussion:* The Department appreciates the range of opinions regarding the consistency of the proposed regulations with the Supreme Court's decision in *Davis.* After reviewing applicable law, the public comments received, and the Department's experience enforcing Title IX with regard to harassment, the Department agrees with commenters who supported the Department's proposed definition of hostile environment sex-based harassment. The final definition of hostile environment sex-based harassment is consistent with the *Davis* standard because, like the *Davis* standard, the definition requires a contextual consideration of the totality of the circumstances to determine whether harassment impacted a complainant's or plaintiff's educational benefits, and only accounts for conduct that is so serious that it implicates a person's access to the recipient's education program or activity. Also, as discussed in the section below on Hostile Environment Sex-Based Harassment—Subjectively and Objectively Offensive (§ 106.2), the Department added the word "offensive," which also appears in the *Davis* standard, to the final definition. The Department's final definition is not identical to *Davis,* however, because the Department also believes a broader standard is appropriate to enforce Title IX's prohibition on sex discrimination in the administrative context, in which educational access is the goal and private damages are not at issue. To that end, the final regulations require that harassing conduct be "subjectively and

objectively offensive" and "severe *or* pervasive," rather than the *Davis* standard's "severe, pervasive, *and* objectively offensive." As described further below, the final definition follows the text of Title IX, falls well within the Department's authority to implement the statute, squares with the Department's enforcement experience, and is compatible with *Davis* as well as other relevant precedent.

The Department disagrees with commenters that the Department's regulatory definition of hostile environment sex-based harassment must be identical to the *Davis* standard. The Court in *Davis* did not set forth any definition of hostile environment sex-based harassment—it articulated the circumstances under which sexual harassment is sufficiently serious to create institutional liability for private damages when a recipient is deliberately indifferent to it. 526 U.S. at 639 (examining "whether a district's failure to respond to student-on-student harassment in its schools can support a private suit for money damages"). Indeed, the *Davis* Court specifically indicated that the question of whether student-to-student harassment could be "discrimination" for purposes of Title IX was not the issue in the case. The Court explained that the defendants did not "support an argument that student-on-student harassment cannot rise to the level of 'discrimination' for purposes of Title IX," and contrasted that question with the issue in the case, which concerned the standard for damages liability under Title IX for such harassment. *Id.* Moreover, the *Davis* Court explicitly stated that it was addressing the relevant scope of discrimination "in the context of a private damages action" when articulating that in such contexts, the sexual harassment must be "severe, pervasive, and objectively offensive." *Id.* at 649–50. Similarly, the *Gebser* Court was especially concerned about the possibility of requiring a school to pay money damages for harassment that exceeded its level of Federal funding, not about the scope of prohibited harassment generally. *See* 524 U.S. at 289–90 (discussing Title IX's administrative enforcement proceedings including the opportunity for a recipient to take corrective measures, and observing, in part, that "an award of damages in a particular case might well exceed a recipient's level of federal funding"). The Supreme Court has noted that the words of an opinion must be evaluated in a "particular context," and readers must determine the "particular work" those words do. *Nat'l*

*Pork Producers Council* v. *Ross,* 598 U.S. 356, 374 (2023). So, although the Court in *Davis* used the phrase "severe, pervasive, and objectively offensive," the opinion as a whole makes clear that the Court was describing only the standards applicable to the "particular context" of a private action for damages—not the standard applicable to administrative enforcement. The standard adopted by the Court was intended, in part, to do the "particular work" of imposing a high bar specifically for private damages claims. *Davis,* 526 U.S. at 652–53.

The *Gebser* Court recognized the authority of Federal agencies such as the Department to "promulgate and enforce requirements that effectuate [Title IX's] nondiscrimination mandate" even in circumstances that would not give rise to a claim for monetary damages. 524 U.S. at 292. *Davis* itself emphasizes the point about the Department's authority to issue rules for administrative enforcement. After observing that Congress "entrusted" Federal agencies to "promulgate rules, regulations, and orders to enforce the objectives" of Title IX, *Davis,* 526 U.S. at 638, the Court repeatedly and approvingly cited the Department's then-recently published guidance regarding sexual harassment, *see id.* at 647–48, 651 (citing 1997 Sexual Harassment Guidance, 62 FR 12039–42). That guidance specifically stated that schools could be found to violate Title IX if the relevant harassment "was sufficiently severe, persistent, or pervasive to create a hostile environment." 62 FR 12040. The guidance thus articulated a broader standard for prohibited harassment than the standard the Court articulated in *Davis* for purposes of private damages liability. And rather than calling into question the validity of that guidance, the Court in *Davis* relied on it. The Court in *Davis* also cited approvingly the Department's racial harassment guidance interpreting Title VI, *see Davis,* 526 U.S. at 648–49 (citing 1994 Racial Harassment Guidance, 59 FR 11449), which, like the Department's 1997 Sexual Harassment Guidance and 2001 Revised Sexual Harassment Guidance, explained that a hostile environment may exist if the relevant harassment was "severe, pervasive or persistent." 59 FR 11449. *Davis* thus implicitly acknowledges the different standards that may govern private claims as compared to administrative enforcement. In addition, the Department is not aware of any court that restricted the Department from applying the prior longstanding definition of hostile environment sexual

harassment in the administrative enforcement context. The Department thus disagrees with the claim that the definition of hostile environment sex-based harassment in the final regulations must be identical to the *Davis* standard—particularly given that the Department's definition was developed to ensure that a recipient operates its education program or activity in a manner that is fully consistent with Title IX, and the *Davis* standard was developed with attention to the challenges associated with imposing money damages on a school district in a private civil action related to student-to-student conduct.[9]

*Gebser* and *Davis* thus align with the Department's long-held view that its administrative enforcement standard need not be identical to the standard for monetary damages in private litigation. The Department made its view clear in the July 2022 NPRM and elsewhere in this preamble. *See* 87 FR 41413–14. In the preamble to the 2020 amendments, the Department similarly stated that it has regulatory authority to select conditions and a liability standard different from those used in *Davis* because the Department has authority to issue regulations that require recipients to take administrative actions to effectuate Title IX's nondiscrimination mandate.[10] 85 FR 30033. The Department also noted that the definition of "sexual harassment" in the 2020 amendments did "not simply codify the *Gebser/Davis* framework" and instead it "reasonably expand[ed] the definition[ ] of sexual harassment" to tailor it to the administrative enforcement context. *Id.* The Department also reiterated in the preamble to the 2020 amendments that the Court in *Davis* did not opine as to what the appropriate definition of

sexual harassment must or should be for the Department's administrative enforcement. *Id.*

The Department acknowledges that some courts have applied the *Davis* standard when deciding whether to grant injunctive relief in addition to damages, but that does not change the fact that the *Davis* standard was developed in the context of determining whether a school district's failure to respond to student-to-student harassment makes the school district liable for monetary damages and that the Department is not bound by that standard in the administrative enforcement context. The cases cited by commenters do not establish that the final regulations exceed the boundaries of Title IX and the Department's authority to effectuate the statute. *Davis, Gebser,* and the reasoning offered in this preamble are more persuasive grounds for determining the content of the final regulations. Indeed, courts have recently confirmed that the Department may use *Davis* and *Gebser* as the "appropriate starting point for administrative enforcement of Title IX," and then "adapt[ ] . . . that framework to hold recipients responsible for *more* than what the *Gebser/Davis* framework alone would require." *Victim Rts. L. Ctr.* v. *Cardona,* 552 F. Supp. 3d 104, 129–30 (D. Mass. 2021) (quotation marks omitted) (emphasis added); *accord New York* v. *U.S. Dep't of Educ.,* 477 F. Supp. 3d 279, 297 (S.D.N.Y. 2020) (holding that it was reasonable for the Department to conclude it "was not required to adopt the definition of sexual harassment in the *Gebser/Davis* framework"). Consistent with that judicial guidance, the Department's definition of hostile environment harassment covers more than that described in *Davis* alone.

The Department disagrees with commenters who maintained that distinctive standards for money damages and administrative enforcement will be unduly burdensome, confusing, or otherwise improper given the 2020 amendments or other Department statements. The *Davis* standard has been in place for Title IX civil actions seeking monetary damages since 1999—well over twenty years— but the Department has never adopted that precise standard for the Department's Title IX administrative enforcement actions. The Department is not aware of any persuasive evidence that recipients were unable to understand the difference between the administrative enforcement and civil damages contexts during the period prior to or since the 2020 amendments. Nor has OCR's experience in enforcing

Title IX during that period provided a basis to conclude that any differences between the administrative enforcement and civil damages contexts were barriers to effective implementation of Title IX's nondiscrimination requirement, or that the Department's approach to enforcement infringed on protected speech rights. It is OCR's experience that when recipients' responses to sex-based harassment fail to comply with Title IX, such failure is not because the recipient is unable to understand the differences between the administrative enforcement and civil damages contexts, but rather because the recipient failed to respond promptly and effectively to known sex-based harassment.

The Department also appreciates the commenters' concern that a recipient might impose a sanction on a student or employee for violating its policy against sex discrimination, while the recipient might not be held liable for money damages in a private civil action if it did not impose such a sanction. But the Department is not convinced the commenters identified a logical inconsistency between discipline for those who engage in harassment and the absence of damages against a recipient for responding to such harassment. A recipient must take action to address sex-based harassment, which may include taking disciplinary action against a respondent, regardless of whether the complainant may be entitled to monetary damages due to the recipient's deliberately indifferent response. That a recipient may not be liable in damages for a student's or employee's harassment does not provide a reason to conclude that the harassing student or employee is immune from disciplinary action under Title IX or any other applicable provision.

Nothing in the comments, the 2020 amendments, or previous Department guidance documents dissuades the Department from concluding in these final regulations that distinguishing between damages and administrative enforcement standards is a lawful and well-reasoned approach to effectuating Title IX.

Given the differences between the two contexts, there is ample justification for the Department to apply a different standard to the type of conduct to which a recipient must respond than to conduct for which a private party may seek damages as a result of a recipient's failure to respond. Requiring conduct to be "severe and pervasive" in private actions for damages requires a broad showing—of intensity and breadth— before a recipient can be held monetarily liable. Such a high barrier is not necessary or appropriate in the

---

[9] *See Davis,* 526 U.S. at 639 (describing the Court's focus on the specific issue of damages in private civil actions); *Gebser,* 524 U.S. at 283 ("In this case, moreover, petitioners seek not just to establish a Title IX violation but to recover *damages* based on theories of *respondeat superior* and constructive notice. It is that aspect of their action, in our view, that is most critical to resolving the case." (emphasis in original)); *Gebser,* 524 U.S. at 292 (recognizing the distinction between administrative enforcement and civil liability).

[10] Although the Department's administrative enforcement proceedings differ in many ways from private lawsuits for money damages, the Department does not mean to suggest that administratively imposed remedial actions can never have financial consequences. *See* 85 FR 30414–15 ("Remedial action required of a recipient for violating Title IX or these final regulations may therefore include any action consistent with 20 U.S.C. 1682, and may include equitable and injunctive actions as well as financial compensation to victims of discrimination or regulatory violations, as necessary under the specific facts of a case.").

administrative context, in which the goal is to ensure access to education.

Because evaluation of harassing conduct depends on the surrounding circumstances, the Department believes it is appropriate to recognize that conduct that is either pervasive or severe may create a hostile environment that limits or denies a person's educational access. Under the final definition of hostile environment sex-based harassment, a recipient must still make an individualized determination as to whether certain conduct constitutes prohibited sex-based harassment and may conclude, for example, that certain conduct between employees is not prohibited while the same conduct between students or between a student and an employee is prohibited. As explained in the section below discussing Hostile Environment Sex-Based Harassment—Factors to be Considered (§ 106.2), whether unwelcome sex-based conduct has created a hostile environment is determined based on the totality of the circumstances. The final regulations thus call for a recipient to consider the ages, roles, and other relevant characteristics of the parties involved, including whether they are students or employees, in making the determination. Based on the specific circumstances in which a particular incident arises, a single serious incident—even if not pervasive—may be so severe as to create a hostile environment. And based on the specific circumstances in which it occurs, pervasive conduct—even if no single occurrence of the conduct, taken in isolation, is severe—may likewise create a hostile environment.

Moreover, in the context of administrative enforcement, a recipient must be given notice and an opportunity to come into compliance before the termination of funding. 20 U.S.C. 1682. Indeed, the Department's administrative enforcement investigations generally result in agreements with the recipient to take action that would bring them into compliance. Thus, if the Department receives a complaint about severe or pervasive harassment, and its investigation confirms the allegations in that complaint, the Department will bring this conduct to the attention of the recipient, and to discuss and determine appropriate corrective measures with the recipient's input. These protective guardrails and opportunity for the recipient to take corrective measures do not apply in the context of private lawsuits for damages; accordingly, a higher bar (*i.e.*, severe and pervasive) may be appropriate in that context. The definition of hostile environment sex-

based harassment in the final regulations takes account of the differences between these two contexts and is consistent with the Department's responsibility to administratively enforce Title IX's strong and comprehensive prohibition on sex discrimination. *See generally* 118 Cong. Rec. 5803–12 (1972) (statement of Sen. Bayh).

Regarding one commenter's concerns about applying Title VII workplace standards to students, as explained in the preamble to the July 2022 NPRM, the Department recognizes the differences between educational and workplace environments. *See* 87 FR 41415–16. Although the final definition of hostile environment sex-based harassment aligns closely with the definition of hostile environment sexual harassment under Title VII, the Department did not simply adopt the Title VII definition and instead appropriately crafted the definition for use in education programs or activities governed by Title IX. There are substantial administrative and compliance benefits associated with greater alignment, given that the vast majority of recipients must comply with both Title IX and Title VII. Even considering the benefits of more closely aligning the Title IX and Title VII standards, however, the Department reiterates that the most fundamental consideration is that the final definition of hostile environment sex-based harassment will better enable the Department to implement Title IX's prohibition on sex discrimination. *See* 87 FR 41415. The Department's commitment to the effective implementation of Title IX is the essential and principal reason for the final regulations. Most importantly, then, the definition of hostile environment sex-based harassment aligns with Congress's commitment in Title IX that no person shall be subjected to sex discrimination under an education program or activity that receives Federal financial assistance.

Regarding some commenters' characterization of the Department's definition of hostile environment sex-based harassment as a "lower standard" than the Supreme Court set out in *Davis*, the Department reemphasizes that the Court in *Davis* did not define hostile environment sexual harassment and that the definition of hostile environment sex-based harassment in these final regulations requires satisfaction of several elements before a hostile environment is established, including that the sex-based conduct be both subjectively and objectively offensive. Thus, the conduct in question must be

(1) unwelcome, (2) sex-based, (3) subjectively and objectively offensive, as well as (4) so severe or pervasive (5) that it results in a limitation or denial of a person's ability to participate in or benefit from the recipient's education program or activity. The changes to the definition of "sexual harassment" in the 2020 amendments are important to the effective implementation of Title IX, the Department determined, but the degree of difference from the *Davis* standard should not be overstated.

The Department is not persuaded by comments arguing that a recipient is equally or more likely to (unlawfully) discipline students because of fear of Federal funding loss than because of fear of damages litigation by private parties. The Department's decades of enforcement experience have not established a convincing basis for that conclusion. In addition, the Department is not persuaded by comments asserting that a recipient will be more driven to impose, and a respondent more likely to face, unfair or unlawful discipline under the Department's definition of hostile environment sex-based harassment than under the *Davis* standard. First, as set out in the July 2022 NPRM and in the discussion of §§ 106.45 and 106.46 in this preamble, the final regulations require a recipient to adopt grievance procedures that include many procedural protections to effectuate investigations, and evidence-based determinations, that are designed to ensure a fair process for all parties, including, for example, equitable treatment and an equal opportunity to access to relevant evidence, and the objective evaluation of all relevant and not otherwise impermissible evidence prior to determination. *See* 87 FR 41461–63; *see also* discussion of Framework for Grievance Procedures for Complaints of Sex Discrimination (II.C). Further, as discussed more fully in the section below on Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2), the final regulations maintain the language in § 106.6(d) that nothing in the Title IX regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment. The Department also maintains that the grievance procedure requirements in these final regulations, combined with the acknowledgement that recipients must not infringe on any First Amendment rights, including in the imposition of discipline, provide protections that—like the *Davis* standard—will ensure respondents do not face unfair discipline. *See Davis,*

526 U.S. at 648 (rejecting the argument that the Court's opinion would require "'expulsion of every student accused of misconduct'").

As for commenters' concern that the Department's enforcement of the definition of "sex-based harassment" might somehow prompt schools to violate the First Amendment's protection of speech, the Department acknowledges that, in the preamble to the 2020 amendments, the Department stated that adopting a definition of "sexual harassment" closely aligned with the *Davis* standard "helps ensure that Title IX is enforced consistent with the First Amendment." 85 FR 30033. The standard in the final regulations is also sufficiently closely aligned with *Davis* for purposes of ensuring that Title IX is enforced consistent with the First Amendment. The Department is not persuaded by the commenters' interpretation of Supreme Court precedent to conclude otherwise or by the commenters' characterizations of the relevant considerations in setting an appropriate standard for hostile environment sex-based harassment to effectuate Title IX. Moreover, the Department notes again that § 106.6(d) assures that nothing in these regulations requires a recipient to take action that conflicts with the U.S. Constitution, including the First Amendment. Further, the Department repeats the statement from the July 2022 NPRM that a recipient must formulate, interpret, and apply its rules in a manner that respects the legal rights of students and employees when taking action to end sex-based harassment that creates a hostile environment. *See* 87 FR 41415.

The final regulations enable broad protection against sex discrimination in federally funded education programs and activities while respecting individual constitutional rights. For example, although the First Amendment may in certain circumstances constrain the manner in which a recipient responds to discriminatory harassment in the form of speech, recipients have ample other means at their disposal to remedy a hostile environment. For additional discussion, see the section below on First Amendment Considerations. Recipients can—consistent with the Due Process Clause—impose discipline, where appropriate and not inconsistent with the First Amendment, by following the various procedures designed to protect respondents in grievance procedures. For further explanation, see the discussions of the grievance procedure requirements in §§ 106.45 and 106.46.

The Department agrees with commenters insofar as they assert that

the *Davis* standard reconciles protected speech and actionable discrimination, but the Department disagrees that the *Davis* standard is the only such standard or was set out by the Court as such. Adopting such a position would seem to rule out the Title VII standard for hostile environment harassment even as to employees in workplaces. Relatedly, while the Department agrees with the commenter who stated that the *Davis* standard protects some complainants whom the commenter describes as survivors of student-to-student harassment, the *Davis* standard does not encompass the full meaning of Congress's prohibition on sex discrimination. As discussed above, the *Davis* Court was not addressing the full scope of Title IX's protection, only the standard under which a private party could seek damages against a recipient in a civil action for student-to-student sex-based harassment under Title IX. *See, e.g.,* 526 U.S. at 639, 649–50.

The Department recognizes that some recipients have adopted harassment policies that have been successfully challenged on First Amendment grounds and that, in some of those cases, courts have invoked *Davis* in reaching their conclusions. *See, e.g., Speech First, Inc.* v. *Cartwright,* 32 F.4th 1110 (11th Cir. 2022). The policies at issue in those cases, however, do not contain the definition of "sex-based harassment" set out in these final regulations and instead were broader and less protective of speech.[11]

---

[11] For example, the policy at issue in *Speech First* stated that discriminatory harassment "may take many forms, including verbal acts, name-calling, graphic or written statements (via the use of cell phones or the internet), or other conduct that may be humiliating or physically threatening." 609 F. Supp. 3d at 1114. The policy's definition of hostile environment harassment did not reference offensiveness, which is in the definition of hostile environment sex-based harassment in these final regulations. It defined hostile environment harassment as "harassment that is so severe or pervasive that it unreasonably interferes with, limits, deprives, or alters the terms or conditions of education (*e.g.,* admission, academic standing, grades, assignment) employment (*e.g.,* hiring, advancement, assignment), or participation in a program or activity (*e.g.,* campus housing), when viewed from a subjective and objective perspective." *Id.* at 1114–15. The court specifically noted that the terms "unreasonably" and "alter," neither of which appear in the definition of hostile environment sex-based harassment in the final regulations, were amorphous and imprecise. *Id.* at 1121. The court also noted that the university's policy prohibited students not only from committing the specified acts, but also from condoning, encouraging, or even failing to intervene to stop them. *Id.* at 1115 (internal quotation marks omitted). The definition of hostile environment harassment in these final regulations does not discuss condoning, encouraging, or failing to intervene. Further, the court noted that the university's student code of conduct stated that the discriminatory harassment policy, among other policies, "should be read broadly and [is] not

Moreover, the cases cited by commenters do not represent the universe of relevant cases in which courts have addressed First Amendment challenges to recipient policies prohibiting harassment. In other cases, courts have upheld recipient prohibitions on harassment against First Amendment challenges. *See, e.g., Rowles,* 983 F.3d at 358–59; *Koeppel,* 252 F. Supp. 3d at 1326; *Marshall,* 2015 WL 1179955, at *6–7. Also, with respect to elementary schools and secondary schools, the Supreme Court has recognized that school regulation of student speech may be appropriate to prohibit "serious or severe bullying or harassment targeting particular individuals," in addition to "threats aimed at teachers or other students." *Mahanoy Area Sch. Dist.* v. *B.L.,* 141 S. Ct. 2038, 2045 (2021). We offer further discussion of the First Amendment in the section on Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2) below.

*Changes:* As explained in the section below on Hostile Environment Sex-Based Harassment—Subjectively and Objectively Offensive (§ 106.2), the Department has revised the definition of "sex-based harassment" to add the word "offensive" to the subjective and objective standard for establishing hostile environment sex-based harassment.

Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2)

*Comments:* These comments have been organized into 12 categories, and the discussion of all of these comments follows.

Support for Enforcing Title IX Protections Consistent With the First Amendment

A group of commenters stated that the proposed definition of hostile environment sex-based harassment would effectively enforce Title IX's protections while ensuring consistency with the First Amendment by requiring a totality of the circumstances approach to assessing and evaluating the conduct from both a subjective and objective perspective to ensure the conduct constitutes harassment and is not only speech. Some commenters appreciated the Department's commitment to freedom of speech and academic freedom and the Department's intention to maintain the First Amendment

---

designed to define prohibited conduct in exhaustive terms." *Id.* at 1121 (internal quotation marks omitted).

language in § 106.6(d) in the 2020 amendments.

One commenter stated that the "severe or pervasive" standard in the definition of hostile environment sex-based harassment recognizes that the government may limit some protected speech in the educational context to preserve its interest in ensuring equal access to education.

## Prohibiting or Chilling Speech

Other commenters were concerned that the proposed definition of hostile environment sex-based harassment would prohibit or chill speech that is protected under the First Amendment. For example, some commenters feared that the proposed definition would strip individuals of their freedom of speech, assembly, press, and religion and disagreed with the Department's contention that the proposed definition would not cover protected speech.

Some commenters expressed concern about the potential for self-censorship and referenced what they said were high rates of self-censorship at postsecondary institutions. One commenter supported maintaining the definition of "sexual harassment" in the 2020 amendments because the commenter said it ensures verbal conduct is not punished in a way that chills speech or restricts academic freedom. The commenter noted that the Department stated in the preamble to the 2020 amendments that the Department found evidence that recipients' anti-harassment policies infringed on speech protected under the First Amendment and encouraged students and faculty to avoid debate and controversial ideas. *See* 85 FR 30154.

A group of commenters stated that the Department cannot compel schools to suppress speech in a manner that would otherwise violate the First Amendment even in private schools where the First Amendment does not apply.

One commenter opposed the proposed definition of hostile environment sex-based harassment because they believed that allegations of sex discrimination would trigger burdensome supportive measures against respondents, and thus students and employees would be forced to avoid any speech that could be perceived as violating the proposed regulations in order to avoid being subjected to such measures.

## Reporting, Tracking, and Investigating

Some commenters expressed concern that nearly all classroom discussions about sex-related topics would involve statements that may constitute sex discrimination and would be subject to the reporting requirements under

proposed § 106.44(c), which would chill free speech of students and employees and lead to investigations. Some commenters were concerned that postsecondary institutions would use Title IX as an excuse to take adverse action against faculty whose research includes controversial positions.

## The Davis Standard and the First Amendment

Similar to the comments discussed above in the section on Hostile Environment Sex-Based Harassment— the *Davis* Standard (§ 106.2), some commenters argued that departing from the *Davis* standard would violate the First Amendment. Some commenters stated that the proposed definition of hostile environment sex-based harassment has already been criticized by the U.S. Court of Appeals for the Eleventh Circuit in *Speech First,* 32 F.4th at 1113, which involves a challenge to a postsecondary institution's policy that used language the commenters asserted is similar to the proposed definition. The commenters also asserted that other courts have looked unfavorably on this definition within the context of postsecondary institutions' anti-harassment policies. These commenters argued that the only way for the Department to avoid invalidation by a court is to use a definition of hostile environment sex-based harassment that includes all of the elements of the *Davis* standard.

## Academic Freedom

Some commenters were concerned that the proposed definition of hostile environment sex-based harassment would not adequately protect academic freedom, asserting that the proposed definition would restrict a recipient from allowing faculty and students at postsecondary institutions to have a constructive dialogue and freely exchange ideas. One commenter was concerned that students would be deterred from making sex-based comments, which the commenter asserted would stop postsecondary students from having the types of conversations from which they might learn the most. Another commenter recommended that the Department amend § 106.6(d), which the Department did not propose to amend, to reference academic freedom.

## Content-Based and Viewpoint-Based Regulation

Some commenters objected to the proposed definition of hostile environment sex-based harassment because they asserted it would impose

invalid content- and viewpoint-based restrictions on protected speech and unconstitutionally compel speech on matters of public debate.

## Compelled Speech

Some commenters objected to the language in the July 2022 NPRM stating that even though "the First Amendment may prohibit a recipient from restricting the rights of students to express opinions about one sex that may be considered derogatory, the recipient can affirm its own commitment to nondiscrimination based on sex and take steps to ensure that competing views are heard." 87 FR 41415. One commenter referenced court decisions holding that freedom of speech includes the right to speak freely and to refrain from speaking at all.

## Speech Related to Abortion

The Department also received comments regarding speech related to abortion. Some commenters were concerned that the proposed definition of hostile environment sex-based harassment would silence speech and viewpoints of students opposed to abortion rights. Other commenters were concerned that students protesting abortion rights would be found responsible for creating a hostile environment or retaliated against by other individuals in the recipient's education program or activity for allegedly creating a hostile environment under the proposed definition of hostile environment sex-based harassment.

One commenter asked the Department to clearly state in the proposed regulations that a recipient would not be compelled to promote abortion and that speech, organizations, events, and speakers that oppose abortion rights would not be considered in violation of Title IX.

## Religious Liberty

Some commenters asserted that the proposed definition of hostile environment sex-based harassment conflicted with the First Amendment's guarantee of religious liberty. One commenter was concerned that the proposed regulations would threaten freedom of expression and academic inquiry at religiously affiliated schools and for professors and students whose areas of teaching and study are related to morality or religion. The commenter stated that requiring students and employees to conform to the Department's views on these issues related to sexual orientation, gender identity, and termination of pregnancy would violate the First Amendment, burden those who hold disfavored

views including views informed by deeply held religious convictions and those who teach about these topics, and lead students and professors to refrain from espousing their beliefs because of the personal risk associated with doing so.

Some commenters asked the Department to ensure that the final regulations not require or encourage a recipient to punish religious exercise and speech, including by amending the proposed regulations to state that they do not require an individual or recipient to endorse or suppress views in a way that violates their sincerely held religious beliefs.

Freedom of Association

Some commenters stated that freedom of association protects the right to exclude others based upon the group's messaging. One commenter was concerned that under the proposed definition of hostile environment sex-based harassment, an LGBTQI+ student group could be forced to allow non-LGBTQI+ students to join or lead the group and urged the Department to maintain the definition of ''sexual harassment'' from the 2020 amendments. Another commenter said that even if student groups benefit from Federal funding provided to their postsecondary institutions, such funding does not transform the actions of these groups into State action.

Supremacy of the First Amendment and Statutory Interpretation

One commenter was concerned about the proposed removal of some references to the primacy of the First Amendment that were in the 2020 amendments and the reduced discussion of the First Amendment in the July 2022 NPRM. The commenter urged the Department to explicitly clarify the ''supremacy of constitutional concerns'' when they conflict with Title IX to avoid recipients being forced to expend resources on litigation.

Another commenter argued the Department violated the Administrative Procedure Act because, in the July 2022 NPRM, the Department did not engage meaningfully with the First Amendment analysis in the preamble to the 2020 amendments. This commenter asserted that the Department must provide a reasoned explanation for why it disregarded the facts and circumstances that the Department considered in the 2020 amendments and explain why it now takes an opposing view.

Private Recipients and Free Speech

One commenter expressed concern that the proposed regulations do not

make allowances for State laws that extend free speech rights to students at private schools and that proposed § 106.6(b) would preempt such laws. Another commenter recommended that the Department extend § 106.6(d) to reach private recipients.

*Discussion:* The Department appreciates the commenters' thoughtful views on the First Amendment implications of the proposed definition of hostile environment sex-based harassment. The Department is fully committed to the freedom of speech, the freedom of association, religious liberty, and academic freedom. The Department reaffirms the importance of the free exchange of ideas in educational settings and particularly in postsecondary institutions, consistent with the First Amendment. Indeed, a free exchange of different ideas is essential to high quality education. Nothing in the Title IX regulations restricts any rights that would otherwise be protected from government action by the First Amendment. *See* 34 CFR 106.6(d).

Consistent with those commitments, and after a thorough review of the 2020 amendments and information received prior to, during, and after the issuance of the July 2022 NPRM, the Department is convinced that the definition of hostile environment sex-based harassment in the final regulations does not infringe the constitutional rights of students, employees, and all others. The Department therefore agrees with those commenters who concluded that the proposed definition of hostile environment sex-based harassment would provide more protection from discrimination than the 2020 amendments and fully effectuate Title IX's nondiscrimination mandate, while still respecting the First Amendment rights of students, employees, and all others.

The Department acknowledges that there can be tension between laws and policies that target harassment and the freedom of speech protected by the First Amendment. *See, e.g., Saxe* v. *State Coll. Area Sch. Dist.,* 240 F.3d 200, 206–07 (3d Cir. 2001). The Department nonetheless believes that the final regulations appropriately protect the rights guaranteed under the First Amendment. First, as explained above in Hostile Environment Sex-Based Harassment—the *Davis* standard (§ 106.2), the final regulations maintain the language from § 106.6(d) in the 2020 amendments that nothing in the Title IX regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment. Second, the

Department reiterates the statement from the July 2022 NPRM that a recipient must formulate, interpret, and apply its rules in a manner that respects the legal rights of students and employees when taking action to end sex-based harassment that creates a hostile environment. *See* 87 FR 41415. The Department maintains that although the First Amendment may in certain circumstances constrain the manner in which a recipient responds to sex-based harassment in the form of speech, recipients have ample other means at their disposal to remedy a hostile environment, and recipients remain free under the final regulations to determine whether discipline is the appropriate response to sex-based harassment, and if so, what form that discipline should take.

The Department further notes that the government's compelling interest in preventing discrimination is well established. *See, e.g., Saxe,* 240 F.3d at 209 (''preventing discrimination in the workplace—and in the schools—is not only a legitimate, but a compelling, government interest'' (citing *Bd. of Dirs. of Rotary Internat'l* v. *Rotary Club of Duarte,* 481 U.S. 537, 549 (1987))). And the Supreme Court has specifically recognized the government's ''compelling interest in eradicating discrimination'' on the basis of sex. *Roberts* v. *U.S. Jaycees,* 468 U.S. 609, 623–24 (1984) (explaining that the goal of eliminating sex discrimination and assuring equal access to publicly available goods and services is ''unrelated to the suppression of expression'' and ''plainly serves compelling state interests of the highest order'').

Although sex-based harassment policies may implicate the First Amendment, the definition of hostile environment sex-based harassment in the final regulations is narrowly tailored to advance the Department's compelling interest in eliminating discrimination on the basis of sex. Indeed, in response to concerns commenters raised regarding the First Amendment implications of the proposed definition, the Department has revised the definition to retain the 2020 amendments' reference to offensiveness. Thus, the definition in the final regulations covers only sex-based conduct that is unwelcome, both subjectively and objectively offensive, and so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity.

The Department acknowledges that ''[l]oosely worded'' anti-harassment

laws may be in tension with the First Amendment, *see Saxe,* 240 F.3d at 207, but the Department's definition of hostile environment sex-based harassment is not. Unlike the policy that was invalidated in *Saxe,* which (among other things) covered speech that merely had the "purpose" of interfering with a person's education performance, *see id.* at 210, the Department's definition of hostile environment sex-based harassment is narrowly tailored to advance the compelling interest in eliminating discrimination on the basis of sex because it requires that the harassment have the actual effect of limiting or denying a person's ability to participate in or benefit from a recipient's education program or activity. *Accord, e.g., Robinson* v. *Jacksonville Shipyards, Inc.,* 760 F. Supp. 1486, 1536 (M.D. Fla. 1991) (concluding that application of Title VII to proscribe hostile environment harassment was narrowly tailored to advance a compelling government interest).

Other case law likewise indicates that some prohibitions on harassment that are directed at speech that materially and substantially disrupts school activities are consistent with the First Amendment. The Supreme Court in *Tinker* v. *Des Moines Independent Community School District* stated that schools may discipline speech that would "impinge upon the rights of other students'' or substantially disrupt school activities. 393 U.S. 503, 509 (1969). The Department maintains that the type of conduct prohibited by the definition of hostile environment sex-based harassment in the final regulations "invades the rights of others'' to receive an education free from sex discrimination and therefore is "not immunized by the constitutional guarantee of freedom of speech.'' *Id* at 513. Other cases from the elementary school and secondary school context have expressed similar conclusions. *See, e.g., Parents Defending Educ.* v. *Linn Mar Cmty. Sch. Dist.,* 83 F.4th 658 (8th Cir. 2023) (distinguishing between harassing speech that involves an invasion of the rights of others with speech that is merely "disrespectful''); *Harper* v. *Poway Unified Sch. Dist.,* 445 F.3d. 1166, 1185 (9th Cir. 2006) ("although *Tinker* does not allow schools to restrict the non-invasive, non-disruptive expression of political viewpoints, it does permit school authorities to restrict 'one particular opinion' if the expression would 'impinge upon the rights of other students' or substantially disrupt school activities'' (citation omitted)); *Parents Defending Educ.* v. *Olentangy Loc. Sch.*

*Dist.,* No. 23-cv-01595, 2023 WL 4848509, at *2 (S.D. Ohio July 28, 2023) (policies prohibiting students from engaging in harassment "fit squarely within this carve-out to schoolchildren's First Amendment rights: they prohibit only speech that gives rise to fears of physical or psychological harm, materially affect student performance, substantially disrupt the operation of the school, or create a hostile educational environment''); *L.M.* v. *Town of Middleborough,* No. 23-cv-11111, 2023 WL 4053023, at *6 (D. Mass. June 26, 2023) (schools can prohibit speech that is in "collision with the rights of others to be secure and be let alone'', and listing cases).

Separate from the narrow-tailoring inquiry, some courts have concluded that appropriately delineated anti-harassment laws encompass only speech that is unprotected by the First Amendment. *See, e.g., Aguilar* v. *Avis Rent A Car Sys., Inc.,* 21 Cal. 4th 121, 137 (1999) (explaining that "harassing speech that is sufficiently severe or pervasive to constitute employment discrimination is not constitutionally protected''). To be sure, the Department agrees that—as courts have recently and repeatedly stated—"[t]here is no categorical 'harassment exception' to the First Amendment's free speech clause.'' *United States* v. *Yung,* 37 F.4th 70, 78 (3d Cir. 2022) (quoting *Saxe,* 240 F.3d at 204). Nonetheless, courts have concluded, for various reasons, that certain forms of harassing speech do indeed lack First Amendment protection. Some courts have concluded that certain forms of purely verbal harassment constitute "speech acts'' that are entirely outside the scope of the First Amendment. This explanation applies most naturally to quid pro quo harassment. *See, e.g., Saxe,* 240 F.3d at 208 ("a supervisor's statement 'sleep with me or you're fired' may be proscribed'' because, despite "the purely verbal quality of such a threat, it surely is no more 'speech' for First Amendment purposes than the robber's demand 'your money or your life' ''). In a similar fashion, but using different terminology, courts have sometimes treated harassment as a form of conduct, thus leaving it outside the scope of the First Amendment even when the harassment was accomplished through speech. *See, e.g., Thorne* v. *Bailey,* 846 F.2d 241, 243 (4th Cir. 1988) (repeated and insulting telephone calls constituted a "course of conduct'' that was "not protected speech'' (citing *State* v. *Thorne,* 175 W. Va. 452, 454, 333 S.E.2d 817, 819 (1985))); *State* v.

*Richards,* 127 Idaho 31, 36 (Ct. App. 1995) (speech uttered with "particular purpose to inflict mental discomfort on another . . . is not protected speech, but conduct that legitimately may be proscribed''); *Robinson,* 760 F. Supp. at 1535 ("pictures and verbal harassment are not protected speech because they act as discriminatory conduct'').

Still other courts have concluded that the Supreme Court's captive-audience doctrine justifies prohibitions on hostile environment harassment, even when they reach speech. *See, e.g., Aguilar,* 21 Cal. 4th at 159 (Werdegar, J., concurring) ("The Supreme Court has in a number of cases recognized that when an audience has no reasonable way to escape hearing an unwelcome message, greater restrictions on a speaker's freedom of expression may be tolerated.'' (citing, among other cases, *Frisby* v. *Schultz,* 487 U.S. 474 (1988))). The "status [of a victim] as forced recipients of [a harasser's] speech'' thus "lends support to the conclusion that restrictions on [the harasser's] speech are constitutionally permissible.'' *Id.* at 162; *see also, e.g., Rodriguez* v. *Maricopa Cnty. Cmty. Coll. Dist.,* 605 F.3d 703, 710 (9th Cir. 2010) (stating in dicta that "racial insults or sexual advances directed at particular individuals in the workplace may be prohibited'' because they " 'intrude upon the targeted listener' '' and " 'do so in an especially offensive way' '' (quoting *Frisby,* 487 U.S. at 486 (alteration omitted))). And indeed, in the Department's experience, many students subject to hostile environment harassment lack reasonable ways to avoid the harasser because of the difficulties inherent in transferring to a different school or taking similar measures.

The Department does not mean to suggest that any of the above-described rationales is the single correct explanation for why courts have concluded that some prohibitions on harassment are either sufficiently narrow to withstand First Amendment scrutiny or sweep in only certain forms of harassment that are not protected by the First Amendment. But whatever the underlying doctrinal theory, it is clear from the case law that narrowly drawn anti-harassment laws are permissible. The Court's three decades-old decision in *Harris* is perhaps most clear on this issue. The harassment at issue in that case took the form of pure speech, and both the parties and amici raised First Amendment objections to the application of Title VII to that speech. *See, e.g.,* Reply Brief of Petitioner, *Harris,* 510 U.S. 17 (No. 92–1168), 1993 WL 632335, at *10–11 (arguing that

there is no First Amendment concern when Title VII is applied only to speech that is ''sufficiently severe or pervasive to alter the conditions of the victim's employment''). The Court concluded— without acknowledging any First Amendment concern—that Title VII could be applied to the speech. *See Harris,* 510 U.S. at 23. Had the Court determined that there were potential First Amendment concerns at issue in this case, the Court had the opportunity to address them and adjust its conclusion accordingly, but it did not. The Department agrees that the First Amendment allows for proscription of a narrow category of speech that, based on the totality of the circumstances, constitutes hostile environment sex-based harassment. *Accord, e.g., Aguilar,* 21 Cal. 4th at 137 (relying on *Harris* to uphold a proscription on hostile environment harassment). Because the Department's definition of hostile environment sex-based harassment in the final regulations is, in the relevant ways, consistent with the scope of the proscription of hostile environment harassment at issue in *Harris;* because § 106.6(d) continues to state that nothing in the Department's Title IX regulations requires a recipient to restrict rights otherwise protected under the First Amendment; and because the Department continues to recognize that a recipient must formulate, interpret, and apply its regulations in a manner that respects the legal rights of students and employees when taking action to end sex-based harassment that creates a hostile environment, the final regulations are fully consistent with the First Amendment. Moreover, as explained elsewhere in this section, although a recipient must respond to speech that creates a hostile environment based on sex, depending on the facts and context, the First Amendment may constrain or limit the manner in which a recipient responds to discriminatory harassment in the form of speech (*e.g.,* by using means other than disciplinary action to end and remedy the hostile environment) without obviating the recipient's obligation for its response to be effective.

The Department is not persuaded by the commenters' constitutional concerns about the final regulations' definition of hostile environment sex-based harassment. A number of commenters relied on *Speech First,* which held that a public university's ''discriminatory harassment'' policy should have been preliminarily enjoined. 32 F.4th at 1110. The court emphasized a range of considerations regarding the policy's

breadth, including that the policy extended to conduct based on ''a long list of characteristics'' such as political affiliation, religion, non-religion, and genetic information; that it reached ''other conduct that may be humiliating,'' not only ''verbal acts, name-calling, [and] graphic or written statements''; that it applied to conduct that, among other effects, ''unreasonably . . . alters'' another student's ''participation in a university program or activity''; and it prohibited students ''not only from committing the specified acts, but also from '[c]ondoning,' 'encouraging,' or even 'failing to intervene' to stop them.'' *Id.* at 1115; *see also id.* at 1121 (adding that the student code of conduct indicated that the policy ''should be read broadly'' and was ''not designed to define prohibited conduct in exhaustive terms'' (internal quotation marks omitted)). Although the university policy under review did reference harassment that is severe or pervasive, *see id.* at 1114–15, that one feature, as highlighted, was not the court's focus. The definition of hostile environment sex-based harassment adopted in these final regulations is far different. The definition is narrower, clearer, and tailored to harms that have long been covered by hostile environment laws. Among other differences, the definition in the final regulations proscribes only certain conduct that ''limits or denies'' a person's ability to participate in a recipient's education program or activity, rather than any conduct that might ''alter'' such participation. In addition, the court in *Speech First* faulted the policy at issue for sweeping in conduct that ''may be humiliating,'' 32 F.4th at 1125, but the definition in the final regulations requires that conduct actually be both subjectively and objectively offensive.[12]

Similar to the commenters who cited *Speech First* to support their concerns, one commenter asserted that the court in *Perlot* v. *Green,* 609 F. Supp. 3d 1106 (D. Idaho 2022), looked unfavorably at a postsecondary institution's harassment policy that the commenter asserted applied a definition of sexual harassment similar to the proposed definition. But the court in *Perlot* did

not question the university's definition of hostile environment sex-based harassment. *Id.* at 1120–21. The issue in the *Perlot* case was that plaintiffs had been issued no-contact orders for conduct that did not ''appear[] to be so 'severe, pervasive, and objectively offensive' as to hamper Jane Doe's access to her University education,'' and the school did not seem to be arguing otherwise. *Id.* at 1120.

Although some commenters fear that the proposed definition of hostile environment sex-based harassment would require postsecondary institutions to enact unconstitutional content- and viewpoint-based restrictions on protected speech, that fear is ungrounded. The final regulations do not, in any way, require postsecondary institutions to enact constitutionally impermissible content- and viewpoint-based restrictions and as explained elsewhere, the Department has narrowly tailored the definition of hostile environment sex-based harassment to advance a compelling government interest unrelated to the suppression of speech. Further, § 106.6(d) continues to provide that nothing in the final regulations limits any rights that would otherwise be protected by the First Amendment. The Department also disagrees with the suggestion that the final regulations' definition of hostile environment sex-based harassment itself discriminates based on viewpoint. The final regulations neither silence any particular view nor compel anyone to adopt any particular view on any issue. In contrast to the anti-discrimination policy in *Speech First,* 32 F.4th at 1126, the final regulations' definition of hostile environment sex-based harassment applies to conduct that is unwelcome, subjectively and objectively offensive, and so severe or pervasive that it limits or denies participation in or benefit from an education program or activity, regardless of the view a person expresses or the perspective the person takes when engaging in that conduct. Although the court in *Speech First,* 32 F.4th at 1126, suggested the policy at issue in that case should be considered viewpoint-based, the definition of sex-based hostile environment harassment in the final regulations is different from that policy. In contrast to the anti-discrimination policy in *Speech First,* the final regulations' definition of hostile environment sex-based harassment applies to conduct that is unwelcome, subjectively and objectively offensive, and so severe or pervasive that it limits or denies participation in or benefit from an education program or

---

[12] The case cited by one commenter, *Cohen* v. *San Bernardino Valley College,* 92 F.3d 968 (9th Cir. 1996), is similarly distinguishable. The policy at issue there, among other differences from the definition in these final regulations, prohibited conduct that had the mere ''purpose'' of creating an offensive ''learning environment''—not just the actual effect of limiting or denying access to an educational benefit or opportunity. *Id.* at 971. The court also expressly left open the question of whether a more carefully worded policy would be consistent with the First Amendment. *Id.* at 972.

activity, regardless of the view a person expresses or the perspective the person takes when engaging in that conduct. As one court reviewing a school harassment policy recently put it, the "crux is whether the ban applies equally to individuals on either side of a given debate." *Olentangy Loc. Sch. Dist. Bd. of Educ.,* 2023 WL 4848509, at *16.

To be clear, the final regulations' definition of hostile environment sex-based harassment does not establish an open-ended, discretionary inquiry. The final regulations only prohibit conduct that meets all the elements listed above—that the conduct is unwelcome, sex-based, subjectively and objectively offensive, and also so severe or pervasive that the conduct limits or denies a person's ability to participate in or benefit from the recipient's education program or activity. The final regulations' reference to the totality of the circumstances derives from these very specific and required elements and is meant to ensure that no element or relevant factual consideration is ignored. Moreover, the final regulations, as discussed further below, enumerate long-established factors that are relevant in this context, including the degree to which the conduct affected the complainant's ability to access the recipient's education program or activity; the type, frequency, and duration of the conduct; the parties' ages, roles within the program or activity, previous interactions, and other factors about each party that may be relevant to evaluating the effects of the alleged unwelcome conduct; the location of the conduct and the context in which the conduct occurred; and other established instances of sex-based harassment in the recipient's education program or activity. As discussed further below, the Department is not persuaded by the commenters' arguments for excluding any of these considerations.

Moreover, the Department disagrees with suggestions made by commenters that multiple constraining elements in regulations, or directives to ensure the consideration of multiple relevant facts, like the totality of the circumstances analysis in the final definition of hostile environment sex-based harassment, make those regulations vague or otherwise constitutionally problematic. As discussed elsewhere, the definition of hostile environment sex-based harassment requires consideration of the totality of the circumstances in determining whether a person has been subjected to a hostile environment, which aims to ensure that recipients consider context when determining whether each element is met, to avoid

inappropriately sweeping in conduct or speech that does not actually create a hostile environment under the circumstances. For additional discussion see the section above on Sex-Based Harassment—Vagueness and Overbreadth.

To the extent commenters suggest that no regulation of educational or work environments may validly reach communication that otherwise qualifies as prohibited harassment, that position cannot be squared with decades of law on hostile environments under Title VI, Title VII, Title IX, Section 504, and other Federal or State statutes, nor does it leave room for either the 2020 amendments or these final regulations. The Department rejects that suggestion. The Department notes that, as discussed elsewhere in this preamble, the Supreme Court in both *Harris* and *Davis* upheld similar proscriptions on hostile environment harassment without raising any First Amendment concerns. Indeed, the dissent in *Davis* raised First Amendment issues, 526 U.S. at 667 (Kennedy, J., dissenting), yet the majority apparently viewed schools' authority to proscribe harassment as so uncontroversial that a response to the First Amendment issue was unwarranted.

The Department also strongly disagrees with claims that students will be, in the words of some commenters, subjected to "federally mandated censorship," a "civility code," or a "speech ban," or that the regulations will essentially prohibit "hate speech," "stifle the 'marketplace of ideas' on campuses," or enable people to "weaponize" Title IX against those with whom they disagree on political, religious, and social issues. There is no basis for those claims in the text of the proposed or final regulations or our explanation of it. The Department also notes a commenter's assertion that some recipients may adopt policies that unduly restrict students' expression, but, given that the final regulations contain no such requirement, and in light of § 106.6(d), the Department does not anticipate that recipients will do so. Similarly, the Department notes some commenters' concerns about campus speech codes. But there is nothing in either the proposed or final regulations that requires adoption or implementation of such a code. Likewise, the Department acknowledges concerns that the final regulations' definition of hostile environment sex-based harassment may chill speech and could lead to investigations and adverse actions against certain faculty members. But these concerns are speculative because there is no credible threat that

the Department will enforce these final regulations so as to require restrictions on speech that would violate the First Amendment. The Department has clearly stated in § 106.6(d) that nothing in the Title IX regulations restricts any rights that would otherwise be protected from government action by the First Amendment. The Department will offer technical assistance, as appropriate, to promote compliance with these final regulations, including how to appropriately apply the definition of hostile environment sex-based harassment so as not to infringe on First Amendment rights.

The Department rejects a commenter's contention that the definition of hostile environment sex-based harassment will somehow lead to more incidents of other forms of sex-based harassment such as "violence and other hateful conduct." The commenter offered no sound basis for that prediction, and the Department is aware of none. The Department is not aware that there was any increase in other discriminatory conduct following the release of prior Department guidance on sexual harassment and sexual violence, including the 2001 Revised Sexual Harassment Guidance or 2011 Dear Colleague Letter on Sexual Violence, or since the Equal Employment Opportunity Commission's (EEOC) regulations on sexual harassment, 29 CFR 1604.11, went into effect.

The Department disagrees that the final regulations improperly compel speech by recipients, including speech related to sexual orientation, gender identity, or abortion. The Department has long acknowledged that, although not required to do so, schools may denounce students' derogatory statements, including derogatory statements that create a hostile environment. *See* 2001 Revised Sexual Harassment Guidance, at 22. When a school chooses to voice its disagreement with student speech, it exercises its own First Amendment rights, *cf. Rumsfeld* v. *F. for Acad. & Institutional Rts., Inc.,* 547 U.S. 47 (2006), and contributes to the diversity of voices on campus. Thus, responding to a hostile environment in such a fashion is fully consistent with the First Amendment. Further, while the final regulations require that recipients respond to sex-based harassment, the final regulations do not dictate that a recipient take any specific disciplinary action in response to sex-based harassment, and any such action a recipient may take must account for and comply with the First Amendment. *See* 34 CFR 106.6(d). A recipient thus can effectively address sex-based hostile environment harassment in ways that

do not implicate or burden the First Amendment rights of students, employees, or others.

The Department does not prejudge or comment on whether specific cases or factual scenarios comply with Title IX prior to conducting an investigation and evaluating the relevant facts and circumstances. The Department notes again that the regulations focus on Title IX's protection from discrimination based on sex, and they do not single out for prohibition any specific view on sexual orientation, gender identity, or any other topic mentioned by commenters. As § 106.6(d) makes clear, and as the Department reaffirms, recipients cannot use Title IX to limit the free exercise of religion or protected speech or expression, or otherwise restrict any other rights guaranteed against government action by the U.S. Constitution. Recipients must fulfill their obligations in a manner that is fully consistent with the First Amendment and other guarantees of the Constitution of the United States. *See* 34 CFR 106.6(d).

The Department acknowledges commenters' efforts to identify situations in which they believe recipients improperly implemented the Title IX regulations in a manner that may have infringed the free expression rights of a student or faculty member or that could constitute hostile environment sex-based harassment and potentially lead to an investigation. The Department will continue to enforce the Title IX regulations as promulgated and address improper implementation of the Title IX regulations through the Department's complaint process and the provision of technical assistance. The Department cannot comment on the identified situations or hypotheticals without conducting a fact-specific investigation. Moreover, in accordance with § 106.6(d), nothing in the regulations would require a recipient to restrict any rights that would otherwise be protected by the First Amendment.

Regarding commenters' concern that professors may have stopped teaching certain subjects that students may find offensive or that they have left teaching altogether, we note that nothing in the Title IX regulations restricts the academic freedom of faculty members. The regulatory limitation on the Department regarding curricular materials under Title IX remains unchanged: "Nothing in this regulation shall be interpreted as requiring or prohibiting or abridging in any way the use of particular textbooks or curricular materials." 34 CFR 106.42. Further, the determination whether a hostile environment exists is inherently fact-

based, and the Department considers the academic setting of a person's conduct to be highly relevant. Conduct that may very well amount to harassment in other settings may not amount to harassment if engaged in appropriately in the academic setting, especially in the context of postsecondary academic discourse. In light of this, the Department does not believe it is necessary to revise § 106.6(d) to explicitly protect academic freedom.

Regarding commenters' concerns related to religious liberty and the freedom of association, the Department notes that as stated above and reflected in § 106.6(d), the Title IX regulations do not require recipients to restrict any rights that would otherwise be protected from government action by the First Amendment, including the freedom of speech, the free exercise of religion, and the freedom of association. The final regulations implement Title IX's protection from discrimination based on sex while also respecting the First Amendment rights of students, staff, and other individuals. In response to commenters who expressed concern about the final regulations' effect on religiously affiliated recipients, the Department emphasizes that both the statute at 20 U.S.C. 1681(a)(3) and § 106.12 of the current regulations— which the Department is not changing— provide that educational institutions controlled by a religious organization are not subject to Title IX or to Title IX regulations to the extent application of the statute or the regulations would not be consistent with the religious tenets of the controlling religious organization. The final regulations adopted here set out requirements to fulfill Congress's commitment that no person shall be subject to exclusion, denial of benefits, or discrimination based on sex in a recipient's education program or activity. In addition, the Department notes that Title IV of the Civil Rights Act of 1964, which is enforced by the Department of Justice's Civil Rights Division, authorizes the Department of Justice to address complaints alleging religious discrimination by public schools and higher education institutions.

In response to a commenter's concern regarding the membership practices of student groups, the Department notes that to the extent Title IX prohibits student groups from discriminating on the basis of sex, including sexual orientation and gender identity, those groups may, consistent with Title IX and other applicable laws, impose membership criteria not related to sex that promote the student group's mission (for example, requiring that

members have a legitimate good faith interest in the group's mission). The Department agrees with a commenter's statement that even if student groups benefit from Federal funding provided to their postsecondary institutions, such funding does not turn the actions of these groups into State action.

In response to a commenter's concern that the Department removed two of three references to the primacy of the First Amendment that were in the 2020 amendments, the Department notes that the commenter did not specify what references were deleted. The Department emphasizes, however, that the removal of any references to the primacy of the First Amendment from the 2020 amendments was not intended to reduce or signal lesser First Amendment protections under these final regulations and reiterates that, consistent with § 106.6(d), nothing in these final regulations requires a recipient to restrict any rights protected by the First Amendment. Although the First Amendment may in certain circumstances affect the manner in which a recipient responds to discriminatory harassment in the form of speech, recipients have ample other means at their disposal to remedy a hostile environment and recipients remain free under the final regulations to determine whether discipline is the appropriate response to sex-based harassment, and if so, what form that discipline should take.

Regarding the commenter who argued that the Department's July 2022 NPRM insufficiently addressed First Amendment protections and thus failed to adequately explain the change in position from the 2020 amendments, the Department notes that the July 2022 NPRM discussed the First Amendment as part of the Department's explanation for the revised definition of "sex-based harassment." 87 FR 41414–15. Among other things, the Department explained that it views the proposed definition as sufficiently narrow so as not to encroach on any constitutional rights and emphasized that applying the definition would require consideration of a respondent's First Amendment rights. An NPRM must provide "sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully," *U.S. Telecom Ass'n* v. *FCC,* 825 F.3d 674, 700 (D.C. Cir. 2016) (internal quotation marks omitted), and the Department's explanation in the July 2022 NPRM, including the discussion of the First Amendment, satisfies this standard.

Regarding commenters' arguments that an administrative agency should not interpret laws in a manner that

could cause First Amendment issues and, therefore, the definition of hostile-environment sex-based harassment exceeds the Department's statutory authority, there are no such constitutional concerns here because as explained in this section, the final regulations are consistent with established case law regarding harassment and the First Amendment. The Department also notes that agencies are not stripped of the power to issue regulations merely because those regulations may intersect with the First Amendment. *See, e.g., Cablevision Sys. Corp.* v. *FCC,* 649 F.3d 695, 709 (D.C. Cir. 2011); *Republican Nat'l Comm.* v. *Fed. Election Comm'n,* 76 F.3d 400, 409 (D.C. Cir. 1996). Here, for example, these final regulations are both reasonable and consistent with the relevant case law addressing hostile environment harassment in the First Amendment context.

Regarding the application of § 106.6(d) to private recipients, the Department notes that § 106.6(d) applies to all recipients of Federal financial assistance, including private recipients, and thus, nothing in these final regulations requires a private recipient to restrict any rights that would otherwise be protected from government action by the First Amendment. This is consistent with OCR's longstanding position in the administrative enforcement of Title IX that the Title IX regulations ''should not be interpreted in ways that would lead to the suppression of protected speech on public or private campuses'' and that ''OCR interprets [the Title IX] regulations consistent with the requirements of the First Amendment, and all actions taken by OCR must comport with First Amendment principles.'' 2003 First Amendment Dear Colleague Letter. Accordingly, nothing in Title IX or these final regulations would preempt a State law that governs speech protected by the First Amendment, including as applied to a private recipient. However, a recipient's obligation to comply with Title IX and these final regulations is not obviated or alleviated by a conflicting State law that governs speech that is not protected by the First Amendment. For more discussion of the application of the preemption provision at § 106.6(b), see the discussion of § 106.6(b). Although the Department will not compel private recipients to restrict conduct that would otherwise be protected under the First Amendment, the Department declines the commenter's suggestion to revise § 106.6(d) to require that all recipients

abide by the U.S. Constitution. Requiring non-State actors to comply with the Constitution would be outside of the Department's authority.

*Changes:* As explained in the section below on Hostile Environment Sex-Based Harassment—Subjectively and Objectively Offensive (§ 106.2), the Department has revised the definition of ''sex-based harassment'' to add the word ''offensive'' to the subjective and objective standard in hostile environment sex-based harassment.

Hostile Environment Sex-Based Harassment—Severe or Pervasive (§ 106.2)

*Comments:* Some commenters supported the severe or pervasive standard because it is more consistent with Title VII; would allow a recipient to address conduct that is severe but not pervasive, or vice versa; and would allow for a more prompt and effective response when a student experiences a hostile environment. Commenters also asserted that the definition of ''sexual harassment'' in the 2020 amendments set too high a bar for when a recipient can address sexual harassment under Title IX.

One commenter questioned how a recipient would measure whether the conduct was sufficiently severe or pervasive.

*Discussion:* The Department appreciates the variety of views expressed by the commenters regarding the adoption of the severe or pervasive standard in the definition of hostile environment sex-based harassment. The Department has determined that the final regulations support a more uniform approach to hostile environment harassment, which is a concept embedded in numerous civil rights laws, including Title VII. *See, e.g., Harris,* 510 U.S. 17; 29 CFR 1604.11. Although the final regulations do not simply track prior OCR guidance, the final regulations do align more closely, as compared with the 2020 amendments, with OCR's longstanding interpretation of Title IX articulated in prior guidance. *See, e.g.,* 2001 Revised Sexual Harassment Guidance. They also align with enforcement practice prior to the 2020 amendments. The final regulations do not set a higher standard for sex-based harassment than for other forms of harassment, such as harassment on the basis of race, color, national origin, or disability. The Department agrees with commenters that the definition of hostile environment sex-based harassment will allow for a more prompt and effective response when a student experiences a hostile environment.

The Department acknowledges the commenters' support for the definition of hostile environment sex-based harassment because it will address conduct that is severe but not pervasive, and conduct that is pervasive but not severe. The Department emphasizes, however, that the severe or pervasive standard is but one element of the definition of hostile environment sex-based harassment as discussed throughout this section. The definition of ''sex-based harassment'' in the final regulations recognizes that isolated comments would generally not meet the definition of hostile environment sex-based harassment.

Regarding one commenter's question about how a recipient would measure conduct to determine whether it is sufficiently severe or pervasive, the Department clarifies that sex-based conduct meets the ''severe or pervasive'' standard of sex-based harassment if it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity. See the discussion below for more detailed explanation of when conduct ''limits or denies'' a person's ability to participate in or benefit from a recipient's education program or activity. To emphasize that the severity or pervasiveness inquiry is necessarily linked to a person's access to an education program or activity, the Department has replaced ''sufficiently'' with ''so'' in the final regulations.

The applicable regulations, this preamble, and other sources of hostile environment harassment law all inform how a recipient should determine whether conduct is severe or pervasive. The final regulations—particularly in § 106.45, and if applicable § 106.46—set out the requirements for a recipient's gathering and evaluation of evidence from parties and witnesses, and the standard by which the persuasiveness of that evidence is to be evaluated. In addition, and as indicated elsewhere in this preamble, one stray remark does not satisfy the level of persuasiveness to which the regulations refer. The Department reaffirms the statement in the July 2022 NPRM that the offensiveness of a particular expression as perceived by some persons, standing alone, would not be a legally sufficient basis to establish a hostile environment under Title IX. *See* 87 FR 41415. Further, a statement of one's point of view on an issue of debate and with which another person disagrees, even strongly so, is not the kind or degree of conduct that implicates the regulations. In contrast, sex-based conduct that occurs on multiple occasions and is so persistent that, for example, it limits

another student's ability to complete assigned coursework at the student's typical level of performance would potentially constitute the type of pervasive sex-based conduct the final regulations are intended to reach. Moreover, because the final regulations draw from settled components of Title VII sexual harassment law, recipients and others may consult that field of law for additional guidance as to how courts have analyzed whether conduct is severe or pervasive.[13]

The Department disagrees with a commenter's assertion that the definition of hostile environment sex-based harassment would require a recipient to track speech because that is the only way to establish whether speech is severe or pervasive. The Department clarifies that nothing in the definition of "sex-based harassment," or §§ 106.44, 106.45, or 106.46, which apply the definition of "sex-based harassment," requires a recipient to directly or indirectly track speech for which no complaint was made or of which the Title IX Coordinator has not been notified. Contrary to the commenter's assertion, affirmatively tracking speech or sex-based conduct is not the only way to determine pervasiveness. Rather, harassment can be pervasive if it is widespread, openly practiced, or well-known to students and staff (such as sex-based harassment occurring in the hallways, graffiti in public areas, or harassment occurring during recess under a teacher's supervision). *See, e.g.,* 2001 Revised Sexual Harassment Guidance, at 13–14 & nn.76–78 (citing *Katz* v. *Dole,* 709 F.2d 251, 256 (4th Cir. 1983)); 85 FR 30166; *Smolsky* v. *Consol. Rail Corp.,* 780 F. Supp. 283, 293 (E.D. Pa. 1991), *reconsideration denied,* 785 F. Supp. 71 (E.D. Pa. 1992); *Jensen* v. *Eveleth Taconite Co.,* 824 F. Supp. 847, 887 (D.

Minn. 1993); *Cummings* v. *Walsh Constr. Co.,* 561 F. Supp. 872, 878 (S.D. Ga. 1983)). Although pervasiveness can also be found if there is a pattern or practice of harassment, as well as if the harassment is sustained and nontrivial, *see, e.g., Moylan* v. *Maries Cnty.,* 792 F.2d 746, 749–50 (8th Cir. 1986); or part of a continuous series of events, *see, e.g., Williams* v. *Bd. of Regents of Univ. Sys. of Ga.,* 477 F.3d 1282, 1298 (11th Cir. 2007), this in no way requires a recipient to affirmatively track all speech, but rather to assess a complaint or notification of allegedly offensive sex-based speech considering the totality of the known circumstances, including whether the Title IX Coordinator has received other related complaints or notifications alleging conduct that reasonably may constitute sex discrimination. To the extent the commenter objects to a recipient maintaining records consistent with § 106.8(f)(1) and (2) for complaints or notifications alleging verbal sex-based harassment, the Department has determined that a recipient's recordkeeping obligations for complaints and notifications of speech-based sex-based harassment should be treated the same as other complaints and notifications of sex discrimination. Accordingly, the Department is unpersuaded that a revision of the "severe or pervasive" requirement is necessary or best serves Title IX's mandate that recipients promptly and effectively address sex discrimination in their education programs or activities.

To the extent commenters raised specific examples of conduct that may or may not satisfy the definition of hostile environment sex-based harassment, the Department declines to opine on specific examples because any such evaluation of the facts must be based on the totality of circumstances. In any event, further explanation of the content of the final regulations is provided in the discussions above and below.

*Changes:* The Department has revised the definition of "sex-based harassment" to state that the conduct must be "so" severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.,* it creates a hostile environment), rather than "sufficiently" severe or pervasive.

Hostile Environment Sex-Based Harassment—Subjectively and Objectively Offensive (§ 106.2)

*Comments:* Some commenters objected to the omission of offensiveness from the definition of

hostile environment sex-based harassment, arguing that it would make students responsible for inoffensive conduct and could discourage a recipient from using informal approaches such as restorative justice to address minor conduct issues.

Some commenters asserted that a standard that is both objective and subjective is necessary to protect students. Other commenters preferred either the objective standard or the subjective standard, but not both. Another commenter asserted that combining subjective and objective components would effectively eliminate the objective component, and one commenter asked from whose perspective the subjective standard would be determined.

Some commenters said that the subjective standard violates the First Amendment and argued that an objective standard is more protective of free speech. Commenters said the subjective standard would require employees to police speech; cause a chilling effect; and potentially compel certain speech. Some commenters said the definition would create a "heckler's veto" because a single statement on a topic like abortion, sex outside marriage, or sexual orientation could be offensive to one student and lead to a complaint of sex-based harassment.

Some commenters said the subjective standard's vagueness would deny respondents due process, lead to meritless investigations and inconsistent enforcement across recipients, and favor complainants; argued that the proposed definition of "sex-based harassment" would discriminate against men; and said that the subjective standard would force recipients to expend scarce resources on an excessive number of investigations.

One commenter posited that the subjective standard could be unfair for complainants because a recipient could find the complainant did not subjectively perceive the environment to be abusive even if it met the objective standard. Another commenter was concerned that the subjective standard gives too much discretion to investigators or decisionmakers who could be biased.

*Discussion:* The Department thanks commenters for noting that the definition of hostile environment sex-based harassment in the proposed regulations omitted the concept of "offensiveness." The Department agrees that "offensiveness" is a key part of the subjective and objective standards and is amending the definition of hostile environment sex-based harassment accordingly. This change also

---

[13] *See, e.g., Faragher* v. *City of Boca Raton,* 524 U.S. 775, 788 (1998) (referencing simple teasing, offhand comments, and isolated incidents as not amounting to discrimination, unless extremely serious); *Oncale* v. *Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 82 (1998) ("Common sense, and an appropriate sensitivity to social context, will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex, and conduct which a reasonable person in the plaintiff's position would find severely hostile or abusive."); *Harris,* 510 U.S. at 21 (referencing situations in which a workplace is permeated with discriminatory intimidation, ridicule, and insult); *Meritor Sav. Bank* v. *Vinson,* 477 U.S. 57, 64–67 (1986). The Department notes that courts often rely on interpretations of Title VII to inform interpretations of Title IX. *See, e.g., Franklin,* 503 U.S. at 75; *Jennings* v. *Univ. of N.C.,* 482 F.3d 686, 695 (4th Cir. 2007) (en banc); *Frazier* v. *Fairhaven Sch. Comm.,* 276 F.3d 52, 65–66 (1st Cir. 2002); *Gossett* v. *Oklahoma ex rel. Bd. of Regents for Langston Univ.,* 245 F.3d 1172, 1176 (10th Cir. 2001).

ameliorates a commenter's concern about a recipient's discretion to use informal mechanisms to address minor misconduct that does not rise to the level of sex-based harassment.

The Department acknowledges the commenters' support for the inclusion of both a subjective and objective standard in the definition of hostile environment sex-based harassment. Requiring unwelcome sex-based conduct to be evaluated subjectively and objectively is consistent with the Department's analysis in the preamble to the 2020 amendments. 85 FR 30167. This is also consistent with Supreme Court case law, which has employed both objective standards—*see, e.g., Davis,* 526 U.S. at 650 (conduct must be "objectively offensive" to trigger liability for money damages); *Oncale,* 523 U.S. at 81 ("[T]he objective severity of harassment should be judged from the perspective of a reasonable person in the [complainant's] position, considering 'all the circumstances.' " (quoting *Harris,* 510 U.S. at 23))—and subjective standards—*see Harris,* 510 U.S. at 21–22 (explaining that "if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation," even if a reasonable person would find the environment hostile or abusive)—in determining whether a hostile environment existed.

The Department appreciates the comments opposed to either the subjective or objective standard, but the Department continues to take the position that unwelcome sex-based conduct must be evaluated both subjectively and objectively. The Department also does not agree with the commenter's assertion that inclusion of a subjective element in a definition would eliminate the objective element. As discussed in the July 2022 NPRM and elsewhere in this preamble, and as illustrated by courts in other contexts, the two elements are distinct, and a decisionmaker must find sufficient evidence to satisfy each element under the applicable standard before determining that alleged conduct constitutes sex-based harassment. *See* 87 FR 41414. The Department maintains, however, consistent with the preamble to the 2020 amendments and the July 2022 NPRM, that the objective standard is assessed from the perspective of a reasonable person in the complainant's position. 85 FR 30167; 87 FR 41414.

The Department agrees that the First Amendment provides clear protection for individual expressions of opinion,

including expressions of opinions that are unpopular. As discussed in the July 2022 NPRM and elsewhere in this preamble, the First Amendment and academic freedom must be considered if issues of speech or expression are involved. *See* 87 FR 41415. The Department disagrees with commenters that subjectively offensive speech, in itself, would constitute sex-based harassment under Title IX, given the inclusion of an objectively offensive element in the definition. To the extent the other comments raise concerns under the First Amendment, those comments are addressed in the section above dedicated to First Amendment Considerations.

The Department disagrees that the inclusion of the subjective standard would be unfair to respondents, including by denying respondents due process, leading to meritless investigations, or leading to inconsistent enforcement across recipients. The Department disagrees that the final regulations discriminate against men and notes that the final regulations protect all students, employees, and other individuals from discrimination based on sex—including men, and ensure that all respondents are treated equitably, regardless of their sex. Specifically, recipient's obligations under § 106.45, and if applicable § 106.46, ensure that respondents' due process rights are respected, that complainants and respondents are treated equitably, and that investigations are evidence-based whenever a complaint is initiated. In addition, a subjective standard is commonly used, including under the 2020 amendments and prior guidance, to determine whether conduct is unwelcome. 85 FR 30167 ("whether harassment is actionable turns on both subjectivity (*i.e.,* whether the conduct is unwelcome, according to the complainant) and objectivity (*i.e.,* 'objectively offensive')"); 2001 Revised Sexual Harassment Guidance, at 5 ("OCR considers the conduct from both a subjective and objective perspective.").

The Department disagrees that the subjective standard will cause a recipient to automatically credit a complainant's allegations or lead to heightened scrutiny that would force a recipient to expend scarce resources. Subjective offensiveness must be supported by evidence, and subjective offensiveness alone would not support a finding or discipline. As discussed previously, the definition of hostile environment sex-based harassment requires an evaluation, based on the totality of circumstances, of several key

elements. Regardless, the inclusion of the objective standard would satisfy commenters' concerns that the subjective standard working alone may implicate these concerns.

The Department disagrees with the contention that the subjective standard could be unfair to complainants because a recipient could find that sex-based harassment did not occur even when objective factors indicate that it did. Whether the complainant subjectively found the conduct offensive or abusive is commonly understood as an important element of hostile environment harassment. *See Harris,* 510 U.S. at 21–22 (explaining that, even if a "reasonable person" might view the conduct as constituting harassment, no Title VII violation occurs "if the victim does not subjectively perceive the environment to be abusive" because "the conduct has not actually altered the conditions of the victim's employment.").

With respect to the comment that recipient employees could act with bias, the final regulations specifically require Title IX Coordinators, investigators, and decisionmakers to be trained on how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias, § 106.8(d)(2); and to act without bias toward any specific party or toward complainants or respondents in general, § 106.45(b)(2). They also require postsecondary institutions, in cases involving a student party, to offer the parties an appeal on the basis that the Title IX Coordinator, investigator, or decisionmaker had a conflict of interest or bias for or against complainants or respondents generally or the individual complainant or respondent that would change the outcome. § 106.46(i)(1)(iii). *See also* the discussions of §§ 106.45(b)(2), 106.46(i)(1)(iii). A respondent who believes a recipient violated its obligations under the final regulations may also file a complaint with OCR.

Finally, the Department appreciates the commenter's questions regarding from whose perspective the subjective standard would be determined. The final regulations' reference to a subjective perspective in the definition of hostile environment sex-based harassment refers to the complainant. The complainant's perspective is likewise part of the Title VII standard. *See Harris,* 510 U.S. at 21 (connecting a Title VII violation to whether, in part, the complainant subjectively perceives the environment to be abusive). Evidence regarding whether sex-based conduct meets the subjective element of the definition could include, but is not

limited to, the complainant's own statements about the alleged conduct or other sources that could establish the complainant's experience of the alleged conduct.

*Changes:* The Department has revised the definition of "sex-based harassment" to add the word "offensive" to the subjective and objective standard for establishing hostile environment sex-based harassment.

Hostile Environment Sex-Based Harassment—Limits or Denies (§ 106.2)

*Comments:* Some commenters supported the proposed definition of hostile environment sex-based harassment but were concerned that it could still create burdens for complainants by requiring a recipient to determine how the complainant's education is limited by the harassment. For example, these commenters said that a recipient could interpret this as requiring a complainant to show that they received lower grades.

A group of commenters, relying on *Davis,* noted that the text of Title IX only prohibits discrimination that denies access to the recipient's education program or activity and does not prohibit conduct that does not rise to that level of severity. One commenter said that the Department could not justify changing "effectively denies" to "denies or limits" because the Supreme Court in *Davis* concluded that Congress was concerned with ensuring equal access and not eradicating every limitation on access.

Some commenters said that the term "limits" is vague and overly broad. Commenters expressed concern that the use of the term "limits" would threaten protected speech, cover conduct that detracts in any way from another student's enjoyment of the recipient's education program, require a recipient to primarily consider the conduct from the complainant's perspective, and expose postsecondary institutions to lawsuits from students alleging they were expelled on arbitrary grounds.

*Discussion:* In the preamble to the 2020 amendments, the Department stated that the "effectively denies a person access" element of the definition of sexual harassment "does not act as a more stringent element than the 'interferes with or limits a student's ability to participate in or benefit from the school's programs' language found in Department guidance." 85 FR 30152. The Department explained in the preamble to the 2020 amendments that this standard does not only apply when a complainant was "entirely, physically excluded from educational opportunities," nor does it require showing that a complainant "dropped out of school, failed a class, had a panic attack, or otherwise reached a 'breaking point' " because "individuals react to sexual harassment in a wide variety of ways." 85 FR 30169–70. As explained in the July 2022 NPRM, the Department believes that the phrase "limits or denies" more accurately captures the full scope of Title IX's nondiscrimination mandate. *See* 87 FR 41414. We also disagree that *Davis* requires the Department to restrict the definition of hostile environment sex-based harassment only to conduct that denies access to a recipient's education program or activity. As described in the July 2022 NPRM and elsewhere in this preamble, the holding in *Davis* does not limit the Department's authority to regulate under Title IX. *See id.* In addition, the Title IX statute states that no person shall, on the basis of sex, "be excluded from participation in, be denied the benefits of, or be subjected to discrimination under" any education program or activity receiving Federal financial assistance. If Title IX only covered exclusion from participation or denial of access, there would have been no reason for Congress to add "be denied the benefits of." A limitation on equal access constitutes a denial of benefits. *See id.*

The Department appreciates the commenters' concern that the proposed definition could burden complainants by requiring a recipient to determine how the complainant's education is limited or impacted by the harassment; however, the Department maintains that the definition of hostile environment sex-based harassment appropriately requires evidence of the impact of the alleged conduct on the complainant, as Title IX requires. The Department reiterates that grades are not the only evidence of a student's ability to participate in and access the benefits of a recipient's education program or activity, and the Department reaffirms that the definition of hostile environment sex-based harassment does not require a complainant to demonstrate any particular harm, such as reduced grades or missed classes. Put another way, a complainant must demonstrate some impact on their ability to participate or benefit from the education program or activity, but the definition does not specify any particular limits or denials. Rather, as with all complaints, the recipient's evaluation of whether sex-based harassment occurred must be based on all of the relevant and not otherwise impermissible evidence.

The Department disagrees with commenters' views that the term "limits" is vague or overbroad, or that it would threaten protected speech because speech that is subjectively or objectively inoffensive would not satisfy that element of hostile environment sex-based harassment. For further discussion see the sections above on Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2), Hostile Environment Sex-Based Harassment—Subjectively and Objectively Offensive (§ 106.2), and Sex-Based Harassment—Vagueness and Overbreadth (§ 106.2).

The final regulations contain a number of provisions that prevent the arbitrary expulsion of students, including the grievance procedure requirements in § 106.45, and as applicable § 106.46. Whether conduct limits or denies a person's ability to participate in or benefit from the recipient's education program or activity is a fact-based inquiry that requires consideration of all relevant and not otherwise impermissible evidence. In response to the commenter who suggested that the definition of hostile environment sex-based harassment will deem a student who acts without animus to have created a hostile environment, the Department notes that consistent with the Supreme Court's analysis in *Davis,* as well as the preamble to the 2020 amendments and in prior OCR guidance, the Department does not understand animus to be a required element of a harassment claim. Instead, the analysis focuses on whether the harassment limits or denies a person's ability to participate in or benefit from the recipient's education program or activity based on sex. *See* 85 FR 30167; U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter: Harassment and Bullying, at 2 (Oct. 26, 2010) (2010 Harassment and Bullying Dear Colleague Letter), *https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf.*

Upon its own review of the proposed regulations, the Department has decided to change the order of the words "denies" and "limits" so that "limits" comes first for clarity. This is a non-substantive change and does not indicate a change in the meaning of the standards discussed herein.

*Changes:* The Department has revised the definition of "sex-based harassment" to reverse the order of "denies" and "limits."

Hostile Environment Sex-Based Harassment—Factors To Be Considered (§ 106.2)

General Support and Opposition

*Comments:* Some commenters supported the inclusion of factors to be considered in determining whether hostile environment sex-based harassment occurred, and others opposed them or requested modifications.

Some commenters questioned the basis for the factors, found them confusing or unworkable, asserted that the examples in the preamble to the July 2022 NPRM did not align with courts' analyses, and asked how the factors might result in similar or different findings than under Title VII.

Some commenters said that it was not clear what conduct would constitute hostile environment sex-based harassment under the factors and objected to a non-exhaustive list, noting that additional factors would be unknown to students and employees. Some commenters said elementary schools need more clarity to distinguish "annoying" and "immature" conduct from conduct that constitutes hostile environment sex-based harassment.

One commenter objected to the Department's inclusion of examples of hostile environment sex-based harassment in the July 2022 NPRM, arguing that some examples, such as those involving speech or a single incident of harassment, could contradict *Davis.*

*Discussion:* The factors listed in the definition of hostile environment sex-based harassment are similar to those discussed in the preamble to the 2020 amendments, 85 FR 30170, and prior guidance based on case law, *see* 2001 Revised Sexual Harassment Guidance, at 5–7 and cases cited (discussing the following factors: the degree to which the conduct affected one or more students' education; the type, frequency, and duration of the conduct; the identity and relationship between the alleged harasser and the subject or subjects of the harassment; the number of individuals involved; the age and sex of the alleged harasser and the subject or subjects of the harassment; the size of the school, location of the incidents, and context in which they occurred; other incidents at the school; and incidents of gender-based, but nonsexual harassment).

The Department also notes that the factors are similar to those that courts and agencies have used in evaluating a hostile environment in the employment context under Title VII. *See, e.g.,* 29 CFR 1604.11 ("In determining whether

alleged conduct constitutes sexual harassment, the Commission will look at the record as a whole and at the totality of the circumstances, such as the nature of the sexual advances and the context in which the alleged incidents occurred. The determination of the legality of a particular action will be made from the facts, on a case by case basis."). *See also* U.S. Equal Emp. Opportunity Comm'n, Enforcement Guidance on National Origin Discrimination (Nov. 18, 2016), *https://www.eeoc.gov/laws/guidance/eeoc-enforcement-guidance-national-origin-discrimination#_Toc451518815* ("Relevant questions in evaluating whether national origin harassment rises to the level of creating a hostile work environment may include any of the following: whether the conduct was hostile/offensive; whether the conduct was physically threatening or intimidating; how frequently the conduct was repeated; or the context in which the harassment occurred.").

The Department acknowledges, as referenced in the comments, that the factors listed in the definition of hostile environment sex-based harassment are not identical to the factors the EEOC considers, but the EEOC similarly examines the totality of the circumstances, including the nature, frequency, and context of the conduct. As discussed in the July 2022 NPRM, the preamble to the 2020 amendments, and elsewhere in this preamble, although there are some differences between the employment and education contexts, interpretations of Title VII appropriately inform interpretations of Title IX. *See* 87 FR 41415; 85 FR 30199. The factors the Department has included in the final regulations, like those used by courts and other agencies, reflect an effort to consider the "constellation of surrounding circumstances, expectations, and relationships," *Oncale,* 523 U.S. at 82, that can inform whether conduct creates a hostile environment in a particular context.

The Department disagrees that the factors listed in the definition of hostile environment sex-based harassment or examples cited in the July 2022 NPRM are vague. The examples demonstrate the variety of contexts in which harassment may arise. Although the list of factors included in the final regulations is not exhaustive and there may be other considerations in examining the totality of the circumstances, the definition of hostile environment sex-based harassment is sufficiently broad to capture the contexts in which harassment can occur and sufficiently specific and consistent

with precedent to provide appropriate notice to the public as to how the Department evaluates sex-based harassment. The Department declines to limit the factors to be considered to those listed in the definition of hostile environment sex-based harassment because of the necessarily fact-specific nature of the totality of the circumstances analysis.

With respect to the commenters' request for more clarity regarding how to draw the line between "annoying" and "immature" conduct and conduct that constitutes sex-based harassment, the Department notes that the legal standard is not whether or not conduct is subjectively "annoying" or "immature." The standard for hostile environment sex-based harassment is whether or not the totality of the circumstances demonstrates conduct that is unwelcome sex-based conduct, subjectively and objectively offensive, and so pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity.

In response to the commenter who said that examples of harassment could contradict *Davis,* the Department notes that any examples the Department provides are for illustrative purposes. In all cases, the totality of the circumstances must be considered in connection with the definition of hostile environment sex-based harassment. The Department also notes that, as explained above, the standard for administrative enforcement need not be identical to the standard for holding a recipient liable for monetary damages under *Davis.* For additional discussion see the section above on Hostile Environment Sex-Based Harassment—the *Davis* Standard (§ 106.2).

Consideration of the factors listed in the definition of hostile environment sex-based harassment is one aspect of ensuring that the determination is made based on the totality of the circumstances. The July 2022 NPRM also made this point, explaining that the Department did not offer a definitive assessment of the examples not because the examples were insufficient but because "a fuller, fact-specific analysis would be required" to reach a final determination. 87 FR 41416; *see also Davis,* 526 U.S. at 651 ("Whether gender-orientated conduct rises to the level of actionable 'harassment' thus 'depends on a constellation of surrounding circumstances, expectations, and relationships' " (quoting *Oncale,* 523 U.S. at 82) (internal quotation marks omitted)). The Department similarly declines to opine on specific examples presented in the

comments because a fuller, fact-specific analysis is required.

*Changes:* None.

The First Factor—Degree of Impact

*Comments:* One commenter asked the Department to add "participate in" to the first hostile environment factor, to cover the degree to which the conduct affected the complainant's ability to access *or participate in* the recipient's education program or activity.

Another commenter said the Department should not limit the first hostile environment factor to the complainant's educational access because a recipient must also consider the impact on campus community members who are directly or indirectly experiencing a hostile environment.

One commenter asserted that a recipient should not evaluate the degree of impact on a complainant based on its idea of a "perfect victim," citing 85 FR 30170.

*Discussion:* The Department declines to add "participate in" to the first hostile environment factor because "access" in this context includes the ability to participate in or benefit from the recipient's education program or activity, consistent with use of the term in the current regulations and in case law. *See, e.g., Davis,* 526 U.S. at 631 (describing Title IX's prohibition on being "excluded from participation in" or "denied the benefits of" a recipient's education program or activity as denial of equal "access").

The Department declines to modify the first hostile environment factor to remove the reference to the complainant. The Department does not think that the factor, as described, will lead a recipient to ignore the impact of conduct on campus community members. As discussed elsewhere in this preamble, Title IX protects individuals who experience sex-based harassment, even if they are not the intended target, and the inclusion of this factor does not prevent a recipient from evaluating whether a hostile environment has been created for others. However, whether a hostile environment has been created for a particular complainant requires an individualized and fact-specific analysis of the effect of the alleged conduct on that complainant. For this reason, the first factor appropriately examines the degree to which the conduct affected the complainant's ability to access the recipient's education program or activity. Because a recipient has an obligation to operate its education program or activity free from sex discrimination as set forth in the final regulations, the definition does not limit

how many people may experience a hostile environment related to conduct that constitutes sex-based harassment or how many people may make a complaint. Even in the absence of an additional complaint, the Title IX regulations permit the Title IX Coordinator to initiate grievance procedures after considering factors such as the risk of additional acts of sex discrimination and information suggesting a pattern, ongoing sex discrimination, or sex discrimination alleged to have impacted multiple individuals. *See* § 106.44(f)(1)(v)(A)(*6*).

The Department takes this opportunity to affirm the statement in the preamble to the 2020 amendments that "equal access" "neither requires nor permits school officials to impose notions of what a 'perfect victim' does or says, nor may a recipient refuse to respond to sexual harassment because a complainant is 'high-functioning' or not showing particular symptoms following a sexual harassment incident. School officials turning away a complainant by deciding the complainant was 'not traumatized enough' would be impermissible." 85 FR 30170.

*Changes:* None.

The Second Factor—Type, Frequency, and Duration

*Comments:* One commenter said that the second factor regarding "type, frequency, and duration" is unnecessary because it is covered by the "severe or pervasive" language in the proposed definition.

Some commenters objected to the July 2022 NPRM's assertion that asking someone out on a date or sending them flowers on one occasion "generally" would not create a hostile environment. Commenters argued that such conduct would clearly not create a hostile environment and cited case law to support this position.

*Discussion:* The Department declines to remove or modify the second factor. The Department acknowledges that type, frequency, and duration may overlap with the meanings of "severe" and "pervasive" in some respects, but a reference to type, frequency, and duration will help guide decisionmakers in their evaluation of the severity and pervasiveness of the conduct. In a case involving multiple incidents, for example, this factor would clarify the need for a decisionmaker to consider both the frequency of the incidents and the duration of each incident.

With respect to the example provided in the July 2022 NPRM of a single request for a date or a single gift of flowers from one student to another, the Department intended that example to

demonstrate the type of conduct that may be sex-based but would not be pervasive. The Department declines to comment further on specific examples or factual scenarios prior to conducting an investigation and evaluating the relevant facts and circumstances.

*Changes:* None.

The Third Factor—Ages, Roles, Previous Interactions, Other Factors

*Comments:* One commenter asked the Department to change "alleged unwelcome conduct" to "alleged sex-based harassment" in the third factor for consistency. One commenter noted that the third factor regarding the parties' ages and roles is less applicable at the postsecondary level but may be a consideration at the elementary school and secondary school level. One commenter asked the Department to add language regarding the parties' developmental levels to clarify how recipients' Title IX obligations intersect with their obligations to students with disabilities.

*Discussion:* The Department declines to change "alleged unwelcome conduct" to "alleged sex-based harassment" in the third factor because the third factor appropriately focuses on the unwelcome conduct that is in the introductory text of the definition of hostile environment sex-based harassment. Based upon the Department's internal review for consistency with the rest of the provision, which does not use the term "alleged" and does not repeat "unwelcome" before "conduct" and to avoid redundancy since the introductory language specifies that the conduct must be unwelcome, the Department determined that the terms "alleged" and "unwelcome" before "conduct" should be removed.

The Department acknowledges the comment that reference to the parties' ages and roles in the third factor is less applicable at the postsecondary level than in the elementary school and secondary school level, but notes that some students in postsecondary education are under 18 years old, and the relative power dynamics and ages of the parties in the postsecondary context could still be a factor, particularly if the conduct involves a student and employee. With regard to the parties' developmental levels, the Department notes that the third factor includes "other factors about each party that may be relevant to evaluating the effects of the alleged unwelcome conduct," which would include developmental levels. The Department is supportive of recipients' consideration of how Title IX obligations intersect with their obligations to students with disabilities,

but does not believe it is necessary to add language to the regulatory text.

*Changes:* The Department has deleted the terms "alleged" and "unwelcome" from the definition of "sex-based harassment" in the third consideration of whether a hostile environment has been created.

### The Fourth Factor—Location and Context

*Comments:* One commenter said that the fourth factor is more applicable to liability for monetary damages than to administrative enforcement, noting that the proposed regulations lay out when behavior by a respondent warrants a response by the recipient without further differentiating respondents. Another commenter was concerned that the fourth factor would be considered without recognizing that *Davis* only imposed liability on recipients for failing to address conduct "where the 'recipient exercises substantial control over both the harasser and the context in which the known harassment occurs.'" 526 U.S. at 645.

*Discussion:* Location and context are important to consider in determining whether a hostile environment has been created because they provide information that is relevant to each of the hostile environment elements: unwelcomeness, objective and subjective offensiveness, and severity and pervasiveness and effect on a complainant's ability to access or benefit from the education program or activity. For example, harassing conduct on a school bus may be more intimidating than on school grounds because of the confined space. Similarly, harassing conduct in a personal and secluded area, such as a dorm room, can be more threatening than the same conduct in a public area. On the other hand, harassing conduct in public can be more humiliating. Each instance of alleged harassing conduct must take into account the totality of the circumstances, including consideration of the location and context.

After considering the comments, the Department is persuaded that the reference to "control the recipient has over the respondent" in the fourth factor created confusion, by mistakenly giving the impression that the substantial control language used in *Davis* to determine whether a recipient may be held liable in damages for a respondent's conduct, is the same as the hostile environment analysis that these factors are focused on. Because of this confusion, and because "location and context" fully account for the considerations intended to be covered by this factor, the Department has

removed that language from the hostile environment factors in the final definition of hostile environment sex-based harassment. For a discussion of the relevance of a recipient's control over a respondent, see discussion of § 106.11.

*Changes:* The Department removed the language regarding "control the recipient has over the respondent" from the definition of "sex-based harassment" in the fourth consideration of whether a hostile environment has been created.

### The Fifth Factor—Other Sex-Based Harassment

*Comments:* One commenter expressed concern about considering other sex-based harassment in the recipient's education program or activity because they said complainants would use this consideration to justify making Title IX complaints over isolated, fleeting, mild, or inoffensive conduct. One commenter said that even though other sex-based harassment may prompt a Title IX Coordinator to address broader concerns, it does not influence whether a hostile environment was created for the complainant. Another commenter asked the Department to clarify when the conduct of multiple individuals toward the same complainant would constitute enough "other sex-based harassment in the recipient's education program or activity" to amount to hostile environment sex-based harassment, but the conduct by one individual alone would not.

*Discussion:* With respect to the fifth factor, the Department notes that the commenters either mischaracterized or misunderstood the requirement that a recipient undertake a fact-specific inquiry that includes consideration of a variety of factors, including the occurrence of other sex-based harassment. As the regulatory text directs, the consideration of the factors must be *fact-specific,* meaning that the determination whether other sex-based harassment in the recipient's education program or activity is relevant will depend on specific facts. In the July 2022 NPRM, the Department provided the example of a student who reports that his peers repeatedly denigrated him as "girly" over a period of weeks. 87 FR 41417. In this example, if one peer made a one-off remark calling the student "girly," that alone may not be severe or pervasive enough to create a hostile environment, but if multiple peers repeatedly call the student "girly," then that same treatment may create a hostile environment for that student. Similarly, if one student at a postsecondary institution made a derogatory comment

to a pregnant student based on her pregnancy, that alone may not be sufficient to create a hostile environment, but if multiple people make similar comments to the same student based on pregnancy, that may create a hostile environment for the student. The Department notes that, when the elements of sex-based hostile environment are satisfied for an affected student, a recipient has an obligation to address that hostile environment, even if a particular respondent's conduct does not justify discipline. For example, in response to a hostile environment created by a series of incidents by different respondents, a recipient may offer supportive measures to the affected student or provide training for the broader school community.

The Department agrees that other sex-based harassment may prompt a Title IX Coordinator to address broader concerns. The Department also clarifies that a respondent's past sex-based harassment of people other than the complainant would not be part of the analysis of whether current sex-based harassment by the respondent created a hostile environment for the complainant. However, as explained in the discussion of § 106.45(b)(7)(iii), such pattern evidence may be permissible for use in Title IX grievance procedures, as the recipient must objectively evaluate pattern evidence to the extent it is relevant, *i.e.,* whether it is related to the allegations of sex-based harassment under investigation and may aid a decisionmaker in determining whether the alleged sex-based harassment occurred.

*Changes:* None.

### Hostile Environment Sex-Based Harassment—Online Harassment (§ 106.2)

*Comments:* Some commenters were concerned that the proposed regulations would obligate a recipient to address sex-based harassment among students that takes place on social media or other online platforms, such as an online comment seen by an employee that is posted by a student from home. These commenters were unsure how a recipient would know if such activity created a hostile environment in an education program or activity. Citing *Mahanoy,* 141 S. Ct. at 2046, commenters noted that the Supreme Court has held that "the leeway the First Amendment grants to schools to control speech is 'diminished' when it comes to off-campus speech" because off-campus speech is generally the responsibility of parents, not schools. In light of this, a group of commenters argued that elementary and secondary school

recipients would not be able to enforce the proposed regulations against off-campus speech without violating the First Amendment, and commenters expressed concern about chilling online debate among students and employees when they are in their own homes.

*Discussion:* When a recipient has information about sex-based harassment among its students that took place online and created a hostile environment in the recipient's education program or activity, the recipient has an obligation to address that hostile environment. As explained in the July 2022 NPRM, the Department does not expect a recipient to follow the online activity of its students outside of the recipient's education program or activity. 87 FR 41440. The Department notes that neither the proposed nor final regulations contain any separate requirements related to online harassment and abuse. Instead, a recipient's obligation is to address all forms of sex discrimination, including sex-based harassment that occurs within the recipient's education program or activity, whether the conduct takes place online, in person, or both. Online harassment can include, but is not limited to, unwelcome conduct on social media platforms such as sex-based derogatory name-calling, the nonconsensual distribution of intimate images (including authentic images and images that have been altered or generated by artificial intelligence (AI) technologies), cyberstalking, sending sex-based pictures or cartoons, and other sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity. A recipient must evaluate online conduct with the same factors that are used to determine whether in-person conduct creates a hostile environment. If an employee has information about sex-based harassment among its students that took place online, such as the nonconsensual sharing of intimate images, and that created a hostile environment in the recipient's education program or activity, the recipient has an obligation to address the conduct. 87 FR 41440; *see also* the discussion of § 106.11. The Department again notes, as stated above and in the July 2022 NPRM, that recipients are not expected to affirmatively monitor students' online activity. *See* 87 FR 41440.

With respect to the First Amendment and online speech, the Department understands that some commenters were concerned that the First Amendment may limit the ability of elementary schools and secondary schools to prevent hostile environments by disciplining students for online harassing conduct. The Department has concluded, however, that these schools retain sufficient authority to do so without running afoul of the First Amendment. First, the Supreme Court's opinion in *Mahanoy* suggests that much student online speech in the school context would be subject to school discipline. The Court observed that it had previously "stressed" that when elementary schools and secondary schools act in loco parentis, they have a greater interest in regulating student speech. 141 S. Ct. at 2045–46. And as Justice Alito explained in concurrence, much online speech will likely fall into this category, including "online instruction at home," "remote learning," "participation in other online school activities," and—to the extent they involve schoolwork— "communications to school email accounts or phones" and speech "on a school's website." *Id.* at 2054 & n.16 (Alito, J., concurring). All of these school-related activities would likely be part of the education program or activity of the recipient, *see* discussion of § 106.11, and, as such, these final regulations would apply.

Second, *Mahanoy* recognizes elementary schools' and secondary schools' authority to regulate online speech to address sex-based harassment, even when that speech occurs outside school-related activities. The majority opinion observed that "severe bullying or harassment targeting particular individuals" "may call for school regulation," 141 S. Ct. at 2045, and in considering the competing interests of the student and the school in the case before it, the majority opinion specifically noted that the speech in question "did not . . . target any member of the school community," *id.* at 2047. The concurrence also agreed that elementary schools and secondary "schools must be able to prohibit threatening and harassing speech." *Id.* at 2052 (Alito, J., concurring). Together, the opinions suggest speech targeting particular individuals may be regulated in certain circumstances. Moreover, in the time since *Mahanoy* was decided, lower courts have continued to recognize that elementary schools and secondary schools retain authority to discipline students for certain online, off-campus harassing speech not involving schoolwork or not part of a school-sponsored activity. *See, e.g., Kutchinski ex rel. H.K.* v. *Freeland*

*Cmty. Sch. Dist.,* 69 F.4th 350, 358 (6th Cir. 2023) (off-campus Instagram posts that constituted "serious or severe harassment" could be regulated as long as the student "bore some responsibility for the speech and the speech substantially disrupted classwork (or [the school] reasonably believed the speech would disrupt classwork)"); *Chen Through Chen* v. *Albany Unified Sch. Dist.,* 56 F.4th 708, 711 (9th Cir. 2022) (school "properly disciplined" two students for "off-campus social media posts" that "amounted to severe bullying or harassment targeting particular classmates" (internal quotation marks omitted)), *cert. denied sub nom. Epple* v. *Albany Unified Sch. Dist.,* 143 S. Ct. 2641 (2023). The Sixth Circuit in *Kutchinski* recognized that elementary schools and secondary schools receive "a high degree of deference in the exercise of their professional judgment" regarding student discipline. 69 F.4th at 360. And the Ninth Circuit in *Chen* specifically observed that, in considering an elementary school's or secondary school's interest in imposing discipline, the school's exposure "to potential liability on the theory that it had 'failed to respond adequately' to a . . . hostile environment" is relevant. 56 F.4th at 722; *see also id.* at 718 (noting that conduct need not be "'directed at the complainant in order to create a hostile educational environment'"). The Department accordingly concludes that elementary schools and secondary schools have sufficient authority to address conduct that creates a hostile environment even when that conduct occurs online and outside of a specific school activity. *See* 87 FR 41440 (explaining that, when an employee has information about sex-based harassment among its students that took place online and created a hostile environment in the recipient's education program or activity, the recipient has an obligation to address that hostile environment).

*Changes:* None.

Hostile Environment Sex-Based Harassment—Sex Stereotyping and Gender Identity (§ 106.2)

*Comments:* Some commenters supported the proposed prohibition on harassment based on sex stereotypes and gender identity, arguing that harassment based on sex stereotypes can deprive students of equal access to educational opportunities, including by adversely affecting their academic performance. Commenters also noted that courts have recognized that such harassment can violate Title IX and other sex discrimination laws. Some

commenters asserted that harassment based on sex stereotypes could include statements like "girls don't belong in school" or "girls should spend less time advancing in athletics and more time learning home economics."

Other commenters urged the Department to clarify that misgendering is a form of sex-based harassment that can create a hostile environment, especially for gender-nonconforming and LGBTQI+ students. One commenter noted that the EEOC has recognized that misgendering can violate Title VII.

Other commenters argued that using names and pronouns consistent with an individual's sex assigned at birth should not be considered harassment based on sex stereotypes. Some commenters argued that prohibiting misgendering as a form of harassment could lead to compelled speech in violation of the First Amendment and could be used to target people with unpopular viewpoints, citing *Meriwether* v. *Hartop*, 992 F.3d 492 (6th Cir. 2021).

One commenter suggested that the Department summarize a recent resolution letter finding that a school district violated Title IX when it failed to effectively respond to misgendering of a student.

*Discussion:* The Department appreciates commenters' support for coverage of harassment based on sex stereotypes and gender identity. The Department has long recognized, consistent with the text and purpose of the statute and courts' interpretations, that Title IX's prohibition on sex discrimination encompasses harassment based on sex stereotypes. *See, e.g.,* 2001 Revised Sexual Harassment Guidance, at 3 (noting that "acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on sex or sex-stereotyping [is] a form of sex discrimination to which a school must respond, if it rises to a level that denies or limits a student's ability to participate in or benefit from the educational program") & nn.17–19 (citing cases); 85 FR 30179 ("sexual harassment . . . may consist of unwelcome conduct based on sex or sex stereotyping").

The Department agrees with commenters that conduct directed at a student's nonconformity with stereotypical notions of how boys or girls are expected to act and appear or that seeks to restrict students from participating in activities that are not stereotypically associated with the students' sex could constitute sex-based harassment that creates a hostile environment. *See, e.g., Seiwert* v. *Spencer-Owen Cmty. Sch. Corp.,* 497 F. Supp. 2d 942, 953 (S.D. Ind. 2007)

(finding plaintiff stated Title IX claim when he alleged harassment for "acting in a manner that did not adhere to the traditional male stereotypes"); *Theno* v. *Tonganoxie Unified Sch. Dist. No. 464,* 377 F. Supp. 2d 952, 972 (D. Kan. 2005) (finding plaintiff stated Title IX claim when peers engaged in teasing, name-calling and crude sexual gestures designed to "disparage his perceived lack of masculinity"); *Lipsett* v. *Univ. of P.R.,* 864 F.2d 881, 903–05 (1st Cir. 1988) (woman participating in a surgical residency program was subjected to hostile environment sexual harassment based on evidence of general antagonism toward women, including statements that women should not be in the program, and assignment of menial tasks, combined with overt sexual harassment); *Montgomery* v. *Indep. Sch. Dist. No. 709,* 109 F. Supp. 2d 1081, 1092 (D. Minn. 2000) (finding plaintiff stated Title IX claim when peers harassed him for "failure to meet masculine stereotypes," including by calling him "girl" and using a feminized version of his name). Similarly, unwelcome conduct based on gender identity can create a hostile environment when it otherwise satisfies the definition of sex-based harassment. *See, e.g.,* U.S. Equal Emp. Opportunity Comm'n, *Sexual Orientation and Gender Identity (SOGI) Discrimination, https://www.eeoc.gov/sexual-orientation-and-gender-identity-sogi-discrimination* (last visited Mar. 12, 2024) (harassment based on gender identity can create a hostile environment in the workplace). Courts have also recognized that policies that prevent transgender students from participating in school consistent with their gender identity can harm those students. *Doe ex rel. Doe* v. *Boyertown Area Sch. Dist.,* 897 F.3d 518, 523 (3d Cir. 2018) (detailing the harms exclusionary school policies have on transgender students).

Sex-based harassment, including harassment predicated on sex stereotyping or gender identity, is covered by Title IX if it is sex-based, unwelcome, subjectively and objectively offensive, and sufficiently severe or pervasive to limit or deny a student's ability to participate in or benefit from a recipient's education program or activity (*i.e.,* creates a hostile environment). Thus, harassing a student—including acts of verbal, nonverbal, or physical aggression, intimidation, or hostility based on the student's nonconformity with stereotypical notions of masculinity and femininity or gender identity—can constitute discrimination on the basis of

sex under Title IX in certain circumstances. Recipients have a responsibility to protect students against sex-based harassment. OCR will continue to address complaints of harassment based on sex stereotypes and gender identity, consistent with OCR's jurisdiction under Title IX and the final regulations.

Many commenters, as highlighted above, believe that misgendering is one form of sex-based harassment. As discussed throughout this preamble, whether verbal conduct constitutes sex-based harassment is necessarily fact-specific. While the final regulations do not purport to identify all of the circumstances that could constitute sex-based harassment under Title IX, a stray remark, such as a misuse of language, would not constitute harassment under this standard. *See* above discussion of Hostile Environment Sex-Based Harassment—Severe or Pervasive (§ 106.2). Similarly, the Department takes First Amendment concerns seriously, and nothing in the regulations requires or authorizes a recipient to violate anyone's First Amendment rights. *See* 34 CFR 106.6(d); *see, e.g., W. Va. State Bd. of Educ.* v. *Barnette,* 319 U.S. 624, 642 (1943); *Hartop,* 992 F.3d at 511 (holding that in the absence of evidence that a professor's conduct "inhibited Doe's education or ability to succeed in the classroom," the conduct was not sufficiently severe and pervasive to implicate Title IX); *see also* above discussion of Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2).

The Department also declines to summarize a resolution letter, as that letter describes OCR's determination in an individual case and is not a formal statement of OCR policy.

*Changes:* None.

Hostile Environment Sex-Based Harassment—Elementary Schools and Secondary Schools (§ 106.2)

*Comments:* One commenter expressed concern that the proposed definition of "sex-based harassment" would be difficult for elementary schools and secondary schools to apply in light of the range of conduct that occurs at that level that may warrant attention or discipline but may not rise to the level of sexual harassment under Title IX. One commenter asserted that the proposed definition of "sex-based harassment" would leave little room for school officials to make judgment calls and asserted that elementary schools and secondary schools have not received sufficient notice of this broad scope of Title IX's coverage as required

by the Constitution's Spending Clause. One commenter urged the Department to narrow the scope of the proposed definition of ''sex-based harassment'' to more closely track the definition in the 2020 amendments and compared the proposed definition to the definition of sexual harassment in OCR's 2011 Dear Colleague Letter on Sexual Violence, which the commenter asserted was unworkable for elementary schools and secondary schools.

A group of commenters expressed concern that the proposed definition of hostile environment sex-based harassment would depart from the *Davis* standard and be inappropriate for the elementary school context. The commenters asserted that under the *Davis* standard, the elementary school student would not be deemed to have engaged in sex discrimination because the conduct would be severe, but not pervasive, but under the proposed regulations, the outcome might be different because the regulations would cover conduct that is either severe or pervasive.

*Discussion:* Regarding the Spending Clause, Title IX has always required elementary school and secondary school recipients to operate their education programs or activities free from sex discrimination. And the Supreme Court has noted that ''[b]ecause Congress did not list any specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered.'' *Jackson* v. *Birmingham Bd. of Educ.,* 544 U.S. 167, 175 (2005) (emphasis omitted). Federal agencies have authority to define the contours of the Spending Clause contract with recipients through their regulations. *Bennett* v. *Ky. Dep't of Educ.,* 470 U.S. 656, 670 (1985). Accordingly, recipients of Federal financial assistance agree to comply with Title IX obligations as a condition of receiving Federal funds, including regulatory requirements. Contrary to the commenter's assertion, recipients received notice of the proposed definition of ''sex-based harassment'' in the July 2022 NPRM and these final regulations. This notice-and-comment rulemaking process provides the notice that the Spending Clause, as construed in *Pennhurst State School & Hospital* v. *Halderman,* requires. 451 U.S. 1, 17 (1981). Thus, recipients should have anticipated the final definition becoming effective when they continued to accept Federal funds. Further, for the reasons discussed elsewhere in this preamble, the regulatory regime is not vague, so recipients have sufficient notice of the conditions imposed on the receipt of funds.

The Department disagrees that the definition of hostile environment sex-based harassment is incompatible with the elementary school context or that it leaves no room for the judgment of school administrators. The definition contemplates and requires application of administrator judgment. The Department notes that, as discussed above, the final regulations define hostile environment sex-based harassment as unwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.,* creates a hostile environment). Whether a hostile environment has been created is a fact-specific inquiry that includes consideration of the degree to which the conduct affected the complainant's ability to access the recipient's education program or activity; the type, frequency, and duration of the conduct; the parties' ages, roles within the recipient's education program or activity, previous interactions, and other factors about each party that may be relevant to evaluating the effects of the unwelcome conduct; the location of the conduct and the context in which the conduct occurred; and other sex-based harassment in the recipient's education program or activity. Because the definition of hostile environment sex-based harassment accounts for factors such as the parties' ages and the objective offensiveness of the conduct—which commenters asserted officials at elementary schools and secondary schools typically consider when addressing student conduct—the Department disagrees with assertions that the definition of hostile environment sex-based harassment would be unworkable for recipients in this educational setting. Further, as discussed in more detail above in Hostile Environment Sex-Based Harassment—the *Davis* Standard (§ 106.2), though *Davis* applies a higher standard for monetary damages in private litigation, it has also endorsed a fact-specific assessment of whether sex-based conduct rises to the level of harassment, and schools have long applied that ''totality of the circumstances'' assessment without issue. *See Davis,* 526 U.S. at 651 (''Whether gender-oriented conduct rises to the level of actionable 'harassment' thus 'depends on a constellation of surrounding circumstances, expectations, and relationships' ''). Accordingly, the Department believes the definition can appropriately be applied in the elementary school and secondary school context.

The Department notes that the hypotheticals posed by commenters ignore other elements of the definition of ''sex-based harassment,'' including that conduct that is an isolated event must be so severe that it limits or denies participation in an activity, and that the conduct be sex-based, not merely a circumstance in which the students involved happen to be different genders. *Cf. Oncale,* 523 U.S. at 80 (''We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex[ ]''). Accounting for the other elements included in the definition of ''sex-based harassment'' significantly narrows the scope of conduct implicated by the final regulations and thus helps address the concerns of these commenters.

Further, the *Davis* Court acknowledged that a single instance of severe student-to-student harassment could have the systemic effect of denying a student equal access to an education program or activity. The *Davis* Court doubted that Congress meant to hold schools liable in private suits for money damages for such single acts, but the Court did not cabin the authority of the Department to administratively enforce Title IX in such contexts. For further explanation of the *Davis* standard and the distinction between private litigation and administrative enforcement, *see* the above discussion of Hostile Environment Sex-Based Harassment—the *Davis* Standard (§ 106.2).

The Department discusses the burdens, costs, and benefits of the definition of hostile environment sex-based harassment in more detail below and in the *Regulatory Impact Analysis.*

*Changes:* None.

### Sex-Based Harassment—Specific Offenses (§ 106.2)

#### General Comments

*Comments:* Some commenters supported general alignment of the specific offenses listed in the definition of ''sex-based harassment'' with the Clery Act, and others opposed it because they said it would make postsecondary institutions more likely to expel respondents without due process. Some commenters supported the inclusion of the definitions of sexual assault, dating violence, domestic violence, and stalking in the definition

as opposed to cross-referencing the applicable provisions in the Clery Act, but others stated that maintaining a cross-reference will prevent confusion if Congress amends the Clery Act definitions in the future.

Some commenters objected to the inclusion of domestic violence, dating violence, and stalking within the definition of ''sex-based harassment'' because they said these offenses are not always sex-based, and Congress did not classify them as sex-based harassment. One commenter urged the Department to include human trafficking in the definition of ''sex-based harassment'' because sex trafficking is a problem in elementary schools and secondary schools.

One commenter supported having a single instance of a specific offense constitute sex-based harassment and cited cases that, according to the commenter, established that a single incident of rape is sufficient to establish that a student was subjected to severe, pervasive, and objectively offensive conduct. To the contrary, another commenter said that courts have dismissed sexual harassment lawsuits over misdemeanor sexual assaults when they have determined that a single sexual assault by a peer did not create a hostile environment. This commenter objected to defining the specific offenses as Title IX violations regardless of where they occurred.

One commenter was concerned that specific offenses would introduce the concepts of intent and consent into the analysis of sex-based harassment, rather than unwelcomeness. Another noted that the specific offenses are not written in the same format as the definitions of quid pro quo sex-based harassment or hostile environment sex-based harassment.

*Discussion:* The Department's definition of ''sex-based harassment'' largely aligns with the Clery Act, as explained in the preamble to the July 2022 NPRM. *See* 87 FR 41418. The Department appreciates the comments affirming the Department's inclusion of textual definitions rather than cross-references in the definitions of sexual assault, dating violence, domestic violence, and stalking. The Department acknowledges the commenters' concern that if the Clery Act definitions are amended, the difference in definitions could be confusing. As explained in the preamble to the July 2022 NPRM and elsewhere in this preamble, while the Department intends the definitions of these terms to be consistent with the Clery Act, the Department opted to include the textual definitions rather than cross-references for readability of

the regulations, to generally eliminate the need for recipients and other members of the public to consult other statutes for the definitions of the specific offenses, and because part of the statutory definition of domestic violence is not applicable in a Title IX context. *See id.* If there are future changes to the statutory definitions, the Department will assess whether a technical update to the Title IX definitions is appropriate to maintain the intended consistency.

The Department disagrees with the commenter who stated that inclusion of the Clery Act offenses would make a postsecondary institution more likely to expel respondents without due process. As discussed elsewhere in this preamble, especially the discussions of §§ 106.45 and 106.46, the final regulations contain numerous guardrails to ensure that grievance procedures are conducted without bias and with notice and an opportunity to be heard, and to ensure that no person is subject to disciplinary sanction absent a determination that they engaged in sex discrimination prohibited by Title IX.

In response to comments that domestic violence, dating violence, and stalking are not always sex-based, the Department notes, similar to the 2020 amendments, that the introductory text of the definition of ''sex-based harassment'' in the final regulations specifies that any sex-based harassment must be ''*on the basis of sex.*'' Therefore, these final regulations capture the requirement that, for conduct to be prohibited under Title IX, it must be on the basis of sex.

The Department recognizes that sex trafficking is both a crime under Federal law, including under 18 U.S.C. 1591, and a grave concern. Although the Department declines to revise the definition of ''sex-based harassment'' at this time because the specific offenses referenced in the definition are limited to those listed in the Clery Act, and sex trafficking is not listed in the Clery Act, the Department takes this opportunity to clarify that acts associated with sex-trafficking may also fall within the definition of hostile environment sex-based harassment if they meet the elements of the definition.

The Department confirms that under these final regulations, similar to the 2020 amendments, the specific offenses of sexual assault, dating violence, domestic violence, and stalking need not satisfy the elements of severity or pervasiveness or subjective and objective offensiveness in order to constitute sex-based harassment. 85 FR 30153–54. Whether courts have found that certain misdemeanor sexual

assaults did not constitute sexual harassment thus is not pertinent to these final regulations. The specific offenses included in the definition of ''sex-based harassment'' are based on the federally validated definitions of these offenses. The Department recognizes that under State law, there may be other sex offenses. Those other sex offenses may meet the definition of hostile environment sex-based harassment if they satisfy the elements of hostile environment harassment set forth in these final regulations.

The Department also confirms that the specific offenses need not satisfy the element of unwelcomeness in order to constitute sex-based harassment. The Department agrees that the reference to sexual assault, which is based on the Clery Act, introduces the concept of consent, as discussed below. The Department recognizes that the specific offenses are not written in the same format as quid pro quo sex-based harassment or hostile environment sex-based harassment, but that is because the specific offenses are based on other federally validated definitions.

The Department disagrees with a commenter's suggestion that the specific offenses are covered regardless of where they occur. The commenter misapprehends the scope of the regulations. As explained in the discussion of § 106.11, Title IX applies to sex discrimination, including sex-based harassment, occurring under a recipient's education program or activity in the United States. When sex-based harassment, including the specific offenses, occurs outside of a recipient's education program or activity, Title IX would not apply. However, as § 106.11 makes clear, Title IX requires that a recipient address a hostile environment that exists under its education program or activity even when some conduct, including in the form of any specific offense, alleged to be contributing to the hostile environment occurred outside of the recipient's education program or activity.

*Changes:* None.

Sexual Assault

*Comments:* One commenter was concerned that the definition of sexual assault was too narrow because it would require the conduct to meet the FBI's definition of rape, incest, fondling, or statutory rape, and also stated that the proposed definition fails to meet the American Academy of Pediatrics' definition of sexual assault.

One commenter asked the Department not to define sexual assault with reference to the FBI's Uniform Crime Reporting (UCR) definition because it is

difficult to locate the definition that the Department wants postsecondary institutions to use on the FBI's UCR website. The commenter suggested, instead, to include the definition of sexual assault in the regulations to ensure that if the FBI revises its definition before the Title IX regulations go into effect, it will not impact the definition under Title IX.

Some commenters were concerned that the proposed definition of sexual assault uses outdated terminology. Commenters objected to the terms "forcible" and "nonforcible" because they are not defined and the appropriate consideration, according to commenters, is lack of consent rather than use of force. Some commenters urged the Department to incorporate the definitions in the Clery Act regulations because they use more inclusive and accessible terminology and so that postsecondary institution recipients can use the same definitions under Title IX and the Clery Act. Other commenters urged the Department to elaborate on the definition of various terms (*e.g.,* fondling, rape), including to clarify whether the covered bases must be limited to the purpose of sexual gratification.

*Discussion:* The Department acknowledges that commenters found the definition of sexual assault confusing and appreciates the opportunity to provide additional clarity to the discussion provided in the July 2022 NPRM. *See* 87 FR 41418. The 2020 amendments and these final regulations adopt the Clery Act's statutory definition of the term "sexual assault," 20 U.S.C. 1092(f)(6)(A)(v), which defines sexual assault as "an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting [UCR] system of the Federal Bureau of Investigation [FBI]." The FBI UCR currently consists of the National Incident-Based Reporting System (NIBRS), which defines sex offenses as "[a]ny sexual act including Rape, Sodomy, Sexual Assault With An Object, or Fondling directed against another person, without the consent of the victim, including instances where the victim is incapable of giving consent; also unlawful sexual intercourse." FBI, Uniform Crime Reporting Program: National Incident-Based Reporting System (2018), *https:// ucr.fbi.gov/nibrs/2018/resource-pages/ nibrs_offense_definitions-2018.pdf.*

The definition of sexual assault in the final regulations mirrors the Clery Act's statutory definition of sexual assault, which tracks the FBI definition of sex offenses. The Department declines to write out the FBI definition of sexual

assault in the final Title IX regulations, as one commenter recommended. While the Department understands the concerns about ease of locating the definition, the Department drafted these final regulations to include the text of the Clery Act statute's definitions of sexual assault, dating violence, domestic violence and stalking (except for minor changes to the definition of domestic violence). *See* 87 FR 41418. The definition of sexual assault in 20 U.S.C. 1092(f)(6)(A)(v) refers to the FBI's UCR system, and therefore these final regulations track VAWA 2022 by doing so as well. The Department recognizes that, as explained in NIBRS, "the UCR program combined the offense categories of Sex Offenses (formerly Forcible) and Sex Offenses, Nonforcible" and beginning in 2018 "all offense types previously published in those two categories are now published in one category as Sex Offenses" and include the following offenses: Rape, Sodomy, Sexual Assault With An Object, Fondling, Incest, and Statutory Rape. Although the terms forcible and nonforcible are no longer used by the UCR, the Department believes it is appropriate to maintain the reference to those terms in the definition of sexual assault to maintain consistency with the statutory definition of sexual assault under the Clery Act. The Department also notes that use of the words "forcible or nonforcible" in the Title IX definition of sexual assault is not meant to imply that force is required. Instead, the use of the terms communicates that either forcible or nonforcible sex offenses under the UCR fulfill the definition.

The Department thanks the commenter for pointing out that definitions of sexual assault vary, and that the definition advanced by the American Academy of Pediatrics captures conduct that is not included in the FBI's definition. However, the Department's Title IX regulations affect both elementary and secondary students, who are children, and postsecondary students, most of whom are adults. Therefore, while the American Academy of Pediatrics' definition of sexual assault may capture additional conduct, the Department notes that it may not be an appropriate definition for all recipients.

The Department declines to adopt a more specific definition of sexual assault as suggested by commenters because the definition contained in the Clery Act, which incorporates the FBI UCR system definition, is broad enough to cover many of the examples mentioned by the commenter. The Department also maintains that this

approach facilitates postsecondary institutions' understanding of their obligations under Title IX and the Clery Act and provides elementary schools and secondary schools with an appropriate definition of sexual assault to protect their students from sex offenses under Title IX. *See* 85 FR 30176. In addition, nothing in the final regulations precludes a recipient from providing examples and scenarios in its policy, from considering the age of the complainant when classifying certain incidents of sexual assault, or from providing related trainings to help students and others understand what types of conduct are prohibited under the recipient's policy. The Department also notes that unwelcome sex-based conduct that is severe or pervasive and meets the other elements of hostile environment sex-based harassment would constitute sex-based harassment under Title IX, that a single instance of sexual assault would likely meet the definition of hostile environment sex-based harassment, and that sexual gratification is not an element required by the definition of "sex-based harassment" under Title IX.

The Department recognizes that one commenter asked for additional explanation of the definition of rape. The Department declines to include additional information in these final regulations because the definition of rape is included in the Clery Act's statutory definition of the term "sexual assault." The Department also notes that unwelcome sex-based conduct that is severe or pervasive and meets the other elements of hostile environment sex-based harassment would constitute sex-based harassment under Title IX regardless of whether the conduct meets the definition of a specific offense.

*Changes:* As discussed below, the Department has added a note to the final regulations regarding consent.

Consent

*Comments:* Some commenters asserted that removing the definition of "consent" exceeds the Department's authority and is inconsistent with Title IX and established case law, citing *Doe* v. *Oberlin College,* 963 F.3d 580, 587–88 (6th Cir. 2020) and *Doe* v. *University of Sciences,* 961 F.3d 203, 206 (3d Cir. 2020). These commenters stated that some courts have criticized the consent definitions used by some postsecondary institutions and that inconsistent application of consent definitions by postsecondary institutions may violate Title IX and a respondent's constitutional rights, citing, *e.g., Doe* v. *Miami University,* 882 F.3d 579 (6th Cir. 2018); *Nokes* v. *Miami University,* No.

17–cv–482, 2017 WL 3674910, at *10 (S.D. Ohio Aug. 25, 2017); *Matter of Doe* v. *Purchase College State University of New York,* 192 A.D.3d 1100, 1103 (N.Y. App. Div. 2021). Other commenters stated that the absence of a clear definition of ''consent'' was not helpful to recipients, students, and employees and that including a definition of ''consent'' would be particularly helpful for elementary schools and secondary schools.

One commenter urged the Department to require a recipient to define ''consent'' when it is part of the definition of any form of sex-based misconduct to alleviate confusion between acquiescence and consent. The commenter noted that unwelcomeness is the historical test for determining whether sex-based harassment occurred. Another commenter asked the Department to prohibit a recipient from using a definition of ''consent'' that shifts the burden of proof to the respondent, including affirmative consent.

One commenter requested that the Department clarify how to apply the concept of consent at the elementary school and secondary school level, including in cases involving very young children and students with disabilities.

*Discussion:* ''Consent'' is a component of the sex offenses classified under the FBI's UCR system, which are referenced in the definition of sexual assault. Although the Department is not itself defining ''consent'' nor requiring recipients to define ''consent,'' a recipient may choose to define ''consent'' in its policies, as explained below.

In the July 2022 NPRM, the Department expressed the tentative view that it was appropriate to remove the entry for consent in § 106.30(a) of the 2020 amendments because it was unnecessary and confusing to include language in the definitions section stating that the Department declines to define a certain term. *See* 87 FR 41423. However, based on comments, the Department has determined that although it is not defining the term ''consent,'' it is helpful to include a note after the description of the specific offenses, similar to the entry for consent in the 2020 amendments at § 106.30(a), that states the Assistant Secretary will not require a recipient to adopt a particular definition of consent with respect to sex-based harassment as defined in this section, if applicable. Including this note will ensure that a recipient is aware that it is within the recipient's discretion whether and how to define consent in its policies.

Commenters cite various cases, but those authorities do not support their position that removing the definition of ''consent'' exceeds the Department's authority, is inconsistent with Title IX, or that a specific definition of ''consent'' is required under Title IX. The cases cited by commenters do not discuss the Department's authority to decline to define consent under Title IX, nor do they hold that Title IX requires a specific definition of ''consent.'' Rather, these cases discuss the meaning and application of consent under particular postsecondary institution's Title IX policies. Under 20 U.S.C. 1682, the Department may promulgate regulations to effectuate Title IX, and after serious consideration and for the reasons stated in this discussion, the Department has decided that providing flexibility to recipients about whether and how to define the term ''consent'' is consistent with that mandate.

The Department acknowledges commenters who wanted the Department to define ''consent'' for recipients. The Department's position remains, as stated in the preamble to the 2020 amendments, that whether and how to define ''consent'' for purposes of sexual assault within a recipient's educational community should be left to the discretion of recipients, including elementary schools and secondary schools, and so the Department declines to adopt a Federal definition of ''consent'' for Title IX purposes. *See* 85 FR 30124–25. The Department notes that many recipients are required by State law to apply particular definitions of ''consent,'' and recipients may consider relevant State law if they choose to adopt a definition of ''consent.''

With respect to the commenter's concern that elementary school and secondary school employees may have less experience applying a definition of ''consent'' than those at the postsecondary level, the Department notes that the training required under the final regulations would include any definitions used by the recipient, including with respect to consent if the recipient chooses to define it.

The Department disagrees that the failure to require recipients to adopt a particular definition of ''consent'' with respect to sexual assault will lead recipients to confuse acquiescence for consent. As discussed earlier, the Department's view is that a recipient has the discretion to choose whether and how to define ''consent'' based on what is best suited for its educational community and consistent with its State law. Therefore, the Department declines in the final regulations to prohibit or

require a particular definition of ''consent.'' Consistent with the position taken in the preamble to the 2020 amendments, the Department disagrees with the commenter that affirmative consent inherently places the burden of proof on a respondent. *See* 85 FR 30125. The Department notes that, similar to the 2020 amendments, the final regulations at § 106.45(f)(1) require that the recipient—and not the parties— gather sufficient evidence to determine whether sex discrimination occurred. Regardless of whether and how a recipient defines ''consent,'' the burden of proof, and the burden of gathering evidence sufficient to reach a determination regarding whether sex discrimination occurred, is on the recipient. The final regulations do not permit the recipient to shift that burden to a respondent to prove consent, nor do they permit the recipient to shift that burden to a complainant to prove absence of consent. *See* 85 FR 30125.

Consistent with the view that institutions should have discretion to choose a particular definition of ''consent,'' the Department declines to provide specific examples of how to apply the concept of consent to specific scenarios in elementary schools and secondary schools. With respect to the application of consent in elementary schools and secondary schools and to students with disabilities, nothing in the final regulations precludes a recipient from using a definition of ''consent'' that takes into account a student's age or developmental level, and a recipient's definition of ''consent'' must be consistent with applicable disability laws. In addition, the final regulations require that when a complainant or respondent is an elementary or secondary student with a disability, the Title IX Coordinator must consult with one or more members of the student's Individualized Education Program (IEP) team, if any, and one or more members of the student's Section 504 team,[14] if any, to help ensure that the recipient complies with the requirements of the IDEA, 20 U.S.C. 1400 *et seq.,* and Section 504, 29 U.S.C. 794, throughout the recipient's implementation of its grievance procedures.

The Department notes that some of the evidence that may be relevant to determining capacity to consent for students with disabilities may be records that are maintained by a physician, psychologist, or other

---

[14] Under the IDEA regulations, that group is known as the IEP Team. 34 CFR 300.23. The term ''Section 504 team'' does not appear in the regulations implementing Section 504, but the Department uses this term informally throughout this preamble, as it is often used by commenters.

recognized professional or paraprofessional in connection with the provision of treatment to the party. The final regulations at § 106.45(b)(7)(ii) state that use of such records in the recipient's grievance procedures is impermissible unless the recipient obtains the party's voluntary, written consent for such use. Therefore, as long as an eligible student or the parent of a student with a disability consents to the use of such records in the recipient's grievance procedures under § 106.45(b)(7)(ii), the recipient may use the records to aid it in making a determination regarding consent.

*Changes:* The Department has added a note to the definition of "sex-based harassment" to explain that the Assistant Secretary will not require a recipient to adopt a particular definition of consent, where that term is applicable with respect to sex-based harassment.

Dating Violence

*Comments:* Some commenters noted that the definition of dating violence in the proposed definition of "sex-based harassment" would not completely align with the statutory definition under VAWA 2013 or VAWA 2022. One commenter recommended that the Department specify whether dating violence requires a crime of violence. The commenter noted that the definition of dating violence includes the term violence, but, unlike the definition of domestic violence, does not specify that it must be a crime of violence.

One commenter suggested combining the definitions of domestic violence and dating violence. One commenter suggested the definition of dating violence should cover coercive behavior that is used to threaten and intimidate survivors. Specifically, the commenter suggested adding to the dating violence definition language from the VAWA 2022 definition of domestic violence regarding victim services that the Department omitted from the proposed definition of domestic violence.

*Discussion:* The Department acknowledges that the definition of dating violence in the proposed definition of "sex-based harassment" would not completely align with the statutory definition in 34 U.S.C. 12291(a) (as cross-referenced in the Clery Act). Under VAWA 2022, dating violence means violence committed by a person (A) who is or has been in a social relationship of a romantic or intimate nature with the victim; and (B) where the existence of such a relationship shall be determined based on a consideration of the following factors: (i) The length of the

relationship; (ii) The type of relationship; and (iii) The frequency of interaction between the persons involved in the relationship. 34 U.S.C. 12291(a)(11). This difference was inadvertent, and the Department is revising the proposed definition of dating violence in the final regulations to align with the definition in section 12291(a)(11). As a point of clarification, the definition does not require that dating violence be a "crime of violence."

The Department acknowledges the suggestion to combine the definitions of domestic violence and dating violence and add references to coercive behavior used to threaten or intimidate survivors, but declines to do so in order to align the specific offenses under Title IX as closely as possible with the relevant parts of the Clery Act and VAWA 2022. The Department similarly declines the suggestion to incorporate the part of the VAWA 2022 domestic violence definition that, as discussed below, was omitted from the Department's proposed definition of domestic violence into the definition of dating violence in the final regulations. As explained below in the discussion of the definition of domestic violence, the Department omitted that part of the VAWA 2022 definition of domestic violence from the final definition because some of the VAWA 2022 definition of domestic violence is not applicable to Title IX. *See* 87 FR 41418.

*Changes:* The Department has revised the definition of dating violence to fully align with the definition in 34 U.S.C. 12991(a) (as cross-referenced in the Clery Act).

Domestic Violence

*Comments:* Some commenters recommended that the Department adopt a final definition of domestic violence that more closely tracks the definition in VAWA 2022 because the Department's proposed definition omitted part of the VAWA 2022 definition. One commenter who wanted the omitted language from the VAWA 2022 definition added to the definition in the Title IX regulations said that the omitted language would require a recipient to recognize how patterns of power and control, including technological and economic abuse, interfere with a complainant's ability to participate in or benefit from the recipient's education program or activity.

One commenter said that while the definition of domestic violence in VAWA 2022 includes conduct that "may or may not constitute criminal behavior," the Department's proposed

definition of domestic violence only applies to criminal behavior, which ignores the fact that domestic violence often includes repeated coercive or controlling behavior, which, when viewed in isolation, may or may not constitute criminal conduct. This commenter also said that because the proposed definition of domestic violence would only cover felony or misdemeanor "crimes of violence," the Department would be ignoring other common forms of abuse besides physical violence that are included in the definition of domestic violence in VAWA 2022. This commenter objected to the Department's assertion that parts of the definition of domestic violence in VAWA 2022 are not applicable to Title IX, explaining that research shows it is common for students to experience forms of domestic violence other than sexual and physical abuse.

One commenter was concerned that the reference to felony or misdemeanor crimes "under the family or domestic violence laws of the jurisdiction of the recipient" would require those implementing Title IX to know the crimes in their jurisdictions and have the ability to evaluate conduct from that perspective.

Other commenters recommended that the Department continue to cross-reference the definitions of dating violence, domestic violence, and stalking and explain in the preamble to the final regulations that only the first part of the VAWA statutory definition of domestic violence applies in the Title IX context.

*Discussion:* The Department appreciates commenters' suggestions that the definition of domestic violence should more closely track the definition in VAWA 2022 and acknowledges that the definition of domestic violence in these final regulations is not the same as the definition of domestic violence in VAWA 2022.

As discussed in the July 2022 NPRM, the Department has not included all of the language from the definition of domestic violence in VAWA 2022 in the definition of domestic violence in the Title IX regulations. *See* 87 FR 41418. The second part of the VAWA 2022 definition begins with "in the case of victim services," and victim services is a defined term in VAWA 2022 that refers to specific victim services funded and made available under VAWA that are not available under Title IX. In addition, the definitions in VAWA 2022 are applicable for purposes of grants authorized under VAWA and Title IX implementation is not a grant program authorized under VAWA. Therefore, the Department was not legally obligated to

incorporate the entire VAWA 2022 definition into the Title IX regulations and determined that including the reference to victim services and the language that follows it from the VAWA 2022 definition of domestic violence in the Title IX regulations would create confusion for recipients. *See id.* The Department maintains the view, expressed in the July 2022 NPRM, that omitting this language does not create a substantive change to the VAWA 2022 definition of domestic violence for Title IX purposes. *Id.* Further, the Department's omission of this language is not intended to suggest that evidence of the conduct described in the omitted language is not or can never be the basis for a determination that sex-based harassment has occurred. Indeed, depending on the facts and circumstances, such conduct (*e.g.,* physical abuse or sexual abuse, or a pattern of any other coercive behavior committed, enabled, or solicited to gain or maintain power and control over a victim, including verbal, psychological, economic, or technological abuse) may constitute sex-based harassment if it is based on sex and meets the elements of the definition of hostile environment sex-based harassment or other specific offenses in the definition of sex-based harassment such as sexual assault or stalking.

The Department acknowledges that the definition of domestic violence in these final regulations may not align with the definition of domestic violence used by other Federal agencies, but nothing precludes recipients from complying with the definition of domestic violence in these final regulations and to the extent applicable, any definition of domestic violence used by other Federal agencies, including the U.S. Department of Housing and Urban Development (HUD). The Department explained in the July 2022 NPRM that, in some cases, the Department and HUD may have overlapping jurisdiction over a recipient due to HUD regulations that apply to campus housing for students, faculty, or staff. *See* 87 FR 41416. The Department noted that it was not required to align its definition of hostile environment sex-based harassment with the definition of "hostile environment harassment" in the context of HUD's enforcement of the Fair Housing Act. *See id.* The Department is similarly not required to align its definition of domestic violence with the definition of domestic violence used by HUD. 24 CFR 5.2003. Recipients that are subject to HUD's regulations must comply with

these final regulations as well as any applicable HUD regulations.

The Department further notes that the beginning of the VAWA 2022 definition does not refer to felony and misdemeanor crimes "of violence" as the proposed definition of domestic violence did, and instead refers to "felony and misdemeanor crimes." In response to comments and after further consideration, the Department is removing the phrase "of violence" to more closely align with VAWA 2022. The Department acknowledges that the definition of domestic violence in the final regulations still refers to crimes, but the Department declines to remove that reference because the Department's view is that it is preferable to track the language in the VAWA 2022 as closely as possible except when the language is not relevant in the Title IX context or the language in VAWA 2022 may be covered by another part of the definition of "sex-based harassment." The Department notes that even if coercive or controlling behavior does not meet the definition of domestic violence under the final regulations, it may constitute sex-based harassment if it is based on sex and meets the elements of the definition of hostile environment sex-based harassment.

The Department does not share the concern expressed by one commenter that individuals responsible for implementing Title IX will not have the knowledge of the criminal laws of the recipient's jurisdiction necessary to evaluate whether the conduct alleged meets the definition of domestic violence under the regulations. The individual responsible for implementing the Clery Act at a postsecondary institution must already be familiar with such laws because the same language appears in VAWA 2022, which also applies to the Clery Act. A recipient may also include information on the relevant crimes and definitions as part of its training on the scope of conduct that constitutes sex discrimination, including sex-based harassment as required under § 106.8(d)(1). Therefore, the Department declines to remove "under the family or domestic violence laws of the jurisdiction of the recipient."

The Department declines to replace the proposed definitions of dating violence, domestic violence, and stalking with cross-references to the Clery Act and VAWA 2022. The 2020 amendments used cross-references, and stakeholders told the Department that this caused some confusion. The Department believes that including the language from the statutory definitions themselves will be more helpful for

recipients because it will be clearer how these terms are defined for purposes of Title IX. 87 FR 41418.

*Changes:* The Department has removed the words "of violence" that were modifying "felony and misdemeanor crimes" in the definition of domestic violence.

Stalking

*Comments:* Some commenters said the proposed definition of stalking is unclear. One commenter was concerned that the proposed definition of stalking could violate the First Amendment because it is overbroad or vague and prohibits protected speech. This commenter suggested that the course of conduct must be "menacing or invasive" and that it be defined as "two or more acts, including, but not limited to acts in which the respondent directly, indirectly, or through third parties, by any action, method, device, or means, follows, monitors, observes, surveils, threatens, or communicates to or about a person, or interferes with a person's property." This commenter suggested that a reasonable person should be defined as "a reasonable person under similar circumstances and with similar identities to the complainant" and that "substantial emotional distress" should be defined as "significant mental suffering or anguish that may but does not necessarily require medical or other professional treatment or counseling." This commenter also requested that the Department include examples of the elements of the definition of stalking in the preamble to the final regulations. Some commenters asserted that the proposed definition could inadvertently discriminate against individuals with disabilities whose nonthreatening behavior is a manifestation of their disability and against individuals from different cultural backgrounds.

*Discussion:* As discussed above, the Department has largely decided to align the definitions of specific offenses with the VAWA 2022 definitions. Under VAWA 2022, stalking means a course of conduct directed at a specific person that would cause a reasonable person to either fear for their safety or the safety of others or suffer substantial emotional distress. 34 U.S.C. 12291(a)(36). Given that the Department is maintaining the definition of stalking from the 2020 amendments in the final regulations, the Department does not believe it is necessary to provide examples of the elements of the definition of stalking, but the Department discusses some of the terms in the definition in more detail below.

With respect to potential speech concerns, the court in *Rowles,* discussed earlier, addressed the university's

stalking policy. 983 F.3d at 352. That policy was similar to the definition of stalking in these final regulations in that it applied to any "course of conduct on the basis of sex with no legitimate purpose that puts another person reasonably in fear for his or her safety or would cause a reasonable person under the circumstances to be frightened, intimidated or emotionally distressed." *Id.* (quoting the policy). As with the university's harassment policy, the court rejected both vagueness and overbreadth challenges to the stalking policy, observing in particular that the "reasonable person" standard appropriately defined the scope and meaning of the policy. *Id.* at 357–58. The Department maintains that the definition of stalking in the final regulations similarly is not vague or overbroad.

In response to the commenter who said that stalking could include nonthreatening behaviors, the Department notes that the definition of stalking under 34 U.S.C. 12291(a) (as cross-referenced in the Clery Act) specifically requires a course of conduct that would cause a reasonable person to fear for safety or suffer substantial emotional distress. A "course of conduct" requires that there be more than one incident and the conduct must be directed at a specific person. Stalking can occur in person or using technology, and the duration, frequency, and intensity of the conduct should be considered. Stalking tactics can include, but are not limited to watching, following, using tracking devices, monitoring online activity, unwanted contact, property invasion or damage, hacking accounts, threats, violence, sabotage, and attacks. *See, e.g.,* Stalking Prevention Awareness and Resource Center, Identifying Stalking SLII Strategies, *www.stalkingawareness.org/wp-content/uploads/2022/04/Identifying-Stalking-as-SLII-Strategies.pdf* (last visited Mar. 12, 2024).

The Department declines to define a reasonable person in the regulations because the definition of stalking in 34 U.S.C. 12291(a) does not include such a definition. In this context, a reasonable person is a reasonable person in the complainant's position, which is consistent with how the Clery Act regulations define a reasonable person in the context of stalking. *See* 34 CFR 668.46(a). The Department does not adopt a definition of substantial emotional distress because the definition of stalking in 34 U.S.C. 12291(a) does not include such a definition. However, consistent with how the Clery Act regulations define

substantial emotional distress in the context of stalking, medical or other professional treatment and counseling would not be required to show substantial emotional distress in the Title IX context. *See* 34 CFR 668.46(a).

In response to comments that the definition of stalking would inadvertently discriminate against individuals with disabilities or individuals from different cultural backgrounds, the Department notes that in the context of stalking a recipient would consider whether a reasonable person in the complainant's position would fear for their safety or suffer emotional distress. The Department also notes that recipients must comply with prohibitions on discrimination based on disability in accordance with Section 504, the ADA, and § 106.8(e) of these final regulations. Additionally, recipients must comply with Title VI, which prohibits discrimination based on race, color, or national origin, including actual or perceived shared ancestry or ethnic characteristics, or citizenship or residency in a country with a dominant religion or distinct religious identity. Under § 106.8(e) of these final regulations, if a party is an elementary or secondary student with a disability, the recipient must require the Title IX Coordinator to consult with one or more members, as appropriate, of the student's IEP team, 34 CFR 300.321, if any, or one or more members, as appropriate, of the group of persons responsible for the student's placement decision under 34 CFR 104.35(c), if any, to determine how to comply with the requirements of the IDEA, 20 U.S.C. 1400 *et seq.,* and Section 504, 29 U.S.C. 794, throughout the recipient's implementation of grievance procedures. If a party is a postsecondary student with a disability, the Title IX Coordinator may consult, as appropriate, with the individual or office that the recipient has designated to provide support to students with disabilities to determine how to help comply with Section 504, 29 U.S.C. 794.

*Changes:* None.

**8. Section 106.2   Definition of "Relevant"**

*Comments:* Some commenters supported the proposed definition of "relevant," as it would help officials understand what evidence can be relied upon in grievance procedures. One commenter opposed the proposed definition because the commenter believed it would be too narrow and would lead to the unfair exclusion of evidence from grievance procedures.

For various reasons, some commenters suggested that the

Department adopt the definition of "relevant" in Rule 401 of the Federal Rules of Evidence, including because they see that definition as well-established and supported by case law. Another commenter recommended the Department retain the requirement in the 2020 amendments to provide directly related information to parties so that they can meaningfully participate in relevance determinations. Another commenter asked the Department to modify the definition of "relevant" to state that evidence is also relevant if it aids in credibility determinations, even if the questions or evidence are not necessarily directly relevant to determining whether the alleged sex discrimination occurred. Another commenter suggested the Department use the term "information" rather than "evidence" in the proposed definition of "relevant" because a recipient does not operate as a court of law and does not apply the Federal Rules of Evidence to its grievance procedures. Some commenters stated that if the Department's final regulations retain proposed § 106.46(e)(6)(i), which requires access to relevant evidence or a written investigative report that summarizes relevant evidence, the Department should keep the distinction between evidence "related to" the allegations and evidence "relevant" to the allegations and not define "relevant" as including all evidence "related to" allegations of sex discrimination. The commenters stated the proposed definition of "relevant" would be too broad and would result in unwieldy hearings and investigative reports. Alternatively, the commenters suggested that the Department remove the requirement to provide parties with access to all relevant evidence and instead define "relevant" as "evidence that may aid a decisionmaker in determining whether the alleged sex discrimination occurred."

One commenter suggested that the proposed definition of "relevant" is complicated and asked whether the proposed definition and the proposed regulations would require the adoption of a set of evidentiary standards. The commenter asked the Department to provide, if possible, a set of guiding standards that a recipient could use to promote consistency. Other commenters expressed concern that the proposed definition of "relevant" is internally inconsistent. The commenters stated that relevant means "related to" the allegations of sex discrimination but noted that not all things "related to" an allegation are relevant to grievance procedures. The commenters also noted

that the proposed definition provides that questions or evidence are relevant if they ''may aid'' in determining whether alleged sex discrimination occurred, which the commenters thought was narrower than the ''related to'' language in the definition. Similarly, another commenter stated that the proposed definition of ''relevant'' is confusing because the commenter did not understand how a question or evidence could be ''related to'' allegations of sex discrimination but not aid the investigation of such allegations as the Department discussed in the July 2022 NPRM. 87 FR 41419.

*Discussion:* The Department has considered commenters' support and concerns with the definition of ''relevant'' and has determined that it will retain the definition as proposed. The Department disagrees with commenters' suggestions that the definition of ''relevant'' is too narrow and will lead to the unfair exclusion of evidence. As the Department explained in the July 2022 NPRM, the definition of ''relevant'' is intended to assist a recipient with relevance determinations and clarify the term for those who may not have substantial experience applying the legal concept. 87 FR 41419. The definition of ''relevant'' is sufficiently broad in that it allows for the inclusion of all evidence that is related to an allegation of sex discrimination and will aid the decisionmaker in determining whether alleged sex discrimination occurred. With respect to scenarios presented by commenters as examples of situations in which evidence might be unfairly excluded due to the definition of ''relevant'' and § 106.45(b)(7), the Department declines to make definitive statements about these hypothetical situations because analyzing whether evidence is relevant is necessarily fact-specific and commenters did not provide sufficient information to make any specific determinations.

These regulations adopt a definition of ''relevant'' that reflects its plain and ordinary meaning and is intended to provide clarity for recipients that do not have extensive familiarity with legal concepts. The Department therefore declines to adopt the Federal Rules of Evidence's definition of ''relevant.'' The Department disagrees with the commenter's suggestion that the Department should also eliminate the term ''evidence'' entirely and use ''information'' in the definition of ''relevant'' instead. The term ''evidence'' is well-known and has a plain and ordinary meaning such that it can be understood by all recipients, even those without a legal background and even

though the grievance procedures are not conducted in a court of law.

The Department also declines the commenter's suggestion to modify the definition of ''relevant'' to state that evidence that aids in credibility determinations is also relevant, even if the questions or evidence are not necessarily directly relevant to whether the alleged sex discrimination occurred. While evidence related to a witness's or party's credibility may be relevant if it aids the decisionmaker in determining whether alleged sex discrimination occurred, the Department declines to state that all evidence that aids in credibility determinations is relevant, as there may be evidence that arguably pertains to credibility but is irrelevant to the allegations of sex discrimination. The Department notes that §§ 106.45(g) and 106.46(f) permit a decisionmaker to question parties and witnesses to assess a party's or witness's credibility, but only to the extent that credibility is both in dispute and relevant to evaluating one or more allegations of sex discrimination.

For the reasons discussed in § 106.46(e)(6)—Access to Evidence, the Department declines to remove the requirement to provide an equal opportunity to access either the relevant and not otherwise impermissible evidence or the same written investigative report that accurately summarizes this evidence in § 106.46, provided that if the postsecondary institution provides access to an investigative report, it must further provide the parties with an equal opportunity to access the relevant and not otherwise impermissible evidence upon the request of any party. The Department also declines to retain the current regulations' distinction between providing parties access to evidence ''directly related to'' allegations of sexual harassment while requiring a recipient only to include ''relevant'' information in an investigative report or hearing. The Department does not agree that the definition of ''relevant'' will result in overly burdensome investigative reports or hearings. As noted in the July 2022 NPRM, a recipient will still be permitted to exclude questions or evidence that are related to allegations of sex discrimination but would not aid a decisionmaker in determining whether the alleged sex discrimination occurred. 87 FR 41419.

The Department also appreciates the opportunity to clarify what the commenters perceived as an inconsistency in the definition of ''relevant.'' The definition states that relevant evidence and relevant

questions in grievance procedures must first be related to the allegations of sex discrimination under investigation as part of the grievance procedures under § 106.45, and if applicable § 106.46. Assuming this threshold standard is met, the definition clarifies that questions are relevant when they seek evidence that may aid in showing whether the alleged sex discrimination occurred, and evidence is relevant when it may aid a decisionmaker in determining whether the alleged sex discrimination occurred. The evaluation of whether questions are relevant under the definition of ''relevant'' includes consideration of whether the question is both related to the allegations of sex discrimination under investigation and will aid in showing whether the alleged sex discrimination occurred. The evaluation of whether evidence is relevant under the definition of ''relevant'' includes consideration of whether the evidence is both related to the allegations of sex discrimination under investigation and will aid a decisionmaker in determining whether the alleged sex discrimination occurred. The Department declines to provide specific examples of such questions or evidence due to the necessarily fact-specific nature of the analysis, but reiterates that under the Department's final regulations a recipient would exclude questions or evidence that are not relevant.

The Department's definition of ''relevant'' does not require the adoption of a specific set of evidentiary rules. Instead, these final regulations provide the appropriate balance between prescribing sufficiently detailed procedures to foster consistently applied grievance procedures while deferring to a recipient to tailor rules that best fit each recipient's unique needs.

*Changes:* None.

9. Section 106.2   Definition of ''Remedies''

*Comments:* One commenter generally supported the proposed definition of ''remedies.'' Some commenters opposed the proposed definition of ''remedies'' as too broad, without further explanation. Other commenters found the proposed definition of ''remedies'' too vague because it does not clarify what a remedy looks like or how a recipient would know when the effects of discrimination have been remedied. One commenter requested that the Department modify the proposed definition of ''remedies'' to state that remedies are ''provided, as appropriate, to a complainant or another person determined by the recipient as having

**Federal Register** / Vol. 89, No. 83 / Monday, April 29, 2024 / Rules and Regulations **33525**

had their equal access to the recipient's education program or activity unlawfully limited or denied by sex discrimination.'' The commenter stated this would ensure there is a process for identification of who is entitled to remedies and avoid the term being misused to protect those found responsible for sex discrimination.

*Discussion:* The definition of ''remedies'' in the final regulations is consistent with the Department's explanation of remedies in the 2020 amendments. It also aligns with the changes the Department has made to other parts of the regulations, such as the application of remedies to all forms of sex discrimination, including sex-based harassment. The Department acknowledges commenters' concerns that the definition of ''remedies'' does not specify what a remedy looks like or how a recipient would know when effects have been remedied. Because remedies generally are designed to restore or preserve access to the recipient's education program or activity for a particular complainant or other person or group of persons, they will be individualized and highly fact-specific. For this reason, the Department has concluded it would not be appropriate for the definition to state what a remedy would categorically look like or how a recipient would know when effects have been remedied in every instance. The Department notes, however, that it provided a non-exhaustive list of examples of possible measures a recipient may need to offer as remedies in the July 2022 NPRM. 87 FR 41423. Examples of possible measures a recipient may need to offer a student to remedy the effects of sex-based harassment, to remedy the additional harm caused by a recipient's action or inaction, or to restore or preserve a student's continued access to a recipient's education program or activity after a determination that sex-based harassment occurred could include: ensuring that a complainant can move safely between classes and while at school or on campus such as by providing a campus escort or allowing a student to park in the teachers' parking lot; making changes to class schedules and extracurricular activities to ensure the complainant and respondent are separated; making adjustments to student housing; providing services, including medical support and counseling; providing academic resources and support; reviewing any disciplinary actions taken against the complainant to determine whether there is a causal connection between the sex-based harassment and

the misconduct; providing reimbursement for professional counseling services; making tuition adjustments; and any other remedies it deems appropriate. *Id.*

The Department acknowledges commenters' concerns about the definition of ''remedies'' but disagrees that the definition of ''remedies'' is too broad. The Department appreciates the commenter's suggested language for revising the definition of ''remedies'' to ensure that there is a process to identify who is entitled to remedies and to avoid misuse of remedies to protect those found responsible for sex discrimination under Title IX. The Department declines to adopt the commenter's suggested language, however, as § 106.45(h)(3) adequately protects against potential misuse by limiting the provision and implementation of remedies to, as appropriate, a complainant and other persons the recipient identifies as having had equal access to the recipient's education program or activity limited or denied by sex discrimination. The Department also notes that § 106.45(h)(3) and (4) make clear that, following a determination that sex discrimination occurred, remedies may be provided to complainants, while disciplinary sanctions may be imposed on respondents.

*Changes:* The Department has added ''their'' to the definition of ''remedies'' for clarity.

## 10. Section 106.2 Definition of ''Respondent''

*Comments:* Commenters generally supported the proposed definition of ''respondent.'' Some commenters noted the proposed definition would more accurately frame the allegations against a respondent in the context of the prohibition on sex discrimination. One commenter also stated that the definition, when combined with the Department's assurances that all other civil rights laws apply to Title IX grievance procedures, would help to ensure a fair and consistent process for respondents with disabilities. Some commenters asked the Department to clarify whether a student organization or other entity is included within the definition of ''respondent.'' Some commenters stated that if a volunteer can be a ''respondent,'' it would be harder for a recipient to recruit and retain volunteers.

*Discussion:* The Department acknowledges commenters' support and agreement with the definition of ''respondent'' and retains the definition as proposed. As discussed in the preamble to the 2020 amendments, only

a person in their individual capacity can be a respondent in a Title IX grievance procedure. 85 FR 30139. The Department continues to decline to require a recipient to apply Title IX grievance procedures to groups or organizations. Nothing within the final regulations prohibits a recipient from addressing the actions of a student organization or other entity through a recipient's applicable code of conduct procedures. To the extent commenters suggest it would be preferable not to hold a recipient responsible for addressing sex discrimination by volunteers because doing so might make volunteering less attractive, the benefits of protecting civil rights and addressing sex discrimination justify any such costs.

*Changes:* None.

## 11. Section 106.2 Definition of ''Student With a Disability''

*Comments:* Many commenters supported the proposed definition of ''student with a disability,'' stating the definition would provide clarity for students with disabilities who experience sex discrimination and would help ensure that all students with disabilities have full access to a recipient's education program or activity.

Some commenters opposed including the proposed definition of ''student with a disability'' in § 106.2 as unnecessary because Title IX applies to all students regardless of disability. Some commenters requested that the definition of ''student with a disability'' also refer to the definition of disability under the ADA, 42 U.S.C. 12102, and one commenter requested that the Department employ alternative language such as ''disabled person'' or ''disabled student.'' Some commenters asked questions about the application of the proposed definition to particular populations of students.

*Discussion:* The Department appreciates the opinions expressed by the commenters and has carefully considered the commenters' views. While it is true that Title IX applies to all students regardless of disability, it is important to clarify the intersection of a recipient's obligations under Title IX with its obligations to protect the rights of students with disabilities. A definition of ''student with a disability'' is necessary for recipients to understand the scope of §§ 106.8(e) and 106.44(g)(6). Because it provides additional clarity, this definition will strengthen overall enforcement of Title IX.

The Department declines to add a reference to the ADA in this definition

since that would be redundant. Further, the Department appreciates the suggestion to use alternative language such as "disabled person" or "disabled student" but declines, as the phrase "student with a disability" is a familiar term regularly used by the Department. The Department also declines to speculate on the application of this definition to particular populations of students, as such inquiries are fact-specific and must be determined on a case-by-case basis.

*Changes:* None.

12. Section 106.2 Definition of "Title IX"

*Comments:* None.

*Discussion:* In the Consolidated Appropriations Act of 2022, Congress directed the Department and other Federal agencies to establish an interagency task force on sexual violence in education, and this provision was subsequently codified in the chapter of the U.S. Code that contains Title IX, 20 U.S.C. 1689. Public Law 117–103, div. W, title XIII, § 1314, Mar. 15, 2022, 136 Stat. 936. The Department has therefore further revised the definition of "Title IX" to include section 1689.

*Changes:* The Department has added section 1689 to the list of sections in title 20 of the U.S. Code that comprise Title IX.

*D. Other Definitions (Definitions That the Department Did Not Propose To Amend)*

1. Section 106.2 Definition of "Employee"

*Comments:* Some commenters asked the Department to include a definition for "employee" to make clear who has reporting requirements under § 106.44(c) and who needs to be trained under § 106.8(d).

*Discussion:* Given the wide variety of arrangements and circumstances across recipients and variations in applicable State employment laws, the Department has determined that recipients are best positioned to determine who is an "employee." For additional discussion on who is subject to the employee reporting obligations in § 106.44(c) and the employee training requirements under § 106.8(d), see those sections of this preamble.

*Changes:* None.

2. Section 106.2 Definition of "Federal Financial Assistance"

*Comments:* A number of commenters asked the Department to amend or clarify the definition of "Federal financial assistance" in light of recent court decisions holding that tax-exempt status under 26 U.S.C. 501(c)(3) constitutes Federal financial assistance for purposes of Title IX.[15] Some commenters were concerned that this would obligate a wider range of educational institutions, including private religious institutions, to comply with Title IX. Commenters asserted this would be inconsistent with the Department's current and proposed regulations and prior interpretations.

*Discussion:* The Department has determined that it is not necessary to amend the definition of "Federal financial assistance" at this time. Generally, tax benefits, tax exemptions, tax deductions, and most tax credits are not included in the statutory or regulatory definitions of Federal financial assistance. *See, e.g.,* 42 U.S.C. 2000d–1; 28 CFR 42.102(c); 31 CFR 28.105; 34 CFR 106.2(g). Most courts that have considered the issue have concluded that typical tax benefits are not Federal financial assistance because they are not contractual in nature.[16] The Department notes that even if tax-exempt status is considered a form of Federal financial assistance by some courts, not all educational institutions that have tax-exempt status are subject to the Department's Title IX regulations because the Department's Title IX regulations only cover educational institutions that receive funds from the Department. 34 CFR 100.2 (incorporated through 34 CFR 106.81). Since the Department's Title IX regulations apply only to recipients of funding from the Department, whether an educational institution may also be a recipient for other purposes is outside the scope of these regulations.

*Changes:* None.

3. Section 106.2 Definition of "Program or Activity"

*Comments:* One commenter was concerned that the current definition of "program or activity" in § 106.2, which the Department did not propose amending, covers entities that are not connected to education and thus are outside the Department's authority to regulate. This commenter urged the Department to revise the definition of "program or activity" to make clear that it only includes programs or activities related to elementary schools and secondary schools or postsecondary institutions and related activities.

*Discussion:* The Department declines the suggestion to amend the definition of "program or activity," as that definition is consistent with the statutory definition of the term as clarified by the Civil Rights Restoration Act of 1987, 20 U.S.C. 1687 (CRRA).[17] Title IX, unlike the other statutes amended by the CRRA, prohibits discrimination only in a recipient's "education" program or activity. 20 U.S.C. 1681(a). The term "education program or activity" is not separately defined in the Title IX statute or regulations, so a fact-specific inquiry is required to determine whether a particular program or activity of a non-educational institution recipient is educational, and thus covered by Title IX. Note that if any part of an educational institution receives Federal funds, all of its operations are covered by Title IX. *See, e.g., O'Connor* v. *Davis,* 126 F.3d 112, 117 (2d Cir. 1997); *Horner* v. *Ky. High Sch. Athletic Ass'n,* 43 F.3d 265, 271 (6th Cir. 1994); *Cohen* v. *Brown Univ.,* 991 F.2d 888, 894 (1st Cir. 1993).

*Changes:* None.

4. Section 106.2 Definition of "Recipient"

*Comments:* One commenter suggested that, in light of the Fourth Circuit's decision in *Peltier* v. *Charter Day School, Inc.,* 37 F.4th 104 (4th Cir. 2022), *cert. denied,* 143 S. Ct. 2657 (2023), the Department should amend the current definition of "recipient" to state that Title IX applies to charter school operating companies and subcontractors engaged by charter schools or their owners to operate charter schools.

*Discussion:* In *Peltier,* the Fourth Circuit held that a for-profit corporation responsible for the day-to-day operations of a charter school received Federal funds through its contract with the charter school operator—the intermediary—and was therefore a recipient subject to the requirements of Title IX. *Id.* at 127. The Department agrees with the Fourth Circuit's determination that, under the longstanding regulatory definition of "recipient" and Supreme Court precedent, "'[e]ntities that receive federal assistance, whether directly or through an intermediary, are recipients

---

[15] Commenters cited *E.H.* v. *Valley Christian Acad.,* 616 F. Supp. 3d 1040, 1050 (C.D. Cal. 2022); *Buettner-Hartsoe* v. *Baltimore Lutheran High Sch. Ass'n,* No. CV RDB–20–3132, 2022 WL 2869041, at *5 (D. Md. July 21, 2022), *reconsideration denied, motion to certify appeal granted,* No. CV RDB–20–3132, 2022 WL 4080294 (D. Md. Sept. 6, 2022).

[16] *See, e.g., Paralyzed Veterans of Am.* v. *Civil Aeronautics Bd.,* 752 F.2d 694, 708–09 (D.C. Cir. 1985); *Johnny's Icehouse, Inca* v. *Amateur Hockey Ass'n of Ill., Inc.,* 134 F. Supp. 2d 965, 971–72 (N.D. Ill. 2001); *Chaplin* v. *Consol. Edison Co.,* 628 F. Supp. 143, 145–46 (S.D.N.Y. 1986).

[17] The CRRA clarified the interpretation of "program or activity" under Title IX, Section 504, the Age Discrimination Act of 1975, and Title VI. *See* Public Law 100–259, 102 Stat. 28 (Mar. 22, 1988).

within the meaning of Title IX.' '" *Id.* (quoting *NCAA* v. *Smith,* 525 U.S. 459, 468 (1999)). The Department therefore declines, as unnecessary, the suggestion to amend the definition of "recipient" in § 106.2, as courts have made clear that the definition applies to charter school operating companies and subcontractors who receive Federal financial assistance directly or through an intermediary.

*Changes:* None.

5. Section 106.2 Definition of "Student"

*Comments:* The Department received comments regarding the longstanding definition of "student," which the Department did not propose to change in the July 2022 NPRM. Some commenters expressed concern that the current definition of "student" as "a person who has gained admission" is overly broad because it includes individuals who have been admitted to and may not enroll in an educational institution. Commenters expressed concern that requiring postsecondary institutions to communicate Title IX policies and rights to all admitted students would be overly burdensome. One commenter was concerned that this definition of "student," combined with language in proposed § 106.11, would suggest that a postsecondary institution would be required to initiate grievance procedures in response to a complaint alleging student-to-student sex-based harassment that occurred prior to either student attending the postsecondary institution.

Conversely, some commenters noted that this definition of "student" may be too narrow because it does not cover individuals who participate in an institution's programs but have not "gained admission." This includes certain elementary school and secondary school students enrolled in dual-enrollment programs and people who audit courses or enroll in courses sporadically.

Some commenters suggested aligning the definition of "student" in the Title IX regulations with the FERPA regulations, 34 CFR 99.3, which include individuals who are or have been "in attendance" at an educational institution, and the Clery Act, 20 U.S.C. 1092, which uses the term "enrolled students."

*Discussion:* The Department appreciates the comments received about the definition of "student." The Department did not propose any changes to the definition of "student" in the July 2022 NPRM, and this definition is the same one that has been in effect since the U.S. Department of Health,

Education and Welfare (HEW) first issued final regulations implementing Title IX in 1975. *See* 40 FR 24128, 24138 (June 4, 1975).[18] Recipients have been required to notify students (defined to include persons who have gained admission) of their nondiscrimination policies and to resolve student complaints of sex discrimination since 1975. The Department disagrees that the application of this longstanding definition of "student" in these contexts is overly burdensome. Title IX protects all persons, including applicants for admission and admitted students, from sex discrimination, and those persons must have appropriate access to a recipient's policies and procedures. The costs associated with changes to the regulatory provisions on nondiscrimination notices and grievance procedures are addressed in more detail in the *Regulatory Impact Analysis.*

The Department disagrees with the commenters' concerns that the definition of "student" as a person who has gained admission is too broad. As stated in the preamble to the 2020 amendments, Title IX prohibits a recipient from discriminating on the basis of sex in its education program or activity and protects any "person" from such discrimination. *See* 85 FR 30187. The preamble to the 2020 amendments also stated that a student who has applied for admission and has gained admission is attempting to participate in the education program or activity of the recipient. *See* 85 FR 30187; *cf. Brown,* 896 F.3d at 132 & n.6, 133 (clarifying that Title IX's coverage is not limited to enrolled students and includes members of the public "either taking part or trying to take part of a funding recipient institution's educational program or activity" when they attend events such as campus tours, sporting events, and lectures, as long as the alleged discrimination relates to the individual's participation or attempted participation in such programs).

With regard to concerns that the definition of "student" is too narrow, the Department maintains the position stated in the preamble to the 2020 amendments that where the final

[18] In 1980, Congress created the United States Department of Education. Department of Education Organization Act, Public Law 96–88, sec. 201, 93 Stat. 668, 671 (1979); Exec. Order No. 12212, 45 FR 29557 (May 2, 1980). By operation of law, all of the determinations, rules, and regulations of what was then HEW continued in effect, and functions of HEW's Office for Civil Rights were transferred to the Secretary of Education. 20 U.S.C. 3441(a)(3). The regulations implementing Title IX were recodified without substantive change in 34 CFR part 106. 45 FR 30802, 30955–65 (May 9, 1980).

regulations use the phrase "students and employees" or "students," such terms are used not to narrow the application of Title IX's nondiscrimination mandate but to require particular actions by the recipient reasonably intended to benefit students, employees, or both. *See* 85 FR 30187. In addition, the Department notes that "admission," as defined in § 106.2, covers a wide range of programs and is not limited to a formal offer of admission but rather is defined to include "selection for part-time, full-time, special, associate, transfer, exchange, or any other enrollment, membership, or matriculation in or at an education program or activity operated by a recipient." *Id.*

Regarding the commenter's concern that a postsecondary institution would be required to initiate its grievance procedures in response to a complaint alleging student-to-student sex-based harassment that occurred prior to either student attending the postsecondary institution, under § 106.11 a recipient has an obligation to address a sex-based hostile environment under its education program or activity, even when some of the conduct alleged to be contributing to that hostile environment occurred outside of the recipient's education program or activity. For additional discussion of the applicability of Title IX, see the section on § 106.11 in this preamble. In addition, under § 106.2 the definition of "complainant" includes a person other than a student or employee who was participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination. For additional discussion of the definition of "complainant," see the section on § 106.2 in this preamble.

The Department agrees with commenters that consistent use of terminology can be valuable; however, terminology may appropriately vary to reflect differences in the structures and purposes of different statutes. FERPA, the Clery Act, and Title IX each serve distinct objectives. For example, in the Clery Act, Congress specified that institutions must carry out certain information dissemination activities for the benefit of both prospective and enrolled students. 20 U.S.C. 1092(a). And in FERPA, the definition of "student," 20 U.S.C. 1232g(a)(6), reflects congressional intent to exclude from that law's coverage applicants for admission who did not attend the educational agency or institution. *See* 120 Cong. Rec. S39863 (Dec. 13, 1974). The Department believes that the longstanding definition of "student" in the Title IX regulations accurately

reflects the scope of Title IX's prohibition on sex discrimination and the longstanding statutory and regulatory framework, under which the requirements governing sex discrimination against applicants for admission and admitted students are addressed separately.

*Changes:* None.

6. Adding a Definition of "Party"

*Comments:* None.

*Discussion:* The Department determined that it would be helpful to clarify that "party" or "parties," as used in the final regulations, is intended to include only a "complainant" or "respondent," as those terms are defined in § 106.2. The term "party" does not include a Title IX Coordinator who initiates a complaint under § 106.44(f)(1)(v) or another participant in Title IX grievance procedures, such as a witness or adjudicator.

*Changes:* Section 106.2 of the final regulations defines "party" as "a complainant or respondent."

7. Adding a Definition of "Sex Discrimination"

*Comments:* Some commenters requested that the Department add a definition of "sex discrimination" to the regulations.

*Discussion:* The Department appreciates the suggestion to define the term "sex discrimination" and believes that final § 106.10 helps clarify the scope of sex discrimination, as discussed more fully in the discussion of § 106.10. To further clarify sex discrimination, other sections of the regulations, including but not limited to § 106.31, include examples of prohibited sex discrimination. The Department therefore determined that it is not necessary to add a definition of "sex discrimination" to these final regulations.

*Changes:* None.

*E. Application*

1. Section 106.11 Application

Obligation To Address Conduct Occurring Under a Recipient's Education Program or Activity

*Comments:* Many commenters expressed overall support for proposed § 106.11, including because it would remove many geographical limitations on a recipient's responsibilities under Title IX and require a recipient to address sex-based harassment in its education program or activity broadly—on a recipient's grounds, during school activities off campus, and under a recipient's disciplinary authority; would be consistent with recent court

decisions recognizing that a recipient must respond to sex-based harassment in off-campus settings; would better reflect where sex-based harassment occurs given that students live, learn, and participate in education programs off campus and in remote settings; and would promote uniformity and consistency of Federal laws because it would be more consistent with Title VII. Some commenters also highlighted student populations more likely to live off campus who would benefit from proposed § 106.11, including graduate, vocational, and community college students; low-income students, students of color, former foster youth, and LGBTQI+ students; student athletes; and students who attend training and workforce development programs. Other commenters supported proposed § 106.11 because it would close a gap in the 2020 amendments that the commenters asserted created the potential for students to engage in off-campus sex-based harassment to avoid disciplinary consequences.

Some commenters opposed proposed § 106.11 and asked that the Department retain the 2020 amendments because they have been upheld by multiple courts. Some commenters asserted that proposed § 106.11 would contradict the spirit and original intent of Title IX and exceed the Department's authority. Other commenters opposed proposed § 106.11 because they believed it would be inconsistent with Supreme Court case law limiting private damages liability under Title IX to "circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs," citing *Davis,* 526 U.S. at 645. One commenter stated that proposed § 106.11 would fail under the major questions doctrine because the commenter felt it is far outside the authority previously asserted by the Department, and Congress has attempted but failed to pass legislation similar to proposed § 106.11—H.R. 5396 ("Title IX Take Responsibility Act of 2021").

Some commenters asked the Department to include additional examples of conduct occurring under a recipient's program or activity in § 106.11, including AI technologies used by a recipient in, for example, grading of tests or admissions programs, and any gender bias within these technologies and conduct that impacts a recipient's education and workplace environments, as well as off-campus locations related to a recipient or a recipient-sponsored event or organization, including fraternity and sorority houses, honors housing, apartments contracted by

third-party housing companies but affiliated with a university, and other organizational meeting places. Another commenter asked the Department to provide guidance on whether § 106.11 would include conduct that occurs during institution-sponsored field trips or outings; conduct that occurs during remote learning in a parent's home; and conduct that occurs in recipient-owned buildings or during recipient-recognized student-run activities. Some commenters asked the Department to clarify what would constitute "off campus" and specifically what authority and obligations a recipient would have off campus.

*Discussion:* The Department acknowledges commenters' support for § 106.11 and agrees with commenters who expressed that § 106.11 aligns with the purpose and intent of Title IX, including the meaning of "under any education program or activity" in the Title IX statute.

The Department recognizes that some commenters would prefer the Department maintain the existing language in § 106.44(a) of the 2020 amendments. The final regulations clarify and more completely describe all of the circumstances in which Title IX applies. This includes conduct that occurs in a building owned or controlled by a student organization that is officially recognized by a postsecondary institution and conduct that is subject to a recipient's disciplinary authority. Title IX also applies to sex-based hostile environments occurring under a recipient's education program or activity even when some conduct alleged to be contributing to the hostile environment occurred outside the recipient's education program or activity or outside the United States.

The Department disagrees that § 106.11 contradicts the original intent of Title IX, exceeds the Department's authority, or is inconsistent with relevant case law. As discussed in the preamble to the 2020 amendments, the Department's regulatory authority is coextensive with the scope of the Title IX statute. 85 FR 30196. The Title IX statute authorizes the Department to regulate sex discrimination occurring under any education program or activity of a recipient, 20 U.S.C. 1682, and defines "program or activity" broadly and without geographical limitation, *see* 20 U.S.C. 1687 (defining "program or activity" to include "all of the operations of" a wide array of recipient entities); *see also* 34 CFR 106.2(h), 106.31(a). Further, the Department disagrees that § 106.11 fails under the major questions doctrine. The Supreme

Court, for example, has recognized the Department's authority to issue regulations prohibiting sex discrimination under Title IX. *Gebser,* 524 U.S. at 280–81 (citing 20 U.S.C. 1682). The Department disagrees that congressional failure to amend Title IX as proposed in H.R. 5396 prevents the Department from adopting § 106.11. The Supreme Court has made clear that ''[c]ongressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change.'' *Pension Ben. Guar. Corp.* v. *LTV Corp.,* 496 U.S. 633, 650 (1990) (citations and quotations omitted). And while the 2020 amendments were upheld by some courts, this does not preclude the Department from changing or modifying the regulations consistent with the Department's overarching Title IX authority and existing case law. *See, e.g., Brown* v. *Arizona,* 82 F.4th 863, 875–76 (9th Cir. 2023), *petition for cert. filed,* No. 23–812 (U.S. Jan. 25, 2024); *Roe* v. *Marshall Univ. Bd. of Governors,* 668 F. Supp. 3d 461, 467–68 (S.D.W. Va. 2023) (finding plaintiff plausibly alleged substantial control over the context of her assault when school exerted disciplinary authority over off-campus incident); *see also* 87 FR 41401–04.

The Department also disagrees that § 106.11 is inconsistent with the Supreme Court's holding in *Davis* that, in the context of a private cause of action, a recipient is only responsible under Title IX for ''circumstances wherein the recipient exercises substantial control over both the harasser and the context in which the known harassment occurs.'' 526 U.S. at 630. Section 106.11 clarifies that Title IX does not apply to sex-based harassment that occurs outside of a recipient's education program or activity. A recipient remains responsible only for discrimination that occurs under its education program or activity, *i.e.,* ''in a 'context' over which the [institution] has substantial control.'' *Brown,* 82 F.4th at 875 (citing *Davis,* 526 U.S. at 644). Consistent with *Davis,* under § 106.11, a recipient is not responsible for the actions of parties over which it lacks significant control. Rather, a recipient is responsible only for alleged discriminatory conduct over which it exercises disciplinary authority or otherwise has substantial control. *See Davis,* 526 U.S. at 641. The Department therefore reiterates that a recipient should not focus its analysis on whether alleged conduct happened ''on'' or ''off'' campus but rather on whether the

recipient has disciplinary authority over the respondent's conduct in the context in which it occurred.

The Department acknowledges that some commenters requested that the Department expand § 106.11 to include additional examples of conduct occurring under a recipient's education program or activity, including AI technologies. Other commenters requested more guidance on what constitutes conduct under a recipient's education program or activity and how § 106.11 would apply to specific circumstances such as institution-sponsored field trips, remote learning that occurs in a parent's home, and recipient-recognized student-run activities, including single-sex clubs and activities, fraternities and sororities, and affinity groups. The Department declines to provide additional examples of conduct occurring under a recipient's education program or activity. As discussed in the July 2022 NPRM, conduct occurring under a recipient's education program or activity would include, but is not limited to, conduct that occurs in off-campus settings that are operated or overseen by the recipient, including, for example, field trips, online classes, and athletic programs; conduct subject to a recipient's disciplinary authority that occurs off campus; conduct that takes place via school-sponsored electronic devices, computer and internet networks and digital platforms operated by, or used in the operations of, the recipient, including AI technologies; and conduct that occurs during training programs sponsored by a recipient at another location. *See* 87 FR 41401. Section 106.11 does not provide an exhaustive list, and additional forms of conduct or scenarios may fall under a recipient's education program or activity, depending on the facts. The Department reiterates that the final regulations do not distinguish between sex discrimination occurring in person and that occurring online. *See id.*

*Changes:* The Department has deleted the reference to ''even if sex-based harassment'' from § 106.11 and replaced it with ''even when some conduct alleged to be'' in final § 106.11 to clarify that a recipient has an obligation to address a sex-based hostile environment under its education program or activity in the United States, even when some conduct alleged to be contributing to the hostile environment occurred outside the recipient's education program or activity or outside the United States.

## Obligation To Address Hostile Environments

*Comments:* Many commenters expressed support for the requirement that a recipient address a hostile environment created under its education program or activity in the United States.

Some commenters opposed the requirement in proposed § 106.11 to address conduct that creates a hostile environment under the recipient's program or activity, stating that the Department failed to identify limits to proposed § 106.11. Some commenters believed that proposed § 106.11 would infringe on family privacy and parental rights by requiring a recipient to address conduct such as speech that generally occurs under the supervision of a student's parent off campus or actions by parents that prevent a child from participating in school in a manner consistent with their gender identity.

Other commenters stated that the police or the FBI, not recipients, should investigate alleged sex-based harassment that occurs outside of a recipient's education program or activity or outside of the United States.

Some commenters asked the Department to provide guidance and examples to help a recipient understand how to apply proposed § 106.11 in a range of settings involving a possible hostile environment. Another commenter asked the Department to clarify a recipient's responsibility to address situations in which a student alleges off-campus sexual harassment without alleging any on-campus misconduct. The commenter also asked whether one student's allegation of an off-campus sexual assault against another student who is in the same class would be sufficient to create a hostile environment in the program and if so, what the recipient's obligation would be to investigate these allegations.

Some commenters asked the Department to clarify an example discussed in the July 2022 NPRM regarding proposed § 106.11 in which Student A reports that she was sexually assaulted by Student B while studying abroad, that Student B has been taunting her with sexually suggestive comments since their return to campus and that, as a result, Student A is unable to concentrate or participate fully in her classes and activities. 87 FR 41403. Several commenters stated that under the current and proposed regulations, Student B's conduct would require a recipient to take action and one commenter asked how proposed § 106.11 would change a recipient's current obligations to Student A,

including whether a recipient would have to investigate and address both the off-campus sexual assault and the on-campus taunting.

One commenter asked the Department to clarify its example of a student (Student C) who was assaulted by a third party at an off-campus nightclub, asking whether such an incident would require a recipient to provide supportive measures to Student C. The commenter stated that although the recipient would not have disciplinary authority over a third-party assailant in the same way that it has authority over a student, it would still have the authority to issue a no-trespass order against a non-affiliated third party who assaults a student. Another commenter asked the Department to clarify what it meant by "representative of the recipient" in the following July 2022 NPRM statement regarding the Student C scenario: "[b]ecause the assault [] occurred off campus, and the respondent is not a representative of the recipient or otherwise a person over whom the recipient exercises disciplinary authority, the assault did not occur under the recipient's education program or activity." 87 FR 41403.

*Discussion:* The Department acknowledges commenters' support for the requirement in § 106.11 that a recipient must address a sex-based hostile environment under its education program or activity in the United States. As discussed in the July 2022 NPRM, this requirement is consistent with the Supreme Court's requirements under *Davis,* 526 U.S. at 645, and lower court precedent. 87 FR 41402–03; *see, e.g., Brown,* 82 F.4th at 875; *Rost* v. *Steamboat Springs RE–2 Sch. Dist.,* 511 F.3d 1114, 1121 n.1 (10th Cir. 2008) (citing *Davis,* 526 U.S. at 645); *L.E.* v. *Lakeland Joint Sch. Dist. #272,* 403 F. Supp. 3d 888, 900–01 (D. Idaho 2019); *Spencer* v. *Univ. of N.M. Bd. of Regents,* 15–cv–141, 2016 WL 10592223, at *6 (D.N.M. Jan. 11, 2016).

Upon further consideration, the Department has modified § 106.11 to clarify that a recipient has an obligation to address a sex-based hostile environment under its education program or activity, even when some conduct alleged to be contributing to the hostile environment occurred outside the recipient's education program or activity or outside the United States. In the July 2022 NPRM, § 106.11 stated that a recipient has an obligation to address a sex-based hostile environment under its education program or activity, even if sex-based harassment contributing to the hostile environment occurred outside the recipient's education program or activity or outside

the United States. 87 FR 41401. In doing so, the Department did not intend to suggest that a recipient must determine that conduct that occurred outside of the education program or activity or outside of the United States is itself "sex-based harassment" to consider that conduct in its assessment of whether a hostile environment exists within its education program or activity. To avoid confusion and provide further clarity, the Department has changed the phrase "even if sex-based harassment contributing to the hostile environment" to "even when some conduct alleged to be contributing to the hostile environment." This change does not change the scope of Title IX's application or a recipient's obligations under § 106.11, but more accurately accounts for the fact that conduct that may contribute to a hostile environment under the recipient's education program or activity need not necessarily be "sex-based harassment." Consistent with the above discussion of Hostile Environment Sex-Based Harassment—Factors to be Considered (§ 106.2), a recipient must evaluate the totality of the circumstances when determining whether there is a sex-based hostile environment in its education program or activity, which may require that the recipient consider allegations about conduct that occurred outside of its education program or activity that may be contributing to the alleged sex-based hostile environment.

When evaluating the totality of the circumstances to determine whether a sex-based hostile environment exists under the recipient's education program or activity, the factors a recipient would need to consider are set forth in the definition of "sex-based harassment" in § 106.2 and include: (1) the degree to which the conduct affected the complainant's ability to access the recipient's education program or activity; (2) the type, frequency and duration of the conduct; (3) the parties' ages, roles within the recipient's education program or activity, previous interactions, and other factors about each party that may be relevant to evaluating the effects of the conduct; (4) the location of the conduct and the context in which the conduct occurred; and (5) other sex-based harassment in the recipient's education program or activity. Not all alleged conduct occurring outside a recipient's education program or activity will contribute to a sex-based hostile environment within a recipient's program or activity. For more information, see the above discussion of Hostile Environment Sex-Based

Harassment—Factors to Be Considered (§ 106.2).

The Department appreciates commenters' concerns about the limits of § 106.11 and requests for guidance and examples of circumstances in which alleged conduct occurring outside a recipient's education program or activity would contribute to a sex-based hostile environment under a recipient's education program or activity. While the Department agrees that conduct anywhere could contribute to a hostile environment in a recipient's education program or activity, the Department appreciates the opportunity to clarify that a recipient's Title IX obligation is to address only the hostile environment that exists under its education program or activity. Alleged conduct, including alleged sex-based harassment, that occurred outside of the recipient's education program or activity may be relevant to the investigation of, and may inform the recipient's response to, the allegation of a hostile environment under the education program or activity. But the recipient is not required to respond independently to the alleged conduct that occurred outside the education program or activity. Thus, in the Department's example of Student A and Student B in the July 2022 NPRM, *see* 87 FR 41403, the recipient would be obligated to address Student A's allegations of a hostile environment under the recipient's program, including Student A's allegations of taunting by Student B and Student A's inability to concentrate in Student B's presence due to Student B's previous alleged sexual assault of Student A. Indeed, a recipient's fact-specific inquiry must consider whether a complainant's encounters with a respondent in the recipient's education program or activity in the United States give rise to a hostile environment, even when related incidents of alleged conduct may have occurred outside of the recipient's education program or activity or outside the United States. 87 FR 41403. The recipient would not, however, have a standalone obligation to address the underlying alleged sexual assault of Student A that allegedly occurred while Student A and Student B were abroad because Title IX's protections do not apply extraterritorially.

In response to commenters' concerns about the Department's Student C example in the July 2022 NPRM, *see id.,* a recipient would not be required under Title IX to provide supportive measures for sex-based harassment that occurred outside the recipient's education program or activity and has not contributed to a sex-based hostile

environment under its education program or activity. Nothing in these final regulations, however, would prohibit a recipient from taking action to support a student in this scenario, including, for example, providing counseling services or other supportive measures. Moreover, if the recipient has information indicating a specific and imminent threat of sexual assault within its education program or activity, it must take reasonable action to address that threat, for instance, by issuing a no-trespass order or working with the student to notify law enforcement.

The Department acknowledges commenters' concerns that the statement "representative of a recipient" in the example of Student C could be confusing. The Department did not intend to introduce a new concept of a "representative" in the July 2022 NPRM and appreciates the opportunity to clarify that, in the hypothetical sexual assault of Student C by a third party, if the recipient determines that the third party is not a person over whom the recipient exercises disciplinary authority, then the sexual assault did not occur within the recipient's education program or activity. 87 FR 41403.

The Department disagrees that § 106.11's requirement to address sex-based hostile environments will infringe on the privacy of family life, compromise parental control, or require a recipient to take action against a parent who, for example, will not acknowledge their child's expressed gender identity. As discussed above, § 106.11 only requires a recipient to address a hostile environment occurring under the recipient's education program or activity. Title IX does not apply to the privacy of family life. The Department appreciates the fundamental role of parents and respects the rights and responsibilities of parents regarding the upbringing of their children. The fact-specific nature of the hostile environment determination prevents the Department from making definitive determinations about specific examples of conduct. But the Department reiterates that § 106.11 does not require a recipient to respond to any conduct occurring solely outside of the recipient's education program or activity.

The Department agrees that when sex-based harassment occurs outside of a recipient's education program or activity, law enforcement may have a responsibility to investigate and respond to such sex-based harassment. The Department notes that nothing in the final regulations prevents a complainant from reporting sex-based

harassment that occurs off campus or outside of a recipient's education program or activity to law enforcement, and the Department acknowledges that mandatory reporting laws often require a recipient to report sex-based harassment to law enforcement in addition to fulfilling the recipient's obligations under Title IX. How a recipient's Title IX grievance procedures interact with a concurrent law enforcement proceeding is a fact-specific analysis that will depend on the requirements of the applicable procedures, details of the particular conduct, and local laws.

*Changes:* The Department has deleted the reference to "even if sex-based harassment" from § 106.11 and replaced it with "even when some conduct alleged to be" in final § 106.11 to clarify that a recipient has an obligation to address a sex-based hostile environment under its education program or activity in the United States, even when some conduct alleged to be contributing to the hostile environment occurred outside the recipient's education program or activity or outside the United States.

Extraterritorial Application

*Comments:* Commenters offered a range of perspectives on proposed § 106.11 and extraterritorial application of Title IX. Some commenters supported proposed § 106.11 because they understood the proposed regulations would protect students studying and participating in school-sponsored programs abroad. Other commenters suggested the Department modify proposed § 106.11 to state clearly that Title IX applies to all forms of sex discrimination that occur outside the United States or strike "in the United States" from proposed § 106.11.

Other commenters stated that proposed § 106.11's application to circumstances outside of the United States has no statutory basis in Title IX and that, absent specific language, the Supreme Court has made clear that statutes have domestic, not extraterritorial, application. Some commenters opposed what they described as the application of Title IX extraterritorially under § 106.11 because it may preempt the laws of foreign countries, conflict with local privacy laws, or conflict with the requirements of the General Data Protection Regulations (GDPR) in the European Union.

Several commenters requested additional clarification on how to handle incidents of sex-based harassment that occur abroad. Another commenter asked whether a postsecondary institution with an

international satellite campus must investigate and respond to sex discrimination arising from conduct outside of the United States even if the conduct does not contribute to a hostile environment under its education program or activity. Some commenters asked whether the application of Title IX under proposed § 106.11 would include events that involve two students outside of the United States and create a hostile on-campus environment when they return.

*Discussion:* The Department appreciates commenters' perspectives concerning § 106.11 and acknowledges commenters who requested that the Department provide additional clarification concerning the extraterritorial application of Title IX, including to study abroad programs. As discussed in the preamble to the 2020 amendments, the Department continues to maintain that 20 U.S.C. 1681 does not have extraterritorial application based on its plain text and the judicial presumption against extraterritoriality. 85 FR 30474. Title IX states that "*No person in the United States* shall, on the basis of sex be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. 1681(a) (emphasis added). The plain language of the statute therefore makes clear that Congress did not intend for 20 U.S.C. 1681 to apply extraterritorially given the language limiting its application to the United States.

The judicial presumption against extraterritoriality is a rebuttable presumption that U.S. laws apply only within U.S. boundaries. *EEOC* v. *Arabian Am. Oil Co (Aramco),* 499 U.S. 244 (1991). This presumption is rebuttable by evidence that Congress has clearly expressed its affirmative intention to give a statute extraterritorial effect. *Morrison* v. *Nat'l Austl. Bank Ltd.,* 561 U.S. 247, 255 (2010). When a statute gives no clear indication of extraterritorial application, the Supreme Court has reiterated that it will be interpreted as having none. *Morrison,* 561 U.S. at 255; *Kiobel* v. *Royal Dutch Petroleum,* 569 US 108, 124–25 (2013).[19] This presumption seeks to avoid unintended conflicts between U.S. laws and the laws of other nations that were the subject of commenters' concerns.

---

[19] While *King* v. *Eastern Michigan University,* 221 F. Supp. 2d 783 (E.D. Mich. 2002), was cited by one commenter as support for the application of Title IX extraterritorially, this case predates the Supreme Court's holdings in *Morrison* and *Kiobel.*

Because Title IX does not apply extraterritorially, it does not apply to conduct that occurs outside of the United States, including in study abroad programs, and the Department declines to modify § 106.11 to state that Title IX applies to sex discrimination that occurs outside of the United States. The Department emphasizes that a recipient does not have an obligation under Title IX address sex discrimination occurring outside of the United States. However, nothing in these regulations prohibits a recipient from responding as appropriate under its existing code of conduct or other policies pertaining to study abroad programs.

As discussed in the July 2022 NPRM, a recipient does, however, have a responsibility to address a sex-based hostile environment in its education program or activity in the United States, even when some conduct alleged to be contributing to the hostile environment occurred outside of a recipient's education program or activity or outside of the United States, including in a study abroad program. 87 FR 41403. When, for example, a student alleges they have been assaulted by a professor in a study abroad program and that a sex-based hostile environment exists when the student and professor return to campus, a recipient would be obligated to address the alleged hostile environment that exists under its education program or activity in the United States. How a recipient should address a complaint of a hostile environment resulting from conduct alleged to have occurred outside of the United States will depend on the particular facts and circumstances.

The Department also appreciates commenters' concerns about privacy laws in other countries, including the application of the GDPR in the European Union. The Department reiterates that because Title IX does not apply extraterritorially, a recipient would not be independently obligated to respond to an incident of sex discrimination that occurs in another country. If, while investigating and addressing a hostile environment under its education program or activity in the United States, a recipient seeks information about conduct that occurred in another country, nothing in these regulations preempts applicable privacy laws.

*Changes:* The Department has deleted the reference to "even if sex-based harassment" from § 106.11 and replaced it with "even when some conduct alleged to be" in final § 106.11 to clarify that a recipient has an obligation to address a sex-based hostile environment under its education program or activity

in the United States, even if conduct alleged to be contributing to the hostile environment occurred outside of the recipient's education program or activity or outside of the United States.

Conduct in Buildings Owned or Controlled by Officially Recognized Student Organizations

*Comments:* Some commenters perceived proposed § 106.11 as closing a gap in a recipient's authority to address sex-based harassment in student-recognized organizations such as spiritual clubs and fraternities and sororities. One commenter stated, however, that proposed § 106.11 could be interpreted to entirely prohibit sororities and fraternities from operating because conduct in a building owned or controlled by a student organization is considered part of the recipient's education program or activity, and a recipient is required to end any sex discrimination occurring in its education program or activity. Another commenter suggested proposed § 106.11 would violate constitutional freedoms of association because the commenter felt it would require a recipient to prohibit single-sex clubs and activities, fraternities and sororities, single-sex affinity groups and even single-sex dormitories. Some commenters asked the Department to clarify the term "officially recognized," and whether an organization is officially recognized only when there is a voluntary agreement to submit to the authority of a postsecondary institution. One commenter asked the Department to clarify whether use of the term "postsecondary institution" means that proposed § 106.11 does not apply to elementary schools and secondary schools.

*Discussion:* The Department appreciates the opportunity to clarify that § 106.11 does not prohibit single-sex clubs and activities, social fraternities and sororities, single-sex affinity groups, or single-sex dormitories that are otherwise permissible under Title IX. Section 106.11 does not change existing statutory exemptions to Title IX, such as 20 U.S.C. 1681(a)(6), which clarifies that Title IX does not apply to the membership practices of social fraternities or sororities or certain voluntary youth organizations; and 20 U.S.C. 1686, which provides that Title IX does not prohibit a recipient from maintaining single-sex living facilities. However, as the Department explained in both the 2020 amendments and the July 2022 NPRM, while Title IX exempts the membership practices of social fraternities and sororities, it does not exempt such organizations from Title IX

altogether; a recipient is responsible for addressing other forms of sex discrimination, including sex-based harassment, against participants in a program offered by any such organization that it officially recognizes or to which it provides significant assistance. *See* 85 FR 30061; 87 FR 41536; *see also* U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter on Voluntary Youth Service Organizations, at 5 (Dec. 15, 2015), *https://www2.ed.gov/about/offices/list/ ocr/letters/colleague-201512-voluntary- youth-service-organizations.pdf.*

The Department also appreciates the opportunity to clarify its discussion of buildings owned or controlled by a student organization officially recognized by a postsecondary institution. The decision to officially recognize a student organization is within the purview of the postsecondary institution itself and will depend on that institution's particular policies and procedures. Depending on the circumstances, a student organization may be officially recognized by a postsecondary institution when the postsecondary institution exerts oversight over the student organization or has the authority to discipline the student organization. *See, e.g., Farmer* v. *Kan. State Univ.,* 16–cv–2256, 2017 WL 980460 at *7–10 (D. Kan. Mar. 14, 2017), *aff'd on other grounds,* 918 F.3d 1094 (10th Cir. 2019); *Weckhorst* v. *Kan. State Univ.,* 241 F. Supp. 3d 1154, 1166–70 (10th Cir. 2019). However, the Department's reference to buildings owned or controlled by a student organization officially recognized by a postsecondary institution does not mean that § 106.11 applies only to postsecondary institutions. Section 106.11 applies to all recipients, including elementary schools and secondary schools.

*Changes:* None.

Conduct Under a Recipient's Disciplinary Authority

*Comments:* Some commenters opposed proposed § 106.11 because they believed it would require a recipient to monitor or police student life for possible sex discrimination, regardless of where it occurs, as part of its responsibility to address conduct under its disciplinary authority. One commenter suggested the Department revise proposed § 106.11 to eliminate references to a recipient's disciplinary authority because many recipients have policies that allow the imposition of discipline for conduct broadly, and expanding Title IX jurisdiction to all such instances would be overbroad and inconsistent with the plain meaning of

the term "program or activity." One commenter asked the Department to define disciplinary authority and asserted that the Department's examples in the July 2022 NPRM did not provide any objective standards by which a recipient could determine whether conduct would be under its disciplinary authority.

One commenter suggested the Department limit proposed § 106.11 to events that occur under or during a recipient's supervision, while another suggested the Department change proposed § 106.11 to include conduct that is subject to potential sanctions by a recipient. One commenter asked the Department to modify proposed § 106.11 to state explicitly that all off-campus sex-based harassment is covered by Title IX, while another raised concerns that a recipient may not be able to fully and fairly investigate all incidents occurring off campus.

One commenter asked the Department to clarify how a recipient should address conduct that implicates Title IX consistent with its disciplinary authority under its code of conduct. The commenter noted that recipients often have provisions in their codes of conduct that grant the recipient broad authority to address illegal or reckless conduct that creates health or safety risks for the campus community, even if the conduct is beyond the typical scope of the recipient's jurisdiction. Another commenter urged the Department to consider whether proposed § 106.11 would cause a recipient to limit its code of conduct to reduce exposure to OCR investigations.

Another commenter asked the Department to clarify what constitutes a "similar context," as discussed in the July 2022 NPRM, for purposes of determining conduct that is within the scope of a recipient's disciplinary authority. Another commenter asked the Department to clarify an example that was included in the preamble to the 2020 amendments and referenced in the July 2022 NPRM, in which the Department stated that a teacher's sexual harassment of a student off campus would "likely" be considered sex-based harassment in the education program or activity.

*Discussion:* The Department disagrees with the commenters' suggestion that including off-campus conduct within a recipient's disciplinary authority is overbroad and inconsistent with Title IX. As discussed in the July 2022 NPRM, conduct occurring under a recipient's education program or activity also includes settings off campus when such conduct is under the recipient's disciplinary authority. *See*

*Davis,* 526 U.S. at 647; 87 FR 41402. The Department has concluded that the final regulations should align with this language in *Davis* to fully clarify all of the circumstances in which Title IX applies. The Department disagrees that covering such conduct requires a recipient to monitor all of student life for possible sex discrimination, is overbroad, or is unsupported by case law. As explained in the discussion of § 106.44(b), these final regulations do not impose a duty on a recipient to affirmatively monitor for all prohibited sex discrimination occurring under its education program or activity. Rather, a recipient with knowledge of conduct that reasonably may constitute sex discrimination under Title IX has specific obligations set out under these final regulations. *See* § 106.44(a), (f)(1) (requiring the Title IX Coordinator, once on notice of conduct that reasonably may constitute sex discrimination, to take action to promptly and effectively end any sex discrimination in its education program or activity, prevent its recurrence, and remedy its effects).

Further, the Department notes that Federal courts have held that a recipient's responsibilities under Title IX extend to conduct subject to the recipient's disciplinary authority. *See, e.g., Brown,* 82 F.4th at 878–79 (finding student presented sufficient evidence of substantial control when, among other things, the university's code of conduct applied to conduct "both on-campus and off-campus" and the university previously issued a no-contact order that applied off campus). Section 106.11 is also consistent with the example that the Department already recognized in the preamble to the 2020 amendments, namely that a teacher's sexual harassment of a student is "likely" to constitute sexual harassment "in the program" of the recipient even if the harassment occurs off campus or off school grounds and outside a school-sponsored activity. 85 FR 30200; 87 FR 41402. The Department therefore finds it unnecessary to include language explicitly stating that off-campus sex-based harassment is covered by Title IX, as one commenter suggested. One commenter sought clarification of the Department's use of the term "likely," which was quoted in the preamble to the July 2022 NPRM from the preamble to the 2020 amendments. *See* 87 FR 41402 (quoting 85 FR 30200). The Department confirms that if a recipient has disciplinary authority over a teacher's sexual harassment of a student that occurs off campus or outside of a school-sponsored activity, a recipient

would be obligated to respond to that sexual harassment under § 106.11.

The Department declines commenters' suggestions to change the language of § 106.11 from conduct "subject to a recipient's disciplinary authority" to conduct "occurring under or during a recipient's supervision," "subject to potential sanctions by a recipient," or "that occurs off campus if the recipient has control over the staff and students at the off-campus event where the conduct occurred." The Department maintains that "conduct subject to a recipient's disciplinary authority" most accurately reflects the scope of a recipient's obligations under Title IX in the administrative context and is consistent with existing case law, including *Davis. See* 526 U.S. at 646–7 ("We thus conclude that recipients of federal funding may be liable for 'subject[ing]' their students to discrimination where the recipient is deliberately indifferent to known acts of student-on-student sexual harassment and the harasser is under the school's disciplinary authority."); *Brown,* 82 F.4th at 875 ("[A] key consideration is whether the school has some form of disciplinary authority over the harasser in the setting in which the harassment takes place."); *Marshall Univ. Bd. of Governors,* 668 F. Supp. 3d at 467–68 (finding plaintiff plausibly alleged substantial control over the context of her assault when school exerted disciplinary authority over off-campus incident); *Pogorzelska* v. *VanderCook Coll. of Music,* No. 19–cv–05683, 2023 WL 3819025, *15 (N.D. Ill. June 5, 2023) (finding that a school may be liable for peer-on-peer harassment when "the harasser is under the school's disciplinary authority" (citing *Davis,* 526 U.S. at 646–67)).

The Department also acknowledges that some recipients may exercise their authority to address conduct that creates health or safety risks for campus communities. The same broad authority would apply to a recipient's obligation to address sex discrimination occurring in similar contexts, as described in the July 2022 NPRM. 87 FR 41402. How a recipient determines whether conduct would be subject to its disciplinary authority and what constitutes a "similar context" is a fact-specific analysis unique to each recipient; however, the Department reiterates that to the extent a recipient addresses other student misconduct or other interactions between students that occur off campus, a recipient may not disclaim responsibility for addressing sex discrimination that occurs in a similar context. If a recipient responds when, for instance, one student steals

from another at an off-campus location, or when a student engages in a nonsexual assault of another student at an off-campus location, it must likewise respond when a student engages in sexual assault or sex-based harassment of another student off campus. The Department notes, however, that a recipient's obligation to investigate conduct occurring under its disciplinary authority is only ever as broad as the recipient's reasonable ability to do so.

The Department recognizes some commenters' concerns that § 106.11 might cause recipients to limit their codes of conduct to reduce exposure to OCR investigations, but the Department believes the benefits of clarifying that conduct subject to a recipient's disciplinary authority occurs under the recipient's education program or activity outweigh potential concerns. The Department does not agree with commenters who believe that a recipient will decide what conduct to regulate based on whether recognition of such conduct would also require them to address off-campus sex-based harassment. The Department notes that recipients have been on notice since the 2020 amendments that their disciplinary authority is a factor considered in evaluating the extent of their responsibilities under Title IX, 85 FR 30093, and commenters have not provided any examples of recipients limiting their codes of conduct in light of such notice. Further, the Department believes that recipients will continue to prioritize the safety and well-being of their educational community in promulgating codes of conduct that address conduct that poses ethical, safety, or health risks to the community.

*Changes:* None.

Benefits and Burdens for Recipients

*Comments:* Several commenters stated that the current regulations have resulted in many recipients adopting a confusing two-track system under which on-campus conduct is handled through a Title IX process and off-campus conduct is handled through alternative disciplinary processes. These commenters supported proposed § 106.11 because it would help a recipient create a more streamlined process that would be less confusing for students, be more resource-efficient, and help a recipient better respond to sex discrimination, which is necessary to fulfill the purpose of Title IX.

Some commenters opposed proposed § 106.11 and stated that requiring a recipient to address off-campus conduct or the on-campus effects of off-campus conduct would strain recipient resources, negatively impact recipient

staffing and finances, and impact the quality of education. One commenter stated that the Department failed to consider the costs to recipients and the difficulty in administering the requirements of proposed § 106.11. Other commenters opposed proposed § 106.11 because they said it would deny a recipient reasonable discretion to determine what conduct it has the capacity to address. Some commenters stated that codes of conduct are a more appropriate mechanism for addressing behavior that occurs outside a recipient's education program or activity or outside of the United States.

Several commenters requested modifications to proposed § 106.11 to assist with the perceived burdens on a recipient. One commenter asked that the Department provide a timeline or expectations for how a recipient should investigate off-campus conduct, including the anticipated duration of such investigations. Another commenter asked the Department to amend proposed § 106.11 to provide that when some of the conduct or parties in a complaint are not within the recipient's education program or activity, the recipient is only required to make reasonable efforts to investigate, provide supportive measures, remedy discrimination, and prevent the recurrence of the discrimination.

*Discussion:* The Department acknowledges commenters' support for the clarity that § 106.11 will provide to a recipient in responding to sex discrimination under its education program or activity. The Department recognizes commenters' concerns that the clarifications provided in § 106.11 may result in an increased caseload for some recipients and possible additional administrative costs. As discussed in the July 2022 NPRM, the Department is aware through anecdotal reports that the 2020 amendments resulted in many recipients adopting a two-track system for addressing sex discrimination, in which on-campus sex-based harassment was addressed through Title IX grievance procedures and off-campus sex-based harassment was handled through alternative disciplinary processes. 87 FR 41549. Accordingly, the Department assumes that many recipients already use alternative disciplinary proceedings to address off-campus sex-based harassment occurring under their disciplinary authority. 87 FR 41554. Thus, as discussed in the *Regulatory Impact Analysis* in the July 2022 NPRM, although § 106.11 may change the procedures under which conduct occurring off campus may be addressed, the Department does not anticipate that it will meaningfully

increase the burden imposed on recipients. 87 FR 41562. Moreover, § 106.11 will assist recipients in responding to sex discrimination in a manner that is less confusing to the educational community and more resource-efficient for some recipients by reducing the need for a two-track system to address sex discrimination. The Department also maintains that ensuring a recipient fully addresses any sex discrimination occurring under its education program or activity is not optional, is of paramount importance, and justifies any increased cost. For more discussion of how the Department has evaluated the costs and burdens of § 106.11, see the *Regulatory Impact Analysis.*

The Department understands that some commenters would prefer more flexibility and discretion in responding to sex discrimination tailored to their individual institutional circumstances. With respect to sex discrimination, however, recipients are not simply enforcing their own codes of conduct; rather, they are complying with a Federal civil rights law, the protections and benefits of which extend uniformly to every person in the recipient's education program or activity. The need for full and complete implementation of the Title IX mandate that no person be subjected to sex discrimination in education programs or activities weighs in favor of adopting Federal regulations that ensure recipients address all sex discrimination that occurs in their education programs or activities consistent with the statute.

In response to commenters' requests for timelines or expectations for how a recipient should investigate off-campus conduct or the anticipated duration of such investigations and requests for changes to proposed § 106.11, those obligations are addressed above.

*Changes:* None.

Free Speech and the Doctrine of Ministerial Exception

*Comments:* Some commenters opposed proposed § 106.11, which they asserted would chill free speech and academic expression and invade privacy at home. Other commenters did not oppose § 106.11 but expressed concerns about its impact on free speech. Some commenters understood the provision to require a recipient to monitor off-campus speech including scholarly articles, blog posts and personal social media messages that could contribute to a hostile environment, while others understood it to require school employees to report any knowledge of potentially sex-related speech online, in person, or off campus. One commenter

urged the Department to provide a clear statement that a recipient does not have a duty to monitor students' online activities proactively because this could lead to discriminatory surveillance. Other commenters stated that the proposed regulations would create uncertainty and increase litigation over a recipient's response to off-campus speech, noting that the First Amendment gives a recipient less control over off-campus speech. Some commenters asserted that the proposed regulations threaten the First Amendment rights of student journalists operating publications in off-campus offices to ensure editorial independence and freedom for their publications.

Other commenters opposed proposed § 106.11 because they claimed it would infringe upon the rights of university-recognized student religious organizations that own buildings off campus, where students congregate for worship, organizational activities, or even to live, such as a Christian sorority. Commenters stated that proposed § 106.11 would also violate the doctrine of ministerial exception under the First Amendment, which they asserted provides student religious organizations with immunity from regulation on matters of internal governance or operations.[20] These commenters asserted that proposed § 106.11 would infringe on these organizations' right to freely exercise their faith and conduct their internal affairs, particularly when their exercise of faith or internal governance might conflict with proposed changes to the definition of "sex-based harassment." One commenter asked the Department to address this conflict either by expanding application of the existing religious exemption under Title IX to apply to religious student groups or by creating an express carve-out in proposed § 106.11 for religious student groups.

*Discussion:* The Department appreciates commenters' concerns about the impact of § 106.11 on free speech among students, faculty, and other members of a recipient's educational community. The Department has determined that the definition of "sex-based harassment" sufficiently protects

individual constitutional rights and interests because it is tailored to require that any finding of a sex-based hostile environment be based on the totality of the circumstances, and be based on conduct that is both subjectively and objectively offensive, and so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity. Under the definition, isolated comments, for example, would generally not meet the definition of hostile environment sex-based harassment. As explained more fully above in the discussion of the Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2) and in the July 2022 NPRM, the Department maintains that this definition comports with *Davis* and First Amendment protections. 87 FR 41414.

In response to commenters who expressed concerns about impacts on student journalists operating off campus, the Department reiterates that Title IX does not regulate the content of speech as such and § 106.6(d) clearly states that nothing in the Title IX regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment or any other rights guaranteed against government action by the U.S. Constitution. The Department notes that although Title IX does not require a recipient to infringe on anyone's right to free speech under the First Amendment, a recipient still has the ability to take responsive action consistent with its policies and procedures to respond to protected speech that affects their community, including by, for example, offering supportive measures to a student who may be targeted by protected speech, providing its own educational programming in response to such speech, and other non-disciplinary measures.

The Department disagrees that § 106.11 will require a recipient to police speech and conduct in any location. In response to a commenter's request for clarification about the obligation of a recipient to monitor students' online activities, the Department notes, as stated in the preamble to the July 2022 NPRM, that a recipient is not expected to monitor the online activity of students or faculty. 87 FR 41440. When an employee, however, has information about conduct among students that took place on social media or other platforms and that reasonably may have created a sex-based hostile environment in the recipient's education program or

activity, the employee must comply with the applicable notification requirements under § 106.44(c) and the recipient would have an obligation under § 106.44(a)(1) to respond promptly and effectively to address any hostile environment. *Id.*

The Department also appreciates commenters' concerns about the impact of § 106.11 on university-recognized student religious organizations that own buildings off campus, where students live or congregate for worship or organizational activities. The Department recognizes the importance of religious freedoms, including the right for such organizations to congregate and freely exercise their faith, as well as the doctrine of ministerial exception that precludes application of Title VII and other employment discrimination laws to the employment relationship between a religious institution and its ministers.[21] As with the concerns commenters raised about free speech, the Department emphasizes that § 106.6(d) clearly states that nothing within these final regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment, which includes any First Amendment rights pertaining to religious freedom. Accordingly, the Department disagrees with commenters who suggested that § 106.11 would infringe on what commenters described as religious organizations' right to congregate and freely exercise their faith. Additionally, because these regulations do not require or authorize a recipient to violate the First Amendment, the Department declines commenters' suggestion to expand the application of the religious exemption to Title IX or to provide an express carve-out in § 106.11 for religious organizations as some commenters suggested. While the statute's religious exemption applies to education programs and activities operated by educational institutions or other entities that receive Federal funds and are controlled by a religious organization, it does not exempt entities that are not controlled by a religious organization or individual employees or students. It would be inappropriate to amend § 106.12, which effectuates Title IX's statutory religious exemption, to address the rights of employees or students or recipients that are not controlled by religious organizations.

The Department notes that it is unclear the extent to which the First

[20] The commenter cited *Our Lady of Guadalupe Sch.* v. *Morrissey-Berru,* 140 S. Ct. 2049 (2020); *Hosanna-Tabor Evangelical Lutheran Church & Sch.* v. *EEOC,* 565 U.S. 171 (2012); *InterVarsity Christian Fellowship/USA* v. *Bd. of Governors of Wayne State Univ.,* 534 F. Supp. 3d 785, 803–04 (E.D. Mich. 2021); *Lamb's Chapel* v. *Ctr. Moriches Union Free Sch. Dist.,* 508 U.S. 384 (1993); *Good News Club* v. *Milford Cent. Sch.,* 533 U.S. 98 (2001); *DeJohn,* 537 F.3d at 317–19; *Reno* v. *ACLU,* 521 U.S. 844, 874 (1997) (quoting *Sable Commc'ns of Cal., Inc.* v. *FCC,* 492 U.S. 115, 126 (1989)).

[21] *Our Lady of Guadalupe Sch.,* 140 S. Ct. 2049; *Hosanna-Tabor Evangelical Lutheran Church & Sch.,* 565 U.S. 171.

Amendment's ministerial exception doctrine applies to student religious organizations and Title IX, as the U.S. Supreme Court has not ruled on this question and some courts have declined to extend this exception beyond an employment law context.[22] To the extent that a future court would find that the doctrine applies to Title IX, § 106.6(d) instructs a recipient not to take action in violation of the First Amendment, which would include such an exception.

*Changes:* None.

### F. The Effect of Other Requirements and Preservation of Rights

1. Section 106.6(e) Effect of Section 444 of General Education Provisions Act (GEPA)/Family Educational Rights and Privacy Act (FERPA) and Directed Question 1

Interaction Between FERPA and Title IX Generally

*Background:* As discussed in the July 2022 NPRM, 87 FR 41404, FERPA protects the privacy of students' education records and the personally identifiable information they contain. Privacy is an important factor that the Department carefully considered in promulgating the proposed and final regulations, and recipients need to consider this factor in implementing these regulations. To the extent that a conflict exists between a recipient's obligations under Title IX and under FERPA, § 106.6(e) expressly states that the obligation to comply with the Title IX regulations is not obviated or alleviated by the FERPA statute or regulations. In 1994, as part of the Improving America's Schools Act, Congress amended GEPA, of which FERPA is a part, to state that nothing in GEPA shall be construed to "affect the applicability of . . . title IX of the Education Amendments of 1972[.]" 20 U.S.C. 1221(d). The Department has long interpreted this provision to mean that FERPA continues to apply in the context of enforcing Title IX, but if there is a direct conflict between FERPA's requirements and Title IX's

requirements, such that enforcing FERPA would interfere with Title IX's primary purpose to eliminate sex-based discrimination in schools, the requirements of Title IX override any conflicting FERPA provisions. 85 FR 30424. This override of FERPA when there is a direct conflict with Title IX is referred to in this preamble as the "GEPA override."

As an agency of the Federal government subject to the U.S. Constitution, the Department is precluded from administering, enforcing, and interpreting statutes, including Title IX and FERPA, in a manner that would require a recipient to deny the parties their constitutional rights to due process. *See* § 106.6(d). This principle was articulated in the Department's 2001 Revised Sexual Harassment Guidance, which clarified that "[t]he rights established under Title IX must be interpreted consistent with any federally guaranteed due process rights involved in a complaint proceeding" and that "[FERPA] does not override federally protected due process rights of persons accused of sexual harassment." 2001 Revised Sexual Harassment Guidance at 22. The Department maintains this interpretation in these final regulations. The override of FERPA when there is a direct conflict with due process rights is referred to in this preamble as the "constitutional override."

These final regulations, including §§ 106.45(c), (f), and (g) and 106.46(c), (e), and (f) help protect a party's, including an employee respondent's, procedural due process rights under the Fifth and Fourteenth Amendments to the U.S. Constitution by providing notice and a meaningful opportunity to respond. *See Mathews* v. *Eldridge,* 424 U.S. 319, 348 (1976) (holding that procedural due process requires notice and a meaningful opportunity to respond). Therefore, to the extent provisions in these final regulations are necessary to protect due process rights but conflict with FERPA, the conflicting FERPA provisions would be subject to the constitutional override, in addition to the GEPA override, as discussed below and as explained in greater detail in the discussions of §§ 106.45(f)(4) and 106.46(e)(6), regarding access to evidence.

*Comments:* The Department received comments in response to Directed Question 1: Interaction with FERPA (proposed § 106.6(e)). The Department addresses these comments and other FERPA-related comments in this section, as well as in other sections that

pertain to FERPA's application to particular regulatory provisions.

Some commenters addressed the GEPA override, including one commenter who recommended incorporating the GEPA override into Title IX's regulatory text and another commenter who stated that FERPA should preempt Title IX if there is a conflict regarding the privacy of student information. Some commenters asked the Department to clarify Title IX's intersection with FERPA and constitutional rights. One commenter stated that complainants have a constitutional right to privacy under the Fourteenth Amendment that overrides both Title IX and FERPA.

The Department received several requests for clarification related to the intersection between FERPA and Title IX. One commenter asked the Department to provide resources addressing the intersection of the Title IX regulations with FERPA, the Equal Access Act,[23] Title VI, the IDEA, and Section 504. Another commenter stated that more detailed regulations regarding the interaction of FERPA and Title IX would be helpful to stop recipients from using FERPA to protect themselves from liability during the Title IX grievance procedures by, for example, restricting the role of advisors or by requiring parties to waive potential claims or indemnify recipients. The commenter noted that Congress could amend FERPA.

*Discussion:* The Department emphasizes that a recipient must fulfill its obligations under both Title IX and FERPA unless there is a direct conflict that precludes compliance with both laws and their corresponding regulations. The Department maintains its prior position from the preamble to the 2020 amendments that "[a] recipient should interpret Title IX and FERPA in a manner to avoid any conflicts." 85 FR 30424; *see also New York,* 477 F. Supp. 3d at 301–02 (rejecting an arbitrary and capricious challenge to the 2020 amendments regarding their interaction with FERPA). Whether a direct conflict arises is a fact-specific determination that must be addressed on a case-by-case basis.

As discussed above, the GEPA override, which is statutorily mandated by GEPA, 20 U.S.C. 1221(d), requires that Title IX override FERPA when there is a direct conflict. Although one commenter asked the Department to include the GEPA override in the regulations, this change is not necessary because the GEPA override is already incorporated into § 106.6(e) with a

---

[22] While commenters cited *InterVarsity Christian Fellowship/USA* v. *Board of Governors of Wayne State University,* 534 F. Supp. 3d 785 (E.D. Mich. 2021), for the proposition that the doctrine can be applied to protect the rights of religious student organizations, other courts have rejected the extension of the ministerial exception to disputes regarding student organizations. *See InterVarsity Christian Fellowship/USA* v. *Univ. of Iowa,* 408 F. Supp. 3d 960, 986 (S.D. Iowa 2019) ("The ministerial exception is an affirmative defense 'grounded in the First Amendment, that precludes application of [employment discrimination laws] to claims concerning the employment relationship between a religious institution and its members.'"), *aff'd,* 5 F.4th 855 (8th Cir. 2021).

[23] 20 U.S.C. 4071.

paragraph heading that references GEPA and with regulatory text stating that the obligation to comply with Title IX is not obviated or alleviated by FERPA. The Department maintains that these final regulations make clear that a recipient must not use FERPA as a shield from compliance with Title IX. *See* § 106.6(e) (stating that the obligation to comply with Title IX and its regulations is not obviated or alleviated by FERPA). The Department notes a commenter's point about changes that Congress could make to FERPA, but legislative changes are outside the scope of the Department's authority. Likewise, the Department does not have the authority to reverse the statutorily mandated GEPA override, as suggested by a commenter.

As discussed above, the constitutional override, in addition to the GEPA override, will apply when there is a direct conflict between constitutional due process rights and FERPA. The Department is bound by the U.S. Constitution and cannot administer Title IX or FERPA in a way that deprives individuals of due process. Section 106.6(d)(2) and (3), which was enacted as part of the 2020 amendments and remains unchanged in these final regulations, states that nothing in Title IX requires a recipient to deprive a person of any rights that would otherwise be protected from government action under the Due Process Clauses of the Fifth and Fourteenth Amendments of the U.S. Constitution or restrict any other rights guaranteed against government action by the U.S. Constitution.

The Department acknowledges the request that the Department provide technical assistance addressing the intersection of the final Title IX regulations with other Federal laws. The Department will offer technical assistance, as appropriate, to promote compliance with these final regulations.

*Changes:* The Department is making technical changes to § 106.6(e) to introduce the acronym "FERPA" in the paragraph heading, replace the reference to "the Family Educational Rights and Privacy Act" with the acronym "FERPA" in the regulatory text, and reference Title IX specifically.

Interaction Between Title IX and FERPA Regarding the Disclosure of Information That is Relevant to Allegations of Sex Discrimination and Not Otherwise Impermissible

*Comments:* Commenters generally sought clarification of the interaction between Title IX and FERPA regarding evidentiary disclosures. Some commenters addressed the disclosure of disciplinary determinations. Some

commenters sought confirmation that FERPA would not prevent a recipient from notifying another recipient of the identity of respondents and disciplinary determinations, while another commenter expressed concern that FERPA exceptions might permit certain information about the determination to be publicly disclosed.

One commenter asked the Department to clarify whether a recipient must redact student names from documents related to the grievance procedures, emphasizing that parties need to know the identities of student-witnesses. Another commenter suggested that the Department limit a recipient's ability to disclose Title IX information without consent that would otherwise be permitted under FERPA, and to apply FERPA's ban on the redisclosure of students' education records to the parties' and their advisors' receipt of information regarding the opposing party.

*Discussion:* These final regulations require a recipient to provide the parties with access to the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible. *See* §§ 106.45(f)(4), 106.46(e)(6). In the context of disciplinary proceedings, the Department has previously recognized that under FERPA, "a parent (or eligible student) has a right to inspect and review any witness statement that is directly related to the student, even if that statement contains information that is also directly related to another student, if the information cannot be segregated and redacted without destroying its meaning." U.S. Dep't of Educ., Office of Planning, Evaluation, and Policy Development, Final Regulations, Family Educational Rights and Privacy, 73 FR 74806, 74832–33 (Dec. 9, 2008). In the context of Title IX grievance procedures, there is no direct conflict between Title IX and FERPA regarding the recipient's disclosure of information contained in one student's education records to another student to whom that information is also directly related. *See* 85 FR 30431; *New York,* 477 F. Supp. 3d at 301–02. The Department acknowledges, however, that certain evidence that is relevant to the allegations may not necessarily be directly related to all parties for purposes of FERPA. To the extent these final regulations require disclosure of personally identifiable information from education records to the parties (or their parents, guardians, authorized legal representatives, or advisors) that directly conflicts with FERPA (*e.g.,* disclosure of a student complainant's education records to an employee

respondent as part of investigating an allegation of sex-based harassment), the constitutional override and the GEPA override apply, and require such disclosure. FERPA does not override the due process rights of the parties, including, at minimum, the right to an explanation of the evidence and a meaningful opportunity to be heard. *See Goss,* 419 U.S. at 579, 581.

The Department notes that the Title IX regulations only require a recipient to provide the parties with the opportunity to access evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible. As explained in detail in the discussion of § 106.45(b)(7), these Title IX regulations require a recipient's grievance procedures to exclude three types of evidence and questions seeking that evidence, namely evidence that is protected under a privilege or confidentiality, records made or maintained by a physician, psychologist, or other recognized professional in connection with treatment, and evidence relating to the complainant's sexual interests or prior sexual conduct. Evidence in these categories, with narrow exceptions as provided in § 106.45(b)(7), is considered impermissible and must not be accessed, considered, disclosed, or otherwise used regardless of whether it is relevant.

With respect to redactions, these final regulations require a recipient to make certain disclosures of personally identifiable information to the parties, including access to the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible. *See* §§ 106.45(f)(4), 106.46(e)(6). A recipient must redact (or otherwise refrain from disclosing) information that is impermissible under § 106.45(b)(7); however, a recipient must not redact information or evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible because such redaction would infringe on the right of the parties to receive access to the relevant and not otherwise impermissible evidence, as well as on the parties' due process rights. As noted above, the Department has previously recognized situations in which FERPA permits the unredacted disclosure of education records related to disciplinary proceedings. When there is a direct conflict and redactions would preclude compliance with Title IX obligations, the GEPA override would require that the recipient comply with Title IX. To the extent that FERPA would require the redaction of personally identifiable information in education records, the

Department takes the position that principles of due process and fundamental fairness require the disclosure of unredacted information to the parties that is relevant to the allegations and not otherwise impermissible. Accordingly, the constitutional override and the GEPA override justify the disclosure to the parties of unredacted personally identifiable information that is relevant to the allegations of sex discrimination and not otherwise impermissible, even if the disclosure is not consistent with FERPA. For additional explanation of redactions within Title IX grievance procedures, see the discussions of §§ 106.45(b)(5), (f)(4), and 106.46(e)(6). For an explanation of the types of evidence that are impermissible under these Title IX regulations regardless of relevance, see the discussion of § 106.45(b)(7).

As explained further in the discussion of § 106.44(j), in response to commenters' concerns regarding confidentiality and the need to limit disclosures under Title IX to prevent sex discrimination, including sex-based harassment and retaliation, the Department has revised § 106.44(j). That provision prohibits a recipient from disclosing personally identifiable information that a recipient obtains in the course of complying with this part, with limited exceptions that are detailed in the discussion of § 106.44(j). Relevant to the comments summarized here, § 106.44(j)(5) allows a recipient to make a disclosure that is permitted by FERPA to the extent such disclosure is not otherwise in conflict with Title IX or this part. FERPA permits disclosures in limited circumstances. *See, e.g.,* 34 CFR 99.31(a)(2), (14). For further explanation of when a recipient may disclose personally identifiable information obtained in the course of complying with this part, including when a recipient can make disclosures that would be permitted by FERPA, see the discussion of § 106.44(j).

FERPA sets forth detailed requirements regarding when and how a recipient can disclose personally identifiable information from education records. FERPA neither authorizes nor restricts a student from redisclosing their own education records. It would not be appropriate to apply the FERPA provisions that govern disclosures by recipients to redisclosures made by parties and their advisors, as suggested by a commenter; however, these final Title IX regulations require recipients to take reasonable steps to prevent and address the parties' and their advisors' unauthorized disclosures of evidence. §§ 106.45(f)(4)(iii), 106.46(e)(6)(iii).

These steps may include restrictions on the parties' and advisors' ability to redisclose the information. The interaction between FERPA and the Title IX regulatory provisions that require disclosure of evidence is explained in greater detail in the discussions of §§ 106.45(f)(4) and 106.46(e)(6).

*Changes:* None.

Interaction Between FERPA and Title IX by Type of Recipient

*Comments:* Some commenters asked the Department to clarify Title IX's requirements for sharing information that qualifies as an education record under FERPA within elementary schools and secondary schools, and one commenter recommended that the Department differentiate the procedures for elementary schools and secondary schools, when appropriate, to safeguard the privacy of these students.

Other commenters urged the Department to acknowledge the privacy and autonomy rights of students at postsecondary institutions, who have their own privacy rights under FERPA.

*Discussion:* FERPA provides certain rights for parents and guardians regarding their children's education records. When a student reaches 18 years of age or attends an institution of postsecondary education at any age, the student becomes an ''eligible student,'' and all rights under FERPA transfer from the parent to the student. *See* 34 CFR 99.3, 99.5(a)(1). The Department's Student Privacy Policy Office (SPPO) administers FERPA. SPPO has issued guidance regarding parents' rights under FERPA. *See, e.g.,* U.S. Dep't of Educ., Student Privacy Policy Office, A Parent Guide to the Family Educational Rights and Privacy Act (FERPA) (July 2021), *https://studentprivacy.ed.gov/resources/parent-guide-family-educational-rights-and-privacy-act-ferpa*. SPPO has also issued guidance regarding eligible students' rights under FERPA. *See, e.g.,* U.S. Dep't of Educ., Student Privacy Policy Office, An Eligible Student Guide to the Family Educational Rights and Privacy Act (FERPA) (Mar. 2023), *https://studentprivacy.ed.gov/resources/eligible-student-guide-family-educational-rights-and-privacy-act-ferpa*. Nothing in these Title IX regulations alters the distinction between the rights of parents and the rights of eligible students under FERPA.

The Department notes that, in certain respects, these Title IX regulations distinguish between elementary school and secondary school students and postsecondary students. For example, with regard to handling sex-based harassment complaints, § 106.45

provides the requirements for grievance procedures for elementary schools and secondary schools, whereas § 106.46, in addition to § 106.45, provides the requirements for those complaints involving a postsecondary student. The notification requirements in § 106.44(c) also vary based on whether the recipient is an elementary school or secondary school, or a postsecondary institution. Section 106.45 contains the Title IX disclosure requirements that apply to elementary schools and secondary schools, principally at § 106.45(c) (notice of allegations), (f)(4) (access to the relevant and not otherwise impermissible evidence or an accurate description of that evidence), and (h)(2) (notification of determination whether sex discrimination occurred). Section 106.46 contains disclosure requirements that, in addition to the disclosure requirements in § 106.45, apply to sex-based harassment complaints involving a postsecondary student, principally at §§ 106.46(c) (notice of allegations), (e)(6) (access to the relevant evidence or a written investigative report), and 106.45(h) (written determination whether sex-based harassment occurred). As discussed above, based on the GEPA and constitutional overrides, an elementary school, secondary school, or postsecondary school must comply with its § 106.45, and if applicable § 106.46, disclosure requirements even when such disclosures conflict with FERPA.

*Changes:* None.

Interaction Between FERPA and Title IX Regarding Students With Disabilities

*Comments:* One commenter expressed concern that the Title IX Coordinator might not have a legitimate educational interest under FERPA to access a student party's education records, including documents related to special education services, while another commenter viewed FERPA's exception for legitimate educational interests as resolving any concerns about the interaction between the proposed Title IX regulations and FERPA.

*Discussion:* Section 106.8(e) requires a Title IX Coordinator to take certain steps if a party is a student with a disability. If the party is an elementary or secondary student with a disability, the Title IX Coordinator must consult with one or more members of the group of persons responsible for the student's placement decision, as appropriate, to ensure that the recipient complies with IDEA and Section 504 requirements during the grievance procedures. If the party is a postsecondary student with a disability, the Title IX Coordinator may consult, as appropriate, with the

individual or office that the postsecondary institution has designated to provide support to students with disabilities to help comply with Section 504. FERPA permits "school officials" to access personally identifiable information from education records without the parent's or eligible student's prior written consent, provided that the recipient has determined that the officials have a "legitimate educational interest" in the information. 34 CFR 99.31(a)(1)(i)(A). FERPA requires a recipient to specify the criteria for determining who constitutes a "school official" and what the recipient considers to be a "legitimate educational interest" in the recipient's annual notification of rights under FERPA. 34 CFR 99.7(a)(3)(iii). The Department has recognized that "[t]ypically, a school official has a legitimate educational interest if the official needs to review an education record in order to fulfill his or her professional responsibility." U.S. Dep't of Educ., Student Privacy Policy Office, A Parent Guide to the Family Educational Rights and Privacy Act (FERPA) (July 2021), *https:// studentprivacy.ed.gov/resources/parent-guide-family-educational-rights-and-privacy-act-ferpa*. To the extent that a Title IX Coordinator obtains access to personally identifiable information from the education records of a party with a disability to comply with § 106.8(e), the Department views this access as a legitimate educational interest. Accordingly, to comply with both FERPA and Title IX, a recipient must establish criteria in its annual notification of FERPA rights to permit its Title IX Coordinator to constitute a school official with legitimate educational interests when performing functions to carry out § 106.8(e).

*Changes:* None.

**Interaction Between FERPA and Title IX Regarding Sexual Orientation, Gender Identity, and Pregnancy**

*Comments:* Some commenters expressed concern that the Title IX regulations would authorize schools to withhold information from parents relating to their child's sexual orientation and gender identity that parents would otherwise be entitled to under FERPA, while other commenters asked the Department to make clear that Title IX overrides FERPA when disclosures about a student's sex, sex characteristics, pregnancy or related conditions, sexual orientation, or gender identity could put the student in danger, could create a chilling effect, or could result in sex-based harassment or retaliation.

*Discussion:* These Title IX regulations do not interfere with a parent's or guardian's rights under FERPA to obtain records or access information involving their child. Additional comments and discussion regarding parental rights and issues related to sexual orientation, gender identity, and pregnancy are addressed in the discussion of §§ 106.6(g) and 106.44(j), as well as in Section III and Section IV.

*Changes:* None.

2. Section 106.6(g) Exercise of Rights by Parents, Guardians, or Other Authorized Legal Representatives

*Comments:* The Department received several comments in support of the proposed addition of an authorized legal representative in § 106.6(g). Some commenters agreed that including an authorized legal representative would be important to recognize the role of court-appointed educational representatives and other legally authorized decisionmakers for youth in out-of-home care, and others believed this addition to § 106.6(g) may be helpful for students with disabilities.

The Department also received comments opposed to the proposed changes to § 106.6(g), requesting that the Department retain § 106.6(g) as written in the 2020 amendments. Some commenters generally asserted that proposed § 106.6(g) would exceed the Department's authority and would be inconsistent with Title IX, case law, and the Constitution.

Some commenters disagreed with the proposed addition of "authorized legal representative" for reasons including that doing so would reduce the role of a parent; would be too vague and could allow teachers, administrators, or advocacy organizations to be a child's representative or to bring a claim against a parent; would encourage students to disregard parental authority; and would give a child the responsibilities of an adult parent. Objections also included that proposed § 106.6(g) would allow a legal representative to make decisions without a parent's consent, including decisions related to a student's medical care. Some commenters suggested that the Department modify proposed § 106.6(g) to include a hierarchy that prioritizes the rights of a parent over the rights of an authorized legal representative, and some commenters asked the Department to clarify how an authorized legal representative is selected. One commenter asked the Department to add language to proposed § 106.6(g) to ensure that an authorized legal representative can communicate with a recipient on behalf of their party. Some commenters asked the

Department to define "authorized legal representative."

Some commenters asked the Department to clarify whether proposed § 106.6(g) would require parental notification when a recipient becomes aware of conduct that may constitute sex-based harassment. Other commenters believed that proposed § 106.6(g) would improperly allow postsecondary institutions to exclude parents from their children's disciplinary proceedings. Commenters expressed differing views about the interaction between proposed § 106.6(g) and FERPA, with one commenter stating that proposed § 106.6(g) would not conflict with FERPA and some commenters stating that it would.

*Discussion:* The revisions the Department proposed to § 106.6(g) clarify that an authorized legal representative, as with a parent or guardian, also has the right to act on behalf of a complainant, respondent, or other person, subject to § 106.6(e), including but not limited to making a complaint of sex discrimination through a recipient's grievance procedures. As the Department explained in the 2020 amendments, § 106.6(g) was added to acknowledge "the legal rights of parents and guardians to act on behalf of a complainant, respondent, or other individual with respect to exercise of rights under Title IX." 85 FR 30136. This rationale holds true for the addition of "authorized legal representative" to § 106.6(g), which ensures the applicability of this section to an individual who is legally authorized to act on behalf of a certain minor, such as a foster parent caring for a youth in out-of-home care but who is not necessarily deemed a parent or guardian.

Section 106.6(g) remains consistent with the 2020 amendments, which provided that, although the student would remain the complainant or respondent in situations involving a minor, "the parent or guardian must be permitted to exercise the rights granted to the party . . . whether such rights involve requesting supportive measures or participating in the process outlined in the recipient's grievance process." 85 FR 30453. As further explained in the 2020 amendments, when the party is a minor or has an appointed guardian, "the parent or guardian must be permitted to accompany the student to meetings, interviews, and hearings during a grievance process to exercise rights on behalf of the student, while the student's advisor of choice may be a different person from the parent or guardian." *Id.* The 2020 amendments also clarified that the regulations do not

alter a parent's or guardian's legal right to act on behalf of the complainant or respondent. *Id.* at 30136. Specifically, "[t]he extent to which a recipient must abide by the wishes of a parent, especially in circumstances where the student is expressing a different wish from what the student's parent wants, depends on the scope of the parent's legal right to act on the student's behalf." *Id.; see also id.* at 30453 ("Whether or not a parent or guardian has the legal right to act on behalf of an individual would be determined by State law, court orders, child custody arrangements, or other sources granting legal rights to parents or guardians.").

The Department disagrees with commenters who view § 106.6(g) as outside the Department's authority and inconsistent with Title IX, case law, and the U.S. Constitution. The Department was unable to find, and commenters did not provide, any case law suggesting that § 106.6(g) is inconsistent with the U.S. Constitution or outside the authority granted by Congress for the Department to issue regulations to effectuate Title IX's prohibition on sex discrimination in education programs or activities that receive Federal financial assistance.

The Department declines to define "authorized legal representative" or describe the process for selecting an authorized legal representative because specific terminology and procedures may differ across States and contexts; nor is it necessary to expand upon an authorized legal representative's authority to communicate on behalf of their party because that will depend on the scope of legal authority under which the authorized legal representative is permitted to act. Whether an individual may serve as the authorized legal representative of a child, and the scope of that authority, would be determined by State law, court orders, child custody arrangements, or other sources granting legal rights to guardians or legal representatives.

The Department appreciates the opportunity to clarify that the addition of "authorized legal representative" to § 106.6(g) does not grant parental authority to any individual or derogate parental rights. Instead, this language acknowledges the role of a court-appointed educational representative or other individual who has been determined by sources such as State law, court orders, or child custody arrangements to have the authority to act on behalf of, for example, a youth in out-of-home care, in matters addressed by the Title IX regulations, consistent with their legally granted authority. With regard to comments stating that

the addition of "authorized legal representative" to § 106.6(g) would allow a teacher, administrator, or an advocacy organization to act on behalf of a student, including with regard to medical decisions, the Department emphasizes that this addition to § 106.6(g) does not grant permission to entities or other individuals who are not bestowed with legal authority to act on a student's behalf. Further, this provision is limited in scope to matters addressed by the Title IX regulations, which do not address or govern decisions about medical care. Because § 106.6(g) does not confer parental rights upon any individual, the Department also declines to add a hierarchy to this section (*i.e.*, to prioritize the rights of parents over authorized legal representatives).

The Department disagrees that recognizing the legally granted authority of an authorized legal representative to act on behalf of certain youth encourages students to disregard parental authority or forces a child to assume responsibilities of an adult; rather, it ensures that students whose rights are committed to an authorized legal representative may still be able to participate in Title IX proceedings through that representative. Section 106.6(g) of the 2020 amendments does not require notification to parents, and the Department declines to do so now because the Department believes additional public comment would be appropriate before making such changes related to parental notification. The Department notes that nothing in these regulations requires or prohibits a recipient from notifying a parent, guardian, or authorized legal representative of a minor student's complaint alleging sex discrimination so they can exercise their rights to act on behalf of the minor student. Additionally, as explained in greater detail in the discussion of § 106.44(j), that paragraph explicitly permits a recipient to disclose personally identifiable information obtained in the course of complying with this part to a parent, guardian, or other authorized legal representative with the legal right to receive disclosures on behalf of the person, including a minor student, whose personally identifiable information is at issue. Further, the modifications that the Department has made to § 106.6(g) do not impact this section's consistency with parents' inspection and review rights under FERPA or its implementing regulations.

Finally, with regard to comments about the application to postsecondary students, as elaborated in the discussion of the overall considerations and

framework for Title IX's grievance procedure requirements, and consistent with the explanation of § 106.6(g) in the 2020 amendments, a parent or guardian does not typically have legal authority to exercise rights on behalf of a postsecondary student, by virtue of a student's age, in contrast to any authority they or another authorized legal representative may have for a student in elementary school or secondary school. Section 106.6(g) does not mandate the exclusion of a parent, guardian, or other authorized legal representative at the postsecondary level, and the opportunity for a postsecondary student to be accompanied by an advisor of their choice or to have persons other than the advisor of choice be present during any meeting or proceeding for a complaint of sex-based harassment is clarified in the discussion of § 106.46(e)(2)–(3).

*Changes:* The Department has made a technical change to § 106.6(g) to add a reference to "Title IX."

### 3. Section 106.6(b) Preemptive Effect

*Comments:* Some commenters raised concerns about preemption of State laws under proposed § 106.6(b). Some commenters asserted that Spending Clause statutes like Title IX can attach conditions to receipt of Federal funds but do not give the Department authority to preempt State law. Some commenters stated that the Department can only preempt a State law to the extent a requirement is within the scope of its congressionally delegated authority and States have clear notice as to any conditions attached to those funds, citing *Pennhurst,* 451 U.S. at 1. Those commenters argued, for example, that the Department cannot preempt State law that discriminates based on gender identity because recipients did not have clear notice that Title IX prohibits gender identity discrimination. A group of commenters asserted that preemption of State law would violate the "presumption against preemption" because it would regulate "in a field which States have traditionally occupied," citing, *e.g., Wyeth* v. *Levine,* 555 U.S. 555, 565 (2009). Some commenters expressed concern that proposed § 106.6(b) is contrary to the Tenth Amendment, which leaves matters not delegated to the Federal government, such as education, to the States.

Some commenters urged the Department to allow State and local governments and schools to make their own decisions that reflect their community standards and local demographic interests and priorities or preserve their existing policies and

procedures to prevent and address sex discrimination. Some commenters urged the Department to maintain current § 106.6(h) and (b) because, under the current versions of those provisions, a narrower set of State laws would be preempted.

Some commenters argued that the First Amendment bars the Federal government from regulating protected speech or preempting State free speech laws.

Some commenters supported proposed § 106.6(b) because it would allow schools to comply with State or local laws that provide greater protections against sex discrimination. Other commenters expressed concern that proposed § 106.6(b) would permit schools to comply with State laws that provide greater protection against sex discrimination but would not permit schools to comply with State laws that provide greater protection for students who were alleged to have engaged in misconduct. Some commenters asserted that the reference to laws that provide "greater protection against sex discrimination" is too vague for a recipient to determine whether a State or local law is preempted. The commenter stated that it would be helpful for the Department to more thoroughly explain how it would analyze such State and local laws to determine whether they conflict with the proposed regulations and whether such a conflict is preempted.

A number of commenters urged the Department to clarify whether and how the proposed regulations would preempt conflicting State laws and policies related to sexual orientation, gender identity, parental rights, or abortion. Commenters also asked the Department to clarify how the proposed regulations would interact with conflicting court decisions, including regarding constitutional due process.

*Discussion:* The Department appreciates the variety of views expressed by commenters regarding the proposed preemption provision. After thoroughly considering the comments, the Department maintains that the preemption provision in the final regulations, with the modification noted below, appropriately ensures the final regulations cover the full scope of Title IX. Thus, final § 106.6(b) does not extend beyond the Department's authority to promulgate regulations to effectuate Title IX.

The Department notes, first, that all 50 States have accepted Federal funding for education programs or activities and are subject to Title IX as to those programs and activities. Compliance with Title IX and its implementing regulations is "much in the nature of a contract: in return for Federal funds, the States agree to comply with federally imposed conditions." 85 FR 30458 (citing *Pennhurst,* 451 U.S. at 17). Nothing in these regulations requires the abrogation of a State's sovereign powers because States retain the ability to address discrimination on the basis of sex in the educational realm in a manner that does not conflict with these final regulations. *See Cameron* v. *EMW Women's Surgical Ctr., P.S.C.,* 595 U.S. 267, 277 (2022) ("Paramount among the States' retained sovereign powers is the power to enact and enforce any laws that do not conflict with federal law." (citing U.S. Const., art. VI, § 2)). The Department also notes that courts have long held that Spending Clause statutes, like Title IX, can preempt inconsistent State laws by operation of the Supremacy Clause. *See, e.g., Planned Parenthood of Hous.* v. *Sanchez,* 403 F.3d 324, 329–37 (5th Cir. 2005) (using "the terminology and framework of preemption in analyzing" a claim that a State law conflicts with a Federal statute enacted under the Spending Clause); *Townsend* v. *Swank,* 404 U.S. 282, 286 (1971) ("state eligibility standard that excludes persons eligible for assistance under federal AFDC standards violates the Social Security Act and is therefore invalid under the Supremacy Clause"); *King* v. *Smith,* 392 U.S. 309 (1968); *O'Brien* v. *Mass. Bay Transp. Auth.,* 162 F.3d 40 (1st Cir. 1998); *cf. Health & Hosp. Corp. of Marion Cnty.* v. *Talevski,* 599 U.S. 166, 188 (2023) (holding that § 1983 litigation to enforce a Spending Clause statute is not necessarily precluded by a separate administrative enforcement scheme). This position is consistent with the 2020 amendments, which state "[t]he Department through these final regulations, is not compelling the States to do anything. In exchange for Federal funds, recipients—including States and local educational institutions—agree to comply with Title IX and regulations promulgated to implement Title IX as part of the bargain for receiving Federal financial assistance, so that Federal funds are not used to fund sex-discriminatory practices. As a consequence, the final regulations are consistent with the Tenth Amendment." 85 FR 30459. Similarly here, these regulations simply reiterate that longstanding principle, which in the Title IX context means that a recipient may not adopt a policy or practice that contravenes Title IX or this part even if such a policy or practice is required by a conflicting State law.

The Department also disagrees with the contention that a presumption against preemption prohibits the promulgation of § 106.6(b). The Supreme Court has explicitly held that Federal law may supersede State law, even in a field historically occupied by States, when "that [is] the clear and manifest purpose of Congress." *Wyeth,* 555 U.S. at 565 (citing *Medtronic, Inc.* v. *Lohr,* 518 U.S. 470, 485 (1996); *Retail Clerks* v. *Schermerhorn,* 375 U.S. 96, 103 (1963); *Rice* v. *Santa Fe Elevator Corp.,* 331 U.S. 218 (1947)); *see also Free* v. *Bland,* 369 U.S. 663, 666 (1962) ("[A]ny state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield."). Title IX's purpose is clear in the text of the statute: to ensure that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance," 20 U.S.C. 1681(a); as is Congress's intent to provide the Department broad authority to issue regulations to effectuate the statute's purpose, *see* 20 U.S.C. 1682 (authorizing Federal agencies to issue regulations consistent with achievement of the objectives of the statute); *see also Gebser,* 524 U.S. at 292. Accordingly, Congress has "unambiguously" "impose[d] a condition on the grant of federal moneys" in the context of Title IX. *Pennhurst,* 451 U.S. at 17. Indeed, the Supreme Court has reaffirmed that Congress intended Title IX's prohibition on sex discrimination to have a broad reach, *see, e.g., Jackson,* 544 U.S. at 175 ("Courts must accord Title IX a sweep as broad as its language" (quoting *N. Haven Bd. of Educ.,* 456 U.S. at 521) (internal quotation marks omitted)); and specifically held that State law may be preempted when its purpose or effect conflicts with the objectives of Federal civil rights law. *See, e.g., Felder* v. *Casey,* 487 U.S. 131, 138 (1988) (preempting a State's notice-of-claim statute when it conflicted in purpose and effect with the remedial objectives of 42 U.S.C. 1983); *cf. Montgomery* v. *Indep. Sch. Dist. No. 709,* 109 F. Supp. 2d 1081, 1101 (D. Minn. 2000) (citing *Felder* while denying defendant's motion for summary judgment on plaintiff's Title IX claim). Because § 106.6(b) limits preemption to instances in which State or local law conflicts with Title IX or this part, this provision is consistent with preemption doctrine as articulated by the Supreme Court.

Second, the Supreme Court has made clear that State laws can be preempted by Federal regulations. *See, e.g.,*

*Hillsborough Cnty.* v. *Automated Med. Labs., Inc.,* 471 U.S. 707, 713 (1985) ("state laws can be pre-empted by federal regulations as well as federal statutes"); *Geier* v. *Am. Honda Motor Co.,* 529 U.S. 861, 873 (2000).

Third, we disagree with the suggestion that the Department lacks the delegated authority to promulgate § 106.6(b). By statute, Congress has conferred authority on the Department to promulgate regulations to effectuate the purposes of Title IX. 20 U.S.C. 1682. The Supreme Court has noted that "[t]he express statutory means of enforc[ing] [Title IX] is administrative," as the "statute directs Federal agencies that distribute education funding to establish requirements to effectuate the non-discrimination mandate, and permits the agencies to enforce those requirements through 'any . . . means authorized by law,' including ultimately the termination of Federal funding." *Gebser,* 524 U.S. at 280–81 (quoting 20 U.S.C. 1682). The Supreme Court has also explained that "[b]ecause Congress did not list any specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered." *Jackson,* 544 U.S. at 175; *see also Grimm* v. *Gloucester Cnty. Sch. Bd.,* 972 F.3d 586, 619 n.18 (4th Cir. 2020), *as amended* (Aug. 28, 2020). As described in more detail in the discussions of §§ 106.10 and 106.31(a), the Supreme Court has held that sex discrimination, as prohibited by Title VII, encompasses discrimination based on sexual orientation and gender identity, *Bostock* v. *Clayton Cnty.,* 590 U.S. 644, 659–62 (2020), and lower courts have applied this reasoning to Title IX. Further, this rulemaking process has afforded recipients notice and opportunity to comment, as well as the opportunity to decline Federal funding.

Fourth, consistent with the Department's position in the 2020 amendments and Supreme Court preemption jurisprudence, in the event of an actual conflict between State or local law and Title IX or its implementing regulations, a conflicting State law would not permit a recipient's noncompliance with Title IX. The Department appreciates that many States, as commenters noted, have laws that address sex discrimination, including sex-based harassment, sexual violence, sex offenses, and other misconduct that negatively impacts students' equal educational access. Nothing in these final regulations precludes a State, or an individual recipient, from continuing to address such matters while also complying with

these final regulations. The Department declines the suggestion to exempt a recipient from certain requirements in the final regulations to the extent they already have comprehensive policies and procedures on sex discrimination. The Department believes that the final regulations provide reasonable options for a recipient to comply in ways that are equitable for the parties, while accommodating each recipient's administrative structure, education community, discretionary decisions, community standards, and applicable Federal and State case law and State or local legal requirements. In addition, the Department notes that nothing in the final regulations precludes a recipient from retaining its existing policies and procedures but making modifications as needed to add any requirements from the final regulations.

Generally, a State law would create a conflict with the final regulations if, for example, it requires a recipient to discriminate based on a student's sexual orientation or gender identity. Consistent with the 2020 amendments, in such a circumstance, Title IX or its implementing regulations would preempt the conflicting State law. As the Department explained in 2020:

Under conflict preemption, a federal statute implicitly overrides state law . . . when state law is in actual conflict with federal law either because it is impossible for a private party to comply with both state and federal requirements or because state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. It is well-established that state laws can be pre-empted by federal regulations as well as by federal statutes. The Supreme Court has held: Pre-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation. The Department is acting within the scope of its congressionally delegated authority in promulgating these final regulations under Title IX to address sexual harassment as a form of sex discrimination.

85 FR 30454–55 (internal quotation marks omitted) (citing *Freightliner Corp.* v. *Myrick,* 514 U.S. 280, 287 (1995); *Hillsborough Cnty.,* 471 U.S. at 713; *Geier,* 529 U.S. at 873).

Nonetheless, the Department declines to maintain the preemption provisions from the 2020 amendments. As explained in the July 2022 NPRM, the final regulations revise § 106.6(b) and eliminate preexisting § 106.6(h) to clarify that the preemptive effect of these regulations is neither confined to circumstances in which sex discrimination may have limited a student's or applicant's eligibility to practice any occupation or profession as

expressed in preexisting § 106.6(b), nor to the three sections of the Title IX regulations enumerated in preexisting § 106.6(h). 87 FR 41405. Rather, final § 106.6(b) makes clear in a simple and comprehensive statement that Title IX and its implementing regulations "preempt *any* State or local law with which there is a conflict," *see id.* (emphasis in original), which as discussed above, is in accordance with the text and purpose of the statute.

With respect to a commenter's question about the regulations' intersection with conflicting case law on due process, the Department notes § 106.6(d)(2) and (3) specifies that nothing in the Title IX regulations requires a recipient to deprive a person of any rights that would otherwise be protected from government action under the Due Process Clauses of the Fifth and Fourteenth Amendments or restrict any other rights guaranteed against government action by the U.S. Constitution.

Similarly, the Department appreciates comments about the regulations' intersection with the First Amendment and agrees that these final regulations do not preempt First Amendment rights. As discussed above in Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2), these final regulations should not be interpreted in ways that would lead to the suppression of protected speech by a public or private recipient. *See also* 2003 First Amendment Dear Colleague Letter. Additionally, § 106.6(d)(1) makes clear that nothing in the Title IX regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution. Accordingly, nothing in Title IX or this part would preempt a State law that safeguards speech protected by the First Amendment, including as applied to a private recipient.

However, a recipient's obligation to comply with Title IX and this part is not obviated or alleviated by a conflicting State law that governs speech unprotected by the U.S. Constitution. The Department disagrees with the contention that the First Amendment prohibits Federal law from preempting a conflicting State or local law governing speech. Commenters did not cite, and the Department is unaware of, any such precedent. Instead, commenters cited: inapposite legal authority;[24] cases that hold enforcement

---

[24] Commenters cited *Louisiana Independent Pharmacies Ass'n* v. *Express Scripts, Inc.,* 41 F. 4th 473, 479 (5th Cir. 2022) (discussing how to establish

of State or local law unconstitutional under the First Amendment; [25] State law that prohibits public and private schools from limiting speech that is protected under the First Amendment; [26] and a court opinion interpreting that State law.[27]

The Department appreciates commenters' input on the proposed exception for State and local laws that provide "greater protections against sex discrimination," including concerns that the language was vague and would be difficult for a recipient to implement. The Department agrees the proposed language could cause confusion and believes the issue of whether the final regulations preempt a State or local law should focus on whether it conflicts with Title IX or the final regulations. Therefore, the Department has removed the "greater protections" language from the final regulations. However, nothing in the final regulations prevents a recipient from complying with a State law, including a State law designed to address sex discrimination, as long as compliance would not conflict with any requirement in the final regulations.

The Department acknowledges the request for guidance regarding how the final regulations may preempt particular State and local laws. The Department will offer technical assistance, as appropriate, to promote compliance with these final regulations, but refrains from offering opinions about how the regulations apply to specific facts or specific State and local laws without first conducting an investigation.

*Changes:* The Department has eliminated the second sentence in proposed § 106.6(b) and modified the end of the first sentence to clarify that preemption applies to any State or local law or other requirement "that conflicts with Title IX or this part." Additionally, the Department has made a technical change to add a reference to "Title IX," to clarify that this provision applies to

conflicts with the statute as well as its implementing regulations.

## II. Recipient's Obligation To Operate Its Education Program or Activity Free From Sex Discrimination

### A. Administrative Requirements

1. Section 106.8(a) Designation of a Title IX Coordinator

*Comments:* Some commenters supported proposed § 106.8(a) because it would centralize the recipient's compliance efforts, ensure accountability and efficiency, and minimize internal conflicts and confusion that could delay compliance. Some commenters supported proposed § 106.8(a) because it would allow for distribution of a Title IX Coordinator's duties to skilled and knowledgeable designees who can support the Title IX Coordinator in identifying trends, coordinating training, and monitoring and addressing barriers to reporting sex discrimination, thereby promoting effective enforcement of Title IX.

Some commenters expressed concern that the proposed regulations would shift compliance responsibility from the recipient to an individual Title IX Coordinator. Other commenters asked for clarification as to the meaning of the term "oversight," when the regulations permit delegation of the Title IX Coordinator's duties, and when such duties can be delegated to an independent contractor. Some commenters raised concerns about the prescriptiveness and burden of the Title IX Coordinator's role as outlined in the proposed regulations, including with respect to duties contemplated by proposed §§ 106.40(b), 106.44(b), 106.44(f), 106.44(k), 106.45(d)(4)(iii), and 106.45(h)(3).

Some commenters asked the Department to require each school or building within a multi-school or multi-building recipient to designate its own Title IX Coordinator and publicize that person's contact information.

Some commenters suggested the Department provide guidance for Title IX Coordinators after the final regulations are issued.

*Discussion:* The Department acknowledges commenters' support for § 106.8(a) and agrees that it furthers centralized, accountable, and effective compliance with Title IX.

The Department appreciates the opportunity to clarify that the recipient itself is responsible for compliance with obligations under Title IX, including any responsibilities assigned to the recipient's Title IX Coordinator under these final regulations. Specifically, the final regulations make clear that Title IX

and its implementing regulations apply to "every recipient and to all sex discrimination occurring under a recipient's education program or activity in the United States," with only limited exceptions. *See* § 106.11. Additionally, § 106.8(a)(1) of the final regulations underscores that the recipient is ultimately responsible for compliance with the regulations, providing that "[e]ach recipient" is responsible for designating a Title IX Coordinator.

Consistent with longstanding regulations and Department policy, these final regulations permit a recipient to designate more than one employee to serve as a Title IX Coordinator, but the recipient is responsible for designating one of its Title IX Coordinators to retain ultimate oversight. The Department explained in the July 2022 NPRM that by having one Title IX Coordinator oversee designees, the Title IX Coordinator would be responsible for ensuring consistent Title IX compliance and would be able to identify trends across the recipient's education program or activity and coordinate training or educational programming responsive to those trends. 87 FR 41424.

With respect to concerns about the meaning of the term "oversight," the Department clarifies that this word is intended to ensure that a single individual is vested with the responsibility for ensuring a recipient's consistent compliance with its responsibilities under Title IX and this part and has revised the final regulations to make that clear. Oversight does not necessarily require a Title IX Coordinator to have a supervisory relationship over other Title IX Coordinators or designees. The Department declines to further specify when a recipient or Title IX Coordinator may delegate Title IX Coordinator duties to another employee or independent contractor. As detailed in the July 2022 NPRM, the decisions about whether and when to delegate will often be recipient- or fact-specific, and depend on things like the number of students enrolled, persons employed, places services are provided, or variety of activities sponsored. 87 FR 41424. In the Department's view, given the number of factors at play, recipients are best situated to determine when delegation is appropriate.

Permission to delegate responsibilities to designees enables a recipient to assign duties to individuals who are best positioned to perform them, avoid actual or perceived conflicts of interest, and align with the recipient's administrative structure. The customizable and adaptable system of

---

Federal question jurisdiction over a claim brought in State court).

[25] Commenters cited *Tinker,* 393 U.S. at 511; *Barnette,* 319 U.S. at 642; *Wooley* v. *Maynard,* 430 U.S. 705, 713 (1977); *City of Hoboken* v. *Chevron Corp.,* 45 F.4th 699, 709 (3d Cir. 2022); *Meriwether,* 992 F.3d at 512. *But cf. Meriwether,* 992 F.3d at 511 (stating that a public university's failure to show evidence of a hostile environment indicated that Title IX compliance was not implicated by university's disciplinary action against professor and reversing dismissal of professor's free speech claims).

[26] Commenters cited Cal. Educ. Code §§ 48950, 94367.

[27] Commenters cited *Yu* v. *University of La Verne,* 196 Cal. App. 4th 779, 769, 791 (2011) (denying de novo review because student's claim did not implicate the First Amendment, but holding university violated Cal. Educ. Code § 94367).

delegation set out in § 106.8(a) also addresses commenter concerns regarding prescriptiveness and burden of the Title IX Coordinator's role throughout the final regulations by providing a recipient with greater flexibility to utilize resources in the manner that works best for its school community. Some recipients may need more than one person to coordinate the recipient's compliance with Title IX, but the Department prefers to leave recipients the flexibility to decide how to effectively comply with Title IX and the final regulations. This flexibility also ameliorates concerns that § 106.8(a) is overly prescriptive or burdensome. By allowing a recipient to delegate (or permitting a Title IX Coordinator to delegate) specific duties to one or more designees, final § 106.8(a)(2) affords a recipient the ability to deploy resources in a manner that works best for them. At the same time, however, the final regulations require each recipient to designate at least one employee as its Title IX Coordinator and provide that the Title IX Coordinator must be authorized to coordinate the recipient's efforts to comply with its responsibilities under Title IX and this part. And if the recipient has more than one Title IX Coordinator, the final regulations provide that the recipient must designate one to retain ultimate oversight and ensure the recipient's compliance with those responsibilities. This oversight structure is consistent with the longstanding requirement to designate an employee to coordinate the recipient's Title IX compliance, *see* 40 FR 24139, and with the Department's view, expressed in the 2020 amendments, *see* 85 FR 30464, that a Title IX Coordinator must be authorized to coordinate a recipient's efforts to comply with Title IX.

With respect to comments about requiring each school or building within a multi-school or multi-building recipient to designate its own Title IX Coordinator, in the July 2022 NPRM, the Department explained that proposed § 106.8(a) would permit a Title IX Coordinator to assign a designee to oversee Title IX compliance for a component of a recipient, such as a school or building. 87 FR 41424. The Department's Title IX regulations have never required a recipient to designate a separate employee to oversee the recipient's Title IX compliance with respect to each school or building, and the Department declines to do so through this rulemaking. The Department maintains that decisions of this sort are best left to the recipient given various fact-specific

considerations, including whether such designation is necessary to ensure compliance with Title IX's nondiscrimination mandate. In addition, the Department did not propose such a requirement in the July 2022 NPRM and declines to do so in this rulemaking without ensuring that the public has had a full notice and opportunity to comment on such a proposal, especially in light of the potential costs and administrative burdens.

The Department recognizes that it is important for members of a recipient's community to know how to identify a recipient's Title IX Coordinator. To address concerns that students, staff, or parents might not know how to contact the Title IX Coordinator, § 106.8(c)(1)(i)(C) of the final regulations maintains the requirement that a recipient must publish the name or title, office address, email address, and telephone number of the recipient's Title IX Coordinator. Nothing in the final regulations prevents a recipient from publicizing contact information for others appointed to coordinate compliance.

The Department acknowledges that supporting recipients and Title IX Coordinators in implementing these regulations is important. The Department will offer technical assistance and guidance, as appropriate, to promote compliance with these final regulations.

*Changes:* Section 106.8(a)(1) has been revised to refer to "a" Title IX Coordinator rather than "the" Title IX Coordinator and to specify that, if a recipient has more than one Title IX Coordinator, the recipient must designate one of its Title IX Coordinators to retain "ultimate oversight" and "ensure the recipient's consistent compliance" with Title IX. The reference to multiple coordinators has been moved from proposed § 106.8(a)(2) to § 106.8(a)(1) in the final regulations. Consistent with the requirement in § 106.8(a)(1) that one Title IX Coordinator retain ultimate oversight over the recipient's compliance responsibilities, § 106.8(a)(2) has been revised to clarify that the recipient may delegate, or permit a Title IX Coordinator to delegate, specific duties to one or more designees.

2. Section 106.8(b) and (c) Nondiscrimination Policy, Grievance Procedures, and Notice of Nondiscrimination

General Support and Opposition

*Comments:* The Department notes that proposed § 106.8(c)(i)–(v) have been redesignated as § 106.8(c)(i)(A)–(E) in these final regulations, and the following comment summaries and discussion generally refer to these provisions in their final forms. Several commenters supported proposed changes that would clarify and streamline requirements for a recipient to adopt and publish a policy prohibiting sex discrimination, comprehensive nondiscrimination policies, and grievance procedures for the equitable resolution of complaints of all forms of sex discrimination. Other commenters appreciated proposed changes that would clarify and streamline the administrative requirements around grievance procedures and notices.

Several commenters noted the importance of informing students of their rights and how to assert them as a means of ensuring that students can be free from sex discrimination in a recipient's education program or activity. Some commenters also supported providing information on how to report sex discrimination and how to access grievance procedures, including the name and specific contact information of a recipient's Title IX Coordinator, so that individuals are aware of a recipient's Title IX policies and how to report sex discrimination and can therefore resolve outstanding issues with a recipient.

Some commenters found the proposed requirements that a recipient adopt grievance procedures burdensome and unnecessary. One commenter criticized that recipients have had to adopt lengthier sex-discrimination policies to conform with the Department's changing Title IX regulations and asserted that the Department's changing positions make it difficult for a recipient to ensure its community understands what Title IX requires.

*Discussion:* Requiring a recipient to adopt, publish, and implement nondiscrimination policies, grievance procedures, and notices of nondiscrimination is critical to ensuring that students and others are protected from sex discrimination. Providing this information, including how to report allegations of sex discrimination and contact the Title IX Coordinator, will make members of recipient

communities safer and more aware of their rights and recipient obligations.

After careful consideration of public comments and based on its own enforcement experience, the Department maintains that requiring one grievance procedure (meaning one, or a set of, recipient procedures that are consistent with the requirements of § 106.45, and if applicable § 106.46) with additional requirements related to sex-based harassment complaints involving a student at a postsecondary institution, is the best approach to ensure that a recipient handles all sex discrimination promptly and equitably while allowing enough flexibility to enable a recipient to account for its educational environment (such as an elementary school, secondary school, community college, online college, or research university).

The Department disagrees that the final regulations related to a recipient's nondiscrimination notice, policies, and grievance procedures are unduly burdensome. Recipients should already have some form of notices and procedures in place because they have been required to maintain nondiscrimination notices and grievance procedures since 1975. 40 FR 24139. The Department appreciates that having clear, preestablished, and publicized policies and procedures is an essential element of ensuring a fair process for all. Congress assigned to the Department the responsibility to ensure full implementation of Title IX, and the authority for the final regulations, including publication of grievance procedures, stems from that congressional allocation of responsibility. The Department appreciates the importance of having regulations that are clear and easy for a recipient to implement. The Department determined that these revisions will help a recipient comply with Title IX, including by ensuring the school community is aware of Title IX rights and obligations. For additional discussion of costs associated with the final regulations, see the *Regulatory Impact Analysis.*

A recipient's obligation does not end with adoption and publication of a nondiscrimination policy and grievance procedure; a recipient must actually implement both. Therefore, the Department revised § 106.8(b)(1) and (2) to refer to implementation. The Department clarifies that the addition of the word "implement" is simply to ensure that nothing in § 106.8(b) relieves a recipient of its responsibility to comply with Title IX or its regulations. It does not create additional duties beyond those specified in Title IX

or its regulations. In § 106.8(b)(2), the Department changed "third parties" to "other individuals" to align with the removal, in response to commenter confusion, of the term "third party" from the description of who can make a complaint of sex discrimination in final § 106.45(a)(2)(iv). In the interest of clarity, the Department also revised § 106.8(b)(2) to clarify that a recipient's grievance procedures apply to complaints alleging any action prohibited by Title IX "or" this part, and that an alleged action need not be expressly prohibited by both the statute and regulations.

*Changes:* The Department has revised § 106.8(b)(1) and (2) to specify that a recipient must "implement" its Title IX nondiscrimination policy and grievance procedures, and § 106.8(b)(2) to state that a recipient's grievance procedures apply to complaints alleging any action prohibited by Title IX "or" this part. We also replaced "third parties" with "other individuals" in § 106.8(b)(2) and simplified the heading for § 106.8 to omit "adoption and publication of."

Requests To Add Protected Bases and Other Information in § 106.8(b) and (c)

*Comments:* Some commenters asked the Department to require a recipient to include additional information in its nondiscrimination policy, grievance procedures, and notice of nondiscrimination, such as additional protected bases (*e.g.,* pregnancy or related conditions, sex-based distinctions related to parental status, gender identity), specific applications of Title IX, and a statement that individuals may have rights under other Federal, State, or local laws. Commenters stated that this additional information would notify individuals of their rights and how to make a complaint under Title IX; inform educators and administrators of their Title IX responsibilities; decrease sex-based harassment; increase student reports of sex discrimination; and increase the effectiveness of recipient responses to reports of sex discrimination.

*Discussion:* As set forth in § 106.8(c)(1), the notice of nondiscrimination, which must be published in accordance with § 106.8(c)(2), notifies individuals of rights protected by Title IX and how to make a report or a complaint under Title IX. In the Department's view, this notice will sufficiently inform individuals of their rights and how to make a complaint under Title IX. Similarly, the required notice, in addition to training required under § 106.8(d), will sufficiently inform educators and

administrators of their Title IX responsibilities and adequately support reporting of sex discrimination, including sex-based harassment, which in turn will help ensure that a recipient can effectively respond. The Department's rulemaking authority is based on Title IX and the Department does not have authority to require a recipient to publish a notice of rights under State or local laws. The Department determined that the interest in having a concise and accessible notice outweighs the interest in including more granular information about Title IX. However, nothing in the final regulations precludes a recipient from enumerating the bases of sex discrimination prohibited by Title IX or State or local laws in its notice of nondiscrimination.

*Changes:* None.

Requests To Add Additional Information in the Grievance Procedures or Notice of Nondiscrimination

*Comments:* The Department notes that proposed § 106.8(c)(i)–(v) have been redesignated as § 106.8(c)(i)(A)–(E) in these final regulations, and the following comment summaries and discussion generally refer to these provisions in their final forms.

Some commenters asked the Department to consider requiring additional information in the grievance procedures or notice of nondiscrimination by, for example, addressing the status of postdoctoral trainees, who are not employees; stating that a complainant is not required to exhaust administrative remedies with the recipient before filing a complaint with OCR; and requiring proof of Title IX training. Commenters also suggested changes that they asserted would improve the clarity of § 106.8(b)(2) and (c), such as changing the word "attempting" to "applying" in reference to third parties who are attempting to participate in the recipient's education program or activity.

Other commenters felt the proposed notice of nondiscrimination was too long.

*Discussion:* The Department has considered commenters' suggestions to include additional information and make changes to § 106.8(b)(2) and (c). Except as described below, the Department declines these suggestions because they would create unnecessary burdens, would not improve clarity, or are unnecessary to further Title IX's purposes.

The Department appreciates the opportunity to clarify that § 106.8(b)(2) is not limited to employee complaints and requires a recipient to state that its

grievance procedures apply to the resolution of complaints made by students, employees, or by other individuals who are participating or attempting to participate in the recipient's education program or activity. *See* final §§ 106.2 (definition of "complainant"), 106.8(b)(2), 106.45(a)(2). Whether a postdoctoral trainee is an employee is a fact-specific inquiry, but regardless of the outcome, they would likely still be entitled to make a complaint under a recipient's grievance procedures if they are participating or attempting to participate in its education program or activity. The Department appreciates the opportunity to clarify that Title IX does not require a complainant to exhaust administrative remedies with a recipient prior to filing a complaint with OCR. However, the Department declines to require additional language in the notice of nondiscrimination because § 106.8(c)(1)(i)(B) makes clear that inquiries about the application of the final regulations may be referred to "the recipient's Title IX Coordinator, the Office for Civil Rights, or both" and the Department has never required an individual exhaust a recipient's administrative processes before filing a complaint with OCR.

The Department also declines to require proof of training in a recipient's notice of nondiscrimination. A recipient is subject to training requirements under § 106.8(d) of the final regulations, which includes a requirement for periodic and ongoing training. If the Department required the notice of nondiscrimination to include proof of training, a recipient would have to update it frequently to maintain its accuracy, which would be burdensome and unnecessary.

The Department declines the commenter's suggestion to revise the term "attempting" in § 106.8(b)(2) to "applying" because "attempting to participate" better encompasses the broad circumstances in which a person might try to access a recipient's education program or activity. As the Department explained in the 2020 amendments, persons who have applied for admission or have withdrawn from a recipient's program or activity but indicate a desire to re-enroll if the recipient appropriately responds to sex-based harassment allegations may be properly understood as "attempting to participate" in the recipient's education program or activity. 85 FR 30198, n. 869. The term "applying" would inappropriately narrow the provision's application.

The notice of nondiscrimination in the final regulations appropriately

informs the recipient's community of relevant Title IX policies and procedures and how to learn more or enforce their rights. As discussed above, the Department declined commenters' suggestions to include additional information that would be burdensome or unnecessary and maintains that the requirements for the notice strike the right balance between providing necessary information without being overly lengthy and cumbersome. But the Department has considered commenters' suggestions on ways to improve clarity in the notice of nondiscrimination and has determined that reorganizing § 106.8(c) will provide the needed clarity. Specifically, the Department has consolidated the requirements specifying that the notice of nondiscrimination must include information on how to locate the recipient's nondiscrimination policy under § 106.8(b)(1) and the recipient's grievance procedures under § 106.8(b)(2) into the same paragraph— *i.e.,* final § 106.8(c)(1)(i)(D). The Department further reorganized § 106.8(c) to improve clarity by grouping similar topics together and deleted references to §§ 106.45 and 106.46 from § 106.8(c)(1)(i)(D) to avoid redundancy as coverage of these sections is implied by the reference to grievance procedures under 106.8(b)(2).

*Changes:* The Department has revised § 106.8(c)(1)(i)(D) and (E) (which is similar to § 106.8(c)(1)(iv) and (v) in the proposed regulations) to now contain all notice of nondiscrimination requirements regarding where to find the recipient's nondiscrimination policy and grievance procedures. The Department has further revised final § 106.8(c)(1)(i)(D) to omit the phrase "§ 106.45, and if applicable § 106.46."

Free Speech and Religious Exemptions

*Comments:* Some commenters opposed the requirement that a recipient adopt and publish a notice of nondiscrimination, asserting that it would infringe on the free speech rights of a recipient that follows religious tenets that conflict with the proposed regulations. Some commenters argued that the Department should either require or permit a recipient with a religious exemption to disclose it in the recipient's notice of nondiscrimination. Some commenters argued that failure to acknowledge a religious exemption could cause a notice to be inaccurate or misleading.

*Discussion:* The Department notes that proposed § 106.8(c)(i)–(v) has been redesignated as § 106.8(c)(i)(A)–(E) in these final regulations, and the following comment summaries and

discussion generally refer to these provisions in their final forms.

Title IX's purpose is to eliminate sex discrimination in federally funded education programs and activities. *See Cannon* v. *Univ. of Chi.,* 441 U.S. 677, 704 (1979) ("Title IX, like its model Title VI, sought to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices."). Likewise, § 106.8, which contains the administrative requirements related to Title IX's nondiscrimination mandate, effectuates that purpose and does not require the suppression of speech or expression.

The Department disagrees that the required contents of a recipient's notice of nondiscrimination renders the notice inaccurate for a recipient that qualifies for a religious exemption. A recipient's nondiscrimination obligation may be limited by various exceptions and limitations in the statute, such as limited application of the prohibition on discrimination in admissions, 20 U.S.C. 1681(a)(1), the religious exemption, 20 U.S.C. 1681(a)(3), and the exception for membership practices of social fraternities and sororities, 20 U.S.C. 1681(a)(6). With respect to the religious exemption, Title IX expressly states that it "shall not apply" to an educational institution controlled by a religious organization to the extent compliance would be inconsistent with the religious tenets of such organization. 20 U.S.C. 1681(a)(3); *see also* 34 CFR 106.12(a). Under § 106.8(c)(1)(i)(A) of the final regulations, the notice of nondiscrimination appropriately limits its application to the obligations with which a recipient is "required by Title IX and this part" to comply. This qualifying language recognizes that some recipients are exempt from Title IX in whole or in part due to statutory and regulatory exemptions, including the religious exemption.

The Department declines commenters' suggestion that the Department amend the regulations to require a recipient to address its eligibility for a religious exemption in its notice of nondiscrimination. Requiring a recipient to include information about a religious exemption in its notice of nondiscrimination would be impractical given the fact-specific nature of the intersection between particular Title IX requirements and particular religious tenets. Such a requirement would be inconsistent with the Department's longstanding

interpretation that the statutory religious exemption applies regardless of whether a recipient has sought advance assurance from OCR or notified the public of its intent to rely on the exemption. *See* 34 CFR 106.12(b); 85 FR 30475–76. For additional information on Title IX's religious exemption, see the discussion of Religious Exemptions (Section VII.C.).

The Department recognizes that a recipient's notice of nondiscrimination may include qualifying language if the recipient intends to assert a religious exemption to particular provisions of the Title IX regulations. The Department has therefore added language to make clear that a recipient may, but is not required to, include information about any applicable exemptions or exceptions in its notice.

*Changes:* The Department has added a provision in § 106.8(c)(1)(ii) to clarify that a recipient is not prevented from including information about any exceptions or exemptions applicable to the recipient under Title IX in its notice of nondiscrimination.

Publication of Notice of Nondiscrimination (§ 106.8(c)(2))

*Comments:* Some commenters opposed as burdensome, duplicative, and impractical the proposed requirement that a recipient include its notice of nondiscrimination in each handbook, catalog, announcement, bulletin, and application form. Commenters offered a variety of changes to the publication requirement, including other methods to publish the notice of nondiscrimination, which commenters suggested would improve clarity.

Other commenters objected to permitting a recipient to post its notice of nondiscrimination solely on a website, arguing that web-posting would not be accessible to everyone and could prevent low-income, transient, or English language learner populations from accessing this information. Some commenters suggested the Department require a recipient to publish its notice of nondiscrimination and grievance procedures in English and Spanish; in a simple, clear, step-by-step manner at an appropriate reading level; and in an accessible format.

Some commenters suggested the Department require a recipient to provide notice to all stakeholders but not delineate the manner for doing so, so that a recipient can consider varying State law requirements. Other commenters argued that it is impractical for a recipient to include multiple notices required under other Federal and State laws in every announcement or bulletin.

*Discussion:* A notice of nondiscrimination must be widely accessible to achieve Title IX's objectives, and multiple modes of communication may assist stakeholders in accessing this information. To that end, the final regulations at § 106.8(c)(2) restore the longstanding requirement that existed from 1975 until 2020 that a recipient publish the notice of nondiscrimination in its handbooks, catalogs, announcements, bulletins, and application forms to increase awareness. *See* 87 FR 41427–28. Restoring this until-recently-applicable requirement will enable a recipient to comply with the final regulations with minimal burden and, given this minimal burden, any reliance interest is minimal.

Recognizing commenter concerns about burden, duplication, and impracticability, the Department notes that the final regulations at § 106.8(c)(2) account for space and format limitations and provide a recipient flexibility by giving it the option to provide a shorter version of the notice of nondiscrimination, if necessary. *See* § 106.8(c)(2)(ii). The short-form notice— which may be a one-sentence statement that the recipient prohibits sex discrimination in any education program or activity that it operates and that individuals may report concerns or questions to the Title IX Coordinator, plus a link to the full notice of nondiscrimination on the recipient's website—provides the minimum information necessary to ensure that the recipient's community members are aware of a recipient's Title IX obligations without unduly burdening the recipient. In addition, a recipient may include its notice of nondiscrimination in its handbooks, catalogs, announcements, bulletins, and application forms in the same manner it makes those materials available (*i.e.,* in print if it distributes those materials in print, and electronically if it maintains those materials only electronically).

The Department agrees with commenters who highlighted a recipient's obligations to ensure meaningful access for students, parents, and others with limited English proficiency or who may not have ready access to information on a website. The Department further agrees that individuals with disabilities and those with limited English proficiency may face additional barriers to accessing information related to Title IX. In connection with the concern that people who do not have access to the internet may not be able to access this information, the final regulations adequately ensure access because § 106.8(c)(2) requires a recipient to publish its notice in handbooks, catalogs, announcements, bulletins, and application forms, in addition to its website.

The Department emphasizes that a recipient is responsible for complying with its obligations under all applicable Federal laws, including those prohibiting discrimination on the basis of disability or national origin. Because these other laws are distinct authorities, however, the Department does not specify these separate obligations in its Title IX regulations. Moreover, because a recipient's obligation to provide information that is accessible to individuals with disabilities and those with limited English proficiency is addressed under other laws such as Title VI and Section 504, it is unnecessary and duplicative to include the same or similar obligations under Title IX as well, as some commenters suggested.

The Department acknowledges commenters' suggestion that a recipient be required to use language in their Title IX policy, grievance procedures, and notice of nondiscrimination that is clear and accessible for students and others in the recipient's community. The final regulations leave a recipient discretion in how it drafts its policy, grievance procedures, and notice of nondiscrimination to ensure it is accessible to the school community. Anyone who believes that a recipient is not communicating effectively with individuals with disabilities or limited English proficiency may file a complaint with OCR. While the requirements of § 106.8(c)(2) will provide communities with appropriate notice of a recipient's Title IX obligations, the final regulations do not bar a recipient from additionally posting its notice of nondiscrimination in a public location at each school or building the recipient operates, sharing it at specific events, or re-distributing it annually. Likewise, nothing in these final regulations prohibits a recipient from identifying other ways, in addition to the recipient's website, that students, parents, and others can access the full notice, if only the short-form notice is used in print.

The final regulations' posting requirement is necessary so that students, their parents or guardians, or other legal representatives as appropriate, employees, and others who seek to participate in a recipient's education program or activity have access to information about Title IX whenever they might need it. Section 106.8(c)(2) may be broader than other State or Federal notice requirements

that relate only to employees because a recipient needs to reach the entire school community, including those who join midway through or for only a limited part of the school year. Although recipients may be subject to requirements under other Federal or State laws, the Department has determined that the requirements in § 106.8(c)(2) are necessary to effectuate Title IX's nondiscrimination mandate. While the Department agrees that Title IX does not itself require a recipient to issue notices mandated under any other law, including State laws, it is unnecessary to address obligations under other laws in the final Title IX regulations.

The Department made minor revisions to § 106.8(c)(2)(ii) for improved clarity and precision.

*Changes:* The Department revised § 106.8(c)(2)(ii) to change the first reference to "paragraph (c)(2)" to "paragraph (c)(2)(i)," to replace the phrase "comply with paragraph (c)(2) of this section by including" with "include," and to change the word "providing" to "provide."

### 3. Section 106.8(d) Training

Benefits, Time, and Expense of Training

*Background:* Section 106.8(d)(1) requires all employees to be trained on the recipient's obligation to address sex discrimination in its education program or activity, the scope of conduct that constitutes sex discrimination under Title IX, including the definition of "sex-based harassment," and all applicable notification and information requirements under §§ 106.40(b)(2) and 106.44. Additionally, § 106.8(d)(2) requires all investigators, decisionmakers, and other persons responsible for implementing the recipient's grievance procedures or who have the authority to modify or terminate supportive measures to also be trained on the recipient's obligations under § 106.44; the recipient's grievance procedures under § 106.45, and if applicable § 106.46; how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias; and the meaning and application of the term "relevant" in relation to questions and evidence, and the types of evidence that are impermissible regardless of relevance under § 106.45, and if applicable § 106.46. Under § 106.8(d)(3), facilitators of the informal resolution process must also be trained on the rules and practices associated with the recipient's informal resolution process and how to serve impartially, including by avoiding conflicts of interest and

bias. Finally, Title IX Coordinators and their designees must also be trained on their specific responsibilities under §§ 106.8(a), 106.40(b)(3), 106.44(f), 106.44(g), the recipient's recordkeeping system and the requirements of § 106.8(f), as well as any other training necessary to coordinate the recipient's compliance with Title IX.

*Comments:* Commenters generally supported the training requirements in proposed § 106.8(d), stating that the requirements would ensure uniformity in how recipients recognize and respond to notice of sex discrimination, require all employees to be well-informed about Title IX, help all employees clearly identify incidents of sex discrimination, and help create a safe and supportive learning environment for students.

Some commenters opposed the training requirements, reasoning that they would require significant time and funding, including to change and expand trainings, identify and purchase comparable training sources, track changes to training mandates, revise policy manuals, and identify and train employees.

Some commenters noted that they had recently paid for training updates stemming from the 2020 amendments and would need additional funding for any new updates. Some commenters stated that the training requirements in proposed § 106.8(d), which differ depending on employee role and reporting requirements, are vague and would be confusing and burdensome to implement, particularly given that larger recipients often onboard large numbers of employees within a short period of time and have many employees in temporary roles, and suggested that a recipient be given flexibility to determine which personnel need to be trained. One commenter asked the Department to clarify whether reasonable exceptions for training are allowed for short-term substitute employees, limited term positions, or other special circumstances.

*Discussion:* The Department acknowledges commenters' support for the training requirements in § 106.8(d), which will enable a recipient and its employees to consistently identify and address sex discrimination in accordance with their responsibilities under Title IX and these final regulations. The Department's own enforcement experience, which commenters reinforced, confirms that inadequate training can lead to improper responses to sex discrimination. The Department acknowledges that the training requirements in the final regulations

will require recipients' time and effort to update training materials and conduct additional training. But the Department concludes that the training requirements in § 106.8(d) are necessary to align a recipient's Title IX training responsibilities with the recipient's overall obligations under these final regulations. 87 FR 41428–29.

While the Department understands that recipients will need to dedicate some additional resources to train employees under § 106.8(d), the benefits of comprehensive training outweigh the additional minimal costs. These benefits include ensuring that all employees receive training on aspects of Title IX that are relevant and critical to their specific roles, that those most likely to interact with students in their day-to-day work have the training necessary to understand their role in ensuring a recipient's Title IX compliance, and that all persons involved in implementing a recipient's grievance procedures and the informal resolution process are clearly designated and trained on conducting a fair process. Each of these benefits, in turn, will help ensure that members of a recipient's community are not discriminated against on the basis of sex and have equal access to the recipient's education program or activity. The Department therefore declines to adopt any exceptions to the training requirements. For additional discussion of benefits and costs associated with the training requirements in the final regulations, see the *Regulatory Impact Analysis.*

In accordance with the Regulatory Flexibility Act, the Department has reviewed the potential effects of the final regulations, including the training requirements, on all recipients, including small entities. As discussed in the final *Regulatory Flexibility Analysis,* the Department does not expect that these final regulations will place a substantial burden on small entities. Similarly, these final regulations do not unreasonably burden entities that have a large number of temporary employees, such as adjunct faculty, because such institutions already have to train temporary employees on institutional policies and applicable laws. As discussed above, training on Title IX's requirements to address sex discrimination is of paramount importance, is a condition of a recipient's receipt of Federal funds, and is justified to help a recipient provide an educational environment free from sex discrimination.

The Department acknowledges that some commenters would prefer more flexibility in training obligations but has determined that the benefits of

prescribed training requirements outweigh their concerns. The Department notes that § 106.8(d) provides a recipient flexibility to structure and staff training in the way that works best for its educational community and accounts for its available resources, as long as a recipient meets the training requirements in § 106.8(d). The Department further notes that the regulations do not require a recipient to hire outside trainers or purchase outside training materials, but that a recipient may choose to do so. The Department declines to require certain training practices or techniques, aside from the requirements of § 106.8(d), to allow a recipient flexibility to determine how to meet training requirements in a manner that best fits its unique educational community.

The Department acknowledges commenters' concerns about the time needed to implement new training requirements. As explained in the discussion of Effective Date and Retroactivity (Section VII.F), the Department has carefully considered these concerns, and recognizes the practical necessity of allowing recipients sufficient time to plan for implementing these final regulations, including, to the extent necessary, time to amend their policies, procedures, and trainings. In response to commenters' concerns such as these and for reasons described in the discussion of Effective Date and Retroactivity (Section VII.F), the Department has determined that the final regulations are effective August 1, 2024.

*Changes:* The effective date of these final regulations is August 1, 2024.

Frequency of Training

*Comments:* Several commenters asked the Department to clarify how often training must be conducted and whether a recipient would be required to retrain employees when their duties shift. The commenters noted that, for many recipients, employee job duties frequently change.

*Discussion:* The Department acknowledges commenters' concerns about whether a recipient is required to retrain employees when their duties shift. The purpose of the Department's training requirements is to ensure that all personnel directly involved in carrying out the recipient's Title IX duties are trained in a manner that promotes compliance with Title IX and these final regulations. The Department has therefore concluded that a revision to the proposed regulatory text is necessary to help ensure this compliance and give employees the

tools they need to perform their duties as required under Title IX and the final regulations. The Department has revised § 106.8(d) to require employees who receive a change of position that alters their duties under Title IX or the final regulations to receive training on such new duties promptly upon such change of position.

The Department is also persuaded that more specificity is required based on commenters' questions about the timing and frequency of training under § 106.8(d). For this reason, the Department has revised this provision to specify that all persons identified as requiring training under § 106.8(d) must receive training related to their responsibilities promptly upon hiring or change of position, and annually thereafter. The requirement to conduct training promptly upon hiring or change of position and on an annual basis thereafter preserves flexibility for recipients to comply with this provision while also ensuring that all persons who require training remain informed of their obligations and responsibilities under Title IX. The Department notes that this revision is consistent with the Department's assumption, as previously stated in the July 2022 NPRM, that all employees of a recipient receive required trainings each year. 87 FR 41552.

*Changes:* The Department has revised § 106.8(d) to clarify that persons who must receive training related to their duties under § 106.8(d) receive such training promptly upon hiring or change of position that alters their duties under Title IX or this part, and annually thereafter. For consistency with the other provisions of these regulations, the Department has also modified § 106.8(d)(1)(ii) to include "Title IX and" before "this part[.]" The Department has also changed "106.44(f) and 106.44(g)" to "106.44(f) and (g)[.]"

Impartiality in the Grievance Process

*Comments:* Commenters supported proposed § 106.8(d)(2)–(4) for a variety of reasons, including that the training requirements that apply to investigators, decisionmakers, Title IX Coordinators and their designees, and other persons responsible for implementing a recipient's grievance procedures assist a recipient in establishing grievance procedures that are fair and equitable and facilitates the aims of Title IX.

Some commenters expressed concern that proposed § 106.8(d)(2)–(4) would not be sufficient to prevent bias in grievance procedures and protect due process. Commenters asserted that trainings should be factually accurate and should emphasize due process

protections to ensure the objectivity of those involved in a recipient's grievance procedures. One commenter expressed concern that training is insufficient to prevent bias in Title IX Coordinators because they believed that individuals drawn to such roles have biases against respondents who are men.

*Discussion:* The Department agrees that the training required under § 106.8(d)(2)–(4) supports Title IX grievance procedures that are fair and equitable for all parties. The Department also acknowledges commenters' concerns regarding avoiding bias in Title IX grievance procedures and notes that the final regulations mandate that grievance procedures be free from bias and include several requirements, in addition to training, to achieve this mandate. For example, §§ 106.44(f)(1)(i) and 106.45(b)(1) require that a Title IX Coordinator and a recipient's grievance procedures treat a complainant and respondent equitably; §§ 106.44(k)(4) and 106.45(b)(2) require that any person designated as a Title IX Coordinator, investigator, decisionmaker, or facilitator of an informal resolution process must not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent; and § 106.46(i)(1)(iii) requires that an appeal following a grievance procedure or dismissal must be offered if there is an allegation that the Title IX Coordinator, investigator, or decisionmaker had a conflict of interest or bias for or against complainants or respondents generally or the individual complainant or respondent that would change the outcome.

To be clear, training is an important component of a recipient's obligation to ensure that grievance procedures are impartial. To that end, § 106.8(d) specifically states that training must not rely on sex stereotypes, including for investigators, decisionmakers, and Title IX Coordinators and their designees; § 106.8(d)(2)(iii) requires all investigators, decisionmakers, and other persons who are responsible for implementing the recipient's grievance procedures be trained on how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias; and § 106.8(d)(3) requires all facilitators of an informal resolution process under § 106.44(k) to be trained on the rules and practices associated with the recipient's informal resolution process and on how to serve impartially, including by avoiding conflicts of interest and bias. In addition to these training requirements, the final regulations adopt §§ 106.44, 106.45, and

106.46 to ensure that a recipient's response to complaints of sex discrimination is free from bias. The Department agrees that trainings should be factually accurate and cover, as applicable to the training, the protections in the grievance procedures to ensure a fair process.

When there is indication that a recipient has failed to comply with any of the requirements in the final regulations, including those related to recordkeeping, training, conflicts of interest or bias, and treating complainants and respondents equitably, a complaint may be filed with OCR. 34 CFR 100.7(b).

The Department has long recognized Title IX to require that training materials and trainers, as well as recipient staff, operate without bias. The Department has addressed such biases when identified in OCR investigations of alleged sex discrimination under Title IX. As discussed above, the Department continues to decline to recommend certain training practices or techniques aside from the requirements of § 106.8(d), leaving flexibility to a recipient to determine how to meet training requirements in a manner that best fits the recipient's unique educational community. The Department notes that § 106.8(f) requires a recipient to make training materials available for public inspection upon request, which provides appropriate public accountability and transparency.

*Changes:* None.

Additional Training Topics

*Comments:* Several commenters suggested that § 106.8(d) include training on a variety of additional subjects for employees, Title IX Coordinators, investigators, and those who facilitate informal resolutions.

Some commenters requested that the Department require training on trauma-informed responses to complaints of sex-based harassment, noting that trauma-informed responses can encourage complainants to move forward with the Title IX process, assist with healing, and prevent re-traumatizing a complainant. Other commenters, however, suggested that trauma-informed training can introduce biases in favor of the complainant and opposed such training, particularly for decisionmakers.

*Discussion:* The Department appreciates commenters' views on whether to expand required training topics in § 106.8(d), such as training on trauma-informed practices. The Department has determined that § 106.8(d) strikes the appropriate balance between requiring training

topics that are necessary to promote a recipient's compliance with these final regulations while leaving as much flexibility as possible to a recipient to choose the content and substance of training topics in addition to those mandated by this provision. The final regulations include appropriate protections against conflicts of interest and bias; mandate trainings on impartiality, conflicts of interest, and bias; and preclude training from relying on sex stereotypes. A recipient has flexibility to choose how to meet these requirements in a way that best serves the needs and values of its community, including by selecting best practices, including trauma-informed practices, that meet or exceed the legal requirements imposed by these final regulations.

*Changes:* None.

Individuals To Be Trained

*Comments:* Some commenters suggested expanding the categories of staff who must be trained under § 106.8(d) to include, for example, advisors, volunteers, contractors, and third-party agents who provide aid to a recipient, such as athletic coaches or extracurricular coordinators.

Some commenters also requested that the Department require recipients to train students and parents on how to report incidents of sex discrimination and how to support other students experiencing sex discrimination.

Some commenters asked the Department to clarify whether proposed § 106.8(d) would require a recipient to train all employees, or if it would be sufficient to make training available to all employees; how a recipient should treat graduate students; and how a recipient should ensure that all employees receive training, noting that collective bargaining agreements may govern a recipient's ability to require and enforce attendance at a training.

*Discussion:* Section 106.8(d)(1) requires all employees to be trained on a recipient's obligation to address sex discrimination in its education program or activity, the scope of conduct that constitutes sex discrimination, and all applicable notification and information requirements under §§ 106.40(b)(2) and 106.44; and further requires all personnel directly involved in carrying out the recipient's Title IX duties to be trained in a manner that promotes a recipient's compliance with these final regulations. The Department notes that this would include any advisors, graduate students, contractors, volunteers, or third-party agents who are performing roles that are directly involved in carrying out the recipient's

Title IX duties. The Department declines to further mandate training for advisors, graduate students, volunteers, contractors, and third-party agents not directly involved in carrying out the recipient's Title IX duties and who are not employees because the benefit of doing so would not be justified by the cost that training this population would impose on a recipient. But the Department notes that under the wide variety of employment or associational arrangements and circumstances in place across recipients, as well as variations in applicable State employment laws, many of these individuals may constitute employees who must be trained under § 106.8(d). The Department also reiterates that nothing within the final regulations prohibits a recipient from choosing to train volunteers, contractors, third-party agents, or other non-employees if such training will further the recipient's compliance with these final regulations.

For clarity in the first sentence of § 106.8(d), the Department has changed the phrase "the persons described below" to "the persons described in paragraphs (f)(1) through (4) below."

The Department acknowledges commenters' support for the value of educating parents and students on sex discrimination. The training in these final regulations is limited to training of recipient employees. Nothing in these final regulations impedes a recipient's discretion to provide educational information to students and parents. The Department also notes that information about a recipient's Title IX policies and procedures will be made publicly available in other ways consistent with the requirements of § 106.8(b).

The Department appreciates the opportunity to clarify that § 106.8(d) requires a recipient to train all employees, as opposed to just making training available. While the Department recognizes that some commenters may find this burdensome, the requirement to train all employees serves the important purpose of ensuring that all employees understand their role in the recipient's compliance with its Title IX obligations and understand their responsibilities when they obtain information about conduct that may reasonably constitute sex discrimination under Title IX. For a discussion of the estimated costs of implementation, see the *Regulatory Impact Analysis.*

The Department notes that many recipients are already subject to State laws that require training for all employees on issues such as child abuse prevention, sexual harassment, and

mandatory reporting. As the Department previously stated in the July 2022 NPRM, the Department assumes that all employees of a recipient receive required trainings each year and that the training required under § 106.8(d) is likely to be incorporated into those existing training sessions. 87 FR 41552. For this reason, and other reasons discussed in the *Regulatory Impact Analysis,* the Department anticipates that the requirement to train all employees will not meaningfully change the overall annual burden from the 2020 amendments related to training requirements for recipient employees. The Department disagrees that collective bargaining agreements preclude offering and enforcing training to employees who belong to a union. The Department notes that the 2020 amendments required a recipient to train employees regardless of whether such employees were members of a union. *See* 34 CFR 106.45(b)(1)(iii).

*Changes:* In the first sentence of final § 106.8(d), the Department has inserted "in paragraphs (d)(1) through (4)" in between "persons described" and "below."

Training on Definition of "Sex-Based Harassment"

*Comments:* Several commenters opposed the proposed requirement in § 106.8(d)(1)(ii) that all employees be trained on the definition of "sex-based harassment." Commenters asserted that the Department lacks the statutory authority to mandate such training, particularly for students, and objected to the Department's definition of "sex-based harassment."

*Discussion:* Training on the definition of "sex-based harassment" under § 106.8(d)(1)(ii) applies only to employee training and does not require a recipient to provide training or instructional content on the definition of "sex-based harassment" or sex discrimination to students. Comments objecting to the definition of "sex-based harassment" are addressed in the discussion of the definition of "sex-based harassment" in § 106.2. The Department declines to remove the requirement that all employees be trained on the definition of "sex-based harassment" under § 106.8(d)(1)(ii) because such training is an essential component of a recipient's ability to identify and address conduct that constitutes sex discrimination.

The Department disagrees that requiring training on the definition of "sex-based harassment" exceeds the Department's statutory authority under Title IX. The Department is authorized to promulgate regulations to effectuate

the purpose of Title IX, including by requiring training on the definition of "sex-based harassment." *See* 20 U.S.C. 1682. This training requirement furthers Title IX's nondiscrimination mandate and ensures that a recipient appropriately addresses sex discrimination occurring in its education program or activity. *See, e.g., Doe* v. *Fairfax Cnty. Sch. Bd.,* 1 F.4th 257, 267 (4th Cir. 2021) (reasoning that "Congress's goal of protecting students from sex discrimination in education" necessarily entails that schools adequately train their staff to identify instances of sexual harassment), *cert. denied,* 143 S. Ct. 442 (2022).

*Changes:* None.

Training on Notification Requirements for Pregnancy or Related Conditions

*Comments:* Commenters generally supported the requirement in proposed § 106.8(d)(1)(iii) that a recipient train employees regarding their obligations under § 106.40(b)(2) to students who are pregnant or experiencing pregnancy-related conditions. Some commenters objected to § 106.8(d)(1)(iii), asserting that it would be unduly burdensome, very few employees will receive pregnancy disclosures from students, and the training obligation should be limited to employees in student-facing roles.

*Discussion:* The Department acknowledges commenters' support of proposed § 106.8(d)(1)(iii), which requires a recipient to train employees on the requirement to promptly provide a student (or person who has a legal right to act on behalf of the student) with the Title IX Coordinator's contact information upon being informed of the student's pregnancy or related conditions. By explicitly requiring a recipient to train its employees regarding the recipient's obligations under §§ 106.40(b)(2) and 106.44, the final regulations will help ensure that students are not discriminated against based on pregnancy or related conditions, that complaints will be handled promptly, and that students who are pregnant or experiencing pregnancy-related conditions [28] have equal access to the recipient's education program or activity as required under Title IX.

Even though Title IX regulations have prohibited discrimination based on pregnancy or related conditions since 1975, feedback that the Department

received during its June 2021 Title IX Public Hearing, in meetings held in 2022, and in the comments in response to the July 2022 NPRM, demonstrated that many employees and students were unaware of these protections, and that discrimination based on pregnancy or related conditions persists. *See* 87 FR 41513. For a recipient to address sex discrimination based on pregnancy or related conditions, the Department has determined that some training is warranted for all employees to help ensure that students understand their option to contact a Title IX Coordinator.

The Department acknowledges that not all employees have student-facing roles, but an employee's role can evolve over time and whether a student is comfortable disclosing pregnancy or related conditions, or resulting discrimination or harassment, to any particular employee—student facing or not—will vary. As such, students may disclose pregnancy or related conditions to employees beyond teachers, professors, Title IX Coordinators, and other employees who have traditionally student-facing roles. By requiring all employees to be trained on the limited, but important, notification requirements, any employee will be able to provide a student (or a person who has a legal right to act on behalf of a student) with the same information.

The Department emphasizes that the information that employees must be trained on is modest and can be incorporated into already-required training sessions. For most employees, the training will consist of how to: (1) promptly notify a student who informs them of their pregnancy or related conditions, or a person who has a legal right to act on behalf of a student and who so informs them, that the Title IX Coordinator can take specific actions to prevent sex discrimination and ensure the student's equal access to the education program or activity, and (2) share the Title IX Coordinator's contact information. *See* § 106.40(b)(2).

*Changes:* None.

Live Trainings

*Comments:* Commenters requested that the Department clarify whether trainings must be in a live or interactive format, and some requested that the Department require a recipient to conduct live training.

*Discussion:* As discussed in the 2020 amendments, the final regulations do not require training to be conducted in-person and do not preclude trainings from being conducted online or virtually, either synchronously or asynchronously. 85 FR 30560. The Department declines to mandate a

---

[28] The Department notes that this preamble uses the terms "pregnancy or related conditions" and "pregnant or experiencing pregnancy-related conditions" interchangeably to mean any condition covered under the definition of "pregnancy or related conditions" in final § 106.2.

particular method of providing training and reiterates its intent to provide recipients with the flexibility to choose how to meet these requirements in a way that best serves the needs of their community. Regardless of the method of presentation, the training must satisfy the requirements of § 106.8(d).

*Changes:* None.

Supportive Measures

*Comments:* Several commenters requested modifications to proposed § 106.8(d)(2) to remove the specific requirement to train those with the authority to modify or terminate supportive measures under § 106.44(g)(4) because the commenters perceived proposed § 106.8(d)(2) to require a recipient to train every employee involved in a supportive measure.

*Discussion:* The Department declines to remove the requirement in § 106.8(d)(2) that individuals with the authority to modify or terminate supportive measures under § 106.44(g)(4) receive training on specified additional topics. Although a variety of recipient employees may be involved in the implementation of supportive measures, § 106.44(g)(4) addresses a narrow category of employees: those who have authority to modify or reverse a recipient's decision to provide, deny, modify, or terminate supportive measures, such as a dean or principal. Because these individuals play a role in implementing the recipient's grievance procedures and have the responsibility and authority to modify or reverse a recipient's decision concerning a supportive measure, it is necessary to ensure that they are properly trained on the additional topics set forth in § 106.8(d)(2).

*Changes:* None.

4. Section 106.8(e) Students With Disabilities

General Comments

*Comments:* Commenters supported proposed § 106.8(e) because it would clarify a recipient's Title IX obligations for students with disabilities; recognize that the requirements of Section 504 and the IDEA must be considered throughout the Title IX grievance procedures; and ensure that students with disabilities have access to all aspects of a recipient's education program or activity, including but not limited to Title IX grievance procedures. Many commenters noted that students with disabilities are frequently overlooked and marginalized; are at an increased risk of experiencing sex discrimination, including sexual

violence; and may be more vulnerable to accusations of sexual misconduct because their behaviors may be misunderstood.

Some commenters expressed concern that proposed § 106.8(e) would place an undue burden on an elementary school or secondary school recipient and staff members to arrange additional meetings of the IEP team and the Section 504 team beyond those required for compliance with the IDEA and Section 504. Commenters believed this would create confusion as to the applicability of procedural requirements under those laws. Some commenters requested that the Department modify proposed § 106.8(e) to give recipients more flexibility, such as by not requiring consultation with entire IEP teams or Section 504 teams, permitting a recipient to make case-by-case determinations as to whether consultation is necessary, or allowing a staff member other than the Title IX Coordinator to engage in consultations about students with disabilities. Other commenters suggested that the Department specify the circumstances under which the Title IX Coordinator must hold meetings with the IEP team or Section 504 team.

Finally, some commenters asked the Department to provide technical assistance or issue supplemental guidance regarding the interaction of the Title IX regulations, Section 504, and the IDEA, and one commenter asked the Department to clarify the interaction between proposed § 106.8(e) and FERPA.

*Discussion:* The Department appreciates the range of opinions expressed by commenters about topics related to the intersection of sex and disability in these regulations. As the Department has recognized previously and as noted by many commenters, students with disabilities experience sex-based harassment in significant numbers, with some populations of students with disabilities at an even higher risk than others. *See* 87 FR 41430; 85 FR 30079. The rights of students with disabilities warrant the attention and concern demonstrated by the obligations set forth in § 106.8(e), and the inclusion of this provision in the final regulations will provide clarity for students with disabilities about what to expect from their educational institutions when they are involved in Title IX grievance procedures as complainants or respondents.

The IDEA and Section 504 protect the rights of students with disabilities in elementary school and secondary school. As explained in the July 2022 NPRM, there are distinctions between

each statute's requirements that are essential in other contexts. *See* 87 FR 41430. For purposes of Title IX, however, the implementing regulations for the IDEA and Section 504 require that a group of persons, known as the IEP team or Section 504 team, be responsible for making individualized determinations about what constitutes a free appropriate public education (FAPE) for each student with a disability, which includes issues such as the placement, special education, and related services appropriate for that student's needs. 34 CFR 300.17; 34 CFR 104.33. When an elementary or secondary student with a disability is a complainant or respondent, the Title IX grievance procedures may intersect with the decisions made by an IEP team or Section 504 team about placement or other matters involving the provision of FAPE. Consultation with the Title IX Coordinator in all such situations will help ensure that an elementary school and secondary school recipient does not interfere with the rights of students with disabilities while complying with these final regulations. The Department declines to alter the final regulations to permit a recipient to make case-by-case determinations as to whether this consultation is necessary, as the Department has concluded that this consultation will always be necessary when a student with a disability is a complainant or respondent, to ensure compliance with both Title IX and the relevant Federal disability laws.

Section 106.8(e) does not require IEP or Section 504 meetings, does not mandate consultation with full IEP teams or Section 504 teams, does not identify particular individuals within the IEP team or Section 504 team who must be part of the consultation, and does not specify the decisionmaking process, leaving these decisions to the discretion of the recipient. This approach recognizes the differences between elementary school and secondary school recipients, as the logistics surrounding consultation may vary depending on factors such as the recipient's size or structure. Beyond stating that these consultations must occur when an elementary school or secondary school student with a disability is a complainant or respondent, the Department declines to delineate specific circumstances under which the consultations must occur, such as at specific stages of the grievance procedure process, in order to support the flexible approach of § 106.8(e). At the same time, § 106.8(e) will not preclude a recipient from taking actions such as convening additional

IEP or Section 504 meetings or consultation with full IEP teams or Section 504 teams if necessary under the particular circumstances (e.g., to revise a student's IEP or services under Section 504 in order to meet the student's special education and related services needs). Moreover, § 106.8(e) does not impact the rights and procedural safeguards guaranteed to students with disabilities or their parents or guardians under the IDEA or Section 504. Recipients must fully comply with those laws and their implementing regulations in addition to Title IX.

After careful consideration of the public comments received regarding proposed § 106.8(e), the Department clarifies in the final regulations that the Title IX Coordinator is not required to consult with a student's full IEP team or Section 504 team and maintains that the final regulations strike the appropriate balance between ensuring that consultation between the Title IX Coordinator and a student's IEP team or Section 504 team occurs at the elementary school and secondary school level, while not stipulating specific parameters of that consultation. The Department also recognizes that the recipient bears responsibility for ensuring this consultation takes place. Therefore, the Department has altered the final regulations to clarify that the recipient must require that the Title IX Coordinator consult with one or more members of a student's IEP team or Section 504 team, as appropriate. Additionally, the Department notes that the Title IX Coordinator's duties are delegable under § 106.8(a)(2) and that, accordingly, a staff member other than the Title IX Coordinator may engage in the consultation if that responsibility has been assigned to a designee.

In response to commenters' requests that the Department provide more information about the purpose of the consultation, the Department emphasizes that mere consultation with one or more members of an IEP team or Section 504 team does not ensure compliance with the IDEA and Section 504. The Department anticipates that, in many cases, consultation will identify additional measures necessary to ensure compliance with the Title IX and Section 504. Accordingly, the Department has revised this provision to emphasize that the purpose of the consultation is to determine how the recipient can comply with relevant special education laws while carrying out the recipient's obligation under Title IX and these final regulations. The Department also appreciates the opportunity to clarify that consultations should be carried out

with an understanding of the sensitivity of the issues involved and consistent with FERPA.

The Department recognizes that sex discrimination can overlap with other forms of discrimination, such as discrimination based on race or disability, and that a recipient's obligations under these final regulations sometimes overlap with a recipient's obligations under other civil rights laws. Sections 106.8(e), 106.44(g)(6), 106.44(h), and 106.44(i), among other sections of these final regulations, recognize the importance of coordinating a recipient's obligations under Federal civil rights laws. Nothing in the final regulations prevents a recipient from adopting additional mechanisms to coordinate compliance with applicable civil rights laws, to maximize protection from discrimination and minimize the potential for redundancy or unnecessary burden on a recipient's students or employees.

The Department also removed the reference to § 106.46 in the first sentence of proposed § 106.8(e) because this sentence only applies to elementary school or secondary school students, so § 106.46 will not apply.

The Department acknowledges that supporting recipients and Title IX Coordinators in implementing these regulations is important. The Department will offer technical assistance and guidance, as appropriate, to promote compliance with these final regulations.

*Changes:* The Department has revised §§ 106.8(e) and 106.44(g)(6)(i) to clarify that the recipient must require the Title IX Coordinator to consult with one or more members, as appropriate, of a student's IEP team or Section 504 team if a complainant or respondent is an elementary or secondary student with a disability. The Department removed references to "Section 504 team" from §§ 106.8(e) and 106.44(g)(6)(i) because such term does not appear in the Section 504 regulations. The Department has revised these sections to provide that the Title IX Coordinator should consult with a student's IEP team or Section 504 team "to determine how to comply" with relevant special education laws, and made a parallel change in the sentence regarding postsecondary students. The Department removed the reference to § 106.46 in the sentence applicable to elementary and secondary students.

Access to Accommodations and Auxiliary Aids

*Comments:* Several commenters suggested that the Department include

language in § 106.8(e) regarding students with disabilities' rights to access reasonable accommodations and auxiliary aids. One commenter suggested that the Department minimize barriers to accessing reasonable accommodations, ensure that recipients provide Title IX information and materials in accessible formats, and ensure that recipients' Title IX offices are accessible to students with disabilities.

*Discussion:* The IDEA, Section 504, and Titles II and III of the ADA and their implementing regulations ensure protections for students with disabilities, including specific provisions safeguarding their rights related to special education and related services and protecting them from discrimination, including the provision of effective communication. These laws and their implementing regulations have their own procedural requirements and provide for accommodations, referred to in this preamble as reasonable modifications, and auxiliary aids and services for students with disabilities. As explained in the July 2022 NPRM, recipients may be required to provide auxiliary aids and services for effective communication and make reasonable modifications to policies, practices, and procedures to ensure equal opportunities for students with disabilities and avoid discrimination on the basis of disability. 87 FR 41466. Title IX and its implementing regulations are limited to addressing sex discrimination; therefore, the Department declines to impose obligations or requirements with respect to rights conferred by the IDEA, ADA, or Section 504 in these final regulations. The Department will continue to enforce the IDEA, Section 504, Title II, and their implementing regulations,[29] and recipients must fully comply with those laws and their implementing regulations, including by providing access to auxiliary aids and services and making reasonable modifications in accordance with their provisions.

*Changes:* As discussed above, we have revised both sentences of § 106.8(e) to replace "help comply" with "to determine how to comply."

Postsecondary Students With Disabilities

*Comments:* Several commenters offered feedback specifically related to students with disabilities at postsecondary institutions. For

---

[29] The Departments of Justice and Education both have enforcement authority under Title II of the ADA. The Department of Justice is responsible for enforcement and implementation of Title III of the ADA.

example, one commenter asked the Department to require postsecondary institutions to provide advisors for students with disabilities involved in Title IX grievance procedures because they may need additional explanation and supports, and some commenters believed that the Department should require, rather than permit, Title IX Coordinators to consult with the individual or office designated to provide support to students with disabilities.

*Discussion:* The Department appreciates commenters' input regarding concerns particular to postsecondary students with disabilities. The IDEA does not apply in the postsecondary education context. As explained in the July 2022 NPRM, *see* 87 FR 41430, a postsecondary student with a disability does not have to disclose that they have a disability to their postsecondary institution. Generally, if a postsecondary student with a disability would like an academic adjustment or other modification, they must provide information regarding their disability to the recipient institution, and the institution must consider the request. *See* 34 CFR 104.44. Because a student with a disability may not have established a voluntary relationship with the postsecondary institution's office that serves students with disabilities, § 106.8(e) permits, but does not require, consultation between the Title IX Coordinator and the postsecondary institution's disability services office. Section 106.8(e) is intended to provide flexibility to postsecondary institutions, while helping to ensure that the needs of students with disabilities are met and while maintaining autonomy for students with disabilities regarding their relationship with a postsecondary institution's disability services office. For the same reasons, the Department declines to require postsecondary students to provide advisors for students with disabilities involved in Title IX grievance procedures. The Department notes that nothing in § 106.8(e) prohibits a recipient from consulting additional school officials as appropriate under the circumstances or from providing advisors to students with disabilities, nor does it abrogate a recipient's obligation to comply with other Federal laws that protect the rights of students with disabilities at the postsecondary level. As such, the Department does not believe modifications with regard to postsecondary institutions are warranted.

*Changes:* None.

## 5. Section 106.8(f) Recordkeeping

Recordkeeping—Documentation Records (§ 106.8(f)(1) and (2))

*Comments:* Several commenters were generally supportive of the proposed recordkeeping requirements because they would streamline the recordkeeping process, promote better understanding of the Title IX regulations among organizations, and reduce sex discrimination.

Some commenters asserted that the recordkeeping requirements were too burdensome and complex for recipients and employees. Some expressed support for the recordkeeping provision from the 2020 amendments at § 106.45(b)(10)(i), which one commenter said balanced the due process rights of all parties with recipient discretion.

Commenters suggested additions to the proposed recordkeeping requirements, including requirements to share evidentiary records to assist OCR investigations and litigation and maintain demographic data related to complainants and respondents to monitor patterns of bias and ensure equitable enforcement. Some commenters urged the Department to require a recipient to retain records regarding respondents found responsible for sexual assault and require those respondents to register as sex offenders.

Some commenters, in contrast, suggested that records related to certain categories of allegations, such as discrimination based on gender identity, not be maintained. Other commenters suggested that recipients should delete or correct records when a complaint is dismissed, goes through the informal resolution process without a finding or admission of responsibility, or there is a judicial determination that punishment was unlawfully imposed.

Commenters offered several suggestions related to the record retention period, with some commenters requesting that recipients maintain records for as long as the student is in attendance; for a period that aligns with State laws; or permanently.

One commenter objected to proposed § 106.8(f)(2) because it would be limited to records of which the Title IX Coordinator has notice rather than records of which any appropriate official or responsible employee has notice. The commenter noted that a complainant or other reporting party may not always know how to contact the Title IX Coordinator and urged the Department to revise proposed § 106.8(f)(2) to apply whenever a recipient has actual or constructive notice. One commenter asked the

Department to clarify which records and in what circumstances information related to a complaint or informal resolution could be disclosed and another commenter asked the Department to clarify whether a recipient would need to document its prompt and effective response.

*Discussion:* The Department acknowledges commenters' support for the recordkeeping provision in § 106.8(f)(1) and (2). It is important for a recipient to maintain records regarding its response to complaints or other notification of sex discrimination. The recordkeeping provision is aligned with a recipient's overall obligations under these final regulations. As explained in the July 2022 NPRM, some aspects of the recordkeeping provision in the 2020 amendments are no longer applicable under these final regulations. *See* 87 FR 41431. Except for the website posting requirement for training materials, which is addressed in more detail below, the Department disagrees that the recordkeeping requirements are too burdensome or complex. It is appropriate to require a recipient to maintain records regarding complaints of sex discrimination, the actions the recipient took to meet its obligations in response to notification to the Title IX Coordinator of conduct that reasonably may be sex discrimination, and materials used to provide training under § 106.8(d). Recordkeeping can reveal effective compliance practices and patterns of noncompliance, through which a recipient can assess its own Title IX compliance. In addition, maintaining records for an appropriate period of time ensures that, during an investigation or compliance review, the Department can ascertain a recipient's compliance with the Title IX regulations. *See* 34 CFR 100.6(c), 100.7(a), 100.7(c) (incorporated through 34 CFR 106.81).

The Department notes that a recipient must conduct a fact-specific analysis to determine whether allegations of sex discrimination, including sex-based harassment, violate Title IX. In light of this, the Department declines to exempt records related to any particular category of allegations, such as discrimination based on gender identity, from the recordkeeping requirements in the final regulations, when such information was included in a complaint or shared with the Title IX Coordinator. Excepting allegations from the recordkeeping requirements could interfere with the Department's ability to evaluate whether a recipient has complied with its obligations under the final regulations. The Department notes that the recordkeeping provision in the

final regulations requires a recipient only to maintain such records and does not govern whether and under what circumstances a recipient could disclose such records in court proceedings or whether such records are part of a student's permanent record. The Department notes that FERPA generally provides eligible students, and parents of students who are under 18 years of age and attending an elementary school or secondary school, with the right to access their or their children's education records. The Department also notes that if, after the Title IX Coordinator was notified of conduct that reasonably may constitute sex discrimination, a recipient determined that the allegations did not constitute sex discrimination, or dismissed the complaint, that information would be included in the records a recipient is required to maintain under § 106.8(f). The Department also notes that § 106.44(j) of these final regulations prohibits the disclosure of personally identifiable information obtained in the course of complying with this part, except in limited circumstances. For additional information on this topic, see the discussion of § 106.44(j).

The Department maintains that it is appropriate that the final regulations limit the scope of this recordkeeping provision to maintaining records and making training materials available for public inspection upon request. The Department declines in these final regulations to require a recipient to share evidentiary records to assist in a subsequent lawsuit or OCR investigation and declines to fine a recipient that fails to maintain or share such records. The Department lacks fining authority under Title IX or the authority to require a recipient to share records outside the context of OCR's administrative enforcement. It is not necessary to add language to the recordkeeping provision requiring a recipient to share evidentiary records to assist in an OCR investigation because this is already required under 34 CFR 100.6(c) (incorporated through 34 CFR 106.81). The Department also notes that § 106.44(j) permits a recipient to comply with a disclosure requirement under other Federal laws or Federal regulations, or, to the extent it would not conflict with Title IX or its implementing regulations, a disclosure required by State or local law, or permitted under FERPA. For further explanation of the circumstances under which a recipient is permitted to disclose personally identifiable information obtained in the course of

complying with this part, see the discussion of § 106.44(j).

The Department declines to add language requiring a recipient to delete records when a complaint is dismissed, the informal resolution process concludes without a finding or admission of responsibility, or a judicial determination results in a change to the recipient's determination whether sex discrimination occurred. As explained above, maintaining certain types of records, including these, is necessary to demonstrate a recipient's compliance with Title IX. In addition, it is not necessary to add language requiring a recipient to correct such records because the final regulations already require that, for each complaint of sex discrimination, a recipient maintains records documenting the informal resolution process under § 106.44(k) or the grievance procedures under § 106.45, and if applicable § 106.46, and the resulting outcome. Thus, a recipient is already required to maintain information regarding the dismissal of a complaint or an informal resolution process that ends without a finding or admission of responsibility under § 106.8(f)(1). If a judicial determination results in a change to the recipient's determination whether sex discrimination occurred, that change to the determination would also be included as part of the records a recipient is required to maintain under § 106.8(f)(1) because it documents the resulting outcome of the recipient's grievance procedures under § 106.45, and if applicable § 106.46.

With respect to the appropriate length of time that records must be maintained, the Department maintains the position taken in the 2020 amendments that seven years is appropriate. *See* 85 FR 30411. The Department notes that nothing in the final regulations prevents a recipient from retaining records for a longer period if the recipient chooses or because of other legal obligations. Similarly, nothing in the final regulations prevents a recipient from keeping its employee records for a longer period if it is concerned about repeat harassers. The Department declines to tie record retention requirements to the potential need for use in litigation or to base record retention requirements on the length of a student's enrollment because recipients can more easily administer a standard threshold than an enrollment timeframe that varies with each student.

The Department declines to revise § 106.8(f)(2) to apply whenever a recipient has actual or constructive notice of a potential Title IX violation. As explained in the discussion of

§ 106.44(c), the most effective way to ensure that a recipient operates its education program or activity free from sex discrimination is to explain a recipient's specific obligations when its Title IX Coordinator receives information about conduct that reasonably may constitute sex discrimination. The recordkeeping requirement in § 106.8(f)(2) thus is appropriately tied to notification of information about conduct that reasonably may constitute sex discrimination and no regulatory text changes are necessary. The Department notes that under § 106.44(c), employees are either required to notify the Title IX Coordinator when they have information about conduct that reasonably may constitute sex discrimination, or to provide the contact information of the Title IX Coordinator and information about how to make a complaint of sex discrimination. Thus, even if a complainant or other reporting individual does not know how to contact the Title IX Coordinator, the information will either be shared with the Title IX Coordinator by the employee who received the report, or the employee who received the report would inform the complainant or other reporting individual how to contact the Title IX Coordinator.

The Department also declines commenters' request to require the collection of certain demographic data of complainants and respondents because the Department did not specifically request comments on the collection of demographic data of complainants and respondents, and it would be appropriate to specifically solicit public comment before requiring such data collection. The Department notes that nothing in the final regulations precludes a recipient from collecting demographic data relating to the recipient's Title IX complainants and respondents for nondiscriminatory purposes provided that it does so consistent with its nondisclosure obligations under § 106.44(j) and other Federal, State, and local laws regarding dissemination of data. *See also* 85 FR 30412.

Under the final regulations, a recipient is required to maintain records documenting the grievance procedures under § 106.45, and if applicable § 106.46, for each complaint of sex discrimination. This includes records of complaints in which the respondent is found responsible for sexual assault. The Department does not have the legal authority to require a respondent found responsible for sexual assault to register as a sex offender.

In response to the commenter's question regarding the circumstances under which information related to a complaint or informal resolution could be disclosed, the Department notes that final § 106.44(j) prohibits a recipient from disclosing personally identifiable information obtained in the course of complying with the Title IX regulations except in limited circumstances. Nothing in the recordkeeping provision in the final regulations requires that records be disclosed, but the Department notes that in addition to the recordkeeping obligations in § 106.8(f), a recipient must also comply with its obligations in § 106.45, and if applicable § 106.46, regarding the provision of evidence and the determination of responsibility to the parties. The Department also notes that § 106.45(f)(4)(iii) requires a recipient to take reasonable steps to prevent and address the parties' unauthorized disclosure of information and evidence obtained solely through the grievance procedures.

The Department appreciates the commenter's inquiry regarding whether a recipient must document its prompt and effective response. The final regulations at § 106.8(f)(2) require that for each notification the Title IX Coordinator receives about conduct that may reasonably constitute sex discrimination, including notifications under § 106.44(c)(1) or (2), a recipient must maintain records documenting the actions it took to meet its obligations in § 106.44, including its prompt and effective response. *See* § 106.44(a).

Through its own review of this provision, the Department has revised § 106.8(f)(2) to align with changes made to § 106.44(c) and clarify which records must be maintained.

*Changes:* In § 106.8(f)(2), the Department has removed the reference to an ''incident of conduct that may constitute sex discrimination under Title IX of which the Title IX Coordinator was notified'' and replaced it with a reference to ''notification the Title IX Coordinator receives of information about conduct that reasonably may constitute sex discrimination under Title IX or this part, including notifications under § 106.44(c)(1) or (2),'' to align with changes made to § 106.44(c).

Recordkeeping—Training Materials (§ 106.8(f)(3))

*Comments:* Some commenters noted the importance of making training materials available to the public to ensure that complaints are handled fairly and free from bias and to ensure due process in the resolution of

complaints. Several commenters urged the Department to remove the website posting requirement for training materials in proposed § 106.8(f)(3), asserting that it is unnecessary, unjustified, burdensome, and may diminish the quality of training provided by recipients. Commenters argued, for example, that the proposed website posting requirement may discourage a recipient from using training provided by third parties due to intellectual property concerns, including video testimonials about individuals' personal experiences, or from tailoring trainings as needed or on a program-by-program basis.

Some commenters proposed alternatives to the website posting requirement. For example, commenters said the Department should allow a recipient to make training materials available upon request for inspection by members of the public or through litigation discovery. One commenter recommended that the Department require a recipient to post a statement on its website that copies of training materials are available upon request through a public records request or email to the Title IX Coordinator.

Some commenters asserted that the website posting requirement is ambiguous and asked the Department to specify how and in what format a recipient should make training publicly available, including whether a recipient must post slides with training content or only a certificate of completion that shows the topic(s) covered and person(s) trained. Some commenters were concerned that providing training materials without additional context could lead to a misunderstanding about the information learned at a training.

*Discussion:* The Department acknowledges the concerns that the website posting requirement is burdensome, could diminish the quality of training that recipients are able to offer, may violate laws regarding the sharing of third-party proprietary information, and could include video testimonials about individuals' personal experiences used in training materials. The Department is therefore persuaded the proposed requirement should be changed. Although the Department agrees with commenters that ensuring transparency is important, posting training materials on a website is not the only way to promote transparency and ensure that training materials comply with the requirements of Title IX, including that training not rely on sex stereotypes.

In consideration of the issues raised by commenters, the Department has revised § 106.8(f)(3) to remove the

requirement that a recipient must post all training materials on its website. The final regulations instead require a recipient to make all materials used to provide training under § 106.8(d) available upon request for inspection by members of the public regardless of whether a recipient maintains a website. Under the 2020 amendments, the requirement for public inspection only applied to a recipient that did not maintain a website. 34 CFR 106.45(b)(10)(D). Requiring a recipient to make all training materials available upon request for inspection by members of the public is practicable and reasonable, especially in light of existing obligations that many recipients already have under public records laws.

In response to commenters' concerns regarding the sharing of proprietary information or video testimonials about individuals' personal experiences used in training materials, the Department acknowledges that the public inspection requirement applies to all training materials, including those that contain proprietary information or include video testimonials about individuals' personal experiences. Consistent with the Federal government's interests in protecting intellectual property that a commenter highlighted, nothing in these final regulations abrogates intellectual property rights. If a recipient seeks to use training from a third-party provider that contains proprietary information, and the third-party provider is unwilling to permit the recipient to make the training materials available for public inspection upon request, the recipient will not be able to use such materials to meet its training obligations under § 106.8(d)(2). *See also* 85 FR 30412. Moreover, if a third-party provider is willing to permit proprietary materials to be available for public inspection upon request, nothing in the final regulations precludes a recipient from formalizing how a public inspection request must be made—and thus exercising discretion in how it facilitates the inspection of such materials and the method in which the public inspection must occur (*e.g.,* at the recipient, with a representative of the recipient present during the inspection). The Department also maintains that sharing these materials through a public inspection request, as opposed to posting them on a website, would allow the recipient to have more control over the manner in which the materials are shared, thereby giving recipients more flexibility to address third-party providers' concerns and protect the privacy interests of

individuals who appear in video testimonials used in training materials.

The Department has determined that removing the website posting requirement, but maintaining the public inspection requirement, provides for public accountability and transparency, and will help alleviate some of the concerns raised by commenters regarding widespread sharing of proprietary information with the public. In addition, nothing in the final regulations precludes a recipient from choosing to post its training materials on a website to fulfill its obligations to make the training materials available for public inspection upon request.

The Department acknowledges some commenters' views that the requirement to make training materials publicly available has not been clearly defined and has led to inconsistent practices across recipients. Although the Department is removing the requirement to post all training materials on a recipient's website, the Department appreciates the opportunity to clarify that the final regulations require a recipient to make all materials used to provide training under § 106.8(d) available to the public upon request. This includes any slides with training content that were used to provide training. It is not sufficient for a recipient only to provide a certificate of completion with the topics covered and the person(s) who attended the training. In addition, if an employee attends an ongoing professional development program to satisfy the recipient's training obligations under § 106.8(d), records from that professional development program would constitute training materials required to be made available for public inspection. The Department notes that nothing in the final regulations precludes a recipient from choosing to provide additional context when making its training materials available for public inspection, to alleviate the concern raised by some commenters that providing training materials without additional context could lead to a misunderstanding about the information learned at a training.

*Changes:* The Department has removed the requirement in § 106.8(f)(3) for a recipient to make training materials publicly available on its website if it maintains a website and replaced it with a requirement for all recipients to make training materials available upon request for inspection by members of the public, regardless of whether the recipient maintains a website.

Recordkeeping (Pregnancy) (Proposed § 106.8(f)(4))

*Comments:* The Department received many comments expressing concerns about proposed § 106.8(f)(4). The Department received numerous comments asking for the elimination of proposed § 106.8(f)(4) due to concerns that this proposed provision would violate privacy rights. Commenters were particularly concerned that there would not be sufficient confidentiality protections regarding who could access these sensitive records regarding pregnancy or related conditions and for what purposes.

Many commenters believed that proposed § 106.8(f)(4) would present legal risks for students and employees. Commenters expressed concern that retaining records related to pregnancy or related conditions would have a chilling effect on pregnant students or employees seeking support under proposed §§ 106.40 and 106.57, respectively, and could result in interruptions to equal educational access, such as missed classes.

One commenter emphasized that, if proposed § 106.8(f)(4) is retained, the Department should impose stringent confidentiality requirements regarding the records that would be created under this proposed provision and should ensure consistency with FERPA and HIPAA.

Comments indicated that clarity was needed if proposed § 106.8(f)(4) is retained, as one commenter believed that the proposed provision would require a recipient to notify a student's parents of a student's pregnancy, while another commenter believed it would not. Several commenters asked for clarity regarding the application of FERPA to records that would be maintained under proposed § 106.8(f)(4).

*Discussion:* After further consideration of the comments, the Department has determined that the recordkeeping requirement in proposed § 106.8(f)(4) is not necessary for OCR to assess whether a recipient has met its obligations to provide reasonable modifications to students and lactation time and space to students and employees. This is because, in many cases, compliance can be determined without documentation. Further, when a student or employee makes a complaint of sex discrimination alleging that a recipient has failed to meet its obligations under §§ 106.40 and 106.57, or a Title IX Coordinator receives information about conduct that reasonably may constitute sex discrimination in the context of

§§ 106.40 and 106.57, proposed § 106.8(f)(4) would not be necessary because the recordkeeping requirements of § 106.8(f)(1)–(2) apply. The Department agrees with commenters that the risks, such as a chilling effect on seeking support under Title IX, outweigh the benefits. The Department is persuaded by commenters' concerns and has removed proposed § 106.8(f)(4) from the final regulations. The Department acknowledges commenters' suggestions for further clarification of a recipient's obligations to protect information that it obtains in the course of complying with its obligations under Title IX and addresses that issue in § 106.44(j).

*Changes:* The Department has removed proposed § 106.8(f)(4) from the final regulations.

*B. Action by a Recipient To Operate Its Education Program or Activity Free From Sex Discrimination*

Statutory Authority

*Comments:* Some commenters asserted that the provisions in proposed § 106.44, specifically, proposed § 106.44(a)–(g) and (j), exceed the Department's authority and are inconsistent with both Title IX and established case law under Title IX, the U.S. Constitution, and State law.

*Discussion:* The Department disagrees that any provisions within § 106.44 exceed the agency's authority or are inconsistent with Title IX, case law interpreting Title IX, or the U.S. Constitution, and the Department is unaware of any conflict between § 106.44 and State law. In adopting § 106.44, the Department is acting within the scope of its congressionally delegated authority under 20 U.S.C. 1682 to "issu[e] rules, regulations, or orders of general applicability" to effectuate Title IX. 20 U.S.C. 1682. The Supreme Court has recognized the Department's "authority [under 20 U.S.C. 1682] to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate," including requiring that a recipient take specific steps to respond to sex discrimination in its education program or activity. *Gebser,* 524 U.S. at 292. Moreover, "Federal departments or agencies with the authority to provide financial assistance are entrusted to promulgate rules, regulations, and orders to enforce the objectives of § 1681, *see* § 1682, and these departments or agencies may rely on 'any . . . means authorized by law' . . . to give effect to the statute's restrictions," *Davis,* 526 U.S. at 638–39.

The final regulations govern how a recipient responds to sex discrimination

in the recipient's education program or activity and were promulgated to effectuate the purposes of Title IX and fully implement Title IX's nondiscrimination mandate. *See Cannon,* 441 U.S. at 704 ("Title IX, like its model Title VI, sought to accomplish two related, but nevertheless somewhat different, objectives. First, Congress wanted to avoid the use of federal resources to support discriminatory practices; second, it wanted to provide individual citizens effective protection against those practices."). As discussed further below, each of the provisions of § 106.44 is necessary to effectuate the purposes of Title IX and ensure that a recipient responds to sex discrimination in its education program or activity.

Further, the Department interprets Title IX and the final regulations consistent with the U.S. Constitution. As the Department noted in the July 2022 NPRM, existing § 106.6(d), to which the Department did not propose any changes, states that nothing in the Title IX regulations "requires a recipient to . . . [r]estrict any rights . . . guaranteed against government action by the U.S. Constitution." 87 FR 41415. In addition, nothing in these final regulations would prevent a recipient from honoring contractual obligations to the extent they do not conflict with Title IX or the Department's regulations.

The Department acknowledges that State laws may impose different requirements for training and notification requirements than these final regulations. In most circumstances, a recipient can comply with both State law and the final regulations. For example, when a State has acted on its own authority to adopt specific notification requirements for discrimination on the basis of sex, nothing in the final regulations prevents a recipient from developing notification requirements that comply with § 106.44(c) and align with its State's requirements. These final regulations do not interfere with a recipient's obligation to comply with State law, to the extent such State law does not conflict with Title IX and these final regulations. For a more detailed explanation of preemption in the final regulations, see the discussion of § 106.6(b).

The Department appreciates the opportunity to respond to commenters' assertions that specific provisions in § 106.44 exceed the scope of the Department's authority. Each of the specific provisions is discussed more thoroughly below, but we address here comments related to the Department's statutory authority. With respect to the Department's authority to require

monitoring for barriers to reporting sex discrimination under § 106.44(b), the Department notes that it has long emphasized the importance of recipient efforts to address and prevent sex discrimination, *see* 87 FR 41435 (citing 85 FR 30063, 30070, 30126), and § 106.44(b) is necessary to effectuate Title IX, *see* 20 U.S.C. 1682; this is because barriers to reporting in a recipient's education program or activity prevent complainants from coming forward and impede a recipient's ability to address sex discrimination in its education program or activity when it occurs. As a result, the recipient must monitor for such barriers and take steps reasonably calculated to address them, as required in § 106.44(b). Similarly, § 106.44(c) does not exceed the Department's statutory authority because it provides the mechanism through which information about conduct that reasonably may constitute sex discrimination received by a recipient's employee is communicated to the Title IX Coordinator so that appropriate steps can be taken. The Department acknowledges that it is valuable to provide certain avenues for students and employees to disclose information confidentially that will not lead to action by the Title IX Coordinator. Many recipients have confidential employees who provide important services to members of the recipient's community. Section 106.44(d) recognizes the importance of communicating which employees have such confidential status and how to make a complaint to the Title IX Coordinator. The Department also recognizes that students and others may disclose information at public awareness events, which are an important part of a recipient's efforts to prevent and address sex discrimination. Section 106.44(e) addresses disclosures that occur in such public awareness events. Sections 106.44(d) and (e) govern how a recipient responds to information about sex-based harassment in its education program or activity and are promulgated to fully implement Title IX's nondiscrimination mandate.

Likewise, the Department disagrees that § 106.44(f) and (g) exceed the Department's statutory authority and notes that both provisions are consistent with the requirement in current § 106.44(a) that a recipient's Title IX Coordinator take specific action in response to information about sexual harassment. The final regulations, including the Title IX Coordinator requirements in § 106.44(f) and the obligation to offer supportive measures in § 106.44(g), govern how a recipient

responds to sex discrimination in the recipient's education program or activity and thereby help effectuate 20 U.S.C. 1681's mandate that no person shall be subject to sex discrimination in a recipient's education program or activity.

Additionally, to the extent that some commenters asserted that § 106.44(j) exceeds the Department's statutory authority or is inconsistent with Title IX, the Department maintains its position, consistent with the 2020 amendments and as explained below in the discussion of this provision, that clear nondisclosure protections are necessary to effectuate Title IX because fear of disclosure chills reporting and participation in the grievance procedures. *See Doe* v. *Mass. Inst. of Tech.,* 46 F.4th 61, 76 (1st Cir. 2022) (explaining that "destroying . . . confidentiality may throw a wrench into . . . Title IX proceedings"). Thus, § 106.44(j) is within the scope of its congressionally delegated authority under 20 U.S.C. 1682 to "issu[e] rules, regulations, or orders of general applicability" to effectuate Title IX.

*Changes:* None.

Freedom of Speech Considerations

*Comments:* Some commenters objected to the proposed revisions to § 106.44 on free speech grounds, asserting that the requirements to report anything that may constitute sex discrimination would infringe on academic expression on a range of divisive subjects because students and faculty would self-censor to avoid the threat of an investigation. Some commenters said the proposed regulations would impose a duty on a recipient to monitor and censor potentially offensive speech even when no complaint about the speech is made and to fire or expel individuals with potentially offensive views to ensure that their speech does not contribute to a hostile environment. Some commenters noted that the Department proposed removing the following statement from current § 106.44(a) without explanation: "The Department may not deem a recipient to have satisfied the recipient's duty to not be deliberately indifferent under this part based on the recipient's restriction of rights protected under the U.S. Constitution, including the First Amendment, Fifth Amendment, and Fourteenth Amendment." These commenters were concerned that the removal of this language would mean that postsecondary institutions could use Title IX "as an excuse" to limit student and faculty speech.

*Discussion:* The Department disagrees that § 106.44 stifles and silences academic expression and disagrees with commenters that recipients will misunderstand or misapply their obligations to address sex discrimination. As discussed above, the Department modified § 106.44(a) in the final regulations to clarify a recipient's duties to address sex discrimination under Title IX. Concerns related to monitoring and censoring speech in § 106.44 are discussed below in connection with § 106.44(b) and (f). The Department removed the sentence commenters referred to because it relates to the deliberate indifference standard, which is not used in these final regulations and was not included in the proposed regulations. The Department explained its reasons for removing the deliberate indifference standard in the July 2022 NPRM. *See, e.g.,* 87 FR 41432–35. The Department clarifies and emphasizes that the removal of the deliberate indifference language in the regulations does not in any way limit current § 106.6(d), which the Department maintained from the 2020 amendments and which states that nothing in the Title IX regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment; deprive a person of any rights that would otherwise be protected from government action under the Due Process Clauses of the Fifth and Fourteenth Amendments; or restrict any other rights guaranteed against government action by the United States Constitution. In light of § 106.6(d), the Department determined it was unnecessary to maintain a reference to rights protected under the U.S. Constitution in § 106.44 of the final regulations. Similarly, we also underscore that nothing in these final regulations changes or is intended to change the commitment of the Department, through these regulations and OCR's administrative enforcement, to act in a manner that is fully consistent with the First Amendment and other Constitutional guarantees. For additional information regarding the First Amendment, see the discussion of Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2) (Section I.C).

*Changes:* None.

Termination of Federal Funds

*Comments:* Some commenters acknowledged that, in the July 2022 NPRM, the Department explained that a recipient would always have an opportunity to take voluntary corrective action prior to the Department seeking to terminate Federal funds, but asserted that such actions typically are costly for a recipient. One commenter stated that a recipient will not know when it has complied with the proposed standard, and further argued that the uncertainty of not knowing whether they may lose Federal funding will cause a recipient to err on the side of finding respondents responsible for sex discrimination.

*Discussion:* The Department disagrees that a recipient will not know when it has complied with any aspect of these regulations. We emphasize here, as we did in the July 2022 NPRM, *see* 87 FR 41433, 41435, that nothing in the final regulations affects existing safeguards for a recipient in administrative enforcement proceedings. Under Title IX, the Department cannot terminate, refuse to grant, or refuse to continue Federal financial assistance to any recipient until the Department has made an express finding on the record of a failure to comply with a regulatory or statutory requirement, notified the recipient and attempted to voluntarily resolve the noncompliance, and provided an opportunity for hearing and judicial review. 20 U.S.C. 1682–1683. Consistent with this statutory scheme, when OCR seeks to administratively enforce the Department's Title IX regulations through an investigation or compliance review, OCR begins by providing notice to the recipient of the allegations of potential Title IX violations it is investigating; if OCR finds a violation, OCR is required to seek voluntary corrective action from the recipient before pursuing fund termination or other enforcement mechanisms. 20 U.S.C. 1682; 34 CFR 100.7(d), 100.8(c) (incorporated through § 106.81); *see also Gebser,* 524 U.S. at 287–89; 2001 Revised Sexual Harassment Guidance, at iii–iv. During OCR's investigation or compliance review and during the administrative enforcement process laid out above, OCR provides notice of the alleged sex discrimination to the recipient, as well as an opportunity for the recipient to voluntarily resolve any noncompliance at multiple stages throughout the process. *See, e.g.,* OCR's Case Processing Manual, at 16–22. Regarding commenters' concerns that corrective actions can be costly, the Department notes that OCR's resolution of compliance concerns, including any required corrective actions, are fact specific and any resolution agreement is negotiated with the recipient and designed to account for the type of recipient and OCR's investigative findings. These safeguards also protect against commenters' fears about the effects of administrative enforcement as well as their concerns that the Department seeks to hold a recipient to a standard of strict liability for conduct about which it has no knowledge. For additional discussion of strict liability concerns, see the discussion of § 106.44(a) below. In response to concerns that a recipient will err on the side of finding respondents responsible for sex discrimination, the Department notes that the discussions of §§ 106.45 and 106.46 explain the various procedural protections for respondents included in the final regulations.

*Changes:* None.

1. Section 106.44(a) General

Recipients' Duty To Address Sex Discrimination

*Comments:* A number of commenters supported proposed § 106.44(a), which they asserted is consistent with Title IX's purpose and would ensure that recipients afford an educational environment free from all forms of sex discrimination, including sex-based harassment. In discussing a recipient's obligation to address sex discrimination, some commenters described sexual misconduct in education as a public health crisis that can have a long-term, detrimental effect on impacted students, and other commenters supported the proposed regulations, stating they would better protect LGBTQI+ individuals. Some commenters supported the proposed regulations because they believed they would hold recipients accountable and require recipients to be more responsive to notices of discrimination, as some commenters stated that recipients do not always take reports of sexual harassment and sexual assault seriously to avoid reputational costs or harms to the respondent.

Some commenters supported the proposed removal of the "actual knowledge" and "deliberate indifference" standards from the 2020 amendments, which they asserted enable recipients to ignore sexual harassment if it is reported to the wrong employee, or to respond inadequately. Some commenters stated that the deliberate indifference standard undermines the Department's enforcement role, has exacerbated a misunderstanding of Title IX obligations, and is not appropriate for a civil rights statute or required by case law.

Other commenters opposed the proposed removal of the "actual knowledge" and "deliberate indifference" standards. Some commenters argued that the 2020

amendments appropriately aligned the standard for administrative enforcement with the standard the Supreme Court adopted for civil litigation in certain harassment cases, citing Supreme Court cases including *Cannon,* 441 U.S. 677; *Franklin,* 503 U.S. 60; and *Gebser,* 524 U.S. 274. Some commenters opined that the actual knowledge standard allowed a recipient to respond efficiently and effectively to reports and complaints of discrimination and argued that the removal of the actual knowledge standard exceeds the Department's authority, with some commenters characterizing the proposed standard as "strict liability," and others characterizing it as "imputed knowledge." Citing *Gebser* and *Davis,* some commenters stated that the Supreme Court has held that a recipient is not liable under a Spending Clause statute without actual knowledge.

Some commenters opposed the proposed regulations as unclear, stating that they do not indicate when a recipient must respond to possible sex discrimination and take reasonable steps to ensure its Title IX Coordinator learns of possible discrimination, and some commenters asked the Department to clarify the meaning of "prompt and effective" and "remedy the effects" in proposed § 106.44(a).

Some commenters said that under proposed § 106.44(a), there is no guarantee of compliance because the requirements are open-ended, and a recipient cannot monitor and control all participants in its education program or activity.

*Discussion:* Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. 1681(a). A recipient therefore must ensure that it operates its education program or activity free from sex discrimination. Section 106.44(a) sets forth a recipient's obligations to respond to sex discrimination in order to fulfill Title IX's mandate.

As a Federal funding agency, the Department must ensure that recipients comply with assurances that they will not use the Department's funds to further sex discrimination. By setting forth clear requirements, § 106.44(a) allows the Department to fulfill its enforcement role, which is prescribed by statute. 20 U.S.C. 1682. To that end, the Department is statutorily obligated to enact regulations that effectuate Title IX, and Federal agencies have authority to define the contours of the Spending Clause contract with recipients through

those regulations. *Bennett,* 470 U.S. at 670. Recipients are on notice of applicable regulations when they accept Federal funding from the Department, and the Department holds them accountable for compliance by providing them notice of noncompliance and an opportunity to voluntarily resolve the noncompliance before administrative enforcement action is taken. *See Gebser,* 524 U.S. at 289–90 (recognizing these features of administrative enforcement). For additional explanation of the Department's administrative enforcement process, see the prior section, Termination of Federal funds.

Regarding commenters' Spending Clause concerns, the statutory text of Title IX requires a recipient to operate its education program or activity free from sex discrimination, including sex-based harassment. *Gebser,* 524 U.S. at 281; *Davis,* 526 U.S. at 649–50. As recognized by the Supreme Court in *Davis,* "the regulatory scheme surrounding Title IX has long provided funding recipients with notice that they may be liable for their failure to respond" to sex discrimination. 526 U.S. at 643–44. These final regulations provide clear notice of recipients' obligations to respond to all forms of sex discrimination prohibited by Title IX.

In addition to the statutorily authorized administrative enforcement scheme, the Supreme Court has recognized an implied private cause of action under Title IX. *Gebser* and *Davis* defined the standard for private parties to hold recipients accountable for money damages when they fail to address sexual harassment in their education program or activity. That theory of liability is premised on the understanding that in certain circumstances, "sexual harassment constitutes a school itself discriminating on the basis of sex in violation of Title IX." 85 FR 30035. The *Davis* Court noted that the Court in *Gebser* "concluded that a recipient of federal education funds may be liable in damages under Title IX where it is deliberately indifferent to known acts of sexual harassment by a teacher," 526 U.S. at 641 and *Davis* extended that conclusion to when the harasser is a student. *Id.* at 643.

The Department acknowledges some commenters' support for the 2020 amendments, which extended and adapted the *Gebser/Davis* framework from private litigation for monetary damages to the context of administrative enforcement of Title IX. However, the standard for administrative enforcement is not derived from the same implied remedy discussed in *Gebser* and *Davis,*

and the Department is not required to adopt the *Gebser/Davis* standard for administrative enforcement purposes. *See, e.g.,* 85 FR 30038, 30043 (stating that "the Department is not required to adopt the deliberate indifference standard articulated in the *Gebser/Davis* framework"). Indeed, recipients must comply with the Department's administrative enforcement regulations and are subject to the Supreme Court's *Gebser/Davis* standard for private damages liability. Even in 2020, when the Department chose to align its administrative enforcement standard more closely with the *Gebser/Davis* standard, it did not fully adopt the deliberate indifference standard, 85 FR 30035; instead, it adapted that standard to an administrative enforcement context, illustrating clearly how the standards for administrative enforcement and private enforcement are in fact distinct.

Under the 2020 amendments, a recipient is required to respond to sexual harassment when the recipient has "actual knowledge." 34 CFR 106.30(a), 106.44(a). The 2020 amendments defined actual knowledge to mean notice of sexual harassment or allegations of sexual harassment to a recipient's Title IX Coordinator or any official of the recipient who has authority to institute corrective measures on behalf of the recipient, or to any employee of an elementary school or secondary school recipient. 34 CFR 106.30(a). The 2020 amendments also stated that imputation of knowledge based solely on "vicarious liability" or "constructive notice" would be insufficient to constitute actual knowledge, and that the standard would not be met when the only official of the recipient with actual knowledge is the respondent. 85 FR 30574. Further, the 2020 amendments announced that a recipient with actual knowledge must respond promptly in a manner that is not "deliberately indifferent," and that a recipient is deliberately indifferent only if its response is clearly unreasonable in light of the known circumstances. *Id.* Throughout this discussion, we refer to the "actual knowledge standard" and the "deliberate indifference standard" as referenced in the 2020 amendments.[30]

In the July 2022 NPRM, the Department proposed removing the actual knowledge standard and the

---

[30] Section 106.44(a) of the 2020 amendments included other provisions, which are addressed elsewhere in this preamble, such as the meaning of "education program or activity"; the recipient's responsibility for offering supportive measures; and the recipient's duty to follow the grievance process before imposition of any sanctions.

**Federal Register** / Vol. 89, No. 83 / Monday, April 29, 2024 / Rules and Regulations **33561**

deliberate indifference standard. *See* 87 FR 41432. The Department further proposed that § 106.44(a) state that a recipient must take prompt and effective action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects. Proposed § 106.44(a) also stated that, to ensure that a recipient can satisfy this obligation, a recipient must comply with all of the requirements of proposed § 106.44.

After the 2020 amendments went into effect stakeholders and commenters representing recipients of all educational levels, Title IX Coordinators, State Attorneys General, and advocacy organizations informed the Department of serious problems associated with the actual knowledge and deliberate indifference standards in the 2020 amendments. They did so through the June 2021 Title IX Public Hearing, listening sessions, and public comments in response to the July 2022 NPRM. For example, the commenters said that the 2020 amendments did not require a postsecondary institution to investigate sexual harassment in its education program or activity even if the recipient's leadership had persuasive evidence that harassment was taking place. Instead, they noted that the 2020 amendments only required an investigation if the person who experienced the harassment reported the harassment to a specifically designated employee. As a result, under the 2020 amendments, a complainant who did not report the harassment to the correct individual could be denied access to an educational environment free from sex discrimination. Likewise, after the 2020 amendments, a variety of stakeholders and commenters convincingly maintained that the deliberate indifference standard is inappropriate in the administrative enforcement context because it requires a limited response that does not fully address sex discrimination in the recipient's education program or activity.

The Department shares the serious concern of stakeholders and commenters that the definition of actual knowledge in the 2020 amendments could permit a recipient to ignore sexual harassment simply because allegations of harassing conduct were not reported to "the right" employee. With the 2020 amendments, although the Department adopted the view that reports of sexual harassment to any employee of an elementary school or secondary school recipient would constitute "actual knowledge" of the recipient, the universe of postsecondary institution employees to whom a report of sexual harassment would constitute "actual knowledge" of the recipient was much more limited—only the Title IX Coordinator or any official of the recipient who had authority to institute corrective measures on behalf of the recipient. The Department is now convinced that limiting a postsecondary institution's obligations in this way is not effective for purposes of ensuring Title IX compliance in the administrative enforcement context because all recipients of Federal financial assistance have a duty to operate their education programs or activities free from sex discrimination regardless of the age of the students they serve.

The Department also agrees with stakeholders and commenters that the 2020 amendments did not require recipients to fully address the impact of sexual harassment in their educational environments, and further fell short of imposing sufficient obligations to respond to possible sex discrimination. Indeed the 2020 amendments created a troubling gap in implementing Title IX's prohibition on sex discrimination: a recipient's employee could have information about possible sex discrimination in a recipient's education program or activity, yet the recipient could have no obligation to take any action to address it unless a formal complaint was filed or the recipient's Title IX Coordinator otherwise became aware of it, leaving conduct that violated Title IX to go unredressed by recipients. The Department has concluded that Title IX does not permit a recipient to act merely without deliberate indifference and otherwise allow sex discrimination to occur. Rather, in the administrative enforcement context, in which the Department is responsible for ensuring that its own Federal funds are not used to further discrimination, the Department expects recipients to fully effectuate Title IX.

The Department also agrees with the stakeholders and commenters who pointed out that the Department's application of a different standard of liability for sexual harassment compared to other forms of discrimination raised serious questions regarding equity and rationality. The approach in the 2020 amendments singled out only sexual harassment as subject to the deliberate indifference standard, thereby raising questions as to why the Department was requiring complainants to meet a particular standard for complaints about sexual harassment, but not for other types of prohibited sex-based harassment.

Moreover, a number of stakeholders and commenters reported that the deliberate indifference standard imposed by the 2020 amendments erodes efforts to promote and sustain institutional trust by appearing to hold schools to a lower standard for sexual harassment compared to other forms of discrimination. Commenters who supported the 2020 amendments and opposed the proposed regulations did not present convincing answers to those challenging questions, and the Department is not able to justify retaining the 2020 amendments against the range of challenges and complications associated with applying the deliberate indifference standard only to sex-based harassment. The Department determined that the overarching standards for adequately addressing sex discrimination should be more uniform—as well as robust in effectuating Title IX—and accordingly § 106.44(a) in these final regulations broadly covers all forms of sex discrimination.

As proposed in the July 2022 NPRM, these final regulations remove the deliberate indifference standard and instead clearly define steps a recipient must take to address sex discrimination, as set forth in § 106.44. *See* 87 FR 41434–35. In addition, the Department has expanded the knowledge standard from the 2020 amendments so that regardless of the type of recipient, a recipient is deemed to have knowledge of sex-based discrimination in its education program or activity and an obligation to respond consistent with the requirements in § 106.44 when any non-confidential employee has information about conduct that reasonably may constitute sex discrimination. The nature of the response required by § 106.44 depends on the person's role, but a recipient must ensure that all of its employees fulfill the duty to respond. All non-confidential employees of an elementary school or secondary school recipient must notify the Title IX Coordinator when the employee has information about conduct that reasonably may constitute sex discrimination. Employees of other recipients who have responsibility for administrative leadership, teaching, or advising in the recipient's education program or activity must do the same. All other non-confidential employees at a recipient that is not an elementary school or secondary school must either notify the Title IX Coordinator or provide the contact information of the Title IX Coordinator and information about how to make a complaint of sex

discrimination to any person who provides the employee with information about conduct that reasonably may constitute sex discrimination. *See* § 106.44(c).

A number of commenters expressed concern that proposed § 106.44(a) appeared to hold recipients to a standard of strict liability under which it could be held liable for any sex discrimination that occurred, even if the recipient had no knowledge of the conduct. The Department did not, and does not intend to impose such a standard, and that is not the effect of these final regulations. The Department has revised the final regulations to clarify that a recipient "with knowledge" of conduct that reasonably may constitute sex discrimination must respond promptly and effectively; that does not, however, mean that the recipient is responsible for conduct that occurred before an employee of the recipient becomes aware of the conduct. As discussed above, § 106.44(c) requires all employees of a recipient to take some action when they have information—and therefore knowledge—about conduct that reasonably may constitute sex discrimination. However, if no Title IX Coordinator, including a contractor who has been delegated Title IX responsibilities, or other employee of a recipient has knowledge of conduct that reasonably may constitute sex discrimination, then the recipient cannot respond promptly and effectively. For additional explanation of the revisions to the scope of conduct covered under § 106.44(c), see the discussion below on Scope of Conduct Subject to § 106.44(c).

After three years of enforcement of the 2020 amendments and feedback from stakeholders, the Department considers final § 106.44(a) to be a natural and necessary outgrowth of the 2020 amendments. At that time, although the Department and commenters recognized that some sexual harassment would go unaddressed, the Department made the determination that, in the postsecondary institution context, it would not require a recipient to respond each time an employee has notice of sexual harassment on the ground that doing so respected the autonomy of postsecondary institution students and employees. 85 FR 30106. The Department's enforcement experience and feedback from stakeholders and commenters has persuaded the Department that Title IX requires more from recipients, as set forth in § 106.44(a) and the other paragraphs of § 106.44. The Department maintains that the requirement in § 106.44(a)(1) to respond promptly and effectively and

the specific actions outlined in § 106.44(b)–(k) will more effectively ensure that a recipient fully effectuates Title IX's nondiscrimination mandate. As explained in greater detail in the discussion of § 106.44(f), the Department maintains that § 106.44 appropriately accounts for complainant autonomy and a recipient's obligation to operate its education program or activity free from sex discrimination. Section 106.44 also responds to concerns that under the standards set forth in the 2020 amendments, some sexual harassment went unaddressed.

In response to commenters' concerns that the obligation in proposed § 106.44(a) was open-ended and a recipient lacks the ability to monitor and control all participants in its education program or activity, the Department has clarified in § 106.44(a)(1) that a recipient's obligation to respond promptly and effectively is triggered when it has knowledge of conduct that reasonably may constitute sex discrimination. Because the Department is charged with enforcing and effectuating Title IX, we view the standard of liability in § 106.44(a)(1) as a preferable approach to confirm for recipients that they must respond promptly and effectively when they have knowledge of conduct that reasonably may constitute sex discrimination and remain obligated to ensure they comply with the standards set out in *Gebser* and *Davis*. Section 106.44(a)(2), which states that a recipient must comply with § 106.44, clarifies a recipient must take the actions outlined in § 106.44(b)–(k) to comply with Title IX's statutory obligation to operate its education program or activity free from sex discrimination. This responds to commenter concerns that proposed § 106.44(a) imposed obligations on recipients that were too open-ended by giving recipients specific instructions for steps they must take both to ensure they have knowledge of conduct that reasonably may constitute sex discrimination and that they respond appropriately when they have the requisite knowledge.

In addition, to more closely align with the revised language in § 106.44(a) describing recipients' duties and address commenters' concerns regarding the standard of liability that proposed § 106.44(a) appeared to hold recipients to, the Department has revised the language in the title of § 106.44 to clarify that this section covers a recipient's response to sex discrimination as opposed to a recipient's responsibility to operate its

education program or activity free from sex discrimination.

In response to commenters' request that the Department clarify the meaning of "prompt and effective" and "remedy the effects," the Department notes that these terms are addressed in the discussion of § 106.44(f) below.

*Changes:* The Department has revised the title of § 106.44 to state that the section covers "a recipient's response to sex discrimination." The Department has also modified § 106.44(a) to state that (1) a recipient with knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity must respond promptly and effectively; and (2) a recipient must also comply with this section to address sex discrimination in its education program or activity.

Notice of Sex Discrimination

*Comments:* Some commenters asked the Department to clarify when a recipient would have a legal duty to address possible sex discrimination and when the Department would consider a recipient to have notice of possible sex discrimination. One commenter asked the Department to clarify that a recipient would be responsible for addressing possible sex discrimination when it knew or should have known of the discrimination. Another commenter suggested that the Department modify the second sentence of proposed § 106.44(a) to clarify that a recipient cannot be held liable for failing to address conduct of which the recipient could not be aware.

One commenter asked the Department to address the circumstance in which the only employee of an elementary school or secondary school recipient with information about sex discrimination is the alleged perpetrator.

*Discussion:* Under § 106.44(a)(1), a recipient with knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity must respond promptly and effectively. As discussed above, in response to comments expressing concern that § 106.44(a) established a standard of strict liability that would hold a recipient responsible for conduct of which it had no knowledge, the Department has amended § 106.44(a)(1) to clarify that a recipient must respond promptly and effectively only when it has knowledge of conduct that reasonably may constitute sex discrimination. And, as discussed above, a recipient has such knowledge when any non-confidential employee has information about conduct that reasonably may constitute sex

discrimination. In that circumstance, the final regulations make clear that non-confidential employees must respond promptly and effectively by either notifying the Title IX Coordinator or providing the Title IX Coordinator's contact information and information about how to make a complaint of sex discrimination to any person who provides the employee with information about conduct that reasonably may constitute sex discrimination under Title IX or this part, consistent with their obligations under § 106.44(c).

Consistent with the 2020 amendments, the recipient need not have incontrovertible proof that conduct violates Title IX for it to have an obligation to respond; if the conduct reasonably may be sex discrimination, the recipient must respond in accordance with § 106.44. *See* 85 FR 30192 ("the recipient need not have received notice of facts that definitively indicate whether a reasonable person would determine that the complainant's equal access has been effectively denied in order for the recipient to be required to respond promptly"); *see, e.g., Doe* v. *Fairfax Cnty. Sch. Bd.,* 1 F.4th at 263–64 (citing *Davis,* 526 U.S. at 646–52) (holding that "a school's receipt of a report that can objectively be taken to allege sexual harassment is sufficient to establish actual notice or knowledge under Title IX—regardless of whether school officials subjectively understood the report to allege sexual harassment or whether they believed the alleged harassment actually occurred"). Further, when an employee of the recipient, including the Title IX Coordinator and any contractor who has been delegated Title IX responsibility has information about conduct that reasonably may constitute sex discrimination, they must respond consistent with their obligations under the regulations. The Department declines commenters' request to impose a "knew or should have known" standard on recipients in these final regulations because such a standard is not necessary in light of the requirement that employees respond promptly and effectively to information about conduct that may reasonably constitute sex discrimination, including by reporting such information to the Title IX Coordinator.

Under § 106.44(a)(2), a recipient must comply with the other paragraphs of § 106.44 to address sex discrimination in its education program or activity. Some of the recipient's duties under § 106.44 arise when the Title IX Coordinator has knowledge of conduct that reasonably may constitute sex discrimination, but the recipient also has duties before such an occurrence.

For example, a recipient must take steps to require all of its non-confidential employees to comply with the notification requirements in § 106.44(c) and its confidential employees to comply with § 106.44(d) through training or otherwise. In addition, a recipient must require its Title IX Coordinator to monitor for and address barriers to reporting under § 106.44(b), which must occur regardless of whether the Title IX Coordinator has received information about conduct that reasonably may constitute sex discrimination.

In response to a commenter's request for clarification, at the elementary school, secondary school, and postsecondary levels, a recipient is not relieved of its Title IX obligations simply because the respondent is the only employee of the recipient with knowledge of possible sex discrimination. However, the Department acknowledges that the recipient may be practically unable to respond until after a complaint is made or the conduct otherwise becomes known to a second non-confidential employee. Upon notification of conduct that reasonably may constitute sex discrimination, a recipient must require its Title IX Coordinator to take action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects under § 106.44(f)(1).

*Changes:* The Department has modified § 106.44(a) to state that (1) a recipient with knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity must respond promptly and effectively; and (2) a recipient must also comply with this section to address sex discrimination in its education program or activity.

Liability Standard Under Title VII

*Comments:* Some commenters opposed having a different standard of liability for Title IX and Title VII. These commenters stated that, under Title VII, an employer is liable for negligence and Title VII requires only reasonably calculated efforts to end harassment, prevent its recurrence, and remedy its effects. Another commenter argued that, unlike Title IX, Title VII was not enacted pursuant to Congress' Spending Clause authority, and that Title VII imposes broad restrictions on employers, including constructive notice of discrimination, that are inappropriate in Title IX enforcement and thus the standards need not align.

*Discussion:* The Department acknowledges commenters' views on the liability standard under Title VII.

Although the Department has taken steps to align these regulations more closely with the standards of Title VII, the Department is not bound by Title VII standards in implementing Title IX. For further discussion of Title VII and Title IX, see the discussions of the Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.C) and § 106.2 (Definition of "Sex-Based Harassment"). As explained in those sections, differences between the workplace and educational environments make certain differences in administrative standards of enforcement for Title VII and Title IX appropriate, even accounting for the Department's efforts to promote consistency. The requirements in § 106.44(b)–(k) are designed to impose no more, and no less, than reasonable demands to advance the successful implementation of Title IX. And, as discussed above, the Department has clearly set forth the steps a recipient must take to comply with § 106.44(a), which provides sufficient notice under the Spending Clause.

*Changes:* None.

Section 504 and the IDEA

*Comments:* One commenter asserted that removal of the actual knowledge standard would incentivize a recipient to take drastic measures in response to possible sex discrimination, such as removal of a student, that would conflict with its obligations under Section 504 and the IDEA.

*Discussion:* The Department disagrees with the commenter that the regulations will somehow incentivize a recipient to take measures in response to possible sex discrimination, such as removal of a student, that would conflict with the recipient's obligations under Section 504 or the IDEA. As discussed above, by adding "with knowledge" to § 106.44(a)(1), the Department has addressed commenters' concerns regarding strict liability. Although the Department has removed the definition of "actual knowledge" from these final regulations, in response to commenters' concerns, the Department has clarified that this revision expands rather than removes a recipient's obligation to respond to conduct of which their employees have knowledge. Nonetheless, nothing in these regulations authorizes a recipient to take any measures that conflict with Section 504 or the IDEA.

As explained in greater detail in the discussion of § 106.8(e), Section 504 and the IDEA protect the rights of students with disabilities, and nothing in § 106.44(a) or any other provision of the final regulations modifies any rights

under those laws or any other Federal civil rights laws. In addition, the Department notes that § 106.44(h), which addresses emergency removal, requires a recipient to undertake an individualized safety and risk analysis to determine whether an imminent and serious threat to the health or safety of a complainant or any students, employees, or other persons arising from the allegations of sex discrimination justifies removal. The respondent must also be provided notice and an opportunity to challenge the decision immediately following the removal, and this provision must not be construed to modify any rights under the IDEA, Section 504, or the ADA.

*Changes:* None.

Neutrality or Impartiality of Title IX Coordinator

*Comments:* Some commenters asserted that proposed § 106.44(a) would eliminate neutrality or impartiality from the role of Title IX Coordinators by requiring them to seek out discrimination and harassment. Commenters argued that Title IX Coordinators would seek to initiate a certain number of cases per year.

*Discussion:* The Department strongly disagrees that § 106.44(a) eliminates neutrality or impartiality from the role of the Title IX Coordinator or will cause Title IX Coordinators to initiate a certain number of complaints per year. Commenters offered no persuasive evidence or reason to draw that conclusion, which lacks foundation in the final regulations themselves. As stated in the July 2022 NPRM, "the recipient is not in the role of prosecutor seeking to prove a violation of its policy." 87 FR 41467. As discussed elsewhere in this preamble, the recipient's role is to ensure that its education program or activity is free of unlawful sex discrimination. Although doing so requires a recipient to adjudicate complaints, both the provisions regarding grievance procedures and other provisions of the final regulations help ensure that all parties are treated fairly and without bias. *See, e.g.,* §§ 106.8(d)(2)(iii), (d)(3) (training requirements), 106.44(k)(4) (informal resolution), 106.45(b)(2) (grievance procedures), 106.46(i)(iii) (appeals). Finally, nothing in the regulations requires the initiation of a certain number of complaints.

*Changes:* None.

Dual Enrollment Programs

*Comments:* Some commenters maintained that the proposed regulations did not clarify institutional responsibilities in cases of sex discrimination involving students in dual enrollment programs, *i.e.,* enrolled in high school but taking college classes.

*Discussion:* The Department appreciates the opportunity to clarify that, in circumstances in which a student is enrolled in two recipient institutions at the same time, each recipient has its own obligations to protect participants from sex discrimination under Title IX. Neither should assume that the other institution is solely responsible for responding to a complaint of sex discrimination from a student participating in both programs, particularly because effective supportive and remedial measures, to the extent appropriate, may implicate both institutions.

*Changes:* None.

2. Section 106.44(b) Monitoring for Barriers

General Comments

*Comments:* A number of commenters supported proposed § 106.44(b) because it would encourage recipients to eliminate barriers to reporting sex discrimination, including among historically marginalized communities, and to monitor for specific barriers faced by individuals with disabilities or limited English proficiency.

Some commenters identified a number of barriers to reporting sex discrimination, including the 2020 amendments' requirements; unfamiliarity with a recipient's Title IX Coordinator and grievance procedures; recipients' history of inadequate responses to sex discrimination; staff discouraging and deterring student reports; unreasonably lengthy response times to reports of sex discrimination; and fears of not being believed or of being judged, blamed, or retaliated against for reporting sex discrimination.

Some commenters opposed proposed § 106.44(b), asserting that it was so vague as to expose recipients to litigation risk.

Other commenters asked for examples of steps "reasonably calculated" to address barriers. Some commenters suggested modifications to proposed § 106.44(b) to require school staff to follow up with students after they report sex discrimination to see if they are experiencing repercussions because of their reports.

Some commenters suggested that the Department expand proposed § 106.44(b) to require recipients to remedy any hostile environments to prevent ongoing sex discrimination in the recipient's education program or activity; require a Title IX Coordinator to "proactively" monitor a recipient's education program or activity; require postsecondary institutions to prevent sex discrimination; require recipients to increase awareness of menstruation-related discrimination and harassment; and include education at the elementary school and secondary school level on healthy relationships.

*Discussion:* The Department acknowledges commenters' support for § 106.44(b) and agrees that barriers to reporting sex discrimination in a recipient's education program or activity impede recipients from realizing Title IX's promise of an educational environment free from such discrimination. This includes barriers for students with disabilities, individuals with limited English proficiency, and other populations. Section 106.44(b) is therefore a key part of recipients' Title IX compliance obligations.

The Department acknowledges commenters' concerns that in some cases a recipient's Title IX reporting and complaint processes and grievance procedures can create barriers to reporting sex discrimination. Shortcomings such as inaccessible complaint reporting processes, confusing grievance procedures that lack transparency, and difficult-to-reach Title IX Coordinators or staff who discourage individuals from making reports all serve as barriers to reporting sex discrimination under § 106.44(b). The Department also agrees with commenters that poorly managed report and complaint processes, or grievance procedures in which individuals have little confidence due to delays or perceptions of bias, pose serious barriers to reporting sex discrimination that recipients will be required to address to comply with § 106.44(b).

Although recipients may choose to use campus surveys to monitor barriers to reporting, and the Department recognizes that climate surveys are already required by some States and VAWA 2022 as a tool to monitor for barriers to reporting sex discrimination, the Department declines to mandate that recipients take particular steps to monitor for such barriers, including employing surveys. Nothing in these regulations would prevent a recipient from using campus surveys to increase awareness about Title IX's protections. The Department declines to require that elementary schools and secondary schools educate students on healthy relationships. *See generally* 20 U.S.C. 1232a.

Once a recipient becomes aware of a barrier to reporting sex discrimination, the recipient must take steps that are reasonably calculated to address that

barrier. A recipient's response to such reporting barriers should be tailored to the specific impediments and obstacles it identifies, and recipients should choose strategies that work best given factors unique to their educational environment. When a recipient deems it appropriate, a response could include trainings targeted at a particular academic department or other subdivision of the recipient where the barriers were identified; in-depth training for specific program staff; or widespread training for staff and students. Responses contemplated by § 106.44(b) could also include more frequent and prominent publication of the Title IX Coordinator's contact information; relocation of the Title IX Coordinator's office to a more visible, central, and accessible location; provision of adequate staff for the Title IX Coordinator's office; enhanced training for employees with Title IX responsibilities, including training to ensure that they are free of conflicts of interest and do not discourage reporting; and the development and circulation of user-friendly Title IX materials. 87 FR 41436.

The Department acknowledges commenters' recommendation that § 106.44(b) be modified to require recipients to follow up with individuals who report sex discrimination to ensure they are not experiencing further discrimination or retaliation due to their report or complaint. The Department declines to mandate a particular response, however, given the fact-specific nature of identifying barriers and a recipient's need to respond as warranted by those facts. Instead, § 106.44(b) will allow recipients to tailor their response to the circumstances of their educational environment and the identified barriers to reporting. Moreover, because additional discrimination and retaliation are already prohibited by other provisions of these final regulations, including §§ 106.44 and 106.71, it is not necessary to modify § 106.44(b) as requested.

Some commenters may have misunderstood the purpose of § 106.44(b), which is focused on barriers to reporting and does not require monitoring related to sex discrimination more generally. The Department appreciates the opportunity to clarify that the aim of § 106.44(b) is to ensure that recipients require their Title IX Coordinators to monitor for and address barriers in their education programs or activities that would prevent or deter individuals from reporting possible sex discrimination. So, for example, a recipient may set up an online reporting system for sex discrimination

complaints; if individuals who wish to report information about possible sex discrimination cannot access the reporting system, however, the lack of access would constitute a barrier to reporting possible sex discrimination. The recipient should therefore monitor the efficacy of this online reporting system for access issues and take steps reasonably calculated to address those issues to fulfill its obligations under § 106.44(b). Aspects of a recipient's campus climate may also discourage or chill students from coming forward to make a report of possible sex discrimination, in which case, a recipient should monitor for and take steps reasonably calculated to address such issues. For example, if a recipient were to learn from staff that some students felt discouraged from reporting sex discrimination or worried about retaliation if they were to make a report, the recipient could conduct student focus groups or survey students about why they feel discouraged from reporting or fear retaliation. Depending on what the recipient learns, the recipient may in response decide to include more readily available information on how to report sex discrimination and emphasize a recipient's prohibition on retaliation in required trainings for all students. Additionally, just as a recipient's obligation to comply with Title IX is ongoing, its obligation to monitor for and take steps reasonably calculated to address barriers to reporting sex discrimination is ongoing.

The Department disagrees that § 106.44(b) is vague. The provision sets out two clear requirements. First, the Title IX Coordinator must monitor the recipient's education program or activity for barriers to reporting information about conduct that reasonably may constitute sex discrimination under Title IX. The Department provides examples of how to monitor such barriers above and in the July 2022 NPRM. 87 FR 41436. Second, when such barriers are identified, the Title IX Coordinator must take steps reasonably calculated to address them. The Department has also provided examples of how to address barriers, above and in the July 2022 NPRM. *Id.* Section 106.44(b) does not require a recipient's Title IX Coordinator to generally monitor *all* conduct in its education program or activity. Rather, the provision imposes a specific duty to monitor the recipient's education program or activity for barriers to reporting sex discrimination, and to take steps reasonably calculated to address those barriers.

In response to comments, the Department has changed the title of this provision from "Monitoring" to "Barriers to Reporting." Framing this provision around barriers to reporting sex discrimination serves as a reminder to recipients and their staff that § 106.44(b) is about barriers in the recipient's education program or activity that impede a recipient from ensuring that no individual is subjected to sex discrimination in its education program or activity.

*Changes:* The Department changed the title of this provision from "Monitoring" to "Barriers to Reporting."

Reporting Channels

*Comments:* One commenter asked the Department to confirm that a recipient's Title IX Coordinator would be required only to monitor formal channels to reporting sex discrimination and not informal channels, because, the commenter stated, monitoring informal channels would undermine a recipient's confidential resources and deter individuals from seeking support due to concerns of losing autonomy over their reports. Another commenter characterized the notification requirements in proposed § 106.44(c) as creating a barrier to reporting sex discrimination that would be subject to proposed § 106.44(b).

*Discussion:* The Department is uncertain what the commenter means by formal channels versus informal channels, but the Department confirms that a recipient would not be permitted to compromise a recipient's confidential resources in order to monitor for barriers to reporting. However, if a recipient learns, for example, that some confidential employees mistakenly believe that discrimination based on sexual orientation or gender identity should not be reported to the Title IX Coordinator and are discouraging individuals from making their own reports of such discrimination to the Title IX Coordinator, then the Title IX Coordinator would be required to take steps reasonably calculated to address such barriers, for example, through publicizing corrected information and training employees. The Department acknowledges that some individuals may be deterred from seeking support due to concerns of losing autonomy over their report. If a Title IX Coordinator learns of such a barrier, the recipient could address the barrier by, for example, developing and circulating user-friendly Title IX materials or provide information sessions that clarify the available support options, including confidential resources.

The Department disagrees that the notification requirements in proposed § 106.44(c) would create a barrier to reporting sex discrimination. To the contrary, the notification requirements will reduce barriers to reporting by ensuring that all employees of a recipient know when and how to respond to reports and other information about conduct that reasonably may constitute sex discrimination.

In response to comments, the Department has determined that, consistent with changes in §§ 106.44(a), (c), (e), (f), (j), and (k) and 106.71 that are discussed more fully below, the final regulatory text for § 106.44(b) should be clarified to state that the Title IX Coordinator must monitor for barriers to reporting related to information about conduct that "reasonably" may constitute sex discrimination. This change, in addition to addressing commenters' concerns discussed below, helps clarify § 106.44(b) by being more specific about the monitoring required under the provision. The Department has also added "or this part" to reference these regulations, which include definitions that explain what conduct reasonably may constitute sex discrimination.

*Changes:* Section 106.44(b) is revised to state that a recipient must require its Title IX Coordinator to take the actions specified in paragraphs (b)(1) and (2). Section 106.44(b)(1) is modified to specify that the Title IX Coordinator's required action is to monitor for barriers to reporting information about conduct that "reasonably" may constitute sex discrimination under Title IX "or this part."

### Free Speech and Academic Freedom

*Comments:* Commenters raised varied concerns that proposed § 106.44(b) would restrict speech, limit constitutional rights, and diminish academic freedom. Some commenters asked the Department to clarify whether proposed § 106.44(b) would require a Title IX Coordinator to monitor for barriers to reporting sex discrimination in the context of academic discourse, including discourse on controversial topics or topics informed by religious or other beliefs. One commenter opposed proposed § 106.44(b) and stated that, contrary to *Mahanoy,* 141 S. Ct. 2038, it would require schools to monitor off-campus speech that typically falls within the zone of parental control. Another commenter asked the Department to clarify how a recipient would know when actions on social media create a hostile environment for

purposes of fulfilling its obligations under proposed § 106.44(b).

*Discussion:* As discussed above, § 106.44(b) requires a recipient to require its Title IX Coordinator to monitor for barriers to reporting sex discrimination in its education program or activity and to address any barriers to reporting the Title IX Coordinator discovers through the monitoring efforts. As stated in the July 2022 NPRM, recipients are not expected to monitor students' online activity, including social media. 87 FR 41440. And § 106.44(b) does not require recipients to monitor the academic discourse of students or teachers in the classroom. The Department has consistently maintained that Title IX is intended to protect students from invidious discrimination, not to regulate constitutionally protected speech. OCR interprets the laws and regulations that the Department enforces consistent with free speech and other rights protected under the First Amendment to the U.S. Constitution. The Department intends these Title IX regulations to be interpreted consistent with rights protected under the First Amendment, and the protections of the First Amendment must be considered if issues of speech or expression are involved, including academic freedom. For additional discussion of the First Amendment, see the discussion of Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2) (Section I.C) (including the discussion of *Mahanoy* and the discussion of § 106.44(a) above. *See also* 2003 First Amendment Dear Colleague Letter.

The goal of § 106.44(b) is to eliminate actual barriers or impediments that would prevent or deter individuals from reporting possible sex discrimination. Title IX's nondiscrimination mandate is best served when persons are unobstructed in their ability to report conduct that reasonably may constitute sex discrimination because that reporting triggers the recipient's obligation to offer appropriate supportive measures, initiate grievance procedures to determine whether sex discrimination occurred, or allow a complaint to be resolved through an informal resolution process, if available and appropriate. It is doubtful that individual comments occurring in classrooms as part of academic discourse, including speech conveyed as part of an expression of sincerely held religious beliefs, would constitute a "barrier" to reporting within the meaning of § 106.44(b). Were a recipient to become aware that speech occurring in classrooms, no matter the viewpoint

being expressed, was creating a barrier to reporting, it would be obligated to address those barriers in ways that do not infringe on an individual's otherwise protected First Amendment rights by, for example, clarifying the recipient's policies for reporting possible sex discrimination.

To ensure that recipients and all members of a recipient's education program or activity understand that § 106.44(b) relates to monitoring for barriers to reporting, the Department has changed the title of § 106.44(b) from "Monitoring" to "Barriers to Reporting."

*Changes:* The Department has changed the title of § 106.44(b) from "Monitoring" to "Barriers to Reporting."

### Compliance Burdens

*Comments:* Commenters expressed concerns about compliance burdens, especially for large State university systems or smaller institutions with fewer resources. Some commenters opposed requiring a recipient to monitor for barriers to reporting sex discrimination and asserted that a recipient's duty should be limited to responding to "actual knowledge" of sex discrimination.

Some commenters expressed concern that proposed § 106.44(b) would place an undue burden or too much responsibility on Title IX Coordinators, who would be required to monitor conduct and speech regardless of whether a complaint is made or a concern is raised over barriers to reporting sex discrimination.

One commenter asked the Department to modify proposed § 106.44(b) to place the obligation to monitor and address barriers to reporting sex discrimination on the recipient instead of the Title IX Coordinator, whom the commenter asserted should coordinate and review efforts by others at the institution to monitor and address barriers to reporting sex discrimination.

Other commenters asked the Department to clarify that a Title IX Coordinator is only required to monitor for barriers to reporting related to conduct that an individual "reasonably believes constitutes sex discrimination under Title IX" and to explain how a recipient would be held accountable if its Title IX Coordinator failed to monitor and address barriers to reporting sex discrimination.

Some commenters encouraged the Department to issue guidance that would provide examples of how to monitor for barriers to reporting sex discrimination under the proposed regulations.

*Discussion:* The Department acknowledges commenters' concerns

about potential compliance burdens but reiterates that federally funded recipients assume the obligation to provide participants the opportunity to attend education programs and activities free from sex discrimination. To meet that obligation, recipients must ensure that participants are able to share information with the recipient about conduct and practices that reasonably may constitute sex discrimination. Requiring recipients to monitor for barriers to reporting is necessary for recipients to promptly and effectively address sex discrimination when it occurs, and otherwise meet their obligation to ensure that no individual is subjected to sex discrimination in their education program or activity.

The Department also notes that the July 2022 NPRM provided suggestions and examples of how a recipient could comply with § 106.44(b) while acknowledging that recipients vary in size and resources in ways that may impact how they implement this provision. 87 FR 41436. Recipients have the flexibility to determine which strategies would be most appropriate and effective in their educational setting and the Department declines to require specific actions. The Department reiterates the importance of a recipient tailoring efforts to uncover and address barriers to reporting sex discrimination to the methods and strategies the recipient determines are likely to be most effective in the recipient's setting. The Department further discusses the regulations' flexibility elsewhere in this preamble, including in the discussions related to the final regulations at § 106.44(k)(1) (flexibility to determine whether to afford an informal resolution process that best serves the recipient's educational community) and § 106.45(b)(4) (flexibility to determine reasonably prompt time frames for grievance procedures in light of a recipient's unique setting).

Contrary to some commenters' objections, § 106.44(b) does not require a recipient to address barriers to reporting sex discrimination in its education program or activity as a substitute for "actual knowledge." The provision ensures that recipients are proactive about identifying barriers to reporting so that they are well-placed to address sex discrimination in their education programs and activities when it exists. The Department appreciates the opportunity to clarify that the obligation to monitor for barriers to reporting is not triggered only when a concern is raised over barriers to reporting. The Title IX Coordinator must monitor for barriers regardless of whether a concern has been raised about

such barriers. The provision is therefore an important part of a recipient's compliance program to ensure that Title IX's nondiscrimination mandate is fulfilled. The Department provides additional background and discussion of the actual knowledge standard adopted by the 2020 amendments in the preamble discussion of § 106.44(a).

The Department acknowledges commenters' concerns that § 106.44(b), alone and together with other provisions in these final regulations, expand the scope of a Title IX Coordinator's duties and responsibilities. These final regulations, including § 106.44(b), provide a role for a recipient's Title IX Coordinator that centralizes duties, promotes accountability, and enables effective Title IX compliance. To address concerns regarding the Title IX Coordinator's capacity, a recipient may authorize its Title IX Coordinator to delegate specific duties to one or more designees as long as one Title IX Coordinator retains ultimate oversight over the assigned duties. *See* § 106.8(a)(2). Additional discussion related to the scope of the Title IX Coordinator's role under these final regulations can be found in the discussion of the Title IX Coordinator requirements under § 106.44(f). Additionally, a discussion of the compliance burdens related to these final regulations can be found in the discussion of the *Regulatory Impact Analysis*.

In response to the commenter who asked the Department to modify proposed § 106.44(b) to place the obligation to monitor and address barriers to reporting sex discrimination on the recipient instead of the Title IX Coordinator, the Department notes that the proposed and final regulations require the recipient to require the Title IX Coordinator to take the prescribed action; the compliance obligation thus falls on the recipient. The Department declines to require the Title IX Coordinator to oversee only institution-wide efforts to address barriers to reporting sex discrimination. Section 106.44(b) appropriately requires recipients, through their Title IX Coordinators, to monitor for barriers to reporting and gives Title IX Coordinators discretion with respect to the manner in which they do so.

In response to the question about recipient accountability, a recipient that fails to ensure that its Title IX Coordinator complies with this duty will not meet the requirements of § 106.44(b) and as such, the recipient would then potentially be the subject of an administrative enforcement action through which the recipient would be

provided notice and an opportunity to come into compliance.

The Department agrees that supporting recipients and Title IX Coordinators in implementing these regulations is important. The Department will offer technical assistance, as appropriate, to promote compliance with these final regulations.

*Changes:* None.

3. Section 106.44(c) Notification Requirements

General Comments

*Comments:* Some commenters supported the notification requirements because they would ensure that a recipient learns of possible sex discrimination so it can operate its education program or activity free from sex discrimination. Commenters also supported the proposed regulations because it would clarify employee responsibilities, especially for elementary school and secondary school employees. Commenters also supported § 106.44(c) on the grounds that it would make it less burdensome for students, especially students with disabilities, to report sex-based harassment and would not limit actionable reporting to a narrow category of employees.

One commenter stated that proposed § 106.44(c) is a departure from the Department's previous guidance limiting the category of employees with notification requirements. Another commenter stated that the notification requirements would elevate sex discrimination over other forms of discrimination.

Some commenters alleged that mandated reporting chills reporting. Some commenters said institutions receive information from employees and then take little or no action. Other commenters argued that the proposed regulations would discourage complainants from seeking advice or assistance from a trusted employee and others stated that mandatory reporting negatively affects families' ability to support students.

Some commenters expressed concern about the lack of institutional discretion to determine which employees should be mandatory reporters and urged the Department to modify the proposed regulations to give the recipient more discretion to categorize which employees must comply with certain notification requirements. Some commenters objected to the breadth of employees with notification duties.

Some commenters asked for supplemental guidance related to notification requirements.

*Discussion:* The Department agrees that notification requirements in

§ 106.44(c) will help ensure that a recipient learns of sex discrimination in its education program or activity so it can be addressed. The Department also agrees that it is less burdensome for students to report sex discrimination when more employees have notification responsibilities that further Title IX's nondiscrimination mandate. In response to one commenter stating that proposed § 106.44(c) departs from the Department's prior guidance, the Department has come to view broader notification requirements as more important in the time since the previous guidance was issued and notes that prior guidance interpreted the regulations and existing case law that preceded the 2020 amendments.

The Department disagrees that these notification requirements elevate sex discrimination over other forms of discrimination. Rather, these requirements ensure that employees know what to do when they are in receipt of information about conduct that reasonably may constitute sex discrimination so that a recipient can take action to address it, as is its obligation under Title IX. Nothing in these regulations prevents a recipient from requiring similar notification requirements for other forms of discrimination or harassment. The Department also notes the discussion of different standards for other harassment in the preamble to the 2020 amendments. 85 FR 30528.

The Department disagrees with commenters that the obligations under § 106.44(c) will chill reporting or compromise complainant autonomy, which is accounted for throughout the regulations, including in § 106.44(f). Rather, § 106.44(c) describes a recipient's obligation to require employees (other than confidential employees as addressed in § 106.44(d)) to notify the Title IX Coordinator of conduct that reasonably may constitute sex discrimination or, as applicable, provide contact information for the Title IX Coordinator and information about how to make a complaint of sex discrimination. Commenters presented no persuasive evidence or reasons to believe that this framework will so significantly deter reporting that the provision's potential chilling effect outweighs its important benefits. The Department is convinced that the final regulations will more effectively implement Title IX and its commitment to eliminating sex discrimination in a recipient's education program and activity. In response to commenters who asserted that institutions do not take action even when they receive information from employees, the

Department notes that under the final regulations a recipient must require its Title IX Coordinator to take the actions outlined in § 106.44(f)(1) to promptly and effectively end any sex discrimination in its education program or activity, prevent its recurrence, and remedy its effects. The Department is prepared to enforce this requirement when it becomes aware that a recipient has declined to take the required actions.

The Department also disagrees that § 106.44(c) discourages complainants from seeking advice or assistance from a trusted employee or negatively affects faculty members' ability to support students. At elementary schools and secondary schools, all non-confidential employees must notify the Title IX Coordinator when the employee has information about conduct that reasonably may constitute sex discrimination. At postsecondary institutions once a student has provided information to non-confidential employees, the employee must either notify the Title IX Coordinator or, as applicable, provide the Title IX Coordinator's contact information and information about how to make a complaint of sex discrimination. A recipient, other than an elementary school or secondary school, has discretion to determine which of these actions employees who do not have authority to institute corrective action or administrative leadership, teaching or advising responsibility must take. 87 FR 41439. A recipient also has the discretion, which the Department maintains is appropriate because recipients vary in size, resources, and administrative structure, to make confidential employees available who do not have notification requirements, and these individuals can also provide confidential support to students. *See* § 106.44(d).

The Department declines to give recipients more discretion to determine which employees should have certain notification requirements. The notification requirements under § 106.44(c) are necessary to provide Title IX Coordinators, and therefore a recipient, with the information needed to respond appropriately to sex discrimination in its education program or activity. Title IX requires that a recipient operate its education program or activity in a manner that subjects no person to discrimination on the basis of sex; allowing a recipient to designate a more limited subset of employees to report discrimination than required under the final regulations would create a risk that individuals in certain aspects of a recipient's education program or

activity would suffer from sex discrimination without that discrimination being addressed.

The Department also notes that a recipient may not avoid compliance with § 106.44(c) by requiring reporting to an external third party, as it must still ensure that the report reaches the Title IX Coordinator. If the Title IX Coordinator has delegated its duties by requiring reporting to the external third party, it must still exercise oversight over those delegated responsibilities to ensure a recipient's consistent compliance with its responsibilities under Title IX and this part.

In response to requests for supplemental guidance and technical assistance, the Department agrees that supporting recipients and Title IX Coordinators in implementing these regulations is important. The Department will offer technical assistance, as appropriate, to promote compliance with these final regulations.

As discussed below, the Department was persuaded that the notification requirements should be streamlined and clarified to facilitate compliance, and the Department has done so in the final regulations.

*Changes:* The notification requirements are streamlined and clarified as explained below, including by dividing § 106.44(c) into subsections to more clearly delineate notification requirements for different categories of employees.

Consistency With State Laws

*Comments:* Some commenters expressed concern about inconsistency with State laws that already require public school employees to notify their principal or supervisor when they become aware of potential sex discrimination or sex-based harassment instead of the Title IX Coordinator.

*Discussion:* Nothing in these final regulations precludes a recipient from complying with both these regulations and State and local laws that do not conflict. *See* 87 FR 41404–05; 85 FR 30454. *see also New York,* 477 F. Supp. 3d at 299 (regulation was not arbitrary and capricious when, among other things, the Department appropriately "concluded that the Rule did not prevent recipients from complying with state and local laws and policies" and commenters had not raised "any actual conflicts with state law").

Employees who are required to report sex discrimination to a supervisor can and should continue to do so. It is not necessarily inconsistent to also require employees to notify the Title IX Coordinator or an appropriate Title IX Coordinator designee. With respect to

State laws that may impose notification requirements related to sex discrimination or sexual harassment, the obligation to comply with Title IX and the final regulations is not obviated or alleviated by any such State or local law or other requirement. *See* § 106.6(b). The commenters did not identify a conflict between these final regulations and the referenced State or local laws, but if one did exist, the recipient's obligations under Title IX remain. *Id.* Whether a conflict exists must be determined based on the facts and the specific requirements under State or local law.

*Changes:* None.

Scope of Conduct Subject to § 106.44(c)

*Comments:* Several commenters suggested replacing ''conduct that may constitute sex discrimination under Title IX'' in proposed § 106.44(c) with ''conduct the employee reasonably believes constitutes sex discrimination under Title IX.'' One commenter stated that proposed § 106.44(c) would not require an employee to have a reasonable basis for believing that a disclosure of possible sex discrimination was reliable, which, the commenter argued, would divert resources from meritorious complaints.

Some commenters expressed concern about the scope of reportable conduct. One commenter asserted that the broad array of conduct that must be reported would impose substantial obligations on recipients and urged the Department to clarify the scope of covered sex discrimination in proposed § 106.44(c). Another commenter argued that the scope of reportable conduct would be overly broad because proposed § 106.44(c) would require notification of conduct that ''may constitute'' sex discrimination.

*Discussion:* The Department is persuaded by commenters that the final regulations should require notification of conduct that ''reasonably'' may constitute sex discrimination under Title IX, as discussed above. Limiting the scope of conduct to that which a recipient must respond based on a reasonable assessment, addresses a commenter's concern that § 106.44(c) as proposed would have diverted resources from meritorious complaints.

The Department acknowledges the concern about the scope of reportable conduct. The Department maintains that employees should be able to assess conduct under a standard that requires them to act based on information about conduct that reasonably may constitute sex discrimination under the recipient's program or activity. As discussed in the July 2022 NPRM, it is not necessary for

the employee to have factual information that definitively indicates that sex discrimination occurred in order for the employee's notification requirements under § 106.44(c) to apply. 87 FR 41440. It would be enough for the employee to have information about conduct that could reasonably be understood to constitute sex discrimination under Title IX, including conduct that could constitute sex-based harassment. *Id.* For this reason, the Department has modified § 106.44(c) to refer to conduct that ''reasonably'' may constitute sex discrimination under Title IX.

The Department also notes that under § 106.8(d)(1), a recipient will be required to train all employees on the scope of conduct that constitutes sex discrimination under Title IX, including sex-based harassment. This training requirement will help recipients ensure that employees are able to recognize when information reported to them reasonably may constitute sex discrimination under Title IX. The Department maintains that speculative risk of an investigation of conduct that may not reasonably constitute sex discrimination outweighs the benefit of ensuring that the Title IX Coordinator learns of conduct that reasonably may constitute sex discrimination, including sex-based harassment, under a recipient's education program or activity. The Department does not think it is appropriate to require employees, in the first instance, to make a determination as to whether the conduct reported or the information learned meets every aspect of this regulation's definition of sex discrimination, including sex-based hostile environment harassment. Rather, under the final regulations, an employee must respond to conduct or information that could reasonably meet that definition.

The Department appreciates the opportunity to clarify that if an employee directly witnesses conduct under the recipient's program or activity that reasonably may constitute sex discrimination, including sex-based harassment, the employee will be considered to have ''information about conduct that reasonably may constitute sex discrimination'' under § 106.44(c) of the final regulations. In such circumstances, the employee is required to report the information to the Title IX Coordinator, or, as applicable, provide the Title IX Coordinator's contact information and information about how to make a complaint of sex discrimination to the person who was subjected to the conduct.

*Changes:* The final regulations require notification to the Title IX Coordinator

when the employee has information about conduct that ''reasonably'' may constitute sex discrimination under Title IX ''or this part,'' which encompasses definitions that explain what reasonably may constitute sex discrimination.

Disclosures

*Comments:* Some commenters raised concerns about recipients disclosing information obtained through the notification requirements in proposed § 106.44(c). One commenter expressed concern that the notification requirements in proposed § 106.44(c) could lead to disclosure of an LGBTQI+ student's identity or expose a student to potential legal consequences for terminating a pregnancy. Some commenters suggested that the Department require recipients to place their reporting protocols online so that employees and students can easily determine who has mandatory reporting duties. Other commenters stated that employees who are not confidential employees should be trained to disclose their reporting requirements in advance and also at the time of a possible disclosure of an alleged incident of sex discrimination.

*Discussion:* The Department acknowledges concerns about disclosures and notes that the final regulations include § 106.44(j), which prohibits the disclosure of personally identifiable information obtained in the course of complying with this part, except in limited circumstances, such as to a parent, guardian, or other authorized legal representative with the legal right to receive disclosures on behalf of the person whose personally identifiable information is at issue. For additional information on this topic, see the discussion of § 106.44(j). The Department also notes that under § 106.8(c)(1), a recipient must provide a notice of nondiscrimination to students; parents, guardians, or other authorized legal representatives of elementary school and secondary school students; employees; applicants for admission and employment; and all unions and professional organizations holding collective bargaining or professional agreements with the recipient. The notice of nondiscrimination must include information on how to report information about conduct that may constitute sex discrimination under Title IX and how to make a complaint of sex discrimination. Through this process, a recipient may include information about employees' notification requirements and confidential employees, but the Department declines to require

reporting protocols to be posted online, because it prefers to leave recipients with flexibility to meet these requirements.

In response to comments, however, the Department has modified § 106.44(d)(2) to require a confidential employee to explain to any person who informs the confidential employee of conduct that reasonably may constitute sex discrimination under Title IX or this part of the circumstances in which the employee is not required to notify the Title IX Coordinator. The recipient must ensure that all applicable notification requirements under § 106.44. *See* § 106.8(d).

The Department acknowledges the concern that a non-confidential employee who receives information about conduct that reasonably may constitute sex discrimination may, in the course of carrying out their notification obligations, identify a student as having been subject to sex discrimination based on sexual orientation or gender identity. To the extent disclosure of such information to the Title IX Coordinator is necessary for the recipient to address sex discrimination in its education program or activity, the Department maintains that such disclosure is justified and would be permitted by § 106.44(j)(3) to carry out the purposes of 34 CFR part 106. With regard to concerns about disclosures of personally identifiable information, § 106.44(j) generally prohibits the disclosure of personally identifiable information the recipient obtains in the course of complying with the Title IX regulations, which protects personal information of all students, including LGBTQI+ students and students who are pregnant or experiencing pregnancy-related conditions. As noted above and as explained in the discussion of § 106.44(j), that provision does not prohibit disclosures to a minor student's parent, guardian, or authorized legal representative who has the legal right to receive disclosures on behalf of the person whose personally identifiable information is at issue. For further explanation of the limited circumstances under which personally identifiable information obtained in the course of complying with this paragraph could be disclosed, see the discussion of § 106.44(j).

*Changes:* None.

Compliance Burdens

*Comments:* Some commenters questioned whether a Title IX Coordinator would be best positioned to provide emotional support to survivors. One commenter stated that the proposed

regulations increase the scope of the Title IX Coordinator's role without considering the Title IX Coordinator's preexisting responsibilities and that, even though they have permission to delegate some duties, Title IX Coordinators remain solely responsible for all administrative tasks.

Some commenters asserted that proposed § 106.44(c) would impose an undue and unworkable burden on recipients, increasing the cost of attendance in higher education. Commenters also referenced the cost of litigation over whether a recipient's mandatory reporting policy implementation was negligent. One commenter asserted that confusion related to proposed § 106.44(c)(2) would incentivize recipients to make everyone a mandatory reporter to minimize risk.

*Discussion:* The Department recognizes that the final Title IX regulations increase the scope of the Title IX Coordinator's duties. Under § 106.8(a), as discussed elsewhere in this preamble, a recipient may have more than one Title IX Coordinator, and a Title IX Coordinator may designate employees to carry out some of its obligations, but a recipient must designate one of its Title IX Coordinators to retain ultimate oversight over those responsibilities and ensure the recipient's consistent compliance with its responsibilities under Title IX. *See* § 106.8(a)(2). To the extent § 106.44(c) places a burden associated with providing notifications under this provision on recipients, such burdens are justified because the requirements will help recipients meet their obligation to address sex discrimination in their education program or activity.

The Department disagrees that § 106.44(c) would impose an undue and unworkable burden on recipients, which could increase the cost of attendance in higher education. The Department has considered the costs, including potential litigation costs, in the *Regulatory Impact Analysis* and determined the benefits of the notification requirements justify the costs. The Department also has no reason to believe that the costs associated with § 106.44(c) are so great that they are likely to increase the overall cost of attending higher education institutions.

*Changes:* None.

First Amendment

*Comments:* Some commenters asserted that the notification requirements in proposed § 106.44(c) would chill protected speech and run afoul of the First Amendment because protected speech will be reported. Some

commenters asked the Department to exempt certain disclosures from notification requirements because a student is unlikely to expect such disclosures to trigger notification to the Title IX Coordinator, such as those made at a public awareness event; in an application or other personal statement or interview; and in an anonymous school climate survey. Other commenters recommended exemptions for disclosures within a social media post, an academic assignment, or a research project.

Some commenters expressed concern that notification requirements would result in a conflict with an employee's religious beliefs. For example, one commenter stated that proposed § 106.44(c) would require an employee to notify the Title IX Coordinator of all possible conduct that might create a hostile environment, despite the employee's professional judgment or personal beliefs about the scope of Title IX. The commenter recommended that the Department modify proposed § 106.44(c) to allow an employee to not notify the Title IX Coordinator in certain circumstances.

*Discussion:* The Department disagrees that the notification requirements in § 106.44(c) will run afoul of the First Amendment and the Department has consistently maintained that Title IX is intended to protect students from invidious discrimination, not to regulate constitutionally protected speech. The notification requirement in § 106.44(c) generally requires employees to notify the Title IX Coordinator when the employee has information about conduct that reasonably may constitute sex discrimination under Title IX or this part. Consistent with the discussion of First Amendment case law in this preamble, academic discourse of students or teachers generally would not meet this standard. First Amendment considerations are addressed at length in the section on First Amendment Considerations in the definition of "sex-based harassment" in § 106.2. The Department is fully committed to freedom of speech and academic freedom, and the Department reaffirms the importance of the free exchange of ideas in educational settings and particularly in postsecondary institutions, consistent with the First Amendment. Thus, nothing in the Title IX regulations restricts any rights that would otherwise be protected from government action by the First Amendment. *See* 34 CFR 106.6(d).

The Department declines to exclude information from notification requirements in some of the circumstances suggested by

commenters, such as in applications, interviews, and personal statements. To the extent these materials may provide a recipient with information about conduct that reasonably may constitute sex discrimination within the recipient's education program or activity, notification is important to allow the recipient to address the discrimination. In contrast to applications, interviews, and personal stories, public awareness events serve many benefits including empowering and informing students and thus it is appropriate to include a limited exception to the required action that a postsecondary institution must take in response to notification of information about conduct that reasonably may constitute sex-based harassment shared at such events. Public awareness events are discussed further in the discussion of § 106.44(e), which provides a limited exception to the required action that a postsecondary institution must take in response to notification of information about conduct that reasonably may constitute sex-based harassment.

The Department notes and references the discussion of religious liberty in the discussion of Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2) (Section I.C). As stated above and reflected in § 106.6(d), the Title IX regulations do not require a recipient to restrict any rights protected from government action by the First Amendment, including the freedom of speech, the free exercise of religion, or the freedom of association. In addition, the Department notes that Title IV of the Civil Rights Act of 1964, which is enforced by the Department of Justice's Civil Rights Division, specifically authorizes the Attorney General to respond to certain complaints alleging religious discrimination against students in public schools and higher education institutions, and Title VII prohibits religious discrimination in employment. The Department declines to modify its Title IX regulations to exempt individual employees from the notification requirements of Title IX when there may be a conflict with an employee's religious beliefs because Title IX imposes obligations on recipients as opposed to employees. The Title IX statute allows the Department to implement the statute's qualified exemption for certain religious institutions, but the statute contains no comparable exemption for individuals. 20 U.S.C. 1681(a)(3). It is within the Department's regulatory authority to define the scope of Title IX regulations consistent with the statute, and an individual employee's personal beliefs about the scope of Title IX cannot alleviate the recipient's responsibilities to comply with the regulations.

*Changes:* None.

Due Process

*Comments:* Some commenters critiqued the proposed regulation's broad reporting requirement as inadequately protective of a respondent's due process rights. In the view of these commenters, the proposed regulations would lead to over-reporting, which would harm respondents because they would be subject to investigations and face discipline.

*Discussion:* The Department disagrees that § 106.44(c) is not protective of respondents' due process rights or that it will lead to over-reporting. As discussed above, employees have a duty to act only upon information that reasonably may constitute sex discrimination in the recipient's education program or activity—not allegations of sex discrimination that do not meet this standard. Notification under these circumstances does not impair a respondent's due process rights, but rather may lead to processes designed to protect those rights. Not all reports pursuant to § 106.44(c) will result in investigation, and not all investigations will result in grievance procedures against respondents. For those that do, the grievance procedures in § 106.45, and if applicable § 106.46, provide respondents with a fair process, as explained in the discussions of the various provisions of §§ 106.45 and 106.46 and in Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.C).

*Changes:* None.

Complainant Autonomy and Mandatory Reporting

*Comments:* Some commenters argued that mandatory reporting violates the autonomy of complainants and their ability to request confidentiality and decide when to initiate grievance procedures.

Some commenters expressed concern that the efficacy of mandatory reporting is not supported by empirical evidence and cited numerous studies. As an example, commenters stated that researchers have found that a policy that requires an employee to report all incidents of suspected sex discrimination against a student to a Title IX Coordinator, even when the student neither expects nor wants the employee to do so, forces the employee to betray the student's trust, violates student autonomy, and could subject the student to grievance procedures they explicitly preferred to avoid. One commenter stated that often recipients fail to act when they receive a report either because the complainant declines to participate in grievance procedures or the recipient determines that the conduct does not violate any policy. The commenter stated that these trends indicate that mandatory reporting is ineffective.

Some commenters suggested that employees should be required to provide information about confidential employees to complainants and some expressed concern that delineating responsibility between confidential employees and non-confidential employees may result in incidents going unaddressed.

*Discussion:* The Department has heard commenters' concerns that the proposed regulations would violate the autonomy of complainants. The Department clarifies that even after a Title IX Coordinator is notified of conduct that reasonably may constitute sex discrimination under § 106.44(f), complainants retain autonomy over whether to make a complaint. Only in very limited circumstances do the regulations contemplate that a Title IX Coordinator may initiate a complaint after a complainant has declined to do so. *See* § 106.44(f)(1)(v). Notably, § 106.44(f)(1)(v)(A)(*1*) includes a complainant's request not to proceed with a complaint investigation as a factor the Title IX Coordinator must consider when determining whether to initiate a complaint of sex discrimination. The Department has determined that complainant autonomy and the ability to seek out confidential resources is better supported through requirements for confidential employees under § 106.44(d) and requirements for Title IX Coordinators under § 106.44(f), rather than by limiting the category of employees who must notify the Title IX Coordinator of conduct that reasonably may constitute sex discrimination under Title IX or this part. It is critical for the Title IX Coordinator to receive notice of such conduct for the recipient to address sex discrimination in its education program or activity.

The Department understands, as noted by commenters, that complainants may not always disclose their experiences with the intent to initiate grievance procedures and may be seeking support and guidance. The Department appreciates the opportunity to clarify that, regardless of whether a complainant seeks to initiate the grievance procedures, § 106.44(f)(1)(ii) will require the Title IX Coordinator to offer and, if accepted, coordinate

supportive measures under § 106.44(g), as appropriate, for the complainant. In addition, § 106.44(f)(1)(iii)(A) requires the Title IX Coordinator to notify the complainant or, if the complainant is unknown, the individual who reported the conduct, of the grievance procedures under § 106.45, and if applicable § 106.46, as well as the informal resolution process under § 106.44(k), if available and appropriate.

The Department also notes that, under § 106.8(c)(1)(i)(E), a recipient must include information about how to report information about conduct that may constitute sex discrimination under Title IX and how to make a complaint of sex discrimination in its notice of nondiscrimination and under § 106.8(c)(1)(i)(D) a recipient must include how to locate its nondiscrimination policy and grievance procedures in its notice of nondiscrimination. A recipient may include information about employees' duties to notify the Title IX Coordinator when they have information, including through a report from a complainant, about conduct that reasonably may constitute sex discrimination under Title IX as part of the description of how to report information about conduct that may constitute sex discrimination in its notice of nondiscrimination or in its nondiscrimination policy.

The Department acknowledges the articles and research cited by commenters regarding the efficacy of mandatory reporting. As discussed in the July 2022 NPRM and the 2020 amendments, the extent to which a universal mandatory reporting system is beneficial or detrimental to complainants is difficult to determine and research to date is inconclusive. *See, e.g.,* 87 FR 41438. Moreover, some of the articles and research cited by the commenters do not directly support the commenters' assertions regarding mandatory reporting, while others provide a more nuanced view, with conflicting evidence on mandatory disclosure.[31] The Department has assessed the conflicting evidence provided by the commenters and has concluded that the reporting requirements in § 106.44(c) are appropriate. *See, e.g., Associated Fisheries of Me., Inc.* v. *Daley,* 127 F.3d 104, 110 (1st Cir. 1997) ("When an agency is faced with conflicting scientific views and chooses among

them, its decision cannot be termed arbitrary or capricious."). Also, while some commenters cite to articles discussing the concept of institutional betrayal in support of their position that mandatory reporting may violate a student's autonomy and betray their trust in the institution, a review of the articles cited by the commenters provides a more fulsome description of the myriad reasons that survivors of sexual assault may experience institutional betrayal, some of which may be alleviated, rather than exacerbated, by the notification requirements in the final regulations.[32] For example, an institutional environment that is conducive to sexual assault; an institution's failure to adequately address reports of sexual assault, including lack of follow-up; and an institution's harmful response to reports of discrimination, such as blaming or punishing survivors for the violence committed against them.[33] These institutional failings illustrate the need to consider recipients' duty to address sex discrimination in their education programs and activities alongside complainant autonomy, which, as discussed elsewhere in this preamble, the final regulations were constructed to carefully consider.

Respecting complainant autonomy while also ensuring an adequate response to sex discrimination can be achieved, in part, by requiring postsecondary institutions to provide clarity regarding "confidential employees," whom students may confide in without automatically triggering a report to the Title IX Coordinator. *See* 85 FR 30043. Notably, some of the literature referenced by commenters opposing mandatory reporting describes the importance of clarity in communicating information about confidential resources as well as mandatory reporters so that complainants can make informed decisions. Section 106.44(d)(1) requires a recipient to notify all participants in the recipient's education program or activity of how to contact its confidential employees, and a recipient must require a confidential employee to

explain to any person who informs the confidential employee of conduct that reasonably may constitute sex discrimination of the employee's confidential status, how to contact the Title IX Coordinator, and that the Title IX Coordinator may be able to offer and coordinate supportive measures, as well as initiate an informal resolution process or an investigation under the grievance procedures. *See* § 106.44(d)(2). Although some individuals who contact confidential employees may choose not to make a complaint, designating some employees as confidential employees supports the recipient's overall responsibility to address sex discrimination. The Department disagrees that reporting to confidential employees will result in incidents going unaddressed; rather, such reporting allows incidents to be addressed in a manner consistent with a complainant's desires by facilitating the complainant's ability to seek supportive measures or initiate a complaint when and if the complainant desires to do so.

As discussed in the July 2022 NPRM, the Department has determined that complainant autonomy would be better supported by including a definition of "confidential employee" and providing requirements for such employees, than by limiting the scope of non-confidential employees who must notify the Title IX Coordinator of conduct that may constitute sex discrimination. 87 FR 41439. Nevertheless, a complainant's desire to pursue a complaint or not should be relevant in a recipient's determination whether to initiate a Title IX complaint as provided under § 106.44(f)(1)(v)(A)(*1*) and explained in the discussion of § 106.44(f) below. The Department maintains that the final regulations carefully balance complainant autonomy and the need to address sex discrimination so all students, employees, and others can participate in a recipient's education program or activity without fear of sex discrimination.

*Changes:* None.

Training Regarding Notification Requirements

*Comments:* Some commenters expressed concern that employees who would have notification requirements under proposed § 106.44(c) would not be appropriately trained to respond to a disclosure of possible sex discrimination because the various notification requirements under proposed § 106.44(c) would make it too challenging and overly burdensome to train employees.

---

[31] *See, e.g.,* Merle H. Weiner, *A Principled and Legal Approach to Title IX Reporting,* 85 Tenn. L. Rev. 71, 103–05 (2017); National Academies of Science, Engineering, & Medicine, *Sexual Harassment of Women: Climate, Culture, and Consequences in Academic Sciences, Engineering, and Medicine,* 105–107 (2018).

[32] *See, e.g.,* Carly Parnitzke Smith & Jennifer J. Freyd, *Dangerous Safe Havens: Institutional Betrayal Exacerbates Sexual Trauma,* 26 J. Traumatic Stress 119 (2013); Nicole Bedera, Settling for Less: How Organizations Shape Survivors' Legal Ideologies Around College Sexual Assault (2021) (Ph.D. dissertation, University of Michigan).

[33] *See, e.g.,* Carly Parnitzke Smith & Jennifer J. Freyd, *Dangerous Safe Havens: Institutional Betrayal Exacerbates Sexual Trauma,* 26 J. Traumatic Stress 119 (2013); Nicole Bedera, Settling for Less: How Organizations Shape Survivors' Legal Ideologies Around College Sexual Assault (2021) (Ph.D. dissertation, University of Michigan).

*Discussion:* As described in more detail below, the Department is persuaded that the notification requirements proposed in the July 2022 NPRM should be simplified. The details of revised § 106.44(c) are discussed below. The Department maintains that the revised notification framework will make it easier for recipients to implement and train on the requirements and address sex discrimination in its education program or activity.

*Changes:* The changes to the notification requirements are described under the paragraphs of § 106.44(c), below.

General Comments Related to § 106.44(c)(1)

*Comments:* Some commenters supported mandatory reporting for younger children under Title IX, noting that these students are not informed about which employees have the authority to address sex discrimination, including sex-based harassment, and likely think it will be addressed by anyone who receives the disclosure. Commenters noted that elementary school and secondary school employees may also have obligations to report possible sexual abuse under mandatory State reporting laws, and some commenters stated that elementary school and secondary school employees can reasonably be trained to identify sex discrimination.

Some commenters objected to proposed § 106.44(c)(1), stating that it would create a new duty for employees in elementary school and secondary schools.

*Discussion:* Under these regulations, the notification requirement applies to conduct that reasonably may constitute sex discrimination, including sex-based harassment, for the same universe of employees at elementary schools and secondary schools that applied under the 2020 amendments—all employees— except that § 106.44(c)(1) exempts confidential employees from the requirement to notify the Title IX Coordinator.

The final regulations for an elementary school or secondary school recipient are similar to that which was proposed, with the addition of "reasonably" to describe the conduct that is subject to the notification requirement, and the addition of "or this part" to reference these regulations, which address definitions that explain what reasonably may constitute sex discrimination.

*Changes:* The Department has revised § 106.44(c)(1) to state that an elementary school or secondary school recipient

must require all of its employees who are not confidential employees to notify the Title IX Coordinator when they have information about conduct that "reasonably" may constitute sex discrimination under Title IX "or this part."

Employee Complainants—§ 106.44(c)(1)

*Comments:* Some commenters recommended that the Department consider modifications to proposed § 106.44(c)(1) to treat disclosures of possible sex discrimination involving an employee complainant differently from disclosures involving a student complainant, arguing that an adult employee can notify the Title IX Coordinator themselves.

*Discussion:* The Department considered commenters' suggestion that § 106.44(c)(1) treat disclosures from students and employees differently. The Department has determined, however, that employees—just like students— may not always realize that they have been subjected to discrimination; that the recipient has a duty to address such discrimination; and that a Title IX Coordinator is available to help the recipient do so. In addition, based on the comments to the July 2022 NPRM, the Department has determined that simplifying the notification requirements will better serve the purpose of addressing sex discrimination in recipients' education programs and activities. The Department has accordingly removed a distinction between students and employees in § 106.44(c)(2) and declines to add such a distinction in § 106.44(c)(1). As commenters noted, when complaints are not reported to and addressed by the Title IX Coordinator, allegations of sex discrimination can go unaddressed and the grievance procedure requirements in these regulations will not be effective.

*Changes:* As described below, the Department has removed the distinction between students and employees in § 106.44(c)(2).

Law Enforcement

*Comments:* One commenter stated that, in elementary schools and secondary schools, typically law enforcement is contacted to investigate without considering the wishes of the student complainant and that administrator-initiated investigations do not typically involve the Title IX Coordinator and tend to be disorganized and lack transparency.

*Discussion:* The Department does not have the authority to control situations in which law enforcement is required to be involved as those situations are

generally covered by State, local, or other Federal laws and involve requirements and processes that are separate from Title IX. As for Title IX, which the Department does have the authority to enforce, including through these final regulations, the Department has put in place the protections described above.

*Changes:* None.

Age-Appropriateness

*Comments:* One commenter expressed concern that proposed § 106.44(c)(1) would fail to account for the likely immaturity of minor students in an arbitrary and capricious manner. The commenter provided an example of a second-grade girl excluded by a group of boys from their kickball team. The commenter asserted that if the girl were to tell a teacher what happened, the teacher would be required to report the matter to the Title IX Coordinator.

*Discussion:* The Department disagrees that proposed § 106.44(c)(1) fails to account for the immaturity of minor students. The determination whether sex discrimination, including sex-based harassment, has occurred in a recipient's education program or activity is necessarily dependent on the context. The Department notes that the determination whether conduct constitutes hostile environment sex-based harassment requires the consideration of the parties' ages, which would account for the maturity level of minor students, among many other contextually specific factors. The Department clarifies that the regulations do not preclude a teacher from drawing on their required training under § 106.8(d)(1)(ii) and exercising their judgment and taking into account the parties' ages—and indeed the regulations require them to do so—in assessing whether the alleged conduct reasonably may constitute sex discrimination under Title IX or this part. The Department has also added "or this part" to reference these regulations, which address definitions that explain what conduct reasonably may constitute sex discrimination.

*Changes:* The final regulations require all employees of an elementary school or secondary school who are not confidential employees to notify the Title IX Coordinator when they have information about conduct that "reasonably" may constitute sex discrimination under Title IX "or this part."

General Comments Related to § 106.44(c)(2)

*Comments:* Some commenters stated that proposed § 106.44(c)(2) was too

complex, would confuse complainants and non-confidential employees about notification requirements, risk complainants not having the information they need, require extensive training, and be impossible to monitor. Commenters urged the Department to simplify proposed § 106.44(c)(2) to help both students and employees easily understand who has notification requirements and when. Some commenters urged the Department to modify proposed § 106.44(c)(2) to succinctly and clearly designate specific categories of employees who must notify the Title IX Coordinator of information related to sex discrimination and provide a recipient flexibility to impose notification requirements on additional employees. Commenters asserted that proposed § 106.44(c)(2) will confuse employees and students and be inefficient and difficult for a recipient to implement. Some commenters noted that an employee could fall under various categories in proposed § 106.44(c)(2) due to fluctuating job duties and responsibilities and questioned the feasibility of requiring a recipient to retrain each employee any time their duties shifted.

Some commenters disagreed with the assertion in the July 2022 NPRM that postsecondary students may be less capable of self-advocacy than employees as a justification for the Department's proposal of different notification requirements for when a student as opposed to an employee is being subjected to sex discrimination.

Some commenters said that many postsecondary institutions currently require any non-confidential employee to notify the Title IX Coordinator of any case of possible sex discrimination.

Commenters offered a number of alternatives to proposed § 106.44(c)(2). For example:

• Eliminate proposed § 106.44(c)(2) so that proposed § 106.44(c)(1) would apply to any recipient.

• Modify proposed § 106.44(c)(2)(i)–(ii) to apply only to any employee who a student could reasonably believe has the authority or ability to address a sexual harassment complaint.

• Require notification to the Title IX Coordinator if the potential target of discrimination is a minor, and provision of the contact information for the Title IX Coordinator if the potential target of discrimination is an adult.

• Modify proposed § 106.44(c) so that only an employee in an administrative or leadership position must notify the Title IX Coordinator of possible sex discrimination.

• Categorize employees as one of (1) confidential employees, (2) employees providing support, or (3) officials required to report as a model that the Department could adopt in final regulations.

• Align proposed § 106.44(c)(2)'s notification requirements with the Clery Act and require training based on the likelihood that an employee will receive disclosures related to sex discrimination.

• Restrict mandatory reporting obligations to a group of designated reporters that is determined in consultation with faculty governance processes, collective bargaining, and collaborative engagement with students and others invested in addressing campus inequities, and consistent with any other Federal or State reporting requirements.

• Expand the categories of employees who are required to comply with § 106.44(c) to include resident assistants, science lab monitors, tech lab monitors, athletic and workout facility workers, volunteers and contractors who provide significant aids and benefits, including athletic coaches, extracurricular coordinators, and other individuals whose duties and interactions with students foster close relationships with students.

• Expand reportable conduct under proposed § 106.44(c)(2)(ii) so that a covered employee would be required to notify the Title IX Coordinator of any conduct that may constitute sex discrimination regardless of whether the person subjected to the conduct is a student or employee.

*Discussion:* The Department is persuaded by commenters that § 106.44(c)(2) should be streamlined and simplified to avoid confusion and to clearly delineate notification responsibilities at recipients other than elementary schools and secondary schools. As stated in the July 2022 NPRM, in the elementary school and secondary school setting, school administrators, teachers, and other employees exercise a considerable degree of control and supervision over a recipient's students, in addition to being mandatory reporters of child abuse under State laws. 87 FR 41437. Therefore, requiring all non-confidential employees in these schools to notify the Title IX Coordinator about conduct that reasonably may constitute sex discrimination under Title IX or this part would implement Title IX's guarantee of protection against sex discrimination in a manner that best serves the needs and expectations of those students. *Id.* In the postsecondary school context, however, the

Department has adopted a more nuanced approach that gives greater weight to complainant autonomy and reflects the more complex administration of postsecondary institutions. 87 FR 41438–39.

Specifically, under paragraph (c)(2), all recipients other than elementary schools and secondary schools, including postsecondary institutions, must distinguish between two categories of employees who are not confidential employees: (1) those who either have authority to institute corrective measures on behalf of the recipient or responsibility for administrative leadership, teaching, or advising in the recipient's education program or activity ("Category 1"); and (2) all other employees who are not confidential employees and not covered under Category 1 ("Category 2"). Category 1 employees must notify the Title IX Coordinator when the employee has information about conduct that reasonably may constitute sex discrimination under Title IX or the regulations. This requirement is the same as that which applies to non-confidential employees at elementary schools and secondary schools, which is appropriate because of the authority and leadership roles Category 1 employees hold, as discussed further below. Category 2 employees must either notify the Title IX Coordinator when the employee has information about conduct that reasonably may constitute sex discrimination under Title IX or the regulations, or provide the contact information of the Title IX Coordinator and information about how to make a complaint of sex discrimination to any person who provides the employee with information about conduct that reasonably may constitute sex discrimination under Title IX or the regulations. The recipient will have discretion to determine which of these two actions Category 2 employees must take or whether to leave the discretion to those employees.

In response to commenters' concerns, the final regulations no longer differentiate obligations based on whether the employee is receiving information from a student or another employee. The Department has determined that it is simpler, easier to understand, and more effective for employees to know what they must do or say under any circumstance, rather than requiring them to alter their actions based on the employee or student status of the person sharing the information. This change also addresses commenters' objection to the distinction in the July 2022 NPRM between students and

employees and their ability to self-advocate. *See* 87 FR 41438.

A recipient has discretion to further simplify the notification requirement by requiring all employees to notify the Title IX Coordinator when the employee has information about conduct that reasonably may constitute sex discrimination under Title IX, or it can follow the framework with two categories of employees and undergo a straightforward set of inquiries to determine whether the employee is in Category 1 and must report the information to the Title IX Coordinator. If the employee has authority to institute corrective measures on behalf of the recipient or has responsibility for administrative leadership, teaching, or advising in the education program or activity, then the employee is in Category 1.

As discussed in the July 2022 NPRM, requiring employees with the authority to institute corrective measures to notify the Title IX Coordinator when they have information about conduct that reasonably may constitute sex discrimination under Title IX is generally consistent with the definition of ''actual knowledge'' in § 106.30(a) in the 2020 amendments. 87 FR 41438. However, it is not sufficient to limit notification requirements to these individuals because most students—and employees—are not in a position to know whether a particular employee has the authority to institute corrective measures. Likewise, students do not necessarily know which employees are in administrative or leadership roles or which employees have responsibilities under the Clery Act.

The other employees in Category 1 are responsible for providing aid, benefits, or services to students, and therefore it is likely that a student would view these employees as persons who would have the authority to redress sex discrimination or obligate the recipient to act. The same is true for employees with administrative roles who are not student-facing (*e.g.,* a director of an employee benefits program). 87 FR 41438. The Department's position, as stated in the July 2022 NPRM, which is consistent with the Department's position in the 2020 amendments, is that whether an employee has the authority to institute corrective measures on behalf of a recipient is a fact-specific determination that rests on the recipient's own policies. 87 FR 41439. The Department's view of which employees have responsibility for administrative leadership, teaching, and advising remains the same as the July 2022 NPRM. *Id.*

The Department acknowledges commenters' suggestions for other notification frameworks, but the Department has determined that the framework adopted in the final regulations best fulfills Title IX's nondiscrimination mandate. A recipient's employees who have information about conduct that reasonably may constitute sex discrimination under Title IX are not permitted to ignore such conduct. And it is not workable or appropriate for employees to make decisions about Title IX reporting based on a student's age; such a requirement could introduce unnecessary complexity. The Department no longer believes it is appropriate to leave the determination of who must report to the Title IX Coordinator to recipients—other than allowing a recipient to determine whether Category 2 employees must report to the Title IX Coordinator or may instead provide only the contact information of the Title IX Coordinator—because an effective compliance program requires that all employees know how to respond appropriately to information about conduct that reasonably may constitute sex discrimination.

The Department declines to enumerate all of the job titles of employees who are covered by sub-paragraph (c)(2). All non-confidential employees have some duty under this provision, and it is up to the recipient to reasonably determine based on the facts whether a particular employee is in Category 1 or 2. Regarding employees who may have fluctuating job duties and responsibilities such that they may move between Category 1 and Category 2 and need updated training, as discussed more fully in the section on training in § 106.8(d), the Department has revised § 106.8(d) to clarify that training must occur promptly when an employee changes positions that alters their duties under Title IX or the final regulations and annually thereafter.

The Department continues to exempt confidential employees from the notification requirements in § 106.44(c)(2) and clarifies that ''confidential employee'' is defined in § 106.2, and that the reference to ''advising'' in § 106.44(c)(2)(i) does not change the definition of confidential employee. An advisor who meets the definition of ''confidential employee'' would not have notification requirements.

*Changes:* The Department has modified § 106.44(c)(2) regarding recipients that are not elementary schools or secondary schools to state that such recipients must, at a minimum, require: Any employee who is not a confidential employee and who either has authority to institute corrective measures on behalf of the recipient or has responsibility for administrative leadership, teaching, or advising in the recipient's education program or activity to notify the Title IX Coordinator when the employee has information about conduct that reasonably may constitute sex discrimination under Title IX or this part. All other employees who are not confidential employees are required to either: notify the Title IX Coordinator when the employee has information about conduct that reasonably may constitute sex discrimination under Title IX or this part; or provide the contact information of the Title IX Coordinator and information about how to make a complaint of sex discrimination to any person who provides the employee with information about conduct that reasonably may constitute sex discrimination under Title IX or this part.

Safety Threats

*Comments:* One commenter suggested that the Department modify the proposed regulations to state that when any employee learns about conduct that poses a safety threat to the disclosing individual or others, the employee should immediately report the conduct to the Title IX Coordinator, regardless of whether the disclosing individual wants to report the conduct to the Title IX Coordinator.

*Discussion:* The Department acknowledges recipients' responsibility to respond to safety threats on campus and reminds commenters that employees' specific reporting obligations are governed by the recipient's policies and, for postsecondary institutions only, the Clery Act. For that reason, the Department declines in these regulations to establish additional requirements pertaining to reporting of safety threats. Nothing in these regulations precludes a recipient from requiring all non-confidential employees to also immediately report safety threats that relate to sex-based conduct to the Title IX Coordinator. For additional discussion of safety threats, see the section on the definition of ''confidential employee'' and the requirements imposed upon such employees. The Department also notes that there are other provisions of the final regulations that address safety threats. *See, e.g.,* §§ 106.44(e), (f), and (h), 106.46(c).

*Changes:* None.

Study Abroad Programs

*Comments:* Some commenters expressed concern that students in study abroad programs will not know the contact information of the Title IX Coordinator, which could deter a complainant from exercising their Title IX rights.

*Discussion:* As an initial matter, § 106.8(c)(1)(i) requires that the name or title, office address, email address, and telephone number of the recipient's Title IX Coordinator must be included in the recipient's notice of nondiscrimination. As stated in § 106.11, Title IX applies to every recipient and to all sex discrimination occurring under a recipient's education program or activity in the United States. A recipient has an obligation to address a sex-based hostile environment under its education program or activity, even when some conduct alleged to be contributing to the hostile environment occurred outside the recipient's education program or activity or outside the United States. Conduct occurring in a study abroad program is not governed by these regulations. However, if a student returns to the United States and conduct that occurred in a study abroad program contributes to a hostile environment in the United States, that conduct may be relevant and considered by the recipient so that it can address the sex discrimination occurring within its program in the United States. Nothing in these regulations precludes a recipient from adopting procedures that address conduct that occurs outside of the United States, but Title IX does not apply outside of the United States. For additional discussion of study abroad programs, see the section on Extraterritoriality under § 106.11.

*Changes:* None.

Employment Discrimination

*Comments:* One commenter opposed proposed § 106.44(c)(2)(iii) because they believed that any discrimination an employee experiences in the course of their employment should be governed by the employment contract. The commenter asserted that the Equal Employment Opportunity Commission and the recipient's human resources department have jurisdiction over sex discrimination within a recipient's workplace, and that neither Title IX nor the Department have jurisdiction over such matters.

*Discussion:* Title IX states that "no person in the United States" shall be subject to sex discrimination under any education program activity receiving Federal financial assistance. Since its enactment, Title IX has been understood

to cover employment discrimination. *See N. Haven Bd. of Educ.,* 456 U.S. at 520 ("Section 901(a)'s broad directive that 'no person' may be discriminated against on the basis of gender appears, on its face, to include employees as well as students."). The Title IX regulations have also covered discrimination on the basis of sex in employment since 1975. *See* 40 FR 24143–44 (subpart E). The Department notes that the EEOC may also have jurisdiction over some Title IX complaints filed with OCR. *See* OCR Case Processing Manual, at 26–27.

*Changes:* None.

Information About How To Make a Complaint

*Comments:* One commenter recommended that the Department delete "and information about how to report sex discrimination" from proposed § 106.44(c)(2)(iv)(B) because this information should come from the Title IX Coordinator. The commenter argued that the Title IX Coordinator is better equipped than an employee to discuss "incident specifics," provide information on supportive measures, explain a recipient's grievance procedures, and assess safety considerations or concerns.

*Discussion:* The Department declines to delete "and information about how to report sex discrimination" from § 106.44(c)(2)(ii)(B) because that is an important part of the alternative option for Category 2 employees, but has modified the text for clarity so that it now reads "how to make a complaint of" sex discrimination, consistent with the Department's intent. However, this requirement does not require more than stating that the Title IX Coordinator will provide information about the grievance procedures, supportive measures, and how to make a complaint of sex discrimination. Category 2 employees are not required by these regulations to explain a recipient's grievance procedures or supportive measures. Indeed, in order to promote consistency of information, the Title IX Coordinator is responsible for providing this information as part of their obligations under § 106.44(f)(1).

*Changes:* The Department has modified § 106.44(c)(2)(ii)(B) to state that one of the options for Category 2 employees is to provide the contact information of the Title IX Coordinator and information about how to make a complaint of sex discrimination to any person who provides the employee with information about conduct that reasonably may constitute sex discrimination under Title IX or this part.

Comments Related to § 106.44(c)(3)

*Comments:* Some commenters urged the Department to provide guidelines outlining proposed § 106.44(c)'s application to student employees, such as work-study participants.

*Discussion:* The Department recognizes that a person may be both a student and an employee of a postsecondary institution. In such cases a postsecondary institution would need to reasonably determine whether the requirements of § 106.44(c)(2) would apply. Proposed § 106.44(c)(3) set out two factors: whether the person's primary relationship with the postsecondary institution is to receive an education and whether the person learns of conduct that reasonably may constitute sex discrimination under Title IX while the person is performing employment-related work. However, after further considering the issue, the Department is removing these factors in the final regulations in recognition of the fact that a recipient may have different bases upon which it reasonably determines a student-employee's status. Because employment laws vary by State, recipient discretion is appropriate in this context and a recipient should give notice to its student-employees of the circumstances under which a person who is both a student and an employee is subject to the requirements of paragraph (c)(2). A recipient is free to consider the factors that were provided in the proposed regulations, but it is not required to do so and has the flexibility to consider those or other factors when determining whether a person who is both a student and an employee is subject to the requirements of § 106.44(c)(2).

*Changes:* The Department has revised proposed § 106.44(c)(3) to state that a postsecondary institution must reasonably determine and specify whether and under what circumstances a person who is both a student and an employee is subject to the requirements of paragraph (c)(2) of this section.

Comments Related to § 106.44(c)(4)

*Comments:* Some commenters supported proposed § 106.44(c)(4) because it would emphasize complainant agency and recognize that a recipient does not have notice if an employee complainant chooses not to disclose sex discrimination they experienced. Other commenters urged the Department to modify proposed § 106.44(c)(4) to state that a recipient does not have notice of or an obligation to respond to sex discrimination if the only employee with actual knowledge of the conduct is the respondent, which

would be consistent with the 2020 amendments at § 106.30(a) (definition of actual knowledge).

*Discussion:* The Department maintains that it would be inappropriate to require an employee to notify the Title IX Coordinator of information about conduct that reasonably may constitute sex discrimination under Title IX when the only employee with the information is the employee complainant. An employee's decision as to whether to notify the Title IX Coordinator that the employee was subjected to sex discrimination or make a complaint of sex discrimination, including sex-based harassment, should be left up to the employee complainant. 87 FR 41441. However, if the employee complainant tells another employee, then the employee who receives the information would have notification requirements under § 106.44(c)(1) and (2). The Department is persuaded, after reviewing the comments, that additional clarity is appropriate and has revised § 106.44(c)(4) to clarify that the notification requirements in § 106.44(c)(1) and (2) do not apply to an employee who has personally been subject to conduct that reasonably may constitute sex discrimination under Title IX or this part.

The Department declines to modify § 106.44(c)(4) to state that a recipient does not have notice of or an obligation to respond to sex discrimination if the only employee with actual knowledge of the conduct is the respondent for the reasons explained in the section on Notice of Sex Discrimination above.

*Changes:* The Department has revised proposed § 106.44(c)(4) such that the final regulations state that "the requirements of paragraphs (c)(1) and (2) of this section do not apply to an employee who has personally been subject to conduct that reasonably may constitute sex discrimination under Title IX or this part."

4. Sections 106.2 and 106.44(d) "Confidential Employee" Requirements and Definition

Sections 106.2 and 106.44(d) Definition of "Confidential Employee" and General Requirements

*Comments:* A number of commenters expressed general support for the definition of "confidential employee" at § 106.2 and for the requirements related to confidential employees at § 106.44(d). Commenters noted that confidential employees or confidential resources help complainants in various ways, including safety planning, explaining the complainants' rights and legal options, helping complainants regain a

sense of control over next steps, and providing referrals to on- and off-campus resources.[34]

Several commenters stressed the importance of services provided by community-based organizations like rape crisis centers. Some commenters asked the Department to explain any distinction between "confidential employee" as defined in proposed § 106.2 and the term "confidential resource" in proposed § 106.45(b)(5). Other commenters urged the Department to designate specific types of individuals as confidential employees, such as teachers, victim advocates, or employees of offices providing mental health services or resources for minority groups.

One commenter raised concerns that having different responsibilities for confidential and non-confidential employees would result in inadvertent failures to address incidents.

Some commenters asked the Department to make multiple confidential resources available to students, to require recipients to collaborate or contract with community-based organizations, or to inform students about such organizations. Some commenters asked for clarification regarding how the regulations related to confidential employees interact with VAWA 2013 and VAWA 2022, the Clery Act, Title VII, and other State and Federal laws. Other commenters asked the Department to modify the definition of "confidential employee" in proposed § 106.2 or to otherwise make clear that postsecondary institutions are not permitted to designate non-employees as mandatory reporters or campus security authorities.

Another commenter asked the Department to confirm that confidential employees are subject to proposed § 106.40(b)(2)'s requirements to, upon receiving a disclosure about a student's pregnancy, provide certain information to the individual making the disclosure.

*Discussion:* The Department acknowledges commenters' support for § 106.2, which defines "confidential employee" and § 106.44(d), which specifies the requirements for these employees. Section 106.44(d) makes clear that a confidential employee is not required to notify the Title IX

Coordinator when a person informs them of conduct that reasonably may constitute sex discrimination under Title IX or this part. Instead, § 106.44(d) requires a recipient to notify all participants in the recipient's education program or activity of how to contact its confidential employees, if any, subject to a limited exclusion discussed below. In addition, the final regulations mandate that a recipient require a confidential employee, in response to a person who informs them of conduct that reasonably may constitute sex discrimination under Title IX, to: explain the employee's status as confidential for purposes of Title IX and the Title IX regulations, including the circumstances in which the employee is not required to notify the Title IX Coordinator about conduct that reasonably may constitute sex discrimination (*e.g.,* when the person is providing confidential services and not in circumstances when the employee is performing another role, such as teaching or coaching, *see* 87 FR 41441–42); provide that person with contact information for the Title IX Coordinator; explain how to make a complaint of sex discrimination; and explain that the Title IX Coordinator may be able to offer and coordinate supportive measures as well as initiate an informal resolution process or an investigation under the grievance procedures.

As discussed in the July 2022 NPRM, OCR received information through listening sessions and the June 2021 Title IX Public Hearing that stressed the importance of access to confidential employees for persons who have been subjected to sex-based harassment, including sexual violence. *See* 87 FR 41441. The comments in support of the proposed confidential employee provisions underscore the importance of a confidential reporting mechanism to allow students to learn about how to obtain supportive measures without disclosing their identity to their alleged harasser or initiating a Title IX investigation. In addition, requiring confidential employees to share information about how to contact the recipient's Title IX Coordinator and make a complaint of sex discrimination assists the recipient in its ability to respond to sex discrimination in its education program or activity. Ensuring that some employees are able to receive confidential reports of sex discrimination is a longstanding priority for the Department and is consistent with the practices of many recipients both before and since the 2020 amendments. *See, e.g.,* 2001 Revised Sexual Harassment Guidance, at 17–18;

---

[34] Please note that certain commenters referred to "confidential resources" rather than "confidential employees," and some of these commenters explained they used the former term to encompass non-employees. This discussion uses the term "confidential resource" when describing comments that use this term. However, as explained below, the term "confidential employee" in the final regulations only covers employees of a recipient.

2014 Q&A on Sexual Violence, at 18–23; 85 FR 30039–40. The Department disagrees that the use of confidential employees will lead to an inadvertent failure to address incidents, and commenters did not offer persuasive evidence in support of that assertion. Rather, the Department agrees with those commenters who expressed that confidential employees allow individuals to feel more comfortable seeking the support they need and ultimately make the recipient aware of incidents that may otherwise have gone unreported.

The Department appreciates the opportunity to clarify that, for purposes of these Title IX regulations, a confidential employee refers to an employee of the recipient. The Department understands that non-employees, such as individuals who provide services in community-based organizations, may serve as valuable confidential resources, providing confidential support for students and employees. Confidential resources include those who provide privileged and confidential support, such as physicians and clergy, regardless of whether they are employed by a recipient. Confidential resources also include individuals who are employed by a recipient and meet the definition of "confidential employee" in § 106.2, including those designated by the recipient to provide confidential services to individuals who may have experienced or been accused of engaging in conduct that may constitute sex discrimination. The Department nonetheless declines to expand the confidential employee provisions to cover non-employees. Section 106.44(d)(2) requires a recipient to ensure that any confidential employees provide certain disclosures to individuals who inform them of conduct that reasonably may constitute sex discrimination under Title IX, and a recipient may not be able to require non-employees to comply with these requirements. Importantly, § 106.44(c) does not require a recipient to impose any reporting requirements on non-employees, and there is accordingly no need to designate certain non-employees as exempt from Title IX's reporting requirements.

Confidential employees remain subject to § 106.40(b)(2)'s requirement to provide information to a student, or a person who has a legal right to act on behalf of the student, when the student or person with a legal right informs the employee of the student's pregnancy or related conditions. This obligation does not apply when the confidential employee—as with other employees—

reasonably believes the Title IX Coordinator has already been notified.

The Department declines to require a recipient to make multiple confidential employees available to students or to collaborate or enter into memoranda of understanding with specific entities that may provide confidential services, such as community-based rape crisis centers, as requested by some commenters. While such organizations can provide important resources, recipients are in the best position to determine whether such collaborations would be helpful in their unique circumstances.

In response to an inquiry about how the regulations regarding confidential employees relate to other Federal and State laws, as explained in the July 2022 NPRM, the confidential employee reporting exceptions in § 106.44(d) are limited to Title IX and do not exempt a recipient's confidential employees from complying with their obligations under Federal, State, or local law to report sex discrimination, including sex-based harassment. *See* 87 FR 41442. While § 106.44(j) generally prohibits disclosures of personally identifiable information obtained in the course of complying with this part, such disclosures are permissible if required by Federal law or regulations. Additionally, if a State or local law obligates a confidential employee to report sex discrimination, that disclosure is permitted by § 106.44(j) as long as it does not otherwise conflict with Title IX or this part. A disclosure pursuant to a State law requiring confidential employees to report sexual assault of a child, for example, is not prohibited by § 106.44(j) or by any other provision of these regulations. In addition, § 106.6(f), to which the Department did not propose making any changes, makes clear that the requirements in the Title IX regulations do not alleviate a recipient's obligations to its employees under Title VII. *See id.* The Department declines to modify § 106.44(d) to address disclosure responsibilities under the Clery Act or to opine on whether a postsecondary institution can designate non-employees as campus security authorities under the Clery Act because these final regulations relate to requirements of Title IX, not the Clery Act. Consistent with the Department's position in the preamble to the 2020 amendments, these final regulations do not alter requirements under the Clery Act or its implementing regulations. *See* 85 FR 30384; 87 FR 41442. The requirements related to confidential employees under these regulations do not pose any inherent conflict with the Clery Act regulations defining a campus security authority to

include, among other things, an individual identified in an institution's statement of campus security policy as an individual or organization to which students and employees should report criminal offenses. 34 CFR 668.46(a).

The confidential employee requirements in these final regulations appropriately balance the need for recipients to learn about and promptly take action in response to sex discrimination, including discrimination that may pose a threat to safety, and the importance of ensuring that individuals can access confidential services without prompting a report to the Title IX Coordinator. Therefore, the Department declines to require confidential employees to immediately report conduct that poses a safety threat. The Department notes that in all circumstances, a confidential employee is required to explain to the individual disclosing the sex discrimination how to contact the Title IX Coordinator and how to make a complaint of sex discrimination and to explain that the Title IX Coordinator may be able to offer and coordinate supportive measures, as well as initiate an informal resolution process or an investigation under the grievance procedures. In addition, if a Federal, State, or local law requires a confidential employee to report conduct that poses a threat to the safety of the disclosing individual or others, the confidential employee generally may do so in accordance with § 106.44(j). As explained above, while § 106.44(j) generally prohibits disclosure of personally identifiable information obtained in the course of complying with this part, such disclosures are permissible if required by Federal law or regulations, or if the disclosures do not otherwise conflict with Title IX or this part and are either required by State law or permitted by FERPA. The Department notes that under § 106.44(d), the confidential employee would be required to explain the employee's status as confidential for purposes of the Title IX regulations— and, implicitly, the purposes for which the employee's status is not confidential, including due to reporting obligations under other Federal, State, or local laws—to any person who informs the confidential employee of conduct that reasonably may constitute sex discrimination. In addition, nothing in the final regulations prohibits a recipient from also requiring a confidential employee to explain the circumstances under which other Federal, State, or local laws require the employee to notify individuals other than the Title IX Coordinator of conduct

that reasonably may constitute sex discrimination.

The Department notes that § 106.45(b)(5) addresses a recipient's obligation to take reasonable steps to protect privacy, as long as such steps do not restrict a party's ability to, among other things, consult with "confidential resources." The Department clarifies that the reference to "confidential resources" in § 106.45(b)(5) is not synonymous with "confidential employee," as defined in § 106.2, although certain individuals may qualify as both. Unlike a confidential employee, a confidential resource does not need to be an employee of the recipient or fall under one of the three categories of confidential employees set out in § 106.2. A confidential resource who is not a confidential employee also does not need to comply with the notification requirements in § 106.44(d)(2).

The Department declines to designate specific types of individuals as confidential employees in the regulations, as requested by commenters, because such a categorical designation does not provide the necessary flexibility and discretion to account for variations among recipients with regard to specific individuals' assigned duties, which could lead to inaccurate designations under the facts specific to a particular employee. However, the Department notes that several of the examples raised by commenters are likely to be confidential employees. For example, a victim advocate could fall under either the first or second category of the definition of "confidential employee" in final § 106.2. We further discuss the three categories of confidential employees below.

*Changes:* Changes to the definition of "confidential employee" and to § 106.44(d) are discussed below.

Section 106.2   First Category of "Confidential Employee"—Employee Whose Communications Are Privileged Under Federal or State Law

*Comments:* One commenter urged the Department to modify the first category of the proposed definition of "confidential employee" in § 106.2 by revising the reference to communications that are "privileged" under Federal or State law to instead refer to communications that are "privileged or confidential" under Federal or State law. The commenter explained this revision would encompass employees who are covered by confidentiality provisions from State, territorial or Tribal constitutions, or statutes that do not rise to the level of

a formal legal privilege. Another commenter suggested aligning the definition with the Clery Act (regarding professional or pastoral counselors).[35]

Some commenters raised concerns that certain confidential employees may be required by law to disclose certain communications they receive. For example, one commenter noted that school psychologists are required by mandatory reporting laws to disclose certain types of sexual misconduct involving minors. Some commenters asked the Department to clarify in the regulatory text that confidential employees are not exempt from compliance with mandatory reporting obligations.

*Discussion:* The Department acknowledges the suggestions from commenters regarding revisions to the first category in the definition of "confidential employee" as proposed in § 106.2. The Department agrees that modifying this category to refer to an employee whose communications are "privileged or confidential" aligns with the Department's rationale for protecting communications with confidential employees as described in the July 2022 NPRM, 87 FR 41441–42, and appropriately encompasses employees whose communications are confidential under law even if they do not fall within a specific legal privilege.

The Department further agrees with commenters' suggestions to clarify the scope of the confidential employee's status as confidential under the first category by using an approach similar to that of the Clery Act. Accordingly, the Department has revised the first category in the definition of "confidential employee" to state that an employee's confidential status for purposes of the Title IX regulations is only with respect to information the employee receives while functioning within the scope of their duties to which privilege or confidentiality applies.

The Department acknowledges commenters' concerns that some individuals who are confidential employees for purposes of Title IX may nonetheless be required to disclose certain information by law, such as by mandated reporting laws that apply in the elementary school and secondary school context. To address potential confusion on this point, the Department has revised the language in the first category to clarify that the definition identifies employees who are

confidential employees "for purposes this part," and that the employee's confidential status is "only with respect to information received while the employee is functioning within the scope of their duties to which privilege or confidentiality applies." These revisions sufficiently clarify that communications are only confidential for purposes of these Title IX regulations to the extent the employee is functioning within the scope of their duties to which privilege or confidentiality applies, and, more generally, that communications with such employees may not be confidential for all purposes. Confidential status of an employee means that the employee need not report conduct that reasonably may constitute sex discrimination to a recipient's Title IX Coordinator, and a recipient is not considered to have knowledge of conduct that reasonably may constitute sex discrimination if the only employee who knows about such conduct is a confidential employee. Other laws, however, may require that information about conduct that reasonably may constitute sex discrimination be disclosed to persons other than a Title IX Coordinator, such as to law enforcement agencies in certain cases. The fact that an employee is "confidential" for purposes of "this part" does not foreclose a confidential employee from disclosing the information in question for other purposes if required to do so by, for example, State law, if such a disclosure is permitted by § 106.44(j). As discussed above, if State law requires a disclosure, such as mandated reporting laws regarding sexual assault of children, the disclosure is permissible under Title IX unless it would otherwise conflict with Title IX or this part. For more information about the circumstances in which disclosures of personally identifiable information obtained in the course of complying with this part are permissible, see the discussion in § 106.44(j).

The Department has also removed the reference to an employee's "role" in the first and second categories of the definition of confidential employee. The Department views the reference to the employee's "duties" as sufficient, rendering a reference to the employee's "role or duties" as unnecessary.

*Changes:* The Department has expanded the first category within the definition of "confidential employee" at § 106.2 to use the phrase "privileged or confidential" in place of the phrase "privileged." In addition, the Department has revised the first category to clarify when information provided to a confidential employee is

---

[35] The commenter cited U.S. Dep't of Educ., Office of Postsecondary Education, *The Handbook for Campus Safety and Security Reporting,* at 4–7 (2016).

confidential by replacing the phrase "associated with their role or duties for the institution" with a sentence stating that "[t]he employee's confidential status, for purposes of this part," applies only to information received while that employee "is functioning within the scope of their duties to which privilege or confidentiality applies." The Department also has removed the reference to the employee's "role" as unnecessary, given the reference to the employee's duties.

Section 106.2   Second Category of "Confidential Employee"—Employee Designated To Provide Services Related to Sex Discrimination

*Comments:* One commenter urged the Department to revise the second category of confidential employees to refer to an employee of a recipient whom the recipient has designated as a confidential resource "while" providing services to persons in connection with sex discrimination. The commenter asked the Department to remove the language that if the employee also has a role or duty not associated with providing these services, the employee's status as confidential is limited to information received about sex discrimination in connection with providing these services. The commenter suggested moving this language to § 106.44(d)(2) to place the burden on the recipient to make sure that designated confidential employees act in accordance with their designations.

One commenter asked the Department to clarify who falls within the second category and whether there is a limit on the number of employees that a recipient can designate as confidential.

Another commenter recommended adding language to the second category to note that, at the K–12 level, confidential employees in this category are likely to qualify as mandated reporters for suspected child abuse and neglect and have associated reporting obligations.

*Discussion:* The Department views the second category of the definition as sufficiently conveying that if an employee is designated as confidential for the purpose of providing services to persons in connection with sex discrimination and that employee also has duties unrelated to providing those services, the employee's confidential status only applies to information received in connection with the employee providing services to persons related to sex discrimination. The Department therefore has concluded that it is unnecessary to replace "for the purpose of providing services" with

"while providing services" when defining employees covered by the second category of confidential employees. The Department disagrees that the language qualifying the employee's status as a confidential employee is better suited for § 106.44(d)(2); rather, retaining this limitation as part of the definition of "confidential employee" at § 106.2 will avoid unnecessary confusion.

The employees who qualify as a "confidential employee" under the second category will vary by recipient and based on the employee's assigned duties. These confidential employees may include, but are not limited to, guidance counselors, organizational ombuds, or staff within an on-campus sexual assault response center. The Department also confirms that these final regulations do not impose any limit on the number of employees a recipient can designate as confidential.

The Department recognizes that some individuals who are confidential employees as defined in proposed § 106.2 may nonetheless be required to disclose certain information by law, such as mandatory reporting laws applying to the elementary school and secondary school context. In addition to the revisions to the first category to address this concern, described above, the Department has added "under this part" to the definition in the second category to emphasize that employees who are designated as confidential by the recipient are so designated for purposes of the Title IX regulations and may not be considered confidential for purposes of other laws.

As noted in the discussion of comments on the proposed definition of "confidential employee" generally, some commenters asked the Department to clarify the distinction between "confidential employee" as defined by § 106.2 and "confidential resources" as used in § 106.45(b)(5). The Department notes that the second category of the proposed definition of "confidential employee" referred to an employee designated by the recipient as a "confidential resource." The Department acknowledges that the use of the phrase "confidential resource" within the definition of "confidential employee" may have caused confusion, and that the two unrelated uses of the phrase "confidential resource" within the Title IX regulations may have caused further confusion. To enhance clarity and minimize the risk of confusion, the Department has made a non-substantive revision to use the phrase "designated as confidential" rather than "designated as a confidential resource" and thereby remove the

reference to a confidential resource. The Department has also made other non-substantive revisions to reduce superfluous language, adopt clearer language, and use consistent phrasing throughout the second category of the definition of confidential employee. *See* discussion of § 106.45(b)(5) for further explanation of a confidential resource.

*Changes:* In the second category of the definition of a "confidential employee," the Department has replaced the phrase "designated as a confidential resource" with the phrase "designated as confidential." The Department has also added "under this part" to clarify the applicability of the employee's confidential status. The Department has also made the following non-substantive revisions: replacing the phrase "in connection with" with the phrase "related to"; replacing the phrase "role or duty" with "duty"; replacing the word "these" with the word "those"; replacing the phrase "limited to" with "only with respect to"; and replacing "status as confidential" with "confidential status."

Section 106.2   Third Category of "Confidential Employee"—Employee of a Postsecondary Institution Conducting an Institutional Review Board-Approved Research Study

*Comments:* Some commenters asked the Department to confirm that the third category covers an employee of a postsecondary institution who is conducting a human-subjects research study designed to gather information about sex discrimination that is approved by the Institutional Review Board (IRB) of another postsecondary institution (*i.e.,* not the institution that employs the individual who is conducting the study).

Some commenters urged the Department to expand the third category to cover employees of research institutions that conduct IRB-approved research through a contract with a recipient, to cover any individual or entity (*i.e.,* not limited to employees of postsecondary institutions) that conducts IRB-approved research, or to cover an employee of a postsecondary institution who is conducting research studies that are exempt from the requirement for IRB approval, such as an employee who conducts sexual harassment climate surveys.

One commenter urged the Department to remove the third category of confidential employees because IRB employees require consent from study participants and share information with recipients.

*Discussion:* The Department appreciates the opportunity to clarify

that the third category of the definition of ''confidential employee'' includes researchers who are employed by one recipient and are conducting research studies that were approved by another recipient's IRB.

The Department acknowledges the suggestion to expand the third category of the definition of ''confidential employee'' to include employees of research institutions that are not affiliated with a recipient but that are collecting IRB-approved research as part of a partnership or contract with a recipient. However, the obligations under Title IX are limited to a recipient and would not cover research institutions that are not affiliated with a recipient. Thus, as noted in the section discussing the definition of ''confidential employee'' generally, the Department declines to expand the confidential employee provisions to cover non-employees generally, or to cover employees of research institutions that are not affiliated with a recipient. Section 106.44(c) does not require a recipient to impose any reporting requirements on non-employees (unless the Title IX Coordinator has delegated some of the Title IX Coordinator's obligations to a non-employee), and so there is no need to exempt non-employees who conduct IRB studies from Title IX's reporting requirements.

The Department recognizes that valuable information can be obtained through climate surveys and similar research and that some students may be reluctant to participate in such surveys or research if they fear the information they share could be disclosed. The Department also recognizes that designating the employees who conduct these surveys as confidential could significantly impede the recipient's ability to learn about and take appropriate actions to address concerns raised in the climate survey or similar study. In the July 2022 NPRM, the Department identified climate surveys as an example of a strategy a recipient could use to monitor for barriers to reporting sex discrimination. *See* 87 FR 41436. The Department notes that a recipient may take steps to protect the privacy of information shared on climate surveys, such as by making the surveys anonymous with an option for students completing the survey to disclose their names. For these reasons, the Department declines to expand the third category to include employees who conduct climate surveys.

The Department also declines to remove the third category in the definition of ''confidential employee'' as one commenter suggested. The fact that studies require participants to consent

or the fact that certain information from studies may be shared with the recipient does not obviate the need to exempt employees who are conducting IRB-approved human subjects research studies related to sex discrimination from the notification requirements of § 106.44(c). Neither an individual's consent to participate in a study nor the agreement of the employees conducting the study to share information with the recipient will necessarily encompass the sharing of information or conduct involving specific individuals with a Title IX Coordinator, so protections for such individuals are still necessary even in these circumstances.

Finally, the Department has made a minor revision to the third category of the definition of ''confidential employee'' to use consistent phrasing throughout the three-part definition of ''confidential employee.''

*Changes:* The Department has revised the third category of the definition of a ''confidential employee'' to replace the phrase ''limited to'' with ''only with respect to.''

*Section 106.44(d)(1) Recipient's Requirement To Identify Any Confidential Employees*

*Comments:* A number of commenters supported proposed § 106.44(d)(1)'s requirement that a recipient inform participants of the identity of any confidential employee. However, these commenters urged the Department to strengthen the provision by requiring a recipient to designate at least one confidential employee, rather than merely allowing a recipient to do so, because they believe some institutions will not do so unless required.

Relatedly, several commenters stated that lack of access to confidential resources can chill reporting and asserted that access to confidential resources is necessary for effectuating Title IX. In addition, some commenters asked the Department to require recipients to increase the hiring of confidential employees or expand confidential services.

Some commenters asked the Department to encourage or require recipients to designate a diverse group of employees to serve as confidential employees to try to address barriers to accessing confidential resources for diverse students, including students of color, students with a disability, LGBTQI+ students, and pregnant students. Some commenters urged the Department to require recipients to designate at least one confidential employee with specific training and skills, such as trauma-informed training.

Other commenters raised concerns about the applicability of confidential employee requirements to an elementary school or secondary school, including one commenter who suggested that elementary schools and secondary schools have discretion to decide whether they have sufficient resources to designate, train, and oversee confidential employees.

Some commenters asked the Department to specify in proposed § 106.44(d)(1) how a recipient must provide notice of the identity of any confidential employee. Some commenters urged the Department to require a recipient to publish the identities of the confidential employees who fall within the first and second categories of the definition through a general notice in a recipient's Title IX policy or catalog. Other commenters viewed providing a list of employees in the first category as unreasonably burdensome for a school district. Commenters also suggested alternatives for how to identify confidential employees that would avoid the need to update this information with every job change.

Other commenters urged the Department to modify proposed § 106.44(d)(1) to require a recipient to notify participants of the confidential employees who are in the best position to help those experiencing sex discrimination (*e.g.,* employees in a postsecondary institution's counseling center). These commenters argued that the requirement to provide notice of all confidential employees poses an unnecessary burden, is not tailored to meet the participants' needs, and could lead to confusion. The commenters added that it might not be appropriate to direct complainants to some employees who qualify as confidential resources under State law, such as an athletic trainer whose privilege might only apply when treating patients and not to disclosures by non-patients.

Some commenters suggested that the Department remove the requirement that postsecondary institutions notify all participants of the identities of all researchers conducting studies on sex discrimination who are considered confidential employees because giving such notice would be difficult due to the dynamic nature of research teams and studies, which change over time.

*Discussion:* The Department agrees with the commenters who noted the many important benefits of making confidential employees available to complainants, particularly confidential employees who can support diverse student populations. The Department also agrees with commenters that

making a diverse group of confidential employees available may help to address barriers to accessing confidential employees.

However, the Department declines to require recipients to designate confidential employees. The Department recognizes that some recipients—particularly smaller schools, elementary schools, and secondary schools—may not have an employee who meets § 106.2's definition of "confidential employee" under the first or third category of that definition and that requiring such recipients to designate one or more confidential employees under the second category of that definition could be unduly burdensome or infeasible for reasons specific to that recipient. These regulations require a recipient, including an elementary school or secondary school recipient, to treat any employees who fall within the first or third categories of the definition of "confidential employee" as confidential employees for purposes of Title IX.

At the same time, the Department emphasizes that nothing in these final regulations prevents a recipient from providing information about off-campus sources of support.

The Department acknowledges commenters' suggestion to require recipients to train confidential employees on certain topics. However, the Department declines to add additional training topics beyond the requirements of § 106.8(d), leaving flexibility and discretion to recipients to determine how to meet training requirements in a manner that best fits the recipient's unique educational community. The training topics required under § 106.8(d)(1) are sufficient for confidential employees to fulfill their obligations. The Department declines to require specific trauma-informed practices because the final regulations already include provisions that prevent reliance on stereotypes and otherwise incorporate some of the important underlying principles of trauma-informed care. In addition, it is important to provide flexibility to recipients to choose how to meet the training requirements under § 106.8(d)(1) in a way that best serves the needs, and reflects the values, of a recipient's community.

In response to concerns and confusion related to notifying participants of the identity of any confidential employee, the Department has revised proposed § 106.44(d)(1) to instead require a recipient to notify participants of how to contact its confidential employees, if the recipient has any. This change gives the recipient the flexibility and discretion to

decide what information to provide (e.g., whether to identify a confidential employee by name, title, office, or phone number), while still ensuring that the recipient provides sufficient information for participants to be able to contact the confidential employees.

In addition, the Department has revised proposed § 106.44(d)(1) to clarify that a recipient does not need to notify participants of any confidential employees who fall within the third category of the definition of "confidential employee"—that is, any employee whose confidential status is only with respect to their conducting an IRB-approved human-subjects research study designed to gather information about sex discrimination. The Department agrees with commenters that the confidential status of such employees may change over time due to the dynamic nature of academic research; thus, requiring a recipient to notify participants of this category of confidential employee could create confusion. The Department also notes that the limited scope of these researchers' confidential status makes it unlikely that students would be able to seek them out to make confidential disclosures, and that students who are participating in the IRB-approved research studies may receive information about the treatment of their disclosures as part of the informed consent process.

The Department acknowledges the suggestions from commenters to specify how a recipient should notify participants in its education program or activity about any confidential employees. The Department declines, however, to prescribe a method for notifying participants about confidential employees, as a particular method may be inapplicable, unsuitable, or unduly burdensome for a specific recipient, depending on the circumstances.

The Department declines the suggestion of some commenters to require a recipient to notify participants in its education program or activity of only those confidential employees who are in the best position to help those experiencing sex discrimination. Identifying all employees who fall within the first and second categories in the definition of "confidential employee" in § 106.2 will be less burdensome for recipients and less confusing to students than it would be for recipients to attempt to delineate between their confidential employees. The Department is also concerned that adopting this limitation would require subjective determinations about which confidential employees are best positioned to provide assistance and

that this limitation could also disincentivize employees who qualify as confidential but are not identified as such from fulfilling their responsibilities under Title IX. Additionally, the commenters' concern regarding the inapplicability of certain employees' confidential status is clarified by the revisions that the Department has made to the first category of the definition of "confidential employee" in § 106.2. Those revisions are discussed above. The Department also declines to require a recipient to identify confidential employees as complainant- or respondent-supporting, as certain confidential employees may support both complainants and respondents. The Department notes that nothing prohibits a recipient from providing additional information about confidential employees.

*Changes:* The Department has replaced the requirement in § 106.44(d)(1) for a recipient to notify all participants in the recipient's education program or activity of the identity of any confidential employee with the requirement to notify all participants about how to contact the recipient's confidential employees, if any, with the exclusion of any employee whose confidential status is only with respect to their conducting an IRB-approved human-subjects research study that is designed to gather information about sex discrimination.

*Section 106.44(d)(2) Requirements of Confidential Employees*

*Comments:* Some commenters asked the Department to require a recipient to provide additional information to participants regarding exceptions to an employee's confidential status, such as State mandatory reporting laws, and to proactively inform students and employees about the distinction between legal privilege and confidentiality. Other commenters suggested that students receive information in writing about what types of information would be kept confidential. Some commenters opposed proposed § 106.44(d)(2) based on their belief that it would be unenforceable because a recipient would have no way of knowing when a confidential employee received information about sex discrimination.

In contrast, other commenters urged the Department to require confidential employees who learn about possible sex discrimination to provide information to the individual about how to report the conduct and how the Title IX Coordinator can help. One commenter stated that some students recommended

requiring confidential employees to give students the option of whether to keep the disclosure confidential or to have the confidential employee report it to the Title IX Coordinator, viewing this as a middle ground approach that would allow for greater trust of confidential employees and encourage more reporting.

Other commenters asked the Department to require researchers with confidential employee status to provide the Title IX Coordinator's contact information and information about how to make a report to all research study subjects during the studies' informed consent process or in another way if informed consent is not required.

Some commenters provided suggestions related to confidential employees in elementary schools and secondary schools, such as requiring confidential employees to assist students with reporting or requiring confidential employees to disclose information connected to sex discrimination involving a minor child to that child's parent or guardian immediately, unless disclosure to the parent or guardian is prohibited by State or Federal law.

Some commenters urged the Department to amend proposed § 106.44(d) and (g) to require, or at minimum permit, a recipient to involve confidential employees and confidential resources when offering and coordinating supportive measures.

One commenter expressed concern about the lengthy list of information that an employee must provide in response to a disclosure of sex discrimination. The commenter recommended that employees simply be required to report the alleged conduct to the Title IX Coordinator, which the commenter viewed as involving less employee training, management, and oversight.

*Discussion:* The Department appreciates the opportunity to reiterate that nothing in § 106.2's definition of "confidential employee" or § 106.44(d) exempts a recipient's employees— including confidential employees—from complying with any obligations under Federal, State, or local law to report sex discrimination, including sex-based harassment. As discussed above and in the discussion of § 106.44(j), disclosures of personally identifiable information obtained in the course of complying with this part are generally prohibited, but there are exceptions for limited circumstances, including when required by Federal law and, if not otherwise in conflict with Title IX or this part, when required by State or local law or permitted by FERPA. The Department acknowledges commenters' concerns

that some individuals who are confidential employees may be required to disclose certain information by law, and that some students may be unaware of this fact. The Department declines to incorporate mandated reporting requirements into the regulatory text because they vary by State and by type of recipient; however, the Department has revised proposed § 106.44(d)(2) to require a confidential employee to explain their status as confidential for purposes this part. For a confidential employee to do so effectively, it would be appropriate for the employee to explain the purposes for which their status is not confidential, including when they may have reporting obligations under applicable Federal, State, or local mandatory reporting laws. The revised language in § 106.44(d)(2)(i) also specifically requires a confidential employee to explain to anyone who informs them of conduct that reasonably may constitute sex discrimination the circumstances in which the employee is not required to notify the Title IX Coordinator about such conduct. These clarifications will help students better understand whether the employee will be able to keep a disclosure confidential, will enable the disclosing individual to make an informed decision about whether and what to disclose to the confidential employee, and will facilitate a trusting relationship. The Department disagrees with the views expressed by one commenter that the requirements in § 106.44(d)(2) are too onerous and thus that all employees should be required to report conduct to the Title IX Coordinator.

The Department further understands commenters' desire that the Department require a recipient to proactively notify students and employees, including confidential employees, about the implications of differences between legal privilege and confidentiality, and require confidential employees to similarly advise students. The Department has revised § 106.44(d)(2) to require the confidential employee to explain the circumstances in which the confidential employee is not required to notify the Title IX Coordinator about conduct that reasonably may constitute sex discrimination. This change adequately addresses the commenters' concerns, without implementing regulations that are unduly prescriptive or potentially ill-suited to the circumstances of a particular confidential employee.

The Department disagrees with the assertion of some commenters that a recipient cannot enforce § 106.44(d)(2) and maintains that a recipient can

manage compliance with § 106.44(d)(2) through training and supervision of confidential employees. The Department notes that § 106.8(d)(1) requires all employees to be trained on the recipient's obligation to address sex discrimination in its education program or activity, the scope of conduct that constitutes sex discrimination under these regulations (including the definition of "sex-based harassment"), and all applicable notification and information requirements under §§ 106.40(b)(2) and 106.44, which includes the requirements of § 106.44(d)(2). As explained in the July 2022 NPRM, the training requirements for a recipient's employees cover both confidential and non-confidential employees. *See* 87 FR 41429. In addition, nothing in the final regulations precludes a recipient from requiring a confidential employee to verify the employee's compliance with the requirements of § 106.44(d)(2) in a manner that does not require disclosure to the recipient of details that are confidential. For example, a recipient could request that confidential employees self-attest that they provided the required information upon being informed of conduct that reasonably may constitute sex discrimination. The Department also acknowledges one commenter's concern that a confidential employee's failure to comply with § 106.44(d)(2) could result in OCR complaints or litigation for the recipient. However, the Department notes that the recipient could face the same consequences if it fails to address sex discrimination in its education program or activity, and that the requirements in § 106.44(d)(2) may help the recipient learn of sex discrimination it needs to address because, as noted in the July 2022 NPRM, making confidential employees available may also result in more individuals feeling comfortable to seek the support they need and ultimately find the confidence to make the recipient aware of incidents that may otherwise have gone unreported. *See* 87 FR 41441.

The Department disagrees with a commenter's concern that the list of information a confidential employee must provide is too lengthy. The Department both disagrees with the characterization of the required information as lengthy and separately maintains that the important benefits of providing this information justify any burden on confidential employees. The alternative option suggested by the commenter—requiring employees to report alleged conduct to the Title IX Coordinator—would eliminate

individuals' ability to make confidential reports of sex discrimination.

The Department declines to adopt a commenter's suggestion to give students the option of whether to have a confidential employee keep a disclosure confidential or have that employee report it to the Title IX Coordinator. The Department is concerned that this approach could create confusion among students and employees as to whether and when a confidential employee has received appropriate consent to report to the Title IX Coordinator. The Department notes that final § 106.44(d)(2), as revised, requires a confidential employee to provide sufficient guidance to enable the student to report to the Title IX Coordinator by providing the student with information about how to contact the Title IX Coordinator and how to make a complaint of sex discrimination.

The Department agrees with commenters who suggested that confidential employees who are informed about possible sex discrimination must explain to the disclosing individual how to report the conduct to the Title IX Coordinator and how the Title IX Coordinator can help. The Department has incorporated these suggestions in final § 106.44(d)(2)(ii), regarding how to contact the Title IX Coordinator and make a complaint of sex discrimination, and final § 106.44(d)(2)(iii), regarding the Title IX Coordinator's ability to offer and coordinate supportive measures, initiate an informal resolution process, or initiate an investigation under the grievance procedures. This information will assist complainants in considering their options, as well as counter any misconceptions that the only action a Title IX Coordinator can take in response to a report is to initiate an investigation. The requirements of § 106.44(d)(2) apply to all three categories of confidential employees, including researchers who qualify as confidential employees under the third category of the definition. The Department declines to specifically require researchers who fall within the third category of confidential employees to provide the information required by § 106.44(d)(2) as part of their informed consent process because doing so would, in the Department's opinion, inappropriately interfere with the researchers' independence and professional judgment in carrying out their studies, though the Department notes that nothing prohibits these employees from doing so.

The Department acknowledges the special considerations that some commenters have raised regarding how confidential employees assist minor children in the elementary school and secondary school context. The additional requirements in final § 106.44(d)(2) will assist confidential employees in responding to disclosures by all participants in a recipient's education program or activity, and the Department declines to articulate further requirements for confidential employees in the elementary school and secondary school context because of the importance of flexibility and discretion under the circumstances. As stated above, nothing in this provision exempts a confidential employee from complying with other Federal, State, or local laws that mandate reporting, and the Department notes that, consistent with § 106.6(g), nothing in this provision may be read in derogation of any legal right of a parent, guardian, or other authorized legal representative to act on behalf of a complainant, respondent, or other person.

In response to comments regarding the ability of confidential employees to offer, provide, or coordinate supportive measures, the Department has added § 106.44(d)(2)(iii) to specifically address supportive measures. Section 106.44(d)(2)(iii) requires confidential employees to explain that the Title IX Coordinator may be able to offer and coordinate supportive measures, and the Department notes that nothing in these final regulations prohibits a confidential employee from providing additional information about the supportive measures that may be available. The Department also recognizes that certain confidential employees, such as a recipient's mental health counselor, may be involved in implementing supportive measures. Under these final regulations, a recipient must require its Title IX Coordinator to offer and coordinate supportive measures under § 106.44(f)(1)(ii); however, § 106.8(a) of these final regulations permits a recipient to designate more than one employee to serve as a Title IX Coordinator and also provides a recipient with the flexibility and discretion to delegate specific duties of the Title IX Coordinator to one or more designees, or to permit a Title IX Coordinator to delegate such duties to one or more designees. Thus, as described in greater detail in the discussion of § 106.44(g), although the final regulations require a Title IX Coordinator to retain ultimate oversight for offering and coordinating supportive measures, nothing in the final regulations otherwise restricts how these duties of offering and coordinating supportive measures may be delegated to other personnel.

The Department has revised § 106.44(d)(2) to refer to conduct that reasonably may constitute sex discrimination, rather than conduct that may constitute sex discrimination, to align with parallel references throughout the final regulations. For additional discussion, see the section of this preamble on § 106.44(c). The Department has also made some non-substantive revisions, including organizational edits, to § 106.44(d)(2) to improve clarity and readability.

*Changes:* The Department has made several revisions to § 106.44(d)(2). First, the Department has replaced the requirement in proposed § 106.44(d)(2) that a confidential employee explain their confidential status with the more detailed requirement in § 106.44(d)(2)(i) that a confidential employee explain their status as confidential for purposes of this part, including the circumstances in which the employee is not required to notify the Title IX Coordinator about conduct that reasonably may constitute sex discrimination. Second, the Department has revised § 106.44(d)(2) to refer to conduct that reasonably may constitute sex discrimination, rather than conduct that may constitute sex discrimination. Third, the Department has replaced the requirement in proposed § 106.44(d)(2) that the confidential employee provide contact information for the recipient's Title IX Coordinator and explain how to report information about conduct that may constitute sex discrimination with the more detailed requirements at § 106.44(d)(2)(ii)–(iii) to explain how to contact the recipient's Title IX Coordinator, explain how to make a complaint of sex discrimination, and explain that the Title IX Coordinator may be able to offer and coordinate supportive measures, as well as initiate an informal resolution process or an investigation under the grievance procedures.

Interaction Between Confidential Employees and Requirements of the Title IX Grievance Procedures

*Comments:* Some commenters urged the Department to revise proposed § 106.45(b)(7) to exclude records provided to confidential employees from investigations or to prohibit use of this evidence unless the disclosing person provides voluntary, written consent for use in the recipient's investigation. One commenter stated that students would not expect confidential resources to provide records as part of an investigation, warning that this treatment of the

records could undermine trust in confidential resources.

Some commenters asked the Department to make clear that confidential employees are not required to act as advisors during the grievance procedures or that the recipient is not permitted to appoint a confidential employee as the advisor unless requested by a party or, as some commenters suggested, by the complainant specifically. One commenter noted that requiring a confidential employee to serve as a student's advisor could negatively impact the legal privileges that protect their confidential communications with the student.

*Discussion:* The Department agrees with commenters' concerns about the need to protect information that is shared with a confidential employee from being used in an investigation without consent from the person who is disclosing information to the confidential employee. Without such protection, a recipient could be obligated to gather records in an investigation from confidential employees or attempt to interview confidential employees during the investigation. The Department has thus revised proposed § 106.45(b)(7)(i) to exclude evidence provided to a confidential employee unless the person to whom the confidentiality is owed has voluntarily waived that confidentiality. This revision protects against the use of information obtained from confidential employees in investigations that would likely undermine trust in the confidential employee and discourage students from seeking this important source of support. The final regulations incorporate the revisions proposed by commenters, with streamlining edits and other modifications for clarity or consistency with language used elsewhere in the section.

Confidential employees are not required by these regulations to act as advisors during the grievance procedures. While a party may choose to have a confidential employee serve as their advisor of choice under final § 106.46(e)(2), a postsecondary institution may not appoint or otherwise require an individual who is currently a confidential employee or an individual who received information related to the particular case as a confidential employee to serve as the advisor to ask questions on behalf of a party when the party lacks their own advisor of choice. Accordingly, the Department has revised proposed § 106.46(f)(1)(ii)(B) to state that in the instances in which a postsecondary institution is required to appoint an

advisor to ask questions on behalf of a party during a live hearing, a postsecondary institution must not appoint a confidential employee. This approach respects the party's autonomy to choose an advisor and avoids conflicts of interest that may arise from requiring a confidential employee to act as an advisor for a live hearing.

*Changes:* The Department has revised proposed § 106.45(b)(7)(i) to add that a recipient must exclude evidence provided to a confidential employee unless the person to whom the confidentiality is owed has waived the confidentiality voluntarily. The Department has also added § 106.46(f)(1)(ii)(B), which clarifies that if a postsecondary institution chooses to use a live hearing, in those instances in which a postsecondary institution is required to appoint an advisor to ask questions on behalf of a party, a postsecondary institution must not appoint a confidential employee to be the advisor.

5. Section 106.44(e) Public Awareness Events

*Comments:* Some commenters opposed the proposed public awareness event exception in § 106.44(e). For example, one commenter proposed that a recipient should be required to respond to all known incidents of sex discrimination. Other commenters asserted that the exception would be inconsistent with what they viewed as the Department's position that a recipient must respond to possible sex discrimination, even over the objection of a complainant. Some commenters were concerned that the public awareness event exception would incentivize students to publicly defame others. Other commenters stated that the Department lacks the authority to require a postsecondary institution to use the information to inform its efforts to prevent sex-based harassment.

Some commenters expressed concern about how information disclosed at a public awareness event would impact an employee's notification requirements in proposed § 106.44(c) and asked the Department to permit postsecondary institutions to exempt such information from the notification requirements.

Some commenters urged the Department to make clear that the Title IX Coordinator is not required to attend public awareness events in order to comply with § 106.44(b).

Other commenters urged the Department to broaden the public awareness event exception. For example, some commenters asked the Department to also exempt from a recipient's obligations under § 106.44

information shared among members of sororities at confidential sorority events if there is no ongoing risk of harm.

One commenter suggested that the Department require postsecondary institutions to post information at public awareness events about how to report sex-based harassment and receive supportive measures and post a disclaimer about how information shared at a public awareness event will be used by the postsecondary institution.

Some commenters stated that the public awareness event exception should not apply to information about sex-based harassment that creates an immediate and serious threat to the community. One commenter asked the Department to require a postsecondary institution to act when information reveals an ongoing threat to the health or safety of any students, employees, or other persons instead of an imminent and serious threat.

One commenter requested that the Department define "public event" and specify whether a public event qualifies under this provision if the event is within the recipient's education program or activity but held off campus or in a community space rather than on campus or online. The commenter also asked the Department to define "sponsored" and "raise awareness."

Another commenter asked the Department to clarify how a recipient should respond to disclosures made in the context of an academic assignment and whether disclosures on social media may fall under the public awareness event exception.

*Discussion:* The Department acknowledges the views of some commenters that a postsecondary institution should be required to respond to all known incidents of sex discrimination even if they are disclosed at a public awareness event. By maintaining an exception, however, the final regulations will account for the many benefits provided by public awareness events including empowering and informing students, and will avoid discouraging student participation that may involve disclosure of personal experiences with sex-based harassment. *See* 87 FR 41442–43. As explained in the July 2022 NPRM, the Department's position is that given the many benefits of public awareness events, it is appropriate to include a limited exception to the required action that a postsecondary institution must take in response to notification of information about conduct that reasonably may constitute sex-based harassment. *See id.*

The exception only applies to a public awareness event held on a

postsecondary institution's campus or through an online platform sponsored by a postsecondary institution to raise awareness about sex-based harassment. In addition, even under this exception, a postsecondary institution must still respond to notifications of sex discrimination other than sex-based harassment and to notifications of information about conduct that reasonably may constitute sex-based harassment that indicates an imminent and serious threat to the health or safety of a complainant, any students, employees, or other persons. A postsecondary institution must also still respond to notifications of sex discrimination, including sex-based harassment, if required by legal obligations other than Title IX, such as Title VII. Moreover, the postsecondary institution must still use the information to inform its efforts to prevent sex-based harassment. Thus, the public awareness exception represents a balanced approach to a relatively narrow yet valuable set of on-campus and online sponsored events, and it will assist postsecondary institutions in complying with their obligation to effectuate Title IX's nondiscrimination mandate.

The Department disagrees it lacks the authority to require a postsecondary institution to use information about sex-based harassment disclosed at a public awareness event to inform its efforts to prevent sex-based harassment. In enacting Title IX, Congress conferred the power to promulgate regulations to the Department. 20 U.S.C. 1682. The Supreme Court has noted that "[t]he express statutory means of enforc[ing] [Title IX] is administrative," as [t]h[at] statute directs Federal agencies that distribute education funding to establish requirements that effectuate the nondiscrimination mandate, and permits the agencies to enforce those requirements through 'any . . . means authorized by law[.]' " *Gebser*, 524 U.S. at 280–81 (quoting 20 U.S.C. 1682). When a recipient learns of sex-based harassment occurring in its education program or activity at a public awareness event, it is well within the Department's authority to require a recipient to use this information in its efforts to prevent further sex-based harassment. Moreover, nothing in § 106.44(e) obligates a postsecondary institution to take specific actions based on information disclosed during a public awareness event. Instead, as explained in the July 2022 NPRM, a postsecondary institution has discretion to determine how to incorporate

information from such events into its prevention training. *See* 87 FR 41443.

The Department also disagrees that the public awareness event exception incentivizes students to publicly defame others or make public accusations of harassment. As discussed above, the Department's view is that public awareness events provide opportunities for students to share information about their experiences and raise awareness of sex-based harassment and thus are directly related to the goal of eliminating sex discrimination. The commenters did not provide any examples of defamation occurring at such events, and nothing in the public awareness event exception is designed to encourage students to defame others.

The Department declines to permit a postsecondary institution to develop its own employee notification requirements, including deciding whether an employee must report information disclosed at a public awareness event. In order to ensure consistency in recipients' obligations under Title IX in response to a notification of sex discrimination, including sex-based harassment, and provide clarity for postsecondary institutions, it is preferable to set out the employee notification requirements with respect to public awareness events, as opposed to permitting a postsecondary institution to develop its own requirements.

As explained above, although it is important to enable students to share information about sex-based harassment at a public awareness event without obligating a postsecondary institution to respond under § 106.44, the Department determined that it would not be appropriate to permit a postsecondary institution to ignore such information. Thus, the Department declines to exempt such information from the employee notification requirements in § 106.44(c), and such information must be reported to the Title IX Coordinator. The Title IX Coordinator would then determine whether the information indicates that there is an imminent and serious threat to the health or safety of a complainant, any students, employees, or other persons as well as coordinate the recipient's use of the information disclosed to inform its efforts to prevent sex-based harassment (*e.g.*, by increasing lighting on school grounds or offering transportation options after dark).

In response to commenters' concerns about privacy and autonomy, the Department has revised the public awareness event exception to remove the references to §§ 106.45 and 106.46 to avoid the impression that, when

information disclosed at a public awareness event indicates an imminent and serious threat to health or safety, the Title IX Coordinator must automatically make a complaint and initiate the postsecondary institution's grievance procedures under § 106.45 and, as appropriate, § 106.46 without first conducting a fact-specific analysis. Rather, in such circumstances, the Title IX Coordinator must comply with the obligations under § 106.44(f), including conducting a fact-specific analysis under § 106.44(f)(1)(v) to determine whether the Title IX Coordinator must initiate a complaint that complies with the postsecondary institution's grievance procedures under § 106.45, including § 106.46.

As explained in the July 2022 NPRM, nothing in § 106.44(e) would require a postsecondary institution's employees to attend a public awareness event. *See* 87 FR 41443. The Department clarifies here that the reference in the July 2022 NPRM to "employees" was intended to include the Title IX Coordinator. In response to commenters' concerns, the Department has revised the public awareness event exception to state that nothing in Title IX or part 106 of the Department's regulations obligates a postsecondary institution's Title IX Coordinator or any other employee to attend such public awareness events.

The Department acknowledges commenters' suggestions for broadening the public awareness event exception but declines to do so. As explained above, the Department intentionally limited the public awareness event exception to information about conduct that reasonably may constitute sex-based harassment. The Department notes that the language in § 106.44(e) was changed from "conduct that may constitute sex-based harassment" to "conduct that reasonably may constitute sex-based harassment" to align with changes made to § 106.44(c) as explained more fully in the discussion of § 106.44(c). The Department has determined that the benefits of public awareness events justify creating an exception for this type of information only and declines to cover information about potential sex discrimination beyond sex-based harassment.

The Department also declines to cover disclosures made in other settings. As explained in the July 2022 NPRM, the public awareness event exception is appropriately limited to public awareness events that meet certain criteria. *See* 87 FR 41443. The Department's position is that information regarding conduct that reasonably may constitute sex-based harassment must generally be provided

to the Title IX Coordinator in order to enable a postsecondary institution to operate its education program or activity free from sex discrimination with only limited exceptions. The Department notes that nothing in the final regulations prohibits a postsecondary institution from informing its community as to when information about conduct that reasonably may constitute sex-based harassment shared in other settings, including in sororities, must be reported to the postsecondary institution's Title IX Coordinator and from informing members of sororities of the availability of public awareness events and confidential reporting options.

The Department declines to dictate the type of information a postsecondary institution must provide at a public awareness event. Declining to mandate the sharing of specified information allows postsecondary institutions to design public awareness events in a way that will be most accessible to their educational communities and most effectively encourage participation. The Department notes that nothing in the final regulations prohibits a postsecondary institution from sharing the contact information of the recipient's Title IX Coordinator or information about how to report or make a complaint of sex discrimination, including sex discrimination, at a public awareness event. In addition, nothing in the final regulations prohibits a postsecondary institution from informing its community how information shared during a public awareness event will be used.

The Department further declines to revise the public awareness event exception to require a postsecondary institution to act when the information reveals an ongoing threat to the health or safety of the campus community. As explained in the July 2022 NPRM, it is appropriate to align the language regarding a threat to health or safety in the public awareness event exception with the language in § 106.44(h) regarding emergency removals. *See* 87 FR 41443. Accordingly, the Department has revised "immediate and serious threat to the health or safety" to "imminent and serious threat to the health or safety" in the public awareness event exception to align with a similar change the Department made to § 106.44(h). The Department's reasons for this change are addressed in the discussion of § 106.44(h) in this preamble. The Department also revised the language in § 106.44(e) regarding the threat to students or other persons in the postsecondary institution's community to instead reference "a complainant, any

students, employees, or other persons" to align with the language in § 106.44(h).

The Department does not agree that it is necessary to provide additional definitions for any of the terms used in the public awareness event exception. As explained in the July 2022 NPRM, the public awareness event exception covers events that are hosted by postsecondary institutions or organized independently by a postsecondary institution's students to raise awareness about sex-based harassment, such as Take Back the Night events or other events at which a postsecondary institution's students may disclose experiences with sex-based harassment. 87 FR 41443. To alleviate any confusion regarding what type of public awareness events are covered, the Department has removed language implying that the exception only applies to public awareness events to raise awareness about sex-based harassment "associated with a postsecondary institution's education program or activity." The removal of this language aligns with the Department's intent to cover public awareness events to raise awareness about sex-based harassment in general and not to limit the exception only to public awareness events focused on sex-based harassment associated with the postsecondary institution's education program or activity. The Department appreciates the opportunity to clarify that, as explained in the July 2022 NPRM, the public awareness event exception applies to public awareness events held on a postsecondary institution's campus or through an online platform sponsored by a postsecondary institution, *id.*—and the exception does not cover events held off campus or in a community space and does not cover disclosures made in the context of an academic assignment or via social media. The Department maintains that the public awareness event exception should not apply to off-campus events, such as events held in spaces in the community surrounding a postsecondary institution, because a recipient's employees are less likely to attend those events, and hence there is a smaller chance that, in the absence of the exception, the recipient's Title IX Coordinator would be required to respond to disclosures of conduct that may reasonably constitute sex discrimination. *See* 87 FR 41443.

The Department also maintains that the public awareness event exception should not apply to disclosures made through academic assignments or via social media. Academic assignments for a particular class and an individual's social media posts generally do not

serve the important function of facilitating a broad public discussion about sex-based harassment in the same way as public awareness events within the meaning of § 106.44(e). The Department thus maintains that the underlying rationale for the exception—reducing the likelihood of chilling student participation in the events—is less applicable to these circumstances.

*Changes:* In final § 106.44(e), the Department has changed "conduct that may constitute sex-based harassment under Title IX" to "conduct that reasonably may constitute sex-based harassment under Title IX or this part,"; and changed "unless the information reveals an immediate and serious threat to the health or safety of students or other persons in a postsecondary institution's community" to "unless the information indicates an imminent and serious threat to the health or safety of a complainant, any students, employees, or other persons." The Department also removed the phrase "associated with a postsecondary institution's education program or activity" and the references to §§ 106.45 and 106.46. The Department has added at the end of § 106.44(e) the statement that "nothing in Title IX or this part obligates a postsecondary institution to require its Title IX Coordinator or other any other employee to attend such public awareness events." The Department has also made revisions to the order of words for clarity, moving "to raise awareness about sex-based harassment" so that it immediately follows "public event" and states "a public event to raise awareness about sex-based harassment."

### 6. Section 106.44(f) Title IX Coordinator Requirements

In the discussion of § 106.44(a) above, the Department explained that the framework it adopted in § 106.44(a) of these final regulations for Title IX compliance requires a recipient to respond promptly and effectively when the recipient has knowledge of conduct that reasonably may constitute sex discrimination. To align with this framework and other provisions in these final regulations, the Department reorganized the Title IX Coordinator requirements into three parts. First, § 106.44(f) clarifies that the Title IX Coordinator is responsible for coordinating a recipient's compliance with its obligations under Title IX and this part. Second, paragraphs § 106.44(f)(1)(i)–(vii) describe the actions a recipient must require its Title IX Coordinator to take, upon being notified of conduct that reasonably may constitute sex discrimination, in order

to promptly and effectively end any sex discrimination in the recipient's education program or activity, prevent its recurrence, and remedy its effects. Third, § 106.44(f)(2) establishes that a Title IX Coordinator is not required to take any of the specific actions outlined in paragraphs (f)(1)(i)–(vii) if the Title IX Coordinator reasonably determines that the conduct as alleged could not constitute sex discrimination under Title IX or this part. The Department explains the requirements of each part of § 106.44(f) in the discussion sections below.

The Department engaged in a thorough review of the 2020 amendments as well as comments received through the Title IX Public Hearing and in its listening sessions, and carefully considered the comments received in response to the July 2022 NPRM. In light of that review, the Department has determined that the final regulations best effectuate Title IX's nondiscrimination mandate related to the role and responsibilities of a Title IX Coordinator to coordinate a recipient's compliance with Title IX. As a result of its comprehensive review, the Department determined that a Title IX Coordinator must take the required actions set out under § 106.44(f)(1)(i)–(vii) to promptly and effectively end any sex discrimination in a recipient's education program or activity, prevent its recurrence, and remedy its effects.

Comprehensive Title IX Coordinator Requirements and Scope of the Title IX Coordinator Role

*Comments:* Some commenters supported proposed § 106.44(f) as affording a comprehensive response to sex discrimination that would align with the purpose of Title IX and more fully effectuate its nondiscrimination mandate, including by addressing what commenters described as the inadequate response to sex discrimination under the 2020 amendments. Commenters stated proposed § 106.44(f) provided greater flexibility to recipients and clear guidance that would likely ensure a nondiscriminatory educational environment by requiring a recipient's Title IX Coordinator to intervene early in response to possible sex discrimination; provide equitable treatment and support to individuals impacted by sex discrimination, including supportive measures for complainants and respondents; offer resources to end sex discrimination and prevent its recurrence; and respond to patterns, trends, and risk factors to prevent future discrimination.

Other commenters were concerned that proposed § 106.44(f) would expand the Title IX Coordinator role beyond coordinating compliance, including to involve broad enforcement and oversight responsibility. Other commenters objected to the Department imposing specific requirements directly on a recipient's Title IX Coordinator rather than the recipient itself. One commenter expressed concern that the proposed regulations would impede a recipient's ability to address concerns about specific actions taken by the Title IX Coordinator. The commenter asserted that, because of the various obligations assigned to the Title IX Coordinator under the proposed regulations, the Title IX Coordinator would have a conflict of interest and would not be able to neutrally evaluate whether the actions the Title IX Coordinator took to respond to sex discrimination were effective.

Some commenters raised concerns about the burden and impact on Title IX Coordinators of expanding their responsibilities. Some commenters expressed concern that an expanded Title IX Coordinator role would diminish other individuals' sense of institutional responsibility for Title IX compliance and asserted that recipients might have other administrators or offices that could better satisfy some of the requirements of proposed § 106.44(f), such as offering and coordinating supportive measures.

Some commenters expressed concern about anticipated compliance costs and the administrability of proposed § 106.44(f). For example, commenters asserted that the Department failed to account for differences among recipients, underestimated the resources required to implement the proposed regulations, and overestimated recipients' ability to employ and retain Title IX Coordinators who would be equipped to comply with the proposed requirements. Some commenters asserted proposed § 106.44(f) would disempower complainants, resulting in fewer reports of sex discrimination. Other commenters stated recipients would face litigation risk when their Title IX Coordinators initiate a complaint against a complainant's wishes.

*Discussion:* The Department acknowledges commenters' support for § 106.44(f) and agrees that the requirements of § 106.44(f) of these final regulations will ensure that Title IX Coordinators play a central role and are responsible for coordinating recipients' comprehensive compliance with their obligations under Title IX. The Department agrees with commenters who described the structure of § 106.44(f) as necessary to require Title

IX Coordinators to respond to patterns, trends, and risk factors. Together, the Title IX Coordinator's oversight of a recipient's response to individual reports and the action required to address and prevent future sex discrimination for all participants in a recipient's education program or activity, will help recipients provide an educational environment free from sex discrimination as required by Title IX.

The Department agrees with commenters that § 106.44(f) sets out clearly defined requirements that will ensure a recipient addresses conduct that reasonably may constitute sex discrimination as its Title IX Coordinator becomes aware of it, through the Title IX Coordinator's coordination of early intervention efforts in response to possible sex discrimination; consistent, equitable treatment of complainants and respondents; and provision of supportive measures and resources to end sex discrimination and prevent its recurrence.

The Department also agrees with commenters that § 106.44(f) provides recipients greater flexibility and Title IX Coordinators clearer instructions than § 106.44(a) from the 2020 amendments regarding how to respond to information about conduct that reasonably may constitute sex discrimination. As explained in the discussion of § 106.44(a), under the 2020 amendments, a recipient with actual knowledge of sexual harassment in its education program or activity was, in the absence of a formal complaint, required only to "treat complainants and respondents equitably by offering supportive measures" and "explain to the complainant the process for filing a formal complaint." 34 CFR 106.44(a). However, the Department determined that the 2020 amendments may in some cases have led to sex discrimination in a recipient's educational environment not being fully addressed. To address this concern, § 106.44(f) gives recipients and their Title IX Coordinators the guidance and flexibility they need to meet their obligation under § 106.44(a) by specifying how Title IX Coordinators must respond to information about any conduct that reasonably may constitute sex discrimination, not only sexual harassment, in a recipient's education program or activity.

The Department acknowledges that some commenters expressed concern that the proposed Title IX Coordinator requirements could have improperly shifted responsibility for Title IX compliance from a recipient to its Title IX Coordinator. This was not the Department's intention. As explained in

the discussion of § 106.8(a), a recipient is responsible for compliance with obligations under Title IX, including the Title IX Coordinator requirements set out in § 106.44(f), and the Department will hold the recipient responsible for meeting all obligations under these final regulations. The Department is persuaded that changes should be made to final § 106.44(f) to clarify that a recipient is ultimately responsible for compliance with these final regulations. Therefore, the Department has revised final § 106.44(f) to include a statement that the Title IX Coordinator is responsible for coordinating the recipient's compliance with its obligations under Title IX and the Department's implementing regulations. This added text indicates that the Title IX Coordinator's role stems from "the recipient's" obligations, emphasizing that it is the recipient that remains responsible for ensuring compliance with its obligations under Title IX. At the same time, the reference to coordinating the recipient's obligations ensures that Title IX Coordinators retain their unique oversight role and their ability to serve as a trusted institutional resource, which commenters asked the Department to preserve.

The Department understands commenters' concerns that § 106.44(f), together with other requirements in § 106.44(b)–(k) and other provisions in these final regulations, increases the scope of the Title IX Coordinator's duties, which some commenters argued would confer enforcement or "extrajudicial authority" on the Title IX Coordinator and which others argued would overburden the Title IX Coordinator. Although the Department's Title IX regulations have long granted authority to the Title IX Coordinator to coordinate a recipient's Title IX compliance, as well as the power to initiate a complaint under limited circumstances, the Department disagrees that Title IX Coordinators may use this authority to deprive individuals of protected rights and freedoms. For a full explanation of the intersection of Title IX with rights and freedoms such as free speech rights, see the discussions of § 106.2 (Definition of "Sex-Based Harassment") and § 106.44(a). Since regulations under Title IX were first issued, *see* 40 FR 24128, 24139 (June 4, 1975), recipients have had to designate an employee to coordinate a recipient's compliance with Title IX, and the Department's enforcement experience since that time does not lead it to believe that increasing the scope of the Title IX Coordinator's oversight duties in certain respects will result in

inappropriately aggressive enforcement of Title IX's requirements. Rather, in its enforcement experience, the Department has observed that recipients often rely on their Title IX Coordinators to oversee the recipient's compliance with Title IX, but do not always afford their Title IX Coordinators sufficient and appropriate authority to effectively coordinate all aspects of that compliance.

The Department has considered the comprehensive and robust nature of the Title IX Coordinator role and agrees that it is an important role that attracts dedicated professionals, but does not agree that these final regulations will deter individuals from serving in the role of Title IX Coordinator or fulfilling their obligations. The Department recognizes that recipients face competing demands for limited resources. However, as the Department explained in the July 2022 NPRM, a recipient must nonetheless ensure that the Title IX Coordinator is effective in their role by giving the Title IX Coordinator the appropriate authority, support, and resources to coordinate the recipient's Title IX compliance efforts. 87 FR 41424–25. This was recognized in the preamble to the 2020 amendments as well, where the Department emphasized that a recipient must not designate a Title IX Coordinator "in name only" and instead must fully authorize them to coordinate the recipient's efforts to comply with Title IX. 85 FR 30464 (internal quotation marks omitted). Recipients retain flexibility to determine how to structure and support the Title IX Coordinator role but must do so in a way that ensures that a Title IX Coordinator can effectively coordinate the recipient's compliance with Title IX. A Title IX Coordinator's effectiveness also depends on the relationships and trust that they build within a recipient's community. The Department disagrees that the additional requirements § 106.44(f) places on Title IX Coordinators will impair a Title IX Coordinator's ability to build trust or will discourage reports of sex discrimination. Instead, the Department views these requirements as facilitating greater institutional effectiveness in responding to reports of sex discrimination. The Department agrees with commenters who indicated that ineffective responses to reports of sex discrimination contribute to a lack of trust and decrease reporting, and further agrees that effective implementation of Title IX's protections against sex discrimination will build trust in the Title IX Coordinator and will not deter individuals from making complaints. The Department addresses

commenters' concerns about preserving complainant autonomy in the discussion of Title IX Coordinator-initiated complaints below.

The Department recognizes that § 106.44(f) and other provisions of these final regulations may add to Title IX Coordinators' existing duties and responsibilities. However, the Department disagrees that § 106.44(f) restricts how recipients allocate responsibility for the various Title IX Coordinator requirements and agrees with commenters that recipients should decide how best to meet these requirements, including by distributing them among employees of a recipient's other offices or programs that are well equipped to fulfill certain requirements. As the Department explained in the discussion of § 106.8(a), these final regulations permit a recipient to designate more than one employee to serve as a Title IX Coordinator. Section 106.8(a) also provides recipients with the flexibility and discretion to delegate specific duties of the Title IX Coordinator to one or more designees or permit a Title IX Coordinator to delegate such duties to one or more designees. In the case of supportive measures, the Department's discussion of § 106.44(g) explains that under these final Title IX regulations, a Title IX Coordinator may delegate responsibilities under § 106.44(f)(1)(ii) related to offering and coordinating supportive measures to designees. Such delegation enables a recipient to assign duties to personnel who are best positioned to perform them; to avoid actual or perceived conflicts of interest; and to align with the recipient's administrative structure. *See* discussion of § 106.44(g). The Department understands commenters' concerns about the human capital needed to comply with § 106.44(f) and other provisions of these final regulations. However, the Department is not persuaded that a Title IX Coordinator would not have the capacity to oversee other individuals or offices that may assist in performing any delegated Title IX Coordinator requirements. Through its enforcement experience, OCR has worked with recipients of different sizes and structures, including public and private, K–12, and postsecondary institutions, and has observed a range of administrative oversight structures and other organizational approaches for ensuring Title IX compliance. The Department understands from this experience that the human capital and other resources recipients devote to structuring Title IX compliance efforts vary greatly and often involve

coordination among offices such as the dean of students, office of academic affairs, office of student conduct, human resources office, counseling and psychological services, and the individual or office designated to provide support to students with disabilities. Coordinating these administrative structures is no different than the coordination required of other high-level employees and officials who oversee other aspects of a recipient's operations, such as a dean or vice president of academic affairs. In some situations, it may be helpful to designate specific employees to coordinate on certain Title IX issues, such as gender equity in academic programs, athletics, pregnancy or related conditions, sex-based harassment, or complaints from employees.

The Department disagrees that two sources cited by some commenters support their argument that these final regulations impose obligations on Title IX Coordinators that they are not equipped to meet. In Jacquelyn D. Wiersma-Mosley & James DiLoreto, *The Role of Title IX Coordinators on College and University Campuses,* 8 Behavioral Sci. 4 (2018), the authors summarized the results of a study that compiled anonymous survey responses from almost 700 Title IX Coordinators at four- and two-year postsecondary institutions in 42 States. The article reported that the majority of the Title IX Coordinator survey respondents indicated that they "felt that they were well-trained to do their jobs." The article recommended full-time roles and greater staff support for Title IX Coordinators to perform their duties. The second article cited by the commenters, Sarah Brown, *Life Inside the Title IX Pressure Cooker,* Chronicle of Higher Education (Sept. 5, 2019), relied in part on survey data reported in the first article, in addition to interviews with Title IX Coordinators who reported feeling overburdened and under-resourced to fulfill their duties. Both articles were published before the 2020 amendments. Because these final regulations afford Title IX Coordinators and recipients a clearer understanding of Title IX Coordinators' responsibilities, and recipients' ultimate responsibility for Title IX compliance, recipients are better positioned to provide the resources needed to ensure their Title IX Coordinators can meet their obligations. Moreover, the Department's final regulations are consistent with the first article's recommendation that recipients employ full-time Title IX Coordinators and specifically allow Title IX Coordinators to delegate duties to other recipient

staff, which further supports Title IX Coordinators in fulfilling their responsibilities. Finally, the Department acknowledges that some commenters stated the requirements of § 106.44(f) are consistent with steps that some recipients are already obligated to take to satisfy State law, which further demonstrates that these final regulations do not impose requirements that exceed the capacity of a well-trained and fully supported Title IX Coordinator.

The Department does not agree with the commenter who asserted that a Title IX Coordinator cannot both oversee a recipient's compliance with its Title IX obligations and perform any of the underlying duties that are necessary to comply with these final regulations because the Title IX Coordinator would have a conflict of interest. While it is true that the Title IX Coordinator must oversee the recipient's compliance with requirements such as providing reasonable modifications for a pregnant student or providing supportive measures, *see* §§ 106.40(b)(3)(ii) and 106.44(f)(1)(ii), if a question were to arise regarding the efficacy of a recipient's reasonable modifications or supportive measures, the Title IX Coordinator would generally be in a position to address such concerns. The Department also acknowledges, however, that if a concern is raised questioning the efficacy of the Title IX Coordinator's efforts to coordinate the provision of reasonable modifications or supportive measures, the recipient would likely need to ensure that an alternative individual resolves the concern to avoid a conflict of interest or a biased determination. Section 106.8(a)(2) specifically allows a recipient to delegate specific duties to employees other than the Title IX Coordinator, and one of these delegees could be tasked with providing input on whether a particular action taken by the Title IX Coordinator was effective. Finally, § 106.8(d)(2)(iii) and (4) require a recipient to train its Title IX Coordinator on, among other things, bias and impartiality to ensure that the Title IX Coordinator can identify situations in which they may be biased or conflicted out of taking a particular action.

The Department also disagrees that § 106.44(f) will increase recipient costs because a Title IX Coordinator's ability to initiate a complaint against a complainant's wishes will expose recipients to greater litigation risk. As explained above, the Department's Title IX regulations have long permitted a Title IX Coordinator to initiate complaints. Rather than increasing a risk that they will do so against a

complainant's wishes, the final regulations provide clear instructions to make it more likely that Title IX Coordinators will honor complainant wishes as much as possible and initiate complaints on their own only in a very specific and limited set of circumstances. *See* § 106.44(f)(1)(v). The Department has considered the costs, including potential litigation costs, in the *Regulatory Impact Analysis* and concluded that the Title IX Coordinator requirements, including the provision regarding Title IX Coordinator-initiated complaints, are necessary to ensure a recipient addresses conduct that reasonably may constitute sex discrimination in its education program or activity and thereby fulfills its obligations under Title IX.

Finally, the Department disagrees with the commenter who asserted that the Title IX Coordinator requirements would diminish other employees' sense of institutional responsibility for Title IX compliance. As noted above, the Title IX Coordinator role is not new, and the Department views collaboration among employees to carry out Title IX obligations as critical to Title IX compliance. For example, in OCR's enforcement experience, recipients often encourage cooperation between a Title IX Coordinator and other employees to ensure consistent enforcement of recipient policies. The Title IX Coordinator may have to work closely with many different members of the school community whose job responsibilities relate to the recipient's Title IX obligations, including administrators, counselors, athletic directors, advocates, and legal counsel. These final regulations enable a recipient to ensure that all employees whose work relates to Title IX communicate with one another and have the necessary support. *See,* for example, § 106.8(c) and (d), which require a recipient to provide a notice of nondiscrimination and training for specific employees, and § 106.44(c), which clarifies that all employees have some notification responsibilities.

*Changes:* The Department has revised proposed § 106.44(f) to state that a recipient's Title IX Coordinator is responsible for coordinating a recipient's compliance with its obligations under Title IX and this part.

Prompt and Effective Action Necessary To Remedy the Effects of Sex Discrimination

*Comments:* Some commenters asked the Department to clarify the meaning of "prompt and effective" and "remedy the effects" in proposed § 106.44(a).

Some commenters opposed the proposed Title IX Coordinator requirements, which the commenters asserted would divert a Title IX Coordinator's attention and a recipient's resources, away from where they are most needed, *i.e.,* responding to complaints of discrimination.

*Discussion:* The Department appreciates the opportunity to further explain what it means by ''prompt[ ] and effective[ ]'' action and action to ''remedy [the] effects'' of sex discrimination in § 106.44(f)(1). As explained in the discussion of § 106.44(a) above, there are important differences between the judicial and administrative enforcement of Title IX. The Department's focus in the administrative enforcement context is on a recipient's responsibility under the Title IX statute and the Department's regulations to take prompt and effective action to prevent, eliminate, and remedy sex discrimination occurring in its education program or activity. 87 FR 41432. A recipient's duty to take prompt and effective action is a standard familiar to recipients from the Title IX regulations issued in 1975 as well as OCR's prior guidance and decades of the Department's enforcement of Title IX predating the 2020 amendments. *See* 40 FR 24128, 24139 (June 4, 1975); 1997 Sexual Harassment Guidance; 2001 Revised Sexual Harassment Guidance.

As the Department explained in the July 2022 NPRM and reaffirms here, there is not a specific timeframe for ''prompt'' action to end sex discrimination. 87 FR 41434. The Department's views regarding how to evaluate prompt action are consistent with the Department's views in the 2020 amendments. A reasonably prompt response to sex discrimination ''is judged in the context of the recipient's obligation to provide students and employees with education programs and activities free from sex discrimination.'' 87 FR 41434 (quoting 85 FR 30269 (discussing a recipient's grievance process)). The Department continues to believe that ''prompt'' action to end sex discrimination in a recipient's education program or activity is necessary to further Title IX's nondiscrimination mandate, including with respect to alleged sex discrimination that is addressed outside of a recipient's Title IX grievance procedures. *Id.* Therefore, an unreasonable delay by a recipient's Title IX Coordinator to take the required action under § 106.44(f)(1) to end sex discrimination in a recipient's education program or activity, prevent its recurrence, and remedy its effects, would not meet Title IX's obligation.

With respect to effective action, the Department considers effective action to mean that a Title IX Coordinator, upon learning of conduct that reasonably may constitute sex discrimination, takes reasonable steps calibrated to address possible sex discrimination based on all available information. And when a Title IX Coordinator's oversight and coordination of a recipient's response through the specific actions required under § 106.44(f)(1)(i)–(vii) are not effective at ending sex discrimination and preventing its recurrence, the prompt and effective response requirement means that the Title IX Coordinator must reevaluate the response and take additional steps to end sex discrimination in the recipient's education program or activity.[36] If a Title IX Coordinator fails to do so, the recipient fails to meet its obligations under § 106.44(a) and (f) and does not demonstrate compliance with the requirements of Title IX and this part. The Department describes the effective actions a Title IX Coordinator is required to take in the discussion of § 106.44(f)(1), below. Additional discussion of ''other appropriate prompt and effective steps'' that a Title IX Coordinator is required to take under § 106.44(f)(1)(vii) that are outside of a recipient's grievance procedures is provided below.

The Department also reaffirms and clarifies the duty of a Title IX Coordinator under § 106.44(f)(1) to remedy the effects of any sex discrimination that occurred in a recipient's education program or activity. When a recipient determines that sex discrimination occurred, it must provide and implement remedies to the complainant or other person the recipient identifies as having had equal access to the recipient's education program or activity limited or denied by sex discrimination. This requirement is consistent not only with the definition of ''remedies'' in final § 106.2, which are provided to restore or preserve equal access to a recipient's education program or activity, but with the Title IX statute itself. *See* 20 U.S.C. 1681(a) (''No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]''). Similarly, if a recipient determines that its own response to a complaint of sex discrimination (*e.g.,* a report to the Title IX Coordinator or a request for modification for a pregnant student) discriminated based on sex because of either the recipient's policies or the way it implemented those policies, the recipient would be required to provide remedies for its own discrimination based on sex and take any additional action necessary to prevent the recurrence of sex discrimination. 87 FR 41433–34.

The Department disagrees with commenters who asserted that proposed § 106.44(f) would improperly divert the focus of Title IX Coordinators from responding to sex discrimination complaints to seeking out possible sex discrimination. The obligations that § 106.44(f)(1) places on a recipient's Title IX Coordinator relate directly to the Title IX Coordinator's duty to coordinate the recipient's response to sex discrimination, including a recipient's obligation to respond to complaints of sex discrimination and its obligation to address information about conduct that reasonably may constitute sex discrimination. The Department disagrees that either obligation should be prioritized over the other. Thus § 106.44(f)(1)(i)–(iii) require a recipient to ensure that the Title IX Coordinator treats the complainant and respondent equitably, offers supportive measures, and provides information about a recipient's grievance procedures; these duties are consistent with what a Title IX Coordinator must do under § 106.44(a) of the 2020 amendments. These obligations ensure that a Title IX Coordinator responds to complaints and information about conduct that reasonably may constitute sex discrimination in an unbiased manner that supports individual complainants and respondents; they do not distract from the Title IX Coordinator's obligation to respond to such complaints and information—they qualify the nature of the response to ensure the response is effective.

Nor do the other requirements of § 106.44(f)(1) distract from a Title IX Coordinator's response to sex discrimination. To the contrary, § 106.44(f)(1) directly advances the Title IX Coordinator's responsibility to

---

[36] Even when a recipient's response to sex discrimination is assessed under the deliberate indifference standard in a private action for damages, some courts have recognized under certain circumstances that the recipient must take additional responsive action if its initial efforts to end sex discrimination are ineffective. *See, e.g., Cianciotto ex rel. D.S. v. N.Y.C. Dep't of Educ.,* 600 F. Supp. 3d 434, 458 (S.D.N.Y. 2022) (denying motion to dismiss when the complaint alleged school officials failed to intensify, reassess, or adjust their response to reports of ongoing and escalating sex-based harassment); *Doe* v. *Sch. Dist. No. 1, Denver,* 970 F.3d 1300, 1314 (10th Cir. 2020) (reversing dismissal of a complaint that adequately pled deliberate indifference by school officials who allegedly knew their actions to end continued sexual harassment ''had not sufficed'' yet failed ''to try something else'').

respond to sex discrimination by initiating the recipient's grievance procedures to determine whether such discrimination occurred. Similar to the 2020 amendments, § 106.44(f)(1)(v) allows a Title IX Coordinator discretion to determine whether to make a complaint. *See* 34 CFR 106.30(a) (defining a formal complaint as a written document filed by a complainant or signed by a Title IX Coordinator). In addition, paragraphs (f)(v) and (vi) include guardrails to protect complainant autonomy and safety, which will help ensure that individuals are not dissuaded from reporting sex discrimination, thus ensuring the recipient is informed of sex discrimination to which it must respond. Finally, paragraph (f)(vii) specifically requires that a Title IX Coordinator take steps to ensure that sex discrimination does not continue or recur in the recipient's education program or activity, and hence it, too, directly advances the goal of responding to sex discrimination.

*Changes:* As described below in the discussions of Title IX Coordinator-initiated complaints, prompt and effective steps to ensure sex discrimination does not continue or recur, and comments on proposed § 106.44(f)(1)–(4), the Department has revised § 106.44(f) to require a recipient to require its Title IX Coordinator to take specific actions set out under paragraph (f)(1) to promptly and effectively end any sex discrimination in its education program or activity, prevent its recurrence, and remedy its effects when notified of conduct that reasonably may constitute sex discrimination under Title IX or this part, unless the Title IX Coordinator reasonably determines under paragraph (f)(2) that the conduct as alleged could not constitute sex discrimination under Title IX or this part.

Conduct That Reasonably May Constitute Sex Discrimination

*Comments:* Some commenters asked the Department to clarify what information would provide notice of "conduct that may constitute sex discrimination" that would require a Title IX Coordinator to take the steps under proposed § 106.44(f)(1)–(6). Some commenters raised concerns that requiring recipients to respond fully to every allegation, including those that do not adequately allege sex discrimination, would waste resources, be unduly burdensome on recipients, and divert support from where it is needed. Other commenters asked whether the requirements would only apply after assessing that the conduct

alleged constitutes sex discrimination or only if the Title IX Coordinator reasonably believes the conduct alleged constitutes sex discrimination under Title IX. Some commenters stated that the Department lacked statutory authority to require recipients to address conduct that "may constitute sex discrimination" and that is not sex discrimination.

Some commenters opposed the increased duties that proposed § 106.44(f) would impose on Title IX Coordinators in light of other changes in the Department's proposed regulations, including the proposed definition of "sex-based harassment" in § 106.2 and the notification requirements in proposed § 106.44(c). Some commenters stated that, taken together, the proposed provisions would require employees to report conduct to a recipient's Title IX Coordinator even if it could not reasonably be considered sex discrimination and would require a Title IX Coordinator to act in response to such conduct, often against a complainant's wishes.

*Discussion:* The Department is persuaded that a change should be made to § 106.44(f) to clarify that the Title IX Coordinator requirements will apply when the Title IX Coordinator is notified of conduct that "reasonably" may constitute sex discrimination under Title IX or this part. The Department agrees with commenters who stated the Title IX Coordinator requirements should not apply to conduct that on its face would not or could not constitute sex discrimination and notes that it would not have authority under Title IX to require such action. The Department does not intend to require a Title IX Coordinator to address conduct that as alleged could not constitute sex discrimination under Title IX or this part. The Department notes that a recipient would, however, have obligations under § 106.44(a) for conduct that reasonably may constitute sex discrimination. The Department declines to make the changes other commenters requested, including changing the Title IX Coordinator requirements to apply only after a Title IX Coordinator assesses the conduct as alleged and determines that it constitutes sex discrimination. A Title IX Coordinator does not determine that conduct as alleged constituted sex discrimination prior to taking the steps required under final § 106.44(f)(1); that determination can only be made by a recipient following grievance procedures undertaken consistent with the requirements of § 106.45, and if applicable § 106.46.

The revised requirements will obligate a Title IX Coordinator to act only when notified of conduct that reasonably may constitute sex discrimination. Paragraphs (f)(1) sets out the specific actions a Title IX Coordinator must take. The Department agrees with commenters that neither a Title IX Coordinator nor a recipient should be required to respond to every assertion of sex discrimination without assessing whether the conduct as alleged reasonably may constitute sex discrimination. A Title IX Coordinator should be permitted to use their judgment and expertise, consistent with these regulations, to determine whether some notifications could not reasonably constitute sex discrimination as alleged. To that end, the Department clarifies in § 106.44(f)(2) of the final regulations that none of the Title IX Coordinator requirements in § 106.44(f)(1) apply when the Title IX Coordinator reasonably determines that the conduct as alleged could not constitute sex discrimination under Title IX or this part.

The Department understands that a Title IX Coordinator will have unique expertise and specialized training that may in some cases distinguish their assessment of alleged sex discrimination from the assessment of the same conduct by a recipient's other employees, including employees a recipient trained under § 106.8(d)(1) on the scope of sex discrimination. The Title IX Coordinator will also have a broader perspective on conduct that reasonably may constitute sex discrimination because of their coordination of a recipient's Title IX compliance, including offering and coordinating supportive measures, and initiating grievance procedures and the recipient's informal resolution process, if any. In coordinating these actions for all reports of alleged sex discrimination, a Title IX Coordinator may be aware of prior conduct, incidents, or concerns that may shed light on the allegations. The Department understands that a Title IX Coordinator's assessment of whether conduct as alleged reasonably may constitute sex discrimination would draw on this institutional expertise and perspective. So, while a recipient must train and require its non-confidential employees to report information about conduct that they believe reasonably may constitute sex discrimination to the Title IX Coordinator under § 106.44(c), a Title IX Coordinator's assessment of the same report might reasonably conclude that the conduct as alleged could not constitute sex discrimination.

These changes address commenters' concerns that the proposed regulations

would have required Title IX Coordinators to satisfy proposed § 106.44(f) even after being notified of conduct that on its face would not constitute sex discrimination. These changes also address commenters' concerns that requiring a Title IX Coordinator to satisfy the obligations set out in proposed § 106.44(f) for every allegation of sex discrimination without considering whether the conduct as alleged reasonably may constitute sex discrimination could negatively impact a Title IX Coordinator's ability to coordinate a recipient's Title IX compliance. The Department appreciates the opportunity to clarify that nothing in these regulations addresses conduct that does not reasonably constitute sex discrimination or precludes a recipient from addressing this conduct through other means.

*Changes:* The Department has revised § 106.44(f) such that a Title IX Coordinator, when notified of conduct that reasonably may constitute sex discrimination under Title IX or this part, will be required to take the actions set out under paragraph (f)(1), unless the Title IX Coordinator determines, pursuant to paragraph (f)(2), that the conduct as alleged could not constitute sex discrimination under Title IX or this part.

Title IX Coordinator-Initiated Complaints

*Comments:* Commenters expressed varied views on the proposed requirements for Title IX Coordinator-initiated complaints under proposed § 106.44(f)(5). Some commenters supported the proposed provision and viewed it as likely to yield better outcomes for all parties and as helpful for assisting a Title IX Coordinator in determining whether to initiate a complaint. One commenter suggested the Department clarify in the Title IX Coordinator requirements that a recipient owes a duty under Title IX to its educational community, not only a complainant.

Some commenters expressed concern that the proposed provision would incentivize Title IX Coordinators to pursue complaints regarding all reports of possible sex discrimination to avoid liability. Others expressed concern that proposed § 106.44(f)(5) would set too low a bar for Title IX Coordinator complaint initiation.

In addition, some commenters raised concerns that proposed § 106.44(f)(5) would deny complainants autonomy to choose whether to pursue a complaint. One commenter asserted that the notification requirements under proposed § 106.44(c) and the complaint

initiation provisions of proposed § 106.44(f)(5) together would erode trust in Title IX Coordinators and decrease reports of possible sex discrimination. Other commenters preferred § 106.44(a) of the 2020 amendments, which requires a Title IX Coordinator, upon learning of possible sex discrimination, to provide a complainant information about supportive measures and the recipient's grievance procedures and requires "actual knowledge" for a Title IX Coordinator to initiate a complaint.

Commenters offered a range of views on the discussion in the July 2022 NPRM of the factors that a Title IX Coordinator should consider in determining whether to initiate a complaint under proposed § 106.44(f)(5). Some commenters supported the Department's view that the factors would appropriately require a Title IX Coordinator to balance complainant autonomy and a recipient's obligation to address sex discrimination in its education program or activity.

Other commenters characterized the factors discussed in the preamble as ambiguous and asked the Department to include clear language in the final regulations or issue subsequent guidance on when a Title IX Coordinator may initiate a sex discrimination complaint. Different commenters asked the Department to grant recipients greater flexibility to determine which factors warrant initiating a complaint. One commenter stated that the factors discussed in the preamble would require an investigation by the Title IX Coordinator to determine whether to initiate a complaint.

Some commenters asserted that complaints initiated against a complainant's wishes may be dismissed and are unlikely to result in a determination of responsibility due to a lack of evidence.

Some commenters proposed modifications to balance complainant autonomy against a recipient's duty to address and prevent sex discrimination in its education program or activity. One commenter recommended a modification to proposed § 106.44(c) that any nonconfidential employee of the recipient who is not an employee with "authority to institute corrective measures" be required to provide the complainant with information on how to report sex discrimination so that the decision whether to report sex discrimination to a recipient's Title IX Coordinator rests with the complainant.

Some commenters questioned how proposed § 106.44(f)(5) would affect the rights of respondents. For example, some commenters stated the proposed provision would deny respondent's

constitutional rights, including a right to confront their accuser, freedom of speech and religion, and due process protections.

Other commenters raised concerns about how proposed § 106.44(f)(5) would impact parents' rights, including that it would authorize a Title IX Coordinator to initiate a complaint on behalf of a minor without the authorization or consent of a parent, including complaints about discrimination contrary to a parent's beliefs. One commenter stated that the Department's proposed regulations create some confusion about the extent of parent involvement and explained that it would be impractical, and in some cases not feasible, to involve a parent in a Title IX Coordinator's inquiry under proposed § 106.44(f)(5) to determine whether to initiate a complaint.

Some commenters raised hypothetical scenarios and asked for clarification on when a Title IX Coordinator would be required to initiate a complaint. For example, commenters asked the Department to clarify how a Title IX Coordinator should respond to alleged, egregious sex discrimination that a complainant declines to pursue through the recipient's grievance procedures for safety reasons; alleged discrimination involving a party who no longer participates in the recipient's education program or activity; and third-party complaints that are not based on firsthand knowledge. Another commenter asked whether a Title IX Coordinator would have discretion to initiate or resume a grievance procedure if the respondent failed to satisfy the terms of an informal resolution agreement or the Title IX Coordinator determined that the informal resolution agreement did not end the sex discrimination and prevent its recurrence.

*Discussion:* The Department has carefully considered commenters' support, opposition, and concerns about the circumstances in which a Title IX Coordinator may initiate a complaint when one is not pending or has been withdrawn by a complainant and acknowledges the range of comments related to proposed § 106.44(f)(5). Final § 106.44(f)(1)(v) and (f)(2) are part of a comprehensive set of Title IX Coordinator requirements that will yield prompt and equitable outcomes for all parties and provide clarity to Title IX Coordinators on how to respond when notified of conduct that reasonably may constitute sex discrimination in the absence of a complaint, in the withdrawal of any allegations in a complaint, or in the absence or

termination of an informal resolution process under § 106.44(k).

Under the 2020 amendments, when a Title IX Coordinator determined that a non-deliberately indifferent response to alleged sex discrimination required an investigation, the Title IX Coordinator had the discretion to initiate a recipient's grievance procedures. 85 FR 30131. Although the Department, as in 2020, recognizes that a Title IX Coordinator is in a specially trained position to evaluate whether initiating the grievance procedures is necessary given the circumstances, *see* 85 FR 30122, additional clarity is needed to provide a recipient's Title IX Coordinator with guidance on how to assess whether a complaint that would initiate a recipient's grievance procedures is necessary to address alleged sex discrimination. This additional instruction is necessary because the preamble to the 2020 amendments provided only one example of when a Title IX Coordinator might initiate a complaint—when presented with allegations "against a potential serial sexual perpetrator"—but gave little guidance other than this example on what factors a Title IX Coordinator should (or should not) consider when determining whether to initiate the recipient's grievance procedures. *See* 87 FR 41445 (quoting 85 FR 30131). Proposed § 106.44(f)(5) sought to address these shortcomings and provided that, upon being notified of conduct that may constitute sex discrimination under Title IX and this part and in the absence of a complaint, a Title IX Coordinator had to determine whether to initiate a complaint. The July 2022 NPRM included six factors a Title IX coordinator might weigh in accounting for both a recipient's duty to ensure equal access to its education program or activity and a nondiscriminatory educational environment, and the wishes of a complainant not to proceed with a complaint investigation. *Id.* The Department agrees with commenters that the discussion of the factors that would assist a Title IX Coordinator in deciding whether to initiate a complaint under proposed § 106.44(f)(5) in the July 2022 NPRM, 87 FR 41445–46, provided helpful clarity on how a Title IX Coordinator must balance complainant autonomy against a recipient's obligation to address alleged sex discrimination in its education program or activity. The Department further recognizes that proposed § 106.44(f) itself did not specify factors a Title IX Coordinator must consider and weigh against a standard that prioritized complainant autonomy except in certain limited circumstances. The Department acknowledges that other commenters disagreed and requested greater flexibility to determine when to initiate a complaint.

After careful consideration, the Department agrees with the commenters who asserted the lack of criteria and factors in the regulatory text created a potentially ambiguous situation in which Title IX Coordinators might not know how to assess whether to initiate a complaint. To address these concerns and provide additional clarity on the narrow instances in which the Title IX Coordinator might initiate a complaint, the Department has revised the regulations to incorporate the factors described in the preamble to the July 2022 NPRM with some modifications. The changes reflect commenters' suggestions that a Title IX Coordinator assess potential harm to a complainant, harm to the educational environment, whether conduct as alleged presents an imminent and serious threat to the health or safety of a complainant or other person, and whether a recipient would be prevented from ensuring equal access on the basis of sex to its education program or activity if a complaint is not initiated. The final regulations enumerate eight factors that a Title IX Coordinator must consider, at a minimum, in making the fact-specific determination whether to initiate a complaint of sex discrimination in the absence of a complaint, following the withdrawal of any or all of the allegations in a complaint, and in the absence or termination of an informal resolution process. These factors are:

(*1*) The complainant's request not to proceed with initiation of a complaint. Although the preamble to the July 2022 NPRM did not enumerate the complainant's request as a separate suggested factor a Title IX Coordinator might consider, the Department explained in its discussion of proposed § 106.44(f)(5) that "a recipient should honor a complainant's request not to proceed with a complaint investigation when doing so is consistent with a recipient's obligation to ensure it operates its education program or activity free from sex discrimination." Final § 106.44(f)(1)(v)(A)(*1*) incorporates that consideration into the factors a Title IX Coordinator must consider.

(*2*) The complainant's reasonable safety concerns regarding initiation of a complaint. Numerous commenters urged the Department to require a recipient's Title IX Coordinator to take a complainant's safety concerns into account in weighing whether to initiate a complaint. The Department agrees with commenters that a complainant's reasonable safety concerns are paramount to whether a Title IX Coordinator should initiate a complaint. Therefore, the Department added final § 106.44(f)(1)(v)(A)(*2*) and (vi), which is discussed further below, to ensure that a complainant's reasonable safety concerns are properly weighed and addressed.

(*3*) The risk that additional acts of sex discrimination would occur if a complaint is not initiated. The Department continues to believe that a Title IX Coordinator must consider circumstances that suggest a risk of additional acts of sex discrimination, which might include whether there have been other reports or complaints of sex discrimination by the respondent or a pattern of behavior that suggests a risk of future discrimination by the respondent. *See* 87 FR 41445.

(*4*) The severity of the alleged sex discrimination, including whether the discrimination, if established, would require the removal of a respondent from campus or imposition of another disciplinary sanction to end the discrimination and prevent its recurrence. This tracks the discussion of two factors in the July 2022 NPRM—the seriousness of alleged sex discrimination, such as whether the alleged incident involved violent acts, threats of violence or retaliation, and use of a weapon; and whether the alleged conduct, if established, might require a respondent's removal or imposition of another disciplinary restriction to end the discrimination and prevent its recurrence. *Id.*

(*5*) The age and relationship of the parties, including whether the respondent is an employee of the recipient. This factor aligns with the factor listed in the July 2022 NPRM suggesting a Title IX Coordinator consider the age and relationship of the parties, and further requires a Title IX Coordinator to specifically consider whether the respondent is an employee of the recipient, which, as explained in the July 2022 NPRM, might indicate a power imbalance between the parties and could also make it more likely that a Title IX Coordinator would initiate a complaint to address the affected workplace or learning environment. *Id.*

(*6*) The scope of the alleged sex discrimination, including information suggesting a pattern, ongoing sex discrimination, or sex discrimination alleged to have impacted multiple individuals. The sixth factor also aligns with a factor listed in the July 2022 NPRM regarding the scope of the alleged sex discrimination. *Id.*

(*7*) The availability of evidence to assist a decisionmaker in determining whether sex discrimination occurred. The seventh factor stems from a factor included in the July 2022 NPRM, with revisions to clarify that the Title IX Coordinator, in deciding whether to initiate a complaint at this stage, is not making a determination whether sex discrimination occurred. *Id.* As explained in the July 2022 NPRM, the lack or unavailability of such evidence could weigh against the Title IX Coordinator initiating a complaint when a complainant has not elected to do so, but the Department reiterates that a Title IX Coordinator would still be required to comply with final § 106.44(f)(1)(vii), by taking other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity. *Id.*

(*8*) Whether the recipient could end the alleged sex discrimination and prevent its recurrence without initiating its grievance procedures under § 106.45, and if applicable § 106.46. The Department added the eighth factor to clarify for recipients that a Title IX Coordinator may have means, other than through the initiation of a recipient's grievance procedures, to end alleged sex discrimination and prevent its recurrence. In particular, this may be a factor when there is not a respondent and the alleged discrimination relates to a recipient's policies or practices. For example, if an employee decides to pursue remedies under an applicable collective bargaining agreement instead of Title IX grievance procedures, the Title IX Coordinator might determine that the collective bargaining agreement affords a process outside of a recipient's Title IX grievance procedures that can end sex discrimination and prevent its recurrence, which might counsel against the Title IX Coordinator initiating a complaint of sex discrimination that complies with the grievance procedures under § 106.45, and if applicable § 106.46.

Consideration of the factors in paragraph (f)(1)(v)(A) aims to ensure that recipients only initiate grievance procedures without the complainant or when the complainant has withdrawn some or all allegations, in very limited, specific circumstances. A recipient should not proceed without the complainant if the alleged conduct neither presents an imminent and serious threat to the health or safety of the complainant or other person, nor prevents the recipient from ensuring equal access based on sex to its education program or activity, *see* 87 FR 41445, and § 106.44(f)(1)(v)(B) restricts a

Title IX Coordinator from initiating a complaint absent these circumstances. The Department disagrees that a Title IX Coordinator would be permitted to initiate a complaint based on mere suspicion or a misunderstanding or would be encouraged to do so to avoid possible legal liability, and in the Department's enforcement experience, it is not likely that a Title IX Coordinator would do so.

The Department appreciates the opportunity to clarify how § 106.44(f)(1)(v) will operate in practice. Under § 106.44(f)(1)(v)(A), at a minimum, a Title IX Coordinator must consider whether the alleged conduct implicates any of the considerations listed in factors (*1*)–(*8*), described above. A Title IX Coordinator would consider each of the eight factors in light of the alleged conduct and the information available at that time. The Department notes that a Title IX Coordinator's required consideration of these enumerated factors does not preclude the Title IX Coordinator from considering other information that may be known to them and that could also be relevant to the Title IX Coordinator's ultimate decision whether to initiate a complaint.

After considering each of the eight enumerated factors, along with any other factors and information the Title IX Coordinator deems relevant, the Title IX Coordinator must determine whether the conduct as alleged presents an imminent and serious threat to the health or safety of the complainant or other person, or whether the conduct as alleged prevents the recipient from ensuring equal access based on sex to its education program or activity as required under final § 106.44(f)(1)(v)(B). If neither of the two considerations set out under § 106.44(f)(1)(v)(B) is present, then a recipient's Title IX Coordinator must not initiate a complaint. A Title IX Coordinator may have reason to believe that conduct as alleged implicates serious health or safety concerns or threatens equal access to a recipient's education program or activity, yet still determine that a complaint is not necessary to address those concerns because events postdating the conduct as alleged have ameliorated those concerns. For example, the respondent might have resigned from their employment at the recipient or withdrawn or transferred from the institution. In such cases there may not be a present health or safety or equal access concern, in which case a Title IX Coordinator's consideration of the factors in § 106.44(f)(1)(v)(B) would not support initiating a complaint.

The Department notes that the standard a recipient will use to assess whether conduct as alleged presents an imminent and serious risk to health and safety will not differ from the assessment a recipient will make of these same considerations prior to removing a respondent under the emergency removal provision. The discussion of final § 106.44(h) below provides additional explanation of such risks. The addition of these requirements, which a Title IX Coordinator must consider before initiating a complaint, addresses commenters' concerns that the proposed regulations set too low a bar for Title IX Coordinator-initiated complaints.

Consideration of the § 106.44(f)(1)(v)(A) factors will not require an investigation by a Title IX Coordinator to determine whether to initiate a complaint. Most of the required factors relate to information that the Title IX Coordinator will receive with the report or in conversations with a complainant if they agree to speak with the Title IX Coordinator, including the complainant's request not to proceed with a complaint and any reasonable safety concerns shared, as well as the severity of the alleged discrimination, the age and relationship of the parties, and whether the respondent is the recipient's employee. Other factors relate to information a Title IX Coordinator may reasonably know from experience initiating complaints and overseeing a recipient's compliance with its grievance procedure requirements or from investigating similar or related complaints. This information will help the Title IX Coordinator assess the scope of the alleged conduct and whether the available information suggests a pattern, ongoing sex discrimination, or conduct that is alleged to have an impact on multiple individuals.

The Department appreciates the opportunity to clarify that a Title IX Coordinator's initial assessment under § 106.44(f)(1)(v) is a threshold determination required to satisfy a recipient's obligation under Title IX to ensure equal educational access on the basis of sex, but it is not a credibility determination or an assessment of whether sex discrimination occurred. For that reason, the Department uses the term "as alleged" to refer to the information provided to a Title IX Coordinator by a student or other person reporting conduct that reasonably may constitute sex discrimination, consistent with the definitions of complaint and complainant in final § 106.2, or by an employee fulfilling the requirements of

final § 106.44(c) by notifying the Title IX Coordinator about conduct that the employee believes reasonably may constitute sex discrimination under Title IX. To meet the requirements of paragraph (f)(2), a Title IX Coordinator would consider the information as alleged along with any other relevant information to decide if the information reported to them requires the Title IX Coordinator to complete the steps in paragraph (f)(1)(v)(A).

Incorporating paragraph (f)(1)(v)(A) into the final regulations appropriately accounts for commenters' support for a balancing approach that weighs not only complainant autonomy, but also concerns for complainant safety and a risk of harm from initiating a complaint that the complainant may not support. The Department disagrees that these final regulations will erode trust in a recipient's Title IX Coordinator and has included provisions, including final § 106.44(f)(1)(vi), to ensure a Title IX Coordinator maintains clear lines of communication with complainants about actions the recipient may take to fulfill the recipient's obligations under Title IX that may be contrary to a complainant's wishes. In addition, under paragraph (f)(1)(v)(A)(7), a Title IX Coordinator would need to consider the availability of necessary evidence to assist a decisionmaker in determining whether sex discrimination occurred, including evidence that could be supplied only by the complainant, before deciding to initiate a complaint without the complainant.

A Title IX Coordinator must consider factors such as the age and relationship of the parties, the severity of the alleged conduct, and whether the sex discrimination as alleged suggests a pattern, ongoing sex discrimination, or widespread sex discrimination such as a sex-based hostile environment that would implicate the rights of numerous individuals to an educational environment free from sex discrimination. These considerations are incorporated into paragraphs (f)(1)(v)(A)(4)–(6) of the final regulations. As the Department explained in the July 2022 NPRM, these factors take into account a recipient's duty to ensure equal access to its education program or activity and provide an educational environment free from sex discrimination, and the regulations require a Title IX Coordinator to also take into consideration the complainant's individual interests. 87 FR 41445.

Additionally, as noted above, the Department added paragraph (f)(1)(vi) to address possible safety concerns when a Title IX Coordinator initiates a

complaint without the complainant, and potentially, over the complainant's objection. This provision of the final regulations will require a Title IX Coordinator, after making the determination to initiate a complaint, to notify the complainant before doing so and appropriately address reasonable concerns related to the complainant's safety or the safety of others. For example, the complainant may have indicated to the Title IX Coordinator a preference not to initiate the recipient's grievance procedures in a case involving serious allegations of sexual misconduct because the complainant encounters the respondent on the walk to and from classes. The complainant may have a reasonable concern that the respondent will engage in physically threatening behavior based on prior experiences. The Title IX Coordinator could offer to address the complainant's reasonable safety concerns by offering to provide an escort to accompany the complainant to and from class. Regardless of the specific measures a Title IX Coordinator might take to address the complainant's reasonable safety concerns, paragraph (f)(1)(vi) requires the Title IX Coordinator to inform the complainant that a complaint is being initiated before doing so to ensure that the complainant is aware of the complaint and able to raise any reasonable safety concerns. These changes address how a Title IX Coordinator may respond to an allegation of egregious sex discrimination that the complainant does not wish to pursue because of safety concerns.

The Department also recognizes that commenters raised concerns about the rights of respondents and parents in connection with a Title IX Coordinator-initiated complaint. The Department shares commenters' concerns about the costs and harms experienced by a respondent when a complaint of sex discrimination is made against them, whether initiated by a complainant or a Title IX Coordinator, and maintains that § 106.44(f)(1)(v) appropriately balances those considerations against a recipient's obligation to ensure it operates its education program or activity free from sex discrimination. 87 FR 41445. As noted above, these final regulations provide for Title IX Coordinators to initiate complaints only in the circumstances of an imminent and serious threat to the health or safety of the complainant or other person or conduct that would prevent a recipient from ensuring equal access to its education program or activity on the basis of sex. The Department does not agree with commenters that respondents

would be deprived of due process or any other procedural rights protected by the U.S. Constitution or Federal law. A Title IX Coordinator-initiated complaint is investigated and resolved under a recipient's grievance procedures; therefore, the rights to a fair process and the protections in § 106.45, and if applicable § 106.46, afforded to the complainant and respondent, apply to such complaints. Additional discussion of how the grievance procedures requirements under §§ 106.45 and 106.46 afford all parties a fair process and necessary protections can be found in the preamble discussion of those provisions.

With respect to parents, the Department has carefully considered commenters' concerns and appreciates the opportunity to clarify that § 106.44(f)(1)(v) of the final regulations does not derogate any legal right of a parent, guardian, or other authorized legal representative to act on behalf of a complainant, respondent, or other person. As explained in § 106.6(g), a parent, legal guardian, or other authorized legal representative must be permitted to exercise whatever rights the parents, guardian, or other authorized legal representative might have to act on behalf of a complainant or other person as a result of State, local, or other sources of law; such rights might include making a complaint of sex discrimination, accompanying a minor student to meetings, interviews, and hearings, and otherwise participating in the recipient's grievance procedures. A Title IX Coordinator is not prohibited from consulting a parent in conducting the inquiry to determine whether to initiate a complaint under § 106.44(f)(1)(v). The factors listed in paragraph (f)(1)(v)(A) are, as the final regulations make clear, the minimum that the Title IX Coordinator must consider and are not a restriction on what may be considered. Further, when a parent and a minor student disagree about a decision to make a complaint of sex discrimination, deference to a parent, guardian, or other authorized representative with a legal right to act on behalf of that student in such matters is appropriate. As a general matter, it is appropriate for the Title IX Coordinator to respect the wishes of the parent with respect to that parent's child except in cases of serious threat to the health or safety of the child. For example, if a recipient is concerned about potential physical harm to a student, or a student's suicidality, the recipient can act to protect the student. Where it is appropriate for the Title IX Coordinator to defer to the parent with respect to a

complaint, the Title IX Coordinator may still be required to, as necessary, take other steps generally to ensure equal access on the basis of sex. The recipient could, for instance, provide training to prevent sex-based bullying and harassment in the school.

Likewise, the Department disagrees that the Title IX Coordinator complaint initiation requirements limit or restrict the rights of respondents or parents to freedom of speech, expression, or religion, which are covered by § 106.6(d). We reaffirm that the Department intends these Title IX regulations not to be interpreted to impinge upon rights protected under the First Amendment, and the protections of the First Amendment must be considered if issues of speech, expression, or religion are involved. The Department also underscores that none of the amendments to the regulations changes or is intended to change the commitment of the Department, through these regulations and OCR's administrative enforcement, to fulfill its obligations in a manner that is fully consistent with the First Amendment and other guarantees of the Constitution of the United States. For additional consideration of the First Amendment, see the discussion of Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2) (Section I.C)) and the discussion of § 106.44(a) above.

Despite some commenters urging the Department to do so, it is unnecessary to modify § 106.44(f)(1)(v) to restrict Title IX Coordinator-initiated complaints in response to third-party reports to circumstances in which there is compelling evidence that the discrimination occurred, was severe, endangers other students, and can be addressed neutrally. The requirements of § 106.44(f)(1)(v)(A), which apply to all situations in which a complaint is not made or was withdrawn in whole or in part, including situations in which conduct was reported by an individual other than the complainant, are sufficient to guide a Title IX Coordinator's determination whether to initiate complaints based on third-party reports without this modification.

The Department also acknowledges the hypothetical examples commenters provided seeking clarification on Title IX Coordinator-initiated complaints. Whether a complaint would need to be initiated in specific circumstances is a fact-specific analysis that would need to be made on a case-by-case basis. The Department recognizes that a Title IX Coordinator must assess such scenarios under the requirements of § 106.44(f)(1)(v) and initiate a complaint

only in the limited circumstances permitted under the final regulations.

The Department understands commenters' views that recipients may wish to explain to the members of their educational community the need to balance individual complainant needs and wishes against the overarching duty to address sex discrimination in a recipient's education program or activity when deciding whether to initiate a complaint. These regulations require such balancing and do not prohibit such communication.

*Changes:* The Department has revised § 106.44(f)(1)(v) in the final regulations to clarify that in the absence of a complaint or the withdrawal of any or all of the allegations in a complaint, and in the absence or termination of an informal resolution process, a recipient must require its Title IX Coordinator not to proceed with a complaint investigation unless, after considering at a minimum the factors described in paragraph (f)(1)(v)(A), the Title IX Coordinator determines that the conduct as alleged presents an imminent and serious threat to the health or safety of a complainant or other person, or that the conduct as alleged prevents the recipient from ensuring equal access on the basis of sex to its education program or activity as required under paragraph (f)(1)(v)(B). The final regulations require a Title IX Coordinator to consider at a minimum the following factors: the complainant's request not to proceed with initiation of a complaint (paragraph (f)(1)(v)(A)(*1*)); the complainant's reasonable safety concerns regarding initiation of a complaint (paragraph (f)(1)(v)(A)(*2*)); the risk that additional acts of sex discrimination would occur if a complaint is not initiated (paragraph (f)(1)(v)(A)(*3*)); the severity of the alleged sex discrimination, including whether the discrimination, if established, would require the removal of a respondent from campus or imposition of another disciplinary sanction to end the discrimination and prevent its recurrence (paragraph (f)(1)(v)(A)(*4*)); the age and relationship of the parties, including whether the respondent is an employee of the recipient (paragraph (f)(1)(v)(A)(*5*)); the scope of the alleged conduct, including information suggesting a pattern, ongoing sex discrimination, or sex discrimination alleged to have impacted multiple individuals (paragraph (f)(1)(v)(A)(*6*)); the availability of evidence to assist a decisionmaker in determining whether sex discrimination occurred (paragraph (f)(1)(v)(A)(*7*)); and whether the recipient could end the alleged sex discrimination and prevent

its recurrence without initiating grievance procedures (paragraph (f)(1)(v)(A)(*8*)). In addition, paragraph (f)(1)(vi) of the final regulations requires, if a Title IX Coordinator initiates a complaint under paragraph (f)(1)(v), that the Title IX Coordinator notify the complainant prior to doing so and appropriately address reasonable concerns about the complainant's safety or the safety of others.

Prompt and Effective Steps To Ensure Sex Discrimination Does Not Continue or Recur (Proposed § 106.44(f)(6))

*Comments:* Commenters shared a range of views on proposed § 106.44(f)(6). Some supported the proposed provision because it would require a Title IX Coordinator, upon being notified of possible sex discrimination, to take "other appropriate prompt and effective steps" to end sex discrimination, in addition to the steps listed in proposed § 106.44(f)(1)–(5).

Other commenters stated the requirements of proposed § 106.44(f)(6) were not well defined and a recipient would not know whether its Title IX Coordinator had complied with them.

Some commenters objected to proposed § 106.44(f)(6) because they believed it would require a Title IX Coordinator to act on any notice of possible sex discrimination, including when the conduct reported does not adequately or plausibly allege sex discrimination. One commenter asserted this requirement would be burdensome and divert a recipient's resources away from where they are most needed, such as responding to complaints of sex discrimination. Another commenter said that requiring a Title IX Coordinator to take action prior to an assessment about whether alleged conduct is persistent or severe would be contrary to other statements in the July 2022 NPRM indicating that a recipient is not required to address alleged sex-based harassment that does not meet the proposed definition of "sex-based harassment."

Commenters also objected to proposed § 106.44(f)(6) because they believed it would authorize a Title IX Coordinator to conduct an independent investigation and punish a respondent (whether by imposing disciplinary sanctions or providing supportive measures) without affording due process or following a recipient's established grievance procedures, which some characterized as contrary to basic fairness and in conflict with other provisions of the Department's proposed regulations. One commenter noted that the July 2022 NPRM stated that the

steps a Title IX Coordinator might take under proposed § 106.44(f)(6) could cause the Title IX Coordinator to reconsider whether to initiate a complaint if they believe disciplinary sanctions may be needed to effectively end sex discrimination, and asked how a Title IX Coordinator would know that disciplinary sanctions are needed if a respondent is presumed not responsible until the conclusion of a recipient's grievance procedures.

Some commenters asked the Department to clarify that proposed § 106.44(f)(6) applies only after a Title IX Coordinator assesses the information they received and determines a response is warranted because the allegation describes conduct that would constitute sex discrimination. One commenter, a postsecondary institution, asked the Department to provide recipients flexibility to determine how to proceed in cases when a complainant does not initiate grievance procedures and the Title IX Coordinator determines the reported conduct does not require the initiation of a complaint, including the flexibility to decide no further action is necessary. Another commenter asserted that the requirements of proposed § 106.44(f) effectively set a "doing nothing is always wrong" standard by requiring prompt and effective action even if grievance procedures are not initiated by a complainant or the Title IX Coordinator.

Other commenters opposed the requirement in proposed § 106.44(f)(6) that a Title IX Coordinator take prompt and effective action to remedy sex discrimination even if a complaint is not filed. The commenters asserted that this requirement, together with several of the July 2022 NPRM's other proposed provisions such as the removal of the "actual knowledge" standard and the requirement that non-confidential employees report conduct that may constitute sex discrimination to the Title IX Coordinator, would mean that a recipient would not comply with the Department's Title IX regulations if its employees failed to take any of the steps the commenters asserted would be required under the proposed regulations, including the required action by its Title IX Coordinator.

*Discussion:* The Department recognizes commenters' concerns that proposed § 106.44(f)(6) might have obligated a Title IX Coordinator to take prompt and effective steps to end sex discrimination when on notice of any conduct that alleged sex discrimination, regardless of whether the allegations were plausible or credible. As explained in the discussion of "conduct that reasonably may constitute sex discrimination" above, to address this and similar concerns raised by commenters, § 106.44(f)(1) of these final regulations will require a Title IX Coordinator to take the actions set out under paragraphs (f)(1) when notified of conduct that reasonably may constitute sex discrimination, and those actions will not be required if the Title IX Coordinator reasonably determines, pursuant to paragraph (f)(2), that the conduct as alleged could not constitute sex discrimination under Title IX or this part. These changes resolve commenters' concerns, including that proposed § 106.44(f)(6) would have required a Title IX Coordinator to prevent the recurrence of conduct that did not plausibly allege sex discrimination or to address under its Title IX authority alleged sex-based harassment that does not meet the definition of such conduct under § 106.2. These changes also afford recipients the flexibility requested by commenters because the changes recognize a Title IX Coordinator's unique position and expertise and authorize them to rely on the Title IX Coordinator's specialized knowledge to assess alleged sex discrimination. These commenters expressed a preference for greater flexibility over how to respond to information about conduct that may constitute sex discrimination outside of their grievance procedures, and the parameters set out under § 106.44(f)(1) afford sufficient flexibility and discretion while ensuring satisfaction of Title IX's nondiscrimination mandate. The Department expects that trained Title IX Coordinators will receive information about a range of conduct that individuals believe may reasonably constitute sex discrimination. The Department anticipates recipients will adequately train their Title IX Coordinators to distinguish allegations that reasonably may constitute sex discrimination from allegations that, even if true, could not constitute sex discrimination, because, for example, they do not involve different treatment on the basis of sex or sex-based harassment.

The Department disagrees with commenters' characterization that proposed § 106.44(f)(6) included unclear requirements and that a recipient could not know if its Title IX Coordinator's actions complied with the requirements. Section 106.44(f)(1)(vii) of these final regulations requires a Title IX Coordinator to take "other appropriate prompt and effective steps," outside of any remedies provided to an individual complainant, to ensure an end to sex discrimination in a recipient's education program or activity that was not addressed through a recipient's grievance procedures and to prevent its recurrence. The Department added the phrase "Regardless of whether a complaint is initiated" to final § 106.44(f)(1)(vii) to clarify that a Title IX Coordinator is required to take action under this provision even in those circumstances when the Title IX Coordinator is notified of conduct that reasonably may constitute sex discrimination under Title IX or these final regulations and determines not to initiate a complaint under § 106.44(f)(1)(v). When the Title IX Coordinator is notified of conduct that reasonably may constitute sex discrimination and does not initiate a complaint, the Title IX Coordinator must take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity.

A prompt and effective response to sex discrimination, as explained in the discussion of "action that is 'prompt and effective' and necessary to 'remedy the effects' of sex discrimination" above, is a standard that is well known to recipients from the 1975 regulations and the Department's longstanding enforcement of Title IX before the 2020 amendments. The requirement to afford a prompt and effective response to sex discrimination is also consistent with how some courts have assessed a recipient's obligation to respond to sexual harassment under the deliberate indifference standard for private suits seeking monetary damages. *See, e.g., Cianciotto,* 600 F. Supp. 3d at 458 (explaining that the deliberate indifference standard of liability can be shown through a delayed and inadequate response to harassment) (citing *Zeno* v. *Pine Plains Cent. Sch. Dist.,* 702 F.3d 655, 667 n.12, 669–71 (2d Cir. 2012) (applying *Davis* to Title VI racial harassment claim and concluding deliberate indifference can be shown by a recipient's "lengthy and unjustifiable delay" or "inadequate or ineffective" response to the harassment)). Finally, a prompt and effective response to sex discrimination is consistent with other Federal civil rights statutes such as Section 504 that are enforced by the Department and require a similar prompt and effective response to discrimination. *See, e.g.,* 34 CFR 104.7(b).

The Department acknowledges that some commenters opposed proposed § 106.44(f)(6), which they characterized as requiring a Title IX Coordinator to undertake an investigation that they asserted would be contrary to principles

of basic fairness, would deny respondents due process, and could result in the provision of supportive measures or imposition of disciplinary sanctions contrary to § 106.44(g)(2) (explaining that supportive measures must not unreasonably burden either party) and § 106.45(h)(4) (limiting imposition of disciplinary sanctions until the conclusion of a recipient's grievance procedures under § 106.45, and if applicable § 106.46). The Department disagrees with these assertions, which misstate the function and structure of the Title IX Coordinator requirements under § 106.44(f) and the requirements of these final regulations. Contrary to commenters' views, final § 106.44(f)(1)(vii) does not conflict with other provisions of these final regulations, and a Title IX Coordinator's response to information about conduct that reasonably may constitute sex discrimination will not authorize a Title IX Coordinator to circumvent the grievance procedures requirements set out under § 106.45 or § 106.46. Nothing in § 106.44(f) will permit a Title IX Coordinator to provide supportive measures that unreasonably burden any party. Nor does anything in § 106.44(f) interfere with any party's right to challenge supportive measures applicable to them under final § 106.44(g)(4). In addition, imposition of disciplinary sanctions will be permitted only after a recipient complies with the requirements of § 106.45, and if applicable § 106.46, and nothing in § 106.44(f) indicates otherwise. Moreover, the action a Title IX Coordinator will be required to take under § 106.44(f)(1)(vii) would not involve discipline of a respondent; instead, it would involve other measures, such as educational programming or employee training, as long as such measures are not imposed for punitive or disciplinary reasons and are not unreasonably burdensome to a party. As the Department explained in the discussion of § 106.44(a), above, these actions are necessary to close the gap in a recipient's required response to sexual harassment under the 2020 amendments. Under those amendments, a recipient could have information about possible sex discrimination in its education program or activity yet have no obligation to address it beyond providing supportive measures and information about grievance procedures if (1) the complainant did not initiate a complaint, and if (2) the Title IX Coordinator did not exercise the Title IX Coordinator's very limited discretion to do so. *See* 85 FR 30131. These final regulations, in contrast, require a Title

IX Coordinator under § 106.44(f)(1)(vii) to take certain actions to more fully address sex discrimination in such circumstances. The more limited obligation to respond to sexual harassment outside of a recipient's grievance procedures under the 2020 amendments failed to recognize the many other steps available to a recipient, such as educational programming or employee training, to address sex discrimination. Depending on the factual circumstances, these steps may be necessary to fulfill a recipient's Title IX obligation to provide participants an education program or activity free from sex discrimination.

The Department strongly disagrees that a Title IX Coordinator's compliance with § 106.44(f)(1)(vii) will lead to outcomes that do not comport with the Department's commitment to procedures that are fair to all. In situations in which a recipient has not initiated its grievance procedures, the prompt and effective steps that a Title IX Coordinator may take under § 106.44(f)(1)(vii) are limited to non-disciplinary action, including for example providing additional training for employees, educational programming aimed at the prevention of sex discrimination, or remedies such as permitting a complainant to retake a class. *See* 87 FR 41446–47. The Department emphasizes that, if a Title IX Coordinator determines that the recipient would be required to impose disciplinary sanctions on a respondent, then the grievance procedures under § 106.45, and if applicable § 106.46, must be initiated and sanctions may only be imposed if there is a determination that the respondent violated the recipient's policy prohibiting sex discrimination. *See* 87 FR 41447.

The Department also disagrees with commenters' suggestion that a Title IX Coordinator's compliance with § 106.44(f) could subject respondents to sex discrimination, which commenters did not support with additional details, and notes that § 106.31(a)(1) prohibits a recipient from discriminating against any party based on sex. Anyone who believes that a recipient's treatment of a complainant or respondent constitutes sex discrimination may file a complaint with OCR, which OCR would evaluate and, if appropriate, investigate and resolve consistent with these regulations' requirement that a recipient not discriminate against parties based on sex.

The Department agrees with the commenter who stated that in some cases no response would be required under proposed § 106.44(f)(6). The same

will be true under final § 106.44(f)(1)(vii). The Department reaffirms the position stated in the July 2022 NPRM that it will not always be necessary for a Title IX Coordinator to take additional steps to ensure that sex discrimination does not continue or recur in its education program or activity. 87 FR 41446. For example, no additional steps would be necessary when the sex discrimination involved only the parties and did not impact others participating or attempting to participate in the recipient's education program or activity, and the sex discrimination was addressed fully through a recipient's grievance procedures or informal resolution process. *Id.* Similarly, a Title IX Coordinator might determine that no additional steps are necessary to ensure that sex discrimination does not continue or recur within the recipient's education program or activity if the complainant has pursued remedies under a collective bargaining agreement. The Department therefore disagrees with the commenter who described § 106.44(f) as imposing a "doing nothing is always wrong" standard. Although a recipient would not be in compliance if its Title IX Coordinator failed to take any of the required steps under § 106.44(f)(1) of these final regulations, if a Title IX Coordinator assessed the information it received about possible sex discrimination in the ways required by these final regulations and reasonably determined no further action was warranted, a recipient would be in compliance.

While some commenters correctly asserted that a recipient would not comply with the Department's Title IX regulations if its Title IX Coordinator or other employees fail to take actions required under § 106.44(f)(1), including the requirement to take prompt and effective action under final § 106.44(f)(1)(vii) and other provisions of these regulations, the Department disagrees with commenters' characterization of this as a problem. Expanded reporting requirements and a greater role for the Title IX Coordinator, as compared to the 2020 amendments, are necessary in the Department's view to more effectively ensure that recipients' education programs and activities are in fact free from discrimination on the basis of sex. The Department therefore fully expects recipients to comply with these Title IX regulations, which give recipients sufficient flexibility to ensure that their Title IX Coordinators and employees are equipped to do so, including by permitting their Title IX Coordinators to

delegate duties and by imposing additional training requirements.

Finally, the Department notes that the wording of final § 106.44(f)(1)(vii), which requires a Title IX Coordinator to ''take other appropriate prompt and effective steps, in addition to steps necessary to effectuate the remedies provided to an individual complainant, if any, to ensure that sex discrimination does not continue or recur within the recipient's education program or activity,'' differs slightly from proposed § 106.44(f)(6), which would have required a Title IX Coordinator to ''take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within a recipient's education program or activity, in addition to remedies provided to an individual complainant.'' This non-substantive change in the structure of this provision clarifies that whatever actions a recipient's Title IX Coordinator might take under this provision would be distinct from any relief that a recipient may have provided to a complainant in connection with a resolved complaint of sex discrimination.

*Changes:* The Department has redesignated proposed § 106.44(f)(6) as final § 106.44(f)(1)(vii), and modified the provision to state that ''[r]egardless of whether a complaint is initiated,'' a recipient must require its Title IX Coordinator to take other appropriate prompt and effective steps, ''in addition to steps necessary to effectuate the remedies provided to an individual complainant,'' to ensure that sex discrimination does not continue or recur within the recipient's education program or activity. As discussed above, the Department has also revised § 106.44(f)(1) of the final regulations to require a recipient to require its Title IX Coordinator, when notified of conduct that reasonably may constitute sex discrimination under Title IX or this part, to take the specific actions described in paragraph (f)(1) to promptly and effectively end any sex discrimination in its education program or activity, prevent its recurrence, and remedy its effects.

Proposed § 106.44(f)(1)–(4)

*Comments:* One commenter suggested that proposed § 106.44(f)(1), regarding equitable treatment of the complainant and respondent, would promote grievance procedures that are more transparent, fair, and likely to address any harm the parties may experience during the pendency of the grievance procedures because it would require a Title IX Coordinator to communicate with the parties equitably. Other

commenters asked whether proposed § 106.44(f)(1) would require a Title IX Coordinator to treat employee and student respondents similarly. One commenter asserted that although proposed § 106.44(f)(1) would require a Title IX Coordinator to treat a complainant and respondent equitably, other provisions in the Department's proposed regulations appear to favor complainants in grievance procedures. Some commenters recommended the Department eliminate proposed § 106.44(f)(1) because it is redundant of proposed § 106.45(b)(1).

Commenters also offered their views, suggested changes, and requested clarifications regarding proposed § 106.44(f)(2), which addresses a Title IX Coordinator's communications with a complainant or respondent upon learning of conduct that may constitute sex discrimination under Title IX. For example, some commenters asserted it would be inequitable for a Title IX Coordinator to notify a complainant when they receive information about conduct that may constitute sex discrimination but delay notifying a respondent until a complaint is made. Other commenters asked whether a Title IX Coordinator may delay notifying a respondent of a Title IX complaint if there is a concurrent criminal investigation that could be negatively impacted. Some commenters asked the Department to clarify whether proposed § 106.44(f)(2) would require a Title IX Coordinator to notify the parent, legal guardian, or other authorized legal representative of a minor. One commenter asked the Department to modify proposed § 106.44(f)(2)(i) to require a Title IX Coordinator to provide written notice of the recipient's grievance procedures as well as notice of any option for informal resolution before a complaint investigation is begun. According to the commenter, including this information on a recipient's website is inadequate because links often break or change.

Commenters expressed support for the Title IX Coordinator's duty to offer and coordinate supportive measures under proposed § 106.44(f)(3) because it would promote early intervention, encourage more support for individuals harmed by sex discrimination, and provide resources to change the behavior of individuals accused of sex discrimination; ensure that students who report sex discrimination are informed of available supportive measures; ensure equitable support for complainants and respondents; and address what some commenters characterized as the inadequacy of the 2020 amendments' response to

information about conduct that may constitute sex discrimination.

Other commenters expressed a preference for the approach in § 106.44(a) of the 2020 amendments, which requires a Title IX Coordinator to provide information about supportive measures to a complainant upon learning of possible sex discrimination. One commenter objected to requiring the Title IX Coordinator to offer supportive measures to a respondent because doing so presumes that a respondent is entitled to such measures. One commenter suggested the Department retain the current regulations' requirement that a recipient investigate each complaint it receives because, in the commenter's view, the approach adopted in the 2020 amendments is a more protective framework than proposed § 106.44(f)(4). Some commenters expressed concern that proposed § 106.44(f)(3) would allow a Title IX Coordinator to offer a complainant supportive measures that would be burdensome to a respondent prior to a finding of responsibility and objected to treating a complainant and respondent differently with respect to the timing of offering supportive measures. Commenters also asked the Department to modify proposed § 106.44(f)(3) to state a recipient is required to offer supportive measures to the complainant and/or the respondent.

One commenter asserted that proposed § 106.44(f)(4), which would require a Title IX Coordinator to initiate a recipient's grievance procedures or informal resolution process in response to a complaint, is unnecessary because proposed §§ 106.45 and 106.46 contain applicable requirements.

*Discussion:* The Department acknowledges commenters' support for proposed § 106.44(f)(1), which is included as § 106.44(f)(1)(i) of the final regulations, and affirms that equitable treatment of a complainant and a respondent will encompass communications with both parties, as warranted, to provide important information about a recipient's Title IX policies and obligations as well as available resources and supports. The Department disagrees that § 106.44(f)(1)(i) is redundant of the similar requirement in § 106.45(b)(1), which is limited to the basic requirements for a recipient's grievance procedures; § 106.44(f)(1)(i), in contrast, applies to a Title IX Coordinator's obligations in response to information about conduct that reasonably may constitute sex discrimination, including in situations that arise outside of or precede a recipient's grievance procedures.

**33601**

Section 106.44(f)(1)(i) of the final regulations will not require a recipient to treat employee and student respondents similarly or favor complainants in a recipient's grievance procedures, as some commenters suggested. The requirement of equitable treatment in § 106.44(f)(1)(i) applies to the complainant and respondent and does not address more generally the relationship of parties to the recipient—for example as an employee, student-employee, or student. And the Department strongly disagrees with commenters' assertion that the requirements under §§ 106.45 and 106.46 favor complainants. For more explanation of the fair procedures afforded to all parties under each of the applicable provisions, see the discussion of the Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.C).

Further, delaying when a Title IX Coordinator notifies a respondent of a recipient's grievance procedures until a complaint is initiated would not be inequitable to a respondent as some commenters asserted. A recipient must provide broad notice of its grievance procedures under § 106.8(b)(2), and the Department continues to believe that providing information about a recipient's grievance procedures to a respondent at the time a Title IX Coordinator oversees initiation of the grievance procedures under § 106.44(f)(1)(iii)(B) is adequate to apprise a respondent of the grievance procedures and the rights they afford. *See* 87 FR 41444. Additional discussion of equitable treatment of the parties to a recipient's grievance procedures, including student and employee respondents, is provided in the preamble discussion of § 106.45(b)(1) of the final regulations.

In response to commenters who asked whether a recipient may delay notifying a respondent of a Title IX complaint in circumstances when a concurrent criminal investigation is underway, the Department clarifies that such delays are not required under §§ 106.45(b)(4) and 106.46(e)(5), which allow a reasonable extension of timeframes on a case-by-case basis for good cause, but that the possibility of a concurrent law enforcement investigation in certain circumstances could justify such a delay, depending on the circumstances. Further, nothing in final § 106.44(f)(1)(iii) or (iv), which require a Title IX Coordinator to notify the parties of a recipient's grievance procedures and informal resolution process if available and appropriate, and to initiate those procedures or informal resolution process if requested by all

parties, will preclude a recipient from requiring its Title IX Coordinator to provide a respondent with that information in writing, if the complainant pursues an informal resolution process or the Title IX Coordinator initiates a complaint, as requested by one commenter. However, the Department declines to require all recipients to require such written communication. The Department appreciates the opportunity to clarify that if a recipient only provides the required information through links to web pages that do not work, it does not satisfy its obligation under final § 106.44(f)(1)(iii)(B) to notify a respondent, if a complaint is made, of the recipient's grievance procedures or an informal resolution process if available and appropriate.

In response to commenters' questions about a Title IX Coordinator's duty to notify the parents of minors of a recipient's grievance procedures under § 106.45, and if applicable § 106.46, upon receiving information about possible sex discrimination, the Department appreciates the opportunity to reiterate that nothing in final § 106.44(f)(1)(iii), which addresses notification of a recipient's grievance procedures, or any other provision of these final regulations, derogates any legal right of a parent, guardian, or other authorized legal representative (*e.g.,* a court-appointed educational representative or a court-appointed decisionmaker) to act on behalf of a complainant, respondent, or other person. *See* § 106.6(g). To the extent commenters are asking the Department to clarify in the final regulations that a recipient's Title IX Coordinator must notify the parents of a minor when the Title IX Coordinator receives information about possible sex discrimination, the Department notes that such a duty would arise under State or local law or school policy and is not required under these final regulations.

In addition, the Department has further clarified the notification requirements in final § 106.44(f)(1)(iii)(A), which will require the Title IX Coordinator to notify the complainant or, if the complainant is unknown, the individual who reported the conduct, about the recipient's grievance procedures and the availability of an informal resolution process if available and appropriate. The Department indicated in the July 2022 NPRM that, under the proposed regulations, when a Title IX Coordinator does not know the identity of the complainant, the Title IX Coordinator would be permitted to provide information about the recipient's

grievance procedures to the individual, if any, who reported the conduct. 87 FR 41444. In its enforcement experience, the Department frequently observed that a complainant is unknown or unidentified at the time information is reported to a Title IX Coordinator, such as when a witness to sexual assault reported the incident but does not know the name of the person who was assaulted. To ensure information is conveyed to an individual who may be in a better position to identify the complainant and provide them the required information, the Department determined that it is necessary to include this information in these final regulations.

With respect to offers and coordination of supportive measures, the Department agrees with commenters who supported proposed § 106.44(f)(3) because it would strengthen a recipient's response to notice of possible sex discrimination, as compared to § 106.44(a) in the 2020 amendments, by requiring a Title IX Coordinator to do more than offer supportive measures to a complainant. The Department maintains that basic commitment in these final regulations and has modified proposed § 106.44(f)(3) to clarify recipient and Title IX Coordinator obligations. Thus, final § 106.44(f)(1)(ii) clarifies that a recipient must require its Title IX Coordinator to offer and coordinate supportive measures, as appropriate, for the complainant upon notice of information that reasonably may constitute sex discrimination; and do so for a respondent upon the recipient's initiation of grievance procedures or offer to a respondent of an informal resolution process. The Department shares commenters' assessment that such a requirement will promote an early response to possible sex discrimination, afford necessary support to the individuals impacted by possible sex discrimination, and afford resources that seek to prevent future incidents of possible sex discrimination for complainants and respondents.

The Department strongly disagrees with some commenters' suggestion that proposed § 106.44(f)(3) would presume that a respondent requires supportive measures that they may not be entitled to receive. With respect to supportive measures, the preamble discussion of § 106.44(g) provides the Department's rationale for requiring a recipient, through its Title IX Coordinator, to offer and coordinate supportive measures to a respondent under final § 106.44(f)(1)(ii). However, to provide greater clarity on what the Department meant by ''as appropriate'' with respect to offering and coordinating supportive

measures for a respondent, the Department changed that requirement in final § 106.44(f)(1)(ii) to align the offer and coordination of supportive measures to a respondent with the time when the Title IX Coordinator initiates the recipient's grievance procedures or offers an informal resolution process to the respondent. The final regulations delay the offer of supportive measures to a respondent until a recipient has initiated grievance procedures or notified the respondent of the availability of an informal resolution process to avoid prematurely notifying the respondent before the complainant has decided whether to make a complaint. The Department also clarified final § 106.44(f)(1)(iv), referencing final § 106.44(k), to state that informal resolution would only be initiated if available, appropriate, and requested by all parties. In addition, the Department streamlined the language regarding supportive measures in final § 106.44(f)(1)(ii) because the definition of supportive measures itself indicates that they are for the purpose of restoring a party's access to the recipient's education program or activity. Further, the discussion of § 106.44(g)(2) below addresses commenters' concerns about a Title IX Coordinator's offer and coordination of supportive measures to a party and ensures that no supportive measures are provided that would unreasonably burden either party.

With respect to initiation of grievance procedures or informal resolution processes, the Department has incorporated proposed § 106.44(f)(4) into final § 106.44(f)(1)(iv), with the modification regarding informal resolution noted above. The Department disagrees with one commenter's assertion that proposed § 106.44(f)(4) would have afforded a less protective framework than § 106.44(a) in the 2020 amendments, which the commenter stated would better prevent a recipient from avoiding its Title IX obligations. For the reasons explained in the discussion of § 106.44(a) and throughout this discussion of § 106.44(f), the Department agrees with other commenters who viewed the provisions of proposed § 106.44(f) as affording a stronger, more comprehensive response to possible sex discrimination than what is afforded under § 106.44(a) in the 2020 amendments and its adapted deliberate indifference standard. The Department also declines to remove proposed § 106.44(f)(4) from these final regulations because it disagrees that this provision is duplicative of the applicable complaint initiation requirements under the grievance

procedures requirements set out under §§ 106.45 and 106.46. The grievance procedures requirements apply only after a complaint is initiated. To determine when to initiate a complaint, however, the Title IX Coordinator must first take the actions set out under § 106.44(f)(1)(i)–(iii) of these final regulations. If, after taking those actions, the Title IX Coordinator learns that a complainant wishes to initiate a complaint, then § 106.44(f)(1)(iv) directs the Title IX Coordinator to initiate grievance procedures in accordance with § 106.45, and if applicable § 106.46. Further, in the event of a Title IX Coordinator-initiated complaint under § 106.44(f)(1)(v), a Title IX Coordinator would also be required to provide a respondent information about the recipient's grievance procedures and informal resolution process, if available and appropriate, under § 106.44(f)(1)(iii)(B).

In response to requests for supplemental guidance and technical assistance on the scope of the Title IX Coordinator role and any of the role's specific requirements, the Department agrees that supporting recipients and Title IX Coordinators in implementing these regulations is important. The Department will offer technical assistance, as appropriate, to promote compliance with these final regulations.

*Changes:* The Department has reorganized several of the provisions in proposed § 106.44(f)(1)–(6) into paragraphs (f)(1)(i)–(vii) of the final regulations. Paragraph (f)(1)(ii) will require a Title IX Coordinator to offer and coordinate supportive measures under § 106.44(g), if appropriate, for a complainant upon being notified of conduct that reasonably may constitute sex discrimination and to offer and coordinate supportive measures for a respondent if the recipient has initiated grievance procedures under § 106.45, and if applicable § 106.46, or has offered the respondent an informal resolution process under § 106.44(k). Under paragraph (f)(1)(iii)(A), when a complainant is unknown, the Title IX Coordinator will be required to notify the individual who reported conduct that reasonably may constitute sex discrimination of the grievance procedures under § 106.45, and if applicable § 106.46, and the informal resolution process under § 106.44(k), if available and appropriate. And a Title IX Coordinator will be required under paragraph (f)(1)(iii)(B) to notify a respondent of grievance procedures under § 106.45, and if applicable § 106.46, and the informal resolution process under § 106.44(k), if available and appropriate, if a complaint is made.

Paragraph (f)(1)(iv) will require a Title IX Coordinator to initiate a recipient's informal resolution process under § 106.44(k) if available and appropriate and requested by all parties.

7. Sections 106.44(g) and 106.2 Supportive Measures and Definition of "Supportive Measures"

Definition of Supportive Measures (§ 106.2)

*Comments:* One commenter supported the proposed definition of "supportive measures" because it would allow a recipient to provide non-disciplinary, non-punitive measures to potential complainants who may not want to initiate Title IX grievance procedures and would allow these complainants continued access to education without unreasonably burdening the respondent.

One commenter opposed the proposed definition of "supportive measures" and urged the Department to keep the definition in the 2020 amendments, on the ground that it correctly balances the need to support a complainant with the need to ensure that a respondent is not punished until found responsible. Some commenters opposed the language in the definition of "supportive measures" because they argued that the standard is different from the standard articulated for burdensome supportive measures in proposed § 106.44(g)(2). One commenter requested the Department use the term "equitable interim measures" rather than "supportive measures." One commenter requested the Department revise the definition to state that supportive measures are offered, as appropriate, "before or after the filing of a formal complaint or where no formal complaint has been filed." One commenter asked the Department to clarify who a "party" is in the definition of supportive measures in § 106.2.

*Discussion:* The Department acknowledges commenters' support for the definition of "supportive measures." The Department declines to retain the definition of "supportive measures" in the 2020 amendments for the reasons discussed in the July 2022 NPRM and herein. The final definition maintains the intent of the definition in the 2020 amendments with revisions to increase clarity and to better align with § 106.44(g) and the other final regulations. *See* 87 FR 41421. The definition of "supportive measures" in the final regulations balances the need to support a complainant with the need to ensure that a respondent is not disciplined unless and until found responsible. While the definition of

"supportive measures" permits supportive measures that do not unreasonably burden a complainant or respondent, a recipient is not required to provide such measures and many supportive measures will not burden a party at all. All supportive measures are subject to the limits set forth in § 106.44(g)(2), may be challenged under § 106.44(g)(4), and may not be imposed for punitive or disciplinary reasons. Additionally, after careful consideration of the comments, the Department has deleted the language "deter the respondent from engaging in sex-based harassment" from the definition of "supportive measures" to avoid any suggestion that a recipient should make a preliminary determination as to whether a respondent has engaged in sex-based harassment when considering what supportive measures to offer to a complainant.

As discussed in more detail below, the Department has revised the definition of supportive measures to remove "temporary measures that burden a respondent that are designed to protect the safety of the complainant" and made conforming edits to § 106.44(g)(2). The Department has replaced this language with a reference to "measures that are designed to protect the safety of the parties." These changes were made to avoid any implication of bias against respondents in the provision of supportive measures. The Department notes that, consistent with the definition of "supportive measures" in the 2020 amendments, this change does not mean that a supportive measure provided to one party cannot impose any burden on the other party; rather, the definition of "supportive measures" specifies that supportive measures cannot impose an unreasonable burden on the other party. 85 FR 30181. The definition of "supportive measures" and § 106.44(g)(2) continue to permit a recipient to provide a wide range of supportive measures intended to meet any of the purposes stated in the definition, including to restore or preserve equal access to education, protect safety, or provide support during a recipient's grievance procedures or informal resolution process, as long as such measures are not unreasonably burdensome and are not imposed for punitive or disciplinary reasons.

By removing the word "temporary" from the definition, the Department acknowledges that some supportive measures may not be temporary, such as a voluntary housing relocation. A recipient is in the best position to determine the appropriate length of time for any given supportive measure.

Sections 106.44(g)(3) and (4) permit a recipient to modify or terminate supportive measures as appropriate and provide parties with the ability to seek modification or termination of supportive measures when a party believes a supportive measure does not meet the definition of "supportive measures" in § 106.2 or when circumstances have changed materially, such as where there has been a finding of non-responsibility following a grievance procedure under § 106.45, or if applicable § 106.46.

The Department also acknowledges commenters' confusion about perceived differences in the requirements articulated in the definition of "supportive measures" in proposed § 106.2 and the standard set forth in proposed § 106.44(g)(2). Although the Department intended the definition of "supportive measures" and proposed § 106.44(g)(2) to establish the same requirements for supportive measures, the Department understands how the different terminology could cause confusion. The Department has revised the definition of "supportive measures" in final § 106.2 to align with the language in § 106.44(g)(2), stating that such measures must not be imposed "for punitive or disciplinary reasons." This change is intended to clarify that, for example, while a recipient may utilize actions such as no-contact orders as supportive measures even if they may also be imposed as or accompany a disciplinary sanction under the recipient's disciplinary code at the conclusion of the grievance procedures, such supportive measures cannot be imposed for punitive or disciplinary reasons.

In addition, the Department has modified proposed § 106.44(g)(2) to include language in the final provision that states that supportive measures must not unreasonably burden a complainant or a respondent and must be designed to protect the safety of the parties or the recipient's educational environment.

The Department declines to replace the term "supportive measures" with "equitable interim measures." The term "supportive measures" accurately reflects the types of measures available to both respondents and complainants, which may be provided even if a complainant chooses not to move forward with a complaint or after a complaint is dismissed and which are not limited to the pendency of a grievance procedure. *See* § 106.44(f)(1)(ii), (g)(3). The Department also declines to add information to the definition of "supportive measures" about when supportive measures are

available as this procedural information is already contained in § 106.44(f)(1)(ii) and (g)(2)–(3).

In consideration of commenter concerns about who is a "party" under the definition of "supportive measures," the Department notes that it has added a definition to § 106.2 to clarify that "party" means a complainant or respondent. Additionally, for clarity in this specific context, the Department has modified the definition of "supportive measures" to state that supportive measures mean individualized measures offered as appropriate, as reasonably available, without unreasonably burdening a "complainant or respondent."

*Changes:* The Department has replaced the phrase "a party" in the introductory paragraph of the definition of "supportive measures" with "a complainant or respondent." Consistent with the changes made to § 106.44(g)(2), as discussed below, the Department has deleted "non-disciplinary, non-punitive" from the introductory paragraph of the definition of "supportive measures," replaced it with "not for punitive or disciplinary reasons," and moved the reference after the phrase "without unreasonably burdening a complainant or respondent." The Department has also removed the reference to non-punitive and non-disciplinary reasons from paragraph (1) of the definition, deleted "temporary measures that burden a respondent that are designed to protect the safety of the complainant" and replaced it with "measures that are designed to protect the safety of the parties," and deleted the language "or deter the respondent from engaging in sex-based harassment" from the definition of "supportive measures" in § 106.2.

Responsibility To Offer and Coordinate Supportive Measures (§ 106.44(g) and 106.44(g)(6))

*Comments:* Many commenters expressed support for proposed § 106.44(g) because it would allow complainants to continue accessing their education during the pendency of the grievance procedures, protect complainants by not forcing them to sacrifice their educational experience, help protect against peer retaliation, and address the history of complainants not receiving the support they need. Some commenters supported proposed § 106.44(g) because it would expand the requirement to offer supportive measures to individuals who experience any form of sex discrimination, while other commenters valued offering supportive measures to individuals who

report sex-based harassment even if they do not pursue resolution through the recipient's Title IX grievance procedures or informal resolution, or if their complaint is dismissed. Other commenters appreciated the flexibility in proposed § 106.44(g) with respect to offering supportive measures. Several commenters supported proposed § 106.44(g) because it would create a more streamlined process with uniform standards that would help to ensure the timely resolution of complaints.

Other commenters interpreted proposed § 106.44(g) and (g)(6) as limiting the ability to offer and coordinate supportive measures to a Title IX Coordinator, which commenters asserted would be burdensome for a Title IX Coordinator and would restrict a recipient's flexibility to involve other employees and administrators in the offering and coordination of supportive measures. One commenter stated that K–12 school districts typically rely on many employees to provide supportive measures, including counselors, assistant principals, and support staff with mental health training, and requested that a recipient have the flexibility to designate multiple staff to offer and coordinate such measures. Another commenter recommended that proposed § 106.44(g)(6) be modified to require a Title IX Coordinator to oversee and coordinate, but not necessarily offer, supportive measures.

Other commenters stated that confidential employees, not Title IX Coordinators, should be responsible for offering and coordinating supportive measures. One commenter expressed concern about a potential chilling effect by locating confidential resources within the Title IX office or otherwise requiring students to seek supportive measures from the Title IX office. Another commenter raised concerns that records that would be kept by the Title IX Coordinator under the proposed regulations could, by risking disclosure, endanger students who seek supportive services. Commenters asserted that confidential employees or campus advocates are better equipped to provide supportive measures because, for example, students do not trust campus administrators and Title IX Coordinators are not trained to provide emotional support. One commenter noted that some State laws now direct that confidential employees have the authority to offer and coordinate supportive measures.

Several commenters raised concerns about the timing and scope of supportive measures offered under proposed § 106.44(g). For example, one commenter stated that supportive

measures should be provided to all complainants and respondents regardless of whether grievance procedures are initiated and should be continued after grievance procedures are complete if necessary to restore or preserve a party's access to the recipient's education program or activity. Another commenter asked the Department to allow supportive measures for any community member engaged in grievance procedures, but did not explain further what they meant, and suggested that a recipient be allowed to consider not only the safety of the complainant but the safety of the broader community. One commenter recommended that a recipient be required to offer supportive measures only for sex-based harassment and not sex discrimination more broadly. One commenter asked the Department to clarify how coordination and implementation of supportive measures should be handled when a student discloses sex-based harassment to a confidential employee and not a Title IX Coordinator.

Several commenters requested that the Department require a recipient to publish additional information about supportive measures, to make information available in different formats and languages, and to require a recipient to work with its Principal Designated School Officials [37] to make sure that international students have access to supportive measures and understand how supportive measures may impact their immigration status.

*Discussion:* The Department agrees that § 106.44(g) will provide a recipient flexibility in offering supportive measures while also restoring and preserving access to a recipient's education program or activity.

The Department understands that some commenters interpreted proposed § 106.44(g) and (g)(6) to permit only a Title IX Coordinator to offer and coordinate supportive measures. The Department appreciates this opportunity to clarify that while a recipient must continue to require its Title IX Coordinator to offer and coordinate supportive measures under §§ 106.44(f)(1)(ii) and 106.8(a) of these final regulations permits a recipient to designate more than one employee to serve as a Title IX Coordinator and also provides a recipient or Title IX Coordinator with the flexibility and discretion to delegate specific duties of the Title IX Coordinator to one or more designees. Permission to delegate responsibilities to designees enables a recipient to assign duties to personnel

who are best positioned to perform them, such as campus personnel with a close relationship with students; to avoid actual or perceived conflicts of interest; and to align with the recipient's administrative structure. Thus, although the final regulations require one Title IX Coordinator to retain ultimate oversight over a recipient's Title IX responsibilities, including oversight over the offering and coordination of supportive measures, nothing in the final regulations otherwise restricts how the duties of offering and coordinating supportive measures may be assigned to other personnel and the Department recognizes that some recipients may find it helpful to delegate certain duties related to the provision of supportive measures.

The Department acknowledges that some commenters would prefer for confidential employees to be responsible for supportive measures and recognizes the support that confidential employees often offer to complainants and respondents. While the Department agrees that confidential employees may play a role in the implementation of supportive measures, for example by providing counseling services, the Department declines to require confidential employees to be responsible for offering and coordinating supportive measures. The provision of supportive measures is part of a recipient's responsibilities under Title IX. As confidential employees must keep the information they receive confidential, they are not well situated to be responsible for offering and coordinating the provision of supportive measures through other offices or individuals on behalf of the recipient. Therefore, the final regulations require a recipient to ensure that its Title IX Coordinator is responsible for coordinating the recipient's compliance with its obligations under Title IX, including the obligation to offer and coordinate supportive measures under § 106.44(g). *See* §§ 106.8(a), 106.44(f)(1)(ii). With respect to State laws that may permit confidential employees to offer and coordinate supportive measures, the obligation to comply with Title IX and the final regulations is not obviated or alleviated by any State or local law or other requirement that conflicts and a recipient must comply with Title IX and the final regulations even if that means the recipient will not receive the full benefit of such State laws. *See* §§ 106.6(b), 106.44(d)(2).

The Department also reiterates that the recipient itself is responsible for compliance with obligations under Title IX, including any responsibilities

---

[37] *See* 8 CFR 214.3(l)(1).

specifically assigned to the recipient's Title IX Coordinator under these final regulations, and the Department will hold the recipient responsible for meeting all obligations under these final regulations. To further clarify the recipient's ultimate responsibility for Title IX compliance and address commenters misunderstandings, the Department has revised § 106.44(g) to state that a recipient must offer and coordinate supportive measures, as appropriate. Additionally, the Department is persuaded that changes should be made to clarify and simplify the language in § 106.44, particularly in proposed § 106.44(f) and (g). To do so, the Department has deleted proposed § 106.44(g)(6) as redundant of final § 106.44(f)(1)(ii) and instead included a reference directly to final § 106.44(f) in § 106.44(g).

The Department also appreciates the opportunity to clarify that supportive measures must be offered to complainants, as appropriate, regardless of whether grievance procedures are initiated. For example, supportive measures must be offered to a complainant, as appropriate, when a complainant elects to pursue an informal resolution process or not to initiate grievance procedures. *See* § 106.44(f)(1)(ii). As indicated in the July 2022 NPRM, supportive measures may also be offered to a respondent. *See, e.g.,* 87 FR 41421. But because a respondent will not always receive notice of a complaint if a complainant elects not to move forward with grievance procedures, the Title IX Coordinator must offer supportive measures to a respondent, as appropriate, only if grievance procedures have been initiated or an informal resolution process has been offered. *See* § 106.44(f)(1)(ii); 87 FR 41448. Additionally, as discussed below in relation to § 106.45(d)(4)(i), even if a recipient elects to dismiss a complaint of sex discrimination because, for example, the recipient is unable to identify the respondent after taking reasonable steps to do so, the recipient must, as appropriate, still offer supportive measures to the complainant, such as counseling.

The Department declines to limit supportive measures to sex-based harassment. As discussed in the July 2022 NPRM, a recipient has an obligation under Title IX to address all forms of sex discrimination, including ensuring that access to the recipient's education program or activity is not limited by such sex discrimination. *See, e.g.,* 87 FR 41405. Supportive measures are designed to restore or preserve a party's access to the recipient's

education program or activity and the need for such support is not limited to sex-based harassment. 87 FR 41421. As such, supportive measures are available for all forms of sex discrimination, which is consistent with the proposed definition of "supportive measures" in § 106.2 and with § 106.44(a). 87 FR 41448. The Department also declines to require a recipient to offer supportive measures to every community member engaged in grievance procedures as this would be burdensome on a recipient. The Department notes that nothing in these final regulations prevents a recipient from offering supportive measures in circumstances not required by these regulations. In addition, to the extent a person other than the complainant who is participating or attempting to participate in a recipient's education program or activity when sex discrimination occurred also had their access to the education program or activity limited or denied as a result of that sex discrimination, that person may be able to receive remedies as appropriate under § 106.45(h)(3) if there is a determination that sex discrimination occurred.

In response to commenters' requests that a recipient be allowed to consider not only the safety of the parties but the safety of the broader community, the Department notes that the definition of "supportive measures" and § 106.44(g)(2) permits a recipient to consider supportive measures designed to protect the safety of the recipient's educational environment and § 106.44(h) allows a recipient to take into account the safety of the campus community when conducting a safety and risk analysis.

In response to commenter concerns about how to coordinate supportive measures when a student discloses sex-based harassment to a confidential employee, the Department clarifies that when a person informs a confidential employee of conduct that reasonably may constitute sex discrimination under Title IX, § 106.44(d)(2)(ii) and (iii) require that the confidential employee explain how to contact the recipient's Title IX Coordinator and that the Title IX Coordinator may be able to offer and coordinate supportive measures, as well as initiate an informal resolution process or an investigation under the grievance procedures.

Further, the Department declines to require recipients to publish additional information about supportive measures, provide information about supportive measures in a particular format, or require a recipient to work with Principal Designated School Officials in offering supportive measures. The

Department has determined that § 106.44(g) strikes the appropriate balance between requiring a recipient to offer and coordinate supportive measures while providing a recipient with flexibility to choose how to meet this requirement in a way that best serves the needs of its community. Nothing within these final regulations prevents a recipient from choosing to publish additional information about supportive measures or from coordinating with other administrators or offices to ensure all members of a recipient's educational community have access to information concerning supportive measures, assuming such efforts otherwise comply with the requirements of these regulations. *See* § 106.8(c)(1).

In response to a commenter's concern about privacy around records related to supportive measures, see the discussion of § 106.44(g)(5) and (j).

*Changes:* To clarify and simplify the language in § 106.44 and further clarify the recipient's ultimate responsibility for Title IX complaints, § 106.44(g) has been revised to change "would" to "does," add "any" before "other person," and specify that, under paragraph (f) of § 106.44, a recipient must offer and coordinate supportive measures, as appropriate, as described by the remainder of the provision. The Department has also deleted proposed § 106.44(g)(6).

Types of Supportive Measures (§ 106.44(g)(1))

*Comments:* Some commenters supported the examples of supportive measures provided in proposed § 106.44(g)(1) but requested that the Department expand the list of examples. Commenters suggested additional examples, including: allowing resubmission of an assignment or to retake an exam, adjusting a complainant's grades or transcript, independently re-grading the complainant's work, preserving a complainant's eligibility for a scholarship, honor, extracurricular, or leadership position, and reimbursing tuition or providing a tuition credit; medical and psychological services including free mental health support; complainant advocacy; changes related to transportation; removal of a respondent from participation on a school athletic team; trauma-informed care; access to a specialized social worker; accessible emergency housing (including housing that is safe for transgender and gender nonconforming students); assistance with breaking off-campus leases to access school-provided emergency housing; waiver of lease

breakage fees for school-owned housing; and assistance with reasonable moving expenses for moving to emergency housing. One commenter requested that the Department clarify in proposed § 106.44(g)(1) that supportive measures do not include involuntary changes to a complainant's schedule.

Some commenters requested that the Department add examples of additional supportive measures for respondents. These commenters stated that support for respondents would not only help to restore and preserve a complainant's access to a recipient's education program or activity but also prevent future sex-based harassment.

Several commenters asked the Department to clarify that supportive measures may include retroactive measures necessary to address harms that complainants have already experienced. One commenter noted that many complainants do not report sex-based harassment immediately after it occurs and may experience the negative academic impacts of such harassment prior to reporting, such as missed exams or failed classes. The commenter stated that supportive measures should include measures to undo these academic impacts.

Some commenters expressed a variety of opinions on the inclusion of restrictions on contact in proposed § 106.44(g)(1). Some commenters opposed the use of any type of no-contact order as a supportive measure, stating that no-contact orders are a prior restraint on speech. Other commenters asked the Department to expressly prohibit mutual no-contact orders, which one commenter suggested are easily abused and are only appropriate when both parties have been accused of misconduct towards each other. Several commenters asked the Department to explicitly state in the final regulations that a recipient is permitted to impose a non-mutual no-contact order against a respondent. Other commenters opposed the inclusion of non-mutual no-contact orders as supportive measures stating that they are highly susceptible to abuse. Some commenters asked the Department to clarify that proposed § 106.44(g)(1) would allow a recipient to impose a non-mutual no-contact order or a mutual no-contact order, depending on what is reasonable under the circumstances.

Some commenters requested that the Department clarify that a recipient is required to provide a supportive measure if the supportive measure is reasonably available. These commenters expressed concern about a recipient refusing to provide supportive measures to complainants even when requests for supportive measures were reasonable.

One commenter asked the Department to clarify whether "involuntary changes in work" refers to changes in work parameters or removal of work.

*Discussion:* The Department acknowledges commenters' views on the examples of supportive measures in proposed § 106.44(g)(1) as well as suggestions for the additional examples noted above. After careful consideration, the Department has determined that final § 106.44(g)(1) strikes the appropriate balance between providing illustrative examples of supportive measures to assist a recipient in determining appropriate supportive measures, while leaving a recipient with as much flexibility and discretion as possible to determine reasonably available supportive measures for their educational community. As discussed in the July 2022 NPRM, while a recipient has substantial discretion over the supportive measures it offers, such discretion is limited by the requirement to offer supportive measures only as appropriate to restore or preserve the party's access to the recipient's education program or activity or provide support during the grievance procedures and not for disciplinary or punitive reasons. 87 FR 41448. The Department agrees that there may be circumstances in which supportive measures for respondents, such as counseling, support groups, or specialized training, if reasonably available, can be appropriate to restore or preserve a party's access to the recipient's education program or activity. The Department also agrees that there may be supportive measures that apply retroactively, such as retroactive withdrawals, extensions of deadlines, adjustments to transcripts, or tuition reimbursements, that, if reasonably available, can be appropriate to restore or preserve a party's access to the recipient's education program or activity.

The Department also acknowledges commenters' views on no-contact orders, including non-mutual no-contact orders and mutual no-contact orders. As discussed in the July 2022 NPRM, the Department proposed eliminating the term "mutual" from the non-exhaustive list of supportive measures under § 106.44(g)(1) to ensure that a recipient understands that it is not limited to imposing mutual restrictions on contact between the parties as supportive measures. 87 FR 41450. After careful consideration of the comments, the Department has made further modifications to the language in § 106.44(g)(1) to address continued commenter confusion about whether mutual and non-mutual no-contact orders are permitted as supportive measures. The Department has changed "restrictions on contact between the parties" to "restrictions on contact applied to one or more parties." This will further clarify that a recipient may apply mutual or non-mutual no-contact orders to complainants and/or respondents as supportive measures.

The Department also disagrees that no-contact orders are highly susceptible to abuse and notes that commenters provided no evidence for such an assertion. The Department reiterates that, as with other supportive measures, a recipient may consider the appropriateness of restrictions on contact in light of factors such as those described in the July 2022 NPRM, including the need expressed by the complainant or respondent; the ages of the parties involved; the nature of the allegations and their continued effects on the complainant or respondent; whether the parties continue to interact directly in the recipient's education program or activity, including through student employment, shared residence or dining facilities, class, or campus transportation; and whether steps have already been taken to mitigate the harm from the parties' interactions, such as implementation of a civil protective order. 87 FR 41448. In considering whether to provide a no-contact order, a recipient must also ensure that a no-contact order is not imposed for punitive or disciplinary reasons and does not unreasonably burden a complainant or a respondent.

The Department disagrees that a no-contact order constitutes an impermissible "prior restraint" on speech. The Supreme Court has cautioned that a content-neutral injunction that incidentally affects expression is not a "prior restraint" when the enjoined party has access to alternative avenues of expression. *Madsen* v. *Women's Health Ctr.,* 512 U.S. 753, 763 n.2 (1994). Moreover, even when such an order restricts access to a public forum, it is constitutionally permissible if it "burden[s] no more speech than necessary to serve a significant government interest." *Id.* at 765. Under these final regulations, a no-contact order available as a supportive measure may not unreasonably burden a complainant or respondent, § 106.44(g)(2). For additional discussion of the relationship between 20 U.S.C. 1681 and freedom of speech, see the discussion of Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2).

The Department also appreciates the opportunity to clarify that supportive measures include measures that a recipient deems to be "reasonably available," consistent with the definition of "supportive measures." The Department understands that use of the phrase "available and reasonable" in proposed § 106.44(g)(1) was confusing to commenters and has modified the language of final § 106.44(g)(1) to "reasonably available."

In response to commenters' confusion about the reference to "voluntary or involuntary" changes in class, work, housing, or extracurricular or any other activity, the Department has eliminated the words "voluntary or involuntary" in the final regulations. Supportive measures may include changes in work schedules or work assignments that are not imposed for punitive reasons, so that the complainant and respondent are not working on the same projects or at the same time. The Department declines to categorically prohibit involuntary changes to a complainant's or respondent's class schedule through supportive measures as it is possible that such changes may not constitute an unreasonable burden on a complainant or respondent. Whether such an involuntary change would constitute an unreasonable burden which is not permitted under the definition of supportive measures and § 106.44(g), is a fact-specific analysis that would depend on the particular circumstances of the complainant or respondent.

*Changes:* The Department has modified "available and reasonable" in the proposed regulations to "reasonably available" in final § 106.44(g)(1). The Department has also modified "restrictions on contact between the parties" to "restrictions on contact applied to one or more parties." The Department has also removed the phrase "voluntary or involuntary."

Temporary Supportive Measures That Impose Burdens (§ 106.44(g)(2) and (g)(3))

*Comments:* Some commenters expressed support for proposed § 106.44(g)(2) because it would allow for supportive measures that may burden a respondent when necessary to protect a complainant's safety or their access to their educational environment, as long as the measures are not punitive or disciplinary. Some commenters stated that temporary burdensome supportive measures would protect the safety and well-being of all students, including the respondent, in a manner fair to all parties. Some commenters supported proposed § 106.44(g)(2) but requested that the Department allow burdensome

supportive measures to be imposed outside the pendency of the grievance procedures, including after grievance procedures are completed. One commenter suggested that burdensome supportive measures may be sufficient to end discrimination and prevent its recurrence, in which case there would be no need to initiate grievance procedures. Another commenter stated that burdensome supportive measures should be permitted for informal resolution and noted that informal resolution is the preferred approach for K–12 school districts.

Some commenters opposed proposed § 106.44(g)(2), including because they believed it would allow a recipient to impose burdensome supportive measures as an "interim punishment" without providing necessary due process, such as the opportunity to present evidence. Some commenters stated that proposed § 106.44(g)(2) would allow a respondent to be denied equitable access to education and would demonstrate a bias against respondents in violation of § 106.45(b)(2). Other commenters stated that a recipient should instead seek to equalize the application of burdensome supportive measures or minimize the combined burden of supportive measures on all parties by taking on the burden itself when possible. One commenter argued that burdensome supportive measures would be arbitrary and capricious and inconsistent with a respondent's constitutional rights, including free speech.

Some commenters opposed proposed § 106.44(g)(2) because they perceived it to provide no limit on the burden a supportive measure could impose, which could lead a recipient to prioritize the complainant's access to the recipient's education program or activity whenever the recipient chooses and without any required justification. One commenter further asserted that the Department's explanation of burdensome supportive measures offered in the July 2022 NPRM is inadequate to limit the burden placed on respondents because it suggests only that a recipient consider the impact to a respondent's access to the recipient's education program or activity but does not require, for example, that a recipient weigh the negative impact against the needs of a complainant. Other commenters stated that the 2020 amendments correctly balanced providing supportive measures with requiring the measures to be non-disciplinary and non-punitive, and another commenter asked the Department to keep the same safety and risk analysis required under the 2020

amendments. One commenter suggested that proposed § 106.44(h), regarding emergency removal, would be sufficient to address any safety concerns about a respondent. One commenter suggested that the Department should clearly limit the situations in which burdensome supportive measures can be imposed, add a statement that burdensome supportive measures do not indicate a respondent is presumed responsible, and state that a decisionmaker is not permitted to consider burdensome supportive measures when making a determination of responsibility. One commenter suggested that the Department clarify that no-contact orders qualify as supportive measures that burden a respondent and offer an immediate opportunity to appeal.

Several commenters expressed confusion over whether a supportive measure can be burdensome while also being non-punitive and non-disciplinary. One commenter stated that such supportive measures would still have a disciplinary effect that would require due process protections. One commenter asked the Department to clarify why burdensome supportive measures cannot be imposed for "disciplinary reasons" if actions that have been identified as possible disciplinary sanctions can also be used as burdensome supportive measures. The commenter asked the Department to further clarify that supportive measures may continue to be listed in codes of conduct or other policies without constituting "disciplinary sanctions" under proposed § 106.2 or proposed § 106.45(h)(4). One commenter stated that any measure that burdens an individual is a punitive measure regardless of the subjective reason for imposing it.

Several commenters sought clarification on burdensome supportive measures, including what constitutes a "reasonable burden" for a supportive measure, how to determine that a burdensome supportive measure is no more restrictive than necessary, and what the difference is between a restrictive and disciplinary measure. Several commenters asked the Department to clarify the difference between burdensome supportive measures and emergency removal under proposed § 106.44(h), including whether burdensome supportive measures are subject to the same safety and risk assessment as required under proposed § 106.44(h) and, if not, to provide examples of when burdensome supportive measures can be used without meeting the threshold of § 106.44(h). Another commenter asked the Department to clarify whether

restrictions on participation in extracurricular activities can be used as a burdensome supportive measure or if such restrictions would have to be justified under the emergency removal provision.

*Discussion:* After careful consideration of the concerns raised by commenters, including concerns that temporary burdensome supportive measures categorically suggest a presumption of responsibility against a respondent, bias against a respondent, inequitable treatment of the parties, or a violation of a respondent's constitutional rights, the Department has determined that it is necessary to modify proposed § 106.44(g)(2) to remove reference to temporary supportive measures that burden a respondent. The Department has deleted this language to avoid any suggestion that respondents and complainants are subject to different treatment in the implementation of supportive measures. Under these regulations, both complainants and respondents may be burdened by supportive measures, but neither may be unreasonably burdened by such measures.

The language in final § 106.44(g)(2) clarifies that a recipient is permitted to provide supportive measures to a complainant or a respondent as long as such supportive measures are not unreasonably burdensome to any party, are not imposed for punitive or disciplinary reasons, and are designed to protect the safety of the parties or the recipient's educational environment or to provide support during the recipient's grievance procedures under § 106.45, and if applicable § 106.46, or during the informal resolution process under § 106.44(k). This language aligns § 106.44(g)(2) with the definition of "supportive measures," and addresses commenters' concerns about perceived inconsistencies between the definition of "supportive measures" and proposed § 106.44(g)(2).

Consistent with the definition of "supportive measures" in the 2020 amendments, *see* 85 FR 30181, this change does not mean that a supportive measure provided to one party cannot impose any burden on the other party; rather, the definition of "supportive measures" specifies that supportive measures cannot impose an unreasonable burden on the other party. As discussed in the July 2022 NPRM, the Department heard from stakeholders that perceived the 2020 amendments to limit supportive measures that burden a respondent to mutual restrictions on contact. 87 FR 41448–49. These stakeholders expressed concern that this limitation hampered their ability to

restore or preserve a complainant's access to the recipient's education program or activity. 87 FR 41449. Section 106.44(g)(2) clarifies that, as the Department explained in the preamble to the 2020 amendments, nothing within the regulations states that a supportive measure cannot impose any burden on a party, but such supportive measures cannot be unreasonably burdensome. 85 FR 30180–81; *see also* 87 FR 41448.

The Department appreciates the opportunity to clarify that § 106.44(g) would not permit a recipient to impose supportive measures without any limitation on how burdensome they may be. First, a recipient must not impose a supportive measure for reasons that are punitive or disciplinary. A punitive or disciplinary measure is one that is intended to punish a respondent for conduct that violates Title IX, whereas a supportive measure is one that is intended to fulfill the purposes of supportive measures set forth in § 106.2. The fact that a measure is burdensome does not determine whether it is a supportive measure or a punitive or disciplinary measure. For example, a stay-away order may be burdensome because it requires a respondent to change routes when navigating campus or avoid a certain hallway in order to preserve a complainant's access to the recipient's education program or activity, but it would be a permissible supportive measure to the extent that the order was imposed to preserve access and was not imposed for any punitive or disciplinary reason. Similarly, a respondent might be asked to register for classes after a complainant in order to make sure that the two parties are not in the same class. While such a request may be burdensome, it would not be punitive or disciplinary because the reason for providing the supportive measure was not to punish or discipline, but rather to ensure that both parties have access to the recipient's education program or activity during the course of the grievance procedures. If a party believes a measure is unreasonably burdensome, it may challenge the supportive measure through the procedures set forth in § 106.44(g)(4).

In response to a commenter, the Department notes that the reason for a supportive measure is important to its validity. While § 106.44(g)(2) gives a recipient the discretion to make case-specific judgments about whether such actions can be used in a manner that complies with this section and the final regulations, the Department has replaced "may" with "must" in § 106.44(g)(2) to emphasize that a

recipient must not impose supportive measures for punitive or disciplinary reasons. If a party could show that a supportive measure that burdened them was intended to punish them because, for example, the supportive measure did not remedy barriers to access for the other party, the recipient would need to terminate the supportive measure. The Department recognizes that some actions used as supportive measures may also be available and employed as disciplinary sanctions after a determination of responsibility. As the Department stated in the July 2022 NPRM, such actions are not inherently disciplinary simply because the same or similar action could be imposed for disciplinary reasons. 87 FR 41449.

Second, as the Department discussed in the 2020 amendments, the Department expects recipients to engage in a fact-specific inquiry to determine whether supportive measures constitute a reasonable burden on a party. 85 FR 30182. The Department reiterates that the unreasonableness of a burden on a party must take into account the nature of the educational programs, activities, opportunities, and benefits in which the party is participating, not solely those components that are "academic" in nature. *Id.* Supportive measures such as schedule or housing adjustments may or may not constitute an "unreasonable" burden on a party. Likewise, in the elementary school and secondary school context, the Department has previously stated that many actions taken by school personnel to quickly intervene and correct behavior, such as educational conversations with students or changing student seating, would be considered reasonable supportive measures. *Id.* The Department notes, however, that actions such as suspension or expulsion are inherently burdensome and would be an unreasonable burden upon a party as a supportive measure. *Id.*

Section 106.44(g)(2) and the definition of "supportive measures" require a recipient to consider each set of unique circumstances to determine what actions will meet the purposes, and limitations, of supportive measures and when a party's access to the array of educational opportunities and benefits offered by a recipient is unreasonably burdened. *See* 85 FR 30182. The Department continues to decline to provide a specific list of what supportive measures might constitute a "reasonable" or "unreasonable" burden because that would detract from a recipient's flexibility to take into account the specific facts and circumstances and unique needs of the parties in individual situations. For this reason, the Department acknowledges

hypothetical scenarios provided by commenters but declines to provide an exhaustive list of circumstances in which actions or restrictions would constitute reasonable supportive measures. The Department understands that a recipient needs case-by-case flexibility to provide supportive measures that restore or preserve access to a recipient's educational community while preserving the rights of all parties.

The Department declines commenters' suggestion to require a recipient to equalize the application of supportive measures or minimize the combined burden of supportive measures on all parties by taking on the burden itself when possible. This is an area in which a recipient must have discretion to consider whether possible supportive measures are necessary to restore or preserve a party's access to the recipient's education program or activity; protect the safety of the parties or the recipient's educational environment; or provide support during the recipient's grievance procedures. The Department appreciates the opportunity to clarify that a recipient should not rely on its flexibility to provide supportive measures that burden a party at the expense of considering other supportive measures, including those that can be provided by the recipient without burden on either party.

As the Department has removed the reference to temporary measures that burden a respondent from the definition of "supportive measures," the Department has also removed the language from § 106.44(g)(2) limiting temporary measures that burden a respondent to the pendency of a recipient's grievance procedures under § 106.45, and if applicable § 106.46, and requiring that such measures be terminated at the conclusion of the grievance procedures. Instead, § 106.44(g)(3) directs a recipient to, as appropriate, modify or terminate supportive measures at the conclusion of the grievance procedures under § 106.45, and if applicable § 106.46, or at the conclusion of the informal resolution process under § 106.44(k). Alternatively, when appropriate, a recipient may continue supportive measures beyond the conclusion of such procedures. The Department cautions, however, that the determination whether a supportive measure constitutes a reasonable burden on a party may change following the conclusion of the grievance procedures, particularly following a determination of non-responsibility, and a recipient should consider whether such measures continue to meet the definition of

"supportive measures," when evaluating whether to continue, modify or terminate supportive measures under § 106.44(g)(3). The Department also notes that the completion of grievance procedures or the informal resolution process may constitute materially changed circumstances permitting a party to seek additional modification or termination of a supportive measure under § 106.44(g)(4) and a finding of non-responsibility will often constitute materially changed circumstances that require modification or termination of a supportive measure.

The Department appreciates the opportunity to clarify that supportive measures are not "relevant evidence" that can be considered in reaching a determination under § 106.45(b)(6) and (h)(1).

The Department also appreciates the opportunity to clarify that providing supportive measures under § 106.44(g)(2) is distinct from emergency removal under § 106.44(h). As explained below in the discussion of § 106.44(h), emergency removal permits a recipient to remove a respondent from the recipient's education program or activity on a limited emergency basis when the recipient undertakes an individualized safety and risk analysis and determines that a respondent poses an imminent and serious threat to the health and safety of the members of the campus community. Unlike emergency removal, supportive measures can be provided to restore or preserve a party's access to the recipient's education program or activity and protect the safety of the parties or the recipient's educational environment. Providing such supportive measures does not require an imminent and serious threat to the health and safety of the campus community or the risk assessment required under § 106.44(h) and the Department therefore declines the commenter's suggestion to utilize the same safety and risk analysis required under the 2020 amendments. Together, § 106.44(g) and (h) provide a recipient with the appropriate flexibility to respond to reports of sex discrimination, including to preserve educational access, protect the safety of all parties, and respond to emergency situations.

The Department disagrees that § 106.44(g)(2) would result in inequitable restrictions on speech and reiterates that it has long made clear that it enforces Title IX consistent with the requirements of the First Amendment. Nothing in these final regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment. *See* discussion of Hostile

Environment Sex-Based Harassment— First Amendment Considerations (§ 106.2); 34 CFR 106.6(d).

*Changes:* To align the definition of supportive measures and § 106.44(g)(2), the Department has modified § 106.44(g)(2) to state that supportive measures must not unreasonably burden either party and must be designed to protect the safety of the parties or the recipient's educational environment or to provide support during the recipient's grievance procedures under § 106.45, and if applicable § 106.46, or during the informal resolution process under § 106.44(k). The Department has also changed "may" to "must" to emphasize that supportive measures must not be imposed for punitive or disciplinary reasons. The Department has also deleted "For supportive measures other than those that burden a respondent" in § 106.44(g)(3).

Challenges to Supportive Measures (§ 106.44(g)(4))

*Comments:* Several commenters supported proposed § 106.44(g)(4) but requested that the Department issue supplemental guidance on how to implement a process for reviewing challenges to supportive measures, including how to conduct the fact-specific inquiry to determine whether a challenge should be allowed, how many challenges should be allowed, the degree of burden that would give a respondent a right to challenge a supportive measure, and the due process required as part of determining whether to modify or reverse a supportive measure. One commenter appreciated that the respondent must be offered the opportunity to seek modification or termination of burdensome supportive measures by appeal to an official other than the one who originally imposed them.

Some commenters opposed proposed § 106.44(g)(4) and requested the Department remove the requirement that parties be allowed to challenge supportive measures. Commenters asserted it would be overly burdensome, including because of the number of requests for supportive measures by parties at postsecondary institutions. A number of commenters raised concerns that proposed § 106.44(g)(4) would place no limit on the number of challenges or require a certain standard of review, which some commenters asserted would, for example, divert resources away from other parts of a recipient's grievance procedures or create a "cycle of disputes," under which each party continually raised challenges claiming that circumstances had changed materially. Several

commenters expressed concern about the burden of identifying an additional administrator to oversee challenges to supportive measures, including on smaller institutions with fewer resources. One group of commenters stated that a recipient would be required to develop an entire administrative structure to comply with proposed § 106.44(g)(4).

Other commenters opposed proposed § 106.44(g)(4) because they believed it would not provide sufficient protection for respondents. For example, one commenter stated that proposed § 106.44(g)(4) would allow for substantial employee discretion and would not require access to evidence, a presumption of non-responsibility, or a deadline for completion. Another commenter stated that proposed § 106.44(g)(4) would not allow respondents to challenge supportive measures as long as they would be necessary to restore or preserve a complainant's access to a recipient's education program or activity.

Several commenters suggested modifications to proposed § 106.44(g)(4) that they perceived to be less burdensome, such as replacing § 106.44(g)(4) with a general requirement for equitable implementation of supportive measures. Other commenters suggested limiting the number of or bases for challenges permitted under proposed § 106.44(g)(4). One commenter suggested that the Department should instead allow the same administrator to handle initial requests for supportive measures and challenges under § 106.44(g)(4). Another commenter requested the Department require the fact-specific determination whether a challenge has been timely to be in writing and require that the determination whether to grant or deny a challenge be resolved based on whether there has been a material change in party circumstances.

Some commenters requested the Department clarify that if a recipient is aware that a supportive measure is ineffective, the recipient must modify the supportive measure or offer alternative supportive measures.

*Discussion:* The Department acknowledges commenters' support for § 106.44(g)(4), including the opportunity to seek modification or termination of supportive measures.

Although the Department recognizes that some commenters requested the Department remove the right to challenge supportive measures, the Department declines to do so, because § 106.44(g)(4) provides the parties with the necessary procedural protections to

address the provision of supportive measures. Section 106.44(g)(4) will provide both parties with the opportunity to contest a recipient's decision regarding supportive measures as long as the supportive measure is applicable to them.

The Department disagrees that § 106.44(g)(4) will not provide sufficient protection for respondents and declines to add additional procedural or evidentiary requirements to § 106.44(g)(4). Section 106.44(g)(4) strikes the appropriate balance of ensuring procedural protections for all parties in the form of independent review while also providing a recipient with the flexibility to handle such challenges in a manner that works best for their educational communities and their available resources.

The Department acknowledges commenters' concerns about the volume of potential challenges under § 106.44(g)(4) and the perception that § 106.44(g)(4) will be burdensome to implement and acknowledges commenters' suggestions of ways to modify § 106.44(g)(4) to reduce burden. While the Department declines to replace § 106.44(g)(4) with an alternative process for the same reasons it declines to remove § 106.44(g)(4), the Department has modified proposed § 106.44(g)(4) to address these concerns and clarify that a complainant or respondent may only challenge a recipient's decision to provide, deny, modify, or terminate supportive measures when such measures are applicable to them. For example, when a complainant seeks, as a supportive measure, to transfer out of a particular section of a course so as not to be in the same class as the respondent, the recipient would not be required to provide the respondent with an opportunity to challenge the recipient's decision to provide or decline such a supportive measure, because the requested supportive measure is not applicable to the respondent. When a complainant requests a supportive measure that applies to a respondent, such a measure would be applicable to both parties and a respondent could challenge the decision to provide the supportive measure or a complainant could challenge the decision to deny it. When a recipient provides a supportive measure to a respondent that a complainant did not request and that is not applicable to the complainant, such as additional training, a recipient would not be required to provide the complainant with the opportunity to challenge the recipient's decision to provide the supportive measure. The Department also clarifies that the same

restriction applies to a party seeking additional modification or termination of a supportive measure based on materially changed circumstances. Materially changed circumstances will vary depending on the particular context of the complainant and respondent. For example, if a respondent is required, as a supportive measure, to transfer to a different section of a certain class so that the respondent and complainant are not in the same class, the respondent may seek to terminate that supportive measure if the complainant withdraws from the class or if the respondent is found not responsible after the conclusion of the applicable grievance procedures. Although there is some risk of repeated challenges based on materially changed circumstances, this provision is necessary to ensure that the supportive measures continue to achieve the goal of preserving or restoring access to the education program or activity.

The Department has also modified § 106.44(g)(4) to provide additional direction on the bases for challenging a supportive measure. The Department has added language to clarify that an impartial employee may modify or reverse a recipient's decision to provide, deny, modify, or terminate supportive measures applicable to them when the impartial employee determines the decision was inconsistent with the definition of ''supportive measures'' in § 106.2. Thus, challenges to supportive measures under § 106.44(g)(4) could include, but are not limited to, challenges concerning whether a supportive measure is reasonably burdensome, whether a supportive measure is reasonably available, whether the supportive measure is being imposed for punitive or disciplinary reasons, whether the supportive measure is being imposed without fee or charge, and whether the supportive measure is effective in meeting the purposes for which it is intended, including to restore or preserve access to the education program or activity, provide safety, or provide support during the grievance procedures.

In light of the removal of temporary burdensome supportive measures from § 106.44(g)(2) and the definition of ''supportive measures,'' the Department has also deleted the language in proposed § 106.44(g)(4) providing that, if a supportive measure burdens a party, the initial opportunity to seek modification or reversal of the recipient's decision must be provided before the measure is imposed or, if necessary, under the circumstances, as soon as possible after the measure has taken effect. As discussed in the July

2022 NPRM, the Department provides a recipient flexibility concerning timing in order to account for the wide range of supportive measures available under proposed § 106.44(g)(1) and to allow a recipient to take into account a party's interests as well as other concerns, such as circumstances in which offering such a review is impractical until after supportive measures have been provided. 87 FR 41450; *see also Mathews,* 424 U.S. at 335, 349 (holding that due process permitted an agency to provide an evidentiary hearing after terminating disability benefits and determining that the adequacy of due process procedures involves a balancing test that considers the private interest of the affected individual, the risk of erroneous deprivation and benefit of additional procedures, and the government's interest, including the burden and cost of providing additional procedures); *Fed. Deposit Ins. Corp.* v. *Mallen,* 486 U.S. 230, 240 (1988) (holding that an FDIC bank official was not entitled to a hearing prior to his suspension from office because the government's interest in protecting depositors and maintaining public confidence justified postponing the opportunity to be heard until after the initial deprivation).

The Department also acknowledges that some commenters expressed confusion about the requirement in proposed § 106.44(g)(4) to conduct a "fact specific inquiry" to determine what constitutes a timely opportunity for seeking modification or reversal, including whether this requires a formal determination and how to conduct such an inquiry. The Department is persuaded that this language may have inadvertently suggested a formal determination process and has deleted this language from final § 106.44(g)(4). The Department notes that a recipient has the flexibility to determine when a request for modification or reversal of a supportive measure is timely, and nothing within these regulations prohibits a recipient from conducting an informal fact-specific inquiry concerning timeliness, consistent with the final regulations, should the recipient choose to do so.

While the Department understands that § 106.44(g)(4) requires a recipient to identify an additional impartial employee with authority to modify or reverse decisions on supportive measures to review challenges under § 106.44(g)(4), the importance of this independent review outweighs any burdens it may impose. Section 106.44(g)(4) does not require an entire administrative structure, as suggested by a group of commenters; it only requires,

at minimum, assigning one person to handle challenged decisions. The Department intends § 106.44(g) to provide a recipient with flexibility to structure the imposition and review of supportive measures while ensuring the procedural protection of a timely independent review. For example, the Title IX Coordinator may choose to delegate the responsibility to provide or deny supportive measures to another employee and provide appropriate and impartial review of requests to terminate or modify such measures themselves, or the Title IX Coordinator may be the one to provide or deny supportive measures and the recipient or the Title IX Coordinator may designate an alternative appropriate and impartial administrator to review challenges to supportive measures. To ensure that the parties receive an independent review, however, neither the Title IX Coordinator nor any other employee will be permitted to both provide and review the same supportive measures. 87 FR 41449.

The Department declines to require a recipient to affirmatively modify supportive measures or initiate new supportive measures because it would be extremely burdensome for a recipient to have to proactively monitor all outstanding cases involving supportive measures for possible changes necessitating a modification or initiation of new supportive measures. When a party believes that a supportive measure is ineffective upon implementation, or when circumstances have materially changed to render it ineffective, § 106.44(g)(4) will allow the party to seek modification of such supportive measures.

In response to the suggestion to replace § 106.44(g)(4) with a general requirement for equitable implementation of supportive measures, it is not clear what the "equitable implementation of supportive measures" would entail, but the Department notes that the challenge procedure in § 106.44(g)(4), as well as the other provisions of § 106.44(g) and the definition of "supportive measures" in § 106.2, ensure that supportive measures are only implemented as appropriate. To the extent the commenters are suggesting that every supportive measure be applied equitably to both the complainant and respondent, the Department declines to impose such a requirement because it is inconsistent with the intent that supportive measures be individualized measures, and would unnecessarily burden a recipient, complainant, and respondent. For example, if either the complainant or respondent required an

escort service on campus, but the other party did not, then it would be unnecessary to provide both parties an escort service.

As to requests for supplemental guidance on how to implement a process for reviewing challenges to supportive measures, the Department agrees that supporting recipients and Title IX Coordinators in implementing these regulations is important. The Department will offer technical assistance, as appropriate, to promote compliance with these final regulations.

*Changes:* The Department has modified § 106.44(g)(4) to clarify that a recipient must only provide a complainant or respondent with a timely opportunity to seek, from an appropriate and impartial employee, modification or reversal of the recipient's decision to provide, deny, modify, or terminate supportive measures when such measures are "applicable to them." The provision also provides that a party must have the opportunity to seek additional modification or termination of a supportive measure "applicable to them" if circumstances change materially. The Department has also modified § 106.44(g)(4) to clarify that an impartial employee considering modification or reversal of a recipient's decision to provide, deny, modify, or terminate supportive measures may do so when the impartial employee determines that the decision was inconsistent with the definition of "supportive measures" in § 106.2. For clarity, the Department changed "the decision being challenged" to "the challenged decision." To avoid implying that a recipient must engage in a formal determination process, the Department has also deleted the requirement that a recipient must make a fact-specific inquiry to determine what constitutes a timely opportunity for seeking modification or reversal of a supportive measure. Finally, the Department has deleted the requirement that if a supportive measure burdens a party, the initial opportunity to seek modification or reversal of the recipient's decision must be provided before the measure is imposed or, if necessary under the circumstances, as soon as possible after the measure has taken effect.

Disclosure of Supportive Measures (§ 106.44(g)(5))

*Comments:* Several commenters supported proposed § 106.44(g)(5) because it would limit the recipient's disclosure of supportive measures, including limiting disclosures to parties unless necessary to restore or preserve

that party's access to the education program or activity. Other commenters raised concerns about the restrictions on the recipient's disclosure of supportive measures in proposed § 106.44(g)(5). Several commenters requested the Department permit recipients to make additional disclosures of supportive measures under proposed § 106.44(g)(5) for "applicable federal and state statutes, regulations and agency policies where disclosure of misconduct, investigations, outcomes and administrative actions is mandated by a government entity." These commenters asserted that proposed § 106.44(g)(5) would conflict with the Creating Helpful Incentives to Produce Semiconductors (CHIPS) and Science Act, which, the commenters stated, requires recipients to report any administrative action taken in response to allegations of sexual harassment by individual personnel participating on the federal research grant,[38] and the grant award terms of agencies such as the National Institutes of Health, National Science Foundation, and National Aeronautics and Space Administration, which require recipients to report administrative actions against grant award personnel for sex-based harassment.

Other commenters opposed proposed § 106.44(g)(5) because, they stated, it would not provide for disclosure of supportive measures to parents and would allow supportive measures to be provided without parental knowledge or consent.

Other commenters suggested the language in proposed § 106.44(g)(5) would be too broad and may violate FERPA. One commenter requested that the Department delete "other than the complainant or respondent" from proposed § 106.44(g)(5) to ensure that information about supportive measures is only disclosed to complainants and respondents as needed. Another commenter requested the Department clarify that a respondent should never be informed of supportive measures provided to complainants that do not affect the respondent.

*Discussion:* The Department acknowledges commenters' views on the disclosure of supportive measures under § 106.44(g)(5). As addressed in the discussion regarding § 106.44(j), the Department received numerous comments requesting clarification of a recipient's obligations regarding nondisclosure protections for information that a recipient obtains in the course of complying with this part. In response to these comments, the

Department revised § 106.44(j) to apply to any personally identifiable information obtained in the course of complying with this part, which includes personally identifiable information obtained in offering and coordinating supportive measures under this paragraph. In addition to § 104.44(j), the Department maintains this nondisclosure provision in § 106.44(g)(5) because of specific considerations that arise in the context of supportive measures.

While § 106.44(j) applies to personally identifiable information obtained in the course of complying with this part, § 106.44(g)(5) applies to any information about supportive measures. If the supportive measure is being provided in connection with grievance procedures or informal resolution, the respondent will already know the identity of the complainant and vice versa, so it is not the identity of the person but the information about the supportive measure itself that warrants protection. For example, if a student has initiated grievance procedures against another student for sex-based harassment and receives counseling services as a supportive measure, the respondent knows who the complainant is but is not entitled to know that the complainant is receiving counseling services. Additionally, this is consistent with the approach in the July 2022 NPRM, 87 FR 41451, and § 106.30(a) of the 2020 amendments ("The recipient must maintain as confidential any supportive measures provided to the complainant or respondent, to the extent that maintaining such confidentiality would not impair the ability of the recipient to provide the supportive measures.").

To avoid confusion or conflict between this provision and § 106.44(j), § 106.44(g)(5) permits disclosure if any of the exceptions in § 106.44(j)(1) through (5) applies. Thus, for instance, if the recipient obtains prior written consent from the person receiving the supportive measure allowing disclosure of that information, the recipient may make the disclosure pursuant to § 106.44(j)(1). In response to commenters' questions about parental knowledge, § 106.44(j)(2) permits disclosures regarding supportive measures to parents of minors in elementary school or secondary school who are receiving the supportive measure. Also, as explained further in the discussion of § 106.44(j), § 106.44(j)(4) reflects the Department's agreement with commenters who asked the Department to permit disclosures of supportive measures when the disclosure is required by Federal laws or

regulations or the terms and conditions of a Federal award in connection with addressing sex discrimination.

Further, this provision clarifies that the limitations on disclosures apply in the context of informing one party of supportive measures provided to another party. In the July 2022 NPRM, this was a separate sentence, but given the addition of the § 106.44(j) exceptions in final § 106.44(g)(5), for clarity and to reduce repetitiveness, the Department combined the two sentences of the July 2022 NPRM into one sentence. The Department emphasizes the importance of not disclosing information to one party regarding a supportive measure provided to another party because, without reassurance that this information will not be disclosed except in the limited circumstances in which such disclosure is necessary to provide the measure or an exception applies, the party may be discouraged from seeking supportive measures. For example, if one party is receiving counseling as a supportive measure, the Department does not anticipate that any of the exceptions of this provision would apply to allow the recipient to disclose that information to another party. However, there are occasions where disclosure to the other party may be necessary to restore or preserve a party's access to the education program or activity, such as where it may be necessary to tell one party that another party has moved to a new dorm in order to maintain the protections of a stay-away order. This provision would allow such a disclosure.

The Department disagrees that a disclosure under § 106.44(g)(5) is too broad or would violate FERPA. FERPA permits a recipient to disclose personally identifiable information from a student's education records without consent if it is to other school officials whom the recipient has determined have a legitimate educational interest, under the criteria set forth in the recipient's annual notification of FERPA rights, in the information. 34 CFR 99.7(a)(3)(iii), 99.31(a)(1)(i)(A). Thus, FERPA need not preclude a recipient from being able to disclose a supportive measure to school officials as necessary to provide the supportive measure. However, as noted above, even if permitted by FERPA, a recipient may inform one party of supportive measures provided to another party only if necessary to restore or preserve the access of the party receiving the supportive measure. For further information about FERPA, see the discussion of § 106.6(e).

The Department has replaced the phrase "complainant or respondent" in

---

[38] Public Law 117–167, Subtitle D (2022).

§ 106.44(g)(5) with ''the person to whom they apply'' to ensure that supportive measures provided to a person who does not make a complaint are encompassed within this provision. Finally, as explained in greater detail in the discussion of § 106.6(g), nothing in this provision may be read in derogation of any legal right of a parent, guardian, or other authorized legal representative to act on behalf of a complainant, respondent, or other person. This includes in connection with supportive measures.

*Changes:* The Department modified § 106.44(g)(5) to prohibit disclosures about supportive measures to persons other than to whom the supportive measures apply. The Department incorporated the exceptions to the disclosure prohibition in § 106.44(j)(1)–(5). For clarity, the Department has combined the two sentences of proposed § 106.44(g)(5) into one sentence. For streamlining purposes, the Department has also deleted the phase ''ensure that it does'' from the first sentence of § 106.44(g)(5).

Students With Disabilities (§ 106.44(g)(6))

*Comments:* The Department notes that proposed § 106.44(g)(7) has been redesignated as § 106.44(g)(6) in the final regulations, and the following comment summaries and discussion refer to the provision as § 106.44(g)(6).

Some commenters expressed support for proposed § 106.44(g)(6) because it would help ensure that a Title IX Coordinator offers and coordinates supportive measures for students with disabilities, including by requiring consultation with the IEP team, Section 504 team, or other disability personnel working with the student given the potential intersection of supportive measures with decisions regarding placement, reasonable accommodations, or special education and related services for students with disabilities.

Several commenters requested modifications to the consultation requirements in proposed § 106.44(g)(6)(i) because of concerns about delays that the consultation requirements would cause. Some commenters suggested that Title IX Coordinators should instead consult only with specific officials or administrators, such as the lead member of the Section 504 team. One commenter suggested that consultation with the IEP or Section 504 team only be required when a supportive measure would impact a student's placement, services, or access to a FAPE. Another commenter suggested the Department should instead require a Title IX

Coordinator to refer to a student's IEP or Section 504 plan rather than require consultation. One commenter asked the Department to clarify whether the required consultation with an IEP and Section 504 team in proposed § 106.44(g)(6)(i) would be an informal consultation.

Other commenters requested the Department include a requirement in proposed § 106.44(g)(6)(ii) that a postsecondary institution's disability services office publish a notice that states the availability of the Title IX Coordinator to consult with a postsecondary student with a disability if that student files a Title IX complaint, because individuals with disabilities are at higher risk of sex-based harassment but may not know a Title IX Coordinator is available to provide supportive measures.

One commenter requested the Department clarify the extent to which a Title IX Coordinator may access a student's education records under proposed § 106.44(g)(6). The commenter stated that it is not clear a Title IX Coordinator would have a legitimate educational interest in such records under FERPA. Additionally, some commenters requested the Department clarify that burdensome supportive measures cannot be so burdensome that they interfere with a respondent's access to special education services or accommodations. Another commenter requested that if a burdensome supportive measure will result in a unilateral placement change under the IDEA and Section 504, the Department clarify that any required manifestation determination review as provided for in the IDEA would not violate proposed § 106.45(b)(3).

*Discussion:* The Department acknowledges commenters' suggestions concerning the requirement to consult with the IEP and/or Section 504 team in § 106.44(g)(6)(i). The Department recognizes that, for an elementary school or secondary school student with a disability who is a complainant or respondent, supportive measures provided under Title IX may intersect with the decisions made by an IEP team or Section 504 team, including with regard to the provision of FAPE. The Department disagrees that consultation with the IEP or Section 504 team should only be required when a supportive measure would impact a student's placement, services, or access to a FAPE, because there may be other ways in which the supportive measures intersect with the decisions made by the IEP team or Section 504 team. For the same reason, the Department also does

not agree that referring to the IEP or Section 504 plan alone is sufficient.

After careful consideration, the Department clarifies in the final regulations that a Title IX Coordinator is not required to consult with a student's entire IEP or Section 504 team. Accordingly, the Department has added language to § 106.44(g)(6)(i) to make clear that a Title IX Coordinator must consult with one or more members, as appropriate, of a student's IEP or Section 504 team. This modification strikes the appropriate balance between ensuring that consultation between the Title IX Coordinator and a student's IEP or Section 504 team occurs at the elementary school and secondary school level, while also providing a recipient flexibility to consult in an appropriate manner given the variety of ways in which the supportive measures can intersect with the decisions made by the IEP team or Section 504 team. The regulations do not require IEP or Section 504 meetings, do not mandate consultation with full IEP teams or Section 504 teams, do not identify particular individuals within the IEP team or Section 504 team that must be part of the consultation, and do not specify the decisionmaking process. At the same time, § 106.44(g)(6)(i) does not preclude a recipient from taking actions such as convening additional IEP or Section 504 meetings or consulting with full IEP or Section 504 teams if appropriate under the particular circumstances. The Department also recognizes that the responsibility of ensuring that this consultation takes place lies with the recipient. Therefore, the Department has altered the final regulations to clarify that the recipient must require that the Title IX Coordinator consult with at least one member of a student's IEP team or Section 504 team.

In response to commenters' requests that the Department provide more information about the purpose of the consultation, the Department notes that the consultation is for purposes of complying with Title IX and emphasizes that mere consultation with members of an IEP team or Section 504 team may not ensure compliance with the IDEA and Section 504, as a recipient's obligations under these statutes operate independent of these regulations. The Department anticipates that, in many cases, consultation will identify additional measures that are necessary to ensure compliance with the IDEA and Section 504. Accordingly, the Department has revised this provision to emphasize that the purpose of the consultation is to determine how the recipient can comply with relevant laws

protecting students with disabilities while carrying out the recipient's obligation under Title IX and this part.

The Department acknowledges commenters' requests that a recipient be required to publish additional notices concerning the availability of a Title IX Coordinator to provide supportive measures to students with disabilities, but declines to mandate such a notice because the requirements for the contents of the notice of nondiscrimination within § 106.8(c)(1) of these final regulations are sufficient to notify a recipient's community members about the scope of a recipient's obligations to them under Title IX. Nothing in these final regulations prohibits a recipient from providing such notice as appropriate under the circumstances and consistent with the requirements of the final regulations.

The Department reiterates that nothing within § 106.44(g)(6) abrogates a recipient's obligation to comply with other Federal laws to protect the rights of students with disabilities, including when implementing supportive measures. Section 106.44(g)(6) does not modify any rights under the ADA, IDEA, or Section 504. The Department further emphasizes that, as discussed in the FERPA overview, to the extent a Title IX Coordinator's consultation under this section results in access to disability-related education records, such as an IEP or Section 504 plan, such access is solely in connection with the implementation of supportive measures, which may be defined by an educational agency or institution as constituting a legitimate educational interest. 34 CFR 99.31(a)(1)(i)(A). FERPA requires a recipient to include criteria on what the recipient considers to be a "legitimate educational interest" in the recipient's annual notification of rights under FERPA. 34 CFR 99.7(a)(3)(iii).

*Changes:* Proposed § 106.44(g)(7) has been redesignated as § 106.44(g)(6) in the final regulations because of the elimination of proposed § 106.44(g)(6), as discussed above. The Department has revised § 106.44(g)(6)(i) to state that "the recipient must require the Title IX Coordinator to consult" with one or more members of the IEP or Section 504 team, as appropriate, to align this section with § 106.8(e), as appropriate, and to clarify that it is the recipient's duty to ensure that the Title IX Coordinator consults with at least one member of a student's IEP team or Section 504 team when implementing supportive measures concerning an elementary or secondary student with a disability.

The Department has also removed the term "Section 504 team" from

§ 106.44(g)(6)(i) because the term does not appear in the Section 504 regulations. The Department has also changed "supports" to "support" in § 106.44(g)(ii) for consistency with § 106.8(e). Finally, the Department has revised § 106.44(g)(6)(i) and (ii) to provide that the Title IX Coordinator should consult "to determine how to comply" with relevant Federal laws protecting students with disabilities.

### 8. Section 106.44(h) Emergency Removal

#### Non-Physical, Serious, and Imminent Threats

*Comments:* Some commenters supported proposed § 106.44(h) because it would provide recipients greater flexibility to remove a respondent on an emergency basis when the respondent poses a serious threat to a complainant's physical or non-physical health and safety and recognizes the full range of serious threats that a respondent may pose to a complainant.

Some commenters objected to removal of the word "physical" because the Department considered and rejected similar requests to permit emergency removal for non-physical threats in the 2020 amendments. Other commenters opposed removal of the term "physical" from current § 106.44(c) including because, the commenters argued, doing so would make the standard for when emergency removal is permitted less clear and subjective and because emergency removal seriously burdens a respondent and therefore should be limited to physical threats. One commenter noted that whether a threat is serious is subjective. Commenters asked the Department to clarify the standard a recipient should apply to determine whether emergency removal is appropriate to address an individual's allegation that a respondent's presence in the recipient's education program or activity causes them emotional distress and what consideration a recipient would be expected to give to a complainant's assertion that they would feel unsafe to participate in an activity if a respondent is not removed.

Some commenters cautioned against permitting indefinite emergency removal of a respondent without providing an opportunity to challenge the decision. Commenters asserted that recipients should be required to follow the grievance procedures in proposed § 106.45, and if applicable § 106.46, before a respondent is removed on an emergency basis. Commenters asked the Department to clarify what constitutes an emergency, the level of due process a recipient must afford a respondent

before removal, and the process a recipient would be required to use if a respondent were to challenge their removal.

Commenters recommended various changes to the immediate and serious threat standard in proposed § 106.44(h). Some commenters opposed proposed § 106.44(h) because they believed it set the bar for emergency removal of a respondent too high and would limit a recipient's ability to protect members of its community from sex discrimination. Commenters asked the Department to replace "immediate and serious threat to health or safety" with "ongoing threat to health or safety." Other commenters recommended the Department replace "immediate" with "imminent" and asserted that tying a recipient's own emergency response to an immediate threat is not aligned with current best practices for threat assessment. One commenter stated that law enforcement should address immediate threats because there is not time for a recipient to assess the risk of such threats. In contrast, the commenter explained that an imminent threat is one that is likely to occur soon but not immediately. Another commenter suggested the Department require a recipient to determine that a realistic or credible threat to health or safety is imminent, ongoing, or reasonably likely to occur. One commenter suggested that the Department replace the term "individualized safety and risk analysis" with the term "threat assessment," which the commenter stated describes campus threat assessment efforts.

*Discussion:* The Department has carefully considered the comments and agrees that § 106.44(h) gives recipients the flexibility they need to remove a respondent on an emergency basis when the recipient determines that a respondent poses an imminent and serious threat to the health or safety of members of its community. The Department has considered comments related to the proposed provision's elimination of the requirement in the 2020 amendments that the threat to safety must be "physical." As noted in the July 2022 NPRM, 87 FR 41452, the Department received feedback through the June 2021 Title IX Public Hearing and listening sessions in which postsecondary institutions and safety compliance officers stated that limiting emergency removals to circumstances in which a respondent poses a threat to the physical health or safety of any student or other individuals fails to account for the significant non-physical harms some respondents pose to complainants and other individuals. A serious non-

physical threat to student safety may warrant the emergency removal of a respondent following an individualized assessment. For example, a complainant who is stalked by a respondent may not experience a physical threat, yet the stalking could present an imminent and serious threat to the student's health and safety. The Department concludes that serious, non-physical threats can be assessed as objectively as physical threats. As the stalking example shows, a complainant's assertion that a respondent's participation in a recipient's education program or activity is making them unsafe and causing them significant distress can be a basis for emergency removal if it rises to the level of an "imminent and serious threat to the health or safety of a complainant." The Department further concludes that it is appropriate to address such serious, non-physical threats on the same basis as physical threats.

The Department understands that emergency removal is a significant hardship for a respondent. The final regulations consider both a recipient's mandate to ensure a safe campus community and the rights of a respondent. As the Department explained in the 2020 amendments, when a genuine emergency exists, a recipient must have the authority to remove a respondent while providing notice and an opportunity for the respondent to challenge that decision. 85 FR 30224. The Department further notes that final § 106.44(h) retains the protection in § 106.44(c) of the 2020 amendments requiring a recipient to provide a respondent with notice and an opportunity to challenge the decision immediately following a removal. The Department appreciates the opportunity to clarify that final § 106.44(h) does not permit a recipient to permanently remove someone from its education program or activity. As noted in the 2020 amendments in response to requests that the Department set a time limitation for emergency removals, "the issue of whether a respondent needs to be removed on an emergency basis should not arise in most cases," 85 FR 30230, and as these final regulations clarify, emergency removal is appropriate only when justified by an imminent and serious threat to health and safety. Moreover, emergency removal is not intended to serve as a substitute for grievance procedures that would resolve underlying allegations of sex discrimination. See id. at 30229. Section 106.44(h) continues "to ensure that recipients have the authority and discretion to appropriately handle

emergency situations that may arise from allegations" of sex discrimination, id.; however, the Department continues to believe that it is not necessary to specify a maximum amount of time for emergency removal arising from allegations of sex discrimination. Id. at 30230. If a recipient seeks permanent expulsion or removal of an individual, the recipient must implement the grievance procedures established in § 106.45, and if applicable § 106.46, prior to taking such action. See § 106.45(h)(4). Those grievance procedures require a recipient to establish reasonably prompt timeframes for the major stages of the grievance procedures including a process for extending timeframes for good cause shown, and notice to the parties. See § 106.45(b)(4). For all of these reasons, the Department has determined that § 106.44(h) gives recipients the necessary flexibility to ensure a safe campus community while protecting the rights of all students.

The Department disagrees with a commenter's concern that the determination whether a threat is "serious" is subjective. It is a familiar term that is adequately flexible to inform an individualized assessment of the unique facts and circumstances of the health and safety risks posed by a respondent. Also, as was true under the 2020 amendments, the Department continues to believe it unnecessary to define what constitutes an emergency or to specify the level of process a recipient must provide through its procedures to challenge an emergency removal, beyond providing the respondent with notice and an opportunity to challenge the decision immediately following the removal. Instead, the Department continues to leave the decision about which specific procedures to employ to a recipient's discretion. See 85 FR 30226. As the Department explained in the 2020 amendments, "[w]e do not believe that prescribing procedures for the post-removal challenge is necessary or desirable, because this provision ensures that respondents receive the essential due process requirements of notice and an opportunity to be heard while leaving recipients flexibility to use procedures that a recipient deems most appropriate." Id. at 30229 (citing Goss, 419 U.S. at 582–83). The Department continues to believe that recipients must have flexibility to address emergency situations and notes that § 106.44(h) appropriately balances the seriousness of a respondent's removal and rights to receive the "essential" protections of due process

against the risks raised in situations in which emergency removal is justified. In particular, the Department notes that the emergency removal provision contains a number of guardrails to protect against misuse of the provision, including requirements that a recipient must: (1) undertake an individualized safety and risk analysis; (2) determine that an imminent and serious threat to the health or safety of a complainant, or any students, employees, or other persons arising from the allegations of sex discrimination justifies removal; and (3) provide the respondent with notice and an opportunity to challenge the decision immediately following the removal. The Department further declines to specify additional protections that must be provided because, since the 2020 amendments went into effect, many recipients have established procedures that comply with these requirements and through which a respondent may challenge their emergency removal. In addition, because § 106.44(h) appropriately balances a recipient's need for flexibility to address emergency situations and a respondent's due process rights, the Department declines to require recipients to follow the grievance procedures in § 106.45, and if applicable § 106.46, before a respondent is removed on an emergency basis.

The Department has carefully considered comments that the emergency removal standard in the 2020 amendments did not give recipients sufficient flexibility to remove a respondent who poses a serious threat to the health and safety of the campus community. The Department also acknowledges comments that suggested a change to align proposed § 106.44(h) with threat assessment best practices by focusing the emergency removal provision on "imminent" rather than "immediate" threats. The Department agrees that there is a need to distinguish emergency situations involving "immediate" threats from those in which a threat is "imminent." The Department agrees with commenters that "immediate" threats involve emergency situations in which there is not time for recipients to assess risks and in which an immediate law enforcement response is necessary. In contrast, "imminent" threats are those that while not active, are likely to occur soon but not immediately, and thus are appropriate for an individualized risk assessment. Therefore, the Department has replaced "immediate threat" in the proposed regulations with "imminent threat" in final § 106.44(h). The Department disagrees with the

commenters who recommended requiring a threat to be "ongoing" to justify emergency removal because a threat may present an imminent and serious risk to safety that justifies emergency removal, even if it is not shown to be an ongoing threat.

Regarding the regulation's requirement that recipients undertake an individualized risk assessment, the Department recognizes that different recipients use different terms to describe their individualized assessments. Regardless of the precise terms or phrases used, recipients will satisfy the requirement in § 106.44(h) if they have a process to conduct an analysis of safety and risk that is particular to the respondent and circumstances at issue, regardless of the words recipients use to describe their assessment.

Finally, commenters who asserted that proposed § 106.44(h) set too high a bar to protect members of the recipient's community from sex discrimination misapprehend the purpose of emergency removal, which is not, as these commenters suggested, to protect against sex discrimination, rather, it is to protect against an imminent and serious threat to health or safety that arises from allegations of sex discrimination. The remaining provisions in final § 106.44 and the grievance procedures requirements in §§ 106.45 and 106.46 afford recipients sufficient tools to adequately protect against sex discrimination allegations that do not raise a concern of imminent or serious threats to health or safety.

*Changes:* The Department has revised § 106.44(h) to replace "immediate" with "imminent" and added the words "a complainant or any" before "students, employees, or other persons" to clarify that the word "students" does not exclude complainants.

Sex Discrimination and Protected Speech

*Comments:* Some commenters objected to allowing a recipient to permit emergency removal for all forms of alleged sex discrimination. One commenter objected to the Department's proposal to expand the basis for emergency removal beyond sexual harassment to other forms of alleged sex discrimination because, the commenter asserted, it would be difficult to identify sex discrimination other than sex-based harassment that would justify emergency removal.

Some commenters expressed concern that respondents could be subjected to emergency removal for expressing their viewpoint, such as engaging in speech questioning or criticizing the inclusion of transgender students in single-sex spaces and activities. One commenter alleged that proposed § 106.44(h) would result in the emergency removal of Christian, conservative, and pro-life students from campus when other students who do not share their views assert that the disagreement causes them distress. Another commenter stated that speech alone cannot pose imminent danger to individuals.

*Discussion:* The Department has carefully considered the comments regarding the appropriateness of emergency removal for all forms of sex discrimination. The Department declines to limit § 106.44(h) to sex-based harassment, because the nondiscrimination mandate in Title IX—and therefore the basis for a recipient's response—applies to all forms of sex discrimination, including circumstances involving sex discrimination other than sex-based harassment. While the Department recognizes that conduct that rises to the level of an "imminent and serious threat to the health or safety" of members of a recipient's communities may often take the form of sex-based harassment, the Department declines to limit the scope of § 106.44(h) to sex-based harassment in order to give recipients flexibility to address circumstances in which conduct falls short of the definition of sex-based harassment but still poses an imminent and serious threat to the health or safety of members of a recipient's communities. The Department has consistently recognized that when a genuine emergency exists, a recipient must have the authority to remove a respondent. *See, e.g.,* 85 FR 30224.

The Department reiterates that emergency removal is intended to apply only to those situations that pose an imminent and serious threat to health and safety of a complainant or any students, employees, or other persons arising from the allegations of sex discrimination, an intentionally high standard. The Department does not anticipate that speech that simply and even strongly articulates a point of view on ethical, social, political, or religious topics would meet this standard even though others may find that speech offensive or objectionable. Indeed, the Department is unaware of circumstances in which such speech has been the basis for removal under the lower standard set forth in § 106.44(c) of the 2020 amendments, which permits removal for even non-serious immediate threats to physical health or safety. *See also* 87 FR 41452 (explaining that the Department added the term "serious" in the proposed regulations to confirm that non-serious threats do not warrant emergency removal). In any event, the Department has long made clear that Title IX is enforced consistent with the requirements of the First Amendment, and nothing in these final regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment. *See* 34 CFR 106.6(d) ("Nothing in this part requires a recipient to . . . [r]estrict any rights that would otherwise be protected from government action by the First Amendment of the U.S. Constitution"); *see also* discussion of Hostile Environment Sex-Based Harassment— First Amendment Considerations (§ 106.2) (Section I.C). For the same reasons, the Department declines to amend § 106.44(h) because of some commenters' concern that individuals could be subjected to emergency removal for expressing their viewpoints.

The Department disagrees with one commenter's claim that the 2020 amendments permitted emergency removal only for an individual's nonspeech actions and did not permit emergency removal for sex-based harassment accomplished through speech. The 2020 amendments specifically recognized emergency removal as an option for threats of violence and did not limit the provision to physical conduct. The 2020 amendments also provided that the underlying sexual harassment from which a threat emanates need not be limited to sexual assault or rape but may be verbal sexual harassment. 85 FR 30225. The Department has therefore consistently recognized that threats beyond acts of physical violence may justify emergency removal.

*Changes:* None.

Partial Emergency Removals and Supportive Measures

*Comments:* Some commenters asked about the distinction between emergency removal and supportive measures that may be provided under § 106.44(g) that would burden a respondent, including those that would remove a respondent from a part of a recipient's education program or activity during the pendency of a recipient's grievance procedures. Commenters asked whether the requirements for emergency removal, including the opportunity to challenge the removal, would need to be met when a recipient institutes a supportive measure that removes a respondent from a specific program or activity but not from a recipient's entire education program or activity. Some commenters favored allowing these kind of "partial"

emergency removals while other commenters opposed it. One commenter stated that recipients currently do not know whether partial emergency removal is permitted under the 2020 amendments and requested clarification.

Some commenters stated that proposed § 106.44(h) should permit greater flexibility for a recipient to remove a respondent for the safety of the complainant and the recipient's educational community, while allowing the respondent to continue to participate in a modified way. One commenter asked the Department to modify proposed § 106.44(h) to include language requiring a recipient to provide respondents with alternative access to their academic classes, work, and responsibilities, which the commenter stated would be consistent with respondents' due process rights.

Multiple commenters asked the Department to clarify when removal from part of a recipient's education program or activity would be permitted and provided several hypothetical scenarios.

*Discussion:* The Department has determined that, together with the requirements of §§ 106.44, 106.45, and if applicable 106.46, allowing emergency removal consistent with the requirements of § 106.44(h) provides appropriate flexibility to recipients to respond to emergency situations. *See, e.g.,* 87 FR 41452. The 2020 amendments allow a recipient to remove a respondent on an emergency basis from a part of a recipient's education program or activity, rather than the entire program or activity, in appropriate circumstances. *See* 85 FR 30232 ("where the standards for emergency removal are met . . . the recipient has discretion to remove the respondent from all the recipient's education programs and activities, or to narrow the removal to certain classes, teams, clubs, organizations, or activities"). The Department agrees with commenters who suggested that this option, when sufficient to address an imminent and serious safety risk, may reduce the burden that an emergency removal from the entire program places on a respondent. For that reason, under § 106.44(h) of the final regulations, a recipient retains discretion to remove a respondent on an emergency basis from one or more parts of its education program or activity, as long as the recipient meets the other requirements of final § 106.44(h).

The Department acknowledges that some commenters expressed confusion over when a recipient would remove a respondent from a part of its education program or activity as an emergency removal that meets the requirements of § 106.44(h) and when a recipient would do so as a supportive measure consistent with the requirements of proposed § 106.44(g)(2). In some cases, a partial removal may be appropriate as a supportive measure, as long as it is consistent with the requirements of § 106.44(g) and the definition of supportive measures in § 106.2. In emergency situations, a recipient could remove a respondent using the emergency removal procedures under § 106.44(h). With emergency removal, a recipient would be permitted to remove a respondent from all or part of its education program or activity, as long as it affords the respondent notice and an opportunity to challenge the decision immediately following the removal.

Finally, as clarified in the preamble to the 2020 amendments, in many cases a recipient will "accommodate students who have been removed on an emergency basis with alternative means to continue academic coursework during a removal period," 85 FR 30226, and the post-removal notice and opportunity to challenge a removal required under final § 106.44(h) provides respondents adequate opportunity to raise concerns about continued access to coursework.

*Changes:* None.

Emergency Removal and Other Legal Requirements

*Comments:* One commenter asked the Department to clarify that disclosure of information related to an emergency removal is permitted to comply with applicable Federal and State statutes, regulations, and agency policies related to misconduct investigations, outcomes, and administrative actions. Other commenters asked the Department to clarify how proposed § 106.44(h) relates to the Clery Act emergency removal provision and whether proposed § 106.44(h) would impact a postsecondary institution's obligations under the Clery Act to restore and preserve campus safety. Some commenters asked the Department to confirm that if recipients can take immediate action consistent with their policies to address discrimination prohibited under other laws, proposed § 106.44(h) would not preclude them from taking comparable action to address sex discrimination. Commenters also asked the Department to clarify that a decisionmaker cannot take into consideration the emergency removal of a student when determining responsibility in any related sex discrimination grievance procedures

under § 106.45, and if applicable § 106.46, which would ensure that a respondent enjoys the presumption of non-responsibility.

Some commenters supported proposed § 106.44(h) because it would provide recipients greater flexibility to remove a respondent on an emergency basis following an individualized assessment while continuing to recognize that emergency removal does not modify rights under the IDEA, Section 504, or the ADA. Other commenters asked the Department to further clarify the relationship between proposed § 106.44(h) and the IDEA and Section 504 requirements for changes to the placement of a student with a disability, including whether a recipient must conduct any required manifestation determination review before removing a respondent who is a student with a disability under § 106.44(h). One commenter suggested the Department modify proposed § 106.44(h) to provide that a recipient may make an initial determination that a respondent student violated the code of conduct solely for purposes of conducting an MDR.

*Discussion:* As noted in the 2020 amendments and as explained in the discussion of the Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.C), these final regulations may impose different requirements than Title VI or Title VII, but they do not present an inherent conflict with those statutes. *See* 85 FR 30439. Therefore, while a recipient may be able to take immediate action to address other discrimination under other laws following procedures that would not satisfy the requirements of § 106.44(h), the Department continues to believe that the emergency removal requirements in these final regulations are appropriate for addressing sex discrimination, even if that means that a recipient is required to handle different types of discrimination under different procedures. *See* 85 FR 30226. The Department has determined that for Title IX purposes, a lower threshold would not appropriately balance a recipient's need to remove a respondent posing an immediate threat with the need to ensure that such action is not inappropriately used to bypass the general prohibition on imposing discipline without first following a recipient's grievance procedures' requirements. And as explained in the discussion of § 106.8(b), these final regulations do not alter requirements under FERPA or its implementing regulations, or the Clery Act or its implementing regulations, and disclosures pursuant to such

requirements generally will be permitted under § 106.44(j). For additional information on the circumstances under which a recipient may disclose personally identifiable information obtained in the course of complying with this part, see the discussion of § 106.44(j).

The Department acknowledges commenters' views on § 106.44(h), including its continued recognition of a respondent's right to an assessment and other disability-related rights under the IDEA, Section 504, and the ADA. Emergency removal under § 106.44(h) provides flexibility to address imminent and serious threats to individual safety in a recipient's education program or activity, including threats to non-physical health, while safeguarding the rights of a respondent under applicable law. The Department made a technical change to final § 106.44(h) to replace the reference and citation to Title II of the ADA with a reference to the ADA and a citation to 42 U.S.C. 12101 *et seq.* The Department made this change to clarify that § 106.44(h) does not modify any rights under any part of the ADA.

As explained in greater detail in the discussion of § 106.8(e), the IDEA and Section 504 protect the rights of students with disabilities in elementary school and secondary school. The implementing regulations for the IDEA and Section 504 require that a group of persons, known as the IEP team or Section 504 team, is responsible for making individualized determinations about what constitutes a FAPE for each student with a disability. Section 106.44(h) does not modify any rights under the ADA, IDEA, or Section 504, including the right to a manifestation determination review as provided for in IDEA in some cases, and a recipient might have to treat a respondent student with a disability subject to emergency removal differently than a respondent student without a disability to comply with applicable Federal disability laws. 85 FR 30228. Nothing in § 106.44(h) prevents a recipient from involving a respondent student's IEP team before making an emergency removal decision, and § 106.44(h) does not require a recipient to remove a respondent when the recipient has determined that the threat posed by the respondent is a manifestation of a disability and IDEA requirements would thus constrain the recipient's discretion to remove the respondent. 85 FR 30229. Moreover, to ensure that the regulations preserve the rights of students with a disability at the elementary school and secondary school levels, the final regulations include § 106.8(e), which requires a recipient's Title IX Coordinator or designee to

consult with one or more members, as appropriate, of the student's IEP or Section 504 team about the student in the course of complying with § 106.45.

Finally, the Department appreciates the opportunity to clarify that emergency removal is not ''relevant evidence'' that can be considered in reaching a determination under § 106.45(b)(6) and (h)(1).

*Changes:* The Department changed the citation of Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. 12131–12134, to the Americans with Disabilities Act, 42 U.S.C. 12101 *et seq.*

### 9. Section 106.44(i) Administrative Leave

*Comments:* Some commenters expressed general support for proposed § 106.44(i), including the recognition that placing a student employee respondent on administrative leave may be appropriate in some cases as a supportive measure. One commenter asked the Department to clarify that a recipient may place volunteers, agents, and other persons authorized by the recipient to provide an aid, benefit, or service on administrative leave.

Some commenters raised due process concerns with proposed § 106.44(i). For example, one commenter likened administrative leave to emergency removal, both of which the commenter asserted would prioritize a recipient's reputation over a respondent's due process rights. Another commenter stated that proposed § 106.44(i) would permit an action that is punitive in nature and presumes an employee respondent's responsibility before or during an investigation. This commenter asked the Department to require a recipient to afford an employee the protections provided under proposed § 106.45, and if applicable § 106.46, before placing the employee on administrative leave.

One commenter observed that administrative leave can be disruptive to an employee respondent's work, damage the employee respondent's reputation, and make an employee respondent vulnerable to targeting by individuals on a recipient's campus. Another commenter asked the Department to clarify that a recipient can resolve workplace issues with employee respondents through its existing faculty and staff processes.

*Discussion:* Section 106.44(i) grants a recipient discretion to place respondents who are employees on administrative leave during the pendency of a recipient's grievance procedures. The Department disagrees with commenters who asserted that allowing administrative leave presumes

a respondent's responsibility. The Department reiterates that a respondent may only be found responsible for sex discrimination under Title IX upon the conclusion of a recipient's grievance procedures under § 106.45, and if applicable § 106.46. The Department appreciates the opportunity to clarify that nothing in § 106.44(i) interferes with a recipient's discretion to place respondents who are employees, including student employees, on administrative leave from their employment responsibilities. This discretion extends only to a student-employee's employment responsibilities during the pendency of the recipient's grievance procedures; a recipient must comply with § 106.45, and if applicable § 106.46, before any disciplinary sanctions are imposed on a student-employee respondent, and supportive measures may not be provided for punitive or disciplinary reasons. Section 106.44(i) of these final regulations is consistent with the Department's position in the preamble to the 2020 amendments that a recipient may place a student-employee respondent on administrative leave if it would not violate other regulatory provisions to do so. 85 FR 30237.

The Department disagrees that proposed § 106.44(i) should be modified to state that a recipient may place volunteers, agents, and other persons authorized by the recipient to provide an aid, benefit, or service on administrative leave. Although the 2020 amendments and § 106.44(i) do not define administrative leave, the Department continues to understand administrative leave as a temporary separation from one's employment, generally with pay and benefits, and thus, the term applies to a recipient's employees. *See* 85 FR 30236. As explained in the discussion of the training requirements in § 106.8(d), given the range of employment arrangements and circumstances across recipients in States with differing employment laws, individual recipients are best situated to determine whether volunteers, agents, and other persons authorized by the recipient to provide an aid, benefit or service are employee respondents to whom § 106.44(i) applies. The Department notes, however, that even if such individuals are not designated as employees, nothing in § 106.44(i) restricts a recipient from following its policies related to administrative leave with respect to other individuals (including volunteers, agents, and the like), provided that the policies comply with these final regulations and other

applicable laws. Nor does § 106.44(i) interfere with a recipient's authority to remove a volunteer, agent, or other authorized person from their position as a supportive measure for non-punitive, non-disciplinary reasons to protect the safety of a party or the recipient's educational environment, consistent with the requirements of § 106.44(g). Likewise, § 106.44(i) does not interfere with a recipient's authority to remove a volunteer, agent, or other authorized person from their position on an emergency basis when such removal is consistent with the requirements of § 106.44(h).

The Department has carefully considered the comments expressing concerns regarding due process in connection with administrative leave. The Department notes that § 106.44(i) is substantially the same as § 106.44(d) of the 2020 amendments, with only minor changes discussed in the July 2022 NPRM. *See* 87 FR 41452. Consistent with its position in the preamble to the 2020 amendments, the Department desires to give each recipient flexibility to decide when administrative leave is appropriate, considering its existing obligations under State laws and employment contracts. *See* 85 FR 30236. Section 106.44(i) does not elevate a recipient's reputation over an employee respondent's due process rights. Nor is an employee placed on administrative leave denied due process. First, if administrative leave is used as a supportive measure under § 106.44(g), the recipient must comply with the procedural protections in that provision. Because § 106.44(g)(2) requires recipients to ensure that supportive measures do not unreasonably burden a party, administrative leave as a supportive measure would generally be paid. Second, if a recipient seeks an emergency removal under § 106.44(h), then those procedural protections apply.

Nonetheless, the Department acknowledges that there could be circumstances in which a recipient determines it must place an employee on administrative leave for reasons other than supportive measures or emergency removal. As explained in the 2020 amendments, the Department acknowledges that some State laws allow or require an employee to be placed on administrative leave, or its equivalent, and § 106.44(i) does not preclude compliance with such State laws while a Title IX investigation is pending. *See* 85 FR 30236. Similarly, § 106.44(i) does not interfere with a recipient's contractual obligations, such as under a collective bargaining agreement, or obligations to comply with the recipient's own policies related

to administrative leave. In such circumstances in which administrative leave is used outside of supportive measures or emergency removal, the final regulations provide recipients flexibility to use their existing procedures related to administrative leave.

In addition, as the Department previously explained, it interprets these Title IX regulations, including § 106.44(i), in a manner that complements an employer's obligations under Title VII for responding to matters involving sex-based harassment and discrimination. *See* 85 FR 30237. The Department notes that other requirements in the U.S. Constitution, Federal or State law, or collective bargaining agreements may limit a recipient's use of administrative leave, and nothing in § 106.44(i) requires a recipient to place an employee on administrative leave during the pendency of the recipient's grievance procedures. Section 106.44(i) is not intended to override or modify rights under other laws or collective bargaining agreements.

As explained in the preamble to the 2020 amendments, the Department notes that administrative leave under these regulations is temporary, and § 106.44(i) only applies "during the pendency of the recipient's grievance procedures," which have been crafted to protect due process rights. Recipients are not precluded from applying applicable administrative leave laws, agreements, or policies at other times, but such application is outside the scope of § 106.44(i). *See* 85 FR 30236–37. The Department notes, however, that placing an employee on administrative leave does not deprive the employee of other rights available under Title IX. If, for example, an employee believes that they have been subject to sex discrimination or retaliation through the application of an employer's administrative leave policy, the employee would have recourse under Title IX and these final regulations. *See* §§ 106.45, 106.46, 106.71.

As stated in the 2020 amendments, the Department acknowledges that being placed on administrative leave may constitute a hardship for an employee. *See* 85 FR 30236. But such leave may be necessary to ensure that a recipient's education program or activity is operated consistent with Title IX's nondiscrimination mandate, such as when a recipient determines that a leave of absence is an appropriate supportive measure under § 106.44(g) or necessary to respond to an imminent and serious threat to health or safety under § 106.44(h). And in those circumstances,

a recipient may impose administrative leave only if it meets the substantive and procedural requirements of § 106.44(g) or (h). The Department also acknowledges that placing an employee on administrative leave may impact the workplace, but for the reasons described above, the Department maintains that a recipient should have flexibility not only to use administrative leave as a supportive measure or in the context of emergency removal, but also to comply with other State law or contractual obligations, and the recipient would be in the best position to know whether administrative leave is appropriate.

Finally, the Department declines to modify the administrative leave provision to permit a recipient to address an employee respondent's employment issues solely through its existing faculty and staff employment or discipline processes. The July 2022 NPRM acknowledged stakeholders' requests that the Department exclude complaints against employee respondents from the various requirements of its Title IX regulations and declined to propose changes to its grievance procedure requirements in response to these concerns. *See, e.g.,* 87 FR 41458–59. The Department also declines to do so now because extending the requirements of these Title IX regulations to employee respondents ensures that recipients meet their obligations under Title IX. As the Department explained in the 2020 amendments, nothing in these Title IX regulations precludes a recipient from taking additional action under an employee code of conduct or other employment policies, *see* 85 FR 30440, or from honoring an employee's rights guaranteed by a collective bargaining agreement or employment contract, as long as doing so does not prevent the recipient from fulfilling its obligations under the Department's Title IX regulations, *id.* at 30442.

*Changes:* To align with a change made in § 106.44(h), the Department changed the citation of Title II of the Americans with Disabilities Act of 1990, 42 U.S.C. 12131–12134, to the Americans with Disabilities Act, 42 U.S.C. 12101 *et seq.*

**10. Section 106.44(j) Prohibited Disclosures of Personally Identifiable Information**

*Comments:* The Department received numerous comments seeking clarification about a recipient's duty to maintain the confidentiality of information obtained while complying with this part. Many commenters supported proposed § 106.44(j) but asked the Department to provide the nondisclosure protections of this

proposed paragraph beyond the context of informal resolution processes, grievance procedures under § 106.45, and if applicable § 106.46, or actions required under proposed § 106.44(f)(6). These commenters asserted that failing to specify protections against disclosure for provisions outside of those listed in proposed § 106.44(j) could chill students and employees from exercising their rights under Title IX or this part with regard to the provisions for which the Department did not specifically articulate nondisclosure protections.

Many commenters raised specific concerns about disclosures of information related to a student's or an employee's sexual orientation, gender identity, or pregnancy or related conditions, stating that, without more clarity as to the intended scope of protections against third-party disclosures, the chilling effect on students or employees seeking to exercise their rights under Title IX would hinder a recipient's ability to operate its education program or activity free from sex discrimination and deny the student equal access to education. For example, one commenter asserted that recipients should not be permitted to share personal details relating to students' healthcare while coordinating or implementing remedies. One commenter asked the Department to clarify how to protect the privacy and safety of LGBTQI+ students and employees in States where disclosure of records of their sexual orientation or gender identity could result in harm and in situations in which students or employees do not wish to have their sexual orientation or gender identity disclosed. One commenter asked the Department to emphasize that Title IX's protections preempt State laws and override FERPA disclosures when disclosure would create a hostile environment for LGBTQI+ students and to clarify that forced disclosure of a student's sexual orientation or gender identity without their consent violates Title IX.

Commenters also pointed out that recipients' or employees' actions to comply with the recipient's obligations under proposed §§ 106.40 and 106.57 could be thwarted by fear that disclosures of such actions, which would be outside of the scope of proposed § 106.44(j), could subject employees to civil or criminal penalties. Thus, while many commenters supported the Department's proposed relocation of the prohibition on disclosures to proposed § 106.44(j) and out of the retaliation provision, the commenters felt more clarity was needed with regard to prohibitions on

disclosures beyond the enumerated circumstances of proposed § 106.44(j). Numerous commenters asked the Department to add regulatory text stating that nondisclosure protections apply to all information obtained by a recipient in complying with this part.

Some commenters raised a concern that proposed § 106.44(j) would prevent disclosures required to comply with Federal grant award terms or applications or with other Federal regulations. The commenters asked the Department to add an exception to proposed § 106.44(j) to permit disclosures to a government entity as required by Federal law, regulations, or grant award terms and conditions. Additionally, several commenters asked the Department to address the interaction between Title IX, FERPA, and HIPAA, and some commenters asked for clarification regarding the disclosure of information that is permissible under FERPA but could subject a student or employee to prosecution or create a hostile environment by placing a student's health or safety in danger.

Some commenters opposed proposed § 106.44(j) because they believed that respondents are entitled to know the identity of all complainants, witnesses, and other participants without limitation or exception. Some commenters asked whether the respondent has the right to remain anonymous. Other commenters raised concerns about the impact this proposed provision would have on informal resolution procedures, and one commenter argued that proposed § 106.44(j) would impose an impermissible "gag order" on parties. Finally, several commenters believed that proposed § 106.44(j) would keep parents uninformed of their child's involvement in important matters, such as being a party to a discrimination complaint.

*Discussion:* The Department acknowledges the numerous commenters who expressed their views on proposed § 106.44(j) and on the importance of a recipient maintaining the confidentiality of information obtained in the course of complying with this part. After careful consideration of these comments, the barriers that disclosure of personally identifiable information can create to a recipient's ability to effectuate Title IX, and the various proposed provisions in the July 2022 NPRM related to disclosure prohibitions, the Department agrees with commenters who asked the Department to provide clarity regarding a recipient's obligation under Title IX to limit the disclosure of information that

a recipient obtains in the course of complying with this part. The Department notes that commenters expressed concerns related to disclosure that are discussed in several other sections of this preamble, including the discussions of §§ 106.31, 106.40, 106.44(c), and 106.44(g), underscoring the need for the Department to clarify the scope of the limitations on disclosures in a consistent manner. As a result, the Department has revised the provision so that final § 106.44(j) protects all personally identifiable information obtained by a recipient in the course of complying with the Department's Title IX regulations, with some exceptions as detailed below, in order to protect the Title IX rights of students and employees and to help ensure that a recipient's education program or activity is free from sex discrimination.

This revision addresses the concern raised by many commenters that, by limiting proposed § 106.44(j) to specific and narrow circumstances, the Department failed to provide protections from disclosures in other circumstances and that such protections are necessary to effectuate Title IX for the same reasons as those articulated for the necessity of protecting the information within the scope of proposed § 106.44(j). For instance, the scope of proposed § 106.44(j) did not include implementing reasonable modifications under § 106.40(b)(3)(ii), but if a student made a complaint of sex discrimination because a reasonable modification was not provided, proposed § 106.44(j) would have applied. However, the privacy interest in personally identifiable information regarding a reasonable modification is the same and not dependent on whether a complaint is filed. Thus, after careful consideration of commenters' views regarding the importance of disclosure protections for personal information beyond the enumerated contexts of proposed § 106.44(j), the Department is revising proposed § 106.44(j) because the concerns that motivated proposed § 106.44(j) are implicated by other personal information obtained by a recipient in the course of its compliance with Title IX.

The Department understands that a recipient cannot fulfill its duty to operate its education program or activity free from sex discrimination if members of a recipient's educational community are not aware of the circumstances under which personally identifiable information shared with a recipient as part of an exercise of their rights under Title IX can be disclosed because there may be a chilling effect on reporting or

participating in the grievance procedures that could then impair a recipient's ability to carry out those obligations. *See* 87 FR 41452 (explaining that, to effectuate a recipient's duty under Title IX to operate its education program or activity free from sex discrimination, a recipient must refrain from disclosures that would be likely to chill participation in the recipient's efforts to address sex discrimination). This is true regardless of whether the recipient obtains the information in the course of, for example, conducting an informal resolution process, implementing grievance procedures, providing supportive measures, coordinating or implementing remedies, or providing reasonable modifications for pregnancy or related conditions. By virtue of its obligations under Title IX, a recipient will obtain highly sensitive personal information about individuals participating in its education program or activity, including an allegation that a specific person experienced or engaged in sex-based harassment or information related to a specific person's pregnancy or related condition, sexual orientation, gender identity, or other sex characteristic. The Department maintains that when exercising any of their rights or engaging in any of the procedures under Title IX or this part, individuals—or, in the case of minors under the age of 18 in elementary schools or secondary schools, their parents or guardians—have a reasonable expectation that related personally identifiable information shared with a recipient generally will not be disclosed to third parties.

As explained in the July 2022 NPRM, proposed § 106.44(j) was based on § 106.71(a) of the 2020 amendments, which the Department explained was added because unnecessarily exposing the identity of complainants, respondents, and witnesses "may lead to retaliation against them." 87 FR 41453 (quoting 85 FR 30537). As explained in the July 2022 NPRM, the Department sought to relocate the prohibition on disclosures in § 106.71(a) outside of the retaliation provision, because "it relates to a recipient's broader responsibilities to address information about conduct that may constitute sex discrimination in its program or activity." 87 FR 41452. The Department believed that this move would reduce confusion and enhance clarity. 87 FR 41453. Moreover, proposed § 106.44(j) sought to apply § 106.71(a) of the 2020 amendments beyond parties and witnesses to include other participants in the Title IX

procedures, such as advisors, parents, guardians, other authorized representatives, interpreters, and notetakers. The Department posited that some of these individuals may be reluctant to participate in Title IX processes without the nondisclosure protections of proposed § 106.44(j) and explained that their "lack of participation could . . . impair the recipient's efforts to address information about conduct that may constitute sex discrimination." 87 FR 41453. Final § 106.44(j) reflects these same concerns that unnecessary disclosures can have a chilling effect on the reporting of sex discrimination that could impair a recipient's ability to carry out its Title IX obligation to maintain an educational environment free from sex discrimination. Additionally, unauthorized disclosures of personally identifiable information can lead to sex-based harm, including harassment, retaliation, and other forms of discrimination.

The Department has adopted the phrase "personally identifiable information" in final § 106.44(j) rather than "identity," which was the term in proposed § 106.44(j). While it is not necessary to adopt a specific definition of the term "personally identifiable information" for final § 106.44(j) because of recipients' general familiarity with the term, as in other contexts, personally identifiable information is information that would tend to reveal the identity of an individual. After consideration of the comments, the Department realized that the term "identity" in proposed § 106.44(j) would not sufficiently protect an individual's interest in the confidentiality of private information, as it could be interpreted to simply protect an individual's name rather than information that would reveal an individual's identity. Thus, the Department adopted the more comprehensive term of "personally identifiable information" in the final regulations.

The Department emphasizes that this paragraph covers personally identifiable information obtained by a recipient in the course of complying with this part, which includes its obligation to maintain an environment free from sex discrimination. Thus, a recipient may not disclose any personally identifiable information related to, for example, a supportive measure or a request for a reasonable modification because of pregnancy or related conditions under § 106.40(b)(3), unless the recipient has obtained consent or one of the other exceptions is met, and, as with proposed § 106.44(j), this paragraph also

applies to personally identifiable information obtained by a recipient with regard to complainants, respondents, or witnesses, or other participants in informal resolution processes, grievance procedures under § 106.45, and if applicable § 106.46.

Section 106.44(j) includes three exceptions to the general prohibition on disclosure of personally identifiable information. The Department reminds recipients that, even when an exception applies, a disclosure cannot be made for retaliatory purposes per § 106.71.

First, as in proposed § 106.44(j)(1), final § 106.44(j)(1) permits disclosure when the recipient has obtained prior written consent to the disclosure. The Department reworded this provision to add the phrase "from a person with the legal right to consent to the disclosure" to recognize that there are various Federal and State laws that may govern who has the legal authority to consent to disclosure of personally identifiable information depending on factors such as the age of the person whose personally identifiable information is at issue, whether the person whose personally identifiable information is at issue is in attendance at an institution of postsecondary education, and whether the personally identifiable information is in an education record. Final § 106.44(j)(1) clarifies that a recipient must obtain consent from a person with legal authority under applicable law, and, if that person is not the same person whose personally identifiable information is at issue, the recipient need not also obtain consent from the person whose personally identifiable information is at issue. For example, if a parent has the legal right to consent to disclosure of their minor child's personally identifiable information, the recipient need only obtain consent from the parent. This exception is to be read consistently with FERPA, and if the personally identifiable information is in an education record, the consent requirements of FERPA apply. Under FERPA, if a student is under the age of 18 and attending an elementary school or a secondary school, the right to consent to the disclosure lies with the student's parent or guardian. If the personally identifiable information is not in an education record, then there may be applicable State law requirements governing consent to the disclosure of personally identifiable information.

The Department added the second exception—final § 106.44(j)(2)—to address commenters' confusion regarding disclosures to parents. As stated elsewhere in this preamble, the

Department supports strong, communicative relationships between recipients and parents. This exception clarifies that this paragraph does not prohibit any disclosure to a parent, guardian, or other authorized legal representative who has the legal right to receive disclosures on behalf of the person whose personally identifiable information is at issue. As with final § 106.44(j)(1), this provision is intended to allow for application of legal rights conferred by other Federal laws and regulations, such as FERPA, and by applicable State laws. For example, if a student is a minor under State law but an "eligible student" under FERPA because they are attending a postsecondary institution, FERPA does not permit disclosures to parents unless the student provides prior written consent or one of FERPA's permissive exceptions to FERPA's written consent requirement applies. However, for students under the age of 18 years old in elementary school or secondary school, the student's parent has the legal right under FERPA to inspect and review their child's education record.

Final § 106.44(j)(3) is consistent with proposed § 106.44(j)(4)—to carry out the purposes of the Department's Title IX regulations, including action taken to address conduct that reasonably may constitute sex discrimination under Title IX in the recipient's education program or activity. The Department added the word "reasonably" for consistency with these final regulations. As an example of final § 106.44(j)(3), in the postsecondary context, a recipient may inform a professor of a supportive measure that a student is receiving that is related to the professor's classroom to ensure its implementation, but the recipient would not be permitted to disclose personally identifiable information about any related complaint of sex-based harassment that is not necessary to implement the supportive measure, unless the student whose personally identifiable information is at issue provided their prior written consent or one of the other exceptions is applicable. For more information about nondisclosure protections regarding supportive measures, see the discussion of § 106.44(g)(5). Additionally, § 106.44(j)(3) permits disclosures required or permitted by §§ 106.44, 106.45, or 106.46 because such disclosures carry out the purposes of 34 CFR part 106 by fully implementing Title IX's nondiscrimination mandate and ensuring fair and equitable resolution of complaints of sex discrimination. For example, this exception allows

disclosures under §§ 106.45(f)(4) and 106.46(e)(6), which require recipients to provide parties with an equal opportunity to access to the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible, and under § 106.46(e)(3), which allows, but does not require, a postsecondary institution to permit parties to have persons other than the party's advisor present at any meeting or proceeding. As explained in the discussion of § 106.46(e)(3), the Department notes that, even though such a disclosure is permitted by § 106.44(j)(3), the presence of that person must not lead to a disclosure of evidence that would conflict with FERPA.

The fourth exception—final § 106.44(j)(4)—is based on proposed § 106.44(j)(3), but the Department modified this exception to cover Federal law, Federal regulations, or the terms and conditions of a Federal award, including a grant award or other funding agreement. As also explained in the discussion of § 106.44(g)(5), the Department agrees with commenters who were concerned that proposed § 106.44(j)(3) would have been interpreted as prohibiting disclosures required by the terms and conditions of a Federal grant or award, which was not the Department's intent. The Department thus added language in final § 106.44(j)(4) to clarify the permissibility of such disclosures. The Department notes that the terms and conditions of a Federal award, including a grant award or other funding agreement, must also be in accordance with FERPA in order for a recipient to make a disclosure under such award. The Department has focused this exception on Federal law and addresses State law in the fifth exception. Additionally, the Department added language specifying Federal regulations to this exception to address commenters' questions about the interaction between Title IX, FERPA, and HIPAA, and their implementing regulations, and to clarify that this exception permits disclosure of personally identifiable information that is required under those statutes, as well as other Federal statutes, and their accompanying regulations. Permissive FERPA disclosures are generally permitted under § 106.44(j)(5), as discussed next.

Final § 106.44(j)(5), consistent with proposed § 106.44(j)(2), allows disclosures that are permitted, but not required, under FERPA, to the extent such disclosures are not otherwise in conflict with Title IX or the Department's Title IX regulations. The

Department added this clarifying language in response to commenters' questions about disclosures that may be permitted under FERPA but that would nonetheless conflict with Title IX, such as by causing sex-based discrimination; by chilling reporting under Title IX; for retaliatory, harassing, or other discriminatory purposes; or by hindering the recipient's ability to operate its education program or activity free from sex discrimination. For example, FERPA permits, but does not require, a recipient to disclose personally identifiable information from a student's education record to third parties without prior written consent if the disclosure meets one or more of the exceptions outlined in 20 U.S.C. 1232g(b), (h) through (j), or 34 CFR 99.31.[39] Even if one of those exceptions is met, the recipient would nonetheless be prohibited from making that disclosure if, for example, the disclosure was for the purpose of retaliating against the student whose personally identifiable information was at issue. In response to commenters' questions, the Department notes that disclosure of personally identifiable information that creates a hostile environment as defined under § 106.2 would be prohibited under these regulations. While determinations of a hostile environment would be made following a case-by-case review of specific facts, it could be a violation of this provision if a school were to disclose personally identifiable information about a student's sexual orientation or gender identity broadly to other students or employees, which resulted in the student experiencing sex-based harassment.

Additionally, final § 106.44(j)(5) permits disclosures required by State or local law to the extent such disclosures are not otherwise in conflict with Title IX or the Department's Title IX regulations. The Department added this language to the regulatory text in response to commenters' questions about the application of State and local laws and regulations regarding disclosures of personally identifiable information obtained by a recipient in the course of complying with Title IX. As explained in the discussion of § 106.6(b) and the July 2022 NPRM, State and local laws that conflict with

---

[39] The Department has previously issued guidance to remind school officials of their obligations to protect student privacy under FERPA. *See, e.g.,* U.S. Dep't of Educ., Student Privacy Policy Office, Family Educational Rights and Privacy Act: Guidance for School Officials on Student Health Records (Apr. 2023), *https:// studentprivacy.ed.gov/sites/default/files/resource_ document/file/FamilyEducationalRightsandPrivacy Act-GuidanceforSchoolOfficialsonStudentHealth Records.pdf.*

Title IX and 34 CFR part 106 are preempted, *see* § 106.6(b); 87 FR 41405, and these final regulations do not alter the application of that well-established doctrine to Title IX or this part. Consistent with § 106.6(b) and with this paragraph, disclosures required under State or local law that would prevent or impede a recipient from carrying out its Title IX obligations as enumerated in this part are not exempt from the nondisclosure obligation under 106.44(j). However, to the extent disclosures required under State or local law do not prevent a recipient from carrying out its Title IX obligations, § 106.44(j)(5) clarifies that such disclosures are generally permitted. For example, this exception would permit recipients to disclose information about an employee accused of sexually assaulting a student pursuant to State mandatory reporting laws because doing so does not conflict with Title IX or 34 CFR part 106. As with the other provisions of this paragraph, a recipient must ensure compliance with FERPA or any other applicable Federal laws and regulations in making such disclosures.

With regard to other comments received on proposed § 106.44(j), the Department disagrees with the assertion that respondents are entitled to know the identity of all complainants, witnesses, and other participants without limitation, as that is not consistent with the Department's longstanding approach,[40] including the approach taken in the 2020 amendments. *See* 85 FR 30133–35, 30537; 34 CFR 106.71(a). For example, a complainant may be able to receive supportive measures before the respondent knows their identity. However, when due process necessitates revealing the identity of a complainant or witness to the respondent, § 106.44(j)(3) permits such disclosures, so the commenters' concern is unwarranted. *See* discussion of § 106.45(b)(5). Further, the Department disagrees with concerns about the application of nondisclosure protections to the informal resolution process, as those processes can be an important aspect of a recipient's efforts to address sex discrimination, and a chilling effect on participation in informal resolution processes could undermine a recipient's ability to effectuate Title IX. In response to some commenters' question regarding a respondent's right to remain anonymous, the Title IX regulations do

not guarantee a right of anonymity and, as explained above, § 106.44(j)(4) permits disclosures under §§ 106.44, 106.45, and 106.46. Finally, the Department disagrees that § 106.44(j) constitutes a "gag order" on parties, as this provision applies to disclosures by recipients. The Department emphasizes that students, employees, and third parties retain their First Amendment rights, and § 106.44(j) does not infringe on these rights. Section 106.6(d) of the Title IX regulations explicitly states that nothing in these regulations requires a recipient to restrict rights that would otherwise be protected from government action by the First Amendment. For additional consideration of the First Amendment, see the discussion of Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2) (Section I.C).

*Changes:* The Department altered the heading of this paragraph to provide more specificity as to the nature of the prohibition that it addresses. Additionally, the Department modified § 106.44(j) to state that the prohibition on disclosures applies to any personally identifiable information obtained in the course of complying with this part. Section 106.44(j) includes five exceptions that may be applied to allow disclosures that do not conflict with Title IX or this part. The Department added language to clarify that § 106.44(j)(1) requires a recipient to obtain prior written consent to the disclosure from a person with the legal right to consent to the disclosure. Section 106.44(j)(2) affirms the permissibility of disclosures to a parent, guardian, or authorized legal representative with the legal right to receive disclosures on behalf of the person whose personally identifiable information is at issue. Section 106.44(j)(3) adds the word "reasonably" before the words "may constitute sex discrimination." Section 106.44(j)(4) specifies that disclosures required by Federal law, Federal regulations, or the terms and conditions of a Federal award, including a grant award or other funding agreement, are permitted. Section 106.44(j)(5) clarifies that recipients may make disclosures that are required by State or local law or are permitted by FERPA to the extent such disclosures are not otherwise in conflict with Title IX or this part.

**11. Section 106.44(k) Informal Resolution Process**

*General Support and Opposition*

*Comments:* Some commenters supported proposed § 106.44(k) to the extent that informal resolution is fully

voluntary, informed, and applies to student-to-student complaints. Other commenters supported the availability of an informal resolution process for sex discrimination complaints for a variety of reasons, including because, the commenters asserted, it is an effective tool to address sex-based harassment when appropriate; empowers the parties to find an effective resolution; supports complainants and facilitates their recovery; prioritizes safety for the parties and the campus; furthers the purpose of Title IX by helping a recipient address inequities; encourages reporting, accountability, and access to support services; recognizes the significant training and expertise that many student affairs practitioners have developed in these forms of resolution; is fair to both parties; and reduces litigation. Several commenters also appreciated that § 106.44(k) would provide an alternative to recipient grievance procedures that would meaningfully address sex discrimination in nuanced ways that a recipient's grievance procedures may not.

Several commenters supported informal resolution on the ground that it would provide recipients more discretion and reduce burdens, particularly on small postsecondary institutions, by allowing them to tailor their response to the specific needs of the parties. The commenters added that the proposed regulations would improve implementation of Title IX; appropriately facilitate a fair and mutually agreeable outcome that is less complicated and confusing, while complying with both State and Federal law; and allow a recipient to respond to, resolve, and reduce the number of incidents of sexual harassment in its education program or activity more efficiently.

Some commenters suggested that the Department change "informal resolution" to "alternative resolution," which they asserted would avoid implying that these processes and outcomes are less legitimate than a recipient's grievance procedures or causing a recipient to underappreciate the training, skill, preparation, and formality needed to appropriately and successfully facilitate a process outside a recipient's grievance procedures, such as a restorative justice process that addresses sex discrimination generally, and sex-based harassment and violence specifically. Some commenters urged the Department to retain the provisions related to informal resolution in the 2020 amendments, which some argued provided a recipient more autonomy to address complaints of sex

---

[40] See 2001 Revised Sexual Harassment Guidance, at 16 ("In all cases, schools should make every effort to prevent disclosure of the names of all parties involved, the complainant, the witnesses, and the accused, except to the extent necessary to carry out an investigation.").

discrimination in a substantive manner that considers the parties' concerns while allowing a recipient to focus on educating, counseling, and mentoring students. Some commenters urged the Department to retain § 106.45(b)(9) from the 2020 amendments, which requires a formal complaint and written consent from both parties before a recipient can offer informal resolution.

One commenter believed that, under § 106.44(a) of the proposed regulations, every report of sex discrimination would require a recipient to initiate its grievance procedures, regardless of the severity of the reported incident. The commenter asserted that many reports of sex discrimination, including possible different treatment, could be handled appropriately by a recipient's faculty or staff without invoking the recipient's grievance procedures. The commenter suggested that the Department provide a mechanism for informal resolution of less serious reports of sex discrimination when the complainant does not wish to resolve the complaint using the recipient's grievance procedures. Another commenter stated that informal resolution would be most appropriate for less serious allegations.

One commenter asked the Department to specify what steps and requirements would be required for an informal resolution to proceed, in the absence of a formal complaint. Another commenter asserted that the proposed regulations provide insufficient guidelines for how or when an informal resolution would be appropriate, including determining if informal resolution is in the best interest of the student, rather than the education program or activity. Commenters requested clearer guidelines on how alternative forms of addressing complaints, such as mediation, would work. Other commenters expressed concern that § 106.44(k) lacked specificity as to what informal resolution should include or exclude, which they asserted would leave complainants vulnerable to inaction on the part of the recipient. Another commenter stated that the Department should either earmark funding for a recipient to develop informal resolution processes or require a recipient to develop informal resolution processes that meet certain requirements.

Some commenters asked the Department to broaden proposed § 106.44(k) to permit a respondent who has accepted responsibility for violating a recipient's Title IX policy to pursue informal resolution, and one commenter also asked that the Department allow a respondent to agree to sanctions when

they accept responsibility within an informal resolution process. One commenter, a trade group for Title IX Coordinators, interpreted the proposed regulations as foreclosing informal resolution of a complaint if there is a determination that a respondent is responsible for sex discrimination. The commenter stated that this result would be inconsistent with the practice of many recipients and its own recommended framework for informal resolution, which allows informal resolution as a means of obtaining acceptance of responsibility or a demonstration of accountability for harmful behavior.

One commenter urged the Department to provide a school district with broad discretion to undertake informal resolution processes that are consistent with Title IX, comply with relevant State law, and are age appropriate. Another commenter alternatively suggested that the Department clarify that any prohibition or limitation on informal resolution in § 106.44(k) would apply only to a postsecondary institution. The commenter asserted that such clarification is needed based on the commenter's interpretation that proposed § 106.44(g)(2) would prohibit supportive measures that burden a respondent during informal resolution, regardless of whether a recipient determines such measures to be appropriate, which the commenter stated would frustrate the ability of an elementary school or secondary school to comply with § 106.44(a).

Some commenters urged the Department to clarify that the Title IX Coordinator has discretion to initiate or resume grievance procedures if the respondent fails to satisfy the terms of the informal resolution or if the Title IX Coordinator determines that the informal resolution was unsuccessful in stopping the discriminatory conduct or preventing its recurrence.

One commenter recommended that the Department provide guidance for how a recipient may resolve a "structural complaint" about the recipient through informal resolution and to what extent a recipient may participate in informal resolution. The commenter stated many complaints allege sex discrimination based on the structure of a recipient's policy, practices, or environment and would not necessarily align with either informal resolution or a recipient's grievance procedures outlined in the proposed regulations. The commenter noted that proposed § 106.44(k) is silent as to whether the recipient can have a participatory role in informal resolution and asserted that many recipients play

a role in informal resolution to ensure equity across complaints.

One commenter recommended that the Department replace "ensure" with "designed to ensure" in proposed § 106.44(k)(1) to acknowledge that a recipient may not be able to effectively ensure that sex discrimination does not continue or recur despite its best efforts. Another commenter recommended that the Department change "Title IX Coordinator" to "recipient" in § 106.44(k)(1) to allow a recipient to designate another official to take appropriate steps to ensure that sex discrimination does not continue or recur.

*Discussion:* The Department acknowledges commenters' support for the informal resolution process provided by § 106.44(k). The Department acknowledges the comments regarding the use of the term "informal resolution," but declines to substitute another term instead. As indicated in the preamble to the 2020 amendments, the Department understands the term "informal resolution processes" to have the same meaning as "alternative dispute resolution processes," with both referring to the processes that have been widely used as a substitute for the formal process. 85 FR 30400. Informal resolution accordingly may encompass a broad range of conflict resolution strategies. *Id.* at 30401. As the Department further explained in the 2020 preamble, by referring to these processes as "informal," it is not the Department's intent to suggest that the personnel facilitating such processes have any less robust training and independence or that a recipient should take allegations of sex discrimination any less seriously than they would in a formal grievance proceeding. *Id.* For that reason we have retained the requirement formerly found at § 106.45(b)(1)(iii), now § 106.44(k)(4), that any person facilitating informal resolutions must be appropriately trained under § 106.8(d)(3). We also believe the term "informal resolution" should be broadly familiar to recipients and parties and draws a helpful contrast with grievance procedures required by § 106.45, and if applicable § 106.46.

The Department disagrees that the proposed changes to the regulations governing informal resolution would undermine a recipient's autonomy or interfere with its educational mission. The 2020 amendments prohibited a recipient from offering informal resolution in the absence of a formal complaint. These final regulations will provide a recipient with additional discretion to offer informal resolution

under more circumstances, including without requiring the complainant to make a complaint requesting that the recipient initiate its grievance procedures. A recipient is in the best position to determine whether an informal resolution process would be appropriate based on the facts and circumstances, except that a recipient must not offer informal resolution in two situations: when there are allegations that an employee engaged in sex-based harassment of an elementary school or secondary school student or when such a process would conflict with Federal, State, or local law. We address those limits below in the discussion of § 106.44(k)(1).

As discussed in the July 2022 NPRM, limiting a recipient's ability to offer informal resolution as an alternative to grievance procedures—by, for example, requiring a complainant to request initiation of grievance procedures before a recipient can offer informal resolution—would undermine the Department's goal of ensuring that, to the extent appropriate, a recipient can provide a range of effective options that meaningfully address and resolve allegations of sex discrimination consistent with Title IX. 87 FR 41455. In response to the commenter who asked what level of investigation would be required to proceed with informal resolution without a complaint, the Department clarifies that these regulations afford a recipient discretion to offer the parties an informal resolution process at any time before determining whether sex discrimination occurred, including before an investigation commences, as well as during the course of an investigation. Requiring that a complaint be made or an investigation be conducted prior to offering an informal resolution process could deter some students from seeking any resolution of alleged sex discrimination and prevent a recipient from using an effective option for resolving such allegations in those cases. If a party pursues an informal resolution process without having made a complaint, § 106.44(k)(3)(iii) specifies that they retain the right to withdraw from the informal resolution process prior to agreeing to a resolution and to initiate or resume the recipient's grievance procedures. Further, if an investigation has commenced under the grievance procedures, and if the circumstances in which informal resolution is prohibited or may be declined by the Title IX Coordinator do not apply, a party could still choose to participate in informal resolution before

a determination whether sex discrimination occurred has been made.

Contrary to assertions by at least one commenter, § 106.44(a) does not require a recipient to initiate its grievance procedures for every report of sex discrimination. Rather, § 106.44(a)(1) requires a recipient with knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity to respond promptly and effectively, and § 106.44(a)(2) clarifies that a recipient must take the actions outlined in § 106.44 (b)–(k) to comply with Title IX's statutory obligation to operate its education program or activity free from sex discrimination. Under paragraph (f)(1)(iii)(A), the Title IX Coordinator must notify the complainant or, if the complainant is unknown, the individual who reported the conduct, of the grievance procedures under § 106.45, and if applicable § 106.46, and the informal resolution process under § 106.44(k), if available and appropriate. The Title IX Coordinator is not required to initiate grievance procedures for every report. Additional information regarding the Title IX Coordinator's obligations under § 106.44(f) are discussed above in this preamble.

Although the Department does not have the authority to earmark funding for recipients to develop informal resolution processes, the Department provides grants that may be used to implement programs such as restorative justice and similar programs.[41] More broadly, the Department offers technical assistance through the National Center on Safe and Supportive Learning Environments and the Title IV–A Technical Assistance Center that may also help a recipient develop informal resolution processes. Additionally, the Department declines to mandate specific requirements for an informal resolution process beyond those stated in the regulations, to provide a recipient discretion to offer an informal resolution process that can be structured to accommodate the particular needs of the parties, the recipient, and the particular circumstances of the complaint in the most effective manner.

The Department appreciates the opportunity to clarify that, under these regulations, a determination whether

sex discrimination occurred can necessarily only be made at the conclusion of grievance procedures consistent with § 106.45, and if applicable § 106.46. Hence, it is the Department's view that an admission, alone, outside the context of grievance procedures consistent with § 106.45, and if applicable § 106.46, is not a determination whether sex discrimination occurred. Accordingly, nothing in § 106.44(k) prohibits a recipient from offering a informal resolution process in which a respondent may accept responsibility or accountability for sex discrimination or harm caused. The Department intends for the limitation regarding such determinations in § 106.44(k)(1)—that a recipient may offer an informal resolution process "prior to determining whether sex discrimination occurred" under § 106.45, and if applicable § 106.46—to clarify at what point a recipient may offer informal resolution, but not to limit the types of informal resolution a recipient may offer.

The Department also appreciates the opportunity to clarify that § 106.44(g)(2) does not prohibit terms that are similar to supportive measures from being agreed to as part of an informal resolution. Additionally, § 106.44(k)(5) states that potential terms of an informal resolution agreement may include but are not limited to, restrictions on contact and restrictions on the respondent's participation in one or more of the recipient's programs or activities or attendance at specific events, including restrictions the recipient could have imposed as remedies or disciplinary sanctions had the recipient determined that sex discrimination occurred under the recipient's grievance procedure. *See* 87 FR 41456.

Additionally, the Department appreciates the opportunity to clarify that, as stated in § 106.44(k)(3)(iii), prior to agreeing to a resolution, any party has the right to withdraw from the informal resolution process and to initiate or resume the recipient's grievance procedures. If a party breaches the resolution agreement or if the recipient has other compelling reasons, such as if it learns of any fraud by a party in entering into the agreement, the recipient may void the informal resolution agreement and initiate or resume grievance procedures. *See* 87 FR 41455. However, this is only one example, and there may be other situations in which a recipient could similarly decide to initiate or resume its grievance procedures, as long as the recipient exercises its discretion in a manner that is equitable to the parties

---

[41] *See, e.g.,* 20 U.S.C. 7111–7122 (codifying Student Support and Academic Enrichment Grants under Title IV, Part A of the Every Student Succeeds Act); 20 U.S.C. 7281 (authorizing Project School Emergency Response to Violence (SERV) program); 20 U.S.C. 7271–7275 (authorizing grants under the Promise Neighborhoods and Full-Service Community Schools programs); 20 U.S.C. 1138 (authorizing grant program to improve postsecondary education opportunities for nontraditional students).

and otherwise complies with these final regulations.

In the July 2022 NPRM, the Department explained that informal resolution would not be available in sex discrimination complaints that do not involve a student, employee, or third-party respondent. 87 FR 41464. This is in part because § 106.45(a) states that the requirements related to a respondent apply only to sex discrimination complaints alleging that a ''person'' violated the recipient's prohibition on sex discrimination, and a complaint that a recipient's policy or practice discriminates on the basis of sex involves an allegation against the recipient itself—not a person. In many circumstances, upon notification of a potentially discriminatory policy or practice, the recipient may resolve the matter under § 106.44(f)(1), which requires a Title IX Coordinator, when notified of conduct that reasonably may constitute sex discrimination under Title IX or this part, to take the enumerated actions to promptly and effectively end any sex discrimination in its education program or activity, prevent its recurrence, and remedy its effects. These actions include, under § 106.44(f)(1)(vii), a requirement that the Title IX Coordinator take ''other appropriate prompt and effective steps,'' in addition to steps associated with remedies provided to an individual complainant, if any, to ensure that sex discrimination does not continue or recur within the recipient's education program or activity.

The Department acknowledges the commenters' request for guidelines for how and when a recipient can decide whether informal resolution would be appropriate. With the exception of when there is an allegation that an employee engaged in sex-based harassment of an elementary school or secondary school student or when an informal resolution process would conflict with applicable Federal, State, or local law, a recipient has discretion to determine when informal resolution is not appropriate, notwithstanding the parties' consent. In making this determination, a recipient may consider the factors a Title IX Coordinator must consider when determining whether to initiate a complaint of sex discrimination, which are enumerated in § 106.44(f)(1)(v)(A).

The Department declines to replace ''ensure'' with ''designed to ensure'' in § 106.44(k)(1) because the regulations as stated fully implement Title IX's nondiscrimination mandate. The Department also declines to change ''Title IX Coordinator'' to ''recipient'' in proposed § 106.44(k)(1) because the obligations are consistent with those set forth in § 106.44(f). Further, as explained in more detail in the discussion of § 106.8(a)(2), a recipient may delegate specific duties to one or more designees.

*Changes:* Consistent with revisions to § 106.44, the Department has modified § 106.44(k)(1)(i) to add the word ''reasonably'' with respect to information about conduct that may constitute sex discrimination under Title IX or this part.

### Section 106.44(k)(1) Discretion To Offer Informal Resolution

*Comments:* Some commenters supported a recipient's discretion to decline to offer informal resolution under proposed § 106.44(k)(1). Other commenters expressed support for safeguards in the proposed regulations, such as the prohibition on the use of informal resolution in cases of employee-to-student sex discrimination and when informal resolution would conflict with Federal, State, or local law, and the discretion afforded by proposed § 106.44(k)(1) to decline to offer informal resolution when, for example there is evidence of actual or potential coercion or when not appropriate in an elementary school or secondary school setting. One commenter agreed that there may be circumstances in which informal resolution would be inappropriate, such as when there is an ongoing threat of danger to others, but the commenter encouraged the Department to specify these circumstances in the final regulations to help ensure complainants are able to direct the informal resolution process within appropriate constraints of their communities' and own safety. Some commenters opposed the use of informal resolution for all sex discrimination cases, including in cases of sexual harassment or assault, because of the seriousness of the conduct necessarily involved in sex discrimination cases, potential negative impacts on the complainant, and potential risk to the community from a repeat offender.

Several commenters noted that courts have recognized the importance of informal resolution, argued that a recipient should not have discretion to decline to offer informal resolution over the preference of the parties, and urged the Department to modify proposed § 106.44(k)(1)(i) to restrict a recipient's discretion to deny a party's request for informal resolution.

One commenter asserted that denying informal resolution would impede a recipient's ability to address sex discrimination, arguing that informal resolution is more likely to reduce future harm than sanctions available through grievance procedures and that some people may forgo filing a complaint if informal resolution is not an option.

### Prohibition on Informal Resolution for Student Complaints Against Employee Respondents

Some commenters urged the Department to retain current § 106.45(b)(9)(iii), which prohibits informal resolution for complaints in which an employee is alleged to have sexually harassed a student. One commenter noted that the regulatory text in proposed § 106.44(k)(1) would prohibit informal resolution in all cases in which an employee allegedly engaged in sex discrimination against a student, whereas the statement in the July 2022 NPRM explaining this proposed provision stated that the provision would prohibit informal resolution in cases in which an employee allegedly engaged in sex-based harassment (not all forms of sex discrimination) against a student. The commenter suggested there might be a conflict between the proposed regulatory text and the July 2022 NPRM preamble language.

Other commenters urged the Department to remove or revise the clause in proposed § 106.44(k)(1) that would prohibit informal resolution of complaints alleging that an employee engaged in sex discrimination toward a student. Some commenters argued that the prohibition would be overly broad and would bar informal resolution in contexts in which it could be effective and appropriate, particularly for less severe allegations. Other commenters supported such a restriction for allegations that an employee sexually harassed an elementary school or secondary school student but objected to barring voluntary participation in informal resolution at a postsecondary institution because such a prohibition would deprive an adult complainant of autonomy. One commenter also asserted that presenting a student complainant with fewer options would further decrease already low reporting rates of employee-to-student sex discrimination allegations.

Some commenters believed that the prohibition on informal resolution for employee-to-student sex discrimination complaints in proposed § 106.44(k)(1) is based on the Department's incorrect assumption that informal resolution processes are less effective, rigorous, and legitimate, and are more prone to power imbalances than a recipient's grievance procedures. The commenter also asserted that students have reached informal resolutions that effectively

addressed behavior and held respondents accountable when a recipient invested in skilled facilitators and created procedures based on developed practices, such as shuttle negotiation or restorative justice.

Another commenter stated that power imbalances between students and employees can be particularly heightened for a student with multiple and overlapping identities, in a graduate program, or in a small or specialized department or program and such a student may view informal resolution as preferable to a more formal and adversarial process.

Several commenters noted that other safeguards exist to prevent unfair informal resolution of employee-to-student complaints. One commenter, a postsecondary institution, noted that its own policy includes a prohibition on requiring face-to-face mediation in any case that involves physical or sexual violence or an employee respondent in a position of authority over the complainant. Another commenter noted that proposed § 106.44(k)(2) and (3)(iii) would create safeguards to address concerns related to power imbalances or unfair outcomes. The commenter also noted that proposed § 106.44(k)(1)(i) would otherwise allow a recipient to decline to offer informal resolution, including if it determined that the power differential was too great. One commenter noted that an appropriately trained Title IX Coordinator or informal resolution facilitator could rely on the same factors outlined in proposed § 106.44(k)(1) and (2) to assess whether a student-to-employee complaint would be suitable for informal resolution.

A number of commenters asked for clarification about whether informal resolution would be available for student complaints against student-employee respondents in light of the lesser power differential between a student and student-employee.

Requests for Modifications or Clarification

Some commenters recommended that the Department modify proposed § 106.44(k)(1) to provide a recipient more discretion in determining when informal resolution would be appropriate, as long as the recipient documents the parties' voluntary and informed consent to participate in such procedures.

Some commenters asked for clarification as to how to assess the future risk of harm to others for purposes of proposed § 106.44(k)(1)(ii). Another commenter recommended that the Department strike proposed § 106.44(k)(1)(ii) because it contains an

example that the commenter believed could be read as exhaustive rather than illustrative. One commenter urged the Department to modify § 106.44(k)(1) to allow a recipient to deny a request for informal resolution only when the recipient reasonably determines that the respondent presents an immediate risk of harm to others. Another commenter urged the Department to revise § 106.44(k)(1) to require a recipient to consider the wishes of the parties before declining to offer informal resolution and amend the preamble to urge a recipient to consider the likelihood that an allegation would be meaningfully investigated without the complainant's participation. Another commenter suggested that the Department add ''or where an informal resolution process may contribute to increased trauma for any party'' to the end of proposed § 106.44(k)(1)(ii) as an example of when informal resolution of a complaint would be inappropriate.

One commenter recommended that the Department offer examples in which informal resolution may be inappropriate, such as with contractors, outside vendors, or when the allegations are based on events sponsored by the recipient that take place off campus.

*Discussion:* The Department acknowledges the support for, and comments related to, the circumstances under which a recipient has discretion to offer informal resolution under § 106.44(k)(1).

The Department is persuaded by commenters who argued that the proposed prohibition regarding allegations that an employee engaged in sex discrimination toward a student in proposed § 106.44(k)(1) would be overly broad. The Department agrees that this limit on recipient discretion to offer informal resolution options would create an unacceptably high risk of dissuading complainants who do not want to undergo grievance procedures from making a complaint and of frustrating a recipient's ability to address sex discrimination in its education program or activity. The Department also agrees that in some cases the parties and recipient may view informal resolution as a better avenue to mitigate power imbalances between a student and an employee. The Department agrees that other safeguards in § 106.44(k), such as the recipient's discretion, the requirement that participation be voluntary, and the right to withdraw, will ensure that all participants are protected from an unfair process. The Department is persuaded that the prohibition would be more appropriate as applied in the elementary school and secondary school context,

given the unique power dynamics between a minor student and an adult employee. The Department is also persuaded that the prohibition is more appropriately limited to the context of sex-based harassment—in which there is a unique risk of physical harm and associated severe emotional trauma. As such, the Department has revised § 106.44(k)(1) to prohibit informal resolution if the complaint includes an allegation that an employee engaged in sex-based harassment of an elementary school or secondary school student. By removing the prohibition as to postsecondary students, the Department has also addressed concerns and questions regarding the application of the prohibition to student-employees.

The Department disagrees with commenters who objected to otherwise giving a recipient the discretion to decide when to offer informal resolution. As described by many commenters, informal resolution is an important avenue for addressing allegations of sex discrimination. The final regulations give a recipient discretion to offer informal resolution within the bounds set forth in § 106.44(k). The Department disagrees that § 106.44(k) grants a recipient unfettered discretion to offer, or decline, informal resolution under these final regulations. As explained in the July 2022 NPRM, even though § 106.44(k) will entrust the decision about whether to offer informal resolution to the recipient's discretion, that discretion will remain subject to important guardrails. 87 FR 41454. Consistent with § 106.44(f)(1)(i), a recipient must exercise this discretion in a manner that treats the parties equitably. Moreover, as discussed below, recipients: must not require or pressure the parties to participate in an informal resolution process; must obtain the parties' voluntary consent to the informal resolution process and must not require waiver of the right to an investigation and determination of a complaint as a condition of enrollment or continuing enrollment, or employment or continuing employment, or exercise of any other right; must provide notice to the parties that describes the allegations, the requirements of the informal resolution process, the right to withdraw from the informal resolution process and initiate or resume the recipient's grievance procedures prior to agreeing to a resolution, the effect of entering into a resolution agreement, the potential terms of a resolution agreement, and the information that will be maintained and could be disclosed; and must ensure that facilitators are

trained and do not have a conflict of interest or bias. These guardrails will ensure that informal resolution is an effective means of addressing sex discrimination prohibited under Title IX.

The Department appreciates the opportunity to clarify that § 106.44(k)(1)(ii) is intended to identify only one illustrative situation in which a recipient might reasonably decide not to offer parties the option of informal resolution. As the wording of § 106.44(k)(1)(ii) indicates ("include but are not limited to"), there may be other circumstances when a recipient may also decline to offer the parties informal resolution, depending upon the facts and circumstances. The Department declines to strike § 106.44(k)(1)(ii) because, contrary to the commenters' concern, the language of that provision clearly conveys that the circumstances identified there are not exhaustive. There may be other circumstances in which a recipient would properly decline to allow informal resolution, and nothing in § 106.44(k) will bar a recipient from doing so. Additionally, in response to commenters' requests for clarification as to how to assess the future risk of harm to others, the Department emphasizes that a recipient has flexibility to structure a process to determine how it makes this assessment, as well as whether such an assessment is necessary in a particular circumstance. Notwithstanding this discretion, such an assessment may depend on the particular allegations that the parties seek to resolve informally and may take into account relevant factors, such as whether either party has a history of engaging in violent conduct or made credible threats of self-harm or harm to others.

There may be cases in which both parties wish to resolve an allegation informally, but because of the nature of the allegations or information involved, or other factors, such as the risk of future harm to others, or repeated allegations against the same respondent, the recipient believes it is more appropriate to pursue resolution through grievance procedures. This fact-specific inquiry depends, in part, on the allegations, the identity of the parties, and a recipient's ability to exert control over them.

In response to the commenter who suggested that it would be inappropriate for a recipient to offer an informal resolution process to resolve a complaint involving conduct at an off-campus recipient-sponsored event or involving a third party, such as a contractor or vendor, the Department disagrees, and reiterates that in such circumstances, the recipient should conduct the same fact-specific inquiry it does in other contexts to determine whether informal resolution is appropriate.

The Department also maintains that a recipient must retain discretion to decline informal resolution to fulfill its obligation to address sex discrimination in its education program or activity, similar to its discretion to initiate grievance procedures absent a complaint.

Finally, the Department declines to require a recipient to provide its reasons for declining to offer informal resolution in writing because doing so would be overly burdensome and is not required to fulfill Title IX's nondiscrimination mandate.

*Changes:* The Department has revised § 106.44(k)(1) to state that a recipient may offer to a complainant and respondent an informal resolution process, unless the complaint includes allegations that an employee engaged in sex-based harassment of an elementary school or secondary school student. For clarity, at the beginning of § 106.44(k)(1)(i), the Department has added the phrase "[s]ubject to the limitations in paragraph (k)(1)," and at the beginning of § 106.44(k)(1)(ii), the Department has added the phrase "[i]n addition to the limitations in paragraph (k)(1)." In addition, consistent with changes elsewhere in the final regulations, § 106.44(k)(1)(i) clarifies that a recipient has discretion to determine whether it is appropriate to offer an informal resolution process when it receives information about conduct that "reasonably" may constitute sex discrimination under Title IX "or this part."

Section 106.44(k)(2) Voluntary Consent

*Comments:* Some commenters supported proposed § 106.44(k)(2) on the ground that it would require a recipient to avoid bias, remain impartial, and ensure that protections and opportunities are available to students during an informal resolution process.

Other commenters expressed concern that proposed § 106.44(k)(2) would not sufficiently prevent a recipient or party from coercing someone into informal resolution, including when a recipient wants to avoid creating a formal record of sex discrimination.

Some commenters argued that an elementary school or secondary school student would be more likely to feel that they have no choice other than to consent to participate if an adult administrator encouraged informal resolution or would be vulnerable to accepting whatever resolution an adult facilitator offered even if it was not adequate or responsive to their needs.

Some commenters urged the Department to modify proposed § 106.44(k)(2) to make clear coercion is prohibited, and to consider replacing "pressure" with "coerce" because "coerce" is a clearer and more objective term. Another commenter suggested the Department state explicitly that declining to engage in informal resolution would not affect a recipient's grievance procedures or outcomes therefrom. One commenter recommended that the Department clearly prohibit a recipient from applying negative or positive pressure to influence either party's decision to proceed with the informal resolution process.

Some commenters urged the Department to clarify the meaning of "voluntary consent" in proposed § 106.44(k)(2). Some commenters urged the Department to specify that "voluntary consent" must be "informed" and in writing to better document the agreement and reduce confusion.

Some commenters asked the Department to require a recipient to offer informal resolution to the respondent only after the complainant has agreed to informal resolution. The commenters stated that this modification would prevent a complainant from feeling coerced, and one commenter argued that this would be consistent with the definition of "restorative practice" in the Violence Against Women Act.[42]

*Discussion:* The Department disagrees with commenters' concern that § 106.44(k)(2) will not sufficiently prevent a recipient or party from coercing a party into informal resolution. Final § 106.44(k)(2) explicitly states that a recipient must not require or pressure a party to participate in informal resolution, and informal resolution cannot be pursued unless both parties voluntarily consent. In addition, Title IX Coordinators and facilitators must be free from conflict of interest or bias, which will prohibit a recipient from using informal resolution to protect a particular party or the recipient's own financial, reputational, or other interests.

The Department recognizes that as minors, elementary school and secondary school students are in a special position relative to administrators and other adults, and in certain circumstances, may feel pressured to consent to informal

---

[42] The commenter cited 34 U.S.C. 12291(a)(31)(B).

resolution if offered. For this reason, as well as (1) a recipient's obligation to comply with laws related to sexual abuse of minors, and (2) the heightened risk of physical harm and severe emotional trauma presented by an allegation that an adult engaged in sex-based harassment of a minor, final § 106.44(k)(1) prohibits informal resolution of a complaint that includes allegations that an employee engaged in sex-based harassment of an elementary school or secondary school student. In addition, under final § 106.6(g), nothing in Title IX or the regulations may be read in derogation of any legal right of a parent, guardian, or other authorized legal representative to act on behalf of a complainant, respondent, or other person, subject to § 106.6(e), including with respect to a student's participation in informal resolution—which also guards against potential coercion of minor students to participate in informal resolution.

The Department agrees with commenters that, in order to provide voluntary consent, a party must have notice and information about the informal resolution process, which the final regulations require in § 106.44(k)(3), as discussed below. With these guardrails, we believe § 106.44(k) will give parties an efficient, fair, and accessible avenue to resolve allegations of sex discrimination while continuing to offer a recipient flexibility to make choices appropriate in light of the particular facts and circumstances.

Accordingly, the Department declines to incorporate the commenters' suggested modifications because they are either already captured in the final regulations, and thus are unnecessary and redundant, or would be contrary to the purpose of informal resolution under § 106.44(k), which is to provide a recipient an informal avenue to address allegations of sex discrimination through a process that is most appropriate for the parties. For example, we believe that § 106.44(k)(2) already makes sufficiently clear that a recipient may not coerce parties, whether through positive or negative pressure, into participating in an informal resolution process, and do not believe the term "pressure" is any less objective, clear, or precise than "coerce." We also believe it unnecessary to specify how a recipient obtains the voluntary consent required by § 106.44(k)(2). We instead believe it appropriate to entrust such decisions to a recipient's discretion and judgment. The Department notes that nothing in § 106.44(k) prohibits a recipient from obtaining a party's voluntary consent in writing or obviates a recipient's recordkeeping

requirements under § 106.8(f). The Department declines the suggestion to require a recipient to offer informal resolution to the respondent only after the complainant has agreed. Although this approach may be appropriate in some cases, it may not be important in all cases and the recipient is in the best position to make that determination. However, nothing in the regulations prevents a recipient from offering informal resolution to the complainant first.

The Department disagrees that a recipient will improperly pressure individuals to use an informal resolution process out of a desire to avoid a formal record of sex discrimination. Section 106.8(f)(1) requires a recipient to "document[ ]" and retain records of "the informal resolution process under § 106.44(k)" as well as grievance procedures under § 106.45, and if applicable § 106.46, for each complaint of sex discrimination. A recipient thus cannot avoid creating records of sex discrimination by encouraging the use of informal resolution instead of grievance procedures.

The Department also declines to incorporate other specific suggestions, such as dictating other conditions for when a recipient may offer informal resolution, in order to avoid overly formalizing the informal resolution process. As explained above, we continue to believe that the recipient is in the best position to decide when informal resolution is appropriate, and how to structure those processes to suit the parties' and its own needs within the guardrails set forth in the regulations. We note again, though, that a recipient retains the discretion to initiate or resume grievance procedures, consistent with the final regulations.

Finally, upon its own review, for clarity and to maintain consistency with other parts of the regulations, the Department changed "adjudication" in § 106.44(k)(2) to "determination."

*Changes:* In final § 106.44(k)(2) the Department has changed "adjudication" to "determination."

Section 106.44(k)(3) Notice Prior to Informal Resolution

*Comments:* Some commenters generally supported the notice provisions in proposed § 106.44(k)(3). However, one commenter stated that requiring notice consistent with § 106.44(k)(3) before the initiation of informal resolution would formalize a process that is meant to be informal. The commenter also interpreted § 106.44(k)(3) as requiring a recipient to disclose the names of the parties, which

could be in tension with the requirement in proposed § 106.44(j) prohibiting the disclosure of certain information.

Some commenters asked the Department to consider additional terms that should be included in the notice.

Some commenters urged the Department to require a recipient to provide clear written materials that describe the informal resolution process and potential outcomes, explain the difference between informal resolutions and grievance procedures, inform complainants about the availability of a recipient's grievance procedures if they are dissatisfied with the informal resolution process, provide clear timeframes for informal resolution, and clarify that informal resolution is optional.

One commenter asked the Department to revise proposed § 106.44(k)(3)(iii) to state that, prior to agreeing to a resolution at the conclusion of the informal resolution process, any party has the right to withdraw from the informal resolution process and to initiate or resume the recipient's grievance procedures.

In connection with proposed § 106.44(k)(3)(iv), one commenter recommended that the Department add "unless the alleged behavior continues" to the end of the provision, because if behavior continues after informal resolution, the decisionmaker in grievance procedures should be able to consider the totality of the allegations, not just those behaviors that occurred after the informal resolution agreement.

Some commenters specifically opposed proposed § 106.44(k)(3)(v) and urged its removal on the grounds that a generic list of possible terms that could be included in an informal resolution agreement would be overly prescriptive, impractical, unhelpful, and fail to recognize the purpose and process of informal resolution. Commenters expressed concern that if a party saw a general list that included inappropriate terms for the situation at hand, it could dissuade the party from pursuing informal resolution.

Alternatively, one commenter suggested that the Department revise proposed § 106.44(k)(3)(v) to refer to "some of the potential terms that may be requested or offered in an informal resolution agreement" to avoid limiting the terms of an agreement. One commenter noted that sometimes a complainant may request that people who are not parties to an informal resolution process, such as other members of a respondent's student organization (*e.g.,* a fraternity), attend a training or take some other action. The

commenter urged the Department to clarify that parties cannot agree to terms on behalf of people who are not part of the informal resolution process.

One commenter also asked the Department to clarify which records and in what circumstances information related to a complaint or informal resolution could be disclosed under the proposed regulations.

Some commenters recommended that the Department remove proposed § 106.44(k)(3)(vii), regarding limiting access to information obtained solely through informal resolution, some asked for clarification regarding its application, and others supported it. Commenters asserted that this provision may allow a party to use informal resolution to strategically disclose information that they can then suppress from being used as evidence during a recipient's grievance procedures if informal resolution is unsuccessful. One commenter stated that a rule conferring absolute confidentiality during informal resolution is rarely effective in practice and stated that either party should be able to ask for confidentiality as a term of the informal resolution agreement, but that it should not be a default term. Other commenters argued that proposed § 106.44(k)(3)(vii) is in tension with statements in the July 2022 NPRM regarding information obtained through informal resolution being shared with law enforcement.

Some commenters asserted that a lack of privacy protections would make informal resolution challenging even if the parties are willing to pursue it. The commenters urged the Department to allow the parties to agree that communications and information shared in the informal resolution process will remain confidential regardless of whether the parties reach an informal resolution or pursue a formal administrative or criminal complaint.

Some commenters expressed concern or confusion with proposed § 106.44(k)(3)(viii), which would permit an informal resolution facilitator to serve as a witness if grievance procedures were resumed. Several commenters stated that proposed § 106.44(k)(3)(viii) would exceed the Department's authority. Commenters argued that proposed § 106.44(k)(3)(viii) could directly conflict with proposed § 106.44(k)(3)(vii), would be unworkable, could create conflicts of interest, and would chill the use of informal resolution. Another commenter recommended that the Department add the word "only" between "witness" and "for purposes" in proposed § 106.44(k)(3)(viii) to further limit when

an informal resolution facilitator can be a potential witness in a recipient's grievance procedures.

One commenter recommended that the Department add a provision in proposed § 106.44(k)(3) that neither party can appeal an agreement that is reached through informal resolution.

Another commenter recommended that the Department modify proposed § 106.44(k)(3) to allow the informal resolution facilitator to stop the process and present the option of initiating or resuming the recipient's grievance procedures before the parties agree to, or the Title IX Coordinator approves, an informal resolution.

One commenter urged the Department to issue supplemental guidance that instructs a recipient on how to create agreements with the parties and local prosecutors that prohibit the use of information, including records, obtained solely through an informal resolution process in a civil or criminal legal proceeding.

*Discussion:* The Department acknowledges the range of comments in response to proposed § 106.44(k)(3). The Department is persuaded that several changes are necessary to address concerns raised in response to this proposed provision in the July 2022 NPRM. First, the Department has modified paragraph (v) to state that the recipient must provide notice of the potential terms that may be requested or offered in an informal resolution agreement, including notice that an informal resolution agreement is binding only on the parties. Second, the Department has modified paragraph (vi) to state that the recipient must provide notice of what information the recipient will maintain and whether and how the recipient could disclose such information for use in grievance procedures under § 106.45, and if applicable § 106.46, if grievance procedures are initiated or resumed. Finally, the Department has deleted proposed paragraph (vii), regarding disclosure, and proposed paragraph (viii), regarding facilitators as witnesses.

The Department declines to make changes to § 106.44(k)(3)(iii) because the provision is already clear that any party has the right to withdraw from the informal resolution process and to initiate or resume the recipient's grievance procedures prior to an agreed-upon resolution at the conclusion of the informal resolution process.

Likewise, the Department declines to modify § 106.44(k)(3)(iv) because the provision is clear that the parties' agreement to a resolution at the conclusion of the informal resolution process would preclude the parties from

initiating or resuming grievance procedures arising from the same allegations. If sex discrimination were to continue after the conclusion of the informal resolution process, it would not be covered under the agreement, and the complainant could initiate the grievance procedures to address such conduct.

The Department disagrees that providing notice of the potential terms as described in § 106.44(k)(3)(v) is unhelpful or impractical, because providing the parties with examples of the potential outcomes and limitations of informal resolution is particularly helpful for individuals who may be unfamiliar with informal resolution generally or specific informal resolution processes offered by the recipient. Additionally, the Department has modified § 106.44(k)(3)(v) to clarify that a recipient must advise the parties that an informal resolution agreement is binding only on the parties, which will prevent a facilitator from offering, and a party from agreeing to, a term in informal resolution that cannot be enforced because it depends on a non-party's action (such as requiring in an informal resolution that a non-party undergo training). Paragraph (v) does not limit the parties' opportunity for resolution, because the notice need not cover every possible measure, remedy, or sanction to which the parties may agree. Rather, the terms covered by paragraph (v) would provide the general framework and parameters of the resolution agreement so that the parties can provide informed consent.

The Department is persuaded that additional clarification is required related to the information obtained through informal resolution that may be maintained or disclosed. Accordingly, the Department has revised § 106.44(k)(3)(vi) to clarify that a recipient must explain to the parties what information related to informal resolution it may maintain or disclose if grievance procedures are initiated or resumed. We believe that the revised § 106.44(k)(3)(vi) strikes the right balance between ensuring that parties are aware of the possible consequences related to pursuing informal resolution and providing a recipient the flexibility needed to structure an informal resolution process that suits its education program or activity.

The Department is also persuaded by concerns commenters raised about potential implementation difficulties and conflicts with other provisions of the proposed regulations. As a result, the Department strikes proposed paragraphs (vii)–(viii). The Department also now maintains that these

provisions are inapposite given the changes the Department has made to § 106.44(k)(3)(vi), which now requires a recipient to tell parties what information related to informal resolution it may or may not disclose if grievance procedures proceed.

The Department also acknowledges the concern that the requirements of § 106.44(k)(3) formalize a process that was intended to be informal. We nevertheless continue to believe these additional notice requirements provide important information to the parties so that they have a complete understanding of all aspects of the informal resolution process and can therefore choose to participate in that process on an appropriately informed basis. We stress, however, that a recipient must comply with § 106.44(j) when conducting an informal resolution process and must therefore not disclose personally identifiable information about the participants in an informal resolution process except in the circumstances enumerated in that provision.

Additionally, we note that § 106.44(k)(3) will require many of the specific points that commenters believed a recipient should provide to parties, including a description of what the informal resolution process requires, potential terms of any informal resolution agreement, and the right of the parties to withdraw from that process and pursue the recipient's grievance procedures instead. We believe that these notice requirements will adequately inform the parties of the contours of the informal resolution process and provide them the information they need to decide whether to choose or continue with informal resolution.

*Changes:* The Department has modified § 106.44(k)(3)(v) to state that the recipient must provide notice of the potential terms that may be requested or offered in an informal resolution agreement, including notice that an informal resolution agreement is binding only on the parties, and has modified paragraph (vi) to state that the recipient must provide notice of what information the recipient will maintain and whether and how the recipient could disclose such information for use in grievance procedures under § 106.45, and if applicable § 106.46, if grievance procedures are initiated or resumed. The Department has deleted proposed paragraphs (vii) and (viii) in the final regulations.

Section 106.44(k)(4) Informal Resolution Facilitators

*Comments:* One commenter appreciated that proposed § 106.44(k)(4) would require any informal resolution facilitator to be properly trained, consistent with research on best practices in the implementation of restorative justice. Other commenters urged the Department to require a recipient to provide formal training to any person who would be involved in carrying out informal resolution processes.

Another commenter expressed concern that proposed § 106.44(k)(4) would prohibit the informal resolution facilitator from also serving as the investigator, which would require additional staff to implement informal resolution. The commenter stated that many recipients currently offer voluntary, informal resolution processes facilitated by the investigator as an alternative to a hearing. The commenter stated that, in these situations, there is a minimal risk of investigator bias because the investigator has made no determination regarding responsibility. Another commenter said that any informal resolution facilitator should be impartial and have no conflict of interest. Another commenter urged the Department to modify proposed § 106.44(k)(4) to allow Title IX investigators to facilitate informal resolution because they are often best positioned to recommend appropriate supportive measures, recourse, or follow-up actions and that requiring a separate facilitator would be inefficient and impede expedited resolution of complaints. The commenter argued that concerns about bias or conflict of interest should be allayed because investigators are trained to be neutral and are likely to also play a role in other aspects of Title IX compliance.

One commenter asked the Department to provide more concrete guidance for how a recipient that uses a single investigator model can avoid bias and a conflict of interest under proposed § 106.44(k)(4). Some commenters suggested that the Department specify that the use of an outside entity to conduct investigations or facilitate informal resolutions may alleviate such concerns.

*Discussion:* The Department acknowledges the comments in support of proposed § 106.44(k)(4) and recognizes the concerns raised about the requirements this provision will impose on facilitators for informal resolutions. However, the Department declines to modify this provision because it is necessary to guard against the appearance of bias or a conflict of interest, which could erode trust in a recipient's grievance procedures and decrease the ability to ensure fair and reliable outcomes in the event a party terminates informal resolution and grievance procedures under § 106.45, and if applicable § 106.46, are initiated or resumed.

We also decline to incorporate suggested modifications in final § 106.44(k)(4) because they are either already captured in the final regulations, and thus are unnecessary and redundant, or would be contrary to other guardrails that protect the integrity of informal resolutions under § 106.44(k). For example, § 106.44(k)(4) specifically provides that any person facilitating informal resolution must receive training under § 106.8(d)(3), and that person must not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent.

*Changes:* None.

Section 106.44(k)(5) Informal Resolution Agreements

*Comments:* One commenter supported proposed § 106.44(k)(5)(ii) because it would clarify that the parties may agree to informal resolution terms that the recipient could have imposed at the conclusion of a recipient's grievance procedures.

In contrast, one commenter recommended that the Department move proposed § 106.44(k)(5) to the preamble of the final regulations because it is an incomplete list of examples that can be read as exhaustive rather than illustrative. Another commenter stated that the use of an incomplete list of potential informal resolution agreement terms in proposed § 106.44(k)(5) fails to recognize that informal resolution varies greatly from case-to-case.

Several commenters urged the Department to clarify what information regarding the informal resolution agreement will be shared with parents if a written report does not need to be provided but may be retained in the recipient's records.

One commenter expressed concern that the inclusion of restrictions on contact in proposed § 106.44(k)(5)(i) could amount to a mutual no-contact order that restricts a complainant and respondent alike. The commenter stated that the mention of a term that only applies to the respondent in § 106.44(k)(5)(ii) supports the interpretation that § 106.44(k)(5)(i) could create a term similar to a mutual no-contact order. In contrast, the

commenter stated that under a recipient's grievance procedures, a recipient may only impose such a consequence on a respondent after a determination that sex discrimination occurred. The commenter stated that although a complainant must agree to any term in the informal resolution agreement, without legal advice a complainant may not understand the risk involved in agreeing to a no-contact order. Other commenters expressed concern that students could not rely on external actors, such as a lawyer or survivor advocate, for advice about their rights in an informal resolution process, because these actors often lack the expertise needed to navigate a recipient's internal Title IX system.

*Discussion:* The Department acknowledges the comments in support of § 106.44(k)(5) and disagrees with commenters' suggestion that the list of examples offered in § 106.44(k)(5)(i) and (ii) could fairly be read as anything but illustrative because it states that potential terms may "include but are not limited to" those specifically described in those provisions.

The Department declines to incorporate modifications suggested by some commenters, such as describing what a recipient may offer in informal resolution, because they are either already captured in the final regulations, and thus are unnecessary and redundant, or would be contrary to the purpose of informal resolutions under § 106.44(k), which is to provide a recipient and the parties more options in resolving complaints of sex discrimination.

With respect to a parent's role in informal resolution, the Department appreciates the opportunity to clarify that nothing in Title IX or these regulations may be read in derogation of any legal right of a parent, guardian, or other authorized legal representative to act on behalf of a complainant, respondent, or other person, subject to § 106.6(e), in proceedings such as an informal resolution process under § 106.44(k), including the right access to any document or other information to which they otherwise would be legally entitled in that role. *See* § 106.6(g).

The Department appreciates the opportunity to clarify that restrictions on contact under § 106.44(k)(5)(i) may be non-mutual or mutual. As explained in the July 2022 NPRM, although the 2020 amendments only included references to mutual no-contact orders, these final regulations eliminate the term "mutual" to ensure that a recipient understands that it is not limited to imposing mutual restrictions on contact between the parties. *See* 87 FR 41450 (as

applied to the non-exhaustive list of supportive measures a recipient may offer under § 106.44(g)(1)). The Department also appreciates the opportunity to clarify that a recipient may impose restrictions on contact prior to the completion of grievance procedures either as a supportive measure during the pendency of grievance procedures and prior to a determination whether sex discrimination occurred, *see* Types of Supportive Measures (§ 106.44(g)(1)); or as a term of an informal resolution agreement, which the final regulations specify may include restrictions the recipient could have imposed as remedies or disciplinary sanctions had the recipient determined at the conclusion of grievance procedures that sex discrimination occurred, *see* § 106.44(k)(5)(ii). Although the Department acknowledges that unfamiliarity with a recipient's internal processes may limit an external actor's ability to advise a party of their rights in an informal resolution process, the requirements in § 106.44(k)(3) are designed to ensure the parties receive important information to help them understand the process and make an informed decision whether to participate in informal resolution. The Department emphasizes that nothing in these final regulations prevents a party from seeking further clarification of any aspect of a recipient's informal resolution process and consistent with § 106.44(k)(2) and (3)(iii), a party has the right to decline an offer to participate in, or withdraw from, a recipient's informal resolution process prior to agreeing to a resolution.

Finally, upon its own review, the Department determined that final § 106.44(k)(5)(ii) should make clear that restrictions on the respondent's participation in the recipient's programs or activities include those that the recipient could have imposed as remedies or disciplinary sanctions had the recipient "determined at the conclusion of the recipient's grievance procedures that sex discrimination occurred."

*Changes:* For clarity and consistency with the rest of the regulations, in final § 106.44(k)(5)(ii) the Department has changed "had the recipient determined that sex discrimination occurred under the recipient's grievance procedures" to "had the recipient determined at the conclusion of the recipient's grievance procedures that sex discrimination occurred."

Requests for Guidance on Informal Resolution Processes

*Comments:* Some commenters appreciated that § 106.44(k) would allow a recipient to offer informal resolution processes, such as mediation, restorative justice, and transformative justice, which one commenter asserted could suitably address intersectional discrimination, provide community education, and allow for non-punitive or less severe outcomes.

However, several commenters requested that the Department clarify the role of restorative justice processes in informal resolution and which informal resolution processes are inappropriate based on the nature of alleged harassment. Some commenters reported that the Department previously stated in its 2001 Revised Sexual Harassment Guidance that mediation would not be appropriate to resolve an allegation of sexual assault. Several commenters also requested that the Department clarify the role of mediation in informal resolutions. Some commenters stated that mediation or conflict resolution is an inappropriate method for resolving a sex-based harassment complaint because it assumes each party shares responsibility or blame for the harassment, could allow a respondent to pressure a complainant into an inappropriate resolution, and often requires direct and possibly retraumatizing interaction between the parties. One commenter noted that this was especially true for Black girls, who are commonly blamed for the sex-based harassment they experience. One commenter identified these same concerns and urged the Department to prohibit mediation from being used to address an allegation of sexual assault, when, according to the commenter, such concerns would be magnified. Commenters contrasted those methods with restorative processes, which require the harasser to admit that they harmed the complainant, focus on the complainant's needs, repair the harm caused, and change future behavior.

Commenters also asked the Department to issue supplemental guidance that describes various types of informal resolution processes that would be appropriate or inappropriate under Title IX, including more information about restorative practices and related sources of funding. One commenter asserted that guidance on effective informal resolution processes, such as restorative justice and transformative justice, would lessen the burden on a recipient that is likely to focus its resources and training on

compliance with the recipient's grievance procedures outlined in proposed §§ 106.45 and 106.46.

Some commenters encouraged the Department to issue guidance that would detail best practices for informal resolution. One commenter urged the Department to collaborate with recipients and community-based organizations that currently conduct restorative justice programs for sexual violence cases to create recommendations that would be included in best practices guidance.

Another commenter raised concerns about a recipient's ability to implement specific informal resolution processes. The commenter stated that the proposed regulations would be untenable for any recipient that has adopted restorative justice practices that seek to achieve mutual understanding between the complainant and respondent and avoid punishment for first-time offenders. Some commenters suggested that the Department modify the regulations to expand restorative and transformative justice practices and provide funding for these practices.

Several commenters, which included State and local survivor advocacy organizations, expressed support for the proposed regulations and urged the Department to explicitly allow and encourage restorative justice practices as an option for informal resolution. The commenters asserted that restorative justice practices are more trauma-informed and survivor-centered than mediation.

*Discussion:* The Department acknowledges the many comments it received requesting clarification of various informal resolution processes that a recipient may elect to use under § 106.44(k). As noted above, informal resolution may encompass a wide variety of alternative dispute resolution processes, and these final regulations provide a recipient discretion to choose a resolution option that is best for them, the parties, and their educational communities. As discussed in the July 2022 NPRM, in the elementary school setting, for example, options might include requiring the respondent to take steps to repair the relationship with the complainant without requiring the students to interact face-to-face. 87 FR 41454. In the postsecondary setting, an informal resolution process could involve mediation or a more complex restorative justice process. *Id.* The Department acknowledges the commenters' concerns regarding mediation (including the Department's previous statements dissuading a recipient from using mediation to resolve an allegation of sexual assault),

as well as the evidence of the potential benefits of restorative justice practices. In the last two decades, based on its enforcement experience, the Department has come to believe it should offer a recipient more flexibility in designing alternative procedures, and nothing prohibits a recipient from declining to offer mediation if it concludes such a process would be inappropriate. The final regulations do not preclude the use of restorative or transformative justice practices, nor did commenters identify any specific conflict between § 106.44(k) and restorative or transformative justice models. Accordingly, a recipient could include such practices in its informal resolution processes. The Department acknowledges the request for further information regarding informal resolution, and the Department will offer technical assistance, as appropriate, to promote compliance with these final regulations.

*Changes:* None.

## C. Framework for Grievance Procedures for Complaints of Sex Discrimination

Section 106.45 of these final regulations specifies grievance procedures for the prompt and equitable resolution of complaints of sex discrimination generally, while § 106.46 specifies further grievance procedures for the prompt and equitable resolution of complaints of sex-based harassment involving a student party in a postsecondary institution. The Department is authorized by statute to promulgate regulations to effectuate the purpose of Title IX, *see* 20 U.S.C. 1682, including by requiring grievance procedures that provide for the prompt and equitable resolution of sex discrimination complaints. *See Gebser,* 524 U.S. at 292 (noting that the Department can administratively enforce the requirement that a school "promulgate a grievance procedure").

The Department received a range of comments on these provisions. Some commenters supported the requirements for grievance procedures in §§ 106.45 and 106.46 as proposed. Other commenters preferred the grievance procedures established by the 2020 amendments, in whole or in part. Still other commenters recommended streamlining § 106.45 and eliminating § 106.46; or eliminating § 106.45 and extending § 106.46 to all sex discrimination complaints. In addition, other commenters requested that the Department modify the procedures depending on the type of recipient, the conduct alleged, or the identity of the parties. The discussion below explains more specific bases for commenters' views, incorporates responses received

to the directed question in the July 2022 NPRM about a recipient's obligation to provide an educational environment free from sex discrimination (proposed §§ 106.44, 106.45, and 106.46), 87 FR 41544, and presents the Department's reasoning and conclusions. Unless otherwise noted, the term "grievance procedures" refers to grievance procedures set forth in § 106.45, and if applicable § 106.46, that provide for the prompt and equitable resolution of complaints made by students, employees, or other individuals who are participating or attempting to participate in the recipient's education program or activity, or by the Title IX Coordinator, alleging any action that would be prohibited by Title IX or this part. *See* § 106.8(b)(2).

### 1. General Support

*Comments:* Many commenters supported the proposed grievance procedures framework for a range of reasons. For example, some commenters appreciated that the procedures would ensure that a recipient takes sexual harassment seriously, outline how a recipient must address any allegation of sex discrimination beyond just sex-based harassment, remove the need for additional or separate grievance procedures for any subset of sex discrimination complaints, and return to a decades-old standard that required a recipient to respond appropriately and provide support to complainants. One commenter stated that the procedures would increase transparency, equity, and trauma-informed care for complainants, address systemic forms of discrimination, and resolve grievances in a prompt, fair, and equitable manner.

Other commenters appreciated that the proposed grievance procedures reflect public input from a range of stakeholders, and provide flexibility, clarity, and streamlined procedures for recipients. On flexibility, one commenter specifically identified the removal of requirements related to written reports, cross-examination, and informal resolution, as well as the inclusion of provisions permitting a recipient to adopt the single-investigator model. Another commenter stated that the structural and operational differences between recipients—such as population size and demographics, staffing, financial resources, and student needs and experiences—make inflexible rules particularly inappropriate.

Other commenters addressed regulatory stability and appreciated that the proposed grievance procedures retained some of the 2020 amendments. Some commenters stated that flexibility in the proposed regulations and

retention of some of the 2020 amendments would deter future proposed rulemaking in favor of stability and resilience.

*Discussion:* The Department acknowledges these comments and agrees that these regulations will provide a recipient greater flexibility and clarity in designing Title IX grievance procedures that are consistent with both due process principles and procedures to address other violations of its student code of conduct, including discrimination based on other protected traits. Final § 106.45 establishes the basic elements of a fair process, sets clear guideposts for prompt and equitable resolution of complaints of sex discrimination, including sex-based harassment, and ensures transparent and reliable outcomes for recipients, students, employees, and others participating or attempting to participate in a recipient's education program or activity. Additionally, the requirements in final § 106.46—which are incorporated from § 106.45 of the 2020 amendments with modifications, as explained in greater detail in the discussion of individual sections in § 106.46, and which apply only to complaints of sex-based harassment involving a student party at a postsecondary institution—afford additional procedural requirements that are appropriate to the age, maturity, independence, needs, and context of students at postsecondary institutions.

The Department appreciates the opportunity to clarify that all recipients must implement grievance procedures consistent with § 106.45 or offer informal resolution consistent with § 106.44(k), as available and appropriate, to resolve a complaint of sex discrimination. At the same time, only postsecondary institutions have an additional obligation to implement grievance procedures consistent with § 106.46 (or offer informal resolution consistent with § 106.44(k), as available and appropriate), and this obligation is limited to resolving an allegation of sex-based harassment in which either the complainant or respondent is a student. Final § 106.45 sets forth baseline requirements to resolve any allegation of sex discrimination, including sex-based harassment, that may occur at a wide range of recipients, including an elementary school, secondary school, and other recipients such as State educational agencies, State vocational rehabilitation agencies, public libraries, museums, and other entities that receive Federal financial assistance from the Department. *See* 87 FR 41460.

The Department shares commenters' concerns about the importance of regulatory stability and the need for a recipient and all members of its educational community to have clear information about rights and responsibilities under Title IX, including the framework for addressing any alleged sex discrimination. By retaining and enhancing many of the requirements in the 2020 amendments, these final regulations provide the regulatory stability that promotes broad understanding of Title IX's nondiscrimination mandate and the rights and responsibilities it confers in educational settings that receive Federal financial assistance from the Department. At the same time, the Department recognizes the need to modify some of the changes made by the 2020 amendments (including by codifying longstanding interpretations of the statute) in order to fully effectuate Title IX's nondiscrimination mandate.

Other commenters objected to various aspects of §§ 106.45 and 106.46. We summarize and respond to their comments in the sections below.

*Changes:* None.

## 2. Due Process Generally

*Comments:* The Department received an array of comments about §§ 106.45 and 106.46 that related to due process. Some commenters expressed general support for the due process considerations reflected in the proposed regulations. For example, some commenters stated that it is reasonable for the Department to update the regulations to ensure effective implementation of Title IX while also safeguarding parties' due process rights. Other commenters concluded that the regulations would be fairer and less adversarial than the 2020 amendments, particularly at postsecondary institutions, and would also afford a recipient flexibility to establish effective and fair procedures tailored to a recipient's educational environment, including applicable State laws. One commenter stated that the proposed regulations would more appropriately balance flexibility, accountability, and due process concerns compared to the current regulations, while another commenter criticized the 2020 amendments for being excessively prescriptive and administratively burdensome.

In contrast, other commenters expressed concern that the proposed regulations would erode or deprive students of due process. For example, some commenters asserted that the 2020 amendments were fair and protected the rights of complainants and respondents alike, while the proposed regulations would mistakenly assume a tension between due process and Title IX's nondiscrimination mandate and would only require a recipient to provide as few procedural requirements as possible. In addition, one group of commenters asserted that the Department's justification for retaining certain procedural requirements from the 2020 amendments in proposed § 106.46 recognized the importance of procedural requirements, and that such recognition was in tension with the Department's proposal to omit many of those procedural requirements from proposed § 106.46 and revoke some provisions of the 2020 amendments.

Other commenters opposed the proposed regulations because, in their view, the regulations would effectively adopt procedures set forth in the Department's 2011 and 2014 guidance documents that, according to these commenters, pressured recipients to adopt unfair procedures that denied adequate notice, denied access to evidence, and failed to sanction false statements.

Some commenters suggested that courts have held that a postsecondary institution denied due process to a respondent while following procedures that the commenters describe as similar to those in the proposed regulations.

*Discussion:* The Department acknowledges commenters' support for the grievance procedures framework and agrees that the final regulations appropriately and fairly safeguard the due process rights of complainants and respondents while affording a recipient flexibility to address all types of sex discrimination complaints. The final regulations hold a recipient accountable for effectuating Title IX's nondiscrimination mandate while striking the right balance of all relevant considerations, including the preservation of due process, the ability of a recipient to tailor grievance procedures to suit its educational environment, and additional legal considerations under State or other laws.

The grievance procedures required in final § 106.46 retain many aspects of the 2020 amendments, including components that diverge from the framing in the 2011 Dear Colleague Letter on Sexual Violence and the 2014 Q&A on Sexual Violence. *See, e.g.,* § 106.46(e)(2) (opportunity to have an advisor of the party's choice at any meeting or proceeding); (f)(1)(ii)(B) (allowing a party's advisor to ask relevant and not otherwise impermissible questions to other parties and witnesses during a live hearing); and (i)(1) and (2) (providing an opportunity to appeal based on

procedural irregularity, new evidence, or conflict of interest or bias, as well as any other bases the recipient offers equally to the parties). And they include provisions that ensure that complainants and respondents have adequate notice and access to evidence and that preserve a recipient's authority to prohibit parties and witnesses from knowingly making false statements. *See* § 106.46(c), (d), (e)(1), and (e)(5) (written notice of allegations, dismissal of complaints, meetings, interviews, hearings, and delays); (e)(6) (equal opportunity to access to relevant and not otherwise impermissible evidence); (c)(1)(iv) (requiring written notices to inform the parties of any provision of a postsecondary institution's code of conduct that prohibits knowingly making false statements. With respect to complaints of sex discrimination other than those of sex-based harassment involving a student at postsecondary institutions, the Department notes that § 106.45 builds on the 2020 amendments by outlining grievance procedures that allow for the prompt and equitable resolution of such complaints in a manner that comports with the requirements of due process and is consistent with the standard set out in *Goss*, 419 U.S. at 579 (requiring schools to provide students facing up to a 10-day suspension with, at a minimum, ''some kind of notice'' and ''some kind of hearing''), as explained in the discussion of the individual provisions below. *See also* 87 FR 41456. The Department further disagrees with the commenters' assertion that the procedures set forth in final §§ 106.45 and 106.46 pressure a recipient to adopt unfair procedures. Instead—and as explained in greater detail below—these procedures appropriately account for a recipient's obligations to comply both with Title IX's nondiscrimination mandate and the requirements of due process.

The Department disagrees with assertions made by some commenters that the justification for additional requirements under § 106.46 is undermined because § 106.45 omits these additional requirements and the final regulations revoke some provisions of the 2020 amendments. As explained in the discussion of the individual provisions of § 106.46, these additional requirements in § 106.46 address unique considerations raised by sex-based harassment complaints involving students in a postsecondary setting but, in other circumstances, are unnecessary to preserve due process and may impair a recipient's ability to resolve sex discrimination complaints in a prompt

and equitable manner. *See* discussion of § 106.46; *see also* 87 FR 41457–61. The Department's view comports with Supreme Court precedent that due process requirements vary with the particular circumstances. *See, e.g., Zinermon* v. *Burch*, 494 U.S. 113, 127 (1990); *Gilbert* v. *Homar*, 520 U.S. 924, 930 (1997); *Cafeteria & Rest. Workers* v. *McElroy*, 367 U.S. 886, 895 (1961).

The requirements for grievance procedures under § 106.45, and if applicable § 106.46, afford clear and predictable safeguards and will ensure fair, transparent, and reliable grievance procedures to resolve all forms of sex discrimination. Thus, by incorporating grievance procedures for the prompt and equitable resolution of sex discrimination complaints broadly in § 106.45, and retaining the aforementioned key provisions for the resolution of complaints that allege sex-based harassment involving a postsecondary student in § 106.46, the Department's final grievance procedure requirements strengthen the 2020 amendments' existing requirements to address sex-based harassment, expand those requirements to cover all forms of sex discrimination, and ensure all parties are afforded procedures that comport with the requirements of due process.

The Department has reviewed the court decisions cited by commenters and disagrees with the commenters' characterization that §§ 106.45 and 106.46 conflict with their holdings. Some of the decisions concluded that the procedures used by a particular recipient in resolving complaints of sexual assault violated due process,[43] while others did not draw final conclusions about whether the particular procedures a recipient provided were sufficient.[44] The decisions cited do not provide a basis for the view suggested by the commenters that the final regulations adopted here are inconsistent with due process requirements.

The Department notes that commenters voiced support and raised questions about specific provisions in proposed §§ 106.45 and 106.46. Those comments, and the Department's reasons for retaining or revising those provisions, are summarized and

addressed in more detail in discussions of the relevant individual provisions below.

*Changes:* None.

Due Process Applied to Various Recipients and the Department

*Comments:* Whether supporting or opposing the proposed regulations, many commenters recognized the importance of due process in a recipient's response to conduct that allegedly violates Title IX. With respect to a public recipient, several commenters noted that a public postsecondary institution must apply constitutional due process protections before disciplining, terminating, or expelling a student. Other commenters addressed the application of due process principles to public elementary schools and secondary schools. In addition, some commenters noted the importance of applying due process principles to sex discrimination complaints in the private college context, drawing on theories of basic fairness under common law, statute, or contract law.

Other commenters addressed the application of constitutional due process requirements to OCR. Some commenters stated that, as a government actor, OCR cannot compel a public or private recipient to deprive a person of due process, nor compel a recipient to take actions that if taken by OCR would violate the Fifth Amendment's Due Process Clause.

*Discussion:* The Department acknowledges the thoughtful comments on the specific role constitutional due process principles should play in a recipient's grievance procedures to determine whether an individual engaged in unlawful sex discrimination while participating in an education program or activity.

As the Department acknowledged in the July 2022 NPRM, courts have held that public postsecondary institutions' disciplinary proceedings are subject to the requirements of procedural due process. 87 FR 41456. And while the Due Process Clauses of the Fifth and Fourteenth Amendments do not apply to a private recipient, the Department does not intend to impose, nor does Title IX require, different procedural standards for public and private recipients. 87 FR 41456. The Department agrees with commenters that as an agency of the Federal government subject to the U.S. Constitution, the Department is precluded from administering, enforcing, and interpreting statutes, including Title IX, in a manner that would require a recipient to deny the

---

[43] *See, e.g., Doe* v. *Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Doe* v. *Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe* v. *Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017).

[44] *See, e.g., Munoz* v. *Strong*, No. 20–CV–984, 2021 WL 5548081 (W.D. Mich. June 23, 2021) (denying university's motion to dismiss due process claim because the plaintiff has ''plausibly'' alleged that his rights to notice and an opportunity to be heard had been violated).

parties their constitutional rights to due process. The final regulations make clear that nothing in the regulations requires a recipient to restrict any rights guaranteed by the U.S. Constitution. 34 CFR 106.6(d).

*Changes:* None.

**Method for Determining What Process Is Due**

*Comments:* Commenters had differing opinions about the process a recipient should be required to provide. For example, one commenter stated that postsecondary institution proceedings are not judicial proceedings and do not have to mimic the latter to be fair and equitable. In contrast, other commenters asserted that the Department's Title IX regulations should adopt the same procedures used in criminal proceedings. Still others invoked the test in *Mathews* v. *Eldridge,* 424 U.S. 319 (1976), for determining what process is due, with one commenter asserting the proposed regulations would fail the *Mathews* test. One commenter asserted that minimum due process requires timely notice of the charges and an opportunity for the respondent to review the evidence and present their side of the story.

*Discussion:* The Department reiterates its strong agreement that procedures to resolve disputes about sex discrimination, including sex-based harassment, must comport with due process. However, as some commenters noted, this agreement does not answer the question of what specific process is due. "[N]ot all situations calling for procedural safeguards call for the same kind of procedure." *Morrissey* v. *Brewer,* 408 U.S. 471, 481 (1972); *see also Hannah* v. *Larche,* 363 U.S. 420, 442 (1960); *Zinermon,* 494 U.S. at 127; *Gilbert,* 520 U.S. at 930. That a particular procedure is required in criminal or civil judicial proceedings does not mean the same procedure is required in all situations. *See, e.g., Bd. of Curators of Univ. of Mo.* v. *Horowitz,* 435 U.S. 78, 88 (1978); *Baxter* v. *Palmigiano,* 425 U.S. 308, 321 (1976); 87 FR 41456; 85 FR 30051, 30531.

As explained in greater detail in the discussions of the individual grievance procedure provisions of the final regulations, the Department concludes that the framework set forth in §§ 106.45 and 106.46 allows a public recipient to meet the requirements of constitutional due process, including that a person be afforded notice and an opportunity to be heard before they may be deprived of "life, liberty, or property." *Goss,* 419 U.S. at 579. Although different grievance procedures might also satisfy due process, the Department strongly

disagrees that the requirements in the final regulations fall short of due process requirements. Moreover, the Department notes that adding further procedures may discourage an individual from making a complaint of sex discrimination or participating in grievance procedures, which would undermine Title IX's nondiscrimination mandate.

In determining whether an agency's administrative procedures afford constitutional due process, courts apply the factors described in *Mathews,* 424 U.S. at 334–35, which are satisfied here as well. Specifically, as several commenters noted and the Department acknowledged in the preamble to the 2020 amendments, *see* 85 FR 30283 n.1130, the factors described in *Mathews* determine what procedural protections due process requires in a particular situation. "Under the *Mathews* balancing test, a court evaluates (A) the private interest affected; (B) the risk of erroneous deprivation of that interest through the procedures used; and (C) the governmental interest at stake." *Nelson* v. *Colorado,* 581 U.S. 128, 135 (2017); *see also Zinermon,* 494 U.S. at 127 (courts "weigh several factors" in determining what procedural protections the Due Process Clause requires in a particular case). Consistent with this understanding, the final grievance procedures set forth in §§ 106.45 and 106.46 are tailored to the unique settings and rights implicated by allegations of sex discrimination (including sex-based harassment) at educational institutions.

*Changes:* None.

**Identifying Relevant Interests**

*Comments:* Some commenters supported the framework for grievance procedures because it would make campuses safer by encouraging the use of grievance procedures. Other commenters opposed the framework because they thought the procedural protections went too far, which would discourage the filing of complaints, or subject complainants to retaliation.

Some commenters expressed concern that the proposed framework for grievance procedures lacked adequate definitions, due process, and fundamental fairness for a student respondent. Commenters raised concern about a recipient wrongfully punishing innocent students, including for sexual assault, which would have significant consequences for such respondents. One commenter asserted that even being named a respondent in a sex discrimination complaint would likely damage a person's reputation if known

to others or if added to written records. One group of commenters asserted that "efficiency" is not a valid justification for departing from procedural requirements that would ensure fairness.

*Discussion:* The Department recognizes that grievance procedures will have significant impact not only on how a recipient investigates sex discrimination allegations, but also on the various interests that commenters identified. Among these is a recipient's interest in ensuring that it operates its education program and activity in a manner that is free from sex discrimination—including through grievance procedures that do not discourage reports of sex discrimination and that protect participants from retaliation. They also include the interest that all parties share in the fairness and reliability of such procedures. The Department describes in greater detail how the requirements for grievance procedures in the final regulations address these important interests in its discussion of the specific provisions in §§ 106.45 and 106.46 and explains the final regulations' robust protections against retaliation in its discussion of § 106.71. For the reasons discussed in those specific sections, the Department strongly disagrees that the requirements for grievance procedures in the final regulations fail to afford due process or ensure fundamental fairness to respondents.

The Department also disagrees that the requirements for grievance procedures in the final regulations ignore concerns about wrongful punishment or the harms respondents experience when they are named in sex discrimination complaints. On the contrary, the final regulations protect these interests, including by adopting specific provisions that operate to ensure fair procedures that result in accurate and reliable outcomes. *See, e.g.,* § 106.45(b)(1), (2), and (6) (requiring equitable treatment of the parties, addressing questions of conflict of interest and bias, setting standards for the objective evaluation of relevant and not otherwise impermissible evidence, and ensuring determinations are not reached before the conclusion of the grievance procedures), (d)(3), (i) (providing bases for appeals of decisions under § 106.45); § 106.46(a) (§ 106.46's grievance procedures "must include provisions that incorporate the requirements of § 106.45"), (i) (providing bases for appeals of decisions under § 106.46). The Department recognizes that being named as a respondent can impose harm (including reputational harm), especially if that

information is made known to others or added to written records. Accordingly, the grievance procedures include provisions to regulate the disclosure of certain types of information related to alleged sex discrimination, as discussed in greater detail below. *See, e.g.,* § 106.45(b)(5), (7) (requiring a recipient to take reasonable steps to protect parties' privacy and to exclude certain evidence and questions as impermissible), (f)(4)(iii) (requiring a recipient to take reasonable steps to prevent and address unauthorized disclosure of information). In addition, these final regulations require a recipient to ensure that respondents have access to supportive measures. *See* §§ 106.44(f)(1)(ii), (g), 106.45(l)(1).

Moreover, the Department notes a respondent's interest is not the only individual interest that must be considered in the *Mathews* analysis. The Supreme Court has explained that when more than one private party's interests are implicated in a proceeding (*i.e.,* both a complainant and a respondent as private parties), both parties' interests must be considered in determining what process is due. *See Brock* v. *Roadway Exp., Inc.,* 481 U.S. 252, 263 (1987). Similar to respondents, complainants likewise have an important interest in remaining enrolled in school and completing their education, an interest that can be threatened if discrimination they face is allowed to continue unremedied. The Department must take these interests into account, and the final regulations reflect these concerns. And contrary to the concerns voiced by some commenters, the final regulations do not go too far in the direction of dissuading a complainant from making a complaint or fail to protect such complainants from retaliation for doing so. Rather, as explained in greater detail in the discussions of §§ 106.45(a)(2) and 106.71, the final regulations ensure that a complainant can make a complaint if they experience sex discrimination (including sex-based harassment) and are protected from retaliation, while also ensuring that all parties receive the process they are due. The Department also notes that under the final regulations a Title IX Coordinator must take certain actions upon being notified of conduct that reasonably may constitute sex discrimination, including offering and coordinating supportive measures or, if available and appropriate, offering to resolve a complaint using an informal resolution process. *See* § 106.44(f)(1)(ii), (f)(1)(iv), (g), (k). These measures will help

mitigate any deterrent effect the grievance procedures might have.

In addition to acknowledging the overlapping, but distinct, private interests involved, the *Mathews* analysis asks what procedures will decrease the likelihood that a decisionmaker reaches the wrong conclusion. Because "a primary function of legal process is to minimize the risk of erroneous decisions," there must be a close assessment "of the relative reliability of the procedures used and the substitute procedures sought." *Mackey* v. *Montrym,* 443 U.S. 1, 13 (1979). For the reasons explained in greater detail in the discussions of specific provisions of §§ 106.45 and 106.46, the Department has concluded that the grievance procedures set forth in the final regulations meet this standard. But the Department notes here that in conducting this analysis, courts do not simply ask whether a particular additional procedure would improve reliability. Instead, they also inquire into how much the procedure would do so and at what cost. Even if some "marginal gains from affording an additional procedural safeguard" would occur, due process does not require that additional procedure if it is "outweighed by the societal cost of providing such a safeguard." *Walters* v. *Nat'l Ass'n of Radiation Survivors,* 473 U.S. 305, 321 (1985). Contrary to commenters' statements, such "societal costs," *id.,* can include considerations of "administrative efficiency," *see Dixon* v. *Love,* 431 U.S. 105, 114 (1977). But they also include other considerations, including the concern—voiced by some commenters—that adopting additional procedures could discourage individuals who experience sex discrimination from making a complaint.

*Changes:* None.

Issues of Bias

*Comments:* Some commenters raised concerns about biased grievance procedures.

*Discussion:* The Department shares commenters' concerns about the potential for bias in grievance procedures and the disproportionate impact biased procedures may have on respondents who come from a range of backgrounds. The Department stresses that the final regulations' grievance procedures must not be tainted by bias. To guard against bias, the final regulations require that any person designated as a Title IX Coordinator, investigator, or decisionmaker not have a conflict of interest or bias against complainants or respondents generally or an individual complainant or

respondent. § 106.45(b)(2); *see also* § 106.46(a) (requiring postsecondary institutions to incorporate § 106.45's requirements into its grievance procedures for resolving complaints of sex-based harassment involving a student party). The final regulations impose the same requirement for any person designated by a recipient to facilitate an informal resolution process under § 106.44(k). *See* § 106.46(k)(4). They also explicitly provide that bias is a ground for appeal from a dismissal or determination whether sex-based harassment occurred. *See* §§ 106.45(d)(3), 106.46(i)(1)(iii). The final regulations also require a presumption that the respondent is not responsible for the alleged sex discrimination until a determination is made at the conclusion of the recipient's grievance procedures. *See* § 106.45(b)(3). And the final regulations include strong protections that build on provisions in the 2020 amendments that seek to prevent biased procedures through appropriate training. *See* § 106.8(d)(2)(iii), (3); 85 FR 30112. The Department explains these anti-bias provisions in greater detail in the discussion of §§ 106.8(d), 106.44(k)(4), and 106.45(b)(2).

*Changes:* None.

3. Administrative Burdens

*Comments:* Some commenters expressed concern that the proposed requirements for grievance procedures would place unmanageable administrative burdens on a recipient. Other commenters suggested the regulations would detract from efforts to identify, prevent, and remedy sex discrimination. Some commenters asserted that having one set of grievance procedures to address sex-based harassment and another for other forms of sex discrimination would create confusion for a recipient as to which requirements apply to which complaints. In addition, some commenters asserted that the revised definition of "sex-based harassment" and the application of § 106.45 to all other sex discrimination complaints would be more burdensome than current regulations.

Some commenters recommended changes to the proposed regulations to alter the burdens on certain recipients. For example, one commenter suggested a "safe harbor" to accommodate religiously affiliated postsecondary institutions that have codes of conduct and progressive discipline policies that do not align with the proposed regulations. The commenter said a "safe harbor" might include an institution stating that it takes allegations of sexual

assault seriously and maintains a Clery Act reporting record accordingly. One commenter, a school district, urged the Department to allow a recipient to develop its own process for responding to complaints of sex discrimination, including sex-based harassment. The commenter stated that it conducted three Title IX investigations under the 2020 amendments, which each averaged 30 hours in mostly paperwork and document writing. Another commenter estimated that a recipient would need at least seven employees to administer grievance procedures under the proposed framework and urged the Department to reduce the number of staff required to prevent overburdening small recipients.

*Discussion:* The Department acknowledges the vast diversity among recipients, the variety of systems used to enforce codes of conduct, and each recipient's desire to retain flexibility and discretion. The need for consistent and predictable enforcement of Title IX weighs in favor of Federal rules standardizing the investigation and resolution of allegations of sex discrimination under these final regulations. *See* 85 FR 30096.

The Department acknowledges both that the Title IX grievance procedures afford strong civil rights protections and ensure a nondiscriminatory educational environment, and that as commenters noted, a recipient needs to have a degree of flexibility in structuring its internal affairs, including with respect to disciplinary decisions. Under §§ 106.45 and 106.46, a recipient retains significant flexibility and discretion, including with respect to decisions to: designate the reasonable timeframes that will apply to grievance procedures (as long as they are "reasonably prompt"), § 106.45(b)(4); use a recipient's own employees as investigators and decisionmakers or outsource those functions to contractors, §§ 106.8(a)(2) and 106.45(b)(2); use an individual decisionmaker or a panel of decisionmakers, § 106.45(b)(2); offer informal resolution options, § 106.45(k); determine which remedies to provide a complainant or disciplinary sanctions to impose against a respondent following a determination that sex discrimination occurred, § 106.45(h)(3) and (4); and formulate appeal procedures, §§ 106.45(i) and 106.46(i). *See also* § 106.46(a) (requiring a postsecondary institution's grievance procedures for resolving complaints of sex-based harassment involving a student to incorporate the requirements of § 106.45).

The Department also notes that the final regulations remove requirements imposed by the 2020 amendments that stakeholders and commenters identified as overly prescriptive, restrictive, and time-consuming, including requirements related to written notice in elementary schools and secondary schools, the requirement to hold a live hearing, and the prohibition on the single-investigator model. *See* 87 FR 41467, 41473, 41482. The Department notes that the final regulations include other specific changes to the requirements of the 2020 amendments that also aim to make grievance procedures less burdensome without reducing their efficacy or fairness. For example, the Department leaves it to recipients' discretion to determine whether to provide written notice of allegations outside the context of complaints of sex-based harassment involving a postsecondary student. *See* §§ 106.45(c) and 106.46(c). The Department also gives postsecondary institutions the discretion to assess credibility through a live hearing or through another live questioning process when investigating complaints of sex-based harassment involving a student. *See* § 106.46(f)–(g). In addition, like the 2020 amendments, the final regulations do not require specific disciplinary sanctions after a determination that sex discrimination occurred or prescribe any particular form of sanctions or remedy. *See* 85 FR 30071. Rather, §§ 106.45 and 106.46 prescribe grievance procedures focused on reaching fair, transparent, and reliable determinations so that a recipient can address sex discrimination in its education program or activity and ensure that a complainant receives remedies designed to restore or preserve equal access to the recipient's education program or activity.

The Department further disagrees with the assertion that the additional administrative burden imposed by these regulations would detract from efforts to identify, prevent, and remedy sex discrimination. On the contrary, by creating a predictable and clear framework for resolving complaints of sex discrimination, the final grievance procedures in §§ 106.45 and 106.46 will enhance those efforts. The Department therefore declines to amend the regulations in the ways suggested by the commenters, such as allowing a recipient to develop its own processes to respond to complaints of sex discrimination.

The Department also disagrees that having one set of grievance procedures for sex-based harassment and another for other forms of sex discrimination will create confusion about which requirements apply to which complaints. The final regulations clearly define "sex-based harassment." *See* discussion regarding the definition of "sex-based harassment" in § 106.2. And recipients already have experience determining what conduct constitutes sex-based harassment, as the 2020 amendments included grievance procedures that applied only to sexual harassment complaints. These final regulations, which apply to all forms of sex discrimination and include discrete additional requirements for a subset of sex-based harassment complaints involving students at postsecondary institutions, clarify and streamline a recipient's Title IX compliance obligations as compared to the 2020 amendments.

The benefits of ensuring that sex discrimination complaints are resolved in a manner that is fair, aims to ensure reliable outcomes, and meets the requirements of Title IX, justify the burdens of the final regulations. The Department's discussion in the *Regulatory Impact Analysis* provides additional information about how the Department reached this conclusion.

The Department also declines to adopt a safe harbor to exempt a recipient from its obligation to adopt and implement grievance procedures consistent with §§ 106.45 and 106.46. With respect to religious institutions, the Department notes that Title IX does not apply to an educational institution controlled by a religious organization for which compliance with Title IX would conflict with religious tenets of the controlling organization. 20 U.S.C. 1681(a)(3). Since Congress enacted the exemption for religious institutions, the authority to eliminate or expand it rests with Congress. For further explanation of Title IX's religious exemptions, see the discussion of Religious Exemptions (Section VII).

Further, the Department emphasizes that these final regulations are promulgated under Title IX and not under the Clery Act. Unlike the Clery Act, these final regulations apply to all recipients of Federal financial assistance, which include many entities that are not institutions of higher education that participate in the Federal student aid programs under Title IV of the Higher Education Act. For example, these final regulations apply to elementary schools, secondary schools, State educational agencies, State vocational rehabilitation agencies, public libraries, museums, and a range of other entities that receive Federal financial assistance from the Department and are not subject to the Clery Act. Accordingly, a safe harbor from a recipient's obligation to

implement grievance procedures that partially relies on a recipient's Clery Act reporting record would be unworkable under Title IX regulations.

For these reasons, the Department maintains that the final regulations account for both the administrative concerns commenters have raised and the need to ensure a nondiscriminatory educational environment through procedures that are designed to promote fair and accurate outcomes in addressing sex discrimination complaints.

*Changes:* None.

4. Bifurcation of Sex-Based Harassment Complaints Between Students and Employees at a Postsecondary Institution

*Comments:* Several commenters raised concerns about the distinction drawn by the proposed regulations between students and employees. Some expressed confusion about which provision—§§ 106.45 or 106.46—applied to which population. Another argued that the distinction lacked adequate justification, arguing that a postsecondary student has the same status as an employee and is capable of self-advocacy. Still others questioned why a recipient's grievance procedures in the postsecondary context would change based on the complainant's identity, and asserted instead that due process rights typically attach to individuals based on their status as a respondent with a property or liberty interest in their education or employment. And some commenters urged the Department to only require a postsecondary institution to comply with grievance procedures articulated in § 106.46 for sex-based harassment complaints when the respondent is a postsecondary student, and otherwise apply grievance procedures established in § 106.45 when the respondent is an employee.

*Discussion:* The Department believes that some commenters may have misunderstood the Department's reasoning for requiring different grievance procedures. To clarify, a postsecondary institution must apply grievance procedures consistent with § 106.45 to any complaint of sex discrimination—including all employee-to-employee sex-based harassment complaints. *See* § 106.46(a). In contrast, a postsecondary institution must apply grievance procedures consistent with § 106.46 to any sex-based harassment complaint that involves a student party—including sex-based harassment complaints in which an employee is the other party. *See id.*

Contrary to a commenter's assertion that postsecondary employees and students have the same status, an employee's legal status is distinct due to the employment relationship between the recipient and employee. As noted in the July 2022 NPRM, Title IX grievance procedures must be sufficiently flexible to allow a recipient to also comply with its obligations under Title VII, using a framework that is suited to these types of complaints. 87 FR 41459. A recipient may also have employees who hold a variety of designations, including temporary, part-time, full-time, at-will, unionized, tenured, and student-employees—and each category may be entitled to unique grievance procedures based on their respective employment designations. The requirement that the recipient's grievance procedures be prompt and equitable means, in this context, that a recipient's Title IX grievance procedures for complaints of sex-based harassment involving employees must function alongside the procedures it uses to implement Title VII and, to the extent not inconsistent, other laws and collective bargaining agreements that govern the employment relationship. In contrast, students at postsecondary institutions do not have the protection of Title VII in their capacity as students. *Id.* In addition, as explained in the discussion of Employees below, § 106.45's requirements are fundamental to a fair process, and the Department anticipates that many recipients either already (or can easily) incorporate them in their grievance procedures for sex discrimination complaints.

To the extent § 106.46 imposes additional requirements, the benefits of affording a postsecondary student party equitable participation in grievance procedures justify the limited burdens of requiring the additional procedural requirements of § 106.46 for employee-to-student sex-based harassment complaints at a postsecondary institution. For similar reasons, although some commenters asked the Department to revise § 106.46 to apply only in cases involving a student respondent, which the commenters stated would make it easier for recipient employers to meet other obligations, including under collective bargaining agreements, the Department does not agree that such a change is necessary. For additional explanation of the application of the final regulations' grievance procedures requirements to employees, see the discussion of Employees below.

Additionally, the Department disagrees with the commenter's assertion that the justification for

imposing additional procedural requirements when a complaint of sex-based harassment involves a student party is unsound because students and employees are both capable of self-advocacy. While many students in postsecondary institutions are older or nontraditional—including graduate and professional students—undergraduate students, who tend to be younger and newly independent adults, make up a significant portion of the postsecondary student population.[45] As such, many postsecondary students would benefit from the additional procedural requirements of § 106.46. And although the commenter notes that some postsecondary students may be able to effectively self-advocate, the Department recognizes that others may not. These final regulations ensure that all students have the opportunity to participate meaningfully and effectively in grievance procedures to protect their right to equal educational opportunities. For similar reasons, the Department declines the suggestion to limit § 106.46 to complaints of sex-based harassment to only those cases in which a student is the respondent. Section 106.46 provides important protections for students who are complainants even when the respondent is an employee. As noted above and in the July 2022 NPRM, postsecondary students are often newly independent, still learning to advocate, and would not be entitled to have a parent, guardian, or other authorized legal representative present at meetings or proceedings, unlike students in elementary schools and secondary schools. 87 FR 41462. Thus, the additional requirements of § 106.46 are particularly beneficial for a student in a complaint that involves an employee respondent because an employee may be afforded additional rights or protections that a student complainant lacks.

The Department is also unpersuaded by commenters' assertions that the framework for grievance procedures as

---

[45] According to the National Center for Education Statistics, of the 18.6 million students enrolled in degree-granting postsecondary institutions in 2021, 15.4 million were undergraduate students and 3.2 million were graduate students. U.S. Dep't of Educ., Institute of Education Sciences, National Center for Education Statistics, *Characteristics of Postsecondary Students* (Aug. 2023), *https://nces.ed.gov/programs/coe/indicator/csb/postsecondary-students.* Of the undergraduate student population, 85 percent of full-time undergraduates and 60 percent of part-time undergraduates were age 25 or younger in 2021. *Id.* Additionally, the overall college enrollment rate for 18- to 24-year-olds was 38 percent in 2021. U.S. Dep't of Educ., Institute of Education Sciences, National Center for Education Statistics, *College Enrollment Rates* (May 2023), *https://nces.ed.gov/programs/coe/indicator/cpb/college-enrollment-rate.*

applied to sex-based harassment complaints that involve a postsecondary student diverges from how courts have construed due process requirements. The Supreme Court has made clear that Federal agencies may use standards in administrative enforcement that differ from those used by courts to litigate private actions for monetary damages, *cf. Davis,* 526 U.S. at 639, and nothing in the final regulations precludes a recipient from complying with the Due Process Clauses of the Fifth and Fourteenth Amendments. *See* 34 CFR 106.6(d); *see also* discussion of § 106.6(b).

The Department recognizes that the U.S. Constitution affords due process protections to individuals who are facing a possible deprivation of property or liberty interests. However, grievance procedures specifically adopted for the student population in a postsecondary institution are needed to carry out Title IX's nondiscrimination mandate. Accordingly, the Department continues to believe that the requirements of § 106.46 afford protections that are appropriate to the age, maturity, independence, needs, and context of students at postsecondary institutions. The Department also views the additional provisions of § 106.46 as necessary to address postsecondary sex-based harassment complaints, which often allege conduct that is highly personal and of a different nature than other types of alleged sex discrimination and which typically require greater participation by a complainant and respondent in grievance procedures than other complaints of sex discrimination.

Moreover, the additional requirements of § 106.46 are not necessary for other individuals, including employees, who have different relationships with postsecondary institutions and may be afforded additional rights or protections under Title VII or other laws, agreements, or commitments by the recipient. Affording additional procedural requirements for postsecondary students is also consistent with the Department's understanding of, and commitment to, due process as dictated by the particular circumstances. Accordingly, as recognized in the July 2022 NPRM, the demands of a sex-based harassment complaint involving a postsecondary student may dictate different procedures than what might be appropriate in other situations. 87 FR 41462.

*Changes:* None.

## 5. Ability To Respond to Threats, Promptly Impose Discipline, or Address Sex Discrimination

*Comments:* Some commenters expressed concern that the proposed regulations would interfere with a recipient's ability to promptly respond to threats, harassment, and discrimination, even when significant evidence would support disciplinary action or when the respondent's conduct also violated rules unrelated to Title IX. Similarly, another commenter asserted that § 106.45 would create a separate and more cumbersome process for investigating and disciplining sex discrimination than what is required for other offenses, and that such a distinction is not equitable. The commenter used the example of a recipient being able to take immediate disciplinary action against a student who commits vandalism, while being required to first implement grievance procedures for a student who commits the potentially more serious offense of sexual misconduct. The commenter also asserted that no other Federal nondiscrimination laws require a complaint process that would restrict student discipline under State law.

Other commenters expressed concern that the proposed framework would deter a complainant from pursuing grievance procedures because they may find them complicated and intimidating.

*Discussion:* The Department disagrees with assertions that grievance procedures under §§ 106.45 and 106.46 would unnecessarily delay resolution of complaints or prevent a recipient from removing a respondent who presents a threat to persons within its education program or activity. Sections 106.45 and 106.46 specifically require a recipient to address complaints of sex discrimination and sex-based harassment "prompt[ly]." §§ 106.45(a)(1), 106.46(a). Further, the Department disagrees that the grievance procedures set forth in § 106.45 prevent a recipient from promptly resolving a complaint involving an elementary school or secondary school student, and the commenters have provided no reason to believe that they will. The Department also notes that it has modified the requirements of the 2020 amendments to address concerns about the length of time it takes to impose discipline in response to concerns when raised by stakeholders who expressed difficulty implementing the prior procedures. *See* 87 FR 41457 (describing stakeholder concerns with lengthy grievance procedures at the elementary school and secondary school level); *id.*

at 41459 (explaining changes the Department proposed to § 106.45 to address concerns about challenges the 2020 amendments' grievance process requirements posed for younger students).

While the Department acknowledges that schools have different procedures for responding to other types of offenses, it maintains that the grievance procedures adopted in the 2020 amendments as enhanced and revised in these final regulations are specifically suited and necessary to address allegations of sex discrimination, which involve considerations that are distinct from many other student conduct offenses, including safeguards to assist a recipient in ensuring an educational environment free from sex discrimination during the pendency of grievance procedures. With respect to recipients' ability to respond to threats, the Department notes that the final regulations permit a recipient to remove a respondent from its education program or activity on an emergency basis in certain circumstances, *see* § 106.44(h), or place an employee respondent on administrative leave from employment responsibilities during the pendency of a recipient's grievance procedures, *see* § 106.44(i). *See also* discussion of § 106.44(g)(2) and (3), (h), –(i).

The Department acknowledges that a complainant may not wish to pursue grievance procedures for a variety of reasons. In such circumstances, the availability of confidential resources, as well as other actions that a Title IX Coordinator must take upon being notified of conduct that reasonably may constitute sex discrimination, including offering and coordinating supportive measures or, if available and appropriate, offering to resolve a complaint using an informal resolution process, will mitigate any deterrent effect the grievance procedures might otherwise have. *See* § 106.44(f)(1)(ii), (iv), (g), (k).

*Changes:* None.

## 6. Grievance Procedures Appearing as Quasi-Judicial Proceedings

*Comments:* Some commenters supported removing requirements for grievance procedures adopted as part of the 2020 amendments that appear quasi-judicial or mimic the criminal or civil legal system. For example, some commenters appreciated that §§ 106.44, 106.45, and 106.46 would establish a baseline for grievance procedures that can be used by non-attorneys, which the commenters stated is more likely to achieve fairness and safeguards equity and equality. Other commenters stated

that the quasi-judicial nature of the procedures adopted in the 2020 amendments deterred students who experienced sexual harassment or sexual assault from coming forward and weakened protections for these students. Another commenter stated that the proposed regulations would allow for a streamlined process more aligned with a recipient's code of conduct as well as responses to individual complaints. One commenter indicated that deemphasizing quasi-judicial elements in the proposed regulations would allow a recipient to apply Title IX in a manner that addresses systemic forms of abuse, including the potential that an institution might try to "cover up" the discrimination, and that the proposed requirements for grievance procedures correctly emphasize preventing re-traumatization and connecting survivors to resources.

Other commenters expressed various concerns about the proposed regulations. Some stated that recipients are not equipped to adjudicate complaints, and that even with the Department's proposed changes to the 2020 amendments, the proposed regulations would turn disciplinary proceedings into overly legalistic quasi-court proceedings. Other commenters similarly argued that the grievance procedures adopted by §§ 106.45 and 106.46 would create an inappropriate adversarial environment in educational settings, which they argued would be particularly inappropriate in an elementary school or secondary school setting. Still other commenters questioned whether recipient officials can or should appropriately adjudicate allegations of rape, attempted rape, sexual assault, or other criminal violations, or whether any allegation of potentially criminal misconduct should be investigated only by law enforcement.

*Discussion:* The Department acknowledges, and agrees with, the commenters who have expressed support for the revisions to the grievance procedures adopted in the 2020 amendments. As the Department explained in the July 2022 NPRM, it proposed to revise some of these procedures in response to comments from stakeholders that these procedures were unduly burdensome, deprived recipients of necessary flexibility to respond to certain circumstances (like addressing certain behavior on the playground), and discouraged individuals who had experienced sex discrimination or sex-based harassment from filing complaints. *See* 87 FR 41457–63.

The Department agrees that elementary schools, secondary schools, postsecondary institutions, and other recipients are not courts of law, but disagrees that the final regulations create overly legalistic or adversarial grievance procedures in any of these school settings. Rather, the procedures promote Title IX's nondiscrimination mandate. They provide a structure for schools to determine whether sex discrimination or sex-based harassment has occurred, and if it has, to determine the proper remedies to provide and disciplinary sanctions to impose, while also complying with due process requirements. Moreover, with limited exceptions, the final regulations allow a recipient to address concerns of sex discrimination or sex-based harassment through other, informal means, when appropriate. *See* §§ 106.44(k), 106.45(k), 106.46(j); *see also* discussion of § 106.44(k).

With respect to commenter suggestions that serious allegations of sex-based harassment (such as rape, sexual assault, and other criminal violations) should be handled by law enforcement as opposed to a recipient, the Department reiterates what it explained in the preamble to the 2020 amendments—that the Supreme Court has held that sex-based harassment constitutes sex discrimination under Title IX,[46] and the Department is responsible for enforcing Title IX. *See* 85 FR 30099. Title IX does not replace redress through civil litigation or the criminal legal system. Title IX requires a recipient to evaluate, and as necessary address, allegations that sex discrimination, including sex-based harassment, has deprived a complainant of equal access to education, and remedy such situations. *Id.* And in many instances, a recipient is the only entity that can take specific action to remedy sex discrimination in its education program or activity and prevent its recurrence, such as through changes in academic schedules or living arrangements, modifications to maintain access to extracurricular activities or other educational resources, or the imposition of disciplinary sanctions aligned with a recipient's code of conduct. Further, Title IX prohibits conduct that is not necessarily criminal in nature, such as a professor offering to raise a student's grade in exchange for sexual favors. Accordingly, recipients—not law enforcement or the courts—are

uniquely positioned and required to carry out Title IX's nondiscrimination mandate.

The Department further acknowledges commenters' concerns that recipients exist primarily to educate, and are not courts with a primary purpose, focus, or expertise in administering procedures to resolve factual disputes. The Department also notes that a recipient may view its code of conduct as an educational process rather than a punitive process and acknowledges that such a recipient may be uncomfortable with grievance procedures in which the fact-finding process is more adversarial. With respect to sex discrimination covered under Title IX, however, the recipient must administer grievance procedures designed to reach reliable factual determinations and do so promptly and equitably. Doing so is necessary to ensure that all members of a recipient's community are not discriminated against on the basis of sex. The Department recognizes that in the context of sex-based harassment, the grievance procedures may be more adversarial in light of the serious nature of the alleged misconduct, and the high stakes that the outcome of the process will have for all parties. But the Department does not see any basis for concluding that the grievance procedures set forth in § 106.46 are inconsistent with a recipient's desire to maintain a code of conduct that prioritizes education and accountability over punishment. The Department also notes that §§ 106.45 and 106.46 provide a recipient discretion to create grievance procedures that may be more or less adversarial, such as by deciding whether to hold live hearings (§ 106.46(g)) or how parties and witnesses are questioned (§§ 106.45(g) and 106.46(f)).

*Changes:* None.

7. Consistency With Other Civil Rights Laws That OCR Enforces

*Comments:* Some commenters expressed concern that the proposed regulations would apply different standards to allegations of sex-based harassment than to allegations of discrimination under the other civil rights laws that OCR enforces, which commenters asserted could lead to inconsistent enforcement of civil rights laws.

Commenters noted a single complaint may allege discrimination on multiple bases and asked the Department to clarify how a recipient should respond to such complaints. Commenters also suggested that the proposed regulations permit a recipient to consider more than one identity at a time (*e.g.,* sex, race,

---

[46] *See, e.g., Gebser,* 524 U.S. at 278, 292 (holding that a sex offense by a teacher against a student—and noting that the offense was one for which the teacher had been arrested—constituted sex discrimination prohibited under Title IX).

disability, citizenship status, national origin) when responding to complaints to promote efficiency, reduce any burden on the parties, and recognize the multidimensional nature of sex-based harassment, and some commenters included the example of Asian women being especially vulnerable to attacks based on race and sex. One commenter recommended that the Title IX Coordinator collaborate with a recipient's staff who coordinate compliance with Title VI and Section 504 so students do not have to go through multiple processes.

*Discussion:* As commenters noted, these final regulations are limited to Title IX and impose no new requirements for grievance procedures under Title VI, Section 504, or the ADA. The Department will continue to enforce regulations under those laws, and a recipient must comply with all regulations that apply to a particular allegation of discrimination (including allegations of harassment on multiple bases) accordingly. For more information on the standards applicable to grievance procedures under the civil rights laws that the Department enforces, see the discussion of § 106.44(a). The Department does not agree that the final regulations' requirements for sex-based harassment cases are incongruous with standards under other laws. In fact, these final regulations set forth grievance procedure requirements in §§ 106.45 and 106.46 to align more closely with the standards used to address harassment under the other statutes that OCR enforces. *See* 34 CFR 104.7(b). For example, the definition of ''sex-based harassment'' in § 106.2, which is applied in grievance procedures consistent with §§ 106.45 and 106.46, more closely aligns with the hostile environment analysis that OCR applies to complaints of harassment based on race, color, national origin, or disability for administrative enforcement purposes. *See* 87 FR 41416 (citing 1994 Racial Harassment Guidance; U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter: Prohibited Disability Harassment (July 25, 2000), *https:// www2.ed.gov/about/offices/list/ocr/ docs/disabharassltr.html;* 2010 Harassment and Bullying Dear Colleague Letter, at 1–2).

The Department agrees that a single complaint can raise allegations of discrimination on multiple bases. If all of the allegations in a complaint relate to sex discrimination (*e.g.,* harassment based on sexual orientation and gender identity), the allegations can be made in a single complaint and investigated and resolved at the same time under a

recipient's Title IX grievance procedures. When allegations involve sex discrimination and discrimination on another basis, a recipient must handle the allegations of sex discrimination under its Title IX grievance procedures but would not be required to handle allegations not alleging sex discrimination under its Title IX grievance procedures. As noted in the preamble to the 2020 amendments, a recipient has discretion to determine whether a non-sex-discrimination issue such as race discrimination should go through grievance procedures like those set forth in Title IX regulations. 85 FR 30449. The same is true under these final regulations. For instance, if allegations of sex-based harassment arise out of the same facts and circumstances as allegations of race discrimination under Title VI, the recipient has the discretion to use grievance procedures consistent with § 106.45, and if applicable § 106.46, to address sex and race discrimination or choose a different process that complies with the Department's regulations implementing Title VI to address the allegations of race discrimination. *Cf. id.* (explaining that a recipient has discretion to use a grievance process consistent with the 2020 amendments to address a sexual harassment allegation that also implicates Title VI). Similarly, if a complaint raises allegations pertaining to sex and disability discrimination, a recipient has flexibility to use a single grievance procedure provided such procedure complies with relevant standards under Title IX and any disability laws that may apply. *See, e.g.,* 34 CFR 104.7(b). Nothing in the final regulations precludes a recipient from processing allegations that do not involve sex discrimination simultaneously with allegations of sex discrimination as long as doing so does not prevent the recipient from complying with these final regulations. The Department emphasizes that these final regulations apply to all individuals who allege or who have allegedly engaged in sex discrimination under Title IX irrespective of race or other demographic characteristics. In addition, nothing in the final regulations precludes a recipient from having its Title IX Coordinator collaborate with staff who coordinate compliance with Title VI and Section 504.

*Changes:* None.

### 8. Elementary Schools and Secondary Schools

General Support and Opposition

*Comments:* Some commenters supported the proposed regulations because they would improve Title IX enforcement in elementary schools or secondary schools, and some commenters asserted that instances of sex-based harassment are both underreported and on the rise. Some commenters appreciated that the proposed regulations included less complex grievance procedures for an elementary school or secondary school—such as oral complaints without signatures—which would be less burdensome, more developmentally appropriate, and more likely to help young students draw connections between a behavior and its outcome.

Other commenters argued that some provisions in the 2020 amendments, including requirements to share evidence and mandatory investigative reports, are inappropriate in an elementary school or secondary school and could also conflict with State laws related to student discipline. One commenter, a school district, noted that its student disciplinary proceedings are subject to the U.S. Constitution, State law, local regulations, and other Federal regulations. The commenter asserted that this complex legal framework already provides students substantive and procedural due process such as, under New York law, a requirement to conduct a hearing within five days of imposing a suspension of five or more days, including the opportunity to present and question evidence and witnesses; and a manifestation determination review hearing no more than ten school days after imposing a disciplinary change in placement for a student with a disability.

Other commenters appreciated that the proposed regulations would allow informal resolution of some complaints and provide an educator flexibility to address harassment consistent with the age of the student and nature of the allegation. Some commenters stated that under the 2020 amendments, the time to complete investigations related to bullying and harassment increased significantly. Commenters stated that those delays exacerbated harms to K–12 students who have experienced (and are still experiencing); increased mental health and academic challenges related to the COVID–19 pandemic; and made it more difficult for administrators—who are already figuring out how to comply with legal requirements related to sex and gender identity that differ from State to State, and historic teacher

and administrator staffing shortages—to respond to these concerns.

In contrast, some commenters expressed concern that the proposed regulations would increase administrative and staffing burdens on elementary schools and secondary schools. One commenter asserted that the Department underestimated the resources required to implement the proposed regulations and overestimated recipients' administrative capacity.

Still other commenters argued the Department should limit differences in grievance procedures requirements between educational levels and suggested that the Department broadly apply one set of reasonable requirements for grievance procedures for sex-based harassment that would afford flexibility regardless of the recipient or status of the parties.

Finally, one commenter suggested that the Department draw from State anti-bullying laws in its grievance procedures' requirements because these laws are in effect in all 50 States, have been in practice over a lengthy period, and set forth investigative models uniquely suited to the educational contexts in which they are used.

*Discussion:* The Department acknowledges comments in support of the proposed framework for grievance procedures as applied to an elementary school or secondary school. As noted in the July 2022 NPRM, § 106.45 reflects significant feedback from stakeholders related to the unique needs of elementary and secondary students and school communities, as well as requests to reduce some of the burdens the 2020 amendments imposed on these schools. 87 FR 41457–58. The Department has determined that grievance procedures that apply to complaints of sex discrimination at elementary schools and secondary schools must account for the particular context of those schools, including the younger student population, which is distinct from the postsecondary context. In addition to compulsory attendance rules and the need for age-appropriate standards for classroom behavior, parents, guardians, or other authorized legal representatives have a legal right to be present and assist their child in Title IX grievance procedures in the elementary school and secondary school setting. Section 106.45 would not alter those rights, as explained in the discussion of the rights of parents and other authorized individuals in § 106.6(g). This legal authorization for an adult representative does not apply to most students at postsecondary institutions. The Department also agrees with commenters that a lengthier process for elementary and secondary students is less effective and less developmentally appropriate for addressing sex discrimination.

The Department recognizes that some commenters would have preferred that § 106.45 include fewer requirements for grievance procedures at the elementary school and secondary school level based on their assertion that the proposed regulations insufficiently address the challenges schools faced implementing the 2020 amendments. However, as explained in the discussion of due process above and in greater detail in the discussion of each of § 106.45's provisions, these requirements are necessary to afford fair, reliable grievance procedures. *See generally* discussion of § 106.45. The Department also heard from a range of commenters in response to the proposed regulations—including elementary schools and secondary schools and entities that represent them—that the proposed grievance procedures requirements were well suited to address sex discrimination complaints in their settings. Accordingly, we disagree with comments asserting that § 106.45 would overburden a recipient, deprive complainants or respondents in elementary schools or secondary schools of procedural protections necessary to ensure fairness, or inadequately account for the differences between a postsecondary institution and an elementary school or secondary school. For additional discussion of how the Department assessed the benefits and burdens of the grievance procedures requirements, see the *Regulatory Impact Analysis,* below.

The grievance procedures under § 106.45 provide important protections to ensure an educational environment that is free from sex discrimination as required by Title IX. The grievance procedure requirements are also consistent with Supreme Court precedent governing student discipline cited by commenters [47] because they include notice and an opportunity for the respondent to be heard before the imposition of discipline. *Compare Goss,* 419 U.S. at 579 ("[a]t the very minimum . . . students facing suspension and the consequent interference with a protected property interest must be given *some* kind of notice and afforded *some* kind of hearing." (emphasis in original)), *with* § 106.45(c) (requiring notice of allegations), (f)(2) (requiring equal opportunity for the parties to present fact witnesses and relevant and otherwise not impermissible evidence), (f)(4) (requiring equal opportunity for the parties to access and respond to relevant and not otherwise impermissible evidence), (h)(4) (requiring compliance with grievance procedures before the imposition of any disciplinary sanction against a respondent). To the extent there are conflicting State law requirements or differences between the Department's Title IX regulations and a recipient's other student conduct processes, the Department reiterates that a recipient must fulfill its obligations under Title IX, as explained in greater detail in the discussion of § 106.6(b). *See* discussion of § 106.6(b).

Moreover, to the extent some recipients expressed a preference for greater flexibility, the Department appreciates the opportunity to reiterate that a recipient retains discretion to offer an informal resolution process under § 106.44(k) for most allegations of sex discrimination. Informal resolution processes can play a significant role in addressing commenters' concerns that complying with each of § 106.45's requirements might not be appropriate in every case.

Further, nothing in the final regulations prohibits a recipient from using an existing process that otherwise satisfies the requirements of § 106.45 to investigate and resolve Title IX complaints, such as investigation and grievance procedures that are consistent with State anti-bullying or student discipline laws. Although processes required under different laws and policies may in some instances comply with the requirements of § 106.45, and in those cases may be used by a recipient to address complaints of sex discrimination as discussed below, the Department continues to believe that a uniform Federal standard is required for compliance with Title IX. *See* discussion of Administrative Burdens above (discussing the need for a uniform standard, while also preserving recipients' flexibility); *see also* 85 FR 30096 ("The need for Title IX to be consistently, predictably enforced weighs in favor of Federal rules standardizing the investigation and adjudication of sexual harassment allegations under these final regulations, implementing Title IX.").

*Changes:* None.

## Applicability and Other Considerations

*Comments:* Some commenters asserted that the proposed regulations' application to elementary and secondary schools would violate Title IX because, in their view, Title IX applies only to postsecondary institutions. Some commenters urged the Department to provide more

---

[47] Commenters cited *Goss,* 419 U.S. 565.

descriptions and examples of how grievance procedures can be implemented effectively and appropriately for different age groups in an elementary school or secondary school. One commenter requested clarification on how definitions and terms should be explained in an elementary school setting where, the commenter asserted, students and parents may lack the necessary maturity and legal context, respectively, to understand defined terms. Other commenters expressed concern that § 106.45 would subject minor complainants to repeated questioning about alleged abuse and suggested that the Department clarify it is not an elementary school or secondary school's role to investigate an allegation of child abuse, but rather to refer such a case to appropriate entities that are better equipped to investigate and coordinate wrap-around services, such as child advocacy centers and multidisciplinary teams.

*Discussion:* The Department appreciates the opportunity to correct the misunderstanding that Title IX is limited to postsecondary institutions. As recipients of Federal financial assistance, elementary schools and secondary schools are also subject to Title IX and its regulations. 20 U.S.C. 1681. Accordingly, a recipient has a legal duty to operate its education program or activity free from sex discrimination, which necessitates grievance procedures for the prompt and equitable resolution of sex discrimination complaints.

The Department also appreciates the opportunity to clarify that nothing in the final regulations requires a recipient to repeatedly question a complainant who may be a minor about alleged sex discrimination, which the Department acknowledges could be traumatizing depending on the nature of the allegation. This consideration is one of the reasons these final regulations, consistent with the 2020 amendments, do not require live hearings at the elementary school and secondary school level. *See* 85 FR 30484–85; 87 FR 41460–63. The Department also notes that these final regulations do not require a recipient to create separate grievance procedures if an existing process satisfies the requirements of § 106.45, which could further reduce the need for a minor student to repeatedly disclose a traumatic experience in multiple proceedings. The Department acknowledges that a recipient may want to take into account the age and developmental level of their students when structuring grievance procedures, and notes that any questions a decisionmaker asks of parties and witnesses as part of the process for assessing a party's or witness's credibility under § 106.45(g) must be relevant and not otherwise impermissible under §§ 106.2 and 106.45(b)(7). Further, when child abuse allegations arise during the course of the Title IX grievance procedures, the Department has determined that a recipient has an important role to play in addressing that abuse. Nothing in the final regulations prohibits a recipient from consulting or partnering with organizations that have expertise in trauma-informed investigations of child sexual abuse in a manner consistent with § 106.44(j), such as child advocacy centers and multidisciplinary teams, to create and implement grievance procedures that satisfy § 106.45.

In response to questions about how proposed definitions and terms should be explained to elementary school students and parents, the Department notes that a recipient retains discretion in how it communicates with students, parents, and other stakeholders about what constitutes sex discrimination, including sex-based harassment, and how the grievance procedures operate, as long as the recipient effectively conveys what its obligations are and what rights other parties have under Title IX. The Department notes that, in general, using terminology in the final regulations facilitates the Department's enforcement efforts by making it easy to compare a recipient's published grievance procedures to the Title IX regulations. Nonetheless, the Department acknowledges that different terminology may be more appropriate and understandable depending on the age, maturity, and educational level of a recipient's student population, and therefore has provided a recipient with that flexibility.

The Department declines to provide examples for how grievance procedures can be implemented effectively and appropriately for different age groups in an elementary school or secondary school at this time. However, it will offer technical assistance, as appropriate, to promote compliance with these final regulations.

*Changes:* None.

### 9. Employees

General Support and Opposition

*Comments:* Some commenters supported the proposed framework for grievance procedures, which they stated would allow Title VII and collective bargaining agreements to primarily govern employee-to-employee harassment. Commenters also appreciated that the framework would acknowledge that a postsecondary institution may have a variety of employee designations, which may be entitled to unique grievance procedures based on their designation and applicable collective bargaining agreement.

In contrast, several commenters questioned the appropriateness of the proposed framework to a complaint involving an employee. Some commenters argued that applying these procedures to employees is unnecessary because such complaints are addressed by Title VII, collective bargaining agreements, employee handbooks, and institution-specific regulations. Others asserted that applying § 106.45 to employees would conflict with or displace well-established processes under Title VII and State employment and nondiscrimination laws; or asked for clarification on how the proposed regulations would interact with contradictory State and local laws, recipient policies governing faculty rights, and union grievance procedures or collective bargaining agreements. Still other commenters expressed concern that § 106.45 would require a recipient to maintain one set of grievance procedures for workplace sex discrimination complaints and another set of procedures for other kinds of workplace discrimination complaints (such as those involving race), which commenters stated would expose the recipient to an allegation that they deprived a party of due process by choosing the wrong set of procedures. Other commenters further asserted that applying the more detailed requirements of § 106.46 to employee-involved complaints would be even more likely to conflict with procedures in employee handbooks, collective bargaining agreements, and at-will employment than would § 106.45.

Some commenters sought clarification on whether § 106.46 would require identical grievance procedures for both student and employee respondents. Commenters asserted that requiring a postsecondary institution's grievance procedures to be the same for any sex-based harassment complaint could result in complicated and confusing grievance procedures for some recipients, due to various obligations under State law regarding student discipline and tenured faculty agreements.

One commenter suggested that the Department consult with the EEOC and issue joint guidance on how to minimize potential conflicts between the obligations of claimants under Title VII and respondents under Title IX.

Finally, a few commenters asked for clarification regarding employees and the grievance procedures set forth in §§ 106.45 and 106.46. One commenter requested clarification on the definition of "employee" under the proposed regulations. Another commenter asked the Department to clarify when an OCR complaint that pertains to employee-to-employee harassment would be investigated by OCR and when such a complaint would be dismissed and transferred to the EEOC.

*Discussion:* The Department acknowledges support for the framework for grievance procedures as applied to complaints that involve an employee, which the Department agrees provides the flexibility needed to align with a recipient's existing workplace policies. The Department disagrees that these regulations are unnecessary because of Title VII, collective bargaining agreements, employee handbooks, or institution-specific policies or procedures. Congress did not limit the application of Title IX to students. *See* 20 U.S.C. 1681. Title IX, thus, applies to all sex discrimination occurring in a recipient's education program or activity in the United States. The Department's regulations have long addressed employees. For example, 34 CFR part 106, subpart E expressly addresses discrimination on the basis of sex in areas unique to employment. Indeed, prior to the establishment of the Department of Education, the Supreme Court noted that the Department of Health, Education, and Welfare's "workload [was] primarily made up of 'complaints involving sex discrimination in higher education academic employment.'" *Cannon,* 441 U.S. at 708, n.42.

The Department acknowledges that Title VII and Title IX impose different requirements in some respects and that many recipients will need to comply with both Title VII and Title IX. The Department disagrees that there are inherent conflicts in complying with the two laws and commenters did not identify any such conflict. We are also unpersuaded by the assertion that a recipient will be exposed to an allegation that it deprived a party of due process by choosing the wrong set of procedures. As noted in the preamble to the 2020 amendments, Congress enacted both Title VII and Title IX to address discrimination in different contexts. *See* 85 FR 30442. Congress enacted Title IX to address sex discrimination in any education program or activity receiving Federal financial assistance, whereas Congress enacted Title VII to address sex discrimination (and discrimination on other bases) in the workplace. *Id.* As

commenters also acknowledge, the Supreme Court has recognized differences in the circumstances under which liability may be incurred for sex discrimination under Title IX and Title VII. *See, e.g., Burlington Indus., Inc.* v. *Ellerth,* 524 U.S. 742, 765 (1998) (affording affirmative defense to vicarious liability of employers for the sexual harassment of their employee supervisors when "the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and the employee plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer"); *Gebser,* 524 U.S. at 283 (describing differences between Title VII and Title IX to explain the scope of relief available under Title IX's judicially recognized implied private cause of action); *see* 85 FR 30199, 30443. In light of these differences, the Department may reasonably establish protections for complainants and respondents in education-related sex discrimination complaints that are not the same as for parties in employment-related sex discrimination complaints under Title VII, and that could result in different outcomes. 85 FR 30442.

As discussed in the July 2022 NPRM, the requirements for grievance procedures under § 106.45 set baseline standards to ensure a fair process under Title IX, including the equitable treatment of the parties; decisionmakers who are free of bias or conflicts of interest; adequate notice to the parties of the allegations and timeframes for grievance procedures; guidelines for ensuring the adequate, reliable, and impartial investigation of the complaint; the opportunity for parties to present evidence; and guidelines for how a decisionmaker must assess such evidence and credibility. 87 FR 41461. The Department anticipates that many recipients already have similar protections in their existing procedures for addressing discrimination, but to the extent that the additional procedural requirements imposed by the final regulations exceed the protections that a recipient already has in place, the benefits of these procedures justify any burden. The Department also wishes to clarify that nothing in these regulations prohibits a recipient from using an existing process to satisfy the requirements of §§ 106.45 or 106.46, such as grievance procedures set forth in a collective bargaining agreement or other contractual agreement between the recipient and its employees, as long as those procedures do not conflict with the requirements of §§ 106.45 and

106.46. Although the Department anticipates that a recipient will be able to implement §§ 106.45 and 106.46 in a manner that does not conflict with State and local law, collective bargaining agreements, union grievance procedures, and recipient policies governing faculty rights, it reiterates that if a conflict arises, a recipient must fulfill its obligations under Title IX. *See* § 106.6(b); discussion of § 106.6(b).

The Department appreciates the opportunity to clarify that all recipients must implement grievance procedures that are consistent with § 106.45 or offer informal resolution consistent with § 106.44(k), as available and appropriate, to resolve an allegation of sex discrimination. Only a recipient that is a postsecondary institution has an additional obligation to implement grievance procedures consistent with § 106.46, and this obligation is limited to resolving allegations of sex-based harassment in which either the complainant or respondent is a student. Consistent with this framework, final § 106.45 sets forth baseline requirements to resolve any allegation of sex discrimination, including sex-based harassment, that occurs in an elementary school, secondary school, and other recipients such as State educational agencies; as well as any allegation of employee-to-employee sex-based harassment and student-involved sex discrimination complaints that do not allege sex-based harassment. And while a recipient may choose to implement a single procedure for all of its complaints (as long as the single procedure satisfies the requirements of § 106.45, and if applicable § 106.46), it may choose otherwise for various reasons, such as to comply with its other obligations under Federal, State, or local law. Nothing in the final regulations prohibits a postsecondary institution from, for example, choosing to maintain one set of grievance procedures for employee-to-employee sex-based harassment complaints that are consistent with § 106.45 and its legal or contractual requirements on employee-involved complaints; one set of grievance procedures for employee-to-student sex-based harassment complaints that are consistent with § 106.46 and those same legal or contractual requirements; and another set of grievance procedures for student-to-student sex-based harassment complaints that are consistent with § 106.46 and State law governing student discipline.

The Department appreciates the opportunity to note that OCR's Case Processing Manual explains which complaints that allege employee-to-

employee discrimination within a recipient's education program or activity OCR will investigate and which it will refer to the EEOC. *See* Case Processing Manual, at 26–27 (citing 29 CFR 1691.11697.13; 28 CFR 42.60142.613). The Department notes that its existing procedures require coordination with the EEOC and reiterates its longstanding commitment to working closely with other Federal agencies, including the EEOC, to ensure robust enforcement of Federal civil rights protections. The Department understands that supporting a recipient in the implementation of these regulations and ensuring that individuals know their rights under Title IX is important and will offer technical assistance, as appropriate, to promote compliance with these final regulations.

The Department declines to further clarify the definition of "employee" or to otherwise specify the types of individuals who are considered employees. As explained in the discussion of training requirements in § 106.8(d), given the wide variety of arrangements and circumstances in place across recipients and variations in applicable State employment laws, a recipient is best positioned to determine who is an "employee." For further explanation of the scope of individuals covered by the employee reporting obligations in § 106.44(c) and the scope of employees who must be trained under § 106.8(d), see the discussion of those provisions.

*Changes:* None.

At-Will Employment and Collective Bargaining

*Comments:* Some commenters expressed concern that the grievance procedure requirements would interfere with a recipient's at-will relationship with its employees and erode at-will employment. They also stated that the grievance procedure requirements would create an arbitrary layer of extra protection for an employee who allegedly engaged in sex discrimination that does not exist for other alleged employee misconduct, such as race-based discrimination, stealing from the employer, bullying, or general poor performance.

Some commenters also argued that, because at-will employees typically are not entitled to any due process protections under existing Federal and State law, imposing such requirements through § 106.45 would exceed the Department's regulatory authority. In contrast, one commenter recommended that the Department revise the proposed regulations to account for inequities in

a postsecondary institution's hierarchy that provide different procedural protections depending on an employee's status.

In addition, some commenters stated that §§ 106.45 and 106.46 would interfere or conflict with the collectively bargained or other contractual employment relationships that many recipients have with their employees, which already include procedures and justifications for discipline and termination of employment. Some commenters noted that this concern is especially acute for a recipient that has multiple bargaining units or collective bargaining agreements, each of which may have different disciplinary grievance procedures. Indeed, some commenters noted that some recipients had changed or initiated collective bargaining procedures in response to the 2020 amendments, and that those changes had created confusion and inconsistent treatment of civil rights matters. Another commenter noted that the 2020 amendments had effectively required a recipient to institute a cumbersome two-tiered process for employee respondents in order to comply with both those amendments and State civil service laws. The commenter argued that this approach likely results in a chilling effect for complainants who do not wish to testify in multiple hearings or risk re-traumatization. The commenter added that lengthy Title IX grievance procedures could cause a recipient to miss the narrow statute of limitations outlined in certain collective bargaining agreements for discipline charges.

Other commenters asked for clarification about the interaction between collective bargaining agreements and the grievance procedures. One commenter noted that a recipient may have processes in place that comply with collective bargaining agreements that are unrelated to a recipient's grievance procedures but that would not comply with all of the requirements for grievance procedures in the proposed regulations, and asked whether the Title IX regulations should take precedence over other procedures. Finally, one commenter recommended that the Department ensure that a recipient consult with unions to write grievance procedures that comply with applicable collective bargaining agreements, while another added that recipients have lacked sufficient guidance about how to appropriately renegotiate or clarify collective bargaining agreements.

*Discussion:* The Department acknowledges that a recipient, like most employers, may have different types of

employees, including unionized and at-will employees. As was the Department's position in the preamble to the 2020 amendments, the Department maintains that all employees covered by Title IX should be afforded prompt and equitable grievance procedures when they are subjected to, or alleged to have engaged in, sex discrimination; and that an employee's position, tenure, part-time status, or at-will status, should not dictate whether that employee is subject to the procedural requirements of the Department's Title IX regulations. *See* 85 FR 30445.

As explained above in the discussion of due process and the Department's assessment of what process is due in different circumstances, the Department has determined that, when Title IX is implicated, the protections and rights set forth in these final regulations represent the most effective ways to promote Title IX's nondiscrimination mandate while also ensuring that all parties receive the process they are due. Contrary to commenters' assertions, the fact that the protections required under the final regulations may exceed the due process protections afforded to at-will employees under other Federal and State law does not mean that the final regulations exceed the Department's authority under Title IX. Moreover, a recipient of Federal financial assistance operating an education program or activity agrees to comply with Title IX obligations as a condition of receiving Federal funds. Those requirements include the longstanding obligation to adopt and publish grievance procedures to promptly and equitably resolve sex discrimination complaints that has existed in Title IX regulations since 1975. 34 CFR 106.8(c) (formerly 45 CFR 86.8); *see* 40 FR 24139. Recipients' contractual arrangements with employees must conform to Federal law, as a condition of receipt of Federal funds.

The Department acknowledges commenters' concern that the final regulations may impede a recipient's ability to terminate an at-will employee who is engaging in sex discrimination. However, Title IX does not distinguish amongst employees based on employment status. The procedural protections afforded by these final regulations for Title IX investigations and grievance procedures promote fair, transparent, and reliable outcomes for all employees. And requiring certain measures before the imposition of disciplinary sanctions—including sanctions imposed upon employees— ensures that those sanctions are not themselves applied in a way that

discriminates on the basis of sex. *See, e.g., New York,* 477 F. Supp. 3d at 295 (stating that the Department can impose grievance procedures ''in order to ensure nondiscriminatory treatment of both complainants and respondents''). For a description of the Department's assessment of the benefits and costs of complying with the grievance procedures' requirements, including the Department's determination that the benefits outweigh any burdens, see the discussion of the *Regulatory Impact Analysis.*

For related reasons, the Department declines to modify the grievance procedures to eliminate any employment ''hierarchy'' or otherwise interfere with the different statuses or employee designations within a recipient. The requirement that the recipient's grievance procedures must be prompt and equitable means, in this context, that a recipient's grievance procedures under Title IX must function well alongside the procedures it uses to implement Title VII and, to the extent not inconsistent, other laws and collective bargaining agreements that govern the employment relationship for complaints of sex-based harassment involving employees. Such flexibility addresses recipient concerns about overly prescriptive requirements because a range of different procedures could address what a recipient understands as differing needs while still satisfying a recipient's obligations under Title IX and these final regulations.

The Department disagrees with commenters' assertions that §§ 106.45 and 106.46 may chill complainants from accessing grievance procedures or cause a recipient to miss the statute of limitations to impose discipline on an employee respondent. First, as explained above, these final regulations do not require a recipient to create separate grievance procedures if an existing process satisfies the requirements of § 106.45, and if applicable § 106.46. Accordingly, a recipient may avoid undue delay or multiple proceedings by using a single set of procedures that meet a recipient's obligations under Title IX and any other obligations that are not contrary to those obligations, including current collective bargaining or other agreements governing employee discipline procedures.

Further, the Department reiterates that the procedural requirements under §§ 106.45 or 106.46 are important to protect the due process rights of complainants and respondents, and, therefore, they are not arbitrary to the extent they differ from protections afforded for other types of misconduct.

Additionally, the Department notes that nothing in these regulations interferes with a recipient's ability to negotiate a grievance process within a collective bargaining agreement that is distinct from grievance procedures under Title IX. Nor do these regulations interfere with a recipient employee's right to pursue remedies under an applicable collective bargaining agreement instead of making a complaint to initiate grievance procedures under Title IX. However, if an employee chooses to pursue a remedy under a collective bargaining agreement, and that process does not include baseline requirements consistent with § 106.45, and if applicable § 106.46, there can be no finding of responsibility or disciplinary action against an individual respondent for sex discrimination under Title IX. Further, an employee's decision to pursue a remedy under an applicable collective bargaining agreement rather than under the Title IX grievance procedures would not alleviate the Title IX Coordinator's obligation to determine whether to initiate a sex discrimination complaint under the recipient's Title IX grievance procedures by making a fact-specific determination consistent with § 106.44(f)(1)(v) and to comply with § 106.44(f)(1)(vii).

The Department acknowledges that a recipient may have relied on or incorporated the 2020 amendments into new collective bargaining agreements, and the Department considered such reliance interests in crafting these final regulations, which either maintain the requirements of the 2020 amendments or make certain provisions permissive rather than mandatory. *See, e.g.,* §§ 106.45(d)(1), 106.46(g). The Department also notes that collective bargaining agreements generally recognize an entity's obligation to comply with applicable laws and contain procedures for consultation and discussion when the law or applicable regulations change.

To the extent a collective bargaining agreement applies to Title IX complaints and does not currently comply with the Title IX regulations, recipients may need to renegotiate their collective bargaining agreements. While such negotiations may cause disruptions, the Department concludes that the benefits of the final regulations—both in terms of ensuring that a recipient complies with Title IX's nondiscrimination mandate and ensuring that all participants in the grievance procedures receive the process they are due—justify the burdens. However, nothing in these regulations prohibits a recipient from using an existing process to satisfy the requirements of §§ 106.45 or 106.46, such as grievance procedures under a collective bargaining agreement or other contractual agreement between the recipient and employees, as long as they meet the requirements of these final regulations. An existing collective bargaining agreement would not be out of compliance with this part if it adopts an option presented in the final regulations, such as a live hearing, or if it sets forth additional procedural requirements, such as designated timeframes for stages of an investigation, as long as such provisions apply equally to the parties. *See* § 106.45(j). As discussed in the July 2022 NPRM, equal treatment does not require identical treatment and a recipient's grievance procedures may recognize that an employee party may have distinct rights in a collective bargaining agreement with the recipient or by other means that are not applicable to parties who are not employees. 87 FR 41491.

The Department does not have the authority to require consultation between a recipient and a union. *See generally* 29 U.S.C. 151–169 (codifying the National Labor Relations Act). However, the Department's final regulations do not prohibit a recipient from consulting with unions to create grievance procedures within collective bargaining agreements that comply with §§ 106.45 and 106.46.

The Department declines to further specify how collective bargaining agreements may interact with a recipient's obligation to implement grievance procedures consistent with § 106.45, and if applicable § 106.46, because this is a fact-specific inquiry that depends on the specific contractual agreement and regulatory provision at issue.

*Changes:* None.

Request To Modify the Application of Grievance Procedures

*Comments:* Commenters suggested a range of modifications to alter the proposed framework for grievance procedures as applied to sex discrimination complaints that involve an employee. Some commenters recommended that the Department not prescribe specific grievance procedures for sex discrimination or sex-based harassment complaints involving an employee respondent, asserting that applying §§ 106.45 and 106.46 to an employee-to-student complaint may intimidate potential student complainants and substantially impede reporting.

*Discussion:* For reasons articulated above, the Department declines to modify the framework for grievance procedures as applied to sex discrimination complaints that involve an employee complainant or respondent. Title IX applies to all sex discrimination occurring under a recipient's education program or activity in the United States, regardless of the identity of the person that alleged or engaged in sex discrimination.

The Department declines to remove the requirement that a recipient apply §§ 106.45 and 106.46 grievance procedures to employee-involved complaints because students and employees in such complaints, including faculty and student workers, should have access to equitable grievance procedures that are designed to ensure a fair, transparent, and reliable process, including procedures that may result in the termination or suspension of a respondent. Grievance procedures consistent with § 106.45 will meet this standard for sex discrimination complaints that involve an employee.

Regarding concerns that such grievance procedures may be intimidating to student complainants in student-to-employee complaints, these final regulations include several provisions to mitigate power imbalances and address concerns that some complainants may be chilled in reporting sex discrimination. For example, § 106.8(d) requires a recipient to ensure that certain persons receive training related to their duties under Title IX and § 106.44(g) requires a recipient to offer and coordinate supportive measures, as appropriate, both of which will support complainants in reporting sex discrimination. The final regulations also ensure that a recipient fulfills its obligation to address sex discrimination in its education program or activity by requiring its Title IX Coordinator to take other prompt and effective steps to address sex discrimination under § 106.44(f)(1)(vii).

*Changes:* None.

## 10. Section 106.45   Grievance Procedures for the Prompt and Equitable Resolution of Complaints of Sex Discrimination

*Comments:* Some commenters expressed general support for proposed § 106.45 because it would establish a baseline for a recipient responding to sex discrimination complaints by setting clear guidelines for prompt and equitable grievance procedures, and ensure transparent and reliable outcomes for students, employees, or others participating in an education program or activity. One commenter appreciated that § 106.45 would be less prescriptive and resource-intensive than, but as effective as, current regulations. Other commenters supported § 106.45 because it requires consistent grievance procedures for all forms of sex discrimination, rather than just sex-based harassment.

Other commenters raised general concerns about proposed § 106.45. For example, one commenter expressed concern that a postsecondary institution could accidentally violate the Clery Act if it only complied with § 106.45 with regard to an employee-to-employee complaint.

Additionally, some commenters suggested that elementary schools and secondary schools should be required to publish their proposed grievance procedures and hold public hearings to receive input from parents and community members before the recipient adopts and implements grievance procedures consistent with the final regulations.

*Discussion:* The Department agrees that § 106.45 establishes a baseline for a recipient to respond to sex discrimination complaints by setting clear guidelines for prompt and equitable grievance procedures and acknowledges the comments in support.

Regarding concerns that a postsecondary institution may violate the Clery Act by implementing grievance procedures consistent with § 106.45, the commenter did not articulate, and the Department does not see, any reason why a postsecondary institution cannot comply with both its obligations under § 106.45 and the Clery Act as applied to employee-to-employee complaints—particularly in light of a postsecondary institution's discretion under § 106.45(j) to adopt additional provisions in its grievance procedures that apply equally to the parties. The Department notes that a postsecondary institution's obligation to implement grievance procedures to resolve employee-to-employee sex discrimination complaints under § 106.45 is distinct from its obligation to maintain procedures for institutional disciplinary action in cases of alleged dating violence, domestic violence, sexual assault, or stalking under the Clery Act. A recipient must ensure that it complies with its separate obligations under the Clery Act. Nothing in these final regulations obviates those obligations.

Regarding the commenters' suggestion that the final regulations require an elementary school or secondary school to receive public input before adopting grievance procedures consistent with § 106.45, the Department notes that State and local law may govern the procedures a school district must follow to revise its policies. The commenter did not identify, and the Department is not aware of, how the failure to solicit public input on proposed grievance procedures contravenes a recipient's ability to prevent and address sex discrimination in its education program or activity. Accordingly, requiring such action is beyond the scope of this rulemaking—as long as the adopted grievance procedures are consistent with the final regulations. However, the Department notes that nothing in these regulations prohibits a recipient from soliciting public input from parents and other stakeholders to create and adopt grievance procedures that are consistent with § 106.45, and if applicable § 106.46. Moreover, a recipient must comply with the requirements of § 106.8(b)(2) by adopting, publishing, and implementing grievance procedures that comply with these final regulations. For additional information about the requirement to adopt a nondiscrimination policy and written grievance procedures, see the discussion of § 106.8(b).

*Changes:* None.

## 11. Section 106.46   Grievance Procedures for the Prompt and Equitable Resolution of Complaints of Sex-Based Harassment Involving a Student Complainant or Student Respondent at Postsecondary Institutions

*Comments:* Some commenters supported proposed § 106.46 because it would provide additional flexibility to postsecondary institutions. One commenter stated that § 106.46 would return grievance procedures for sex-based harassment at postsecondary institutions to a more survivor-centered and trauma-informed process that is appropriate for the educational setting, specifically by continuing to require written notice of allegations under § 106.46(c), requiring postsecondary institutions to provide parties the same opportunity, if any, to have persons other than their advisor present under § 106.46(e)(3), granting a recipient discretion to determine whether to allow expert witnesses under § 106.46(e)(4) or limit their use, and making live hearings and cross-examination by a party's advisor discretionary under § 106.46(f) and (g). Another group of commenters indicated that § 106.46 would reinforce Title IX's nondiscrimination mandate, ensure a fair process for all parties, and align with civil rights law and Title IX's intent by making live hearings optional; introducing flexibility into the process

of assessing credibility; removing the requirement that advisors conduct cross-examination; excluding certain sensitive or harassing evidence from grievance procedures; no longer mandating dismissal of complaints; and providing guidance regarding whether Title IX grievance procedures apply when the individuals involved are both students and employees.

In contrast, other commenters raised general concerns about proposed § 106.46. For instance, one commenter urged the Department to remove § 106.46 and apply § 106.45 to any sex discrimination complaint, to provide postsecondary institutions flexibility. Some commenters asserted that the Department's justification for applying § 106.46 to employee-to-student sex-based harassment complaints only applied when students are respondents, and that the Department therefore did not adequately justify applying proposed § 106.46 to a complaint that involves an employee respondent.

Another commenter, who believed that § 106.46 applied only to student-to-student complaints, recommended instead that the procedures outlined in § 106.46 apply to all sex-based harassment. The commenter also interpreted § 106.46 as excluding an applicant or third party from accessing a recipient's grievance procedures. One commenter went further and recommended that § 106.46 apply to any sex discrimination complaint in a postsecondary institution to provide a consistent and more robust level of due process.

*Discussion:* The Department appreciates commenters' support of § 106.46 and agrees that these provisions will afford protections that are appropriate to the age, maturity, independence, needs, and context of students at postsecondary institutions. The Department also appreciates commenters' concerns, including their preferences for a single set of grievance procedures that would apply to all parties and all types of sex discrimination, or their preferences for procedures that include more or less specificity. After fully considering the public comments on its proposed grievance procedures' requirements, the Department maintains that the final regulations best effectuate the requirements of Title IX, for reasons explained in the discussion of the specific provisions of §§ 106.45 and 106.46.

Regarding concerns about whether § 106.46 would only apply to student-to-student sex-based harassment complaints or complaints in which a non-student or non-employee is a

respondent, the Department appreciates the opportunity to clarify that § 106.46 applies to any sex-based harassment complaint in which a postsecondary student is either a complainant or a respondent, including complaints in which the other party is an employee, another student, or an individual who is neither a student nor an employee but who was participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination. Specifically, § 106.46(a) incorporates § 106.45(a)(2)(iv)(B), which allows a person who is not a student or employee but who was participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination to make a complaint to initiate grievance procedures, and § 106.45(d)(1)(ii), which allows a recipient to dismiss a complaint when the respondent is not participating in the recipient's education program or activity and is not employed by the recipient. Because the final regulations allow a non-student or non-employee complainant or respondent to access grievance procedures in certain circumstances, the Department declines the commenter's suggestions to further modify § 106.46.

The Department disagrees with the assertion that applying § 106.46 to employee-to-student sex-based harassment complaints does not adequately accommodate the needs of student complainants. As the Department explained in the July 2022 NPRM, the additional requirements in § 106.46 are justified in recognition that postsecondary students are often younger, may be still learning to self-advocate, and would not be entitled to have a parent, guardian, or other authorized legal representative present at meetings or proceedings, unlike students in elementary schools and secondary schools. 87 FR 41462. Thus, the additional requirements of § 106.46 are particularly beneficial for a postsecondary student complainant in a complaint involving an employee respondent because an employee may be afforded additional rights or protections that a student complainant would otherwise lack absent the requirements for grievance procedures under § 106.46. For example, a recipient may be required to afford an employee certain procedural protections consistent with State employment laws, or a collective bargaining, tenured faculty, or other contractual agreement. Accordingly, § 106.46 affords postsecondary students with appropriate procedural protections,

such as the opportunity to be accompanied by an advisor under § 106.46(e)(2), an equal opportunity to access relevant and not otherwise impermissible evidence under § 106.46(e)(6), and the opportunity to appeal a dismissal or determination under § 106.46(i). Further, even in circumstances in which an at-will employee respondent is not entitled to additional procedural requirements, the additional requirements of § 106.46 are necessary to address power differentials between a student complainant and employee respondent, as well as to ensure transparent and reliable outcomes in sex-based harassment complaints that involve a postsecondary student.

Similarly, because sex-based harassment complaints subject to the provisions of § 106.46 could, and often would, involve a student respondent who faces a potential disciplinary sanction as an outcome of the grievance procedures, the potential for a disciplinary sanction of a student respondent necessitates affording additional procedural requirements to ensure an equitable outcome.

The Department acknowledges the concerns raised by commenters that due process requires a recipient to implement grievance procedures consistent with § 106.46 for all sex discrimination complaints but maintains that the structure of these final regulations strikes an appropriate balance to ensure protections while maintaining appropriate flexibility at different levels of education. The additional requirements of § 106.46 are not necessary to ensure accuracy in grievance procedures outside the context of sex-based harassment complaints involving a student at the postsecondary level and may impair a recipient's ability to resolve sex discrimination complaints in a prompt and equitable manner, which many commenters stressed is a critical need for elementary school and secondary school recipients. The Department emphasizes that Title IX's regulations have required promptness in grievance procedures since 1975 (*see* 34 CFR 106.8(c); 40 FR 24139) and avoiding unnecessary delay in the resolution of sex discrimination complaints serves Title IX's nondiscrimination mandate.

Additionally, as stated in the July 2022 NPRM and reiterated here, the Department views the additional provisions of § 106.46 as necessary to address postsecondary sex-based harassment complaints involving a student, which involve allegations of conduct that is highly personal and often of a different nature than other

types of alleged sex discrimination. 87 FR 41462. Sex-based harassment complaints may require greater participation by a complainant and respondent in grievance procedures than other complaints of sex discrimination. In contrast, other sex discrimination complaints may not involve two parties in a contested factual dispute in which credibility determinations often play a critical role. For example, in complaints alleging unequal treatment of student athletes based on sex, there will not be two parties whose conduct and credibility are closely scrutinized. Instead, these cases require analysis of available information regarding the specific factors that apply to equal opportunity in athletics. Similarly, alleged different treatment in grading or in providing opportunities to benefit from specific programs will require a close analysis of grading rubrics, opportunities offered, and other evidence, if any, of sex discrimination. *Id.* Contrary to the commenter's assertion, grievance procedures consistent with § 106.45 include basic requirements to ensure transparency and reliability in outcomes. *See* discussion of Employees—General Support and Opposition below (enumerating provisions in the final regulations that ensure a fair process under Title IX).

*Changes:* None.

*D. Grievance Procedures for the Prompt and Equitable Resolution of Complaints of Sex Discrimination (Section 106.45)*

1. Section 106.45(a)(1) and Section 106.46(a)

General Support and Opposition

*Comments:* One commenter expressed general support for proposed §§ 106.45(a)(1) and 106.46(a), requiring grievance procedures to be in writing. Some commenters supported informing a recipient of its obligations under Title IX, including by clearly explaining required grievance procedures. Other commenters generally believed the grievance procedure requirements in proposed § 106.45 would be detrimental to those recipients they would govern. Some commenters generally opposed aspects of the grievance procedure requirements in the proposed regulations, stating they were inconsistent with various cases without specifying the nature of the inconsistency.

*Discussion:* The Department acknowledges commenters' support for the requirements in §§ 106.45(a)(1) and 106.46(a) that the grievance procedures must be in writing and agrees that it is important to inform a recipient of its

obligations under Title IX, including by clearly explaining required grievance procedures.

The Department disagrees with commenters' view that the grievance procedure requirements in § 106.45 would be detrimental to those recipients they would govern and notes that the commenters did not specifically state how the grievance procedure requirements would negatively impact recipients. As the Department explained in the July 2022 NPRM, the requirement for a recipient to adopt grievance procedures dates back to 1975 and has remained constant in the Department's Title IX regulations, including under the 2020 amendments. *See* 87 FR 41456. The final regulations take into account both this longstanding requirement, the concerns expressed by stakeholders regarding the grievance process under the 2020 amendments, and the comments received in response to the July 2022 NPRM. The grievance procedure requirements in the final regulations provide appropriate procedural protections that account for the age, maturity, and level of independence of students in various educational settings, the particular contexts of employees and third parties, and the need to ensure that a recipient's grievance procedures provide for the prompt and equitable resolution of sex discrimination complaints in its particular setting. As stated in the July 2022 NPRM, the Department maintains that all parties and recipients require clear guidance for grievance procedures that lead to fair and reliable outcomes, which the final regulations provide in §§ 106.45 and 106.46. *See* 87 FR 41461.

The Department disagrees with commenters who asserted that the grievance procedure requirements set forth in the regulations are inconsistent with case law. The Department has carefully examined relevant case law and has determined that the procedures outlined in §§ 106.45 and 106.46 are consistent with that case law. The approach taken in these final regulations on these issues is consistent with all applicable authorities, within the Department's discretion, and supported by the reasons given in the sections of the preamble discussing these issues. *See, e.g.,* the sections on conflicts of interest and bias in § 106.45(b)(2); notice of allegations in § 106.45(c) and written notice of allegations in § 106.46(c); complaint investigation in §§ 106.45(f) and 106.46(e); evaluating allegations and assessing credibility in §§ 106.45(g) and 106.46(f); live hearings in § 106.46(g); and standard of proof in § 106.45(h)(1).

*Changes:* The Department has made minor revisions to the order of the words "prompt and equitable" and added "resolution of" in §§ 106.46(a)(1) and 106.46(a) for clarity. Any other revisions to other provisions within §§ 106.45 and 106.46 are discussed in the preamble sections related to those provisions.

Agency Authority and Consistency With Case Law

*Comments:* Some commenters asserted that various provisions within the proposed grievance procedure requirements in §§ 106.45 and 106.46 would exceed the Department's authority or be inconsistent with Title IX and established case law under Title IX, the U.S. Constitution, contract law, and State law.

*Discussion:* The Department disagrees that any provisions within §§ 106.45 and 106.46 exceed the agency's authority or are inconsistent with Title IX and case law under Title IX, the U.S. Constitution, contract law, or State law. In adopting §§ 106.45 and 106.46, the Department is acting within the scope of its congressionally delegated authority under 20 U.S.C. 1682, which directs the Department to issue regulations to effectuate the purposes of Title IX. The Supreme Court has recognized the Department's "authority [at 20 U.S.C. 1682] to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate," including requiring that a recipient adopt and publish grievance procedures for resolving complaints of sex discrimination. *Gebser,* 524 U.S. at 292.

Further, the Department interprets Title IX and the final regulations consistent with the U.S. Constitution. As the Department noted in the July 2022 NPRM, § 106.6(d), to which the Department did not propose any changes, states that nothing in the Title IX regulations "requires a recipient to . . . [r]estrict any rights . . . guaranteed by the U.S. Constitution." *See also* 87 FR 41415.

In addition, nothing in §§ 106.45 or 106.46 prevents a recipient from honoring contractual obligations to the extent that they do not conflict with Title IX or the final regulations. While State laws may impose different requirements than these final regulations, in most circumstances compliance with both State law and the final regulations is attainable. When a State has acted on its own authority to require a recipient to adopt grievance procedures, nothing in the final regulations prevents a recipient from adopting and publishing grievance procedures that comply with §§ 106.45

and 106.46 and align with its State's requirements. A recipient may continue to comply with State law to the extent that it does not conflict with the requirements in these final regulations. In the event of an actual conflict between State or local law and the provisions in §§ 106.45 and 106.46, the latter would have preemptive effect over conflicting State or local law. The Supreme Court has held that "[p]re-emption may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." *La. Pub. Serv. Comm'n* v. *FCC,* 476 U.S. 355, 369 (1986). In addition, Federal courts have generally held that when a State law purportedly conflicts with Federal statutes enacted under the Spending Clause, such claims should be analyzed under traditional preemption doctrine. *See, e.g., Planned Parenthood of Hous.,* 403 F.3d at 330; *O'Brien,* 162 F.3d at 42–43. For further explanation of preemption in the final regulations, see the discussion of § 106.6(b).

*Changes:* None.

Removal of Language From the 2020 Amendments That Treatment of a Complainant or Respondent May Be Sex Discrimination

*Comments:* Some commenters objected to the removal of language in § 106.45(a) of the 2020 amendments stating that a recipient's "treatment of a complainant or a respondent in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under Title IX" because, in their view, it would remove protections for respondents. Another commenter questioned the Department's view in the July 2022 NPRM that the statement was redundant. One commenter asserted that case law shows that postsecondary institutions have deficient processes that lead to inappropriate discipline of boys and men.

*Discussion:* The Department recognizes that some commenters would prefer as a policy matter that the Department retain the language from the 2020 amendments stating that "treatment of a complainant or a respondent in response to a formal complaint of sexual harassment may constitute discrimination on the basis of sex under Title IX." The Department also acknowledges that in certain cases courts have determined that a postsecondary institution's application of its grievance procedures violated a party's rights under Title IX or raised constitutional concerns. The Department notes that a formal

complaint is not required under the final regulations and maintains that it is not necessary to include language in the grievance procedure requirements stating that treatment of a complainant or a respondent in response to a complaint of sex discrimination may constitute discrimination on the basis of sex under Title IX, because the Title IX regulations already address this point in § 106.31(a)(1) and (b)(4). As explained above and in the July 2022 NPRM, *see* 87 FR 41463, these provisions require that a recipient carry out its grievance procedures in a nondiscriminatory manner and prohibit a recipient from discriminating against any party based on sex. Anyone who believes that a recipient's treatment of a complainant or respondent constitutes sex discrimination may file a complaint with OCR, which OCR would evaluate and, if appropriate, investigate and resolve consistent with these regulations' requirement that a recipient carry out its grievance procedures in a nondiscriminatory manner.

*Changes:* None.

Recipient Is Not a Respondent

*Comments:* Some commenters said that grievance procedures should only apply to a sex discrimination complaint for which there is a complainant and a respondent. One commenter stated that the language in proposed § 106.45(a)(1) that a recipient is not considered a respondent when a sex discrimination complaint challenges the recipient's policy or practice could be read to suggest that respondents' only rights under Title IX are those specified in §§ 106.45 and 106.46 and that individuals who are named as respondents do not have other substantive Title IX rights, including the right to be free from sex discrimination. Another commenter was concerned that the language could be interpreted to mean that a recipient is not required to comply with the grievance procedure requirements when a complaint accuses the recipient of engaging in a policy or practice of sex discrimination and suggested adding "as it relates to the respondent's rights in these regulations" to the end of the text in proposed § 106.45(a)(1) to dispel that purported confusion.

Some commenters asked the Department to provide additional clarification for the language regarding a recipient not being a respondent. One commenter asked the Department to clarify that a complaint against an individual respondent based on actions the respondent took in accordance with a recipient's policy or practice should be handled the same way a recipient

would handle a complaint about the recipient's policy or practice even if the complainant names an individual respondent.

*Discussion:* The Department has determined that grievance procedures should not be limited to sex discrimination complaints in which there is a complainant and respondent. Since 1975, the Department's Title IX regulations have required recipients to adopt and publish grievance procedures for complaints of sex discrimination and have not limited this requirement to only those that involve a complainant and a respondent. As explained in the July 2022 NPRM, the Department recognizes that not all complaints of sex discrimination involve active participation by complainants and respondents, including those alleging that the recipient's own policies and procedures discriminate based on sex. *See* 87 FR 41464. As a result, the Department recognizes that some provisions in § 106.45 will not apply to certain complaints of sex discrimination. *Id.* But the Department clarifies that recipients must fully implement and follow those parts of § 106.45 that do apply to such complaints, including when responding to a complaint alleging that the recipient's policy or practice discriminates on the basis of sex.

The Department notes that the language in § 106.45(a)(1) regarding a recipient not being considered a respondent is to clarify that when a complaint is against a recipient and not an individual respondent, the recipient would not be entitled to certain procedural rights and steps afforded to individual respondents. The Department agrees that respondents have the same rights as other students to be protected from sex discrimination in a recipient's education program or activity and clarifies that the language in § 106.45(a)(1) does not suggest otherwise.

The Department's view is that it is not necessary to add language to § 106.45(a)(1) regarding complaints about a recipient's policy or practice, but the Department appreciates the opportunity to clarify § 106.45(a)(1) in response to commenters' concerns and suggestions. As explained in the July 2022 NPRM, the grievance procedure requirements in § 106.45 related to a respondent apply only to sex discrimination complaints alleging that a person violated a recipient's prohibition on sex discrimination and do not apply when a complaint alleges that a recipient's policy or practice discriminates based on sex. *See* 87 FR 41464.

In response to a commenter's question regarding a complaint alleging that an individual engaged in sex discrimination based on actions the individual took in accordance with the recipient's policy or practice, the Department notes that the recipient must treat the individual as a respondent and comply with the requirements in § 106.45 that apply to respondents. This is because such complaints may involve factual questions regarding whether the individual was, in fact, following the recipient's policy or practice, what actions the individual took, and whether the individual could be subject to disciplinary sanctions depending on these facts. To the extent an individual was following the recipient's policy or practice, a recipient has flexibility to determine whether the original complaint must be amended to be a complaint against the recipient or whether this determination can be made based on the original complaint against the individual.

*Changes:* None.

## 2. Section 106.45(a)(2) Who Can Make Complaint

### General Support

*Comments:* Commenters generally supported § 106.45(a)(2) and stated that its additional information on reporting sex discrimination, including who can make a complaint, was needed. A group of commenters praised the proposed regulations for returning flexibility to Title IX Coordinators to decide whether a complaint should be initiated and added that the 2020 amendments' restrictions on who may file a complaint were inflexible, too prescriptive, and created barriers to investigating sex discrimination. One commenter noted that the mandatory dismissal provision of the 2020 amendments left a number of individuals who were subject to sex-based harassment without protections.

Some commenters expressed particular support for the requirement that a recipient address complaints from individuals who are not current students or employees. For example, one commenter stated that proposed § 106.45(a)(2) would empower survivors of sexual violence to make a complaint even if they had left the recipient's education program or activity, and that allowing complaints of sex discrimination to be made by a person who is not a student or employee as long as they were participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination would help ensure that a recipient's education program or activity is free from sex discrimination and would align with the statutory language of Title IX, which says that "no person" shall be discriminated against on the basis of sex. *See* 20 U.S.C. 1681.

*Discussion:* The Department acknowledges commenters' support for § 106.45(a)(2) and agrees that the final regulations provide needed clarity. The Department also appreciates commenters' concerns about the impact of the 2020 amendments on the ability of a recipient to effectively address sex discrimination in its education program or activity. The Department shares commenters' goals of ensuring accurate reporting and safety in a recipient's educational community and removing barriers to reporting while also protecting complainant confidentiality and autonomy.

*Changes:* None.

### "Third-Party" Language

*Comments:* Some commenters requested that the Department clarify what it meant by "third party" in proposed § 106.45(a)(2)(iv) and who can initiate a Title IX complaint, observing that the definition of "complainant" in proposed § 106.2 did not use the term "third party." One commenter noted that proposed § 106.45(a)(2)(i) stated that a complaint may be filed by a complainant, but the definition of "complainant" in proposed § 106.2 did not include any of the qualifications of proposed § 106.45(a)(2)(iv). Commenters further expressed confusion based on their observations that proposed § 106.45(a)(2) stated that any student or employee, or any third party participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination, may make a complaint, while the July 2022 NPRM preamble used the term "third party" to describe a person who does not have a legal right to act on behalf of a student, *see* 87 FR 41519, 41520 (referencing a third party who does not have such a legal right), and in another part of the preamble the Department gave examples of third parties and used the phrase "such as a friend, parent, or witness to sexual harassment," *id.* at 41440 (referencing the 2020 amendments).

One commenter asserted that the language in proposed § 106.45(a)(2)(iv) was not clear because of the placement of a semicolon after "any student or employee." The commenter was confused about whether the Department intends the "participating or attempting to participate" requirement to apply to any student or employee, or only to any

third party. Overall, the commenter asked the Department to clarify: (1) when complaints by a non-student, non-employee third party would initiate Title IX grievance procedures, including whether these complaints are limited to sex discrimination that is not sex-based harassment and in which the third party is participating or attempting to participate in the recipient's education program or activity at the time of the alleged discrimination; and (2) when a person's student or employee status would initiate Title IX grievance procedures.

Commenters also expressed confusion about whether someone who merely observes or becomes aware of potential discrimination can make a complaint. One commenter expressed concern that the way proposed § 106.45(a)(2)(iv) was drafted, it was not clear whether a person who has a right to make a complaint on behalf of a complainant (paragraph (a)(2)(ii) of the proposed regulations) or a Title IX Coordinator (paragraph (a)(2)(iii) of the proposed regulations) could make a complaint of sex discrimination other than sex-based harassment.

*Discussion:* Based on these comments and to avoid confusion, the Department has revised § 106.45(a)(2)(iv) in these final regulations by removing the term "any third party." In addition, it has created two new paragraphs: § 106.45(a)(2)(iv)(A), which now reads "Any student or employee"; and § 106.45(a)(2)(iv)(B), which now reads "Any person other than a student or employee who was participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination." As these revisions make clear, the qualifier "who was participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination" applies only to a person who is neither a student nor an employee of the recipient; such a limitation is not necessary for a student or employee because they already have an affiliation with the recipient.

Upon further reflection, the Department has also revised § 106.45(a)(2)(ii) by removing "a person who has a right to make a complaint on behalf of a complainant under § 106.6(g)" and replacing it with "a parent, guardian, or other authorized legal representative with the legal right to act on behalf of a complainant." This change was made to avoid confusion because § 106.6(g) does not create any legal rights, but instead merely provides that nothing in the regulations infringes on the right of a parent, guardian, or

legal representative to make a complaint or take other action on behalf of a complainant, respondent, or other person.

To answer commenters' questions, a person who observes or becomes aware of potential discrimination may submit a complaint only for allegations of non-harassment sex discrimination, and the person may only do so if they are one of the following: a student or employee, or any person other than a student or employee who is participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination. *See* § 106.45(a)(2)(iv). Under the final regulations, a sex-based harassment complaint may only be made by a complainant; a parent, guardian, or other authorized legal representative with the legal right to act on behalf of a complainant; or, in limited circumstances, the Title IX Coordinator. *See* §§ 106.45(a)(2)(i)–(iii), 106.44(f)(1)(v). These persons may also make complaints of sex discrimination. *See* § 106.45(a)(2)(iv). The Department has limited the class of persons who may make complaints of sex-based harassment because such complaints may involve deeply personal aspects of the complainant's life, and because permitting complainants (or those with the legal authority to act on their behalf) to choose whether to ask the recipient to initiate grievance procedures, except in the very limited circumstances in which a Title IX Coordinator may initiate the recipient's grievance procedures, best protects complainant autonomy interests while effectuating Title IX. *See, e.g.,* 87 FR 41408, 41465; § 106.44(f)(1)(v)(B). Under the definition of "complainant," an individual may only be a complainant if they themselves are alleged to have been subjected to conduct that could constitute sex discrimination under Title IX. *See also* discussion of § 106.2 (Definition of "Complainant").

In addition, the final regulations at § 106.2 include minor changes to the definition of "complaint" and the Department updated the introductory language in § 106.45(a)(2) to match the new definition, changing "initiate its grievance procedures" to "investigate and make a determination about alleged discrimination under Title IX and this part." *See* section on the definition of "complainant" in § 106.2.

*Changes:* The Department has revised § 106.45(a)(2)(iv), to clarify that for complaints of sex discrimination other than sex-based harassment, the individuals listed in § 106.45(a)(2)(i)–(iii) can make a complaint, in addition to the individuals listed in paragraph

(a)(2)(iv). In § 106.45(a)(2)(iv)(B), the Department has replaced the words "third party" with "[a]ny person other than a student or employee who was" and divided that paragraph into separate paragraphs (iv)(A) and (B). In § 106.45(a)(2)(ii), the Department has clarified that a parent, guardian, or other authorized legal representative with the legal right to act on behalf of a complainant may file a complaint of sex discrimination, including sex-based harassment, and removed the reference to § 106.6(g). The Department also has revised the introductory language in § 106.45(a)(2) to align it with the changes to the definition of "complaint" in final § 106.2. *See* section on the definition of "complainant" in § 106.2. The Department also has made a minor technical edit by replacing "when the alleged sex discrimination occurred" with "at the time of the alleged sex discrimination" in final § 106.45(a)(2)(iv)(B).

Complainant Autonomy

*Comments:* Some commenters supported the Department's continued exclusion of complaints by non-aggrieved persons for allegations of sex-based harassment, which the commenters acknowledged helps to preserve complainant autonomy in matters of sex-based harassment, but opposed the Department's proposal to allow complaints of other types of sex discrimination to be made by any student, employee, or other person participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination. Some commenters misunderstood proposed § 106.45(a)(2) and objected to allowing a non-aggrieved person to make a complaint of sex-based harassment even if the aggrieved person chooses not to. Some commenters expressed concern that sex-based harassment complaints could be made by bystanders who are not directly involved in an incident.

One commenter asserted that allowing complaints of sex discrimination other than sex-based harassment to be made by a non-aggrieved person could take autonomy away from the aggrieved person and give control to a person who has less knowledge of the alleged discrimination than the aggrieved person. Another commenter noted that even sex discrimination that does not constitute harassment still may be personal and sensitive for the aggrieved person.

Some commenters acknowledged that, under proposed § 106.45(a)(2)(iii), in limited circumstances a Title IX Coordinator may decide to initiate

grievance procedures without the aggrieved person's consent but argued that such a decision should not be granted to third parties. One commenter asserted that it would be arbitrary and capricious for the Department to allow someone without training and possibly no affiliation with the recipient to make a complaint and trigger grievance procedures on behalf of an aggrieved person.

One commenter asserted that § 106.45(a)(2) defies the legal principle that a person with a personal stake in the outcome of the dispute is best situated to seek a remedy from a court. The commenter asserted the provision would give standing to any person who believes discrimination may have occurred, even if that person did not suffer any injury as a result of the alleged discrimination. Another commenter suggested that the Department adopt a "standing" requirement for third-party complaints as part of proposed § 106.45(a)(2)(iv) and require a third-party complainant to have firsthand knowledge of the facts that form the basis of the complaint to preserve resources. The same commenter recommended that the Department revise the language in proposed § 106.45(a)(2)(iv) to clarify what it means by "complaints of sex discrimination other than sex-based harassment."

*Discussion:* As the Department explained in the July 2022 NPRM, in drafting § 106.45(a)(2), the Department purposefully imposed different requirements for who may make a complaint of sex-based harassment and who may make a complaint of sex discrimination other than sex-based harassment. 87 FR 41464. Under § 106.45(a)(2)(i)–(iii), a complaint of sex-based harassment can only be made by a "complainant," defined in § 106.2 as a person alleged to have been subjected to sex discrimination; by a person who has the legal right to make a complaint on behalf of a complainant; or by the Title IX Coordinator. The Department proposed that limitation to give a complainant autonomy over whether to request initiation of a recipient's grievance procedures (except in limited circumstances in which a Title IX Coordinator would be obligated to initiate the grievance procedures if the complainant chooses not to, *see* § 106.44(f)(1)(v)), recognizing that allegations of sex-based harassment may involve deeply personal and sensitive issues. Under § 106.45(a)(2)(iv), however, a complaint of sex discrimination that is not sex-based harassment can be made by any of the people listed in paragraphs (a)(2)(i)–(iii),

as well as by a non-aggrieved student, employee, or person other than a student or employee who was participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination. Allegations of sex discrimination that are not sex-based harassment often implicate a recipient's policies or practices, are more likely to represent community-wide experiences, and are made against a recipient instead of against another person, such as a peer. Expanding reporting options to include those who have not been subject to sex discrimination will help recipients root out prohibited discrimination, protect their communities from sex-based harms, and ensure that all community members impacted by sex discrimination can find support. While the interest in protecting communities from sex-based harassment is equally important, the Department finds that the heightened need for complainant autonomy in cases of sex-based harassment justifies limiting complaints of sex-based harassment to those who have been aggrieved.

The Department disagrees with a commenter's characterization that the proposed regulations would permit bystanders who are not directly involved in an incident to make complaints of sex-based harassment. Under the final regulations, a person who witnesses an incident that creates a hostile environment for them may make a complaint on their own behalf. A person with no connection to the educational institution and who thus has not experienced a hostile educational environment would not be able to make a complaint of sex-based harassment. Harassment law has consistently recognized that individuals may be subject to a hostile environment, even if they are not the target of the harassment; thus, contrary to the commenter's characterization, these "bystanders" may in fact be involved in the conduct in question in that they, too, may experience a hostile environment. *See, e.g., Jennings,* 482 F.3d at 695 ("A coach's sexually charged comments in a team setting, even if not directed specifically to the plaintiff, are relevant to determining whether the plaintiff was subjected to sex-based harassment."); *id.* at 703 (Gregory, J., concurring) ("I agree with the majority that Anson Dorrance's sexually explicit, inappropriate, and harassing comments directed to other players on the team, but overheard by Jennings, are relevant to determining whether Jennings was subjected to a

hostile environment."); *Broderick* v. *Ruder,* 685 F. Supp. 1269, 1277–78 (D.D.C. 1988) (citing *Vinson* v. *Taylor,* 753 F.3d 141, 146 (D.C. Cir. 1985)). Individuals who do not fit these categories, whether an uninvolved bystander or otherwise, cannot make a Title IX complaint.

For the reasons discussed above, the Department notes again that it edited § 106.45(a)(2)(iv) based on comments it received and to improve clarity on who may submit which types of complaints. Section 106.45(a)(2) does not permit anyone who does not have one of the specified relationships with the recipient to make a complaint of sex discrimination, and it does not allow a person who was not subject to alleged sex-based harassment to make a complaint of sex-based harassment, unless they are the Title IX Coordinator or are authorized to act on a complainant's behalf per § 106.45(a)(2)(ii). This framework will encourage reporting from persons in the recipient's educational community, which in turn will help the recipient learn about possible sex discrimination in its education program or activity and improve its ability to comply with Title IX. Far from being arbitrary and capricious, this approach was carefully considered by the Department, was explained in the July 2022 NPRM, *see* 87 FR 41465, and received support from commenters.

The Department declines to add a separate standing requirement for Title IX complaints because Title IX complaints are resolved by an educational entity, not a court of law. As explained above, all of the parties allowed to make a sex discrimination complaint have some relationship or connection to the recipient's education program or activity, mitigating the risk of a speculative complaint or that the person who made the complaint lacks a stake in the complaint's outcome. The Department also notes that Title IX's statutory language says "no person" shall be subject to sex discrimination in a recipient's education program or activity, *see* 20 U.S.C. 1681, which is broad and meant to protect everyone in a recipient's education community. Indeed, many commenters praised § 106.45(a)(2) because it will help recipients protect their education communities from harm and help ensure that all community members impacted by discrimination can find support.

Finally, the language "complaints of sex discrimination other than sex-based harassment" in § 106.45(a)(2)(iv) includes all complaints of sex discrimination that do not involve sex-

based harassment, including, for example, allegations of retaliation under § 106.71, allegations that a recipient failed to make reasonable modifications under § 106.40(b)(3)(ii), or allegations that a recipient's policy or procedures discriminate on the basis of sex. As explained in more detail in the discussion of § 106.10, the final regulations clarify that sex discrimination includes, but is not limited to, discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

*Changes:* None.

Title IX Coordinator

*Comments:* Some commenters objected to giving the Title IX Coordinator authority to initiate grievance procedures even without receiving a complaint. One commenter was concerned that an aggrieved person could be stripped of the decision whether to move forward with a complaint because of a misunderstanding between the aggrieved person and the Title IX Coordinator. Other commenters argued that if the aggrieved person declines to participate or denies that the conduct occurred, the recipient should not proceed with an investigation unless there is compelling evidence that the misconduct occurred and that an investigation is necessary to ensure student safety.

One commenter asked whether, if a person alleges they were subject to sex discrimination but cannot make a complaint because they were not participating or attempting to participate in a recipient's education program or activity when the alleged conduct occurred, but the Title IX Coordinator makes a complaint to investigate the alleged conduct, the investigation would be subject to the "resolution process" in accordance with the Title IX regulations. In addition, this commenter requested that the Department clarify that it intends for a complaint initiated by the Title IX Coordinator under proposed § 106.45(a)(2)(ii) to not be a complaint made on behalf of the Title IX Coordinator, but rather on behalf of another person, and suggested adding "on behalf of a complainant under § 106.6(g)" (which recognizes that a parent, guardian, or other authorized legal representative can act on behalf of a complainant).

*Discussion:* The Department appreciates the points made by commenters on proposed § 106.45(a)(2)(iii). The Department disagrees, however, with commenters'

characterization of the regulations because the regulations do not give the Title IX Coordinator broad authority to initiate grievance procedures even without a complaint. Rather, as explained in more detail in the discussion of § 106.44(f), per the final regulations at § 106.44(f)(1)(v), in the absence of a complaint, the Title IX Coordinator may initiate a complaint only after determining that the alleged conduct "presents an imminent and serious threat to the health or safety of a complainant or other person, or that conduct as alleged prevents the recipient from ensuring equal access based on sex to its education program or activity." *See* § 106.44(f)(1)(v)(B). In making this fact-specific determination, the Title IX Coordinator must consider, at a minimum, factors now listed in § 106.44(f)(1)(v)(A)(*1*)–(*8*). Those factors, which were also discussed in the preamble to the July 2022 NPRM, include the complainant's request not to proceed with a complaint investigation; the complainant's reasonable safety concerns regarding initiation of a complaint; the risk that additional acts of sex discrimination would occur if the grievance procedures are not initiated; the severity of the alleged sex discrimination, which would include but not be limited to discrimination that, if established, would require the removal of a respondent from campus or imposition of another disciplinary sanction to end the discrimination and prevent its recurrence; the age and relationship of the parties, including whether the respondent is an employee of the recipient; the scope of the alleged sex discrimination, including information suggesting a pattern, ongoing sex discrimination, or conduct alleged to have impacted multiple individuals; the availability of evidence to assist a decisionmaker in determining whether sex discrimination occurred; and whether the recipient could end the alleged sex discrimination and prevent its recurrence without initiating its grievance procedures under § 106.45, and if applicable § 106.46. *See* § 106.44(f)(1)(v)(A)(*1*)–(*8*); 87 FR 41445. These factors will help the Title IX Coordinator balance the complainant's wishes with the risk of future sex discrimination and the likely effectiveness of making a complaint and proceeding through the grievance procedures. An aggrieved person declining to participate or denying that the conduct occurred, as a commenter suggested, may affect the Title IX Coordinator's analysis of the above factors, such as the availability of evidence. Because the Title IX

Coordinator must consider the factors in § 106.44(f)(1)(v)(A)(*1*)–(*8*) before initiating a complaint, it is extremely unlikely that such a decision could be made based on a misunderstanding with the complainant. For more about the Title IX Coordinator's initiation of a complaint, see the discussion of § 106.44(f)(1).

A complaint is essentially a request to initiate the recipient's grievance procedures and prompts an investigation and a determination whether sex discrimination occurred. Regarding the commenter's question about what procedures would be required if someone who is not one of the persons listed in § 106.45(a)(2)(i)– (iv) alleges that they were subject to sex discrimination and the recipient's Title IX Coordinator decides to make a complaint, this would only happen under the limited circumstances allowed in § 106.44(f)(1)(v). The commenter is correct that a complaint made by the Title IX Coordinator under § 106.45(a)(2) would be made on behalf of neither the Title IX Coordinator nor another person (including those mentioned in § 106.6(g)). Instead, complaints initiated by the Title IX Coordinator would be based on the Title IX Coordinator's determination, in accordance with § 106.44(f)(1)(v), that the alleged conduct presents an imminent and serious threat to the health or safety of a complainant or other person, or that the alleged conduct prevents the recipient from ensuring equal access based on sex to its education program or activity, taking into consideration a variety of factors. *See* § 106.44(f)(1)(v). Therefore, the change to the regulatory text proposed by the commenter to clarify on whose behalf the complaint would be made is not necessary.

Finally, the Department appreciates the opportunity to clarify that the final regulations and the preamble sometimes refer to the rights or obligations of "the parties" in connection with grievance procedures. In the case of a complaint initiated by a recipient's Title IX Coordinator rather than a complainant, the Department does not intend for the Title IX Coordinator to "stand in" for the complainant and become one of "the parties." References to "the parties" in such cases should not be read to refer to the Title IX Coordinator as the complainant. This is consistent with the 2020 amendments, which said that "[w]here the Title IX Coordinator signs a formal complaint, the Title IX Coordinator is not a complainant or otherwise a party under this part or under § 106.45." 34 CFR 106.45(b)(1)(iii).

*Changes:* The Department has revised final § 106.44(f)(1)(v) to add a requirement that the Title IX Coordinator may make a complaint of sex discrimination only in the absence of a complaint or withdrawal of any or all of the allegations in a complaint, or in the event of a termination of the informal resolution process, and only if the Title IX Coordinator determines that the alleged conduct presents an imminent and serious threat to the health or safety of a complainant or other person, or that the alleged conduct prevents the recipient from ensuring equal access based on sex to its education program or activity. Final § 106.44(f)(1)(v)(A) includes a list of specific factors the Title IX Coordinator must consider, at a minimum, in making such a determination. The Department has also revised final § 106.45(a)(2)(iii) by adding the words "after making the determination specified in § 106.44(f)(1)(v)" after the words "The Title IX Coordinator." This change is not a substantive change from the proposed regulatory text, but rather makes clear that a Title IX Coordinator may only make a complaint of sex discrimination in the limited circumstances specified in § 106.44(f)(1)(v). *See* 87 FR 41445.

Burden on Recipients

*Comments:* Some commenters expressed concern that allowing a non-aggrieved person who was participating or attempting to participate in the recipient's education program or activity at the time of the alleged discrimination to make a complaint of sex discrimination other than sex-based harassment could create the potential for abuse and allow bad actors to use the procedures to overload recipients with complaints. Another commenter, a postsecondary institution, asserted that complaints by non-aggrieved parties may be difficult to investigate and that there may be little that a recipient can do to support a complainant who is not their student or employee. One commenter requested that the Department acknowledge that with respect to obligations toward a third party, such as supportive measures, a recipient may be limited by a lack of relationship with that party.

One commenter objected that proposed § 106.45(a)(2) would allow a complaint to be made by a non-aggrieved person, such as spectators at a recipient's sports games or visitors on campus tours, and expressed concern that persons might be pulled into grievance procedures when they did not perceive the alleged conduct to be discriminatory or were not aware of the

reported conduct. The commenter argued that such a broad sweep goes beyond Congress' intent in passing Title IX, which the commenter asserted was to ensure that girls and women get equal access to education programs and activities.

One commenter expressed concern that community colleges are likely to be affected by the proposed requirement that grievance procedures be available to a non-aggrieved person participating or attempting to participate in a recipient's education program or activity, because of the general openness of community colleges and their mission to serve their communities in a variety of ways. The commenter suggested that the regulations require a sex discrimination complaint brought by a non-aggrieved person to be addressed solely through the requirements of proposed § 106.44 instead of the grievance procedures of proposed § 106.45 unless a student respondent or the recipient chooses to use the grievance procedures.

*Discussion:* First, to address commenters' misunderstanding—and as clarified in final § 106.45(a)(2)—it is not correct that under § 106.45(a)(2) anyone who claims to have knowledge of sex discrimination can make a complaint that a recipient then would have to investigate. Rather, under § 106.45(a)(2)(i)–(iii), a complaint alleging sex-based harassment can only be made by a complainant—defined in § 106.2 as a person alleged to have been subjected to the sex discrimination themselves; a parent, guardian, or other authorized legal representative with the legal right to act on behalf of a complainant; or the Title IX Coordinator. A complaint of sex discrimination that is not sex-based harassment, on the other hand, could be made by any of those persons, *see* § 106.45(a)(2)(iv), as well as any student or employee, *see* § 106.45(a)(2)(iv)(A), or any person who is not a student or employee but who is participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination. Therefore, a scenario in which a complaint could be made by a student on behalf of another student is only possible for complaints of sex discrimination that are not sex-based harassment. Still, even without a complaint a recipient has an obligation to a student who is alleged to have experienced sex discrimination; under § 106.44(f)(1)(v) and (vii) the Title IX Coordinator must determine whether to initiate a complaint of sex discrimination or take other appropriate prompt and effective steps to ensure

that sex discrimination does not continue or recur within the recipient's education program or activity.

Second, the Department does not agree with commenters who asserted that the Department should revise § 106.45(a)(2) because it will cause recipients to be flooded with complaints of sex discrimination, some of which may be filed in bad faith. Even if the overall number of sex discrimination complaints increase somewhat, the Department's goal is to effectuate Title IX's nondiscrimination mandate, which § 106.45(a)(2) will do. After careful consideration, the Department has decided that the benefit of allowing a complaint to be made by some non-aggrieved persons with respect to some kinds of sex discrimination justifies the relatively low risk that a complaint will be made in bad faith.

Regarding commenters' concerns that there may be little a recipient can do to support someone who makes a complaint of sex discrimination but who is not a student or employee, that may be true in some cases but is not a reason to prohibit those who are not students or employees from making a complaint. The Department reiterates that anyone who makes a complaint must have some relationship with the recipient. The final regulations also provide that recipients need only offer supportive measures "as appropriate" and "to restore or preserve that party's access to the recipient's education program or activity, including measures that are designed to protect the safety of the parties or the recipient's educational environment." §§ 106.2 (definition of "supportive measures"), 106.44(g). Section 106.44(g) requires a recipient to fulfill its Title IX obligations in those instances, recognizing that when not appropriate or necessary to restore or preserve that party's access, the recipient would not have an obligation to offer supportive measures.

The Department disagrees with the commenter's contention that allowing a complaint to be made by a person who was not the target of the sex discrimination, such as a spectator at a recipient's sports game or a visitor on a campus tour, goes beyond Congress' intent in passing Title IX. The plain language of Title IX provides broad protection in stating that "no person" shall be subjected to sex discrimination in a recipient's education program or activity. 20 U.S.C. 1681. That statutory text does not state or suggest that only targets of sex discrimination have the ability to file complaints even when a complaint by a different individual would protect the target from sex discrimination in a recipient's

education program or activity. The Department has long interpreted Title IX to require a recipient to take action to address discrimination regardless of who reports it, to ensure that the recipient's education program or activity is free from sex discrimination. *See, e.g.,* 2001 Revised Sexual Harassment Guidance, at 13. In addition, the permissive dismissal rules apply to all complaints, so the recipient can dismiss a complaint on any of the bases listed in § 106.45(d)(1)(i)–(iv), including if the recipient determines that the conduct alleged in the complaint, even if proven, would not constitute sex discrimination under Title IX.

Finally, the Department appreciates hearing about the challenges a community college may face due to its mission to serve the community broadly. The Department disagrees, however, with the suggestion to revise the regulations so that complaints by non-aggrieved persons are addressed only through § 106.44 and not § 106.45 unless the student respondent or the recipient elects to go through the grievance procedures. As the Department explained in the preamble to the July 2022 NPRM, the grievance procedures required by § 106.45 are critical to effective enforcement of Title IX's prohibition on sex discrimination because they ensure that a recipient has a process in place for investigating and resolving complaints of sex discrimination. 87 FR 41456. The provisions in § 106.45 "establish the basic elements of a fair process, set clear guideposts for prompt and equitable grievance procedures, and ensure transparent and reliable outcomes for recipients, students, employees, and others participating or attempting to participate in a recipient's education program or activity." 87 FR 41461.

*Changes:* None.

3. Section 106.45(b)(1) Treat Complainants and Respondents Equitably

General Support and Opposition

*Comments:* Some commenters supported proposed § 106.45(b)(1) because it would strike a balance between protecting the rights of a respondent and allowing a recipient to investigate claims of sex-based harassment. Other commenters stated that the provision would ensure the equitable resolution of sex-based harassment complaints by treating complainants fairly in contrast to the grievance procedure requirements in the 2020 amendments. One commenter stated that the proposed regulations

would correct the impression in the 2020 amendments that, to treat the parties equitably, a recipient need only offer supportive measures to a complainant and follow the grievance procedure requirements before imposing sanctions.

Some commenters opined that the Department should not remove the requirement that the regulations apply equally to both parties and questioned why access to equal protections for boys and men was not highlighted in proposed § 106.45(b)(1). Other commenters generally asserted, without further explanation, that the proposed grievance procedure requirements would favor some students and ignore all girls and women.

*Discussion:* The Department agrees that treating complainants and respondents equitably is necessary to ensure a fair resolution of sex discrimination complaints. The Department agrees that the requirement to treat complainants and respondents equitably is not limited to providing supportive measures and following the grievance procedure requirements before, potentially, imposing disciplinary sanctions. Section 106.45(b)(1) includes equitable treatment of complainants and respondents throughout the grievance procedures to ensure they can engage fully in the grievance procedures.

The Department clarifies that it has not removed the requirement in the 2020 amendments that any provisions adopted by a recipient as part of its grievance procedures beyond those required by the amendments must apply equally to both parties. Instead, the Department proposed moving the requirement from § 106.45(b) in the 2020 amendments to proposed § 106.45(i) and broadened this requirement to apply to grievance procedures for all forms of sex discrimination, not only sex-based harassment. *See* 87 FR 41491. These final regulations include this requirement at § 106.45(j). *See* § 106.45(j) ("If a recipient adopts additional provisions as part of its grievance procedures for handling complaints of sex discrimination, including sex-based harassment, such additional provisions must apply equally to the parties.").

Regarding commenters who raised concerns related to the relative treatment of boys and men as compared to girls and women, § 106.45(b)(1) requires a recipient's grievance procedures to treat complainants and respondents equitably. This requirement applies regardless of the sex of the complainant or respondent. The Department notes that any person regardless of sex may be a complainant or a respondent, and, thus, requiring a recipient's grievance procedures to treat complainants and respondents equitably does not discriminate based on sex. In addition, the Title IX regulations at § 106.31(a) and (b)(4) require that a recipient carry out its grievance procedures in a nondiscriminatory manner and prohibit a recipient from discriminating against any party based on sex.

*Changes:* None.

Explanation of Equitable Treatment

*Comments:* Some commenters opposed removal of regulatory language explaining the meaning of the term "equitably" and asked the Department to retain the language from § 106.45(b)(1)(i) in the 2020 amendments.

One commenter requested that the Department use the term "equally" rather than "equitably" in proposed § 106.45(b)(1). In contrast, another commenter asked the Department to clarify that "equitable" does not mean strictly "equal," and that the purpose of proposed § 106.45(b)(1) is fundamental fairness and not rigid application of procedural rules.

Another commenter asked the Department to define "equitable" in proposed § 106.45(b)(1) by adding "which means without favoritism, presumption or bias" to the end of the provision. The commenter suggested this language would help alleviate confusion between "equitable" and "equal." Another commenter asked the Department to clarify that "equitably" means to treat complainants and respondents "fairly and without prejudice."

*Discussion:* The Department acknowledges that some commenters wanted the Department to retain the language from § 106.45(b)(1)(i) in the 2020 amendments referring to two examples of treating complainants and respondents "equitably," but declines to do so. The Department agrees that a recipient is required to treat complainants and respondents equitably and § 106.45(b)(1) requires them to do so. As explained in the July 2022 NPRM, the Department proposed to remove the two examples of equitable treatment from § 106.45(b)(1)(i) of the 2020 amendments—providing remedies for the complainant when a determination of responsibility for sexual harassment had been made and following grievance procedures before imposing disciplinary sanctions on a respondent—to avoid the impression that these are the only two situations in which a recipient is required to treat complainants and respondents equitably. *See* 87 FR 41466. In the final regulations at § 106.45(b)(1), the Department makes clear that a recipient is required to treat complainants and respondents equitably throughout the grievance procedures; not only at the two stages the 2020 amendments identified. The Department also agrees with commenters that an impartial investigation is necessary for the equitable adjudication of sex discrimination complaints, and notes that the final regulations at § 106.45(f) require a recipient to provide for an adequate, reliable, and impartial investigation of complaints. The Department also notes that the final regulations retain language from the 2020 amendments requiring recipients to comply with the grievance procedure requirements in § 106.45, and if applicable § 106.46, before the imposition of any disciplinary sanctions against a respondent. *See* § 106.45(h)(4).

In response to requests from commenters to use the term "equally" instead of "equitably," the Department clarifies that equitable treatment of complainants and respondents better effectuates Title IX's prohibition on sex-based discrimination. Equitable treatment of the parties has been a longstanding feature of the Department's Title IX regulations dating back to 1975, including the 2020 amendments. *See* 40 FR 24128 (codified at 45 CFR 86.8(b) (1975)); 34 CFR 106.8(b) (current); 34 CFR 106.45(b)(1)(i) (2020 amendments). Consistent with the position in the 2020 amendments, the Department maintains that the requirement for equitable treatment recognizes that the interests of a respondent and complainant may differ. Thus, it is appropriate and necessary for a recipient to treat complainants and respondents differently in some respects during the course of the grievance procedures and the outcomes of the grievance procedures will necessarily have different consequences for the complainant and the respondent. *See* 85 FR 30242. For example, under the final regulations, a recipient must provide remedies to the complainant as appropriate if there is a determination that sex discrimination occurred, *see* § 106.45(h)(3), must use its grievance procedures before imposing discipline on a respondent, *see generally* §§ 106.45 and 106.46, and must notify complainants and respondents about and offer supportive measures at different times, *see* § 106.44(f)(1).

The Department acknowledges the suggestions from some commenters to add language defining "equitably" as

"fair[ ] and without prejudice,'' or "without favoritism, presumption, or bias.'' The Department declines these suggestions because the language in § 106.45(b)(1) requiring a recipient's grievance procedures to treat complainants and respondents equitably, along with the requirements in § 106.45(b)(2) and (3), already requires recipients to adopt procedures that are free of favoritism or bias. For example, any person designated as a Title IX Coordinator, investigator, or decisionmaker must not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. § 106.45(b)(2). In addition, § 106.45(b)(3) promotes fairness by requiring a recipient's grievance procedures to include a presumption that the respondent is not responsible for the alleged sex discrimination until a determination is made at the conclusion of the recipient's grievance procedures.

*Changes:* None.

Trauma-Informed Approach, Fairness, Neutrality

*Comments:* Some commenters objected to a recipient using a trauma-informed approach in sex-based harassment cases, arguing that trauma-informed approaches create bias in favor of complainants that could influence the outcome of Title IX proceedings. Additionally, some commenters said that all recipients should be directed to use "complainant/accuser'' or another neutral term instead of "victim/survivor'' when implementing their Title IX grievance procedures. However, another commenter stated the grievance procedures must be complainant-centered and trauma-informed.

One commenter asked the Department to ensure that a recipient's disciplinary procedures are fair, and stated that stereotypes can lead to biased treatment of complaints from students of color, LGBTQI+ students, and students with disabilities.

*Discussion:* The Department understands the term "trauma-informed approach'' to mean an approach that takes into consideration the signs and symptoms of trauma and takes steps to avoid re-traumatizing individuals participating in a recipient's Title IX grievance procedures. Consistent with the Department's position explained in the preamble to the 2020 amendments, a recipient has discretion to use a trauma-informed approach in handling sex discrimination complaints, as long as the approach complies with the requirements in the final regulations, including the grievance procedure

requirements in § 106.45, and if applicable § 106.46. *See* 85 FR 30187. Under § 106.45(b)(2) and (6), recipients must be fair, unbiased, and impartial toward both complainants and respondents.

With respect to commenter concerns about the terminology used in grievance procedures, the Department declines to require a recipient to use or prohibit a recipient from using specific terms— including "complainant,'' "respondent,'' "survivor,'' or "victim''— when implementing its Title IX grievance procedures. In addition to final § 106.45(b)(1)'s general requirement that complainants and respondents be treated equitably, the final regulations at § 106.45(b)(2) require that persons designated as Title IX Coordinators, investigators, or decisionmakers not have conflicts of interests or bias for or against complainants or respondents. And final § 106.45(b)(6) provides that recipients' grievance procedures must require an objective evaluation of all evidence that is relevant and not otherwise impermissible, and provide that credibility determinations must not be based on a person's status as a complainant, respondent, or witness.

The Department agrees that a recipient's disciplinary procedures must be fair, and acknowledges that data and other evidence indicate that some complainants have been subjected to stereotyping based on sex and race, and that complainants of color, LGBTQI+ complainants, and complainants with disabilities have faced challenges in reporting sex-based harassment. For more information on the data and other evidence, see the discussion of Data Related to Sex-Based Harassment in Section I.C. The Department notes that the final regulations include requirements that outcomes not be based on stereotyping and that recipients remove barriers to reporting harassment, which would include those that the communities identified by the commenters have faced. *See* §§ 106.45(b)(6), 106.44(b). The Department emphasizes that every person, regardless of demographic or personal characteristics or identity, is entitled to the same protections against sex discrimination under these final regulations, and that every individual should be treated with fairness, equal dignity, and respect. The grievance procedure requirements in the final regulations—including the requirement to treat complainants and respondents equitably—appropriately protect the due process rights of the persons involved in a recipient's grievance procedures and provide for fair and

reliable resolutions of complaints of sex discrimination. Final § 106.45(h)(4) requires a recipient to comply with the grievance procedure requirements in § 106.45, and if applicable § 106.46, before imposing discipline on a respondent. In addition, final § 106.45(h)(5) precludes a recipient from disciplining a party, witness, or others participating in the recipient's grievance procedures for making a false statement or for engaging in consensual sexual conduct based solely on the recipient's determination whether sex discrimination occurred. These provisions, along with others, protect individuals participating in the grievance process from unfair or improper sanctions that may chill reporting, improperly rely on stereotypes, or detract from the fairness of the process. Anyone who believes that a recipient has failed to comply with any of the requirements in the final regulations or the other civil rights laws enforced by OCR, including those that prohibit discrimination based on race and disability, may file a complaint with OCR.

*Changes:* None.

4. Section 106.45(b)(2) Conflicts of Interest or Bias

Prohibition on Conflicts of Interest and Bias

*Comments:* Commenters generally agreed that the bias and conflict of interest prohibitions in proposed § 106.45(b)(2) for the Title IX Coordinator, investigators, decisionmakers (as well as identical prohibitions in § 106.44(k)(4) for informal resolution facilitators) were important because bias persists in schools, and students and employees deserve to have confidence that their institution will uphold their rights without bias or conflicts of interest. However, one commenter recommended that the Department retain the version of § 106.45(b)(1) from the 2020 amendments. The commenter argued that version reflected many court decisions that found recipients biased in favor of complainants or girls and women in their resolution of Title IX complaints.

In addition, one commenter argued that proposed § 106.45(b)(2) would not sufficiently guard against bias that can arise in Title IX matters. The commenter expressed concern that policies that do not actively mitigate bias will have the effect of reinforcing bias and discrimination. Some commenters asserted that the proposed regulations would encourage Title IX Coordinators to measure success by the number of

reports received, investigations completed, and students found responsible rather than by the fairness of the proceedings and reduction of errors.

Some commenters reported personal experiences of dealing with bias or conflicts of interest in the Title IX process, including when they felt a school showed bias in favor of certain respondents, such as athletes, or bias against respondents generally.

Moreover, some commenters expressed concern that the proposed regulations failed to address the competence and integrity of investigators. To better protect against bias and conflicts of interest, some commenters proposed ensuring that the training requirements in § 106.8(d) explicitly address anti-bias training, ensuring that parties to a Title IX investigation are notified of the identity of the investigators and decisionmakers before the investigation begins so that they have the opportunity to raise concerns about bias, and including slow and deliberate processes and checks and balances.

Additionally, some commenters proposed alternative measures or approaches to addressing conflict of interest or bias. Some commenters maintained that Title IX allegations should only be investigated by law enforcement. One commenter suggested that decisionmaking should be assigned to independent, State-level commissions made up of trained Title IX officials elected for long terms and funded by dues from the recipients in each State. One commenter recommended that Title IX Coordinators be required to provide information verifying that the officials involved in the grievance procedures have no conflict of interest or bias with respect to the parties involved or the recipient. Another commenter expressed concern that § 106.45(d)(3), which addresses appeals of decisions dismissing a complaint, does not require the recipient to ensure there is no bias or conflict of interest, or to allow the parties to raise such an objection if so. Further, some commenters suggested that recipients ensure a neutral factfinder for cases in which the Title IX Coordinator pursues an investigation after the complainant decides not to do so. Other commenters stated that the regulations should specifically address bias in cases involving Multiple Perpetrator Sexual Assault (MPSA).

Other commenters asked the Department to clarify, possibly through supplemental guidance, which roles (such as principal, athletics director, or general counsel) may create a conflict of interest if they also serve as Title IX

Coordinator. Some commenters who have represented complainants in Title IX investigations said that Title IX investigators are predisposed to issue findings of no responsibility and are reluctant to expel or suspend respondents to protect their institution from lawsuits. Some commenters asserted that a recipient's employees cannot be objective and unbiased decisionmakers because they rely on the recipient for their salary.

One commenter argued that proposed § 106.45(b)(2) might be particularly difficult for smaller postsecondary institutions because of the relationships that staff members develop with students at such institutions. This commenter further stated that avoiding conflicts of interest may affect how long it takes to resolve a complaint and increase costs for such institutions, by requiring them to hire outside personnel.

*Discussion:* The Department appreciates the variety of comments shared in support of § 106.45(b)(2). The Department agrees that the final regulations are important for ensuring a fair process, free from bias and conflicts of interest, that supports all members of a recipient's community and promotes trust in a recipient's grievance process.

With respect to a commenter's preference for the 2020 amendments, the Department notes that the proposed and final regulations' general prohibition on conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent largely mirrors the language of the 2020 amendments, except with respect to the categorical prohibition in 2020 on the use of a single-investigator model described in more detail below.

The Department disagrees with commenters' assertions that the proposed anti-bias provision does not adequately address the competence and integrity of investigators or other decisionmakers, including Title IX Coordinators or individuals who resolve appeals. In response to the commenter who expressed concern that § 106.45(d)(3) does not require the recipient to ensure there is no bias or conflict of interest, the Department notes that § 106.45(b)(2) applies to all decisionmakers, including those who decide appeals of dismissals, and it is therefore unnecessary for § 106.45(d)(3) to restate the obligation. The Department has determined that recipients should have discretion in determining the bases for appeal of dismissals, other than those that fall under § 106.46(i). *See* 87 FR 41489; § 106.45(i).

The Department maintains that § 106.45(b)(2) and the other anti-bias provisions in the final regulations contain adequate safeguards to maintain integrity and protect against investigator or decisionmaker misconduct. For example, § 106.45(b)(1) requires a recipient to treat complainants and respondents equitably; § 106.45(b)(3) requires the grievance procedures to, among other things, include a presumption that the respondent is not responsible for the alleged sex discrimination until a determination is made at the conclusion of the recipient's grievance procedures; § 106.45(b)(5) requires a recipient to take reasonable steps to protect the privacy of the parties and witnesses during the grievance procedures (subject to certain exceptions); and § 106.45(b)(6) requires an objective evaluation of all relevant and not otherwise impermissible evidence and provides that credibility determinations will not be based on a person's status as a complainant, respondent, or witness. Recipients are also required to train investigators on how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias. *See* § 106.8(d). For more explanation of the regulations' training requirements and investigator neutrality, see the discussion of § 106.8(d).

The Department declines to add additional grievance procedure requirements regarding conflict of interest and bias because the grievance procedures required by the final regulations provide fair resolution of complaints of sex discrimination and adequately protect against conflict of interest and bias. In addition to the protection just identified in § 106.45(b), § 106.45(i) requires a recipient to offer the parties an appeal that, at minimum, is the same as it offers in all other comparable proceedings, if any. Section 106.46(i) further requires a postsecondary institution to offer an appeal based on factors that would change material aspects of the matter, including, among other things, a procedural irregularity that would change the outcome, and decisionmaker conflict of interest or bias that would change the outcome. In addition, anyone who believes that a recipient has failed to comply with any of the requirements in the final regulations, including those related to conflicts of interest or bias and treating complainants and respondents equitably, may file a complaint with OCR.

Regarding commenters' request for supplemental guidance on whether allowing persons with particular job

responsibilities at a recipient—such as principal, athletics director, or general counsel—to also serve as Title IX Coordinator would constitute a conflict of interest, the Department declines to identify any roles that would presumptively constitute a conflict of interest for any recipient. The Department notes that determining whether a conflict of interest exists is likely to be fact-specific, and that recipients assign roles differently and are in the best position to determine to whom to assign the role of Title IX Coordinator. The Department agrees that supporting recipients and Title IX Coordinators in implementing these regulations is important, and the Department will offer technical assistance, as appropriate, to promote compliance with these final regulations.

The Department does not agree with commenters' broad-based assumption that a recipient's employees are inherently biased in favor of the recipient or that Title IX Coordinators are biased against respondents who are boys and men, and notes that commenters have provided no evidence to support such assertions.

The Department appreciates the opportunity to clarify the role of law enforcement in Title IX matters. While allegations of conduct that constitutes sex discrimination under Title IX sometimes also could constitute criminal offenses under other laws, the Department disagrees that law enforcement is better positioned than recipients to evaluate claims of sex discrimination under Title IX. Whereas the criminal justice system can address criminal conduct, only recipients can address equal access to their education programs and activities. The Department notes that in circumstances in which alleged sex discrimination may also be a crime, it would be appropriate for law enforcement to pursue their own investigation of such conduct.

With respect to the comment about establishing independent State commissions to resolve Title IX complaints, the Department notes that a recipient may delegate duties under these final regulations to designees, including designees who are not employees of the recipient, as long as implementation of its grievance procedures satisfies all of the requirements in these final regulations, including training designees consistent with § 106.8(d). *See* § 106.8(a)(2). The Department can offer technical assistance to recipients or States who seek to establish such a commission to meet their obligations under these final regulations.

The Department appreciates that a Title IX Coordinator, investigator, or decisionmaker may sometimes have relationships with students, particularly at smaller institutions, which could create a conflict of interest or bias for or against an individual complainant or respondent. This does not relieve recipients of their duty to comply with § 106.45(b)(2)'s requirement that the investigator or decisionmaker for any particular complaint be free of conflicts of interest or bias. The Department has long made clear that adequate, reliable, and impartial investigations are a critical component of grievance procedures. *See, e.g.,* 2001 Revised Sexual Harassment Guidance, at 15, 20. A recipient has flexibility in how it ensures its personnel are unbiased, which could include restricting Title IX personnel from pursuing close relationships with students, training more than one employee to perform Title IX roles so they can step in when conflicts of interest arise, or hiring outside personnel when conflicts of interest arise.

*Changes:* None.

Single-Investigator Model

*Comments:* Proposed § 106.45(b)(2) stated that the decisionmaker may be the same person as the Title IX Coordinator or investigator. Directed Question 3 in the July 2022 NPRM invited comments on recipients' experiences using the single-investigator model that was referenced in proposed § 106.45(b)(2). In response, commenters provided information and model policies, which the Department reviewed. Commenters also offered many differing views about the single-investigator model, and whether the regulations should permit recipients to adopt some form of it or instead prohibit its use.

*Support for allowing the model.* Some commenters expressed general support for allowing the single-investigator model in proposed § 106.45(b)(2). For example, some commenters stated that the model would provide a recipient more flexibility to respond promptly to sex-based harassment, and some stated it would better serve elementary school and secondary school children. One commenter noted that greater flexibility would make the Title IX grievance procedures less judicialized, and another commenter supported proposed § 106.45(b)(2) provided that a recipient has appropriate checks and balances in place to ensure a fair and impartial process. Some commenters noted that other parts of the proposed regulations provide additional protections to ensure a fair and equitable investigation—including by prohibiting conflicts of interest, allowing parties to respond to the investigative report or relevant evidence, and providing appeals based on conflict of interest or bias.

Other commenters, including a system of State postsecondary institutions, supported proposed § 106.45(b)(2) as more time- and cost-effective than the requirements in the 2020 amendments. They argued that the proposed provision would allow recipients to shorten grievance procedure timelines, allow the individual with the most knowledge of the investigation to make the determination, and increase efficiency in scheduling. One commenter added that proposed § 106.45(b)(2) would allow investigators to reach individuals when their memories are fresher and ensure witnesses are available. Another commenter supported the model as better suited to the scale of operations in large school districts and allowing a district Title IX Coordinator to have designees carry out some responsibilities at the school level. Some commenters stated that, in their experience, individuals who normally serve as a single investigator tend to have lower turnover and be more highly trained, are skilled in other types of investigations, and have the most investigative experience.

Further, some commenters supported proposed § 106.45(b)(2) because, they concluded, it would encourage reporting under Title IX by avoiding direct confrontations between the parties. Commenters observed that this would improve complainant confidence and a sense of safety. One commenter supported proposed § 106.45(b)(2) because it would encourage reporting by making the Title IX grievance procedures less prescriptive. Relatedly, some commenters said that parties and witnesses are usually more open to participating and sharing information in a private and contained process. One commenter asserted the model helps alleviate the anxiety that live hearings can create for complainants, respondents, and witnesses.

*Opposition to or criticism of the model.* Other commenters stated that the single-investigator model exceeds the Department's authority and is inconsistent with Title IX and established case law or State law. Some commenters asserted that proposed § 106.45(b)(2) would ignore what they claimed is a lengthy record of Federal court criticism of the model. Some commenters asserted that proposed § 106.45(b)(2) would force recipients to implement procedures like those under the 2011 Dear Colleague Letter on

Sexual Violence, or pressure recipients into adopting a single-investigator model, which one commenter asserted was the case prior to the 2020 amendments. Another commenter stated that restoring the single-investigator model would ignore the reliance interests that recipients have in the 2020 amendments.

*Impartiality and arbitrariness.* A number of commenters were concerned about bias and arbitrariness. For example, one commenter stated that single investigators cannot review their own work for fairness, completeness, neutrality, and lack of bias. Another commenter shared stories from clients who reported that investigators were biased in favor of the complainant, ignored evidence, failed to ask questions, and had opaque procedures. Other commenters expressed concerns about confirmation bias and motivated reasoning on the part of investigators. Some commenters asserted there is no evidence that additional training can mitigate the risk of errors and unconscious biases. Other commenters argued that potential bias renders the proposed regulations arbitrary and capricious. Relatedly, one commenter stated that the Department has recognized the perceived importance of separating the roles of Title IX Coordinator, investigator, and decisionmaker in proposed § 106.44(k)(4) and asserted that the failure to do so for grievance procedures would be arbitrary and capricious.

*Due process.* Other commenters opposed the model on due process grounds. For example, one commenter stated the model would make it more difficult to raise concerns with a recipient's grievance procedures and investigation if the Title IX Coordinator, investigator, and decisionmaker are the same person. One commenter said this is particularly concerning because proposed § 106.45(d)(1)(iv) would allow an investigator to clarify the allegations in a manner that validates their investigation. Some commenters objected that proposed § 106.45(b)(2) would curtail ''due process protections'' put in place under the 2020 amendments such as an independent adjudicator, a clear and convincing evidence standard, cross-examination, and hearing rights. Additional commenters claimed that the single-investigator model inhibits the ability to test credibility; those commenters raised concerns about questions posed to parties in private and during individual meetings, and about the absence of adversarial questioning at a live hearing. One commenter expressed concern that a person serving as Title IX Coordinator

and decisionmaker might be influenced by irrelevant evidence they reviewed during the investigation that was never acknowledged or disclosed to the parties.

*Resources and timeliness.* Some commenters asserted that the single-investigator model would suffer from lack of resources, specialized training, and competence of campus Title IX staff. Some commenters were concerned that the model would cause delays in grievance procedures, and one commenter stated that proposed § 106.45(b)(2) would require a recipient to conduct a new procedure if it determines that the single investigator had a conflict of interest or bias. Other commenters stated that timeframes would be extended if a single person is responsible for multiple investigation phases at the same time. One commenter stated that the Department did not identify the potential length of delay when investigators are separate from adjudicators, whether this delay outweighs the risk of bias in a single-investigator model, and what length of delay would be appropriate to ensure due process. One commenter was concerned that proposed § 106.45(b)(2) would make it difficult for faculty members to participate in complaints that are academic in nature, asserting that the single-investigator model fails to utilize faculty expertise to reach reliable outcomes. Other commenters argued that § 106.45(b)(2) could lead to an increase in litigation.

Further, some commenters rejected financial savings and administrative capacity as justifications for the single-investigator model. For instance, one commenter asserted that short-term savings under the model would be outweighed by negative consequences to the accused and loss of due process rights. One commenter stated that although the Department and commenters asserted that small recipients struggle with the administrative capacity to handle grievance procedures, the Regulatory Impact Analysis in the 2020 amendments indicated that the regulatory changes adopted in 2020 would generate additional costs to small institutions of higher education of only approximately 0.28 percent of annual revenue. Another commenter stated that Department and stakeholder concern for parties who want to minimize their interaction with employees involved in Title IX cases can be better addressed by limiting the job duties of those responsible for grievance procedures. The commenter suggested recipients could pool resources to set up regional tribunals, and stated this option was not

considered in the Department's Regulatory Impact Analysis in the July 2022 NPRM.

*Suggested modifications.* Other commenters suggested changes to strengthen the impartiality of the model. For example, one commenter recommended using more than one investigator, investigators from outside the unit from which the complaint arose, or investigators outside of the college or university. Other commenters recommended that appeals be required. Still other commenters suggested that the regulations be modified to allow investigators to make non-binding recommended findings of responsibility. And some commenters suggested best practices of, for example, investigators asking parties to review their interview summary, ensuring all parties can view and respond to all information, and capturing their responses in the investigation report. One commenter stated that the final sentence of proposed § 106.45(b)(2) should be revised to state, ''The decisionmaker may be the same person as the Title IX Coordinator and/or investigator.''

Other commenters recommended that the final regulations make the single-investigator model available on a limited basis. One commenter would prohibit its use by postsecondary institutions unless they can show that resource limitations or recipient size preclude the use of any other model, and require recipients that use the model to provide a full written decision of its determination to facilitate appeals. Another commenter suggested that a single-investigator model should not be allowed unless a respondent makes a voluntary and informed choice to proceed with the model, and some commenters recommended that the model only be allowed if both parties agree to its use. Other commenters stated that the model should not be allowed when conduct violations may result in a marked transcript, suspension, or expulsion.

*Requests for clarification.* Finally, several commenters asked for clarification. One commenter requested clarification about whether the individual who acts as the decisionmaker on appeal may serve in any other role during the grievance procedures and recommended against it. Another commenter requested clarification that using outside entities to conduct investigations may alleviate concerns of bias or conflicts of interest, and another commenter asked whether a recipient has discretion to employ a panel or board as a single investigator. Some commenters requested that the single-investigator model be more

clearly defined. For example, one commenter asked the Department to clarify whether a recipient has discretion to use a single-investigator model for some but not all cases, or to separate the role of decisionmaker from the individual who determines sanctions. One commenter, a State postsecondary institution, noted it is required to conduct a live hearing in certain cases under State law but would prefer to use a single-investigator model when possible. It requested clarification on whether different procedures could be used for student and employee respondents or if one procedure compliant with proposed § 106.46 is required. Another commenter asked the Department to clarify whether it is still true that the Title IX Coordinator cannot be the decisionmaker.

*Discussion:* The Department acknowledges commenters' support for proposed § 106.45(b)(2) and agrees with the reasons commenters gave for retaining proposed § 106.45(b)(2). We respond to comments below.

*General opposition to the single-investigator model.* The Department disagrees with commenters who asserted that proposed § 106.45(b)(2) would force recipients to implement procedures like those under the 2011 Dear Colleague Letter on Sexual Violence, or pressure recipients into adopting a single-investigator model. Similar to the proposed regulations, the final regulations permit, but do not require, a single-investigator model. As explained in the July 2022 NPRM, throughout listening sessions and the June 2021 Title IX Public Hearing, OCR heard about the importance of providing recipients flexibility in how to structure their Title IX grievance procedures to accommodate each institution's unique circumstances. 87 FR 41457–58. OCR also learned that requiring separate staff members to handle investigation and adjudication is burdensome for some recipients in a way that undermines their ability to ensure their education programs or activities are free from sex discrimination under Title IX. 87 FR 41466–67. The Department maintains that permitting, but not requiring, the single-investigator model (which would allow recipients to use a single investigator, a group of investigators, or internal or external investigators), in conjunction with the other measures designed to ensure equitable treatment of the parties as required throughout § 106.45, and if applicable § 106.46, addresses commenters' concerns by offering recipients reasonable options to structure their grievance procedures in compliance with Title IX, while accommodating each institution's

administrative structure, educational community, and applicable Federal and State case law and State or local legal requirements.

The Department acknowledges that recipients and other stakeholders may have made changes to their policies or procedures in reliance on the 2020 amendments. But stakeholder feedback from the June 2021 Public Hearing, the 2021 listening sessions, the 2022 meetings held under Executive Order 12866, and responses to the July 2022 NPRM indicated that many recipients found that some of the procedural requirements of the 2020 amendments made compliance more difficult for them, including for example mandatory dismissal requirements and live hearing and cross examination requirements. Therefore, the Department has good reason to believe that many recipients will appreciate the flexibility these final regulations will afford them, including the option to use a single-investigator model, to better fulfill their obligation not to discriminate based on sex in their education programs or activities. *See* 87 FR 41397. The Department notes that recipients would have the discretion under the final regulations to keep in place policies and procedures adopted in reliance on the 2020 amendments that utilize separate investigators and decisionmakers or to change course and adopt a single investigator model as long as they meet their obligations under these final regulations. Recipients are well-suited to assess whether the benefits of using a single investigator model that complies with the final regulations outweighs any costs that recipients will incur as a result of making such a change.

The Department disagrees that § 106.45(b)(2) exceeds the Department's authority or is inconsistent with Title IX or established case law. In adopting §§ 106.45 and 106.46, the Department is acting within the scope of its congressionally delegated authority under 20 U.S.C. 1682, which directs the Department to issue regulations to effectuate the purposes of Title IX. The Supreme Court has recognized the Department's ''authority to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate,'' including requiring that a recipient adopt and publish grievance procedures for resolving complaints of sex discrimination. *Gebser,* 524 U.S. at 292. The final regulations, which include permissive use of a single-investigator model, govern how a recipient responds to sex discrimination in the recipient's education program or activity, and were promulgated to effectuate the purposes of Title IX and

fully implement Title IX's nondiscrimination mandate. Because § 106.45(b)(2) permits but does not require a single-investigator model, recipients can choose a model that allows them to comply with legal requirements in their jurisdiction that may require separation of the investigator and decisionmaker functions.

*Impartiality and arbitrariness.* The Department disagrees that changes to § 106.45(b)(2) are necessary to protect against bias because the final regulations appropriately balance flexibility for recipients with protections against bias by investigators and decisionmakers. Section 106.45(b)(2) prohibits any person from serving as a Title IX Coordinator, investigator, or decisionmaker if they have a conflict of interest or bias, either for or against complainants or respondents generally or an individual complainant or respondent. Additionally, in circumstances in which an otherwise unbiased Title IX Coordinator, because of a close relationship with a particular party, may not be able to serve as investigator or decisionmaker, a recipient retains the flexibility to utilize an alternative investigator or decisionmaker. The final regulations, like the proposed regulations, contain other obligations to ensure overall fairness and accuracy in grievance procedures. As discussed in detail above in the discussion of bias and conflicts of interest, the final regulations contain numerous provisions directed at ensuring overall fairness and accuracy in grievance procedures.

The Department disagrees that § 106.44(k)(4) renders the single-investigator model arbitrary and capricious. The commenter is correct that under § 106.44(k)(4), the person who facilitates informal resolution cannot be the same person as the investigator or decisionmaker in order to allow the parties to participate fully and candidly in the informal resolution process. As explained in the July 2022 NPRM, the Department views this provision as furthering protections against any improper access, consideration, disclosure, or other use of information obtained solely through the informal resolution process, or conflict of interest, in the event a party terminates informal resolution and the complaint proceeds to grievance procedures under § 106.45, and if applicable § 106.46. 87 FR 41455. The Department's support for § 106.44(k)(4) is not inconsistent with allowing a single-investigator model under § 106.45(b)(2). The grievance procedures

at § 106.45, regardless of whether the investigator and decisionmaker are the same person, include numerous procedural protections.

For instance, the grievance procedures require an objective evaluation of all relevant and not otherwise impermissible evidence, consistent with the definition of ''relevant'' in § 106.2 and with § 106.45(b)(7)—including both inculpatory and exculpatory evidence. *See* § 106.45(b)(6). In an investigation, under § 106.45(f)(3), the recipient must review all evidence gathered through the investigation and determine what evidence is relevant and what evidence is impermissible regardless of relevance, consistent with § 106.2 and with § 106.45(b)(7). In the decisionmaking process, under § 106.45(h)(1), the decisionmaker must evaluate relevant and not otherwise impermissible evidence for its persuasiveness, and if the decisionmaker is not persuaded under the applicable standard of proof by the evidence that sex discrimination occurred, whatever the quantity of the evidence is, the decisionmaker must not determine that sex discrimination occurred. Thus, permitting the investigator and decisionmaker to be the same person will not result in improper access, consideration, or disclosure of information, nor will it create a conflict of interest, because the investigator and decisionmaker have the same responsibility—to evaluate all relevant evidence. The Department confirms, however, that a recipient's grievance procedure must still require that any person designated as an investigator or decisionmaker not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. *See* § 106.45(b)(2). Therefore, if an investigator developed a conflict of interest or bias during an investigation, then the recipient must designate someone else to serve as the investigator and decisionmaker.

Similarly, the Department does not agree that the Title IX Coordinator must be categorically prohibited from serving as an investigator or decisionmaker because an evaluation of all relevant and not otherwise impermissible evidence is also not inherently inconsistent with the Title IX Coordinator's responsibility to coordinate the recipient's compliance with its obligations under Title IX and the final regulations. *See* § 106.44(f). However, a recipient must ensure that the Title IX Coordinator can serve in these roles without conflict of interest or bias.

The Department also disagrees that § 106.45(b)(2) gives too much power to the Title IX Coordinator. The Title IX Coordinator must treat the complainant and respondent equitably and must not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. If the Title IX Coordinator cannot serve as an investigator or decisionmaker without conflict of interest or bias, then the Title IX Coordinator must not serve in that role.

*Due Process.* The Department also disagrees that the single-investigator model, if adopted by a recipient, would make it more difficult to raise concerns with a recipient's grievance procedures and investigation if the Title IX Coordinator, investigator, and decisionmaker are the same person. The final regulations contain a number of safeguards to ensure that any party is able to raise concerns related to Title IX and have such concerns fully and fairly heard. As stated above, the Title IX Coordinator must treat the complainant and respondent equitably, *see* §§ 106.45(b)(1) and 106.44(f)(1)(i), and must not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent, *see* § 106.45(b)(2). If a party raises concerns regarding a recipient's grievance procedures, and the Title IX Coordinator cannot serve as an investigator or decisionmaker without conflict of interest or bias, then the Title IX Coordinator must not serve in that role. With respect to the commenter's concern that § 106.45(d)(1)(iv) would allow a recipient to clarify allegations in a manner that ''validates'' their initial determination to investigate, the Department notes that the decision to dismiss a complaint is appealable if a party believes that the decision to investigate was biased or that a conflict of interest impacted the recipient's efforts to clarify the initial allegations, and the recipient must ensure that the decisionmaker for the appeal did not take part in an investigation of the allegations or dismissal of the complaint. *See* § 106.45(d)(3)(iii).

The Department disagrees that the single-investigator model, if adopted by a recipient, inhibits the ability to test credibility. The final regulations require an objective evaluation of all relevant and not otherwise impermissible evidence, consistent with the definition of ''relevant'' in § 106.2 and with § 106.45(b)(7)—including both inculpatory and exculpatory evidence— and prohibit basing credibility determinations on a person's status as a

complainant, respondent, or witness. § 106.45(b)(6). A recipient must provide a process that enables the decisionmaker to question parties and witnesses to adequately assess a party's or witness's credibility, to the extent credibility is both in dispute and relevant to evaluating one or more allegations of sex discrimination. For additional discussion of the evaluation of allegations and assessment of credibility, see the discussion of § 106.45(g).

In addition, the Department disagrees that due process principles require the investigator and decisionmaker to be different individuals. As the Department has explained elsewhere, due process ''varies according to specific factual contexts.'' *Hannah* v. *Larche,* 363 U.S. at 442; *see also* discussion of Due Process Generally (Section II.C). Here, the safeguards detailed above— including the requirement that investigators and decisionmakers not have conflicts of interest or bias for or against complainants or respondents individually or generally, *see* § 106.45(b)(2), ensure that the process is consistent with due process. *See generally Mathews,* 424 U.S. at 335 (describing the factors weighed in determining whether the requirements of due process have been met).

*Resources and timeliness.* The Department continues to believe, as stated in the July 2022 NPRM, *see* 87 FR 41467, that permitting the single-investigator model will relieve administrative burden for some recipients, especially smaller institutions, without sacrificing the quality and reliability of investigations or decisionmaking. Although such recipients could engage outside investigators or adjudicators to separate the roles, permitting a single-investigator model is consistent with a fair grievance procedure and provides flexibility to recipients consistent with their compliance responsibilities under Title IX and these regulations. The Department acknowledges that under a single-investigator model, a recipient may choose not to have a faculty member in an investigatory or decisionmaking role in complaints involving academic matters, but the Department has determined that giving recipients discretion to determine who should conduct investigations and engage in decisionmaking is consistent with Title IX. As long as a recipient's grievance procedure comports with the requirements of § 106.45, and if applicable § 106.46, recipients have the discretion to use the model that works best for their educational community.

The Department disagrees that the single-investigator model will necessarily cause delays in the grievance process compared to other options, and notes that commenters had varying views of which model—a single-investigator model or hearing model—would cause more delay. The Department maintains that the flexibility that availability of the single-investigator model will provide to recipients is important, that permitting recipients to adopt a single-investigator model will not necessarily introduce more delay compared to the hearing model, and that any concerns about delay associated with that model are addressed by other provisions in the final regulations, including §§ 106.45(b)(4) and 106.46(e)(5), that protect against such delay. Regardless of whether a recipient uses the single-investigator model, or has separate investigators and adjudicators, recipients must establish prompt and reasonable timeframes for their grievance procedures, *see* § 106.45(b)(4), and have a broader duty to address complaints of sex discrimination in a "prompt" manner, *id.* § 106.45(a)(1).

In response to commenters who suggested that § 106.45(b)(2) and the single-investigator model will lead to an increase in private lawsuits against recipients and OCR complaints, the Department believes this to be speculative. Commenters who suggest that the single-investigator model will increase lawsuits and complaints assume there will be conflicts of interest and bias, undue delays, or other procedural irregularities, but the final regulations address these concerns, as discussed above. The Department agrees with commenters that considerations of financial savings and administrative capacity should not supersede considerations of fairness and due process, and—as evidenced by the comments the Department received in response to the July 2022 NPRM—the Department firmly maintains that the single-investigator model will sacrifice neither.

*Suggested modifications.* For the reasons explained in the prior sections discussing impartiality, bias, and due process, the Department maintains that further changes are not needed to ensure impartiality if a recipient decides to use a single-investigator model.

The Department declines commenters' suggestions to change the final regulations to make the single-investigator model available on a limited basis or to require the complainant and respondent to consent in writing before a postsecondary institution may utilize a single-

investigator model because recipients are in the best position to determine whether the single-investigator model is appropriate and consistent with their compliance obligations related to grievance procedures under Title IX. The Department maintains that, by setting forth the specific requirements for prompt and equitable grievance procedures, while allowing some discretion for recipients within that framework to account for size, type, resources, administrative structure, expertise, and other unique factors at individual institutions, the final regulations set forth a highly effective compliance framework. Nothing in the final regulations precludes a postsecondary institution from deciding that it will only use a single-investigator model when both parties consent in writing.

The Department notes, however, that we have added § 106.45(b)(8) to the final regulations to ensure that a recipient's educational community is aware in advance of when a recipient will utilize a single-investigator model. We have done so partly in response to comments asking whether a recipient has discretion to use a single-investigator model in some but not all cases. *See also* discussion of § 106.45(b)(8). When a recipient chooses to adopt grievance procedures that apply to the resolution of some, but not all, complaints, § 106.45(b)(8) requires a recipient's grievance procedures to articulate consistent principles for how the recipient will determine which procedures apply. Under this provision, for example, a postsecondary institution that chooses to utilize a live hearing only for some types of sex-based harassment complaints and a single-investigator model for others would be required to explain in its grievance procedures the circumstances under which, or the types of complaints to which, either model would apply. A recipient's determination regarding whether to apply certain procedures to some, but not all, complaints must be made in a manner that treats complainants and respondents equitably, consistent with § 106.45(b)(1).

*Requests for Clarification.* The Department appreciates the opportunity to clarify that § 106.45 of the final regulations requires an appeal process that, at minimum, is the same as it offers in all other comparable proceedings, if any, including proceedings relating to other discrimination complaints. *See* § 106.45(i). The Department declines to require recipients to provide for a live hearing during the appeals process, but notes that nothing in the final regulations precludes a recipient from

providing such a hearing in its discretion or when required by applicable case law or other sources of law. As explained in the prior section responding to requests for modifications, recipients have discretion to use a single-investigator model in some but not all cases, as long as the recipient articulates consistent principles for how it will determine which procedures will apply under § 106.45(b)(8). The Department also clarifies that a recipient has discretion to use outside entities to conduct investigations; to employ a panel or board of individuals to function as the decisionmaker; to employ more than one investigator for a complaint; and to separate the roles of decisionmaker, investigator, and sanctioning officer. As long as a recipient's grievance procedures comport with the requirements of § 106.45, and if applicable § 106.46, recipients have the discretion to use the model that works best for their educational community.

*Changes:* The Department has added a new § 106.45(b)(8), requiring a recipient to articulate consistent principles for how it will determine whether certain grievance procedures apply to some, but not all, complaints, if a recipient adopts grievance procedures that apply to the resolution of some, but not all, complaints.

5. Section 106.45(b)(3) Presumption That the Respondent Is Not Responsible for the Alleged Sex Discrimination Until a Determination Is Made at the Conclusion of the Grievance Procedures

*Comments:* The Department received a range of views from commenters regarding the presumption of non-responsibility in proposed § 106.45(b)(3).

Several commenters supported proposed § 106.45(b)(3). For example, one commenter considered the presumption of non-responsibility essential for securing a just result, and remarked that a Title IX hearing can lead to social and psychological injury, lost educational opportunity, and termination or denial of tenure for employees. Another commenter argued that respondents should not have the burden to "prove a negative," and asserted that the presumption is essential to unbiased, neutral proceedings.

Some commenters referred to court decisions that, commenters stated, ruled for respondents in cases in which recipients had improperly deemed the respondent responsible for alleged sex discrimination before following its procedures and offering the respondent an opportunity to be heard. Other

commenters viewed the proposed regulations as eliminating the presumption. Some commenters stated the Department claims to be preserving the presumption of non-responsibility from the 2020 amendments, but alleged that the presumption would be rendered meaningless by allowing a recipient to institute temporary supportive measures that may burden a respondent and restrict a respondent's access to the education program or activity prior to a determination that sex discrimination occurred. Some commenters viewed the proposed regulations as reverting to the standards from OCR's 2011 Dear Colleague Letter on Sexual Violence, which they characterized as demanding a presumption of guilty until proven innocent. Some commenters stated that the presumption of innocence in criminal proceedings has existed for hundreds of years and is important to due process.

Some commenters offered differing views on how to support or confine the presumption. Some commenters suggested that the presumption of non-responsibility be retained and strengthened, such as by stating that a person's silence shall not be held against them. Some commenters suggested the Department go beyond the existing presumption and require a recipient to explicitly state that the respondent is "presumed innocent until proven guilty." These commenters referred to due process, compared student codes of conduct to the criminal system, and asserted that the lack of a presumption of innocence made the proposed regulations unconstitutional. Another commenter recommended that the final regulations make clear that the presumption is not inconsistent with a recipient's responsibility, such as under § 106.44, to take action to reduce the risk of future harm in its education program or activity when there is a reasonable likelihood of such harm and the remedy does not unreasonably or disproportionately aggrieve either party.

In contrast, other commenters recommended the removal of the presumption of non-responsibility and opposed its extension to all forms of sex discrimination in proposed § 106.45(b)(3). In general, these commenters argued that mandating a presumption of non-responsibility makes it less likely that recipients will effectively create and maintain school environments free from sex discrimination and ensure that all persons have equal access to educational opportunities in accordance with Title IX's nondiscrimination mandate. In particular, commenters raised concerns that the presumption of

non-responsibility required by the 2020 amendments causes confusion for recipients and interferes with the effective implementation of a recipient's grievance procedures. These and other commenters asserted that a formal presumption of non-responsibility is superfluous given that the proposed regulations would require a recipient to conduct impartial, unbiased investigations.

Some commenters asserted that the presumption of non-responsibility should be eliminated because it could be confused with the presumption of innocence in the criminal law context. They argued that the presumption in the regulations might give the impression that the "beyond a reasonable doubt" standard applies in Title IX proceedings, when in fact it is prohibited under the regulations. Some commenters stated that criminal procedure has no place in the educational system. Other commenters believed that presuming non-responsibility inappropriately tilts the scales in favor of the respondent. Some commenters argued that a presumption in favor of the respondent can be misconstrued as a presumption that the complainant is lying or imply that a recipient should discount the credibility of survivors. Similarly, some commenters noted that a presumption of non-responsibility is not required in any other type of school proceeding, perpetuates stereotypes that those who report sex-based harassment and sexual violence are not trustworthy, and is confusing for recipients and difficult to administer.

Some commenters asserted that the presumption of non-responsibility has a chilling effect on reporting, adding to the problem that sexual violence tends to be underreported. Other commenters asserted that the presumption would be an obstacle to informal or alternative resolution processes, one example being the restorative justice process, a key part of which involves respondents who caused harm taking responsibility for their actions. Some commenters stated that the presumption of non-responsibility may discourage respondents who wish to be accountable from participating in such a process, while also sending a message to complainants that their allegations are presumed insufficient, which deters aggrieved students from exploring options including alternative or informal resolution.

In addition, some commenters asserted that removing the presumption of non-responsibility would improve consistency with other regulatory requirements the Department has

adopted. For example, some commenters asserted that the presumption would conflict with proposed § 106.8(d)(2)(iii), which would require that recipients train Title IX Coordinators and investigators on how to avoid prejudgment of the facts at issue, as well as the requirement in proposed § 106.45(b)(6) that credibility determinations not be based on a person's status as a complainant, respondent, or witness. These commenters argued that, to presume non-responsibility at the outset of the grievance procedures, a recipient would have to assume that the respondent is credible and the complainant is not. Additionally, some commenters stated that a presumption of non-responsibility conflicts with the proposed requirements in § 106.45(a)(1) and (b)(1) that a recipient treat the parties equitably and provide equitable resolution of complaints, because a presumption in favor of any one party is not equitable.

Commenters suggested a variety of amendments to the regulations, such as requiring the grievance procedures to state, more neutrally, that a determination about responsibility will not be made until the end of a fair and equitable investigation or to state both that a determination about responsibility will not be made until the end of an investigation and from the outset neither party is presumed to be telling the truth or lying. Some commenters suggested retaining the presumption of non-responsibility and adding a presumption that the complainant made their allegations in good faith; some commenters reported that their institution's policy includes such a statement.

*Discussion:* The Department appreciates the variety of views shared by commenters and has carefully considered the support for and objections to the presumption of non-responsibility. The Department understands that some commenters view the presumption as critical to ensuring a fair process for the respondent. The Department also understands the importance of ensuring, at the beginning and throughout the proceedings, that the decisionmaker is not biased in favor of or against any party. The Department agrees with commenters that giving complete effect to Title IX requires ensuring equitable treatment for all parties in, and throughout, Title IX proceedings.

After careful consideration of the comments, the Department has decided to maintain in the final regulations the presumption that the respondent is not responsible for the alleged sex

discrimination until a determination is made at the conclusion of the grievance procedures. The regulations are meant to support a neutral, bias-free grievance process in which the burden of proof is on the recipient and responsibility determinations are only made after the conclusion of the recipient's grievance procedures. The presumption of non-responsibility is one component of that process.

The Department is concerned that commenters may have misunderstood the presumption of non-responsibility to require credibility determinations based on a person's status as a complainant, respondent, or witness. That was not the Department's intention in the 2020 amendments, nor is it the Department's intention now. To be clear, the Department emphasizes that the retention of the presumption of non-responsibility is not a presumption that the complainant is lying or that the allegations are not made in good faith. Likewise, given the Title IX requirement that parties be treated equitably, the presumption cannot reasonably be understood as a signal that a complainant's allegations will be presumed non-credible or are inherently suspect. The Department does not intend to send any such signal, and such an approach would be inequitable and inconsistent with Title IX.

Instead, as the Department noted in the 2020 amendments, the presumption is meant to reinforce that the burden of proof is on the recipient, not on either party, and to reinforce careful application of the standard of evidence selected by the recipient. 85 FR 30263. Because the burden of proof is on the recipient only, and not the complainant or respondent, the presumption that the respondent is not responsible until the relevant and not otherwise impermissible evidence has been considered and a determination has been made does not disadvantage the complainant. Rather, under a recipient's Title IX grievance procedures, each party may present their own view of the relevant and not otherwise impermissible evidence, but the burden of gathering evidence and the burden of proof is on the recipient.

The final regulations include many provisions that aim to ensure that Title IX proceedings operate free from bias, that investigators and decisionmakers equitably collect and review evidence, and that decisionmakers draw conclusions following investigations that comport with these regulations. For example, final § 106.45(b)(2) requires that any person designated as a Title IX Coordinator, investigator, or decisionmaker not have a conflict of

interest or bias for or against complainants or respondents generally or an individual complainant or respondent; the same is required of any person designated by a recipient to facilitate an informal resolution process in final § 106.44(k)(4). In addition, final § 106.8(d)(2)(iii) and (d)(3) require that Title IX Coordinators and their designees, as well as any employees involved in the implementation of the recipient's grievance procedures, informal resolution process, or the provision of supportive measures, receive training on how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias. These measures to ensure fairness, together with the presumption of non-responsibility, will increase the confidence of the parties and public in the outcome of Title IX proceedings, which should help to improve compliance with these regulations.

That confidence, in turn, will counteract any chilling effect that the presumption of non-responsibility might otherwise have, as will other provisions that support complainants and encourage them to report sex discrimination. For example, under the revised definition of "complaint" in § 106.2, complaints may be oral or written. Even in the absence of a complaint, under § 106.44 a recipient that has knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity must respond promptly and effectively, including by offering and coordinating supportive measures as appropriate, offering the option of an informal resolution process if available and appropriate, and by taking other steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity. The presumption of non-responsibility must not be used by recipients to discourage complainants from reporting misconduct, accessing supportive measures, or exploring resolution options, including alternative or informal resolution. The Department disagrees that these final regulations perpetuate stereotypes about the trustworthiness of those who report sex-based harassment and as discussed above, the final regulations include many provisions that support bias-free grievance procedures. In response to the assertion that the presumption of non-responsibility is not required in any other type of school proceeding, the Department notes that its authority to issue these regulations is derived from Title IX and that grievance procedures

that are not related to sex discrimination are beyond the scope of this rulemaking. As explained in the 2020 amendments, the APA does not require the Department to adopt identical or even similar rules to address discrimination based on sex, race, or any other basis. *See* 85 FR 30528–29.

The Department declines to implement commenters' suggestion to add to the presumption that a respondent's silence must not be held against them. The presumption that the respondent is not responsible until a determination is made at the conclusion of the grievance procedures prevents the decisionmaker from inferring responsibility for the alleged sex discrimination, including based on a respondent's silence, before the conclusion of the grievance procedures. In addition, § 106.46(f)(4) separately states that, in sex-based harassment proceedings at postsecondary institutions involving a student complainant or student respondent, a decisionmaker must not draw an inference about whether sex-based harassment occurred based solely on a party's or witness's refusal to respond to questions deemed relevant and not impermissible. And the Department declines to require recipients to import criminal law concepts, such as the Fifth Amendment right against self-incrimination, into school disciplinary proceedings.

For the same reason, the Department disagrees with commenters who asserted that there must be a specific presumption that the respondent is "innocent until proven guilty" in order for a respondent to be afforded due process. That phrasing applies in the criminal system, in which innocence and guilt for purposes of imposing criminal penalties are at issue and is not used in civil or administrative proceedings. The second sentence of final § 106.45(h)(1) regarding the standard of proof makes the point that if responsibility is not established by the evidence in accordance with the applicable standard of proof, the recipient must find that the respondent is not responsible. This is consistent with the allocation of the burden of proof in civil and administrative proceedings and further reminds recipients that the burden of proof is on the recipient and that a respondent may only be found responsible after a full and fair process. For more explanation of the recipient's burden of proof, see the discussions of § 106.45(f)(1) and (h)(1).

In addition, the Department does not agree that requiring a presumption of non-responsibility will be confused

with allowing the application of a "beyond a reasonable doubt" standard of proof. As the Department explained in the July 2022 NPRM and explains further in the discussion of § 106.45(h)(1), the "beyond a reasonable doubt" standard of proof is limited to the criminal context and is never appropriate in a recipient's Title IX proceedings. 87 FR 41486.

The Department does not agree with commenters that a presumption of non-responsibility will deter respondents who are otherwise motivated to participate in informal or alternative resolution processes from doing so. Commenters explained, for example, that in the restorative justice process respondents who caused harm are typically required to take responsibility for their actions, which can lead to more appropriate interventions and better ensure that the needs of parties are met. Respondents who wish to take responsibility for their actions and recognize the benefits of informal resolution are not likely to be deterred from participating in such a process just because the recipient's grievance procedures include a presumption that the respondent is not responsible until a determination is made at the conclusion of the grievance procedures.

The Department's changes to final § 106.44(g) render moot some commenters' argument that the presumption of non-responsibility is undermined by allowing a recipient to institute temporary supportive measures that may burden a respondent. The Department has removed the reference to temporary measures that burden a respondent from the definition of "supportive measures" to avoid any suggestion that respondents and complainants are subject to different treatment in the implementation of supportive measures. Final § 106.44(g)(2) clarifies that recipients are permitted to provide supportive measures to a complainant or a respondent as long as such supportive measures are not unreasonably burdensome, are not provided for punitive or disciplinary reasons, and are designed to protect the safety of the parties or the recipient's educational environment or to provide support during the recipient's grievance procedures under § 106.45, and if applicable § 106.46, or during the informal resolution process under § 106.44(k). Additionally, under § 106.44(g)(4), the recipient must provide the parties a timely opportunity to challenge the provision of supportive measures. The neutrality and lack of bias required by the final regulations, and the presumption that the

respondent is not responsible for the alleged sex discrimination, are not rendered meaningless by provisions allowing a recipient to take non-punitive and reasonable steps necessary to protect the safety of the parties or the recipient's educational environment. For more information regarding the limitations on recipients and their ability to take actions to prevent the risk of future harm in their education programs or activities, see the discussions of §§ 106.44(g), (h), and (i).

The Department also notes, as it did in the July 2022 NPRM, that § 106.45(b)(3) would not apply to a sex discrimination complaint that does not allege that a person violated the recipient's prohibition on sex discrimination, but instead alleges the recipient violated Title IX. *See* 87 FR 41468. Consistent with final § 106.45(a)(1), "[w]hen a sex discrimination complaint alleges that a recipient's policy or practice discriminates on the basis of sex, the recipient is not considered a respondent." Accordingly, the Department recognizes that some provisions in § 106.45, like § 106.45(b)(3), will not apply. *See* discussion of § 106.45(a)(1). In those instances, the Department will still not presume that a recipient accused of sex discrimination through its policy or practice operated its education program or activity in a discriminatory manner until a determination is made at the conclusion of the recipient's grievance procedures under § 106.45.

The Department made minor clarifying edits to this provision, replacing the word "conduct" with "sex discrimination" for precision. Additionally, the Department removed the phrase "whether sex discrimination occurred" from the regulatory text because it is clear from the context and reduces repetitiveness of the sentence.

*Changes:* The Department changed the word "conduct" to "sex discrimination" for accuracy and removed the phrase "whether sex discrimination occurred" to streamline the provision.

6. Sections 106.45(b)(4) and 106.46(e)(5) Timeframes

*Comments:* Some commenters supported proposed § 106.45(b)(4) because it would require a recipient to establish grievance procedures that are prompt and equitable and would allow a recipient to respond quickly to Title IX complaints to restore access to a safe educational and work environment, facilitate faster and less traumatic grievance procedures, avoid undue delay, reduce administrative burden,

ensure fairness, and keep individuals accountable for discriminatory conduct. Further, some commenters supported the removal of strict timeframes under the 2020 amendments and providing recipients greater flexibility. Commenters observed that this flexibility would allow a recipient to delay grievance procedures due to concurrent law enforcement activities, assess good cause on a case-by-case basis, and would benefit elementary school and secondary school recipients.

Other commenters opposed the timeframes in the proposed regulations. One commenter stated that, even with the requirement for prompt timeframes, the proposed regulations have too many steps that would take at least 60 days to follow. One commenter opposed changes to the language on timeframes at § 106.45(b)(1)(v) in the 2020 amendments because, the commenter stated, this provision was upheld in *Victim Rights Law Center,* 552 F. Supp. 3d 104, and it accounts for the neurobiology of trauma.

Other commenters opposed the proposed regulations' removal of specific timeframes because they thought the lack of specific maximum timeframes for completing grievance procedures would or might lead to, for example, excessive delay; lack of transparency or accountability; chilled reporting or participation; and feelings of betrayal or anxiety. Some commenters offered examples of individuals who reported that they had experienced lengthy grievance procedures that impacted their educational experience. One commenter argued that the Department failed to offer data in its previous rulemaking to support its assertion that the prior 60-day guideline sacrificed accuracy for speed.

Some commenters requested clear timeframes and benchmarks within the grievance procedures. Several commenters requested the reinstatement of the 60-day guideline provided in the 2011 Dear Colleague Letter on Sexual Violence. These commenters raised concerns that recipients would deliberately delay proceedings, and requested that the final regulations state that deliberate delays by a recipient in responding to complaints of sex-based harassment could constitute a form of institutional retaliation. One commenter suggested the Department issue guidance encouraging recipients to finish their investigations and make a determination within 60 calendar days. Another commenter suggested that the Department define "reasonably prompt" timeframes as approximately 60 calendar days but permit a recipient to

extend the investigation period in certain situations. Other commenters suggested that the final regulations establish specific timeframes for certain stages of the process or require recipients to set timeframes for stages and keep the parties updated.

In contrast, some commenters requested that the Department define "prompt," but did not specify a recommended timeframe. One commenter suggested that the final regulations state that a reasonably prompt timeframe is less than one full academic year and ideally one semester. Some commenters requested clarity as to whether the regulations require recipients to include timeframes for each major stage or for the overall process. One commenter requested that the final regulations give clearer guidance on the length of the grievance procedures and under what conditions an extension should be granted. Several commenters suggested modifications to the examples of the major stages of a grievance procedure in proposed § 106.45(b)(4).

Other commenters requested that the Department define "good cause" and retain the examples of good cause from the 2020 amendments, state that good cause exists only in specific cases, or clarify what constitutes a reasonable delay. One commenter requested the Department issue separate guidance on what constitutes "good cause." One commenter requested that the Department clarify that recipients should use good cause rather than a rigid application of timeframe procedures to achieve reasonable fairness. In addition, some commenters requested that proposed § 106.45(b)(4) be modified to require "written" notice to the parties that includes the reason for the delay on the premise that this requirement would facilitate Clery Act compliance. And some commenters asked the Department to require that advisors' schedules be considered in determining timeframes and scheduling. One commenter requested the Department remove the requirement to set a timeframe for the evaluation stage, asserting that pressuring complainants on evaluation deadlines would lead to a stressful process for complainants and could produce a chilling effect.

In addition, other commenters recommended various modifications to proposed § 106.45(b)(4) and § 106.46(e)(5) related to law enforcement proceedings. One commenter suggested that if law enforcement proceedings occur concurrent with Title IX grievance procedures, recipients should not be allowed to draw adverse inferences from a respondent's silence during grievance procedures.

Finally, other commenters proposed a statute of limitations for filing a complaint—for example, a one-year statute of limitations that could be tolled if the parties elect to proceed with an informal resolution process. Some commenters argued that a limitations period would ensure fairness and due process, especially when the respondent is no longer participating as a student in the recipient's education program or activity.

*Discussion:* The Department acknowledges commenters' support for §§ 106.45(b)(4) and 106.46(e)(5) and notes that the final regulations will continue to require that a recipient establish grievance procedures that are prompt and equitable. The Department shares the goals of ensuring that recipients promptly respond to complaints of sex discrimination and restore access to a safe educational and work environment, that the timing of grievance procedures be fair and transparent, and that students feel safe in their school environments. The Department also acknowledges commenters' support for the flexibility provided in § 106.45(b)(4) and agrees that allowing recipients the ability to set reasonably prompt timeframes, as well as allowing reasonable extensions of such timeframes for good cause, will allow recipients to better meet the needs of their educational communities.

The Department disagrees that the requirement for prompt timeframes will result in grievance procedures that are too lengthy. The Department maintains that the grievance procedures in the final regulations appropriately balance the need for the prompt resolution of complaints; thorough and accurate investigations; and a fair process for all parties. The Department also notes that, to the extent that some commenters preferred the language in the current regulations because it has been upheld by a Federal court, these final regulations do not significantly change the requirements for timeframes set forth in the 2020 amendments. As the Department stated in the July 2022 NPRM, the Department continues to adhere to the rationale of § 106.45(b)(1)(v) in the 2020 amendments and has adopted only minor revisions to simplify the regulatory language and better align it with other sections of the final regulations. *See* 87 FR 41468.

The Department disagrees with commenters' suggestions that these regulations allow a recipient to conduct grievance procedures without specific timeframes, allow for indefinite delays by a recipient, and provide no guarantee of transparency or accountability. Section 106.45(b)(4) requires a recipient to establish reasonably prompt timeframes for the major stages of the grievance procedures, including, for example, evaluation, investigation, determination, and appeal. Any extensions of these established timeframes must be reasonable and for good cause, and the recipient must notify the parties of the reason for the extension. Section 106.46(e)(5) likewise requires recipients to provide "reasonable extension[s] of timeframes on a case-by-case basis for good cause with written notice to the parties that includes the reason for the delay." The requirements of §§ 106.45(b)(4) and 106.46(e)(5) thus allow for neither indefinite grievance procedures nor for a recipient to hide the nature of its required timeframes or reasons for an extension.

The Department agrees with commenters' assertions that timeframes are important for setting parties' expectations about the grievance procedures and facilitating participation, but maintains that recipients should have the flexibility to establish specific reasonably prompt timeframes for the major stages of their grievance procedures. The Department also agrees with commenters that excessive or lengthy delays in grievance procedures can have a negative impact on parties and their educational experience. To address this concern, the Department's regulations require a recipient to set, and abide by, reasonably prompt timeframes and only allow for reasonable extensions for good cause. The Department maintains that conclusion of the grievance procedures must be reasonably prompt because parties should not have to wait longer than necessary to know the resolution of a sex discrimination complaint, and prompt resolution of such complaints is necessary to further Title IX's nondiscrimination mandate. The Department notes that supportive measures designed to protect safety are available during the pendency of the grievance procedures, and, under § 106.44(h), recipients may remove a respondent on an emergency basis, when appropriate, without awaiting the conclusion of a grievance procedure.

The Department acknowledges that withdrawn Department guidance referred to a 60-day timeframe for sexual harassment complaints. Each recipient is in the best position to balance promptness with equity, including fairness and accuracy, based on the recipient's unique environment and experience, and the Department

therefore declines to set a specific minimum or maximum timeframe for recipients or to require that recipients use business or calendar days. Recipients that determine 60 days represents a reasonable timeframe to conclude grievance procedures have discretion to include that timeframe in their Title IX grievance procedures under the final regulations, while other recipients may determine they can conclude a grievance procedure in a shorter or longer period of time. With respect to the commenter's assertion that the Department did not provide data in its previous rulemaking to show that the 60-day timeframe compromised accuracy and fairness, the Department refers to the preamble to the 2020 amendments which addresses this concern and identifies comments made on behalf of complainants and respondents about grievance procedures often taking too long, and comments made on behalf of recipients expressing concern that fair grievance procedures could take more than 60 days in many cases. *See* 85 FR 30270.

The Department declines to adopt a statute of limitations for the filing of a sex discrimination complaint. Applying a statute of limitations would be unfair to complainants because, as many commenters have noted, for a variety of reasons complainants sometimes wait before pursuing a grievance procedure in the aftermath of sex discrimination. The final regulations safeguard the fundamental fairness and reliability of Title IX grievance procedures without the need to impose a statute of limitations. Additionally, as the Department discussed in the 2020 amendments, Title IX obligates recipients to operate education programs and activities free from sex discrimination; imposing a time limit on a complainant's decision to file a complaint would not support Title IX's nondiscrimination mandate. 85 FR 30127.

The Department appreciates commenters' suggestions for modifications to the examples of the major stages of a grievance procedure identified in § 106.45(b)(4), but declines to make such modifications. Beyond the stages identified by the Department—evaluation, investigation, determination, and appeal—recipients have the flexibility to identify additional stages for which they would like to provide timeframes for resolution if they believe this would help parties understand the approximate length of each stage of the grievance procedures. While the Department appreciates commenters' concern about setting a timeframe for the evaluation process, the Department

maintains that the recipient's initial evaluation of whether to dismiss or investigate a complaint of sex discrimination constitutes a major stage of a recipient's grievance procedure, and that for promptness and transparency the parties should be aware of the timeframe governing when such an evaluation will be completed. To further clarify the examples of major stages it has provided in § 106.45(b)(4), the Department has slightly modified the description of the evaluation stage, from "the recipient's determination of whether to dismiss or investigate a complaint of sex discrimination" to "the recipient's *decision* whether to dismiss or investigate a complaint of sex discrimination," to avoid multiple uses of the term "determination" and prevent confusion.

The Department acknowledges commenters' requests that the regulations require a delay of Title IX grievance procedures for concurrent law enforcement proceedings or, alternatively, prohibit more than a temporary delay due to a concurrent law enforcement proceeding. The Department acknowledges that the criminal justice system and Title IX grievance procedures serve distinct purposes but may sometimes overlap with respect to allegations of conduct that constitutes sex discrimination under Title IX and criminal offenses under State or other laws. The Department declines to require a recipient to delay its grievance procedures when there is an ongoing concurrent law enforcement proceeding and likewise declines to specifically prohibit a recipient from delaying a grievance proceeding due to a concurrent law enforcement proceeding. A variety of situations may necessitate the reasonable extension of timeframes on a case-by-case basis for good cause, including the possibility of a concurrent law enforcement proceeding. On the other hand, a concurrent law enforcement proceeding will not always constitute good cause for a delay, and the Department encourages recipients whenever possible to apply their grievance procedures in a manner that avoids the need for an extension.

The Department notes that, to the extent a reasonable extension of timeframes is implemented for good cause, a recipient must not delay the provision of supportive measures because of a concurrent law enforcement proceeding; a recipient must continue to offer and provide supportive measures, as appropriate, to restore or preserve a party's access to the recipient's education program or activity, or to provide support during

the recipient's grievance procedures or during the informal resolution process. *See* §§ 106.44(f)(1)(ii), (g). A recipient is likewise required to operate its education program or activity free from discrimination at all times and may therefore need to take action as permitted by these final regulations during the pendency of law enforcement proceedings to ensure students' access to education is not limited or denied based on sex. Concerning the commenter's request regarding adverse inferences based on a respondent's silence when a request for extension due to concurrent law enforcement proceedings is denied, the Department notes that § 106.46(f)(4) prohibits a decisionmaker from drawing an inference about whether sex-based harassment occurred based solely on a party's or witness's refusal to respond to questions deemed relevant and not impermissible. For further discussion of this provision and its impact, see the discussion of § 106.46(f)(4). The Department appreciates commenters' request that the Department explicitly identify deliberate delays in grievance procedures as a form of institutional retaliation. While the Department acknowledges that an intentional delay could constitute retaliation if it meets the standard in the definition of "retaliation" in § 106.2, including that the delay was imposed for a retaliatory motive, the Department declines to specifically identify additional types of retaliation in § 106.71 for the reasons discussed in that section.

While the Department appreciates that commenters would like the Department to define terms such as "prompt," "good cause," and "reasonable" delays, the Department declines to do so because the meaning of these terms depends on specific contexts. The Department declines to assign a particular timeframe to the terms because recipients should retain flexibility to designate appropriate timeframes, and what is "prompt" or "reasonable" is a decision that must be made in the context of a recipient's obligation to provide an education program or activity free from sex discrimination. As discussed in the July 2022 NPRM, the Department maintains that good cause for an extension of a timeframe may include, for example, reasonable extensions of time to accommodate the absence of a party, a party's advisor, or a witness; however, the Department intends to grant flexibility, based on recipients' experience and familiarity with their cases, to determine whether particular circumstances constitute good cause

that could justify extending a timeframe. 87 FR 41468. When evaluating extensions for good cause, the Department reiterates that recipient considerations include whether there may be ways to address such circumstances that avoid the need for an extension, such as allowing a witness to participate via videoconference or requiring a party to choose an advisor who has sufficient availability under the recipient's existing timeframes. The Department notes that recipients should be able to provide reasonable modifications for those with disabilities and language assistance for those with limited proficiency in English within the established timeframes and without need for extension. Anyone who believes that a recipient has failed to comply with reasonably prompt timeframes set forth in its grievance procedures may file a complaint with OCR.

As the Department explained in the July 2022 NPRM, the Department has removed specific examples of good cause because the Department is concerned that their inclusion may have inadvertently suggested to recipients that extensions were mandatory in each of those situations, which may have slowed down overall investigation and resolution of complaints. 87 FR 41468. The Department maintains that good cause may include considerations such as the absence of a party but declines to include specific examples of good cause in order to clarify that good cause should be considered on a case-by-case basis. 87 FR 41468. The Department appreciates commenters' concerns about aligning § 106.45(b)(4) with the Clery Act by requiring written notice of the reason for any delay. The Department declines to require written notice in § 106.45(b)(4) because this provision also applies to recipients that are not subject to the Clery Act, including elementary schools and secondary schools, but notes that § 106.46(e)(5), which applies to postsecondary institutions subject to the Clery Act, requires written notice of a reasonable extension of timeframes for good cause.

*Changes:* The Department has revised "the recipient's determination of whether to dismiss or investigate a complaint of sex discrimination" in § 106.45(b)(4) to "the recipient's decision whether to dismiss or investigate a complaint of sex discrimination."

**7. Section 106.45(b)(5) Reasonable Limitations on Sharing of Information**

Privacy Protections Generally

*Comments:* Commenters expressed support for proposed § 106.45(b)(5) for a variety of reasons, including because it promotes fairness and consistency for all parties, addresses privacy concerns and chilling effects raised by the 2020 amendments, prevents unnecessary disclosure of personal information, balances privacy interests (especially of young students) with the parties' need to represent themselves, acknowledges that investigations must be conducted in a sensitive and confidential way, and provides protection for parties against retaliation. Some commenters shared that the 2020 amendments' prohibition on restricting the parties' ability to discuss the allegations exposes students to retaliation and harassment, leads to a chilling effect, can exacerbate a hostile environment on campus, and negatively affects the reliability of witness testimony.

Some commenters expressed support for § 106.45(b)(5), citing the importance for certain parties, such as students with disabilities or young students, of being able to access additional support to participate in a recipient's grievance procedures. Some commenters asked the Department to allow elementary schools and secondary schools to decide what constitutes reasonable steps to protect privacy in a particular case. Some commenters questioned whether recipients could restrict the parties' ability to engage in the speech described in § 106.45(b)(5) for reasons other than protecting privacy. The commenters urged the Department to modify § 106.45(b)(5) to prohibit recipients from interfering with these types of speech, regardless of whether the recipient is taking steps to protect privacy or for another reason.

Some commenters recommended changes to the limitation in proposed § 106.45(b)(5) that the recipient's reasonable steps to protect privacy must not restrict the parties' ability to consult with a family member, confidential resource, or advisor, such as using "discuss" rather than "consult with" and being less prescriptive in listing the individuals with whom parties can consult.

Some commenters asked for clarification regarding who constitutes a "confidential resource" or "advisor" for purposes of proposed § 106.45(b)(5). Some commenters urged defining these terms as broadly as possible, or to permit consultation with a broader range of sources, such as police, prosecutors, and judges. Some

commenters urged restrictions on a recipient's ability to volunteer information to law enforcement. One commenter suggested clarifying that a party does not have a right to communicate with a family member, confidential resource, or advisor during a hearing or meeting.

Some commenters asked the Department to replace the phrases "prepare for a hearing, if one is offered" and "otherwise defend their interests" with the phrase "otherwise prepare for or participate in the grievance process" based on a concern that defending their interest is a broad phrase that parties could use to justify widespread disclosures. Another commenter asked whether "defend their interests" means that a party would need to be challenged by someone else or whether they could proactively speak about the allegations.

Some commenters also asked the Department to clarify whether there are any differences between the privacy requirements in §§ 106.45(b)(5) and 106.46(e)(6)(iii). Other commenters asked whether § 106.45(b)(5) conflicts with the retaliation provision in proposed § 106.71.

*Discussion:* The Department acknowledges commenters' support of § 106.45(b)(5). The Department continues to believe that § 106.45(b)(5) appropriately addresses concerns about chilling effects on participation in the grievance procedures, peer retaliation, and the integrity of the grievance procedures associated with widespread disclosures.

Section 106.45(b)(5) requires a recipient to take reasonable steps to protect the parties' and witnesses' privacy during the pendency of a recipient's grievance procedures, provided that these steps do not restrict the parties' ability to: obtain and present evidence, including by speaking to witnesses, subject to § 106.71; consult with family members, confidential resources, or advisors; or otherwise prepare for or participate in the grievance procedures. The steps that are reasonable to protect privacy may vary depending on the circumstances, and thus a recipient must consider the circumstances of a particular complaint when determining what steps the recipient must take to protect privacy, which includes consideration of whether a particular step is reasonable and whether it impermissibly restricts a party's ability to gather evidence, consult with certain individuals, or prepare for or participate in the grievance procedures. Nevertheless, the Department emphasizes that any steps that infringe on constitutional rights or

otherwise undermine due process are inherently unreasonable, and such steps do not qualify as "reasonable steps" under § 106.45(b)(5). *Cf.* 34 CFR 106.6(d).

In response to commenters' concern that § 106.45(b)(5) permits a recipient to restrict the parties' ability to gather evidence, consult with certain individuals, or prepare for or participate in the grievance procedures as long as the recipient did not impose these restrictions as part of its reasonable steps to protect privacy, the Department clarifies that § 106.45(b)(5) prohibits a recipient from taking reasonable steps for the purpose of protecting privacy that restrict the parties' ability to gather evidence, consult with certain individuals, or prepare for or participate in the grievance procedures. Although § 106.45(b)(5) does not apply to steps that a recipient takes for purposes other than privacy protection, the Department notes that other provisions in these final regulations provide additional protection for the parties—*e.g.,* § 106.45(f)(2) addresses the opportunity to present witnesses and evidence, § 106.46(e)(2) addresses the opportunity to be accompanied by a party's advisor in cases of sex-based harassment involving a student party at postsecondary institutions, and § 106.6(g) addresses participation by parents, guardians, and authorized legal representatives.

The Department declines the commenter's request to change "consult with" to "discuss" in § 106.45(b)(5) to prevent parties from communicating with family members, confidential resources, or advisors during a hearing or meeting. The Department notes that other provisions in these final regulations, such as §§ 106.6(g) and 106.46(e)(2) and (3), may affect when and how a party may communicate with these individuals in certain proceedings.

The Department also declines the suggestions to broadly define or be less prescriptive as to the individuals listed in § 106.45(b)(5). The Department maintains that this list sufficiently protects the parties' ability to confide in other individuals during the grievance procedures, and nothing in § 106.45(b)(5) prevents a recipient from allowing the parties to consult with individuals beyond those listed in the provision.

Regarding commenters' questions about communications with law enforcement and the judicial system, the Department notes that the Title IX regulations do not impose limitations on the parties' ability to speak with law enforcement or to speak at judicial proceedings. The Department notes a recipient must be mindful of the requirements of § 106.44(j) when considering whether to disclose information to law enforcement or to the judicial system.

The Department wishes to clarify that "confidential resources," as used in this provision, is not synonymous with "confidential employee," as defined in § 106.2, although certain individuals may qualify as both. Unlike a confidential employee, a confidential resource does not need to be an employee of the recipient. The confidential resource must, however, have a confidential status under a Federal, State, or local law, or by virtue of their profession. Thus, a teacher or friend will generally not qualify, whereas a mental health counselor or a community-based rape crisis counselor will generally qualify.

The Department clarifies that "advisors," as used in § 106.45(b)(5), refers to any individual who is acting as an advisor to the party for purposes of the grievance procedures. This includes but is not limited to the advisor of the party's choice referenced throughout § 106.46.

In response to concerns that "defend their interests" is an overly broad phrase that could be used to justify widespread disclosures, the Department is modifying § 106.45(b)(5) by replacing the phrases "prepare for a hearing, if one is offered" and "otherwise defend their interests" with the phrase "otherwise prepare for or participate in the grievance procedures." The Department also notes that this change avoids the concern expressed by one commenter as to whether a party would need to be challenged by someone else to be considered as defense of their interest.

Commenters asked about the differences between §§ 106.45(b)(5) and 106.46(e)(6)(iii). Section 106.45(b)(5) requires a recipient to take reasonable steps to protect the privacy of the parties and witnesses throughout the grievance procedures, whereas § 106.46(e)(6)(iii) and the corresponding provision at § 106.45(f)(4)(iii) require a recipient to prevent and address parties' unauthorized disclosure of material obtained solely through the grievance procedures. When providing the parties with an equal opportunity to access the relevant and not otherwise impermissible evidence under §§ 106.45(f)(4)(i) and 106.46(e)(6)(i), a recipient must take reasonable steps under §§ 106.45(f)(4)(iii) and 106.46(e)(6)(iii) to prevent and address unauthorized disclosures. The Department recognizes that there is some overlap in the three provisions requiring privacy protections (*i.e.,* §§ 106.45(b)(5) and (f)(4)(iii) and 106.46(e)(6)(iii)), and certain steps that a recipient takes to protect privacy may further the requirements of more than one provision. However, the Department does not agree that these provisions conflict, or that their differences would create difficulties for recipients.

The Department appreciates commenters' questions about the interaction between § 106.45(b)(5) and the retaliation provision. Although the factual scenarios posed by the commenters would require an analysis of the specific facts and circumstances, the Department emphasizes that a recipient must comply with the requirements of both §§ 106.45(b)(5) and 106.71. Accordingly, a party's right to speak to witnesses is subject to the requirement in § 106.71 that a recipient prohibit retaliation, which is defined in § 106.2 as "intimidation, threats, coercion, or discrimination" against any individual, including witnesses, for the purpose of interfering with any right or privilege under Title IX or the regulations or because that individual participated in any way in the grievance procedures.

*Changes:* The Department has made a technical edit to § 106.45(b)(5) to change "[t]ake" to "[r]equire the recipient to take" for clarity. The Department has also changed "a family member, confidential resource, or advisor" to "their family members, confidential resources, or advisors." The Department has also replaced the phrases "prepare for a hearing, if one is offered" and "otherwise defend their interests" with the single phrase "otherwise prepare for or participate in the grievance procedures."

More Stringent Privacy Protections

*Comments:* Some commenters raised concerns that proposed § 106.45(b)(5) does not adequately protect the privacy or identity of the parties or witnesses, which could have a chilling effect and raise concerns of retaliation, especially for members of the LGBTQI+ community. Some commenters asked for clear guidelines to protect the parties' privacy during the early stages of an investigation, during the process of providing remedies or accommodations, and after the conclusion of the grievance procedures.

Some commenters expressed concern that proposed § 106.45(b)(5) allows parties to independently investigate allegations, such as by speaking with witnesses to influence whether the witnesses would participate in a grievance procedure and what they

might say. Commenters also noted that allowing parties to speak to witnesses increases the risk of retaliation.

Commenters also inquired about when a recipient is permitted to redact information, including witness names, when disclosing evidence. Other commenters asked the Department to prohibit the use of nondisclosure agreements in Title IX grievance procedures to dissuade recipients from conditioning supportive measures or the initiation of grievance procedures on parties or their advisors signing nondisclosure agreements.

Some commenters expressed overarching concerns about privacy without explicitly referencing § 106.45(b)(5). One commenter stated that recipients and their employees have an ethical duty of confidentiality and should be trained on privacy laws and how to protect sensitive data. Another commenter seemed to suggest that the regulations should restrict Freedom of Information Act (FOIA) requests for medical information, consistent with the Fourteenth Amendment, FERPA, and HIPAA.

Commenters also asked for clarification about when a recipient may include a statement regarding the privacy rights of the parties and how to ensure privacy while using language assistance services.

*Discussion:* The Department aims to prevent the harms associated with widespread disclosure by requiring a recipient to take reasonable steps to protect the privacy of the parties and witnesses. The disclosure requirements and the right to present evidence under these final regulations are necessary to ensure the integrity and fairness of the grievance procedures, as explained in greater detail in the discussions of §§ 106.45(f)(2) and (4) and 106.46(e)(6). The Department maintains that these final regulations strike an appropriate balance between ensuring that parties are able to prepare and participate in the grievance procedures, while requiring privacy protections and prohibiting retaliation to address fears related to overly broad disclosures. The Department also notes that these regulations must not infringe on any federally guaranteed constitutional rights.

In response to commenters' concerns about witness intimidation and improper influence of witnesses, the Department reiterates that parties are prohibited under § 106.71 from intimidating a witness because the witness has participated in the grievance procedures. The Department further notes that § 106.45(g), and if applicable § 106.46(f), require a

recipient to assess the credibility of parties and witnesses. Nothing in these regulations prohibits a recipient from requiring its investigator to speak to witnesses prior to speaking with the parties in order to minimize the risk that their statements will be improperly influenced.

Commenters inquired about a recipient's ability to redact materials. The Title IX regulations require a recipient to make certain disclosures of personally identifiable information to the parties, including the requirements in §§ 106.45(f)(4) and 106.46(e)(6) to provide the parties with an equal opportunity to access the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible. A recipient may redact information that is not relevant to the allegations but that is contained within documents or evidence that are relevant to the allegations. A recipient must redact (or otherwise refrain from disclosing) information that is impermissible under § 106.45(b)(7)— such as information protected by a legally recognized privilege or provided to a confidential employee; records made by a physician or psychologist in connection with the treatment of a party or witness; or evidence about the complainant's sexual interests or prior sexual conduct, with narrow exceptions—even if the information is contained within documents or evidence that are relevant to the allegations.

Under these final regulations, however, a recipient is not permitted to redact information or evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible because such redaction infringes on the right of the parties (and their advisors, for complaints under § 106.46) to receive access to the relevant and not otherwise impermissible evidence, as well as on the parties' due process rights. The Department has previously recognized situations in which FERPA permits the unredacted disclosure to a parent (or eligible student) of education records related to disciplinary proceedings when the information cannot be segregated and redacted without destroying its meaning.[48] To the extent

that FERPA would require the withholding or redaction of personally identifiable information in education records, for purposes of Title IX the Department takes the position that principles of due process and fundamental fairness require the disclosure of unredacted evidence and information to the parties that is relevant to the allegation and not otherwise impermissible. Accordingly, the constitutional override justifies this disclosure, even if the disclosure is not consistent with FERPA. To the extent the constitutional override does not apply, the GEPA override also requires a recipient to fully comply with the requirements of the Title IX regulations, even if those requirements are not consistent with FERPA's protection of education records. *See* the section on § 106.6(e) for discussion of the constitutional, GEPA, and FERPA overrides. For additional discussion of redactions within Title IX grievance procedures, see the discussion of §§ 106.45(f)(4) and 106.46(e)(6).

The final regulations neither require nor prohibit nondisclosure agreements or confidentiality agreements, as nondisclosure agreements fall within the recipient's discretion to determine which reasonable steps to take to protect privacy based on the circumstances. The Department notes that if a recipient requires such an agreement, it must comply with all of the requirements in the final regulations, including § 106.45(b)(5), and any applicable laws.[49] The Department clarifies that although § 106.45(b)(5) requires a recipient to take reasonable steps to protect the privacy of parties and witnesses during the pendency of a recipient's grievance procedure, such steps may not restrict the ability of the parties to obtain and present evidence, to speak with certain individuals, or to participate in the grievance procedures. In addition, depending on the facts and circumstances, a nondisclosure agreement, especially one that is overly broad, may not satisfy § 106.45(b)(5)'s requirement that any steps a recipient takes to protect the privacy of parties and witnesses must be reasonable.

---

[48] Under FERPA's definition of education records, "a parent (or eligible student) has a right to inspect and review any witness statement that is directly related to the student, even if that statement contains information that is also directly related to another student, if the information cannot be segregated and redacted without destroying its meaning." 73 FR 74832–33; *see also* Letter from Michael Hawes, Director of Student Privacy Policy, U.S. Dep't of Educ., Office of Mgmt., to Timothy S. Wachter, Knox McLaughlin Gornall & Sennett,

P.C. (Dec. 7, 2017), *https://studentprivacy.ed.gov/ resources/letter-wachter-regarding-surveillance-video-multiple-students* (requiring a school district to provide a video of a hazing incident to the parents of a disciplined student because "[i]t does not appear to us that the District can segregate or redact the video without destroying its meaning").

[49] The Department notes that the Speak Out Act, 42 U.S.C. 19403, generally prohibits the judicial enforceability of a nondisclosure clause or non-disparagement clause before a dispute arises involving a sexual assault or sexual harassment alleged to be in violation of Federal, State, or tribal law.

Sections 106.45(f)(4)(iii) and 106.46(e)(6)(iii) similarly require that any steps a recipient takes to prevent and address the parties' and their advisors' unauthorized disclosure of information obtained solely through the grievance procedures must be reasonable. In response to commenters, the Department also clarifies that § 106.44(g) requires a recipient to offer and coordinate supportive measures as appropriate, and recipients may not condition the offer or coordination of supportive measures or the initiation of grievance procedures on a party signing a nondisclosure or other confidentiality agreement.

Due to the fact-specific nature of these issues, the Department declines to provide more specific guidelines for protecting privacy, including guidelines for sanctioning employees who violate a student's privacy. The Department maintains that a recipient is well positioned to determine reasonable steps to protect privacy based on the particular circumstances, including but not limited to the nature of the allegations and the stage of the grievance procedures, within the parameters set forth by § 106.45(b)(5) and other provisions. The Department revised final § 106.44(j) to prohibit the disclosure of personally identifiable information obtained while carrying out a recipient's Title IX obligations, with some exceptions. The circumstances under which such information may be disclosed are explained more fully in the discussion of § 106.44(j).

The Department also declines to extend the requirement for the recipient to take reasonable steps to protect the privacy of parties and witnesses beyond the conclusion of the grievance procedures. After the grievance procedures have concluded, the disclosure of information presents little or no threat to the fairness and integrity of the investigation and outcome of a particular complaint. Although § 106.45(b)(5) does not apply after the conclusion of the grievance procedures, Title IX continues to prohibit harassment, including harassment of a party or witness after conclusion of grievance procedures, and retaliation under § 106.71. In addition, § 106.44(j) prohibits a recipient from disclosing personally identifiable information obtained while carrying out its Title IX obligations, with some exceptions, and continues to apply after the conclusion of the grievance procedures. Other privacy laws, such as FERPA, may also be applicable.

Regarding the suggestion to require privacy-related training, the Department notes that § 106.8(d)(2)(ii) requires

recipients to ensure that employees and individuals who have any role in implementing the Title IX regulations receive training on the recipient's grievance procedures under § 106.45, and if applicable § 106.46, to the extent related to their responsibilities. As noted above, a recipient is obligated to take reasonable steps to protect privacy under §§ 106.45(b)(5) and (f)(4)(iii) and 106.46(e)(6)(iii). Accordingly, the regulations already require privacy-related training. Nothing in the final regulations prevents a recipient from providing training on other privacy laws or methods to protect sensitive data.

Although the Department is not authorized to restrict FOIA requests, as requested by a commenter, the Department notes that FOIA exempts certain information about individuals, including information in medical files, when the disclosure of this information "would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. 552(b)(6). The Department notes that under § 106.45(b)(7)(ii), a party's or witness's records that are made or maintained by a physician, psychologist, or other recognized professional or paraprofessional related to the treatment of the party or witness must not be accessed, considered, disclosed, or otherwise used as part of the grievance procedures, unless the recipient obtains that party's or witness's voluntary, written consent for use in the grievance procedures. *See* section on § 106.45(b)(6) and (7).

The Department agrees that it is important to protect the parties' privacy while using language assistance services; however, a recipient is in a better position to identify how to ensure privacy based on the particular circumstances of what services are needed and how they factor into the recipient's grievance procedures.

In response to a commenter's inquiry about when a recipient may include a statement regarding the privacy rights of the parties, the Department notes that various provisions of these final regulations (*e.g.*, §§ 106.44(f)(1)(iii) and 106.45(c)(1)(i)) require a recipient to inform the parties of the grievance procedures, which must include reasonable steps to protect privacy.

*Changes:* None.

**Due Process Concerns**

*Comments:* Commenters raised concerns about the difficulty of balancing privacy concerns with the requirements of due process.

Some commenters appreciated the clarification that a recipient must maintain the privacy of parties and witnesses if possible and that parties

may contact witnesses, obtain evidence, and participate in the investigation.

Other commenters emphasized the importance of ensuring impartial investigations and grievance procedures. One commenter referenced the importance of protecting a respondent's confidentiality, while another commenter referenced their experience as a respondent and noted that the recipient's refusal to disclose the identity of the complainant and witnesses to the respondent until after the investigation concluded prevented the respondent from organizing their defense.

*Discussion:* The Department appreciates commenters' concerns about protecting privacy interests without infringing on due process rights, as well as commenters' views that privacy protections are needed to protect the fairness of the procedures. The Department maintains that § 106.45(b)(5) appropriately balances these considerations by requiring a recipient to take reasonable steps to protect privacy while prohibiting a recipient from taking such steps that restrict the ability of the parties to obtain and present evidence; consult with their family members, confidential resources, or advisors; or otherwise prepare for or participate in the grievance procedures. In response to a commenter's concern about restrictions on their ability to organize a defense, the Department notes that under these final regulations, as discussed above, a recipient is not permitted to withhold information that is relevant to the allegations of sex discrimination and not otherwise impermissible. In addition, under § 106.45(c)(1)(ii), the parties are entitled to a notice of the allegations that includes the identities of the parties involved in the incident.

As the Department noted in the July 2022 NPRM, unrestricted disclosures of sensitive information could threaten the fairness of the grievance procedures by deterring parties or witnesses from participating, negatively affecting the reliability of witness testimony, facilitating retaliatory harassment, and causing other potential harms. 87 FR 41469–70. Overly restrictive measures to protect privacy could also jeopardize the fairness of the grievance procedures and the reliability of the outcome, such as by interfering with the parties' ability to identify relevant witnesses and gather other evidence. Section 106.45(b)(5) therefore identifies certain limitations on the recipient's ability to impose reasonable steps to protect privacy.

*Changes:* None.

## Authority and First Amendment Concerns

*Comments:* Some commenters expressed concern that proposed § 106.45(b)(5) would exceed the Department's authority, would be arbitrary and capricious (by shielding recipients from accountability), and would be inconsistent with the First Amendment, free speech values, and established law.

Some commenters opposed proposed § 106.45(b)(5) because they believed it would chill speech. Other commenters urged the Department to modify proposed § 106.45(b)(5) to include an exception that allows parties to criticize how recipients handled their complaints to hold recipients accountable. Another commenter criticized the exception in proposed § 106.45(b)(5) that would allow parties to discuss allegations when defending their interests as overly narrow and vague and an inappropriate limitation on free speech. Some commenters inquired about the recipient's ability to act in response to a party revealing information about an investigation in an article or on social media.

Some commenters expressed concern that proposed § 106.45(b)(5) would invite a recipient to impose "gag orders." Some commenters urged the Department to retain the 2020 amendments' prohibition on restricting parties from discussing allegations and gathering evidence and emphasized the importance of permitting parties to seek guidance and criticize the allegations or the handling of the grievance process.

*Discussion:* The Department emphasizes that students, employees, and third parties retain their First Amendment rights, and § 106.45(b)(5) does not infringe on these rights. Section 106.6(d) of the Title IX regulations explicitly states that nothing in these regulations requires a recipient to restrict rights that would otherwise be protected from government action by the First Amendment. Accordingly, a recipient must be mindful of the rights protected by the First Amendment when taking reasonable steps to protect the privacy of the parties and witnesses under § 106.45(b)(5). For additional discussion of the First Amendment, see the section on First Amendment Considerations in the definition of "sex-based harassment."

The Department understands that some commenters wish to retain § 106.45(b)(5)(iii) from the 2020 amendments, which prohibits a recipient from restricting a party's right to discuss the allegations under investigation or gather and present

evidence. The Department, however, is persuaded by the concerns expressed by commenters during the June 2021 Title IX Public Hearing, *see* 87 FR 41469, and during the July 2022 NPRM public comment period, as described earlier in this section of the preamble, regarding the many ways in which unrestricted disclosures jeopardize the fairness of the grievance procedures. The Department disagrees with commenters who characterized proposed § 106.45(b)(5) as an invitation for recipients to impose "gag orders." As discussed above, final § 106.45(b)(5) will protect the parties' ability to discuss the allegations by prohibiting a recipient from taking steps to protect privacy that restrict the parties' ability to obtain evidence, consult with certain individuals, or prepare for or participate in the grievance procedures. With respect to commenters' requests to retain § 106.45(b)(5)(iii) from the 2020 amendments to preserve the ability to seek guidance from others, the Department notes that final § 106.45(b)(5) prohibits a recipient from restricting a party's ability to consult with their family members, confidential resources, or advisors.

It is the Department's view that § 106.45(b)(5)'s requirement that a recipient take reasonable steps to protect the privacy of parties and witnesses during the grievance procedures may include restrictions on discussing the allegations or investigation in an article or on social media as long as those restrictions are consistent with the First Amendment. Widespread disclosures of personally identifiable information on social media or in the media can threaten the fairness of the grievance procedures and lead to harassment, including retaliation. Section 106.45(b)(5) also limits the reasonable steps a recipient can take to protect the privacy of the parties or witnesses to those that do not restrict the parties' ability to obtain and present evidence, consult with certain individuals, or otherwise prepare for or participate in the grievance procedures. The Department maintains that a recipient may be able to limit social media or other widespread media disclosures in a manner that does not conflict with § 106.45(b)(5), depending on the circumstances and consistent with the First Amendment.

Contrary to commenters' assertions, § 106.45(b)(5) does not exceed the Department's authority and is not inconsistent with Title IX or established case law. We maintain our position, consistent with the 2020 amendments and as explained in the discussion of § 106.44(j), that measures to protect the

privacy of personally identifiable information are necessary to effectuate Title IX and to fully implement Title IX's nondiscrimination mandate. The Department notes that commenters who raised these issues did not explain how § 106.45(b)(5) exceeds the Department's authority or is inconsistent with case law. The Department is acting within the scope of its congressionally delegated authority in requiring recipients to take reasonable steps to protect the privacy of parties and witnesses.

The Department declines to add an exception to § 106.45(b)(5) to allow parties to criticize how recipients handled their complaints; however, the Department reiterates that § 106.45(b)(5) applies only to protect the privacy of parties and witnesses during the pendency of a recipient's grievance procedures. A categorical prohibition on criticizing the recipient's handling of grievance procedures is not a reasonable step to protect privacy, whereas a reasonable step might include prohibiting a party from identifying parties or witnesses while the grievance procedures are ongoing.

Regarding a commenter's criticism of "defending their interests" as overly narrow and vague and an inappropriate limitation on free speech, the Department is replacing the phrases "prepare for a hearing, if one is offered" and "otherwise defend their interests" with the phrase "otherwise prepare for or participate in the grievance procedures." The Department views this revised language as easier for parties to understand and apply. The Department recognizes that some might think this exception is also too narrow; however, the Department maintains that § 106.45(b)(5) appropriately balances the need for parties to be able to make certain disclosures during the pendency of the grievance procedures with the need to protect unrestricted disclosures that could threaten the fairness of the procedures. The Department reiterates that § 106.45(b)(5) does not require a recipient to restrict rights protected by the First Amendment.

*Changes:* The Department has replaced the phrases "prepare for a hearing, if one is offered" and "otherwise defend their interests" with the single phrase "otherwise prepare for or participate in the grievance procedures."

8. Section 106.45(b)(6) Objective Evaluation of All Relevant Evidence and 106.45(b)(7) Exclusion of Impermissible Evidence

§ 106.45(b)(6): Objective Evaluation of All Relevant Evidence

*Comments:* Commenters expressed support for § 106.45(b)(6) for multiple reasons, including that it would establish clear guideposts, ensure reliable resolutions, and establish a fair process. Commenters expressed support for § 106.45(b)(6)'s requirement that recipients review all relevant evidence, including inculpatory and exculpatory evidence, because this protects due process, limits litigation risk, and is consistent with case law.

Some commenters sought clarification of the term "relevant" or objected to a recipient's exercise of discretion regarding what evidence is "relevant." Commenters also expressed concern about the parties' inability to contest the relevance determination.

*Discussion:* The Department appreciates the comments regarding the importance of clarity, reliability, fairness, and impartiality. The Department emphasizes that § 106.45(b)(6) retains the same language as § 106.45(b)(1)(ii) in the 2020 amendments.

Both § 106.45(b)(6) in these final regulations and § 106.45(b)(1)(ii) in the 2020 amendments require an objective evaluation of all "relevant" evidence. The 2020 amendments did not define the term "relevant," and the Department stated in the preamble to the 2020 amendments that "the ordinary meaning of the word should be understood and applied." 85 FR 30247 n.1018. Section 106.2 defines "relevant" as "related to the allegations of sex discrimination," and clarifies that "evidence is relevant when it may aid a decisionmaker in determining whether the alleged sex discrimination occurred." It is the Department's view that both the final regulations and the 2020 amendments require a similar universe of evidence to be objectively evaluated by the decisionmaker. For a more detailed discussion on the definition of "relevant," please refer to the section on the definition of "relevant" in § 106.2.

For clarity, the Department has revised § 106.45(b)(6) to state that the recipient's grievance procedures must require an objective evaluation of all evidence that is relevant, as defined in § 106.2, excluding evidence that is deemed impermissible under § 106.45(b)(7). The Department articulated this interpretation in the July 2022 NPRM, when the Department proposed to consolidate the three categories of impermissible evidence into § 106.45(b)(7) to "make clear to recipients and others that these types of evidence would be excluded from the general requirement that the recipient conduct an objective evaluation of all relevant evidence." 87 FR 41471. As explained in the discussion of § 106.45(b)(7) of these final regulations, a recipient may only consider impermissible evidence for the purpose of determining whether an exception under § 106.45(b)(7)(i) through (iii) applies.

Parties may raise concerns about relevance determinations as part of their reasonable opportunity to respond to the evidence under §§ 106.45(f)(4)(ii) and 106.46(e)(6)(ii). The Department also notes that, under § 106.8(d)(2)(iv), all investigators, decisionmakers, and other persons who are responsible for implementing the grievance procedures receive training on the meaning and application of the term "relevant." In addition, nothing prohibits a recipient from choosing to allow other opportunities for the parties to contest relevance determinations. *See* § 106.45(j). For complaints under § 106.46, the parties may appeal erroneous relevance determinations that affected the outcome under § 106.46(i)(1)(i). *See* 85 FR 30343.

*Changes:* The Department has revised § 106.45(b)(6) to clarify that a recipient's grievance procedures must require an objective evaluation of all evidence that is relevant and not otherwise impermissible. The Department has added a cross-reference to § 106.2, which defines "relevant," and a cross-reference to § 106.45(b)(7), which describes the types of impermissible evidence and notes certain exceptions.

§ 106.45(b)(7): Exclusion of Impermissible Evidence Regardless of Relevance

*Comments:* Some commenters supported § 106.45(b)(7) for clarifying when evidence is impermissible even if relevant and for resolving discrepancies with State laws.[50] One commenter expressed concern that § 106.45(b)(7) requires the exclusion of relevant evidence, though the commenter acknowledged that § 106.45(b)(7) generally retains the prohibitions that appear in the 2020 amendments.

Some commenters sought clarification as to whether, under § 106.45(b)(7), a party may consent to the use of part of a record (*e.g.,* a sexual assault nurse examiner's report) while withholding the rest of the record, stating that the other party must be able to view the entire document to assess whether the withheld material is relevant.

*Discussion:* The Department acknowledges the comments in support of § 106.45(b)(7), which sets forth the types of evidence (and questions seeking that evidence) that must not be accessed, considered, disclosed, or otherwise used, regardless of whether they are relevant. The three categories of evidence that must be excluded under § 106.45(b)(7) are substantially similar to the prohibitions that appear in the 2020 amendments in § 106.45(b)(1)(x), (5)(i), and (6)(i) and (ii). The Department continues to believe that such evidence is particularly sensitive (*e.g.,* medical records, evidence of the complainant's prior sexual conduct) or otherwise inappropriate for use in grievance procedures (*e.g.,* information protected by attorney-client privilege). *See* 85 FR 30303–04, 30317, 30351, 30361.

The Department declines to modify § 106.45(b)(7) to require a party to provide consent to an entire document if the party consents to use of a portion of it. Keeping in mind that the types of evidence listed in § 106.45(b)(7) are presumptively excluded, a decisionmaker may consider a party's reasons for partially withholding consent as part of the decisionmaker's overarching role in assessing credibility and deciding responsibility. The Department recognizes that there may be circumstances in which a partial disclosure is reasonable, such as when portions of the document are privileged or otherwise legally protected, when portions of the document are appropriately redacted or withheld as irrelevant, or when the party only has access to a portion of the document.

The Department recognizes that a recipient may need to access or consider impermissible evidence (and questions seeking that evidence) for the narrow purpose of determining whether an exception in § 106.45(b)(7)(i) through (iii) applies. Accordingly, the Department has revised § 106.45(b)(7) to clarify that impermissible evidence (and questions seeking that evidence) must not be accessed or considered except by a recipient for the purpose of determining whether an exception applies that would permit the use of such evidence.

*Changes:* The Department has revised § 106.45(b)(7) to make it clear that impermissible evidence must not be accessed, considered, disclosed, or otherwise used; however, there is a narrow exception for the recipient to access and consider evidence to determine whether an exception in § 106.45(b)(7)(i) through (iii) applies.

---

[50] One commenter cited N.Y. Educ. Law § 6444(5)(c)(vi).

**§ 106.45(b)(7)(i): Exclusion of Privileged Evidence or Evidence Provided to a Confidential Employee**

*Comments:* Some commenters praised the Department for clarifying the prohibitions on using privileged information, including that this prohibition encompasses Federal and State privileges. Some commenters urged the Department to modify § 106.45(b)(7)(i) to exclude records provided to confidential employees who do not fall under a preexisting legally recognized privilege. Some commenters urged the Department to require written voluntary consent before information provided to a confidential employee could be used in the investigation. Some commenters encouraged the Department to require recipients to notify parties of the possibility of privilege and to encourage parties to consult counsel to prevent parties from inadvertently turning over privileged information.

*Discussion:* The Department acknowledges commenters' support for § 106.45(b)(7)(i) as excluding evidence protected under a privilege recognized by Federal or State law.

The Department declines to include additional requirements about what recipients must advise parties regarding privileged information because this is already covered by the final regulations. Under § 106.44(f)(1)(iii) and (iv), the Title IX Coordinator is obligated to notify the complainant, upon notification of conduct that reasonably may constitute sex discrimination, and the respondent, if a complaint is made, of the grievance procedures under § 106.45, which includes information regarding what types of evidence and questions seeking evidence are impermissible under § 106.45(b)(7). The recipient is also required to notify the parties of the grievance procedures, as part of the notice of allegations under § 106.45(c)(1)(i), and the grievance procedures include information regarding what types of evidence and questions seeking evidence are impermissible under § 106.45(b)(7). The Department declines to require recipients to encourage parties to consult attorneys regarding privileged information because nothing in the final regulations requires parties to have an attorney. Parties may choose to consult an attorney, and the Department does not intend to imply otherwise.

The Department agrees with the concerns expressed by commenters about the need to protect information shared with confidential employees and the expectation that such information would be excluded from the grievance procedures. Accordingly, the Department has revised § 106.45(b)(7)(i) to state that evidence provided to a confidential employee is impermissible unless the person who confided in the confidential employee has waived that confidentiality. If, however, the evidence provided to a confidential employee is also available from other non-confidential sources, the evidence may be accessed from those non-confidential sources and used as part of the grievance procedures.

Section 106.45(b)(7)(i) continues to require any waiver to be voluntary; however, the Department has removed the specification from proposed § 106.45(b)(7)(i) that the waiver be made in a manner permitted in the recipient's jurisdiction. The Department notes that jurisdictions may not have an established waiver standard for evidence shared with confidential employees. For situations in which there is an existing legal standard for waiving a particular privilege (*e.g.,* specified by a State law), that legal standard governs. The Department does not intend for § 106.45(b)(7)(i) to supplant established waiver standards but rather to provide flexibility for situations in which no waiver standard exists. The Department has determined that it is not necessary to specify the manner for waiving a privilege and maintains that it is appropriate to give recipients the discretion to specify the manner for waiving a privilege (unless there is an existing waiver standard that applies), which may include requiring that it be in writing if the recipient so chooses. The Department also notes that § 106.45(b)(1)(x) of the 2020 amendments permitted a waiver of privilege without specifying the manner.

*Changes:* The Department has revised § 106.47(b)(7)(i) to state that a recipient must exclude evidence that is protected under a privilege as recognized by Federal or State law and evidence provided to a confidential employee, unless the person to whom the privilege or confidentiality is owed has voluntarily waived the privilege or confidentiality.

**§ 106.45(b)(7)(ii): Exclusion of Records Maintained in Connection With Treatment**

*Comments:* Commenters expressed support for § 106.45(b)(7)(ii) for multiple reasons. Some noted that nonconsensual disclosure of medical and counseling records can result in distrust, and others recommended extending the protection to a witness's records, in addition to a party's records.

Some commenters supported § 106.45(b)(7)(ii) but proposed alterations. Some commenters recommended including a narrow exception to allow a recipient to access, consider, or disclose a party's records in connection with treatment in cases in which physical injury is relevant and the records are probative of that issue. Some commenters urged revisions to state that postsecondary students have a right to access their on-campus treatment records prior to deciding whether to consent to their use in the Title IX grievance procedures. Some commenters opposed § 106.45(b)(7)(ii) as unduly broad and instead recommended that these records be subject to the ordinary test of relevance, except as protected by privilege. One commenter stated that materials related to a student-party's special education services (or eligibility for such services) should not be used as evidence.

One commenter asked the Department to extend the ban on the nonconsensual use of records to recipients who are sued for Title IX violations. Another commenter expressed concern that allowing parties to consent to the use of medical and treatment records might open the door to their use in related litigation, and that individuals are unable to comprehend the meaning or consequences of waiving their privilege.

Some commenters sought clarification regarding the application of § 106.45(b)(7)(ii) to allegations of sexual misconduct involving clinicians employed by universities who work in academic medical centers (AMCs). Commenters sought clarification about the interaction between HIPAA and § 106.45(b)(7)(ii); some recommended that this provision not apply to medical records that are subject to HIPAA, and some recommended that this provision align with HIPAA because school records include medical information.

Some commenters objected to the removal of the reference to FERPA in § 106.45(b)(5)(i) of the 2020 amendments as removing a reminder of the rights of parents, or sought clarification of the approach to records related to treatment under Title IX and FERPA.

*Discussion:* The Department acknowledges the commenters' support for § 106.45(b)(7)(ii). The Department agrees with commenters regarding the importance of extending the exclusion of records in connection with treatment to witnesses, and the Department has revised § 106.45(b)(7)(ii) accordingly. The Department recognized the particular sensitivity of these records in the preamble to the 2020 amendments, *see* 85 FR 30303, and the Department maintains that this sensitivity justifies a prohibition on the nonconsensual use of

these records as related to both parties and witnesses.

The Department clarifies that, consistent with the preamble to the 2020 amendments, § 106.45(b)(7)(ii)'s prohibition on the use of records related to treatment includes a student's IEP or Section 504 plan. *See* 85 FR 30427. Thus, the recipient must obtain voluntary, written consent for the use of such materials in the recipient's grievance procedures before such materials can be used as evidence.

In response to a request to extend § 106.45(b)(7)(ii) to recipients who are sued in court for Title IX violations, the Department notes that § 106.45 sets forth the requirements for a recipient's Title IX grievance procedures for administrative proceedings. Whether a court may require disclosure of a party's records in connection with treatment as part of litigation is beyond the scope of this rulemaking. While the Department is sympathetic to the concern that individuals may not understand the meaning of waiving their privilege, the Department maintains that § 106.45(b)(7)(ii)'s heightened protection of records related to treatment sufficiently cautions parties and witnesses to consider whether to voluntarily consent to the use of their records in the grievance procedures.

The Department declines to create an exception to § 106.45(b)(7)(ii) to allow a recipient to use a party's records in connection with treatment in cases in which physical injury is relevant to the proceedings. The 2020 amendments do not allow a recipient to use, or require a party to submit, treatment records in light of the sensitivity of such records (§ 106.45(b)(5)(i)), and the Department maintains this position in the final regulations. The Department continues to maintain that these records constitute "some of the most sensitive documents about a party," 85 FR 30525, which warrants giving the parties the right to control access to their own records even in cases in which the absence of consent to use crucial records may affect the recipient's ability to determine whether sex discrimination occurred by the preponderance of the evidence.

The Department acknowledges that treatment records are carved out of the definition of education records in FERPA. *See* 20 U.S.C. 1232g(a)(4)(B)(iv); 34 CFR 99.3. Title IX does not require a recipient to provide postsecondary students or students who are eighteen years of age or older with access to their treatment records prior to their decision whether to consent to use of their records in the Title IX grievance procedures, though a recipient may

choose to provide this access [51] and those students may be able to access them through State laws prior to deciding whether to give consent. The disclosure of treatment records is governed by these other laws and therefore is outside the scope of this rulemaking. Recipients should be mindful of any applicable requirements under FERPA or State laws regarding such disclosure.

The Department disagrees with the suggestion to apply the general relevance standard to a party's (or witness's) records that are made or maintained by a physician, psychologist, or other recognized professional or paraprofessional in connection with the provision of treatment to the party absent voluntary, written consent. The Department continues to maintain that medical, psychological, and similar records made in connection with treatment are particularly sensitive and warrant heightened privacy protections.

The Department appreciates the comments regarding HIPAA, which protects the privacy and security of certain health information; however, the Department does not enforce HIPAA and lacks authority under Title IX to require recipients to comply with HIPAA through these Title IX regulations. The Department also notes that HIPAA specifically excludes from its coverage records that are protected by FERPA, including education records and treatment records. *See* U.S. Dep't of Health & Hum. Servs. & U.S. Dep't of Educ., Joint Guidance on the Application of the Family Educational Rights and Privacy Act (FERPA) and the Health Insurance Portability and Accountability Act of 1996 (HIPAA) to Student Health Records, at 7 (Dec. 2019 update), *https://studentprivacy.ed.gov/ resources/joint-guidance-application- ferpa-and-hipaa-student-health-records.* A recipient must comply with all applicable laws, and the recipient is in the best position to determine whether and how HIPAA may apply to it. *See* 85 FR 30434. These Title IX regulations apply to records involved in a Title IX grievance proceeding, regardless of whether HIPAA also applies to the records. Section 106.45(b)(7)(ii) also applies to grievance procedures involving allegations of sexual

misconduct involving clinicians who are employed by recipients and work at AMCs.

The Department maintains that it is not necessary to reference FERPA's definitions of "eligible student" and "parent" in a provision describing which records may be used as part of the Title IX grievance procedures. These final Title IX regulations make clear, in § 106.6(g), that nothing in these regulations limits the rights of a parent, guardian, or authorized legal representative to act on behalf of a complainant, respondent, or other person, which would include their child, subject to FERPA. When considering evidence that is relevant but may be impermissible, the Department expects recipients to be mindful of the rights of parents, guardians, and other authorized legal representatives, including any authority they may have to consent on behalf of a student to the use of records maintained in connection with treatment. For additional information regarding the interaction between FERPA and Title IX, see the section on § 106.6(e).

*Changes:* The Department has extended § 106.45(b)(7)(ii) to apply to a witness's records that are made or maintained by a physician, psychologist, or other recognized professional or paraprofessional in connection with the provision of treatment to the witness, unless the recipient obtains the witness's voluntary, written consent for use in the recipient's grievance procedures.

### § 106.45(b)(7)(iii): Exclusion of Evidence Related to the Complainant's Sexual Interests or Prior Sexual Conduct

*Comments:* Some commenters expressed support for § 106.45(b)(7)(iii)'s exclusion of evidence and questions regarding prior sexual conduct and the requirement that prior sexual conduct between the parties does not prove or imply consent. For example, some commenters said it would be consistent with many States' rape shield laws. Another commenter expressed appreciation for the Department's efforts to protect parties from invasions of privacy, character attacks, and stereotyping.

Other commenters expressed concern about aligning proposed § 106.45(b)(7)(iii) with State rape shield laws. Some commenters opposed proposed § 106.45(b)(7)(iii) as unduly broad. For example, some commenters recommended that evidence of prior sexual conduct be subject to the ordinary test of relevance unless privileged or recommended requiring a particularized showing of relevance.

---

[51] *See* U.S. Dep't of Educ., Dear Colleague Letter to School Officials at Institutions of Higher Education, at 3 (Aug. 2016), *https:// studentprivacy.ed.gov/resources/dear-colleague- letter-school-officials-institutions-higher-education* (noting that a recipient may choose to disclose a treatment record for a postsecondary student or a student who is eighteen years of age or older to that student, and that the treatment record would then become an "education record" under FERPA).

Some commenters recommended that proposed § 106.45(b)(7) align more closely with Federal Rule of Evidence 412(b)(1)(C). Some commenters recommended that the limitations on disclosure of prior sexual conduct or sexual interests apply equally to both parties, and another commenter asked for clarification that proposed § 106.45(b)(7) does not prohibit respondents from presenting exculpatory contextual information. One commenter asserted that proposed § 106.45(b)(7)(iii) is unworkable in the elementary school and secondary school contexts and appeared to suggest removing the exceptions that would allow evidence of prior sexual conduct.

One commenter expressed concern that proposed § 106.45(b)(7)(iii) would improperly put the investigator in control of whether to include certain evidence based on the investigator's view of how the parties might use the evidence in the proceeding.

Some commenters asked the Department to expressly permit evidence of a respondent's prior sex-based conduct as pattern evidence and to weigh such evidence based on its strength. As support for their recommendation to permit evidence of a respondent's prior sex-based conduct, the commenters referenced alignment with Federal or State evidentiary rules, Title VII, the Clery Act, research findings that students who commit sex-based harm are frequently repeat perpetrators, and the small likelihood that all survivors of a repeat perpetrator will report the misconduct due to the underreporting of sexual assault.

Some commenters asked the Department to address the interests of "pattern witnesses," which a commenter noted would be consistent with Rule 412 of the Federal Rules of Evidence.

One commenter urged the Department to revise proposed § 106.45(b)(7)(iii) to state that the complainant can always provide evidence of their own sexual history, interests, or predisposition.

*Discussion:* The Department acknowledges commenters' support for § 106.45(b)(7)(iii). Section 106.45(b)(7)(iii) applies to the entirety of a recipient's Title IX grievance procedures for complaints of sex discrimination, including sex-based harassment, and is substantially similar to the corresponding evidentiary exclusions in the 2020 amendments at § 106.45(b)(6)(i) and (ii). The Department does not agree with commenters who viewed the general prohibition in § 106.45(b)(7)(iii) or the two exceptions to the general prohibition as overly broad. As noted in

the preamble to the 2020 amendments, these prohibitions align with rape shield protections used in Federal litigation and serve the critically important purpose of protecting complainants in Title IX grievance procedures from being questioned about or having evidence considered regarding their sexual interests or prior sexual conduct, with two limited exceptions. *See* 85 FR 30103. The Department is not aware of any rape shield laws that conflict with § 106.45(b)(7)(iii), nor did commenters identify any. Given the particularly sensitive nature of this type of evidence, as well as the potential for prejudice and chilling effects associated with the use of this evidence, it is inappropriate to apply a standard of relevance or particularized relevance to this evidence.

The Department disagrees that § 106.45(b)(7)(iii) is unworkable in elementary schools and secondary schools, and the Department notes that a similar provision exists in the 2020 amendments at § 106.45(b)(6)(ii). It is important to limit access to this particularly sensitive information except in two narrow circumstances across all types of recipients. The Department also notes that § 106.8(d)(2) requires investigators, decisionmakers, and other persons responsible for implementing the recipient's grievance procedures to be trained on the types of evidence that are impermissible regardless of relevance; this required training will help elementary schools and secondary schools with the application of this provision.

The Department declines to add an exception to allow evidence of sexual history when its exclusion would allegedly violate the respondent's constitutional rights (based on Rule 412(b)(1)(C) of the Federal Rules of Evidence) or when the evidence is exculpatory. As the Department noted in the preamble to the 2020 amendments, the exception in Rule 412(b)(1)(C) of the Federal Rules of Evidence is explicitly limited to criminal defendants, whose rights differ from respondents in Title IX grievance procedures, because, among other things, criminal defendants face the possibility of incarceration. *See* 85 FR 30351–52. Thus, prohibiting the introduction into a Title IX grievance procedure of evidence that may have been permitted in a criminal trial does not present the same constitutional concerns. In addition, these final regulations permit a wide universe of relevant and not otherwise impermissible evidence. Consistent with the 2020 amendments, the Department maintains that the grievance

procedures outlined in § 106.45, and if applicable § 106.46, provide robust procedural protections of respondents' due process rights. *See id.* Additionally, the Department maintains its reasoning from 2020 that importing a complex set of evidentiary rules from the criminal setting makes it less likely that non-lawyers would feel competent to serve as a recipient's decisionmaker. *See id.*

The Department disagrees that § 106.45(b)(7)(iii) puts the investigator in control of whether to include certain evidence based on the investigator's view of how the parties might use the evidence in the proceeding because the parties may articulate why the evidence should not be excluded under § 106.45(b)(7)(iii). Parties may assert that certain evidence should not be excluded as part of their reasonable opportunity to respond to the evidence that is relevant to the allegations and not otherwise impermissible under §§ 106.45(f)(4)(ii) and 106.46(e)(6)(ii). In addition, nothing prohibits a recipient from allowing parties to explain why evidence should not be excluded during other parts of the grievance procedures. *See* § 106.45(j).

The Department declines to opine on specific evidentiary scenarios because such determinations related to the applicability of § 106.45(b)(7)(iii) are inherently fact-specific.

The Department declines to extend § 106.45(b)(7)(iii)'s protections to respondents. Consistent with the Department's position expressed in the preamble to the 2020 amendments, the Department does not wish to exclude more evidence and information than is necessary to further the goals of the Title IX grievance procedures. *See* 85 FR 30352. The Department has determined that respondents' prior sexual conduct does not require a special provision to adequately protect them, whereas the Department maintains—consistent with case law [52] and rape shield protections in many States—that rape shield protections for complainants are needed to counteract historical and societal misperceptions that a complainant's sexual history is always relevant to sex-based harassment allegations. The Department continues to caution recipients that some situations will involve counterclaims between parties, such that a respondent is also a complainant. *See* 85 FR 30352. In such situations, the recipient must take care to properly apply the rape shield protections to any party designated as a "complainant," even if the same party is

---

[52] *See, e.g., Michigan* v. *Lucas,* 500 U.S. 145, 146 (1991).

also a ''respondent'' in a consolidated grievance process.

The Department also declines to modify these final regulations to expressly permit evidence of a respondent's prior sexual conduct as pattern evidence. Such evidence is governed by the relevance standard, as defined in § 106.2 of these final regulations, and must be assessed on a case-by-case basis. The Department appreciates the commenter's point that pattern evidence may be admissible in other proceedings, such as court proceedings governed by the Federal Rules of Evidence. The Department notes that pattern evidence may be permissible for use in Title IX grievance procedures, as the recipient must objectively evaluate pattern evidence to the extent it is relevant, *i.e.,* related to the allegations of sex discrimination under investigation and may aid a decisionmaker in determining whether the alleged sex discrimination occurred. *See* § 106.2.

The Department appreciates the concerns raised regarding pattern witnesses, *i.e.,* witnesses who were allegedly sexually harassed or assaulted by the same respondent; however, the Department declines to extend the protections of § 106.45(b)(7)(iii) to pattern witnesses. To ensure fair proceedings based on a broad universe of admissible evidence, the Department is not expanding § 106.45(b)(7)(iii) beyond evidence that relates to the sexual interests or prior sexual conduct of complainants. The Department notes that a witness may decline to answer particular questions as part of the grievance procedures.

The Department also declines to revise § 106.45(b)(7)(iii) to generally permit the complainant to provide evidence of their own sexual history, interests, or predisposition. Allowing complainants to broadly introduce the evidence prohibited by § 106.45(b)(7)(iii) threatens to deprive respondents of due process (*e.g.,* allowing a complainant to introduce evidence of prior sexual conduct but not permitting the respondent to rebut) and might result in misuse by the parties. Complainants, like respondents, are only permitted to use such information under the exceptions to § 106.45(b)(7)(iii) when evidence about the complainant's prior sexual conduct is offered to prove that someone other than the respondent committed the alleged conduct or is offered to prove consent with evidence concerning specific incidents of the complainant's prior sexual conduct with the respondent.

The Department appreciates concerns that State laws may differ from the grievance procedures outlined here. A recipient may continue to comply with State law to the extent that it does not conflict with the requirements in these final regulations. In the event of an actual conflict between § 106.45(b)(7)(iii) and State or local law, § 106.45(b)(7)(iii) has preemptive effect over the conflicting State or local law. For a more detailed discussion of preemption in these final regulations, see the discussion of § 106.6(b).

*Changes:* None.

§ 106.45(b)(7)(iii): Evidence Offered To Prove Consent

*Comments:* Some commenters opposed proposed § 106.45(b)(7)(iii) based on their view that evidence of sexual interests or prior sexual conduct could prove or imply consent. Some commenters urged the Department to remove the second sentence of proposed § 106.45(b)(7)(iii) or to replace it with language stating that the prior sexual conduct does not ''necessarily'' demonstrate or imply consent. One commenter viewed the first and second sentences of proposed § 106.45(b)(7)(iii) as contradicting each other. Another commenter expressed concern that proposed § 106.45(b)(7)(iii) will encourage recipients to draw improper inferences about implied consent and urged the Department to narrow the exception to apply to evidence about how the parties communicated consent rather than to prove consent itself or to clarify that similarities in the types of communications related to consent do not imply consent.

One commenter suggested that the Department revise proposed § 106.45(b)(7)(iii) to clarify that consent is not implied based on a variety of factors, including but not limited to a social or romantic relationship between the parties, and that prior conduct includes conduct occurring after the alleged incident. Another commenter urged the Department to change the references to ''sex-based harassment'' in the second sentence of proposed § 106.45(b)(7)(iii) to ''sexual discrimination.''

*Discussion:* The Department appreciates the concerns and questions from commenters regarding evidence of the complainant's prior sexual conduct and whether such evidence can demonstrate or imply the complainant's consent to the alleged sex-based harassment. After considering the comments seeking clarification about how evidence of prior sexual conduct can be used, the Department has revised § 106.45(b)(7)(iii) to clarify that the fact

of prior consensual sexual conduct does not ''by itself'' demonstrate or imply the complainant's consent to the alleged sex-based harassment or preclude a determination that sex-based harassment occurred. Even if there are similarities in the types of consent-related communication, such similarities do not on their own demonstrate or imply the complainant's consent to the alleged conduct or preclude a determination that sex-based harassment occurred. The addition of ''by itself'' helps resolve any perceived inconsistency between the first and second sentences of § 106.45(b)(7)(iii).

The Department clarifies that ''prior'' sexual conduct refers to any conduct prior to the conclusion of the grievance procedures and is not limited to the conduct that occurred prior to the alleged incident of sex-based harassment. This aligns with the Department's position expressed in the preamble to the 2020 amendments that the admission of evidence offered to prove a complainant engaged in other sexual behavior should be prohibited. *See* 85 FR 30354 n.1355 (explaining the Department's use of ''prior'' rather than ''other'' as a more widely understood reference to evidence unrelated to the alleged conduct at issue). The Department also wishes to clarify that § 106.45(b)(7)(iii) does not apply to evidence about a relationship between the parties that is not related to the complainant's sexual interests or prior sexual conduct. Evidence, however, that is directly linked to prior sexual conduct (*e.g.,* evidence of a pregnancy, use of birth control, or a medical history of a sexually transmitted infection) is prohibited under § 106.45(b)(7)(iii) and is only permissible if it falls within an exception.

The Department declines to revise the second sentence of § 106.45(b)(7)(iii) to refer to consent to alleged sex discrimination, rather than consent to alleged sex-based harassment, because evidence of prior consensual sexual conduct generally will not relate to complaints alleging sex discrimination other than sex-based harassment.

*Changes:* For consistency with the phrase in the second sentence, the Department has revised the first sentence to refer to ''consent to the alleged sex-based harassment.'' The Department has revised the second sentence of § 106.45(b)(7)(iii) to state that prior consensual sexual conduct between the parties does not ''by itself'' demonstrate or imply the complainant's consent to the alleged sex-based harassment or preclude a determination that sex-based harassment occurred. The Department has also made non-

substantive revisions for clarity to move the language "offered to prove consent" to the end of the sentence, to add "to the alleged sex-based harassment" for clarity, and to replace the word "concerning" with the word "about."

### § 106.45(b)(7)(iii): Sexual Interests

*Comments:* Some commenters objected to the use of the phrase "sexual interests or prior sexual conduct," and suggested alternatives, including "sexual interests, history, and/or predisposition," or some combination of those terms. One commenter cited Rule 412(a)(2) of the Federal Rules of Evidence, which uses the term "sexual predisposition." One commenter expressed concern about the absence of a definition of sexual interests.

*Discussion:* For the reasons expressed in the July 2022 NPRM, the Department continues to maintain that the phrase "sexual interests or prior sexual conduct" best describes the sensitive information that the Department seeks to protect under § 106.45(b)(7)(iii). 87 FR 41472. The Department maintains its position from the July 2022 NPRM that the best approach is to reference the complainant's "prior sexual conduct" instead of "prior sexual behavior" or "prior sexual history" because these Title IX regulations repeatedly use the term "conduct." In addition, the Department continues to maintain that the term "sexual interests" is more appropriate than the term "sexual predisposition," which the Department views as an outdated phrase that may conjure the type of assumptions that the Department seeks to prohibit. *See* 87 FR 41472 (citing 85 FR 30351). Although the Department has updated the terminology, evidence related to sexual predisposition that the 2020 amendments prohibited continues to be prohibited as evidence related to sexual interests under these final regulations. The Department notes that evidence related to sexual interests includes, but is not limited to, evidence like mode of dress, speech, and lifestyle. This position is not inconsistent with the Federal Rules of Evidence. *See* Fed. R. Evid. 412 advisory committee's note to the 1994 amendment (explaining "sexual predisposition").

*Changes:* None.

### 9. Section 106.45(b)(8) Procedures That Apply to Some, But Not All, Complaints

*Comments:* Some commenters asked whether a recipient has discretion to use certain procedures for some, but not all, complaints of sex discrimination, provided that those procedures are all consistent with the regulations.

*Discussion:* As explained elsewhere in the preamble, the final regulations provide a recipient with reasonable options for how to structure grievance procedures to ensure they are equitable for the parties while accommodating each recipient's administrative structure, education community, and applicable Federal, State, or local law. In light of this goal, it is appropriate to provide a recipient with discretion to use certain procedures for some, but not all, complaints of sex discrimination, provided that it informs its education community in advance of when certain procedures apply. The Department has added a new § 106.45(b)(8) requiring a recipient that chooses to adopt grievance procedures that apply to some, but not all, complaints, to articulate consistent principles in its written grievance procedures for how the recipient will determine which procedures apply. This means that a recipient must provide information regarding what factors, if any, the recipient will consider when determining under what circumstances or to which types of sex discrimination complaints certain procedures apply (*e.g.*, complaints involving certain forms of sex-based harassment, student-to-student sex-based harassment complaints, complaints with certain types of evidence, complaints involving students of certain ages or education levels). The Department also notes that a recipient's determination regarding whether to apply certain procedures to some, but not all, complaints must be made in a manner that treats complainants and respondents equitably, consistent with § 106.45(b)(1). In addition, although this provision permits a recipient to use different procedures for some, but not all, complaints of sex discrimination, a recipient is not permitted to use different procedures for different parties within a specific complaint investigation (*e.g.*, use a live hearing with questioning by an advisor for assessing the credibility of one party and use live questioning during individual meetings to assess the credibility of the other party) absent a party's need for a disability-related accommodation or language access services.

*Changes:* The Department has added new § 106.45(b)(8) requiring a recipient's grievance procedures to articulate consistent principles for how the recipient will determine which procedures apply if a recipient chooses to adopt certain aspects of the grievance procedures for the resolution of some, but not all, complaints.

### 10. Section 106.45(c) Notice of Allegations

*Comments:* Some commenters urged the Department to maintain the 2020 amendments' requirements for providing a notice of allegations for multiple reasons, including that such a notice ensures respondents receive due process protections and are able to adequately respond to allegations. Commenters noted that courts have recognized the importance of providing adequate notice to respondents.

Some commenters requested more clarity regarding what constitutes "sufficient information" in § 106.45(c)(1)(ii) to allow the parties to respond to the allegations, including whether it should specify specific forms of discrimination or identify specific policies alleged to have been violated.

Other commenters suggested further simplifying or eliminating the notice of allegations requirement in proposed § 106.45(c).

Some commenters expressed support for the proposed requirement that recipients provide written notice of sex-based harassment allegations at the postsecondary level and allow oral notice of sex discrimination allegations in elementary schools and secondary schools, noting that different procedures are appropriate due to differences in the ages and needs of different students. Conversely, some commenters expressed concern and confusion that the "sufficient information" identified in § 106.45(c)(1)(ii) is not the same as the written notices required by § 106.46(c). Some commenters urged the Department to extend the requirement for a written notice of allegations in proposed § 106.46(c) to the contexts covered by § 106.45(c), arguing that written notice promotes predictability, transparency, and consistency, enhances the legitimacy of the process, and ensures recipients have a written documentation of having provided notice.

Some commenters urged the Department to add other elements to the notice, including, for example, information regarding grievance procedures, the parties' rights, access to an advisor, evidentiary standards, and the retaliation reporting process.

Some commenters sought clarifications or changes regarding the timing of the notice. For example, some commenters asked the Department to clarify how a recipient can ensure simultaneous communication with the parties when notice is provided orally. Some commenters suggested that recipients should be required to provide a notice of allegations only when a

recipient is bringing a misconduct charge under Title IX, not upon the receipt of a complaint. One commenter asked the Department to clarify whether a recipient needs to provide notice of allegations to parties prior to informal resolution, noting that proposed § 106.45(c)(ii) seems to conflict with the nondisclosure protections in proposed § 106.44(j).

One commenter urged the Department to examine how certain notifications to a student's parents could adversely impact an LGBTQI+ or pregnant student in some cases, such as leaving them homeless or vulnerable to abuse.

*Discussion:* The Department acknowledges comments supporting a notice of allegations that ensures fairness and transparency and aligns with due process protections recognized by Federal courts. As explained in the July 2022 NPRM, § 106.45(c) maintains many components of the notice of allegations in the 2020 amendments, meets and surpasses the due process requirements set by the Supreme Court in *Goss,* 419 U.S. at 581, allows flexibility in recognition of differences in the elementary and secondary and postsecondary contexts, and aligns with other revisions to the grievance procedure requirements. 87 FR 41473–74.

The Department proposed the changes in the July 2022 NPRM in light of factors including public input OCR received in listening sessions and during the June 2021 Title IX Public Hearing. 87 FR 41473. The principal changes were to broaden the requirement for a notice of allegations to apply to any form of sex discrimination rather than applying only to allegations of sex-based harassment, add a requirement that the notice remind parties that retaliation is prohibited to address concerns raised by some stakeholders, and give recipients more flexibility to provide a simplified and oral notice in appropriate contexts to address stakeholder concerns about challenges in applying this requirement in elementary schools and secondary schools. The Department maintains that these changes make the notice of allegations more consistent with the scope of Title IX and give recipients appropriate flexibility to apply the requirement in ways that are better designed to timely and effectively inform parties of its investigation.

The Department declines to adopt commenters' suggestions to further simplify or eliminate the notice of allegations requirement. As explained in more detail in the July 2022 NPRM and below, the Department has determined each element of the notice of allegations serves an important function to ensure

adequate, reliable, and impartial investigations of sex discrimination complaints. 87 FR 41472–74.

Further, the Department agrees with commenters that a written notice of allegations can promote predictability, transparency, consistency, and legitimacy in a recipient's implementation of its grievance procedures. A recipient may choose to reduce notices of allegations to writing, particularly in cases involving more serious conduct and more serious consequences, and in which the recipient determines written notice is required by due process, State or local law, or a recipient policy. Section 106.8(f) requires recipients to maintain records documenting their response to complaints of sex discrimination, which would include providing the notice of allegations. However, as explained in the July 2022 NPRM, a requirement that the notice be in writing may limit a recipient's ability to respond promptly and in a developmentally and age-appropriate way when a student complains of sex discrimination. 87 FR 41473. For example, in the elementary school or secondary school context, a prompt oral response can be a valuable teaching moment, particularly with younger students. To allow for this important flexibility, we decline to require written notice of the allegations for an elementary school or secondary school in these final regulations, but note that the requirements in § 106.8(f) require a recipient to keep records documenting the grievance procedures, including a notice of allegations provided orally. In addition, in complaints outside the harassment context, there may be no respondent and therefore the notice would only need to be provided to the complainant, who presumably will already have information about the alleged sex discrimination. In such a situation, oral notice may be appropriate.

With respect to comments on differences between what constitutes "sufficient information" for purposes of §§ 106.45(c)(1)(ii) and 106.46(c), the Department has determined that providing detailed information about the grievance procedures in § 106.46(c)(2) would not always be suitable in the context of providing oral notice or notice to a young student under § 106.45(c). However, as noted above, nothing in the final regulations prevents a recipient from providing additional information in its oral notice of allegations or from reducing its notice to writing.

The Department appreciates the commenter's question about how a recipient can ensure simultaneous

communication with the parties when notice of the allegations is provided orally. The final regulations require that a recipient provide the notice of allegations to the parties who are known, but simultaneous notice is not required. The Department notes that § 106.45(b)(1) requires a recipient to treat complainants and respondents equitably throughout the grievance procedures, but equitable treatment does not necessarily require simultaneous notice, particularly when it would be inappropriate or impractical to do so.

The Department appreciates the opportunity to clarify the timing of the notice of allegations. Section 106.45(c) requires a recipient to provide the notice "[u]pon initiation of the recipient's grievance procedures," which is different from the 2020 amendments, which required notice "[u]pon receipt of a formal complaint." 34 CFR 106.45(b)(2)(i). This change ensures a recipient has time to review a complaint, determine whether the complaint is appropriate for dismissal under § 106.45(d)(1), confirm the accuracy of information to be included in the notice, and address any safety concerns, if appropriate. However, a recipient will need to provide the notice as soon as these threshold issues have been resolved and the grievance procedures have been initiated, to ensure that any delay does not undermine a recipient's obligation to resolve a sex discrimination complaint promptly and equitably.

In response to questions about what constitutes "[s]ufficient information available at the time to allow the parties to respond to the allegations," the Department notes that § 106.45(c) specifies that the recipient must include the identities of the parties involved in the incident, the conduct alleged to constitute sex discrimination under Title IX or this part, and the date and location of the alleged incident, if available to the recipient. A recipient may, but is not required to, provide additional information at that time, as long as sharing the information does not violate other obligations. The Department declines the commenters' suggestions to narrow or broaden the requirement to specify the "conduct alleged to constitute sex discrimination under Title IX," as the appropriate information may vary depending on the facts of a particular complaint, how a recipient defines prohibited conduct in its policies, and other factors. In all cases, however, the information included must be sufficient to allow the parties to respond to the allegations.

Including additional information and reducing the notice to writing may be particularly helpful in cases involving more serious conduct and more serious consequences. As a baseline, however, a streamlined notice will be easier for a recipient to implement consistently and easier for parties to understand. In addition, as noted in the July 2022 NPRM, requiring a recipient to include detailed information in its notice of allegations is not necessary in all cases and may prevent a recipient from responding promptly and appropriately to all forms of sex discrimination in the educational environment, particularly at the elementary school and secondary school level. 87 FR 41473.

With respect to informal resolution, the Department appreciates the opportunity to clarify that a recipient must provide the notice of allegations upon initiation of the recipient's grievance procedures, which necessarily precedes offering the parties any opportunity for informal resolution. Providing the parties notice of the allegations is essential even when resolving a case informally, to ensure the parties can make an informed decision as to whether to agree to participate in an informal resolution process. The Department disagrees with the commenter's suggestion that a conflict may arise between the notice provision in §§ 106.45(c)(iii) and 106.44(j). The disclosure restrictions described in § 106.44(j) specify exceptions in which personally identifiable information may be disclosed, and they include disclosures made to carry out this part, which includes disclosures made in accordance with §§ 106.44, 106.45, and 106.46.

The Department appreciates the commenter's concern as to how sending a notice of allegations to a student's parents could adversely impact a student who feels unsafe at home. The Department recognizes that some students feel unsafe at home or could have fears about their safety if disclosures were made to a parent or guardian. Concerns about abuse or threats to a student's safety should be addressed in a manner consistent with applicable State and local laws, which may provide protection in those circumstances. As a general matter, it is important for parents to be involved in decision-making about a minor child, and the Department declines to make a change to § 106.45(c) in response to the commenter's concern. We also note that nothing in Title IX or the final regulations can derogate any legal right of a parent, guardian, or other authorized legal representative to act on

behalf of a student. *See* the discussion regarding § 106.6(g).

To ensure clarity and consistency with § 106.45(f)(4) and ensure that parties are notified of their rights regarding access to the evidence, the Department has revised proposed § 106.45(c)(1) to require the notice to include a statement that the parties are entitled to an equal opportunity to access the relevant and not otherwise impermissible evidence or an accurate description of this evidence and if a recipient provides a description of the evidence, the parties may also request— and then must receive—access to the relevant and not impermissible evidence under § 106.45(f)(4)(i).

The Department also observed that the reference to additional allegations "about the respondent's conduct toward the complainant" in § 106.45(c)(2) did not limit these allegations to those involving sex discrimination. The Department therefore revised this paragraph to clarify that it applies to additional allegations "of sex discrimination by the respondent."

*Changes:* The Department has added "(s)" to the end of the words "incident," "date," and "location," to account for alleged conduct that includes more than one incident or that occurred on more than one date or at more than one location. The Department has added § 106.45(c)(1)(iv) stating that the notice of allegations must include a statement that the parties are entitled to an equal opportunity to access the relevant and not otherwise impermissible evidence or an accurate description of this evidence and if a recipient provides a description of the evidence, the parties may request and then must receive access to the relevant and not otherwise impermissible evidence. The Department revised § 106.45(c)(2) to clarify its application to additional allegations "of sex discrimination by the respondent" and to change a reference to paragraph (c)(1) to paragraph (c).

11. Section 106.45(d) Dismissal of a Complaint

General Support and Opposition

*Comments:* Some commenters supported proposed § 106.45(d), arguing that it would increase flexibility, reduce burden on a recipient, and alleviate confusion for parties. For example, some commenters included specific anecdotes of barriers that parties faced to resolve complaints under the prior approach to dismissal.

Some commenters requested clarifications on § 106.45(d), including whether a recipient could dismiss a complaint because the alleged conduct

did not occur under the recipient's education program or activity, or whether the recipient must use the term "dismissal," which could be distressing and confusing to complainants.

*Discussion:* The Department agrees that § 106.45(d) will provide a recipient increased flexibility to address sex discrimination in its education program or activity and will lead to more effective Title IX enforcement. The Department also agrees that § 106.45(d) will streamline and clarify grievance procedures for students and recipients.

The Department appreciates the opportunity to clarify that, consistent with § 106.45(d)(1)(iii) and (iv), a recipient may dismiss a complaint because the alleged conduct did not occur under the recipient's education program or activity. As explained in more detail in the discussion of § 106.11, a recipient has an obligation to address all sex discrimination occurring under a recipient's education program or activity. Conduct that occurs under a recipient's education program or activity includes but is not limited to conduct that occurs in a building owned or controlled by a student organization that is officially recognized by a postsecondary institution and conduct that is subject to the recipient's disciplinary authority. *See* § 106.11. Further, a recipient has an obligation to address a sex-based hostile environment under its education program or activity, even when some conduct alleged to be contributing to that hostile environment occurred outside of the recipient's education program or activity or outside the United States. *See id.* However, if alleged conduct did not occur under the recipient's education program or activity, neither Title IX nor this part apply. *See id.; see also* discussion of § 106.11. Accordingly, a complaint that alleges such conduct would not constitute sex discrimination "under Title IX or this part" and may be dismissed. *See* § 106.45(d)(1)(iii), (iv).

The Department declines to opine on whether a recipient's grievance procedures should replicate terminology such as "dismissal." As a general matter, using the same terminology from final regulations could facilitate comparisons between a recipient's published grievance procedures and Title IX regulations, which could aid in enforcement efforts by the Department. Nonetheless, the Department acknowledges that different terminology may be more appropriate and understandable depending, for example, on the age, maturity, and educational level of a recipient's student population. Accordingly, a recipient has discretion in how it communicates its obligations

under § 106.45(d) to students, as long as it effectively conveys the circumstances in which a recipient may decline to initiate or continue a Title IX investigation or grievance procedures and otherwise complies with § 106.45(d).

*Changes:* None.

Section 106.45(d)(1) Permissive Dismissals

*Comments:* Commenters supported the permissive dismissals approach codified in proposed § 106.45(d)(1) and commended the removal of the mandatory dismissal provision from the 2020 amendments for numerous reasons. For example, some commenters emphasized that the 2020 amendments' mandatory dismissal requirements resulted in premature and improper dismissal of complaints that may have uncovered actionable sex discrimination with more investigation or inappropriately required dismissals of complaints in which the respondent was a student, but the complainant was no longer a student or employee.

In contrast, some commenters believed a recipient should not have authority to dismiss a complaint under proposed § 106.45(d), arguing that it creates burdens and confusion for complainants, is contrary to the purposes of Title IX, and could lead recipients to eliminate alternative resolution options. Other commenters opposed permissive dismissals under proposed § 106.45(d)(1) because, they asserted, they would threaten the First Amendment rights of students if a recipient declined to dismiss a complaint and proceeded with grievance procedures that punish or chill student speech. For example, some commenters urged the Department to maintain the dismissal requirements in the 2020 amendments that are similar to legal standards used by courts when evaluating a motion to dismiss.

Commenters suggested modifying proposed § 106.45(d)(1) to expand or clarify the appropriate grounds for dismissal. For example, some commenters suggested that § 106.45(d) should permit the dismissal of a complaint when there are no supporting alleged facts or behaviors, the allegations are outside the recipient's jurisdiction, there is not a sufficient nexus between the alleged conduct and the recipient, the complainant is no longer participating in the recipient's education program or activity, or the complaint is based on false allegations or wrongful behavior by the complainant. Some commenters sought clarification on whether the named grounds for permissive dismissal are

exhaustive and on how a recipient should proceed in cases in which the complainant is no longer a student or employee.

*Discussion:* The Department agrees that the removal of mandatory dismissals better fulfills Title IX's nondiscrimination mandate by supporting access to a recipient's grievance procedures. The Department agrees that final § 106.45(d)(1) will allow a recipient to investigate and resolve complaints that are within the scope of Title IX more effectively.

The Department understands that the mandatory dismissal provision in the 2020 amendments may have limited the effectiveness of Title IX enforcement, including by requiring dismissal of complaints when recipients may not have been in a position to know whether further investigation and resolution of potential sex discrimination would be warranted. The Department received extensive feedback objecting to mandatory dismissals, including from recipients, through the June 2021 Title IX Public Hearing, numerous listening sessions with stakeholders, 2022 meetings held under Executive Order 12866, and in response to the July 2022 NPRM. After considering that feedback, the Department determined that requiring the dismissal of complaints without the completion of an investigation may not fully afford students the protections of Title IX's nondiscrimination mandate. Accordingly, the Department maintains that a recipient should not be required to dismiss a complaint based on a determination whether the conduct alleged meets the definition of sex discrimination at the outset of grievance procedures. Based on the feedback described, the Department recognizes that in many cases, it will not be clear at the beginning of an investigation whether alleged conduct could constitute sex discrimination and, therefore, a recipient would be required to take additional steps to comply with its obligation under Title IX to ensure its education program or activity is free from sex discrimination. In these cases, a recipient's grievance procedures consistent with § 106.45, and as applicable § 106.46, would guide the recipient's investigation and determination to ensure that both are thorough, prompt, and equitable. The Department recognizes, however, that a dismissal determination may be appropriate in a limited set of circumstances, which are articulated in § 106.45(d)(1). In those cases, the Department's view is that a recipient should have the discretion to dismiss

the complaint and avoid conducting an unnecessary investigation.

For these reasons, the Department disagrees with the assertion that a recipient should not have authority to dismiss a complaint or that dismissals of complaints are contrary to the purpose of Title IX. Specifically, in instances in which it would be impracticable to address alleged sex discrimination because the recipient is unable to identify or exert control over the respondent, *see* § 106.45(d)(1)(i) and (ii), or the alleged conduct would not constitute sex discrimination, *see* § 106.45(d)(1)(iii) and (iv), dismissal is proper and consistent with the purpose of Title IX. Further, because there are circumstances in which it would be unclear whether a complaint satisfies these categories at the outset of an investigation, § 106.45(d) allows a recipient to comply with its obligation to address sex discrimination by either initiating or continuing grievance procedures to make a determination whether sex discrimination occurred, or alternatively, allowing a recipient to address such conduct in the manner it deems fit, such as by offering supportive measures or informal resolution options, as appropriate, to the parties. *See* § 106.45(d)(4)(iii).

Regarding the assertion that permissive dismissals will incentivize recipients to eliminate informal resolution options, the Department notes that § 106.45(d) does not preclude a recipient from offering informal resolution prior to dismissal of a complaint.

The Department also disagrees that any part of § 106.45(d) exceeds the Department's authority. Congress has authorized the Department to issue regulations to effectuate Title IX's prohibition on sex discrimination, 20 U.S.C. 1682, and the Supreme Court has specifically recognized the Department's authority to adopt regulations governing the procedures recipients use to resolve complaints of sex discrimination. *Gebser,* 524 U.S. at 292. Section 106.45(d) is an important element of a recipient's compliance with Title IX because it helps ensure a recipient's efforts focus on the harms Title IX prohibits and that are within a recipient's power to address.

Regarding concerns that § 106.45(d) will confuse complainants, the Department notes that a recipient is required to put its grievance procedures in writing under § 106.45(a)(1) and include information on how to locate its grievance procedures in the notice of nondiscrimination that is disseminated to students under § 106.8(c)(1)(i)(D). Additionally, the Title IX Coordinator

serves as a resource to complainants and respondents who can explain grievance procedures to parties and answer questions related to a recipient's procedures.

We disagree that § 106.45(d)(1) would undermine an individual's free speech rights. Title IX requires a recipient to address sex-based harassment in its education program or activity, and the final regulations do not and cannot restrict rights protected by the First Amendment. Additional discussion regarding the definition of sex-based harassment and the First Amendment is provided in the discussion of Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2) (Section I.C).

The Department declines to incorporate the commenters' suggested additional bases for dismissal because they are either already captured in the final regulations or would be contrary to the purpose of dismissal. For example, some bases, such as lack of nexus or jurisdiction may, depending on the facts, be covered by the bases listed in § 106.45(d)(1) or other provisions such as §§ 106.45(a)(2) or 106.11. The Department also declines to add bases that depend on evaluation of credibility or factual determinations because a recipient would not be able to determine the veracity of a statement or testimony without an investigation or other factfinding associated with grievance procedures. For instance, the proper response to alleged retaliation from any party is to initiate an investigation under a recipient's grievance procedures, not to dismiss an underlying complaint for which the recipient has not determined whether sex discrimination has occurred.

The Department appreciates the opportunity to clarify that the categories for which a recipient may dismiss a complaint in § 106.45(d)(1) are exhaustive. As such, unless one of the four reasons under § 106.45(d)(1) is satisfied, a recipient must implement grievance procedures under § 106.45, and as applicable § 106.46, or an informal resolution process under § 106.44(k), if available and appropriate. We note that dismissals under § 106.45(d)(1) are permissive, rather than mandatory, and that a recipient could either decline, initiate, or continue grievance procedures if any of the four reasons is satisfied. As such, the Department disagrees that final § 106.45(d) would encourage dismissals in a manner that disfavors complainants or discourage dismissals in a manner that disfavors respondents. In addition, a recipient exercising its permissive dismissal of a complaint under Title IX

may still be obligated by other requirements, such as Title VII, to investigate and address the complaint. Further, as explained in more detail in the discussion of § 106.45(d)(4), the final regulations require a recipient that dismisses a complaint to offer supportive measures to the complainant and respondent, as appropriate, as well as take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity, which will further mitigate the risk of depriving any party of an educational opportunity.

The Department declines to offer more specific guidance at this time on how a recipient should investigate a complaint made by a person who is no longer participating in its education program or activity. How a recipient investigates and conducts grievance procedures for such a complaint could depend on a variety of factors, including the conduct alleged; the identity of the respondent, if known; and whether the respondent is participating in the recipient's education program or activity. The Department understands that supporting recipients in the implementation of these regulations and ensuring that members of the recipient's community know their rights is important. The Department will offer technical assistance, as appropriate, to promote compliance with these final regulations, the scope of which will be determined in the future.

*Changes:* None.

Section 106.45(d)(1)(i) Recipient Is Unable To Identify the Respondent

*Comments:* One commenter said that it would be inappropriate or impossible to initiate grievance procedures or notice to the respondent in any circumstance under § 106.45(d)(1)(i), in part because the respondent would be unknown.

*Discussion:* The Department disagrees that it would be inappropriate or impossible for a recipient to ultimately initiate grievance procedures or provide notice to a respondent who was unknown to the complainant. Under § 106.45(d)(1)(i), a recipient must take reasonable steps to identify the respondent. These steps may include, but are not limited to, interviewing the complainant, interviewing potential witnesses, and reviewing contemporaneous records such as video footage and visitor logs if relevant.

If a respondent's identity cannot be ascertained, a recipient should consider, in deciding whether dismissal may be appropriate, if there are good reasons to proceed with grievance procedures

without a respondent, such as providing closure to the complainant or addressing circumstances independent of the identity of the respondent that may have contributed to an incident (*e.g.,* unsafe conditions, lack of monitoring, inadequate policies). If the specific steps set out in § 106.45 will not be effective without a respondent, dismissal under § 106.45(d)(1)(i) would be permitted and may be proper. For example, in *Feminist Majority Foundation* v. *Hurley,* the Fourth Circuit held that a recipient's failure to identify or adequately address sex-based harassment directed at students on an anonymous social media platform may violate Title IX. 911 F.3d 674, 692–93 (4th Cir. 2018). In its holding, the court identified several steps that the university could have taken to address the anonymous harassment, including more vigorously denouncing the harassing conduct, mandating a student body assembly to discourage such harassment on social media platforms, seeking external advice to develop policies to address and prevent harassment, or offering counseling to the complainants. *Id.*

Additionally, although § 106.45(d)(1)(i) allows a recipient to dismiss a complaint if it is unable to identify the respondent after taking reasonable steps to do so, this provision does not permit a recipient to dismiss a sex discrimination complaint alleging that a recipient's policy or practice discriminates based on sex simply because no individual respondent was named in the complaint.

*Changes:* None.

Section 106.45(d)(1)(ii) Respondent Is Not Participating in the Recipient's Education Program or Activity and Is Not Employed by the Recipient

*Comments:* Some commenters supported § 106.45(d)(1)(ii), which permits dismissal of a complaint if the respondent is not participating in or employed by the recipient's education program or activity. Commenters appreciated the change from current § 106.45(b)(3)(ii), which permits dismissal of a complaint if the respondent is no longer enrolled, because § 106.45(d)(1)(ii) permits the recipient to address an allegation even if the respondent is disenrolled or is on recipient-approved leave.

Some commenters argued § 106.45(d)(1)(ii) would exceed the Department's authority by allowing a recipient to take action against a third party.

In contrast, some commenters were concerned that § 106.45(d)(1)(ii) may require a recipient to dismiss a

complaint against a respondent who is not an employee or participating in the education program or activity, contrary to the Department's previous recognition that a third party could create a hostile environment on campus.

One commenter asserted that § 106.45(d)(1)(ii) would encourage a respondent to leave a recipient's education program or activity so they would not be subject to that recipient's grievance procedures and would permit the respondent to become a student or employee at another recipient where they could engage in sex discrimination.

Commenters suggested language changes to proposed § 106.45(d)(1)(ii), including that the Department replace "participating" with "accessing," reference "educational benefits" in addition to the recipient's "education program or activity," and replace "and" with "or" to clarify the breadth of the provision.

Some commenters requested clarification as to whether a recipient could restrict a respondent from attending a recipient's event if a complaint against that respondent was dismissed under § 106.45(d)(1)(ii).

*Discussion:* The Department agrees that allowing a dismissal only when a respondent is no longer participating in, rather than merely disenrolled from, a recipient's education program or activity could require a recipient to investigate a broader range of complaints of sex discrimination. Contrary to some commenters' assertions, a recipient has an obligation to address allegations of sex discrimination that limit or deny a person's participation in its education program or activity, including when the discrimination is perpetuated by a non-student or non-employee if it otherwise falls within the scope of Title IX. *See, e.g., Hall,* 22 F.4th at 403, 405–07 (3d Cir. 2022); *Simpson* v. *Univ. of Colo. Boulder,* 500 F.3d 1170, 1180–85 (10th Cir. 2007) (holding that a university could be liable under Title IX for sexual harassment by nonstudent football recruits). Final § 106.45(d)(1)(ii) therefore requires a recipient to implement grievance procedures under § 106.45, and if applicable § 106.46, or an informal resolution process under § 106.44(k), if available and appropriate, if a non-student or non-employee who is participating in the recipient's education program or activity engages in sex discrimination.

It appears that some commenters misunderstood § 106.45(d)(1)(ii) as requiring dismissal. In fact, under § 106.45(d)(1)(ii), dismissal of a complaint is permitted, but not required. Because dismissal under this category is at the discretion of the recipient, the Department disagrees that § 106.45(d)(1)(ii) encourages respondents to disenroll and engage in sex discrimination in another recipient's education program or activity. In addition, if a respondent is disenrolled but otherwise participating in a recipient's education program or activity, dismissal of the complaint on that basis would be improper. As noted in the July 2022 NPRM, participation in a recipient's education program or activity could include serving in an alumni organization or as a volunteer or attending school-related events. 87 FR 41476.

A recipient has an obligation to address sex discrimination in its own education program or activity, but a recipient may have limited control over a respondent who is no longer employed by the recipient or participating in its education program or activity. Under § 106.45(d)(1)(ii), a recipient may elect to implement grievance procedures for a complaint in which a respondent is not employed by or participating in its education program or activity, though it would not be required to do so. As noted in the 2020 amendments, by granting recipients the discretion to dismiss in situations in which the respondent is no longer a student or employee of the recipient, § 106.45(d)(1)(ii) appropriately permits a recipient to consider, for example, whether a respondent poses an ongoing risk to the recipient's community or whether a determination could provide a benefit to the complainant or assist the recipient in complying with its obligations under other laws related to addressing sexual misconduct involving minor students. *See, e.g.,* U.S. Dep't of Educ., Office of Elementary and Secondary Education, Dear Colleague Letter on ESEA Section 8546 Requirements (June 27, 2018), *https:// www2.ed.gov/policy/elsec/leg/essa/ section8546dearcolleagueletter.pdf* (referencing the obligation of an elementary school or secondary school to determine if there is probable cause to believe that an employee engaged in sexual misconduct under the Every Student Succeeds Act, 20 U.S.C. 7926); 85 FR 30290. Additionally, continuing grievance procedures under § 106.45(d)(1)(ii) may assist another recipient in meeting its obligations under Title IX, particularly if a respondent becomes an employee or student at another recipient. *Cf. Williams,* 477 F.3d at 1296 (holding that a university that recruited a student who engaged in sexual harassment at a previous university without properly supervising the recruit or informing him of the recipient's sexual harassment policy may be found deliberately indifferent to sexual harassment committed by the recruit under Title IX); 34 CFR 99.31(a)(2) (permitting an educational agency or institution to disclose education records to another school, school system, or postsecondary institution in which the student seeks to enroll or is already enrolled) and 99.34 (setting forth requirements for such disclosures). In the event that the recipient elects to dismiss such a complaint, under § 106.45(d)(4)(i) and (iii) of the final regulations, it must offer supportive measures to the complainant, as appropriate, and take other steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity.

The Department declines the suggestion to modify § 106.45(d)(1)(ii) to allow dismissal if the respondent is no longer "accessing education benefits" because doing so could create inconsistencies with the terminology used in the statute and current and final regulations, which consistently refer to "participation" in a recipient's education program or activity. *See, e.g.,* 20 U.S.C. 1681(a); 34 CFR 106.34(a), 106.40(b). Similarly, unlike "an education program or activity," which is used throughout the statute and regulations, the meaning of "education benefits" is not readily understood by reference to Title IX, the Department's Title IX regulations, or other State and Federal laws. The Department also declines a commenter's suggestion to change "and" to "or" in § 106.45(d)(1)(ii) because "and" more clearly communicates that this dismissal option is available only when the respondent is not participating in the education program or activity and not employed by the recipient.

The Department appreciates the opportunity to respond to questions about whether a recipient should restrict a respondent from attending a recipient event if a complaint was dismissed under § 106.45(d)(1)(ii) before the recipient learned that the respondent was participating in the recipient's event. As explained in the July 2022 NPRM, if a Title IX Coordinator is notified that a third party who is not a student or an employee of the recipient is attending events organized by the recipient and engaging in harassing or discriminatory behavior at such events, the Title IX Coordinator would need to take prompt and effective action consistent with § 106.44(f)(1)(vii) to end such discrimination and prevent its recurrence even in the absence of a

complaint. 87 FR 41447. In this example, the Title IX Coordinator may choose to bar the third party from the recipient's events or campus in general, or otherwise take appropriate prompt and effective steps to ensure sex discrimination does not continue or recur in the recipient's education program or activity. *Id.* Alternatively, the recipient may reopen the complaint to initiate or resume grievance procedures.

The Department also emphasizes that unless one of the other permissive bases for dismissal exists, a recipient must not dismiss a complaint when a respondent is participating in a recipient's education program or activity, such as by attending recipient events. Further, consistent with § 106.44(g)(2), a recipient may provide supportive measures, as appropriate, that do not unreasonably burden either party, are designed to protect the safety of the parties or the recipient's educational environment or to provide support during the recipient's grievance procedures or during the informal resolution process, and are not imposed for punitive or disciplinary reasons. *See* discussion of § 106.44(g).

*Changes:* None.

Section 106.45(d)(1)(iii) Complainant Voluntarily Withdraws Any or All of the Allegations in the Complaint

*Comments:* One commenter urged the Department to consider whether a recipient would have an obligation to proceed with a Title IX investigation when a complainant withdraws a complaint because a private settlement was reached with the respondent, but the settlement does not resolve a broader, ongoing safety issue on campus. The commenter also suggested that § 106.45(d)(1)(iii) be narrowed to read: "The complainant voluntarily withdraws all of the allegations in the complaint."

*Discussion:* The Department emphasizes that whether the conditions for dismissal of a complaint under § 106.45(d)(1)(iii) would be met is a fact-specific inquiry. The Department acknowledges that in some cases, a complainant's withdrawal of allegations would leave no remaining allegations for a recipient to address through its grievance procedures. Dismissal would then be permitted under § 106.45(d)(1)(iii). In other cases, there may be remaining allegations that would independently constitute sex discrimination under Title IX. This might occur, for example, in a complaint that involves multiple complainants, allegations against several respondents, alleged

discrimination that occurred on more than one occasion, or as one commenter intimated, when there is an ongoing safety issue. Final § 106.45(d)(1)(iii) would leave to the recipient's discretion the determination whether any alleged conduct that remains could, if proven, constitute sex discrimination under Title IX. Because dismissal could be appropriate if "any" of the allegations are withdrawn, or if "all" of the allegations have been withdrawn, the Department declines to narrow § 106.45(d)(1)(iii). The Department also notes that even when a recipient dismisses a withdrawn complaint under § 106.45(d)(1)(iii), under § 106.44(f)(1)(v), the recipient also has an obligation to consider whether other factors warrant initiating grievance procedures to investigate alleged conduct that either presents an imminent and serious threat to the health or safety of a complainant or other person or prevents the recipient from ensuring equal access based on sex to its education program or activity. *See* discussion of § 106.44(f)(1)(v).

Finally, upon its own review, for clarity and consistency with other parts of the regulations, the Department has included a reference to Title IX "or this part."

*Changes:* The Department has revised § 106.45(d)(1)(iii) to include a cross-reference to § 106.44(f)(1)(v) to make clear that if a complainant withdraws any or all of the allegations of the complaint, the Title IX Coordinator still has an obligation to determine whether other factors warrant initiating grievance procedures. Additionally, to maintain consistency with other parts of the regulations, final § 106.45(d)(1)(iii) states that dismissal is permissive if the alleged conduct, even if proven, would not constitute sex discrimination under Title IX "or this part."

Section 106.45(d)(1)(iv) Conduct Alleged Would Not Constitute Sex Discrimination Under Title IX

*Comments:* Some commenters argued that a recipient should be required, rather than merely allowed, to dismiss any complaint that does not on its face meet the Title IX definition of "sexual harassment."

Some commenters specifically expressed concern about the last sentence of § 106.45(d)(1)(iv), which requires that a recipient, prior to dismissing the complaint, make reasonable efforts to clarify the allegations with the complainant. For example, commenters expressed concern that this could allow an investigator to inappropriately revise the complaint or have inappropriate *ex

parte* communications with the complainant.

Conversely, some commenters suggested that the Department further strengthen the recipients' obligations under § 106.45(d)(1)(iv) to prevent dismissal solely because a complaint is not clearly articulated, which might happen for many reasons, including because a complainant misunderstands the legal standard, has limited English proficiency, or has a disability.

*Discussion:* The Department declines commenters' suggestion to require dismissals under § 106.45(d)(1)(iv) rather than granting a recipient discretion as to whether to dismiss such a complaint. As discussed in the July 2022 NPRM, the procedures in § 106.45 are designed to elicit information sufficient for a recipient to make an informed decision as to whether sex discrimination occurred and requiring, rather than permitting, dismissal would cause a recipient to forgo these procedures in many cases or possibly make hasty judgment calls at the outset of a complaint. 87 FR 41477–78. In the early stages of the complaint process, gathering more information, including from the complainant, may help to confirm whether the allegations, if true, would amount to sex discrimination. For instance, in cases of sex-based harassment in which one or more of the parties may have been incapacitated during the alleged incident, a recipient may gain additional information to establish what occurred through witness interviews conducted as part of its investigation under its grievance procedures. 87 FR 41478. In other cases, a complainant may report an allegation of sex-based harassment but lack information about severity or pervasiveness that, for example, a recipient might receive through evidence gathering under its grievance procedures. *Id.* Requiring dismissal of all such complaints would prevent a recipient from using its grievance procedures to address possible sex-based harassment in its education program or activity. *Id.* The Department recognized this in the preamble to the 2020 amendments when, in response to comments, the Department declined to permit dismissal of "frivolous complaints" because "the point of the § 106.45 grievance process is to require the recipient to gather and objectively evaluate relevant evidence before reaching conclusions about the merits of the allegations." 85 FR 30290.

For similar reasons, the Department maintains that it is necessary and appropriate for recipients to make reasonable efforts to clarify allegations with the complainant before dismissing

a complaint under § 106.45(d)(1)(iv) and disagrees that such efforts would be improper or biased against a respondent. The requirement to clarify allegations with the complainant also would help avoid mistaken dismissal of a complaint based on a complainant's limited English proficiency, disability, or general misunderstanding of what facts are relevant. The Department also disagrees that § 106.45(d)(1)(iv) would permit a Title IX Coordinator or decisionmaker to act in a biased or improper manner. The Department has appropriately considered and addressed potential bias in § 106.45(b)(2), which requires that any person designated as a Title IX Coordinator, investigator, or decisionmaker not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent, as well as in § 106.8(d)(2)(iii), which requires that these persons be trained on how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias.

Because § 106.45(d)(1)(iv) makes clear that a recipient must make an effort to clarify the allegations with the complainant before dismissing a complaint under this provision, the Department does not find it necessary to amend the provision to prevent dismissal solely because a complaint is not clearly articulated.

Finally, upon its own review, for clarity and consistency with other parts of the regulations, the Department has revised § 106.45(d)(1)(iv) to include a reference to Title IX "or this part."

*Changes:* For consistency with other parts of these regulations, the Department has revised § 106.45(d)(1)(iv) to clarify that a recipient may dismiss a complaint if the alleged conduct, even if proven, would not constitute sex discrimination under Title IX "or this part."

Section 106.45(d)(2) Notification of a Dismissal

*Comments:* Some commenters supported § 106.45(d)(2) because it requires notice to a respondent only if the respondent has been notified of the allegations, and because it requires simultaneous notice of dismissal to the parties, when appropriate.

Some commenters suggested that a recipient should not be allowed to dismiss a complaint without providing the parties a reason for that dismissal.

*Discussion:* The Department acknowledges commenters' support of § 106.45(d)(2). The Department agrees that a recipient needs to notify a respondent of a dismissal only if the

respondent has been notified of the allegations. Notifying a respondent of the dismissal of a complaint for which they had no prior notice would likely cause confusion and could put a complainant at risk of retaliation or sex discrimination, particularly in circumstances in which a complainant withdrew a complaint due to safety concerns. Further, the Department appreciates the opportunity to clarify that § 106.45(d)(2) requires the recipient to notify the complainant and, as applicable, the respondent of the basis for the dismissal.

*Changes:* None.

Section 106.45(d)(3) Appeal From a Dismissal

General

*Comments:* Some commenters opposed proposed § 106.45(d)(3). For example, some commenters asserted that § 106.45(d)(3), combined with the absence of the right to appeal a recipient's final determination under proposed § 106.45, would favor complainants over respondents (contrary to § 106.45(b)(1)), would violate the principles of equitable treatment and due process, and would cause the burden on recipients to outweigh any benefits. Some commenters expressed concern that the proposed regulations would not require a recipient to provide a written appeal decision to the parties simultaneously. Conversely, some commenters opposed § 106.45(d)(3) as burdensome on recipients and lacking necessary limitations on a party's opportunity to appeal a dismissal, such as the bases for which a recipient must offer an appeal.

Some commenters opposed § 106.45(d)(3) to the extent that it would allow a Title IX Coordinator, rather than a different adjudicator, to decide an appeal. Some commenters supported provisions that require an individual other than the initial decisionmaker to decide the appeal.

Some commenters requested that the Department modify the proposed dismissal requirements to replicate or align with the Clery Act, including, for example, by requiring a recipient to include its reasoning in its notification of the appeal's outcome.

Some commenters opposed the application of § 106.45(d)(3)(i)–(iv) and (vi) in the elementary school and secondary school context, especially because proposed § 106.45 does not otherwise require a recipient to offer an appeal from the final determination of the grievance procedures.

*Discussion:* The Department wishes to clarify that the 2020 amendments

require a recipient to offer both parties an appeal from a dismissal. 34 CFR 106.45(b)(8)(i). As discussed further below, the only difference in these final regulations is to condition the availability of respondent appeals from a dismissal on whether the respondent has been notified of the complaint, and once a dismissal is appealed, the regulations apply equally to both parties under § 106.45(d)(3)(ii). As such, any burdens associated with § 106.45(d)(3) are largely the same as those in parallel requirements in the 2020 amendments and the benefits of providing an avenue to review a recipient's decision to dismiss a complaint justify the asserted burden on recipients.

In response to concerns about what limitations the final regulations would place on a party's opportunity to appeal a dismissal, the Department clarifies that, as indicated in the July 2022 NPRM, final § 106.45(d)(3) requires a recipient to offer an appeal from a dismissed complaint on the same bases as required under the 2020 amendments, 87 FR 41478–79, which are specifically procedural irregularity; new evidence that was not reasonably available at the time of the dismissal; or Title IX Coordinator, investigator, or decisionmaker bias or conflict of interest. *See* 34 CFR 106.45(b)(8)(i). Accordingly, the Department has revised § 106.45(d)(3) in the final regulations to cross-reference these bases, which are incorporated at § 106.46(i)(1).

The Department declines to require a recipient to notify the parties in writing of the outcome of an appeal, which is consistent with extensive stakeholder feedback that requiring written notice in grievance procedures often prevents elementary schools and secondary schools from handling incidents when they arise, delays their ability to respond to sex discrimination when it occurs, and may be a more appropriate requirement for postsecondary institutions. *See* 87 FR 41458; *see also* discussion of § 106.45(c) and (f)(4). However, nothing in these regulations prohibits a recipient from complying with the requirements of § 106.45(d)(3)(vi) in writing.

With respect to commenters who objected to requiring an elementary school or secondary school to offer an appeal from a dismissal—particularly because the proposed regulations did not require a recipient to offer an appeal from a determination whether sex discrimination occurred—the Department notes that new § 106.45(i) requires a recipient to offer an appeal process that, at a minimum, is the same as it offers in all other comparable

proceedings, if any, including proceedings relating to other discrimination complaints. Although a recipient may not be required to offer an appeal under § 106.45(i), the Department maintains that providing a mechanism to review a recipient's decision to dismiss a complaint promotes Title IX's goal of addressing sex discrimination and preventing its recurrence in federally funded education programs and activities. As explained in more detail in the discussion of § 106.45(i), because § 106.45 provides substantially more procedural requirements than were previously required under Title IX regulations (*see generally* § 106.45(b)(1) and (2) and (f)(1)–(4)), requiring a recipient to offer an appeal from the final determination in all sex discrimination complaints regardless of whether a recipient offers an appeal in comparable proceedings is unnecessary to ensure an equitable and reliable process; and doing so may impair a recipient's ability to resolve sex discrimination complaints in a prompt and equitable manner. However, in the case of a complaint that has been dismissed, it is the Department's view that an appeal is necessary because dismissal occurs before a determination is reached and before an investigation may have been initiated or completed. Moreover, the procedural requirements that precede dismissal are necessarily more limited than those required at the completion of grievance procedures. As noted in the preamble to the 2020 amendments, providing a party the opportunity to appeal a dismissal will make it more likely that a recipient reaches sound determinations regarding dismissal of complaints, which will give complainants and respondents greater confidence in grievance procedures. 85 FR 30396.

The Department is not persuaded that § 106.45(d)(3) of these final regulations violates due process and equitable treatment principles, including § 106.45(b)(1). The appeal process outlined in the final regulations ensures that parties have an equal opportunity to appeal dismissals and other determinations. Final § 106.45(d)(3) similarly provides both parties a right to appeal a dismissal of allegations, except when the dismissal occurs before the respondent has been notified of the allegations. As discussed in more detail below, when the recipient dismisses allegations before issuing a notice of allegations, offering the respondent an opportunity to appeal would not be efficient or effective because the dismissal reflects the recipient's

determination that it need not determine whether the respondent is responsible for sex discrimination on the basis of those allegations. To the extent a recipient issues a notice of allegations and thus requires the respondent to take some action in response, the respondent would have an equal right to appeal a dismissal of those allegations. Section 106.45(d)(3) is designed to fulfill Title IX's mandate to eliminate sex discrimination in a recipient's education program or activity, and the final regulations' framework for prompt and equitable grievance procedures ensure transparent and reliable outcomes for recipients, students, employees, and others participating or attempting to participate in a recipient's education program or activity.

The Department also clarifies that, contrary to the commenters' concerns, § 106.45(d)(3)(iii) requires a recipient to ensure that the decisionmaker for the appeal did not take part in an investigation of the allegations or dismissal of the complaint. Consequently, a Title IX Coordinator would be prohibited from deciding the appeal if they took part in the investigation or dismissal of the complaint. The Department declines to further restrict who may decide an appeal of a dismissal under § 106.45(d)(3)(iii) for the same reasons explained in more detail in the discussion of § 106.45(b)(2). Further, as previously noted, §§ 106.45(b)(2) and 106.8(d)(2)(iii) protect against bias and conflict of interest, and this includes decisionmakers on appeal.

The Department declines to modify § 106.45(d)(3) to align with the Clery Act because many recipients covered by Title IX, including all elementary schools and secondary schools, have no obligations under, and may be unfamiliar with, the Clery Act. The Department notes that nothing in the final regulations prevents a recipient from notifying the parties of the result of the appeal and the rationale for the result in a manner that is also consistent with the Clery Act.

The Department disagrees with assertions that requiring a recipient to implement appeal procedures equally, rather than equitably, for the parties would allow one party to appeal a dismissal without allowing the other party to be notified or challenge the appeal. Section 106.45(d)(3) requires a recipient to notify the complainant and respondent, as applicable, that a dismissal may be appealed; paragraph (d)(3)(i) requires a recipient to notify the parties when the appeal is filed, including the respondent if the

respondent has not previously been notified; paragraph (d)(3)(v) requires a recipient to provide the parties a reasonable and equal opportunity to make a statement in support of, or challenging, the outcome; and paragraph (d)(3)(vi) requires a recipient to notify the parties of the result of the appeal and the rationale for the result. While the application of this provision is fact-specific, the Department observes that it would not be appropriate for a recipient to reverse a decision related to dismissal without providing both the complainant and respondent a reasonable and equal opportunity to support or challenge the decision.

The Department notes that "equal" and "equitable" have different implications and, consistent with the 2020 amendments, the final regulations use both terms with that distinction in mind. *See* 85 FR 30186; *see also* discussion of the explanation of equitable treatment in § 106.45(b)(1). In the context of § 106.45(d), the Department uses the words "equal" and "equally" intentionally because once a dismissal is appealed, a recipient must implement the same appeal procedures for all parties. However, the final regulations at § 106.45(b)(1) require a recipient's grievance procedures to treat complainants and respondents equitably, recognizing that there are certain aspects of the grievance procedure requirements under which equitable, but not equal, treatment is appropriate. *See* discussion of § 106.45(b)(1).

*Changes:* The Department has revised § 106.45(d)(3) to cross-reference § 106.46(i)(1) and to clarify the notice of appeal, which is described in further detail below.

Notice of the Opportunity To Appeal a Dismissal When the Respondent Has Not Been Notified of the Complaint

*Comments:* Some commenters expressed confusion about whether proposed § 106.45(d) would require notifying a respondent of a right to appeal a dismissal when the respondent has not been notified of the complaint. For example, some commenters asserted that proposed § 106.45(d)(2) and (3) are inconsistent for this reason, and some commenters suggested that proposed § 106.45(d)(3) be altered so that a respondent need only be notified of the opportunity to appeal if the respondent has been notified of the complaint.

Some commenters asked the Department to consider possible unintended consequences of notification requirements related to a student's right to appeal a dismissal, including whether a recipient might

unwittingly disclose sensitive information to an unsupportive parent, which could harm the student.

*Discussion:* The Department is persuaded by commenters' recommendation that the Department modify § 106.45(d)(3) so that whether a respondent is notified of the opportunity to appeal a dismissal depends on whether the respondent has been notified of the complaint and dismissal. The Department agrees that notifying a respondent of the opportunity to appeal the dismissal of a complaint for which they had no prior notice would likely cause confusion. The Department also notes that once a dismissal is appealed, equal treatment principles require a recipient to provide the respondent a reasonable opportunity to argue that the complaint was properly dismissed, which would be difficult if the respondent had not yet been notified of the allegations. For these reasons, the Department has revised § 106.45(d)(3) to clarify that a recipient must notify the respondent that the dismissal may be appealed only if the dismissal occurs after the respondent has been notified of the allegations. If any party appeals the dismissal, a recipient must notify all parties, including notice of the allegations consistent with § 106.45(c) if notice was not previously provided to the respondent. The Department declines commenters' suggestion to remove requirements related to the respondent in § 106.45(d)(3)(v)–(vi) because doing so would not provide the respondent an equal opportunity to make a statement and understand the result of the appeal.

The Department acknowledges commenters' concern about the disclosure of sensitive information related to Title IX compliance. The Department revised final § 106.44(j) to prohibit the disclosure of personally identifiable information obtained while carrying out a recipient's Title IX obligations, with some exceptions, which is explained more fully in the discussion of § 106.44(j).

Finally, for consistency and clarity, the Department has replaced ''its'' with ''the'' in final § 106.45(d)(3), ''when the appeal is filed'' with ''of any appeal'' in final § 106.45(d)(3)(i), and ''all parties'' with ''the parties'' in final § 106.45(d)(3)(vi).

*Changes:* Proposed § 106.45(d)(3)(i) through (v) has been revised and redesignated as § 106.45(d)(3)(i) through (vi) to separate into two paragraphs the requirements regarding notice and equal implementation of appeal procedures. Final § 106.45(d)(3) now clarifies that the recipient must notify the complainant that a dismissal may be

appealed and provide the complainant with an opportunity to appeal the dismissal of a complaint on the bases set out in § 106.46(i)(1); that if the dismissal occurs after the respondent has been notified of the allegations, then the recipient must also notify the respondent that the dismissal may be appealed on the bases set out in § 106.46(i)(1). The Department has also revised § 106.45(d)(3)(i) to make clear that if a dismissal is appealed, the recipient must notify the parties of any appeal, including notice of the allegations consistent with § 106.45(c) if notice was not previously provided to the respondent. Finally, for consistency and clarity, the Department has replaced ''its'' with ''the'' in final § 106.45(d)(3), ''when the appeal is filed'' with ''of any appeal'' in final § 106.45(d)(3)(i), and ''all parties'' with ''the parties'' in final § 106.45(d)(3)(vi).

*Section 106.45(d)(4) Prompt and Effective Steps To Address Sex Discrimination After Dismissal*

*Comments:* Some commenters expressed strong support for § 106.45(d)(4)(i) because it would ensure that a complaint is handled fairly, promptly, and effectively. Other commenters recommended that § 106.45(d)(4) be amended to provide the respondent with supportive measures on the same basis as the complainant.

Some commenters supported proposed § 106.45(d)(4)(iii) because it would help ensure students' safe access to education. In contrast, other commenters opposed § 106.45(d)(4)(iii) because it would be burdensome, or not necessary when a complaint is dismissed because the recipient determined that sex discrimination did not occur. One commenter asserted that, depending on a recipient's administrative structure, the Title IX Coordinator might not be best positioned to take the steps required by § 106.45(d)(4)(iii). One commenter asserted that § 106.45(d)(4)(iii) would be illogical as applied to dismissals made under paragraph (d)(1)(iv) on the grounds that a Title IX Coordinator would be required to ensure sex discrimination does not continue or recur after already dismissing based on a determination that the conduct would not constitute sex discrimination.

*Discussion:* The Department agrees that § 106.45(d)(4) promotes fairness by ensuring that if a recipient dismisses a complaint, it must, as appropriate, offer supportive measures to the complainant and, as applicable, the respondent, as well as take prompt and effective steps to ensure that sex discrimination does

not continue or recur within its education program or activity. The Department disagrees that § 106.45(d)(4) is illogical because dismissal under § 106.45(d)(1)(iv) occurs before the conclusion of grievance procedures and a recipient's determination whether sex discrimination occurred. Consequently, when a recipient dismisses a complaint under these provisions, it has not conclusively determined that no sex discrimination occurred; rather, at the time of dismissal prior to a final determination whether sex discrimination occurred, there is insufficient evidence to support a claim of sex discrimination. Because dismissal is not mandatory, the final regulations allow a recipient to either implement grievance procedures to reach a determination whether sex discrimination occurred or dismiss the complaint. Discretionary dismissal is accompanied by a recipient's legal duty to operate its education program or activity free from sex discrimination. *See, e.g.,* 87 FR 41405 (citing 20 U.S.C. 1681(a), 1682, 1221e–3, 3474; *N. Haven Bd. of Educ.,* 456 U.S. at 521; *Cannon,* 441 U.S. at 704). Accordingly, § 106.45(d)(4) allows a recipient to avoid an unnecessary investigation if it concludes that the conditions for permissive dismissal have been met, while requiring steps, as appropriate, to ensure that sex discrimination does not continue or recur within its education program or activity. For example, if an allegation of a sex-based hostile environment is based solely on a complainant's statement that on multiple occasions, they heard strange voices while using the dormitory showers, a recipient may decide to investigate under its grievance procedures to determine whether an individual is inappropriately surveilling private facilities, such as by interviewing witnesses or reviewing contemporaneous video footage outside the facilities. Alternatively, a recipient may dismiss the complaint, either because it is unable to identify the respondent after taking reasonable steps to do so or because the facts alleged (*i.e.,* the presence of another person indicated by the strange voice) would not constitute sex discrimination under Title IX. If the recipient dismisses the complaint on those bases, it must, as appropriate, offer the complainant supportive measures, and take other appropriate prompt and effective steps to ensure that possible sex discrimination does not continue or recur, such as convening a floor meeting to discuss the allegations in a manner that retains the complainant's

anonymity or encouraging potential witnesses or other complainants to come forward. *See* § 106.45(d)(4). Consistent with § 106.44(f)(1)(vii), the Department notes that a recipient has discretion to determine what prompt and effective steps would be appropriate to meet its obligation to operate its education program or activity free from sex discrimination, which may include actions suggested by commenters such as investigating whether other persons have been subjected to sex discrimination or following up with the parties individually to determine the effectiveness of offered supportive measures.

The Department agrees that either a complainant or respondent may require supportive measures, as appropriate, to restore or preserve access to the recipient's education program or activity even if a complaint is dismissed. *See* discussion of § 106.44(g). Further, § 106.45(d)(4)(ii) already requires a recipient to provide supportive measures to a respondent on an equitable basis with a complainant because it only excepts from this obligation instances in which it would be impracticable to offer supportive measures to a respondent (*i.e.,* when the recipient is unable to identify the respondent after taking reasonable steps to do so, when the respondent is not participating in the recipient's education program or activity and is not employed by the recipient, or when the respondent has not been notified of the allegations).

The Department appreciates the opportunity to clarify that a recipient, not the Title IX Coordinator, has an obligation to ensure that it complies with grievance procedures under § 106.45, and if applicable § 106.46, including taking other appropriate prompt and effective steps consistent with § 106.45(d)(4). As explained in more detail in the discussion of § 106.8(a), the final regulations expressly permit a recipient or a Title IX Coordinator to delegate specific duties to one or more designees, provided the Title IX Coordinator retains ultimate oversight over the recipient's efforts to comply with its responsibilities under Title IX and this part and ensure the recipient's consistent compliance under Title IX and this part.

*Changes:* The Department has revised § 106.45(d)(4)(ii) and (iii) to update and clarify internal cross-references.

### 12. Section 106.45(e) Consolidation of Complaints

Consolidation Generally

*Comments:* Some commenters expressed support for proposed § 106.45(e) for various reasons, including because consolidation often accords with the recipients' and parties' wishes, and because consolidation can yield increased efficiency and reduced burden for recipients, parties, and witnesses. Other commenters noted that complainants in cases involving multiple respondents tend to be particularly vulnerable and experience heightened fear, harassment, barriers to reporting, and case management challenges.

Some commenters stated that consolidation, when combined with the single-investigator model, may impact the integrity of the investigation by increasing the probability of witness collusion and the inclusion of unsupported or weak allegations.

Other commenters asked the Department to clarify the considerations for consolidating complaints. One commenter asked the Department to permit recipients to consolidate cases in which pattern conduct arises from similar, but not the same, facts or circumstances.

*Discussion:* The Department appreciates the range of opinions expressed by commenters regarding consolidation. The Department agrees that cases involving multiple parties can pose unique concerns, such as heightened vulnerabilities and case management challenges. The Department also agrees with commenters who asserted that consolidation enables a recipient to coordinate cases involving multiple parties and minimize unnecessary burdens that could interfere with a party's ability to access their education. The Department also acknowledges commenters' concerns about the potential impact of consolidation on the integrity of the grievance procedures, but the Department disagrees that the consolidation provision will cause these results.

These final regulations contain sufficient procedural protections to safeguard against the concerns that commenters have raised. With respect to commenters' concerns about bias and unsupported allegations, the final regulations require that a recipient treat complainants and respondents equitably (§ 106.45(b)(1)) and that any person designated as an investigator or decisionmaker "not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent" (§ 106.45(b)(2)). The final regulations also require, at § 106.8(d)(2)(iii), that investigators and decisionmakers receive training on "[h]ow to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias." Although § 106.8(d)(2)(iii) does not expressly require bias training that addresses complaints involving multiple respondents, the Department notes that nothing in these final regulations prevents a recipient from providing such training. As explained in the discussion of § 106.8(d), the Department has determined that § 106.8(d) strikes the appropriate balance between requiring training topics necessary to promote a recipient's compliance with these final regulations, while leaving maximum flexibility to recipients to choose the content and substance of training topics beyond the topics mandated by § 106.8(d).

The Department declines to categorically require or prohibit consolidation of complaints of sex discrimination against more than one respondent, or by more than one complainant against one or more respondents, or by one party against another party. The Department continues to support a discretionary approach, which enables a recipient to consider the facts and circumstances of the particular complaints when deciding whether to consolidate, including the toll of separate proceedings on the parties and any risks to the fairness of the investigation or outcome.

Regarding commenters' concerns about harassment of complainants or collusion by witnesses, these final regulations prohibit harassment that amounts to retaliation, including peer retaliation, as set forth in § 106.2 (definitions of "retaliation" and "peer retaliation") and § 106.71. The final regulations require a recipient to conduct an "adequate, reliable, and impartial investigation of complaints" (§ 106.45(f)) and to assess witnesses' credibility to the extent that credibility is in dispute and relevant (§ 106.45(g)). Discretion to consolidate cases does not relieve a recipient of its obligations to comply with the requirements of Title IX and these final regulations.

Some commenters asked the Department to clarify the considerations for consolidating complaints. Although the Department recognizes that recipients and parties may desire more detailed guidelines for when and how to consolidate, the Department declines to specify guidelines for consolidation, aside from those listed in § 106.45(e),

because of the necessarily fact-specific nature of the consolidation decision. The Department wishes to clarify, however, that § 106.45(e) must be interpreted to be consistent with a recipient's obligations under FERPA, as explained more fully in the "Consolidation and FERPA" subsection below. In all other respects, the final regulations give recipients the flexibility to determine whether to consolidate in a manner that best addresses the parties, the complaints, and the recipient's unique structure and resources.

A commenter inquired whether recipients may consolidate complaints in circumstances other than those outlined in § 106.45(e), though the commenter did not offer any examples for consideration. Another commenter inquired about consolidating complaints involving pattern conduct and similar facts or circumstances. The Department declines to broaden § 106.45(e) to expressly permit consolidation in other circumstances, such as those involving facts or circumstances that are similar but not the same. The Department views the guidelines set forth in § 106.45(e) as covering the complaints in which consolidation is most likely to be fair to all parties, to create efficiencies in the grievance procedures, and to comply with FERPA. Nothing in these final regulations expressly prohibits recipients from consolidating in circumstances other than those outlined in § 106.45(e), and § 106.45(j) expressly permits a recipient to adopt additional provisions as long as they apply equally to the parties. Recipients, however, must be mindful of their obligations under these final regulations (*e.g.,* the obligation to conduct adequate, reliable, and impartial investigations) and their obligations under other laws (*e.g.,* FERPA).

The Department wishes to make clear that a recipient must comply with the requirements set out in § 106.45, and if applicable § 106.46, regardless of whether the recipient chooses to consolidate complaints or to handle them separately, including but not limited to the requirements to ensure that any person designated as an investigator or decisionmaker not have a conflict of interest or bias (§ 106.45(b)(2)); to establish reasonably prompt timeframes (§ 106.45(b)(4)); to provide for the adequate, reliable, and impartial investigation of complaints (§§ 106.45(f) and 106.46(e)); and to provide a process for the decisionmaker to assess a party's or witness's credibility (§§ 106.45(g) and 106.46(f)). The Department also notes that, under § 106.44(k), a recipient has discretion to decide whether it is appropriate to offer

an informal resolution process; however, a recipient should be mindful that an informal resolution agreement is binding only on the parties to that process. In addition, as provided by § 106.44(k)(1)(ii), a recipient may decide not to offer informal resolution if the conduct alleged presents a future risk of harm to others. Recipients are in the best position to make decisions about processing consolidated complaints since they may have a better understanding of how to balance the interests of promptness, fairness to the parties, and accuracy of adjudications in each case.

*Changes:* For clarity, the Department has made a non-substantive revision to require that the consolidated complaint comply with the requirements of "§ 106.46 in addition to the requirements of this section" rather than comply with the requirements of "this section and § 106.46."

Consolidation and Complaints by One Party Against Another

*Comments:* Some commenters asked the Department to clarify that a respondent may make cross-complaints against the complainant. The commenters stated that, although false cross-complaints could be used strategically by the respondent, the veracity of these cross-complaints should be determined during the investigation. Other commenters asked the Department to modify the regulations to allow for cross-complaints for slander.

*Discussion:* The Department confirms that a recipient has the discretion to consolidate the initial complaint and a subsequent complaint or complaints, regardless of filer, under § 106.45(e) (as a type of complaint "by one party against another party").[53] As noted in the preamble to the July 2022 NPRM, if a complainant alleges that the subsequent complaint was made in retaliation for their original complaint, the recipient must determine whether the subsequent complaint constitutes prohibited retaliation under § 106.71. 87 FR 41543. In addition, a recipient has discretion under § 106.45(d)(1) to determine whether to dismiss the subsequent complaint, including based on a determination that the conduct alleged, even if proven, would not constitute sex discrimination under Title IX.

A party may file a complaint under the Title IX grievance procedures,

including a counter-complaint or a cross-complaint, to pursue any allegations of sex discrimination as defined in these regulations, including sex-based harassment and retaliation. The Department declines to revise § 106.45(e) to expressly address complaints of slander, but nothing in these final regulations precludes a recipient from addressing slander or other misconduct outside the scope of Title IX under the recipient's conduct codes.

*Changes:* None.

Consolidation and Constitutional Concerns

*Comments:* Some commenters raised concerns that consolidation could limit respondents' due process or free speech rights by, for example, punishing individuals for "guilt by association" rather than for their own conduct or by aggregating the speech or conduct of multiple people to meet an actionable threshold. Some commenters further stated that a recipient should not be allowed to consolidate complaints over the objection of a respondent unless the recipient has documented and implemented efforts to remove bias or group guilt.

*Discussion:* Section 106.45(e) provides that when multiple complainants or respondents are involved, the references within §§ 106.45 and 106.46 to a party, complainant, or respondent "include the plural, as applicable." This language is unchanged from the 2020 amendments and, as explained in the preamble to the 2020 amendments, *see* 85 FR 30096 n.454, ensures that when a recipient consolidates complaints involving multiple complainants or multiple respondents into a single set of grievance procedures, each individual party has each right granted to a party under § 106.45, and if applicable § 106.46. The Department confirms that when a recipient consolidates complaints, each party retains their status as an individual, as opposed to a group or organization. A recipient must comply with the requirements under § 106.45, and if applicable § 106.46, regardless of whether the recipient chooses to consolidate complaints under § 106.45(e) or handle them separately. Nothing in these final regulations permits a recipient to curtail a party's rights or weigh the evidence differently due to a consolidation of the complaints.

In response to concerns related to group-related bias, the final regulations require that any person designated as an investigator or decisionmaker must "not have a conflict of interest or bias for or

---

[53] Commenters referred to this as a cross-complaint, though the Department notes that this type of complaint is sometimes referred to as a counter-complaint.

against complainants or respondents generally or an individual complainant or respondent'' (§ 106.45(b)(2)), that investigators and decisionmakers receive training on ''[h]ow to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias'' (§ 106.8(d)(2)(iii)), and that a recipient maintain records documenting the grievance procedures and the materials used to provide training (§ 106.8(f)(1) and (3)). Such requirements to eliminate bias include any potential bias towards a group in a consolidated case. These regulations require a recipient to respond to complaints of sex discrimination in specific ways, including by investigating the allegations, assessing credibility, and determining whether sex discrimination occurred, *see* § 106.45(f)–(h). Like the 2020 amendments, *see* 85 FR 30274–75, these final regulations only contemplate adjudication of allegations as to an individual respondent. The regulations, at § 106.2, define a ''respondent'' as a *person*—not a group—alleged to have violated the recipient's prohibition on sex discrimination.

*Changes:* None.

Consolidation and FERPA

*Comments:* Some commenters raised privacy and FERPA concerns in connection with proposed § 106.45(e). Other commenters sought clarification regarding recipients disclosing evidence about all students involved in a consolidated complaint to all parties and their advisors, given FERPA's general prohibition on non-consensual disclosure of information from a student's education record.

*Discussion:* The Department appreciates the opportunity to clarify that § 106.45(e) must be interpreted consistent with a recipient's obligations under FERPA. A recipient must comply with its obligations under both Title IX and FERPA unless there is a direct conflict that precludes compliance with both laws.[54] These final Title IX regulations provide a recipient with the *option* to consolidate complaints, but the regulations do not *require* a recipient to consolidate. Accordingly, there is no direct conflict between any § 106.45(e) requirement and FERPA. If consolidation of certain complaints

means that a recipient is unable to comply with FERPA, the recipient is not permitted to exercise its discretion to consolidate those complaints.

Regarding commenters' questions related to sharing evidence and the responsibility determination with all parties to a consolidated complaint, the Department reiterates that a recipient cannot choose to consolidate complaints when such consolidation would give rise to FERPA violations. The Department notes that consolidation would not violate FERPA when a recipient obtains prior written consent from the parents or eligible students to the disclosure of their education records.

A recipient may redact information that is not relevant to the allegations of sex discrimination; however, a recipient must, when redacting information, ensure that the recipient is fully complying with its obligations under § 106.45, and if applicable § 106.46. For additional discussion of a recipient's ability to redact information as part of the grievance procedures, see the discussions of §§ 106.6(e), 106.45(b)(5) and (f)(4), and 106.46(e)(6). The Department notes that the regulations require a recipient to take reasonable steps to protect the privacy of the parties (§ 106.45(b)(5)) and to prevent and address the unauthorized disclosure of information (§§ 106.45(f)(4)(iii) and 106.46(e)(6)(iii)).

The Department acknowledges that FERPA permits a recipient to disclose personally identifiable information from a student's education record without prior written consent if the disclosure is to a school official who has been determined to have a legitimate educational interest (applying the criteria set forth in the educational agency's or institution's annual notification of FERPA rights) in such information. *See* 20 U.S.C. 1232g(b)(1)(A); 34 CFR 99.7(a)(3)(iii), 99.31(a)(1)(i)(A).

*Changes:* None.

13. Section 106.45(f) Complaint Investigations

*Comments:* Commenters generally supported the requirement in § 106.45(f) for adequate, reliable, and impartial investigation of complaints because this provision lays the foundation for equitable adjudications and requires equitable treatment of complainants and respondents. Some commenters shared personal stories of traumatic or difficult experiences with grievance procedures. One commenter suggested that a recipient send detailed information from investigations to local school boards for oversight.

One commenter expressed concern regarding a return to the 2011–2017 requirement for adequate, reliable, and impartial investigations based on the commenter's view that this standard yielded biased outcomes and the railroading of respondents. Another commenter asked the Department to add a new paragraph to proposed § 106.45(f) to require the recipient to conduct grievance procedures in an impartial manner and to ensure that the recipient makes an impartial determination regarding responsibility. Some commenters requested clarity on what assistance the Department will provide to a recipient for investigating Title IX complaints.

*Discussion:* The Department acknowledges the commenters' support for § 106.45(f), which requires recipients to provide for adequate, reliable, and impartial investigation of complaints. In response to concerns that this requirement may not be sufficient, the Department emphasizes that these final regulations contain numerous procedural requirements for the various stages of the investigation and resolution process to support recipients in reaching adequate, reliable, and fair outcomes.

The Department declines a commenter's suggestion to add a new paragraph regarding impartiality because § 106.45(f) already states that a recipient must provide for an impartial investigation. In addition, § 106.45(b)(1) requires grievance procedures to treat complainants and respondents equitably, and § 106.45(b)(2) requires that any person designated as a Title IX Coordinator, investigator, or decisionmaker not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent.

The Department disagrees with a commenter's suggestion to require recipients to share detailed information from investigations with school boards for oversight. Disclosures of sensitive and personally identifiable information with school boards may raise privacy concerns. Privacy protections within these final regulations and FERPA may limit a recipient's ability to disclose information from the investigation. The Department also notes that the Office for Civil Rights has the authority to investigate and enforce recipients' compliance with Title IX.

The Department acknowledges the request for technical assistance. The Department will offer technical assistance and guidance, as appropriate, to promote compliance with the final regulations.

---

[54] When there is a direct conflict between the requirements of Title IX and FERPA, the GEPA override, as incorporated into § 106.6(e), applies such that a recipient must comply with Title IX. When there is a direct conflict between constitutional due process rights and FERPA, a constitutional override applies. The interaction between FERPA and Title IX is explained in greater detail in the discussion of § 106.6(e) in this preamble.

*Changes:* None.

### 14. Section 106.45(f)(1) Investigative Burden on Recipients

*Comments:* Some commenters expressed concern that § 106.45(f)(1) is not sufficient to ensure that the burden to conduct an investigation that gathers sufficient evidence to determine whether sex discrimination occurred remains on the recipient and not on the parties or especially on the respondent. Another commenter asked the Department to preserve § 106.45(b)(5)(i) in the 2020 amendments to prevent a recipient from improperly placing the burden of proof on respondents. The commenter noted that some recipients inappropriately shift the burden to students, such as in cases involving an affirmative consent policy that requires a student prove that a sexual interaction was not a sexual assault. One commenter asked the Department to clarify the meaning of "sufficient evidence," in light of FERPA considerations.

*Discussion:* Section 106.45(f)(1) retains similar language to § 106.45(b)(5)(i) in the 2020 amendments that requires the recipient, and not the parties, to bear the burden of gathering sufficient evidence to reach a determination. The Department has substituted the legalistic phrases "burden of proof" and "burden of gathering evidence" in the 2020 amendments with the more accessible phrase "burden . . . to conduct an investigation," but the meaning is the same: the recipient bears the burden of conducting an investigation that gathers sufficient evidence to make a determination whether sex discrimination occurred.

Regarding a commenter's concern that affirmative consent policies effectively shift the burden of proof from recipients onto students, the Department clarifies that these final regulations, consistent with the 2020 amendments, do not permit a recipient to shift the burden to a respondent to prove consent, nor do they permit the recipient to shift the burden to a complainant to prove absence of consent. *See* 85 FR 30125. To the extent that a recipient improperly uses a consent requirement to instruct a respondent to prove the existence of consent, this practice would violate § 106.45(f)(1). *See* 85 FR 30125, 30125 n.554. Consistent with the 2020 amendments, these regulations do not adopt a particular definition of consent in connection with sexual assault. For additional discussion of the Department's approach to consent policies, see the discussion of the definition of "sex-based harassment" in

§ 106.2. Regardless of whether and how a recipient defines consent in the context of sexual assault, the burden of proof and the burden of gathering evidence sufficient to reach a determination regarding whether sex discrimination occurred is always on the recipient.

Regarding a commenter's request to clarify any FERPA implications on the requirement to gather sufficient evidence, the Department emphasizes that FERPA does not relieve a recipient of its obligation to gather sufficient evidence to determine whether sex discrimination occurred. For additional information regarding the interaction between FERPA and Title IX's evidentiary provisions, see the discussions of §§ 106.6(e), 106.45(e), (f)(4), and 106.46(e)(6).

*Changes:* None.

### 15. Section 106.45(f)(2) Opportunity To Present Witnesses and Other Evidence That Are Relevant and Not Otherwise Impermissible

*Comments:* Some commenters supported § 106.45(f)(2) for providing elementary schools and secondary schools with more flexible and less formal approaches to present evidence and witnesses.

Some commenters suggested additional modifications or clarifications. For example, one commenter urged the Department to clarify that expert witnesses are permissible. Other commenters recommended expanding § 106.45(f)(2)'s applicability to any relevant witnesses, or to all evidence and witnesses regardless of relevance. One commenter noted that the Department should not restrict the right to present evidence and witnesses based on a premature evaluation of relevance. Other commenters urged that all evidence should be presented and weighed according to corroborating evidence.

Some commenters opposed proposed § 106.45(f)(2) as limiting due process rights. One commenter urged the Department to preserve current § 106.45(b)(5)(ii), arguing that numerous courts have affirmed the importance of parties having an equal opportunity to present evidence. Some commenters requested clarification on whether a recipient could exclude character witnesses, and one commenter urged the Department to expressly prohibit them.

*Discussion:* The Department acknowledges commenters' support for § 106.45(f)(2), which requires a recipient to provide an equal opportunity for the parties to present fact witnesses and other inculpatory and exculpatory

evidence that are relevant and not otherwise impermissible. Although § 106.45(f)(2) differs from § 106.45(b)(5)(ii) of the 2020 amendments in some respects, it retains the important principle that the parties have an equal opportunity to present evidence. Section 106.45(f)(2) retains the requirement from the 2020 amendments that a recipient provide an equal opportunity for the parties to present fact witnesses and other inculpatory and exculpatory evidence, and § 106.45(f)(2) clarifies that the witnesses and other evidence must be relevant and not otherwise impermissible. This relevance threshold is consistent with the numerous provisions in the 2020 amendments and in these final regulations that limit the evidence in the grievance procedures to evidence that is "relevant," as defined in § 106.2. *See* 87 FR 41480. The Department has revised § 106.45(f)(2) to clarify that parties do not have the right to present impermissible evidence, as described by § 106.45(b)(7), regardless of relevance. In the July 2022 NPRM, the Department stated that § 106.45(b)(7)'s prohibition on the use of impermissible evidence applies to the grievance procedures under § 106.45, and if applicable § 106.46. 87 FR 41470. The Department has added "and not otherwise impermissible" to the regulatory text of § 106.45(f)(2) to avoid any confusion.

The Department disagrees that § 106.45(f)(2) limits the due process rights of respondents, as constitutional due process does not demand that respondents have the opportunity to present irrelevant evidence. *Cf. Crane* v. *Kentucky,* 476 U.S. 683, 689 (1986) ("[T]he Constitution leaves to the judges who must make these decisions 'wide latitude' to exclude evidence that is . . . 'only marginally relevant.'" (quoting *Delaware* v. *Van Arsdall,* 475 U.S. 673, 679 (1986))). In the preamble to the 2020 amendments, the Department described the provision as referring to relevant witnesses and evidence, and the Department now makes this explicit in the final regulations. *See* 85 FR 30283. Because the relevance limitation addresses the potential harm and unnecessary use of resources caused by the introduction of irrelevant testimony and evidence, it is important to retain the relevance limitation on the right to present fact witnesses and evidence in these final regulations. *See* 87 FR 41481. Regarding commenters' suggestion to require evidence to be presented and weighed based on corroborating evidence, the Department maintains that relevance provides a more accessible and workable standard. Evidence may

be determined to be accurate and valid even if there is no other evidence to corroborate it. *See* 85 FR 30085–86. Further, at the time that a party seeks to present a particular witness or piece of evidence, it may not yet be known whether corroborating evidence exists. These final regulations, like the 2020 amendments (*see* 85 FR 30381), do not require corroborative evidence to reach a determination; however, a decisionmaker may consider corroborative evidence as part of their evaluation of the allegations.

Section 106.45(f)(2) does not govern the use of expert witnesses. The Department has moved the provision regarding expert witnesses from § 106.45(b)(5)(ii) of the 2020 amendments to § 106.46(e)(4) of these final regulations, which applies to complaints of sex-based harassment involving a student complainant or a student respondent at a postsecondary institution. The Department is not requiring recipients to allow expert witnesses because the use of expert witnesses may introduce delays without adding a meaningful benefit to the recipient's investigation and resolution of the case, particularly in the types of cases governed by § 106.45. The Department discusses expert witnesses in the discussion of § 106.46(e)(4). Nevertheless, a recipient has the discretion to allow the parties to present expert witnesses as part of investigating and resolving complaints under § 106.45, provided that the recipient applies this decision equally to the parties. *See* § 106.45(j); 87 FR 41481.

The Department declines to categorically allow or disallow character evidence, which aligns with the approach taken in the preamble to the 2020 amendments. *See* 85 FR 30247–48. These final regulations require that parties have the opportunity to present relevant and not otherwise impermissible evidence (§ 106.45(f)(2)) and require recipients to objectively evaluate relevant and not otherwise impermissible evidence (§ 106.45(b)(6)). The requirement that character evidence be ''relevant,'' as defined by § 106.2, will exclude character evidence that will not aid the decisionmaker in determining whether sex discrimination occurred.

The Department declines to impose further requirements on the presentation of evidence in § 106.45(f)(2) because the circumstances vary greatly for different types of complaints. Section 106.45(g) requires recipients to provide a process for questioning parties and witnesses to assess a party's or witness's credibility, to the extent credibility is in dispute and relevant, and § 106.45(h)(1) requires

a decisionmaker to evaluate relevant and not otherwise impermissible evidence for its persuasiveness. Consistent with the approach taken by the 2020 amendments, the Department maintains that the final regulations reach the appropriate balance between prescribing detailed procedures and deferring to recipients to tailor their grievance procedures to their unique circumstances, within the bounds of the regulatory requirements. *See* 85 FR 30247. Here, recipients have discretion as long as they provide an equal opportunity for the parties to present fact witnesses and other inculpatory and exculpatory evidence that are relevant and not otherwise impermissible.

*Changes:* The Department has revised § 106.45(f)(2) to clarify that fact witnesses and other evidence must be ''relevant and not otherwise impermissible.''

16. Section 106.45(f)(3) Review and Determination of Relevant Evidence

*Comments:* Some commenters expressed general support for this provision. Other commenters expressed opposition to proposed § 106.45(f)(3), including on the ground that an investigator might not be able to determine which evidence is relevant until all evidence has been gathered.

*Discussion:* Section 106.45(f)(3) requires a recipient to review all evidence gathered throughout the investigation and to assess that evidence for relevance and impermissibility. The Department recognizes that a recipient may make relevance determinations throughout the course of an investigation; however, the Department emphasizes that a recipient remains responsible for assessing relevance in light of all evidence gathered. To avoid inadvertently excluding relevant evidence, a recipient may need to revisit an earlier relevance determination and reconsider a witness or a piece of evidence that the recipient had previously excluded.

*Changes:* None.

17. Section 106.45(f)(4) Access to the Relevant and Not Otherwise Impermissible Evidence

§ 106.45(f)(4)(i): Equal Opportunity To Access the Evidence or an Accurate Description of the Evidence

*Comments:* Commenters supported proposed § 106.45(f)(4) for a variety of reasons. For example, multiple commenters expressed support for sharing a summary of relevant evidence rather than the evidence itself, which they stated would safeguard sensitive evidence and would reduce the chilling

effect on complainants who fear that disclosure of their evidence could lead to retaliation, further harassment, or other harms. One commenter supported not giving parties at the elementary school and secondary school level access to all investigative materials. Other commenters expressed support for streamlined procedures and increased flexibility for recipients under proposed § 106.45(f)(4), noting that different approaches are appropriate for different educational settings.

Some commenters expressed concern that proposed § 106.45(f)(4) entitles parties to a description of the relevant evidence, but not access to the evidence itself. Commenters noted that a recipient might intentionally or inadvertently exclude important evidence from the description, which could harm respondents, in particular, who need to understand the evidence against them. Commenters also raised concerns that a description would make it challenging for parties to determine how to respond or what additional evidence to present. Some commenters encouraged the Department to require that at least the respondent be able to access the evidence. Some commenters expressed concern that the parties' lack of access to the evidence could potentially violate a party's due process rights, citing court cases related to access to evidence. Some commenters criticized the July 2022 NPRM for referencing a study by Foundation for Individual Rights and Expression (FIRE), which the commenters described as stating that respondents should be able to view the evidence against them, without enacting that requirement.[55] Some commenters expressed confusion as to whether proposed § 106.45(f)(4) affects due process rights, which the 2020 amendments recognized as important. Commenters also noted that recipients' and parties' experiences before the 2020 amendments demonstrate that a summary of the evidence is insufficient. Some commenters cited *Goss,* 419 U.S. at 581, 584, as holding that elementary school students are entitled to an explanation of the evidence against them, especially in proceedings that could have severe consequences.

Some commenters sought clarification of what information must be included in the description of the evidence, including whether information could be redacted.

---

[55] The referenced study is FIRE, *Spotlight on Due Process 2020–2021, https://www.thefire.org/research-learn/spotlight-due-process-2021-2022* (last visited Mar. 12, 2024).

Some commenters expressed concern that the summary of the evidence could be oral, rather than written. Other commenters noted that providing a verbal summary of the evidence does not noticeably lessen the burden on recipients. Some commenters noted that the parties should be able to make copies of the evidence or at least be able to access a written investigative report, while other commenters expressed that the investigative report requirement in the 2020 amendments is inappropriate in the context of elementary schools and secondary schools.

Some commenters supported the use of the "relevant" standard rather than the "directly related" standard because "relevant" is used throughout the proposed regulations and therefore avoids confusion, and because the "relevant" standard will help ensure that recipients are appropriately safeguarding sensitive or privileged information from disclosure and not relying on it. Other commenters expressed concern about the investigator deciding which evidence is relevant, which some commenters argued would inject subjectivity into the grievance procedures. Other commenters argued that because schools are not courts and do not apply rules of evidence, schools should provide a description of the evidence that is not limited to relevant evidence. Others expressed concern that allowing the initial relevance determination to be made by the same person who is the ultimate decisionmaker would impair the decisionmaker's ability to be neutral and fair.

Some commenters noted that providing only a description of the relevant evidence, rather than the evidence itself, could violate a collective bargaining agreement.

*Discussion:* The Department appreciates the range of opinions expressed by commenters regarding proposed § 106.45(f)(4), which would have required recipients to provide each party with a description of the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible. As discussed in the July 2022 NPRM, the Department held the tentative view that proposed § 106.45(f)(4) would streamline the investigation process while ensuring the parties receive a description of the relevant evidence so that they could have a meaningful opportunity to respond. 87 FR 41482. The Department also noted that a recipient that was not required by § 106.46(e)(6) to provide access to the underlying relevant evidence would nevertheless have the discretion to do so. *Id.*

After careful consideration of the comments in response to the July 2022 NPRM, the Department has decided to modify § 106.45(f)(4) to make these two options for providing access to the evidence more explicit and to give parties the right to receive access to the underlying evidence upon the request of any party. Under final § 106.45(f)(4), a recipient must provide each party with an equal opportunity to access the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible, consistent with § 106.2 and with § 106.45(b)(7), by providing an equal opportunity to access the relevant and not otherwise impermissible evidence ("evidence option") or an accurate description of such evidence ("description option"). If the recipient initially chooses the description option and then a party requests access to the evidence, the recipient is required to provide all parties with an equal opportunity to access the underlying relevant and not otherwise impermissible evidence. The Department has also modified final § 106.45(f)(4) to include paragraphs that follow the general framework of § 106.46(e)(6), which are discussed later in this preamble.

Final § 106.45(f)(4) addresses commenters' due process concerns. The Department maintains that due process does not require access to the underlying evidence in all instances in order for the party to have a meaningful opportunity to respond, and also acknowledges that the Supreme Court has not held that due process requires access to the underlying evidence in all cases governed by § 106.45. However, providing recipients with the option to provide either an accurate description or the underlying evidence provides sufficient flexibility for recipients to structure their grievance procedures to comply with due process. In addition, the parties have the right to access the underlying evidence by requesting such access.

The Supreme Court and other Federal courts have recognized that procedural due process requirements depend on the circumstances of each particular case, and that due process is a flexible standard. *See Morrissey,* 408 U.S. at 481; 87 FR 41456. In *Goss,* the Supreme Court held that when a short suspension from a public elementary school or secondary school is at issue, procedural due process requires, at a minimum, notice and a meaningful opportunity to be heard. 419 U.S. at 579. In that context, *Goss* explained that due process entitles the student to "oral or written notice of the charges against him and, if he denies them, an explanation

of the evidence the authorities have and an opportunity to present his side of the story." *Id.* at 581. The Court also observed that due process may require additional procedures for more severe sanctions. *Id.* at 584. Final § 106.45(f)(4) gives a recipient the flexibility to provide access to the evidence in a manner that would satisfy *Goss,* while also giving all parties the right to access the underlying evidence upon request by any party. Section 106.45(f)(4) provides recipients the flexibility and discretion, consistent with due process, to adapt the manner of providing access to the evidence to the circumstances at hand.

Although a recipient has flexibility in determining the manner of providing the description or the underlying evidence, subject to the equal opportunity requirement, § 106.45(b)(8) requires the recipient to articulate consistent principles in its grievance procedures for determining when the recipient will initially provide a description of the evidence or access to the underlying evidence. The Department notes that the description option may be more appropriate for complaints involving younger students and individuals facing less severe consequences, allowing the recipient to streamline the investigation process while ensuring that the parties have a meaningful opportunity to be heard. Complaints involving high school or postsecondary students or students facing possible expulsion are more likely to warrant a recipient providing the parties with access to the underlying evidence.

Regarding a commenter's request for parties to receive copies of the evidence, the Department notes that a recipient has the discretion to determine how to provide access to the evidence but must be mindful of the privacy protections required by § 106.45(f)(4)(iii). Section 106.45(f)(4) does not require a recipient to give the parties a physical or electronic copy of the description or the underlying evidence. Recipients may tailor the manner in which they present the relevant and not otherwise impermissible evidence in light of various factors, such as the ages of the parties, the severity of the alleged conduct, the volume of evidence, and other case-specific or recipient-specific factors. *See* 87 FR 41482. Under § 106.45(f)(4), a recipient may provide a description of the evidence orally or in writing. Regardless of how the recipient provides the parties with access to the evidence, a recipient must maintain records documenting the grievance procedures for each complaint under § 106.8(f)(1). The Department wishes to

clarify that § 106.8(f)(1) does not specify that a recipient must maintain written records, but an oral description must be documented in some manner to comply with § 106.8(f)(1) (*e.g.,* audio recording).

Section 106.45(f)(4) requires a recipient to provide access to a description of the evidence or access to the underlying evidence. Unlike § 106.46(e)(6), which requires access to a written investigative report or access to the underlying evidence, § 106.45(f)(4) reflects the Department's view that a written investigative report may not be necessary or appropriate for complaints that do not relate to sex-based harassment involving a student at a postsecondary institution. Recipients that choose the description option under § 106.45(f)(4) have discretion to determine the form of a description of the evidence, considering the nature of the complaint, the type and volume of evidence, including witness interviews, and the age of the parties. A recipient may, but is not required to, provide the description of the evidence in the form of a written investigative report.

The Department disagrees with a commenter's suggestion that a recipient could provide only the respondent with access to the evidence. To ensure that the grievance procedures are fair and provide all parties with a meaningful opportunity to respond to the evidence, recipients are not permitted to provide greater access to evidence to respondents or complainants. An equal opportunity to access the evidence requires a recipient to provide all parties with the same description of the evidence or to provide them with the same access to the underlying evidence. A recipient cannot choose to provide access to the underlying evidence to one party and to provide a description of the evidence to the other party or parties. The requirement to provide an equal opportunity to access the evidence also extends to the mode of delivery, such as whether a physical or electronic copy is provided. The requirement to provide an equal opportunity to access the evidence, however, does not mean that a recipient must treat the parties in an identical manner. A recipient may need to provide a particular mode of access through auxiliary aids and services to a party with a disability to ensure effective communication, which would not be applicable to the other party. Similarly, for persons with limited English proficiency, a recipient may need to provide language assistance services to only one party.

To address commenters' concerns that the description of the evidence could exclude important exculpatory or inculpatory evidence or not fully describe the evidence, the Department has revised the final regulations to require § 106.45(f)(4)(i)'s description of the evidence to be "accurate." By requiring that the description of the evidence be "accurate," the Department means it must fairly summarize the relevant and not otherwise impermissible evidence and be sufficient to provide the parties with a reasonable opportunity to respond, including a meaningful opportunity to prepare arguments, contest the relevance of evidence, and present additional evidence for consideration. The Department declines to specify what must be included in the description of evidence, other than that it must be accurate and sufficient to provide a reasonable opportunity to respond. The Department also reminds recipients that § 106.45(f) requires an investigation to be adequate, reliable, and impartial, and § 106.45(b)(2) further requires that any person designated as an investigator must have a conflict of interest or bias, including as reflected in a description of the evidence. In addition, under final § 106.45(f)(4)(i), a party has the right to receive access to the underlying evidence, and thus a party does not need to rely solely on a description of the evidence that the party believes to be incomplete.

In response to commenters' concerns that providing a description of the evidence could expose recipients to liability, the Department notes that a recipient is free to decide in all cases to provide the underlying evidence, rather than a description of the evidence, under final § 106.45(f)(4). Regarding commenters' criticism that the Department referenced a FIRE study in the July 2022 NPRM regarding access to the evidence without implementing such a requirement, the Department notes that the July 2022 NPRM cited this study only as recent research regarding the standard of proof used by postsecondary institutions. *See* 87 FR 41485. The Department acknowledges that in FIRE's study, which reviewed and scored "procedural safeguards" in disciplinary proceedings at postsecondary institutions, institutions did not earn any points in FIRE's scoring scheme for providing parties with access solely to a summary of the evidence.[56] However, § 106.45(f)(4)(i) requires a recipient to do more than merely provide a summary: if a recipient chooses to provide a description of the evidence, that description must be "accurate," meaning it must fairly summarize the relevant and not otherwise impermissible evidence and be sufficient to provide the parties with a reasonable opportunity to respond, including a meaningful opportunity to prepare arguments, contest the relevance of evidence, and present additional evidence for consideration. Further, under § 106.45(f)(4)(i), if a recipient chooses to provide a description, the parties have the right to request—and then must receive—access to the underlying evidence. Not only do the final regulations require several features that FIRE's study recommended, even FIRE's study recognizes that access to evidence is only one kind of procedural safeguard. The final regulations require several procedural safeguards that promote fair and reliable grievance procedures.

The Department appreciates commenters' support for use of the "relevant" standard in § 106.45(f)(4) and also acknowledges commenters' concerns. The 2020 amendments distinguish between evidence that is directly related to the allegations, to which the recipient must provide the parties with access (§ 106.45(b)(5)(vi)), and relevant evidence, which the recipient must evaluate (§ 106.45(b)(1)(ii)), include in the investigative report (§ 106.45(b)(5)(vii)), and permit questions about (§ 106.45(b)(6)). The preamble to the 2020 amendments clarifies that a recipient must disclose to the parties any evidence related to a complainant's sexual predisposition or prior sexual behavior that is directly related to the allegations, *see* 85 FR 30428, even though the 2020 amendments required such evidence to generally be excluded from an investigative report and questioning as irrelevant, *see* 34 CFR 106.45(b)(6)(i), (ii); 85 FR 30304. OCR received feedback during the June 2021 Title IX Public Hearing that the distinction between "directly related" and "relevant" is confusing and not well-delineated. In the July 2022 NPRM, the Department proposed merging these standards by defining "relevant" in § 106.2 to mean evidence "related to the allegations of sex discrimination" and explaining that evidence is "relevant" when it may aid a decisionmaker in determining whether the alleged sex discrimination occurred. 87 FR 41419. These final regulations require access to a similar scope of evidence with one exception: unlike the 2020 amendments, these final regulations prohibit a recipient from disclosing evidence of the complainant's sexual interests and

---

[56] FIRE, *Spotlight on Due Process 2020–2021,* at 7–8, 10 *https://www.thefire.org/research-learn/spotlight-due-process-2021-2022* (last visited Mar. 12, 2024).

prior sexual conduct, except as narrowly permitted by § 106.45(b)(7)(iii). The expansive definition of "relevant," combined with the additional requirement that a description of the evidence be "accurate," addresses commenters' concern that recipients would have too much discretion to determine relevance; that it would lead students and faculty to censor their speech; and that it would impair a decisionmaker's ability to be neutral and fair. For further explanation of the definition of "relevant," see the discussions of §§ 106.2 and 106.46(e)(6).

With respect to commenters' concerns that providing a description of the relevant evidence could violate a collective bargaining agreement, the Department notes that, under § 106.45(f)(4), recipients have the option to provide the underlying relevant and not otherwise impermissible evidence instead of a description and that parties have the right to receive access to this evidence upon the request of any party.

*Changes:* The Department has modified § 106.45(f)(4) to expressly identify two options for a recipient to provide each party with an equal opportunity to access the relevant and not otherwise impermissible evidence—namely, to provide access to the evidence, or to provide an accurate description of such evidence. In addition, the Department has added a sentence to final § 106.45(f)(4)(i) to state that if the recipient initially chooses the description option and then a party requests access to the evidence, the recipient is required to provide the parties with an equal opportunity to access the underlying relevant and not otherwise impermissible evidence. The Department has also restructured § 106.45(f)(4) to clarify that both the evidence option and the description option require a recipient to give the parties a reasonable opportunity to respond.

§ 106.45(f)(4)(ii): Reasonable Opportunity To Respond to Evidence

*Comments:* Commenters asked for clarification of what constitutes a reasonable opportunity to respond. Some commenters asked for examples, and some asked whether what is reasonable can vary based on specific factors such as the amount of evidence. Other commenters requested clarity on whether the opportunity to respond would take place at the end of the investigation or at another time.

*Discussion:* The parties must be given a reasonable opportunity to respond to the evidence or to the accurate description of the evidence under § 106.45(f)(4)(ii). When properly

implemented, both the evidence option and the description option give parties a reasonable opportunity to respond. In determining reasonableness, a recipient must ensure that the parties can meaningfully respond to the evidence. *See Goss,* 419 U.S. at 579 (noting that in the context of short suspensions from public elementary schools and secondary schools, procedural due process requires, at a minimum, notice and a meaningful opportunity to be heard). Because a reasonable timeframe accommodates the nature and volume of evidence, which can vary greatly based on the allegations in a complaint, the Department declines to provide examples. The opportunity to respond to the evidence would generally take place at the end of the investigation after the evidence is gathered, but recipients have the discretion to permit the parties to respond at another point in the investigation.

*Changes:* The Department has revised § 106.45(f)(4)(ii) to make it clear that a recipient must provide a reasonable opportunity to respond to the evidence or to the accurate description of the evidence described in § 106.45(f)(4)(i).

§ 106.45(f)(4)(iii): Unauthorized Disclosures

*Comments:* Some commenters expressed concerns about protecting student privacy while allowing the parties access to a description of the evidence. Multiple commenters expressed concern that sharing information about a student's complaint will open the student up to further harassment or retaliation, especially if the respondent is an employee of the recipient. Multiple commenters emphasized that sharing the party's evidence (even a description of the evidence) with other parties could have a significant chilling effect on students' willingness to report.

*Discussion:* The Department appreciates commenters' concerns regarding the impacts of disclosing relevant evidence to parties, regardless of whether the recipient uses the description option or evidence option. Access to the evidence in some format, whether through access to the underlying evidence or access to an accurate description of the evidence, is necessary for fair grievance procedures and required under these regulations. But in order to minimize these impacts, the Department is persuaded that the final regulations must require recipients to take reasonable steps to prevent and address the parties' unauthorized disclosure of information, so as to prevent a chilling effect on reporting, fear of retaliation, harassment, or other

harmful consequences. The unauthorized disclosure of sensitive information could threaten the fairness of the grievance procedures by deterring parties or witnesses from participating, affecting the reliability of witness testimony, leading to retaliatory harassment, and other consequences. The Department is not proposing specific steps that a recipient must take, as what is reasonable to prevent unauthorized disclosure may vary depending on the circumstances. As discussed in the July 2022 NPRM with respect to proposed § 106.46(e)(6)(iii), *see* 87 FR 41501, in some circumstances, it may be sufficient to inform the parties of the recipient's expectations for how the parties should safeguard the evidence and the consequences for unauthorized disclosures, whereas other circumstances may warrant software that restricts further distribution. Under the grievance procedures applicable to postsecondary institutions for complaints of sex-based harassment involving a student complainant or student respondent, § 106.46(e)(6)(iii) addresses unauthorized disclosures, and the Department is adding an analogous provision at § 106.45(f)(4)(iii) of the final regulations.

In both §§ 106.45(f)(4)(iii) and 106.46(e)(6)(iii), the Department is adding a sentence to make clear that disclosures of information and evidence for purposes of administrative proceedings or litigation related to the complaint of sex discrimination are authorized. The Department does not intend to limit—and does not view §§ 106.45(f)(4)(iii) or 106.46(e)(6)(iii) as limiting—the parties' ability to disclose information obtained solely through the grievance procedures as part of exercising their legal rights, such as the right to file an OCR complaint and the right to initiate (or defend against) a related legal proceeding. Additional discussion related to unauthorized disclosures in connection with § 106.46(e)(6)(iii) is addressed in that section of this preamble.

*Changes:* The Department has added § 106.45(f)(4)(iii), which requires a recipient to take reasonable steps to prevent and address a party's unauthorized disclosure of information and evidence obtained solely through the grievance procedures. The provision also states that for purposes of paragraph (f)(4)(iii), disclosures of such information and evidence for purposes of administrative proceedings or litigation related to the complaint of sex discrimination are authorized.

**§ 106.45(f)(4) and FERPA**

*Comments:* Some commenters questioned how a recipient could share relevant evidence with the parties in a manner consistent with FERPA. Some commenters noted that recipients have at times cited FERPA as a reason to withhold some evidence obtained in the investigation or the outcome of the investigation. Some commenters requested clarification regarding what information about grievance procedures will be shared with parents of elementary school students.

*Discussion:* The Department appreciates the opportunity to clarify the interaction between FERPA and the Title IX provisions requiring disclosure of evidence. FERPA and its implementing regulations define "education records" as, with certain exceptions, records that are directly related to a student and maintained by an educational agency or institution, or by a person acting for the agency or institution. 20 U.S.C. 1232g(a)(4); 34 CFR 99.3.

Under FERPA, a parent or eligible student has the right to inspect and review the student's education records with certain limitations. 20 U.S.C. 1232g(a)(1); 34 CFR part 99, subpart B. In the context of disciplinary proceedings, the Department has previously recognized that under FERPA, "a parent (or eligible student) has a right to inspect and review any witness statement that is directly related to the student, even if that statement contains information that is also directly related to another student, if the information cannot be segregated and redacted without destroying its meaning." 73 FR 74832–33.[57] These final Title IX regulations, at §§ 106.45(f)(4) and 106.46(e)(6), require a recipient to provide the parties with an equal opportunity to access the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible. The Department acknowledges that certain evidence that is relevant to the allegations may not necessarily be directly related to all parties for purposes of FERPA. While there may be instances in which unrelated material could be redacted without compromising due process, to the extent that these Title IX regulations require disclosure of information from education records to the parties (or their parents, guardians, authorized legal representatives, or advisors) that would not comply with FERPA, the

constitutional override and the GEPA override apply and require disclosure of evidence under §§ 106.45(f)(4) and 106.46(e)(6) to the parties and their advisors.[58] *See New York,* 477 F. Supp. 3d at 301–02 (upholding a similar approach to the interaction between FERPA and Title IX in the 2020 amendments against an arbitrary and capricious challenge). With respect to the rights of parents, § 106.6(g) states that nothing in Title IX may be read in derogation of any legal right of a parent, guardian, or other authorized legal representative to act on behalf of a complainant, respondent, or other person. Additional discussion related to the interaction between FERPA and the evidentiary disclosures required by the Title IX regulations is addressed in the discussion of § 106.46(e)(6).

*Changes:* None.

**18. Section 106.45(g) Evaluating Allegations and Assessing Credibility**

*Comments:* Commenters supported proposed § 106.45(g) for many reasons. For example, some commenters supported it because it would provide needed flexibility for elementary schools and secondary schools and make it easier to establish credibility.

Some commenters opposed proposed § 106.45(g) because it would permit methods of assessing credibility other than cross-examination, it would decrease uniformity of process across recipients, or it might interfere with parties' due process rights. Some commenters were concerned that it requires elementary schools and secondary schools to develop a formalized hearing process, which could burden recipients. Some commenters asserted proposed § 106.45(g) would be too prescriptive for cases of sex discrimination not involving allegations of sex-based harassment.

One commenter was concerned about removing the language from the 2020 amendments regarding the right of elementary school and secondary school students to submit questions to be asked of the other party and witnesses.

One commenter asked the Department to add language prohibiting a recipient from using a live hearing or cross-examination to assess credibility under proposed § 106.45(g) because they are not appropriate for elementary schools and secondary school students. Another commenter asked the Department to require a live hearing and cross-examination at the elementary school and secondary school levels because

respondents face severe and long-lasting consequences. One commenter suggested that instead of applying proposed § 106.45(g) to complaints of sex discrimination involving elementary school and secondary school students, the Department should develop a process based on State anti-bullying laws.

Some commenters were concerned that the types of questions asked when assessing credibility could make the process traumatizing for complainants.

Some commenters sought supplemental guidance on the phrase "provide a process" in proposed § 106.45(g), including how to implement it effectively for students of different ages, what process would be required under proposed § 106.45(g), and whether review of the evidence would be sufficient to satisfy proposed § 106.45(g).

*Discussion:* The Department acknowledges the commenters' support for proposed § 106.45(g). The Department understands that some commenters would prefer the Department maintain the requirement in § 106.45(b)(6)(ii) from the 2020 amendments that each party must be afforded the opportunity to submit written relevant questions to be asked of the other party and witnesses and were concerned about removing that right for elementary school and secondary school students, and other commenters were concerned that requiring recipients to create a process for assessing credibility was unnecessary, not beneficial, and could lead to lack of uniformity. After carefully considering the views expressed by the commenters, the Department maintains the position articulated in the July 2022 NPRM that, in order to fully effectuate Title IX's nondiscrimination mandate, it is necessary to require recipients to create a process for assessing the credibility of parties and witnesses under § 106.45(g), to the extent credibility is both in dispute and relevant to evaluating one or more allegations of sex discrimination. *See* 87 FR 41482. The requirements of § 106.45 apply to complaints alleging all forms of sex discrimination, that is they are not limited to sex-based harassment, and the requirements apply to all types of recipients. In light of these variations, the Department has determined that it is appropriate to provide recipients flexibility and discretion to structure the process for assessing credibility, taking into account due process, their administrative structure, their education community, and applicable Federal and State case law and State or local legal requirements. *See id.*

---

[57] The Department made this statement in its FERPA rulemaking in response to concerns about impairing due process in student discipline cases.

[58] The constitutional override is explained in greater detail in the discussion of § 106.6(e).

The Department disagrees that providing recipients with this discretion is arbitrary and capricious or does not adequately protect due process. As explained in the discussions of § 106.46(f)–(g) in the July 2022 NPRM and the preamble to the 2020 amendments, what constitutes a meaningful opportunity to be heard depends on the specific circumstances. *See* 87 FR 41504; 85 FR 30327. The requirement in § 106.45(g) is designed to provide recipients with a way to assess credibility without engaging in a quasi-legal process that may be inappropriate in some circumstances, including at the elementary school and secondary school levels due to the age or education level of the parties. The Department maintains that requiring recipients to design a process allowing the decisionmaker to question parties and witnesses to assess credibility, but giving them discretion over how the process works, will provide recipients with necessary flexibility while enabling them to fully effectuate Title IX's nondiscrimination mandate and provide all parties with a meaningful opportunity to respond to allegations. The Department notes, however, that a recipient may be required to provide additional process in individual cases to satisfy constitutional due process. Moreover, anyone who believes that a recipient has failed to comply with § 106.45(g), including by abusing its discretion, may file a complaint with OCR. For additional discussion of OCR's enforcement authority, see the discussion of OCR Enforcement (Section VII).

In *Mathews* v. *Eldridge,* the Supreme Court held that determining the adequacy of due process procedures involves a balancing test that considers the private interest of the affected individual, the risk of erroneous deprivation and benefit of additional procedures, and the government's interest, including the burden and cost of providing additional procedures. 424 U.S. at 335, 349. Following the analysis in *Mathews,* the Department considered a number of factors in determining whether to require a decisionmaker rather than the parties themselves to ask questions, including the interests of the respondent, the goal of ensuring that Title IX grievance procedures are prompt and equitable, providing the parties with a meaningful opportunity to be heard and respond, producing reliable outcomes, and the potential administrative burden additional procedural requirements would place on recipients. The Department recognizes that the interests of the

respondent will vary depending on the education level and the severity of the potential disciplinary sanctions. However, the Department maintains that requiring the decisionmaker to question a party or witness to adequately assess that party's or witness's credibility along with the other requirements in § 106.45, including an adequate, reliable, and impartial investigation of complaints, provides the respondent with a meaningful opportunity to be heard and respond and will produce reliable outcomes. The Department has no reason to conclude that requiring additional procedures in all cases, like permitting the parties to ask questions, would significantly improve the reliability of the outcome of the grievance procedures. In addition, permitting party questioning would increase the administrative burden on recipients, especially elementary schools and secondary schools. Given the age of the students they serve, elementary school and secondary school recipients would have to be more actively involved in facilitating the process of obtaining the written questions and answers from the parties and would need to work with the parties' parents as to facilitate this process, which would impact their ability to respond promptly to all complaints of sex discrimination. Weighing these factors, the Department reasonably concluded that questioning by a decisionmaker, and not the parties themselves, provides for a fair process that will produce reliable outcomes in investigations of Title IX violations. Nothing in Title IX or these regulations prevents recipients from implementing additional processes for certain types of proceedings that, in line with the *Mathews* balancing test, raise due process implications.

The Department notes that nothing in the final regulations precludes a recipient, including an elementary school or secondary school, from using a process that permits the parties to submit written questions like that required under § 106.45(b)(6)(ii) in the 2020 amendments to satisfy its obligations under § 106.45(g) or from providing other procedures in addition to questioning by the decisionmaker.

In addition, § 106.45(g) is consistent with permitting a recipient to choose a single-investigator model instead of holding a live hearing with questioning by an advisor because § 106.45(g) provides recipients with discretion to design a process for assessing credibility that does not include a live hearing with questioning by an advisor. For additional discussion of the requirements for assessing credibility in

complaints of sex-based harassment involving student complainants or student respondents at postsecondary institutions, see the discussion of § 106.46(f) and (g). For additional discussion of the single-investigator model, see the discussion of § 106.45(b)(2).

In response to commenters who found proposed § 106.45(g) vague or confusing, the Department has revised the language to clarify that the process required under § 106.45(g) is one that enables the decisionmaker to question parties and witnesses to adequately assess the party's or witness's credibility. This revision addresses the confusion the commenters identified by making clear that the process for assessing credibility must include questioning parties and witnesses and thus reviewing the evidence would not be sufficient to satisfy a recipient's obligations under § 106.45(g). The Department notes however that nothing in the final regulations requires a recipient to use the type of process described in § 106.46(f) or (g) to satisfy its obligations under § 106.45(g), although a recipient is permitted to do so if it so chooses.

In response to commenters who suggested that credibility may be at issue in most cases, the Department cannot opine on the percentage of sex discrimination complaints in which credibility is at issue. The Department notes that § 106.45(g) applies to all complaints of sex discrimination, not just sex-based harassment complaints, and that the potential number or percentage of impacted cases would not dictate the appropriateness of this provision. At least one Federal court has recognized that credibility disputes may be more common in sexual assault or harassment cases than other types of cases that recipients handle. *See Univ. of Cincinnati,* 872 F.3d at 406. The Department declines to define credibility, but notes that at least one Federal court has explained that cases in which credibility is in dispute and relevant to evaluating the allegations of sex discrimination would include those in which the recipient's determination relies on testimonial evidence, including cases in which a recipient "has to choose between competing narratives to resolve a case." *Baum,* 903 F.3d at 578, 584.

Similar to the position taken by the Department in the preamble to the 2020 amendments, the Department maintains that it is appropriate not to require live hearings or questioning by an advisor for all complaints of sex discrimination, including complaints of sex-based harassment involving elementary school

and secondary school students. *See* 85 FR 30363–64. The Department maintains the view that because elementary school and secondary school students are usually under the age of majority and generally do not have the same developmental ability or legal rights as adults to pursue their own interests, it is not appropriate to require live hearings or questioning by an advisor under § 106.45(g). *See* 85 FR 30364.

The Department notes, however, that nothing in the final regulations precludes an elementary school or secondary school or a postsecondary institution in cases other than sex-based harassment involving a student party from choosing to use a live hearing either with or without questioning by an advisor. As explained in the discussion of § 106.46(g), the Department maintains its general position from the 2020 amendments that if an elementary school or secondary school or a postsecondary institution in cases other than sex-based harassment involving a student party chooses to hold a live hearing as part of its process for questioning parties and witnesses under § 106.45(g), it is not subject to the live hearing procedures in § 106.46(g) that apply to postsecondary institutions for cases of sex-based harassment involving a student party because the Department intends to leave such recipients with flexibility to apply live hearing procedures that fit the needs of their educational environment and the nature of the allegations. *See* 85 FR 30365. This is consistent with the Department's position in the 2020 amendments acknowledging that, for example, an elementary school and secondary school recipient could determine that their education community is best served by holding live hearings for high school students, for students above a certain age, or not at all. *See* 85 FR 30365. In addition, recipients located in a jurisdiction where applicable law requires live hearings for certain disciplinary matters may be required to hold a live hearing under those laws.

In addition, the Department notes that the final regulations at § 106.45(j) require that any additional provisions adopted by a recipient as part of its grievance procedures for handling sex discrimination must apply equally to the parties. This includes any provision a recipient adopts regarding how it conducts a live hearing.

The Department disagrees that proposed § 106.45(g) is too prescriptive for cases of sex discrimination that do not involve allegations of sex-based harassment and declines to narrow its application. The Department notes that

a recipient is only required to use the process implemented under § 106.45(g) to the extent credibility is in dispute and relevant to evaluating the allegations of sex discrimination. The Department also emphasizes that § 106.45(g) gives recipients flexibility to design their own process, and nothing in the final regulations requires a recipient to use the type of process described in § 106.46(f) to satisfy its obligations under § 106.45(g), although they are not prohibited from doing so if they so choose.

The Department declines to replace proposed § 106.45(g) with a process based on State anti-bullying laws, but notes that nothing in the final regulations precludes a recipient from consulting its State anti-bullying laws when designing a process for the decisionmaker to question parties and witnesses to assess credibility to satisfy its obligations under § 106.45(g). The Department also notes that nothing in the final regulations precludes a recipient from using an existing process to satisfy its obligations under § 106.45(g) to assess credibility, if that process otherwise satisfies § 106.45(g).

The Department acknowledges that recipients may want to take into account the age and developmental level of their students when designing a process to comply with their obligations under § 106.45(g). The Department declines to provide specific information regarding how to design such a process, but will offer technical assistance and guidance, as appropriate, to promote compliance with these final regulations.

Regarding concerns that the process for assessing credibility can be traumatizing for complainants due to the nature of the questions, the Department notes that any questions a decisionmaker asks of parties and witnesses as part of the process for assessing credibility under § 106.45(g) must comply with the evidentiary standard applicable to all evidence in the grievance procedures, that they be relevant and not otherwise impermissible under §§ 106.2 and 106.45(b)(7).

*Changes:* The Department has revised § 106.45(g) to clarify that it covers questioning parties and witnesses to aid in evaluating allegations and assessing credibility and that the process required under § 106.45(g) is one that enables the decisionmaker to question parties and witnesses to adequately assess a party's or witness's credibility.

**19. Section 106.45(h)(1) Standard of Proof and Directed Question 4**

*Comments:* The text below documents examples of the comments received and

incorporates responses to Directed Questions 4.a.–c., about proposed § 106.45(h)(1) from the July 2022 NPRM.

Standards of Proof

*Comments:* Some commenters supported the requirement in proposed § 106.45(h)(1) that recipients use the preponderance of the evidence standard to determine whether sex discrimination occurred unless the recipient uses the clear and convincing evidence standard of proof in all other comparable proceedings. Commenters appreciated that proposed § 106.45(h)(1) honors the diversity of recipients' student codes of conduct and gives recipients the flexibility to choose one standard of proof for all comparable proceedings instead of mandating the uniform use of one standard, and that it allows recipients to treat student and employee misconduct as required by State law and contractual obligations.

Some commenters supported the use of the preponderance of the evidence standard for multiple reasons and urged the Department to mandate its use in all Title IX investigations. Some commenters asserted that the preponderance of the evidence standard best promotes compliance with Title IX because it is less burdensome than the clear and convincing evidence standard and balances the interests of the parties by giving equal weight to the evidence supporting each party. Some commenters supported the use of the preponderance of the evidence standard because it is more easily understood by decisionmakers and therefore more likely to be applied correctly. Some commenters opined that the preponderance of the evidence standard is most appropriate because it is the standard used by courts in civil rights cases and other civil proceedings, has long been the standard used by most recipients for Title IX claims, and has been recommended for use in student disciplinary matters for nearly 30 years. Other commenters noted that different evidentiary standards are appropriate in different contexts, and here, when there is not the same risk of harm as in a criminal proceeding and both parties have equal stakes in the outcome (often, the ability to continue attending the school of their choice), the comparatively lower standard of a preponderance of the evidence is appropriate. Other commenters argued that using the preponderance of the evidence standard would encourage complainants to come forward to report complaints because it would give them more trust in the process, which they said was particularly important for complainants from groups that have

historically been less able to trust adjudicatory proceedings, including students of color and LGBTQI+ students. By contrast, commenters stated, the 2020 amendments' permission to use a higher standard of proof, combined with other legalistic requirements, had suggested that recipients would not believe complainants, and thus deterred complainants from coming forward.

Some commenters objected to proposed § 106.45(h)(1) based on a misunderstanding of what the proposed provision would require and what the 2020 amendments required. Some thought § 106.45(h)(1) would mandate use of the preponderance of the evidence standard of proof and that the 2020 amendments required use of the clear and convincing evidence standard; other commenters misunderstood the 2020 amendments to require the beyond a reasonable doubt standard. Commenters who had these misunderstandings opposed proposed § 106.45(h)(1) because they believed that requiring the preponderance of the evidence standard would violate respondents' due process rights, improperly place the burden on the respondent to demonstrate that no discrimination occurred, and increase litigation against recipients by respondents alleging that their rights were violated.

Some commenters objected to proposed § 106.45(h)(1) because they asserted that the risks of harm to the respondent are so significant that the standard must be higher than a preponderance of the evidence. For more on what commenters said regarding the risks of harm for respondents, see the discussion of Due Process Generally above. Some of these commenters urged the Department to require recipients to adopt a clear and convincing evidence standard in all instances, while some of these commenters urged the Department to require use of the beyond a reasonable doubt standard in all instances. Some commenters raised concerns that proposed § 106.45(h)(1) would reduce confidence in the Title IX system and chill speech.

Some commenters urged the Department to require recipients to use a sliding scale approach whereby a higher standard of proof is required to impose more severe consequences. Similarly, some commenters suggested that the standard of proof should vary based on the severity of the alleged violations, with a preponderance of the evidence standard more appropriate for the equivalent of civil claims, and the beyond a reasonable doubt standard more appropriate for the equivalent of criminal violations.

*Discussion:* The Department appreciates the variety of views shared by commenters and has carefully considered the support for and objections to the proposed standard of proof. The Department understands commenters' different perspectives about which standard of proof is most appropriate for a recipient to use in making a determination about whether sex discrimination occurred. The Department heard many similar views shared by stakeholders during the June 2021 Title IX Public Hearing and in listening sessions the Department conducted prior to the development of the July 2022 NPRM.

The Department has decided to retain the standard of proof proposed in the July 2022 NPRM, without any changes. Under the final regulations, therefore, in determining whether sex discrimination occurred following an investigation and the evaluation of evidence under § 106.45, and if applicable § 106.46, a recipient must use the preponderance of the evidence standard of proof unless the recipient uses the clear and convincing evidence standard in all other comparable proceedings, including proceedings relating to other discrimination complaints, in which case the recipient may elect to use the clear and convincing evidence standard of proof for sex discrimination cases as well. The 2020 amendments also gave recipients a choice between the preponderance of the evidence standard and the clear and convincing evidence standard, but the 2020 amendments required recipients to apply the same standard of evidence for complaints against students as for complaints against employees, including faculty, which these final regulations do not require. Also, the 2020 amendments required recipients to apply the same standard of evidence to all formal complaints of sexual harassment, whereas the final regulations regarding grievance procedures apply to all cases of sex discrimination, not just sex-based harassment.

The Department is committed to ensuring that a recipient's grievance procedures provide a fair and reliable process for all involved, and it is the Department's view that the final regulations establish a strong framework for such a process. As stated in the preamble to the July 2022 NPRM, several Federal courts, including appellate courts, have held that the preponderance of the evidence standard is constitutionally sound and sufficient to satisfy the requirements of due process to a respondent when a school evaluates allegations of sexual harassment. 87 FR 41484 (citing *Doe* v. *Univ. of Ark.-Fayetteville,* 974 F.3d 858, 868 (8th Cir. 2020) ("[W]e do not think a higher standard of proof [than preponderance of the evidence] is compelled by the Constitution. . . . . A heightened burden of proof may lessen the risk of erroneous deprivations for an accused, but it also could frustrate legitimate governmental interests by increasing the chance that a true victim of sexual assault is unable to secure redress and a sexual predator is permitted to remain on campus."); *Lee* v. *Univ. of N.M.,* 449 F. Supp. 3d 1071, 1132 (D.N.M. 2020) ("[D]ue process permits state education institutions . . . to adjudicate sexual misconduct disciplinary proceedings according to a preponderance-of-the-evidence standard."); *Messeri* v. *DiStefano,* 480 F. Supp. 3d 1157, 1167–68 (D. Colo. 2020) ("Increasing the evidentiary standard would undoubtedly make it less likely that the University erroneously sanctioned Plaintiff or others similarly situated. . . . [but] requiring a higher evidentiary standard would . . . detract from the University's 'strong interest in the educational process, including maintaining a safe learning environment for all its students.' . . . Balancing these interests, the Court concludes that it is beyond dispute that due process currently permits state educational institutions to adjudicate disciplinary proceedings relating to sexual misconduct using a preponderance of the evidence standard." (quoting *Plummer* v. *Univ. of Hous.,* 860 F.3d 767, 773 (5th Cir. 2017))); *Haas,* 427 F. Supp. 3d at 350 ("The Court also rejects the contention that due process required that the university apply a standard more stringent than the preponderance of the evidence. Such a standard is the accepted standard in the vast majority of civil litigations and . . . courts have rejected the notion that the safeguards applicable to criminal proceedings should be applied in the school disciplinary context.")).

In addition, Federal courts have upheld the preponderance of the evidence standard based on the fact that other procedures in the Title IX regulations work together with the standard to provide sufficient process for the respondent. *See, e.g., Doe* v. *Cummins,* 662 F. App'x 437, 449 (6th Cir. 2016) ("Allocating the burden of proof [equally under the preponderance of the evidence standard]—in addition to having other procedural mechanisms in place that counterbalance the lower standard used (*e.g.,* an adequate appeals process)—is constitutionally sound and

does not give rise to a due-process violation.''). These final regulations establish, and in some instances maintain from the 2020 amendments, a number of procedural safeguards that together ensure that a recipient's grievance procedures provide a fair process for all involved, including requirements that a recipient's grievance procedures, among other things: treat complainants and respondents equitably, § 106.45(b)(1); provide the recipient the discretion to dismiss a complaint in four different circumstances, including when the allegations, even if proven, would not constitute sex discrimination under Title IX, § 106.45(d); require notice to the parties of the allegations, § 106.45(c); must be followed before the imposition of any disciplinary sanctions against a respondent, § 106.45(h)(4), which may be imposed only if it is determined that the respondent engaged in prohibited sex discrimination, § 106.45(h)(3); require an objective evaluation of all relevant evidence and exclude certain types of evidence as impermissible, § 106.45(b)(6) and (7); place the burden on the recipient to conduct an investigation that gathers sufficient evidence to reach a determination, § 106.45(f)(1); provide an equal opportunity for the parties to present fact witnesses and other inculpatory and exculpatory evidence that are relevant and not otherwise impermissible, § 106.45(f)(2); provide each party with an equal opportunity to access the evidence that is relevant and not otherwise impermissible and a reasonable opportunity to respond to that evidence, § 106.45(f)(4); and require the decisionmaker to adequately assess a party's or witness's credibility to the extent credibility is in dispute and relevant to the allegations, § 106.45(g). Moreover, a recipient may adopt additional provisions as part of its grievance procedures as long as they are applied equally to the parties. *See* § 106.45(j).

In addition, there are a number of safeguards that protect against bias in Title IX proceedings. For example, § 106.45(b)(2) requires that a decisionmaker not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent; § 106.45(b)(3) requires the grievance procedures to include a presumption that the respondent is not responsible for the alleged conduct until a determination whether sex discrimination occurred is made at the conclusion of the recipient's grievance procedures; and § 106.45(b)(5) requires a

recipient to take reasonable steps to protect the privacy of the parties and witnesses during the grievance procedures. There are also requirements in § 106.8(d) about training for decisionmakers, including training on how to serve impartially by avoiding prejudgment of the facts at issue, conflicts of interest, and bias. Section 106.45(i) of the final regulations provides that a recipient must offer the parties an appeal and that, at a minimum, is the same as it offers in all other comparable proceedings, if any, while § 106.45(d)(3) provides the right to appeal the dismissal of a complaint, and § 106.46(i) requires a postsecondary institution to offer an appeal based on—among other things—a procedural irregularity or bias or conflict of interest by the decisionmaker that would change the outcome. A postsecondary institution may offer an appeal equally to the parties on additional bases, as long as the additional bases are available to all parties. In addition, the Department reminds all stakeholders that under the regulations, the burden is on the recipient to gather evidence that meets the standard of proof, not on the complainant or the respondent. *See* 106.45(f)(1).

While the above safeguards are not all the same safeguards that are available in civil litigation in a court of law, they are legally sufficient to provide the due process and fundamental fairness required in the school discipline context. As discussed in the July 2022 NPRM, the requirements for grievance procedures under § 106.45 comport with the requirements set out by *Goss* v. *Lopez,* 419 U.S. 565 (1975). *See* 87 FR 41456 (explaining that at a minimum, *Goss* requires recipients to provide students facing temporary suspension notice of the allegations against them and an opportunity to present their account of what happened). Courts have also made clear that school disciplinary proceedings are not civil or criminal trials and, as such, the parties are not entitled to the same rights as parties in a civil trial or defendants in a criminal trial. *See, e.g., Horowitz,* 435 U.S. at 88 ("A school is an academic institution, not a courtroom or administrative hearing room.''); *Doe* v. *Univ. of Ky.,* 860 F.3d 365, 370 (6th Cir. 2017) (holding that ''school disciplinary proceedings, while requiring some level of due process, need not reach the same level of protection that would be present in a criminal prosecution'' (citing *Cummins,* 662 F. App'x at 446)); *Nash* v. *Auburn Univ.,* 812 F.2d 655, 664 (11th Cir. 1987) (''Due process requires that appellants have the right to

respond, but their rights in the academic disciplinary process are not co-extensive with the rights of litigants in a civil trial or with those of defendants in a criminal trial.''). Because a recipient's disciplinary goals are different than the goals of the civil and criminal legal systems, requiring use of the preponderance of the evidence standard would not cause a recipient to diminish a respondent's due process rights. In any event, however, the Department is not requiring use of the preponderance of the evidence standard across the board; use of that standard is only required of a recipient if it uses that standard for all comparable proceedings. For further explanation of how the final regulations comply with legal due process and fundamental fairness requirements, see the discussion of Due Process Generally above.

After fully considering all of the comments received, the Department maintains its view that the preponderance of the evidence standard of proof best promotes compliance with Title IX because it ensures that when a decisionmaker determines, based on the evidence, that it is more likely than not that sex discrimination occurred in its education program or activity, the recipient can take sufficient steps to end the sex discrimination, prevent its reoccurrence, and remedy the effects. The Department continues to believe, and many commenters emphasized, that the preponderance of the evidence standard best recognizes that all parties to a Title IX complaint have a strong interest in the outcome of the proceedings, including the right to equal access to education absent discrimination on the basis of sex. For instance, as commenters noted when discussing interests in the outcome of grievance proceedings, a respondent found responsible for sex-based harassment might face suspension or expulsion, the latter of which could restrict their ability to attend school elsewhere, and a complainant alleging sex-based harassment by a respondent who is found not responsible may be denied certain remedies and potentially feel compelled to transfer schools or drop out if the respondent remains at their school. In addition, all parties may face the possibility of reputational harm or stigma, peer harassment, or retaliation as a result of their involvement in a sex-based harassment matter if their involvement becomes known.

The Department also agrees that by applying the preponderance of the evidence standard of proof to Title IX allegations, a recipient can help

encourage students—such as those who may find a recipient's use of the clear and convincing evidence standard to be intimidating or may take it as a signal that the recipient thinks allegations of sex discrimination are suspect—to come forward and report instances of sex discrimination. This makes it more likely that sex discrimination will be addressed and deterred from happening again in the future, and helps recipients meet their Title IX obligations to provide an educational environment free from sex discrimination.

The Department does not agree with the assertion of some commenters that using a preponderance of the evidence standard of proof will encourage frivolous claims that are not supported by evidence. Commenters did not provide any evidence to support their prediction. Allowing use of the preponderance of the evidence standard is not new with this rulemaking, and the preamble to the 2020 amendments does not indicate that the Department was concerned about frivolous claims when it decided to allow recipients to use either the preponderance of the evidence standard or the clear and convincing evidence standard for complaints of sex-based harassment. The overall number of sex discrimination complaints filed may increase if a recipient that has been using the clear and convincing evidence standard begins to apply the preponderance of the evidence standard to comply with these regulations, but encouraging reporting and facilitating complaints is an important part of the recipient's duty to effectuate Title IX's nondiscrimination mandate. As a condition of receiving Federal funds, a recipient agrees to operate its education program or activity free from sex discrimination; doing so requires knowing about possible sex discrimination and investigating it to determine the need for remedy, if any. In addition, procedural protections are built into the grievance procedures to address such a circumstance. For example, the regulations governing permissive dismissal allow a recipient to dismiss a complaint on any of the bases listed in § 106.45(d)(1)(i)–(iv), including if the recipient determines that the conduct alleged in the complaint, even if proven, would not constitute sex discrimination under Title IX. And the grievance procedures are structured to be fair and accurate, so even if a permissive dismissal is not available, the procedural safeguards mean that recipients can be confident in the integrity of the outcome because complaints made in bad faith will not

result in a determination that sex discrimination occurred. In light of this framework, the Department has carefully considered the concerns raised by commenters and has decided that the above-stated benefits to a recipient and to the parties of allowing use of the preponderance of the evidence standard of proof justify the risk that a complaint will be made in bad faith.

The Department also disagrees with commenters' concerns that allowing use of the preponderance of the evidence standard in § 106.45(h)(1) will reduce confidence in the system and cause professors and students to censor their speech to avoid the risk of harm. Allowing recipients to use the preponderance of the evidence standard is not a change from the 2020 amendments. Students' confidence in the system should not be affected because, as the Department explained in the 2020 amendments and again in the July 2022 NPRM, both the preponderance of the evidence and clear and convincing evidence standards of proof can be used to produce reliable, accurate outcomes. *See* 85 FR 30381; 87 FR 41484. As explained above, the regulations contain procedural protections to help ensure a fair process. And the Department reaffirms that nothing in the final regulations should be interpreted to impinge upon rights protected under the First Amendment, and the protections of the First Amendment must be considered if issues of speech or expression are involved. *See* § 106.6(d). For additional explanation of the interaction between Title IX and the First Amendment, see the discussion of the definition of "sex-based harassment" in § 106.2 and the discussion of § 106.44(a).

Still, the Department recognizes that some commenters believe the clear and convincing evidence standard to be clearer and fairer. Under the Department's approach, if a recipient uses the clear and convincing evidence standard of proof in all other comparable proceedings, including proceedings relating to other discrimination complaints, it may do so for sex discrimination complaints, which may promote perceptions of fairness. 87 FR 41486 (citing *Doe* v. *Brandeis Univ.,* 177 F. Supp. 3d 561, 607 (D. Mass. 2016) (holding that a university deprived a student accused of sexual misconduct of "basic fairness," in part because the university used a lower standard of proof for sexual misconduct cases than for "virtually all other forms of alleged misconduct")). Under these final regulations, recipients will have the flexibility to select the standard of evidence that they believe is

most appropriate for sex discrimination complaints, as long as the standard selected for allegations of sex discrimination is not higher than the standard selected for allegations of other types of discrimination or comparable offenses. A recipient may not use the clear and convincing evidence standard of proof for sex discrimination allegations if it uses a lower standard of proof for other comparable proceedings because that would impermissibly discriminate based on sex in violation of Title IX's mandate and reinforce harmful myths about the credibility of sex discrimination complainants. 87 FR 41486.

A relatively small number of recipients use the clear and convincing evidence standard for all student conduct violations. Some commenters asked whether the Department knows what proportion of recipients are using the preponderance of the evidence standard, and according to commenters who described themselves as representing K–12 and postsecondary recipients, the preponderance of the evidence standard is used by "the overwhelming majority of postsecondary institutions . . . for the resolution of non-sex discrimination incidents," and preponderance of the evidence is "the most common standard of evidence used by public schools in student sexual harassment and other incidents." Again, either the preponderance of the evidence standard or the clear and convincing evidence standard may be used to produce reliable outcomes, and thus the Department felt comfortable allowing recipients the flexibility to select the standard of evidence they believed was most appropriate in the 2020 amendments, 85 FR 30373, 30382, and continues to do so now.

While a commenter correctly pointed out that the new regulatory language does not directly address what standard should be used if a recipient uses a higher standard of proof than the clear and convincing evidence standard for comparable proceedings, such as the beyond a reasonable doubt standard, the Department emphasizes that—as it made clear both in the preamble to the 2020 amendments, 85 FR 30373, and in the July 2022 NPRM, 87 FR 41486—the beyond a reasonable doubt standard is never appropriate to use in sex discrimination proceedings. *See also Santosky* v. *Kramer,* 455 U.S. 745, 768 (1982) (noting that the Supreme Court hesitates to apply the "unique standard" of beyond a reasonable doubt "too broadly or casually in noncriminal cases") (internal quotation marks and citations omitted). The Department

thinks few, if any, recipients are using the beyond a reasonable doubt standard for comparable proceedings.

The Department acknowledges that its position, allowing a recipient to choose which standard to use yet expressing its view that the preponderance of the evidence is the better standard for Title IX purposes, is a change from the 2020 amendments. For the reasons stated above, the preponderance of the evidence standard is a more appropriate choice for Title IX proceedings, and the Department wants recipients to consider using it. However, the Department stands by its decision to allow recipients a choice because it is important for them to have the flexibility to choose the standard that best meets their unique needs and reflects the values of their educational community, and both standards are fair and can lead to reliable outcomes. See 85 FR 30382. One of the primary concerns commenters shared about the clear and convincing evidence standard was that it is vague and a factfinder trying to apply it might be tempted to borrow from the beyond a reasonable doubt standard, particularly in light of the presumption of non-responsibility in proposed § 106.45(b)(3). The Department has made it clear, however, that the beyond a reasonable doubt standard must not be used for Title IX proceedings under any circumstances. Another concern raised was that the use of the clear and convincing evidence standard suggests that allegations of sex discrimination are inherently untrustworthy and reinforces stereotypes about the veracity of sexual harassment allegations. However, if all comparable proceedings are judged by the clear and convincing evidence standard as well, then sex-based harassment complaints will not be singled out as inherently untrustworthy.

The Department does not think the sliding scale approach some commenters recommended would be appropriate or practicable, whether based on the type of disciplinary sanction or based on the nature of the allegations. For example, determining the applicable standard of proof based on possible disciplinary consequences would be difficult for recipients to administer because often there are a range of possible disciplinary sanctions for a student conduct offense, depending on the severity of the conduct and other facts. A recipient will not necessarily be able to predict before the investigation and adjudication what the disciplinary consequence will be. And applying the same standard of proof to every offense that presents any possibility of a consequence such as

suspension or expulsion might be a distinction without a difference because that might include all offenses, depending on the recipient's code of conduct. Creating a tiered system requiring a higher standard for potentially criminal Title IX offenses may result in those offenses being subjected to a higher standard of proof than non-Title IX potentially criminal offenses covered by the recipient's code of conduct, which would raise the same concerns about comparable complaints not being treated comparably. And under either of these tiered approaches, the lack of predictability would be problematic not only for recipients but also for students and employees, whether complainants or respondents, who deserve to know ahead of time what standard will be used to evaluate claims of sex discrimination.

After thoughtfully reviewing all of the input from commenters and re-weighing the costs and benefits of its proposed approach, the Department has decided to keep the standard of proof provision as proposed in the July 2022 NPRM. In addition, for clarity and consistency with other provisions in the regulations, the Department revised the second sentence of § 106.45(h)(1) to clarify that under either standard of proof, the evidence the decisionmaker must evaluate must be both "relevant" and "not otherwise impermissible."

*Changes:* In the second sentence of § 106.45(h)(1), the Department has added the words "and not otherwise impermissible" after the word "relevant" to describe the evidence that the decisionmaker must evaluate for its persuasiveness under either standard of proof.

"Comparable Proceedings" and Other Requests for Clarification

*Comments:* Some commenters sought clarification of the term "comparable proceedings" as used in § 106.45(h)(1).

Some commenters requested that the Department amend the language of proposed § 106.45(h)(1) to state that a decisionmaker "must not" (instead of "should not") determine that sex discrimination occurred if the decisionmaker is not persuaded by the evidence, and conversely, "must" determine that sex discrimination did occur if the decisionmaker is persuaded by the evidence.

Some commenters urged the Department to reiterate that the recipient still has an obligation to take prompt and effective action to end sex discrimination, prevent its recurrence, and remedy its effects, regardless of whether the recipient determines that

the standard was met in a given instance.

*Discussion:* The Department appreciates the questions from commenters about what is meant by "comparable proceedings," but declines to define that term in the final regulations. There are many different types of disciplinary proceedings, which may vary from recipient to recipient, and the Department does not want to enshrine too rigid a definition of "comparable proceedings" in the regulatory text instead of leaving determinations of comparability to each recipient's reasonable discretion. As the Department explained in the preamble to the July 2022 NPRM, what proceedings are comparable may depend on a recipient's student code of conduct, but certainly would include, but not be limited to, proceedings related to complaints of other types of discrimination involving the same category of respondents (*e.g.,* students or employees). 87 FR 41487.

The Department acknowledges commenters' concerns that some recipients might interpret "comparable proceedings" too narrowly, which might lead to allegations of non-sexual physical violence being evaluated under the preponderance of the evidence standard of proof and allegations of sexual violence being evaluated under the higher standard of clear and convincing evidence. The Department agrees that such a discrepancy would be inequitable and would reinforce stereotypes about sexual assault survivors and the perceived veracity of sexual assault allegations. To avoid that outcome, the Department clarifies that it generally understands and intends comparable proceedings to include, for example, allegations of similar types of person-to-person (as distinct from recipient-to-person) offenses that are physical in nature and not based on sex. In addition, the Department clarifies that under the final regulations, a recipient may only use the clear and convincing evidence standard for sex discrimination proceedings if it uses that standard for all of its comparable proceedings. If a recipient uses the clear and convincing evidence standard for some comparable proceedings and the preponderance of the evidence standard for others, then it must use the preponderance of the evidence standard to evaluate sex discrimination complaints.

The Department also acknowledges the concerns raised by commenters who pointed out that under the regulations as proposed, a recipient that uses the clear and convincing evidence standard of proof for student conduct complaints,

including complaints of race discrimination, could still choose to use the preponderance of the evidence standard for sex discrimination complaints, even though sex and race discrimination complaints are comparable. A recipient must consider the standard it uses for other civil rights allegations in deciding what standard is appropriate to use for Title IX allegations, and nothing in these regulations obviates a recipient's separate obligation to comply with other Federal civil rights laws. This approach to the Title IX standard of proof does not require the violation of any statutory or regulatory requirements under Title VI or Title VII that may apply to recipients. See 85 FR 30382. Some commenters accused the Department of acting arbitrarily and capriciously by not considering the possible effect its standard of proof approach might have on the enforcement of other laws, such as Title VI, if a recipient chooses to raise all of its standards of proof in order to come into compliance with § 106.45(h)(1). The Department did consider the possibility of such an outcome, and as the Department explained in the preamble to the July 2022 NPRM, recipients that have been using the clear and convincing evidence standard for claims of sexual harassment but the preponderance of the evidence standard for comparable proceedings, including for claims regarding discrimination on other bases, will have to either lower the standard for sex discrimination claims to preponderance of the evidence, or raise the standard for all comparable proceedings to clear and convincing evidence. *See* 87 FR 41486. The Department has decided that recipients should retain flexibility to select the standard of evidence that they believe is most appropriate, as long as the standard selected for allegations of sex discrimination is not higher and therefore more restrictive than the standard selected for allegations of other types of discrimination or comparable offenses. As stated earlier, the Department's understanding is that a minority of recipients at both the K–12 and postsecondary levels are using the clear and convincing evidence standard for student conduct proceedings, whether for sex discrimination or otherwise. Nonetheless, the Department maintains, as it concluded in 2020, 85 FR 30376, that either the preponderance of the evidence standard or the clear and convincing evidence standard may be applied to reach reliable outcomes when recipients apply sufficient

guardrails to fulfill their nondiscrimination obligations.

Turning to the second sentence of § 106.45(h)(1), the Department agrees with commenters that the words "should not" in the second sentence of § 106.45(h)(1) should be changed to "must not." The Department did not intend to suggest that a recipient has discretion, even if the decisionmaker is not persuaded by the available evidence that sex discrimination occurred, to determine that sex discrimination occurred. The Department does not think it is necessary to add language to the regulatory text stating that the converse of that sentence is also true, but agrees that if a recipient is persuaded by the evidence under the applicable standard that sex discrimination occurred, the decisionmaker must determine that sex discrimination occurred.

Finally, the Department appreciates the opportunity to remind recipients that, even when the evidence does not meet the clear and convincing evidence standard, the recipient still has to consider whether it has additional obligations under these regulations, including any obligation it may have to take prompt and effective steps under § 106.44(f)(1)(vii) to ensure that sex discrimination does not continue or recur within its education program or activity, which could, for example, include taking non-disciplinary steps such as providing additional training or educational programming. *See* § 106.44(f)(1)(vii).

*Changes:* In the second sentence of final § 106.45(h)(1), the word "should" has been replaced with the word "must."

Different Standards for Students and Employees

*Comments:* Some commenters appreciated that proposed § 106.45(h)(1) would, in contrast to § 106.45(b)(1)(vii) under the 2020 amendments, afford recipients flexibility to use a different standard when investigating student conduct than they do when addressing employee conduct, as appropriate. Some commenters appreciated the Department providing recipients flexibility to select the standard that best meets the recipient's unique needs and reflects the recipient's values. Others stated that giving recipients a choice is appropriate because there may be collective bargaining agreements, State labor laws, faculty bylaws, systemwide employee policies, or other constraints that a recipient cannot unilaterally change that may dictate the standard of proof that can be used in matters involving employees.

Conversely, some commenters objected to allowing different standards of proof for students and faculty or staff. For example, some commenters asserted this is discriminatory or unfair and contradicts the Department's stated justification of consistency with comparable proceedings. Some commenters asserted that use of a different standard for employee-involved cases sends a message to students that their experience is not being taken as seriously, and that employees are better supported than students. Some commenters noted that students should not be deprived of procedural protections simply because they are not covered by a collective bargaining agreement, and noted that faculty and staff typically have more resources for legal representation and are better able to navigate the grievance process.

*Discussion:* The Department appreciates all of the comments regarding the Department's proposal to remove the 2020 requirement that a recipient apply the same standard of proof to complaints against students as it does to complaints against employees. After discussing this issue in the July 2022 NPRM and specifically asking for comments on it, 87 FR 41486–87, and carefully considering the comments received, the Department continues to believe that this change from the 2020 amendments is necessary because of the difference in the relationships and obligations recipients have to their students as compared to their employees. Stakeholders told the Department that requiring recipients to use the same standard of proof for complaints against students and employees hampered the recipient's flexibility to choose a standard that is responsive to the many differences in their obligations to their students and their employees. For example, recipients may have collective bargaining agreements or be subject to State laws mandating a higher standard of proof for evaluating allegations of employee misconduct that they would prefer not to use, or under State law cannot use, for student conduct allegations. The Department also recognizes that it might be unfair to hold students to the same standard of evidence as employees under a collective bargaining agreement because students are not parties to that agreement and were not able to participate in its negotiation. In addition, as explained in the July 2022 NPRM, 87 FR 41487, the Department does not think it is necessary, for student predictability purposes, to require the same standard of proof to be

used for student and employee complaints because final § 106.45(a)(1) and (h)(1) require recipients to put the grievance procedures in writing and state which standard of proof they will use to determine whether the respondent violated the recipient's prohibition on sex discrimination.

To be clear, the Department does not maintain that sex-based harassment by a recipient employee is less serious or less consequential than sex-based harassment by a student. The Department recognizes that power imbalances between students and employees can create the conditions for sex-based harassment; in fact, the Department's definition of sex-based harassment acknowledges this by including both quid pro quo and hostile environment harassment, and by requiring, in determining whether a hostile environment has been created, a recipient to consider—among other things—the parties' ages and their respective roles within the recipient's education program or activity. *See* discussion of § 106.2 (Definition of ''Sex-Based Harassment''). Some commenters relied on an OCR case resolution letter from the 1990s, Letter from Gary D. Jackson, Reg'l Civil Rights Dir., Office for Civil Rights, U.S. Dep't of Educ., to Jane Jervis, President, The Evergreen State Coll. (Apr. 4, 1995) (Evergreen Letter), *https://www2.ed.gov/ policy/gen/leg/foia/misc-docs/ed_ehd_ 1995.pdf*,[59] to argue that the power differential between a student and an employee dictates that the preponderance of the evidence standard must be used for allegations brought by students against employees, and that the Department's proposal to allow a different standard to be used for allegations against students and those against employees would reinforce that power imbalance. However, in the Evergreen matter OCR required the recipient to use the preponderance of the evidence standard because OCR policy at the time was that all sexual harassment allegations had to be evaluated using a preponderance of the evidence standard, not because the allegations were brought by a student against a professor. Evergreen Letter at 1. Even under the preponderance of the evidence standard, OCR found the evidence insufficient to support a finding that the Evergreen professor engaged in unwelcome sexual conduct relative to the student or that the professor created a hostile environment for the student. *Id.* at 5–6. OCR did find

that the recipient's grievance procedures violated Title IX, not only because the recipient applied a higher standard of proof to allegations against employees, but also because under the recipient's grievance procedures the respondent employee had a right to challenge the composition of the panel of decisionmakers considering the allegations and the complainant did not, and the employee respondent was given a right to present their case to the panel of decisionmakers while the student complainant was not. *Id.* at 9–10. Under these final regulations such inequitable grievance procedures are not permitted.

The Department has said before, and maintains, that consistency with respect to the enforcement of Title IX is desirable. However, in the employment context there are numerous other legal obligations that recipients have to comply with, such as other civil rights laws, State laws regarding employee rights, and contractual obligations such as collective bargaining agreements. The Department has decided that in this case the value of flexibility to recipients to manage their relationships with their employees and students, respectively, counsels against requiring recipients to use the same standard of proof to evaluate allegations against employees that they use to evaluate allegations against students.

*Changes:* None.

20. Section 106.45(h)(2) Notification of Determination Whether Sex Discrimination Occurred

*Comments:* Some commenters supported the removal of the written notice requirement in § 106.45(b)(7) of the 2020 amendments because it would eliminate excess paperwork and redundancy and provide recipients with more flexibility. Some commenters supported the inclusion of the requirement in § 106.45(h)(2) that recipients notify both the complainant and respondent about the outcome of a complaint.

In contrast, other commenters opposed the lack of a written requirement in proposed § 106.45(h)(2) for several reasons, including because they believe it would make appeals difficult, reduce confidence in the process and reduce the parties' understanding of why an outcome was reached. Some commenters also noted that written notifications are especially important for elementary and secondary students and for students with disabilities and their parents. Some commenters noted that proposed § 106.45(h)(2) may be inconsistent with the written notice requirements under

the Clery Act for postsecondary institutions.

Some commenters asked the Department to clarify some aspects of proposed § 106.45(h)(2), including that a notice of outcome would need to be provided in adaptive formats as necessary to accommodate a student's disability and whether the notice required in proposed § 106.45(h)(2) must include notice of the right to appeal.

*Discussion:* As discussed in the July 2022 NPRM, the Department heard from elementary school and secondary school recipients during the June 2021 Title IX Public Hearing that they did not have the infrastructure to perform all of the requirements in the 2020 amendments, 87 FR 41488, and the Department received comments raising similar concerns in response to the July 2022 NPRM. After carefully considering comments received in response to proposed § 106.45(h)(2) and in light of the Department's decision to modify § 106.45(i) to require a recipient to offer an appeal process from a determination arising out of a sex discrimination complaint that is the same as it offers in other comparable proceedings, the Department has determined that it is necessary to modify § 106.45(h)(2) to require recipients to provide a written notification of the determination whether sex discrimination occurred. The Department is persuaded that written notification is necessary to ensure transparency and consistency in a recipient's grievance procedures and to provide the parties with the information necessary to utilize their right to appeal, if applicable, under the recipient's procedures. Additionally, for consistency with other provisions in these final regulations and to avoid recipient confusion as to whether a notice of outcome is different from a determination whether sex discrimination occurred, the Department has revised § 106.45(h)(2) to replace the requirement to notify the parties of the outcome of the complaint with the requirement to notify the parties in writing of the determination whether sex discrimination occurred under Title IX or this part. The Department is also persuaded that § 106.45(h)(2) should be modified to require recipients to provide not only a determination whether sex discrimination occurred but also a rationale for such determination, as such information is also necessary to facilitate the appeals process.

The Department has determined that when considered in the context of the overall flexibility provided to recipients in these final regulations, the benefit

[59] The Evergreen Letter is cited for historical purposes only, and recipients should not rely on it for guidance regarding Title IX.

provided to parties in requiring written notification, including notification of the rationale for the determination, outweighs the burden imposed on recipients. The Department also agrees with commenters that written notification will be particularly helpful in ensuring that parents, guardians, or other legally authorized representatives of students in elementary school or secondary school and students with disabilities receive the information they need to understand the outcome of relevant grievance procedures. The Department notes that under the recordkeeping requirements in § 106.8(f)(1), recipients are already required to maintain documentation of the grievance procedures undertaken in response to a complaint of sex discrimination. For this reason, it will not require significantly more work or documentation on the part of an elementary school or secondary school recipient to provide written notification of a determination whether sex discrimination occurred and the rationale for such determination. The Department also notes that § 106.45(h)(2) does not require elementary school and secondary school recipients to provide the same degree of detail as that required of postsecondary institutions in § 106.46(h). Section 106.45(h)(2) provides a recipient with flexibility to choose what information to share in a written notification while setting a baseline requirement that recipients inform any parties of the determination whether sex discrimination occurred under Title IX or this part, the rationale for such determination, and the procedures and permissible bases for the complainant and respondent to appeal, if applicable. Consistent with § 106.8(e), recipients must ensure that such notice complies with the requirements of the IDEA and/ or Section 504, if applicable, when a grievance procedure includes students with disabilities.

These changes acknowledge the importance of parties' access to the information necessary to understand how a final determination was reached and are consistent with the numerous requirements in the final regulations that ensure such transparency, including: notice of the allegations to the parties (§ 106.45(c)); equitable treatment of complainants and respondents (§ 106.45(b)(1)); objective evaluation of all relevant, and not otherwise impermissible, evidence (§ 106.45(b)(6) and (7)); allowing the parties an equal opportunity to present fact witnesses and other inculpatory and exculpatory evidence that are relevant

and not otherwise impermissible (§ 106.45(f)(2)); providing each party with an equal opportunity to access the evidence that is relevant and not otherwise impermissible (§ 106.45(f)(4)); requiring adherence to these grievance procedures before imposition of any disciplinary sanctions (§ 106.45(h)(4)); and the right to appeal complaint dismissals (§ 106.45(d)(3)).

The Department appreciates commenters' concerns that the Clery Act requires postsecondary institutions to provide written determinations of responsibility and notes that § 106.46(h) requires a written determination for complaints of sex-based harassment involving student complainants or student respondents at postsecondary institutions, which are subject to the Clery Act. Elementary school and secondary school recipients, however, are not subject to the Clery Act. As discussed above, however, the Department has modified § 106.45(h)(2) to require a written determination.

The Department also appreciates the opportunity to clarify that § 106.45(h)(2) also requires a recipient, including at the elementary school and secondary school level, to provide parties with notice of the procedures and permissible bases for the complainant and respondent to appeal, as applicable, under § 106.45(i).

*Changes:* The Department has modified § 106.45(h)(2) to require notification in writing of the determination whether sex discrimination occurred and has added the requirement that notification include the rationale for such a determination. For the reasons stated previously and consistent with changes made to other provisions, the reference to "Title IX" has also been modified to "Title IX or this part."

### 21. Section 106.45(h)(3) Remedies to a Complainant and Other Appropriate Prompt and Effective Steps

*Comments:* Some commenters expressed general support for proposed § 106.45(h)(3) to ensure recipients consistently take steps to prevent sex discrimination.

Some commenters urged the Department to clarify that the responsibilities assigned to the Title IX Coordinator are responsibilities of the recipient itself and might sometimes be carried out by other personnel.

Some commenters noted the scope of the obligation contemplated by proposed § 106.45(h)(3) is too broad to the extent that it would impose strict liability on recipients or require remedies for persons other than the complainant. One commenter urged the

Department to remove "limited or" from proposed § 106.45(h)(3) to better align with the standard set by the Supreme Court in *Davis,* 526 U.S. at 652, which uses "denying . . . equal access to an educational program or activity."

Some commenters urged the Department to clarify the remedies a recipient may provide, including that remedies may be appropriate when a recipient determines that sex discrimination did not occur (such as requiring a respondent to take classes on consent, issuing no-contact orders, or making changes to schedules); what remedies would apply to students who graduate before resolution of a complaint; and whether recipients must provide notice to the parties of remedies that will be provided to other students.

*Discussion:* With respect to the Title IX Coordinator's role in providing and implementing remedies, the Department notes that the recipient itself is responsible for compliance with obligations under Title IX, including any responsibilities specifically assigned to the recipient's Title IX Coordinator under these final regulations. Although the proposed and final regulations require one Title IX Coordinator to retain ultimate oversight, the regulations expressly permit delegation of duties at § 106.8(a)(2), which enables a recipient to assign duties to personnel who are best positioned to perform them, to avoid actual or perceived conflicts of interest, and to align with the recipient's administrative structure. In order to eliminate any ambiguity as to the Title IX Coordinator's role with respect to remedies and whether the Title IX Coordinator can delegate the provision and implementation of remedies to designees, the Department revised the description of the Title IX Coordinator's role in § 106.45(h)(3) from "provide and implement remedies" to "coordinate the provision and implementation of remedies." For example, remedies that involve transcript changes would need to be coordinated through the registrar's office and remedies that involve counseling would need to be coordinated through counseling resources.

With respect to the concern that proposed § 106.45(h)(3) would broaden the Title IX Coordinator's authority to implement remedies based solely on that person's discretion, the Department disagrees that this provision changes the Title IX Coordinator's authority or discretion regarding remedies. The Department notes that remedies may only be provided after a recipient determines that sex discrimination has occurred, and the recipient is ultimately

responsible for ensuring that any remedies are designed to restore or preserve access to its education program or activity. *See* § 106.2 (definition of ''remedies''). Similarly, a recipient may not impose discipline on a respondent for sex discrimination prohibited by Title IX unless there is a determination at the conclusion of the recipient's grievance procedures that the respondent engaged in prohibited sex discrimination.

In response to the commenter who urged removal of ''limited or'' from proposed § 106.45(h)(3), the Department notes that 20 U.S.C. 1681(a) prohibits any person ''on the basis of sex'' from ''be[ing] excluded from participation in, be[ing] denied the benefits of, or be[ing] subjected to discrimination under any education program or activity receiving Federal financial assistance.'' Limiting access based on sex is therefore clearly prohibited by the statute. *Davis* did not purport to hold otherwise. Title IX's broad nondiscrimination mandate requires a recipient to provide an education program or activity that does not unlawfully limit access based on sex, and the Title IX regulations have long prohibited a recipient from ''limit[ing] any person in the enjoyment of any right, privilege, advantage, or opportunity'' based on sex. 34 CFR 106.31(b)(7). For additional explanation regarding the addition of the ''limit or deny'' language to the definition of hostile environment sex-based harassment, please see Hostile Environment Sex-Based Harassment—Limits or Denies (§ 106.2) (Section I.C).

The Department also disagrees that requiring a recipient to ''take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur'' constitutes a strict liability standard. The Department's application of the requirement to respond promptly and effectively is further detailed in the discussion of § 106.44(a) and (f). As explained in the July 2022 NPRM, the Department would not terminate Federal funds from a recipient, without taking further steps, simply because an official failed to take prompt and effective steps to ensure that sex discrimination did not continue or recur. 87 FR 41433. When OCR begins an investigation or compliance review, it provides notice to the recipient of the potential Title IX violations it is investigating; if OCR finds a violation, OCR is required to seek voluntary corrective action from the recipient before pursuing fund termination or other enforcement mechanisms. 20 U.S.C. 1682; 34 CFR 100.7(d) (incorporated through 34 CFR 106.81);

*see also Gebser,* 524 U.S. at 287–89. In the administrative enforcement process, there will never be a circumstance in which OCR pursues fund termination without the recipient first having notice and the opportunity to take corrective action to address a Title IX violation.

With respect to the concern about remedies for persons other than the complainant, as explained in the July 2022 NPRM, the Department included this language to recognize that in some situations, remedies may be appropriate for someone other than the complainant. 87 FR 41489. In final § 106.45(h)(3), the Department changed the reference to providing remedies to a complainant ''or other person'' identified by the recipient as having had equal access to its education program or activity limited or denied by sex discrimination, to instead refer to a complainant ''and other persons,'' recognizing that depending on the circumstances of the sex discrimination, a recipient may have to provide remedies to both a complainant and another person or persons. For example, a student reports to her Title IX Coordinator about pervasive sex-based harassment in the school's robotics club, including allegations that boys make the girls carry the equipment, clean up the lab, and take notes for them. The school determines that there is a hostile environment that limited the complainant's access to the benefits of the club and therefore must take steps to end the harassment and eliminate the hostile environment. As part of that response, the recipient determines that the two other girls in the club were subjected to the same hostile environment and were similarly limited in their opportunities to participate in the club. To fully eliminate the effects of the discrimination, the recipient may have to offer remedies to the students who were subjected to the hostile environment but did not report discrimination. Similarly, a recipient that provides a remedy to a complainant who experienced sex-based harassment might also need to provide training or other educational programming to address challenges for other participants in that environment who, while not harassed, may have witnessed the sex-based harassment. The final regulations do not require the recipient to notify the respondent of the remedies provided to the complainant or other persons. It would not further Title IX's purposes or be necessary for a prompt and equitable process, which will at that time be concluded, to notify the respondent of remedies that require no action by the respondent. The Department notes,

however, that some remedies might require action by the respondent. For example, if a determination is made after a grievance procedure that an employee respondent gave a student a failing grade based on sex discrimination, and the remedy required that respondent to change the grade, then the respondent would be notified of such remedy. The final regulations do, however, require that the Title IX Coordinator notify the complainant of any disciplinary sanctions imposed on a respondent under § 106.45(h)(3) because such disciplinary sanctions are imposed following a determination that the respondent violated the recipient's prohibition on sex discrimination as to the complainant, and notification to the complainant is necessary to remedy its effects. In some cases, notification to the complainant may also be necessary to prevent recurrence of or end sex discrimination. For example, if a student respondent is found responsible for engaging in sex-based harassment and is removed from an extracurricular activity in which the complainant also participates, it would serve the purpose of ending the harassment to both remove the student from the activity and notify the complainant of this disciplinary action so that the complainant can continue to participate with the knowledge that the respondent will not.

The Department declines a commenter's request to identify remedies a recipient may provide when it is determined that sex discrimination did not occur because under the definition in § 106.2, ''remedies'' cannot be imposed if a recipient determines that sex discrimination did not occur. However, a recipient may offer supportive measures, as that term is defined in the final regulations at § 106.2, even if the recipient does not determine that sex discrimination occurred, as long as the supportive measures do not unreasonably burden a party. For more information regarding supportive measures, see the discussion of § 106.44(g).

In response to a comment about remedies for students who graduate before a complaint is resolved, the Department recognizes that a student's graduation may limit the remedies that may be available or appropriate. For example, a respondent's graduation may limit a recipient's discretion to implement certain remedies that affect the respondent, but the recipient would still have authority, for example, to restrict a respondent's access to campus. A complainant's graduation may also limit the remedies that may be available or appropriate, but there may be

remedies that would serve to restore or preserve a complainant's access to the recipient's education program or activity after graduation. For example, the recipient may decide to prohibit an employee respondent from attending an alumni event that the complainant seeks to attend. And, as noted above, there may be appropriate remedies for students other than the complainant who are still participating in the recipient's education program or activity.

The Department appreciates the opportunity to clarify that when there is a determination that sex discrimination occurred, a recipient, through its Title IX Coordinator or designees, is also required to coordinate the implementation of any disciplinary sanctions on the respondent. This coordination includes notifying the complainant of any disciplinary sanctions the recipient will impose on the respondent. As the Department explained in the 2020 amendments, a complainant should know what sanctions the respondent receives because knowledge of the sanctions may impact the complainant's equal access to the recipient's education program or activity. 85 FR 30428. The Department did not intend to suggest a change from this rationale in the 2020 amendments by excluding this language from proposed § 106.45(h)(3). To ensure that there is no confusion, the Department added language to § 106.45(h)(3) to clarify that these final regulations continue to require a Title IX Coordinator to coordinate the implementation of any disciplinary sanctions on a respondent, including notification to the complainant of such disciplinary sanctions. As stated above, a recipient may not impose discipline on a respondent for sex discrimination prohibited by Title IX unless there is a determination at the conclusion of the recipient's grievance procedures that the respondent engaged in prohibited sex discrimination. The Department has added a statement to § 106.45(h)(3) to clarify its intent in that regard.

*Changes:* The Department has revised the description of the Title IX Coordinator's role in § 106.45(h)(3) from "provide and implement remedies" to "coordinate the provision and implementation of remedies." The Department has changed the words "or other person" to "and other persons." Additionally, the Department has revised § 106.45(h)(3) to state that a Title IX Coordinator is also responsible for coordinating the implementation of any disciplinary sanctions on a respondent, and that such coordination should include notification to the

complainant of any such disciplinary sanctions. The Department also has made a technical update to the provision by changing the reference to § 106.44(f)(6) to instead reference § 106.44(f)(1)(vii). Finally, the Department has added a statement that a recipient may not impose discipline on a respondent for sex discrimination prohibited by Title IX unless there is a determination at the conclusion of the recipient's grievance procedures that the respondent engaged in prohibited sex discrimination.

22. Section 106.45(h)(4) Comply With This Section Before Imposition of Disciplinary Sanctions

*Comments:* Some commenters supported proposed § 106.45(h)(4) on the ground that it would require due process before imposing disciplinary sanctions.

Several commenters expressed concern that proposed § 106.45(h)(4) would require a recipient to treat sex-based harassment differently from all other forms of student misconduct. For example, some commenters noted that other forms of student misconduct may be addressed immediately if a respondent admits to the conduct, there are undisputed facts or other irrefutable proof, or staff directly and personally witnesses the misconduct. Some commenters observed that the inability to take prompt actions under proposed § 106.45(h)(4) could result in a hostile environment for a complainant and shared personal experiences of instances in which this occurred.

Other commenters opposed proposed § 106.45(h)(4) because they believed that a recipient should have flexibility to impose sanctions upon a finding of responsibility, instead of after an appeal. Some commenters suggested proposed § 106.45(h)(4) might also incentivize a respondent to engage in meritless appeals to delay sanctions. The commenters also highlighted difficulties a recipient might face under proposed § 106.45(h)(4) if a respondent commits another violation during the period between finding responsibility and when the determination becomes final, or if a respondent graduates or receives a diploma while an appeal is pending. Some commenters suggested the Title IX Coordinator should make a preliminary determination that a Title IX violation might have occurred and if it may result in a warning, suspension, or expulsion, prior to the start of an investigation.

Some commenters requested clarification as to how proposed § 106.45(h)(4) intersects or aligns with other laws. For example, some

commenters noted that some State laws require or permit suspension or expulsion within a certain number of days after a recipient determines sexual assault or harassment occurred, citing as an example California Education Code § 48918, 48900(n). Some commenters sought clarification as to how proposed § 106.45(h)(4) would intersect with the emergency removal provisions in the Clery Act.

Some commenters urged the Department to require a recipient to notify State certification authorities of any determination that an employee engaged in sex-based harassment.

*Discussion:* Following the Department's review of public comments we note that the requirement to comply with the grievance procedures before the imposition of any disciplinary sanctions against a respondent is consistent with the 2020 amendments, which provided in §§ 106.44(a) and 106.45(b)(1)(i) that a recipient's response to sexual harassment must treat complainants and respondents equitably by "following a grievance process that complies with § 106.45 before the imposition of any disciplinary sanctions or other actions that are not supportive measures . . . against a respondent." 34 CFR 106.44(a). The July 2022 NPRM proposed, and these final regulations maintain, this same general requirement at § 106.45(h), which is a different part of the regulations as explained in the July 2022 NPRM. 87 FR 41489. Section 106.45(h)(4) also applies to all complaints of sex discrimination, not just formal complaints of sexual harassment as it did under the 2020 amendments. The requirement to comply with the grievance procedures before the imposition of any disciplinary sanctions against a respondent in § 106.45(h)(4) is also consistent with § 106.45(b)(3) and supports the implementation of a neutral, bias-free grievance process.

With respect to the comment that § 106.45(h)(4) will require a recipient to treat sex discrimination differently from all other forms of student misconduct, which may be handled more summarily in certain circumstances, § 106.45(h)(4) strikes the right balance between expediency and requiring that recipients conduct a bias-free grievance procedure and comply with grievance procedures before the imposition of disciplinary sanctions. While the Department understands that different types of misconduct may be handled differently, these protections are critical to Title IX's nondiscrimination mandate. The final regulations treat complainants and respondents equitably, create a fair

process for handling complaints, and address concerns that respondents may suffer disciplinary sanctions or punitive action from pending allegations. For this reason, the Department declines commenters' suggestions to require Title IX Coordinators to instead make a preliminary determination that a Title IX violation might have occurred.

The Department appreciates the opportunity to clarify that § 106.44(g)–(i) allows a recipient to protect a complainant's access to the education program and the health and safety of students, such as removing a respondent from an extracurricular activity or employment responsibilities as a non-disciplinary measure, if certain conditions are met. Under § 106.44(g), recipients must offer and coordinate supportive measures, as long as such supportive measures do not unreasonably burden either party, are not provided for punitive or disciplinary reasons, and are designed to protect the safety of the parties or the recipient's educational environment or to provide support during the recipient's grievance procedures under § 106.45, and if applicable § 106.46, or during the informal resolution process under § 106.44(k). Such supportive measures may not be provided for punitive or disciplinary reasons because a determination whether sex discrimination occurred has not yet been made under the grievance procedures. Under § 106.44(h), a recipient may remove a respondent from the recipient's education program or activity on an emergency basis, provided that the recipient undertakes an individualized safety and risk analysis, determines that an imminent and serious threat to the health or safety of the complainant, students, employees, or other persons arising from the allegations of sex discrimination justifies removal, and provides the respondent with notice and an opportunity to challenge the decision immediately following the removal. Under § 106.44(i), a recipient may place an employee respondent on administrative leave from employment responsibilities during the pendency of the recipient's grievance procedures. Only after a finding that sex discrimination has occurred may disciplinary sanctions be imposed.

The Department disagrees that § 106.45(h)(4) decreases a recipient's flexibility with respect to disciplinary sanctions because recipients retain discretion to determine the disciplinary sanctions that may be imposed. The Department also disagrees that § 106.45(h)(4) will incentivize a respondent to engage in meritless

appeals to delay disciplinary sanctions. While any appeal is pending, respondents may continue to be subject to supportive measures, and emergency removal under § 106.44(h) or administrative leave under § 106.44(i), if applicable. The bases for appeal will also be carefully delineated and therefore less suspect to abuse. Under § 106.45(i), a recipient must offer the parties an appeal process that, at a minimum, is the same as it offers in all other comparable proceedings, if any, including proceedings relating to other discrimination complaints. Recipients have discretion regarding the bases for appeal under § 106.45(i), but a respondent may only appeal on the bases offered by the recipient. The final regulations do not permit a respondent to seek an appeal for reasons beyond those set forth by the recipient. If, as commenters suggested, a respondent committed an additional violation during the pendency of an appeal, a recipient would be obligated to take action to address that violation as well and to provide supportive measures to a complainant as appropriate. Waiting to impose disciplinary sanctions until the conclusion of the grievance procedure through any appeal is consistent with the treatment of sanctions pending appeals under the 2020 amendments, *see* 85 FR 30393, and with § 106.46(h)(2), discussed elsewhere in this preamble. To the extent State law requires disciplinary action to be imposed within a certain period of time after a determination that sex discrimination, including sex-based harassment, occurred, recipients should comply with such State laws unless there is a conflict with these regulations, in which case State law does not obviate or alleviate a recipient's obligations under Title IX and these regulations. *See* § 106.6(b) and the related discussion in this preamble. And consistent with the Department's position in the preamble to the 2020 amendments, these final regulations do not alter requirements under the Clery Act or its implementing regulations. *See* 85 FR 30384.

The Department declines to require recipients to impose particular disciplinary sanctions after a finding that sex discrimination occurred, nor does the Department believe that offering examples of types of disciplinary sanctions is necessary. Recipients retain discretion in determining what disciplinary sanctions may be appropriate, as long as their use of disciplinary sanctions fulfills the Title IX nondiscrimination mandate.

The Department declines to require a recipient to report an employee it

determines engaged in sex-based harassment to State authorities. Violations of Title IX are distinct from State criminal laws, and Title IX is not enforced by State authorities. Nonetheless, nothing in the final regulations prevents a recipient from disclosing such determinations of sex discrimination to a State agency.

*Changes:* For clarity, the Department has changed "this section" to "§ 106.45."

## 23. Section 106.45(h)(5) Prohibition on Discipline Based Solely on Determination

### False Statements

*Comments:* Some commenters supported proposed § 106.45(h)(5) based on a belief that it eliminated disciplinary actions for false complaints or false statements. Some of these commenters noted that misperceptions and inconsistencies are not intentionally false but rather can be associated with trauma or the influence of alcohol.

Other commenters supported proposed § 106.45(h)(5) because it would strengthen protections against retaliation for making a complaint or serving as a witness.

Several commenters opposed § 106.45(h)(5) based on the belief that it prohibits a recipient from punishing students for filing false complaints or making false statements. For example, some commenters noted that because of the "severe consequences" at stake in Title IX investigations, recipients should hold individuals accountable for false statements. Some commenters expressed concern that proposed § 106.45(h)(5) would encourage or condone false reports, while others felt proposed § 105.45(h)(5) would prevent Title IX decisionmakers from ascertaining the true facts and circumstances around complaints.

One commenter argued that proposed § 106.45(h)(5) would deny respondents the basic rights needed to protect themselves from false accusations.

Several commenters suggested modifications to proposed § 106.45(h)(5), including that recipients should be required to have policies in place to address false statements; that discipline for knowingly false statements should be permitted; and that false statements should be punishable in accordance with existing codes of conduct. Some commenters urged the Department to add a requirement that when allegations are proven false, the students must sign a nondisclosure agreement related to such allegations.

Several commenters expressed confusion about proposed § 106.45(h)(5). Some commenters sought clarification of whether discipline for a false statement based solely on a recipient's decision of whether sex-based discrimination occurred is prohibited retaliation. Some commenters suggested the Department use the language in § 106.71(b)(2) of the 2020 amendments because it is clearer. Some commenters requested clarification on whether proposed § 106.45(h)(5) would prohibit a recipient from punishing someone who makes a materially false statement in bad faith.

*Discussion:* The Department appreciates the opportunity to clarify the meaning of § 106.45(h)(5). Section 106.45(h)(5) does not categorically prohibit recipients from ever disciplining parties, witnesses, or others participating in a Title IX grievance procedure for making false statements. It prohibits recipients from disciplining such individuals ''based solely'' on the recipient's determination whether sex discrimination occurred. As discussed in the July 2022 NPRM, § 106.45(h)(5) furthers the Department's goal of ensuring that a recipient's efforts to address sex discrimination are equitable by allowing parties, witnesses, and others to participate in grievance procedures without fear that the outcome alone could lead to a determination that false statements were made. 87 FR 41490. Under § 106.71(b)(2) of the 2020 amendments, charging an individual with a code of conduct violation for making a materially false statement in bad faith during a Title IX grievance proceeding was permitted as long as the recipient did not base its charge solely on the outcome of the grievance proceeding. The Department incorporated that same principle from the 2020 amendments into § 106.45(h)(5). 87 FR 41490. Section 106.45(h)(5) continues to protect anyone who participates in the grievance procedures, not just those who participate as complainants, and as discussed in the July 2022 NPRM, it addresses concerns that the general retaliation provision in the 2020 amendments had a chilling effect on a person's participation in a recipient's grievance procedures due to confusion from the wording. 87 FR 41490. Section 106.45(h)(5) maintains the recipient's discretion to discipline those who make false statements, including materially false statements made in bad faith, based on evidence other than or in addition to the outcome of its Title IX grievance procedures.

The Department disagrees that § 106.45(h)(5) will condone or encourage false reports. As discussed above, the 2020 amendments contained a similar provision, and commenters provided no evidence that false reports have increased, nor is the Department aware of any. To be clear, § 106.45(h)(5) permits a disciplinary process to be initiated under a recipient's code of conduct to address false statements as long as there is evidence independent of the determination whether sex discrimination occurred, and evidence developed during the Title IX grievance process may be used in such a disciplinary process.

In response to commenter concerns, the Department also notes that § 106.45(h)(5) will not inhibit the ability of Title IX decisionmakers to ascertain the facts and circumstances of a complaint because this provision does not pertain to the factfinding phase of a recipient's grievance procedure. Section 106.45(h)(5) is only applicable after a determination of sex discrimination is made and only if a recipient is considering whether to initiate a disciplinary process alleging a party, witness, or other participant in the Title IX grievance procedure made a false statement.

The Department disagrees that § 106.45(h)(5), which applies equally to all parties, will deny procedural rights to a respondent. Nothing in § 106.45(h)(5) prohibits a recipient from considering the credibility of any party or witness during the grievance procedure.

The Department appreciates the opportunity to clarify that threatening to institute or instituting disciplinary proceedings against a party, witness, or other person who participated in a grievance procedure could, under the circumstances outlined in § 106.71, constitute retaliation under that section. Section 106.45(h)(5) informs parties, witnesses, and others that they cannot be disciplined under any circumstance for making a false statement—whether the discipline would constitute retaliation or not—if the discipline is based solely on the recipient's determination whether sex discrimination occurred.

The Department appreciates commenters' suggestions for modifications to § 106.45(h)(5). The Department declines commenters' suggestions that the Department impose requirements on recipients' non-Title IX disciplinary processes for false statements, such as requiring recipients to have policies and procedures in place to address false statements generally, requiring recipients to impose discipline for false statements made during a grievance process in situations

that would not violate § 106.45(h)(5), or requiring recipients to impose nondisclosure agreements on the relevant parties when allegations are proven false. How recipients structure their disciplinary processes for false statement offenses is not the subject of this rulemaking.

*Changes:* None.

Consensual Sexual Activity

*Comments:* Some commenters expressed support for proposed § 106.45(h)(5) because they believe the practice of punishing students who report sexual harassment for engaging in prohibited consensual sexual conduct interferes with a survivor's access to education and chills reporting.

Some commenters opposed proposed § 106.45(h)(5), stating that the language addressing consensual sexual misconduct is unnecessary because they believe a postsecondary recipient would not discipline students for engaging in consensual sexual conduct.

Some commenters stated that because ''consensual sexual conduct'' is a different topic from ''false statements,'' they should be addressed in separate provisions with more clarity.

*Discussion:* The Department is aware that some recipients have codes of conduct that prohibit students from engaging in consensual sexual conduct. The Department received comments in the June 2021 Title IX Public Hearing and in response to the July 2022 NPRM supporting a broader prohibition on discipline for collateral conduct violations, such as consensual sexual conduct, and the Department noted that the concern regarding discipline for consensual sexual conduct had been raised by plaintiffs in Title IX litigation as well as in OCR's enforcement practice. 87 FR 41490. As discussed in the July 2022 NPRM, the Department recognizes that discipline for collateral conduct violations that may be connected to conduct at issue in a Title IX complaint, including consensual sexual conduct, may create a barrier to participation in the recipient's grievance procedures. 87 FR 41490. By providing protection from collateral discipline for consensual sexual conduct, the regulations remove this potential barrier to information sharing in the grievance procedures, which, in turn, promotes a fair process in which parties, witnesses, and participants are not discouraged from fully and accurately relating necessary facts.

The Department disagrees with the commenters that the inclusion of consensual sexual activity in § 106.45(h)(5) is unnecessary. While the commenters may be correct that many

postsecondary institutions would not discipline students for consensual sexual activity, other postsecondary institutions do.

The Department appreciates commenters' requests to clarify how § 106.45(h)(5) addresses both false statements and consensual sexual conduct. As discussed in the July 2022 NPRM, in order to provide an education program or activity free from sex discrimination, a recipient must implement grievance procedures in a manner that does not impede parties, witnesses, and other participants from providing information to the recipient regarding sex discrimination that may have occurred in the recipient's education program or activity. *Id.* Section § 106.45(h)(5) addresses two concerns—the possibility of discipline for engaging in consensual sexual activity and the fear of being accused of false statements—that have repeatedly been raised about potential barriers to participation in a recipient's grievance procedures. Addressing these concerns is consistent with the Department's Title IX authority because, as noted above, § 106.45(h)(5) directly fosters a more equitable sex discrimination grievance process by protecting all participants from collateral discipline based solely on a determination whether sex discrimination occurred, which promotes full and accurate factfinding.

*Changes:* None.

### 24. Section 106.45(i) Appeals

*Comments:* Some commenters appreciated the narrowed scope of the proposed appeals requirements for several reasons, including that it is clearer and more streamlined and treats the parties more fairly.

In contrast, other commenters expressed concern that the proposed regulations only require recipients to offer appeals from a dismissal of a sex discrimination complaint under proposed § 106.45(d)(3) or from a determination whether sex-based harassment occurred in a complaint that involves a postsecondary student under proposed § 106.46(i). Some commenters characterized the Department's interest in improving the expediency of grievance procedures for some complaints in an elementary school or secondary school setting as arbitrary, capricious, and in conflict with case law. These commenters questioned why the rationale offered in the preamble to the 2020 amendments (*i.e.,* increasing the likelihood that recipients reach sound determinations and giving the parties greater confidence in the ultimate outcome) would not necessitate a requirement to offer an appeal from

any determinations of whether sex discrimination occurred.

Some commenters interpreted the proposed provisions related to appeals as a return to Title IX enforcement prior to the 2020 amendments, which they opposed, and urged the Department to retain the 2020 amendments in full.

Some commenters urged the Department to require an appeal from a determination in sex discrimination complaints generally or for specific categories of complaints, such as complaints that allege employee-to-employee sex discrimination, discrimination based on gender identity, or that a postsecondary institution engaged in discrimination.

Other commenters suggested amending proposed § 106.45 to require an elementary school or secondary school to offer an appeal from a determination in a sex discrimination complaint that is the same as what the recipient would offer in comparable complaints. The commenters asserted that such a revision would prevent an elementary school or secondary school from providing fewer opportunities to appeal a sex discrimination complaint than other comparable complaints, which one commenter stated could constitute sex discrimination itself. Commenters also suggested that such a revision would prevent an elementary school or secondary school from providing greater appeal rights for a sex discrimination complaint than other comparable complaints, which one commenter stated could reinforce a belief that sex-based harassment is exceptional as compared to other forms of harassment.

Other commenters requested guidance on what sort of appeal process is permitted or required under § 106.45.

*Discussion:* The Department acknowledges comments that supported the narrowed scope of the proposed appeals requirements but is persuaded by commenters' recommendation to require a recipient to offer an appeal process from a determination arising out of a sex discrimination complaint that is the same as it offers in other comparable proceedings. Specifically, the Department recognizes that a recipient may have existing appeal procedures for other offenses in its code of conduct that may reflect certain values of its educational community related to student discipline, advance other institutional interests in a broad array of disciplinary cases, or be guided by other historical or legal factors. The Department also notes that offering the opportunity to appeal a determination in proceedings related to other student conduct violations, while denying the

same opportunity for sex discrimination complaints, may give rise to confusion, the perception of unfairness, and resentment in ways that are counterproductive to preventing and responding to sex discrimination in the recipient's education program or activity.

Accordingly, the Department has added a new § 106.45(i) in these final regulations to state that, in addition to an appeal of a dismissal consistent with § 106.45(d)(3), a recipient must offer the parties an appeal process that, at a minimum, is the same as it offers in all other comparable proceedings, if any, including proceedings relating to other discrimination complaints. Final § 106.45(i) also clarifies that, for complaints of sex-based harassment involving a postsecondary student, a postsecondary institution must also offer an appeal on the bases set out in § 106.46(i)(1). This addition is consistent with the Department's view, stated in the July 2022 NPRM and reiterated here, that for complaints of sex discrimination, other than complaint dismissals or final determinations of complaints of sex-based harassment involving a student at a postsecondary institution, a recipient has discretion to decide whether the opportunity to appeal a determination would be appropriate for a given type of complaint, as long as a recipient does not exercise this discretion arbitrarily. 87 FR 41489. Accordingly, final § 106.45(i) includes protections against the kind of arbitrary decisionmaking referenced in the preamble to the July 2022 NPRM. For the same reasons, the Department declines to require specific categories of appeals in § 106.45(i), such as for complaints alleging discrimination based on gender identity or complaints alleging employee-to-employee sex discrimination, when a recipient does not provide them for comparable proceedings. The Department recognizes that recipients have obligations under Federal law to employees under Title VII and Title IX and may also have obligations under other State or local laws, which may require processes that are specifically adapted for employee-to-employee complaints and may include the opportunity to appeal a determination.

The Department declines to require a postsecondary institution to offer an appeal of a complaint that alleges a recipient engaged in sex discrimination because other provisions in § 106.45 sufficiently account for the power differentials in such complaints. Specifically, requirements related to the equitable treatment of the parties under § 106.45(b)(1); decisionmakers being

free of bias or conflicts of interest under § 106.45(b)(2); guidelines for ensuring the objective evaluation of relevant and not otherwise impermissible evidence and the adequate, reliable, and impartial investigation of the complaint under § 106.45(b)(6) and (f)(1); the opportunity for parties to present and access relevant and not otherwise impermissible evidence under § 106.45(f)(2) and (4); and guidelines for how a decisionmaker must assess such evidence and credibility under § 106.45(b)(6), (f)(3), and (g) address power differentials in such complaints by ensuring an objective and transparent investigation, impartial decisionmaker, and a meaningful opportunity for a complainant to respond to evidence prior to the determination whether sex discrimination occurred. These requirements provide procedural safeguards in how a recipient must resolve sex discrimination complaints in more types of proceedings than were previously required under the 2020 amendments. *See* 34 CFR 106.8(c), 106.45 (requiring a recipient to adopt and publish grievance procedures that provide for the prompt and equitable resolution of sex discrimination complaints, but only outlining procedural requirements for complaints that allege sexual harassment). The Department again reiterates that, consistent with final § 106.45(i), a recipient must offer the opportunity to appeal the outcome of a sex discrimination complaint against a recipient if it provides such a process for other comparable proceedings, including other discrimination complaints.

The Department also appreciates the opportunity to note that, despite some commenters' objections, balancing equity with promptness in grievance procedures has been a requirement in Title IX regulations since 1975 (*see* 34 CFR 106.8(c); 40 FR 24139), and it is the Department's view that promptness in grievance procedures serves Title IX's nondiscrimination mandate by avoiding unnecessary delay in the resolution of sex discrimination complaints. Commenters cited no case law, and the Department is unaware of any, that indicates this view is contrary to Title IX.

The Department notes that nothing in the final regulations prevents a recipient from adopting additional appeal provisions in its grievance procedures as long as such provisions apply equally to the parties, including notification of any such procedures and the permissible bases for appeal, consistent with § 106.45(h)(2). The Department also notes that the final regulations do not require recipients to adopt a specific timeframe for an appeal and that a recipient has discretion to set its own reasonably prompt timeframe for implementing appeals under § 106.45(i). *See* § 106.45(b)(4) and related discussion.

*Changes:* The Department has added to the final regulations a new § 106.45(i), requiring that, in addition to an appeal of a dismissal consistent with § 106.45(d)(3), a recipient must offer the parties an appeal process that, at a minimum, is the same as it offers in all other comparable proceedings, if any, including proceedings relating to other discrimination complaints. Final § 106.45(i) also clarifies that, for complaints of sex-based harassment involving a postsecondary student, a postsecondary institution must offer an appeal on the bases set out in § 106.46(i)(1). As a result of this addition, the Department has redesignated proposed § 106.45(i) and (j) as § 106.45(j) and (k).

**25. Section 106.45(j) Additional Provisions**

*Comments:* The Department notes that proposed § 106.45(i) has been redesignated as § 106.45(j) in the final regulations, and the following comment summaries and discussion refer to the provision as § 106.45(j) for ease.

One commenter suggested changing "equally" to "equitably" to align with the examples provided in the preamble to the July 2022 NPRM, which the commenter viewed as examples of equitable rather than equal treatment. Another commenter suggested that the Department modify § 106.45(j) to recognize that shared governance and collective bargaining are important means to allow a recipient to exercise its discretion to adopt practices not required by the regulations and suggested involving faculty in developing grievance procedures through shared governance and collective bargaining agreements.

*Discussion:* The Department maintains its position, as stated in the preamble to the 2020 amendments, that under Title IX, "recipients [have] discretion to adopt rules and practices not required under § 106.45 [or § 106.46]." 85 FR 30209. The 2020 amendments require that any additional provisions that a recipient adopts as part of its grievance procedures must apply equally to the parties. The Department did not propose removing that requirement in the July 2022 NPRM. Instead, the Department proposed moving the requirement from § 106.45(b) to § 106.45(i) and broadening it to apply to grievance procedures for all forms of sex discrimination, not only sexual harassment. The final regulations include this requirement at § 106.45(j).

The Department declines to change "equally" to "equitably" in § 106.45(j). As explained above, the Department is maintaining the requirement from the 2020 amendments that any additional provisions a recipient adopts as part of its grievance procedures must apply equally to the parties. Consistent with the Department's position in the 2020 amendments, the examples offered by the Department in the preamble to the July 2022 NPRM clarify for recipients that, while any additional provisions a recipient adopts in its grievance procedures must be applied equally to the parties, identical treatment of both parties is not always required in the implementation of those provisions. 87 FR 41491 (citing 85 FR 30186). A recipient is permitted to take into account the individual needs and circumstances of a person when applying the additional provisions. *See* 85 FR 30189. For example, a provision under which a recipient offers disability accommodations or an interpreter as part of its grievance procedures applies equally to the parties even if only one party needs and receives such accommodations or an interpreter. The recipient does not have to provide an interpreter or disability accommodation to any party that does not need one simply because another party that does need one is receiving one. The fact that the parties had an equal opportunity to receive an accommodation or an interpreter as needed is enough to satisfy § 106.45(j). For additional information regarding equitable treatment of the parties, see the discussion of § 106.45(b)(1).

The Department acknowledges that a recipient may use shared governance and collective bargaining to adopt additional rules and practices beyond those required by the final regulations and that some employees have additional rights created by shared governance and collective bargaining agreements. This is permissible under the final regulations and consistent with the Department's statement in the July 2022 NPRM that nothing in the final regulations precludes a recipient's Title IX grievance procedures from recognizing that employee parties have additional rights in a collective bargaining agreement or other shared governance policy. *See* 87 FR 41491. The Department also notes that as explained in the July 2022 NPRM and as discussed above, identical treatment is not always required in the application of any additional rules or practices, and, as such, the Department recognizes that

employee parties may have distinct rights in a shared governance or collective bargaining agreement that are not applicable to parties who are not employees. *See id.* The Department further notes that the final regulations do not make any changes to current § 106.6(f), which states that "[n]othing in this part may be read in derogation of any individual's rights under title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e *et seq.* or any regulations promulgated thereunder.'' These final regulations permit recipients to use existing grievance procedures under collective bargaining agreements, as long as they comply with these final regulations. The Department reminds recipients that under § 106.45(b)(8), if a recipient adopts grievance procedures that apply to the resolution of some, but not all complaints, the recipient must articulate consistent principles for how the recipient will determine which procedures apply.

The Department understands that a postsecondary institution may involve faculty in developing its Title IX grievance procedures through a shared governance or collective bargaining process, and these final regulations do not preclude faculty participation in a postsecondary institution's efforts to address sex discrimination under Title IX. A recipient has discretion to determine how best to develop its Title IX grievance procedures, including how and whether to involve faculty through shared governance, in accordance with § 106.45, and if applicable § 106.46.

*Changes:* Proposed § 106.45(i) has been redesignated as § 106.45(j) in the final regulations.

26. Section 106.45(l) Range of Supportive Measures and Disciplinary Sanctions and Remedies

*Comments:* The Department notes that proposed § 106.45(k) has been redesignated as § 106.45(l) in the final regulations, and for ease the following comment summaries and discussion refer to the provision as § 106.45(l).

Some commenters opposed § 106.45(l), arguing that section § 106.45(b)(1)(ix) of the 2020 amendments has been upheld by courts and that proposed § 106.45(l)(2) is inconsistent with the Clery Act requirements to list sanctions.

Some commenters requested that the Department move proposed § 106.45(l) to proposed § 106.46 because paragraph (l) would apply only to cases alleging sex-based harassment.

Some commenters requested clarification about disciplinary sanctions, including whether a Title IX Coordinator has authority to bring civil

or criminal charges against a respondent and what sanctions a recipient can impose on a respondent, including after the respondent has graduated.

*Discussion:* The Department acknowledges commenters' opposition to modifying the 2020 amendments. As explained in the July 2022 NPRM, § 106.45(l)(1) maintains the requirement previously in § 106.45(b)(1)(ix) of the 2020 amendments that a recipient include a description of the range of supportive measures available to a complainant and respondent in its grievance procedures for sexual harassment claims. *See* 87 FR 41492. Similarly, the Department has maintained the existing requirement (previously in § 106.45(b)(1)(vi) of the 2020 amendments) that a recipient must either describe the range of possible disciplinary sanctions and remedies that a recipient may impose after completion of the grievance procedures for sexual harassment claims or list the possible disciplinary sanctions and remedies. These requirements will continue to ensure that a recipient is transparent about its variety of supportive measures, disciplinary sanctions, and remedies. In response to the commenter's request for clarification, a recipient may impose on a respondent only disciplinary sanctions that are set forth in the range or list of possible disciplinary sanctions that a recipient may impose, including after a respondent has graduated.

The Department disagrees that § 106.45(l) should be modified to mirror the Clery Act by requiring a list of sanctions. *See* 20 U.S.C. 1092(f)(8)(B)(ii). Consistent with the Department's position in the preamble to the 2020 amendments, these final regulations do not alter requirements under the Clery Act or its implementing regulations. *See* 85 FR 30384. If the Clery Act applies to a recipient, the recipient must provide a list of sanctions that the postsecondary institution may impose following a disciplinary proceeding based on an allegation of rape, acquaintance rape, dating violence, domestic violence, sexual assault, or stalking. 20 U.S.C. 1092(f)(8)(B)(ii). Such a list also satisfies the requirement in § 106.45(l)(2) to describe the range of possible disciplinary sanctions or list the possible disciplinary sanctions that a recipient may impose on a respondent at the conclusion of grievance proceedings regarding sex-based harassment. However, if a recipient intends to impose additional types of disciplinary sanctions in cases involving sex-based harassment that are not covered by the Clery Act (*e.g.,* quid pro quo and hostile environment), a

recipient would need to supplement any list required by the Clery Act to describe the range of such sanctions or provide a list of such sanctions under § 106.45(l)(2). The Department notes that the requirements of the Clery Act were designed to fit the population, environment, and traditional procedures used by postsecondary institutions. Section 106.45(l) applies to elementary schools, secondary schools, and to types of conduct outside of the Clery Act's scope. The Department maintains that it is appropriate for elementary schools and secondary schools and other recipients to retain discretion in imposing sanctions in cases involving sex-based harassment while also ensuring that the parties know the sanctions that may be imposed upon a determination that sex-based harassment occurred. Accordingly, the Department will continue to allow recipients to describe the range of possible sanctions or list all possible sanctions. Because the Department is retaining the language in § 106.45(l)(2) that permits a recipient to provide a range of possible disciplinary sanctions and remedies as an alternative to a list, it is not necessary to add language permitting a recipient to utilize a disciplinary sanction or remedy that is not contained in the recipient's list.

In order to further clarify that a recipient may list, or describe the range of, the possible disciplinary sanctions that a recipient may impose and remedies that the recipient may provide following a determination that sex-based harassment occurred, the Department has revised § 106.45(l)(2) from "Describe the range of, or list," to "List, or describe the range of.''

The Department declines to move § 106.45(l) to § 106.46 because the additional requirements in § 106.46 are limited to sex-based harassment complaints involving a student at a postsecondary institution. Although § 106.45(l) applies only to sex-based harassment complaints, it applies to all recipients, including elementary schools and secondary schools. Proposed § 106.45(l) and the prior language in § 106.45(b)(1)(vi) under the 2020 amendments provide consistency, predictability, and transparency about the range of consequences all students can expect from the outcome of grievance procedures regarding sex-based harassment. It is important to provide all students, faculty, and other personnel subject to a sex-based harassment complaint, including those at the elementary school and secondary school levels, with this information.

The Department appreciates the opportunity to clarify that a Title IX

Coordinator does not have the authority to bring civil or criminal charges against a respondent. The Department declines to specify the disciplinary sanctions a recipient may impose on a respondent, including after the respondent has graduated, which may vary depending on the type of recipient, the population it serves, State laws, and other factors. The Department respects a recipient's discretion to make disciplinary decisions under its own code of conduct as long as it complies with § 106.45, and if applicable § 106.46, before the imposition of any disciplinary sanctions against a respondent.

*Changes:* Proposed § 106.45(k) has been redesignated as § 106.45(l) in the final regulations. The Department has also revised § 106.45(l) to require recipients to "List, or describe the range of" the possible disciplinary sanctions that the recipient may impose and remedies that the recipient may provide following a determination that sex-based harassment occurred.

*E. Grievance Procedures for the Prompt and Equitable Resolution of Complaints of Sex-Based Harassment Involving a Student Complainant or Student Respondent at Postsecondary Institutions* [60]

1. Section 106.46(b) Student-Employees

*Comments:* Some commenters supported proposed § 106.46(b) because it would provide appropriate guidance to postsecondary institutions without being overly prescriptive.

Other commenters did not support proposed § 106.46(b). For example, one commenter stated that the Department did not explain how the two factors a postsecondary institution must consider—whether the party's primary relationship with the postsecondary institution is to receive an education, and whether the alleged sex-based harassment occurred while the party was performing employment-related work—relate to one another. Another commenter was concerned that proposed § 106.46(b) would not address a postsecondary institution's ability to take adverse employment action against a student-employee who is alleged to have perpetrated sex-based harassment.

One commenter asked the Department to add language stating that complainants or respondents shall only be subject to one resolution process for a complaint, either §§ 106.45 or 106.46, as determined by the fact-specific inquiry.

*Discussion:* The Department agrees with commenters that proposed § 106.46(b) will assist a postsecondary institution in making an appropriate determination regarding whether the grievance procedure requirements in § 106.46 apply to complaints involving a party who is both a student and an employee. The Department also agrees it is important for postsecondary institutions to consider the needs of student-employees and that the fact-specific inquiry in § 106.46(b) enables postsecondary institutions to do so.

The Department appreciates this opportunity to further explain in response to comments how the two factors in § 106.46(b) relate to one another. Section 106.46 potentially applies based on the student-employee's status as a student in a postsecondary institution (when the other party is not a student) if, after undertaking a fact-specific inquiry, the institution determines either that the student-employee's primary relationship with the institution is to receive an education; or that the alleged sex-based harassment occurred while the student-employee was engaged in an education-related activity (rather than performing employment-related work); or both. Satisfying either one of these factors would be sufficient for § 106.46 to apply but would not require that § 106.46 apply. Whether § 106.46 applies for a complaint involving a party who is both a student and an employee is ultimately a fact-specific inquiry in which the recipient may consider any other factors the postsecondary institution reasonably deems appropriate and then determine, in light of all the factors, whether to apply § 106.46. Because such an inquiry is fact-specific, and student employment at postsecondary institutions depends on a number of factors, it is not appropriate to prescribe how a postsecondary institution must weigh these factors, instead leaving that to the institution's discretion. Doing so will enable a postsecondary institution to take into account any unique needs of its educational community, consider additional relevant factors in determining whether a party is primarily a student or an employee, and take into account any applicable Federal, State, or local law and any collective bargaining or other employment agreements.

If, after conducting a fact-specific inquiry, a postsecondary institution determines that the grievance procedure requirements in § 106.46 do not apply, the postsecondary institution must still comply with the grievance procedure requirements in § 106.45. The grievance procedure requirements in § 106.45

appropriately ensure that a recipient can respond to sex-based harassment involving employees promptly and equitably as required by Title IX, while also providing appropriate procedural protections for employees. *See* 87 FR 41458–59.

In response to a commenter's concern that proposed § 106.46(b) would not address a postsecondary institution's ability to take adverse employment action against a student-employee who is alleged to have perpetrated sex-based harassment, the Department notes that nothing in § 106.46(b) prohibits a postsecondary institution from imposing a disciplinary sanction against a respondent who is both a student and an employee if, after the conclusion of the applicable grievance procedures, the postsecondary institution determines that sex-based harassment occurred. The final regulations at § 106.2 define "disciplinary sanctions" as consequences imposed on a respondent following a determination under Title IX that the respondent violated the recipient's prohibition on sex discrimination and do not preclude a postsecondary institution from imposing a adverse employment action as a disciplinary sanction. In addition, the final regulations at § 106.44(i) permit a recipient to place a student-employee respondent on administrative leave from employment responsibilities during the pendency of the recipient's grievance procedures.

The Department also declines to add language stating that complainants or respondents will be subject to only one resolution process for student or employee complaints, as determined by the fact-specific inquiry, because it is sufficiently clear from the structure of these regulations that a person would only be subject to a single set of Title IX grievance procedures for a particular complaint of sex discrimination. The Department clarifies that when a complainant or respondent is both a student and an employee of a postsecondary institution, the postsecondary institution must use the fact-specific inquiry in § 106.46(b) to determine whether the grievance procedures in § 106.46 apply, or whether the complaint will be governed solely by the procedures in § 106.45.

*Changes:* None.

2. Section 106.46(c) Written Notice of Allegations

Comments on Proposed § 106.46(c)

*Comments:* Commenters addressed the Department's proposal in § 106.46(c) to maintain, eliminate, or clarify various components of § 106.45(b)(2) in the

---

[60] The comments, discussion, and changes for § 106.46(a) are included in the section on § 106.45(a)(1).

2020 amendments. For example, commenters addressed the appropriateness of including in proposed § 106.46(c) a statement that the respondent is presumed not responsible and whether proposed § 106.46(c)(1)(ii) permissibly applies to respondents or would give respondents an advantage by creating a delay between notice and an opportunity to be heard. Another commenter urged the Department to revise proposed § 106.46(c)(2)(ii) to notify parties that the person they choose to serve in the role of advisor set out in paragraph (e)(2) may not also serve as a witness in the grievance procedures. Some commenters expressed concern that proposed § 106.46(c)(2)(iv) contradicts proposed § 106.45(h)(5). Some commenters urged the Department to require recipients to notify parties of a recipient's prohibition on knowingly making false statements only when the recipient includes a parallel notice for all disciplinary matters.

Other commenters expressed support for proposed § 106.46(c)(3), which would allow recipients to notify respondents of allegations after they have taken steps to address concerns for the safety of any person that would arise as a result of providing the notice, such as protecting complainants who allege dating and domestic violence from their abusers. Some commenters requested that the Department provide more specificity about this provision, including with respect to what may qualify as a "legitimate concern for safety," timeframes for delaying notice, and the need to document the justification for any delay.

*Discussion:* The Department notes that proposed § 106.46(c) has been revised and renumbered, and the following discussion refers to the provisions in the final regulations unless we specify the proposed provisions. The Department acknowledges the comments about the intersection of §§ 106.45(b)(3) and 106.46(c) and the impact of such interaction on § 106.46(c)(1)(i). Section 106.46(c)(1)(i) requires that the written notice of allegations include a statement that the respondent is presumed not responsible for the alleged conduct until a determination whether sex-based harassment occurred is made at the conclusion of the grievance procedures.

The Department disagrees with a commenter who argued that giving the respondent time to prepare for an interview is unfair or inconsistent with Title IX. These elements of § 106.46 are an important part of a grievance process that is designed to be fair to all parties and lead to reliable outcomes to further

Title IX's nondiscrimination mandate. The notice of allegations must be provided to the parties whose identities are known, including respondents and complainants.

In response to a comment observing that proposed § 106.46(c)(2)(i) referenced parties' ability to present evidence to "a" decisionmaker, the Department appreciates the opportunity to clarify that a recipient may have more than one decisionmaker and that the reference to "a" decisionmaker is not intended to suggest otherwise. If a recipient has more than one decisionmaker, its written notice of allegations must assure parties that they will have an opportunity to present relevant and not otherwise impermissible evidence to those trained, impartial decisionmakers.

The Department disagrees with a commenter's suggestion to require the notice of allegations to specify that a party's advisor may not also serve as a witness. As explained in more detail in the discussion of § 106.46(e)(2), a recipient may establish restrictions regarding the role an advisor may play in grievance procedures, and the decisionmaker should consider a witness's relationship to a party when making credibility assessments, but a prohibition on an individual serving as both a party's advisor and a witness is not warranted, and the Department declines to require notice of such a specification.

The Department appreciates the opportunity to clarify that the term "receive" in proposed § 106.46(c)(2)(iii) was not intended to convey a right for a party to keep a copy of any evidence. As explained in the discussion of § 106.46(e)(6), an institution has discretion to determine whether it will provide access to the relevant and not otherwise impermissible evidence or to a written investigative report that accurately summarizes this evidence. Under § 106.46(e)(6), a postsecondary institution has the discretion to determine the mode of providing access to the investigative report or to the underlying evidence, such as electronic copies, physical copies, or inspection of the institution's copies; however, the institution must exercise this discretion in a manner that ensures that the parties have an equal opportunity to access the evidence. *See* § 106.46(e)(6)(i), (ii). To avoid possible confusion and to more closely align the required contents of the notice of allegations with the text of § 106.46(e)(6), the Department deleted the term "receive" in § 106.46(c)(1)(iii) so that the final regulations state that the parties are "entitled to an equal

opportunity to access" the evidence or investigative report.

The Department does not view final § 106.46(c)(1)(iii) as impermissibly conflicting with FERPA. As described in more detail in the discussion of § 106.46(e)(6) below, under FERPA, an eligible student generally has a right to "inspect and review" records, files, documents, and other materials that are directly related to the student and maintained by a postsecondary institution. 20 U.S.C. 1232g(a). The final regulations provide parties an equal opportunity to access the evidence that is relevant to the allegations of sex-based harassment and not otherwise impermissible. But to the extent access to the evidence would conflict with FERPA, the override provision in GEPA, as set forth in 20 U.S.C. 1221(d) and incorporated into the Title IX regulations at § 106.6(e), would apply to permit the disclosure as required by the final Title IX regulations.

The Department disagrees that § 106.46(c)(1)(iv) conflicts with § 106.45(h)(5). Section 106.46(c)(1)(iv) appropriately alerts parties when the recipient's own code of conduct has a policy against making false statements in a disciplinary proceeding, so that both parties understand that risk. Section 106.45(h)(5) prohibits the discipline of a party, witness, or participant for making a false statement "based solely on the recipient's determination whether sex discrimination occurred." While a recipient may discipline a person for making a false statement in a Title IX grievance procedure, it may not find that the person made a false statement based solely on whether the decisionmaker found the respondent responsible for sex discrimination. As explained in the July 2022 NPRM, to discipline a person for making a false statement, the recipient would have to find that the person made the statement knowing that it was false or that the person made it in bad faith. 87 FR 41494–95. The Department also removed the phrase "any provision in" from final § 106.46(c)(1)(iv) so that the paragraph more naturally flows from the stem in § 106.46(c)(1).

Similarly, § 106.45(h)(5) addresses concerns about protecting those participating in a grievance procedure from inappropriate discipline that would chill participation in Title IX grievance procedures, but the section also maintains the recipient's discretion to discipline those who make false statements if the basis for alleging false statements is evidence other than the outcome of the grievance procedures. Although any potential discipline

associated with participation in Title IX grievance procedures could have a chilling effect, the Department recognizes that a recipient has a legitimate interest in holding students accountable for knowingly deceitful statements and in preserving the reliability of its determinations in Title IX grievance procedures. In revising §§ 106.45(h)(5) and 106.46(c)(1)(iv), the Department carefully balanced the important interests in encouraging full and honest participation in Title IX grievance procedures. *See also* discussion of § 106.45(h)(5).

The Department disagrees with the commenter's suggestion to require notification of a recipient's prohibition on knowingly making false statements only when the recipient includes a parallel notice for all disciplinary matters. Nothing prevents a recipient from including such a notification as part of its disciplinary process for other violations of a its code of conduct, but the value of knowing the risk of such discipline to a participant in Title IX grievance procedures does not depend on whether notice is provided with respect to other disciplinary matters.

The Department agrees with commenters that protecting survivors of dating and domestic violence from their abusers is important. Section 106.46(c)(3) gives recipients appropriate flexibility to reasonably delay providing written notice of the allegations to address concerns for the safety of any person as a result of providing the notice. The Department notes that delay may be justified based on a need to address a concern for the safety of any person, including a complainant, a respondent, or other person.

With respect to commenters' questions as to what constitutes a "legitimate concern for safety," the Department seeks to use consistent and accessible terminology throughout the final regulations to the extent appropriate. The final regulations have therefore been revised to permit delay in providing the written notice of allegations to address "reasonable" safety concerns, which more closely aligns with the language of § 106.44(f)(1)(v)(A)(*2*) and is more common and familiar.

The Department appreciates the opportunity to clarify that a determination as to whether a concern for safety is reasonable necessarily begins with the particular allegations and particular individuals involved and may take into account factors such as any history of violent or abusive conduct, any credible threats of self-harm or harm to others, whether a person needs to secure different housing

or a schedule change, or evidence of substance abuse. Section 106.46(c)(3) specifies that the analysis must be individualized and must not rely on mere speculation or stereotypes.

With respect to the timeframe within which notice must be provided after a delay, the Department notes that these determinations will depend on the steps that need to be taken to address the safety concern. For example, if the recipient determines that a complainant lives with the respondent and needs to secure a safe place to stay, the delay should not exceed the amount of time it takes for the complainant to relocate. A recipient may not, however, unreasonably delay providing the notice. The notice may be delayed only to the extent necessary to address reasonable safety concerns, and the recipient must always provide notice with sufficient time for the parties to prepare a response before any initial interview. Further, the Department notes that under § 106.8(f), a recipient must maintain records documenting its implementation of the requirements of § 106.46, including the justification for any delay in providing the notice of allegations under § 106.46(c)(3).

*Changes:* In § 106.46(c)(1)(i), the Department replaced the reference to "106.45(c)" with "106.45(c)(1)(i) through (iii)." The Department also removed the phrase "any provision in" from § 106.46(c)(1)(iv). Finally, the Department has replaced two uses of the term "legitimate" in § 106.46(c)(3) with "reasonable."

Other Clarifications to Regulatory Text

*Comments:* None.

*Discussion:* The Department observed some inconsistencies between the text of proposed § 106.46(c) and other sections of the regulations.

To more closely align the structure and content of § 106.46(c) with § 106.45(c), and to improve clarity, the Department revised § 106.46(c) to begin with the general requirement to provide the written notice and moved the requirement that the notice be provided with sufficient time for the parties to prepare a response before any initial interview to that first sentence of § 106.46(c). The Department further revised § 106.46(c) to begin numbering of paragraph (1) after that first sentence to cover the required contents of the written notice. Section 106.46(c)(1) requires that the notice include all information required under § 106.45(c)(1)(i) through (iii). The Department removed proposed § 106.46(c)(1)(ii) as redundant in light of other changes to § 106.46(c).

For consistency with other provisions in the regulations, the Department also revised § 106.46(c)(1)(i) and (iii) to clarify that two of the rights listed in the written notice of allegations—to present evidence to the decisionmaker and to receive access to evidence—are limited to "relevant and not otherwise impermissible" evidence. To ensure clarity and consistency with § 106.46(e)(6), the Department further revised proposed § 106.46(c) to require a postsecondary institution to inform the parties that, if the recipient provides access to an investigative report, the parties may also request—and then must receive—access to the relevant and not impermissible evidence under § 106.46(e)(6)(i).

The Department also observed that proposed § 106.46(c) lacked a paragraph on the obligation to provide notice of additional allegations, consistent with § 106.45(c)(2). To clarify this obligation under § 106.46(c), the Department added, at § 106.46(c)(2), a statement that, if a recipient decides to investigate additional allegations of sex-based harassment by the respondent toward the complainant that were not included in the original written notice of allegations or that were included in a complaint that is consolidated under § 106.45(e), the recipient must provide written notice of those additional allegations to the parties whose identities are known.

*Changes:* The Department revised the first sentence of § 106.46(c) to include language requiring that the notice be provided with sufficient time for the parties to prepare a response before any initial interview and renumbered the remaining paragraphs so that § 106.46(c)(1) outlines the required contents of the written notice. Proposed § 106.46(c)(1)(ii) has been removed. In § 106.46(c)(1)(i), the Department has added the words "and not otherwise impermissible" after the word "relevant." The Department has also deleted the term "receive" in § 106.46(1)(2)(iii) and added the clause "and if a postsecondary institution provides access to an investigative report, the parties may request and then must receive access to the relevant and not otherwise impermissible evidence" at the end of that paragraph. The Department added § 106.46(c)(2) to clarify the obligation to provide written notice of additional allegations.

3. Section 106.46(d) Dismissal of a Complaint

*Comments:* Some commenters supported § 106.46(d) because it would require simultaneous notice of dismissal to both parties. Other commenters

recommended that the Department modify § 106.46(d) to require a recipient to notify a respondent of a dismissal only if the respondent had notice of the underlying complaint, noting that a complaint may be dismissed before the respondent has notice of it because it has been withdrawn by the complainant, there has been reasonable delay by the recipient to prepare interim safety measures for the complainant, or other circumstances.

*Discussion:* For the same reasons explained in the discussion of § 106.45(d)(3), the Department is persuaded by commenters' recommendation that the Department modify § 106.46(d)(1) so that, when a complaint is dismissed before the respondent has been notified of the allegations, a recipient need only provide the complainant, and not the respondent, with written notice of the dismissal. The Department agrees that notifying a respondent of the dismissal of a complaint for which they had no prior notice would likely cause confusion and could put a complainant at risk of retaliation or sex discrimination, particularly in circumstances in which a complainant withdrew a complaint due to safety concerns. Accordingly, the final regulations have been revised to address commenters' concerns. The Department notes that, because § 106.46(a) incorporates the requirements of § 106.45, a postsecondary institution implementing grievance procedures under § 106.46 also must comply with § 106.45(d)(3) in providing the parties an opportunity to appeal the dismissal of a complaint of sex-based harassment. *See* Notice of Opportunity to Appeal in discussion of § 106.45(d)(3).

*Changes:* The Department has revised § 106.46(d)(1) to state that if dismissal occurs before the respondent has been notified of the allegations, the recipient must provide written notice of the dismissal and the basis for the dismissal only to the complainant.

### 4. Section 106.46(e)(1) Notice in Advance of Meetings

*Comments:* Commenters generally expressed support for requiring sufficient notice of meetings. Some commenters supported requiring sufficient notice of meetings but suggested additional modifications or clarifications. One commenter suggested requiring a reasonable amount of time, rather than sufficient time, to give discretion to recipients and not provide protections for respondents beyond what due process requires.

*Discussion:* As noted in the July 2022 NPRM, the Department has not

substantively changed the language in § 106.46(e)(1) from § 106.45(b)(5)(v) in the 2020 amendments other than the overall change in its prior applicability only to sex-based harassment complaints involving a student complainant or student respondent at a postsecondary institution. 87 FR 41496. The Department does not agree with a commenter's suggestion to substitute "who will be in attendance" for "participants" because § 106.46(e)(1) is about meetings, and it is sufficiently clear that "participants" refers to those who will be attending the meetings. Nor does the Department agree with a commenter that it is necessary to change the language "with sufficient time for the party to prepare" for the meeting to "in a reasonable amount of time before" the meeting. The phrase "with sufficient time for the party to prepare" permits recipients to exercise their discretion regarding how far in advance notice must be given. The provision also applies both to complainants and respondents and therefore, contrary to a commenter's assertion, is not designed to benefit only respondents; complainants, much like respondents, may need time to consult with an advisor, identify witnesses, or otherwise prepare for a meeting. The Department explained in the July 2022 NPRM that ensuring sufficient time for participants to prepare, and possibly consult with others for help preparing, is important for due process, especially in light of the age, maturity, and independence of postsecondary students, many of whom may not have extensive experience with self-advocacy. 87 FR 41496. The Department also notes that postsecondary institutions are separately required by the Clery Act to provide "timely notice of meetings" in proceedings based on an allegation of dating violence, domestic violence, sexual assault, or stalking. *See* 34 CFR 668.46(k)(3)(i)(B)(2).

*Changes:* The Department has made a non-substantive change to replace "meetings, investigative interviews, or hearings" with "meetings or proceedings" for consistency with § 106.46(e)(2) and (3).

### 5. Section 106.46(e)(2) Role of Advisor

#### Advisor Generally

*Comments:* Some commenters supported § 106.46(e)(2) for allowing students to have an advisor, particularly because postsecondary students are newly independent and thus may have a greater need for assistance from an individual in an advisory role. Some of these commenters noted that § 106.46(e)(2), along with

§ 106.46(c)(2)(ii), will help to ensure that postsecondary students with disabilities are able to request and receive the support of an advisor. Another commenter supported the flexibility of allowing postsecondary institutions to define the appropriate role for advisors as long as the rules are applied equally and are consistent with other legal requirements.

One commenter opposed § 106.46(e)(2) for limiting parties to one advisor, which forces postsecondary students to choose between the assistance of a parent or a different advisor. Some commenters opposed what they characterized as the removal of the right to an advisor, on due process grounds. A different commenter opposed § 106.46(e)(2) as conflicting with the rights of unionized employees to have a union representative at a meeting that might lead to disciplinary action, and as possibly conflicting with a union's duty to provide fair representation.

Some commenters urged the Department to extend § 106.46(e)(2) to require a recipient to permit advisors for all complaints alleging sex discrimination or for certain categories of complaints. Other commenters asked the Department to require elementary schools and secondary schools to provide a right to an advisor, stating that these schools do not tend to fully comply with their Title IX obligations. Some commenters noted that employee complaints may have protections under the Clery Act that include the right to an advisor.

Some commenters urged the Department to require postsecondary institutions to allow advisors in any type of investigation under § 106.45, with one commenter noting that sex discrimination complaints frequently involve a power imbalance of a student against the recipient. Another commenter criticized the Department for failing to address any harms of excluding advisors in non-sex-based harassment cases involving postsecondary students. One commenter urged the Department to provide the right to an advisor without the rest of the requirements of § 106.46 to sex-based harassment complaints involving a postsecondary student complainant and an employee respondent.

*Discussion:* Section 106.46(e)(2) requires postsecondary institutions to provide parties with the same opportunities to have an advisor of their choice present during any meeting or proceeding as part of the grievance procedures under § 106.46. The Department notes that the presence of an advisor may violate FERPA;

however, as explained in the discussion of § 106.6(e), the GEPA override dictates that Title IX overrides FERPA when there is a direct conflict. Thus, a postsecondary institution must permit the parties to have an advisor of their choice as required by § 106.46(e)(2).

In response to a request to allow multiple advisors so that postsecondary students can receive assistance from an attorney and a parent, the Department declines to require an institution to allow parties to be accompanied to meetings and proceedings by multiple advisors. Requiring an institution to allow multiple advisors is likely to present scheduling challenges that could delay the proceedings, create a chilling effect on parties and witnesses due to the presence of additional individuals, and weaken privacy protections by disclosing sensitive information to additional individuals. In addition, while a postsecondary student could choose a parent to be their advisor, the Department declines to allow parents the automatic right to attend because, as noted in the discussion of § 106.6(g) in this preamble, a parent or guardian typically does not have legal authority to exercise rights on behalf of a postsecondary student. For further information about the presence of additional individuals at meetings and proceedings, see the discussion of § 106.46(e)(3).

The Department appreciates the opportunity to clarify that in grievance procedures in which one party is a postsecondary student and another party is not, § 106.46(e)(2) requires the postsecondary institution to permit the non-student party the same opportunity for an advisor as the postsecondary student to ensure equitable opportunity to participate under § 106.45(b)(1). For reasons discussed in Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.C), sex-based harassment complaints involving a postsecondary student complainant and employee respondent must comply with all of the requirements under § 106.46 (and not simply the right to an advisor, as suggested by a commenter). The Department also clarifies that § 106.46(e)(2) provides the parties with the right to be accompanied to any meeting or proceeding, including interviews with investigators, by an advisor of the parties' choice.

The Department acknowledges the concerns raised by a commenter related to the role of labor union representatives in the grievance procedures. The Department clarifies that nothing in these final regulations precludes parties from choosing to have a union representative serve as their advisor in

the Title IX grievance procedures. For information about the presence of a union representative who is not serving as a party's advisor of choice, see the discussion of § 106.46(e)(3).

The Department declines to extend the right to an advisor of choice to complaints outside of § 106.46. In general, students at postsecondary institutions are differently situated from other parties to grievance procedures in a way that warrants the right to an advisor of choice for complaints under § 106.46. Unlike elementary school and secondary school students, postsecondary students generally have the authority to act on their own behalf and are generally less likely to be represented by a parent or guardian throughout their educational experience, yet they may also not have the sufficient maturity or experience with self-advocacy to participate in grievance procedures, which are unique compared to other aspects of the educational experience, without the assistance of an advisor. Employees may have access to a union representative or other employee-specific resources, whereas postsecondary students do not tend to have comparable options.

In addition, the Department views postsecondary students who are participating in grievance procedures for complaints of sex-based harassment as differently situated from those who are participating in grievance procedures for complaints involving other types of sex discrimination. Complaints of sex-based harassment often involve multiple parties whose conduct and credibility are subjected to scrutiny; sensitive material and disputes over the relevance and permissibility of the evidence; and a student respondent facing potential disciplinary sanctions. By contrast, complaints of sex discrimination other than sex-based harassment often allege different treatment by an employee or by a recipient's policy or practice, such as different treatment in grading. These cases are less likely to involve credibility assessments of multiple parties, sensitive material, or a party that faces disciplinary sanctions. For example, a complaint alleging discriminatory grading based on sex by a faculty member in a college math course would likely involve a review of the grading rubric and a review of the graded examinations of the other students in the course. While credibility may play a role, it is less likely to be a central role in the evaluation of this type of complaint. The Department thus views postsecondary students as able to meaningfully participate in the § 106.45 grievance procedures for complaints of

other types of sex discrimination without the assistance of an advisor. The Department disagrees that student complainants should have the right to counsel under § 106.45 to address any power imbalance because the numerous procedural safeguards within § 106.45 provide sufficient support for these students and impose various obligations on the recipient to ensure equitable proceedings.

There is no conflict between § 106.46(e)(2) and Clery Act protections. The Clery Act protections described in 34 CFR 668.46(k)(2), including the right to an advisor of choice in disciplinary proceedings, *see* 34 CFR 668.46(k)(2)(iv), apply to "cases of alleged dating violence, domestic violence, sexual assault, or stalking" at postsecondary institutions. Dating violence, domestic violence, sexual assault, and stalking all fall within the scope of sex-based harassment as defined in § 106.2. The final Title IX regulations require an advisor of choice in § 106.46(e)(2), which applies to complaints alleging sex-based harassment involving a postsecondary student. Thus, the Clery Act and § 106.46(e)(2) similarly provide the right to an advisor. The Department also notes that in proceedings involving an allegation of dating violence, domestic violence, sexual assault, or stalking, postsecondary institutions are separately required by the Clery Act to provide the parties with the opportunity to be accompanied to any meeting or proceeding by an advisor of their choice. *See* 34 CFR 668.46(k)(2)(iii)–(iv). Recipients are able to comply with these final Title IX regulations as well as the Department's regulations implementing the Clery Act.

In response to commenters' due process concerns related to the Department's changes to the parties' right to an advisor, the Department emphasizes that the parties to sex-based harassment grievance procedures involving a postsecondary student retain the right to an advisor of choice under § 106.46(e)(2). The Department is not removing any right to an advisor for complaints involving sex discrimination that is not sex-based harassment because the 2020 amendments do not provide that right: like the final regulations, the 2020 amendments conferred (at § 106.45(b)(5)(iv)), a right to an advisor only in cases involving formal complaints of sexual harassment.

While the final regulations no longer require a recipient to provide a right to an advisor at meetings or proceedings in sex-based harassment cases other than those involving a postsecondary student, the Department reiterates that

nothing in these final regulations prohibits parties from having an advisor of choice outside of the § 106.46 grievance procedures. In the preamble to the 2020 amendments, the Department stated that the right to an advisor in formal complaints of sexual harassment under § 106.45(b)(5)(iv) of the 2020 amendments would make the grievance process more thorough and fair and would result in more reliable outcomes. *See* 85 FR 30297. As discussed in greater detail in Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.C), the Department received significant feedback that the 2020 amendments are too inflexible, are unduly burdensome, and fail to account for younger students and the unique contexts of elementary schools and secondary schools. In response, the Department reconsidered the requirements of the 2020 amendments and removed certain procedures for complaints under § 106.45. The Department acknowledges that some commenters raised concerns about the lack of an advisor in elementary schools and secondary schools and concerns about these schools' compliance with Title IX; however, the Department views the assistance of a parent, guardian, or other authorized legal representative as sufficient to ensure a thorough and fair investigation and a reliable resolution in the revised grievance procedures that apply to complaints under § 106.45. The Department also notes that anyone who believes that a recipient has failed to comply with Title IX may file a complaint with OCR, which OCR would evaluate and, if appropriate, investigate and resolve consistent with these final regulations.

*Changes:* The Department has made a non-substantive change to replace ''any meeting or grievance proceeding'' with ''any meeting or proceeding'' for consistency within § 106.46(e)(2), and for consistency with § 106.46(e)(1) and (3).

Choice of Advisor

*Comments:* Some commenters urged the Department to require a recipient to provide free legal counsel to parties. One commenter appeared to urge the Department to draw from the ''authorized legal representative'' language in § 106.6(g), rather than in § 106.46(e)(2), to provide the right to counsel. Other commenters broadly opposed § 106.46(e)(2) as weakening the right to counsel. Another commenter expressed concern that § 106.46(e)(2) creates the impression that an advisor needs to be an attorney.

Some commenters urged the Department to prohibit recipients from requiring confidential employees to serve as advisors under § 106.46(f) for questioning by an advisor when a party does not have an advisor of their choice, but to otherwise permit parties to select confidential employees to serve as their advisor of choice. Other commenters urged the Department not to allow confidential employees to serve as advisors without distinguishing between advisors appointed by the recipient and those selected by the party. Some commenters urged the Department to clarify that a witness should not be permitted to act as an advisor in any hearing or should be limited in their role as an advisor when acting as a witness due to concerns about witness credibility and the integrity of an investigation or hearing.

One commenter stated that a recipient should be allowed to place reasonable restrictions on the parties' choice of advisor. Another commenter urged the Department to modify § 106.46(e)(2)–(3) to state that, with respect to a student-to-student complaint, the representative for one student at the hearing must not be an individual who has academic or professional authority over the other student. Other commenters suggested allowing a recipient to prevent a person in a position of authority over the other parties or relevant witnesses from serving as the advisor. Different commenters asked for further clarity on the role of the advisor, including how they should be trained, whom they can be, and whether they require compensation from recipients.

*Discussion:* The Department appreciates the range of comments regarding legal counsel serving as a party's advisor of choice. Consistent with § 106.45(b)(5)(iv) of the 2020 amendments, § 106.46(e)(2) specifies that a party's advisor of choice may be an attorney. The Department acknowledges that a party's choice of advisor may be limited by whether the party can afford to hire an advisor or must rely on an advisor appointed by the postsecondary institution or otherwise available without fee or charge. The Department emphasizes that the status of a party's advisor (*i.e.,* whether the advisor is an attorney) and the financial resources of any party must not affect the institution's compliance with §§ 106.45 and 106.46, including the obligations to objectively evaluate the relevant and not otherwise impermissible evidence, treat complainants and respondents equitably, and use investigators and decisionmakers who are free from bias or conflicts of interest. The Department

declines to require recipients to pay for parties' legal counsel or advisors because, as the Department recognized in the 2020 amendments, the procedural rights provided to the parties during the grievance procedures afford all parties the opportunity to engage fully and advance their interests, regardless of financial ability. *See* 85 FR 30297. The Department also notes that while these final regulations do not require an institution to pay for the parties' advisors, nothing in the final regulations precludes an institution from choosing to do so. Likewise, nothing in these regulations precludes an institution from offering to provide attorney-advisors or non-attorney advisors to the parties, though § 106.46(e)(2) ensures that the parties retain the right to select their own advisor of choice and decline the institution's offer.

In response to comments suggesting that § 106.46(e)(2) weakens a party's ability to be represented by counsel, the Department notes that § 106.46(e)(2)—similar to § 106.45(b)(5)(iv) of the 2020 amendments—specifically allows a party to choose an attorney as their advisor. In addition, although § 106.46 allows an institution to establish restrictions regarding the extent to which the advisor may participate in the grievance proceedings, restrictions on advocates are a common and accepted part of adversarial proceedings, and are necessary to ensure orderly and efficient functioning of such proceedings. The Department also notes that any such restrictions must apply equally to the parties and thus will not disproportionately impair the role of either party's advisor. The Department notes that an institution must not limit the presence of the advisor for a complainant or respondent in any meeting or proceeding. Further, the institution's grievance procedures must comply with § 106.46, which requires an institution to permit certain levels of participation by advisors (*e.g.,* requirements related to questioning by an advisor in a live hearing under § 106.46(f)(1)(ii)(B), if an institution employs that process). The Department disagrees that § 106.46(e)(2) suggests that the advisor of choice must be an attorney, given that the language expressly states that the advisor is not required to be an attorney.

In response to the comment asking the Department to provide the right to counsel through § 106.6(g), the Department wishes to clarify that the phrase ''authorized legal representative'' in § 106.6(g) does not refer to legal counsel. Rather, it refers to an individual who is legally authorized to act on behalf of certain youth, such as

youth in out-of-home care, but is not necessarily deemed a parent or guardian. *See* discussion of § 106.6(g).

In response to questions regarding whether a confidential employee may serve as an advisor, the Department wishes to clarify that a party may choose a confidential employee to serve as their advisor of choice under § 106.46(e)(2); however, an institution may not appoint or otherwise require a confidential employee to serve as the postsecondary institution's advisor of choice to ask questions on behalf of a party when the party lacks their own advisor of choice. The Department has revised § 106.46(f)(1)(ii)(B) to state that, when a postsecondary institution is required to appoint an advisor to ask questions on behalf of a party for the purpose of conducting questioning at a live hearing, a postsecondary institution may not appoint a confidential employee. Requiring a confidential employee to serve as an advisor may jeopardize that employee's ability to serve as a confidential employee and could risk disclosing communications that would otherwise be protected from disclosure under § 106.45(b)(7)(i). Although these concerns may also be present if a party chooses a confidential employee to serve as their advisor of choice, preserving a party's choice of advisor is important enough to accept these concerns when a party has voluntarily chosen a confidential employee as their advisor. Further, a party's choice of a confidential employee as their advisor suggests that the party is not concerned with the confidential employee's ability to serve as an advisor or with any risk of that employee disclosing confidential communications.

Given the importance of preserving a party's choice of an advisor, the Department is not prohibiting a party from selecting an advisor who has served or who may serve as a witness in the grievance proceedings. This position is consistent with the position expressed by the Department in the preamble to the 2020 amendments, in which the Department acknowledged the potential complications of a witness serving as an advisor but believed that it would be inappropriate to preclude a party from selecting an advisor who is also a witness. *See* 85 FR 30299. The Department maintains, as stated in the preamble to the 2020 amendments, a decisionmaker may consider any conflicts of interest as part of weighing the credibility and persuasiveness of the advisor-witness's testimony. *See id.* The decisionmaker may also consider, as part of the requirement to assess witness credibility under § 106.46(f)(1), whether

the witness was exposed to any information in their role as advisor that may have influenced their witness testimony. Institutions may wish to advise parties on the potential complications of selecting an advisor who might be called as a witness.

It is not necessary or appropriate to place other restrictions on who may serve as a party's advisor, such as a prohibition on an advisor who has academic or professional authority over another party. The Department is not limiting the party's right to select an advisor with whom the party feels most comfortable and who the party believes will best assist them during the grievance procedures. The Department does not view an advisor with authority over another party as jeopardizing the reliability of the evidence presented or the integrity of the proceedings and the outcome. The Department notes that § 106.46(e)(2) permits an institution to place equal restrictions on the advisors' participation in the proceedings, and that § 106.71 prohibits retaliation against anyone who has made a complaint, testified, assisted, or participated or refused to participate in an investigation, proceeding, or hearing under § 106.45, and if applicable § 106.46. The Department declines to require institutions to mandate advisor training, as this could limit the parties' ability to select an advisor of their choice based on whether the advisor has received, or is able to receive, such training. These final regulations, however, do not preclude a recipient from providing training for advisors.

Regarding commenters' requests to require the institution to accommodate the advisor's availability, the Department notes that, under § 106.46(e)(5), an institution must allow for the reasonable extension of timeframes on a case-by-case basis for good cause, while remaining mindful of its obligation to meet its own reasonably prompt timeframes.

*Changes:* The Department has clarified in § 106.46(f)(1)(ii)(B) that if a postsecondary institution chooses to use a live hearing, it may allow the questions proposed by the party for other parties and witnesses to be asked by the decisionmaker or by the party's advisor, and that in those instances in which a postsecondary institution is required to appoint an advisor to ask questions on behalf of a party during advisor-conducted questioning, a postsecondary institution may not appoint a confidential employee to be the advisor.

Restrictions on Advisor's Participation

*Comments:* Some commenters urged the Department to remove the language permitting the recipient to establish restrictions on the extent to which the advisor may participate or to restrict the limitations that recipients may place on advisors. One commenter asked the Department to require that an advisor be able to actively participate in proceedings as much as reasonably practicable. Another commenter asked the Department to clarify the extent to which a party may delegate certain functions or communications to their advisor, and some commenters requested that an advisor be allowed to attend a hearing in the absence of a party and present evidence on that party's behalf.

*Discussion:* Consistent with the Department's position in the preamble to the 2020 amendments, *see* 85 FR 30298, the Department declines to remove the discretion of a postsecondary institution to restrict an advisor's participation so as not to unnecessarily limit an institution's flexibility to conduct its grievance procedures that both comply with §§ 106.45 and 106.46 and, in the institution's judgment, best serve the needs and interests of the institution and its educational community. If, however, a postsecondary institution permits questioning by an advisor at a live hearing, under § 106.46(f)(1)(ii)(B), the institution must allow the party's advisor of choice to conduct the questioning. The final regulations do not specify what types of restrictions on advisor participation may be appropriate or what types of functions the advisor may conduct, as the Department views these determinations as best left to the discretion of the postsecondary institution.

In response to a comment about whether a party's advisor can attend a live hearing in lieu of the party, the Department notes that if a postsecondary institution chooses to conduct a live hearing with questioning by an advisor, each party has a right to have their advisor ask relevant and not otherwise impermissible questions and follow-up questions of any party or witness. § 106.46(f)(1)(ii)(B). A party retains their right to have their advisor ask questions at the live hearing even if the party chooses not to appear at the hearing. If a party refuses to respond to relevant and not otherwise impermissible questions by not attending the hearing, however, under § 106.46(f)(4), a decisionmaker may choose to place less or no weight on the statements made by that party. The

decisionmaker must not, however, draw an inference about whether sex-based harassment occurred based solely on a party's refusal to respond. *See* § 106.46(f)(4). The Department notes that the parties have the right to request that the live hearing be held with the parties present in separate locations, and the postsecondary institution must do so upon the party's request. *See* § 106.46(g) and the discussions of § 106.46(f) and (g) of this preamble.

*Changes:* None.

6. Section 106.46(e)(3) Other Persons Present at Proceedings

*Comments:* Some commenters expressed general support for § 106.46(e)(3) and encouraged postsecondary institutions to permit parties to have additional people present as support. Other commenters opposed § 106.46(e)(3) for excluding parents from disciplinary proceedings at postsecondary institutions. Some commenters stated that the need for parental presence is often stronger for college students, many of whom are legally dependent on their parents until around the time they arrive at college. In response to the statement in the July 2022 NPRM that college students are more likely to live alone and be independent than younger students, and that parents are less likely to be able to exercise legal rights on their behalf, one commenter stated, without providing further detail, that these assertions are not true for many college students.

Other commenters urged the Department to allow parties to have both an advisor and a support person. Some commenters asserted that because § 106.46(e)(2) permits one advisor, college students need to choose between legal representation (who can help with legal and technical aspects but is essentially a stranger) and the emotional support of a family member or close friend.

Some commenters expressed support for applying § 106.46(e)(3) to complaints under § 106.45. Commenters stated that many elementary and secondary students would benefit from a support person other than a parent or advisor. One commenter asserted that in most sex discrimination investigations other than those involving sex-based harassment, students are faced with the intimidating situation of challenging decisions made by their school or its officials.

By contrast, another commenter urged the Department to prohibit postsecondary institutions from permitting anyone other than parties and their advisors to attend sex-based harassment proceedings, noting

concerns with a complainant sharing sensitive information in front of a respondent's parent, a journalist, or another respondent who was accused by the same complainant.

Some commenters expressed concern that parties will interpret § 106.46(e)(3) as conferring the right to have persons other than their advisor present at meetings and proceedings, noting that the presence of other individuals will generally violate FERPA and proposed § 106.44(j) unless the presence of that individual is required by Title IX or by law. Alternatively, the commenters asked the Department to make clear that a postsecondary institution complies with § 106.46(e)(3) by allowing only additional individuals whose presence is legally required.

*Discussion:* The Department appreciates the range of opinions expressed by commenters regarding the postsecondary institution's discretion to allow parties to have persons other than their advisor present at any meeting or proceeding, provided that the institution provides the same opportunities to the parties.

The Department appreciates the opportunity to clarify that § 106.44(j) does not prohibit a postsecondary institution from allowing parties to have persons other than the parties' advisor present at any meeting or proceeding because the exception at § 106.44(j)(3) permits disclosures of personally identifiable information to carry out the purposes of Title IX and these final regulations, including action taken to address conduct that reasonably may constitute sex discrimination. Section 106.44(j)(3) permits an institution to exercise its discretion under § 106.46(e)(3) to allow the parties to have persons other than their advisor attend any meeting or proceeding.

The Department also clarifies that, as some commenters noted, § 106.46(e)(3) must be interpreted consistent with a postsecondary institution's obligations under FERPA. If the presence of persons other than the party's advisor means that an institution is unable to comply with FERPA, the institution is not permitted to exercise its discretion under § 106.46(e)(3) to allow persons other than the parties' advisors to attend meetings or proceedings. The GEPA override, as stated in § 106.6(e), is not applicable to permit the presence of an individual other than the party's advisor whose presence would violate FERPA. Because § 106.46(e)(3) does not require an institution to allow the presence of persons other than the party's advisor, there is no direct conflict between Title IX and FERPA: an institution can comply with its obligations under both

Title IX and FERPA by not permitting the presence of an individual other than the party's advisor when the presence would violate FERPA. *See* discussion of § 106.6(e). If a party has a constitutional right to the presence of a particular individual at meetings or proceedings, the constitutional override would apply to permit the presence of that individual. The Department also notes that an institution would be able to allow persons other than the parties' advisors to attend meetings or proceedings and still comply with FERPA if any student party, witness, or other participant whose personally identifiable information is subject to disclosure provides prior written consent.

In addition, a party may be accompanied by a union representative if the postsecondary institution chooses to provide the parties with the opportunity to have persons other than the advisor of the parties' choice present during any meeting or proceeding, provided that the union representative's presence does not conflict with FERPA. Further, as noted above, if any student party, witness, or other participant whose personally identifiable information is subject to disclosure provides prior written consent to permit the presence of persons other than the parties' advisors (*e.g.*, a union representative), their presence will not violate FERPA.

In addition, there are certain situations in which a postsecondary institution may be required to permit a party to have another person, in addition to an advisor, present during any meeting or proceeding to comply with another law. Under the ADA and Section 504, a postsecondary institution must ensure effective communication for persons with disabilities through the provision of auxiliary aids and services (*e.g.*, providing a sign language interpreter for a party who is deaf or hard of hearing) and by making reasonable modifications to policies, practices, and procedures to avoid discrimination based on disability. A postsecondary institution may need to provide language assistance services under Title VI, such as translations or interpretation for persons with limited English proficiency. In these situations, a postsecondary institution must provide the parties with the same opportunities to have necessary support persons to overcome language- or disability-based barriers to participation, although this may result in only one party (*e.g.*, the party with a disability) having another person present. In situations in which the presence of a person (other than an

advisor) may conflict with FERPA but is necessary to comply with certain antidiscrimination statutes, including Title VI, the ADA, and Section 504, the override provision in GEPA, as set forth in 20 U.S.C. 1221(d), would apply to permit the other person to attend a meeting or proceeding to ensure the party can engage fully in the grievance procedures.[61] The Department does not believe that it is necessary to revise § 106.46(e)(3) to reflect that the requirements of other antidiscrimination laws may result in only one party being permitted to have a support person.

In response to concerns about the potential exclusion of parents from disciplinary proceedings at postsecondary institutions, the Department reiterates that § 106.6(g) prohibits the Title IX regulations from being read in derogation of any legal right of a parent, guardian, or other authorized legal representative to act on behalf of a party, and that nothing in the regulations prohibits a student from choosing a parent as their advisor. As noted in the discussion of § 106.6(g) in this preamble, a parent or guardian would not automatically be eligible to attend a proceeding with a postsecondary student; because postsecondary students generally are older than elementary school and secondary school students, parents and guardians typically do not have the same legal authority to exercise rights on behalf of postsecondary students. Section 106.46(e)(3) gives a postsecondary institution the discretion to permit parties to have persons other than the party's advisor—such as the party's parent or guardian—attend any meeting or proceeding; however, a recipient must not permit a parent or guardian of a postsecondary student to attend a meeting or proceeding when their presence would violate FERPA.

The Department acknowledges the benefits of a support person (other than an advisor). The Department also acknowledges the privacy concerns, potential chilling effect, and possible scheduling challenges associated with the presence of additional individuals. The Department continues to believe that postsecondary students are more likely to be independent and that their parents are less likely to be able to

exercise legal rights on their behalf. The Department maintains the position, as stated in the preamble to the 2020 amendments, that the sensitivity and high stakes of the sex-based harassment grievance procedures weigh in favor of protecting the parties' privacy to the extent feasible (unless otherwise required by law). Thus, the Department declines to require postsecondary institutions to allow parties to be accompanied to a meeting or proceeding by persons other than the parties' advisors or those whose presence is legally required, as described above. *See* 85 FR 30339. The Department also declines to extend § 106.46(e)(3) to complaints under § 106.45 for similar reasons to the decision not to extend § 106.46(e)(2)'s right to an advisor of choice to complaints under § 106.45. As explained in greater detail in the discussion of § 106.46(e)(2), in general, postsecondary students are differently situated from other parties to grievance procedures, and postsecondary students who are participating in grievance procedures for sex-based harassment complaints are differently situated from those participating in grievance procedures for non-sex-based harassment complaints. The Department also notes that in proceedings involving an allegation of dating violence, domestic violence, sexual assault, or stalking, postsecondary institutions are separately required by the Clery Act to provide the parties with the same opportunity to have others present at any disciplinary proceeding. *See* 34 CFR 668.46(k)(2)(iii).

It is not necessary to modify § 106.46(e)(3) to specify a limit on the number of persons who may accompany a party to a meeting or proceeding or to require attendees to sign a confidentiality agreement. As noted above, § 106.46(e)(3) must be interpreted consistent with a postsecondary institution's obligations under FERPA so an institution may not permit the presence of a person other than the party's advisor when the presence of that person would violate FERPA. In addition, § 106.45(b)(5) already requires a recipient to take reasonable steps to protect the privacy of the parties and witnesses during the pendency of a recipient's grievance procedures, and reasonable steps could include a confidentiality agreement if a recipient concludes such an agreement would be appropriate.

*Changes:* None.

### 7. Section 106.46(e)(4) Expert Witnesses

*Comments:* Commenters offered a variety of views on § 106.46(e)(4). One commenter supported the provision for

giving postsecondary institutions the discretion to decide whether to allow expert witnesses, while another commenter urged the Department to prohibit expert witnesses and instead ensure decisionmakers are trained on topics on which expert witnesses might often provide testimony. The commenter identified drug and alcohol incapacitation as areas in which expert witnesses might provide testimony. Some commenters stated that expert witnesses cannot provide case-specific information, are not usually used in educational adjudications, and would unfairly tip the scales in favor of parties who can afford them.

Several commenters opposed § 106.46(e)(4) for eliminating the requirement in the 2020 amendments that a recipient allow all parties to present expert testimony. Commenters also criticized § 106.46(e)(4) for, they asserted, limiting the scope of relevant evidence, restricting a student's right to present claims or defenses using evidence of their choice, and eroding protections grounded in fairness principles and case law. Commenters stated that depriving parties of their own expert witnesses could lead to errors or unfair outcomes.

Some commenters disagreed with the Department's statement in the July 2022 NPRM that postsecondary institutions are in the best position to decide whether expert testimony will be helpful.

One commenter expressed concern that the Department appeared to discourage expert witnesses in the July 2022 NPRM. Another commenter criticized § 106.46(e)(4) for failing to specify when expert witnesses would be necessary or helpful. The commenter also asserted that § 106.46(e)(4) could harm complainants because complainants sometimes rely on experts and because unfair institutional processes can give rise to litigation and reversals, which drag out cases and deny closure. Some commenters requested that § 106.46(e)(4) be extended to provide a recipient the discretion to permit character witnesses.

*Discussion:* The Department appreciates the range of views expressed by commenters, including concerns about both allowing and excluding expert testimony. Although the 2020 amendments require a recipient to provide an equal opportunity for the parties to present fact and expert witnesses, we maintain our position expressed in the July 2022 NPRM, *see* 87 FR 41497, that the Department is neither encouraging nor discouraging the use of expert witnesses in an investigation of a sex-based harassment

---

[61] *See* 20 U.S.C. 1221(d) ("Nothing in this chapter shall be construed to affect the applicability of title VI of the Civil Rights Act of 1964 [42 U.S.C. 2000d *et seq.*], title IX of the Education Amendments of 1972 [20 U.S.C. 1681 *et seq.*], title V of the Rehabilitation Act of 1973 [29 U.S.C. 790 *et seq.*], the Age Discrimination Act [42 U.S.C. 6101 *et seq.*], or other statutes prohibiting discrimination, to any applicable program.").

complaint involving a student at a postsecondary institution. The Department agrees with the views expressed by commenters that expert witnesses may, in certain cases, unnecessarily prolong the grievance procedures and are not an essential component in all administrative proceedings. Further, because expert witnesses would not have observed the alleged conduct, their testimony may not be necessary or helpful to the institution in determining whether sex-based harassment occurred. *See* 87 FR 41497.

The Department, however, acknowledges that there may be specific circumstances in which an institution believes expert witnesses could provide helpful information. The Department declines to identify instances in which expert witnesses will be necessary or helpful because this decision should take into account the facts and circumstances of a particular complaint and be left to the discretion of the institution. Institutions are in the best position to identify whether a particular case might benefit from expert witnesses and to balance the interests of promptness, fairness to the parties, and accuracy of adjudications in each case. Parties may explain to the institution why they believe that expert testimony will be helpful in their case. The Department disagrees that giving institutions the discretion to decide whether to permit experts will prolong the grievance procedures by rendering the procedures unfair. A postsecondary institution must exercise its discretion regarding expert witnesses in a manner that complies with these Title IX regulations, including the obligations to objectively evaluate the relevant and not otherwise impermissible evidence, treat the parties equitably, and use investigators and decisionmakers who are free from bias or conflicts of interest. The Department emphasizes that parties continue to have an equal opportunity to present fact witnesses and other inculpatory and exculpatory evidence that are relevant and not otherwise impermissible under § 106.45(f)(2), and parties also have the opportunity under § 106.46(i)(1) to appeal from a determination whether sex-based harassment occurred on several bases, including on the basis that the investigator or decisionmaker had a conflict of interest or bias for or against complainants or respondents generally or the individual complainant or respondent that would change the outcome.

The Department understands the concern expressed by some commenters that expert witnesses confer an advantage on the parties who can afford them. The Department again emphasizes that the financial resources of any party must not affect a recipient's compliance with §§ 106.45 and 106.46, including the obligations to objectively evaluate the relevant and not otherwise impermissible evidence, treat complainants and respondents equitably, and use investigators and decisionmakers who are free from bias or conflicts of interest.

In response to a commenter's request to prohibit expert witnesses altogether and to instead ensure that decisionmakers are adequately trained on certain topics that might be raised by the parties during the grievance procedures, the Department has determined that § 106.8(d) in these final regulations strikes the appropriate balance between requiring training on topics that are necessary to promote a recipient's compliance with these regulations—such as the scope of prohibited sex discrimination, the meaning of relevance, and the requirements of the recipient's grievance procedures—while leaving flexibility to recipients to choose the content and substance of any additional training topics.

In response to the commenters' request to give a recipient discretion to allow character witnesses, the Department notes that the parties have an equal opportunity to present relevant and not otherwise impermissible evidence (§ 106.45(f)(2)), and that recipients must objectively evaluate relevant and not otherwise impermissible evidence (§ 106.45(b)(6)). Section 106.45(f)(2) permits character evidence, including character witnesses, that present relevant and not otherwise impermissible evidence. The requirement that evidence be "relevant," as defined by § 106.2, means that a party's ability to present character evidence (and a recipient's ability to consider such evidence) is limited to evidence that will aid the decisionmaker in determining whether the alleged sex discrimination occurred. Whether a character witness is relevant will depend on the facts and circumstances of a particular complaint.

*Changes:* None.

**8. Section 106.46(e)(5) Timeframes**

Comments related to both timeframe provisions, §§ 106.45(b)(4) and 106.46(e)(5), are discussed together in the discussion of § 106.45(b)(4) in this preamble.

**9. Section 106.46(e)(6) Access to Relevant and Not Otherwise Impermissible Evidence**

*§ 106.46(e)(6)(i): Access to a Written Investigative Report or to the Relevant and Not Otherwise Impermissible Evidence*

*Comments:* Many commenters expressed support for § 106.46(e)(6) for ensuring that parties are able to access relevant evidence while also protecting privacy by excluding impermissible evidence and requiring steps to prevent unauthorized disclosures. Several commenters expressed support for the additional flexibility for postsecondary institutions to determine the manner for sharing information with the parties.

Some commenters specifically supported the shift from "directly related" in § 106.45(b)(5)(vi) of the 2020 amendments to "relevant" in proposed § 106.46(e)(6)(i), while other commenters expressed concern or confusion about the use of "relevant." Some commenters were concerned that a recipient would have too much discretion in determining relevance, and that parties would not have the opportunity to explain why certain evidence is relevant because they would not know what evidence was excluded. Some commenters urged the Department to retain § 106.45(b)(5)(vi) of the 2020 amendments.

Some commenters urged the Department to require a recipient to provide access to both the relevant evidence and to an investigative report, as required by the 2020 amendments at § 106.45(b)(5)(vi)–(vii). One commenter noted that it is standard practice for postsecondary institutions to create investigative reports for civil rights investigations, and that postsecondary institutions have become accustomed to creating written investigative reports both prior to and in response to the 2020 amendments. Other commenters criticized § 106.46(e)(6)(i) for purportedly providing flexibility and reducing the burden to postsecondary institutions while actually imposing the same burdens as the 2020 amendments.

Some commenters said that limiting access to witness testimony would hinder a respondent's ability to file a lawsuit to protect their civil rights, though the commenters did not explain the basis for their concern. One commenter objected to the exclusion of "otherwise impermissible evidence" from the evidence shared with respondents.

Several commenters expressed concern that the underlying evidence would, in some instances, only be available upon request. Some

commenters expressed concern that an investigative report would not include all important information or would reflect the investigator's bias. Other commenters noted that the risk of unfairness is increased if the investigator creating the investigative summary is also the ultimate decisionmaker. Some commenters recommended that the parties have the opportunity to respond to draft investigative reports or provide input on the evidence to be included in the investigative report.

Other commenters asked the Department to modify § 106.46(e)(6)(i) to align with the Clery Act.

Some commenters recommended that § 106.46(e)(6)(i) require (rather than only permit) institutions to provide the parties with an organized, synthesized investigative report to help the parties understand and therefore respond appropriately to the evidence. One commenter suggested that § 106.46(e)(6) require documentary evidence to be attached to the investigative report, and the commenter stated that the regulations do not explain how investigators should share oral evidence (*e.g.*, a recording or transcript of investigative interviews) with the parties.

*Discussion:* Section 106.46(e)(6)(i) requires a postsecondary institution to provide an equal opportunity to access the relevant and not otherwise impermissible evidence by providing access to this evidence ("evidence option"), or by providing access to the same written investigative report that accurately summarizes this evidence ("investigative report option"). If the postsecondary institution initially chooses the investigative report option and then a party requests access to the evidence, the institution is required to provide all parties with an equal opportunity to access the underlying relevant and not otherwise impermissible evidence. Section 106.46(e)(6) requires an institution to provide the parties and their advisors with access to the underlying evidence or the investigative report, but does not require an institution to give the parties or their advisors a physical or electronic copy of these materials.

The 2020 amendments distinguish between evidence that is "directly related" to the allegations, to which the recipient must provide the parties with access (§ 106.45(b)(5)(vi)), and "relevant" evidence, which the recipient must evaluate (§ 106.45(b)(1)(ii)), include in the investigative report (§ 106.45(b)(5)(vii)), and permit questions about

(§ 106.45(b)(6)). The preamble to the 2020 amendments explained that the universe of evidence "directly related" to a complaint may sometimes be larger than the universe of evidence "relevant" to a complaint. 85 FR 30304.

OCR received feedback during the June 2021 Title IX Public Hearing that the distinction between "directly related" and "relevant" is confusing and not well-delineated. In the July 2022 NPRM, the Department proposed merging these standards by defining "relevant" in § 106.2 as evidence "related to the allegations of sex discrimination" and "evidence that may aid a decisionmaker in determining whether the alleged sex discrimination occurred." 87 FR 41419. Despite the change in terminology from "directly related" to "relevant" to describe the scope of evidence to which the parties must receive access, the Department views these final regulations as requiring access to a similar scope of evidence as the 2020 amendments with one exception.

Specifically, the 2020 amendments contemplate that evidence regarding a complainant's sexual predisposition or prior sexual behavior may be "directly related" to an allegation, but that such evidence is not "relevant" unless the evidence is offered to prove that someone other than the respondent committed the conduct alleged or the evidence concerns specific incidents of the complainant's prior sexual behavior with respect to the respondent and the evidence is offered to prove consent. 85 FR 30428; *see also* 34 CFR 106.45(b)(6)(i), (ii).[62] Thus, the 2020 amendments give parties the right to inspect and review all evidence regarding a complainant's sexual predisposition or prior sexual behavior that is "directly related" to the allegations, even though only evidence that falls into one of the two exceptions is deemed "relevant" and can be used in the investigative report and at the hearing. *See* 85 FR 30304, 30428; 34 CFR 106.45(b)(6)(i), (ii). The Department no longer agrees with this approach and maintains it is inappropriate to broadly allow parties to review evidence regarding a complainant's sexual interests or prior sexual conduct. Thus, these final regulations do not permit the parties to have any access to evidence

relating to the complainant's sexual interests or prior sexual conduct unless evidence about the complainant's prior sexual conduct falls within one of the two narrow circumstances in § 106.45(b)(7)(iii) in that it (1) is offered to prove that someone other than the respondent committed the alleged conduct or (2) is evidence about the specific incidents of the complainant's prior sexual conduct with the respondent and is offered to prove consent to the alleged sex-based harassment.

The Department disagrees that the relevance standard gives too much discretion to recipients. The 2020 amendments use a relevance standard in various provisions without defining the term, except for the clarifications in the preamble to the 2020 amendments that "relevant" should be interpreted using its plain and ordinary meaning and that laypeople can make relevance determinations based on logic and common sense. *See* 85 FR 30304, 30320. Adding a definition of "relevant" in § 106.2 of these final regulations appropriately limits the discretion that recipients may exercise in determining the relevance of evidence. The Department appreciates the opportunity to clarify that a decisionmaker cannot rely on evidence to which the parties were not given access. Under § 106.46(e)(6), the parties must have an equal opportunity to access evidence that is relevant to the allegations and not otherwise impermissible, and under § 106.46(h)(1)(iii), the written determination whether sex-based harassment occurred must include the decisionmaker's evaluation of the relevant and not otherwise impermissible evidence. The scope of evidence that the decisionmaker must evaluate and that the parties must have an equal opportunity to access are coextensive.

Postsecondary institutions have discretion under § 106.46(e)(6)(i) to decide whether to provide the parties with access to the relevant and not otherwise impermissible evidence by providing access to the actual relevant and not otherwise impermissible evidence or by providing access to a written investigative report that accurately summarizes the relevant and not otherwise impermissible evidence. If a postsecondary institution provides access to an investigative report, it must then provide access to the underlying evidence if requested by one or more parties. As the Department noted in the July 2022 NPRM, *see* 87 FR 41500, institutions vary greatly in terms of size, resources, and expertise, and complaints of sex-based harassment also

---

[62] As noted above in the discussion of § 106.45(b)(7)(iii), the Department views the term "sexual interests" as more appropriate than the term "sexual predisposition," which the Department views as an outdated phrase that may conjure the type of assumptions that the Department seeks to prohibit. The Department uses the term "sexual predisposition" in this discussion of § 106.46(e)(6) only in the context of referencing the requirements under the 2020 amendments.

vary greatly in terms of the nature of the conduct alleged, the volume and format of the evidence, and in other ways. Although an institution has the discretion to decide whether to provide access to the underlying evidence or the investigative report (subject to the requirement to provide access to the underlying evidence if requested by a party), the institution must articulate in its written grievance procedures under § 106.45(a)(1) consistent principles for determining whether and when it will initially provide access to the underlying evidence or an investigative report. The Department has added § 106.45(b)(8) to the final regulations to clarify that a recipient's grievance procedures must articulate consistent principles for how the recipient will determine which procedures apply when a recipient chooses to adopt grievance procedures that apply to the resolution of some, but not all, complaints.

The Department understands that some commenters would like the Department to continue to require recipients to provide the parties with access to both an investigative report and the underlying evidence. Although there may be different benefits for the parties associated with an investigative report or with the evidence itself, the Department continues to believe that either option under § 106.46(e)(6) enables the parties to access the evidence that is relevant to the allegations of sex-based harassment. Either option enables the parties to meaningfully prepare arguments, contest the relevance of evidence, and present additional evidence for consideration. Requiring an institution to provide access to the same universe of evidence in two different formats at the outset is not necessary for ensuring equitable and effective grievance procedures and may increase costs, burdens, and delays without providing offsetting benefits to the parties. The Department accordingly declines to require a postsecondary institution to provide the parties with access to an investigative report in cases in which the institution gives the parties access to the underlying evidence. In response to comments noting that institutions may ultimately provide access to the evidence in both formats, which will not reduce the burden, the Department notes that an institution may wish to consider the likelihood that a party will request access to the underlying evidence or the preference to create an investigative report to assist the decisionmaker in deciding how to exercise a recipient's discretion under

§ 106.46(e)(6)(i). An institution is permitted to decide how to provide access to the evidence on a case-by-case basis in accordance with the consistent principles set forth in the institution's grievance procedures.

Nothing in these regulations prohibits postsecondary institutions from providing the parties with access to the underlying evidence instead of or in addition to access to an investigative report. As noted above, there may be different benefits for the parties associated with providing access to a synthesized investigative report and access to the underlying evidence, and institutions are permitted to provide the parties and their advisors with access to both an investigative report and the underlying evidence.

These regulations do not prescribe a particular manner for sharing oral evidence, nor do these regulations require institutions to attach documentary evidence to the investigative report. Beyond the requirement to provide an equal opportunity to access the relevant and not otherwise impermissible evidence, § 106.46(e)(6) does not impose specific requirements on the manner of providing access to the investigative report or the underlying evidence to the parties. *See* 87 FR 41500. As noted above, § 106.46(e)(6) does not require an institution to give the parties a physical or electronic copy of the evidence or the investigative report. These final regulations, however, require the institution to provide the parties with an audio or audiovisual recording or transcript of the questioning of parties and witnesses as part of the process for assessing credibility under § 106.46(f)(1)(i)(C) (if the institution holds individual meetings instead of a live hearing) and § 106.46(g) (if the institution holds a live hearing). To avoid the impression that an institution must provide a copy of the investigative report, the Department has revised § 106.46(e)(6)(i) to replace the phrase "[i]f the postsecondary institution provides an investigative report" with the phrase "[i]f the postsecondary institution provides access to an investigative report."

Unlike § 106.45(f)(4), which permits a recipient to provide access to an accurate description of the evidence to the parties that may be oral, § 106.46(e)(6)(i) requires a postsecondary institution that chooses the investigative report option to provide access to a written investigative report. As noted by a commenter, postsecondary institutions are accustomed to creating written investigative reports. The Department

views written investigative reports as the more appropriate alternative to providing the underlying evidence for complaints governed by § 106.46, which are more likely than complaints governed only by § 106.45 to involve complex investigations with voluminous evidence, more interviews, participation of advisors, and possible involvement of expert witnesses.

Under the investigative report option, the postsecondary institution must provide an equal opportunity to access the underlying relevant and not otherwise impermissible evidence to all parties if one party makes such a request. In response to concerns about the risk of incomplete or biased investigative reports, the Department notes that an institution violates § 106.46(e)(6)(i) by providing parties with access to an investigative report that fails to accurately summarize the relevant and not otherwise impermissible evidence.[63] Further, the parties retain the right to access the underlying evidence by requesting such access. No party will be denied access to the underlying evidence, even if the institution chooses to provide the parties with access to an investigative report, because § 106.46(e)(6)(i) allows either party to request that the parties have access to the underlying evidence. The Department disagrees that the investigative report option will give an advantage to the parties whose advisors are familiar with the Title IX process and know how to request the underlying evidence. As noted in the following section of the preamble, an institution cannot choose to initially provide access to the evidence to one party and access to an investigative report to the other party or parties. In addition, the Department has revised § 106.46(c)(2)(iii) to specifically require postsecondary institutions to inform parties that they are entitled to an equal opportunity to access the relevant and not otherwise impermissible evidence or an investigative report, and, if the institution provides access to an investigative report, that they are entitled to an equal opportunity to access the relevant and not otherwise impermissible evidence upon the request of any party. The final regulations thus put parties on notice of this right.

The Department disagrees that § 106.46(e)(6)(i) is contrary to due process, fairness, or transparency. The Department also disagrees that § 106.46(e)(6)(i) limits a respondent's

---

[63] For a discussion of the Department's authority to enforce compliance with Title IX, see the discussion of OCR Enforcement (Section VII).

ability to file a lawsuit to protect their civil rights. While some commenters cited cases involving the importance of access to the evidence, § 106.46(e)(6)(i) is consistent with such case law because § 106.46(e)(6)(i) requires a postsecondary institution to provide access to the relevant and not otherwise impermissible evidence. In all cases under § 106.46, the parties retain the right to access the underlying relevant and not otherwise impermissible evidence (*see* 87 FR 41500), which is the same scope of evidence on which the decisionmaker can rely in reaching their determination whether sex-based harassment occurred.

In response to concerns regarding bias by the investigator or decisionmaker, the Department notes that § 106.45(b)(2) requires that any person designated as an investigator or decisionmaker not have a conflict of interest or bias, and bias is one of the grounds for appeal under § 106.46(i)(1)(iii). The Department also notes that compliance with the investigative report option of § 106.46(e)(6)(i) requires the investigative report to provide an accurate summary of the evidence.

The Department declines to include a provision permitting the parties the opportunity to respond to or comment upon draft investigative reports because the time needed to review and respond to the draft report will unnecessarily prolong the grievance procedures and impede a prompt resolution to the case. The Department emphasizes that the parties have an opportunity to review and respond to the investigative report under § 106.46(e)(6)(ii), as discussed below. The Department notes that the parties have the opportunity to provide input on the evidence to be included in the investigative report through their right to present witnesses and other evidence in connection with the investigation (§ 106.45(f)(2)).

In response to the request to modify § 106.46(e)(6)(i) to track the Clery Act, the Department notes that there is no conflict between § 106.46(e)(6)(i) and the Clery Act regulations at 34 CFR 668.46(k)(3)(i)(B)(3), which requires an institution to "provide[ ] timely and equal access to the accuser, the accused, and appropriate officials to any information that will be used during informal and formal disciplinary meetings and hearings." Recipients that are subject to these final Title IX regulations are able to comply with these final Title IX regulations as well as the Department's regulations implementing the Clery Act, including 34 CFR 668.46(k)(3)(i)(B)(3). These final Title IX regulations do not change,

affect, or alter any rights, obligations, or responsibilities under the Clery Act.

In response to comments that a detailed investigative report would help individuals with cognitive disabilities, the Department notes that Section 504 and the ADA prohibit discrimination against individuals with disabilities, and relatedly § 106.8(e) states that the Title IX Coordinator may consult, as appropriate, with the individual or office that the recipient has designated to provide support to students with disabilities.

*Changes:* The Department has revised § 106.46(e)(6)(i) to replace the phrase "[i]f the postsecondary institution provides an investigative report" with the phrase "[i]f the postsecondary institution provides access to an investigative report." As discussed below, the Department has revised § 106.46(e)(6) and § 106.46(e)(6)(i) to refer to an "equal opportunity to access" the evidence rather than "equitable access" to the evidence.

### § 106.46(e)(6)(i): Equal Opportunity To Access Evidence

*Comments:* Some commenters supported the use of the term "equitable access" in proposed § 106.46(e)(6)(i) and emphasized that the Department should clarify what the term means and how it applies. Multiple commenters expressed concern that the phrase "equitable access" in proposed § 106.46(e)(6)(i) is more open to interpretation than the phrase "equal opportunity" in § 106.45(b)(5)(vi) of the 2020 amendments. One commenter asked the Department to require recipients to provide the parties with equal, reasonable, and continuous access to the evidence, while another commenter expressed concern that institutions could interpret "equitable" as permitting access to the evidence in an equal but inadequate manner. One commenter suggested modifying proposed § 106.46(e)(6)(i) to clarify that "equitable access" refers to the manner and mode of delivery of the evidence, not the scope of the evidence that is accessible. Other commenters expressed concern that proposed § 106.46(e)(6) provides too much discretion to the Title IX Coordinator and the recipient to exclude evidence if it is "equitable" to do so. Some commenters recommended that the Department adopt the language from the Clery Act of providing "timely and equal access" to the evidence "to the accuser, accused, and appropriate officials" rather than the "equitable access" language of proposed § 106.46(e)(6)(i).

*Discussion:* In response to comments about the meaning of "equitable" and

how it differs from "equal" as used in the 2020 amendments, other parts of the proposed regulations, and the Clery Act, the Department has revised § 106.46(e)(6) to require a postsecondary institution to provide an "equal opportunity" to access the relevant and not otherwise impermissible evidence. The Department emphasizes that this change from "equitable" in proposed § 106.46(e)(6) to "equal opportunity" in § 106.46(e)(6) of these final regulations does not substantively change the institution's obligations or the parties' rights related to access to the evidence. Under § 106.46(e)(6), an equal opportunity to review the evidence requires a postsecondary institution to provide all parties with access to the same written investigative report or to provide them with access to the underlying evidence—the institution cannot choose to provide access to the evidence to one party and access to an investigative report to the other party or parties, nor can the institution choose to provide different versions of an investigative report to each party. A postsecondary institution has the discretion to determine the mode of providing access to the investigative report or to the underlying evidence, such as electronic copies, physical copies, or inspection of the institution's copy; however, the institution must exercise its discretion in a manner that ensures that the parties have an equal opportunity to access the evidence. The requirement to provide an equal opportunity to access the evidence means that the parties must have the same opportunity to access the evidence, but it does not mean that an institution must treat the parties in an identical manner regarding the mode of accessing the evidence. A postsecondary institution may need to provide a particular mode of access through auxiliary aids and services to a party with a disability to ensure effective communication, which would not be applicable to the other party. Similarly, for persons with limited English proficiency, consistent with Title VI, a postsecondary institution may need to provide language assistance services to only one party. An institution must also recognize any extenuating circumstances (*e.g.,* one party is studying abroad) that affect a party's ability to access the evidence in a particular manner. The Department acknowledges that these final regulations use "equitably" in §§ 106.44(f)(1)(i) and 106.45(b)(1). The preamble for § 106.45(b)(1) explains the Department's reasoning for retaining "equitably" in those provisions.

Beyond the requirement to provide an equal opportunity to access the relevant and not otherwise impermissible evidence, § 106.46(e)(6) does not impose specific requirements on the manner of providing access to the investigative report or the underlying evidence to the parties. As the Department noted in the July 2022 NPRM, *see* 87 FR 41500, a postsecondary institution has the discretion to determine how to provide this information, subject to § 106.46(e)(6)(ii)'s requirement that the parties and advisors have a meaningful opportunity to review it and § 106.46(e)(6)(iii)'s requirement that the institution take reasonable steps to prevent its unauthorized disclosure. Under § 106.46(a), a postsecondary institution must have written grievance procedures that incorporate the requirements of §§ 106.45 and 106.46, including § 106.46(e)(6). Therefore, an institution cannot decide ad hoc how to provide an equal opportunity to access the evidence that is relevant and not otherwise impermissible. To comply with § 106.45(b)(8), an institution's grievance procedures could explain that the recipient will consider the roles of the parties, the nature of the conduct alleged, and the severity of the potential sanctions. An institution is permitted to decide how to provide access to the evidence on a case-by-case basis in accordance with the consistent principles set forth in the institution's grievance procedures.

The Department declines to modify § 106.46(e)(6) to state that institutions must provide the parties with reasonable and continuous access to the evidence. Section 106.46(e)(6) sets forth detailed requirements for the disclosure of evidence that will ensure access is reasonable. Requiring continuous access to the evidence would be unworkable and unduly burdensome and could significantly delay resolution of the case. The Department notes that the parties must have the opportunity to review the evidence prior to the determination (and prior to the live hearing, if one is conducted).

The Department disagrees that § 106.46(e)(6) provides too much discretion to the Title IX Coordinator to exclude evidence or provide access to evidence in an equal but inadequate manner because § 106.46(e)(6)(ii) requires postsecondary institution to give the parties a "reasonable opportunity to review" the relevant and not otherwise impermissible evidence. The regulations make clear that an equal opportunity to access the evidence refers to how the institution is providing access to the evidence, rather than the

scope of the evidence, because § 106.46(e)(6) refers to access to the "relevant and not otherwise impermissible evidence" to describe the scope. In addition, § 106.45(b)(6) requires an objective evaluation of all evidence that is relevant, consistent with the definition of "relevant" in § 106.2, and not otherwise impermissible, including both inculpatory and exculpatory evidence. The Department also declines to modify § 106.46(e)(6) to adopt the language in the Clery Act. The Department interprets the evidentiary requirements in these final regulations as consistent with those in the Clery Act.

Section 106.46(e)(6)(i), which specifies that the postsecondary institution must provide each party and the party's advisor with an equal opportunity to access the evidence that is relevant to the allegations of sex-based harassment and not otherwise impermissible, consistent with §§ 106.2 and 106.45(b)(7), does not require a party to be present for their advisor to access the evidence. However, the Department declines to further revise the regulatory text because § 106.46(e)(6)(i) is sufficiently clear on this point.

*Changes:* The Department has revised §§ 106.46(e)(6) and (6)(i) to refer to "an equal opportunity to access" the evidence rather than "equitable access" to the evidence. As noted above, the Department has revised § 106.46(e)(6)(i) to replace the phrase "[i]f the postsecondary institution provides an investigative report" with the phrase "[i]f the postsecondary institution provides access to an investigative report."

### § 106.46(e)(6)(ii): Reasonable Opportunity To Review and Respond to Evidence

*Comments:* Multiple commenters expressed support for the more flexible approach in § 106.46(e)(6)(ii) and the removal of the ten-day timeframes and other procedural requirements from the 2020 amendments related to reviewing and responding to evidence before a decision is rendered. Some commenters noted that this proposed approach would expedite the adjudication process, which would benefit all parties and enable investigations even when a party would soon be graduating. Some commenters noted that the prior approach under the 2020 amendments at times conflicted with State laws and collective bargaining agreements. One commenter asserted that investigations that would previously take ten days now take up to three months under the 2020 amendments and proposed

§ 106.46(e)(6)(ii) would remedy this problem.

Other commenters expressed concern that the phrase "reasonable opportunity" is vague, would undermine the predictability of the timeframes, and would cause recipients to impose insufficient timeframes to promptly resolve complaints, to the detriment of parties' rights to fundamental fairness. Another commenter noted that because reviewing evidence can re-traumatize a complainant, providing insufficient time would be especially harmful. Some commenters recommended that parties and their advisors should have access to evidence ten days before any hearing and that requests to reschedule a hearing be accommodated.

Some commenters expressed concern that allowing a respondent to review the evidence against them and to respond to that evidence only at a live hearing, and not in advance, would inhibit the respondent's ability to prepare their response and the recipient's ability to determine responsibility. One commenter expressed concern that § 106.46(e)(6)(ii) provides too much discretion to a recipient to determine whether respondents can respond to evidence in a live hearing versus in another format.

*Discussion:* The Department maintains that a postsecondary institution must provide parties with a reasonable opportunity to review and respond to the evidence or the investigative report before determining whether sex-based harassment has occurred. *See* 87 FR 41501. Reasonableness is a well understood concept, and setting a reasonableness standard in this context better supports prompt and equitable grievance procedures, whereas specific timeframes do not necessarily accomplish either objective because they may be unreasonably long in some circumstances or unreasonably short in others. In exercising their discretion to determine reasonableness, postsecondary institutions must ensure that the parties are able to meaningfully review and respond to the evidence or the investigative report. The nature and volume of evidence varies greatly based on the allegations in a complaint, and a reasonable timeframe accommodates this variation. 87 FR 41501. Parties may need more time to meaningfully review hundreds of pages of evidence and dozens of witness statements than they would need to review a much smaller evidentiary file. If a postsecondary institution provides the parties with access to an investigative report and then subsequently provides the parties

with access to the underlying evidence in response to a party's request for the underlying evidence, the parties must have a reasonable opportunity to review and respond to the underlying evidence as well. It is the Department's view that preventing the parties from reviewing and responding to the evidence to which the institution provided access would not comply with § 106.46(e)(6)(ii)'s requirement for a reasonable opportunity to review and respond to the evidence.

A reasonable opportunity to review and respond also accommodates particular circumstances that the parties may be facing that may interfere with their ability to review and respond in a brief period. The Department further notes that § 106.46(e)(5) requires a postsecondary institution to allow for the reasonable extension of timeframes for good cause.

The Department appreciates the opportunity to clarify that § 106.46(e)(6)(ii) requires a postsecondary institution to provide the reasonable opportunity to review the evidence or the investigative report before a hearing so that the parties are not inhibited in their ability to prepare a response. At the same time, those institutions have discretion to allow the party to respond before a hearing, during a hearing, or both. Allowing institutions to choose the manner in which the parties respond to the evidence or the investigative report enables the institution to take into account the complexity of the evidence, the likelihood that the parties will need additional time to formulate a response, the resources of the institution, and other factors. The Department also notes that, if an institution concludes that an additional response from the parties would be helpful to address issues raised at the hearing, the institution may allow the parties to submit statements or otherwise respond to evidence after the conclusion of the hearing. In this situation, the institution would need to allow the other party or parties to have an opportunity to review and respond to any additional evidence provided in a party's post-hearing submission.

Under § 106.46(i), parties have the right to appeal from a determination whether sex-based harassment occurred based on a procedural irregularity that would change the outcome; new evidence that would change the outcome and that was not reasonably available when the determination was made; and conflict of interest or bias by the Title IX Coordinator, investigator, or decisionmaker that would change the outcome. Depending on the specific circumstances, a party may be able to

appeal an institution's failure to comply with § 106.46(e)(6) under one or more of the appeal bases. In addition, anyone who believes that a recipient has failed to comply with Title IX may file a complaint with OCR, which OCR would evaluate and, if appropriate, investigate and resolve consistent with these regulations. For a discussion of the Department's authority to enforce compliance with Title IX, see the discussion of OCR Enforcement (Section VII).

*Changes:* The Department has changed "as provided under" to "described in" for clarity. The Department has also added "or the investigative report" to clarify that § 106.46(e)(6)(ii) requires a postsecondary institution to provide the parties with a reasonable opportunity to review and respond under the evidence option or the investigative report option.

§ 106.46(e)(6)(iii): Unauthorized Disclosures

*Comments:* Multiple commenters supported § 106.46(e)(6)(iii) and its protection against unauthorized disclosures and protection of student privacy. Commenters asked for clarification of the phrases "unauthorized disclosure" and "reasonable steps." One commenter recommended moving § 106.46(e)(6)(iii) to § 106.45 because privacy should concern all recipients, not just postsecondary institutions. The commenter urged the Department to modify § 106.46(e)(6)(iii) to require a recipient to penalize unauthorized disclosures; however, the commenter also expressed concern that § 106.46(e)(6)(iii) does not state how a party or their advisor can use information obtained during the grievance procedures in a related legal proceeding.

Some commenters expressed concerns that the prohibition on unauthorized disclosures interferes with free speech rights, describing it as a "gag order" or prior restraint that could only be consistent with the First Amendment if it satisfied strict scrutiny. Some commenters expressed concern that § 106.46(e)(6)(iii) would prevent students from seeking support of friends and family. Commenters also expressed concern that § 106.46(e)(6)(iii) would prevent students and faculty from being able to publicly criticize their institution for its handling of a complaint. Some commenters noted that § 106.45(b)(5) contains exceptions permitting disclosure that § 106.46(e)(6)(iii) does not, but that it would be difficult to revise § 106.46(e)(6)(iii) to include examples of

authorized disclosure of protected speech. Another commenter asked the Department to clarify that, under § 106.46(e)(6)(iii), journalists would not be disciplined for reporting on Title IX proceedings or compelled to reveal confidential sources.

*Discussion:* The Department agrees that unauthorized disclosures should be addressed under all grievance procedures and has added an analogous provision at § 106.45(f)(4)(iii). Unauthorized disclosure of sensitive information could compromise the fairness of grievance procedures by deterring participation, impairing the reliability of witness testimony, causing fear of retaliation, and other consequences. *See* 87 FR 41501.

Postsecondary institutions must take reasonable steps to protect against the parties' and their advisors' unauthorized disclosure of evidence and information obtained solely through the sex-based harassment grievance procedures. Parties and witnesses are less likely to participate in the grievance procedures—or less likely to participate fully and openly—if they fear that any relevant and not impermissible information that is provided, including sensitive information from their education records, can be widely shared with the campus community or posted online. Section 106.46(e)(6)(iii) promotes trust and participation in the equitable resolution of sex-based harassment complaints by limiting the parties' and advisors' ability to disclose information and evidence gained solely through the sex-based harassment grievance procedures. The limitation on disclosing information in § 106.46(e)(6)(iii) is accordingly necessary to "effectuate the provisions" of Title IX, *see* 20 U.S.C. 1682, because the limitation ensures that recipients have grievance procedures that provide for an effective response to allegations of discrimination so that recipients' education programs and activities can be free from discrimination on the basis of sex, *see* 20 U.S.C. 1681.

Due to the sensitive nature of the evidence and information, the Department anticipates that most disclosures by the parties or advisors of evidence or information obtained solely through the sex-based harassment grievance procedures will not be authorized. Section 106.45(b)(5) prohibits a recipient from taking any steps to protect privacy that restrict the parties' ability to gather evidence; consult with their family members, confidential resources, or advisors; or otherwise prepare for or participate in the grievance procedures. Accordingly, authorized disclosures for purposes of

§ 106.46(e)(6)(iii) include those disclosures that are permitted under § 106.45(b)(5). In addition, consistent with § 106.46(e)(6)(iii), institutions may authorize narrow disclosures to particular individuals or of particular pieces of evidence, depending on the circumstances. The final regulations do not impose specific requirements because this is an appropriate area for postsecondary institutions to exercise discretion depending on the circumstances. To prevent the unauthorized disclosure of this information, institutions must ensure that parties and their advisors are aware of any types of disclosures that are permissible (including disclosures that are authorized by the institution, authorized by other laws, or consented to by the parties), as well as the types of disclosures that parties and their advisors are prohibited from making by the institution or other laws. When exercising its discretion to authorize certain disclosures, the institution must satisfy its obligation under § 106.45(b)(5) to take reasonable steps to protect the privacy of the parties and witnesses. Reasonable steps may include, but are not limited to, policies that protect sensitive evidence and software that restricts further distribution of evidence beyond those who need access in the grievance procedure. A postsecondary institution that authorizes the parties to make widespread disclosures of information obtained solely through the grievance procedures would likely violate § 106.45(b)(5) by failing to take reasonable steps to protect privacy. Comments related to nondisclosure agreements are addressed in § 106.45(b)(5).

Section 106.46(e)(6)(iii) is narrowly framed to address privacy concerns related to information and evidence obtained solely through the grievance procedures, including through the institution's sharing of an investigative report or underlying evidence under § 106.46(e)(6)(i), whereas § 106.45(b)(5) more broadly requires a recipient to take reasonable steps to protect the parties' and witnesses' privacy during the pendency of a recipient's grievance procedures. The Department recognizes that, depending on the particular circumstances of the case, these two provisions may overlap in the types of reasonable steps needed to comply with these provisions. The Department does not view §§ 106.45(b)(5) and 106.46(e)(6)(iii) as conflicting. For example, in response to an inquiry about a party's ability to seek the support of friends and family, the

Department notes that § 106.45(b)(5) prohibits a recipient from taking steps to protect privacy that restrict a party's ability to consult with family members, and therefore disclosures to family members would be authorized under § 106.46(e)(6)(iii). Neither §§ 106.45(b)(5) nor 106.46(e)(6)(iii) necessarily prohibits a party from seeking support from friends. Section 106.46(e)(6)(iii), however, does prohibit a party from disclosing information and evidence with friends that the party obtained solely through the sex-based harassment grievance procedures, unless the postsecondary institution has appropriately exercised its discretion under § 106.46(e)(6)(iii) to expressly authorize such a disclosure, the institution complies with its obligation under § 106.45(b)(5) to take reasonable steps to protect the privacy of the parties and witnesses, and the disclosure does not violate any applicable laws.

Section 106.46(e)(6)(iii) requires institutions to address unauthorized disclosures, which may include penalizing unauthorized disclosures. The Department declines, however, to require institutions to penalize unauthorized disclosures because the institution should take into account the specific circumstances of the unauthorized disclosure when determining how to respond.

The Department expects postsecondary institutions to implement this provision consistent with the First Amendment and consistent with § 106.6(d), and nothing in this provision prevents recipients from doing so. The Department also notes that § 106.46(e)(6)(iii) is limited to information and evidence obtained solely through the sex-based harassment grievance procedures; this provision does not limit disclosures, including public criticism of the institution's handling of a complaint, based on information learned through other means, such as personal experience. Section 106.46(e)(6)(iii) requires a postsecondary institution to prevent and address unauthorized disclosures by parties and their advisors; § 106.46(e)(6)(iii) does not impose any restrictions on journalists.

The Department recognizes that parties may need to disclose information obtained solely through the grievance procedures as part of exercising their legal rights, including the right to file an OCR complaint and the right to initiate (or defend against) a related legal proceeding. The Department does not intend to limit the exercise of these rights and does not view § 106.46(e)(6)(iii) as prohibiting

parties from disclosing information obtained solely during the sex-based harassment grievance procedures in related administrative or judicial proceedings. The Department has revised § 106.46(e)(6)(iii) to make clear that disclosures of such information and evidence for purposes of administrative proceedings or litigation related to the complaint of sex-based harassment are authorized.

*Changes:* The Department has added a sentence to § 106.46(e)(6)(iii) to clarify that, for purposes of this paragraph, disclosures of information and evidence for purposes of administrative proceedings or litigation related to the complaint of sex-based harassment are authorized. As previously discussed, the Department agrees that unauthorized disclosures should be addressed under all grievance procedures and has added a provision analogous to § 106.46(e)(6)(iii) at § 106.45(f)(4)(iii).

§ 106.46(e)(6) and FERPA

*Comments:* Several commenters sought confirmation that the proposed regulations do not conflict with, or abridge, FERPA. Some commenters requested clarification that disciplinary records are "education records" under FERPA and of whether parties can access Title IX evidentiary files in the event of litigation.

*Discussion:* The Department appreciates the opportunity to clarify the interaction between FERPA and the Title IX regulatory provisions that permit or require the recipient's disclosure of evidence. FERPA and its implementing regulations define "education records" as, with certain exceptions, records that are directly related to a student and maintained by an educational agency or institution, or by a party acting for the agency or institution.[64] Under FERPA, a parent or eligible student has the right to inspect and review education records related to the student under certain circumstances.[65] In the context of disciplinary proceedings, the Department has historically recognized, and the Sixth Circuit has affirmed, that student disciplinary records are education records as defined in FERPA and that such records may only be disclosed with the prior written consent of the parent or eligible student or under one of the enumerated exceptions to

---

[64] 20 U.S.C. 1232g(a)(4); 34 CFR 99.3.
[65] 20 U.S.C. 1232g(a)(1); 34 CFR part 99, subpart B. FERPA's implementing regulations define an "eligible student" as a student who has reached 18 years of age or is attending an institution of postsecondary education. 34 CFR 99.3.

FERPA's general consent requirement.[66] These final Title IX regulations, at § 106.46(e)(6), require a postsecondary institution to provide the parties with access to the evidence that is relevant to the allegations of sex-based harassment and not otherwise impermissible.

The Department acknowledges that certain evidence that is relevant to the allegations may not necessarily be directly related to all parties for purposes of FERPA. To the extent that these Title IX regulations require disclosure of information from education records to the parties (or their parents, guardians, authorized legal representatives, or advisors) that would not comply with FERPA, the GEPA override applies—as well as the constitutional override in certain circumstances—and requires disclosure of evidence under § 106.46(e)(6) to the parties and their advisors.[67]

Consistent with the approach in the 2020 amendments, *see* 85 FR 30306, the Department maintains the requirement for a postsecondary institution to provide the parties and their advisors with an equal opportunity to access the evidence, rather than providing access only to the parties and permitting the parties to choose whether to share with their advisors. It is sensible and efficient to provide access to the evidence to the advisors, given that a party who exercises their right to choose an advisor is making the decision to receive assistance from that advisor during the grievance procedures. The Department notes that, under FERPA, an eligible student can consent to the disclosure of their own education records. To the extent that the relevant evidence consists of education records that are not directly related to that student, the student would be unable to consent to the disclosure of that information. In such circumstances, however, a GEPA override of FERPA would permit a postsecondary institution to share evidence with the parties' advisors of choice, in the same manner that the Constitutional override permits sharing evidence with the party. 20 U.S.C. 1221(d).

The Department reiterates that, under § 106.46(e)(6)(iii), a postsecondary institution must take reasonable steps to prevent and address parties' and their advisors' unauthorized disclosures of information and evidence obtained solely through the sex-based harassment grievance procedures. These steps may include restrictions on the parties' and advisors' use of the information and evidence, including limitations on their ability to redisclose the information and limitations on their ability to receive physical copies of the information. FERPA does not limit an eligible student's use or redisclosure of their own education records or personally identifiable information contained therein. In addition, final § 106.46(e)(6)(iii) expressly authorizes parties (and their advisors) to disclose information and evidence obtained through the grievance procedures for purposes of administrative proceedings or litigation related to the complaint of sex-based harassment.

*Changes:* None.

### 10. Section 106.46(f) Evaluating Allegations and Assessing Credibility

§ 106.46(f)(1): Process for Questioning Parties and Witnesses

General Support and Opposition

*Comments:* A number of commenters supported the proposed removal of the requirement for live hearings with advisor-conducted cross-examination, noting that meetings during which the decisionmaker asks questions can produce fair and accurate outcomes. Other commenters opposed eliminating the requirement for live hearings with advisor-conducted cross-examination because they were concerned about the risk of bias and conflicts of interest. Some commenters generally stated men were already outnumbered by women at postsecondary institutions, but did not cite specific data or studies, and were concerned that removing the requirement for live hearings with advisor-conducted cross-examination would negatively impact men's access to education.

*Discussion:* The Department appreciates the variety of views expressed regarding proposed § 106.46(f). As explained in more detail below, after carefully considering the views of the commenters, the Department maintains the position that as part of the grievance procedure requirements in § 106.46, all postsecondary institutions must be required to provide a live-questioning process that enables the decisionmaker to assess the credibility of parties and witnesses if credibility is in dispute and relevant to evaluating one or more allegations of sex-based harassment. The live-questioning process must be provided either through (1) individual meetings with the investigator or decisionmaker, who will ask initial and follow-up questions proposed by the parties, as well as the investigator's or decisionmaker's own questions, if any, or (2) a live hearing with questions, including questions proposed by the parties, asked by the decisionmaker or the party's advisor. The Department has determined that this approach is equitable and provides the parties with a meaningful opportunity to be heard and respond to the allegations, while appropriately taking into account the diversity of postsecondary institutions in terms of size, type, administrative structure, location, and educational community.

In response to commenters who were concerned about the risk of bias if live hearings with advisor-conducted cross-examination were no longer required, the Department notes that final § 106.45(b)(2) prohibits any Title IX Coordinator, investigator, or decisionmaker from having a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. In addition, final § 106.8(d)(2) requires all investigators, decisionmakers, and other individuals responsible for implementing a postsecondary institution's grievance procedures to be trained on how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias. Section 106.46(f)(1) also ensures that, no matter which live-questioning process is used, each party has an opportunity to have their relevant and not otherwise impermissible questions asked, either by an investigator or decisionmaker or by their advisor. The investigator or decisionmaker must also consider all relevant and not otherwise impermissible evidence. *See* § 106.45(b)(6) and (7), (f)(3), (h)(1)(iii). Many of these requirements are consistent with the 2020 amendments.

Regarding commenter assertions that removing the requirement for live hearings with advisor-conducted cross-examination would negatively impact men's access to education, the Department notes that any person, regardless of sex, may be a complainant or a respondent, and thus permitting, but not requiring, a postsecondary institution to use live hearings with questioning by an advisor does not discriminate based on sex. In addition, the Title IX regulations at § 106.31(a) and (b)(4) require that a recipient carry out its grievance procedures in a nondiscriminatory manner and prohibit a recipient from discriminating against any party based on sex. Anyone, including a man, who believes that they have been discriminated against based

---

[66] *See* 73 FR 74832–33; *United States* v. *Miami Univ.*, 294 F.3d 797, 811–15 (6th Cir. 2002). The Department made the statement at 73 FR 74832–33 in response to concerns about impairing due process in student discipline cases in its FERPA rulemaking.

[67] The constitutional override is explained in greater detail in the discussion of § 106.6(e).

on sex may file a complaint with OCR, which OCR would evaluate and if appropriate investigate and resolve consistent with these regulations' requirement that a recipient carry out its grievance procedures in a nondiscriminatory manner.

*Changes:* All changes to § 106.46(f)(1) are described below.

Impact on Reporting

*Comments:* A number of commenters supported the proposed removal of the requirement for live hearings with advisor-conducted cross-examination because it chilled reporting of sex-based harassment. A group of commenters challenged the notion that a decrease in complaints was due solely to the live hearing with advisor-conducted cross-examination requirement in the 2020 amendments, asserting that the COVID–19 pandemic was also a factor. Other commenters stated that even if the decrease in complaints was due to concerns regarding live hearings with advisor-conducted cross-examination, this is not necessarily a concern because this requirement discouraged the filing of inaccurate or bad faith complaints.

*Discussion:* The Department agrees with commenters' assessment based on their experiences that the requirement for live hearings with advisor-conducted cross-examination may have chilled reporting of sex-based harassment. The Department acknowledges that the stakeholders who expressed this concern during the June 2021 Title IX Public Hearing, and the commenters who shared this concern during the public comment period, did not provide information definitively attributing the decrease to just that factor, to the exclusion of others which could have played a role, such as the COVID–19 pandemic. The Department previously explained that this concern, as shared by stakeholders during the June 2021 Title IX Public Hearing, was one of many factors considered by the Department in connection with this issue. 87 FR 41505. The Department maintains that individuals decline to report sex-based harassment for a variety of reasons and disagrees with the proposition that declining to report sex-based harassment necessarily means, as some commenters alleged, that additional complaints would have been unfounded or made in bad faith.

*Changes:* All changes to § 106.46(f)(1) are described below.

Flexibility, Costs, and Burdens

*Comments:* Some commenters, including postsecondary institutions, appreciated that permitting, but not requiring, live hearings with

questioning by an advisor would provide a postsecondary institution the necessary flexibility to adjust its Title IX grievance procedures to its campus environment and resources while still assessing credibility in a live format. The commenters also stated that the requirement for live hearings with advisor-conducted cross-examination in the 2020 amendments required them to expend resources that could have been used for other things, including training for decisionmakers. Other commenters noted that postsecondary institutions have already incurred costs required to implement the requirement for live hearings with advisor-conducted cross-examination in the 2020 amendments and argued that there would be costs associated with eliminating this requirement.

A number of commenters supported giving postsecondary institutions the flexibility to use live hearings with questioning by an advisor or an alternative format for live questioning consistent with proposed § 106.46(f)(1). However, some other commenters were concerned that, if given a choice, many postsecondary institutions, regardless of resources, will opt for something other than a live hearing with questioning by an advisor. In those cases, the commenters argued, respondents' procedural protections would be subject to variations in State law and institutional requirements. Some commenters requested that the Department give postsecondary institutions additional flexibility by providing general guidance as opposed to the requirements in § 106.46(f)(1).

*Discussion:* The Department recognizes that some commenters, including postsecondary institutions that shared their experiences with implementation, viewed the requirement for live hearings with advisor-conducted cross-examination as burdensome and said it required them to expend resources that could have been spent on other things, including additional training for decisionmakers. The Department acknowledges that postsecondary institutions have already incurred costs to comply with the requirement for live hearings with advisor-conducted cross-examination under the 2020 amendments. The Department notes, however, that as some commenters shared, there are costs of maintaining the requirement, including hiring and retaining adequate staff, appropriately training any new staff, and paying for advisors if volunteer advisors are not available or if a postsecondary institution provides attorneys for parties without one when the other party is represented. The

Department also understands that there may be costs associated with removing the requirement under the 2020 amendments for live hearings with advisor-conducted cross-examination, including potential costs of litigation and liability insurance as commenters mentioned. Under the final regulations, a postsecondary institution has the option to determine whether to use live hearings with questioning by an advisor or some other form of live questioning. When making this decision, each postsecondary institution may consider, among other things, the costs associated with eliminating or maintaining a requirement of a live hearing with advisor-conducted cross-examination, although the Department notes that postsecondary institutions that receive Federal financial assistance from the Department must comply with these final regulations regardless of their resources. For a detailed discussion of the costs and benefits of these final regulations, see the *Regulatory Impact Analysis* section of this preamble.

The Department acknowledges that once the final regulations go into effect, some postsecondary institutions may choose to provide another live-questioning process instead of a live hearing with questioning by an advisor for some or all types of sex-based harassment complaints. As explained in the section above on Due Process and Basic Fairness Considerations Specific to Questioning by an Advisor or Decisionmaker, the relevant case law does not obligate every postsecondary institution to hold a live hearing with questioning by an advisor to effectuate Title IX's nondiscrimination mandate. At the same time, nothing in the final regulations precludes a postsecondary institution from complying with applicable Federal or State case law or other sources of law regarding live hearings with questioning by an advisor. For additional discussion, see the section on Due Process and Basic Fairness Considerations Specific to Questioning by an Advisor or Decisionmaker. Title IX and these final regulations establish the procedures that the Department has determined are necessary to fully effectuate Title IX's nondiscrimination mandate, but States and institutions are free to provide additional procedures as long as they do not conflict with Title IX or these final regulations. The Department recognizes that this may result in some lack of uniformity among States, but that is to be expected when the Department, States, and institutions have overlapping and sometimes different interests.

Although the Department maintains that requiring live hearings with questioning by an advisor is not necessary to effectuate Title IX's nondiscrimination mandate in all cases, as explained in the July 2022 NPRM, the Department recognizes the importance of a postsecondary institution having procedures in place to assess credibility and to provide a meaningful opportunity to be heard. *See* 87 FR 41503. The Department has determined that it is consistent with Title IX for a postsecondary institution to determine, based on consideration of its administrative structure, resources, and applicable Federal, State, or local law that a live hearing with questioning by an advisor is appropriate, especially in light of the protections for the parties built into the live hearing requirements in § 106.46(g).

Regarding some commenters' requests for additional flexibility in the form of general guidance as opposed to the requirements in § 106.46(f)(1), the Department's view is that § 106.46(f)(1) appropriately balances the Department's goal to give postsecondary institutions additional flexibility while providing adequate structure and requirements to ensure that postsecondary institutions design procedures to assess credibility that provide a meaningful opportunity for the parties to respond.

*Changes:* All changes to § 106.46(f)(1) are described below.

Impact on the Parties

*Comments:* Some commenters viewed cross-examination as harmful and re-traumatizing for complainants and shared personal stories about undergoing cross-examination. Other commenters noted that the 2020 amendments permit the parties to participate in the live hearing from separate locations upon request and do not permit the parties to personally cross-examine each other. Some commenters shared personal stories of how the lack of cross-examination impacted respondents.

Some commenters asserted that cross-examination is beneficial for both parties because assessing credibility impacts both parties, ensures both parties receive all of the rights to which they are entitled, and produces reliable outcomes.

*Discussion:* The Department agrees that it is important to consider the impact that live hearings with advisor-conducted cross-examination has on the parties in addition to the impact they have on postsecondary institutions. The Department acknowledges that some commenters viewed cross-examination as harmful and re-traumatizing for complainants and appreciates the personal stories commenters shared about undergoing cross-examination. The Department recognizes other commenters noted that the 2020 amendments addressed the potential harm of cross-examination by permitting the parties to participate in the live hearing from separate locations upon request and by not permitting the parties to personally cross-examine each other. The Department also appreciates the commenters who shared personal stories of how lack of cross-examination impacted respondents. The Department acknowledges commenters who viewed cross-examination as beneficial for both parties because assessing credibility impacts both parties and commenters who asserted that cross-examination equitably ensures both parties receive all of the rights to which they are entitled and produces reliable outcomes. The Department's view is that permitting, but not requiring, postsecondary institutions to hold a live hearing with questioning by an advisor appropriately balances the needs of both parties and enables a postsecondary institution to take into consideration the impact that questioning by an advisor may have on the parties, including potential harms and benefits, when determining what procedures to use to assess credibility.

The Department agrees with commenters that, to ensure all participants have confidence in the process, Title IX requires grievance procedures that treat the parties equitably and produce reliable outcomes, but disagrees that requiring live hearings with questioning by an advisor is the only way to accomplish these goals. As explained in greater detail below, the Department has determined that requiring live questioning with the opportunity for a party to propose questions to be asked of the other party and witnesses, while giving postsecondary institutions discretion as to the live questioning format, ensures that postsecondary institutions can fully effectuate Title IX's nondiscrimination mandate while providing the parties with a meaningful opportunity to be heard and respond. The Department also notes that, in addition to the live questioning requirement in § 106.46(f)(1), the final regulations include a number of additional procedural protections to ensure a fair process and reliable outcomes, including, but not limited to, requiring that the parties be treated equitably (§ 106.45(b)(1)); prohibiting a Title IX Coordinator, investigator, or decisionmaker from having a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent (§ 106.45(b)(2)); requiring a presumption that the respondent is not responsible for the alleged sex discrimination until a determination is made at the conclusion of the recipient's grievance procedures for complaints of sex discrimination (§ 106.45(b)(3)); requiring an objective evaluation of all evidence that is relevant and not otherwise impermissible (§ 106.45(b)(6)); requiring an equal opportunity to access either the relevant and not otherwise impermissible evidence, or the same written investigative report that accurately summarizes this evidence and requiring an equal opportunity to access the relevant and not otherwise impermissible evidence upon the request of either party if the postsecondary institution provides access to an investigative report (§ 106.46(e)(6)(i)); and providing for appeal rights (§ 106.46(i)).

*Changes:* All changes to § 106.46(f)(1) are described below.

Due Process and Fairness Considerations Generally

*Comments:* Some commenters generally asserted that the 2020 amendments improperly impose a requirement on all postsecondary institutions that was created by a single court and that advisor-conducted cross-examination is not required by Title IX, due process, or fundamental fairness. On the other hand, a number of commenters generally asserted that due process, fairness, and accuracy require advisor-conducted cross-examination and urged the Department to maintain the requirement from the 2020 amendments.

*Discussion:* The Department appreciates the variety of views expressed by the commenters regarding whether due process and basic fairness require live hearings with questioning by an advisor for all complaints of sex-based harassment involving a student complainant or student respondent at a postsecondary institution. The Department reiterates that, as discussed in the preambles to the 2020 amendments and the July 2022 NPRM, while the Supreme Court has not ruled on what procedures satisfy due process under the U.S. Constitution in the specific context of a Title IX sexual harassment grievance process held by a postsecondary institution, and the Federal appellate courts that have considered this particular issue in recent years have taken different approaches, 85 FR 30327; 87 FR 41504,

these final regulations satisfy fundamental due process rights of notice and opportunity to be heard, while balancing the parties' interests, consistent with Supreme Court case law to date. The Department has previously stated that what constitutes a meaningful opportunity to be heard may depend on specific circumstances. 85 FR 30327; 87 FR 41504. And as the Department stated in the preamble to the 2020 amendments, and as is evident from the comments and discussed further below, Federal and State courts are split on the specific issue of whether due process or basic fairness requires live advisor-conducted cross-examination in sex-based harassment complaints at the postsecondary level. *See* 85 FR 30329.

As discussed further in the section above on Due Process and Basic Fairness Considerations Specific to Live Questioning by an Advisor or Decisionmaker, after carefully considering the comments and the case law, the Department maintains the position from the July 2022 NPRM that neither Title IX nor due process or basic fairness require postsecondary institutions to hold a live hearing with questioning by an advisor in all cases. *See* 87 FR 41505. The Department has determined that the procedures in the final regulations at § 106.46(f)(1), which incorporate the revisions made in response to commenters' concerns and suggestions, appropriately protect the rights of all parties to have a meaningful opportunity to be heard and respond, including the ability to probe the credibility of parties and witnesses; and also protect the postsecondary institution's interest in helping the decisionmaker seek the truth and make a reliable determination, while minimizing any chilling effects on reporting of sex-based harassment and on full participation of parties and witnesses in the grievance procedures.

*Changes:* All changes to § 106.46(f)(1) are described below.

Mathews Balancing Test

*Comments:* One commenter was concerned that the Department acknowledged a due process framework was relevant but did not conduct a *Mathews*-type analysis to determine whether to revoke the live hearing with advisor-conducted cross-examination requirement in the 2020 amendments. Other commenters noted that the interests at stake for respondents are substantial and asserted that cross-examination may in certain circumstances help ensure the outcome of a grievance proceeding is accurate.

*Discussion:* In *Mathews,* the Supreme Court held that determining the adequacy of pre-deprivation due process procedures involves a balancing test that considers the private interest of the affected individual, the risk of erroneous deprivation and benefit of additional procedures, and the government's interest, including the burden and cost of providing additional procedures. 424 U.S. at 335, 349. The Department rejects one commenter's assertion that the Department did not conduct a *Mathews*-type analysis, including considering the lasting impact of a sex-based harassment accusation on a respondent, when determining whether to remove the requirement for live hearings with advisor-conducted cross-examination and that the Department only considered the burdens expressed by unspecified stakeholders. As explained in the July 2022 NPRM, the Department considered the issue and reweighed the factors after receiving feedback from a wide variety of stakeholders regarding the implementation of the live hearing and advisor-conducted cross-examination requirement in the 2020 amendments. *See* 87 FR 41505. The Department notes that many of these stakeholders expressed their views in live and written comments as part of the June 2021 Title IX Public Hearing. A transcript of the hearing and corresponding written comments received are publicly available, and the Department considered the hearing and comments in proposing and adopting these final regulations.[68] Additional information regarding the stakeholders who participated in the public hearing is available in the July 2022 NPRM. *See* 87 FR 41395. For additional discussion of *Mathews* and the Department's grievance procedure requirements, see the subsections on the Department's methods for determining what process is due and identifying relevant interests in Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.C).

As detailed in the discussion of proposed § 106.46(f) in the July 2022 NPRM, the Department considered a number of factors in determining whether to maintain the requirement for live hearings with advisor-conducted cross-examination, consistent with a *Mathews*-type analysis. *See* 87 FR 41505–06. In addition to the impact on respondents, these included the impact of the requirement on reporting of sex-based harassment and parties'

willingness to participate in Title IX grievance procedures in light of a postsecondary institution's obligations to operate its education program or activity free from sex discrimination; the goal of ensuring that Title IX grievance procedures are prompt and equitable and provide the parties, including the respondent, with a meaningful opportunity to be heard and respond and are designed to produce reliable outcomes; and the potential financial and administrative burden that the requirement would place on postsecondary institutions.

In light of these factors and after carefully considering the comments received in response to the July 2022 NPRM, the Department determined that the grievance procedure requirements in § 106.46 will include a live-questioning process that enables the decisionmaker to assess credibility of parties and witnesses to the extent credibility is both in dispute and relevant to one or more allegations of sex-based harassment. To provide postsecondary institutions with necessary flexibility while protecting the interests of the parties and ensuring reliable outcomes, the Department concluded that this live questioning, including questions and follow-up questions proposed by the parties, could occur in individual meetings with the investigator or decisionmaker, or in a live hearing with questions asked by the decisionmaker or the party's advisor.

The Department agrees with commenters who noted that the interests at stake for respondents are substantial, and hence that the Department must ensure that procedures to protect their interests are carefully tailored. The Department's procedures accordingly allow for live questioning, including questions proposed by respondents themselves but asked by the decisionmaker or an advisor. The Department also agrees with commenters who asserted that live questioning by an advisor may in certain circumstances help ensure the outcome of a grievance proceeding is accurate, as well as those commenters who, as noted above, expressed concern or shared personal stories that live questioning by an advisor can re-traumatize a complainant. Both of these concerns are relevant to the second *Mathews* factor—the risk of erroneous deprivation and benefit of additional procedures—because both testing credibility and ensuring parties and witnesses are willing to participate in a proceeding help ensure that a decisionmaker has access to reliable information on which to base a decision. The Department maintains

---

[68] The transcript and written comments are available at *https://www2.ed.gov/about/offices/list/ocr/public-hearing.html* (last visited Mar. 12, 2024).

that the form of live questioning permissible under § 106.46(f)(i) appropriately balances these concerns by reducing the likelihood of re-traumatization while still allowing live questioning to occur. Finally, the Department agrees with the comments from recipients stating that, as noted above, resources now devoted to live, adversarial hearings can be directed toward other methods of implementing Title IX's nondiscrimination mandate and fairly adjudicating complaints, such as by providing training for employees. The Department therefore maintains that allowing recipients to eschew live, adversarial hearings if they conclude doing so is in their best interests appropriately accounts for the third *Mathews* factor, which is the government's interest, including the burden and cost of providing additional procedures.

*Changes:* All changes to § 106.46(f)(1) are described below.

Procedural Requirements for School Disciplinary Proceedings

*Comments:* Some commenters stated that although courts agree that due process requires some ability to meaningfully examine the credibility of witnesses in Title IX grievance procedures, courts have refused to require that a recipient permit the respondent or the respondent's representative to conduct the questioning and instead only require that a postsecondary institution have the opportunity to observe the complainant respond to live questioning.

One commenter disagreed that the cases cited by the Department supported the position that school disciplinary proceedings are not civil or criminal trials and therefore the parties are not entitled to the same rights. The commenter noted that the cases cited by the Department did not address discipline for sex-based harassment and were decided before *Davis* and OCR's subsequent interpretation that *Davis* required postsecondary institutions to adjudicate student-to-student sex-based harassment cases.

Some commenters argued that questioning of parties and witnesses should occur at a live hearing because they are akin to trials in the criminal justice system in which new information can be elicited. Some commenters said that some courts have required due process in other non-court settings that are analogous to Title IX grievance procedures.

*Discussion:* School disciplinary proceedings are not civil or criminal trials and therefore, contrary to

commenters' assertions, disciplinary proceedings need not provide the same panoply of procedural requirements afforded parties in a civil trial or defendants in a criminal trial. As explained in the July 2022 NPRM and the preamble to the 2020 amendments, *see* 87 FR 41457; 85 FR 30052, courts have repeatedly made this point clear in cases analyzing what due process requires in school discipline proceedings, including cases decided post-*Davis* and involving allegations of sex-based harassment [69] and cases involving academic dishonesty [70] or unsatisfactory performance.[71] One commenter expressed concern that some of these cases did not involve Title IX; however, all of these cases provide useful guidance on what due process requires in an academic setting. Regardless of the fact that sex-based harassment grievance proceedings are not civil or criminal trials, the Department adheres to its view that basic principles of fairness require a live-questioning process that enables the decisionmaker to adequately assess a party's or witness's credibility to the extent credibility is both in dispute and relevant to evaluating one or more allegations of sex-based harassment. For additional discussion of this issue, see the section of this preamble on Grievance Procedures Appearing as Quasi-Judicial Proceedings.

In response to commenters who said that questioning of parties and witnesses should occur at a live hearing because live hearings are akin to trials in the criminal justice system in which new information can be elicited, the Department acknowledges that allegations of conduct that constitute sex-based harassment under Title IX may overlap with criminal offenses under State or other laws. Criminal trials and Title IX, however, serve distinct purposes. The purpose of Title IX is to address sex discrimination, including by ensuring that all students can access a recipient's education program or activity free from sex discrimination, while the purpose of the criminal justice system is to discipline and punish criminal conduct; the potential infringement on a person's liberty interest in the criminal context in the form of incarceration is much

greater even than the admittedly significant consequence of a Title IX grievance procedure (*e.g.,* suspension, expulsion). In light of the different purposes served by Title IX and the criminal justice system and the differences in infringement on a person's liberty interest, it is appropriate for the final regulations to include requirements or permit processes that may not be permissible in the criminal justice system.

The Department agrees with commenters that consideration of due process is also appropriate in non-court settings. As explained in more detail in this section, the live questioning requirements in § 106.46(f)(1) provide appropriate due process protections, including a meaningful opportunity to respond, even though they do not require live hearings with questioning by an advisor. The Department also notes that recipients remain free to use live hearings, either with or without questioning by an advisor, when they think it appropriate under the circumstances or when they believe due process requires it, and compliance with the minimum requirements of Title IX in the final regulations does not relieve a recipient of any legal requirements it might otherwise have.

*Changes:* All changes to § 106.46(f)(1) are described below.

Due Process and Basic Fairness Considerations Specific to Live Questioning by an Advisor or Decisionmaker

*Comments:* One commenter stated that cross-examination does not need to occur in the form of advisor-conducted questioning, noting that the Sixth Circuit emphasized that such questioning only must occur "in front of the fact-finder" so that the postsecondary institution can conduct a credibility assessment.[72]

Other commenters noted some courts have held that due process requires advisor-conducted cross-examination. The commenters also stated that courts have recognized that postsecondary institutions have a legitimate interest in avoiding procedures that may subject a complainant to further harassment and advisor-conducted cross-examination provides the benefits of cross-examination without subjecting the complainant to further trauma. The commenters further explained that courts have held that basic fairness requires a live, meaningful, adversarial hearing and some method of cross-examination.

---

[69] *See, e.g., Univ. of Ark.-Fayetteville,* 974 F.3d at 868 ("There also would be costs and burdens associated with imposing on a university all of the formal procedural requirements of a common law criminal trial."); *Haidak v. Univ. of Mass.-Amherst,* 933 F.3d 56, 69 (1st Cir. 2019) ("We also take seriously the admonition that student disciplinary proceedings need not mirror common law trials.").

[70] *See Nash,* 812 F.2d at 664.

[71] *See Horowitz,* 435 U.S. at 86.

[72] The commenter cited *Baum,* 903 F.3d at 583.

Some commenters were concerned that postsecondary institutions will have difficulty complying with applicable Federal or State case law or State or local laws requiring live hearings with advisor-conducted cross-examination in specific circumstances. Some commenters asserted that the Department failed to adequately justify removing the 2020 amendments' requirement for advisor-conducted live cross-examination.

*Discussion:* The Department acknowledges that, as noted by commenters and discussed in the July 2022 NPRM, Federal and State courts have held, in both public and private postsecondary settings, that some method of live cross-examination is required by due process and basic fairness when a disciplinary charge rests on a witness's or complainant's credibility, but the decisions differ in terms of what specific method is necessary. *See* 87 FR 41505–07. In *Winnick* v. *Manning,* the court held that although unlimited cross-examination is not an essential element of due process in college discipline cases, it may be required when the resolution of the case turns on credibility assessments. 460 F.2d 545, 549–50 (2d Cir. 1972). In some cases involving postsecondary institutions with procedures that included a live hearing model, courts have held that some method of live questioning is required in certain circumstances but have stopped short of requiring that it be conducted by a party's advisor. In *Haidak* v. *University of Massachusetts-Amherst,* the court held that adversarial cross-examination was not required, and a postsecondary institution could satisfy due process by having a neutral school official pose probing questions in real time. 933 F.3d at 69–70. Relying on the holding in *Haidak,* the court in *Overdam* v. *Texas A&M University* held in a sexual assault case in which suspension was imposed that due process requires some opportunity for real-time questioning, even if only through a hearing panel, but does not require the questioning be done by the respondent's attorney. 43 F.4th 522, 529–30 (5th Cir. 2022). On the other hand, some courts have held that questioning by an advisor at a live hearing is required. In *University of Sciences,* the court held a university's contractual promises of fair and equitable treatment "require[d] at least a real, live, and adversarial hearing and the opportunity for the accused student or his or her representative to cross-examine witnesses—including his or her accusers." 961 F.3d at 215. And, responding to similar concerns about a

university's procedures limiting a student's ability to challenge the credibility of witnesses, the court in *Baum* held that "some form of cross-examination" was necessary to satisfy due process in sexual misconduct cases that turn on party credibility. 903 F.3d at 581.[73]

Since the publication of the July 2022 NPRM, at least one court has taken an approach similar to § 106.46(f)(1) by giving private postsecondary institutions discretion to develop their own procedures for assessing credibility. In *Boermeester,* the California Supreme Court held that the common law doctrine of fair procedure requires notice of the charges and a reasonable opportunity to respond, but does not require private universities to provide respondents the opportunity to directly or indirectly cross-examine the complainant and other witnesses at a live hearing. 15 Cal.5th at 93. Instead, the court directed private postsecondary institutions to balance competing interests to craft the precise procedures necessary to afford a party with notice and an opportunity to respond. *Id.* at 90, 93.

It is also important to note that each court that has opined on the issue of whether and in what form cross-examination is required has reviewed the specific facts and circumstances to determine what process was required, including what other procedural protections, if any, were provided to the respondent and the potential burden on the postsecondary institution of requiring cross-examination at a live hearing. For example, in *Baum* the court noted that providing Doe with the opportunity for cross-examination would have cost little for the university because it already provided a hearing with cross-examination in all misconduct cases other than those involving sexual assault. 903 F.3d at 582. In *Nash,* the court upheld a procedure allowing the parties to ask questions of hearing participants

through the non-voting chancellor of the Student Board of Ethical Relations, concluding that, although the opportunity to question witnesses directly would have been valuable, "there was no denial of [the students'] constitutional rights to due process by their inability to question the adverse witnesses in the usual, adversarial manner." 812 F.2d at 663–64. In *Boermeester,* the court held fair process did not require a private university to conduct a live hearing with the respondent in attendance and with the respondent directly or indirectly cross-examining the complainant. 15 Cal.5th at 93. The court noted that the university provided the respondent with the opportunity to provide his version of events in an interview with the investigator, the opportunity to review evidence with his attorney-advisor, the opportunity to submit his own evidence and witnesses, the opportunity to respond to evidence during a hearing although he declined to attend in favor of responding to the evidence in writing, and the opportunity to appeal. *Id.* at 94–95.

In addition, similar to the Department's approach, courts have considered a variety of factors when determining what process is due in sexual misconduct cases. *See, e.g., Haidak,* 933 F.3d at 66 (noting the interests at stake in school disciplinary proceedings include the respondent's interest in completing their education and avoiding unfair or mistaken exclusion from the educational environment and the accompanying stigma; the school's interest in protecting itself and other students from students whose behavior violates the basic values of the school; and balancing the need for fair discipline against the need to allocate resources to educating students (citing *Gorman* v. *Univ. of R.I.,* 837 F.2d 7, 14 (1st Cir. 1988); *Goss,* 419 U.S. at 580, 583); *Boermeester,* 15 Cal.5th at 93 (explaining that, when designing the procedures necessary to provide a meaningful opportunity to respond, a private university must balance its own interest in a fair proceeding and completing an education; and the university's interest in maintaining a safe campus, encouraging students to report sexual misconduct, and encouraging witnesses to participate in the process without having to divert too many resources away from educating students).

Together, the cases discussed above recognize the diversity of interests at stake in sex-based harassment grievance procedures and the ways in which particular cases and particular

---

[73] Some commenters relied on *Doe* v. *Allee,* 30 Cal. App. 5th 1036, 1039 (Ct. App. 2019), for the holding that fundamental fairness requires, at a minimum, that the university provide a way for people accused of sexual misconduct to cross-examine witnesses, directly or indirectly, at a hearing where the witnesses appear in person or by other means. The Department notes that the California Supreme Court recently disapproved that holding in *Boermeester v. Carry,* 15 Cal.5th 72, 95 (Cal. 2023), *cert. denied,* 144 S. Ct. 497 (2023). In the absence of constitutional protections, courts generally have required that private school disciplinary procedures adhere to a fundamental or basic fairness standard. *See, e.g.,* Lisa Tenerowicz, *Student Misconduct at Private Colleges and Universities: A Roadmap for "Fundamental Fairness" in Disciplinary Proceedings,* 42 B.C. L. Rev. 653 (2001).

institutions may vary considerably from one to another. The courts' observations in these cases are consistent with the Department's own experience in enforcing Title IX across a broad range of recipients and with respect to many alleged forms of discrimination. As a result, the Department is persuaded that affording more discretion to recipients to develop processes for conducting grievance procedures is appropriate. Although the Department recognizes that these final regulations depart from the 2020 amendments with respect to the requirement of live hearings, the Department maintains—after reevaluating the relevant considerations, including case law post-dating the 2020 amendments, such as *Boermeester* and *Overdam*—that these final regulations will more appropriately respect the interests of both institutions and parties.

In response to concerns that postsecondary institutions will have difficulty complying with applicable Federal or State case law or State or local laws requiring live hearings with questioning by an advisor in specific circumstances, the Department notes that nothing in § 106.46(f)(1) or elsewhere in the final regulations precludes a postsecondary institution from choosing to use a live hearing with questioning by an advisor, either because it is required under applicable Federal or State case law or for any other reason, and the Department expects that some postsecondary institutions will choose to maintain the approach required under the 2020 amendments.

The Department did not fail to adequately justify removing the 2020 amendments' requirement for live hearings with advisor-conducted cross-examination. As an initial matter, and as the Department acknowledged in the preamble to the 2020 amendments, due process does not in all cases require the specific procedures that were included in the § 106.45 grievance process under the 2020 amendments, including the requirement for live hearings with advisor-conducted cross-examination. *See* 85 FR 30053 ("The Department acknowledges that constitutional due process does not require the specific procedures included in the § 106.45 grievance process."). Those provisions were adopted as a matter of policy. The preamble to the 2020 amendments explained that the Department was prescribing this and other requirements in § 106.45 because the Department's view at the time was that the provisions were important to ensuring a fair process for both parties. *See id.* After reconsidering the issue, and for reasons discussed in detail above, the

Department has decided to permit a live-questioning process while removing the requirement for live hearings with questioning by an advisor to be conducted in all circumstances. Throughout the July 2022 NPRM and this preamble, the Department provides the requisite reasons, discussion, and justification for the removal of the requirement in the 2020 amendments for live hearings with advisor-conducted cross-examination. *See, e.g.,* 87 FR 41503.

*Changes:* All changes to § 106.46(f)(1) are described below.

Scholarship on Cross-Examination

*Comments:* One commenter asserted that the scholarship the Department cited in support of the superiority of the inquisitorial approach to cross-examination was outdated because it was published before the 2020 amendments. The commenter also stated that the scholarship cited by the Department discussed approaches to cross-examination outside of Title IX and the school setting.

*Discussion:* The Department acknowledges that the scholarship on cross-examination discussed in the July 2022 NPRM, 87 FR 41507, was published prior to the 2020 amendments and involved approaches to cross-examination outside of the Title IX or school disciplinary context. The Department still maintains that such scholarship on the effectiveness of adversarial cross-examination is helpful to consider as one of a number of factors in finalizing these regulations. The Department recognizes that cross-examination can be an appropriate tool for seeking the truth, especially when conducted by an experienced attorney. However, the Department maintains the position that scholarship has not yet shown that cross-examination is the only way to produce reliable outcomes in sex-based harassment complaints involving students at postsecondary institutions. The Department notes that the court in *Haidak* took a similar position, stating that it was "aware of no data proving which form of inquiry produces the more accurate result in the school disciplinary setting." 933 F.3d at 68. The court acknowledged that "[c]onsiderable anecdotal experience suggests that cross-examination in the hands of an experienced trial lawyer is an effective tool," but it then observed that courts have generally found that a respondent has no right to legal counsel in school disciplinary proceedings, leading it to doubt whether—in the absence of such counsel—cross-examination would actually increase the probative value of hearings. *Id.* at 68–69.

In addition, in *University of Arkansas-Fayetteville,* the court noted that "[w]hile adversarial cross-examination, when employed by a skilled practitioner, can be an effective tool for discovering the truth, there are legitimate governmental interests in avoiding unfocused questioning and displays of acrimony by persons who are untrained in the practice of examining witnesses." 974 F.3d at 868 (internal citations omitted).[74]

*Changes:* All changes to § 106.46(f)(1) are described below.

Consideration of All Viewpoints

*Comments:* One commenter asserted that the Department did not consult with certain stakeholders before proposing to remove the requirement for live hearings with advisor-conducted cross-examination and that the Department failed to acknowledge previously stated positions of OCR leadership regarding cross-examination.

*Discussion:* The Department disagrees with the commenter's assertions. The July 2022 NPRM discussed the Department's consideration of all viewpoints, including the opportunity for stakeholders to provide input at the June 2021 Title IX Public Hearing and the Department's engagement with various stakeholders and other members of the public in developing the proposed regulations. 87 FR 41395–96. All of these stakeholders' views were considered in development of the July 2022 NPRM. The Department then considered more than 240,000 comments received on the July 2022 NPRM and that input was taken into account with respect to each issue addressed in these final regulations, including § 106.46(f)(1). Throughout this process, the Department has properly followed, and as described above exceeded, the requirements of the Administrative Procedure Act (APA) in promulgating these final regulations. *See Little Sisters of the Poor Saints Peter & Paul Home* v. *Pennsylvania,* 140 S. Ct. 2367, 2385 (2020) (noting that the Court has "repeatedly stated that the text of the APA provides the maximum procedural requirements that an agency must follow in order to promulgate a rule." (quotation marks omitted) (citations omitted)). Previously articulated views of Department officials are addressed in the discussion of Views of Assistant Secretary Lhamon (Section VII).

*Changes:* All changes to § 106.46(f)(1) are described below.

---

[74] As stated in *Haidak,* there is generally no right to counsel in disciplinary proceedings. 933 F.3d at 69.

Live-Questioning Process, Individual Meeting Logistics, Recordings of Meetings

*Comments:* Some commenters requested clarification regarding the logistics of live questioning and individual meetings, including how individual meetings with parties and witnesses would work in practice, the scope of the live-questioning process, and whether a postsecondary institution could choose to hold a live hearing without questioning by an advisor. Some commenters asked whether individual meetings may be held virtually and whether the individual meetings with parties and witnesses must occur at the same time or separate from investigative interviews. Some commenters asked the Department to clarify whether there was a limit on the number of individual meetings a postsecondary institution would be required to hold and expressed concern that the process could be time consuming and more cumbersome than a live hearing.

Some commenters asked the Department to clarify whether the parties could propose questions to ask of witnesses in addition to the other party and whether investigators or decisionmakers could conduct individual meetings and with whom. One commenter asked the Department whether a postsecondary institution that uses a panel of decisionmakers must have the entire panel of decisionmakers present for individual meetings, or whether one decisionmaker can represent the panel.

Some commenters stated that if a postsecondary institution used individual meetings instead of a live hearing and wanted to give the parties a meaningful opportunity to be heard, it must record the individual meetings and give opportunities to respond and ask follow-up questions until each party's statements were fully explored.

One commenter suggested that the Department prohibit credibility questions about a complainant's sexual history.

Some commenters said that a live hearing with advisor-conducted cross-examination is necessary because of the proposed limitations on a respondent's access to the evidentiary record and asked the Department to clarify whether the information gathered during individual meetings would be considered evidence that must be provided to the parties.

Some commenters suggested that the Department provide three options for assessing credibility: (1) live hearings with questioning by an advisor; (2) live hearings with questioning by the decisionmaker; and (3) another process that allows each party to suggest questions of the other party and witnesses to be asked by the investigator or decisionmaker, respond to the evidence by the other party, and have access to all information made available to the decisionmaker.

*Discussion:* Notwithstanding that the Department maintains the position that postsecondary institutions must be permitted, but not required, to use live hearings with advisor-conducted cross-examination, upon considering the commenters' concerns, suggestions, and requests for clarification, the Department has made several revisions to proposed § 106.46(f)(1) that are reflected in the final regulations. These revisions are designed to clarify the process for live questioning as well as to ensure that whatever live-questioning process a postsecondary institution chooses to use under § 106.46(f)(1) provides an adequate opportunity for the parties to be meaningfully heard and respond to the allegations.

Commenters raised several concerns about proposed § 106.46(f)(1), regarding how individual meetings with parties and witnesses would work in practice, the scope of the live-questioning process, and whether a postsecondary institution could choose to hold a live hearing without advisor-conducted cross-examination. The Department finds many of these concerns persuasive and is making the following changes and offering the following clarifications to address them, provide additional clarity, and ensure that the live-questioning process provides a meaningful opportunity for the decisionmaker to assess credibility and for the parties to respond.

First, the Department has revised the introductory language in proposed § 106.46(f)(1) to clarify that this provision covers a process that enables a decisionmaker to question a party or witness to assess a party's or witness's credibility and to more clearly set forth the manner in which such questioning must occur.

Second, the Department has revised and reorganized proposed § 106.46(f)(1) to add a new § 106.46(f)(1)(i) describing the process for live questioning when a postsecondary institution chooses not to conduct a live hearing. The revisions make clear that when a postsecondary institution chooses not to conduct a live hearing, the process for proposing and asking relevant and not otherwise impermissible questions and follow-up questions of parties and witnesses under §§ 106.2 and 106.45(b)(7) must allow the investigator or decisionmaker to ask such questions during individual meetings with a party or witness; must allow each party to propose such questions that the party wants asked of any party or witness and have those questions asked by the investigator or decisionmaker during one or more individual meetings, including follow-up meetings; and must provide each party with a recording or transcript of the individual meeting with enough time for the party to have a reasonable opportunity to propose follow-up questions. In response to a commenter's suggestion that the Department prohibit credibility questions about a complainant's sexual history, the Department notes that § 106.46(f)(1) requires that credibility questions comply with § 106.45(b)(7)(iii), which addresses evidence that relates to the complainant's sexual interests or prior sexual conduct.

Third, after considering commenters' concerns, the Department has determined that revisions are necessary to further guarantee that a respondent has a meaningful opportunity to respond even outside of a live hearing and better enable all parties to propose follow-up questions to be asked of parties and witnesses during individual meetings. To address this concern, the Department has added new § 106.46(f)(1)(i)(C), which as mentioned above, requires postsecondary institutions that choose not to hold a live hearing to provide each party with an audio or audiovisual recording or transcript of the individual meetings with enough time for the party to have a reasonable opportunity to propose follow-up questions. The Department acknowledges that providing a recording or transcript of a party's or witness's statement with an opportunity for follow-up questions based on that recording or transcript is not identical to the process of live questioning that may play out in a civil or criminal trial. The Department reiterates, however, that these regulations establish only the baseline procedures that recipients must follow. Any recipient that concludes that its constitutional obligations, other sources of authority, or other circumstances require additional procedural protections may provide for such protections.

Regarding individual meetings and the evidentiary record, the Department notes that in addition to receiving a recording or transcript of the individual meetings with parties and witnesses, the final regulations at § 106.46(e)(6)(i) require a postsecondary institution to provide an equal opportunity to access either the relevant and not otherwise impermissible evidence, or the same

written investigative report that accurately summarizes this evidence and to provide an equal opportunity to access the relevant and not otherwise impermissible evidence upon the request of either party if the postsecondary institution provides access to an investigative report. The information gathered at individual meetings with parties and witnesses would be part of the evidence or investigative report that accurately summarizes the evidence covered under the final regulations at § 106.46(e)(6)(i), and the final regulations at § 106.46(e)(6)(ii) require a postsecondary institution to provide the parties with a reasonable opportunity to review and respond to the evidence or investigative report prior to the determination whether sex-based harassment occurred. Therefore, the parties will have an opportunity to respond to the information gathered during the individual meetings with parties and witnesses as part of their opportunity to review and respond to the evidence or investigative report.

Fourth, in response to questions regarding the number of individual meetings, the revised language of § 106.46(f)(1)(i)(B) also clarifies that there may be one or more individual meetings, including follow-up meetings with the parties and witnesses, as needed to establish facts, assess credibility, and ask follow-up questions. It is not necessary to specify how many individual meetings must occur because the appropriate number will vary depending on the facts and circumstances of the case and the type and number of questions proposed by the parties, but the Department also does not anticipate that there would be an endless cycle of meetings. In addition, the Department notes that questions proposed by the parties to be asked of parties and witnesses must be relevant and not otherwise impermissible under §§ 106.2 and 106.45(b)(7) and may not be unclear or harassing under § 106.46(f)(3). Thus, if at some point the follow-up questions proposed by the party are duplicative of questions that have already been asked or are designed to harass as opposed to assess credibility or elicit relevant information, the postsecondary institution may decline to hold additional meetings to ask the questions. The Department accordingly maintains that §§ 106.2, 106.45(b)(7), and 106.46(f) will ensure that the questioning process is not overly long or burdensome.

Fifth, the July 2022 NPRM discussed questioning by the decisionmaker in individual meetings and also referred to the parties proposing questions to the investigator or decisionmaker to ask during individual meetings. *See, e.g.,* 87 FR 41503–09. The discussion referred to witnesses in some places, but not all places, which the Department understands created confusion regarding whether investigators or decisionmakers could conduct individual meetings and with whom. In response to commenters' requests for clarification, the revised language in § 106.46(f)(1) clarifies throughout that the individual meetings would be with meetings with parties and meetings with witnesses, as opposed to just parties. It also clarifies that the individual meetings may be conducted by the investigator, decisionmaker, or both, at the institution's discretion. *See* § 106.46(f)(1)(i)(B). The Department declines to specify whether a postsecondary institution that uses a panel of decisionmakers must have the entire panel of decisionmakers present for individual meetings, or whether one decisionmaker can represent the panel, because that is a determination best left to the postsecondary institution. Regardless of whether the investigator, decisionmaker, or both will attend the individual meetings with the parties and witnesses, the Department notes that under § 106.46(f)(3) the decisionmaker must determine before the question is posed whether a question proposed by the parties is relevant and not otherwise impermissible under §§ 106.2 and 106.45(b)(7) or unclear or harassing under § 106.46(f)(3), and the institution must ensure that the process it adopts under § 106.46(f)(1) enables a decisionmaker to adequately assess the credibility of parties and witnesses.

In response to comments regarding whether individual meetings may be held virtually, the Department clarifies that nothing in the final regulations precludes a recipient from conducting individual meetings with parties and witnesses virtually with technology enabling the decisionmaker or investigator and the party or witness to simultaneously see and hear one another.

In response to comments regarding the timing of individual meetings, the Department notes that a postsecondary institution has discretion to determine whether the individual meetings with parties and witnesses occur at the same time or separate from investigative interviews. The Department also clarifies that, as discussed above, the information gathered through these individual meetings would be part of the evidence or investigative report under the final regulations at § 106.46(e)(6)(i) to the extent the information is relevant and not otherwise impermissible, and thus the individual meetings would occur before the parties receive access to the evidence or investigative report.

Sixth, in response to confusion regarding whether a postsecondary institution that uses a live hearing would be required to allow questioning by an advisor, the Department has made additional revisions to proposed § 106.46(f)(1). The Department has reorganized § 106.46(f)(1) and added § 106.46(f)(1)(ii)(A) and (B), stating that when a postsecondary institution chooses to conduct a live hearing under § 106.46(g), the process must allow the decisionmaker to ask such relevant and not otherwise impermissible questions and follow-up questions of parties and witnesses, including questions challenging credibility, and either: (a) allow each party to propose such questions that the party wants asked of any party or witness and have those questions asked by the decisionmaker as long as they are not unclear or harassing, or (b) allow each party's advisor to ask any party or witness such questions as long as they are not unclear or harassing. The Department did not intend to require questioning by an advisor in live hearings, and the revised language makes clear that postsecondary institutions that use a live hearing may either permit the parties to propose questions to be asked of any party or witness by the decisionmaker or may permit questioning by an advisor of any party or witness.

Some commenters suggested that the Department provide three options for assessing credibility: (1) live hearings with questioning by an advisor; (2) live hearings with questioning by the decisionmaker; and (3) any process that allows each party to suggest questions of the other party and witnesses to be asked by the investigator or decisionmaker, respond to the evidence by the other party, and have access to all information made available to the decisionmaker. The Department notes that the changes made to § 106.46(f)(1) provide for each of these options.

*Changes:* All changes to § 106.46(f)(1) are described below.

Methods for Assessing Credibility

*Comments:* One commenter asked whether a postsecondary institution must use the same method for assessing credibility for each party or witness in a particular live hearing, and whether the same method of assessing credibility must be used for all live hearings held by a postsecondary institution.

*Discussion:* The Department clarifies that, as explained in the discussion of § 106.45(b)(8), a postsecondary institution is not required to use the same method of assessing credibility for all live hearings, but absent a party's need for a disability or language access accommodation or the provision of auxiliary aids or services, it must use the same method for assessing credibility for each party or witness within resolution of a particular complaint because grievance procedures must be fair and treat the parties equitably. The Department added § 106.45(b)(8) to clarify, for example, that a postsecondary institution may use a different method of assessing credibility at a live hearing for different sex-based harassment complaints, but the postsecondary institution must articulate consistent principles in its written grievance procedures for how it will determine which method of assessing credibility will apply (*e.g.,* use questioning by an advisor for sex-based harassment complaints when the maximum sanction is suspension or expulsion and have the decisionmaker ask questions proposed by the parties for other complaints of sex-based harassment, or use questioning by an advisor for all sex-based harassment complaints unless one of the parties or witnesses is a minor). This provision ensures that a recipient's educational community is aware in advance of what method of assessing credibility will be used. Under this provision, for example, a postsecondary institution that chooses to use a live hearing with questioning by an advisor only for some types of sex-based harassment complaints would be required to explain in its grievance procedures under what circumstances or to which types of sex-based harassment complaints a live hearing with questioning by an advisor would apply. In addition, a recipient's determination regarding whether to apply certain procedures to some, but not all, complaints must be made in a manner that treats complainants and respondents equitably consistent with § 106.45(b)(1).

*Changes:* All changes to § 106.46(f)(1) are described below.

Cross-Examination and Advisors of Choice

*Comments:* Some commenters said parties should not be able to personally cross-examine each other at a live hearing. Other commenters argued that the proposed regulations should be revised to allow respondents to directly cross-examine complainants if they lack an advisor or if their advisor is unwilling to conduct cross-examination.

Some commenters asked whether a postsecondary institution is required to provide an advisor of choice if it is not using a live hearing with questioning by an advisor. Some commenters asked whether a postsecondary institution could place restrictions on the extent to which an advisor may participate in a live hearing. Some commenters were concerned about confidential employees serving as an advisor of choice. Other commenters suggested that the Department focus on other roles advisors play besides conducting cross-examination, such as providing support for a party.

*Discussion:* The Department appreciates the opportunity to clarify that even if a postsecondary institution chooses to use a live hearing with questioning by an advisor, the parties are never permitted to personally cross-examine each other, and that this prohibition, which exists in the 2020 amendments at § 106.45(b)(6)(i), is expressly included in what is now § 106.46(f)(1)(ii)(B).

In response to comments regarding advisors of choice, the Department clarifies that the requirement in § 106.46(f)(1)(ii)(B) to provide an advisor for a party who does not have one, who can ask questions on their behalf, only applies if a postsecondary institution is using a live hearing with questioning by an advisor. Nothing in the final regulations requires a postsecondary institution to provide a party with an advisor under any other circumstances. The Department also clarifies that although a postsecondary institution is permitted to use live hearings with questioning by an advisor even in such cases, the postsecondary institution, not the advisor, is responsible for conducting and overseeing the hearing. The Department notes that under § 106.46(e)(2), a postsecondary institution may establish restrictions regarding the extent to which an advisor may participate in the grievance procedures, as long as the restrictions apply equally to the parties. Thus, a postsecondary institution that is using a live hearing without questioning by an advisor may, for example, place limitations on an advisor's ability to speak during the live hearing.

As explained more fully in the discussion of § 106.44(d), in response to comments, the Department has revised § 106.46(f)(1)(ii)(B) to state that, when a postsecondary institution is required to appoint an advisor to ask questions on behalf of a party during advisor-conducted questioning, to avoid potential conflicts of interest a postsecondary institution may not appoint or otherwise require an individual who is currently a confidential employee or an individual who received information related to a particular case as a confidential employee to serve as the advisor in that case. However, as also explained in the discussion of § 106.44(d), a party may choose to have a confidential employee serve as the advisor of the party's choice under § 106.46(e)(2). The Department maintains that this approach respects the party's autonomy to choose an advisor while avoiding conflicts of interest that may arise from requiring a confidential employee to act as an advisor for the live hearing. The Department declines to make other changes with respect to the discussion of the role of advisors, but notes that under § 106.46(e)(2), a party has the right to be accompanied to any meeting or proceeding by an advisor of their choice, and this right applies regardless of whether a postsecondary institution is using live hearings with questioning by an advisor and includes the right to be accompanied by an advisor to individual meetings held under § 106.46(f)(1)(i).

In response to a commenter's suggestion that the Department focus on other roles advisors play besides conducting cross-examination, such as providing support for a party, the Department notes that nothing in the final regulations prohibits an advisor from providing support for a party regardless of whether the advisor will also be conducting the questioning.

*Changes:* All changes to § 106.46(f)(1) are described below.

When Credibility Is in Dispute

*Comments:* Some commenters asked why a decisionmaker only needs to assess credibility when it is in dispute and relevant to the allegations, asserting this limitation would give postsecondary institutions too much discretion. Some commenters said that the credibility of both parties is almost always an issue. Some commenters suggested that the Department add specific language to the regulatory text regarding how to determine whether credibility is in dispute. A group of commenters asked the Department to clarify whether a postsecondary institution is required to make specific findings on whether credibility is in dispute and relevant prior to cross-examination of each witness.

*Discussion:* In response to commenters who questioned why the requirements in proposed § 106.46(f)(1) would apply only when credibility is in dispute, the Department maintains that it is appropriate to require a postsecondary institution to provide a

process that enables decisionmakers to question parties and witnesses to adequately assess their credibility when credibility is in dispute and relevant to one or more allegations of sex-based harassment. As explained in the July 2022 NPRM, courts have held that cross-examination is unwarranted in situations in which credibility is not in dispute. *See* 87 FR 41508. The Department declines commenters' suggestion to add specific language to the regulatory text regarding how to determine whether credibility is in dispute because whether credibility is in dispute requires a fact-specific analysis. The Department explains that cases in which credibility is in dispute include those in which the recipient's determination relies on testimonial evidence, including cases in which a recipient ''has to choose between competing narratives to resolve a case.'' *Baum,* 903 F.3d at 578, 584.

The Department acknowledges that credibility disputes may be more common in sex-based harassment cases than other types of postsecondary discipline cases, but credibility is not in dispute in every sex-based harassment case. *See Univ. of Cincinnati,* 872 F.3d at 406 (recognizing that credibility is commonly in dispute in sex-based harassment cases but then observing that universities might also impose discipline based on evidence other than disputed witness testimony). For example, courts have held that credibility is not in dispute in the following situations: (1) when the respondent admits to engaging in the misconduct or admits the crucial facts at issue, *see, e.g., Baum,* 903 F.3d at 584 (explaining that if a student admits to engaging in misconduct, cross-examination is unnecessary because there is little to be gained by adversarial questioning when the accused student has already confessed); *Winnick,* 460 F.2d at 549–50 (due process did not require cross-examination because, among other reasons, credibility was not at issue because the plaintiff admitted to the crucial fact at issue); *Doe* v. *Univ. of Neb.,* 451 F. Supp. 3d 1062, 1123 (D. Neb. 2020) (no right to cross-examination exists when the accused admits to engaging in the misconduct); and (2) when a recipient reaches a decision based on evidence other than the complainant's statements, *see, e.g., Plummer,* 860 F.3d at 767, 775–76 (holding that a respondent had no right to cross-examination when the defendant university did not rely on testimonial evidence from the complainant); *Flor* v. *Univ. of N.M.,* 469 F. Supp. 3d 1143, 1153–54 (D.N.M.

2020) (holding there was no right to cross-examination because the university did not rely on the accuser's statements in concluding that the plaintiff violated university policy and instead relied on communications between the plaintiff and the accuser, and plaintiff did not challenge the authenticity of those communications). As explained in the July 2022 NPRM, in these situations, a postsecondary institution would not be required to implement its questioning process required under § 106.46(f)(1). *See* 87 FR 41508. The Department also clarifies that a postsecondary institution is not required to make specific findings on whether credibility is in dispute and relevant prior to cross-examination of each witness.

*Changes:* All changes to § 106.46(f)(1) are described below.

The Clery Act and Live Hearings or Individual Meetings

*Comments:* Some commenters noted that the Clery Act does not require a live hearing or individual meetings and questioned why the proposed regulations needed to include such requirements.

*Discussion:* The Department agrees that, as some commenters noted, the Clery Act does not require a live hearing or individual meetings with the decisionmaker. The Department promulgates these final regulations under Title IX and not under the Clery Act. The Department acknowledges that its Clery Act regulations overlap with these final regulations and impose different but not conflicting requirements in some circumstances. It has always been true that some recipients that are subject to both the Clery Act and the Title IX regulations must comply with both sets of regulations. The Department's regulations implementing the Clery Act establish requirements specific to the authority under and purposes of the Clery Act. As also acknowledged in the 2020 amendments, the lack of a live hearing or live meeting requirement in the Clery Act does not present a conflict, *see* 85 FR 30512–13, and the Department maintains that recipients are able to comply with the requirements of the Clery Act and these final regulations.

*Changes:* All changes to § 106.46(f)(1) are described below.

Additional Suggestions From Commenters

*Comments:* Commenters offered a number of additional suggestions for the Department regarding proposed § 106.46(f)(1). These suggestions

included changing the language in proposed § 106.46(f)(1) to focus on reliability instead of assessing credibility; giving postsecondary institutions the authority to institute rules of decorum in light of the fact that some students will continue to be subject to questioning by an advisor; and requiring postsecondary institutions to provide reasonable accommodations to ensure full participation for people with disabilities in the live hearing process. Some commenters recommended using regional center consortiums to handle sex-based harassment cases. Some commenters requested guidance regarding alternatives to assess credibility beyond live hearings with questioning by an advisor, such as trauma-informed methods and suggested the Department add training on these topics to § 106.8(d).

*Discussion:* In response to a commenter's suggestion that the Department change the language in § 106.46(f)(1) to focus on reliability instead of assessing credibility, the Department agrees that a decisionmaker's review of the evidence may include analyzing the reliability of the evidence, but declines to change the language in § 106.46(f)(1) to focus on reliability. The Department notes that the related case law discussed above uses the term credibility. The Department also notes that a decisionmaker's determination regarding whether sex-based harassment occurred is not limited to assessing credibility, and the final regulations at § 106.45(h)(1) explain that a decisionmaker is also required to evaluate relevant and not otherwise impermissible evidence for its persuasiveness. The Department also maintains that postsecondary institutions are familiar with the term credibility and its usage in sex-based harassment grievance procedures.

In response to a commenter's suggestion that the Department permit postsecondary institutions to institute rules of decorum in light of the fact that some students will continue to be subject to cross-examination, the Department reiterates that the requirements in § 106.46(f)(3) operate as a floor, not a ceiling. Postsecondary institutions remain free to implement rules of decorum at live hearings beyond those specified in the final regulations at § 106.46(f)(3), as long as the rules apply equally to the parties.

The Department agrees with a commenter that postsecondary institutions are required to provide reasonable accommodations to ensure full participation for people with

disabilities in the live hearing process. The Department clarifies that recipients must comply with applicable disability laws, including by providing appropriate reasonable accommodations and providing auxiliary aids and services during a live hearing. What is required will depend on the disability and the circumstances, but might include, for example, providing a party or witness with extra time to answer a question or a particular means of answering questions. For additional information regarding complying with applicable disability laws throughout the grievance procedures, see the discussion of § 106.8(e).

The Department acknowledges commenters' recommendations for using regional center consortiums to handle sex-based harassment cases. Under the final regulations, consistent with the Department's position in the preamble to the 2020 amendments, recipients remain free to consider alternate investigation and adjudication models, including regional center models that outsource the investigation and adjudication responsibilities to outside experts. *See* 85 FR 30026, 30063. The Department notes that, even if a postsecondary institution chooses to outsource the investigation and adjudication function, the postsecondary institution as the recipient of Federal funding from the Department remains responsible for ensuring that its grievance procedures comply with the requirements in § 106.45, and if applicable § 106.46.

The Department acknowledges commenters' request for guidance regarding alternatives to assess credibility beyond live hearings with questioning by an advisor, such as trauma-informed methods. The Department notes that § 106.46(f)(1) includes two alternatives to advisor-conducted cross-examination, *i.e.,* live questioning in individual meetings with an investigator or decisionmaker or a live hearing with questioning by the decisionmaker. Section 106.46(g) also permits institutions to hold a live hearing with the parties in separate locations, and, in an effort to address potential trauma to any of the parties, § 106.46(f)(3) of the final regulations prohibits unclear or harassing questions. The Department understands that supporting recipients in the implementation of these regulations is important and will offer technical assistance, as appropriate, to promote compliance.

The Department declines commenters' suggestions to add additional training topics beyond the requirements of § 106.8(d), leaving flexibility to recipients to determine how to meet training requirements in a manner that best fits the recipient's unique educational community. The Department notes that the final regulations at § 106.8(d)(2) require all investigators, decisionmakers, and other individuals responsible for implementing a postsecondary institution's grievance procedures to be trained on how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias.

*Changes:* The Department has revised § 106.46(f)(1) to clarify that it covers the process for questioning parties and witnesses to aid in evaluating allegations and assessing credibility. The Department has also reorganized § 106.46(f)(1) to clarify that there are two options for questioning parties and witnesses to adequately assess a party's or witness's credibility, depending on whether the postsecondary institution chooses to conduct a live hearing. Section 106.46(f)(1)(i) governs the process when an institution chooses not to conduct a live hearing, and § 106.46(f)(1)(ii) governs the process when an institution chooses to conduct a live hearing. Section 106.46(f)(1)(i) also clarifies the process for conducting individual meetings with a party or witness, including, under § 106.46(f)(1)(i)(A), that such meetings may be conducted with the investigator or decisionmaker. In § 106.46(f)(1)(i)(B), the Department has clarified the process for allowing each party to propose questions that the party wants asked of any party or witness by the investigator or decisionmaker during individual meetings. The Department has added § 106.46(f)(1)(i)(C) to require each party to receive a recording or transcript of any individual meetings with parties or witnesses, with enough time for the party to have a reasonable opportunity to propose follow-up questions. In § 106.46(f)(1)(ii), the Department clarifies that if a postsecondary institution chooses to use a live hearing, it may allow the questions proposed by the party for any party or witness to be asked by the decisionmaker or by the party's advisor, and that in those instances in which a postsecondary institution is required to appoint an advisor to ask questions on behalf of a party during advisor-conducted questioning, a postsecondary institution may not appoint a confidential employee to be the advisor.

§ 106.46(f)(3): Procedures for the Decisionmaker To Evaluate the Questions and Limitations on Questions

*Comments:* Some commenters supported proposed § 106.46(f)(3), but noted that implementation would depend on what the decisionmaker considers relevant. Other commenters welcomed the continued discretion to limit advisor participation in proceedings and to establish rules of decorum. One commenter supported proposed § 106.46(f)(3), but asked the Department to require the decisionmaker to explain the rationale for excluding any question, not just those excluded due to relevance.

Some commenters asserted proposed § 106.46(f)(3) exceeded agency authority and was inconsistent with Title IX and case law because they viewed it as banning credibility testing of the parties.

Some commenters asserted that the Department does not have the authority to require parties to submit questions to the decisionmaker for approval before asking them and expressed concern that allowing the decisionmaker to approve questions would give the decisionmaker the power to place arbitrary limits on questioning that may impact the outcome of the grievance proceeding.

One commenter objected to the Department's proposal to prohibit unclear or harassing questions as arbitrary and capricious and expressed concern that this prohibition would lead decisionmakers to exclude relevant questions.

*Discussion:* The Department maintains that it is appropriate for the decisionmaker to determine whether a proposed question is relevant and not otherwise impermissible under §§ 106.2 and 106.45(b)(7) prior to the question being posed. This requirement is consistent with § 106.45(b)(6)(i) in the 2020 amendments, which similarly requires the decisionmaker to determine whether a question is relevant and explain any decision to exclude a question as not relevant before a complainant, respondent, or witness answers a cross-examination or other question. The Department notes that although the 2020 amendments do not include the term "impermissible," as explained in the July 2022 NPRM, such questions and evidence were similarly prohibited under various provisions in the 2020 amendments, and the Department simply moved them to a single provision and categorized them as "impermissible." *See* 87 FR 41470. The Department disagrees that requiring prescreening of questions is a ban on testing credibility and notes that § 106.46(f)(1) requires postsecondary

institutions to provide a process that enables the decisionmaker to question parties and witnesses to adequately assess a party's or witness's credibility to the extent credibility is both in dispute and relevant to one or more allegations of sex-based harassment.

In addition to being consistent with the 2020 amendments, requiring prescreening of questions for relevance and permissibility increases the efficiency and accuracy of the grievance procedures and, as stated in the preamble to the 2020 amendments, reduces the potential for traumatization of the parties. *See* 85 FR 30316. The Department also maintains the position from the 2020 amendments that requiring prescreening of questions does not result in unfairness or inaccuracy because, for example, these final regulations at § 106.8(d) require a decisionmaker to be trained on how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias. *See* 85 FR 30337.

The Department has the authority to require parties to submit questions to the decisionmaker to determine whether a question is relevant and not otherwise impermissible and declines to revise the language in § 106.46(f)(3) to permit someone other than the decisionmaker to make the determination. In enacting Title IX, Congress conferred the power to promulgate regulations onto the Department. 20 U.S.C. 1682. The Supreme Court has noted that ''[t]he express statutory means of enforc[ing] [Title IX] is administrative,'' as ''[t]h[at] statute directs Federal agencies that distribute education funding to establish requirements that effectuate the nondiscrimination mandate, and permits the agencies to enforce those requirements through 'any . . . means authorized by law' including ultimately the termination of Federal funding.'' *Gebser*, 524 U.S. at 280–81 (quoting 20 U.S.C. 1682). Thus, the Department is well within its authority under 20 U.S.C. 1682 to promulgate this provision.

The Department also notes that the 2020 amendments at § 106.45(b)(6)(i) similarly require the screening of questions by the decisionmaker for relevance and impermissibility and the Department has the authority to limit questions to those that are relevant and not otherwise impermissible. As explained elsewhere in this preamble, the Department has concluded that information that is irrelevant or that falls into one of the categories of impermissible evidence should not be introduced into a proceeding because such information could delay or confuse

the proceedings, unduly infringe on parties' privacy interests, or otherwise have pernicious consequences. The Department accordingly maintains that requiring questions to be screened for relevance and permissibility helps effectuate Title IX by ensuring that recipients' grievance procedures are efficient and fair. *See* § 106.45(b)(6) and (h). The decisionmaker is the appropriate person to prescreen questions for relevance and permissibility because, as explained above, the decisionmaker is required to receive training on impartiality as well as on the meaning and application of the term ''relevant'' and on the types of evidence that are impermissible. The Department notes that to assist the decisionmaker in making consistent determinations regarding whether or not to exclude a question, the Department added a definition of ''relevant'' to § 106.2 that was not in the 2020 amendments. Section 106.46(f)(3) also requires a decisionmaker to explain any decision to exclude a question that is not relevant or otherwise permissible. These requirements adequately guard against a decisionmaker arbitrarily excluding questions. The Department also notes that, consistent with the preamble to the 2020 amendments, the ''parties may appeal erroneous relevance determinations, if they affected the outcome,'' 85 FR 30343, under the final regulations at § 106.46(i)(1)(i), which provides for ''appeal rights on grounds that include procedural irregularity that affected the outcome.'' *Id.*

To align with language in § 106.46(f)(1), the Department has revised § 106.46(f)(3) to require the decisionmaker to explain the any decision to exclude questions that are impermissible in addition to those that are excluded for relevance. But the Department declines to require the decisionmaker to explain the rationale for excluding questions that are unclear or harassing. To ensure that otherwise permissible questions are not inadvertently rejected because they were worded or framed in an unclear or harassing way, however, the Department is persuaded that a party must have an opportunity to clarify or revise a question that the decisionmaker has determined is unclear or harassing. This opportunity to clarify or revise a question is not available when a decisionmaker determines that a question is not relevant or otherwise impermissible because, in those cases, it is the underlying substance of the question—not the manner in which it was asked—that is prohibited. The

Department has revised § 106.46(f)(3) to require this opportunity and to also require that the question be asked if the party sufficiently clarifies or revises a question so that it is no longer unclear or harassing. Permitting a party to satisfactorily revise a question and have it asked ultimately provides the decisionmaker and the parties with better evidence and leads to more reliable outcomes as opposed to excluding the question and requiring the decisionmaker provide a rationale for the exclusion. It is also appropriate to require the decisionmaker to explain any decision to exclude questions due to relevance or impermissibility because the final regulations specifically define ''relevant'' and the types of evidence that are impermissible, and decisionmakers receive training on these issues. The terms ''harassing'' and ''unclear'' are more easily understood by laypeople and thus do not require the same level of explanation.

The Department disagrees with commenters who asserted that the Department cannot prohibit questions that are unclear or harassing. As noted above, in enacting Title IX, Congress conferred the power to promulgate regulations onto the Department. 20 U.S.C. 1682. And the Supreme Court has affirmed the agency's administrative authority ''to establish requirements that effectuate the nondiscrimination mandate,'' and to enforce those requirements through '''any . . . means authorized by law[.]''' *Gebser*, 524 U.S. at 280–81 (quoting 20 U.S.C. 1682). Thus, the Department is well within its authority under 20 U.S.C. 1682 to promulgate this provision. The Department also notes that the preamble to the 2020 amendments similarly permitted a recipient to prohibit advisors from questioning witnesses in an abusive, intimidating or disrespectful manner, and noted that a recipient may remove an advisor for asking a question in a harassing, intimidating, or abusive manner (*e.g.*, advisor yells, screams, or approaches a witness in an intimidating manner). *See, e.g.*, 85 FR 30319–20, 30324, 30331, 30342, 303061. Prohibiting such questions also serves the important purpose of ensuring nondiscrimination by prohibiting harassment as a condition of participating in grievance procedures. Declining to prohibit harassing questions could deter students from reporting sex-based harassment because of fears about traumatization during grievance proceedings, ultimately impairing the goal of effectuating Title IX's mandate that recipients operate their education programs and activities

**33744** **Federal Register** / Vol. 89, No. 83 / Monday, April 29, 2024 / Rules and Regulations

free of discrimination on the basis of sex.

The Department declines to define unclear or harassing in the regulatory text because the terms have wide and common general understanding, and a determination of what specifically would be harassing or unclear in particular scenarios is necessarily fact-specific. The Department notes that the prohibition on these sorts of questions could apply to both the question and to the manner in which the question is asked. For assistance in understanding the meaning of the terms, the Department directs the commenter to the above-cited language from the preamble to the 2020 amendments, which was also referenced in the July 2022 NPRM, *id.,* and to the language in the July 2022 NPRM explaining that a question would be unclear if it is "vague or ambiguous such that it would be difficult for the decisionmaker or party being asked to answer the question or discern what the question is about. For example, some of the key words in the question may have more than one meaning, or the period of time to which the question refers to may be unclear." 87 FR 41510. The Department also notes that, as explained above, § 106.46(f)(3) has been revised to require the decisionmaker to give a party an opportunity to clarify or revise a question the decisionmaker deemed unclear or harassing and have it asked if it is sufficiently clarified or revised. In addition, as noted above, consistent with the 2020 amendments, under the final regulations at § 106.46(i)(1)(i), the parties may appeal the erroneous exclusion of questions if they affected the outcome because it provides for appeal rights on grounds that include procedural irregularity that affected the outcome. *See* 85 FR 30343. The Department clarifies that questions about the complainant's sexual interests would always be excluded as impermissible, and questions about the complainant's prior sexual conduct would be excluded as impermissible unless offered to prove that someone other than the respondent committed the alleged conduct or is evidence about specific incidents of the complainant's prior sexual conduct with the respondent that is offered to prove consent to the alleged sex-based harassment. *See* § 106.45(b)(7)(iii). Whether other questions about a party's prior sexual conduct are harassing is a fact-specific determination that depends on the content of the question, the manner in which it is asked, and the purpose for which is it offered.

The Department appreciates the opportunity to clarify that the ban on unclear or harassing questions applies to questions asked of both parties and witnesses. The language describing proposed § 106.46(f)(3) in the July 2022 NPRM, which cited language from the preamble to the 2020 amendments on this issue, discussed prohibiting advisors from questioning parties or witnesses in an abusive, intimidating, or disrespectful manner, and the Department did not intend to limit the provision to parties. *See* 87 FR 41510. To clarify this, the Department has revised the language in § 106.46(f)(3) to state that a postsecondary institution must not permit questions that are unclear or harassing of the party or witness being questioned.

To provide additional clarity for postsecondary institutions regarding their ability to impose and enforce rules of decorum, the Department has revised the language in § 106.46(f)(3) to state that a postsecondary institution may "adopt and apply other reasonable rules regarding decorum" instead of "impose other reasonable rules regarding decorum."

*Changes:* The Department has revised § 106.46(f)(3) to require a decisionmaker to explain any decision to exclude a proposed question as impermissible, as well as for relevance, and to require a party to have the opportunity to clarify or revise a question that the decisionmaker has determined is unclear or harassing and have the question asked if it is sufficiently clarified or revised. The Department has also clarified that unclear or harassing questions may not be asked of a party or witness. Finally, the Department has revised the language to clarify that a postsecondary institution may "adopt and apply other reasonable rules regarding decorum."

§ 106.46(f)(4): Refusal To Respond to Questions and Inferences Based on Refusal To Respond to Questions

*Comments:* Commenters offered varied opinions of proposed § 106.46(f)(4). For example, some commenters supported proposed § 106.46(f)(4) because the section as proposed required a decisionmaker to disregard prior supportive statements of a party who does not respond to questions related to their credibility while permitting a decisionmaker to consider statements against interest made by the party. Other commenters asserted that proposed § 106.46(f)(4) exceeded agency authority, was inconsistent with Title IX and case law, including the court's decision in *Victim Rights Law Center,* 552 F. Supp. 3d at 134, and created a ban on testing the credibility of the parties. And other commenters viewed proposed § 106.46(f)(4), including the phrases "does not respond to questions related to their credibility" and "supports that party's position," as unworkable, vague, or confusing. Some commenters were also concerned that proposed § 106.46(f)(4) could chill reporting because potential complainants may choose not to report sex-based harassment if they know that if they refuse to answer a question related to their credibility all of their statements will be disregarded.

Commenters who favored giving postsecondary institutions additional flexibility and discretion proposed various ideas for alternative language. Some commenters suggested allowing a decisionmaker to rely on prior statements and consider how the refusal to answer some or all questions integrates with their overall credibility assessment or to consider the party's refusal to respond to questions and give such refusal the weight they deem appropriate under the totality of the circumstances, noting this approach has been adopted by other administrative hearing bodies when a witness is unavailable or unwilling to appear to answer certain questions. One commenter suggested that a postsecondary institution should be permitted to consider the extent to which a party's evasiveness or apparent candor impacts that party's credibility and be given reasonable discretion to decide whether to consider or exclude certain evidence. Another commenter opposed proposed § 106.46(f)(4) because it would not distinguish between a party or witness who intentionally refuses to cooperate with an investigation and a party or witness who may not or cannot remember aspects of the incident.

Some commenters were concerned that proposed § 106.46(f)(4) would only apply to parties and not witnesses and urged the Department to apply proposed § 106.46(f)(4) to witnesses in the same manner as it applies to parties.

Some commenters were concerned that proposed § 106.46(f)(4) would conflict with some State laws that require a postsecondary institution to give the complainant the choice as to whether the complainant wants to repeat their account of the alleged sex-based harassment.

One commenter asked the Department to remove the word "solely" because, according to the commenter, it is impermissible to draw any inference based on lack of testimony, especially in cases that could involve future criminal proceedings.

*Discussion:* The Department proposed § 106.46(f)(4) due to concerns that

''placing no limitations on the decisionmaker's ability to consider statements made by a party who does not submit to a credibility assessment could lead to manipulation by the parties.'' 87 FR 41509. After carefully considering the comments, the Department agrees with the many commenters who expressed concerns that proposed § 106.46(f)(4) would have been difficult to implement in practice. The Department also acknowledges commenters' concerns that proposed § 106.46(f)(4) failed to provide postsecondary institutions and their decisionmakers with appropriate flexibility to fully implement Title IX. In light of the commenters' concerns, the Department has revised § 106.46(f)(4) to provide the decisionmaker with additional discretion and has removed the language commenters found confusing and difficult to implement, while still permitting the decisionmaker to place less weight on statements made by a party or witness who refuses to respond to questions. Final § 106.46(f)(4) is within the Department's authority and not inconsistent with the case law because it is designed to effectuate Title IX's nondiscrimination mandate by helping ensure that grievance procedures produce fair and reliable outcomes. Final § 106.46(f)(4) provides postsecondary institutions with necessary flexibility and discretion to rely on their expertise in evaluating and weighing evidence while still enabling them to address situations in which a party or witness attempts to manipulate the process by presenting inaccurate testimony and refusing to answer questions that probe at those inaccuracies. This addresses the potential for manipulation by the parties that the court in *Victim Rights Law Center* expressed concern about. *See* 552 F. Supp. 3d at 132–33.

In addition, in response to commenters' specific concerns that it would be difficult to determine which questions are related to credibility and that whether a question is related to credibility could differ depending on the context, circumstances, and substance of the answer, the Department has removed the reference to questions related to credibility from § 106.46(f)(4) in the final regulations and has revised this provision to apply to questions in general and not just those related to credibility.

As many commenters discussed, decisionmakers are regularly tasked with evaluating and weighing evidence when making determinations as to whether sex-based harassment occurred. After considering the commenters' views and proposed alternatives, the Department has decided that it is not necessary to set out specific regulatory requirements for when and how a decisionmaker may consider statements made by a party or witness who refuses to respond to questions related to their own credibility. Instead, the Department has determined a decisionmaker must have the flexibility to determine, based on the totality of the circumstances, the weight to be given, if any, to a statement made by a party or witness who refuses to respond to questions deemed relevant and not impermissible, including those related to credibility. The Department notes that questions posed to a party or witness, and thus the only questions to which a party or witness might not respond, must be relevant and not impermissible under §§ 106.2 and 106.45(b)(7) and not unclear or harassing under § 106.46(f)(3). The Department also notes that the final regulations at § 106.45(h)(1) require the decisionmaker to evaluate all relevant and not otherwise impermissible evidence for its persuasiveness. The requirement to evaluate the relevant evidence for its persuasiveness necessarily includes consideration of the weight or credibility to assign to a party's or witness's statements. The language in § 106.46(f)(4) giving the decisionmaker flexibility to decide how to handle statements made by a party who refuses to respond to relevant and not impermissible questions applies to situations in which a party or witness declines to participate entirely in the Title IX grievance procedures. It also applies to situations in which a party or witness otherwise participates in the Title IX grievance procedures but declines to respond to some or all questions. Consistent with the Department's position in the 2020 amendments, ''statements'' applies to any statement of a party or witness and ''has its ordinary meaning, but would not include evidence (such as videos) that do not constitute a person's intent to make factual assertions, or to the extent that such evidence does not contain a person's statements.'' 85 FR 30349.

As part of the evaluation and weighing of the evidence, a decisionmaker could therefore take into account the reasons why a party or witness refused to answer questions when determining what weight to assign to that party or witness's statements. For example, the decisionmaker could consider whether the party or witness intentionally refused to answer any questions so that earlier statements made by that party or witness could not be tested during questioning, or whether the party or witness answered nearly all relevant questions and offered a reasonable justification for not responding to a small number of questions. This change will provide postsecondary institutions with necessary flexibility and discretion to rely on their expertise in evaluating and weighing evidence in responding to complaints of sex-based harassment, while still enabling them to address situations in which a party or witness attempts to manipulate the process by presenting inaccurate testimony and refusing to answer questions that probe at those inaccuracies. This additional flexibility may alleviate commenters' concerns that proposed § 106.46(f)(4) would have conflicted with some State laws that require a postsecondary institution to give the complainant the choice as to whether the complainant wants to repeat their account of the alleged sex-based harassment because a decisionmaker could take the existence of such a State law into account in considering the complainant's refusal to respond to questions.

The Department acknowledges that some commenters questioned why proposed § 106.46(f)(4) would not apply to witnesses and asked the Department to apply it to witnesses. The Department has revised the language in § 106.46(f)(4) based on the determination that it should apply to witnesses in the same manner it applies to the parties.

The Department acknowledges that some commenters would prefer the Department not permit a decisionmaker to discount statements made by a party or witness who does not respond to questions, but as explained above the Department has concerns that prohibiting a decisionmaker from determining the amount of weight, if any, to give a statement made by a party or witness who refuses to respond to questions could lead to manipulation by the parties. The Department notes that under § 106.46(f)(4) as revised, a decisionmaker may decide, based on the totality of the circumstances, to give full weight to statements made by a party or witness who refused to respond to a question, and a decisionmaker is not required to exclude such statements.

The Department disagrees that § 106.46(f)(4) creates a ban on testing the credibility of the parties. The final regulations at §§ 106.45(g) and 106.46(f) discuss the processes that a recipient must have in place to assess credibility, and § 106.46(f)(4) permits a decisionmaker to determine the amount of weight, if any, to place upon statements made by a party or witness who refuses to respond to questions. It

does not prohibit recipients from assessing credibility.

The Department acknowledges that some commenters requested clarification regarding the phrase ''does not respond to questions related to their credibility'' and how many questions a party must refuse to answer and whether refusal to respond to one question was sufficient. The Department has removed this language in the final regulations. Although the final regulations discuss a party or witness who refuses to respond to questions, it is not necessary to define this phrase or clarify how many questions a party or witness must refuse to respond to in light of the other revisions made to § 106.46(f)(4). As explained above, § 106.46(f)(4) as finalized permits a decisionmaker to determine, based on the totality of the circumstances, what weight, if any, to give statements made by a party or witness who refuses to respond to one or more questions. Thus, the decisionmaker has discretion to consider whether the number of questions the party or witness refused to respond to should be taken into consideration when determining the weight to give that party's statements. The decisionmaker also has discretion to determine whether the party or witness intentionally refused to respond to questions, or did not refuse but simply could not recall details for a variety of valid reasons.

The Department declines to make any substantive revisions to the language in § 106.46(f)(4) restricting a recipient from drawing inferences about whether sex-based harassment occurred based solely on the refusal to answer by a party or witness. The Department notes that this language is similar to language in the 2020 amendments, *see, e.g.,* 85 FR 30349 n.1341, and it is appropriate not to permit a postsecondary institution to draw inferences about whether sex-based harassment occurred based solely on a party's or witness's refusal to respond to questions because such a determination must be based on the decisionmaker's evaluation of all the relevant and not otherwise impermissible evidence under § 106.46(h). It is not necessary to change ''whether sex-based harassment occurred'' to ''whether or not sex-based harassment occurred'' because the current phrasing is consistent with the terminology used throughout the final regulations and would include a determination that sex-based harassment did not occur. The Department disagrees with a commenter that it is never permissible to draw an inference as to whether sex-based harassment occurred based on a party's

or witness's refusal to respond to questions. *Cf. Baxter,* 425 U.S. at 318 (discussing the ''prevailing rule that the Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them''). To be sure, as the commenter pointed out, criminal consequences may sometimes follow from the same conduct that constitutes sex-based harassment, but whether it would be permissible to draw an adverse inference from a refusal to respond to such questions in a later criminal trial is distinct from the issue of whether such an inference is permissible in Title IX grievance procedures. As already explained above, Title IX grievance procedures are significantly different from criminal trials because, among other things, they do not implicate the same degree of potential infringement on a respondent's liberty and hence do not require the same protections for respondents. The Department clarifies that it is impermissible to draw an adverse inference about whether sex-based harassment occurred based only on a respondent's refusal to respond to questions, including in situations in which a respondent may face future criminal proceedings, and thus the Department declines the commenter's suggestion to remove the term ''solely.''

Regarding specifying when credibility assessments are appropriate, who should make them, and how to apply them to determine investigation outcomes, the Department notes that the final regulations at §§ 106.45(g) and 106.46(f) discuss the processes that a recipient must have in place to enable the decisionmaker to assess credibility, and more specific information regarding processes for assessing credibility is provided in the preamble section discussing § 106.46(f)(1).

In light of the revisions the Department has made to proposed § 106.46(f)(4) to remove references to credibility and language regarding statements that support that party's position from the final regulations, it is not necessary to further clarify those terms.

*Changes:* The Department has removed the reference to questions related to credibility from § 106.46(f)(4) and revised this provision to apply to questions in general and not just those related to credibility. The Department has also revised § 106.46(f)(4) to permit a decisionmaker to determine the weight to be given, if any, to a statement made by a party or witness who refuses to respond to questions deemed relevant and not impermissible.

11. Section 106.46(g) Live Hearings

Impact of Live Hearings on Parties and Postsecondary Institutions

*Comments:* Some commenters asserted that the proposed removal of the live hearing requirement would provide postsecondary institutions with the flexibility to adopt practices based on their unique environments. Other commenters stated that the live hearing requirement from the 2020 amendments unnecessarily burdens parties and postsecondary institutions, especially smaller and less well-resourced postsecondary institutions. Some commenters noted that making live hearings optional will enable smaller postsecondary institutions to pursue alternatives to live hearings that encourage reporting and address fears of retaliation.

Some commenters supported the proposed removal of the live hearing requirement because, according to the commenters, live hearings burden and traumatize complainants and may cause them not to seek support. Some commenters said that removing the live hearing requirement would cause less trauma for complainants without impacting parties' due process rights.

Some commenters stated that a live hearing requirement chills reporting and explained that complainants may not participate in the Title IX grievance procedures to avoid public ridicule and exposure of sensitive information. Some commenters said in-person interaction between the parties should be avoided.

Other commenters disagreed that the live hearing requirement posed unreasonable burdens or chilled reporting. One commenter, for example, stated that the credibility of an allegation should be questioned when an individual is not willing to make a complaint that will be subject to the accountability that a live hearing provides.

*Discussion:* The Department acknowledges the views of some commenters that removal of the live hearing requirement would provide flexibility and may increase reporting and thanks postsecondary institutions for sharing their specific experiences with the requirements of the 2020 amendments. The Department also understands that some commenters disagree that live hearings are burdensome and chill reporting and view live hearings as necessary regardless of any potential burden they may pose to a postsecondary institution. After carefully considering the views expressed by the commenters, the Department maintains the position articulated in the July 2022 NPRM that

the relevant case law interpreting Title IX, due process, and fundamental fairness do not require every postsecondary institution to hold a live hearing in all sex-based harassment cases as long as the postsecondary institution provides another live-questioning process. *See* 87 FR 41506–07. The Department has determined that the requirements in the final regulations at § 106.46(g) for the live hearing process, and § 106.46(f) for the live-questioning process if a postsecondary institution chooses not to use a live hearing, appropriately protect the right of all parties to have a meaningful opportunity to present and respond to allegations of sex-based harassment. These provisions also protect postsecondary institutions' interest in grievance procedures that enable the decisionmaker to determine the facts and that are equitable to the parties. The Department acknowledges that in-person interaction may be challenging for parties and notes that even if a postsecondary institution chooses to use a live hearing, the final regulations at § 106.46(g) permit a postsecondary institution to conduct the live hearing with the parties physically present in separate locations, including virtually.

The Department recognizes that before the 2020 amendments postsecondary institutions used a variety of methods to conduct investigations and that postsecondary institutions have varying resources. Without taking a position on the specific investigation methods described by the commenters, the Department notes that, as discussed above, the final regulations provide a postsecondary institution with reasonable options for how to structure its grievance procedures to ensure they are equitable for the parties while accommodating each postsecondary institution's administrative structure, educational community, and the applicable Federal, State, or local law. The Department also notes that all recipients of Federal financial assistance from the Department are required to comply with the final regulations regardless of their resources.

The Department maintains that individuals decline to make a complaint of sex-based harassment for a variety of reasons and disagrees with the proposition that declining to make a complaint of sex-based harassment when a live hearing is required means, as one commenter alleged, that the credibility of the allegation should be questioned.

*Changes:* None.

Due Process and Fairness Considerations

*Comments:* Some commenters stated that, at the postsecondary level, live hearings are necessary for due process and fundamental fairness, arguing that a live hearing with cross examination is valuable when parties and witnesses are adults. Some of these commenters added that the rights of the respondent must be balanced with the rights of the complainant, particularly in light of the harm to the respondent caused by a wrongful finding, such as expulsion, and further argued that recipients will not protect respondents' rights on their own.

Some commenters stated that the proposed regulations would lead to the elimination of live hearings because postsecondary institutions are more likely to use procedures that are less transparent and accountable so that, according to the commenters, institutions can let their biases play out when given flexibility to do so. One commenter stated that when postsecondary institutions have discretion, they remove procedural safeguards, which happened with conduct that is not covered under the definition of "sexual harassment" under the 2020 amendments. One commenter stated that live hearings should be required in cases in which credibility is at issue so decisionmakers can hear a full and unbiased presentation of evidence. Some commenters stated that the proposed removal of the live hearing requirement will foster sex bias and stereotypes in adjudications. Other commenters stated that it will also impact the ability to review and respond to evidence, noting that access to evidence prior to a hearing allows parties to effectively participate in the proceedings. Some commenters shared personal stories of bias and other experiences under the Department's guidance that was in effect before the 2020 amendments.

*Discussion:* The Department understands that some commenters would prefer the Department to maintain the requirement for live hearings with advisor-conducted cross-examination from the 2020 amendments. Although the Department agrees that some courts have held that postsecondary institutions must use a live hearing in certain sex-based harassment cases, after thoroughly considering the views of the commenters, the Department maintains the position articulated in the preamble to the 2020 amendments that the Supreme Court has not ruled on what procedures satisfy due process in the

specific context of Title IX sex-based harassment grievance procedures held by a postsecondary institution and that what constitutes a meaningful opportunity to be heard depends on specific circumstances. *See* 85 FR 30327. As discussed above, the Department also maintains the position articulated in the July 2022 NPRM that the relevant case law interpreting Title IX, due process, and fundamental fairness do not require every postsecondary institution to hold a live hearing in all cases as long as the postsecondary institution provides another live-questioning process. *See* 87 FR 41506–07. As stated in the July 2022 NPRM, permitting, but not requiring, postsecondary institutions to use a live hearing for sex-based harassment complaints provides a postsecondary institution with reasonable options for how to structure its grievance procedures to ensure they are equitable for the parties while accommodating each postsecondary institution's administrative structure, educational community, and the applicable Federal, State, or local law. *See* 87 FR 41505.

The Department recognizes the view of some commenters that, if the final regulations do not require live hearings under Title IX, postsecondary institutions will eliminate live hearings, and the concerns expressed by some commenters that, when not required to do so, a number of postsecondary institutions did not to choose to hold a live hearing. However, the Department disagrees that this approach will lead to the elimination of live hearings. As an initial matter, the final regulations permit a postsecondary institution to use a live hearing when applicable case law or other sources of law require that approach. The Department acknowledges that once the final regulations go into effect some postsecondary institutions, particularly those for which applicable case law or other sources of law do not require a live hearing or that have an administrative structure that makes it difficult to conduct a live hearing, may choose to provide another live-questioning process instead of a live hearing for some or all types of sex-based harassment complaints. The goal of the final regulations is to fully effectuate Title IX's nondiscrimination mandate and, as explained above, the relevant case law does not support requiring every postsecondary institution to hold a live hearing as part of its obligations under Title IX. Nothing in the final regulations precludes a postsecondary institution from complying with applicable case law or

other sources of law regarding live hearings.

The Department acknowledges commenters who stated that a live hearing is necessary when credibility is at issue so that the decisionmakers can hear a full and unbiased presentation of evidence and expressed concern that methods other than live hearings are inadequate because they may not be objective, rely on investigators who lack training, or foster stereotypes and bias because they are not transparent. The Department also acknowledges commenters who shared personal stories of bias and other experiences prior to the 2020 amendments. The Department notes that the final regulations do not simply implement prior OCR guidance. They include, for example, more specific requirements for a recipient's prompt and equitable grievance procedures and explicitly require training on how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias. The final regulations, like the 2020 amendments, require training regarding conflicts of interest and bias, regardless of whether a live hearing is used. The final regulations at § 106.45(b)(2) prohibit any person designated as a Title IX Coordinator, investigator, or decisionmaker from having a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. Additionally, § 106.8(d) requires investigators, decisionmakers, and other persons responsible for implementing the recipient's grievance procedures to receive training on a number of topics, including the recipient's grievance procedures under § 106.45, and if applicable § 106.46 (which could include training on how to assess credibility under § 106.46(f)); how to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias; the meaning and application of the term "relevant" in relation to questions and evidence; and the types of evidence that are impermissible regardless of relevance under § 106.45, and if applicable § 106.46.

Regarding commenters who expressed specific concern that the removal of the live hearing requirement would lead to bias based on sex, § 106.31(a)(1) and (b)(4) require that a recipient carry out its grievance procedures in a nondiscriminatory manner and prohibit a recipient from discriminating against any party based on sex. In addition, § 106.45(b)(1) requires a recipient's grievance procedures to treat complainants and respondents equitably

and that this requirement applies regardless of the sex of the complainant or respondent. Anyone who believes that a recipient's treatment of a complainant or respondent constitutes sex discrimination may file a complaint with OCR, which OCR would evaluate and, if appropriate, investigate and resolve consistent with the requirement that a recipient carry out its grievance procedures in a nondiscriminatory manner. The Department also notes that any person, regardless of sex, may be a complainant or a respondent, and thus permitting, but not requiring, a postsecondary institution to use live hearings does not discriminate based on sex.

In response to commenters who raised concerns that the removal of the live hearing requirement would limit transparency and negatively impact the parties' ability to review and respond to the evidence, the Department notes that the final regulations contain several requirements regarding accessing evidence, which apply regardless of whether a live hearing is used and which promote transparency. Section 106.45(f)(4) requires that a recipient provide each party with an equal opportunity to access the relevant and not otherwise impermissible evidence or an accurate description of such evidence, as well as a reasonable opportunity to respond. If the recipient provides a description of the evidence, it must provide the parties with an equal opportunity to access the relevant and not otherwise impermissible evidence upon the request of any party. In addition, § 106.46(e)(6)(i) requires that, for complaints of sex-based harassment involving a student party at postsecondary institutions, a postsecondary institution must provide the parties with an equal opportunity to access either the relevant and not otherwise impermissible evidence, or the same written investigative report that accurately summarizes the evidence. If the postsecondary institution provides access to an investigative report, it must provide the parties with an equal opportunity to access the relevant and not otherwise impermissible evidence upon the request of any party.

*Changes:* None.

Explanation of Removal of Live Hearing Requirement

*Comments:* Some commenters generally stated that the proposed removal of the live hearing requirement would be arbitrary and capricious. Another commenter stated that the Department only focused on why cross-examination is not necessary but failed

to discuss the costs of removing a requirement to conduct live hearings with cross-examination, as compared with other methods.

*Discussion:* The Department disagrees that the removal of the live hearing requirement is arbitrary and capricious. The Department notes the extensive discussion in the July 2022 NPRM regarding the proposed removal of the requirement for live hearings with advisor-conducted cross-examination. *See* 87 FR 41503–09. As discussed above, some courts have held that postsecondary institutions must utilize a live hearing in certain sex-based harassment cases. However, as the Department articulated in the preamble to the 2020 amendments, the Supreme Court has not ruled on what procedures satisfy due process in the specific context of a postsecondary institution's Title IX sex-based harassment grievance procedures. What constitutes a meaningful opportunity to be heard depends on the specific circumstances. *See* 85 FR 30327. In addition, as discussed above, the Department maintains the position articulated in the July 2022 NPRM that the relevant case law interpreting Title IX, due process, and fundamental fairness does not require a postsecondary institution to hold a live hearing in all cases as long as the postsecondary institution provides another live-questioning process. *See* 87 FR 41506–07.

The Department maintains that it has adequately addressed any costs associated with the removal of the live hearing requirements and references the July 2022 NPRM, which discussed the costs and benefits of the various proposed changes to the grievance procedure requirements. *See* 87 FR 41546–47, 41554–58. For a detailed discussion of the costs and benefits of these final regulations, see the *Regulatory Impact Analysis* section.

*Changes:* None.

Requiring Live Hearings in Certain Circumstances

*Comments:* Some commenters stated that a postsecondary institution should be required to hold a live hearing if requested to do so by either party. Other commenters urged the Department to require a live hearing unless both parties knowingly and voluntarily waive the right to a live hearing by choosing an informal resolution process or if the postsecondary institution has good cause as to why a live hearing would be inappropriate and clearly articulates its good cause in writing with an opportunity for the parties to be heard. Another commenter stated that live hearings should be required unless a

complainant requests a single decisionmaker. One commenter stated that when a postsecondary institution makes live hearings optional, they should only take place when both parties consent in writing so that both parties have an equal say in determining the method used for adjudication. Another commenter asked the Department to require a postsecondary institution to provide for a live hearing during the appeals process if new evidence or arguments are offered to the appellate decisionmaker.

Some commenters stated that live hearings should be required when there is a possibility of serious or life-altering consequences. One commenter said that a live hearing should be required for all sex-based harassment complaints at elementary schools and secondary schools because it is the best way to assess credibility.

Another commenter asked whether postsecondary institutions that typically use an administrative decisionmaking process to resolve sex-based harassment complaints would be permitted to use a live hearing under extraordinary circumstances.

*Discussion:* The Department declines to make any changes in response to suggestions from commenters to require a postsecondary institution to conduct a live hearing under certain circumstances or for certain types of complaints. As explained above, a postsecondary institution should have some degree of latitude to determine how to structure its grievance procedures to ensure they are equitable for the parties while accommodating each postsecondary institution's administrative structure, educational community, and the applicable Federal, State, or local law. This includes determining whether and under what circumstances to use a live hearing for sex-based harassment complaints involving student complainants or student respondents. Regardless of that discretion, however, postsecondary institutions must provide a live-questioning process that enables the decisionmaker to assess the credibility of parties and witnesses to the extent credibility is both in dispute and relevant to evaluating one or more allegations of sex-based harassment. In situations in which a recipient chooses not to use a live hearing, § 106.46(f)(1)(i) allows either the investigator or the decisionmaker to ask questions of the parties and witnesses during individual meetings. If the investigator asks the questions of the parties and witnesses, the decisionmaker would rely on the investigator's assessment of credibility.

The Department similarly declines to require a postsecondary institution to provide for a live hearing during the appeals process if new evidence or arguments are offered to the appellate decisionmaker. Nothing in the final regulations precludes a postsecondary institution from doing this when applicable case law or other sources of law require that approach or the postsecondary institution uses its discretion to choose that approach.

The Department maintains that it is appropriate to give postsecondary institutions the discretion as to whether to use a live hearing and declines to require live hearings when there is a possibility of serious or life-altering consequences. The Department notes that postsecondary institutions might well choose to develop more formal procedures for disciplinary matters with more significant consequences, but believes the final regulations—which require an equal opportunity to access relevant and not otherwise impermissible evidence, a live-questioning process, and an opportunity for an appeal—are sufficient to ensure the fairness of grievance procedures.

The Department also declines a commenter's suggestion to require a live hearing for all sex-based harassment complaints at elementary schools and secondary schools. Nothing in § 106.45(g), which governs the process for questioning parties and witnesses at the elementary school and secondary school level, precludes an elementary school or secondary school from choosing to utilize a live hearing for sex-based harassment complaints. However, the Department notes that, as explained in the preamble to the 2020 amendments, parties under the grievance process in elementary schools and secondary schools generally are not adults and lack the developmental ability of adults and the legal right to pursue their own interests. *See* 85 FR 30364. If an elementary school or secondary school chooses to hold a live hearing as part of its process for questioning parties and witnesses under § 106.45(g), it has discretion as to how to conduct such a hearing because the live hearing procedures in § 106.46(g) only apply to sex-based harassment complaints involving a student complainant or respondent at postsecondary institutions. The Department wants to leave elementary schools and secondary schools with flexibility to apply live hearing procedures that fit the needs of their educational environment, which is consistent with the Department's position on this issue in the preamble to the 2020 amendments. *See* 85 FR 30365.

For example, if a recipient chooses to use a live hearing in a proceeding at the elementary school level, the young ages of the parties and witnesses involved may warrant limiting the duration of the hearing or ensuring that parties and witnesses have assistance during questioning.

Regarding commenters' questions as to whether a postsecondary institution that typically does not hold a live hearing for sex-based harassment complaints could do so for some cases and whether a postsecondary institution could decide on a case-by case basis or for certain categories of cases to hold a live hearing, as explained in the discussion of § 106.45(b)(8), a postsecondary institution may choose to use a live hearing for some, but not all, complaints of sex-based harassment as part of its grievance procedures under § 106.46. As required under § 106.45(b)(8), the postsecondary institution's written grievance procedures must articulate consistent principles for how it will determine the types of complaints for which it will use live hearings (*e.g.,* for complaints in which both parties are students or complaints for which the maximum sanction is suspension or expulsion). In addition, a recipient's determination regarding whether to apply certain procedures to some, but not all, complaints must be made in a manner that treats complainants and respondents equitably consistent with § 106.45(b)(1).

The Department declines to require both parties to consent in writing before a postsecondary institution may use a live hearing because as explained above, it is appropriate to provide postsecondary institutions with the flexibility to determine whether and when to use a live hearing. Nothing in the final regulations precludes a postsecondary institution from choosing to do so on its own only to use a live hearing if both parties consent in writing.

Regarding whether certain aspects of the live hearing are optional and how the removal of the live hearing requirement impacts the live-questioning process, the Department notes that if a postsecondary institution chooses to use a live hearing for complaints of sex-based harassment involving a student, the postsecondary institution must comply with all of the requirements for a live hearing in § 106.46(g). A detailed discussion of live-questioning procedures, including the various options a postsecondary institution has for questioning parties and witnesses to aid in evaluating allegations and assessing credibility, is in the discussion of § 106.46(f). If the

postsecondary institution chooses to use a live hearing under § 106.46(g), then it must follow the procedures in § 106.46(f)(1)(ii). Conversely, if the postsecondary institution chooses not to use a live hearing under § 106.46(g), then it must follow the procedures in § 106.46(f)(1)(i).

*Changes:* None.

Live Hearing Logistics

*Comments:* One commenter supported the option of holding live hearings virtually because it provides a trauma-informed process for complainants and allows the process to continue when in-person meetings are not feasible. Another commenter asked the Department to issue guidance on virtual live hearings. One commenter supported the requirement that recipients hold live hearings virtually upon the request of any party, but asked the Department to change "will" in proposed § 106.46(g) to "must" for clarity. One commenter asked the Department to state that the postsecondary institution must ensure both parties have equal opportunity to speak and listen in a hybrid live hearing, when one person testifies in person and the other remotely. Some commenters, however, stated that telephonic or virtual testimony hinders the ability to assess witness demeanor and requested that the Department require in-person testimony.

Some commenters expressed concern that the phrase "or communicating in another format" is unclear because although the language likely permits an alternative form of communication to accommodate a disability, individuals without a disability could claim the right to communicate in another format, such as typing in a chat instead of speaking. Other commenters encouraged the Department to ensure that hearings and questioning are trauma-informed, which the Department understood to mean that it would ensure that individuals conducting the hearing would be required or trained to take into consideration the signs and symptoms of trauma and take steps to avoid re-traumatizing individuals participating in the hearing.

*Discussion:* The Department appreciates the varying views expressed by commenters regarding holding live hearings with the parties physically present in the same geographic location or with the parties physically present in separate locations, including virtual participation. The Department declines to issue any additional guidance at this time regarding conducting live hearings virtually but clarifies that nothing in § 106.46(g) requires the parties to be physically present at the same location for a live hearing. Section 106.46(g) permits a postsecondary institution to allow any party to participate in the live hearing virtually as long as the decisionmaker and parties can simultaneously see and hear the party or witness while that party is speaking. The Department maintains that it is necessary to revise § 106.46(g) to require a postsecondary institution to ensure both parties have equal opportunity to speak and listen in a hybrid live hearing when one person testifies in person and the other remotely and notes that the final regulations at § 106.45(b)(1) require a recipient's grievance procedures to treat the parties equitably.

The Department agrees with the commenter's suggestion to change "will" to "must" to clarify that upon the request of either party, the postsecondary institution must conduct the live hearing with the parties physically present in separate locations (which can be virtual) and the Department has revised the regulatory text accordingly.

The Department acknowledges the view of the commenters that telephonic or virtual testimony may hinder the ability to assess witness demeanor but declines to make any changes to require in-person testimony at a live hearing. The Department notes that § 106.46(g) only permits the parties to participate virtually if the decisionmaker and parties can simultaneously see and hear the party or witness while that party is speaking; thus, telephonic testimony without video is not permitted. The Department maintains the position in the preamble to the 2020 amendments that any minimal reduction in the ability to assess demeanor by the use of technology is justified by the benefits of shielding a complainant from testifying in the presence of a respondent. *See* 85 FR 30355–56.

The Department agrees the proposed § 106.46(g) was potentially unclear as to when a person would be allowed to "communicat[e] in another format." The Department's intent was that a person would be allowed to do so only when necessary to accommodate a disability that required communication in a format other than speaking. Upon further consideration, the Department has determined that it is not necessary to include this language in the regulatory text. The Department reiterates the position from the preamble to the 2020 amendments, 85 FR 30498, and elsewhere in this preamble that recipients' obligations to comply with these final regulations and with disability laws applies to all aspects of responding to sex discrimination under Title IX, including throughout the grievance procedures in § 106.45, and if applicable § 106.46. Compliance with disability laws may require a postsecondary institution to permit a person with a disability to use an alternative form of communication during a live hearing. Persons who do not require an accommodation for a disability or auxiliary aid or service would be required to speak during the hearing, as opposed to communicating through a method such as typing in a chat, as suggested by the commenter. For additional information regarding students with disabilities who are complainants or respondents in Title IX grievance procedures, see the discussion of § 106.8(e).

The Department declines to require recipients to ensure that hearings and questioning are trauma-informed because recipients that sufficiently train their investigators, decisionmakers, and other persons who are responsible for implementing the recipient's grievance procedures, as required by § 106.8(d)(2), will be able to implement the recipients' grievance procedures in ways that treat complainants and respondents respectfully and fairly, and that imposing specific trauma-informed obligations would interfere with recipients' need for flexibility in tailoring their training for their educational community. The Department notes that, consistent with the Department's position explained in the preamble to the 2020 amendments, a recipient has discretion to use a trauma-informed approach in handling sex discrimination complaints as long as the approach complies with the requirements in the final regulations, including the grievance procedure requirements in § 106.45, and if applicable § 106.46. *See* 85 FR 30323.

*Changes:* The Department has revised § 106.46(g) by replacing "will" with "must" so that upon the request of either party the postsecondary institution must conduct the live hearing with the parties physically present in separate locations, and by removing the phrase "or communicating in another format."

12. Section 106.46(h) Determination Whether Sex-Based Harassment Occurred

*Comments:* Commenters expressed a variety of views on proposed § 106.46(h). For example, one commenter supported proposed § 106.46(h) because it would require recipients to notify both complainants and respondents of sanctions. The commenter stated such information is necessary for the complainant to feel

safe returning to school. Another commenter supported proposed § 106.46(h) because it would help parties to understand a recipient's determination, allow a party to appeal, and help the judiciary to evaluate whether recipients handled cases appropriately.

Some commenters opposed proposed § 106.46(h) because, for example, they preferred the 2020 amendments or believed proposed § 106.46(h) was too vague in describing the information required in a written determination. One commenter also expressed concern that recipients would be able to find students responsible for sex-based harassment without demonstrating any violation of a recipient's code of conduct. Other commenters opposed proposed § 106.46(h) because it would not require the written determination to include an analysis of credibility.

One commenter requested that proposed § 106.46(h) be modified to apply to all complaints of sex discrimination. Another commenter requested proposed § 106.46(h) include a requirement that the written determination expressly identify which elements of the allegations were found by the standard of proof and which were not.

One commenter requested clarification of whether "simultaneously" would mean "without undue delay between notifications." Another commenter requested clarification whether recipients must separately inform a complainant of "any" remedies they will receive, not just "whether" they will receive remedies.

*Discussion:* The Department disagrees that § 106.46(h) is too vague in describing the information required in a written determination. Section 106.46(h) mandates that a written determination must include certain key elements so that the parties have a thorough understanding of the investigative process and information considered by the recipient in reaching conclusions. *See* 87 FR 41511. Section 106.46(h) provides for a written determination adequate for the purpose of an appeal or judicial proceeding reviewing the determination regarding responsibility. The Department also disagrees that references to "sex-based harassment" within § 106.46(h) are not sufficiently precise. "Sex-based harassment" is a defined term under these regulations and can be understood to include all conduct in the definition in § 106.2.

The Department declines to modify § 106.46(h) to apply to all complaints of sex discrimination. Section

§ 106.45(h)(2), which applies to all complaints of sex discrimination for all recipients, including elementary schools and secondary schools, provides for notification in writing of the determination whether sex discrimination occurred under Title IX, including the rationale for this determination. Section 106.46(h), on the other hand, contains additional requirements that apply only to complaints of sex-based harassment involving a student party at a postsecondary institution. Because the allegations, evidence, and disciplinary sanctions in sex-based harassment cases at postsecondary institutions are often more extensive and complex than other forms of complaints of sex discrimination, it is appropriate to require notifications about the determination whether sex-based harassment occurred to provide additional details, including a written explanation of how the evidence was evaluated and how the harassment, if any, will be disciplined. A detailed notification, in writing, also helps all parties understand how these often-complex cases have been resolved.

The Department also declines to require recipients to identify a violation of a recipient's code of conduct in a written determination. Recipients retain discretion to refer in the written determination to any provision of the recipient's own code of conduct that prohibits conduct meeting the § 106.2 definition of "sex-based harassment," but § 106.46(h) helps ensure that these final regulations are understood to apply to a recipient's response to sex-based harassment under Title IX and not to apply to a recipient's response to non-Title IX types of misconduct. The Department likewise declines to expressly require a written determination to include an analysis of credibility or identify which elements of the allegations were found by the standard of proof and which were not. The Department notes that to the extent that a credibility analysis is relevant to a decisionmaker's evaluation of the relevant evidence and determination whether sex-based harassment occurred, it would be included in the written determination under § 106.46(h)(1)(iii). The Department also declines to specify the exact types of sanctions that may be imposed in a written determination under § 106.46(h) because recipients have the flexibility to determine disciplinary sanctions, as appropriate, consistent with these final regulations. The Department notes that any disciplinary sanctions imposed would need to be consistent with the definition

of "disciplinary sanctions" and otherwise comply with the requirements in these final regulations.

The Department appreciates the opportunity to clarify that the term "simultaneously" in § 106.46(h) should be interpreted in accordance with its plain meaning. The Department understands "simultaneously" to ordinarily mean "at the same time." *See Simultaneous,* Merriam-Webster Dictionary, *https://www.merriam-webster.com/dictionary/simultaneous* (last visited Mar. 12, 2024). The Department declines to adopt the commenter's suggestion that simultaneously might mean "without undue delay between notifications," but the Department would not conclude a recipient failed to comply with Title IX because of a de minimis delay in notifications, such as a delay of a few minutes when sending email notifications to the parties. The Department also appreciates the opportunity to clarify that § 106.46(h) does not require a recipient to provide information about the particular remedies offered in the written determination, only whether remedies will be provided, to protect the privacy of the complainant while preserving the overall fairness of giving both parties identical copies of the written determination simultaneously. Section § 106.45(h)(3) provides that the Title IX Coordinator is responsible for coordinating the provision and implementation of remedies and, when a written determination states that remedies will be provided, the party receiving such remedies can then communicate separately with the Title IX Coordinator to discuss what remedies are appropriately designed to preserve or restore access to the recipient's education program or activity.

Finally, for consistency with other provisions in the regulations, the Department has revised § 106.46(h)(1)(iii) to clarify that a written determination from a postsecondary institution whether sex-based harassment occurred must include the decisionmaker's evaluation of the evidence that is "relevant and not otherwise impermissible," and replaced "the appeal, if an appeal is filed, or, if an appeal is not filed," with "any appeal, or if no party appeals," in § 106.46(h)(2) for clarity and consistency with other provisions. The Department has also deleted "of" before "whether" for consistency with the other provisions in the final regulations.

*Changes:* In § 106.46(h)(1)(iii), the Department has added the words "and not otherwise impermissible" after the word "relevant." In § 106.46(h) and

(h)(1)(iii), the Department has deleted "of." In § 106.46(h)(2), the Department has replaced "the appeal, if an appeal is filed, or, if an appeal is not filed" with "any appeal, or, if no party appeals[.]"

13. Section 106.46(i) Appeals

General Support and Opposition

*Comments:* Some commenters supported § 106.46(i) because it would outline the bases upon which an appeal must be offered and provide a recipient discretion to grant an appeal on an additional basis if equally available to the parties.

However, other commenters objected to § 106.46(i)(1) based on their interpretation that it would only require a recipient to offer a respondent an appeal from a determination that sex-based harassment did occur, while imposing no such requirement to offer a complainant an appeal from a determination that sex-based harassment did not occur. These commenters asserted that such a provision would be inconsistent with requirements to resolve complaints in an "equitable" manner in § 106.45(b)(1) and to ensure that any additional bases for appeal are equally available to all parties in § 106.46(i)(2).

In contrast, other commenters disagreed with allowing a complainant to appeal a determination that sex-based harassment did not occur, although one commenter acknowledged that the Clery Act requires a recipient to offer equivalent appellate rights to both parties. Some commenters asserted that allowing a complainant to appeal a dismissal or determination that sex-based harassment did not occur disfavors respondents.

One commenter challenged the Department's assertion that § 106.46(i) is not a departure from the appeals provision in the 2020 amendments because the proposed regulations would require a party to show that one of the bases for appeal would "change," rather than "affect," the outcome of the complaint. The commenter asserted that the Department failed to justify this proposed change, which would make it nearly impossible to successfully appeal a decision. Another commenter suggested replacing "change" with "impact" throughout § 106.46(i)(1)(i)–(iii) because, in the commenter's view, it would more accurately describe the Department's intent in outlining the bases for appeal.

One commenter asked how the requirement to offer an appeal would interact with State laws that require an elementary school or secondary school to hold an expulsion hearing within 30 school days after the recipient determines that a student has engaged in sexual harassment. The commenter also suggested that the ability of a student complainant or respondent to file an OCR complaint would provide an adequate appeal process such that the Department could delete the requirement that a recipient offer an appeal from a determination whether sex-based harassment occurred.

*Discussion:* The Department acknowledges the comments on § 106.46(i) and clarifies language in the proposed regulations that might have been misinterpreted as only requiring a recipient to offer an appeal to a respondent from a determination that sex-based harassment did occur. As discussed in the July 2022 NPRM, § 106.46(i) preserves § 106.45(b)(8) of the 2020 amendments, 87 FR 41511, which requires a recipient to "offer both parties an appeal from a determination regarding responsibility, and from a recipient's dismissal of" a complaint based on procedural irregularity; new evidence that was not reasonably available at the time of the determination; or Title IX Coordinator, investigator, or decisionmaker bias or conflict of interest. *See* 34 CFR 106.45(b)(8). Accordingly, the final regulations contain a technical revision at § 106.46(i) to clarify that a postsecondary institution must offer the parties an appeal from a determination whether sex-based harassment occurred and from a postsecondary institution's dismissal of a complaint or any allegations therein.

As noted in the preamble to the 2020 amendments, requiring a postsecondary institution to offer an appeal equally to the parties will make it more likely that a recipient reaches sound determinations in sex-based harassment complaints, which will give complainants and respondents greater confidence in the final outcome of grievance procedures. 85 FR 30396. Additionally, the Department disagrees that requiring a recipient to offer an appeal on an equal basis to the parties disfavors a respondent because both a complainant and a respondent have important interests in the outcome of a sex-based harassment complaint that can affect either party's ability to access educational opportunities. The complainant's interest is whether any sex-based harassment that occurred will be remedied and its recurrence prevented. At the same time, the respondent has an interest in not being subjected to undue disciplinary sanctions. Although these interests may differ, each represents high-stakes, potentially life-altering consequences

deserving of an accurate outcome. *Univ. of Cincinnati,* 872 F.3d at 404 (recognizing that the complainant "deserves a reliable, accurate outcome as much as" the respondent). Also, as commenters noted, § 106.46(i) is consistent with the Clery Act requirement that a postsecondary institution equally offer the parties an appeal from the result of disciplinary proceedings if such procedures are available. *See* 34 CFR 668.46(k)(2)(v)(B).

Further, the Department disagrees with assertions that allowing a complainant to appeal a determination that sex-based harassment did not occur disfavors the respondent. As stated in the preamble to the 2020 amendments, Title IX grievance procedures differ in purpose and procedure from a criminal proceeding, 85 FR 30397, and in any event, the Department is not persuaded that a complainant's ability to appeal an adverse determination results in "double jeopardy." The Department acknowledges that respondents face a burden if a complainant appeals a determination that sex-based harassment did not occur, but we maintain that it is important for a postsecondary institution to review a determination that was reached via alleged procedural irregularity, bias, or conflict of interest affecting the outcome, or when newly discovered evidence may change the outcome. As noted above, the ability to appeal extends equally to complainants and respondents who would each have the right and opportunity to ask for a redetermination if warranted. Additionally, several commenters— including State legislators, Title IX practitioners, and organizations that combat sexual violence—supported the bases for which an appeal must be offered under § 106.46(i)(1).

Despite some commenters' assertions, using the term "change" from proposed § 106.46(i), the term "affect" from the 2020 amendments, or the term "impact" from one commenter's suggestion would not have any substantive effect on how § 106.46(i) is applied.[75] Nonetheless, of the three terms, "change" is most consistent with directives that Federal agencies ensure that regulations are written in plain language and easy to understand. *See, e.g.,* Exec. Order No. 13563. Further, because using the term "change" rather than "affect" does not

---

[75] *Compare Change,* Merriam-Webster Dictionary, *https://www.merriam-webster.com/dictionary/change* (last visited Mar. 12, 2024), with *Affect,* Merriam-Webster Dictionary, *https://www.merriam-webster.com/dictionary/affect* (last visited Mar. 12, 2024), and *Impact,* Merriam-Webster Dictionary, *https://www.merriam-webster.com/dictionary/impact* (last visited Mar. 12, 2024).

substantively alter the regulations, the Department disagrees with the commenter's assertion that using the word "change" would make it "impossible" to appeal an adverse decision.

Additionally, in response to one commenter expressing concern with the requirement to offer an appeal while referencing State law that appears to govern disciplinary proceedings for elementary schools and secondary schools, the Department wishes to clarify that only a postsecondary institution that receives a complaint of sex-based harassment involving a student party must offer the parties an appeal consistent with § 106.46(i). Further, it is the Department's view that an elementary school or secondary school will be able to comply with § 106.45(i), which is the applicable provision governing appeals for complaints of sex discrimination at the elementary school and secondary school levels, while meeting its separate obligations under State law governing student discipline because a recipient is only required to offer the parties an appeal process that, at a minimum, is the same as it offers in comparable proceedings, if any, including proceedings relating to other discrimination complaints. The Department recognizes that many States have laws that address sex discrimination, including sex-based harassment, and other misconduct that negatively impacts students' access to equal educational opportunities. Nothing in these final regulations precludes a State, or an individual recipient, from continuing to address such matters in a manner that also complies with these final regulations.

The Department declines to remove requirements related to appeals from the final regulations because offering the opportunity to appeal a determination on the bases in § 106.46(i)(1) enables a recipient to correct significant issues that could undermine the impartiality and reliability of grievance procedures and reduces a party's reliance on OCR or private litigation to challenge the outcomes. As a result, as discussed in the preamble to the 2020 amendments, offering the opportunity to appeal can potentially yield just outcomes more efficiently than a process outside the recipient's grievance procedures. *See* 85 FR 30398. The same reasoning applies to a recipient's dismissal of a complaint, or allegations therein; when a recipient's dismissal is in error, the parties should have the opportunity to challenge the recipient's dismissal decision so that the recipient may correct the error and avoid inaccurately

dismissing a complaint that needs to be resolved in order to identify and remedy sex discrimination. *See id.*

*Changes:* The Department has revised final § 106.46(i)(1) to clarify that a postsecondary institution must offer the parties an appeal from a determination whether sex-based harassment occurred, and from a postsecondary institution's dismissal of a complaint or any allegations therein. Additionally, the Department has revised final § 106.46(i)(2)–(3) for clarity and to update cross references to other parts of these final regulations.

Request To Add or Modify Bases for Appeal

*Comments:* Some commenters objected to the absence of certain bases for appeal, including not requiring a recipient to offer an appeal for simple error or a determination being against the weight of the evidence, and asserted that case law supports requiring a recipient to offer an appeal on these bases. Other commenters asked whether the proposed regulations would limit the bases for appeals to just those enumerated under § 106.46(i) or allow appeals to challenge parts of the recipient's determination, such as the appropriateness of a sanction or remedy.

One commenter suggested the Department outline a procedure for appeal to ensure fair and consistent appeals.

*Discussion:* The Department declines to add additional bases for which a postsecondary institution must offer an appeal under § 106.46(i) because the requirement to offer an appeal based on procedural irregularity, new evidence, and bias or conflict of interest balances the interest a party has in reviewing a recipient's determination and ensuring sex-based harassment does not continue or recur with a recipient's interest in having discretion to design and implement grievance procedures that are appropriate for its education program or activity. As explained in the preamble to the 2020 amendments, the Department selected these three bases for which a recipient must offer an appeal because each basis represents an error that, if left uncorrected by the recipient, indicates that the determination may be inaccurate, and thus that sex-based harassment in the recipient's education program or activity has not been identified and appropriately addressed. 85 FR 30398. At the same time, the Department recognizes the importance of granting a recipient flexibility and discretion in designing and implementing grievance procedures that are otherwise consistent with § 106.45, and if applicable

§ 106.46. Recipients are better positioned in these circumstances to know the unique needs and values of their educational communities. Accordingly, §§ 106.45(i)–(j) and 106.46(i)(2) provide a recipient the discretion to offer an appeal on additional bases, which may include the opportunity to appeal a remedy or sanction. If a recipient decides to offer an appeal on additional bases, then both the complainant and respondent must have the opportunity to appeal on the same bases. As stated in the preamble to the 2020 amendments, it would be unfair and run counter to the spirit of Title IX to permit complainants to appeal a sanction but not permit respondents to appeal a sanction, and vice versa. As a result, if a recipient allows appeals on the basis of severity of sanctions, that appeal must be offered equally to both parties. 85 FR 30399.

The Department similarly declines to require a postsecondary institution to offer an appeal on the basis of simple error or a determination being clearly erroneous or against the weight of the evidence. First, the Department is unpersuaded by arguments that the authorization of the single investigator model necessitates an appeal on such a basis because final § 106.45(d)(3)(iii) requires a recipient to ensure that the decisionmaker for the appeal did not take part in an investigation of the allegations or the dismissal of the complaint. This requirement from § 106.45 is incorporated by § 106.46(a) for an appeal under § 106.46(i). As such, the decisionmaker for an appeal arising out of a sex-based harassment complaint involving a postsecondary student cannot be the same person who investigated or dismissed the complaint, which ensures that the recipient's appeal decisionmaker reviews the underlying case independently. Additionally, final § 106.45(b)(2) requires an appeal decisionmaker to be free from bias and conflicts of interest, and § 106.8(d)(2)(iii) requires an appeal decisionmaker to be trained to serve impartially.

Second, the appellate cases cited by commenters do not hold that a recipient must offer an appeal on the bases of simple error,[76] clear error, or a determination being against the weight of the evidence. Rather, those cases indicate that a decision being against the weight of the evidence can support an inference of bias in the implementation of a recipient's Title IX procedures. *See Oberlin Coll.,* 963 F.3d at 586–88 (explaining that "the merits of

---

[76] The cases cited by commenters did not discuss the meaning of "simple error."

the decision itself'' can ''support an inference of sex bias''); *Doe* v. *Univ. of S. Ind.,* 43 F.4th 784, 799 (7th Cir. 2022) (''In a sufficiently lopsided Title IX case, . . . an erroneous outcome can support an inference of gender bias.''); *Doe* v. *Tex. Christian Univ.,* 601 F. Supp. 3d 78, 89 (N.D. Tex. 2022) (''missteps running 'against the substantial weight of the evidence' are at least some indication of bias'' (quoting *Univ. of Ark.-Fayetteville,* 974 F.3d at 864)). The Department's final regulations at § 106.46(i)(1)(iii) allow a party to appeal on the basis of decisionmaker bias, and an appeal under the final regulations can thus take into account whether a decision was against the weight of the evidence as part of a party's assertion of bias. Accordingly, a party would be able to appeal on the basis of decisionmaker bias in the hypotheticals posed by one commenter.

The Department also declines to modify § 106.46(i)(1)(ii) to prohibit a party from withholding evidence because the provision already specifies that new evidence must not have been reasonably available at the time the determination or dismissal was made. Accordingly, § 106.46(i)(1)(ii) already adequately guards against a party inappropriately withholding evidence during an investigation to present on appeal. Further, because the final regulations contemplate that not every recipient will include a live hearing in its grievance procedures under § 106.46, the commenter's suggestion to deem any evidence not presented during the investigation as forfeited during the hearing could be inapplicable for many recipients, as well as overly restrictive for recipients that do require a live hearing.

For similar reasons, the Department declines to use the word ''adjudication'' rather than ''determination'' in § 106.46(i)(1)(i)–(ii). The commenter who suggested this change appeared to assume that an ''adjudication'' would be synonymous with a ''hearing.'' Making the suggested change with that understanding of the term ''adjudication,'' however, would result in an inconsistency with § 106.46(g) by implying that a live hearing is required.

The Department also declines to remove the reference to ''Title IX Coordinator'' and ''investigator'' from § 106.46(i)(1)(iii) because, as the commenter acknowledged, bias or a conflict of interest on behalf of the Title IX Coordinator or investigator may not always result in a procedural irregularity, and providing the parties the opportunity to appeal based on Title IX Coordinator or investigator bias or conflict of interest will help ensure

accuracy in a recipient's grievance procedures, which will serve Title IX's goal of identifying sex discrimination, remedying its effects, and preventing its recurrence.

Additionally, the Department declines to offer more specific guidance at this time on what a recipient's appeal procedures should entail. How a recipient implements its appeal procedures could depend on a variety of factors, including a party's basis for requesting an appeal and whether the recipient offers an appeal on additional bases. Regardless of how a recipient structures its appeal procedures, however, those procedures must treat complainants and respondents equitably, in accordance with § 106.45(b)(1). The Department understands that supporting recipients in the implementation of these regulations and ensuring that students know their rights is important. The Department will offer technical assistance, as appropriate, to promote compliance with these final regulations.

Finally, based on its own review, the Department has deleted references to ''the matter'' and made other revisions to § 106.46(i)(1)(i)–(iii) for clarity and consistency with other parts of the final regulations.

*Changes:* The Department has deleted references to ''the matter'' and made other revisions to § 106.46(i)(1)(i)–(iii) for clarity and consistency with other parts of the final regulations.

14. Section 106.46(j) Informal Resolution

*Comments:* Some commenters expressed general support for proposed § 106.46(j). Other commenters opposed proposed § 106.46(j) because they believed it would exceed the Department's authority and be inconsistent with Title IX and established case law, but did not elaborate on their reasoning. Commenters also objected to a recipient having the choice not to offer informal resolution.

*Discussion:* The Department disagrees that § 106.46(j) exceeds the Department's authority. Congress has authorized the Department to issue regulations to effectuate Title IX's prohibition on sex discrimination in education programs or activities that receive Federal financial assistance consistent with achievement of the objectives of the statute. *See* 20 U.S.C. 1682. For further explanation of the Department's authority to promulgate and enforce regulations related to grievance procedures requirements, see the discussion of §§ 106.45(a)(1) and 106.46(a). Comments related to a

recipient's discretion to offer informal resolution are addressed in the discussion of § 106.44(k) in this preamble.

*Changes:* None.

*F. Assistant Secretary Review*

1. Section 106.47 Assistant Secretary Review

*Comments:* Commenters generally supported proposed § 106.47. Some commenters, however, asked the Department to require students to give OCR notice when a lawsuit is filed against a postsecondary institution and suggested that OCR conduct a review before or after a lawsuit is resolved to determine whether the postsecondary institution handled the matter appropriately.

One commenter asked the Department to clarify that, for Title IX erroneous outcome claims, the Assistant Secretary should be able to question whether a recipient reached an erroneous determination because the recipient was unlawfully discriminating on the basis of sex by, for example, favoring male over female complainants or vice versa.

*Discussion:* The Department agrees that § 106.47 will promote clarity and flexibility for recipients by confirming that OCR will not substitute its judgment for the judgment of the recipient's decisionmaker and that recipients have the flexibility to make their own determinations regarding the appropriate weighing of relevant and not otherwise impermissible evidence. The Department recognizes that a student may file a private Title IX lawsuit against a postsecondary institution. Such a lawsuit is separate from OCR's administrative enforcement authority under Title IX, and the Department declines in this rulemaking to require students to notify OCR when a lawsuit is filed against a postsecondary institution or to require OCR to review private Title IX lawsuits to determine whether a postsecondary institution complied with Title IX. The Department will enforce the final regulations consistent with its authority under 20 U.S.C. 1682 and the procedures in 34 CFR 100.7–11 (incorporated through 34 CFR 106.81). Anyone who believes a recipient of Department funds has violated Title IX may file a complaint with OCR.

The Department clarifies that § 106.47 applies only to determinations regarding whether sex-based harassment occurred under § 106.45, and if applicable § 106.46. The Department maintains the position taken in the preamble to the 2020 amendments that the intent of § 106.47 is to convey that OCR will not

substitute its judgment for the judgment of the recipient's decisionmaker regarding the weighing of relevant and not otherwise impermissible evidence in a particular case. *See* 85 FR 30221. Nothing in § 106.47 prevents OCR from holding a recipient accountable for noncompliance with any provision of the Department's Title IX regulations, including § 106.31(a) and (b)(4), which require that a recipient carry out its grievance procedures in a nondiscriminatory manner and prohibit a recipient from discriminating against any party based on sex.

*Changes:* The Department has revised § 106.47 to specify that the provision covers a determination made by a recipient in a particular complaint alleging sex-based harassment. The Department has also revised § 106.47 to clarify that the provision applies to situations in which the Assistant Secretary for Civil Rights would have reached a different determination than the recipient.

## III. Pregnancy and Parental Status

### A. Revised Definitions

1. Section 106.2 Definition of "Pregnancy or Related Conditions"

General Scope of Coverage

*Comments:* Some commenters supported the proposed definition of "pregnancy or related conditions" in § 106.2 for reasons including that it will help remove barriers to educational access for all students who are pregnant or experiencing pregnancy-related conditions and address perceived gaps in the current regulations. Some commenters emphasized the importance of coverage for lactation in the proposed definition in § 106.2, noting this coverage's consistency with similar protections in the Pregnancy Discrimination Act of 1978, 42 U.S.C. 2000e(k) (PDA), the Patient Protection and Affordable Care Act, 42 U.S.C. 18001 *et seq.* (ACA), and the Fair Labor Standards Act of 1938, 29 U.S.C. 201 *et seq.* (FLSA).

Some commenters urged the Department to clarify the proposed definition covers a variety of pregnancy-related medical conditions and types of recoveries. Some commenters asked the Department to explain that a related condition within the definition of "pregnancy or related conditions" under § 106.2 need not qualify as a disability under the ADA to fit the Title IX definition of pregnancy-related conditions under § 106.2 or to qualify for a reasonable modification under § 106.40(b)(3)(ii). Some commenters asked that the final regulations use

terminology that protects all students, employees, and applicants for admission or employment from sex discrimination based on pregnancy or related conditions.

Some commenters urged the Department to include "perceived" and "expected" pregnancy or related conditions in the definition of "pregnancy or related conditions" to prevent discrimination against students seeking fertility care, planning to become pregnant, or who have the potential to become pregnant. One commenter asked that the Department clarify what "potential" pregnancy or related conditions means in proposed § 106.40(b)(1) as applied to the elementary school and secondary school settings.

Some commenters requested an explanation of the Department's proposed change from the phrase "pregnancy and related conditions" that is used in the title of current § 106.40(b) to "pregnancy or related conditions" in the proposed definition in § 106.2.

Some commenters asserted the Department's proposed definition was unnecessary.

*Discussion:* As discussed in the July 2022 NPRM, *see* 87 FR 41534, and in the discussion of § 106.10, the definition of "pregnancy or related conditions" builds on the longstanding prohibition on discrimination based on "pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery" that has existed since the Title IX regulations were first promulgated in 1975, *see* 40 FR 24128 (codified at 45 CFR 86.21(c)(2), 86.40(b)(2), 86.57(b) (1975); 34 CFR 106.21(c), 106.41(b)(1), 106.57(b) (current). Since 1975, the Department has also been clear that recipients cannot discriminate based on these conditions and gained experience and further understanding about what standards are necessary and appropriate to provide students and employees the ability to learn and work while pregnant or experiencing pregnancy-related conditions. *See* 87 FR 41513. Based on the Department's longstanding interpretations and enforcement activities as well as information from commenters, stakeholders who spoke at the June 2021 Title IX Public Hearing, and the development of related laws and case law in this area detailed in the July 2022 NPRM, the revised definition of "pregnancy or related conditions" in the final regulations is necessary to carry out Title IX's nondiscrimination mandate. *See* 87 FR 41513–16.

Accordingly, the final definition of "pregnancy or related conditions" includes pregnancy, childbirth, termination of pregnancy, and lactation,

and all related medical conditions and recovery. The definition includes the full spectrum of processes and events connected with pregnancy. For many, needs related to pregnancy, childbirth, termination of pregnancy, lactation, recovery, and related medical conditions will be highly intertwined, and in many cases inseparable. To emphasize the scope of the definition and to add clarity, the Department is also deleting the word "their" from the definition, so the reference to recovery reads "[r]ecovery from pregnancy, childbirth, termination of pregnancy, lactation, or related medical conditions."

The Department agrees with commenters that including "lactation" in the definition of "pregnancy or related conditions" is consistent with Title IX's goal of eliminating discrimination on the basis of sex in education. As explained in the July 2022 NPRM, "it is undisputed that lactation is a physiological result of being pregnant and bearing a child[.]" 87 FR 41514 (internal citations omitted). The Department also agrees the definition more closely aligns with obligations under other statutes,[77] such as the PDA and the Providing Urgent Maternal Protections for Nursing Mothers Act (PUMP Act), 29 U.S.C. 218d.[78]

[77] The Department notes that the ACA requirement to provide most non-exempt employees with reasonable break time and space to pump (incorporated into the FLSA, 29 U.S.C. 207(r)), has since been replaced by the PUMP Act (also incorporated into the FLSA, 29 U.S.C. 218d), which provides similar protections to most exempt employees as well.

[78] *See, e.g., Hicks* v. *City of Tuscaloosa*, 870 F.3d 1253, 1259 (11th Cir. 2017) (holding that lactation is a pregnancy-related medical condition covered under the PDA); *EEOC* v. *Hous. Funding II, Ltd.*, 717 F.3d 425, 428–29 (5th Cir. 2013) (same); U.S. Equal Emp. Opportunity Comm'n, Enforcement Guidance on Pregnancy Discrimination and Related Issues (June 25, 2015) (2015 EEOC Pregnancy Guidance), *https://www.eeoc.gov/laws/guidance/enforcement-guidance-pregnancy-discrimination-and-related-issues* (explaining that because "lactation is a pregnancy-related medical condition," discrimination against lactating or breastfeeding employees can implicate Title VII); U.S. Dep't of Labor, Fact Sheet #73: FLSA Protections for Employees to Pump Breast Milk at Work (Jan. 2023), *https://www.dol.gov/agencies/whd/fact-sheets/73-flsa-break-time-nursing-mothers* (recognizing most employees' rights under the FLSA to break time for lactation). The Department is aware that some courts have held that the PDA's protection of pregnancy-related medical conditions requires that those conditions be "incapacitating," *see, e.g., Wallace* v. *Pyro Mining Co.*, 789 F. Supp. 867, 869–70 (W.D. Ky. 1990), *aff'd*, 951 F.2d 351 (6th Cir. 1991). But, in its 2015 guidance, the EEOC stated its disagreement with *Wallace* and said: "Nothing [in the PDA] limits protection to incapacitating pregnancy-related medical conditions," *see* 2015 EEOC Pregnancy Guidance, at n.55. The Department agrees with the EEOC and

Continued

The Department acknowledges that there are many different medical conditions that are related to pregnancy, childbirth, termination of pregnancy, or lactation. To avoid confusion or the implication that a specific medical condition may not be covered, the Department declines to add to the regulatory text a list of specific medical conditions that are related to, affected by, or arise out of pregnancy, childbirth, termination of pregnancy, or lactation. However, the Department acknowledges that such conditions include but are not limited to conditions identified in the July 2022 NPRM and by commenters, such as pregnancy-related fatigue, dehydration (or the need for increased water intake), nausea (or morning sickness), increased body temperature, anemia, and bladder dysfunction; gestational diabetes; preeclampsia; hyperemesis gravidarum (*i.e.,* severe nausea and vomiting); pregnancy-induced hypertension (high blood pressure); infertility; recovery from childbirth, miscarriage, or abortion; ectopic pregnancy; prenatal or postpartum depression; and lactation conditions such as swelling or leaking of breast tissue or mastitis. 87 FR 41515. In response to commenters who requested that the Department add menstruation as a related condition, discrimination pertaining to menstruation, perimenopause, menopause, and related conditions is a basis of prohibited sex discrimination, as explained in detail in the discussion of § 106.10.

A pregnancy-related medical condition does not have to be a disability as defined by the ADA for it to fall within the definition of "pregnancy or related conditions" in § 106.2, or for a student to qualify for a reasonable modification under § 106.40(b)(3)(ii). Sections 106.10 and 106.40(b)(3)(ii) do not refer to or rely on the ADA. In addition, if someone who is pregnant or experiencing a pregnancy-related condition has a disability as defined in Section 504 or the ADA, that individual is protected from discrimination under Section 504 and the ADA, as applicable, whether or not the disability is related to pregnancy. In response to comments regarding the scope of application of the pregnancy-related protections, the Department confirms that the pregnancy-related protections of the final regulations protect all students, employees, and applicants for

with those courts, such as the Fifth Circuit, that have recognized that the PDA contains no such limitation. *See, e.g., Hous. Funding II, Ltd.,* 717 F.3d at 428.

admission or employment from discrimination on the basis of pregnancy or related conditions.

With respect to the suggestion to add the word "perceived" to the definition of "pregnancy or related conditions," the Department agrees that the definition of "pregnancy or related conditions" in § 106.2, as it is applied in § 106.10, extends to discrimination based on a perceived status, whether the perception is accurate or not. However, this conclusion is already apparent from the text of the statute and relevant case law, which recognizes that discrimination based on perceived characteristics violates Title IX. *See, e.g., Grabowski* v. *Arizona Bd. of Regents,* 69 F.4th 1110, 1113, 1116–18 (9th Cir. 2023) (holding that Title IX bars sexual harassment on the basis of perceived sexual orientation) (citing *Bostock,* 590 U.S. 644; *Price Waterhouse* v. *Hopkins,* 490 U.S. 228 (1989)); *cf. EEOC* v. *Abercrombie & Fitch Stores, Inc,* 575 U.S. 768, 773–74 (2015) (holding that a plaintiff need not show that the employer knew that an applicant required a religious accommodation to prove religious discrimination under Title VII, in part because Congress did not add a knowledge requirement to Title VII's prohibition on disparate-treatment discrimination). As noted in the July 2022 NPRM, Title IX's broad prohibition on discrimination "on the basis of sex" includes, at a minimum, "discrimination against an individual because, for example, they are or are perceived to be . . . currently or previously pregnant[.]" 87 FR 41532. For example, if a professor refuses to allow a student to participate in a clinical course based on the mistaken belief that the student is pregnant, that professor may be discriminating against a student based on sex and denying the student access to the recipient's education program or activity based on the stereotype that a pregnant student is not physically capable of participating in the course or will not be as dedicated due to the demands of pregnancy.

Likewise, in connection with the suggestion to add the word "expected" to the definition of "pregnancy or related conditions," the Department disagrees that this is necessary, because §§ 106.21(c) (Admission), 106.40(b)(1) (Parental, family, or marital status, pregnancy or related conditions (for students)), and 106.57(b) (Parental, family, or marital status, pregnancy or related conditions (for employment)), as amended in these final regulations, provide that a recipient may not discriminate against any applicant, student, or employee on the basis of

"current, potential, or past pregnancy or related conditions." The Department interprets the word "potential" to cover pregnancy or related conditions that are expected, likely, or have the capacity to occur. In response to one commenter's question, protection based on potential pregnancy or related conditions would apply to, for example, individuals about whom rumors circulate related to pregnancy (*e.g.,* regarding an individual's fertility care, planning for pregnancy, circumstances of pregnancy, or the cause or reason for termination of pregnancy) or in the context of individuals seeking fertility care or otherwise planning a possible pregnancy.

Additionally, § 106.10 of the final regulations prohibits discrimination on the basis of sex stereotypes, which may include discrimination based on others' expectations regarding a person's pregnancy or related conditions and assumptions about limitations that may result. For example, a school that fired a teacher when she got married based on the assumption that all married women get pregnant and quit their jobs would be discriminating based on sex stereotypes about both married women and about pregnancy and would thus violate Title IX's prohibition on discrimination "on the basis of sex." 20 U.S.C. 1681.

In response to commenters' question as to the reason the Department changed the title of § 106.40(b) from "pregnancy and related conditions" to "pregnancy or related conditions," the Department did so for clarity and to match the defined term "pregnancy or related conditions" as defined in these final regulations at § 106.2. "Or" is more accurate and inclusive as "pregnancy or related conditions" includes situations in which a person is pregnant and also has a related condition as well as in which someone is only pregnant or only has a pregnancy-related medical condition.

While some commenters thought that defining "pregnancy or related conditions" was unnecessary because pregnancy discrimination is already protected under Title IX, as indicated in the July 2022 NPRM, defining the term "pregnancy or related conditions" more precisely describes the requirements of Title IX and helps clarify perceived gaps in coverage. 87 FR 41515.

*Changes:* The Department deleted the word "their" from clause (3) of the definition of "pregnancy or related conditions," so that clause (3) now states "[r]ecovery from pregnancy, childbirth, termination of pregnancy, lactation, or related medical conditions."

Comments Regarding Inclusion of Termination of Pregnancy

*Comments:* Some commenters expressed support for the Department's inclusion of "termination of pregnancy" in the proposed definition of "pregnancy or related conditions," and explained that many forms of discrimination occur based on termination of pregnancy, including harassment, the refusal to excuse absences, and retaliation. Some commenters also expressed the view that the proposed regulations will help student athletes, who need support during and after pregnancy or termination of pregnancy to recover and resume educational and athletic activities.

Some commenters generally opposed the inclusion of "termination of pregnancy" in the definition of "pregnancy or related conditions," for a variety of reasons, including religious or moral objections; because they see it as dissimilar from pregnancy, childbirth, or lactation; or because they believe its inclusion is inconsistent with the purpose of Title IX. Some commenters stated that they opposed any Federal government support for or involvement with abortion.

Some commenters requested that the Department clarify that the phrase "termination of pregnancy" in the definition of "pregnancy or related conditions," includes miscarriage, "loss of pregnancy," future or past abortion, or abortion for any reason. Others asked that some or all these elements be excluded; for example, some commenters asked that "termination of pregnancy" include miscarriage but exclude abortion. Some commenters expressed that the phrase "termination of pregnancy" was vague.

*Discussion:* The Department appreciates commenters' range of views about the inclusion of "termination of pregnancy" in the definition of "pregnancy or related conditions" in § 106.2. To reiterate, the Title IX regulations have included nondiscrimination protection for "termination of pregnancy" since their initial promulgation in 1975, which prohibited discrimination on the basis of "pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery therefrom[.]" *See* 40 FR 24128 (codified at 45 CFR 86.21(c)(2), 86.40(b)(2), 86.57(b) (1975)); 34 CFR 106.21(c), 106.41(b)(1), 106.57(b) (current). Thus, to the extent that commenters' concerns involved the Department newly including such protection in the regulations, those concerns were based on a

misunderstanding of the current regulations.

Addressing commenters' concerns about clarity and vagueness, the Department disagrees that the term "termination of pregnancy" is vague. Consistent with the inclusion of the text in the original Title IX regulations in 1975, the Department interprets "termination of pregnancy" to mean the end of pregnancy in any manner, including, miscarriage, stillbirth, or abortion. Additionally, the definition of "pregnancy or related conditions" includes "medical conditions related to" or "recovery from" pregnancy and termination of pregnancy. Miscarriage, stillbirth, and abortion, among other conditions, are medical conditions related to pregnancy, as are recovery from miscarriage, stillbirth, and abortion. Title IX prohibits discrimination against any person based on their seeking, obtaining, or having experienced termination of pregnancy, subject only to narrow limitations discussed in the next section. The Department reiterates that the inclusion of "termination of pregnancy" in the revised definition of pregnancy or related conditions under § 106.2 merely incorporates the current regulations in place since 1975. *See* 40 FR 24128 (codified at 45 CFR 86.21(c)(2), 86.40(b)(2), 86.57(b) (1975)); 34 CFR 106.21(c), 106.41(b)(1), 106.57(b) (current).

The Department disagrees that "termination of pregnancy" should be excluded from the definition of "pregnancy or related conditions" based on the commenters' arguments that it is inconsistent with the purpose of Title IX because it is unlike pregnancy, childbirth, and lactation. As noted in the preceding section, the definition of "pregnancy or related conditions" is broadly inclusive and covers all aspects of pregnancy, as necessary to carry out Title IX's nondiscrimination mandate. Termination of pregnancy is an aspect of pregnancy. Like pregnancy or childbirth, termination of pregnancy— whether related to miscarriage, stillbirth, or abortion—can present health needs that create obstacles to education or employment. As a result, ensuring that recipients do not discriminate on the basis of termination of pregnancy is necessary to ensure that individuals are not subject to discrimination on the basis of sex.

Comments related to termination of pregnancy and religious objections are addressed in the First Amendment discussion below.

*Changes:* None.

Abortion Neutrality Provision, 20 U.S.C. 1688

*Comments:* Some commenters asserted that including "termination of pregnancy" in the definition of "pregnancy or related conditions" would be inconsistent with 20 U.S.C. 1688 (the "Danforth Amendment" or "section 1688"), and that instead the definition should exempt abortion and health insurance coverage of abortion. Some commenters asked whether a recipient is required to or would feel pressured to report a suspected abortion to law enforcement, and if so, the implications for parental rights. Some commenters asked the Department to confirm that it would be a violation of Title IX to discipline a student for terminating a pregnancy.

Some commenters concluded that including "termination of pregnancy" in the definition of "pregnancy or related conditions" impermissibly preempts State law. A group of commenters asked the Department to clarify how a recipient can comply with its Title IX obligations to those who experience termination of pregnancy or related conditions without coming into conflict with or violating State abortion laws.

*Discussion:* As explained above, since the Title IX regulations were first promulgated in 1975, the Department consistently interpreted the statute's broad nondiscrimination mandate to prohibit discrimination on the basis of termination of pregnancy. 40 FR 24128 (codified at 45 CFR 86.21(c)(2), 86.40(b)(1), 86.57(b) (1975)); 34 CFR 106.21(c), 106.41(b)(1), 106.57(b) (current). Although "termination of pregnancy" encompasses abortion, the Department acknowledges that section 1688 limits the Department's enforcement of section 1681's general nondiscrimination mandate in specific ways. Section 1688 provides that nothing in Title IX "shall be construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." This is followed by a clause that prohibits the first sentence from being read "to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a legal abortion."

Consistent with this limitation, these final regulations prevent recipients from being required to provide or pay for benefits or services related to, or use facilities for, abortions, even when the denial could otherwise be construed as discriminatory under section 1681. Said another way, if a recipient's refusal to

provide or pay for benefits or services related to abortion is challenged as sex discrimination under section 1681, the recipient could cite section 1688 to argue that it is under no obligation to provide or pay for any benefit or services related to an abortion. For example, because of section 1688, Title IX does not require a campus-run hospital or health center to provide abortions, even if it offers a wide array of other health services. Similarly, because of section 1688, Title IX does not require a school that offers student health insurance to cover abortion under its plan, even if the plan covers other temporary medical conditions. By contrast, a school that chooses to provide health insurance for other temporary medical conditions cannot deny coverage for treatment related to miscarriage, which is covered by Title IX's protection against discrimination for "termination of pregnancy," but does not fall within the limitation of section 1688. A determination that the Danforth Amendment limits Title IX, if at all, in ways beyond those just described will be fact-specific and must be evaluated on a case-by-case basis, considering whether the issue involves (1) a request for a recipient to pay for or provide (2) a benefit or service, that is (3) related to an abortion, within the intent of section 1688. The Department further explains the application of section 1688 to reasonable modifications for students due to pregnancy or related conditions in the discussion of final § 106.40(b)(3)(ii) below.

The Danforth Amendment text makes clear that the narrow limitation it places on the Department's enforcement of Title IX's nondiscrimination mandate may not justify other forms of discrimination prohibited by section 1681. Consistent with section 1688's self-constraining clause, and informed by contemporaneous sources regarding congressional intent with respect to the passage of the Danforth Amendment,[79]

the Department interprets section 1688's prohibition on penalties to mean that a recipient may not rely on section 1688 to deprive any person of any right or privilege because they are considering, want to have, or have had a legal abortion, provided that the right or privilege the person seeks to exercise does not require the recipient to provide or pay for a benefit or service related to an abortion. As such, a policy or action that specifically targets individuals who have received abortion care for adverse treatment may violate the general nondiscrimination mandate in section 1681. Moreover, a recipient may not punish or retaliate against a student or employee solely for seeking or obtaining an abortion. For example, a high school may not exclude the student from participating in the student council solely because the student has had an abortion, because doing so would be discrimination prohibited by section 1681. Participating in the student council is not a benefit or service related to abortion, and excluding the student on the basis of abortion would constitute a penalty. Accordingly, section 1688 would provide no defense to the school. Similarly, a college may not deny a professor a raise just because it learned she planned to have an abortion because doing so would constitute discrimination prohibited by section 1681. Because the raise has nothing to do with abortion and so is not a benefit or service related to abortion, and denying the raise would also be a penalty, section 1688 likewise would provide no defense. *See also* 134 Cong. Rec. H565–02 (daily ed. Mar. 2, 1988) (statements of Sen. John Danforth, Sen. James Jeffords, Rep. Augustus Hawkins, Rep. Walter Leslie AuCoin, Rep. William Donlon Edwards). Inquiries into the circumstances of an abortion may also be discriminatory— for example, if informed by sex stereotypes or handled in a manner different than how a recipient treats other temporary medical conditions—or may impermissibly deter a student or employee from exercising rights under Title IX. A recipient can implement these regulations without asking questions of a student, employee, or applicant for admission or employment about the specific circumstances

surrounding the person's pregnancy or related conditions, including a potential or past abortion.

Section 1688 provides a partial limitation on the Department's ability to enforce section 1681's nondiscrimination protection related to abortion. However, the Department disagrees that section 1688 requires it to wholly exempt abortion and abortion services from the proposed definition of "pregnancy or related conditions," as suggested by one commenter.

*Changes:* None.

Dobbs v. Jackson Women's Health Organization and Consistency With State Law

*Comments:* Some commenters asked the Department to clarify how the proposed regulations' inclusion of "termination of pregnancy" complies or otherwise interacts with the Supreme Court's overturning of *Roe* v. *Wade,* 410 U.S. 113, 154 (1973) in *Dobbs* v. *Jackson Women's Health Organization,* 597 U.S. 215, 230 (2022). Some believed *Dobbs* made inclusion of "termination of pregnancy" more important for reasons including that State abortion restrictions could result in more students remaining pregnant or more likely to be discriminated against based on termination of pregnancy.

Some commenters concluded that including "termination of pregnancy" in the definition of "pregnancy or related conditions" impermissibly preempts State law. A group of commenters asked the Department to clarify how a recipient can comply with its Title IX obligations to those who experience termination of pregnancy or related conditions without coming into conflict with or violating State abortion laws.

*Discussion:* The Supreme Court issued the *Dobbs* decision on June 24, 2022, the day after the Department released an unofficial copy of the July 2022 NPRM to the public. The content of the unofficial copy did not change before publication in the **Federal Register** on July 12, 2022. With respect to questions commenters raised about the *Dobbs* decision's interaction with nondiscrimination protection for termination of pregnancy under Title IX, as well as section 1688's prohibition on penalties related to legal abortions, the Department clarifies that the *Dobbs* decision does not alter the Department's interpretation of the terms "pregnancy or related conditions" or "termination of pregnancy," or its interpretation of Title IX's general nondiscrimination mandate in section 1681 and section 1688. The Department is not adopting the final regulations as a response to *Dobbs. Dobbs* did not opine on a

---

[79] The legislative history of the Danforth Amendment indicates that Congress intended the scope of the Amendment's first sentence to be confined to providing or paying for benefits or services related to an abortion, not to extend to all forms of discrimination against someone who has an abortion or experiences related medical conditions. *See* 134 Cong. Rec. H565–02 (daily ed. Mar. 2, 1988) (daily ed. Mar. 2, 1988) (statements of Rep. Augustus Hawkins, Rep. William Donlon Edwards, and Sen. James Jeffords). For example, several lawmakers observed that the Amendment would not limit Title IX's general nondiscrimination protections for medical conditions or complications related to an abortion. *See* 134 Cong. Rec. H565–02 (daily ed. Mar. 2, 1988) (statements of Rep. Augustus Hawkins, Rep. Walter Leslie AuCoin, Rep. William Donlon Edwards, Sen. James Jeffords). Congressional debate also reflects that lawmakers

intended the Danforth Amendment's prohibition on "penalties" to broadly include the denial of privileges, such as scholarships, housing, participation in extracurricular activities, including athletics; and the refusal to hire or promote employees. *See* 134 Cong. Rec. H565–02 (daily ed. Mar. 2, 1988) (statements of Sen. John Danforth, Sen. James Jeffords, Rep. Augustus Hawkins, Rep. Walter Leslie AuCoin, Rep. William Donlon Edwards).

recipient's obligation to ensure that students or employees who seek or have had abortions have equal access to education or employment. The Department acknowledges commenter questions regarding the intersection of the final regulations with Title IX, *Dobbs,* and State laws restricting access to abortion, and the Department will offer technical assistance, as appropriate, to help respond to questions. In response to commenters asking about the interaction between Title IX and State laws restricting access to abortion, the Department notes that, a policy or action that specifically targets individuals who have received abortion care for adverse treatment may violate the general nondiscrimination mandate in section 1681.

*Changes:* None.

Statutory Authority

*Comments:* Some commenters posited that prohibiting discrimination based on a decision to terminate a pregnancy is beyond the Department's authority under Title IX, and that such a prohibition would require a congressional amendment to Title IX or else would violate the major questions doctrine, as articulated by the Supreme Court in *West Virginia* v. *EPA,* 597 U.S. 697, 721 (2022). Some commenters expressed their concern that the Department would expand abortion access through enforcement and other regulatory guidance.

*Discussion:* The Department's regulation of discrimination based on pregnancy or related conditions, including termination of pregnancy, does not raise concerns under the major questions doctrine.[80] The Supreme Court has recognized the Department's broad authority, based on Congress' express delegation, to issue regulations prohibiting sex discrimination under Title IX. *Gebser,* 524 U.S. at 292; 20 U.S.C. 1682. As discussed in the July 2022 NPRM and in the above section on the § 106.2 Definition of "Pregnancy or Related Conditions"—General Scope of Coverage, the prohibition on discrimination based on pregnancy or related conditions, including termination of pregnancy, is neither extraordinary nor unprecedented, and in fact has been in place since the Title IX regulations were first promulgated in 1975. *See* 87 FR 41513; 40 FR 24128 (codified at 45 CFR 86.21(c)(2), 86.40(b)(1), 86.57(b) (1975)); 34 CFR

106.21(c), 106.41(b)(1), 106.57(b) (current).

While only Congress has the authority to amend a statute, the Department disagrees that the definition of "pregnancy or related conditions" is beyond the scope of the Department's authority under Title IX. Congress authorized the Department to issue regulations to effectuate Title IX's prohibition on sex discrimination in education programs or activities that receive Federal financial assistance, consistent with achievement of the objectives of the statute. *See* 20 U.S.C. 1682. The Department is not redefining or attempting to redefine Title IX, but rather effectuating Title IX pursuant to its statutory authority, *see* 20 U.S.C. 1682, and the applicable regulations have prohibited discrimination based on termination of pregnancy for nearly half a century.

Responding to concerns that the Department will expand abortion access through enforcement and other regulatory guidance, the Department again reiterates that it has interpreted Title IX to protect against discrimination based on termination of pregnancy since 1975. Title IX and its implementing regulations ensure that students and employees are able to make their own decisions about pregnancy or related conditions without losing equal access to education or education-related employment. Further, the Department's enforcement and other regulatory guidance are limited to a recipient's obligation under Title IX to ensure that students or employees who seek or have had abortions have equal access to education or employment, and, therefore, are unrelated to expanding abortion access.

*Changes:* None.

Cost-Benefit Analysis and Rationale

*Comments:* Some commenters argued that defining "pregnancy or related conditions" to include abortion or termination of pregnancy is arbitrary and capricious, and that the Department did not adequately justify or weigh the costs and benefits of broadly defining pregnancy or related conditions. Other commenters directed the Department's attention to research and data regarding barriers faced by pregnant students and employees in educational environments.

*Discussion:* The Department explains in detail the potential costs and benefits of the final regulations related to nondiscrimination based on pregnancy or related conditions in the *Regulatory Impact Analysis.* In addition to this discussion, the Department notes that the final regulations reflect the Department's decisions regarding how

best to implement the nondiscrimination mandate of Title IX, after considering public comment and stakeholder engagement. The Department is not required under the Administrative Procedure Act, relevant Executive Orders, or OMB circulars, to cite statistics regarding every underlying issue when conducting rulemaking. Nor is it arbitrary and capricious to interpret "pregnancy or related conditions" to include termination of pregnancy, including abortion, for reasons explained in the July 2022 NPRM and reiterated above. *See* 87 FR 41513.

*Changes:* None.

Harm

*Comments:* Some commenters stated that including "termination of pregnancy" in the definition of pregnancy or related conditions would harm women in various ways they felt were contrary to Title IX, including that it might impermissibly encourage or fund abortions or increase sexual violence. Other commenters argued that including "termination of pregnancy" in the definition of pregnancy or related conditions would incentivize recipients to offer access to abortions because accommodating a student's or an employee's termination of pregnancy and recovery would be less expensive and less burdensome for the recipient than providing the student or employee with modifications for pregnancy, childbirth, and lactation.

*Discussion:* The Department disagrees with commenters who argued that the final regulations should not prohibit discrimination based on termination of pregnancy for the reasons they described above. The regulations simply ensure that students and employees are able to make their own decisions about pregnancy or related conditions without losing equal access to education or education-related employment.

The final regulations make clear that a recipient has obligations to students and employees at all stages of pregnancy, including through recovery and in connection with related medical conditions. Contrary to some commenters' assertions, making clear that a recipient may not discriminate on the basis of pregnancy or related conditions and must provide reasonable modifications to students will enable students to participate in education programs and activities without discrimination. As described below, the final regulations clarify and strengthen protections based on pregnancy or related conditions that will promote students' and employees' continued access to a recipient's education program or activity including, for

---

[80] *See, e.g., West Virginia,* 597 U.S. at 721. The Supreme Court's decision in *West Virginia* was issued on June 30, 2022, after the Department released the unofficial copy of the July 2022 NPRM on June 23, 2022, so that case also could not be addressed in the July 2022 NPRM.

example, providing reasonable modifications to students for prenatal care, birth, and postpartum care, and providing lactation space for students and employees.

In addition to protections against pregnancy discrimination, these final regulations contain provisions providing lactation space for students and employees. Nothing in the final regulations encourages or discourages pregnancy or termination of pregnancy. In addition, contrary to commenters' concern, the final regulations do not encourage sexual violence but rather contain extensive provisions aimed at preventing, addressing, and eliminating it, because sexual violence is prohibited sex discrimination.

Some comments appear to reflect a misunderstanding of the regulations. First, a recipient is not required to provide reasonable modifications due to pregnancy or related conditions for employees. Second, with respect to students, these final regulations at § 106.40(b)(3)(ii) make clear that a recipient must make only such reasonable modifications as necessary to prevent sex discrimination and ensure equal access to the recipient's education program or activity based on the student's individualized needs in consultation with the student. Although such reasonable modifications will be determined on a case-by-case basis, the Department anticipates that typically they will not be particularly expensive or extensive.

With respect to concerns that these regulations may encourage individuals to get abortions or incentivize recipients to offer access to abortions rather than reasonable modifications, the Department is unaware of evidence that Title IX's longstanding provisions relating to discrimination on the basis of pregnancy or related conditions, including termination of pregnancy, have the effects commenters projected. As noted above, the final regulations do not dictate how students or employees make pregnancy or health-related decisions, but rather ensure that a recipient allows them equal educational or employment access no matter how their pregnancy progresses or what conditions result. The Department concludes, in any event, that ensuring that individuals do not face discrimination on the basis of pregnancy or related conditions, including termination of pregnancy, in federally funded education programs or activities is necessary to effectuate Title IX's mandate.

*Changes:* None.

Intent of Title IX

*Comments:* Some commenters asserted that prohibiting discrimination based on termination of pregnancy conflicts with Title IX because discrimination based on termination of pregnancy is not a basis of sex discrimination or because it only affects women.

*Discussion:* Discrimination based on termination of pregnancy is sex discrimination for several reasons. First, the Department notes that discrimination on the basis of pregnancy is a type of sex discrimination acknowledged by case law. *See Conley* v. *Nw. Fla. State Coll.,* 145 F. Supp. 3d 1073, 1077–78 (N.D. Fla. 2015) (holding that Title IX's prohibition on sex discrimination covered pregnancy based on both statutory interpretation and legislative history); *see also Wort* v. *Vierling,* Case No. 82–3169, slip op. (C.D. Ill. Sept. 4, 1984), *aff'd on other grounds,* 778 F.2d 1233 (7th Cir. 1985) (noting that the district court found that a school discriminated against a student on the basis of sex in violation of Title IX when it dismissed her from the National Honor Society because of her pregnancy); *Muro* v. *Bd. of Supervisors of La. State Univ. & Agric. & Mech. Coll.,* No. CV 19–10812, 2019 WL 5810308, at *3 (E.D. La. Nov. 7, 2019) ("Courts have held that discrimination on the basis of pregnancy, childbirth, or related medical conditions is a form of sex discrimination prohibited by Title IX."); *Varlesi* v. *Wayne State Univ.,* 909 F. Supp. 2d 827, 854 (E.D. Mich. 2012) (holding that pregnancy discrimination "is unquestionably covered as a subset of sex discrimination under Title IX"). Likewise, the Title IX regulations have considered discrimination based on termination of pregnancy an aspect of pregnancy discrimination since 1975. *See* 40 FR 24128 (codified at 45 CFR 86.21(c)(2), 86.40(b)(1), 86.57 (1975)); 34 CFR 106.21(c), 106.41(b)(1), 106.57(b) (current).

Second, because pregnancy is necessarily a condition related to sex characteristics (*e.g.,* uterus, ovaries, fallopian tubes), discrimination based on conditions that arise from pregnancy, including termination of pregnancy, constitutes discrimination on the basis of sex characteristics. Commenters offered no persuasive reason for withdrawing protections for pregnancy discrimination on the basis of the termination of pregnancy.

Finally, pregnancy discrimination, including because of termination of pregnancy, is also a type of discrimination on the basis of sex stereotypes. For example, a professor who learns a student recently terminated her pregnancy and refuses to allow her into a field work course because the professor believes that students who recently terminated a pregnancy are unable to complete field work would be discriminating on the basis of sex stereotypes. As discussed in the July 2022 NPRM, discrimination against students and employees who are pregnant or experiencing pregnancy-related conditions—including conditions relating to termination of pregnancy—frequently functions as a proxy for sex in discriminatory policies and procedures. *See* 87 FR 41513. Such discrimination is sometimes based on sex stereotypes about the roles of men and women, or, in other cases, a recipient may fail to accommodate conditions associated with women as effectively as those associated with men. This sort of discrimination can result not only from animus, but also from sex-based indifference to the needs of this student and employee population. *See id.*

*Changes:* None.

Consistency With Other Federal laws

*Comments:* Some commenters argued that including "termination of pregnancy" in the definition of pregnancy or related conditions is inconsistent with other Federal laws, including Title VII, Section 1557 of the ACA, 42 U.S.C. 18116 (Section 1557), Title X of the Public Health Service Act, 42 U.S.C. 300 to 300a-6 (Title X), the Helms Amendment, 22 U.S.C. 2151b(f)(1), and Federal case law. For example, some commenters asserted that the Title IX final regulations would require recipient health insurance or healthcare to cover abortion under Title IX and not under Title VII; and that the regulations violate the Helms Amendment, which prohibits the use of certain Federal funds for foreign assistance to pay for abortion as a method of family planning or to coerce anyone to provide an abortion. Some commenters said that the Department should address the impact of the proposed regulations in health care or explicitly state that Title IX does not apply in the health care context.

*Discussion:* To the extent that commenters raised concerns that the final regulations conflict with other Federal laws such as Title VII, Title X, Section 1557, and the Helms Amendment because these commenters perceived the final Title IX regulations to require a recipient to pay for abortions either directly or through health insurance, these commenters are mistaken. As explained above in the

section on the § 106.2 Definition of "Pregnancy or Related Conditions"— Abortion Neutrality Provision, 20 U.S.C. 1688, nothing in Title IX or these final regulations requires recipients to pay for abortions either directly or through health insurance. Indeed, these regulations are consistent with 20 U.S.C. 1688, which provides that Title IX may not be "construed to require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." The Department and these final regulations abide by that limitation.

Section 1557 prohibits sex discrimination in federally funded health programs and activities, some of which may also be education programs and activities covered under Title IX. Title IX and Section 1557 are independent authorities, and requirements under Section 1557 are outside of the scope of this rulemaking. To the extent a recipient operates an education program or activity subject to Title IX that is also a health program or activity subject to Section 1557, it is obligated to comply with both.

*Changes:* None.

Alternative Proposals

*Comments:* Some commenters suggested alternatives to the inclusion of "termination of pregnancy" in the definition of "pregnancy or related conditions," including providing adoption assistance and free medical care, providing accommodations and assistance to pregnant students and mothers, supporting lactation spaces in schools and adding changing tables to restrooms.

Some commenters asked that the Department address the issues related to pregnancy in ways other than through the regulations, including through a separate rulemaking, subregulatory guidance, training, or a public forum.

*Discussion:* The Department appreciates commenters' suggestions for alternatives to inclusion of "termination of pregnancy" in the regulations but believes that such coverage is necessary to prevent sex discrimination, as described above. Although some of the commenters' ideas such as adoption assistance and free medical care are beyond the scope of the final regulations, the Department notes that several of the commenters' other suggestions are encompassed in the final regulations, such as requiring lactation spaces in schools and providing reasonable modifications for students who are pregnant or experiencing pregnancy-related conditions.

The Department declines the suggestions to conduct a separate rulemaking related to pregnancy or related conditions, instead of issuing these final regulations, because the process for developing these final regulations has been extensive and thorough, with a wide range of views expressed and considered, including on issues related to pregnancy or related conditions. Going forward, the Department will offer technical assistance and guidance, as appropriate, to promote compliance with the final regulations.

*Changes:* None.

First Amendment

*Comments:* Some commenters opposed the inclusion of abortion within the definition of "pregnancy or related conditions" because of their views—moral, religious, or otherwise— that life begins at conception. Relatedly, they stated that including "termination of pregnancy" in the definition of pregnancy or related conditions would interfere with constitutionally protected rights, including parental rights, various religious freedoms, and free speech rights. For example, they suggested that the inclusion of "termination of pregnancy" in the proposed definition of "pregnancy or related conditions" would jeopardize the religious freedoms of individuals and entities that object to abortion, including healthcare providers, members of certain faiths, or religious schools or other institutions, and potentially subject them to discrimination.

Commenters asked the Department to exempt individuals and recipients from Title IX compliance that would conflict with their moral or religious beliefs; for example, so they would not have to provide abortion-related health care or information. Some commenters asked the Department to clarify when anti-abortion speakers or acts would violate Title IX.

*Discussion:* The Department has carefully considered concerns that the definition of "pregnancy or related conditions" may impact religious beliefs and expression. As an initial matter, the Department observes again that prohibiting discrimination based on "termination of pregnancy" is not new but instead has been part of the Title IX regulations since 1975. *See* 40 FR 24128(codified at 45 CFR 86.21(c)(2), 86.40(b)(1), 86.57(b) (1975)); 34 CFR 106.21(c), 106.40(b)(1), 106.57(b) (current). Thus, to the extent that commenter concerns involved negative consequences that commenters thought might follow from "adding" such protection to the regulations, those

concerns are based on a misunderstanding of the existing regulations. Likewise, as described under the heading Consistency with Other Federal Laws, the final regulations do not require a recipient to provide or pay for benefits or services related to, or use facilities for, abortions.

Further, the pregnancy-related provisions, including the definition of "pregnancy or related conditions," do not limit § 106.6(d), which states that nothing in the Title IX regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment; deprive a person of any rights that would otherwise be protected from government action under the Due Process Clauses of the Fifth and Fourteenth Amendments; or restrict any other rights guaranteed against government action by the United States Constitution. The Department reaffirms that a recipient cannot use Title IX to limit the free exercise of religion or protected speech or expression. Similarly, the Department also underscores that none of the amendments to the regulations changes or is intended to change the commitment of the Department to fulfill its obligations in a manner that is fully consistent with the First Amendment and other guarantees of religious freedom in the Constitution of the United States and Federal law. *See, e.g.,* 42 U.S.C. 2000bb–2000bb-4 (Religious Freedom Restoration Act). For additional discussion regarding the First Amendment, see the section on Hostile Environment Sex-Based Harassment— First Amendment Considerations (§ 106.2).

Finally, Title IX has since its passage in 1972 contained an exemption for a recipient that is controlled by a religious organization from complying with provisions of the regulations that conflict with a specific tenet of the religious organization. 20 U.S.C. 1681(a)(3). This provision and § 106.12 of the Department's Title IX regulations, which implements this statutory provision, remain unchanged. The Department posts correspondence regarding religious exemptions on its website.[81] For additional explanation of religious exemptions from Title IX, see the discussion of Religious Exemptions (Section VII).

*Changes:* None.

---

[81] *See https://www2.ed.gov/about/offices/list/ocr/ correspondence/other.html* (last visited Mar. 12, 2024).

2. Section 106.2 Definition of ''Parental Status''

*Comments:* The Department received many comments expressing support for the proposed definition of ''parental status.'' The Department also received comments opposing the proposed definition of ''parental status,'' with several commenters asserting that the definition would be too broad and others raising concerns about the proposed additions of ''in loco parentis,'' ''legal custodian or guardian,'' and ''actively seeking legal custody, guardianship, visitation, or adoption.'' One commenter suggested raising the age of the person receiving care from 18 years old to 21 years old.

Other commenters proposed that the Department adopt a more inclusive term than ''parental status,'' such as guardian or representative, and asked the Department to include coverage of domestic partners of a child's parent as well as parents who have conceived via assisted reproductive technology but are not biologically related. Some commenters asked the Department to define ''family status.''

*Discussion:* Since 1975, the regulations implementing Title IX have prohibited sex-based distinctions based on parental, family, or marital status to ensure that persons are not limited or denied in their access to a recipient's education program or activity based on sex. 40 FR 24128 (codified at 45 CFR 86.21(c), 86.40(a), 86.57(a) (1975)); 34 CFR 106.21(c), 106.40(a), 106.57(a) (current). However, prior to this rulemaking, the term ''parental status'' had not been defined in the Title IX regulations. The Department recognizes that sex stereotypes about who bears responsibility for raising children are still common and may affect applicants, students, and employees who are or may become parents when accessing educational opportunities. By defining ''parental status'' in § 106.2, the Department provides clarity regarding the scope of Title IX's prohibition on sex discrimination related to parental status, and the Department acknowledges commenters' support for including this definition. As explained in the July 2022 NPRM, the Department found Executive Order 13152, 65 FR 26115, which has been in place since May 2000, informative in developing this definition. *See* 87 FR 41516. Commenters provided no case law, nor was the Department able to find any, indicating that the definition is too broad, unclear, or otherwise legally insufficient. The definition of ''parental status'' in § 106.2 does not bestow parental authority on any person. As a

general matter, parental rights are determined by State law, and this definition does not abrogate those rights. Instead, the definition defines the scope of the prohibition on sex discrimination in the adoption or implementation of any policy, practice, or procedure concerning parental status of a student, employee, or applicant for admission or employment.

Regarding the inclusion of a person who is ''in loco parentis,'' many commenters interpreted this language as permitting a recipient to be ''in loco parentis'' over a student. The definition of ''parental status'' in § 106.2 applies only to its use in §§ 106.21(c)(2)(i), 106.37(a)(3), 106.40(a), and 106.57(a)(1), which prohibit sex discrimination related to a person's parental status. To read the definition to include a recipient as ''in loco parentis'' would be incorrect as the definition refers to a person who may be subjected to sex discrimination under these regulations, which in this context would not be an entity. Moreover, as stated above, this provision does not bestow parental authority or grant parental rights. The Department declines to offer specific examples of people who would be considered ''in loco parentis'' and how to obtain that designation because that will depend on the facts and circumstances of a particular case and on State law. As ''in loco parentis'' is a familiar term in law, it is unnecessary to offer further clarification.

Similarly, the Department declines to offer specific examples of who would be considered a legal custodian or guardian and how such an individual would be selected and appointed, as that determination will depend on the facts and circumstances of a particular case and on State law. As with ''in loco parentis,'' ''legal custodian or guardian'' is familiar in law and it is unnecessary to offer further clarification.

Regarding the inclusion of a person who is ''actively seeking legal custody, guardianship, visitation, or adoption,'' the Department disagrees with commenters who asserted this language diminishes parental rights. Commenters misinterpreted this provision as creating a conflict among parental rights by granting the same parental rights to those who are actively seeking legal custody over another person as an individual who already has legal authority over another. Again, this definition does not grant or diminish parental rights to any person. It simply defines categories of individuals who are protected against sex discrimination under final §§ 106.21(c)(2)(i), 106.37(a)(3), 106.40(a), and 106.57(a)(1); it also does not dictate whom the

Department would consider to be a parent, guardian, or authorized legal representative for purposes of other parts of the Title IX regulations.

The Department declines to raise the age of the person receiving care to 21 years old because most States have set the age of legal majority at 18 years old, and the definition of ''parental status'' includes those with the relevant relationship with respect to persons over the age of 18 who are incapable of self-care because of a physical or mental disability.

The Department acknowledges the suggestion to use a more inclusive term than ''parental,'' such as guardian or representative, but the text of the definition addresses the underlying concern of ensuring that individuals other than legal parents are protected from discrimination. Additionally, the Department declines to add a separate category to the definition of ''parental status'' for domestic partners and parents who have conceived via assisted reproductive technology but are not biologically related to a child because only one of the seven categories enumerated in the definition is limited to biological relationships and many of the categories could also apply to such individuals, depending on the facts presented.

Finally, the Department considered the suggestion to define ''family status'' but determined that a definition is not necessary. The Department considers the term ''family status'' to be sufficiently well understood that it need not be defined in the regulatory text, but nevertheless clarifies that the Department considers the term to be broadly inclusive and refers to the configuration of one's family or one's role in a family.

*Changes:* None.

*B. Admissions*

1. Section 106.21(c) Parental, Family, or Marital Status; Pregnancy or Related Conditions

General Support

*Comments:* Some commenters supported prohibiting discrimination against applicants for admission based on pregnancy or related conditions because it would allow for a more inclusive educational environment, would contribute to increased college or university completion rates and greater upward mobility for students who are pregnant or experiencing pregnancy-related conditions, and would be vital to such applicants' wellness and success. A group of commenters stated that the proposed regulations clarify and expand upon existing Title IX protections and

help ensure that neither pregnancy nor parenting status hinder a student's full and equal access to educational opportunities.

*Discussion:* The Department acknowledges commenters' support for § 106.21. The Department shares the goals of ensuring that school environments are inclusive and that recipients prevent discrimination and ensure equal access to their education programs or activities for students who are pregnant or experiencing pregnancy-related conditions to give full effect to Title IX.

The Department made three changes to the text of final § 106.21(c)(2). Upon review, the Department determined that replacing the word "apply" with "implement" in § 106.21(c)(2)(i) improves clarity consistent with similar revisions in final §§ 106.40(a) and 106.57(a), and for consistency also decided to replace the words "establish or follow" in § 106.21(c)(2)(ii) with "adopt or implement." In addition, in § 106.21(c)(2)(iii), the Department made a grammatical correction by adding the word "a" between the words "[m]ake" and "pre-admission inquiry."

The Department explains the application of the final regulations to parental status in the discussion of the definition of "parental status" in § 106.2.

*Changes:* Section 106.21(c)(2)(i) has been revised to substitute the word "implement" for the word "apply." Section 106.21(c)(2)(ii) has been revised to substitute the words "adopt or implement" for the words "establish or follow." Lastly, § 106.21(c)(2)(iii) has been revised to add the word "a" before "pre-admission inquiry."

**Application Only to Recipients Subject to Subpart C**

*Comments:* Some commenters suggested that the Department clarify that the revised provisions in proposed § 106.21 do not apply to nonvocational elementary schools and secondary schools, which the commenters deemed appropriate considering current § 106.15(d), proposed § 106.31(a)(3), and current Departmental guidance.

*Discussion:* The Department confirms that Subpart C of the regulations, which governs admissions, does not apply to nonvocational elementary schools and secondary schools. 34 CFR 106.15(c), (d). The Department adds that, under § 106.34(a), nonvocational elementary schools and secondary schools may not refuse participation based on sex, with some exceptions listed in the provision, and § 106.34(c) addresses admissions to single-sex public nonvocational

elementary schools and secondary schools.

*Changes:* None.

"Perceived" and "Expected"

*Comments:* One commenter urged the Department to add "perceived" and "expected" to the list of protected statuses in § 106.21(c)(2)(ii) to better capture the ways that stigma and bias about pregnancy prevent equal access to educational opportunities. The commenter explained that adding "perceived" and "expected" to the list of protected statuses would help ensure that applicants rumored or otherwise perceived to be pregnant are not denied educational opportunities, that applicants who seek fertility care or otherwise plan to be pregnant are not discriminated against on that basis, and that applicants are not denied educational opportunities because they might become pregnant.

*Discussion:* The Department declines to add "perceived" and "expected" statuses to § 106.21(c)(2)(ii) for the same reasons discussed in connection with the comment recommending that the Department make the same change to the "definition of pregnancy" in § 106.2. The Department's rationale is explained more fully in the discussion of § 106.10.

*Changes:* None.

Pre-Admission Inquiries

*Comments:* One commenter requested that the Department change proposed § 106.21(c)(2)(iii), which prohibits a recipient from making a pre-admission inquiry into the marital status of an applicant, to include "current, potential, or past pregnancy or related conditions," which the commenter stated is particularly important following *Dobbs.* That commenter also requested that the Department extend proposed § 106.21(c)(2)(iii) to include "family status and parental status" because women are often custodial parents and a recipient with stereotypical concerns about a parenting applicant's commitment to her education may use such information to discriminate against that applicant. Another commenter urged the Department to clarify that pre-admission inquiries regarding the parental status of an applicant are permitted under Title IX if they do not affect the applicant's chances of admission.

A group of commenters objected to the Department's proposal to replace the phrase "such applicants of both sexes" in current § 106.21(c)(4) with "all applicants" in proposed § 106.21(c)(2)(iii), because the "both sexes" phrasing best conveys what Title IX prohibits and is used in the Title IX

statute, the removal of the phrase would make the sentence grammatically incorrect, and keeping the words "both sexes" would not preclude a recipient from choosing to ask more specifically how an applicant identifies.

Some commenters encouraged the Department to consider the impact of proposed changes to pre-admission inquiries regarding a student's sex in proposed § 106.21(c)(2)(iii), including the impact on student privacy.

*Discussion:* The Department agrees that an applicant's pregnancy or related conditions and sex-based distinctions regarding parental, family, or marital status should not affect their chances of admission to a recipient institution and emphasizes that pre-admission inquiries regarding the marital status of an applicant are not permitted under the Department's Title IX regulations. However, the Department declines to add "current, potential, or past pregnancy or related conditions" or "family status and parental status" to § 106.21(c)(2)(iii) of the final regulations. Section 106.21(c)(2)(i) and (ii) of the final regulations already states that a recipient covered by subpart C must not discriminate against any applicant based on current, potential, or past pregnancy or related conditions and must not implement any policy, practice, or procedure—including pre-admission inquiries—concerning the parental, family, or marital status of a student or applicant that treats that person differently based on sex. In addition, the Department acknowledges the concerns raised by commenters who explained that the widely used Common Application includes a question regarding whether the applicant has children and if so, how many, and that the anonymized responses are a rare source of data on the parenting student population that is helpful to researchers and advocates.

The Department disagrees with the assertion that it is critical to retain the words "such applicants of both sexes" in § 106.21(c)(2)(iii). Contrary to the commenters' characterization, stating that this pre-admission inquiry is permissible "only if this question is asked of all applicants" is consistent with Title IX's prohibition on sex discrimination and conveys the same point as the current language, which prohibits a recipient from asking such questions just of students of one sex. In addition, the words "all applicants" are more inclusive and are grammatically correct. The Department also does not find persuasive the fact that the "both sexes" language was used in the 1972 statutory text, because it was used in only one specific provision for

recipients that were transitioning from admitting only students of one sex to admitting students of both sexes. *See* 20 U.S.C. 1681(a)(2).

As explained more fully in the discussion of § 106.44(j), the Department has carefully considered the impact of the regulatory changes on maintaining confidentiality of personally identifiable information, and in response to commenter concerns the Department revised final § 106.44(j) to prohibit the disclosure of personally identifiable information obtained in the course of complying with this part, with some exceptions. The disclosure restrictions are explained more fully in the discussion of § 106.44(j).

*Changes:* None.

Intersection With Disability Law

*Comments:* One commenter opposed the requirement in proposed § 106.21(c)(1) that, in determining admissions, a recipient must treat pregnancy or related conditions or any temporary disability resulting therefrom in the same manner and under the same policies as any other temporary disability or physical condition, because the commenter interpreted the standard as requiring pregnancy to be considered a disability. Another commenter asserted that the proposed regulations were inconsistent with disability law to the extent they would require a recipient to treat pregnant applicants differently than those with other types of temporary disabilities.

*Discussion:* As the Department indicated in the July 2022 NPRM, some conditions or complications related to pregnancy might qualify as disabilities under Section 504 and the ADA, but pregnancy itself is not a disability. 87 FR 41523. The Department continues to stress that if someone who is pregnant or experiencing pregnancy-related conditions has a disability, Section 504 or the ADA may also apply, whether or not the disability is related to pregnancy.

At the same time, the Department agrees that it is important that a recipient understand how to treat applicants for admission who are pregnant or experiencing pregnancy-related conditions under Title IX. The Department has considered the fact that some recipients may not maintain standalone policies related to "temporary disabilities," since that term is not used in Section 504 or the ADA, and that such an omission could result in the application of the Title IX provision regarding pregnancy and admissions being unclear. To simplify § 106.21(c)(1) and avoid any suggestion that the provision applies only when a

recipient maintains policies related strictly to "temporary disabilities" that may be used in comparison, the Department has deleted the term "or any temporary disability resulting therefrom" and changed the words "any other temporary disability or physical condition" to "any other temporary medical conditions." The Department views these changes as clarifying the scope of coverage and ensuring that § 106.21(c)(1) will apply to the extent a recipient has any policies or practices regarding temporary medical conditions, as that term is ordinarily understood.

A recipient's policy with respect to temporary medical conditions may be subsumed within its policy related to disabilities, or it may be separate. The Department also clarifies that, if the recipient does not have a policy regarding the treatment of temporary medical conditions, it must treat pregnancy or related conditions in the same manner that it treats temporary medical conditions in practice. When the applicant has a pregnancy-related condition that qualifies as a disability under the ADA or Section 504, the individual is also protected from discrimination under those laws as well.

Because a recipient's policies and practices regarding other temporary medical conditions are the proper comparators for pregnancy or related conditions, final § 106.21(c)(1) requires that pregnancy or related conditions and temporary medical conditions be treated in the same manner and under the same policies and practices, including with respect to the provision of reasonable modifications to applicants with temporary medical conditions. If a recipient does not have a policy or practice of providing reasonable modifications for applicants with temporary medical conditions, it is not required to provide reasonable modifications for pregnancy or related conditions under Title IX. However, as noted above, when the applicant has a pregnancy-related condition that qualifies as a disability, the recipient must comply with its nondiscrimination obligations under the ADA and Section 504.

*Changes:* In final § 106.21(c)(1), the words "or any temporary disability resulting therefrom" have been removed and the words "disability or physical condition" have been changed to "medical conditions."

Request To Extend Reasonable Modifications to Applicants

*Comments:* A group of commenters asserted that under proposed § 106.21(c)(1), pregnant and parenting

applicants for admission should have rights to reasonable modifications under Title IX, independent of what modifications are provided to those with temporary disabilities, so that pregnant and parenting applicants are afforded the same protections under Title IX as pregnant and parenting students who are enrolled and to address the concern that a recipient may be unaware of its obligation to accommodate an applicant with a temporary disability.

*Discussion:* The Department carefully considered the suggestion to extend the reasonable modifications requirement to applicants for admission but declines to do so for a few reasons. First, the Department would need to consider additional information before making such a change, particularly given factors of possible cost, administrative burden, and possible interplay with other overlapping legal requirements. Second, the Department notes that final § 106.21(c)(1) requires a recipient, in the admissions process, to treat pregnancy or related conditions in the same manner and under the same policies as it would treat any other temporary medical condition. As a result, for example, if a recipient provides an applicant who is recovering from back surgery an extension of time for a medically necessary period to submit a required application essay, it must do the same for a student who is recovering from childbirth. Finally, applicants whose pregnancy-related medical conditions qualify as disabilities under Section 504 or the ADA may also be entitled to reasonable accommodations during the application process under those laws.

*Changes:* None.

Parental Status

*Comments:* One commenter stated that it is unnecessarily narrow for proposed § 106.21(c)(2)(i) to prohibit only discrimination that treats parenting applicants differently based on sex and urged the Department to explicitly prohibit discrimination against applicants for admission based on that person's "current, potential, perceived, expected, or past parental, family, marital, or caregiver status," so that recipients will not think they may discriminate against parenting students or applicants as long as they do so equally across sexes. The commenter explained that discrimination based on parental, family, and caregiver status often constitutes discrimination on the basis of sex because women are more often custodial parents, and such discrimination is often tied to stereotypes that women who are

mothers are likely to neglect their education or should be focused only on providing care to their children.

*Discussion:* The Department would need to consider additional information before making such a change, particularly given possible considerations of cost and administrative burden. The Department notes that a recipient covered by Subpart C is prohibited from treating parenting applicants differently based on sex under final § 106.21(c)(2)(i) and from discriminating based on sex stereotypes under § 106.10, including about the proper roles of mothers and fathers or the proper gender of caretakers.

*Changes:* None.

*C. Discrimination Based on a Student's Parental, Family, or Marital Status, or Pregnancy or Related Conditions*

1. Section 106.40   Parental, Family, or Marital Status; Pregnancy or Related Conditions; and Section 106.40(a) Status Generally

*Comments:* Many commenters expressed support for proposed § 106.40(a) because it provides protection and addresses barriers that parenting students face in pursuing educational opportunities. Some commenters shared personal stories regarding their experiences as parenting students, including being asked to withdraw from a postsecondary institution, being discouraged from having more children, risking loss of scholarships, and being subjected to sex stereotypes regarding the expected roles of mothers and fathers.

In addition, several commenters urged the Department to broaden the protections in proposed § 106.40(a) by explicitly prohibiting discrimination, including sex-based harassment, based on perceived, expected, or past parental, family, marital, or caregiver status rather than prohibiting only discrimination that treats parenting students differently based on sex. One commenter asked the Department to specify that discrimination based on parental status is prohibited throughout the student's participation in the education program or activity, not just immediately following the birth or adoption of a child. Some commenters asserted that expectant parents who are not giving birth, caregivers who are not parents, and students who are perceived to be parents are improperly excluded from the protection of proposed § 106.40(a).

*Discussion:* The Department acknowledges commenters' support of proposed § 106.40(a). The Department understands commenters' suggestions to broaden the protections in proposed § 106.40(a) to explicitly prohibit discrimination and harassment based on perceived, expected, or past parental, family, marital, or caregiver status rather than prohibiting discrimination that treats parenting students differently based on sex. However, the Department would need to consider additional information before making such a change.

With respect to the suggestion to add the word "perceived," the Department declines this suggestion because a recipient is already prohibited from treating parenting students differently based on sex and from discriminating against them based on sex stereotypes, including stereotypical views about the roles of mothers, fathers, or caretakers, under § 106.10. The Department agrees that it is sex discrimination to use sex stereotypes to deny equal educational opportunities related to a student's perceived marital or parental status.

The Department also declines suggestions to add the word "expected" to the regulatory text, as the text already includes the word "potential," which the Department interprets to cover discrimination based on the expectation that a student is or is not married or a parent or has some other family status. The Department further notes that the definition of "parental status" is not limited to a timeframe immediately following the birth or adoption of a child and agrees that the protection of § 106.40(a) applies throughout a student's participation in a recipient's education program or activity. Regarding concerns about non-birthing parents and caregivers, the Department refers commenters to the discussion of the definition of "parental status" in § 106.2.

*Changes:* Consistent with similar changes for consistency in §§ 106.40(a) and 106.57(a), the Department has substituted the word "implement" for "apply."

2. Section 106.40(b)(1) Pregnancy or Related Conditions—Nondiscrimination

*Comments:* Many commenters expressed general support for the proposed regulations' prohibition on discrimination on the basis of "pregnancy or related conditions," explaining that this prohibition would be consistent with Title IX's mandate to prohibit sex discrimination. These commenters believed proposed § 106.40(b)(1) would advance pregnant and parenting students' equal access to educational opportunities and improve outcomes for those students and their children. Some commenters appreciated that the proposed regulations would remove the outdated "false pregnancy" term. Some commenters stated that students who are, or might be, pregnant should not be denied education, and that modifications to an education program should be made when necessary for the safety and comfort of pregnant students, allowing them to both parent and succeed academically. Several commenters cited the experiences of individual students who either were harassed or feared harassment related to pregnancy or related conditions.

Many commenters explained that pregnant and parenting students face barriers to completing their education, including discrimination, harassment, and a lack of institutional supports. Some commenters provided information about the impact of pregnancy and parenting on teen parents, including the negative impact on high school graduation rates, career opportunities, and mental health, noting the disproportionate impact of teen pregnancy and parenting on certain groups. Some commenters observed that pregnancy discrimination is prevalent in postsecondary education, and that parenting students are less likely to graduate because of punitive attendance policies and, when they do graduate, have higher levels of debt than their non-parenting peers.

Some commenters asked the Department to confirm that it is a violation of Title IX for a recipient to cause someone to lose a college scholarship or their place on a team because of pregnancy. Finally, some commenters urged the Department to issue updated guidance for K–12 recipients on the Title IX rights of pregnant and parenting students.

*Discussion:* The Department acknowledges the information shared by commenters about the barriers to education faced by students who are pregnant, experiencing pregnancy-related conditions, or parenting. The Department agrees that the final regulations will clarify recipient obligations to ensure that pregnant and parenting students are not subject to discrimination on the basis of sex. The Department acknowledges the support for § 106.40(b)(1) prohibiting discrimination against students and employees based on "current, potential, or past" pregnancy or pregnancy-related conditions, and agrees that this updated and comprehensive term will help reduce barriers to educational access and professional achievement and improve access to education and career opportunities.

Commenters' support reinforces the Department's view, as indicated in the

July 2022 NPRM, that protecting students from discrimination on these bases will help to achieve Title IX's objective of eradicating sex discrimination in federally funded education programs and activities. *See* 87 FR 41518. As discussed in the July 2022 NPRM, Title IX was enacted in part because women were being denied educational access due to views that they were less capable and less committed to academic demands given their perceived pregnancy and childbearing obligations. 87 FR 41393. The Department is convinced that clarifying Title IX's protections to cover current, potential, or past pregnancy or related conditions will ensure that a student is not treated unfairly due to, for example, a likelihood of having children in the future, having had children in the past, or having experienced pregnancy or related medical conditions. The Department further confirms its view that, fundamental to the purpose of Title IX, the final regulations will significantly help address the barriers to educational access arising from perceptions about pregnancy and childbearing.

The Department notes that current § 106.40(b)(1) already prohibits discrimination against any student, including in any extracurricular activity such as athletics, based on pregnancy, childbirth, false pregnancy, termination of pregnancy, or recovery therefrom. Final § 106.40(b)(1) similarly prohibits any discrimination based on a student's current, potential, or past pregnancy or related conditions. ''Pregnancy or related conditions'' is defined in § 106.2 to include pregnancy, childbirth, termination of pregnancy, and lactation; medical conditions related to pregnancy, childbirth, termination of pregnancy, and lactation; and recovery from pregnancy, childbirth, termination of pregnancy, lactation, or related medical conditions, providing broadly inclusive coverage.

In these final regulations, the Department maintains its longstanding interpretation that a recipient violates Title IX by stopping or reducing financial assistance on the basis of pregnancy or related conditions; subjecting students of one sex to additional or different requirements, such as requiring women athletes to sign contracts listing pregnancy as an infraction; or excluding students from participating in a recipient's education program or activity, including extracurricular activities and athletics, on the basis of the student's pregnancy or a related condition. *See, e.g.,* U.S. Dep't of Educ., Office for Civil Rights, Dear Colleague Letter: Student Athletes

and Pregnancy (June 25, 2007), *https://www2.ed.gov/about/offices/list/ocr/letters/colleague-20070625.html.*

Regarding the request for updated guidance for K–12 students, the Department understands the importance of supporting recipients in the implementation of these regulations and ensuring that students know their rights. The Department anticipates that these regulations, which apply with equal force in the elementary school and secondary school setting, will clarify a recipient's obligations to students experiencing pregnancy or related conditions or who are parenting. To the extent that questions remain, or situations arise that require further clarification, the Department will offer technical assistance and consider guidance, as appropriate, to promote compliance with these final regulations.

*Changes:* The Department has not made changes to the first sentence of final § 106.40(b)(1). Changes to the second sentence of final § 106.40(b)(1) are explained in the discussion of § 106.40(b)(1) and (b)(3)(iii) below regarding Voluntary Access to Separate Portion of Program or Activity.

3. Section 106.40(b)(2) Pregnancy or Related Conditions—Responsibility To Provide Title IX Coordinator Contact and Other Information

*Comments:* Many commenters expressed support for the proposed requirement that a recipient who has been informed of a student's pregnancy or related conditions provide that student, or a person who has the legal right to act on behalf of the student, with information relating to the Title IX Coordinator, including contact information. Commenters noted that even though Title IX has long prohibited sex discrimination against pregnant and parenting students, many students and employees are unaware of their rights, and that proposed § 106.40(b)(2) will benefit students by informing them of those rights and making staff more responsive to such students. Several commenters shared personal accounts of how their lack of awareness of their rights as pregnant or parenting students led them to lose instructional time and other educational opportunities.

One commenter asserted that the requirement that the employee tell the student how to notify the Title IX Coordinator ''for assistance'' was vague and could run afoul of certain State laws that restrict or discourage access to abortion. Some commenters also asserted that the phrase ''informed of'' in the proposed provision was vague, overbroad, or could capture information that is revealed unintentionally, and

asked the Department to provide relevant examples demonstrating its application. One commenter asked the Department to explain when, if ever, an employee should act based on information regarding a student's pregnancy obtained indirectly.

Some commenters raised concerns about students' privacy and, for example, urged that the regulations protect students from incurring civil or criminal penalties related to pregnancy or related conditions, and clarify that disciplining or referring students to law enforcement on these bases violates Title IX. Some commenters worried the proposed provision would require a recipient to ask students sensitive or unwelcome questions or make inappropriate assumptions about their medical status and needs. Some commenters asked what the provision would require a recipient to document, including whether they needed to document if the Title IX Coordinator was previously notified, and how to protect student privacy and records.

One commenter suggested that the Department remove the part of the proposed provision that states that an employee need not act if the employee reasonably believes the Title IX Coordinator has already been notified, to avoid an employee's mistaken assumption regarding such notification.

One commenter expressed that the provision was burdensome, for example, due to the cost of training staff on action that may be unneeded and because the proposed provision would be too difficult to implement and monitor.

Other commenters objected that the provision was paternalistic or would encourage sex stereotyping. Some commenters feared that the provision would require employees to speak with students in cases of abuse or unintended pregnancy or to incorrectly imply that a student required a modification to the educational program. One commenter stated that an employee providing the relevant information under the provision could harm student-faculty relations.

Several commenters suggested the Department use other approaches to inform students of their rights related to pregnancy or related conditions, either instead of or in addition to the proposed provision. These suggestions included written policies and procedures pertaining to pregnancy and parental rights, student training, or providing information through a website or syllabus statement.

Other changes to the provision suggested by commenters included that employees refer students to the disability services office to reduce the

burden on recipients and students and better align the processes under Section 504 and the ADA; or that the Department adopt a single process for both pregnancy-related and disability accommodations.

Some commenters suggested that the Department narrow the type of employees subject to the provision to those with student-facing roles. In addition, some commenters requested that references to "the Title IX Coordinator" in proposed § 106.40 be changed to "the recipient" to clarify that the recipient has the ultimate responsibility under this section.

Finally, some commenters opposed proposed § 106.40(b)(2), arguing that the provision would expand the scope of Title IX beyond the Department's authority or without required congressional authorization.

*Discussion:* Requiring employees to share the Title IX Coordinator's contact information and information about the Title IX Coordinator's ability to take specific actions will give students the information they need to choose whether to seek reasonable modifications, voluntary leave, or access to a lactation space as necessary, and will help prevent potential disruptions to their access to education.

Importantly, the provision will not require students or their families to have any advance knowledge of a recipient's obligations (such as providing reasonable modifications, lactation space, or leave), or to invoke specific words to trigger the requirement to provide them with information about the Title IX Coordinator. But the provision also does not require the recipient's employees to directly inform the Title IX Coordinator of any information they obtain related to a student's pregnancy. The provision thus balances several important interests. First, the provision respects the student's interest in being free from sex discrimination and accessing necessary support from the recipient. Second, the provision promotes the right of the student and the student's legal representatives to determine if, when, and what information to share with a recipient regarding a student's pregnancy or related conditions. Third, the provision accounts for the administrative burden on recipients in carrying out this critical informational function. Overall, the Department is convinced that the regulations will empower students and their families to decide whether they wish to obtain school-based supports, thereby avoiding sex discrimination to the greatest extent possible, with minimal burden for recipients.

The Department agrees with the commenter's suggestion that replacing the term "for assistance" in § 106.40(b)(2) would provide clearer instruction to employees about what information they must share and would prevent mischaracterization of the Title IX Coordinator's role. In response to this comment, the Department has revised the final regulations to require that an employee inform the student or a person who has a legal right to act on behalf of the student, when applicable, of the Title IX Coordinator's contact information and that the Title IX Coordinator can coordinate specific actions to prevent sex discrimination and ensure the student's equal access to the recipient's education program or activity.

Further, the Department seeks to clarify other aspects of the employee's role under § 106.40(b)(2). Contrary to the misunderstanding of some commenters, the Department clarifies that § 106.40(b)(2) does not require a school employee to approach a student unprompted, ask a student about their pregnancy or any other subject, or make assumptions about the student's needs or medical status. The provision also does not require an employee to directly notify the Title IX Coordinator regarding a student's pregnancy or related conditions. Rather, the final provision requires an employee to promptly provide the Title IX Coordinator's contact information only when a student, or a person who has a legal right to act on behalf of the student, first informs that same employee of that student's pregnancy or related conditions. Even then, the employee would only provide this information if the employee reasonably believes that the Title IX Coordinator has not already been notified. The employee must also inform the student or person who has a legal right to act on behalf of the student that the Title IX Coordinator can coordinate specific actions to prevent sex discrimination and ensure the student's equal access to the education program or activity. The Department is modifying the final regulations to omit the phrase "employee is informed," which drew concern from some commenters, and to clarify that a student or their legal representative must directly inform an employee to trigger the requirements under this provision. It is not enough for an employee to be informed indirectly, or by someone other than the student or their legal representative, or to merely suspect that a student may be pregnant or experiencing pregnancy-related conditions.

A student or a person who has a legal right to act on behalf of the student "informs" an employee of a student's pregnancy or related conditions when the student or such person tells the employee that the student is pregnant or experiencing pregnancy-related conditions, either verbally or in writing. For example, if a student tells a teacher, "I am pregnant and will be late to class on Wednesday due to a doctor's appointment," the student has informed the teacher of the pregnancy and the teacher's obligations under § 106.40(b)(2) are triggered. However, if the teacher merely overhears one student making the same statement to another, the student has not directly informed the teacher, so the employee is not required to act under the provision. The requirement that the employee act only when directly informed in this manner balances a student's interest in privacy and autonomy with the necessity of preventing or eliminating sex discrimination in a recipient's education program or activity. For similar reasons, once information about the Title IX Coordinator's contact information and coordination duties is provided, a student or the student's legal representative should have the choice to disclose pregnancy or related conditions to a recipient through the Title IX Coordinator as they feel appropriate. Absent information about conduct that reasonably may constitute sex discrimination (*e.g.,* the student telling the employee that not only is the student pregnant, but that the student has been prohibited from trying out for the school play due to the pregnancy)—in which case notification obligations are governed by § 106.44(c)—employees are not required to directly inform the Title IX Coordinator of a student's pregnancy or related conditions.

In addition, while an employee has no duty to act under § 106.40(b)(2) based only on their observation of or receipt of a secondhand report about a student's pregnancy, employees should recognize that such information may trigger duties outside of Title IX. *See* 87 FR 41519 n.10; 34 CFR 104.35; U.S. Dep't of Educ., Office for Civil Rights, Parent and Educator Resource Guide to Section 504 in Public Elementary and Secondary Schools, at 12, 19 (Dec. 2016), *http:// www.ed.gov/ocr/docs/504-resource-guide-201612.pdf.*

For several reasons, the Department declines the suggestion to modify the provision so that an employee would be obliged to provide the student relevant information only when the student first requests a reasonable modification. First, a student may be unaware of their right to a reasonable modification and

thus not know to ask a staff member about it. Second, this type of requirement would complicate the employee's duty by requiring the employee to determine whether a student's statement regarding pregnancy also expressed interest in reasonable modifications, instead of simply requiring an employee to act whenever a student or the student's legal representative informs the employee of the student's pregnancy or related conditions. Third, the Title IX Coordinator is best and most efficiently positioned to provide information to a student on the complete range of the recipient's obligations under these final regulations, including leave, lactation space, and how the student can make a complaint of discrimination.

Further, the Department is sensitive to and has accounted for student concerns about confidentiality. While a recipient must comply with final § 106.40(b)(2), the provision does not require documentation of compliance—contrary to what some commenters asserted. Any records maintained voluntarily by a recipient would be subject to the disclosure restrictions of § 106.44(j) of the final regulations, which prohibits the disclosure of personally identifiable information obtained in the course of complying with this part, with some exceptions. The disclosure restrictions are explained more fully in the discussion of § 106.44(j). Also, as explained above in the discussion of final § 106.2 regarding the definition of "pregnancy or related conditions" and its application to termination of pregnancy, a recipient may not punish or retaliate against a student solely for seeking or obtaining an abortion.

The Department acknowledges commenters' questions and range of views regarding whether the provision should apply when an employee reasonably believes that the Title IX Coordinator has been notified. The Department clarifies that there is no requirement that an employee ask a student whether the Title IX Coordinator has been notified. If the employee is unaware whether the Title IX Coordinator has been notified at the moment the student or their legal representative informs the employee of the student's pregnancy or related conditions, the employee's only responsibility under the provision is to provide the student with the required information regarding the Title IX Coordinator. For example, if a student tells a teacher, "I'm letting you know I'm pregnant" and nothing more, the employee must provide the necessary information under the provision—specifically, the Title IX Coordinator's

contact information and that the Title IX Coordinator can coordinate specific actions to prevent sex discrimination and ensure the student's equal access to the education program or activity. However, if the student instead says, "I'm pregnant and working with the Title IX Coordinator to make sure I have access to a bigger desk in your math class," the employee has no further obligation to inform under § 106.40(b)(2), because it is reasonable for the employee to believe from that conversation that the Title IX Coordinator has already been notified of the student's pregnancy. The Department notes that an employee's "reasonable belief" that the student has informed the Title IX Coordinator does not need to come from the student but could also come from the Title IX Coordinator telling relevant teachers, for example, that the student has been approved for reasonable modifications related to the student's pregnancy. The Department's approach minimizes the burden on employees and students when it is reasonably clear from context that the Title IX Coordinator already knows about the student's pregnancy or related conditions.

With respect to the concern that § 106.40(b)(2) may result in the student learning about the Title IX Coordinator from multiple staff members—which would only occur because the student, or a person who has a legal right to act on behalf of the student, informed multiple employees of the student's pregnancy or related conditions—the Department acknowledges this possibility but believes it is important to err on the side of the student receiving more, rather than less, information about the rights and modifications that may be available to them during their pregnancy. The Department concludes that this provision is calibrated to enhance student access to this important information, while avoiding redundancy, when possible, and respecting student autonomy and privacy.

The Department disagrees with commenter concerns that the provision is discriminatory, paternalistic, or encourages sex stereotyping. As discussed above, an employee's action under the provision is driven completely by the student or the student's legal representative and contains no requirement that an employee act based on supposition regarding the student's status. The provision focuses on students who are pregnant or experiencing pregnancy-related conditions to avoid having those students face obstacles to education related to those conditions and

associated with their sex characteristics, and thus falls within the scope of Title IX under final § 106.10. While equal access to education for students who are not pregnant or experiencing pregnancy-related conditions—such as a pregnant student's partner, a student adopting a child, or a student whose close family member is pregnant—is important, there is no need to immediately inform such students, who are not pregnant or experiencing pregnancy-related conditions, of how to obtain pregnancy-related rights under § 106.40(b)(3) that do not apply to them. The Department further disagrees with the commenter's assertion that the provision will harm student-faculty relationships; to the contrary, providing a simple framework under § 106.40(b)(2) for employees to respond to students who disclose pregnancy or related conditions will strengthen such relationships by increasing students' perceptions that staff care about their needs.

The Department acknowledges commenters who shared a variety of alternative or supplemental approaches for students to receive information about the Title IX Coordinator, which some commenters also felt would minimize the burden on recipients. The Department declines to narrow the provision's application to employees who are "student facing" because students may be more comfortable disclosing pregnancy or related conditions to some employees over others for a variety of reasons. This approach fosters recipients providing students with more information rather than less, considering that commenters indicated—as a general matter and in their own personal accounts—that students are not currently aware of the Title IX prohibition on pregnancy discrimination and the rights that follow from it. For instance, a registrar may not be a "student facing" role like a teacher or a coach, but a student might disclose to a registrar that they are dropping a class because they are pregnant and will be delivering a child during exam time. In that setting, it is important for the registrar to inform the pregnant student about how to contact the Title IX Coordinator if they want to ask for reasonable modifications or about other recipient obligations that might allow them to stay enrolled in the class.

The Department declines the suggestion to require recipients to conduct training for students. This provision is focused on conveying information, in a timely manner, to the subset of students who are pregnant or experiencing pregnancy-related conditions while in school.

As to the suggestion that the Department require recipients to post information about the availability of pregnancy-related modifications on syllabi or websites, the Department does not think that website or syllabi-type notifications, which are not directed at the individual student, will alone effectively ensure that students know about these important and time-sensitive Title IX rights. However, nothing in Title IX or this part prohibits recipients from posting information about the availability of pregnancy-related modifications on syllabi or websites.

Responding to concerns about the employee training burden, the Department continues to view this burden as minimal. Under the final regulations, employees are asked to share only two pieces of information with students: (1) the Title IX Coordinator's contact information; and (2) that the Title IX Coordinator can coordinate specific actions to prevent sex discrimination and ensure the student's equal access to the recipient's education program or activity. Training on this matter, as required by § 106.8(d)(1)(iii), will likely require a limited amount of time and can be incorporated into existing broader trainings on Title IX issues or other topics. For further explanation of the training requirements of § 106.8(d)(1)(iii), see the discussion of that provision.

The Department understands commenters' interest in aligning pregnancy and disability accommodation procedures. A recipient is welcome to do so when consistent with the requirements of the final Title IX regulations and other applicable laws. However, given the role the Title IX Coordinator plays in ensuring the recipient's consistent compliance with Title IX and their awareness of applicable regulations, the Title IX Coordinator—or their designee as permitted under final § 106.8(a)(2)—remains the appropriate point of contact for students under § 106.40(b)(2). Likewise, it is inappropriate to replace "Title IX Coordinator" with "the recipient" in the provision, because telling a student to contact the recipient generally does not provide clear direction as to an appropriate point of contact. The final regulations will provide such clarity.

The Department disagrees that the provision is beyond the scope of the Department's authority under Title IX. Pregnancy discrimination has long been prohibited by Title IX and its implementing regulations, but comments the Department received

confirm that students do not know about their rights in this context and do not know that Title IX obligates recipients to help them ensure that they can fully access the recipient's education program or activity even while pregnant or experiencing pregnancy-related conditions. This provision is therefore necessary to ensure that pregnant students—whose needs are by nature time sensitive—can promptly avail themselves of available Title IX resources. Thus, this provision is necessary to "effectuate the provisions of Title IX" and is at the core of the Department's Title IX regulatory authority. As explained in the July 2022 NPRM, Title IX requires a variety of implementation strategies if it is to serve as a "strong and comprehensive measure," 118 Cong. Rec. at 5804 (statement of Sen. Bayh), to "achieve[ ] . . . the objective[ ]" of eliminating sex discrimination in federally subsidized education programs and activities under 20 U.S.C. 1682, *id.* at 5803. 87 FR 41513.

The Department has revised the title of this provision from "Requirement for recipient to provide information" to "Responsibility to provide Title IX Coordinator contact and other information" because it is more explanatory and better informs readers of the topic of the provision. The Department has also revised the phrase "unless the employee reasonably believes that the Title IX Coordinator has been notified" for clarity by removing the word "already," and moved the phrase from the end of the sentence to the middle for readability.

*Changes:* The Department has revised final § 106.40(b)(2) to clarify that unless the employee reasonably believes that the Title IX Coordinator has been notified of the student's pregnancy or related conditions, the employee's obligation to act begins when a student or a person who has a legal right to act on behalf of the student "informs" the employee of such pregnancy or related conditions. The Department has further revised § 106.40(b)(2) to clarify that the employee's obligation is to promptly provide the student, or person who has a legal right to act on behalf of the student, with the Title IX Coordinator's contact information and inform that person that the Title IX Coordinator can coordinate specific actions to prevent sex discrimination and ensure the student's equal access to the recipient's education program or activity. The Department revised the phrase "unless the employee reasonably believes that the Title IX Coordinator has been notified" in § 106.40(b)(2) by removing the word "already," and moved the phrase from the end of the sentence to

the middle. The Department also revised the title of this provision from "Requirement for recipient to provide information" to "Responsibility to provide Title IX Coordinator contact and other information."

4. Section 106.40(b)(3) Pregnancy or Related Conditions—Specific Actions To Prevent Discrimination and Ensure Equal Access

Timelines

*Comments:* Some commenters asked the Department to clarify how much notice a student must provide to obtain reasonable modifications and other steps in proposed § 106.40(b)(3) and how promptly the recipient must respond to such requests. Some commenters urged that a student be required to provide notice in a timeframe that is reasonable, allows the recipient sufficient time to prepare and act on the student's request, and considers the complexity and logistics of the task; and that absent such timely notice, a recipient has no obligation to act.

*Discussion:* As set out in final § 106.40(b)(3) and consistent with the proposed regulations in the July 2022 NPRM, 87 FR 41520, a recipient must promptly take the steps specified in § 106.40(b)(3), including implementing reasonable modifications. Determining promptness in each case is a fact-specific inquiry that depends on a variety of factors, including the needs of the student, the substance and timing of the requested modification, and the characteristics of the education program or activity. A recipient should consider the importance to a student of accessing reasonable modifications to ensure full participation in the recipient's education program or activity, and whether the absence of a modification to a policy, practice, or procedure could impede a student's academic or educational progress. As explained in greater detail in the discussion of § 106.40(b)(3)(ii)(A), a recipient is not required to make a modification that the recipient can demonstrate would fundamentally alter the nature of its education program or activity.

The Department agrees that it would be helpful for students who seek reasonable modifications to notify the Title IX Coordinator or their designee as early as possible to ensure that the recipient has enough time to review their request and provide a reasonable modification. However, no matter when a student notifies the Title IX Coordinator of pregnancy or related conditions or seeks any measures under § 106.40(b)(3)(ii)–(v), a recipient must

respond promptly and effectively to ensure equal access to the recipient's education program or activity consistent with the requirements of Title IX. Students may not be able to provide notice to a recipient related to pregnancy far in advance of when specific actions consistent with § 106.40(b)(3) are needed for various reasons, including because the need for specific actions may occur without advance warning, the student may need time to decide whether to disclose their pregnancy or related condition to their school, or the student may lack awareness of a recipient's process.

The Department notes that many modifications can be offered and implemented with relatively little administrative effort on the part of the recipient, such as the examples provided in § 106.40(b)(3)(ii)(C) of allowing the student to drink, eat, sit, or stand during class as needed. There is also no prohibition on a student returning to the Title IX Coordinator after the recipient has taken initial steps under final § 106.40(b)(3)(ii)–(v) if a further need emerges related to pregnancy or related conditions. In such a case, the recipient must take further action consistent with § 106.40(b)(3)(ii)–(vi).

*Changes:* The Department has revised § 106.40(b)(3) to state that a recipient must take specific actions under paragraphs (b)(3)(i) through (vi) to promptly and effectively prevent sex discrimination and ensure equal access to the recipient's education program or activity once the student, or a person who has a legal right to act on behalf of the student, notifies the Title IX Coordinator of the student's pregnancy or related conditions.

Staffing Flexibility and Effectiveness

*Comments:* Some commenters supported the proposed regulations— which would have required that reasonable modifications because of pregnancy or related conditions "be effectively implemented, coordinated, and documented by the Title IX Coordinator"—because they would have made clear that the Title IX Coordinator has the authority and responsibility to ensure that reasonable modifications are provided to students.

Several commenters suggested that the Department allow recipients greater flexibility regarding which employees oversee compliance with a recipient's obligations to students who are pregnant or experiencing pregnancy-related conditions. These commenters' reasons included that the Title IX Coordinator's job has become too large for one person; other staff at the recipient may be more

knowledgeable about the students or available resources; a Title IX Coordinator may have a conflict of interest in both receiving and investigating reports of discrimination related to pregnancy or related conditions; and pregnancy protection under some local laws allows greater staffing flexibility.

Some commenters asked the Department to clarify that the Title IX Coordinator's responsibility is to coordinate, rather than implement, the steps required in the proposed provision. Some commenters requested that the Department clarify that the responsibilities in proposed § 106.40(b)(3) are the recipient's, not the Title IX Coordinator's individually.

*Discussion:* Recognizing the need for clarity regarding the role of the Title IX Coordinator in their official capacity, and the need for staffing flexibility in carrying out these provisions, the Department has revised final § 106.40(b)(3) to state that the recipient is responsible for taking the actions specified in that paragraph once a student (or a person with the legal right to act on the student's behalf) has notified the Title IX Coordinator of a student's pregnancy or related conditions. The final regulations at § 106.40(b)(3) provides that the recipient must do so promptly and effectively.

The Department has further amended the provision to state that the Title IX Coordinator must be responsible for coordinating the actions. Consistent with final § 106.8(a)(2), the Department clarifies that a recipient may delegate, or permit a Title IX Coordinator to delegate, specific duties to one or more designees. Accordingly, recipients have flexibility to choose the staff they think are most appropriate to carry out duties under § 106.40(b)(3), provided that the Title IX Coordinator retains ultimate oversight for ensuring that the recipient complies with § 106.40(b)(3)'s requirements. The Department agrees that providing recipients this flexibility will enable them to use resources most effectively to serve students in a way that will be responsive to the needs of their school communities. To the extent that a recipient wishes to utilize other administrators or departments to carry out some tasks required under § 106.40(b)(3), they may do so provided the work is coordinated with oversight of the Title IX Coordinator and performed consistent with the requirements of the final regulations.

Recognizing that each of the steps under § 106.40(b)(3) (as adopted in these final regulations) is equally important, the Department further revised the requirement that a recipient's actions be

effective—which the Department had previously proposed to include as an express term in § 106.40(b) only in connection with reasonable modifications—to apply to all the recipient's actions under final § 106.40(b)(3). This requirement ensures that recipients and members of their communities understand that the recipient's actions, including providing reasonable modifications and voluntary leave because of pregnancy or related conditions, and access to lactation spaces, must be fully and effectively implemented and serve their intended purposes under the final regulations to prevent sex discrimination and ensure equal access to the recipient's education program or activity. Effectiveness requires, for example, ensuring that all relevant school staff are complying with their role in carrying out § 106.40(b)(3)(iii)–(vi) and that there are no other structural or resource barriers to compliance. For example, if a recipient provides the student a reasonable modification to use the restroom when needed during the student's high school classes, but the student's science teacher refuses to allow the student to do so, the reasonable modification has not been effectively implemented by the recipient, and the recipient must remedy the situation to ensure effective implementation. Likewise, if the recipient provides a student with an access code to a locked lactation space, but the student cannot enter because the keypad is broken, this is ineffective implementation that the recipient must remedy.

Responding to a commenter's concern that the regulations as revised conflict with a city regulation[82] that requires a school principal or their designee to take particular steps once they become aware that a student is pregnant or has a child, the Department notes that the revisions here make clear that recipients can delegate certain duties of the Title IX Coordinator, such as to a school principal, consistent with § 106.8(a)(1) and (2). With respect to bias, the Department disagrees that there is inherent bias in a Title IX Coordinator both receiving and investigating a complaint of pregnancy discrimination. However, if for some other reason a Title IX Coordinator who receives a complaint of pregnancy discrimination had a conflict of interest or bias for or against complainants or respondents

---

[82] The commenter cited Chancellor's Regulation A–740, *Pregnant and Parenting Students and Reproductive Health Privacy* (Nov. 13, 2008), *https://www.nyc.gov/html/acs/education/pdf/ A740%20Pregnant%20and%20Parenting %20students.pdf.*

generally or an individual complainant or respondent, the Title IX Coordinator would be prohibited from serving as an investigator or decisionmaker in connection with that particular complaint consistent with the requirements of final § 106.45(b)(2), and the recipient would be responsible for ensuring the substitution of an alternate appropriate individual. In addition, final § 106.8(d)(2)(iii) and (4) require that a Title IX Coordinator receive training on bias, which is designed to ensure that any Title IX Coordinator in this situation is able to identify bias and take the necessary steps to address it.

*Changes:* As noted above, the Department has revised § 106.40(b)(3) to clarify that it is the recipient's obligation to take the specific actions under paragraphs (b)(3)(i) through (vi) to promptly and effectively prevent sex discrimination and ensure equal access to the recipient's education program or activity once the student, or a person who has a legal right to act on behalf of the student, notifies the Title IX Coordinator of the student's pregnancy or related conditions. The Department has further revised § 106.40(b)(3) to clarify that the Title IX Coordinator must coordinate these actions.

5. Section 106.40(b)(3)(i) Pregnancy or Related Conditions—Responsibility To Provide Information About Recipient Obligations

*Comments:* Commenters expressed several reasons for supporting the proposed requirement at § 106.40(b)(3) and (3)(i) that once a student, or a person who has a legal right to act on that student's behalf, notifies the Title IX Coordinator of the student's pregnancy or related conditions, the Title IX Coordinator must inform the student of the recipient's obligations related to pregnancy or related conditions. Commenters' reasons included that the provision would clarify recipients' responsibilities to these students and assist recipients in providing them equal access to education; remove barriers to education; and be consistent with similar notice and antidiscrimination laws in many States. Commenters noted that the requirement is particularly important considering restrictive State abortion laws that may drive up the numbers of students who are pregnant or experiencing pregnancy-related conditions. Commenters noted that even though Title IX has long prohibited discrimination against pregnant and parenting students as sex discrimination, many students and employees are unaware of their rights. Several commenters shared personal

accounts of how their lack of awareness of their rights as pregnant or parenting students led them to lose instructional time and other educational opportunities.

Some commenters asked whether instead of, or in addition to, the requirements of proposed § 106.40(b)(3) and (b)(3)(i), the Department could require recipients to communicate procedures related to pregnancy or related conditions through written procedures, or website or syllabus statements.

Some commenters raised concerns about students' privacy and, for example, urged that the regulations protect students from incurring civil or criminal penalties related to pregnancy or related conditions, and for clarification that disciplining or referring students to law enforcement on these bases violates Title IX.

Some commenters suggested revising proposed § 106.40(b)(3) for what commenters viewed as consistency with Section 504 and the ADA, for example, by only requiring the Title IX Coordinator to inform a student of their rights or take other action after a student follows internal processes and asks for assistance related to pregnancy or related conditions; or using a single process for students with disabilities and students who are pregnant and experiencing pregnancy-related conditions.

Other commenters asked the Department to revise the proposed regulations to require that recipients tailor the information they are required to provide to a student's specific request, for example, by excluding lactation information when a student reports miscarriage.

Because the proposed regulations listed the application of grievance procedures under § 106.45, and if applicable § 106.46, as one of several required topics for the Title IX Coordinator to inform the student about upon notification of pregnancy, one commenter asked the Department to clarify with whom students should make a complaint and whether such procedures were prompt enough to address pregnancy issues.

Some commenters stated that the requirement to provide information would be burdensome and non-beneficial. Some commenters believed the provision exceeds the scope of Title IX and requires congressional authorization.

Other commenters asked the Department to undertake a separate rulemaking to address students who are pregnant or experiencing pregnancy-related conditions, referring to the

complexity of issues relating to pregnancy, student privacy, and risk to recipients.

*Discussion:* The Department agrees with commenters who emphasized the importance of the proposed requirements regarding steps a recipient must take upon notice of a student's pregnancy or related conditions, including informing the student of the recipient's obligations to prevent discrimination and ensure equal access. The Department agrees with commenters' statements that informing a student of the recipient's obligations directly will remove barriers to education and increase the likelihood of a student successfully remaining in school.

The Department acknowledges the variety of alternative or supplemental approaches commenters shared, by which students could receive information about the recipient's obligations under § 106.40(b)(3)(i)— including through written procedures or website or syllabus statements—which some commenters also felt would minimize the burden on recipients. As noted above, the Department does not think that website or syllabi-type notifications, which are not directed at the individual student, are alone sufficient to ensure that students know about these important and time-sensitive Title IX rights. However, nothing in Title IX or this part prohibits recipients from posting information about the availability of pregnancy-related modifications on syllabi or websites.

Further, the Department agrees with the many commenters expressing concern about the privacy of student records and other information a recipient obtains related to Title IX compliance. In response to commenter concerns, the Department revised final § 106.44(j) to prohibit the disclosure of personally identifiable information obtained while carrying out a recipient's Title IX obligations, with some exceptions. To ensure that a student and their legal representative are aware of this provision, the Department has revised § 106.40(b)(3)(i) to require that the Title IX Coordinator inform them of this provision. The disclosure restrictions are explained more fully in the discussion of § 106.44(j). As explained in the discussion of final § 106.2 regarding the definition of ''pregnancy or related conditions'' and its application to termination of pregnancy, a recipient may not punish or retaliate against a student solely for seeking or obtaining an abortion.

Responding to the comment that a recipient should provide a student

information about their rights only once they ask for assistance and exhaust the remainder of a recipient's administrative requirements, the Department declines to do so for the same reasons discussed in connection with a similar comment regarding § 106.40(b)(2). Specifically, § 106.40(b)(3)(i) does not require students or their families to have any advance knowledge of a recipient's available supports, or to invoke specific words or requests, for the recipient to be required to provide them with information about the recipient's obligations under Title IX to students experiencing pregnancy or pregnancy-related conditions. This approach ensures that members of a recipient's community have access to necessary support; promotes the right of the student and the student's legal representatives to determine if, when, and what information to share with a recipient regarding a student's pregnancy or related conditions; and maximizes administrative efficiency by recognizing that the Title IX Coordinator is best positioned to coordinate the efficient provision of information. For these reasons, the recipient should inform the student or person with a legal right to act on the student's behalf of the student's relevant rights as soon as they notify the Title IX Coordinator of the student's pregnancy or related conditions to ensure that the student (and their legal representative, as applicable) has complete and timely information. The Department notes that this paragraph discusses only the obligation of the recipient to ensure that the Title IX Coordinator provides information to a student or the person who has a legal right to act on behalf of the student, upon notification of pregnancy under § 106.40(b)(3)(i). The separate responsibility of the recipient to ensure that all employees provide information about the Title IX Coordinator to a student or their legal representative regarding pregnancy or related conditions, when the student or their legal representative informs any employee of the student's pregnancy or related conditions, is addressed in the discussion of § 106.40(b)(2).

The Department understands the commenter's interest in allowing a recipient to have a single process, or similar processes, to address both pregnancy and disability. When recipients can use the same or similar processes for pregnancy and disability in a manner that is consistent with the requirements of these final Title IX regulations and applicable disability laws, recipients may do so. For

example, the same staff member may be assigned to provide students with notice of their rights related to pregnancy and disability; however, staff in this role must comply with § 106.40(b)(3)(i) in addition to any other relevant requirements under Section 504, the ADA, or other applicable disability laws, and the Title IX Coordinator must retain ultimate oversight over the recipient's responsibilities under Title IX and this part, consistent with § 106.8(a)(1).

Additionally, the Department declines the proposal to limit the information a recipient must provide to a student upon notice of the student's pregnancy or related conditions. It is essential that a recipient inform the student, and the student's legal representative, as applicable, of the recipient's obligations under §§ 106.40(b)(1)–(5) and 106.44(j) and provide the recipient's notice of nondiscrimination under § 106.8(c)(1) for several reasons. First, doing so will provide the student with the broadest possible amount of information upon which to make informed choices about next steps, including information about reasonable modifications, voluntary leave, access to lactation space, the general right not to be discriminated against on the basis of pregnancy or related conditions, and limits on certifications to participate in the recipient's education program or activity. Second, the regulations will relieve the recipient of having to decide unilaterally and subjectively what information should be shared. Third, the regulations will prevent a recipient from depriving a student of information based on a staff member's own misjudgment or lack of awareness about the student's particular pregnancy or needs. For example, a student who has miscarried may need or want information about access to a lactation space, because a student can lactate following miscarriage and may wish to use such a space to express breast milk. Requiring a recipient to provide information about all of a recipient's obligations under §§ 106.40(b)(1)–(5) and 106.44(j) and to provide the recipient's notice of nondiscrimination under § 106.8(c)(1) does not obligate students to take any action after receiving the information but empowers students to make the most appropriate choices based on their own unique needs.

In connection with the commenter's question regarding the application of grievance procedures under § 106.45, and if applicable § 106.46, to pregnancy-related issues, and resolving pregnancy-related matters quickly, the Department clarifies that these procedures still

apply. However, for simplicity, rather than list a number of discrete items that the recipient must disclose to the student as it did in the proposed regulations, the Department revised final § 106.40(b)(3)(i) to state that the recipient must inform the student and their legal representative (as applicable) of the recipient's obligations under §§ 106.40(b)(1)–(5) and 106.44(j) and provide the recipient's notice of nondiscrimination under § 106.8(c)(1). The notice of nondiscrimination under § 106.8(c)(1) contains the recipient's nondiscrimination statement and contact information for the Title IX Coordinator, explains how to locate the recipient's Title IX policy and grievance procedures, and provides information about how to report sex discrimination.

Further explaining how the final regulations function to resolve concerns of pregnancy-related discrimination, the Department notes that if a student notifies the recipient of the recipient's failure to implement a reasonable modification or make a lactation space available, a recipient is required to take additional steps consistent with § 106.44(f)(1) to comply with its Title IX obligation to ensure that its education program or activity is free from discrimination on the basis of sex. Such steps will vary based on the facts and circumstances. For example, if a complaint is made, a recipient's grievance procedures under § 106.45 (and § 106.46, if the situation arises at a postsecondary institution and involves sex-based harassment), would guide the recipient's investigation and resolution of the complaint. If there is a determination that sex discrimination occurred, the Title IX Coordinator must coordinate the provision and implementation of remedies to a complainant and take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity. *See* § 106.45(h)(3). Additionally, consistent with § 106.44(g), a student may need and a recipient must provide supportive measures, as appropriate, to restore or preserve access to the recipient's education program or activity in the absence of a complaint or during the pendency of grievance procedures. Finally, responding to concerns about timeliness of a recipient's response to issues regarding reasonable modifications, the Department emphasizes that under § 106.40(b)(3), a recipient always remains responsible for taking prompt and effective steps to prevent sex discrimination once the Title IX Coordinator is notified of a

student's pregnancy or related conditions, including through timely steps such as the provision of reasonable modifications, leave, and lactation space. Likewise, a recipient with knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity—such as a complaint that actions required under § 106.40(b)(3) have not been appropriately taken— must respond promptly and effectively under § 106.44(a) and (f)(1).

The Department disagrees that the requirements of final § 106.40(b)(3) or (3)(i) are unduly costly or burdensome. Specifically, the requirement that a recipient inform the student of its obligations under § 106.40(b)(3)(i) could be done in the context of a single conversation, or, if appropriate to the age and ability of the student, in a standardized written communication. The Department explains in detail the potential costs and benefits of the final regulations related to pregnancy or related conditions in the *Regulatory Impact Analysis.*

Moreover, the Department disagrees that the provision is beyond the scope of the Department's authority under Title IX or requires separate congressional authorization. The Supreme Court has recognized that the Department has broad regulatory authority under Title IX to issue regulations that it determines will best effectuate the purpose of Title IX, and to require recipients to take administrative actions to effectuate the nondiscrimination mandate of Title IX. *See Gebser,* 524 U.S. at 292; 20 U.S.C. 1682. Since 1975, the Department has required recipients to provide students with information about their rights under Title IX. *See, e.g.,* 40 FR 24128 (codified at 45 CFR 86.8 (1975)); 34 CFR 106.8(c) (current). Section 106.40(b)(3)(i) expands upon this longstanding requirement in a manner that is tailored to a student's need for information in the relevant circumstance. Ensuring that students (or those who have a legal right to act on their behalf) have information about the reasonable modifications to which they are entitled is necessary to effectuate that mandate. In addition, the Department declines to conduct a separate rulemaking related to pregnancy or related conditions. The Department's clarification of the pregnancy-related regulations under Title IX at this time, aided by the input of commenters, is justified and appropriate. That the provisions related to pregnancy discrimination in the final regulations were proposed alongside other provisions implementing Title IX

in no way diminished the public's notice of, and ability to comment on, those proposed provisions.

The Department notes that it has added "Responsibility to provide information about recipient obligations" as the title of this provision to assist readers in locating the topic more easily.

*Changes:* The Department has revised § 106.40(b)(3)(i) to require the recipient to provide information about the recipient's obligations under §§ 106.40(b)(1) through (5) and 106.44(j), in addition to providing the recipient's notice of nondiscrimination under § 106.8(c)(1). The Department further added a title to § 106.40(b)(3)(i) of "Responsibility to provide information about recipient obligations."

**6. Section 106.40(b)(3)(ii) Pregnancy or Related Conditions—Reasonable Modifications**

*General Support*

*Comments:* The Department notes that proposed § 106.40(b)(3)(ii) and (b)(4) have been revised and redesignated as § 106.40(b)(3)(ii) in the final regulations to consolidate into one paragraph provisions regarding a recipient's obligation to provide a student with reasonable modifications based on pregnancy or related conditions, and the following comment summaries and discussion refer to these provisions as § 106.40(b)(3)(ii).

Multiple commenters supported reasonable modifications for a student who is pregnant or experiencing pregnancy-related conditions as appropriate and necessary to allow such a student to succeed educationally. Several commenters stated that the reasonable modifications provision would clarify the protections that a recipient must provide to a student who is pregnant or experiencing pregnancy-related conditions and how a student can request reasonable modifications because of pregnancy or related conditions. Some commenters stated that pregnant students' civil rights are violated in ways other than outright exclusion such as by not providing necessary supports. Some commenters also noted that the proposed regulations would be consistent with many State antidiscrimination laws related to pregnancy. Several commenters supported § 106.40(b)(3)(ii) as particularly important for certain groups. Some commenters asked that the final regulations use terminology that provides reasonable modifications to all students based on pregnancy or related conditions.

Several commenters provided examples of how recipients' denials of reasonable modifications have forced students who are pregnant or experiencing pregnancy-related conditions to choose between their health and education, including a recipient or school official refusing to modify an exam schedule or grading policy when a student gave birth during final exams, denying a student's request for a larger desk, failing to accommodate a student's need to take lactation breaks, requiring a student to return to school days after having an emergency cesarean section despite not being able to drive or carry books, telling a student with a high-risk pregnancy to schedule medical appointments outside of class time despite having a note from their physician, encouraging a student to drop a course due to pregnancy, refusing to provide academic adjustments or excused absences, and denying basic modifications to protect pregnant students' health, including additional bathroom breaks and access to remote instruction or previously recorded classes.

Some commenters appreciated the reasonable modification provision because students who are pregnant or experiencing pregnancy-related conditions are often overlooked in discussions of a recipient's Title IX obligations. One commenter asserted that a student who is pregnant or experiencing pregnancy-related conditions will often need only modest accommodations and stated that when a recipient refuses to make these modifications, a student's education and health suffer.

*Discussion:* The reasonable modification provision of the final regulations under § 106.40(b)(3)(ii) will better fulfill Title IX's mandate with respect to students who are pregnant or experiencing pregnancy-related conditions. The specific examples provided by commenters are compelling, and together with the Department's Title IX enforcement experience, affirm the importance of this provision.

The Department agrees that recipients have the obligation under Title IX to provide reasonable modifications to policies, practices, or procedures for students who are pregnant or experiencing pregnancy-related conditions and that clarifying this responsibility will facilitate compliance with the nondiscrimination mandate of the statute. Accordingly, the Department has revised the proposed regulations to clarify that a recipient is ultimately responsible for taking specific actions to facilitate the reasonable modification

process when a student notifies the Title IX Coordinator that they are pregnant or experiencing pregnancy-related conditions.

*Changes:* Proposed § 106.40(b)(4) has been revised, consolidated with proposed § 106.40(b)(3)(ii), and redesignated as § 106.40(b)(3)(ii)(A)–(C) in the final regulations to list in one paragraph the recipient's obligations to a student regarding reasonable modifications for pregnancy or related conditions. Final § 106.40(b)(3) now states that the Title IX Coordinator must coordinate actions under paragraphs (b)(3)(i) through (vi), and final § 106.40(b)(3)(ii) now specifically states that a recipient must make reasonable modifications to the recipient's policies, practices, or procedures as necessary to prevent sex discrimination and ensure equal access to the recipient's education program or activity.

Process for Providing Reasonable Modifications

*Comments:* The Department notes that proposed § 106.40(b)(4)(i)–(iii) have been revised and redesignated as § 106.40(b)(3)(ii)(A)–(C) in the final regulations, and the following comment summaries and discussion refer to the provision as § 106.40(b)(3)(ii)(A)–(C).

Some commenters supported the Department's proposed process for providing students with reasonable modifications because of pregnancy or related conditions, because it would prevent a recipient from forcing a student to take leave or to accept a particular modification. One commenter stated that § 106.40(b)(3)(ii)(A) would properly place the burden on the recipient to show that a modification would fundamentally alter a program or activity and would still require the recipient to identify a suitable alternative modification. Another commenter believed that the required interactive process would facilitate student self-advocacy and foster collaboration between the student and recipient.

In contrast, several commenters expressed concern that the proposed regulations would encourage a recipient to deny a student's requested modification. One commenter, a legal services provider, characterized the proposed regulations as a regression from the Department's prior guidance, and cited the U.S. Dep't of Educ., Office for Civil Rights, Supporting the Academic Success of Pregnant and Parenting Students Under Title IX of the Education Amendments of 1972 (June 2013) (2013 Pregnancy Pamphlet), *https://www2.ed.gov/about/offices/list/ ocr/docs/pregnancy.pdf,* which, the

commenter stated, required a recipient to excuse any medically necessary absence and was implemented by recipients nationwide for decades. The commenter stated that they often receive calls from students who were denied minimal time off from school, such as missing two or three classes in a semester, even while facing grave health complications and staying caught up on coursework. Another commenter asked the Department to clarify whether a student has any burden in identifying how a recipient could implement a requested modification.

Several commenters asked the Department to clarify how leave that would fall under reasonable modifications—such as intermittent absences to attend medical appointments, time to address lactation needs, or bathroom breaks—would be handled. Among other things, they asked for clarification about how to ensure that students would not be penalized for accessing such modifications; what discretion a recipient has to deny such absences or breaks because they are "reasonable modifications" under § 106.40(b)(3)(ii) rather than absences that must be granted under § 106.40(b)(3)(iv); and whether the final regulations adopt a presumption that such absences or breaks are reasonable modifications.

Other commenters asked for clarification on how reasonable modifications because of pregnancy or related conditions should be implemented, including whether "reasonable" means that a modification cannot impose an excessive burden on the recipient regardless of whether it would fundamentally alter the education program or activity. Some commenters asserted that § 106.40(b)(3)(ii) would not articulate any standard by which a student must demonstrate, or a recipient must evaluate, what reasonable modification a student needs to prevent discrimination and ensure equal access to an education program or activity. Another commenter asked the Department to confirm that recipients have flexibility in providing modifications to students who are pregnant or are experiencing pregnancy-related conditions. Commenters asked the Department to clarify when a request for a modification is properly denied and a recipient's obligations in such a circumstance.

Some commenters urged the Department to modify the regulations to require a recipient to identify an alternate modification that would meet the student's needs if a requested modification is unavailable or

ineffective. Other commenters recommended that the Department clarify that if a modification is ineffective or fundamentally alters an education program or activity, the recipient must engage in a good faith, interactive dialogue to identify another modification that would meet the student's needs.

Finally, some commenters urged the Department to modify the regulations to explicitly prohibit a recipient from forcing a student to accept an unwanted or unneeded modification. They stated that such a provision was necessary because it is unclear whether the use of "voluntary" in the proposed regulations refers to a student's voluntary acceptance of a modification or a recipient's voluntary provision of a modification.

*Discussion:* As stated in the July 2022 NPRM, 87 FR 41521, and as the Department reaffirms here, providing a student with the option of reasonable modifications to the recipient's policies, practices, or procedures because of pregnancy or related conditions is essential to preventing pregnancy-based discrimination and to ensuring equal access to a recipient's education program or activity. The Department acknowledges commenters who asserted that § 106.40(b)(3)(ii) should prevent a recipient from forcing a student to accept a particular modification, should place the burden of demonstrating that a particular modification would fundamentally alter the nature of an education program or activity on the recipient before denying a requested modification, and should require consultation with the student before a recipient offers or implements a particular modification. The Department clarifies and confirms that the final regulations operate consistently with these suggestions.

As discussed in the July 2022 NPRM and clarified in the final regulations, when considering the range of available reasonable modifications, a recipient must consider a student's needs on an individualized basis, as situations will vary based on unique factors such as the age of the student, the type of education program or activity, the student's health needs, and other circumstances. 87 FR 41522–23. Under the final regulations, a recipient is required to consider all reasonable modifications based on pregnancy or related conditions as necessary to prevent sex discrimination and ensure equal access to the recipient's education program or activity in each student's case rather than adopt a generalized approach for all students who are pregnant or who are experiencing pregnancy-related

conditions. *See* § 106.40(b)(3)(ii)(A). While the recipient's obligations are initiated when the student or person who has a legal right to act on behalf of the student notifies the Title IX Coordinator of the student's pregnancy or related conditions, it is not incumbent on the student or the person with a legal right to act on behalf of the student to identify or request a specific possible reasonable modification. *See* 87 FR 41524. Instead, if a student seeks a reasonable modification, a recipient must consult with the student to determine the student's individualized needs and offer options that will best prevent sex discrimination and ensure equal access. *See* § 106.40(b)(3)(ii)(A); 87 FR 41524. Identifying a reasonable modification will be a collaborative effort between the student and the recipient, but, under § 106.40(b)(3) and (3)(ii)(A) and (B), it will be the recipient's duty to offer any reasonable modifications, and—if accepted by the student—promptly and effectively implement them. *See* 87 FR 41524. As noted, the Department's final regulations ensure that a student will receive a modification only on a voluntary basis, and that a student cannot be required to accept a particular modification. *See* § 106.40(b)(3)(ii)(A), (B); 87 FR 41524. The student can decide whether to accept the reasonable modification offered by the recipient, request an alternative reasonable modification, or remain in their program under the status quo. *See* § 106.40(b)(3)(ii)(A)–(B).

Further, the Department clarifies that if there are a range of reasonable modifications that are appropriate to a student's individualized needs under the circumstances that prevent sex discrimination and ensure equal access to the education program or activity, § 106.40(b)(3)(ii) affords a recipient discretion to offer a student the full range of options or to choose to offer one or more preferred options. If a student declines an offered reasonable modification that is based on the student's individualized needs and that would prevent sex discrimination and ensure equal access, the recipient is not required to determine whether there are other reasonable modifications based on that specific need, even if there are other reasonable modifications that could be offered. A recipient would, however, be responsible to offer and make reasonable modifications consistent with final § 106.40(b)(3)(ii)(A) and (B) if any new or additional needs arise.

As discussed in the July 2022 NPRM and further clarified in the text of final § 106.40(b)(3)(ii)(A), a modification that

a recipient can demonstrate would fundamentally alter the nature of its education program or activity is not a reasonable modification. *See* 87 FR 41523; *see also Alexander* v. *Choate,* 469 U.S. 287, 300 (1985) (detailing "fundamental alteration[s]" in the Section 504 context). The recipient has the burden of demonstrating that a modification fundamentally alters the nature of the recipient's education program or activity or is otherwise unreasonable. A recipient has no obligation to offer or make such an unreasonable modification under final § 106.40(b)(3)(ii)(A).

Demonstrating that a particular or requested action is not a reasonable modification does not, however, relieve a recipient of its obligation to otherwise comply with § 106.40(b)(3)(ii)(A) and (B) by offering, and if the student accepts, implementing reasonable modifications to policies, practices, or procedures as necessary to prevent sex discrimination and ensure equal access to the recipient's education program or activity. Because § 106.40(b)(3)(ii) requires a recipient to consider the provision of a modification based on each student's individualized needs, the determination whether a modification is reasonable will necessarily be a fact-specific inquiry that considers, for example, whether the student has a preferred modification, whether alternative modifications exist, and the feasibility and effectiveness of the modification in addressing the student's specific needs.

Jurisprudence outlining modifications that would be unreasonable or rise to the level of a fundamental alteration to the nature of the program in the educational and disability context is illustrative. For example, courts have found a requested modification to fundamentally alter a recipient's education program or activity if it would completely waive requirements that demonstrate mastery of a particular field of study, *see Brief* v. *Albert Einstein Coll. of Med.,* 423 F. App'x 88, 91–92 (2d Cir. 2011) (citing *Powell* v. *Nat'l Bd. of Med. Exam'rs,* 364 F.3d 79, 88 (2d Cir. 2004)); *Zukle* v. *Regents of Univ. of Calif.,* 166 F.3d 1041, 1051 (9th Cir. 1999); *Kaltenberger* v *Ohio Coll. of Podiatric Med.,* 162 F.3d 432, 436–37 (6th Cir. 1998); or jeopardize an institution's accreditation, *see Harnett* v. *Fielding Graduate Inst.,* 400 F. Supp. 2d 570, 580 (S.D.N.Y. 2005), *aff'd in part, rev'd in part & remanded,* 198 F. App'x 89 (2d Cir. 2006).

Similarly, courts have held that modifications that would completely waive requirements that demonstrate academic competency, such as clinical

components or examinations, were unreasonable. *McGuinness* v. *Univ. of N.M. Sch. of Med.,* 170 F.3d 974, 979 (10th Cir. 1998); *Doherty* v. *S. Coll. of Optometry,* 862 F.2d 570, 575 (6th Cir. 1988) (holding that waiver of requirement that demonstrated proficiency was not a reasonable modification); *Darian* v. *Univ. of Mass. Bos.,* 980 F. Supp. 77, 89–90 (D. Mass. 1997) (finding a student's request to not see patients or attend required clinical program to be unreasonable). In contrast, courts have indicated that a school may reasonably accommodate a student with a disability by allowing a student to defer or make up an examination at a later time, permitting a student to repeat one or more classes, providing a student with tutoring, taped lectures, and the like, and allowing a student to take untimed examinations, *see Wynne* v. *Tufts Univ. Sch. of Med. (Wynne II),* 976 F.2d 791, 795–96 (1st Cir. 1992); modifying a student's seating arrangement, *see Nathanson* v. *Med. Coll. of Pa.,* 926 F.2d 1368, 1385 (3d Cir. 1991); or reducing or modifying a student's duties in a required clinical course, or deferring to another semester completion of a program's clinical requirement, *see Darian,* 980 F. Supp. at 88–89. As a general matter, the Department notes that in the context of Federal disability law, courts have distinguished between modifications that are reasonable and those that rise to the level of a fundamental alteration to the nature of the program by analyzing whether the modification would waive academic requirements rather than providing a student another means to comply with academic requirements. The 2008 amendments to the ADA also affirm that consideration of academic requirements fits within the reasonable modifications framework. *See* 42 U.S.C. 12201(f) ("Nothing in this chapter alters the provision of section [12182] (b)(2)(A)(ii) [. . .] specifying that reasonable modifications in policies, practices, or procedures shall be required, unless an entity can demonstrate that making such modifications in policies, practices, or procedures, including academic requirements in postsecondary education, would fundamentally alter the nature of the goods, services, facilities, privileges, advantages, or accommodations involved.").

This case law is consistent with the examples of reasonable modifications that were identified in the July 2022 NPRM, such as providing a student who must be intermittently absent from class to attend morning prenatal appointments with the opportunity to

make up lost class time without penalty or offering the student the opportunity to switch to a comparable course that met in the afternoon (as long as either arrangement would be appropriate to the pregnant student's individualized need and would not fundamentally alter the nature of the recipient's education program or activity). 87 FR 41524. In contrast, a student's request to waive their entire senior year and graduate without those credits would likely be a fundamental alteration of the nature of the recipient's program. *Id.* But a recipient would still be required to offer reasonable modifications sufficient to prevent sex discrimination and ensure equal access to its education program or activity, such as by allowing the student to complete the required number of credits at a slower pace or granting an extension to complete certain tests or assignments. *Id.* Consistent with this framework, many of the modifications referenced by commenters—such as allowing a student to miss class to attend medical appointments with the opportunity to make up exams or coursework, allowing a student to take lactation or bathroom breaks during class without penalty, or providing a larger desk—would be more akin to modifications that provide students an alternative means to access an education program or activity rather than a complete waiver of academic requirements. And it would likely follow that a recipient would have difficulty demonstrating that such modifications would fundamentally alter the nature of its education program or activity or otherwise be unreasonable.

For these reasons, the Department disagrees with commenters' assertion that § 106.40(b)(3)(ii) encourages recipients to deny reasonable modification requests. Rather, consistent with cases construing Federal disability law and the examples provided in the July 2022 NPRM, recipients must meet a rigorous standard to demonstrate that a particular or requested modification under § 106.40(b)(3)(ii)(A) would be a fundamental alteration to the nature of a program or activity. To be sure, in the context of Federal disability law, courts have afforded recipients some deference in "genuine academic decisions," *Wynne* v. *Tufts Univ. Sch. of Med. (Wynne I),* 932 F.2d 19, 25 (1st Cir. 1991), such as those involving a request to waive a particular academic program requirement. But they have emphasized that such deference is not the same as the sort of "broad judicial deference" that courts use when applying the "rational basis test." *Id.* And courts

have only accorded deference to these concerns upon a showing that an academic institution has "conscientiously carried out" its obligation to "seek suitable means of reasonably accommodating" the needs of a person with a disability. *Id.* at 25–26. Courts have also indicated that new approaches or technological advances may further weaken the deference a recipient is due in its assessment that a reasonable modification would negatively impact genuine academic decisions. *Id.* at 26 (citing *Se. Comm. Coll.* v. *Davis,* 442 U.S. 397, 412 (1979)). The Department anticipates similar standards will apply when assessing whether a modification is "reasonable" under § 106.40(b)(3)(ii).

In the event a particular modification would result in a fundamental alteration, the Department acknowledges the concerns voiced by commenters that a recipient could interpret the proposed regulations as allowing a recipient to deny a student's request for modifications completely without any further obligation to prevent sex discrimination and to ensure equal access for a student who is pregnant or experiencing pregnancy-related conditions. To address such concerns, the Department has revised § 106.40(b)(3)(ii)(A) to clarify that a modification that a recipient can demonstrate would fundamentally alter the nature of its education program or activity is not a reasonable modification. Accordingly, demonstrating a particular modification would be a fundamental alteration does not relieve a recipient of its obligation under § 106.40(b)(3)(ii)(A) to otherwise consult with the student, determine whether there are reasonable modifications based on the student's individualized needs, offer such reasonable modifications and, if the student accepts, make such reasonable modifications that sufficiently prevent sex discrimination and ensure equal access.

The Department disagrees that § 106.40(b)(3)(ii) will retreat from previously issued guidance regarding voluntary leaves of absence for pregnancy or related conditions. A recipient's obligation to provide reasonable modifications to a student for pregnancy or related conditions under § 106.40(b)(3)(ii) is separate and distinct from its longstanding obligation—preserved in final § 106.40(b)(3)(iv)—to provide a voluntary leave of absence to a student for pregnancy or related conditions. As explained below in the discussion of § 106.40(b)(3)(iv), that provision provides a basic framework for determining leave due to a student's

pregnancy or related conditions. But if a student requests leave that exceeds this framework, the recipient should consider the amount of leave that the student requests in excess of that required under § 106.40(b)(3)(iv) as a request for a reasonable modification under § 106.40(b)(3)(ii). *See* 87 FR 41521 (providing examples of circumstances in which leave that exceeds the medically necessary time would be a reasonable modification, such as when the medically necessary leave would end in the middle of a college semester).

*Changes:* Proposed § 106.40(b)(4) has been revised, consolidated with proposed § 106.40(b)(3)(ii), and redesignated as § 106.40(b)(3)(ii)(A)–(C) in the final regulations. Final § 106.40(b)(3)(ii)(A) now states that a recipient must make reasonable modifications to its policies, practices, or procedures as necessary to prevent sex discrimination and ensure equal access to the recipient's education program or activity; that each modification must be based on a student's individualized needs; that the recipient must consult with the student when determining what modifications are required; and that a modification that a recipient can demonstrate would fundamentally alter the nature of its education program or activity is not a reasonable modification. Section 106.40(b)(3)(ii)(B) now states that a student has discretion whether to accept or decline an offered modification; and that, if the student accepts the offered modification, the recipient must implement the modification.

Inclusive List of Reasonable Modifications

*Comments:* The Department notes that proposed § 106.40(b)(4)(iii) has been revised and redesignated as § 106.40(b)(3)(ii)(C) in the final regulations, and the following comment summaries and discussion refer to the provision as § 106.40(b)(3)(ii)(C).

One commenter supported § 106.40(b)(3)(ii)(C) because it would provide critical guidance to recipients. Some commenters asked the Department to add various specific examples of modifications or require supplemental services, such as medical care. One commenter recommended that the Department add "or laboratory work" after "coursework." Some commenters asked the Department to revise, rather than add to, the list of potential modifications. For example, one commenter suggested that instead of "homebound" instruction, the regulations should refer to online

educational programs or other home-based educational services.

Another commenter urged the Department to move "intermittent absences to attend medical appointments" from § 106.40(b)(3)(ii)(C) to § 106.40(b)(3)(iv), which relates to voluntary leaves of absence because of pregnancy or related conditions, and clarify that such intermittent absences or voluntary leaves of absence may include pre- and postnatal appointments, as well as bed rest and leave to recover from childbirth or related conditions such as mastitis, or otherwise clarify that a recipient must provide reasonable modifications to an absence policy after childbirth.

*Discussion:* The Department agrees that § 106.40(b)(3)(ii)(C) will provide critical guidance to recipients. The Department has revised this provision to clarify that online education need not be homebound and to be consistent with final § 106.40(b)(3)(vi), which references certain modifications and is explained in more detail in the discussion of § 106.40(b)(3)(vi), to clarify that breaks from class may be provided to attend to lactation, eating, drinking, using the restroom, or other needs associated with pregnancy or related conditions.

The Department declines to make other revisions to § 106.40(b)(3)(ii)(C) suggested by commenters, including the request to move "intermittent absences to attend medical appointments" to § 106.40(b)(3)(iv). As explained above, a recipient's obligation to provide reasonable modifications to a student for pregnancy or related conditions under § 106.40(b)(3)(ii) is separate and distinct from its longstanding obligation to provide a voluntary leave of absence to a student for pregnancy or related conditions, which is codified at § 106.40(b)(3)(iv) in the final regulations. The Department further emphasizes that the regulation's use of the introductory phrase "[m]ay include but are not limited to" confirms that the list of possible reasonable modifications is non-exhaustive and broadly inclusive. Section 106.40(b)(3)(ii)(C) includes reasonable modifications that are typical, unlikely to result in a fundamental alteration to the nature of a recipient's education program or activity, and effective in preventing sex discrimination and ensuring equal access for students who are pregnant or experiencing pregnancy-related conditions. For additional clarity, the Department has added the reasonable modifications of breaks to eat, drink, or use the restroom, allowing a student to sit or stand, and allowing a student to carry or keep water nearby. As discussed above, whether a particular or

requested modification is reasonable is a fact-specific inquiry that must be individualized to the student in the context of the recipient's education program or activity. Nothing in these regulations prevents a student from requesting or a recipient from affirmatively offering a particular modification, including those suggested by commenters, such as tutoring, supplemental instruction, academic counseling, homework assistance, changes in course load, modification of a school or sport uniform policy, or other modifications that would apply to an athletic or extracurricular context.

As the Department indicated in the July 2022 NPRM, 87 FR 41524, reasonable modifications for a student based on pregnancy or related conditions include many possible options. A student's options for reasonable modifications because of pregnancy or related conditions will not be limited or defined by the fact that the recipient has never had occasion to provide a particular modification to any other student in the past. Further, as explained above, it is not incumbent on the student to propose or suggest any particular reasonable modification in order for the recipient to offer reasonable modifications with the student's input. Additionally, because § 106.40(b)(3)(ii)(A) requires a recipient to consider the provision of a modification on a basis individualized to each student's pregnancy or related condition and needs, a recipient may consider a variety of factors when offering reasonable modifications, such as whether the student has a preferred modification, whether alternative modifications exist, and the feasibility of a modification. However, the Department reiterates that a recipient ultimately has discretion in what reasonable modifications it offers if there is more than one reasonable modification that would address the student's individualized needs, prevent sex discrimination, and ensure equal access to the recipient's education program or activity. Additionally, a recipient has the burden of demonstrating that a particular modification would fundamentally alter the nature of its education program.

*Changes:* Proposed § 106.40(b)(4)(iii) has been revised and redesignated as § 106.40(b)(3)(ii)(C). The Department has revised the redesignated non-exhaustive list of examples in § 106.40(b)(3)(ii)(C) for consistency with final § 106.40(b)(3)(vi); to clarify that breaks from class may be provided to attend to lactation or other health needs associated with pregnancy or related conditions, including eating, drinking,

or using the restroom; and to delete "other" from the phrase "online or other homebound education" to clarify that online education need not be homebound.

Title IX Coordinator's Role

*Comments:* Some commenters supported the proposed regulations—which would have required that reasonable modifications because of pregnancy or related conditions "be effectively implemented, coordinated, and documented by the Title IX Coordinator"—because they would have made clear that the Title IX Coordinator has the authority and responsibility to ensure that reasonable modifications are actually provided to students.

In contrast, other commenters expressed concern that the proposed regulations would have (1) hindered the effectiveness of other departments within a recipient that typically address student requests for disability-related accommodations; (2) been inconsistent with proposed § 106.40(b)(5) (redesignated in the final regulations as § 106.40(b)(4)), which requires comparable treatment to temporary disabilities or conditions; (3) overburdened the Title IX Coordinator; and (4) failed to take into account the expertise and resources most recipients allocate to offices that provide accommodations for students with disabilities. Some commenters noted that other departments within a recipient may also play a role in providing accommodations or be better positioned than the Title IX Coordinator to do so, including academic affairs, student life, enrollment, and campus health services.

Some commenters urged the Department to clarify instances in which the Title IX Coordinator should consult with or defer to disabilities services staff, a student's Section 504 team, or a student's IEP team when the Title IX Coordinator is facilitating a reasonable modification because of pregnancy or related conditions, in order to increase coordinated compliance under Title IX and Federal disability laws.

Some commenters recommended a variety of revisions to the proposed regulations to decrease the role of the Title IX Coordinator in implementing reasonable modifications. Other commenters urged the Department to revise the proposed regulations to make clear that a recipient, not the Title IX Coordinator, is responsible for requests related to reasonable modifications or leaves of absence.

*Discussion:* The Department agrees with commenters that the recipient, not

the Title IX Coordinator, is ultimately responsible for implementing requests for reasonable modifications and other specific actions the recipient must take under final § 106.40(b)(3)(ii)–(vi). Accordingly, the Department has revised § 106.40(b)(3) to clarify that it is the recipient's responsibility to take, and the Title IX Coordinator's responsibility to coordinate, these actions, including the provision of reasonable modifications because of pregnancy or related conditions. Additionally, the final regulations expressly permit a recipient or a Title IX Coordinator to delegate specific duties as appropriate, provided the Title IX Coordinator retains ultimate oversight to ensure the recipient's consistent compliance under Title IX and the regulations. *See* discussion of § 106.8(a). Consistent with these revisions, and as noted in a similar discussion above regarding § 106.40(b)(3) generally, a recipient may delegate the provision of reasonable modifications because of pregnancy or related conditions to other personnel beyond the Title IX Coordinator.

Permission to delegate responsibilities to designees enables a recipient to assign duties to personnel who are best positioned to perform them, to address actual or perceived conflicts of interest, and to align with the recipient's administrative structure. For example, as long as the Title IX Coordinator retains oversight and a recipient's process for providing reasonable modifications because of pregnancy or related conditions is consistent with § 106.40(b)(3)(ii), a recipient may delegate responsibilities under that process to any staff or departments as appropriate, including those who support students with disabilities.[83] The Department declines to further limit the Title IX Coordinator's role in coordinating reasonable modifications because of pregnancy or related conditions, however. The Title IX Coordinator has unique and specific knowledge of a recipient's obligations to prevent sex discrimination and ensure equal access that must inform the implementation of § 106.40(b)(3)(ii), even if certain portions of the process are delegated to other employees or departments acting with the Title IX Coordinator's oversight. Additionally, the Title IX Coordinator can serve as a critical point of contact for students or provide other support to coordinate multiple departments or employees tasked with implementing reasonable modifications, such as communicating

approved modifications to the student and any relevant staff members or ensuring that all other staff members involved in carrying out the modifications are performing their roles.

Revising the regulatory text to state that the Title IX Coordinator's role is to coordinate, rather than exclusively to implement, emphasizes the opportunity for the Title IX Coordinator to delegate and decreases the likelihood that reasonable modification requests overburden the Title IX Coordinator with duties better suited for other personnel. Additionally, the Department has also removed the proposed requirement for the Title IX Coordinator to "document" reasonable modifications to decrease administrative burdens on the Title IX Coordinator and address privacy concerns related to such documentation. The Department emphasizes that while a recipient must comply with the final regulations regarding reasonable modifications, the reasonable modification provision does not require a recipient to maintain documentation of compliance with § 106.40(b)(3)(ii). While a recipient may choose to voluntarily maintain such records, those records would be subject to § 106.44(j) of the final regulations, which prohibits the disclosure of personally identifiable information obtained in the course of complying with this part with some exceptions. The disclosure restrictions are explained more fully in the discussion of § 106.44(j).

The Department declines to require a recipient to consult with disabilities support staff in every case related to the provision of reasonable modifications because of pregnancy or related conditions. While doing so may be prudent in some cases, in other cases it will be unnecessary, inappropriate, or inefficient, and whether it is required will be a fact-specific determination. For example, if a high school student with a disability that affects mobility requests a dress code modification for gym class due to pregnancy, this may not impact the student's placement such that coordination with the student's IEP or Section 504 team is required. However, if a student with ADHD requests a six-week, medically necessary leave from high school to recover from childbirth, the student's IEP or Section 504 team would likely have to convene to discuss how to provide the student appropriate education during this period, beyond or in combination with any reasonable modifications the student is entitled to under Title IX. The Department also declines to mandate that a Title IX Coordinator coordinate with disabilities support staff or a student's IEP or

Section 504 team because it will better serve a student's privacy interests in circumstances in which a student does not wish to disclose information related to their pregnancy or pregnancy-related condition to their IEP or Section 504 team. For example, a high school student with a vision disability who requests breaks from class to address lactation needs may not wish to share the reason for the breaks beyond the Title IX Coordinator if the disability has no connection to the pregnancy.

Nothing in the final regulations prevents a recipient from adopting additional mechanisms to coordinate compliance with relevant laws to maximize protection from discrimination and minimize the potential for redundancy or unnecessary burden on a recipient's students or employees.

*Changes:* Proposed § 106.40(b)(4) has been revised, consolidated with proposed § 106.40(b)(3)(ii), and redesignated as § 106.40(b)(3)(ii)(A)–(C) in the final regulations, and the requirement for the Title IX Coordinator to implement and document reasonable modifications has been removed. Final § 106.40(b)(3) now states that the Title IX Coordinator must coordinate actions under paragraphs (b)(3)(i) through (vi). Final § 106.40(b)(3)(ii) now explicitly states that a recipient must make reasonable modifications to the recipient's policies, practices, or procedures as necessary to prevent sex discrimination and ensure equal access to the recipient's education program or activity.

Termination of Pregnancy

*Comments:* The Department notes that proposed § 106.40(b)(3)(ii), (iii), and (4) have been revised and redesignated as § 106.40(b)(3)(ii) and (iv) in the final regulations, and the following comment summaries and discussion refer to these provisions as § 106.40(b)(3)(ii) and (iv).

Some commenters supported reasonable modifications and voluntary leaves of absence because of pregnancy or related conditions as helpful to students in understanding their options for educational access. Several commenters asked the Department to clarify a recipient's obligation to provide reasonable modifications or a leave of absence for complications arising from termination of pregnancy or for out-of-State travel for health care related to pregnancy or related conditions. Other commenters asked that the reasonable modifications provision state that recipients would not be required to provide, pay for, or refer a student for an abortion or any abortion-related services. Some

---

[83] Such a delegation would not affect the legal determination whether a student has a disability.

commenters asked the Department to clarify or issue guidance on a recipient's obligations regarding disclosure of information related to modifications sought or provided to a student to access an abortion.

*Discussion:* The Department acknowledges the perspective of commenters who described the importance of the proposed provisions requiring reasonable modifications and voluntary leaves of absence and appreciates the opportunity to clarify a recipient's distinct obligations under these two provisions in the final regulations. Under § 106.40(b)(3)(ii), a recipient must provide a student who is pregnant or experiencing pregnancy-related conditions with reasonable modifications as necessary to prevent sex discrimination and ensure equal access to an education program or activity. Under § 106.40(b)(3)(iv), a recipient must allow a student who is pregnant or experiencing pregnancy-related conditions to voluntarily take a leave of absence from the recipient's education program or activity to cover, at a minimum, the time deemed medically necessary by the student's licensed healthcare provider. As explained more fully above in the discussion of the definition of "pregnancy or related conditions" in § 106.2, "pregnancy or related conditions" includes pregnancy, childbirth, termination of pregnancy, or lactation, as well as related medical conditions and periods of recovery.

As detailed above in the discussion of the definition of "pregnancy or related conditions" in § 106.2, 20 U.S.C. 1688 states that Title IX's general nondiscrimination mandate cannot "require or prohibit any person, or public or private entity, to provide or pay for any benefit or service, including the use of facilities, related to an abortion." The Department does not view a recipient's reasonable modification of its policies, practices, and procedures when necessary due to a student's termination of pregnancy under § 106.40(b)(3)(ii) or allowing a voluntary leave of absence under § 106.40(b)(3)(iv), as running afoul of section 1688. Such modifications or leave are not "benefits or services" under 20 U.S.C. 1688. *See* 134 Cong. Rec. H565–02 (daily ed. Mar. 2, 1988) (describing the abortion neutrality provision as limited to "the performance of or payment for abortion"). The modifications required under § 106.40(b)(3)(ii) do not require any recipient to fund or perform abortions. Rather, modifications required under § 106.40(b)(3)(ii) are specifically related to non-

discriminatory access to a recipient's education program or activity and could include, for example, access to online or homebound instruction during recovery from termination of pregnancy; or allowing extra time to complete an exam or coursework for a student who needs to travel out of State to receive specialized care for a high-risk pregnancy.

Further, section 1688 contains a self-limitation; the second sentence indicates that the first must not be "construed to permit a penalty to be imposed on any person or individual because such person or individual is seeking or has received any benefit or service related to a legal abortion." Thus, it is clear that section 1688 does not justify such penalties, which constitute prohibited sex discrimination under section 1681. For purposes of complying with Title IX, schools may presume that individuals seeking reasonable modifications, voluntary leaves of absence, or comparable treatment to other temporary medical conditions related to an abortion intend to obtain a legal abortion. Students can legally terminate a pregnancy either in their State or by traveling to another State where the abortion is lawful. In addition, questions about when an abortion is lawful under State law often involve complex medical and factual considerations that fall well outside the expertise of educational institutions, making recipients ill equipped to assess the legality of an abortion. In response to requests for reasonable modifications, leaves of absence, or comparable treatment, recipients have no education-related need to access information about how or where a student will obtain medical treatment or for other personal health-related information related to termination of a pregnancy.

The Department notes that recipients routinely provide reasonable modifications or accommodations for a wide array of temporary medical conditions (including illness, injury, or medical procedures) without requesting sensitive and specific healthcare information from students about the origin or timeline of such a condition, or about how, where, by whom, or in what manner the condition will be treated. Nothing in these regulations requires a different approach in the abortion context. Were a recipient to treat requests for reasonable modifications for abortion care differently than they do requests for reasonable modifications for other temporary medical conditions with respect to the information students must provide to accompany such requests, such treatment could contravene the

broad nondiscrimination mandate in section 1681, as discussed above. Asking a student for such personal information in the course of providing reasonable modifications or comparable treatment may constitute sex discrimination—particularly if the inquiry is informed by sex stereotypes (*e.g.,* questions about whether the student is married or the circumstances surrounding the pregnancy) or could constitute different treatment (*e.g.,* if a recipient would not ask a student how they became disabled or specific questions about treatment of their disability, but asks a student how they became pregnant or specific questions about treatment of their pregnancy, including potential termination). And asking unnecessary and invasive questions could compromise student privacy in a manner that could chill students from seeking reasonable modifications or comparable treatment that they are entitled to under these regulations, which may also contravene Title IX.

In such a scenario, section 1688 would not justify the discrimination because requiring a recipient to apply the same information gathering policies across temporary medical conditions is not requiring a "benefit or service" related to abortion. More specific questions and issues related to a recipient's compliance with both Title IX and State law, including when preemption issues may arise, must be considered on a case-by-case basis given the fact-specific nature of the inquiry. Likewise, section 1688 does not preclude the requirement under § 106.40(b)(3)(iv) that a recipient must allow a student to take a voluntary leave of absence for as long as medically necessary for pregnancy or related conditions, including termination of pregnancy. Such a leave of absence is not a benefit or service relating to abortion, particularly when the recipient makes leave generally available to ensure that students with a variety of pregnancy-related (and non-pregnancy related) conditions can continue to access the recipient's education program or activity.

The Department will offer technical assistance, as appropriate, the scope of which will be determined in the future, to promote compliance with these final regulations.

*Changes:* None.

Interaction With Other Federal Laws

*Comments:* The Department notes that proposed § 106.40(b)(3)(ii) and (4) have been revised and redesignated as § 106.40(b)(3)(ii) in the final regulations, and the following comment summaries

and discussion refer to these provisions as § 106.40(b)(3)(ii).

One commenter supported § 106.40(b)(3)(ii) because it would clarify that a recipient has other obligations regarding pregnancy or related conditions beyond student and employee health plans and benefits. The commenter asserted that recipients are familiar with the Department's proposed process for pregnancy-related reasonable modifications because they have similar obligations under Title II of the ADA, and that familiarity will facilitate compliance with the proposed regulations.

Another commenter asked the Department to explicitly state that a pregnancy-related condition need not qualify as a disability under the ADA to qualify for a reasonable modification under Title IX.

In contrast, some commenters asserted that the provision of reasonable modifications because of pregnancy or related conditions would exceed the Department's authority under Title IX because the modifications would address disability discrimination. Specifically, the commenters argued that the proposed reasonable modification requirements would go beyond prohibiting different treatment to requiring a recipient to affirmatively provide modifications based on pregnancy or related conditions. The commenters asserted that this requirement would give preferential treatment to a student based on sex in violation of Title IX.

Some commenters also argued that because pregnancy or related conditions generally are not disabilities under the ADA or Section 504, the proposed regulations would impermissibly use Title IX to expand a student's rights and a recipient's obligations under disability law. These commenters further asserted that the requirement to affirmatively notify a student of available modifications and the procedures to determine whether to provide a modification would differ from those outlined in the ADA and Section 504.

Some commenters argued that because Title IX is modeled after Title VII and proposed § 106.40(b)(3)(ii) would provide more protections to a student who is pregnant or experiencing pregnancy-related conditions than a similarly situated employee would be provided under Title VII, the proposed regulations would exceed and conflict with Title VII.

Finally, one commenter asked for clarification about how proposed § 106.40 would interact with other parts of Title IX, the PDA, Section 504, and the ADA. The commenter also asked for

clarification about the differences between a recipient's obligations toward pregnant students and employees, how § 106.40 would apply to a student-employee, and whether there is a distinction based on whether the individual is primarily a student (*e.g.,* undergraduate students with part-time campus-based jobs) or primarily an employee (*e.g.,* employees who may be enrolled in one or two classes at a time) and the context for the sex discrimination reported. This commenter observed that § 106.46(b) addresses this issue regarding sex-based harassment grievance procedures.

*Discussion:* The Department agrees that § 106.40(b)(3)(ii) will clarify that a recipient has obligations that extend beyond student health plans and benefits for students who are pregnant or experiencing pregnancy-related conditions. Additionally, the Department agrees that similarities between § 106.40(b)(3)(ii) and Title II of the ADA will facilitate compliance for recipients.

The Department disagrees that § 106.40(b)(3)(ii) exceeds the Department's authority under Title IX or provides preferential treatment to a student based on sex in violation of Title IX. Since 1975, consistent with the Department's broad statutory authority to issue regulations prohibiting sex discrimination, the Title IX regulations have included provisions that require a recipient to take proactive steps to ensure equal treatment and access for students who are pregnant or experiencing pregnancy-related conditions that differ from what accommodations are provided to other students, including students with disabilities. *See* 40 FR 24128 (codified at 45 CFR 86.40(b)(1), (5) (1975)); 34 CFR 106.40(b)(1), (5) (current); 20 U.S.C. 1682. The provision of reasonable modifications based on pregnancy or related conditions is not preferential treatment based on sex, but rather measures that are necessary to prevent sex discrimination and ensure equal access to a recipient's education program or activity for students who are pregnant or experiencing pregnancy-related conditions. A recipient's denial of reasonable modifications for a student based on pregnancy or related conditions uniquely deprives that student of an educational opportunity of which they would not otherwise be deprived, but for their sex.

Moreover, the Department disagrees with commenters' assertion that § 106.40(b)(3)(ii) impermissibly uses Title IX to expand a student's rights or a recipient's obligations under disability law. As some commenters and the July

2022 NPRM noted—and as the Department clarifies here—pregnancy itself is not a disability. 87 FR 41523. Therefore, a recipient's obligation to provide reasonable modifications because of pregnancy or related conditions under § 106.40(b)(3)(ii) is distinct from its obligation to provide reasonable modifications because of a disability under Section 504 or the ADA. Further, whether a pregnancy-related condition is categorized as a disability under Section 504 or the ADA has no effect on a recipient's separate obligation to provide reasonable modifications under § 106.40(b)(3)(ii). 87 FR 41525. The Department clarifies that nothing in § 106.40(b)(3)(ii) obviates a recipient's separate obligation to comply with other applicable civil rights law, including the ADA, Section 504, Title VII as amended by the PDA, or the Pregnant Workers Fairness Act (PWFA), codified at 42 U.S.C. 2000gg *et seq.,* which has become law since the issuance of the July 2022 NPRM.

The Department disagrees that the obligation to provide reasonable modifications because of pregnancy or related conditions conflicts with the obligation to provide reasonable modifications for a disability. As indicated in the July 2022 NPRM, the framework for reasonable modifications because of pregnancy or related conditions is similar to the framework of Title II of the ADA, and the approach of § 106.40(b)(3)(ii) will invite collaboration between the student and the recipient to determine what reasonable modifications are required considering the student's individualized needs, a process that is similar to the one used to identify the reasonable modifications or reasonable accommodations that must be implemented under the ADA. *See* 87 FR 41523. The Department expects that this framework not only will be most effective in ensuring equal access and preventing sex discrimination as required by Title IX, but also will be familiar to most recipients and thus will be relatively straightforward to adopt and implement for students who are pregnant or experiencing pregnancy-related conditions. As such, the Department declines to remove the requirement to provide reasonable modifications because of pregnancy or related conditions.

The Department disagrees with the assertion that providing unique protections to students under Title IX necessarily conflicts with Title VII. As explained in the July 2022 NPRM, the treatment of pregnancy-related discrimination under the PDA, the ACA, and other statutes enacted since 1975

informs, but does not dictate, the Department's understanding of discrimination on the basis of sex under Title IX. 87 FR 41394. Title IX regulations have long included protections and requirements that are unique to the context of education programs and activities. *See generally* 40 FR 24128 (1975). For example, the provision of a voluntary leave of absence to a student or employee for pregnancy and certain related conditions (34 CFR 106.40(b)(5) (current) and 34 CFR 106.57(d) (current)) are longstanding requirements in Title IX regulations that have no corollary in Title VII. Further, in response to a commenter's request to clarify how § 106.40(b)(3)(ii) and this part would interact with the PDA, Section 504, and the ADA, explaining all the ways that Title IX may interact with these laws is too extensive to summarize and beyond the scope of this rulemaking,

Additionally, under § 106.40(b)(3)(ii), a recipient is obligated to provide reasonable modifications to a student, defined in § 106.2 as "a person who has gained admission," who is pregnant or experiencing pregnancy-related conditions. The recipient has this obligation regardless of whether the student is also an employee of the recipient. The primary purpose of reasonable modifications under Title IX is to ensure that pregnancy or related conditions do not deny educational opportunities or disrupt a student's academic progress, regardless of whether the student is enrolled full-time, part-time, or in only one or two classes. Consequently, if an employee is enrolled in the recipient's education program or activity, the recipient must offer and make reasonable modifications sufficient to allow the employee to continue their educational progress as a student consistent with § 106.40(b)(3)(ii). Additionally, the Department clarifies that a recipient must comply with grievance procedures outlined in § 106.45, and if applicable § 106.46, for any complaint that alleges a recipient failed to take specific action under § 106.40(b)(3), regardless of whether the student is also an employee. Final § 106.46(b) further discusses the application of grievance procedures to a sex-based harassment complaint, which may include pregnancy harassment, that involves a postsecondary student-employee. *See* discussion of § 106.46(b).

*Changes:* None.

## Request To Extend Reasonable Modifications to Applicants

*Comments:* The Department notes that proposed § 106.40(b)(3)(ii) and (4) have been revised and redesignated as § 106.40(b)(3)(ii) in the final regulations, and the following comment summaries and discussion refer to these provisions as § 106.40(b)(3)(ii).

Some commenters recommended that the Department revise proposed § 106.40(b)(3)(ii) to state that an applicant for admission has the right to a reasonable modification to ensure that pregnancy or related conditions do not act as a barrier to entering a recipient's education program or activity, as well as to align with other civil rights laws.

*Discussion:* The Department declines to require a recipient to apply § 106.40(b)(3)(ii) to applicants for reasons discussed in more detail in the discussion of § 106.21(c)(1).

*Changes:* None.

## Terminology

*Comments:* The Department notes that proposed § 106.40(b)(3)(ii) and (4) have been revised and redesignated as § 106.40(b)(3)(ii) in the final regulations, and the following comment summaries and discussion refer to these provisions as § 106.40(b)(3)(ii).

Some commenters recommended that the Department replace the term "reasonable modifications" with the term "reasonable accommodations" because, they stated, it would be less confusing and more appropriate for the context. Some commenters asserted that "modification" implies a change to what a student is expected to do while "accommodation" implies a support or service to help a student do an expected task. The commenters asserted that "accommodation" describes a broader range of support that a recipient may provide to a student who is pregnant or experiencing pregnancy-related conditions. In contrast, another commenter stated that a "modification" to a policy, practice, or procedure seems more permanent and implies that it would be changed for all students.

*Discussion:* While the Department acknowledges commenters' concerns about the term "reasonable modifications" and its meaning, the term is appropriate and straightforward. Final § 106.40(b)(3)(ii) clearly sets out the purpose of reasonable modifications and the very broad range of individual modifications that a recipient may provide based on the circumstances. Under the final regulations, a recipient can implement a reasonable modification for just one student, such as a modification that is provided to just

the student who is pregnant or experiencing pregnancy-related conditions, or implement a broader policy or procedural change that affects many students, including the student who is pregnant or experiencing pregnancy-related conditions; for example, implementing a student's reasonable modification request for an extension on an assignment by extending the deadline for all students in the class. Additionally, the regulatory framework from which § 106.40(b)(3)(ii) primarily draws—but is not identical to—and with which many recipients must comply under Title II of the ADA uses the term "reasonable modifications." 28 CFR 35.130(b)(7). Therefore, using the term "reasonable modifications" is less confusing and more appropriate than any other term.

*Changes:* None.

Cost-Benefit Analysis

*Comments:* The Department notes that proposed § 106.40(b)(3)(ii) and (4) have been redesignated as § 106.40(b)(3)(ii) in the final regulations, and the following comment summaries and discussion refer to these provisions as § 106.40(b)(3)(ii).

One commenter objected to proposed § 106.40(b)(3)(ii) because, the commenter asserted, the Department did not consider what reasonable modifications would be required, aside from lactation spaces and leave; the financial costs of such modifications; how providing a modification could negatively impact or be unfair to another student, such as delayed or longer times for test taking; or any reasonable modifications required for parents or fathers.

*Discussion:* The commenter overstates the increased costs or burdens for implementing reasonable modifications unrelated to lactation and leave. As noted in the July 2022 NPRM, recipients have existing obligations that are similar to those under § 106.40(b)(3)(ii), which require a recipient to make modest modifications to a policy, practice, or procedure, such as providing a student a larger desk, allowing more frequent bathroom breaks, or permitting temporary access to elevators. 87 FR 41560.

The Department declines to extend reasonable modifications to individuals other than students who are pregnant or experiencing pregnancy-related conditions, because such students have unique sex-based needs and requiring reasonable modifications for that population is necessary for ensuring equal access to a recipient's education program or activity and preventing sex discrimination. The Department notes

that, even though recipients are not required to extend reasonable modifications beyond the student who is pregnant or experiencing a pregnancy-related condition, any rules related to a student's parental, family, or marital status cannot treat students differently based on sex. A policy that allowed for leave for only students of one sex to, for example, provide bonding time "for the natural caregiver"—rather than leave to recover from childbirth—would be based on impermissible sex stereotypes in violation of Title IX. Nothing in Title IX prevents a recipient from offering reasonable modifications or leave to parents or caregivers, provided the recipient does not treat students differently on the basis of sex.

Further, the Department disagrees with the implication that the costs or burdens of § 106.40(b)(3)(ii) would not be justified by the benefits of clarifying a recipient's obligation to provide, and ensuring that students are able to access, reasonable modifications and voluntary leaves of absence for pregnancy or related conditions. The Department views the final regulations as an effective means of preventing sex discrimination and ensuring equal access to a recipient's education program or activity for students who are pregnant or experiencing pregnancy-related conditions. Although there are limited data quantifying the economic impacts of sex discrimination, the Department's review of public comments shows that such barriers can prevent students from obtaining a high school diploma, pursuing higher education, or obtaining a postsecondary degree, which limits their economic opportunities and may have long-term or generational impacts. A more detailed discussion and analysis of the costs and benefits of provisions related to reasonable modifications in these final regulations is included in the *Regulatory Impact Analysis* discussion of pregnancy or related conditions.

*Changes:* None.

7. Sections 106.40(b)(1) and 106.40(b)(3)(iii) Pregnancy or Related Conditions—Voluntary Access to Separate and Comparable Portion of Program or Activity

*Comments:* The Department notes that proposed § 106.40(b)(3)(i)(C) has been redesignated as § 106.40(b)(3)(iii) in the final regulations, and the following comment summaries and discussion generally refer to this provision as § 106.40(b)(3)(iii).

Some commenters appreciated that the provisions in the proposed regulations at § 106.40(b)(1) and (3)(iii)

would preserve the existing and longstanding requirement that participation in any separate program based on pregnancy or related conditions must be voluntary and that such programs must be comparable to those offered to students who are not pregnant and do not have related conditions.

Some commenters cited examples of pregnant students, particularly those in high school, being coerced or pressured into inferior alternative education programs. A group of commenters provided examples from their own experiences and reported that, when educators or counselors learn of a student's pregnancy or parental status, they often pressure the student to attend an alternate school of lower quality that offers fewer options for courses and extracurricular activities or force the student to withdraw from the recipient's education program or activity altogether instead of offering support to help them continue their education.

Some commenters urged the Department to change the proposed regulatory language to explicitly prohibit a recipient from forcing a student who is pregnant or is experiencing a pregnancy-related condition to participate in a separate portion of the recipient's education program or activity. Some commenters requested that the Department alter the standard in proposed § 106.40(b)(1) and require separate programs to be "substantially equal" instead of "comparable." Some commenters suggested that the Department specify that such programs must be substantially equal "in purpose, scope, and quality" to those offered to students who are not pregnant or parenting. One commenter suggested that the Department incorporate into its standard the factors outlined in the current regulations regarding single-sex classes at § 106.34(b)(3) to evaluate whether a program offered to pregnant students is substantially equal.

Other commenters requested that the Department change proposed § 106.40(b)(1) to apply to parenting students.

*Discussion:* The Department disagrees that the regulations need to be revised to state that a recipient must not force a student who is pregnant or experiencing pregnancy-related conditions to participate in a separate portion of its education program or activity or to further define the terms in the proposed regulations. Under final § 106.40(b)(1) and (3)(iii), a recipient does not engage in prohibited discrimination when it allows a student who is pregnant or experiencing

pregnancy-related conditions to participate voluntarily in a separate portion of the recipient's education program or activity. Indeed, since the Department's Title IX regulations were originally promulgated in 1975, they have required that such admittance be "completely voluntary on the part of the student[.]" 40 FR 24128 (codified at 45 CFR 86.40(b)(3) (1975)); *see also* 34 CFR 106.40(b)(3) (current). The Department clarifies here that the use of the word "voluntarily" means that recipients must not coerce or pressure any student to participate in such separate programs. This is consistent with OCR's public education documents regarding Title IX and pregnant and parenting students, issued first in 1991 and again in 2013, which explained the Department's policy that the regulations prohibited a recipient from requiring or pressuring a student to participate in a separate program for pregnant students. *See* 2013 Pregnancy Pamphlet at 7; U.S. Dep't of Educ., Office for Civil Rights, Teenage Pregnancy and Parenthood Issues Under Title IX of the Education Amendments of 1972, at 6 (1991) (1991 Pregnancy Pamphlet), *https://files.eric.ed.gov/ fulltext/ED345152.pdf*. Because a student's participation in a separate portion of its education program or activity under final § 106.40(b)(1) and (3)(iii) on the basis of pregnancy or related conditions is voluntary, a recipient may neither coerce nor pressure such a student to participate. For these reasons, the alternate definitions or constructions offered by commenters are unnecessary.

Additionally, the Department declines the commenters' suggestion to require any voluntary and separate portion of a recipient's education program or activity to be "substantially equal" instead of "comparable." The requirement that a separate program for pregnant students be "comparable" has been in the regulations as part of current § 106.40(b)(3) since they were originally promulgated in 1975, and OCR has interpreted the term, as it is generally understood, to mean of equivalent quality or similar such that it is capable of comparison. 40 FR 24128 (codified at 45 CFR 86.40(b)(3) (1975)); *see also* 34 CFR 106.40(b)(3) (current). As OCR explained in 1991, the comparability requirement means that voluntary alternative programs must provide "educational quality and academic offerings similar to those in the regular program." 1991 Pregnancy Pamphlet, at 7. And in 2013 the Department further explained that, for example, an alternative program providing only a vocational track with no opportunity for

advanced academic or college-preparatory classes would not meet the comparability standard. *See* 2013 Pregnancy Pamphlet, at 7. The Department clarifies that the term "comparable" refers to all aspects of a student's access to educational opportunity.

There may be legitimate, nondiscriminatory reasons that a temporary program for students who are pregnant or are experiencing related conditions could not be substantially the same as the permanent academic program offered to all students. For example, while an online portion of a recipient's program in some cases may not be considered substantially equal in quality to in-person instruction (because, for example, it lacks certain extracurricular activities or opportunities for social interaction that a traditional program would have), such an option might offer a pregnant student who is confined to bed rest a comparable alternative that would keep them engaged in school for a specific timeframe and be preferable to remaining completely out of school. Likewise, an alternative program geared toward pregnant students may exceed the offerings of a recipient's general curriculum, for example by including parenting classes to support the needs of this specific population. A determination about such programs would depend on the facts and circumstances, but the Department generally considers these types of supplemental courses or services to be allowed under the § 106.40(b)(1) and (3)(iii) "comparable" standard. Shifting to a "substantially equal" standard could suggest that they are impermissible.

The Department declines the commenter's suggestion to incorporate into final § 106.40(b)(1) and (3)(iii) the factors for single-sex classes under current § 106.34(b)(3). Doing so could inaccurately imply that any "separate portion" of a recipient's education program or activity subject to § 106.40(b)(1) and (3)(iii) is always single-sex. However, the Department agrees that the § 106.34(b)(3) factors are nevertheless helpful and relevant to explain how the Department interprets comparability under final § 106.40(b)(1) and (3)(iii). Accordingly, the Department clarifies that in determining whether such "separate portion" of a recipient's education program or activity under final § 106.40(b)(1) and (3)(iii) is "comparable" to that offered to students who are not pregnant and do not have related conditions, the Department considers, as appropriate, factors including the policies and

criteria of admission; the educational benefits provided, including the quality, range, and content of curriculum and other services and the quality and availability of books, instructional materials, and technology; the qualifications of the instructors; and the quality, accessibility, and availability of facilities and resources provided in the class.

For clarity, rather than stating that a recipient may permit a student based on pregnancy or related conditions to participate voluntarily in a separate and comparable portion of its education program or activity as outlined above and set out in proposed § 106.40(b)(1), the Department has revised the second sentence of final § 106.40(b)(1) to state that such a voluntary and comparable placement is not prohibited discrimination. This revision will increase coherence within § 106.40(b)(1) and emphasize that a recipient may allow the type of enrollment described without running afoul of the regulation's general prohibition on discrimination based on pregnancy or related conditions in the same provision.

The Department acknowledges the suggestion that the Department revise § 106.40(b)(1) to apply to parenting students. The Department notes that under the final regulations, treating parenting students differently based on sex is prohibited, *see* § 106.40(a), as is discriminating against parenting students and employees based on sex stereotypes about the proper roles of mothers and fathers, *see* § 106.10. The Department will consider the need for the suggested revision, and the cost and administrative burden it may place on recipients, in future rulemakings.

*Changes:* For stylistic consistency with other references to "voluntary" in the final regulations, the Department has replaced "participate voluntarily" in § 106.40(b)(1) with "voluntarily participate." The Department has further replaced the words "may permit" with the words "does not engage in prohibited discrimination when it allows[.]"

**8. Section 106.40(b)(3)(iv) Pregnancy or Related Conditions—Voluntary Leaves of Absence**

General

*Comments:* The Department notes that proposed § 106.40(b)(3)(ii), (iii), and (4) have been revised and redesignated as § 106.40(b)(3)(ii) and (iv) in the final regulations, and the following comment summaries and discussion refer to these provisions as § 106.40(b)(3)(ii) and (iv).

Some commenters supported proposed § 106.40(b)(3)(iv) because it would ensure a recipient's absence policy does not affect a student's access to its education program or activity due to pregnancy or related conditions. One group of commenters shared personal experiences of being penalized for pregnancy-related absences, including a student who was given a failing grade because she was in the hospital recovering from a miscarriage during final exams and a postsecondary student who was told to return to school to take exams, days after giving birth, against her doctor's recommendation. Other commenters shared experiences of feeling pressured to return to an education program or activity before they were physically capable or against medical advice, such as inducing labor to avoid missing a class or seeking a release from a doctor to return sooner than what is advised for a surgery as complicated as a cesarean section.

Some commenters supported proposed § 106.40(b)(3)(iv) because it would ensure leave is based on medical necessity and require a student to be restored to the same status upon return. One commenter said that this provision is needed based on a survey, which found that pregnant students are typically out of school from four to six weeks after childbirth but receive no academic instruction or connection to teachers or school; that students who return to school often struggle to make up for lost instruction time; and that students are unaware of the supports available to them in school to maintain access to educational opportunities.

Some commenters urged the Department to modify language related to reinstatement after a leave of absence, such as defining "academic status" in § 106.40(b)(3)(iv) and acknowledging that reinstatement in a particular semester may depend on the program in which the student is enrolled.

Another commenter stated that the Department should be as specific as possible regarding student-athletes, to prevent a recipient from penalizing a student-athlete for pregnancy or related conditions during a leave of absence.

Some commenters asked the Department to clarify the timeline for when a student is to be reinstated to the academic status that they held prior to taking leave consistent with § 106.40(b)(3)(iv). Another commenter asked the Department to clarify the term "leave of absence" in § 106.40(b)(3)(iv) as it applied to an elementary school or secondary school, because attendance is compulsory in these grades.

*Discussion:* The Department agrees that § 106.40(b)(3)(iv) will afford equal

opportunity and clarify a recipient's obligation to allow a student to take a voluntary leave of absence related to pregnancy or related conditions for, at a minimum, a period that is deemed medically necessary by their healthcare provider. The Department is persuaded by the perspective offered by several commenters regarding their experiences with recipients' absence policies that effectively punished or caused students who were pregnant or experiencing pregnancy-related conditions to stop participating in an education program or activity. These experiences further demonstrate the importance of § 106.40(b)(3)(iv).

The Department declines to further define "academic status" or "leave of absence" or adopt commenters' other suggested modifications to § 106.40(b)(3)(iv). As explained in greater detail in the July 2022 NPRM, a student's right to take leave for pregnancy or related conditions has been included in the Title IX regulations since 1975, and, like the proposed regulations, the final regulations are consistent with the Department's longstanding interpretation of Title IX regulations. *See* 87 FR 41521; 40 FR 24128 (codified at 45 CFR 86.40(b)(5) (1975)); *see also* 34 CFR 106.40(b)(5) (current); 1991 Pregnancy Pamphlet, at 6; 2013 Pregnancy Pamphlet, at 5. Moreover, the Department's view is that reinstating a student to the academic status that the student held when voluntary leave began, consistent with § 106.40(b)(3)(iv), necessarily will require a recipient to provide a student a meaningful opportunity and reasonable time to make up any coursework or exams missed while on leave. This position accords with the Department's view of the current Title IX regulations as stated in the 2013 Pregnancy Pamphlet, at 10, and these final regulations incorporate that position. Additionally, as discussed in more detail above, a recipient has a distinct and separate obligation under § 106.40(b)(3)(ii) to consult with the student to offer and implement reasonable modifications that meet the student's individualized needs to prevent sex discrimination and ensure equal access. A recipient must meet its obligations under § 106.40(b)(3) in all parts of its education program or activity, including programs that grant professional degrees or certifications or are subject to licensure requirements.

The Department declines to specify how a recipient's obligation to allow a student to take a voluntary leave of absence under § 106.40(b)(3)(iv) interacts with compulsory attendance requirements for students in elementary school or secondary school. This is a fact-specific inquiry that depends on the specifics of a State or local law and whether the application of such law conflicts with a recipient's obligations under Title IX or its regulations, consistent with the preemption provision at § 106.6(b). For a more detailed explanation of preemption in the final regulations, see the discussion of § 106.6(b).

The Department clarifies that, consistent with the existing regulations, a recipient may not preclude a student from participating in any part of an education program or activity due to pregnancy or related conditions under final § 106.40(b)(1). This prohibition extends to athletic and other extracurricular opportunities. Additionally, as noted in the July 2022 NPRM, the Department recognizes that if a student elects to take a voluntary leave of absence under § 106.40(b)(3)(iv), in some instances, an extracurricular activity, event, or program will have ended by the time a student returns from leave or the student may not be able to participate due to timing or other logistical reasons. 87 FR 41521. Therefore, although the final regulations create a presumption that a student returning from leave should be reinstated to the same extracurricular status, there may be some limited instances when exact reinstatement would not be administratively possible or practicable under the circumstances. Beyond these general principles, the Department declines to further specify the application of § 106.40(b)(3)(iv) to student athletes because this is a fact-specific determination best made on a case-by-case basis.

Similarly, the Department declines to further specify timelines for reinstatement after a leave of absence because this is also a fact-intensive inquiry that must be determined on a case-by-case basis. However, the Department has revised the final regulations to further clarify that any leave of absence must be voluntary on the part of the student and that the medically necessary period is only a minimum requirement. In addition, § 106.40(b)(3)(iv) clarifies that to the extent a student qualifies for leave under a recipient's leave policy for students that allows a greater period of time than the medically necessary period, the recipient must permit the student to take leave under that policy instead, if the student chooses. When a student needs additional time beyond that available under § 106.40(b)(3)(iv), the recipient should consider such a request under the reasonable modification standard of § 106.40(b)(3)(ii).

*Changes:* The Department has redesignated proposed § 106.40(b)(3)(iii) as § 106.40(b)(3)(iv) in the final regulations and made revisions to clarify further that "voluntary" refers to a student's decision to take a leave of absence, and that a recipient needs to allow a student to take leave under a leave policy that allows for a greater period of time than what is medically necessary only if the student qualifies for leave under that policy.

Implementation

*Comments:* Some commenters requested clarification of whether an admitted student would be entitled to a pregnancy-related leave of absence before the start of classes. Specifically, commenters asked how the proposed regulations would operate if an admitted student needed to miss the first few weeks of class due to pregnancy or related conditions. Commenters reported that many recipients currently require admitted students who need a leave of absence before the start of classes to withdraw and reapply to the recipient's education program or activity, which could impede their academic progress if a class is only offered once a year.

Some commenters asserted that the Department should further modify or clarify § 106.40(b)(3)(ii) and (iv) considering enrollment practices and leave policies at postsecondary institutions related to financial aid eligibility. Specifically, commenters interpreted financial aid regulations as limiting the amount of leave a student may take to one leave of absence for up to 180 days per academic year, and only after completion of at least one semester. Some commenters also stated that if a student goes over this limit or has not completed one semester, many recipients' leave policies require the student to withdraw from the recipient's education program or activity and reapply for admission—regardless of whether the leave of absence is due to pregnancy or related conditions. One commenter indicated that the proposed leave provision raises questions about who would be responsible for any additional expenses incurred as a result of a student taking medically necessary leave, such as additional student loan and interest expenses when a student postpones reenrollment to accommodate a structured cohort program, particularly in clinical healthcare programs. Other commenters urged the Department to require a recipient to maintain the student's access to benefits while on leave, such as housing,

financial aid, scholarships, and health care, on the grounds that a student can lose access to these benefits if required to withdraw or deregister while on medically necessary leave.

*Discussion:* The Department's definition of "student" in its Title IX regulations, which dates to 1975, is broad and includes anyone admitted to a recipient institution. *See* 40 FR 24128 (codified at 45 CFR 86.2(q) (1975) (defining student to mean "a person who has gained admission")); 34 CFR 106.2(r) (current) (same definition); § 106.2 (same definition). Under final § 106.40(b)(3)(iv), a recipient must allow a student to take a voluntary leave of absence from the recipient's education program or activity to cover, at minimum, the period of time deemed medically necessary by the student's healthcare provider. Therefore, any admitted or enrolled student would qualify for a voluntary leave of absence for pregnancy or related conditions. A recipient may not require a student who needs a leave of absence due to pregnancy or related conditions prior to the school year starting or in the first few weeks of classes to withdraw and reapply to the education program or activity because doing so would be inconsistent with § 106.40(b)(3)(iv). To the extent that a recipient maintains a general policy requiring that all students who need a leave of absence prior to the school year starting or in the first few weeks of classes must withdraw and reapply, a student who requires such a leave due to pregnancy or related conditions must be exempted from such a general policy in order for the recipient to comply with § 106.40(b)(3)(iv). To the extent a student needs leave that exceeds the period of time deemed medically necessary by the student's healthcare provider, a recipient must determine whether there is a reasonable modification under § 106.40(b)(3)(ii). With respect to general information about a recipient's obligations under § 106.40(b)(3)(iv) and requirements of the Federal Student Aid program as it may relate to a recipient's leave policy, as discussed more fully above, § 106.40(b)(3)(iv) requires a recipient to excuse a student's absences due to pregnancy or related conditions for as long as the student's healthcare provider deems the absences to be medically necessary. The recipient must allow the student to return to the same academic status held as before medical leave began, which must include giving the opportunity to make up any missed work. A recipient may also offer the student alternatives to making up

missed work, especially after longer periods of leave. Consistent with § 106.40(b)(4), a recipient is not permitted to adopt or apply a medical leave policy that treats a student who withdraws from school due to pregnancy or related conditions worse than a student who withdraws from school due to any other temporary medical condition.

The Federal student financial programs authorized by Title IV of the Higher Education Act of 1965, as amended (Title IV), are administered by the Department's Federal Student Aid office. 20 U.S.C. 1070a. Under the Department's regulations related to Title IV at 34 CFR 668.22(a)(1), if a student who has received Title IV grant or loan funds withdraws from an education program or activity after beginning attendance, the amount of Title IV grant or loan assistance earned by the student must be determined. If the amount the recipient receives on behalf of the student is greater than the amount earned, the unearned funds must be returned to the Department. *See generally* 34 CFR 668.22. This is often referred to as the "return to Title IV" funds calculation. However, a recipient's Title IX obligation to provide a voluntary leave of absence for pregnancy or related conditions does not necessarily require a recipient to meet its obligations under Title IV in a manner that disadvantages a student who requests such leave. For example, the Title IV regulations at 34 CFR 668.22(d)(1) explain that a recipient does not have to treat a leave of absence as a withdrawal for Title IV purposes, if it is an approved leave of absence and meets the requirements in 34 CFR 668.22(d)(1)(i)–(viii). If a leave of absence meets these requirements, it is considered a temporary interruption and is not counted as a withdrawal for Title IV purposes, so the recipient is not required to perform the "return to Title IV" calculation and return unearned funds to the Department, and there cannot be unearned Title IV aid due from the student.

If a pregnant student's healthcare provider deems a leave of absence medically necessary, the recipient would be required by Title IX to grant the academic leave of absence for as long as the student's healthcare provider deems it medically necessary. *See* 34 CFR 106.40(b)(3)(iv). The Title IV regulations governing approved leave of absences are only applicable with regard to the process the recipient must have in place to determine whether or not the student's leave of absence is considered a withdrawal for Title IV purposes. Depending on the facts of the case and,

in particular, the length of the pregnant student's academic leave of absence, such a leave of absence under § 106.40(b)(3)(iv) may also qualify as an approved leave of absence for Title IV purposes. Determination of whether it qualifies depends on the application of the factors specified in 34 CFR 668.22(d)(1)(i)–(vii). In addition, the Title IV regulations governing the return of funds do not prohibit a school from developing its own refund policy, consistent with the Title IX requirements described above. If the length of the leave of absence for pregnancy or related conditions in combination with any other approved leaves of absence will exceed 180 days in a 12-month period, *see id.* § 668.22(d)(1)(vi), the recipient would be required to calculate the earned and unearned portions of Title IV assistance and follow the other requirements in 34 CFR 668.22.

*Changes:* None.

Relation to Reasonable Modifications

*Comments:* One commenter asked the Department to clarify what discretion a recipient has in implementing voluntary leaves of absence under proposed § 106.40(b)(3)(iv) if leave would fundamentally alter the recipient's education program or activity, such as when a sequenced curriculum would require a student to take leave for a period that is longer than medically necessary or more than the amount of leave desired by the student.

*Discussion:* The Department clarifies that the inquiry related to fundamental alteration relates to reasonable modifications under § 106.40(b)(3)(ii). As such, it has no bearing on a recipient's obligation to allow a voluntary leave of absence for pregnancy or related conditions under § 106.40(b)(3)(iv). Since 1975, a recipient has had an obligation to allow a student to take a voluntary leave of absence for as long as deemed medically necessary for pregnancy or related conditions and to reinstate the student to the same status held before leave was taken. 40 FR 24128 (codified at 45 CFR 86.40(b)(5) (1975)); *see also* 34 CFR 106.40(b)(5) (current). Consistent with longstanding regulations and the need to ensure access to education for students who are pregnant or experiencing pregnancy-related conditions, § 106.40(b)(3)(iv) requires a recipient to, at a minimum, offer and provide such leave and reinstatement, regardless of whether the recipient believes that such leave and reinstatement would fundamentally alter the nature of the recipient's education program or activity. A

recipient otherwise has discretion in how it administers voluntary leaves of absence, as long as implementation is consistent with § 106.40(b)(3)(iv), Title IX, and this part, including the requirement to treat pregnancy or related conditions in the same manner and under the same medical leave policies as any other temporary medical condition under § 106.40(b)(4) and the general prohibition on discrimination based on pregnancy or related conditions under § 106.40(b)(1).

The Department preserved the requirement to offer voluntary leaves of absence for pregnancy or related conditions in the final regulations because it is widely known that most persons experiencing pregnancy or related conditions will need to take some medically necessary leave—most commonly after childbirth or termination of pregnancy, although some common pregnancy-related conditions may require a person to take a leave of absence during a pregnancy, such as preeclampsia or placenta previa. As a result, the ability to take voluntary leaves of absence is critical to ensuring pregnancy or related conditions do not deprive students of equal educational opportunities. Allowing a student to take leave and preserve their status in an education program advances Title IX's nondiscrimination objectives much more effectively than, for example, requiring a student to withdraw from a program and then go through the administratively burdensome and costly process of reenrolling in the future. Further, pregnancy is inherently time-limited and affects a segment of the general population based on sex. As such, § 106.40(b)(3)(iv) sets forth a simple and straightforward process that recipients can apply consistently with minimal administrative burdens to fulfill Title IX's mandate to prevent sex discrimination and ensure equal access to students who are pregnant or experiencing pregnancy-related conditions.

*Changes:* None.

Determination of Leave Period

*Comments:* The Department notes that proposed § 106.40(b)(3)(iii) has been revised and redesignated as § 106.40(b)(3)(iv) in the final regulations, and the following comment summaries and discussion refer to this provision as § 106.40(b)(3)(iv).

Several commenters supported language in § 106.40(b)(3)(iv) that would allow any licensed healthcare provider to verify medically necessary leave. Some commenters stated that this change would recognize that a student may be under the care of a provider who

is not a physician, such as a nurse practitioner, midwife, doula, registered nurse, or lactation consultant. Some commenters stated this language would recognize that contemporary medical standards commonly allow advanced practice clinicians to provide care and that not every student has easy access to a physician, particularly students from economically disadvantaged backgrounds.

One commenter highlighted the credentials and prevalence of nurse practitioners in health care. The commenter also stated that proposed § 106.40(b)(3)(iv) would be consistent with recommendations from the National Academies of Science, Engineering, and Medicine, World Health Organization, U.S. Department of Health and Human Services, Federal Trade Commission, and several nonprofit policy organizations.

*Discussion:* The Department agrees with the perspective provided by commenters who stated the language in § 106.40(b)(3)(iv) would reflect contemporary medical standards, which recognize that a student may be under the care of a licensed healthcare provider who is not a physician. The Department also agrees with comments noting that students may not have ready and affordable access to physician care due to economic, geographic, or many other reasons. Finally, the Department acknowledges, and its conclusions are reinforced by, the supportive information regarding the qualifications of nurse practitioners to provide high-quality, cost-effective care, particularly in rural or economically disadvantaged areas.

Given commenters' interests in including a wide array of healthcare providers under the provision and not overburdening recipients or students with technical requirements regarding licensure, the Department clarifies that the term "licensed" in final § 106.40(b)(3)(iv) broadly encompasses any healthcare professional who is qualified to practice in their State. Recognizing that some students may travel for needed healthcare (because, for instance, the care they need is not available locally or they receive care in their home State during a break), final § 106.40(b)(3)(iv) does not require recipients to verify licensure or otherwise understand varying licensure requirements for different healthcare professions within and between the States, which could be onerous, inefficient, and confusing.

*Changes:* The Department has redesignated proposed § 106.40(b)(3)(iii) as § 106.40(b)(3)(iv) in the final regulations and revised the provision to

clarify that the licensed healthcare provider who determines a medically necessary absence need not be a physician.

9. Section 106.40(b)(3)(v) Pregnancy or Related Conditions—Lactation Space

*Comments:* The Department notes that proposed § 106.40(b)(3)(iv) has been revised and redesignated as § 106.40(b)(3)(v) in the final regulations, and the following comment summaries and discussion refer to this provision as § 106.40(b)(3)(v).

Commenters generally supported the requirement that a recipient provide a private space and breaks for a student who is lactating and appreciated that § 106.40(b)(3)(v) would require a lactation space be clean and usable for both breastfeeding and pumping. Commenters asserted that the lack of a lactation space in a recipient's education program or activity is an issue that affects many students, impairs the health of students who are lactating and their children, interrupts learning and other educational opportunities, and increases absences due to illness.

A group of commenters noted that requiring a recipient to provide a lactation space helps support students' choices related to the health and nutrition of their child. The group of commenters provided examples of recipient practices that they reported were inconsistent and insufficient for students who are lactating, including a mother who was so discouraged by her school's failure to provide a lactation space that she almost disenrolled; a student who delayed obtaining her degree because her postsecondary institution did not provide a lactation space; and another student who stated that her school did not allow her to pump, which caused her to stop producing milk. The commenters noted that because each pumping session can take between fifteen to forty minutes, a lactation space is important to maintain access to a recipient's education program or activity. Many commenters noted that without a designated, private lactation space, a student who is pregnant or experiencing pregnancy-related conditions may resort to pumping in places such as a car, janitor's closet, or bathroom stall. Commenters added that a lack of privacy for students may lead to sexual harassment, bullying, stress-induced interruptions that could affect the student's ability to produce milk, inconvenience, and feelings of isolation. Commenters also asserted that requiring a recipient to provide a lactation space that is not a bathroom will make the

process of breastfeeding, pumping, and filling bottles more hygienic.

Further, several commenters stated that § 106.40(b)(3)(v) would significantly improve public health and be consistent with recommendations from the World Health Organization related to breastfeeding. Other commenters stated that § 106.40(b)(3)(v) would improve the health of students by minimizing obstacles to expressing breast milk and allowing students to reap the health benefits of breastfeeding, including a reduced long-term risk of diabetes, cardiovascular disease, and breast or ovarian cancer. Commenters also noted that an inability to express milk as frequently as every few hours often leads to pain, illness, infection, and reduced milk supply, and can result in an eventual inability to continue nursing. Commenters stated that a student's ability to breastfeed or express breast milk became even more important due to nationwide shortages in baby formula in 2022 and 2023.

Many commenters stated that providing a lactation space is a widely recognized accommodation that has been acknowledged by administrative agencies, Federal courts, and legal scholars to be consistent with other laws, such as the ACA, the FLSA, and State laws. Commenters asserted that because a recipient must follow these laws, compliance with § 106.40(b)(3)(v) would not be burdensome.

In contrast, one commenter asserted that § 106.40(b)(3)(v) would exceed the scope of Title IX, while another commenter asserted that the proposed regulation's cost-benefit analysis was insufficient. One commenter expressed concern that § 106.40(b)(3)(v) may be unworkable for a small elementary school or secondary school where space is limited and urged the Department to allow a recipient flexibility in complying with this requirement in final regulations.

Other commenters urged the Department to modify § 106.40(b)(3)(v) to require a recipient to equip a lactation space with a chair, flat surface, electrical outlet, running water, and a refrigerator or cooler to store expressed milk. These commenters also stated that a lactation space should be in reasonable proximity to a student's specific place of study.

Some commenters asked the Department to clarify where lactation spaces must be located, the required number of lactation spaces based on certain factors, and whether a recipient is required to make lactation spaces accessible during evenings and weekends. One commenter asked whether a recipient is required to construct new lactation spaces or features to comply with § 106.40(b)(3)(v). Some commenters expressed concern about how the administration of a lactation space would be handled if multiple students needed to access the space simultaneously.

Some commenters recommended that the Department change § 106.40(b)(3)(v) to state that a student has a right to express milk or breastfeed in a place other than a designated lactation space, such as in an office, at a childcare facility, or in a public space to be consistent with State or local laws that allow a person to breastfeed in any place they are otherwise allowed to be.

In contrast, other commenters asked the Department to clarify the circumstances in which a student in an elementary school or secondary school would be allowed to breastfeed a child in a lactation space and how the student's ability to breastfeed would change depending on whether the school had onsite childcare. One commenter suggested that the Department remove the words "or breastfeeding" from § 106.40(b)(3)(v) because the term implied an obligation to accommodate the presence of an infant in a recipient's education program or activity, which the commenter stated may not be safe or practicable in all circumstances.

Some commenters urged the Department to clarify that the requirement to provide lactation space is an obligation of the recipient, rather than a personal obligation of the Title IX Coordinator. Other commenters suggested that the Department revise the language to use terms such as "express milk" and "nursing" to be more inclusive of all students.

Some commenters urged the Department to require a recipient to treat breaks to use a lactation space, including those during class and exams, as well as travel time to reach the lactation space, as medically necessary absences for which medical documentation specifying when or how long someone must express milk is not required. Commenters stated that many students have difficulty accessing healthcare and that it would be overly burdensome to require lactating students to document lactation needs, which are common with pregnancy or related conditions and easily anticipated.

*Discussion:* The Department agrees that § 106.40(b)(3)(v) will help students who are lactating maintain access to an education program or activity by improving those students' ability to pursue their education while lactating.

Having reviewed and considered all comments received, the Department concludes that without § 106.40(b)(3)(v), a student who is lactating would likely face significant barriers to participating in and benefiting from a recipient's education program or activity. These barriers can easily lead to adverse educational consequences as well, causing a student to miss or drop out of school and lose access to a recipient's education program or activity due to their lactation needs.

Further, the Department disagrees that § 106.40(b)(3)(v) exceeds the Department's authority. Congress has authorized the Department to issue regulations to effectuate Title IX's prohibition on sex discrimination in education programs or activities that receive Federal financial assistance consistent with achievement of the objectives of the statute. *See* 20 U.S.C. 1682; *Gebser*, 524 U.S. at 292. Additionally, Title IX regulations have long included provisions that require a recipient to take proactive steps to ensure equal treatment and access for students who are pregnant or experiencing pregnancy-related conditions. *See* 34 CFR 106.40(b)(5) (current). As discussed above and in the July 2022 NPRM, these requirements are part and parcel of ensuring that Title IX's nondiscrimination requirements are met, as the failure to take these steps often reflects sex-based stereotypes about the roles of men and women, sex-based indifference to the needs of this population, animus, or a failure to accommodate conditions associated with women as effectively as those associated with men. *See* 87 FR 41513. The assurance of access to clean, private, and secure lactation spaces in § 106.40(b)(3)(v) represents an appropriate application of existing Title IX principles to better effectuate the statute considering the complaints received by OCR in recent years, and the well-demonstrated, practical needs of lactating students.

Moreover, the Department carefully considered not only benefits but also costs and the abilities of recipients to provide lactation space. As explained in the July 2022 NPRM, the Department anticipates that a recipient would be able to comply with § 106.40(b)(3)(v) using existing space at minimal cost, partly because there is no requirement that a lactation space be a particular size or shape or include particular structural features. *See* 87 FR 41560. Accordingly, recipients are not required to construct new lactation spaces if an existing space otherwise meets the requirements of § 106.40(b)(3)(v). And while § 106.40(b)(3)(v) may result in increased

demand for lactation space or break time, such demand likely will vary over time, based on the composition of the student population at any time, which further reduces the potential impact to a recipient. Further, these costs are justified by the benefits of requiring a recipient to provide an appropriate space for a student who is lactating, including allowing student-parents to remain in school during the early months or years of a child's life, which helps eliminate a sex-based barrier to education. Although there are limited data quantifying the economic impacts of sex discrimination, the Department's review of public comments shows that such barriers can prevent students from obtaining a high school diploma, pursuing higher education, or obtaining a postsecondary degree, which limits their economic opportunities and may have long-term or generational impacts. A more detailed discussion and analysis of the costs and benefits of these final regulations is included in the *Regulatory Impact Analysis.*

Similarly, the assertion that a small elementary school, secondary school, or other recipient would be unable to comply with § 106.40(b)(3)(v) is speculative. At the time of the July 2022 NPRM, nearly all recipients were already required to provide a similar lactation space for non-exempt employees under a provision of the FLSA, 29 U.S.C. 207(r)(1). This provision has since been replaced by the PUMP Act, 29 U.S.C. 218d, which expanded the requirement to provide lactation space to most exempt employees as well. In addition, many recipients are required to provide the same for employees generally under many State laws. *See* 87 FR 41559 (collecting State laws). Nothing in the final regulations prohibits a recipient from complying with § 106.40(b)(3)(v) by ensuring a student who is lactating can access an existing employee lactation space or other space that otherwise meets the requirements of § 106.40(b)(3)(v).

The Department acknowledges concerns voiced by commenters that certain factors, including the location and other restrictions on the use of lactation spaces, could effectively make them inaccessible to a student who is lactating. Accordingly, the Department has revised § 106.40(b)(3)(v) to clarify that a recipient must ensure that a student can access a lactation space, rather than merely ensuring the availability of one.

Section 106.40(b)(3)(v) requires that a recipient ensure a student's access to a lactation space that "may be used" for pumping or breastfeeding as needed.

The Department emphasizes that, as with all the requirements under final § 106.40(b)(3), the recipient's provision of lactation space must be prompt and effective to prevent sex discrimination and ensure equal access to the recipient's education program or activity. Whether the lactation space a recipient provides meets these standards is best determined on a case-by-case basis, but generally means that the space is functional, appropriate, and safe for the student's use. The Department however declines to adopt additional specific requirements about the size and setup of lactation spaces for students at this time to preserve recipient flexibility and to be able to review the degree of and obstacles to compliance with other Federal lactation laws. Section 106.40(b)(3)(v) sets minimum standards for a recipient's lactation space and nothing in the final regulations prohibits a recipient from offering additional features in its lactation space to increase functionality and comfort, either as reasonable modifications under § 106.40(b)(3)(ii) or otherwise. Likewise, the final regulations do not preempt State or local laws that require lactation spaces to have certain features, such as a chair, a flat surface, an electrical outlet, running water, or a refrigerated place to store expressed milk. The Department will take commenters' suggestions under consideration for possible technical assistance.

The Department also declines to remove references to breastfeeding from § 106.40(b)(3)(v). This provision is focused solely on what may take place in the lactation space that a recipient must make accessible to its students. To further clarify, if a student is already permitted to bring their child into the recipient's education program or activity (*e.g.,* through onsite childcare, a recipient's visitor policy, or a State or local law), they may use lactation spaces for breastfeeding instead of pumping. Moreover, nothing in the final regulations precludes a lactating student or employee from expressing breast milk or breastfeeding outside of the recipient's designated lactation spaces if a State or local law allows it.

Additionally, to ensure clarity in the implementation of the final regulations, the Department declines commenters' suggestion to revise the terminology used in § 106.40(b)(3)(v) but emphasizes that a recipient must ensure that any student who is lactating can voluntarily access a lactation space that complies with § 106.40(b)(3)(v) regardless of a student's gender identity or gender expression. Moreover, nothing in the final regulations prohibits a recipient

from using any of the terminology suggested by commenters in its communications with students.

The Department clarifies that whether a recipient must make a lactation space accessible to a student in the evenings or on weekends depends on a variety of factors, including whether an inability to access a lactation space would frustrate a lactating student's ability to participate in the recipient's education program or activity, which may include extracurricular activities or attendance at school-related events in the evenings or on weekends. As long as the lactation space complies with the requirements of § 106.40(b)(3)(v), a recipient has discretion in where a lactation space is located; the number of lactation spaces; and how it handles the administration of a lactation space, including managing access to lactation spaces for multiple students, which may include suggestions proposed by commenters such as signage, a scheduling system, or a multi-person space separated by partitions that are shielded from view and free from intrusion from others.

The Department agrees with commenters that the recipient, not the Title IX Coordinator, is ultimately responsible for ensuring that a student can access a lactation space. Accordingly, the Department has revised § 106.40(b)(3) to clarify that it is the recipient's responsibility to take, and the Title IX Coordinator's responsibility to coordinate, specific actions under § 106.40(b)(3), including a student's access to a lactation space. For further explanation of the role of the Title IX Coordinator in connection with student pregnancy or related conditions, see the discussion of § 106.40(b)(3).

The Department agrees that as a general matter, medical documentation is unnecessary for a recipient to provide access to a lactation space and unduly burdensome to the student, particularly given the fact that many students lack access to or do not obtain maternity care.[84] As such, it would be difficult for

---

[84] *See* Christina Brigance et al., March of Dimes, *Nowhere to Go: Maternity Care Deserts Across the U.S,* at 4–5 (2022), *https://www.marchofdimes.org/ sites/default/files/2022-10/2022_Maternity_Care_ Report.pdf* (reporting that approximately 12 percent of births in the United States occur in counties with limited or no access to maternity care and 4.7 million women live in counties with limited maternity care access); Presidential Task Force of Redefining the Postpartum Visit, Committee on Obstetric Practice, American College of Obstetricians and Gynecologists Committee Opinion No. 736: Optimizing Postpartum Care (May 2018), *https://www.acog.org/clinical/clinical-guidance/committee-opinion/articles/2018/05/ optimizing-postpartum-care* (finding that as many as 40% of women do not attend a postpartum visit and that attendance rates are lower among populations with limited resources, which contributes to health disparities).

many lactating students to obtain medical documentation—especially on an ongoing basis—as a condition of accessing a lactation space. Accordingly, the Department has added § 106.40(b)(3)(vi) to the final regulations to clarify that a recipient must not require a student to provide supporting documentation to confirm lactation needs in connection with, for example, reasonable modifications or to gain access to a lactation space. For further explanation of the limitation on recipient requests for supporting documentation, see the discussion of § 106.40(b)(3)(vi).

*Changes:* The Department has redesignated proposed § 106.40(b)(3)(iv) as § 106.40(b)(3)(v) in the final regulations. Final § 106.40(b)(3) now states that the Title IX Coordinator must coordinate actions under paragraphs (b)(3)(i) through (vi), and § 106.40(b)(3)(v) now states that a recipient must ensure that the student can access a lactation space.

10. Section 106.40(b)(3)(vi) Pregnancy or Related Conditions—Limitation on Supporting Documentation

*Comments:* The Department notes that proposed § 106.40(b)(3)(ii) and (4) have been redesignated as § 106.40(b)(3)(ii) in the final regulations, and the following comment summaries and discussion refer to these provisions as § 106.40(b)(3)(ii).

Several commenters urged the Department to state in the final regulations that medical documentation is frequently or typically unnecessary for a recipient to provide a requested modification, while other commenters expressed concern that the proposed regulations would be silent as to whether a recipient can require such supporting documentation. The commenters stated that requiring documentation for modifications such as increased bathroom breaks, a larger desk, or lactation accommodations would be unnecessarily burdensome for a student and could be used to harass or retaliate against a student who is pregnant or experiencing pregnancy-related conditions. One commenter, a legal service provider, shared that they regularly receive calls about recipients requiring students to obtain medical documentation on short notice and at significant expense, which often delays or prevents a student from receiving these modifications, even when the need is obvious.

*Discussion:* The Department agrees that as a general matter medical documentation is unnecessary for a recipient to determine the reasonable modifications it will offer for pregnancy

or related conditions, or to take the specific actions identified under § 106.40(b)(3)(ii) through (v), including providing access to a lactation space. Accordingly, the Department has added § 106.40(b)(3)(vi) to the final regulations to clarify that a recipient must not require supporting documentation under § 106.40(b)(3)(ii) through (v) unless the documentation is necessary and reasonable under the circumstances for the recipient to determine the reasonable modifications to offer or other specific actions to take. As discussed below, the Department has also included in final § 106.40(b)(3)(vi) a non-exhaustive list of situations in which it would not be necessary and reasonable for a recipient to require a student to provide supporting documentation and in which a recipient is therefore prohibited from requiring documentation.

For several important reasons, the Department emphasizes that the final regulations do not require a recipient to seek supporting documentation from a student who seeks specific action under § 106.40(b)(3)(ii) through (v) in any circumstances. First, the Department notes that students who are pregnant or experiencing pregnancy-related conditions may need modifications before they have had any medical appointments. For example, some students may experience morning sickness and nausea early in their pregnancies and need modifications such as late arrival, breaks during class, or access to online instruction. Second, as discussed above, the Department further recognizes that it may be difficult for a student who is pregnant or experiencing pregnancy-related conditions to obtain an immediate appointment with a healthcare provider early in a pregnancy due to lack of access.[85] For example, according to one study, almost a quarter of women who gave birth did not receive prenatal care during their first trimester.[86] Finally,

even for students who have access to medical care, needs may develop between scheduled medical appointments, such that requiring documentation in those situations would increase the cost to the student and could require them to take additional leave in order to obtain the documentation. For example, early in a pregnancy when medical appointments tend to be less frequent, a student could develop increasingly severe morning sickness in between medical appointments that warrants reasonable modifications that cannot wait until the next medical appointment, by which time the severeness of the morning sickness may or may not have abated.

Accordingly, consistent with § 106.40(b)(3)(ii)'s emphasis on the importance of ensuring consultation with a student to meet their individualized needs in a prompt and effective manner, a recipient may simply discuss with the student the nature of the pregnancy-related need and the desired modification or action without requesting supporting documentation. In virtually all situations, proceeding without documentation, or based on a student's self-attestation of their needs, will be the least burdensome for the student and enable the recipient to meet the student's needs fastest.

When a recipient chooses to require supporting documentation, however, clearly defined limits on such requests are critical to ensure that recipients do not overburden students or frustrate Title IX's purpose. Thus, final § 106.40(b)(3)(vi) makes clear that a recipient's ability to require supporting documentation is restricted under final § 106.40(b)(3)(vi), which provides that the documentation must be only that which is necessary and reasonable under the circumstances for the recipient to determine the reasonable modifications to make or whether to take additional specific actions under § 106.40(b)(3)(ii) through (v). Necessary and reasonable documentation generally includes no more than is sufficient to confirm—in a manner that is fair to the student under the circumstances—that a student has a need related to pregnancy or related conditions that requires a reasonable modification or other specific action under § 106.40(b)(3)(ii) through (v).

For example, if a student requests a reasonable modification in the form of access to online or homebound

---

[85] *See* Christina Brigance et al., March of Dimes, *Nowhere to Go: Maternity Care Deserts Across the U.S,* at 4–5 (2022), *https://www.marchofdimes.org/sites/default/files/2022-10/2022_Maternity_Care_Report.pdf*. Even where such care exists, it is not typically offered or accessed in the earliest weeks of pregnancy. *See* Am. Pregnancy Ass'n, Your First Prenatal Visit, *https://americanpregnancy.org/healthy-pregnancy/planning/first-prenatal-visit/* (last visited Mar. 12, 2024) (stating that the first prenatal visit for individuals who did not meet with their health care provider pre-pregnancy is generally around 8 weeks after their last menstrual period); Boston Med. Ctr., Newly Pregnant?, *https://www.bmc.org/newly-pregnant* (last visited Mar. 12, 2024) (stating that the first prenatal appointment will be scheduled between the 8th and 12th weeks of pregnancy).

[86] Joyce A. Martin et al., Ctrs. for Disease Control & Prevention, *Births in the United States, 2019,* 2

---

(Oct. 2020), *https://www.cdc.gov/nchs/data/databriefs/db387-H.pdf* (indicating that, in 2019, almost 23 percent of women who gave birth did not receive prenatal care during their first trimester).

education to follow their healthcare provider's recommendation of bed rest during the student's pregnancy, it may be necessary and reasonable under the circumstances for a recipient to require documentation from the student's healthcare provider to support a student's reasonable modification request (*i.e.,* that the student is or will be on medically ordered bed rest during their pregnancy). However, in this case, it would not be necessary and reasonable for a recipient to require additional supporting documentation to verify the pregnancy itself or other unrelated medical details regarding the pregnancy (such as the date of the student's last menstrual cycle, or whether fetal development is appropriate)—particularly if the student has already provided self-confirmation of the pregnancy.

A recipient may not justify the denial of a reasonable modification or other specific action under § 106.40(b)(3)(ii) through (v) based on the lack of documentation if its request for documentation does not comport with § 106.40(b)(3)(vi).

To provide further clarity, § 106.40(b)(3)(vi) includes a non-exhaustive list of situations in which it would not be necessary and reasonable for a recipient to require a student to provide supporting documentation and in which a recipient therefore may not require documentation. These situations are not all mutually exclusive; several may apply at the same time to bar a recipient from requesting documentation depending on the circumstances.

First, it is not necessary and reasonable for the recipient to require supporting documentation when the student's need for a specific action under paragraphs (b)(3)(ii) through (v) is obvious. Depending on the nature of the need, a need may be obvious based on the student's self-confirmation of pregnancy or related conditions, or a pregnancy or related condition that is itself physically obvious. For example, when a student states or confirms they are pregnant and asks for a different size uniform, the need for the uniform modification to accommodate the pregnancy is obvious (regardless of whether the recipient agrees that the student's pregnancy is easily noticeable), and the recipient may not require supporting documentation. However, if a student states or confirms that they are pregnant or experiencing pregnancy-related conditions (or the fact of pregnancy is apparent in some other way), but the need related to the pregnancy or related conditions or parameters of a potential reasonable

modification is not obvious, the recipient may only request documentation relevant to the reasonable modification. For example, if a student states or confirms that they are pregnant and asks to avoid lifting heavy objects during their clinical placement, it may be necessary and reasonable for the recipient to request documentation about the need such as the extent of the lifting restriction and its expected duration. However, if a student provides such documentation but it omits confirmation of the pregnancy itself, it would not be necessary and reasonable for the recipient to request further documentation because the student's self-confirmation is enough to establish pregnancy under § 106.40(b)(3).

Second, it is not necessary and reasonable for the recipient to require documentation when the student has previously provided the recipient with sufficient supporting documentation— in other words, when the student has already provided the recipient with sufficient information to substantiate that the student has a need related to pregnancy or related conditions and needs a modification of the recipient's policy, practice, or procedure. For example, if a student already provided documentation that they need to be periodically late to class for the next two months because of morning sickness, it would not be necessary and reasonable for the recipient to require the student to provide a new note when the student requests a reasonable modification to leave class early for a prenatal appointment. Such a requirement would be onerous for the student, could deter them from requesting reasonable modifications or other specific actions to ensure equal access and prevent sex discrimination under § 106.40(b)(3)(ii) through (v), and could potentially infringe on a student's privacy related to treatment of their pregnancy or related conditions. As another example, if a pregnant student provided documentation of gestational diabetes to support modifications of eating in class and needing leave for frequent medical appointments, the recipient must not require the student to re-submit documentation of gestational diabetes if the condition progresses and the student later needs a new modification, such as breaks to administer insulin. In such a case, it may be necessary and reasonable for the recipient to request documentation to confirm information not already covered by the prior documentation, such as the need to take breaks during class, as opposed to re-confirming the underlying condition itself. However, the

Department reiterates that nothing in these final regulations require a recipient to seek any documentation to determine what reasonable modifications to offer, and that offering and making reasonable modifications absent such documentation will be the least burdensome for the student and enable the recipient to meet the student's needs fastest.

Third, it is not necessary and reasonable for a recipient to require documentation when a student states or confirms that they are pregnant or are experiencing pregnancy-related conditions and asks for the following reasonable modifications: (1) carrying or keeping water nearby and drinking; (2) using a bigger desk; (3) sitting or standing; or (4) taking breaks to eat, drink, or use the restroom. It is not necessary and reasonable to require documentation, beyond self-attestation, when a student is pregnant or experiencing pregnancy-related conditions and seeks one of the four listed modifications because these are a small set of commonly sought modifications that are widely known to be needed during a pregnancy and for which documentation would not be easily obtainable or necessary. As noted above, particularly early in pregnancy, students are less likely to have sought or been able to obtain an appointment with a healthcare provider for their pregnancy. Further, they may not be able to obtain an appointment with a healthcare provider repeatedly on short notice for every need, as each becomes apparent. This position is consistent with the overarching goal of Title IX to ensure equal access and that a student is not deprived of educational opportunities due to pregnancy or related conditions.

A fourth example in § 106.40(b)(3)(vi)'s non-exhaustive list of when it is not necessary and reasonable to require documentation involves a student's lactation needs. Usually, beginning around or shortly after birth, lactation occurs. As it is uncommon to obtain medical documentation regarding the initiation of lactation (absent a related medical condition, like mastitis), the Department has determined that it is not necessary and reasonable for a recipient to require documentation regarding lactation or pumping. And as a practical matter, the Department notes that healthcare providers may not be able to provide documentation regarding whether a student is pumping, nor the types of modifications needed to pump breast milk. The Department notes that not all students can or choose to breastfeed after childbirth, and that those who do

elect to breastfeed do so for widely varying lengths of time. Although the final regulations state that it is not necessary and reasonable for a recipient to require supporting documentation for lactation or pumping, a recipient will not violate the final regulations simply by asking the student whether they require a lactation space while in the recipient's education program or activity, which a recipient is required to allow a student to access under § 106.40(b)(3)(v). Student confirmation—or a simple request to access a recipient's lactation space—is sufficient confirmation.

A fifth example in § 106.40(b)(3)(vi)'s non-exhaustive list of when it is not necessary and reasonable to require documentation is when the specific action under paragraphs (b)(3)(ii) through (v) is available to students for reasons other than pregnancy or related conditions without submitting supporting documentation. For example, if a recipient has a policy or practice of only requiring a student to submit supporting documentation if they miss three or more class periods, it would not be necessary and reasonable for the recipient to require supporting documentation from a student who requests to miss less than three class periods for postpartum medical appointments. Conversely, if a recipient has a policy or practice of requiring documentation that is not consistent with § 106.40(b)(3)(vi), and a student requests specific action under paragraphs (b)(3)(ii) through (v) that implicates such a policy or practice, the limitation on supporting documentation in these final regulations would apply.

*Changes:* The Department has added § 106.40(b)(3)(vi) to state that a recipient must not require supporting documentation under § 106.40(b)(3)(ii) through (v) unless the documentation is necessary and reasonable for the recipient to determine the reasonable modifications to make or whether to take additional specific actions under paragraphs (b)(3)(ii) through (v). The Department has also included a non-exhaustive list of situations when requiring supporting documentation is not necessary and reasonable, including when the student's need for a specific action under paragraphs (b)(3)(ii) through (v) is obvious, such as when a student who is pregnant needs a uniform; when the student has previously provided the recipient with sufficient supporting documentation; when the reasonable modification because of pregnancy or related conditions at issue is allowing a student to carry or keep water near and drink, use a bigger desk, sit or stand, or take

breaks to eat, drink, or use the restroom; when the student has lactation needs; and when the specific action under paragraphs (b)(3)(ii) through (v) is available to students for reasons other than pregnancy or related conditions without submitting supporting documentation.

### 11. Section 106.40(b)(4) Pregnancy or Related Conditions—Comparable Treatment to Other Temporary Medical Conditions

### Comparable Treatment to Other Temporary Medical Conditions

*Comments:* The Department notes that proposed § 106.40(b)(5) has been redesignated as § 106.40(b)(4) in the final regulations, and the following comment summaries and discussion refer to the provision as § 106.40(b)(4).

One commenter supported proposed § 106.40(b)(4), but recommended revisions to avoid the inference that a recipient should treat pregnancy as a temporary disability, which the commenter asserted conflicts with disability law. The commenter suggested that the Department amend the provision to clarify that a recipient should treat a condition or complication related to pregnancy, but not the pregnancy itself, as a temporary disability. Another commenter supported adding the phrase "or physical condition" to the provision, stating that recipients should be required to treat pregnant students or those with related conditions comparably to how they treat students with another temporary physical condition, whether or not it rises to the level of a disability.

*Discussion:* The Department acknowledges commenters' support and notes that the final regulations at § 106.40(b)(4) will require a recipient to treat pregnancy or related conditions comparably to how it treats other temporary medical conditions when also consistent with a student's rights under § 106.40(b)(3).

The Department acknowledges the commenter's concern that the text of § 106.40(b)(4), as proposed, suggested that pregnancy standing alone was a disability. The Department emphasizes, as explicitly stated in the July 2022 NPRM, that while some conditions or complications related to pregnancy might qualify as a disability under Section 504 or the ADA, pregnancy itself is not a disability. 87 FR 41523. If someone who is pregnant or experiencing pregnancy-related conditions has a disability, the individual is protected from discrimination under Section 504 and

the ADA, whether or not the disability is related to pregnancy.

Regarding § 106.40(b)(4), the Department agrees with the commenter that it is important to make clear that the provision applies regardless of whether pregnancy-related conditions qualify as disabilities under Section 504 or the ADA. The Department has also determined that the proposed provision's reference to "pregnancy or related conditions or any temporary disability resulting therefrom" contained a redundancy: the phrase "or any temporary disability resulting therefrom." Because the term "pregnancy or related conditions" as defined in § 106.2 would include any medical conditions related to pregnancy, childbirth, termination of pregnancy, or lactation, or recovery from any of those conditions, the term would necessarily include any such resulting disabilities. The definition of "pregnancy or related conditions" in the final regulations is adequate in scope for the purpose of § 106.40(b)(4) without the term "temporary disability."

To address these concerns, the Department revised some of the language in § 106.40(b)(4) of the final regulations compared to the proposed regulations. Specifically, the Department changed the phrase "in the same manner and under the same policies as *any other temporary disability or physical condition*" in the proposed regulations to "in the same manner and under the same policies *as any other temporary medical condition*" in the final regulations (emphases added). The Department changed "physical condition" to "medical condition" to clarify that the proper comparator with respect to a medical or hospital benefit, service, plan, or policy is not limited to conditions that are only physical in nature, and includes, for example, psychological or emotional conditions.

This revision will eliminate an inference that pregnancy standing alone is a disability and emphasize that pregnancy-related conditions do not need to qualify as disabilities for § 106.40(b)(4) to apply. The revision will also clarify coverage in cases in which a recipient does not have any medical or hospital benefit, service, plan, or policy related to temporary disabilities, but may have such benefits, services, plans, or policies related to temporary medical conditions generally. The Department notes that a recipient's "benefits, services, plans, or policies" with respect to temporary medical conditions may be subsumed within its "benefits, services, plans, or policies"

related to disabilities, or they may be separate.

*Changes:* The Department has redesignated proposed § 106.40(b)(5) as § 106.40(b)(4) in the final regulations. In § 106.40(b)(4) of the final regulations, the Department has removed the references to "disability" and "disabilities" from the provision and revised the term "physical condition" to "medical condition." Final § 106.40(b)(4) now states that, to the extent consistent with paragraph (b)(3), a recipient must treat pregnancy or related conditions in the same manner and under the same policies as any other temporary medical condition with respect to any medical or hospital benefit, service, plan, or policy the recipient administers, operates, offers, or participates in with respect to students admitted to the recipient's education program or activity.

Intersection With Disability Law

*Comments:* The Department notes that proposed § 106.40(b)(5) has been redesignated as § 106.40(b)(4) in the final regulations, and the following comment summaries and discussion refer to the provision as § 106.40(b)(4).

One commenter conveyed that because of the difference between § 106.40(b)(4) and disability law, the way a temporary disability is handled by a recipient would not necessarily align with the proposed reasonable modifications because of pregnancy, and in some cases, recipients will not be able to comply with both standards. The commenter recommended that the Department either clarify its requirement that a recipient treat pregnancy or related conditions as it would any other temporary disability or modify the requirement to provide greater flexibility for a recipient to address the needs of students who are pregnant or have related conditions.

*Discussion:* The Department acknowledges the commenter's concern that a difference in the requirements of Title IX and relevant disability laws may, at times, require a recipient to maintain different processes or reach different results when addressing pregnancy or related conditions versus disabilities, and that this may cause confusion. In response to the commenter's suggestions, the Department clarifies in the final regulations when a recipient must apply different rules as between pregnancy or related conditions and other kinds of temporary medical conditions, and when they should be treated the same. As proposed, the comparability provision would have applied to the extent the matter was "not otherwise

addressed" under § 106.40(b)(3). To add clarity, the Department revises § 106.40(b)(4) in the final regulations to state the provision applies only "to the extent consistent with" a recipient's obligations under § 106.40(b)(3).

The Department interprets "consistent with" to mean that § 106.40(b)(4) applies when doing so would not deny or limit any person's rights or the recipient's obligations under § 106.40(b)(3). In other words, § 106.40(b)(3) provides a floor beneath which a recipient's treatment of pregnancy and pregnancy-related conditions may not fall, even if the recipient provides lesser protections for students with non-pregnancy related temporary medical conditions. A recipient must be able to meet its responsibilities under § 106.40(b)(3) to take specific actions, such as providing reasonable modifications, leave, and access to lactation space. When consistent with these obligations, a recipient must further apply § 106.40(b)(4) and treat pregnancy or related conditions in the same manner and under the same policies as other temporary medical conditions. As noted above, a recipient's "benefits, services, plans, or policies" with respect to temporary medical conditions may be subsumed within its "benefits, services, plans, or policies" related to disabilities, or they may be separate.

For example, if a student requires breaks during class to attend to pregnancy-related health needs, the recipient must provide reasonable modifications consistent with § 106.40(b)(3)(ii). However, a recipient must additionally consider how students with other temporary medical conditions are treated under § 106.40(b)(4) with respect to any medical or hospital benefit, service, plan, or policy it maintains. To the extent that the recipient maintains a medical or disability policy that provides breaks to students with temporary medical conditions that is more generous (for example, providing longer or more frequent breaks) than what it has provided to the pregnant student as a reasonable modification, the recipient must apply this more generous policy to the pregnant student. If its policy for non-pregnancy-related temporary medical conditions is less generous than what it is required to provide to the pregnant student as a reasonable modification, however (for example, by disallowing breaks absent emergency circumstances), the recipient must not apply this policy to the pregnant student because it would deprive the student of rights under § 106.40(b)(3)(ii) and be inconsistent

with the recipient's obligations under § 106.40(b)(3). There is no conflict between these final regulations and a student's rights under the ADA or Section 504, because if a student's pregnancy-related condition qualifies as a disability and the recipient's disability policy provides a more generous result, that will have to be provided to the student. Conversely, if the recipient's disability policy would provide a less generous result, the recipient will have to provide the student with the more generous benefit consistent with § 106.40(b)(3).

The Department notes that § 106.40(b)(4) also prohibits discriminatory recipient policies even if a particular individual does not request a reasonable modification. For example, if a recipient maintains a policy that allows students with disabilities, including temporary medical conditions that qualify as disabilities, to access free at-home tutoring, but states that the option is not available to pregnant students, the recipient will violate § 106.40(b)(4) because its policy treats pregnant students differently than students with other types of temporary medical conditions. This would be the case regardless of whether an individual student is pregnant and seeking access to tutoring as a reasonable modification under § 106.40(b)(3). *See* 2013 Pregnancy Pamphlet, at 6 ("Any special services provided to students who have temporary medical conditions must also be provided to a pregnant student . . . [so] if a school provides special services, such as homebound instruction or tutoring, for students who miss school because they have a temporary medical condition, it must do the same for a student who misses school because of pregnancy or childbirth.").

The Department notes that a recipient's processes for pregnancy or related conditions may be different from those for other temporary medical conditions if treating the two identically would not be consistent with § 106.40(b)(3). For example, as noted by a commenter, the Title IX regulations since 1975 have required that voluntary leave for pregnancy or related conditions must be granted consistent with medical necessity. 40 FR 24128 (codified at 45 CFR 86.40(b)(5) (1975)); 34 CFR 106.40(b)(5) (current). The Department acknowledges that the process for obtaining leave may include additional steps were a student seeking it in connection with a temporary medical condition unrelated to pregnancy. However, to the extent that additional steps are necessary for voluntary leave in connection with a non-pregnancy-related temporary

medical condition, final § 106.40(b)(3)(iv) requires that a recipient permit voluntary leave for pregnancy or related conditions without requiring those additional steps. The Department views the requirements of the final regulations as necessary to prevent sex discrimination and ensure equal access related to pregnancy or related conditions. The final regulations sometimes provide a simpler process for pregnancy or related conditions than might be required under laws pertaining to disability because by its nature, pregnancy is inherently time-limited, and because, for most uncomplicated pregnancies, the types of supports that a student will need are similar and foreseeable. Disability rights laws address a wider range of medical conditions and therefore, a wider range of student needs and possible supports. Accordingly, the same level of flexibility need not be afforded to the recipient in the context of pregnancy or related conditions.

*Changes:* Proposed § 106.40(b)(5) has been redesignated as § 106.40(b)(4) in the final regulations and revised to state the provision applies only "to the extent consistent with" a recipient's obligations under § 106.40(b)(3).

"Medical or Hospital" Limitation

*Comments:* The Department notes that proposed § 106.40(b)(5) has been revised and redesignated as § 106.40(b)(4) in the final regulations, and the following comment summaries and discussion refer to the provision as § 106.40(b)(4).

One commenter suggested that the Department remove the words "medical or hospital" that modified the words "benefit, service, plan, or policy" in proposed § 106.40(b)(4) because, the commenter said, the proposed provision is unclear in scope and removing any limitation would further Title IX's purpose without giving preferential treatment to one group of students based on their sex.

*Discussion:* The Department declines to alter the language of the regulations in the manner suggested and disagrees that § 106.40(b)(4) is unclear in scope. As the Department noted in the July 2022 NPRM, the current version of § 106.40(b)(4) has required a recipient to treat pregnancy or related conditions similarly to temporary disabilities with respect to any "medical or hospital" benefit, service, plan, or policy the recipient offers for students since the regulations were first promulgated in 1975. 87 FR 41523; 40 FR 24128 (codified at 45 CFR 86.40(b)(4) (1975)); 34 CFR 106.40(b)(4) (current). As the Department indicated in the July 2022 NPRM, *see* 87 FR 41523, there is a need

for greater clarity regarding the reasonable modifications a recipient must make to prevent discrimination and ensure equal access for pregnant students and those experiencing related conditions, in part because the wording of the current version of § 106.40(b)(4) may have suggested that a recipient's responsibility extends only to medical or hospital benefits, services, plans, or policies. However, the reasonable modifications framework in final § 106.40(b)(3) alleviates the potential ambiguity in this section and achieves Title IX's nondiscrimination goal. As discussed above, the Department has further clarified the text of § 106.40(b)(4) to state that the provision will apply only when consistent with the recipient's obligations in § 106.40(b)(3).

*Changes:* None.

12. Section 106.40(b)(5) Pregnancy or Related Conditions—Certification To Participate

*Comments:* Some commenters supported the Department's proposed prohibition on a recipient requiring a pregnant student to certify physical ability before allowing the student's participation except under narrow circumstances. Commenters' reasons for support included: the need to counteract stereotypes regarding what is safe, appropriate, or possible for a pregnant student, which may lead a recipient to restrict or exclude a student from participation; ensuring students' equal access to physically intensive extracurricular activities or course-related placements in laboratories or medical facilities; and because the provision reasonably limits required certification only to courses or activities that included a physical component. Some commenters appreciated that the Department revised the provision to remove a prior reference to a student's emotional ability to participate, which the commenters found paternalistic, outdated, and stereotyping. Finally, some commenters supported the proposed provision's clarification to apply to certifications from healthcare providers in addition to physicians.

One commenter objected that the provision requiring a recipient to compare pregnant students to non-pregnant students, as opposed to students who are also receiving medical attention for a physical or emotional condition, was inconsistent with *Young* v. *United Parcel Service, Inc.,* 575 U.S. 206, 228 (2015). The same commenter argued the provision would require a recipient to allow pregnant students to engage in unsafe activities, potentially exposing the recipient to liability; surprise a recipient with medical

emergencies that pregnant students are more likely to have than other students who are neither pregnant nor experiencing other medical conditions; and force a recipient to require every student to obtain a doctor's note before it could lawfully require the same of a pregnant student. The same commenter suggested that it may be reasonable to limit the required certification to the question of whether the student is physically able to participate but that a student's emotional stability could be relevant in some narrow situations.

One commenter opposed the proposed provision because they felt a recipient and a coach should decide whether a pregnant student should participate on an athletic team. Another commenter supported the proposed regulations, provided the Department clarify that a recipient should treat pregnancy-related conditions or complications, but not the pregnancy itself, as temporary disabilities. A final commenter asked the Department to clarify the distinction between paragraphs (b)(5)(i) and (ii) of the proposed provision.

*Discussion:* The Department agrees with commenters that the provision will limit the burden on students who are pregnant or experiencing pregnancy-related conditions from unnecessary requests for documentation to remain in their classes and activities. The Department acknowledges comments that explained how recipient requests for such certifications are often driven by harmful and inaccurate stereotypes that may lead a recipient to exclude a student across a variety of educational settings. To clarify the protection of this provision further, the Department expanded the types of certifications subject to this prohibition to include those by non-healthcare providers and "any other person." The Department clarifies that students who are pregnant or experiencing pregnancy-related conditions should not be subject to a certification of physical ability from a healthcare provider or any other person that the student is physically able to participate in the recipient's class, program, or extracurricular activity unless such certification requirement satisfies § 106.40(b)(5)(i)–(iii). A request for certification from someone other than a student's healthcare provider—such as a student's parent, legal representative, coach, administrator, or advisor—would also be burdensome and potentially subject a student with pregnancy or related conditions to different treatment if inconsistent with § 106.40(b)(5)(i)–(iii).

The Department disagrees that final § 106.40(b)(5) would require a recipient to allow a pregnant student to engage in unsafe activities or surprise a recipient with medical emergencies. While this provision is intended to ensure that a recipient does not subject a student who is pregnant or experiencing pregnancy-related conditions to discriminatory paperwork requirements, it does not dictate any decisions a recipient may make as to participation in a program or activity as those must be made on a case-by-case basis, depending on relevant facts and consistent with Title IX's nondiscrimination requirements in totality. Responding to a further commenter concern, the Department agrees that—as set forth in § 106.40(b)(5)—while there is no requirement under Title IX that a recipient obtain pre-participation certification from any student, to the extent that a recipient wishes to require such certification from a pregnant student, it must require the same of all students in a class, program, or extracurricular activity.

With respect to the difference between paragraphs (b)(5)(i) and (ii) of § 106.40, the Department explains that paragraph (b)(5)(i) pertains to the level of physical ability or health necessary to participate in each activity, such as walking at a fast pace for 20 minutes or lifting more than 50 pounds, and paragraph (b)(5)(ii) means that all students participating in the class or activity, even those who are not pregnant or experiencing related conditions, are asked to provide the same certification.

The Department agrees with commenters that removing the reference in the current regulations to a student's emotional ability to participate will underscore that a recipient should never assume that a student who is pregnant or experiencing pregnancy-related conditions is any less emotionally able to participate than any other student. If a recipient requires a certification of emotional ability from a student who is pregnant or experiencing pregnancy-related conditions, such certification is subject to the general prohibition on sex discrimination under § 106.31(a)(1), the prohibition on sex discrimination based on pregnancy or related conditions under § 106.40(b)(1), and the requirement to provide students with reasonable modifications because of pregnancy or related conditions under § 106.40(b)(3)(ii), among other relevant provisions of the final regulations. If the student has a pregnancy-related condition that qualifies as a disability, such certification may also be subject to Section 504 or the ADA.

Regarding the suggestion that a recipient and a coach should decide whether a pregnant student remains on a team, the Department reminds recipients that a recipient's decision regarding a pregnant student's participation must comply with all specific actions to prevent discrimination and ensure equal access set out in § 106.40(b)(3), including the provision of reasonable modifications. Additionally, to the extent consistent with any reasonable modifications or other student rights under § 106.40(b)(3), if a school maintains a medical or hospital benefit, service, plan, or policy related to temporary medical conditions that is relevant to a potential exclusion from a team, the recipient must also treat a pregnant student consistent with those plans or policies under § 106.40(b)(4). Excluding a student based on pregnancy is sex discrimination in violation of §§ 106.31(a)(1) and 106.40(b)(1).

The Department disagrees with the contention that a recipient should not have to treat students who are pregnant or experiencing pregnancy-related conditions like non-pregnant students for the purpose of determining whether they may be excluded from a recipient's education program or activity. In this case, the Department finds it to be a relevant and straightforward comparison to ensure that students are not being discriminated against due to pregnancy or related conditions. For example, because the provision requires all students to be treated the same, it will be easy for pregnant students to know whether a recipient is asking them for information different from the rest of the class or team and permit the pregnant students to take prompt action to enforce their rights.

The Department disagrees that the Supreme Court's decision in *Young* controverts this approach. *Young* involved an employer's denial of an employee's request for a pregnancy-related lifting restriction under Title VII, in which the Court concluded that there was a genuine dispute of material fact as to whether the employer provided more favorable treatment to at least some non-pregnant employees "whose situation cannot reasonably be distinguished" from the plaintiff. *Young*, 575 U.S. at 231. The Court's holding did not limit the universe of acceptable comparators to one specific type, such as only employees with non-pregnancy-related health restrictions or suggest that other possible comparators would not be allowed. *See id.* at 228. Likewise, in the context of final § 106.40(b)(5), the issue is that in most cases, a student who is pregnant or

experiencing pregnancy-related conditions will have no limitation relevant to participation, making comparison to the general student population the most appropriate.

The Department further disagrees with the assertion that the provision prevents a recipient from requiring a student who is pregnant or experiencing pregnancy-related conditions from providing certification as to physical ability; to the contrary, the provision sets out clearly that a recipient may do so when (i) the certified level of physical ability or health is necessary for participation in the class, program, or extracurricular activity; (ii) the recipient requires such certification of all students participating in the class, program, or extracurricular activity; and (iii) the information obtained is not used as a basis for discrimination prohibited by the Title IX regulations. This provides the appropriate framework to ensure that a student who is pregnant or experiencing pregnancy-related conditions is asked for relevant information on equal footing with other students, while balancing a recipient's interest in student safety.

Further, the Department did not intend to suggest that pregnancy, standing alone, is a disability. The Department reemphasizes, as explicitly stated in the July 2022 NPRM, that while some conditions or complications related to pregnancy might qualify as a disability under Section 504 or the ADA, pregnancy itself is not a disability. 87 FR 41523. If someone who is pregnant or experiencing pregnancy-related conditions has a disability, the ADA or Section 504 may apply, whether or not the disability is related to pregnancy. However, the Department notes that, as explained more fully in the discussion of final § 106.40(b)(4), that provision requires a recipient, when consistent with § 106.40(b)(3), to treat students who are pregnant or experiencing pregnancy-related conditions in the same manner and under the same policies as any other temporary medical condition with respect to any medical or hospital benefit, service, plan, or policy.

*Changes:* The Department has redesignated proposed § 106.40(b)(6) as § 106.40(b)(5) in the final regulations, revised the provision to state that a recipient may not require a certification from a healthcare provider or any other person unless the certification satisfies § 106.40(b)(5)(i)–(iii), and made a technical change to make clear that a recipient's compliance is required.

*D. Discrimination Based on an Employee's Parental, Family, Marital Status, Pregnancy, or Related Conditions*

1. Section 106.51(b)(6) Employment—Granting and Return From Leaves

*Comments:* Some commenters asserted that proposed § 106.51(b)(6) was not necessary and should be addressed through sub-regulatory guidance but did not object to the proposed changes.

*Discussion:* Changing the language in § 106.51(b)(6) from ''leave for pregnancy, childbirth, false pregnancy, termination of pregnancy'' to ''leave for pregnancy or related conditions'' is important to ensure § 106.51 is consistent with the definition of pregnancy or related conditions in § 106.2 and consistent with like changes in §§ 106.21, 106.40, and 106.57.

*Changes:* None.

2. Section 106.57 Parental, Family, or Marital Status; Pregnancy or Related Conditions

*Comments:* Some commenters opposed § 106.57 generally as inconsistent with Title IX and case law. Some commenters opposed proposed § 106.57 because they did not believe Title IX authorizes the Department to enact regulations governing employment. One commenter stated that they believed that the Department did not have jurisdiction over workplace concerns, including sex discrimination and hiring decisions, which they believed to be solely under the authority of the EEOC and a recipient's human resources department.

One commenter suggested that, because Title IX protects any ''person,'' the Department should clarify that its protections extend beyond traditional employees to other workers, such as independent contractors.

*Discussion:* The Department disagrees with the assertion that § 106.57 is contrary to case law. Most of the provisions in § 106.57 have been part of the Title IX regulations for nearly half a century. 40 FR 24128 (codified at 45 CFR 86.57 (1975)); 34 CFR 106.57 (current). The Department was unable to find, and commenters did not provide, any case law holding that current § 106.57 exceeded the authority granted by Congress for the Department to issue regulations to effectuate Title IX's prohibition on sex discrimination in education programs or activities that receive Federal financial assistance consistent with achievement of the objectives of the statute. *See* 20 U.S.C. 1682. To the extent commenters raised

similar objections with regard to specific aspects of § 106.57, those comments are addressed in the discussion of the applicable subsections below.

In addition, contrary to commenters' assertions, § 106.57 does not exceed the scope of the Department's congressionally delegated authority under Title IX. The Supreme Court has recognized that the Department has broad regulatory authority under Title IX to issue regulations that it determines will best effectuate the purpose of Title IX and to require recipients to take administrative actions to effectuate the nondiscrimination mandate of Title IX. *See, e.g., Gebser,* 524 U.S. at 292; 20 U.S.C. 1682. Title IX provides that ''no person'' shall be subjected to sex discrimination under any education program or activity receiving Federal financial assistance, and Title IX has long been understood to prohibit discrimination against recipients' employees. *See, e.g., N. Haven Bd. of Educ.,* 456 U.S. at 530. As the Department noted in the July 2022 NPRM, 87 FR 41527, ensuring equal access to employment in the education sector was a central purpose of Title IX at the time of its passage. *See* 118 Cong. Rec. 5810 (paper by Dr. Bernice Sandler printed in the record with unanimous consent, explaining that employers in the education sector often refused to hire women because of concerns about absenteeism due to family obligations, even though the Women's Bureau of the Department of Labor found that ''men lose more time off the job because of hernias than do women because of childbirth and pregnancy'').

Finally, given the wide variety of arrangements and circumstances across recipients and variations in applicable State employment laws, recipients are best positioned to determine who is an ''employee.'' The Department declines to mandate at this time that all independent contractors be covered by § 106.57 because more information would be needed before making such a change, particularly given the possible cost, administrative burden, and interplay with common law principles and other legal requirements. The Department notes that to the extent a contractor is an employee of the recipient, the contractor will be entitled to the protections of § 106.57. In addition, nothing within the final regulations prohibits a recipient from choosing to cover independent contractors under § 106.57 if the recipient believes such protection will further its compliance with these final regulations.

*Changes:* None.

3. Section 106.57(a) Parental, Family, or Marital Status

*Comments:* Some commenters supported the proposed regulations related to the rights of employees not to be discriminated against based on sex regarding their parental, family, or marital status. Some commenters urged the Department to add greater protections for parenting employees, including reasonable modifications for parenting employees. Some commenters shared personal stories of recipients asking women whether their children would interfere with their employment responsibilities, while men were not asked similar questions.

In contrast, the Department also received feedback that protections for parenting employees should not be included because, the commenters argued, parents are not a protected class and being a parent detracts from a person's ability to perform their employment duties.

*Discussion:* The Department acknowledges commenters' support of the regulatory provisions regarding sex discrimination based on employees' parental, family, and marital status. As explained in the discussion of § 106.40(a) regarding parenting students and § 106.21 regarding applicants for admission, the Department declines to require a recipient to provide reasonable modifications to parenting employees or applicants for employment at this time. In the future, the Department could consider whether modifications for parenting employees are necessary to effectuate the nondiscrimination mandate of Title IX. However, the Department again notes that a recipient is prohibited from treating parenting employees or applicants for employment differently based on sex under § 106.57(a)(1) and from discriminating against them based on sex stereotypes under § 106.10.

The Department disagrees with the commenters asking to remove § 106.57(a)(1) based on an assertion that parents are not a protected class, because the prohibition on discrimination against parenting employees is limited to different treatment based on sex, and sex is a protected class under Title IX. In addition, sex discrimination in the treatment of parenting employees has been covered by the Title IX regulations for nearly 50 years and continues to be necessary to effectuate Title IX's nondiscrimination mandate. *See* 40 FR 24128 (codified at 45 CFR 86.57(a) (1975)); 34 CFR 106.57(a) (current).

The Department has, however, decided to make three small changes to

the text of final § 106.57(a) compared to the proposed regulations. Upon review, the Department has determined that replacing the word "apply" with "implement" in § 106.57(a) will improve clarity consistent with similar revisions in final §§ 106.21(c)(2)(i) and 106.40(a). The Department also has decided to replace the word "shall" with the word "must" consistent with the other final regulations but does not intend any decrease in coverage. The Department has also replaced the word "Which" in § 106.57(a)(2) with the word "That" for clarity.

*Changes:* Section 106.57(a) has been revised to substitute the word "implement" for the word "apply" and to substitute the word "must" for the word "shall." Section 106.57(a)(2) has been revised to substitute the word "That" for the word "Which."

4. Section 106.57(b) Pregnancy or Related Conditions

*Comments:* Some commenters expressed support for the prohibition on discrimination on the basis of "pregnancy or related conditions" in proposed § 106.57(b), explaining that it is consistent with Title IX's mandate to prohibit sex discrimination and would improve employment opportunities for pregnant and parenting teachers and narrow the wage gap between men and women. Other commenters expressed support for the language in proposed § 106.57(b) prohibiting discrimination against employees based on "current, potential, or past" pregnancy or related conditions, adding that such protection will create a more welcoming environment for pregnant employees because educators historically have been fired or excluded from the classroom when they became pregnant, and they continue to face discrimination and barriers to receiving workplace accommodations for pregnancy-related medical issues. Some commenters described personal stories of pregnancy-related discrimination in the workplace and being pushed out of the workplace due to pregnancy or termination of pregnancy. Some commenters appreciated the explicit protection for "potential" pregnancy, stating it will protect people who are attempting to get pregnant.

Other commenters asked the Department to change the proposed regulations to require reasonable modifications for employees based on pregnancy or related conditions as the proposed regulations would for students, instead of making accommodations dependent on what is provided to employees with temporary disabilities. Some commenters stated

that reasonable modifications for employees are particularly important given the fast-paced nature of the school environment to make sure employees can work while pregnant and after pregnancy. Some commenters stated that, like the Department's proposal to require that recipients provide lactation time and space to employees, clearly defined rights to reasonable modifications are essential to prevent different treatment based on sex in the workplace and that, absent reasonable modifications, employees may have no choice but to leave their employment. Some commenters stated that matching employees' rights with students' rights with respect to reasonable modifications for pregnancy or related conditions would reduce the burden and complexity of compliance on recipients. These commenters opined that recipients are already familiar with the "reasonable accommodation" framework and structure from its use in the disability context under Title II of the ADA.

Some commenters observed that many students, particularly at postsecondary institutions, are also paid employees of the recipient. Some commenters argued that it would be illogical to, for example, guarantee a pregnant student access to a stool to rest while studying in their science lab, but not to provide the same modification to that student while they perform work as a receptionist for the science department. These commenters maintained that in both contexts, the modification is necessary to ensure that the student can fully access the educational environment.

*Discussion:* The Department acknowledges the support expressed for the protections in proposed § 106.57(b) prohibiting discrimination against employees based on current, potential, or past pregnancy or related conditions, and agrees that this updated and comprehensive protection will address barriers to professional achievement and improve access to career opportunities.

The Department acknowledges commenters' suggestions about providing the same reasonable modifications to employees that are available to students. After careful consideration, the Department does not agree that reasonable modifications for employees are currently necessary to effectuate Title IX and ensure equal opportunity for recipient employees. The Department has reached that conclusion for several reasons.

First, considering recent new Federal legislation in this area, such as the PUMP Act and the PWFA, and a pending rulemaking that may address

reasonable workplace accommodations for employees affected by pregnancy, childbirth, or related medical conditions, *see* 88 FR 54714, the Department declines to require reasonable modifications for employees at this time without the opportunity to more fully consider the interplay between Title IX and other employer obligations. In addition, many, if not most, of the pregnancy-related barriers employees face will be addressed by recipients in their compliance with the non-discrimination protections of § 106.57.

Second, as noted in the discussion of § 106.57(c) below, the obligation that a recipient treats an employee's pregnancy or related conditions as it treats other temporary medical conditions is more robust than the requirement that a recipient treat a student's pregnancy or related conditions comparably to other students' temporary medical conditions. Final § 106.40(b)(4) states that a recipient must treat a student's pregnancy or related conditions in the same manner and under the same policies as any other temporary medical condition with respect to any medical or hospital benefit, service, plan, or policy the recipient administers, operates, offers, or participates in. However, the language of § 106.57(c) is broader, stating that a recipient must treat an employee's pregnancy or related conditions as it does any other temporary medical conditions for all job-related purposes, including commencement, duration and extensions of leave, payment of disability income, accrual of seniority and any other benefit or service, and reinstatement, and under any fringe benefit offered to employees by virtue of employment. Accordingly, both § 106.40(b)(4) and the reasonable modification requirement in § 106.40(b)(3)(ii) are required to effectuate Title IX's nondiscrimination mandate with respect to pregnant students. But because § 106.57(c) standing alone is sufficiently broad to effectuate Title IX's nondiscrimination mandate with respect to employees who are pregnant or experiencing pregnancy-related conditions, it is unnecessary to also require recipients to provide reasonable modifications to pregnant employees without further study. And the Department disagrees with the suggestion that requiring reasonable modifications for employees because of pregnancy or related conditions under all circumstances is less burdensome than requiring reasonable modifications only to the extent that a recipient

provides the same modifications for other temporary medical conditions.

With respect to student-employees, the final regulations require that the recipient provide such students with reasonable modifications consistent with § 106.40(b)(3)(ii) as necessary to prevent sex discrimination and ensure equal access to the recipient's education program or activity. To the extent that a student's individualized, pregnancy-related needs impact their employment consistent with this standard, § 106.40(b)(3)(ii) provides the appropriate framework for a recipient to address such needs—in consultation with the student—in a manner that is flexible enough to respond to a wide variety of circumstances and types of employment. The Department agrees with the commenter that, depending on the circumstances, the provision may require reasonable modifications in connection with a student's on-campus employment when such employment is part of, or necessary to enable, access to the student's education program or activity. For further explanation of reasonable modifications with respect to students based on pregnancy or related conditions, see "Interaction with Other Federal Laws" in the discussion of § 106.40(b)(3)(ii).

Nothing in § 106.57 obviates a recipient's separate obligation to comply with other civil rights laws, including Title VII as amended by the PDA, Section 504, the ADA, and the PWFA, which has become law since the issuance of the July 2022 NPRM. *See* 34 CFR 106.6(a). The PWFA requires covered employers to make reasonable accommodations for a worker's known limitations related to pregnancy, childbirth, or related medical conditions, unless the accommodation will cause the employer an undue hardship. Moreover, to the extent an employee's related condition qualifies as a disability, Section 504 or the ADA may apply, which may require the recipient to provide reasonable accommodations. And nothing in these regulations precludes a recipient from using its discretion and flexibility to provide reasonable accommodations to employees for whom pregnancy or related conditions present barriers to employment. For the same reasons, the Department also declines to require a recipient to provide reasonable modifications based on pregnancy or related conditions for applicants for employment with a recipient.

Finally, the Department has changed the word "shall" to "must" in § 106.57(b) and revised the phrase "discriminate against or exclude from employment" to remove the words "or

exclude from employment." The Department makes these changes for clarity and consistency with language in the remainder of the regulations but does not intend any decrease in coverage. As explained in the July 2022 NPRM with respect to an identical change to "exclude" language in § 106.21(c) pertaining to the treatment of pregnancy in admissions, the words "exclude" and "excludes" were used only occasionally in the current regulations to refer to discrimination and such intermittent use was confusing. 87 FR 41517. Throughout the final regulations, the Department interprets "discriminate" to encompass exclusion.

*Changes:* The Department has changed the word "shall" to "must" and deleted the words "or exclude from employment" from § 106.57(b).

### 5. Section 106.57(c) Comparable Treatment to Other Temporary Medical Conditions

*Comments:* Some commenters supported proposed § 106.57(c). One commenter expressed support for proposed § 106.57(c) but raised concerns that the regulatory text would imply that a recipient should treat pregnancy as a temporary disability, which the commenter argued is inconsistent with disability law and the Department's explanation in the July 2022 NPRM. Another commenter asked for clarification regarding the interaction of § 106.57(c), the PDA, Section 504, and the ADA.

*Discussion:* The Department emphasizes again here, as it explicitly stated in the July 2022 NPRM, that while some conditions or complications related to pregnancy might qualify as a disability under Section 504 or the ADA, pregnancy itself is not a disability. 87 FR 41523. The Department also reemphasizes that if an employee who is pregnant or experiencing related conditions also has a disability, the ADA and Section 504 may apply.

As the Department noted in the July 2022 NPRM, there are other Federal laws in addition to Title IX that may govern a recipient's responsibilities regarding pregnancy or related conditions in its workplace, including the ADA, Section 504, the FLSA, and the PDA which amended Title VII. *See* 87 FR 41394, 41514–15. In addition, since the July 2022 NPRM was issued, Congress passed the PWFA, which also pertains to pregnancy, childbirth, and related medical conditions in the workplace, and the PUMP Act, which pertains to lactation rights. The Department clarifies that nothing in § 106.57(c) obviates a recipient's

separate obligation to comply with those other civil rights laws.

In addition, as noted above in the discussion of § 106.40(b)(4) with respect to students, the Department notes that the reference to "pregnancy or related conditions or any temporary disability resulting therefrom" contained a redundancy because the term "pregnancy or related conditions" as defined in § 106.2 includes any medical conditions related to pregnancy, childbirth, termination of pregnancy, or lactation, and recovery from any of those conditions. To address these concerns, the Department revised the language in § 106.57(c) of the final regulations to delete the term "any temporary disability resulting therefrom" and substitute the term "temporary medical conditions" for the remaining references to "temporary disabilities" and "temporary disability." The Department's revisions will eliminate any possible inference that pregnancy standing alone is a disability. The Department did not, however, change the reference to "payment of disability income" in the list of job-related purposes in § 106.57(c), as that is a specific benefit that may be available to employees with disabilities. The Department is not aware of anything called "medical conditions income," so changing that term to correspond with the changes to "temporary disability" and "temporary disabilities" would not make sense.

*Changes:* In § 106.57(c) of the final regulations, the Department has removed the phrase "or any temporary disability resulting therefrom." Additionally, the Department has changed the other two references to "temporary disability" and "temporary disabilities" to "temporary medical conditions." Final § 106.57(c) now states that a recipient must treat pregnancy or related conditions as any other temporary medical condition for all job-related purposes. Finally, the section header has been changed from "Comparable treatment to temporary disabilities or conditions" to "Comparable treatment to other temporary medical conditions."

### 6. Section 106.57(d) Voluntary Leaves of Absence

*Comments:* Some commenters supported proposed § 106.57(d) because it would require recipients to provide leave to employees who are affected by pregnancy-related medical conditions even if a recipient does not maintain a leave policy for its employees or if an employee does not have sufficient leave or accrued employment time to qualify for leave under the recipient's policy.

Some commenters asserted that employees should have a right to all medically necessary time off for pregnancy or related conditions, just as students do under § 106.40(b)(3)(iv), such as leave to recover from pregnancy-related health conditions, to attend related medical appointments, and to accommodate bed rest. Commenters asserted that it is unclear in proposed § 106.57(d) whether leave for a "reasonable period of time" would include leave for pregnancy-related medical appointments. Commenters also asked the Department to clarify that to the extent a recipient maintains a leave policy for employees that is more generous, the recipient must permit the employee to take leave under that policy instead. Several commenters maintained that depriving employees of the same right students have to voluntary leave would reinforce the stereotype that motherhood and work are incompatible, contrary to the purpose of Title IX.

Some commenters asked that the Department clarify that a recipient may not require a doctor's note or other medical documentation for breaks to attend to basic health needs, such as bathroom breaks. Other commenters suggested that the Department revise the section title of proposed § 106.57(d) from "Pregnancy leave" to "Pregnancy and related conditions leave" or "Time off for pregnancy-related needs and leave" to make it clear that the leave is available for childbirth and other medical conditions related to pregnancy.

*Discussion:* The Department acknowledges commenters' support for § 106.57(d) and their questions about its implementation. Section 106.57(d) requires a recipient—only if it does not have another leave policy or an employee does not have enough leave under the policy or has not worked there long enough to qualify—to treat pregnancy or related conditions as a justification for an employee's voluntary leave of absence for a reasonable period of time. After such time, the employee shall be reinstated to the status held when the leave began or to a comparable position without a negative effect on any right or privilege of employment. The pre-existing rule referred to "pregnancy or related conditions" for "pregnancy, childbirth, false pregnancy, termination of pregnancy and recovery therefrom," but these final regulations use "pregnancy or related conditions" instead; however, the substance of the provision remains the same.

Still, the Department understands that commenters had questions about the meaning of "for a reasonable period of time" and whether it is the same as the

"period of time deemed medically necessary" referenced in § 106.40(b)(3)(iv) regarding voluntary leaves of absence for students. Determining what is a reasonable period of time under § 106.57(d) is a fact-specific inquiry that depends on the totality of the circumstances, including the period of time deemed medically necessary by an employee's healthcare provider. Considering recent new Federal legislation in this area, such as the PUMP Act and the PWFA, and a pending rulemaking that may address reasonable accommodations for employees who are pregnant or experiencing related conditions, *see* 88 FR 54714, the Department declines the commenters' suggestion to go further and mandate a blanket right to all medically necessary time off for employees at this time without the opportunity to more fully consider the interplay between Title IX and other employer obligations.

In response to commenters' concerns about an employee's ability to take advantage of a more generous leave policy, the Department further clarifies that § 106.57(d) only applies if the recipient does not maintain a leave policy for its employees or the employee has insufficient leave or accrued employment time to qualify for leave under the policy. Therefore, if a recipient maintains a leave policy for employees that is more generous than what is articulated in § 106.57(d), the recipient must permit the employee to take leave under that policy instead. And under § 106.57(c), a recipient must at least treat pregnancy or related conditions as it does any other temporary medical condition with respect to duration and extensions of leave. For example, if an employee with another temporary medical condition can take leave for medical appointments related to that condition, employees who are pregnant or have related conditions must be permitted to do so as well.

Although the Department declines to add to the final regulations a provision prohibiting a recipient from requiring a doctor's note or other medical documentation from employees for breaks to attend to basic health needs, such as bathroom breaks, the Department reminds recipients that such documentation may only be required for pregnancy or related conditions if it is required of all employees with temporary medical conditions. *See* § 106.57(c). Therefore, for example, if a recipient does not require an employee with a urinary tract infection to provide a doctor's note to take bathroom breaks more frequently

than usual, it must not require such notes from employees who need more frequent bathroom breaks because of pregnancy or related conditions.

As for the title of the provision, the Department agrees with commenters that the title "Pregnancy leave" did not encompass the reach of the provision. As explained in the July 2022 NPRM, the Department proposed adding "voluntary" to modify "leave of absence" in the text of the provision to clarify that an employee must not be forced to take leave due to pregnancy or related conditions, but rather must have the right to choose whether to take leave. 87 FR 41527. For this reason, "Voluntary leaves of absence" is a suitable title for this provision.

Finally, the Department has changed the word "shall" to "must" in § 106.57(d) for consistency with language in the remainder of the regulations but does not intend any decrease in coverage.

*Changes:* The title of § 106.57(d) has been changed from "Pregnancy leave" to "Voluntary leaves of absence," and in the text of the provision, the word "shall" has been changed to "must."

### 7. Section 106.57(e) Lactation Time and Space

#### General Support

*Comments:* Commenters expressed general support for the requirement in proposed § 106.57(e) that employees have a clean, private, non-bathroom lactation space and reasonable break time to express breast milk or breastfeed. Commenters stated that proposed § 106.57(e) would provide much-needed support for employees and would advance Title IX's non-discrimination goals because, they stated, pregnant educators historically discriminated against, were fired or excluded from the classroom, and did not get paid parental leave, causing them to return to work before they were ready, and they had difficulty finding time to express breast milk or getting support from their employer to do so.

Some commenters noted that some educators had to pump in supply closets or cars while juggling schedules that made it extremely difficult to express breast milk on a regular basis and that securing break time is one of the biggest barriers faced by lactating employees in education. Some commenters noted that if a lactating employee does not express breast milk as needed, they may experience pain and end up with health complications including infection, or their milk supply will reduce, making it harder to continue breastfeeding. Therefore, commenters explained, a

lactating employee without adequate time and space to express breast milk will be forced to choose between their job and their health and that of their child.

Some commenters reported that thousands of recipients nationwide already provide their employees with lactation time and space, due to the ACA, State laws, and the rise in breastfeeding rates, and that others can learn from their peer institutions, suggesting that compliance with proposed § 106.57(e) is readily achievable.

*Discussion:* The Department acknowledges the commenters' variety of reasons for supporting § 106.57(e). In the final regulations, in response to comments and upon further review, the Department changed the language "[a] recipient must ensure the availability of a lactation space" to "[a] recipient must ensure that an employee can access a lactation space" to match the language adopted in final § 106.40(b)(3)(v), the corollary provision regarding student access to lactation space. As the Department explained above in the student context, for this provision to be effective a recipient must not only ensure that an appropriate lactation space is available but also that it is accessible to the employees who need it.

The Department agrees with commenters that the final regulations, by requiring access to time and space for lactating employees to breastfeed or express breast milk, will help recipients to fulfill Title IX's nondiscrimination goals of addressing sex discrimination in employment and ensuring that neither pregnancy nor its related conditions are barriers to equal opportunities in employment by recipients of Federal financial assistance. The Department also agrees with commenters that § 106.57(e) will help ensure that recipient employees do not have to choose between breastfeeding and staying in their jobs and that they can be productive in the workplace and avoid serious health complications. Finally, the Department agrees that compliance with § 106.57(e) should be achievable because so many recipients nationwide already provide their employees with lactation time and space, due to the ACA, State laws, and the rise in breastfeeding rates.

The Department notes that new Federal laws regarding lactation in the workplace, including the PWFA and the PUMP Act, both of which were passed after the issuance of the July 2022 NPRM, may also apply to recipients.

*Changes:* In final § 106.57(e)(2), the Department has changed "[a] recipient must ensure the availability of a

lactation space" to "[a] recipient must ensure that an employee can access a lactation space."

Requests for Clarification Regarding Lactation Spaces

*Comments:* Some commenters expressed support for proposed § 106.57(e)(2)'s requirement that a recipient provide employee access to lactation space and requested that the Department provide more clarity by providing specifics such as the recommended location of lactation spaces, the number of spaces to be provided, whether they should have evening and weekend access, and how they must be equipped. Some commenters stated that the minimum requirements for a functional lactation space include a chair, a flat surface on which to place a pump, access to an electrical outlet, nearby access to running water, a refrigerator or other space in which an employee can store expressed milk, and reasonable proximity to an employee's specific place of work, and stated that the cost of implementing such requirements would be minimal because almost all recipients are already required to provide certain employees with a lactation space under the FLSA (as amended by the ACA) and a recipient may offer a common space for both students and employees.

In addition, some commenters asked the Department to state in the regulations and in supplemental guidance that if multiple students or employees need simultaneous access to a lactation space, the recipient should discuss various options with all parties to find a solution that meets their needs, such as using signage or a scheduling system, or installing partitions or screens in the space so it can be used by multiple persons at the same time.

*Discussion:* The final regulations at § 106.57(e) require recipients to ensure employees can voluntarily access a space other than a bathroom that is clean, shielded from view, free from intrusion from others, and may be used by an employee for expressing breast milk or breastfeeding as needed. This is the same as what recipients are required to provide for students under final § 106.40(b)(3)(v). Whether the lactation space a recipient provides meets the standards of § 106.57(e)—including that the space "may be used" for pumping and breastfeeding as needed—is best determined on a case-by-case basis, but generally means that the space is functional, appropriate, and safe for the employee's use. The Department declines to adopt additional specific requirements about the size and setup of

lactation spaces for employees at this time to preserve recipient flexibility and to be able to review the degree of and obstacles to compliance with other Federal lactation laws.

The Department notes that there may be Federal, State, or local laws or regulations that contain more specific requirements regarding lactation spaces for employees, and the Department does not intend for these regulations to preempt those laws or regulations to the extent they provide employees with more rights regarding lactation spaces.

Regarding the request that the Department require lactation spaces to be reasonably close to the employee's specific place of work, the Department notes again that, in final § 106.57(e)(2), the Department changed the phrase "ensure availability of" to "ensure that an employee can access" a lactation space. This change was made in recognition of the fact that, for the provision of lactation space to be effective, a recipient must ensure not only that an appropriate lactation space is available but also that it is accessible to the employees who need it in the reasonable break time they must use it. If the lactation space is so far from an employee's workstation, office, or classroom that the employee cannot reasonably get there and back, breastfeed or pump, and store their expressed milk in the time given, the Department would not consider the space to be accessible to the employee. This change in text also parallels the revised language regarding student access to a lactation space in § 106.40(b)(3)(v).

To provide recipients flexibility, the Department also declines to mandate in the regulations any particular arrangement a recipient must follow in connection with a shared lactation space. However, the Department notes that even with multiple users a recipient must comply with its obligations under § 106.57(e)(2) with respect to each one. If multiple students or employees need simultaneous access to a lactation space, a recipient must develop a solution consistent with § 106.57(e)(2) that meets the needs of the users of the space. Such a solution might include, as commenters suggested, using signage or a scheduling system, or installing partitions or screens in the space so it can be used by multiple persons at the same time. Given the variety among recipients, the Department defers to a recipient to find a system that works best at its institution consistent with § 106.57(e)(2), taking into consideration the needs of its employees and students.

*Changes:* None.

Pumping and Breastfeeding

*Comments:* Some commenters opposed the inclusion of "breastfeeding" in this provision because they believed it goes beyond the obligations that exist currently in some other Federal, State, and local laws, arguing that this language implies that a recipient must accommodate the presence of nursing infants in its school or other recipient workplace, which may not be safe or feasible in all circumstances. Commenters asserted that a recipient should have discretion regarding such matters.

In contrast, some commenters urged the Department to explicitly state in the regulations that a lactating student or employee will still have the right to express breast milk or breastfeed outside of the designated lactation spaces, if they wish, consistent with laws in all 50 States, the District of Columbia, Puerto Rico, and the Virgin Islands that generally allow breastfeeding in public or private places. *See* National Conference of State Legislatures, State Breastfeeding Laws, *https://www.ncsl.org/research/health/breastfeeding-state-laws.aspx* (last visited Mar. 12, 2024).

Some commenters requested that the Department revise the language in § 106.57(e) to use terms such as "express milk" and "nursing" to be more inclusive of all employees.

*Discussion:* The Department acknowledges commenters' suggestions and understands their concerns but disagrees with the suggestion to remove references to breastfeeding from § 106.57(e). This provision is focused solely on what may take place in the lactation space that a recipient must make accessible to its employees, and the Department wants to be clear that an employee may use that space for breastfeeding instead of pumping if the employee has access to their child while at work. The Department is not suggesting that Title IX requires a recipient to allow nursing infants to be present in the rest of its school or other workplace. Whether or not an employee's child may be present in recipient spaces outside the lactation room is a fact-specific determination beyond the scope of this rulemaking, and the Department agrees with commenters that a wide variety of State and local laws may provide such rights and that recipients would be obligated to honor those rights as applicable. Nothing in these final regulations would preclude a lactating employee from expressing breast milk or breastfeeding outside of the recipient's designated lactation spaces if State and local laws

allow it. The decision of where to pump or breastfeed is at the employee's discretion if it is consistent with all applicable laws and regulations.

Finally, the Department declines commenters' suggestion to revise the terminology used in § 106.57(e). Section 106.57(e) requires a recipient to ensure that any employee who is lactating can access a lactation space regardless of that employee's gender identity or gender expression and regardless of whether the employee plans to express milk via pumping or breastfeeding. Nothing in these final regulations prohibits a recipient from using different terminology to describe lactation spaces in its communications with employees.

*Changes:* None.

Other Requests for Clarification

*Comments:* One commenter raised a few issues they believed needed clarification regarding the intersection of proposed § 106.57(e) with employment-related rights regarding lactation spaces and break times, such as whether all claims regarding lactation rights now should be adjudicated under Title IX and whether employers need to add anything to employee handbooks about this matter. Some commenters requested that the Department prohibit a recipient from requiring an employee to get medical certification or documentation to get a lactation modification.

*Discussion:* In response to the commenter's question, all claims regarding lactation rights need not be adjudicated solely under Title IX. Employees can make a complaint pertaining to lactation under a recipient's Title IX grievance procedures if they wish. However, there is no requirement that an individual exhaust remedies under Title IX before pursuing a claim under another law in court or administratively. As the Department noted in the July 2022 NPRM, there are other Federal laws that govern employers' responsibilities regarding pregnancy or related conditions in the workplace including the PDA, which amended Title VII, and the ACA, which amended the FLSA. 87 FR 41514–41515. In addition, since the July 2022 NPRM was issued, Congress passed the PWFA and the PUMP Act, which also pertain to lactation in the workplace. There are State and local laws that may apply as well. Not all recipient employees will be covered by all of these laws, and whether an employee chooses to pursue a claim under Title IX will depend on the individual employee's circumstances.

In response to the question about whether a recipient must add information about lactation to employee handbooks, the Department notes that the final regulations do not require such notice standing alone; however, if the recipient provides notice of similar policies or benefits related to temporary medical conditions, the recipient will be required under § 106.57(c) to provide comparable notice related to lactation.

Regarding commenters' requests that the Department prohibit a recipient from requiring medical documentation for lactation needs, the Department has added § 106.40(b)(3)(vi) to the final regulations, which states, among other things, that a recipient may not require a student to provide supporting documentation related to lactation needs in connection with the provision of reasonable modifications or access to lactation space. Just as in the student context, the Department agrees with commenters that it is not reasonable for an employer to require documentation regarding employee lactation needs because the initiation of lactation after childbirth is nearly universal and the fact of lactation is obvious. However, considering recent new Federal legislation in this area, such as the PUMP Act and the PWFA, and a pending rulemaking that may address similar limits on medical documentation in the employee context, *see* 88 FR 54714, the Department declines to adopt similar language in § 106.57 at this time and believes that considering additional information would be appropriate before making this change, particularly given the interplay between Title IX and other employer obligations.

*Changes:* None.

8. Section 106.60   Pre-Employment Inquiries

*Comments:* Some commenters opposed proposed § 106.60 because they believe it exceeds the Department's authority and is inconsistent with Title IX and case law. Some commenters opposed proposed § 106.60(b) because they objected to the term "self-identify," without providing additional information as to the reason.

*Discussion:* The Department disagrees with the assertion that § 106.60 exceeds the Department's authority or is contrary to case law. The provisions in § 106.60 have been part of the Title IX regulations since 1975. *See* 40 FR 24128 (codified at 45 CFR 86.60 (1975)). As discussed above, the Supreme Court has recognized that the Department has broad regulatory authority under Title IX to issue regulations that it determines will best effectuate the purpose of Title

IX and to require recipients to take administrative actions to effectuate the nondiscrimination mandate of Title IX. *See, e.g., Gebser,* 524 U.S. at 292. Regulations that ensure that employees are not discriminated against in the employment application process are consistent with this grant of authority. *See* 20 U.S.C. 1682. The Department was unable to find, and commenters did not provide, any case law to the contrary in connection with § 106.60.

Although the commenter did not provide sufficient information regarding the objection to "self-identify" for the Department to understand the commenter's concern, this term will assist both applicants and recipients by clarifying that recipients may ask applicants to identify their sex under certain conditions.

In addition, in § 106.60(a), the Department made a grammatical correction by adding the word "a" between the words "make" and "pre-employment inquiry."

*Changes:* Section 106.60(a) has been revised to add the word "a" before "pre-employment inquiry." In § 106.60(b), the Department has made a technical change by inserting "Title IX or" for clarity and consistency.

## IV. Title IX's Coverage of Sex Discrimination

### A. Section 106.10   Scope

1. General

*Comments:* Some commenters expressed general support for proposed § 106.10's clarification of the scope of Title IX's prohibition on sex discrimination on the ground that it would help ensure that all students can learn and thrive in educational environments free from sex discrimination. Commenters stated that proposed § 106.10 would improve students' educational experiences by encouraging recipients to create inclusive, safe, and supportive learning environments and remedy discriminatory educational environments that have a negative effect on student mental health. Commenters asserted that proposed § 106.10 would help schools to better prevent and remedy sex discrimination against certain populations, including LGBTQI+ students and pregnant students, who, the commenters asserted, are disproportionately affected by discrimination. Commenters also shared research that commenters asserted shows that enumeration of bases of prohibited discrimination in school policies can reduce rates of bullying and suicidality among students.

Some commenters viewed proposed § 106.10 as necessary because LGBTQI+ and pregnant students and individuals lack clear protections in some schools. Other commenters noted proposed § 106.10 would alleviate threats, bullying, and harassment that students and employees experience in some schools. Commenters also asserted that individuals' right to be free from sex discrimination in education should not depend on the State in which they live or which school they attend.

Some commenters asserted that proposed § 106.10 conflicts with Title IX because it includes bases of discrimination that are not expressly referenced in the statute's text. Other commenters asserted that express coverage of the bases listed in proposed § 106.10 is consistent with the broad framing of the statute and court interpretations of Title IX.

Some commenters urged the Department to define "sex." Some commenters argued that "sex" should be defined in biological terms, referring to male or female. Some commenters criticized the July 2022 NPRM for asserting that the term "sex" is not necessarily limited to a single component of an individual's anatomy or physiology and asserting that a definition is not necessary. Those commenters asserted that this position contradicts the history of the term, and asserted that "sex" is objective, immutable, innate, and biological. One commenter asserted that sexual orientation, gender identity, and transgender status are distinct concepts from sex and the word "sex" cannot fully encompass all of these terms at once.

Some commenters argued that proposed § 106.10 does not meet the conditions for rulemaking set out in Executive Order 12866, which directs Federal agencies to "promulgate only such regulations as are required by law, are necessary to interpret the law, or are made necessary by compelling public need." Some commenters said that the July 2022 NPRM lacked substantial evidence about the prevalence of discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

One commenter asserted that covering discrimination based on gender identity, sexual orientation, sex stereotypes, and sex characteristics would violate the Protection of Pupil Rights Amendment (PPRA), 20 U.S.C. 1232h. The commenter argued that recipients would have to ask a student about sex behavior or attitudes and religious practices to comply with the regulations.

Some commenters urged the Department to clarify or modify proposed § 106.10 to add examples of discrimination, including sex-based harassment, sexual violence and exploitation, and preventing a student from participating in an education program or activity consistent with their gender identity. Other commenters supported adding other terms to proposed § 106.10, including biological sex, gender norms, gender expression, intersex traits, and marital status. Some commenters urged the Department to clarify in § 106.10 that discrimination based on gender expression would be prohibited discrimination based on gender identity and sex stereotyping. Commenters also urged the Department to clarify that pay inequity based on sex is a form of sex discrimination; explicitly prohibit discrimination on the basis of "actual or perceived" protected classes; and clarify the application of proposed § 106.10 to digital or online harassment.

Some commenters expressed concern that proposed § 106.10 is vague and would make it difficult for recipients and the public to discern what constitutes sex discrimination (*e.g.,* one commenter objected to the Department's assertion that the bases listed in proposed § 106.10 are not exhaustive, arguing that this would deprive a school community of notice of what constitutes discrimination). Some commenters expressed concern that proposed § 106.10 could be arbitrarily or selectively enforced in the absence of clear, objective definitions of the terms used in the regulations (such as sex stereotypes, sexual orientation, gender identity, and sex). Some commenters expressed concern that terms used in the preamble are not defined (*e.g.,* transgender, intersex). Some commenters raised concerns about the term "LGBTQI+," including that the identities represented by the acronym should not be conflated and that it may not encompass the full range of identities that individuals might have.

One commenter urged the Department to reopen the comment period to consider the impact of the pending Supreme Court decision in *303 Creative LLC* v. *Elenis,* No. 21–476.

*Discussion:* The Department agrees with commenters that § 106.10 will promote nondiscriminatory educational environments by clarifying the scope of Title IX's prohibition on sex discrimination and expects that § 106.10 will facilitate a consistent understanding of Title IX across the country.

The Department disagrees with commenters who argued that bases

specified in § 106.10 conflict with Title IX. As explained in the July 2022 NPRM, Title IX does not use the term "on the basis of sex" in a restrictive way, 87 FR 41531–32, and, as other commenters noted, many Federal courts have broadly interpreted the scope of prohibitions on sex discrimination in Title IX and other laws to cover the bases identified in § 106.10. *See, e.g., Bostock,* 590 U.S. at 659–62 (sexual orientation and gender identity); *Grabowski,* 69 F.4th at 1113 (sexual orientation); *Grimm,* 972 F.3d at 618–19 (sex characteristics and gender identity); *Whitaker By Whitaker* v. *Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,* 858 F.3d 1034, 1049–50 (7th Cir. 2017) (gender identity), *abrogated on other grounds as recognized by Ill. Republican Party* v. *Pritzker,* 973 F.3d 760, 762 (7th Cir. 2020); *Price Waterhouse,* 490 U.S. at 251 (sex stereotypes); *Nevada Dep't of Hum. Res.* v. *Hibbs,* 538 U.S. 721, 736 (2003) (pregnancy). The text of Title IX unambiguously covers any sex discrimination, except to the extent excluded in certain statutory provisions, and the exceptions in the statute must be construed strictly. *See, e.g., Jackson,* 544 U.S. at 175 ("Title IX is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition."); *Andrus* v. *Glover Constr. Co.,* 446 U.S. 608, 616–17 (1980) ("Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of evidence of a contrary legislative intent.").

As the Department explained in the July 2022 NPRM, providing a specific definition of "sex" for purposes of § 106.10 is unnecessary for these regulations. 87 FR 41531. As explained in more detail below in the discussions of each basis in § 106.10, discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or "biological distinctions between male and female," as the Supreme Court assumed in *Bostock.* 590 U.S. at 655. The Department described each of these bases, and the justification for including each, in the July 2022 NPRM, and they are addressed in more detail below. 87 FR 41531–34. The Department believes it is important to clarify that Title IX's prohibition on sex discrimination includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

Relatedly, the Department has determined it is not necessary to define each of the bases of discrimination listed in § 106.10 or other related terms used in the preamble. The Department has defined key terms as necessary in § 106.2. The Department disagrees that the terms in § 106.10 and the related terms in the preamble are vague. Rather, as explained in more detail below, they are well understood, informed by case law, and used widely in other laws and policies. To the extent that recipients want to further clarify the scope of discrimination under Title IX and these regulations, nothing in the final regulations prevents a recipient from adopting policies that include examples of prohibited conduct or providing training to its community on the scope of Title IX's coverage.

The Department disagrees that § 106.10 fails to comply with Executive Order 12866. The persistence of discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity each present a compelling public need, and this need is bolstered by commenters who discussed the prevalence of such discrimination. Section 106.10 will help ensure recipients, students, and other members of the public understand how the Department interprets the scope of Title IX's prohibition on sex discrimination. As described above, commenters provided many examples of discrimination on the bases in § 106.10 and the ways such discrimination impedes access to education, which is reinforced by OCR's enforcement experience.

The Department disagrees that prohibitions on discrimination based on gender identity, sexual orientation, sex stereotypes, and sex characteristics in these final regulations violate the PPRA. The PPRA requires parental consent (unless the student has turned 18 or is an emancipated minor) before an LEA may require, as part of an applicable program (or a program that the Department/Secretary of Education administers), a student to "submit to a survey, analysis, or evaluation that reveals information concerning" certain issues, including "sex behavior or attitudes" and "religious practices, affiliations, or beliefs of the student or student's parent." 20 U.S.C. 1232h(b)(3) and (7). The PPRA also requires an LEA to develop and adopt policies, in consultation with parents, to provide arrangements to protect privacy in the event of the administration or distribution of a survey to a student containing such items, including direct notification to parents (or to a student

if a student has turned 18 or is an emancipated minor) of the specific or approximate dates during the school year of the administration of such a survey and the opportunity to opt their children out of such a survey. 20 U.S.C. 1232h(c)(1)(B), (2)(B), (2)(C)(ii). Neither § 106.10 nor any other part of the final regulations requires a recipient to mandate that students disclose information about their sex behavior or attitudes or their or their parents' religious practices, affiliations, or beliefs or requires that an LEA administer surveys to students that contains questions on these topics. Further, § 106.6(g) reinforces any legal right of a parent or guardian to act on behalf of their child. The Department is committed to complying with the PPRA and expects LEAs to do the same.

The Department appreciates commenters' interest in ensuring that § 106.10 is sufficiently clear to adequately notify school communities of what constitutes unlawful discrimination. The Department disagrees that the structure of § 106.10 is impermissibly vague as it is common for laws, regulations, and policies to specify the bases of discrimination that are prohibited. Section 106.6(d) makes clear that nothing in the Title IX regulations requires a recipient to restrict rights guaranteed by the U.S. Constitution, such as by restricting constitutionally protected speech, and no other provision authorizes such actions. The Department maintains that the final regulations provide adequate notice of the scope of a recipient's legal obligations without purporting to specify outcomes for all scenarios and situations, many of which will turn on particular facts and circumstances. Other sections of the regulations address specific requirements and prohibitions.

The Department disagrees with commenters' suggestion to add specific forms of discrimination to § 106.10. The Department appreciates the opportunity to clarify that § 106.10 describes *bases* of discrimination that involve consideration of sex. Sex-based harassment and sexual violence, on the other hand, are examples of discriminatory conduct; they are not themselves "bases" of discrimination. These two concepts—the basis of the discrimination and the form that discrimination takes—are distinct and should remain separate in the final regulations. This distinction is reflected in the definition of "sex-based harassment" in § 106.2, which states that harassment on the basis of sex is a "form" of sex discrimination, and includes harassment on the "bases" listed in § 106.10. The Department

therefore also disagrees with commenters' suggestions to modify § 106.10 to address issues like pay inequity, various forms of sex-based harassment, or treating a person inconsistent with their gender identity, because those are not themselves "bases" that involve consideration of sex, but rather, are examples of ways that sex discrimination may occur.

The Department declines to add marital status to § 106.10 because Title IX does not prohibit discrimination based on marital status *per se,* as discrimination based on marital status does not necessarily require consideration of a person's sex. Title IX does, however, prohibit a recipient from applying rules concerning marital status that treat individuals differently on the basis of sex (*e.g.,* treating married women more or less favorably than married men, treating an unmarried mother worse than a married mother based on sex stereotypes, treating a man who is married to a man worse than a woman who is married to a man). *See* 34 CFR 106.21(c), 106.37(a)(3), 106.40(a), 106.57(a), 106.60.

While the Department appreciates commenters' suggestions for including additional overlapping bases in § 106.10, the Department declines those suggestions as unnecessary. For example, as discussed in the July 2022 NPRM and below, the Department interprets "sex characteristics" to include "intersex traits," and therefore declines to add the latter term into the regulatory text. 87 FR 41532. Similarly, the Department does not find it necessary to add commenters' suggested bases such as "gender norms" and "gender expression," as each of these is rooted in one or more of the bases already represented in § 106.10 and does not need to be set out separately.

The Department agrees that § 106.10 extends to discrimination based on a perceived status, whether the perception is accurate or not, but this conclusion is already apparent from the text of the statute and relevant case law. Courts have recognized that discrimination based on perceived characteristics violates Title VII. *See Abercrombie & Fitch Stores,* 575 U.S. at 773–74 (holding that to prove religious discrimination under Title VII a plaintiff need not show that the employer had actual knowledge that the plaintiff needed a religious accommodation as long as the plaintiff could show that the perceived need for an accommodation was a motivating factor in the employer's adverse decision); *Roberts* v. *Glenn Indus. Group, Inc.,* 998 F.3d 111, 120–21 (4th Cir. 2021) (holding that discrimination based on perceived

sexual orientation violates Title VII's prohibition on sex discrimination); *Jones* v. *UPS Ground Freight,* 683 F.3d 1283, 1299, 1304 (11th Cir. 2012) (holding that plaintiff who alleged race discrimination based, in part, on the use of epithets associated with ethnic or racial groups that differed from the plaintiff's actual ethnicity or race could survive a motion for summary judgment); *EEOC* v. *WC&M Enters., Inc.,* 496 F.3d 393, 401 (5th Cir. 2007) (quoting EEOC guidelines that state Title VII does not require a showing "that the alleged discriminator knew the particular national origin group to which the complainant belonged [because] it is enough to show that the complainant was treated differently because of [their] foreign accent, appearance, or physical characteristics"). And the Supreme Court and lower Federal courts often rely on interpretations of Title VII to inform interpretations of Title IX, rendering it appropriate to do so here. *See, e.g., Franklin,* 503 U.S. at 75; *Jennings,* 482 F.3d at 695; *Frazier,* 276 F.3d at 65–66; *Gossett,* 245 F.3d at 1176. Further, at least one circuit court of appeals has held that Title IX similarly bars sex discrimination on the basis of perceived sex. *See Grabowski,* 69 F.4th at 1113, 1116–18 (holding that Title IX bars sexual harassment on the basis of perceived sexual orientation) (citing *Bostock,* 590 U.S. 644; *Price Waterhouse,* 490 U.S. 228). In *Grabowski,* the Ninth Circuit noted that the harassment at issue stemmed from the perception that a male student was attracted to men, was motivated by the impermissible sex stereotype that men should be attracted only to women, and thus may not have occurred if the student was a different sex. *See id.* at 1116; *id.* at 1117 (citing *Price Waterhouse,* 490 U.S. at 250; *Nichols* v. *Azteca Restaurant Enters., Inc.,* 256 F.3d 864, 874 (9th Cir. 2001)). Accordingly, as noted in the July 2022 NPRM, Title IX's broad prohibition on discrimination "on the basis of sex" includes, at a minimum, discrimination against an individual on the basis of their perceived sex, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. 87 FR 41532. The inclusion of sex stereotypes in § 106.10 further underscores the point that Title IX covers discrimination based on one person's perception of another, whether or not those perceptions are accurate.

The Department disagrees that noting the bases listed in § 106.10 are not exhaustive deprives recipients of notice of what constitutes sex discrimination.

The Department proposed adding the bases in § 106.10 as examples to clarify the scope of Title IX's coverage of sex discrimination, which includes any discrimination that depends in part on consideration of a person's sex. The bases listed in § 106.10 are intended to provide recipients notice of the broad scope of prohibited sex discrimination.

This preamble and the preamble to the July 2022 NPRM use terms such as "LGBTQI+," "transgender," and "intersex," for purposes of convenience and explanation, but they do not appear in, and therefore need not be defined for purposes of applying, the final regulations because no rights and obligations under the final regulations depend on use of those terms. For example, the Department uses the term "LGBTQI+" as shorthand to describe "students who are lesbian, gay, bisexual, transgender, queer, questioning, asexual, intersex, nonbinary, or describe their sex characteristics, sexual orientation, or gender identity in another similar way." 87 FR 41395. The Department understands the term "transgender" to refer to a person whose sex assigned at birth differs from their gender identity. The Department explained in the July 2022 NPRM that the term "intersex" "generally describes people with variations in physical sex characteristics. These variations may involve anatomy, hormones, chromosomes, and other traits that differ from expectations generally associated with male and female bodies." 87 FR 41532.

The Department declines the commenter's suggestion to reopen the comment period to consider the impact of *303 Creative LLC* v. *Elenis,* 600 U.S. 570 (2023), because the decision did not address the education context and would not change the final regulations, which already specify that nothing in these regulations requires a recipient to restrict rights protected under the First Amendment.

*Changes:* None.

2. Authority To Enact Regulations on Sexual Orientation and Gender Identity Discrimination

*Comments:* Some commenters supported § 106.10, noting that Title IX provides express statutory authority for the Department to enact regulations that are "consistent with the achievement of the objectives" of Title IX. 20 U.S.C. 1682. Some commenters supported § 106.10 because it is consistent with the Supreme Court's description of Title IX in *North Haven Board of Education,* 456 U.S. at 521. Similarly, some commenters said proposed § 106.10

would be consistent with prior and current Department guidance and enforcement; Executive Orders 13803, 13985, 13988, 14021, and 14075; Title VII case law, including *Price Waterhouse, Oncale,* and *Bostock;* and Federal court decisions recognizing that Title IX's prohibition on sex discrimination includes discrimination based on sexual orientation and gender identity.[87]

Other commenters asserted that Title IX's legislative history lacks reference to sexual orientation and gender identity and expressed concern that coverage of these bases of discrimination in proposed § 106.10 would be at odds with Title IX's original purpose, which commenters argued was to protect the interests of women and girls.[87] Commenters also asserted that § 106.10 reflects an unexplained departure from the Department's historical interpretation of Title IX and exceeds the Department's authority under Title IX.

Commenters argued that "sex" should be interpreted according to the ordinary public meaning of the term when Title IX was enacted, that "sex" was understood by contemporary dictionaries and courts to refer to physiological differences between males and females, that the use of the term "gender identity" was very limited at that time, and that the term "gender" has been used in contradistinction to "sex." Some commenters said that Title IX's references to "both sexes," 20 U.S.C. 1681(a)(2), and "one sex" and "the other sex," 20 U.S.C. 1681(a)(8), are at odds with coverage of sexual orientation and gender identity discrimination.

Commenters also cited examples in which courts and the Department have declined to interpret sex discrimination laws to include sexual orientation and gender identity discrimination.

Some commenters expressed concern that proposed § 106.10 would circumvent Congress, which has declined to pass bills that would clarify that Title IX's coverage of sex discrimination encompasses gender identity discrimination. H.R. 1652, 113th Cong. (2013); S. 439, 114th Cong. (2015).

Some commenters asserted that Title IX's contractual nature demands a

narrow reading of the law and that § 106.10 exceeds Congress's power to impose funding conditions under the Constitution's Spending Clause. The commenters said that recipients could reasonably have read Title IX as ambiguous as to whether it covered sexual orientation and gender identity discrimination when they accepted funds, that the Department may not impose post-acceptance or retroactive conditions on Federal funds, and that private recipients of Federal funds must have notice of their responsibilities.

Some commenters asserted that the Department's interpretation of Title IX to cover sexual orientation and gender identity discrimination readjusts the balance between State and Federal authority, implicating the Tenth Amendment, sets up potential conflicts with State laws, weakens local control of education, and undermines the Department's compliance with the Department of Education Organization Act, 20 U.S.C. 3403(b). Other commenters, in contrast, supported the inclusion of sexual orientation and gender identity in proposed § 106.10, in part because it would be consistent with other anti-discrimination laws and the anti-discrimination policies already in place at some recipients.

Some commenters also objected to the July 2022 NPRM's citation to OCR's Notice of Interpretation—Enforcement of Title IX with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of *Bostock* v. *Clayton County,* 86 FR 32637 (June 22, 2021) (*Bostock* NOI), *https://www.govinfo.gov/content/pkg/FR-2021-06-22/pdf/2021-13058.pdf.* Commenters said the Department cannot rely on the *Bostock* NOI as authority for § 106.10 because the U.S. District Court for the Eastern District of Tennessee preliminarily enjoined the Department from enforcing it against twenty States. *See Tennessee* v. *U.S. Dep't of Educ.,* 615 F. Supp. 3d 807, 842 (E.D. Tenn. 2022).

Some commenters objected to the Department's reliance on Executive Orders 13988 and 14021.

*Discussion:* The Department agrees with commenters that, as explained in more detail below, § 106.10 is consistent with the Department's statutory authority under Title IX, prior and current Department guidance, various Executive Orders, and Federal case law precedents. The Department's authority to issue regulations governing equal opportunity to participate in an education program or activity is well established. 20 U.S.C. 1682; 20 U.S.C. 1221e–3; 20 U.S.C. 3474; Education Amendments of 1974 section 844.

The Department disagrees with commenters who argued that coverage of sexual orientation and gender identity discrimination is at odds with the purpose of Title IX. The purpose of Title IX, as shown from its text and structure, is to broadly prohibit sex discrimination. It has appropriately been applied in contexts that are covered by that broad prohibition, even if Congress did not specify those contexts when the law was passed. The Supreme Court has long recognized that statutory prohibitions on sex discrimination encompass sexual harassment, *Davis,* 526 U.S. at 647–48 (Title IX); *Gebser,* 524 U.S. at 281 (Title IX); *Harris,* 510 U.S. at 21 (Title VII); *Franklin,* 503 U.S. at 74–75 (Title IX); *Meritor Sav. Bank,* 477 U.S. at 64 (Title VII); retaliation, *Jackson,* 544 U.S. at 173–74 (Title IX); discrimination against men, *Newport News Shipbuilding & Dry Dock Co.* v. *EEOC,* 462 U.S. 669, 682 (1983) (Title VII); and same-sex sexual harassment, *Oncale,* 523 U.S. at 79 (Title VII); *Frazier,* 276 F.3d at 66 ("*Oncale* is fully transferable to Title IX cases"). Justice Scalia, writing for a unanimous Supreme Court, recognized that same-sex sexual harassment constitutes sex discrimination under Title VII because "statutory prohibitions often go beyond the principal evil to cover reasonably comparable evils, and it is ultimately the provisions of our laws rather than the principal concerns of our legislators by which we are governed." *Oncale,* 523 U.S. at 79; *cf. Bostock,* 590 U.S. at 680–81 (rejecting employers' request that the Court base its decision on what the Court thinks is best instead of interpreting the underlying statute). The authority to address sexual orientation discrimination and gender identity discrimination as sex discrimination under Title IX, including supportive and contrary case law, is addressed in more detail in the separate discussion of those bases below.

The Department disagrees with commenters who asserted that the statute's use of the terms "both sexes," "one sex," and "the other sex" suggests that the statute does not cover sexual orientation and gender identity discrimination. As explained in the July 2022 NPRM, Title IX's coverage of discrimination based on sexual orientation and gender identity does not depend on whether sex is defined to encompass only certain biological characteristics. 87 FR 41531–32. Indeed, *Bostock's* reasoning dictates that, even assuming that "sex" refers to "biological distinctions between male and female," discrimination against a person because

---

they are gay or transgender is, in part, discrimination on the basis of sex. *See Bostock,* 590 U.S. at 659–62. The Department recognizes that some early Federal court decisions did not recognize sexual orientation and gender identity discrimination as sex discrimination, but many subsequent Federal court decisions have declined to extend those earlier decisions.[88] Some of these subsequent decisions cited intervening decisions of the U.S. Supreme Court, including *Bostock,* which recognized that Title VII's prohibition on sex discrimination encompasses sexual orientation and gender identity discrimination, and *Price Waterhouse,* 490 U.S. at 251, which recognized that Title VII's prohibition on sex discrimination encompasses discrimination based on a failure to conform to stereotypical gender norms.

Federal courts' more recent analyses of Title IX's coverage of sexual orientation and gender identity discrimination are more persuasive because they apply *Bostock* and *Price Waterhouse* and acknowledge the full scope of Title IX's prohibition on sex discrimination. *See, e.g., Grabowski,* 69 F.4th at 1113 (Title IX prohibits sexual orientation discrimination); *Grimm,* 972 F.3d at 616 (Title IX prohibits gender identity discrimination); *Whitaker,* 858 F.3d at 1049 (same); *cf. Adams* v. *Sch. Bd. of St. Johns Cnty.,* 57 F.4th 791, 808–09 (11th Cir. 2022) (recognizing that *Bostock* held that discrimination because a person is gay or transgender "necessarily entails discrimination based on sex," but opining that this holding did not resolve the question of whether a school board's policy excluding transgender students from bathrooms consistent with their gender identity was otherwise permissible under Title IX).

Although Congress has not amended Title IX to clarify its application to sexual orientation and gender identity discrimination, the Department agrees with the Supreme Court that "congressional inaction lacks persuasive significance because several equally tenable inferences may be drawn from such inaction, including the inference that the existing legislation already incorporated the offered change." *LTV Corp.,* 496 U.S. at 650 (citations and quotations omitted). The Department's

interpretation of Title IX flows from the statute's "plain terms," *see Bostock,* 590 U.S. at 662–63, 674–76, and is consistent with the recent analysis of the statute's text and structure by various Federal courts, *see Grabowski,* 69 F.4th at 1113; *Grimm,* 972 F.3d at 616.

The Department disagrees with commenters who argued that Title IX's contractual nature demands a narrow reading of the law or that § 106.10 constitutes an unfair surprise or retroactive condition. While Title IX is in the nature of a contract, under Congress's Spending Clause authority, recipients have been on notice since enactment of Title IX that the statute means that no recipient may discriminate on the basis of sex. *See Jackson,* 544 U.S. at 175 ("Because Congress did not list any specific discriminatory practices when it wrote Title IX, its failure to mention one such practice does not tell us anything about whether it intended that practice to be covered."); *see also Bennett,* 470 U.S. at 665–66, 673 (noting that "the possibility that application of [the condition] might be unclear in [some] contexts" does not render it unenforceable under the Spending Clause); *Sch. Bd. of Nassau Cnty.* v. *Arline,* 480 U.S. 273, 184, 286 n.15 (1987) (holding that individuals with contagious diseases are covered by Section 504 and rejecting lack of notice objections given Spending Clause statute's broad nondiscrimination mandate); *Grimm,* 972 F.3d at 619 n.18. Moreover, the notice required for the Spending Clause is satisfied by the text itself; just as the Supreme Court held in *Bostock* regarding Title VII, it is clear from the statutory text that, by its plain terms, Title IX covers discrimination that, like sexual orientation and gender identity discrimination is based on "sex." *Cf. Bostock,* 590 U.S. at 662–63 (holding Title VII's prohibition on discrimination on the basis of sexual orientation or gender identity flows from the statute "plain terms"). Further, this rulemaking process has afforded recipients notice and opportunity to comment, and recipients that do not wish to comply with the requirements of the final regulations have had and continue to have the opportunity to decline Federal funding. Further, the Department will not—and does not have the authority to—enforce these final regulations retroactively; they apply only to sex discrimination that allegedly occurred on or after August 1, 2024.

Consistent with Title IX, the final regulations provide for an appropriate balance between State and Federal authority. By statute, Congress has conferred authority on the Department

to promulgate regulations under Title IX to effectuate the purposes of Title IX. 20 U.S.C. 1682. Compliance with Title IX and its implementing regulations is "much in the nature of a contract," because, "in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst,* 451 U.S. at 17. Consistent with its position with respect to the 2020 amendments, the Department maintains that, through these final regulations, it is not compelling recipients to do anything. Recipients—including States and educational institutions—agree to comply with Title IX and its implementing regulations as part of the bargain for receiving Federal financial assistance, so that Federal funds are not used to support sex discrimination. *See* 85 FR 30459. States retain the ability to further address discrimination on the basis of sex in education in a manner that complies with these final regulations.

Accordingly, the Department disagrees that it lacks the delegated authority to promulgate § 106.10. In enacting Title IX, Congress conferred the power to promulgate regulations on the Department. 20 U.S.C. 1682. The Supreme Court has noted that "[t]he express statutory means of enforc[ing] [Title IX] is administrative," as "th[at] statute directs federal agencies that distribute education funding to establish requirements to effectuate the nondiscrimination mandate, and permits the agencies to enforce those requirements through 'any . . . means authorized by law' including ultimately the termination of federal funding." *Gebser,* 524 U.S. at 280–81 (quoting 20 U.S.C. 1682). The Supreme Court has held that sex discrimination, as prohibited by Title VII, encompasses discrimination based on sexual orientation and gender identity, *Bostock,* 590 U.S. at 659–62, and lower courts have applied this reasoning to Title IX, *see, e.g., Grabowski,* 69 F.4th at 1116; *Grimm,* 972 F.3d at 616. Section 106.10's coverage of discrimination on the basis of sexual orientation and gender identity is consistent with these Federal court holdings and is properly promulgated to effectuate the purposes of Title IX's nondiscrimination mandate.

Additionally, with respect to concerns that coverage of sexual orientation and gender identity discrimination under § 106.10 will lead to conflicts with State laws, the Department notes that the obligation to comply with Title IX and these final regulations is not obviated or alleviated by any State or local law or other requirements that conflict with Title IX and these final regulations. As

---

[88] *See, e.g., Ulane* v. *Eastern Airlines,* 742 F.2d 1081, 1085–87 (7th Cir. 1984), *not followed as dicta by Hively* v. *Ivy Tech Cmty. Coll. of Indiana,* 853 F.3d 339 (7th Cir. 2017); *Sommers* v. *Budget Mktg., Inc.,* 667 F.2d 748, 750 (8th Cir. 1982); *Holloway* v. *Arthur Andersen & Co.,* 566 F.2d 659, 664 (9th Cir. 1977), *overruling recognized by Schwenk* v. *Hartford,* 204 F.3d 1187, 1201–02 (9th Cir. 2000).

addressed in more detail in the discussion of § 106.6(b), it is well established that State laws can be preempted by Federal statutes and regulations when it is impossible for a private party to comply with both State and Federal requirements or because State law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress. *See Freightliner Corp.,* 514 U.S. at 287; *Hillsborough Cnty.,* 471 U.S. at 713; *Planned Parenthood of Hous.,* 403 F.3d 324; *O'Brien,* 162 F.3d 40. As long as State laws do not conflict with Title IX and these final regulations, recipients should be able to comply with State laws as well as these final regulations.

Relatedly, the Department disagrees that Title IX's coverage of sexual orientation and gender identity discrimination inappropriately infringes on the responsibility of State and local governments to provide public education or prevents States from customizing policies for their local communities. Nothing in these regulations prevents States or local governments from adopting innovative and customized approaches to education, as long as they are consistent with Title IX's prohibition on sex discrimination. And Title IX does not dictate curriculum. *See* 34 CFR 106.42 ("Nothing in [theseTitle IX regulations]shall be interpreted as requiring or prohibiting or abriging in any way the use of particular textbooks or curricular materials."). The Department declines to highlight examples of existing State laws and policies that directly conflict with Title IX because the Department refrains from offering opinions about specific laws or policies without an evaluation of all of the relevant facts.

The Department also disagrees with commenters who stated that the final regulations exceed the Department's authority under the Department of Education Organization Act; the final regulations do not grant the Department authority to direct, supervise, or control the administration or personnel of any recipient. 20 U.S.C. 3403(b).

The Department acknowledges that a district court entered a preliminary injunction barring the Department from enforcing its *Bostock* NOI against twenty States because the court concluded that the plaintiffs were likely to succeed on their claim that the *Bostock* NOI and other accompanying documents were required to go through notice-and-comment rulemaking. *Tennessee,* 615 F. Supp. 3d at 840. The Department disagrees with the conclusion and is appealing that ruling.

But the district court's holding has no bearing on the Department's statutory authority to promulgate and amend its Title IX regulations as failure to employ notice-and-comment rulemaking was the ground upon which the *Tennessee* court enjoined that notice. The Department disagrees that the cases commenters cited prevent the Department from regulating on Title IX's application to sexual orientation or gender identity discrimination. *Mann Construction, Inc.* v. *United States,* 27 F.4th 1138 (6th Cir. 2022), for example, does not involve Title IX and examines notice-and-comment rulemaking requirements. Here, however, the Department has complied with all applicable APA requirements for this rulemaking, and thus, *Mann* does not apply.

The Department also clarifies that it did not rely on Executive Orders 13988 or 14021 for its interpretation of Title IX. Rather, these orders directed the Department to review its current regulations implementing Title IX for consistency with Title IX's statutory prohibition on sex discrimination. The Department's statutory authority for § 106.10 comes from Title IX, 20 U.S.C. 1682, and other statutes, 20 U.S.C. 1221e–3 and 3474.

*Changes:* None.

### 3. Reliance on Bostock and Title VII Case Law

*Comments:* Some commenters noted that Federal courts have found that discrimination on the basis of sexual orientation and gender identity is sex discrimination under Title VII, Title IX, and other laws, and noted that courts have historically equated the meaning of sex discrimination under Title IX with Title VII and looked to Title VII to interpret Title IX.

Other commenters objected to the Department's reliance on Title VII case law because of differences between Title IX and Title VII, including that Title IX expressly permits separation or different treatment of students based on sex in certain contexts and because education and employment are different in analytically material ways; that Title IX has a contractual framework whereas Title VII is framed as an outright prohibition; that Title IX is "sex-affirmative" and expressly permits some sex-based distinctions whereas Title VII is "sex-prohibitive;" and that the text of Title VII's prohibition on discrimination "because of sex" and Title IX's prohibition on discrimination "on the basis of sex" are sufficiently different that the reasoning of *Bostock* should not apply to the latter.

Some commenters objected to the Department's reliance on *Bostock* for explicitly including sexual orientation and gender identity discrimination under Title IX, arguing that the Supreme Court assumed that "sex" referred to "biological distinctions between male and female," 590 U.S. at 655, framed the issue before it narrowly, and stated that the decision did not apply to other Federal laws that prohibit sex discrimination, *id.* at 681. Some commenters asserted that discrimination against a person for being "nonbinary" or "bisexual" may not require consideration of sex in the same way the *Bostock* Court analyzed discrimination because a person is gay or transgender.

Some commenters argued that the Department did not provide a persuasive explanation for its change from the position taken in a memorandum from its General Counsel's office commenting on *Bostock's* application to Title IX. U.S. Dep't of Educ., Memorandum from Principal Deputy General Counsel delegated the authority and duties of the General Counsel Reed D. Rubinstein to Kimberly M. Richey, Acting Assistant Secretary of the Office for Civil Rights re *Bostock* v. *Clayton Cnty.* (Jan. 8, 2021) (archived and marked not for reliance in March 2021) (Rubinstein Memorandum), *https://www2.ed.gov/ about/offices/list/ocr/correspondence/ other/ogc-memorandum-01082021.pdf.* Some commenters urged that the final regulations should not extend beyond the boundaries of the Rubinstein Memorandum, which they argued is consistent with *Bostock* and better protects cisgender women and girls from discrimination.

*Discussion:* Some courts have declined to extend the Supreme Court's reasoning in *Bostock* to Title VII by concluding that prohibitions on discrimination "because of sex" and discrimination "on the basis" of sex do not mean the same thing. *See, e.g., Neese* v. *Becerra,* 640 F. Supp. 3d 668, 675–84 (N.D. Tex. 2022). The Department disagrees. Both phrases simply refer to discrimination motivated in some way by sex. Indeed, the Supreme Court has used the terms "because of" and "on the basis of" interchangeably, including in *Bostock* itself. *Bostock,* 590 U.S. at 650 ("[I]n Title VII, Congress outlawed discrimination in the workplace on the basis of race, color, religion, sex, or national origin."); *see also Meritor Sav. Bank,* 477 U.S. at 64 ("[W]hen a supervisor sexually harasses a subordinate because of the subordinate's sex, that supervisor 'discriminate[s] on

the basis of sex.''). And like Title VII, Title IX's prohibition on discrimination ''on the basis of'' sex clearly encompasses discrimination on the basis of sexual orientation and gender identity, given that such bases of discrimination meet the same but-for causation test relied upon in *Bostock. See, e.g., Sheppard* v. *Visitors of Va. State Univ.,* 993 F.3d 230, 236–37 (4th Cir. 2021); *cf. Radwan* v. *Manuel,* 55 F.4th 101, 131–32 (2d Cir. 2022) (addressing but not deciding the question). Indeed, some courts have construed Title IX to impose a ''motivating factor'' standard, and discrimination based on sexual orientation and gender identity is motivated, at least in part, by sex. *See, e.g., Doe* v. *William Marsh Rice Univ.,* 67 F.4th 702, 708–09 (5th Cir. 2023). As *Bostock* explained, ''under this more forgiving [motivating factor] standard, liability can sometimes follow even if sex wasn't a but-for cause of the . . . challenged decision.'' 590 U.S. at 657. Nonetheless, the Court concluded that even ''the more traditional but-for causation standard'' encompassed discrimination on the basis of sexual orientation and gender identity. *Id.* Thus, Title IX's statutory text is no more permissive of discrimination on the basis of sexual orientation and gender identity than Title VII's.

With respect to the justification for changes from the position taken in the now-archived Rubinstein Memorandum, the Department explained in the July 2022 NPRM that the Department found that the position taken in the Rubinstein Memorandum was at odds with Title IX's text and purpose and the reasoning of the courts that had considered the issue. 87 FR 41531–37. In particular, the Department found that Title IX and its implementing regulations did not determinatively set forth the definition of ''sex'' to mean ''biological sex.'' 87 FR 41537. The Department agrees, however, that even assuming ''sex'' means ''biological sex,'' Title IX's prohibition on sex discrimination encompasses sexual orientation and gender identity discrimination. *See* 87 FR 41531. A recipient would not therefore need to determine on a case-by-case basis whether a particular incident of sexual orientation or gender identity discrimination is rooted in ''biological sex'' as discrimination on these bases always demands consideration of sex. The Department is also concerned that a narrower interpretation could exclude some individuals from Title IX protections that properly apply to all students. Indeed, the Department recognized this concern in the

Rubinstein Memorandum. *See* Rubinstein Memorandum at 2 (declining to conclude that all sexual orientation discrimination constitutes sex discrimination, but suggesting that *Bostock's* analysis ''would logically extend to individuals who allege discrimination on the basis that they are heterosexual or non-transgender.'')

With respect to the Supreme Court's decision in *Bostock,* the Department first notes that the Court did not adopt a particular definition of ''sex'' in *Bostock,* instead ''assum[ing]'' a definition provided by the employers that the employees had accepted ''for argument's sake.'' 590 U.S. at 655. The Court made clear that ''nothing in [its] approach to these cases turn[ed] on the outcome of the parties' debate'' about the definition of sex. *Id.* The same is true here. Nothing in the Department's interpretation of the scope of discrimination ''on the basis of sex'' under Title IX turns on resolving the meaning of sex because, as in *Bostock* and as explained further below, it is impossible to discriminate against a person on the bases listed in § 106.10 without discriminating against that individual based, at least in part, on sex, even if ''sex'' is understood only in terms of certain physiological sex characteristics.

The Department disagrees with the commenter who argued that discrimination against a person because they are nonbinary or bisexual does not require consideration of a person's sex. As the Court explained in *Bostock,* such traits are ''inextricably bound up with sex.'' 590 U.S. at 660–61. Moreover, it is plainly sex discrimination under longstanding Supreme Court precedent to treat a person worse because of their gender nonconformance. *See Price Waterhouse,* 490 U.S. at 251. A person's nonconformity with expectations about the sex of the person to whom they should be attracted or the sex with which they should identify implicate one's sex, and discrimination on that basis is prohibited. *See Whitaker,* 858 F.3d at 1048.

The Department acknowledges that *Bostock* interpreted Title VII and did not purport to interpret other Federal laws or address issues not raised in that litigation. *See* 590 U.S. at 681. The Department notes that this is consistent with the principle that Federal courts may not provide advisory opinions and are limited to deciding particular cases and controversies. *See, e.g., Carney* v. *Adams,* 592 U.S. 53, 58 (2020). As noted above, because the statutory prohibitions against sex discrimination in Title VII and Title IX are similar, the Supreme Court and other Federal courts

look to interpretations of Title VII to inform Title IX. Thus, *Bostock's* discussion of the text of Title VII appropriately informs the Department's analysis of Title IX. Since *Bostock,* three Federal courts of appeals have held that the plain language of Title IX's prohibition on sex discrimination must be read similarly to Title VII's prohibition. The Department agrees with the reasoning in these cases. *See A.C. by M.C.* v. *Metro. Sch. Dist. of Martinsville,* 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski,* 69 F.4th at 1116–17; *Doe* v. *Snyder,* 28 F.4th 103, 113–14 (9th Cir. 2022); *Grimm,* 972 F.3d at 616.

More broadly, the Department also disagrees with commenters who argued that Title VII case law should not be considered when interpreting the scope of prohibited sex discrimination under Title IX. Federal courts, including the Supreme Court, often look to interpretations of other laws barring sex discrimination, particularly Title VII, when analyzing Title IX.[89]

The Department also disagrees with commenters who asserted that the fact that Title IX and its regulations include several express exceptions that permit recipients to separate or treat students differently on the basis of sex under certain circumstances prevents the Department from interpreting Title IX's broad prohibition on sex discrimination consistent with courts' interpretation of Title VII or other Federal sex discrimination laws. Indeed, like Title IX, Title VII also includes an exception that allows an employer to differentiate or separate individuals on the basis of sex in certain circumstances. *See* 42 U.S.C. 2000e–2(e)(1) (allowing an employer to consider a person's sex in employment decisions where a person's sex is ''a bona fide occupational qualification reasonably necessary to the normal operation of that particular business or enterprise''). In addition, like Title IX, Title VII has also been interpreted to permit employers to offer sex-separate facilities despite its ''sex-prohibitive'' framework. *See, e.g.,* U.S. Equal Emp. Opportunity Comm'n, *Sexual Orientation and Gender Identity (SOGI) Discrimination, https:// www.eeoc.gov/sexual-orientation-and-gender-identity-sogi-discrimination* (last visited Mar. 12, 2024). The Department therefore disagrees that Title IX's

---

[89] *See, e.g., Davis,* 526 U.S. at 631 (holding that Title VII agency principles do not apply in determining liability for money damages under Title IX, but finding Title VII remains relevant in determining what constitutes sex discrimination under Title IX); *Olmstead* v. *L.C. ex rel. Zimring,* 527 U.S. 581, 617, n.1 (1999) (Thomas, J., dissenting) (''This Court has also looked to its Title VII interpretations of discrimination in illuminating Title IX.'').

limited allowance for separate or different treatment on the basis of sex in certain contexts prevents the Department from relying on Title VII case law to inform its interpretation of Title IX's general prohibition on sex discrimination.

*Changes:* None.

4. Sexual Orientation and Gender Identity Discrimination Generally

*Comments:* Some commenters shared views on Title IX's coverage of sexual orientation and gender identity discrimination together. Comments that separately address coverage of those bases are discussed in separate sections below.

Many commenters expressed support for the proposed inclusion of sexual orientation and gender identity in proposed § 106.10 because they stated that it would: help recipients create more inclusive, safe, and supportive environments for all students, allowing for equal and equitable access to education; protect LGBTQI+ students and families from sex discrimination in schools; help reduce elevated rates of discrimination, suicidality, and bullying experienced by LGBTQI+ students; be consistent with congressional intent in passing Title IX, which was to broadly prohibit sex discrimination; and ensure that Title IX is given "a sweep as broad as its language." Other commenters supported the inclusion of sexual orientation and gender identity in proposed § 106.10, noting the high levels of sex discrimination, including sex-based harassment, against LGBTQI+ students and school employees and the negative effects of such discrimination.

Some commenters expressed concern that coverage of sexual orientation and gender identity discrimination will harm religious students, including religious students who do not attend recipient institutions that are eligible for a religious exemption, particularly if they could be held responsible for conduct that does not constitute intentional discrimination (*e.g.,* expressing a religious belief that another individual finds offensive). Commenters also asserted that institutions with conflicting religious beliefs would be forced to choose between accepting Federal funding and adopting policies and curricula related to sexual orientation and gender identity that align with their religious beliefs. Some commenters opposed proposed § 106.10 because students who participate in Federal financial aid programs may be unable to attend their college of choice if those colleges choose to forego Federal funds to avoid obligations under the proposed regulations.

Some commenters asked the Department to amend proposed § 106.2 to include definitions of conduct and practices that may constitute discrimination on the bases of sexual orientation and gender identity, including intentional use of offensive language, and to distinguish between genuine mistakes and repeated and intentional conduct.

Some commenters raised concerns that proposed coverage of sexual orientation and gender identity discrimination will be costly for recipients to implement and may make recipients vulnerable to costly and increased complaints, investigations, and litigation. Some commenters requested that the Department issue additional guidance and provide technical assistance and training with regard to best practices creating educational environments free from discrimination against LGBTQI+ students and families, and responding promptly and appropriately to all complainants regardless of sexual orientation and gender identity.

*Discussion:* The Department agrees with commenters who noted that discrimination based on sexual orientation and gender identity is a serious problem that the final regulations' clarification of the scope of sex discrimination will help to address in the context of federally funded education programs and activities. The Department also agrees that the final regulations will increase the inclusion and the safety of LGBTQI+ students and employees in schools; provide them with access to a process to address sex-based harassment; and be consistent with the text and intent of Title IX. The Department agrees with the comments that the inclusion of sexual orientation and gender identity in § 106.10 will improve consistency between Title IX and the nondiscrimination laws of some States and the policies of many recipients.

The Department disagrees with the contention that including sexual orientation and gender identity in the scope of § 106.10 harms women. Recognizing these bases of sex discrimination under Title IX in no way lessens the force of Title IX's protections against discrimination that limits educational opportunities for girls and women. Further, discrimination based on sexual orientation or gender identity is typically motivated by the same sex stereotypes that limit opportunities for women regardless of whether they identify as LGBTQI+. *See, e.g., Price Waterhouse,* 490 U.S. at 250 ("In the specific context of sex stereotyping, an employer who acts on the basis of a

belief that a woman cannot be aggressive, or that she must not be, has acted on the basis of gender."); *Grabowski,* 69 F.4th at 1117 (holding that discrimination against a student because they do not conform to a particular masculine or feminine sex stereotype is prohibited under Title IX); *Whitaker,* 858 F.3d at 1049 ("A policy that . . . punishes [an] individual for his or her gender non-conformance . . . violates Title IX."); *Pederson* v. *La. State Univ.,* 213 F.3d 858, 880 (5th Cir. 2000) (recognizing that a university violated Title IX when its athletic funding decisions were based on "paternalism and stereotypical assumptions about [women's] interests and abilities," and a "remarkably outdated view of women and athletics"); *Videckis* v. *Pepperdine Univ.,* 150 F. Supp. 3d 1151, 1160 (C.D. Cal. 2015) ("It is undisputed that Title IX forbids discrimination on the basis of gender stereotypes."); *Pratt* v. *Indian River Cent. Sch. Dist.,* 803 F. Supp. 2d 135, 152 (N.D.N.Y. 2011) (holding that allegations of peer harassment based on nonconformity or perceived nonconformity with sex stereotypes state a claim under Title IX); *cf. United States* v. *Virginia,* 518 U.S. 515, 533 (1996) (stating that in making classifications based on sex, the State "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females.").

With respect to concerns about potential conflicts with beliefs of religious students and institutions, the Department notes that it is fully committed to respecting rights protected under the First Amendment and adhering to Title IX's religious exemption. A recipient's compliance with the final regulations must be carried out consistent with § 106.6(d), which specifies that nothing in these regulations requires a recipient to restrict rights protected under the First Amendment or any other constitutional provisions, and no other provision authorizes such action. Further, Title IX does not "apply to an educational institution which is controlled by a religious organization if the application of [20 U.S.C. 1681(a)] would not be consistent with the religious tenets of such organization." 20 U.S.C. 1681(a)(3).

The Department declines the suggestion to add definitions of specific conduct and practices that constitute sexual orientation or gender identity discrimination because the Department refrains from offering opinions about how the regulations apply to specific facts without first conducting an investigation. The Department notes

that school policies that limit or deny a student's participation in a recipient's education program or activity on the basis of that student's sexual orientation or gender identity are subject to Title IX's prohibitions on sex discrimination. The Department will investigate complaints and make fact-specific determinations, as appropriate, to determine whether a particular practice or policy limits or denies a student their right to participate in the recipient's education program or activity free from sex discrimination. 34 CFR 100.7 (incorporated through 34 CFR 106.81).

The Department is cognizant that some commenters disagree with Title IX's coverage of sexual orientation and gender identity discrimination, but the Department is guided by the text and purpose of the statute. The Department's goal in adopting § 106.10 is to clarify the scope of Title IX's prohibition on sex discrimination, consistent with Title IX's text and purpose and the interpretations of Federal courts.

Likewise, the Department maintains that it has sufficiently examined relevant data on the impact of these regulations and accounted for such impact. In connection with the clarification of Title IX's scope under § 106.10, the Department's view is that articulating this standard will result in greater nondiscrimination protection, which in turn will result in more students able to access education and employees able to work free from sex discrimination. For a detailed analysis of costs and benefits related to the final regulations, please see the *Regulatory Impact Analysis.* These final regulations protect recipients' discretion to shape responses to sex discrimination in nondiscriminatory ways that account for the needs of the parties involved. The final regulations clarify the scope of a recipient's legal obligations. They do not, however, specify outcomes for all scenarios, which will turn on particular facts and circumstances.

The Department agrees that discrimination or hostility toward LGBTQI+ students, parents, guardians, caregivers, and family members can deny students' equal access to educational opportunities. Anyone who believes that a recipient has engaged in prohibited discrimination against a person participating or attempting to participate in the recipient's education program or activity may file a complaint with OCR.

*Changes:* None.

5. Gender Identity

*Comments:* In addition to the comments discussed above, the Department received comments

specifically focused on coverage of gender identity discrimination under proposed § 106.10. Some commenters urged the Department to articulate a specific definition of ''gender identity,'' or clarify if certain identities would constitute ''gender identity'' under proposed § 106.10. Some commenters argued that the term ''gender identity'' is subjective, unconstitutionally vague, overbroad, and requires ''self-identification'' of which others may not be aware, or that may change unbeknownst to a recipient. One commenter asserted that the failure to define the term makes it impossible for recipients to determine how to adequately ensure they do not discriminate on that basis.

Other commenters asked for clarity on how a recipient must balance a student's allegations of gender identity discrimination against another student's right to freedom of expression.

Some commenters asked whether the prohibition on gender identity discrimination protects only transgender people. One commenter stated that it would be more consistent with *Bostock* to frame proposed § 106.10 as discrimination based on transgender status.

Other commenters urged the Department to modify proposed § 106.10 or another section of the regulations to permit recipients to separate students based on biological sex rather than gender identity when reasonable to ensure privacy, safety, and fairness.

One commenter asked the Department to clarify how Title IX's coverage of gender identity discrimination may overlap with court decisions treating gender dysphoria as a disability under the Americans with Disabilities Act.

*Discussion:* The Department disagrees that the term ''gender identity'' is too vague, subjective, or overbroad a term to incorporate in the Title IX regulations, or that it is necessary to further clarify what ''gender identity'' means in the regulations. The Department understands gender identity to describe an individual's sense of their gender, which may or may not be different from their sex assigned at birth. Courts have used the term consistent with this understanding, *see Bostock,* 590 U.S. at 660, 669; *Parents for Priv.* v. *Barr,* 949 F.3d 1210, 1217 (9th Cir. 2020); *Whitaker,* 858 F.3d at 1049, sometimes with only a brief explanation, *Grimm,* 972 F.3d at 594 (''gender identity—or their deeply felt, inherent sense of their gender''); *Boyertown Area Sch. Dist.,* 897 F.3d at 522 (''A person's gender identity is their subjective, deep-core sense of self as being a particular

gender''); *Schroer* v. *Billington,* 577 F. Supp. 2d 293, 295 (D.D.C. 2008). The term is now well understood as it is used widely in laws and policies, and so the Department determined that— consistent with the approach taken by many courts—it is unnecessary to articulate a specific definition of ''gender identity'' in § 106.10.

The Department appreciates a commenter's recognition that one person may not know another's gender identity without inquiring unless the other person volunteers the information. This, however, does not undermine the fact that gender identity discrimination is sex discrimination. By comparison, one person may not know another person's sexual orientation, religion, race, or national origin without asking, but may still discriminate against them by, for example, harassing them on one of those bases in a manner that creates a hostile educational environment, or by discriminating against them based on perceived traits. To comply with the prohibition on gender identity discrimination, a recipient must not treat individuals more or less favorably based on their gender identity and, as described in more detail in the discussion of § 106.31(a)(2), generally may not prevent a person from participating in its education program or activity consistent with the person's gender identity.

The Department declines the suggestion to revise § 106.10 to address separation of students based on sex. Permissible sex separation under the statute is discussed further below in the discussion of § 106.31(a)(2).

The Department declines the suggestion to include discrimination based on transgender status instead of or in addition to discrimination based on gender identity in § 106.10. *Bostock* instructs that when a person is discriminated against because their gender identity is not consistent with their sex assigned at birth, ''sex'' is, at least in part, a basis for that discrimination. *See Bostock,* 590 U.S. at 669. This therefore includes discrimination against a person because they are transgender, or because they identify in some other way that is inconsistent with their sex assigned at birth. *See id.* at 669; *see also, e.g., Doe* v. *Mass. Dep't of Corr.,* No. CV 17–12255, 2018 WL 2994403 (D. Mass. June 14, 2018); *EEOC* v. *R.G. & G.R. Harris Funeral Homes, Inc.,* 884 F.3d 560 (6th Cir. 2018); *Whitaker,* 858 F.3d 1034. The Department also notes that a dissent in *Bostock* asserted that ''there is no apparent difference between discrimination because of transgender status and discrimination because of

gender identity.'' 590 U.S. at 686, n.6 (Alito, J. joined by Thomas, J., dissenting). The Department has determined that ''gender identity'' encompasses a person's ''transgender status,'' but is a more widely understood term that more accurately and fully reflects the scope of Title IX's protections.

With respect to the need to respond to a student's allegations of gender identity discrimination while respecting another student's right of freedom of expression, there is no inherent conflict between one student's right to be free from sex discrimination and another student's right to freedom of expression, and the Department notes that it is fully committed to respecting rights protected under the First Amendment. For additional discussion of the First Amendment, see the definition of Hostile Environment Sex-Based Harassment—First Amendment Considerations (Section I.C) (§ 106.2).

With respect to the question about gender dysphoria, the Department notes that the Fourth Circuit recognized that Congress directed ''courts [to] construe the ADA in favor of maximum protection for those with disabilities,'' and saw ''no legitimate reason why Congress would intend to exclude from the ADA's protections transgender people who suffer from gender dysphoria.'' *Williams* v. *Kincaid,* 45 F.4th 759, 769–70, 773 (4th Cir. 2022), *cert. denied,* 143 S. Ct. 2414 (June 30, 2023) (No. 22–633). A recipient may have overlapping obligations not to discriminate against a transgender individual based on disability in addition to the final regulations' prohibition on gender identity discrimination.

*Changes:* None.

6. Sexual Orientation

*Comments:* Some commenters urged the Department to define ''sexual orientation'' and clarify what conduct may be considered discrimination or harassment based on sexual orientation. Some commenters who opposed protections based on sexual orientation argued that the term is vague and could be interpreted in ways that harm students or encompass particular sexual practices or abusive or criminal conduct. One commenter expressed concern that the July 2022 NPRM conflates ''gay'' with ''queer'' and that ''queer'' can be interpreted very broadly.

One commenter asked whether a recipient can apply provisions permitting sex separation to separate students by sexual orientation.

Another commenter asked the Department to clarify that Title IX does

not and cannot interfere with the private associational rights of lesbian, gay, and bisexual individuals.

*Discussion:* The Department disagrees with commenters who asserted that the term ''sexual orientation'' must be defined in the Title IX regulations. Courts routinely use the term without providing an express definition. *See, e.g., Bostock,* 590 U.S. at 653–54, 671; *Grabowski,* 69 F.4th at 1113; *Hively,* 853 F.3d at 340. The term is now well understood as it is used widely in laws and policies. The Department strongly disagrees with commenters who falsely suggested that protection from sexual orientation discrimination would encompass abusive and criminal conduct that does not describe the sex of a person to whom another person is attracted, as the term sexual orientation is commonly understood to mean. Further, the idea that stronger protections for lesbian, gay, and bisexual individuals will result in protections for abusive or criminal activity is itself grounded in harmful sex stereotypes.

The Department recognizes that a concept like sexual orientation is distinct from sex, even if it is ''inextricably bound up with sex,'' *cf. Bostock,* 590 U.S. at 660–61. As discussed above, § 106.10 does not define ''sex,'' but rather clarifies the scope of Title IX's prohibition on ''sex discrimination.'' When the regulations permit separation on the basis of ''sex,'' § 106.10 does not permit a recipient to separate students on the basis of sexual orientation or other bases in § 106.10, such as pregnancy or sex stereotypes. Indeed, a recipient's intentional separation or different treatment of students based on their sexual orientation generally would constitute sex discrimination under the final regulations. *Cf. Bostock,* 590 U.S. at 659–62.

The final regulations prohibit discrimination on the basis of sexual orientation under Title IX. *See* § 106.10. Nothing in these final regulations impacts any private associational rights of lesbian, gay, and bisexual individuals.

*Changes:* None.

7. Sex Characteristics

*Comments:* Some commenters applauded the inclusion of an explicit prohibition on discrimination based on sex characteristics in proposed § 106.10. Commenters asserted that discrimination based on sex characteristics, including intersex traits, is invariably motivated by sex-based considerations, and coverage under Title IX is thus consistent with the

reasoning of *Bostock* and other Federal court precedent. Some commenters asserted that the 2020 amendments failed to clarify the nondiscrimination protections for people whose anatomy is neither typically male nor typically female. Other commenters objected to the Department's reliance on court cases that address gender identity discrimination and asserted that the term ''sex characteristics'' should not encompass ''gender identity.''

Some commenters urged the Department to clarify the term ''sex characteristics,'' because they believed the term is vague, should be explicitly limited to mean only male or female, or should only refer to reproductive sex traits. Some commenters asserted that coverage of discrimination based on sex characteristics should be based on objective medical analysis or observation and limited to conditions affecting an individual's reproductive capacity. A commenter argued that sex characteristics should not be based on a subjective perception of one's identity. The commenter argued that the Department's assertion that ''[d]iscrimination based on intersex traits is rooted in perceived differences between an individual's specific sex characteristics and those that are considered typical for their sex assigned at birth'' is vague and misleading. 87 FR 41532.

Some commenters supported the proposed prohibition on discrimination on the basis of sex characteristics because it would protect intersex people from discrimination and denial of educational opportunities. Commenters noted that discrimination against intersex individuals is often rooted in sex stereotypes. One commenter urged the Department to provide examples of prohibited discrimination that intersex students may face, such as harassment based on a student's visible nonconformity with sex stereotypes caused by their intersex traits, inappropriate disclosure of medical information about a student's intersex traits, or denial of access to sex-separate facilities consistent with a student's gender identity based on a student's intersex traits.

One commenter objected to the term ''intersex,'' arguing that it is a colloquial term, and suggested that the term ''differences of sex development'' is more accurate.

*Discussion:* The Department agrees with commenters that the prohibition on discrimination based on sex characteristics in § 106.10 is consistent with Title IX and sex discrimination case law. *See, e.g., Bostock,* 590 U.S. at 669 (addressing discrimination against

"persons with one sex identified at birth and another today"); *Grimm,* 972 F.3d at 608. In the July 2022 NPRM, the Department cited case law involving gender identity discrimination for the principle that sex discrimination bars discrimination based on traits that are "inextricably bound up with" sex. 87 FR 41532; *Bostock,* 590 U.S. at 660–61.

The Department appreciates the opportunity to clarify that the term sex characteristics is intended to refer to physiological sex-based characteristics. Sex discrimination based on a person's physiological sex characteristics may include discrimination based on a person's anatomy, hormones, and chromosomes associated with male or female bodies. As explained in the July 2022 NPRM, discrimination on the basis of sex characteristics includes discrimination based on intersex traits. 87 FR 41532.

The Department disagrees with a commenter who suggested that a medical diagnosis may be required to substantiate discrimination based on sex characteristics, or that sex characteristics are necessarily limited to a person's reproductive capacity. Discrimination based on a person's physiological sex characteristics could be considered sex discrimination regardless of any specific medical diagnosis, and could include, for example, discrimination based on physiological sex characteristics that differ from or align with expectations generally associated with male and female bodies.

The Department agrees with commenters who argued that the prohibition on discrimination on the basis of sex characteristics in § 106.10 will help clarify protections from sex discrimination for people with intersex traits, among others. The Department declines to make definitive statements about examples, due to the necessarily fact-specific nature of the analysis, but the Department recognizes that examples such as inappropriate disclosure of medical information about a student's intersex traits could constitute prohibited discrimination based on sex characteristics.

With respect to the term "intersex," the Department notes that it did not propose using this term in the regulations, but rather described intersex traits as an example of a context in which the prohibition on discrimination based on sex characteristics could apply. The Department uses the term "intersex" because it is more accessible and commonly used than "differences of sex development." The Department also notes, however, that the July 2022

NPRM also cited guidelines from the Consortium on the Management of Disorders of Sex Development, and clarifies that the Department understands that the term "intersex" to include the same spectrum of conditions. 87 FR 41532.

*Changes:* None.

### 8. Sex Stereotypes

*Comments:* Some commenters objected to the Department's reliance on *Price Waterhouse* for the proposition that discrimination based on sex stereotypes constitutes sex discrimination because *Price Waterhouse* interpreted Title VII rather than Title IX. Commenters further asserted that *Price Waterhouse's* plurality deemed sex stereotyping to be probative of sex discrimination, but not to constitute sex discrimination in and of itself.

One commenter argued that the term "sex stereotypes" is open to overbroad and inconsistent interpretation absent an objective definition of "sex."

One commenter asked the Department to clarify that the application of sex-specific rules and practices is not a form of sex stereotyping.

*Discussion:* The July 2022 NPRM describes sex stereotypes as "fixed or generalized expectations regarding a person's aptitudes, behavior, self-presentation, or other attributes based on sex." 87 FR 41533. The Department disagrees that any differences between Title VII and Title IX support a conclusion that Title IX does not prohibit discrimination based on sex stereotypes. Sex stereotyping violates Title IX when it operates to exclude a person from participation in, deny a person the benefits of, or otherwise subject a person to discrimination under a recipient's education program or activity. As noted in the July 2022 NPRM, many courts have applied the reasoning in *Price Waterhouse* to hold that sex stereotyping can be a form of sex discrimination. 87 FR 41533–34; *see, e.g., Whitaker,* 858 F.3d at 1049 ("A policy that . . . punishes [an] individual for his or her gender non-conformance . . . violates Title IX."); *Pederson,* 213 F.3d at 880 (recognizing that a university violated Title IX when its funding decisions in athletics were based on "paternalism and stereotypical assumptions about [women's] interests and abilities," and a "remarkably outdated view of women and athletics"); *see also Grabowski,* 69 4th at 1117.

The Department also disagrees that "sex" must be defined narrowly to avoid overbroad application of a prohibition on discrimination based on

sex stereotypes. The Department appreciates the opportunity to clarify that not all conduct one might label "sex stereotyping" necessarily violates Title IX. Rather, in order to establish sex discrimination under Title IX, including discrimination based on sex stereotypes, a school policy, practice, or other conduct must, on the basis of sex, exclude a person from participation in, deny a person the benefits of, or otherwise subject a person to discrimination under a recipient's education program or activity. The Department has specified in § 106.31(a)(2) that otherwise permissible sex separation is consistent with Title IX as long as it is carried out in a manner that does not impose more than de minimis harm on affected students.

*Changes:* None.

### 9. Pregnancy or Related Conditions

*Comments:* Many commenters supported the clarification provided in § 106.10 that Title IX's prohibition on sex discrimination applies to discrimination on the basis of pregnancy or related conditions. Commenters said that discrimination based on pregnancy or related conditions is a type of sex discrimination that is far too common, prevents students from having equal access to educational opportunities, and derails education and careers. Commenters said that the proposed regulations will increase pregnant students' access to educational opportunities.

Some commenters noted that although the Department's Title IX regulations have prohibited recipients from discriminating against students based on pregnancy or related conditions since 1975, pregnant and parenting students are routinely stigmatized, discriminated against, and denied the resources and support they need to thrive.

Some commenters appreciated that the proposed regulations would clarify that harassment based on pregnancy or related conditions is a form of sex-based harassment. Some commenters noted that pregnant students experience higher rates of sexual harassment, which negatively impacts their education.

Some commenters described personal stories of harassment based on pregnancy, noting that students who become pregnant are often subjected to shame, punishment, or unwanted sexual attention and others suggested that schools are more likely to ignore or punish pregnant or parenting students who report sexual harassment because of stereotypes that they are

''promiscuous.'' Commenters said that explicit inclusion of pregnancy or related conditions in the scope of sex discrimination in § 106.10, combined with better procedures for resolving complaints, will foster an atmosphere of respect, and that students will feel safer knowing that any discrimination and harassment they experience will be properly addressed.

Some commenters suggested that proposed § 106.10 should be amended to add ''current, potential, or past'' to the description of ''pregnancy or related conditions'' that are protected from discrimination. One commenter suggested that the Department add ''reproductive health'' to prohibit harassment a person might experience based on their views on abortion, birth control, and other aspects of reproductive health. As an alternative, the commenter suggested changing the wording of proposed § 106.10 to make the meaning of ''related conditions'' clearer but did not suggest a specific revision.

One commenter asserted that § 106.10 would for the first time expand the scope of prohibited pregnancy discrimination to apply to all aspects of a recipient's education program or activity, rather than only admissions.

*Discussion:* Section 106.10 makes clear that Title IX's prohibition on sex discrimination includes discrimination based on pregnancy or related conditions. While this interpretation of Title IX is longstanding, as discussed above, many of these comments further demonstrated the need for § 106.10, as they show that pregnant students face higher rates of sexual harassment than non-pregnant peers and that recipients sometimes improperly rely on sex stereotypes about this population, which impedes the recipient's response. The comments further show that although discrimination based on pregnancy or related conditions has been prohibited by the Title IX regulations for decades, the existing regulations lacked clarity and consistency regarding recipient obligations. The Department agrees with commenters that § 106.10 is both consistent with Title IX's nondiscrimination mandate and essential to ensuring that students are not denied educational opportunities because of sex discrimination, including harassment, based on pregnancy or related conditions.

The Department does not agree that it is necessary to add ''current, potential, or past'' to modify ''pregnancy or related conditions'' in § 106.10 to protect against sex discrimination on this basis because final §§ 106.21(c), 106.40(b)(1), and 106.57(b) already prohibit discrimination based on ''current, potential, or past pregnancy or related conditions.''

The Department does not need to clarify the meaning of ''related conditions'' in § 106.10 because ''pregnancy or related conditions'' is separately defined in § 106.2. The Department also declines to add ''reproductive health'' to the final regulations because the scope of the commenter's suggested ''discrimination on the basis of reproductive health'' is unclear.

The commenter who suggested that adding a reference to ''pregnancy or related conditions'' in § 106.10 would for the first time expand the scope of pregnancy nondiscrimination protection beyond a recipient's admissions process is mistaken. Sections of the current Title IX regulations in §§ 106.40, 106.51, and 106.57 have long prohibited pregnancy discrimination against students and employees in areas other than admissions. 40 FR 24128 (codified at 45 CFR 86.40(b)(2), 86.51(b)(6), 86.57(b) (1975)); 34 CFR 106.40(b)(1), 106.51(b)(6), 106.57(b) (current).

*Changes:* None.

### 10. Menstruation or Related Conditions

Requests To Add ''Menstruation or Related Conditions'' Within Scope of Sex Discrimination

*Comments:* Some commenters argued that to meet the goal of prohibiting all sex discrimination covered by the statute, the Department should add ''menstruation and related conditions'' to the list of prohibited bases of discrimination in proposed § 106.10. These commenters requested that the Department explicitly prohibit discrimination based on menstruation, perimenopause, and menopause, and all of their related conditions in the regulatory text to clarify that such discrimination against students and employees is a form of discrimination based on sex. They asserted that such discrimination often includes sex-based harassment and stigma and leads to learning loss and other harms. Commenters cited examples of discrimination such as unnecessary menstruation-related bathroom restrictions by teachers, coaches, and other school officials; discipline for excessive bleeding; and harassment by employees or students. Commenters asserted that adding ''menstruation and related conditions'' to the scope of discrimination based on sex is consistent with the Department's position on other types of sex discrimination, such as discrimination based on sex characteristics. Commenters added that menstruation-related coverage will help protect all persons who menstruate.

Some commenters argued that in the alternative, the Department should amend its definition of ''pregnancy or related conditions'' in § 106.2 to state that ''pregnancy or related conditions'' includes menstruation or related conditions. Commenters argued that—in a manner similar to the July 2022 NPRM's explanation of discrimination based on pregnancy or related conditions—discrimination based on menstruation or related conditions is often based on stereotypes about women and society's sex-based indifference to their needs, and that policies fail to accommodate conditions associated with women as effectively as those associated with men. A group of commenters further requested that the Department require reasonable modifications for menstruation or related conditions for students and employees, such as changes to attendance policies to enable bathroom access, dress code modifications, or permission to request a classroom or seat that is closer to the bathroom. Some commenters requested that the Department go beyond offering reasonable modifications to individual students and require all recipients to provide access to menstrual products and ''menstruation-friendly'' bathrooms, noting that one recent study showed that around 20 percent of teenagers struggled to or could not afford menstrual products, and that students from lower-income households, students of color, and those in rural communities with limited resources were most affected. Commenters pointed to other studies demonstrating that without access to menstrual products, students may face barriers to learning, such as being forced to arrive late to class, leave early, or miss school altogether, all of which can affect their academic success. To minimize loss of learning time, some commenters argued that students should not be disciplined or marginalized due to menstruation.

*Discussion:* Discrimination based on menstruation, perimenopause, menopause, or their related conditions is sex discrimination because, depending on the facts presented, it can overlap or fall within the scope of discrimination based on pregnancy or related conditions, sex stereotypes, or sex characteristics under § 106.10. Menstruation is a process, triggered by hormones, that prepares the body for possible pregnancy. It typically occurs from puberty until menopause. Perimenopause (the time of transition to

menopause) and menopause are processes related to cessation of menstruation. Menstruation, perimenopause, and menopause may each be accompanied by various medical conditions, such as premenstrual syndrome, premenstrual dysphoric disorder, missed or irregular periods, migraines, pain, hot flashes, or heavy bleeding.

Accordingly, while the Department acknowledges commenters' suggestion that the final regulations explicitly include "menstruation or related conditions," either standing alone or as part of the definition of "pregnancy or related conditions" under §§ 106.2 or 106.10, the Department concludes that doing so is unnecessary as discrimination on this basis is already covered as outlined above. We appreciate the opportunity to clarify for schools, students, and employees that harassment and other discrimination based on menstruation, perimenopause, menopause, or their related conditions and symptoms is prohibited sex discrimination under § 106.10.

Recognizing that discrimination based on menstruation or related conditions is in the scope of sex discrimination is also consistent with court decisions that have reached the same conclusion when interpreting Title VII. In particular, the Department notes that those decisions held that Title VII prohibited discrimination on the basis of menstruation or related conditions based on the statute's "because of sex" language, not the "pregnancy . . . or related conditions" language of the Pregnancy Discrimination Act. *See, e.g., Petrosino* v. *Bell Atl.,* 385 F.3d 210, 215 (2d Cir. 2004) ("gender-hostile environment" was sufficiently severe and pervasive to defeat motion for summary judgment when male supervisors "routinely [connected] their perceptions of [a menstruating worker's job performance] and her anatomy, especially [with] vulgar references to her breasts and menstrual cycle"); *Conner* v. *Schrader-Bridgeport Int'l, Inc.,* 227 F.3d 179, 196 (4th Cir. 2000) (asking a factory worker if she was "on the rag today" in front of colleagues multiple times a month was evidence of a hostile work environment).

To the extent that discrimination based on menstruation or related conditions becomes a barrier to an individual's participation in a recipient's education program or activity, schools have an obligation to address such barriers, prevent their recurrence, and remedy their effects. *See* § 106.44(a) and (f)(1). These barriers could include, for example, menstruation-related harassment by

students or employees, unreasonable limits on students' or employees' bathroom access to address menstrual needs, conduct by school officials that publicly exposes that a student is menstruating (*e.g.,* requiring a student to remove a garment around their waist, or prohibiting a student from changing clothes at school when the student needs to address a menstruation-related issue), or similar menstruation-related restrictions or discipline. *See generally* T4PA Center, Considerations for Menstrual Equity and Student Success, at 4 (2023).

The Department declines to change the regulatory text to explicitly require recipients to provide reasonable modifications for menstruation or related conditions for students and employees, or access to menstrual products and "menstruation-friendly" bathrooms. The Department intends to continue to study the issue to determine whether further action or clarification is required to address discrimination on the basis of menstruation. Presently, the Department maintains that many, if not most, of the menstruation-related issues students and employees face will be addressed by recipients in their compliance with the nondiscrimination protections of § 106.10, such as requiring flexibility in a dress code policy for a student who has experienced a menstrual leak and for whom discipline for a resulting failure to comply with the dress code would be discriminatory; requiring a recipient to address a situation in which one employee is harassed by another for having headaches related to perimenopause; or requiring a recipient to allow a teacher to use a fan in a classroom to address hot flashes due to menopause, if, for example, the recipient allows teachers to use fans or other items or make other changes in their classroom to increase comfort for other types of reasons. The Department further notes that, due to the specific facts presented, should a student's menstruation or related conditions meet the definition of "pregnancy or related conditions" set out in § 106.2, the student is entitled to reasonable modifications under § 106.40(b)(3)(ii). For example, a student suffering from polycystic ovary syndrome, may also be entitled to reasonable modifications for pregnancy or related conditions if the student requires time off for medical treatment. Similarly, to the extent a student's or employee's menstruation-related condition qualifies as a disability under Section 504 or the ADA, that individual must be provided full rights under those laws, as

applicable, including reasonable modifications.

Nothing in these final regulations precludes a recipient from using its discretion to provide reasonable modifications to students and employees for whom menstruation or related conditions present barriers to education or employment.

*Changes:* None.

Privacy of Menstruation-Related Records

*Comments:* Commenters also encouraged the Department to clarify in the regulations that students' menstruation-related records should be kept private and may not be used to track students' or employees' menstrual cycles, as that would raise serious privacy concerns. Commenters urged the Department to specify that Title IX Coordinators may not share an individual's menstruation-related information with law enforcement or keep it in a disclosable student record. Commenters also requested that the Department issue subsequent guidance to address this concern.

*Discussion:* The Department agrees with comments expressing concern about the privacy of records related to menstruation or related conditions. The Department emphasizes that nothing in these regulations requires a recipient to collect and maintain more information than is necessary under the recordkeeping provision at § 106.8(f) to ensure that a student or employee is not discriminated against or harassed based on menstruation or related conditions, for example in records of complaints of sex discrimination and the steps the recipient took to meet its obligations under § 106.44. In addition, the Department's final regulations revise § 106.44(j) to prohibit a recipient from disclosing personally identifiable information—which could include information about menstruation or related conditions—obtained in the course of complying with this part, with some limited exceptions. The provision that prohibits disclosure of personally identifiable information is explained more fully in the discussion of § 106.44(j). Finally, the Department understands that supporting recipients in the implementation of these regulations is important. The Department will offer technical assistance, as appropriate, to promote compliance with these final regulations.

*Changes:* The Department has revised § 106.44(j) to clarify that a recipient must not disclose personally identifiable information obtained in the course of complying with this part, except in limited circumstances.

Requests for Menstrual Education and Training

*Comments:* Some commenters requested that the Department explicitly require a recipient to provide menstrual education and training. Regarding training for staff, some commenters said that training requirements for Title IX Coordinators and all staff should include information about menstruation and related conditions and what constitutes discrimination on that basis, so that staff members understand the recipient's obligation to address it. Commenters encouraged the Department to provide guidance to Title IX Coordinators, including examples of menstruation-related discrimination that Title IX Coordinators could use to raise awareness and sample questions that recipients could use to conduct surveys on this issue.

Regarding students, commenters said that providing menstrual health education to all students in middle to late elementary school, along with puberty education, would give students the confidence and skills they need to take care of themselves when they start menstruating, reduce the fear and shame regarding menstruation that students often experience, and lead to long-term changes in attitudes and policies regarding menstruation.

*Discussion:* The Department acknowledges commenters' suggestion that required training for Title IX Coordinators and other staff include information about menstruation, related conditions, and discrimination on that basis, so that all staff members understand the recipient's obligation to address it. These final regulations do not explicitly require training related to menstruation or related conditions. However, under § 106.8(d)(1), all employees must be trained on the recipient's obligation to address sex discrimination in its education program or activity and the scope of conduct that constitutes sex discrimination. Because discrimination on the basis of menstruation or related conditions falls within the scope of § 106.10, schools may benefit from including it as part of any employee training on the scope of conduct that constitutes sex discrimination. The Department also declines to mandate the content of trainings, beyond the general requirement that they provide employees with the tools necessary to identify conduct that may constitute discrimination, in order to allow recipients flexibility. Nothing in the final regulations precludes a recipient from including in its employee trainings more comprehensive information on

menstruation or related conditions and how they might affect student and employee participation in the recipient's education program or activity. Regarding the request for guidance with examples of menstruation-related discrimination and sample survey questions, the Department will consider whether future guidance is appropriate and will provide technical assistance to ensure compliance with these regulations.

With respect to menstrual education for students, the Department does not control school curricula, *see* 20 U.S.C. 1232a, and does not require recipients to provide instruction regarding menstrual health. Nothing in these final regulations impedes a recipient's discretion to provide accurate educational information to students.

*Changes:* None.

*B. Section 106.31(a) Education Programs or Activities—General*

1. De Minimis Harm Standard

*Comments:* Some commenters supported § 106.31(a)(2) because it would be consistent with courts' analysis of discrimination on the basis of sex and would clarify a recipient's obligations under Title IX.

Several commenters objected to the "de minimis harm" standard, arguing that it is not rooted in Title IX or case law, that it is confusing, ambiguous, vague, or overbroad, or is too malleable, enabling recipients and the Department to act arbitrarily rather than based on objective principles.

One commenter suggested that the Department revise proposed § 106.31(a)(2) to clarify that harm must be assessed at an individual level from the perspective of a reasonable person in the individual's position.

Some commenters argued that proposed §§ 106.10 and 106.31(a)(2) violate the constitutional principle of separation of powers and the "major questions" doctrine as articulated by the Supreme Court in *West Virginia,* 597 U.S. 697. Commenters argued that prohibiting schools from engaging in gender identity and sexual orientation discrimination and treating individuals consistent with a gender identity that differs from their sex assigned at birth are questions of great political and economic significance. Commenters asserted that §§ 106.10 and 106.31(a)(2) will have a broad economic impact and that the Department has not accounted for costs such as construction, sanctions, litigation, and non-monetary costs of changed policies, such as risks to due process rights and free speech concerns.

Some commenters asserted that the de minimis harm standard is inconsistent with the hostile environment standard.

*Discussion:* The Department agrees with commenters who asserted that § 106.31(a)(2) is consistent with Title IX's text and purpose, and that it will help recipients understand their nondiscrimination obligations.

As the Department explained in the July 2022 NPRM, the Department's regulations have long specified that separate or different treatment on the basis of sex is generally prohibited under Title IX because such treatment is presumptively discriminatory. 87 FR 41534; *see* 34 CFR 106.31(b)(4), (7) ("Except as provided in this subpart, in providing any aid, benefit, or service to a student, a recipient shall not, on the basis of sex . . . [s]ubject any person to separate or different rules of behavior, sanctions, or other treatment; [or] [o]therwise limit any person in the enjoyment of any right, privilege, advantage, or opportunity."). Despite this presumption and general prohibition, however, the Department's regulations have long recognized limited contexts in which sex separation or differentiation is allowed. *See* 87 FR 41534. The Department therefore seeks with § 106.31(a)(2) to further explain the legal authority for permitting sex separation in certain circumstances, and the limitations the statute sets on how recipients may carry out such separation.

Consistent with Supreme Court precedent, the Department interprets Title IX's nondiscrimination mandate to mean that, save for the limited instances allowed by statute and listed in the text of § 106.31(a)(2), recipients may not make "distinctions or differences in treatment [on the basis of sex] that injure protected individuals." *Bostock,* 590 U.S. at 681 (citing *Burlington N. & Santa Fe Ry. Co.* v. *White,* 548 U.S. 53, 59–60 (2006)). The Department does not interpret Title IX to prohibit all sex-based distinctions or separation, but rather, only those that subject a person to injury, or harm—*i.e.,* discrimination prohibited by the statute. The Department has therefore concluded that to provide an education program or activity that does not subject participants to sex discrimination, a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to legally cognizable injury—*i.e.,* more than de minimis harm—unless there is a statutory basis for allowing otherwise.

The Department disagrees with commenters who asserted that the Department's articulation of this "de minimis harm" standard is not

grounded in case law. Rather, it is well-established that the concept of discrimination includes an element of injury or harm. *See, e.g., Oncale,* 523 U.S. at 81 (Title VII does not reach non-harmful "differences in the ways men and women routinely interact with" each other); *Peltier,* 37 F.4th at 129 ("for the plaintiffs to prevail under Title IX, they must show that . . . the challenged action caused them harm"). Such harm, however, must generally be something more than innocuous, or de minimis, to be actionable discrimination. *See, e.g., Threat* v. *City of Cleveland,* 6 F.4th 672, 678 (6th Cir. 2021); *cf. Chambers* v. *DC,* 35 F.4th 870, 875 (D.C. Cir. 2022), *judgment entered,* No. 19–7098, 2022 WL 2255692 (D.C. Cir. June 23, 2022) (declining to decide whether Title VII includes a de minimis harm exception because in that case, the denial of a job transfer request easily surmounted that bar). Setting the bar at more than de minimis harm accounts for this important aspect of courts' legal construction of the meaning of the term "discrimination." *See Burlington N. & Santa Fe Ry. Co.,* 548 U.S. at 59 ("No one doubts that the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals."); *see also Bostock,* 590 U.S. at 657 ("To 'discriminate against' a person, then, would seem to mean treating that individual worse than others who are similarly situated."). This threshold concept is particularly important in the context of determining when separate or different treatment on the basis of sex may be permitted, and when it constitutes prohibited discrimination under Title IX. The Department notes that there are injuries, including stigmatic injuries, associated with treating individuals differently on the basis of sex, and in such circumstances, no additional showing of a mere "material" harm is required under Title IX.

The Department appreciates commenters' questions as to how to determine whether a harm is more than de minimis, and whether the inquiry is objective or purely subjective. Harm under § 106.31(a)(2) must be genuine and objectively non-trivial and assessed from the perspective of a reasonable person in the individual's position. It is not necessary to elaborate on this point in the regulatory text, because this objective standard is consistent with and grounded in longstanding anti-discrimination law and its injury requirement. *See, e.g., Burlington N. & Santa Fe Ry. Co.,* 548 U.S. at 59, 68–69 (explaining that, under Title VII,

"judging harm must be objective. An objective standard is judicially administrable. It avoids the uncertainties and unfair discrepancies that can plague a judicial effort to determine a plaintiff's unusual subjective feelings. We have emphasized the need for objective standards in other Title VII contexts[.]"). As discussed in detail below, § 106.31(a)(2) further clarifies that preventing a person from participating in an education program or activity consistent with the person's gender identity violates this standard and is generally prohibited.

The Department disagrees that the major questions doctrine applies to the Department's adoption of §§ 106.10 and 106.31(a)(2). *West Virginia* described "extraordinary cases" in which an "unprecedented" agency action concerns issues of such "economic and political significance" that there is reason to hesitate before concluding that Congress conferred the authority. 597 U.S. at 700, 721–23. The case also concerned a situation in which the Court concluded that the "agency ha[d] no comparative expertise" in making the relevant policy judgments and had invoked an "ancillary" statutory provision to enact its regulations. *Id.* at 724, 729 (quotation marks omitted). The Department's issuance of these regulations does not resemble the circumstances described in *West Virginia.* The applicable statutory provisions are in no way ancillary to the statutory scheme, and there is nothing unprecedented about these regulations, which are consistent with the analysis of Federal courts and the practices of many recipients. Moreover, they reflect the Department's expertise on what constitutes sex discrimination in education programs or activities. *See* U.S. Dep't of Educ., Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 65 FR 52858, 52859 (Aug. 30, 2000) (discussing the Department's "leadership role in Title IX enforcement").

Further, these regulations do not require the kind of costs or restructuring that might implicate the major questions doctrine. In *West Virginia,* the Court characterized the agency action as "substantially restructur[ing] the American energy market," and as a "transformative expansion" of agency authority. 597 U.S. at 724 (quotation marks omitted). In contrast, the final regulations more fully implement Title IX, consistent with the Department's longstanding authority, and the Department estimates that most of the

costs associated with the final regulations that may accrue to federally funded education programs will be offset by savings as a result of these final regulations. Additional discussion of comments on the costs of the final regulations can be found in the *Regulatory Impact Analysis.* The Department agrees with commenters that protection from sexual orientation and gender identity discrimination is an important issue; its capacity to deprive students of equal access to educational opportunities has informed the Department's decision to clarify Title IX's coverage of sexual orientation and gender identity discrimination in this rulemaking. The importance of this application of Title IX supports the Department's decision to pursue this rulemaking, consistent with Executive Order 12866.

Even if the major questions doctrine did apply, the Department's authority is especially clear based on ordinary tools of statutory interpretation, as the Department discusses throughout this preamble. The final regulations fall within Congress's clear and explicit statutory grant of authority to the Department to issue regulations that are consistent with the objectives of Title IX. *See* 20 U.S.C. 1682 (authorizing the Department to "issu[e] rules, regulations, or orders . . . which shall be consistent with achievement of the objectives of the statute."). The Department is not relying on a novel or long dormant authority in this rulemaking. Congress indisputably entrusted the Department with the authority to articulate what constitutes sex discrimination in schools. For a more detailed explanation of the Department's authority, see the discussion of statutory authority (Section II.B).

In addition, §§ 106.10 and 106.31(a)(2) are consistent with Federal court decisions, including those from the Supreme Court, that have defined the contours of sex discrimination. Most recently, the Supreme Court held in *Bostock* that sex discrimination, as prohibited by Title VII, encompasses discrimination based on sexual orientation and gender identity. 590 U.S. at 659–62; *see* 87 FR 41530. The *Bostock* Court also flatly rejected the argument advanced in dissent that Title VII's prohibition on sex discrimination should not be read to include sexual orientation or gender identity because Congress had failed to add such terms to the statute. 590 U.S. at 669–70. Indeed, the Court held that while there was no way to know why Congress had not amended Title VII to include those bases in subsequent years, the issue was

irrelevant given that the existing statutory text so clearly encompassed discrimination on the basis of sexual orientation and gender identity. *Id.* The Supreme Court's statement that "it is impossible to discriminate against a person" because of their sexual orientation or gender identity "without discriminating against that individual based on sex," *Bostock,* 590 U.S. at 660, is equally true under Title IX. Federal courts have relied on *Bostock* to recognize that Title IX's prohibition on sex discrimination encompasses discrimination based on sexual orientation and gender identity. *See, e.g., Grabowski,* 69 F.4th at 1113; *Grimm,* 972 F.3d at 616. Federal courts have likewise recognized that preventing students from participating in a recipient's education program or activity consistent with their gender identity causes harm that violates Title IX. *See, e.g., Whitaker,* 858 F.3d at 1045–46; *Grimm,* 972 F.3d at 617–18. The Department's final regulations are not "beyond what Congress could reasonably be understood to have granted." *West Virginia,* 597 U.S. at 700–01, 724.

With respect to comments that the de minimis harm standard is inconsistent with the hostile environment standard, the Department disagrees. The hostile environment standard in the definition of "sex-based harassment" § 106.2, applies when determining whether harassing conduct rises to the level of a hostile environment, such that the conduct constitutes discrimination prohibited by the statute. A recipient's obligations to respond promptly and effectively to sex-based harassment are described in § 106.44(a). Section 106.31(a)(2), on the other hand, does not apply to sex-based harassment; it applies only to the manner in which a recipient carries out otherwise permissible different treatment or separation on the basis of sex. As explained below, however, absent a limited exception under Title IX, a recipient policy or practice that separates or treats students differently based on sex violates § 106.31(a)(2) if the policy or practice prevents a student from participating in the recipient's education program or activity consistent with their gender identity or otherwise causes a student more than de minimis harm.

*Changes:* None.

2. Application

*Comments:* Some commenters asked the Department to clarify how proposed § 106.31(a)(2) would apply to people other than students (*e.g.,* employees, parents, or other parties participating in a recipient's education program or activity).

Some commenters asked the Department to specify the types of permissible "different treatment or separation on the basis of sex" covered by § 106.31(a)(2), including, for example, single-sex classes and activities, social fraternities or sororities, or sex-specific appearance codes.

Some commenters urged the Department to specify when subjecting a person to more than de minimis harm is "otherwise permitted" by Title IX or the regulations to avoid causing "unfair surprise" when OCR enforces the final regulations or ad hoc judgments about when harm may be implicitly authorized. Some commenters expressed confusion as to whether and how § 106.31(a)(2) would apply to criteria a recipient uses to determine a student's eligibility to participate on a male or female athletic team.

*Discussion:* With respect to questions about who is covered by § 106.31(a)(2), the Department appreciates the opportunity to clarify that it applies to any "person," including students, employees, applicants for admission or employment, and other individuals participating or attempting to participate in the recipient's education program or activity, which also could include parents of minor students, students from other institutions participating in events on a recipient's campus, visiting lecturers, or other community members whom the recipient invites to campus.

The Department also appreciates the opportunity to clarify that § 106.31(a)(2) applies, with some limited exceptions discussed below, to any circumstances in which a recipient engages in permissible sex separation or differentiation, such as in its provision of restrooms and locker rooms (34 CFR 106.33), access to classes and activities (34 CFR 106.34(a)–(b)), and policies such as appearance codes (including dress and grooming codes). For additional context on Title IX's application to appearance codes, see separate discussion below.

Proposed § 106.31(a)(2) specifies that the prohibition on subjecting a person to more than de minimis harm does not apply when "otherwise permitted by Title IX or this part." The Department agrees with commenters that the Department should specify the contexts in which Title IX or the regulations permit such harm. Section 106.31(a)(2) recognizes that in the limited circumstances in which recipients are permitted to separate or differentiate on the basis of sex, recipients must carry out such separation consistent with the statute's nondiscrimination mandate, 20 U.S.C. 1681, except when the statute itself allows otherwise. Those contexts are limited to the enumerated exceptions in 20 U.S.C. 1681(a)(1) through (9) and the regulatory provisions that implement those statutory provisions, namely §§ 106.12 (religious exemption), 106.13 (military and merchant marine educational institutions), 106.14 (membership practices of social fraternities and sororities, YMCA, YWCA, Girl Scouts, Boy Scouts and Camp Fire Girls, and voluntary youth service organizations); § 106.15(d), (e) (admissions to certain classes of educational institutions); the provision for living facilities under 20 U.S.C. 1686 and its implementing regulatory provision, § 106.32(b)(1) (sex-separate housing); and § 106.41(b) (sex-separate athletic teams), as explained in more detail below. However, even in these limited contexts where Congress has enumerated exceptions, nothing in the final regulations prohibits a recipient from voluntarily taking steps to protect students from sex-based harm, including by permitting them to participate consistent with their gender identity.

Regarding commenters' questions on sex-separate athletic teams, § 106.31(a)(2) does not apply to male and female athletic teams a recipient offers under § 106.41(b). As background, for decades, recipients' obligations with regard to the operation of athletics in schools have been governed by an overarching nondiscrimination mandate and obligation to provide equal athletic opportunities for students regardless of sex. *See* 34 CFR 106.41(a), (c). As discussed in the July 2022 NPRM, in 1974 Congress enacted the Javits Amendment, which directed that the Title IX regulations should include reasonable provisions that take into account unique considerations that arise in athletic competition among schools. 87 FR 41538, Education Amendments of 1974 section 844. In 1975, HEW, the Department's predecessor, first promulgated regulations under Title IX after multiple congressional hearings. 87 FR 41393; 121 Cong. Rec. 20467 (1975) (statement of Sen. Birch Bayh). The regulations were subject to a statutory "laying before" provision, designed to afford Congress an opportunity to examine the proposed regulations and disapprove them by resolution within 45 days if Congress deemed them to be inconsistent with Title IX. *N. Haven Bd. of Educ.,* 456 U.S. at 531–32. The Supreme Court has stated that the fact that no such

disapproval resolution was adopted "strongly implies that the [Title IX] regulations accurately reflect congressional intent." *Grove City Coll.* v. *Bell,* 465 U.S. 555, 568 (1984); *see also N. Haven Bd. of Educ.,* 456 U.S. at 533–35.

Consistent with the Javits Amendment and the longstanding athletics regulations, the Department has historically interpreted Title IX's nondiscrimination mandate to tolerate sex separation in athletics in a manner that imposes more than de minimis harm on individual students when such separation served educational interests consistent with Title IX's nondiscrimination mandate. *See* 34 CFR 106.41(b) (permitting exclusion of a student of a particular sex from a sex-separate athletic team in certain circumstances, even when student wishes to participate). Under the longstanding athletics regulations, individual students may be excluded from a particular male or female athletic team on the basis of their sex, even when doing so may impose on them more than de minimis harm, *see id.,* as long as students, regardless of sex, have an equal opportunity to access the recipient's athletic program as a whole, *see* 34 CFR 106.41(c). Consistent with the Javits Amendment, under § 106.41(c), the Department has also long evaluated a recipient's provision of equal athletic opportunity on the basis of sex at a program-wide level, rather than at an individual-level, as the Department does with respect to other aspects of a recipient's education program or activity. *Compare* 34 CFR 106.41(c) ("A recipient which operates or sponsors interscholastic, intercollegiate, club or intramural athletics shall provide equal athletic opportunity for members of both sexes"), *with, e.g.,* 34 CFR 106.21(a) ("No person shall, on the basis of sex, be denied admission . . . .").

Consistent with the longstanding athletics regulations, § 106.31(a)(2) does not apply to permissible sex separation of athletic teams. The Department of Education issued a notice of proposed rulemaking that would, if finalized, provide a standard for criteria for a student's eligibility to participate on sex-separate athletic teams in the future. *See* Notice of Proposed Rulemaking on Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 FR 22860 (Apr. 13, 2023) (Athletics NPRM). The Athletics NPRM said a categorical ban on transgender students playing sports consistent with their gender

identity would not satisfy the proposed regulation, but more targeted criteria, substantially related to sport, level of competition, and grade or education level, could be permissible. The Department is continuing to evaluate comments on that proposed regulation, and will issue its final rule on this standard for criteria for a student's eligibility to participate on sex-separate athletic teams in the future. Until that rule is finalized and issued, the current regulations on athletics continue to apply.

*Changes:* To clarify the scope of § 106.31(a)(2), the Department is replacing "unless otherwise permitted by Title IX or this part" with "except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations at §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b)".

### 3. Participation Consistent With Gender Identity

*Comments:* Some commenters supported § 106.31(a)(2) because providing access to sex-separate activities and facilities consistent with a student's gender identity aligns with Title IX's statutory text and purpose of ensuring that all students have equal opportunity to participate in federally funded education programs and activities free of sex discrimination, as well as case law interpreting Title IX and other sex discrimination laws.

Other commenters asserted that there is no basis in the statutory text or case law for the principle that treating a person inconsistent with their gender identity constitutes sex discrimination. Some commenters argued that § 106.31(a)(2) effectively eliminates the sex-based distinctions that Title IX allows. Some commenters noted that the Supreme Court in *Bostock* declined to prejudge questions about "sex-segregated bathrooms, locker rooms, and dress codes" and did not address whether treating a person inconsistent with their gender identity constitutes sex discrimination. 590 U.S. at 681. Other commenters asserted that § 106.31(a)(2) is at odds with *United States* v. *Virginia,* which recognized that sex-based classifications are sometimes permissible because certain "differences between men and women" are "enduring." 518 U.S. at 533.

Some commenters argued that § 106.31(a)(2) elevates protections for transgender students over other students, especially cisgender girls and women.

Some commenters asked the Department to clarify how a recipient

should determine a person's gender identity for purposes of proposed § 106.31(a)(2); what medical, procedural or documentation requirements a recipient can impose on a person prior to permitting access to sex-separate facilities; and whether a recipient may require a student to disclose medical records and related information.

Some commenters asked the Department to clarify whether the prohibition on preventing students from participating consistent with their gender identity in § 106.31(a)(2) would apply to sex-separate restrooms, locker rooms, housing, classes or portions of classes, and academic programs. Many commenters expressed concern about issues such as competitive fairness and safety in school athletic programs if § 106.31(a)(2) were applied to sex-separate athletic teams. Some commenters urged the Department to modify the proposed regulations to require recipients to provide gender-neutral facilities, noting, for example, that nonbinary students may not be fully accommodated by sex-separate facilities.

Some commenters said the de minimis harm standard could result in chilling protected speech both at an individual and group association level and feared that § 106.31(a)(2) would result in compelling and restricting speech in violation of the First Amendment.

Some commenters expressed concern about the propriety of students participating in education programs and activities consistent with their gender identity. Those commenters suggested that § 106.31(a)(2) would effectively eliminate single-sex spaces and could compromise some students' privacy and safety. Some commenters urged the Department to require that all students have access to a single-occupancy restroom or changing facility, or require transgender students to use separate facilities. Other commenters argued that requiring a student to use a separate facility can be stigmatizing and could result in the disclosure of a student's transgender status. Some commenters asked whether a recipient or a student organization would violate Title IX if they offer a transgender person a private alternative to sex-separate shared spaces, to be sensitive to their needs or preferences.

Some commenters noted that § 106.31(a)(2) is consistent with case law concluding that denying a student access to a recipient's education program or activity, including extracurricular activities or facilities, consistent with their gender identity causes students harm in violation of

Title IX. Some commenters asserted that preventing students from participating in school consistent with their gender identity causes more than de minimis harm and stated that many transgender students avoid school bathrooms or other sex-separate spaces at school because they do not feel safe using them. Some commenters argued that permitting students to participate in school consistent with their gender identity positively impacts their mental health and improves educational outcomes and noted that major organizations representing medical professionals support such policies. Other commenters argued that affirming a gender identity different than a person's sex assigned at birth could do more harm than good, particularly for young children. These commenters asserted that school policies that accept students' requests to treat them consistent with a gender identity that does not align with their sex assigned at birth are harmful.

Commenters asked the Department to clarify whether proposed § 106.31(a)(2) requires recipients to allow students to live in sex-separate housing consistent with gender identity. Some commenters felt that the Department's interpretation of 20 U.S.C. 1686 in the July 2022 NPRM—to permit sex separation in living facilities even when it causes more than de minimis harm—would conflict with *Grimm's* analysis and Title IX's statutory text. Commenters also asked how proposed § 106.31(a)(2) applies in the context of random roommate assignment programs for students.

Some commenters argued that provisions permitting separation by "sex" should be interpreted to focus on physiological differences between males and females to align with contemporary dictionary definitions and courts' understanding of the term. Commenters noted that the original Title IX rulemaking did not mention "gender identity," and asserted that the current regulations permitting separation by sex (*e.g.*, bathrooms, locker rooms, and athletic teams) assume "sex" is limited to sex assigned at birth. One commenter argued that § 106.31(a)(2)'s focus on gender identity undermines the Department's statement in the July 2022 NPRM that Title IX does not depend on any particular definition of the term "sex." Some commenters said that separating locker rooms, bathrooms, and shower facilities by sex assigned at birth is authorized by 20 U.S.C. 1686, citing *Adams,* 57 F.4th 791.

*Discussion:* The Department disagrees with commenters who assert that § 106.31(a)(2)'s articulation of a recipient's nondiscrimination obligation with respect to gender identity is inconsistent with Title IX. As explained in the July 2022 NPRM, *see* 87 FR 41535, courts have recognized that, except as otherwise provided in the statute, Title IX prohibits all sex discrimination, including gender identity discrimination in federally funded education programs and activities, and that students experience sex-based harm that violates Title IX when a recipient bars them from accessing sex-separate facilities or activities consistent with their gender identity. *See, e.g., Whitaker,* 858 F.3d at 1045–46 (discussing district court's findings, based on expert testimony, that denying transgender student's access to a sex-separate education program or activity consistent with his gender identity imposed significant harm on his mental health and overall well-being in violation of Title IX); *Grimm,* 972 F.3d at 617–18 (holding that evidence that a transgender boy suffered physical, emotional, and dignitary harms as a result of being denied access to a sex-separate program or activity consistent with his gender identity was sufficient to constitute sex-based harm prohibited under Title IX); *Bd. of Educ. Of the Highland Loc. Sch. Dist.,* 208 F. Supp. 3d at 870–71 (describing stigma and isolation and interference with learning caused by district's exclusion of transgender girl from a sex-separate education program or activity consistent with her gender identity and concluding that such harm is sufficient to demonstrate a Title IX violation).

The Department disagrees that § 106.31(a)(2) is inconsistent with Supreme Court precedent, including *Bostock* and *Virginia.* 87 FR 41532. Under *Bostock,* treating a person worse because their sex assigned at birth differs from their gender identity is sex discrimination under Title IX, just as it is under Title VII. 87 FR 41532 (citing *Bostock,* 590 U.S. at 659–62). *Bostock,* however, did not purport to address the specific question of whether sex separation in bathrooms or locker rooms "might not qualify as unlawful discrimination or find justifications under other provisions" of the law, 140 S. Ct. at 1753, which is the question the Department addresses here with respect to Title IX.

The Department has determined, based on a careful reading of Title IX and each of its statutory provisions, that sex separation in certain circumstances, including in the context of bathrooms or locker rooms, is not presumptively unlawful sex discrimination. However, when such separation imposes more than de minimis injury on a protected individual, *see Bostock,* 590 U.S. at 681, such as when it denies a transgender student access to a sex-separate facility or activity consistent with that student's gender identity, this would violate Title IX's general nondiscrimination mandate, 20 U.S.C. 1681. The Department recognizes, however, that the statute created exceptions to that general nondiscrimination mandate in 20 U.S.C. 1681(a)(1)–(9), and also carved out from its general nondiscrimination mandate the maintenance of sex-separate living facilities in 20 U.S.C. 1686; and Congress further recognized that the unique circumstances of athletics also merit a different approach to addressing sex discrimination in that context, as reflected in the Department's promulgation of §§ 106.41(b) and (c). Therefore, as explained above and in the July 2022 NPRM, the Department interprets those provisions to mean that, in those contexts, recipients may carry out sex-specific policies and practices in a manner that may cause more than de minimis harm to a protected individual. 87 FR 41536.

Title IX protects students from sex discrimination, including sex-based harassment, in a recipient's education program or activity, including when they access sex-separate facilities. This protection applies with equal force to all students, including transgender and nonbinary students. Under § 106.31(a)(2), a recipient must provide access to sex-separate facilities, including bathrooms, in a manner that does not cause more than de minimis harm. Title IX also prohibits sex-based harassment, including when students access sex-separate facilities. Section 106.31(a)(2) does not specify how a recipient must provide access to sex-separate facilities for students who do not identify as male or female. For nonbinary students, a recipient may, for example, coordinate with the student, and the student's parent or guardian as appropriate, to determine how to best provide the student with safe and nondiscriminatory access to facilities, as required by Title IX. Under § 106.44(a), a recipient must respond promptly and effectively when it knows of conduct that reasonably may constitute sex discrimination, including sex-based harassment, in its education program or activity, including in any sex-separate facilities.

The Department disagrees with commenters who argued that this interpretation of Title IX is inconsistent with the Supreme Court's recognition in *Virginia* that physiological differences can sometimes justify sex-based classifications. Title IX's statutory

prohibition on sex discrimination is "narrower in some respects and broader in others" than the substantive rights and protections guaranteed under the Equal Protection Clause. *Fitzgerald* v. *Barnstable Sch. Comm.*, 555 U.S. 246, 256 (2009). Thus, although equal protection case law may inform the Department's interpretation, the Department does not read *Virginia* as opining on the scope of Title IX's statutory exceptions. But some lessons from *Virginia* are instructive in the Title IX context. For instance, *Virginia* recognized that, unlike in the context of race or national origin classifications, some sex-based classifications may be constitutionally permissible because of enduring physical differences between the sexes. *Virginia*, 518 U.S. at 533. Like *Virginia*, § 106.31(a)(2) acknowledges that there are circumstances in which sex differentiation is not presumptively discriminatory. Nonetheless, *Virginia* goes on to hold that reliance on these generalized differences alone cannot substantiate a categorical sex-based exclusion from an education program under the Equal Protection Clause. 518 U.S. at 533. To do so would be to rely on the "notably circular argument" that separation on the basis of sex can serve as both an institution's discriminatory means and its justifiable end under the intermediate scrutiny analysis. *See id.* at 544–45 ("Virginia and VMI trained their argument on 'means' rather than 'end,' and thus misperceived our precedent.").

The Department also disagrees that § 106.31(a)(2) eliminates the sex-based distinctions permitted by Title IX. As explained in the July 2022 NPRM, the Department recognizes that Title IX does not treat all sex-based distinctions as impermissible discrimination. 87 FR 41534. The Department's regulations have always recognized that recipients can separate students on the basis of sex in contexts where separation is generally not harmful, and § 106.31(a)(2) does not change that. However, consistent with Supreme Court precedent and Title IX's general nondiscrimination mandate, § 106.31(a)(2) clarifies that when such otherwise permissible sex separation causes more than de minimis harm to a protected individual—and the harm is not otherwise permitted by Title IX— such harm cannot be justified or otherwise rendered nondiscriminatory merely by pointing to the fact that, in general, there are physical differences between the sexes.

Section 106.31(a)(2)'s prohibition on preventing students from participating consistent with their gender identity applies to any circumstance in which a recipient engages in permissible sex separation or differentiation, except when more than de minimis harm is permitted by the statute. For example, the text of § 106.31(a)(2) makes clear that it does not apply to sex-separate athletic teams permitted under 34 CFR 106.41(b). As noted above, Congress made clear that the Title IX regulations should reflect the fact that athletic competition raises unique considerations and the Department's regulations have always permitted more than de minimis harm to individual students in the context of sex-separate athletic teams. On the other hand, § 106.31(a)(2) applies in contexts for which there is no statutory exception, such as sex-separate restrooms and locker rooms under § 106.33, and single-sex classes or portions of classes under § 106.34(a) and (b). The Department has always treated access to facilities and classes differently than athletics. Classes, for example, focus on learning skills and competencies and do not raise the unique issues that are present in sex-separate interscholastic or intercollegiate athletic competition. As explained in more detail below, a recipient can address any concerns about the application of § 106.31(a)(2) to contexts like classes and facilities without preventing students from participating consistent with their gender identity.

With respect to concerns that the "de minimis harm" standard will chill or otherwise limit protected speech, the Department reiterates that § 106.31(a)(2) generally prohibits a recipient from preventing a person from participating in school consistent with their gender identity. The provision does not in any way limit § 106.6(d), which states that nothing in the Title IX regulations requires a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment; deprive a person of any rights that would otherwise be protected from government action under the Due Process Clauses of the Fifth and Fourteenth Amendments; or restrict any other rights guaranteed against government action by the United States Constitution. The Department reaffirms that a recipient may not invoke Title IX to require restricting speech, expression, or conduct in violation of the First Amendment. Similarly, the Department also underscores that none of the amendments to the regulations change or are intended to change the commitment of the Department, through these regulations and OCR's administrative enforcement, to fulfill its obligations in a manner that is fully consistent with the First Amendment

and other guarantees of the Constitution of the United States. For additional information regarding Title IX and the First Amendment, see the discussion of Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2).

With respect to commenters' questions about how a recipient should determine a person's gender identity for purposes of § 106.31(a)(2), the Department is aware that many recipients rely on a student's consistent assertion to determine their gender identity, or on written confirmation of the student's gender identity by the student or student's parent, counselor, coach, or teacher. However, requiring a student to submit to invasive medical inquiries or burdensome documentation requirements to participate in a recipient's education program or activity consistent with their gender identity imposes more than de minimis harm. In particular, a recipient may not require a person to provide documentation (such as an amended birth certificate or evidence of medical treatment) to validate their gender identity for purposes of compliance with § 106.31(a)(2) if access to such documentation is prohibited by law in that jurisdiction.

The Department agrees with commenters who noted the substantial harm transgender students experience when they are excluded from a sex-separate facility consistent with their gender identity, and § 106.31(a)(2) properly accounts for such harm. As detailed in the July 2022 NPRM, several Federal courts have found that excluding students from sex-separate facilities and activities consistent with their gender identity can impose significant harm on those students' mental health and overall well-being. 87 FR 41535. These findings are consistent with the guidelines published by well-established medical organizations, which say being able to live consistent with one's gender identity is critical to the health and well-being of transgender youth.[90] To the extent there are also harms associated with being treated consistent with a gender identity that

---

[90] *See* World Professional Association for Transgender Health, *Standards of Care for the Health of Transgender and Gender Diverse People, Version 8*, 23 Int'l J. Transgender Health S1 (2022); Jason Rafferty et al., Am. Acad. of Pediatrics, *Ensuring Comprehensive Care and Support for Transgender and Gender Diverse Children and Adolescents* 142 Pediatrics 72 (2018); Tanya Albert Henry, *Exclusionary Bathroom Policies Harm Transgender Students*, American Medical Association (Apr. 17, 2019), *https://www.ama-assn.org/delivering-care/population-care/exclusionary-bathroom-policies-harm-transgender-students.*

differs from one's sex assigned at birth, individuals (and their parents, as appropriate) are better positioned to weigh any harms and benefits for themselves than is an educational institution. Section 106.31(a)(2) therefore simply prohibits a recipient from adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity when that person seeks to participate consistent with their gender identity.

The Department disagrees that prohibiting more than de minimis harm in the context of sex-separate bathrooms and locker rooms would result in the elimination of the sex-based separation that Title IX allows in this context. Recipients continue to have discretion under these regulations to provide sex-separate facilities consistent with Title IX's nondiscrimination mandate; making Title IX's protections against sex-based harms explicit does not change that.

The Department also disagrees that § 106.31(a)(2) elevates protections for transgender students over cisgender students. The application of § 106.31(a)(2) is not limited to transgender students—and indeed protects all students from harm when a recipient separates or treats students differently based on sex. As explained in more detail above, § 106.31(a)(2) recognizes that students experience sex-based harm when they are excluded from sex-separate facilities consistent with their gender identity. However, based on the Department's enforcement experience, listening sessions with stakeholders, and its review of Federal case law, the Department is unaware of instances in which cisgender students excluded from facilities inconsistent with their gender identity have experienced the harms transgender students experience as a result of exclusion from facilities consistent with their gender identity.

While the Department strongly agrees that recipients have a legitimate interest in protecting all students' safety and privacy, we disagree that such goals are inconsistent with § 106.31(a)(2). As noted in the July 2022 NPRM, a recipient can make and enforce rules that protect all students' safety and privacy without also excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity. 87 FR 41535; *see also, e.g.,* Rehearing Amicus Brief of School Administrators from Twenty-Nine States and the District of Columbia in Support of Plaintiff-Appellee Gavin Grimm,

*Grimm,* 972 F.3d 586 (No. 19–1952), 2019 WL 6341095. The Department disagrees that it has disregarded potential harms to cisgender students.

The Department does not agree with commenters who alleged there is evidence that transgender students pose a safety risk to cisgender students, or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interest. In many cases, Federal courts have rejected claims that treating students consistent with their gender identity necessarily harms cisgender students in violation of Title IX. For example, when plaintiffs have asserted only unsubstantiated and generalized concerns that transgender persons' access to sex-separate spaces infringes on other students' privacy or safety, courts have rejected those claims. *See, e.g., Grimm,* 972 F.3d at 626 (Wynn, J., concurring); *Whitaker,* 858 F.3d at 1052 (holding that transgender student's presence provides no more of a risk to other students' privacy rights than does the presence of any other student in a sex-separate space); *Boyertown,* 897 F.3d at 521 (same); *Parents for Priv.,* 949 F.3d at 1228–29 (holding that "[t]he use of facilities for their intended purpose, without more, does not constitute an act of harassment simply because a person is transgender"); *Cruzan v. Special Sch. Dist. # 1,* 294 F.3d 981, 984 (8th Cir. 2002) (per curiam) (holding that a transgender woman's mere presence in a sex-separate space did not constitute actionable sexual harassment of her women co-workers). The Supreme Court has also rejected the notion that the preferences or discomfort of some can justify otherwise unconstitutional discrimination against others. *See City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 450 (1985).

The Department also appreciates the opportunity to clarify that nothing in Title IX or the final regulations prevents a recipient from offering single-occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason. The Department agrees with commenters that access to gender-neutral or single-occupancy facilities may be helpful for accommodating students who do not want to use shared sex-separate facilities. The Department declines the suggestion to require that recipients provide gender-neutral or single-occupancy facilities because such facilities are not the only way a recipient could provide nondiscriminatory access to its facilities. In addition, the proposal would likely carry significant cost implications and it would be

appropriate to seek public comment on this issue before making any such changes. Additionally, nothing in § 106.31(a)(2) prohibits recipients from taking nondiscriminatory steps to ensure privacy and safety for all students in a recipient's sex-separate facilities—steps that many recipients already take consistent with their general codes of conduct, including rules prohibiting harassment, assault, and other forms of misconduct.

The Department has previously made clear that all students are protected from sex discrimination under Title IX, and that a recipient generally must treat transgender students consistent with their gender identity with respect to their participation in single-sex classes and activities. *See* U.S. Dept of Educ., Office for Civil Rights, Questions and Answers on Title IX and Single-Sex Elementary and Secondary Classes and Extracurricular Activities, at 25 (Dec. 1, 2014), *https://www2.ed.gov/about/offices/list/ocr/docs/faqs-title-ix-single-sex-201412.pdf.* The Department recognizes that § 106.31(a)(2) interprets Title IX differently from the 2021 Rubinstein Memorandum. The Department explained in detail in the July 2022 NPRM why it disagreed with the reasoning in that archived memorandum. *See* 87 FR 41536–37. The Rubinstein Memorandum's suggestion that Title IX requires separation according to sex assigned at birth or that treating a student inconsistent with their gender identity does not implicate Title IX is at odds with Title IX's text and purpose and the reasoning of the courts that had considered the issue. The Department reiterates that § 106.31(a)(2) is consistent with Federal case law on this point, *see, e.g., Metro. Sch. Dist. of Martinsville,* 75 F.4th 760; *Grimm,* 972 F.3d 586; *Whitaker,* 858 F.3d 1034, and to the extent some courts have come to a different conclusion, *see, e.g., Adams,* 57 F.4th 791; *Bridge v. Okla. State Dep't of Educ.,* No. CIV–22–00787, 2024 WL 150598, at *8 (W.D. Okla. Jan. 12, 2024); *Roe v. Critchfield,* No. 1:23-cv-00315, 2023 WL 6690596, at *1 (D. Idaho Oct. 12, 2023), the Department does not agree with those courts' interpretation of Title IX for the reasons that follow.

For example, in *Adams,* the Eleventh Circuit held that a school district policy preventing a transgender boy from using the boys' restroom did not violate Title IX because the Court determined that "sex" as used in Title IX can only refer to "biology and reproductive function," not gender identity, 57 F.4th at 812–15, and that restrooms are covered by a statutory provision permitting a recipient to maintain "separate living

facilities for the different sexes,'' *id.* at 812–15 (quoting 20 U.S.C. 1686). The Department determined that it is not necessary to resolve the question of what ''sex'' means in Title IX for the Department to conclude that no statutory provision permits a recipient to discriminate against students—*i.e.,* to subject them to more than de minimis harm—in the context of maintaining certain sex-separate facilities or activities. In particular, contrary to the reasoning in *Adams,* even if ''sex'' under Title IX were to mean only sex assigned at birth, Title IX's ''living facilities'' provision, does not permit a recipient to subject a person to more than de minimis harm on that basis in any context *except* living facilities. As explained in the July 2022 NPRM, 20 U.S.C. 1686 specifically carves out from Title IX's general statutory prohibition on sex discrimination an allowance for recipients to maintain sex-separate living facilities. 87 FR 41536; 20 U.S.C. 1686 (''Notwithstanding anything to the contrary contained in [Title IX],'' nothing in Title IX ''shall be construed to prohibit any educational institution . . . from maintaining separate living facilities for the different sexes.''). And it provides the statutory basis for the Department's housing provision at § 106.32(b)(1). But that carve-out does not apply to the remainder of § 106.32 or to any other aspects of a recipient's education program or activity for which Title IX permits different treatment or separation on the basis of sex, such as bathrooms, locker rooms, or shower facilities—regulations that the Department adopted under different statutory authority, and which have long been addressed separately from ''living facilities.'' The Department notes that when HEW adopted the original Title IX regulations, it cited section 907 of the Education Amendments (20 U.S.C. 1686) as one of the sources of its statutory authority for the housing provision, 40 FR 24141 (codified at 45 CFR 86.32 (1975)), whereas it cited only sections 901 and 902 of the Education Amendments (20 U.S.C. 1681–1682) as its statutory authority for the provision governing toilet, locker room, and shower facilities, 40 FR 24141 (codified at 45 CFR 86.33 (1975)), and the Department of Education retained those authorities when it adopted its own Title IX regulations in 1980. 45 FR 30955 (May 9, 1980) (codified at 34 CFR 106.32 and 106.33). As the statutory sources cited in the text of the regulations themselves demonstrate, a recipient's provision of separate bathrooms and locker rooms is governed not by 20 U.S.C. 1686, but by

the statute's general nondiscrimination mandate, 20 U.S.C. 1681. And § 106.33 ''cannot override the statutory prohibition against *discrimination* on the basis of sex.'' *Grimm,* 972 F.3d at 618 (emphasis in the original). The *Adams'* court's reasoning therefore cannot be reconciled with Title IX's plain text and ignores that Congress could have, but did not, address anything other than the practice of maintaining sex-separate ''living facilities'' in 20 U.S.C. 1686. *See* 87 FR 41536 (''Congress's choice to specify limited circumstances where harm resulting from sex separation is permitted illustrates that, outside of those contexts, Title IX's general prohibition on sex discrimination prohibits such harm.''). The Department therefore declines to adopt the Eleventh Circuit's reasoning in *Adams* that the statutory carve out for living facilities governs the interpretation of § 106.33, the Department's regulations on bathrooms and locker rooms, or any other regulatory provision other than housing, 34 CFR 106.32(b)(1).

With respect to commenters' questions about whether § 106.31(a)(2) prohibits a recipient from excluding students from sex-separate housing consistent with their gender identity, it does not, because of the express carve-out for sex-separate living facilities under 20 U.S.C. 1686. But that is the extent of the reach of 20 U.S.C. 1686, and nothing in the statute or final regulations precludes a recipient from voluntarily choosing to adopt policies that enable transgender students to access sex-separate housing consistent with their gender identity.

*Changes:* None.

### 4. Parental Rights

*Comments:* Some commenters expressed concern that proposed § 106.31(a)(2) would prevent schools from respecting a parent's wishes regarding how their child should be treated and urged the Department to clarify parental rights in this context. Some commenters asserted that in most cases parents should make important decisions about their children's health and well-being, that parents are best situated to act in the best interests of their children, and that parents have a right to ''direct the upbringing and education of children under their control,'' citing *Pierce* v. *Soc'y of Sisters,* 268 U.S. 510, 534–35 (1925).

Some commenters raised questions about matters related to gender identity, including whether a recipient should comply with a request by a minor student to change their name or pronouns used at school if their parent

opposes the change and whether the proposed regulations would lead to claims that a parent is mistreating a child if that parent does not affirm the child's gender identity.

Commenters also asked the Department to clarify whether it would be a potential violation of Title IX for a recipient to treat a student according to their sex assigned at birth if requested by the parents to do so; notify a student's parents of the student's gender transition or gender identity; or to deny parents access to their child's educational records, including information about their child's gender identity. Some commenters urged the Department to amend the regulations to expressly provide that a minor student's parents must be consulted before a school could begin treating a student consistent with a different gender identity.

Some commenters expressed concern that proposed § 106.31(a)(2) would conflict with State laws, like Florida's Parental Rights in Education Act, HB 1557. Some commenters asserted that proposed § 106.31(a)(2) would affect the content of a recipient's curricula and override claimed parental rights over curricula. Some commenters worried that a school board could feel pressured to include information about gender identity in the curriculum to avoid a Title IX violation and to use Title IX to justify denying parental opt-outs from lessons on gender identity.

Some commenters argued that because the proposed regulations define ''parental status'' to include a person acting ''in loco parentis,'' a school district employee could act in place of a student's parent, including regarding the student's gender identity.

*Discussion:* The Department acknowledges and respects the rights of parents and their fundamental role in raising their children. The Department appreciates the opportunity to clarify that nothing in the final regulations disturbs parental rights, and accordingly the Department determined that additional regulatory text regarding parental rights is not necessary to effectuate Title IX's prohibition on sex discrimination.

Indeed, as explained in the discussion of § 106.6(g), that provision reinforces the right of a parent to act on behalf of their minor child, whether their child is a complainant, respondent, or other person. Under § 106.6(g), nothing in Title IX or the final regulations may be read in derogation of any legal right of a parent, guardian, or other authorized legal representative to act on behalf of a minor child, including but not limited to making a complaint through the

recipient's grievance procedures for complaints of sex discrimination. When a parent and minor student disagree about how to address sex discrimination against that student, deference to the judgment of a parent, guardian, or other authorized legal representative with a legal right to act on behalf of that student is appropriate.

Further, nothing in these final regulations prevents a recipient from disclosing information about a minor child to their parent who has the legal right to receive disclosures on behalf of their child. For additional explanation of the final regulations' application to disclosure of information to parents of minor children, see the discussions of §§ 106.44(j) (Section II.B) and 106.6(g) (Section I.F).

Although the hypothetical factual scenarios raised by commenters require case-by-case determinations, the Department reiterates that nothing in the final regulations restricts any right of a parent to act on behalf of a minor child or requires withholding of information about a minor child from their parents. *See* §§ 106.44(j)(2), 106.6(g). A recipient can coordinate with a minor student and their parent, as appropriate, to ensure sex discrimination does not interfere with the student's equal access to its education program or activity.

The Department declines to opine on how § 106.31(a)(2) interacts or conflicts with any specific State laws because it would require a fact-specific analysis, but refers the public to § 106.6(b), which affirms that a recipient's obligation to comply with Title IX and the regulations is not obviated or alleviated by any State or local law.

In response to comments regarding curricula, the Department does not have the authority to regulate curricula and reiterates that these final regulations do not regulate curricula or interfere with any asserted parental right to be involved in recipients' choices regarding curricula or instructional materials. The explicit regulatory limitation on the Department regulating curricular materials under Title IX remains unchanged: "Nothing in this regulation shall be interpreted as requiring or prohibiting or abridging in any way the use of particular textbooks or curricular materials." 34 CFR 106.42.

In response to the comments regarding the inclusion of "in loco parentis" in the definition of "parental status," the Department appreciates the opportunity to clarify that the definition is limited to the context of §§ 106.21(c)(2)(i), 106.37(a)(3), 106.40(a), and 106.57(a)(1), which prohibit sex discrimination related to

the parental status of students, employees, and applicants for admission or employment (*e.g.,* treating mothers more or less favorably than fathers). This definition does not affect the rights or status of a student's parents, authorize a recipient to act in the place of parents, or diminish parental rights. The Department further clarifies that the definition of "parental status" does not relate to parental rights under § 106.6(g) and does not bestow parental authority on any person. *See* discussion of the definition of "parental status'' in § 106.2 (Section III).

*Changes:* None.

5. Intersection With Health Care

*Comments:* Some commenters expressed concern that proposed § 106.31(a)(2) could set a new medical standard of care by virtue of Title IX's application to campus health centers, teaching hospitals, and school nurses' offices. Specifically, commenters raised concerns about whether § 106.31(a)(2) would require a recipient to provide gender-affirming care.

Commenters urged the Department to exclude minor children from any "mandates'' concerning gender transition procedures or prohibit a recipient from treating gender dysphoria in a minor student without parental involvement. One commenter suggested the Department should require rigorous gatekeeping procedures before medical interventions.

Another commenter asserted that § 106.31(a)(2) would coerce health care providers' medical care and speech and require providers to treat gender dysphoria in ways to which they have medical, ethical, or religious objections. Some commenters argued that § 106.31(a)(2)'s effect on health care violates the Religious Freedom Restoration Act, 42 U.S.C. 2000bb–1 (RFRA), and the First Amendment's Free Speech and Free Exercise of Religion Clauses.

Another commenter asked the Department to jointly consider the impact of the proposed regulations with the impact of the regulations proposed by the U.S. Department of Health and Human Services (HHS) for Section 1557.

*Discussion:* Title IX applies to recipients of Federal funding that operate an "education program or activity." 20 U.S.C. 1681(a). When a recipient is an educational institution, all of its operations are considered covered by Title IX. *See* Public Law 100–259, 102 Stat. 28 (Mar. 22, 1988) (codified at 20 U.S.C. 1687); U.S. Dep't of Justice, Title IX Legal Manual at III.C, *https://www.justice.gov/crt/title-ix* (last visited Mar. 12, 2024) ("In the context

of traditional educational institutions, it is well established that the covered education program or activity encompasses *all* of the educational institution's operations including, but not limited to, 'traditional educational operations, faculty and student housing, campus shuttle bus service, campus restaurants, the bookstore, and other commercial activities.'" (footnote omitted) (citing S. Rep. No. 64 at 17, reprinted in 1988 U.S.C.C.A.N. at 19)). Thus, for example, when a federally funded educational institution operates a health center or nurses' office, those centers and offices are part of the institution's "education program or activity" and are subject to the Department's Title IX regulations. For recipients that are not educational institutions, the Department's Title IX regulations apply only to any education program or activity operated by such entities.

The Department's Title IX regulations do not (and cannot) promote any particular medical treatment, require provision of particular medical procedures, or set any standard of care. As such, these regulations do not interfere with providers' exercise of their professional medical judgment. Rather, these regulations implement the nondiscrimination requirements of Title IX.

Section 1557, 42 U.S.C. 18116, prohibits discrimination on the basis of race, color, national origin, sex, age, and disability in a range of health programs and activities. While we appreciate that some recipients may be covered under both the Department's Title IX regulations and HHS' Section 1557 regulations, the Section 1557 rulemaking undertaken by HHS is outside of the scope of the Department's Title IX rulemaking. It is the Department's practice to collaborate with other Federal agencies when there may be overlapping civil rights jurisdiction, and we are committed to continuing such collaboration should it arise in the context of these two sets of regulations. The Department will provide technical assistance in the future, as appropriate.

Further, as stated in § 106.6(d), nothing in these regulations requires a recipient to restrict rights protected under the First Amendment or any other rights guaranteed against government action under the U.S. Constitution. The Department likewise interprets and applies its regulations consistent with RFRA and Title IX's exemption for educational institutions controlled by religious organizations.

*Changes:* None.

6. Intersection With Individuals' Religious Beliefs

*Comments:* Commenters raised concerns regarding the application of proposed §§ 106.10 and 106.31(a)(2) to institutions and individuals when compliance with such provisions would violate their religious beliefs.

Some commenters raised specific concerns regarding the application of the religious exemption in Title IX, with some asserting that §§ 106.10 and 106.31(a)(2) would not apply when the provisions would conflict with the religious tenets of an organization. Other commenters suggested further clarification around the religious exemption in Title IX and posed specific hypotheticals for the Department to address and affirm as falling within the religious exemption. Some commenters raised concerns that persons of faith attending or employed by non-religious schools or religious schools are unable to invoke the religious exemption. One commenter argued that declining to consider the need of such persons to freely exercise their faith would be arbitrary and capricious.

Some commenters expressed concern that requirements under § 106.31(a)(2) would potentially interfere with their constitutionally protected free speech and free exercise rights under the First Amendment. Commenters further asserted that proposed § 106.31(a)(2) would prohibit persons with traditional religious views of family and sexuality from exercising their constitutionally protected free speech and free exercise rights. One commenter also expressed concerns that the proposed regulations would compel faculty, staff, and students to speak in particular ways about sexual orientation and gender identity that may conflict with their religious beliefs, citing *Vlaming* v. *W. Point Sch. Bd.,* 10 F.4th 300, 304 (4th Cir. 2021). One commenter also asserted that these provisions would conflict with RFRA, insofar as these provisions apply to non-exempt religious schools or insofar as they require individual religious teachers, students, and visitors at secular schools to violate their religious beliefs.

Some commenters urged the Department to clarify that free speech and religious liberty protections extend to recipients and individuals and that such protections will not be altered or abridged through the final regulations or future Department guidance or practice.

*Discussion:* The Department is committed to enforcing Title IX consistent with all applicable free speech and religious liberty protections.

With respect to religious educational institutions, the Department agrees with commenters that §§ 106.10 and 106.31(a)(2) do not apply to an educational institution that is controlled by a religious organization to the extent that the provisions' application would not be consistent with the religious tenets of such organization. 20 U.S.C. 1681(a)(3). If an institution wishes to claim an exemption, its highest-ranking official may submit a written statement to the Assistant Secretary for Civil Rights, identifying the provisions of Title IX that conflict with a specific tenet of the controlling religious organization. 34 CFR 106.12(b).

The Department notes that that the religious exemption in Title IX applies to an ''educational institution'' or other ''entity'' that is controlled by a religious organization, 20 U.S.C. 1681(a)(3); 1687(4); it does not address an individual student or employee's exercise of their religious beliefs. As commenters also noted, however, RFRA provides that the Federal government ''shall not substantially burden a person's exercise of religion'' unless the government ''demonstrates that application of the burden to the person . . . is in furtherance of a compelling governmental interest; and . . . is the least restrictive means of furthering that compelling governmental interest.'' 42 U.S.C. 2000bb–1.

The Department cannot opine on how RFRA might be applied in particular situations, including in hypotheticals suggested by commenters, because determinations about whether the application of Title IX in a particular context substantially burdens a person's exercise of religion would necessarily depend on the circumstances at hand. The Department, however, must abide by RFRA, and OCR considers RFRA's requirements when it evaluates a recipient's compliance with Title IX. An individual may also inform the Department of a burden or potential burden under RFRA by sending an email to *RFRA@ed.gov.* The Department's Office of the General Counsel, in consultation with other Department offices or Federal agencies when appropriate, will determine whether further investigation is warranted.

With regard to commenters' concerns related to the Free Speech and Free Exercise Clauses of the First Amendment, § 106.6(d) explicitly states that nothing in the regulations requires a recipient to restrict rights protected under the First Amendment or other constitutional provisions. The Department, likewise, must act in accordance with the U.S. Constitution.

*Changes:* None.

7. Appearance Codes

*Comments:* Some commenters urged the Department to clarify how Title IX and the final regulations apply to sex-specific appearance codes, including dress and grooming codes. Some commenters urged the Department to clarify whether and how sex-specific appearance codes violate Title IX and how the final regulations' prohibition in § 106.31(a)(2) on separating or treating students differently based on sex in a manner that causes more than de minimis harm applies in this context.

Commenters said that appearance codes with sex-specific requirements perpetuate sex stereotypes and contribute to sex discrimination, including sex-based harassment. Some commenters explained that dress and appearance codes are enforced disproportionately against girls and LGBTQI+ students and often restrict common Black protective hairstyles like braids, locs, hair wraps, Bantu knots, and bandanas or impose hair length requirements on students for whom wearing long hair may be an important part of their identity, including Indigenous students, Sikh students, and others.

Some commenters stated that the Department should restore and update the dress code provision in the original 1975 Title IX regulations that was rescinded in 1982. One commenter stated that the absence of a provision regarding dress codes has led many school boards and school administrators to believe that Title IX does not cover dress codes. This commenter asked the Department to provide guidance or additional regulations making clear that dress and appearance codes that include sex-based distinctions, either on their face or as enforced, are subject to Title IX. Commenters also noted that the Fourth Circuit recently held that Title IX applies to dress codes. *Peltier,* 37 F.4th at 128.

Some commenters asked the Department to offer examples of how sex-specific dress and appearance codes could violate Title IX, including with respect to sex-specific hair length requirements for boys and girls, and asked whether a sex-specific appearance code could violate the right of any students, including cisgender and transgender students.

*Discussion:* The Department appreciates the opportunity to clarify that sex-specific appearance codes, including sex-specific dress and grooming codes, are subject to Title IX and § 106.31(a)(2) of the final regulations. Thus, under § 106.31(a)(2),

a recipient may adopt an appearance code with some sex-based distinctions to the extent those distinctions do not cause more than de minimis harm. For example, some sex-based distinctions may be appropriate in the protective gear or uniforms a recipient expects students to wear when participating in certain physical education classes or athletic teams. On the other hand, imposing different restrictions on how boys and girls dress or appear would violate Title IX if the sex-specific restriction causes students more than de minimis harm under § 106.31(a)(2). *See, e.g., Peltier,* 37 F.4th at 130; discussions of de minimis harm standard (below and Section IV.B.1).

Although the Title IX regulations no longer include a provision explicitly addressing appearance codes as they did from 1975 until 1982, neither the Title IX statute nor the regulations contain an exception that would permit a recipient to discriminate on the basis of sex in the context of appearance codes. However, in light of comments the Department received, the Department understands the need to clarify its view of the final regulations' application to sex discrimination in the context of appearance codes.

In addition to several of the specific prohibitions in what is now § 106.31(b), the Title IX regulations that HEW originally issued in 1975 also included a specific prohibition on "[d]iscrimination against any person in the application of any rules of appearance." 40 FR 24128 (codified at 45 CFR 86.31(b)(5) (1975)). In 1982, the Department removed this specific prohibition from its Title IX regulations. The corresponding **Federal Register** notice offered three reasons for the removal: (1) to permit the Department "to concentrate its resources on cases involving more serious allegations of sex discrimination"; (2) because "[d]evelopment and enforcement of appearance codes is an issue for local determination"; and (3) because allegedly there was "no indication in the legislative history of Title IX that Congress intended to authorize Federal regulations in the area of appearance codes." U.S. Dep't of Educ., Nondiscrimination on the Basis of Sex in Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance, 47 FR 32526, 32526–27 (July 28, 1982).

The Department notes that the third reason offered in the July 1982 notice was materially incomplete. Although the legislative history preceding enactment of Title IX in 1972 may not have included any discussion of appearance codes, it also did not suggest

that such codes would be treated differently from other sex-based rules of student behavior and sex-based treatment of students. And although some witnesses at congressional hearings to review HEW's proposed rules in 1975 criticized the proposed regulations' prohibition on discrimination in appearance codes (and some witnesses praised it), *see Hearings Before the Subcomm. on Postsecondary Educ. of the Comm. on Educ. and Labor in the H.R., Review of Regulations to Implement Title IX of Public Law 92–318 Conducted Pursuant to Sec. 431 of the Gen. Educ. Provisions Act,* 94th Cong. 239, 250, 252, 362, 374, 450, 514–15, 609, 637 (1975), Congress did not disapprove the regulations or amend the law before the regulations, including the appearance provision, took effect in July 1975.

More importantly, although the 1982 amendment removed a specific reference to appearance codes from the regulations, it did not create a new exception or alter in any way the Title IX regulations' central prohibition on sex discrimination or the other specific prohibitions in § 106.31(b). Indeed, the Department would not have authority to take any action that creates an exception from Congress's clear prohibition on sex discrimination or that is otherwise inconsistent with Title IX.

The Departments of Justice and Education have clarified that the 1982 amendment did not exempt rules of appearance from the regulatory prohibitions on sex discrimination. *See* Statement of Interest of the United States at 13–14 & n.13, *Arnold* v. *Barbers Hill Indep. Sch. Dist.,* No. 20-cv-01802 (S.D. Tex. July 23, 2021), *https://www.justice.gov/crt/case-document/file/1419201/download; see also* Rehearing En Banc Brief for the United States as Amicus Curiae Supporting Plaintiffs-Appellees/Cross-Appellants, at 28 n.5, *Peltier,* 37 F.4th 104 (No. 20–1001(L), 20–1023), *https://www.justice.gov/crt/case-document/file/1449811/download.*

Moreover, since 1982 Federal courts, including in a recent Fourth Circuit en banc opinion, have affirmed that a recipient's enforcement of a sex-differentiated appearance code is subject to Title IX's statutory prohibition on sex discrimination. *See, e.g., Peltier,* 37 F.4th at 114, 127–31 (holding that based on the "plain language and structure of the statute," Title IX "unambiguously covers . . . sex-based dress codes," and remanding the case for consideration of whether the girl plaintiffs were harmed by the charter school's policy requiring only girls to wear skirts). Courts have likewise recognized that different hair

length requirements for boys and girls are subject to Title IX. *See Hayden* v. *Greensburg Cmty. Sch. Corp.,* 743 F.3d 569, 583 (7th Cir. 2014) (holding that a policy requiring male basketball players, but not female basketball players, to keep their hair cut short, violated Title IX and the Equal Protection Clause); *cf. Arnold* v. *Barbers Hill Indep. Sch. Dist.,* 479 F. Supp. 3d 511, 524 (S.D. Tex. 2020) (finding under intermediate scrutiny that plaintiff had a substantial likelihood of success on his sex discrimination claim under the Equal Protection Clause challenging school district's sex-specific hair-length policy).

With respect to questions on whether and how § 106.31(a)(2) applies to all students and all appearance codes, the Department appreciates the opportunity to clarify that a recipient is barred from carrying out different treatment or separation in a manner that subjects "any person" to more than de minimis harm, except as permitted by Title IX.

Note that if a sex-specific requirement or set of requirements in a recipient's appearance code violate individual students' rights under Title IX, it would not be a defense for that recipient to point to a "comparably burdensome" requirement for other students, or to argue that the appearance code generally imposes "equal burdens" on both sexes, because Title IX, like Title VII, "works to protect individuals of both sexes from discrimination, and does so equally." *Bostock,* 590 U.S. at 659 (finding that it is not a defense to sex discrimination under Title VII for an employer to say that it discriminates against both men and women because of sex); *see also Peltier,* 37 F.4th at 130 (rejecting the application of the "comparable burdens" test to a claim of sex discrimination under Title IX and citing *Bostock* for the proposition that "[d]iscriminating against members of both sexes does not eliminate liability, but 'doubles it.'"). The Department is aware that some courts still apply a "comparable burdens" test to analyze Title IX claims alleging discrimination in the application of appearance codes, *see, e.g., Doe* v. *Rocky Mountain Classical Acad.,* No. 19–CV–03530, 2022 WL 16556255, at *7 (D. Colo. Sept. 30, 2022), but the Department disagrees with that test for the reasons noted in *Peltier,* 37 F.4th at 130 n.13.

The final regulations sufficiently account for discriminatory appearance codes, including both dress and grooming codes, and no further changes to the regulations are necessary.

*Changes:* None.

8. Juvenile Justice Facilities

*Comments:* Some commenters argued that, by treating youth consistent with their gender identity, the proposed regulations would increase the risk of rape and sexual assault in juvenile justice facilities, making it more difficult for such facilities to comply with applicable standards under the Prison Rape Elimination Act (PREA), and noted that the Department is obligated to thoroughly examine this potential issue along with alternatives that would minimize or avoid increased risk of sexual assaults in these facilities. The commenter noted PREA's requirement that facilities have a written policy of zero tolerance for sexual abuse and sexual harassment (28 CFR 115.311). Other commenters referenced a lawsuit alleging that a cisgender inmate was raped by a transgender inmate. Commenters also urged the Department to allow juvenile justice facilities to make placements according to sex assigned at birth.

*Discussion:* The Department's Title IX regulations apply to juvenile justice facilities that receive Federal funds from the Department, but they apply only to any education program or activity offered by such facilities. Further, as noted above, § 106.31(a)(2) does not apply in contexts in which different treatment that causes more than de minimis harm is "otherwise permitted under Title IX," including in "living facilities." 20 U.S.C. 1686. The Department recognizes that juvenile justice facilities have an obligation to protect their populations. The generalized data and anecdotal information cited by commenters do not support the commenters' conclusion that these regulations will increase the risk of rape or sexual assault at juvenile justice facilities.

*Changes:* None.

9. Burden on Schools

*Comments:* Some commenters asserted that proposed § 106.31(a)(2) would burden recipients and other entities to the extent it causes recipients to construct or retrofit facilities to protect privacy; bear administrative and increased legal costs associated with rule changes and record-keeping; monitor for sexual assaults in restroom and locker room facilities; provide lengthier trainings; seek additional assurances of religious exemptions; and forego participation in Federal student aid programs in order to avoid application of these final regulations under Title IX.

*Discussion:* The *Regulatory Impact Analysis* addresses costs and benefits associated with the final regulations, including those specifically attributable to § 106.31(a)(2).

*Changes:* None.

## V. Retaliation

### A. Section 106.71 Retaliation

1. General Support and Opposition

*Comments:* Many commenters expressed support for the proposed retaliation provisions, indicating the provisions would encourage reporting, support a safer and more welcoming environment, promote equal access to a recipient's education program or activity, be consistent with case law, and clarify and streamline the process for handling retaliation complaints, including the obligation to comply with § 106.44.

Some commenters opposed the proposed retaliation provisions to the extent the provisions would treat all retaliation as a form of sex discrimination, noting that there are motives for retaliation that do not implicate sex.

Some commenters expressed concern that the proposed changes to § 106.71 would restrict respondents' ability to defend themselves, and some commenters urged the Department to clarify that non-frivolous cross-complaints do not constitute retaliation. Other commenters noted that respondents sometimes make a retaliatory cross-complaint against a complainant, which can force the parties to interact, lengthen the process, drain the complainant's financial resources, and cause a complainant to take a leave of absence or transfer schools.

*Discussion:* The Department agrees that the retaliation provisions advance Title IX's nondiscrimination mandate by protecting those who exercise their rights under Title IX and participate in grievance procedures.

The Department disagrees with commenters who argued that the proposed regulations would cover conduct that does not constitute sex discrimination and confirms that is not the Department's intent. The Supreme Court in *Jackson* made clear that retaliation against a person for complaining of sex discrimination is " 'discrimination' 'on the basis of sex' " in violation of Title IX "because it is an intentional response to the nature of the complaint: an allegation of sex discrimination." 544 U.S. at 173–74. The Department agrees with commenters who noted that Title IX does not prohibit an individual from taking adverse action against a person who engaged in protected activity for legitimate, non-retaliatory reasons and that retaliation unrelated to sex is not covered by Title IX. The definition of "retaliation" in the final regulations at § 106.2 accounts for this by specifying that retaliation covers only those actions taken "for the purpose of interfering" with Title IX rights or "because" the person participated in the Title IX process.[91]

The Department disagrees with commenters who suggested that proposed § 106.71 would restrict a respondent's ability to defend themself, including by filing a cross-complaint. Section 106.45(e) recognizes that a respondent may make a cross-complaint and a recipient may consolidate resolution of that complaint with other complaints that arise out of the same facts or circumstances. A cross-complaint would not constitute retaliation under these regulations as long as there is another reason for the cross-complaint that is not a pretext for sex-based retaliation.

*Changes:* None.

2. Intersection With § 106.45(h)(5)

*Comments:* Some commenters supported the proposed removal of the statement in § 106.71(b)(2) of the 2020 amendments that retaliation does not include charging an individual with a code of conduct violation for making a materially false statement in bad faith during a Title IX grievance proceeding. Commenters argued that individuals should not be punished simply because their allegations cannot be substantiated. Commenters asserted that the prospect of being disciplined for making false statements under the 2020 amendments has deterred complainants from reporting sex discrimination.

Other commenters asserted that false allegations harm respondents, future complainants, and the integrity of the grievance procedures, and argued that the proposed change would make it harder to punish people who lie during a Title IX grievance procedure.

Other commenters acknowledged that the Department moved a revised version of this provision from § 106.71(b)(2) in the 2020 amendments to new § 106.45(h)(5) but asserted that differences between the language in the

---

[91] References to participation "in the Title IX process" in Section V include contexts where a person "reported information, made a complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part, including in an informal resolution process under § 106.44(k), in grievance procedures under § 106.45, and if applicable § 106.46, and in any other actions taken by a recipient under § 106.44(f)(1)," consistent with the definition of "retaliation" in § 106.2.

two provisions may be confusing to non-lawyers.

Some commenters urged the Department to clarify whether it is retaliation for a recipient to discipline a student for making a false statement or for engaging in consensual sexual conduct based solely on the recipient's determination whether sex discrimination occurred.

*Discussion:* Section 106.71(b)(2) in the 2020 amendments provided that when a recipient charges an individual with a code of conduct violation for making a materially false statement in bad faith in the course of a Title IX grievance proceeding, such an action would not be considered retaliatory as long as the recipient did not base its determination that a person made a materially false statement in bad faith solely on the outcome of the grievance proceeding. *See* 85 FR 30084. As explained in the July 2022 NPRM, the Department proposed removing this provision in response to feedback that the framing of § 106.71(b)(2) in the 2020 amendments was confusing and could have a chilling effect on a person's willingness to participate in a recipient's grievance procedures. 87 FR 41490. Instead, the final regulations include § 106.45(h)(5), which prohibits a recipient from disciplining a party, witness, or others participating in a grievance procedure for making a false statement based solely on the recipient's determination whether sex discrimination occurred.

The Department is not persuaded by commenters who suggested that the differences between § 106.71(b)(2) in the 2020 amendments and § 106.45(h)(5) in the final regulations would cause confusion or make it harder to discipline students for lying. The Department maintains that the affirmative prohibition on discipline based solely on a determination whether sex discrimination occurred in § 106.45(h)(5) of the final regulations will be easier to understand and apply than its prior framing as an exception to a general rule permitting discipline. A recipient will still have discretion to discipline those who make false statements based on evidence other than or in addition to the determination of the Title IX grievance procedure. For example, a recipient may rely on the same evidence presented during the grievance procedure as evidence that a person made a false statement. However, the determination that a person made a false statement cannot be based solely on the determination whether sex discrimination occurred, because a determination that sex discrimination did not occur is not a proxy for a finding that statements made

were false. For example, statements alleging that particular conduct occurred may be true and still not meet the standard for prohibited "sex-based harassment," because the conduct did not create a hostile environment. Or a recipient may determine that there is insufficient evidence to conclude that the alleged conduct occurred, but that does not necessarily mean that the student lied about the conduct. Conflating the determinations of whether sex discrimination occurred and whether false statements were made can have a chilling effect on participation in Title IX grievance procedures.

The Department appreciates the opportunity to clarify that disciplining someone for making a false statement or for engaging in consensual sexual conduct would violate § 106.45(h)(5) if it is based solely on the recipient's determination whether sex discrimination occurred in a Title IX grievance procedure, and it would also constitute retaliation if it otherwise meets the standards outlined in § 106.71 and the definition of retaliation in § 106.2 (*e.g.,* the recipient engaged in the discipline for purpose of interfering with the person's Title IX rights or because they participated in Title IX grievance procedures).

*Changes:* None.

3. Examples of Prohibited Retaliation

*Comments:* Some commenters expressed support for proposed § 106.71(a), stating that the examples of prohibited retaliation would encourage reporting incidents of discrimination and promote Title IX's goal of eliminating sex discrimination.

Other commenters argued that proposed § 106.71(a) is not necessary because the definition of "retaliation" is broad enough to cover the circumstances described in that paragraph. One commenter argued that proposed § 106.71(a) could unintentionally limit enforcement objectives, such as by preventing alcohol or drug violations from being adjudicated against a respondent when associated with a Title IX complaint.

Some commenters suggested that the Department clarify proposed § 106.71 by providing non-exhaustive examples of retaliation, such as disciplining a pregnant student seeking reasonable modifications or disciplining a complainant for conduct that the school knows or should know results from the harassment or other discrimination (*e.g.,* defending themselves against harassers or acting out in age-appropriate ways in response to trauma). Another commenter urged the Department to

modify the proposed regulations to address other code of conduct violations, beyond those arising out of the same facts and circumstances, to include any information learned as a result of the Title IX grievance procedures. As an example, the commenter stated that pursuing discipline against a student for an earlier violation of a recipient's alcohol policy could deter a complainant from reporting an unrelated sexual assault. Another commenter suggested that expressly encouraging or requiring recipients to adopt amnesty policies would more directly address the policy concern than proposed § 106.71(a).

Other commenters expressed concern that proposed § 106.71(a) fails to consider recipients' interests in maintaining codes of conduct for students, including codes of conduct that reinforce a recipient's policies on sexual morality or religious observance. Commenters asserted that recipients' inability to enforce their codes of conduct for non-Title IX transgressions during the pendency of a grievance procedure could prevent schools from maintaining effective discipline among students and have negative impacts on the community.

*Discussion:* Proposed § 106.71(a), which largely tracks the language from the 2020 amendments, recognized that fear of being disciplined for other code of conduct violations, such as underage drinking, can be a significant impediment to a student's willingness to report incidents of sex-based harassment and other forms of sex discrimination. 85 FR 30536; 87 FR 41542. Proposed § 106.71(a) was intended to encourage reporting of sex discrimination and participation in Title IX grievance procedures by providing assurance that a recipient may not use its code of conduct to dissuade a person from exercising their rights under Title IX or to punish them for having done so.

The Department agrees with commenters who argued that initiating a disciplinary process under the circumstances described in proposed § 106.71(a) may qualify as retaliation under the definition of "retaliation" absent the inclusion of that paragraph in the regulations. It is valuable to remind recipients that they violate the prohibition on retaliation if they initiate a disciplinary process against a student for the purpose of interfering with Title IX rights or because the student participated in Title IX grievance procedures. However, proposed § 106.71(a) was not intended to limit the contexts in which initiating a disciplinary process could constitute retaliation. For example, disciplining a

student who filed a complaint of sexual assault for an earlier violation of a recipient's alcohol policy that did not arise from the same facts or circumstances as the assault would not meet the standard in proposed § 106.71(a). But, in this example, it could still constitute retaliation under § 106.2 if the recipient initiated such discipline for the purpose of interfering with that student's Title IX rights or because the student had filed a Title IX complaint.

Because the example in proposed § 106.71(a) does not articulate substantive requirements or limitations beyond the standard outlined in the definition of retaliation at § 106.2, the Department has removed it from the final regulations. The Department similarly removed the example of peer retaliation in proposed § 106.71(b) and instead moved the reference to peer retaliation to the first sentence of § 106.71 of the final regulations to make clear that references to retaliation include peer retaliation. However, the removal of these examples from the text of the regulations does not reflect a change in policy; it reflects the Department's determination that examples of prohibited conduct are more appropriately discussed in this preamble.

For similar reasons, the Department declines to add other examples of prohibited retaliation to § 106.71. The analysis of whether specific conduct constitutes retaliation under the final regulations requires a close examination of all the facts and circumstances. Generally speaking, a recipient engages in retaliation in violation of Title IX when it takes an adverse action against a person because they engaged in a protected activity such as exercising their rights under Title IX. For example, in the commenter's hypothetical of a recipient disciplining a student after the student sought reasonable modifications related to the student's pregnancy, OCR would generally consider discipline to be an adverse action and a request for reasonable modifications to be a protected activity. However, OCR would also need to determine whether the recipient knew about the protected activity when it initiated the discipline and whether there was a causal connection between the protected activity and the discipline. OCR would then need to determine whether the recipient had a legitimate, non-retaliatory reason for the adverse action and whether that reason was genuine or a pretext for prohibited retaliation. OCR would also consider whether any exceptions to Title IX may apply, such as a religious exemption.

Similarly, if the trauma of a sexual assault causes a complainant to engage in problematic behavior (*e.g.*, defiant or aggressive conduct, missing class), a recipient may not initiate its disciplinary process for that misconduct for the purpose of interfering with the student's rights under Title IX. And, when the recipient knows that the student has been subject to possible sex discrimination, it must offer and coordinate supportive measures as described in § 106.44(g), which may include, as appropriate, measures to address trauma, fear of retaliation, or harassment. But the prohibition on retaliation does not bar a recipient from taking disciplinary action to address the problematic behavior described above absent a retaliatory motive.

The Department recognizes that some recipients have adopted broader "amnesty" policies under which a recipient will not discipline students for collateral conduct related to an incident of sex-based harassment and that such policies may help encourage reporting. Nothing in the final regulations precludes a recipient from adopting a broader amnesty policy. The Department has determined, however, that Title IX does not require all recipients to adopt such amnesty policies because recipients may have legitimate nondiscriminatory reasons for enforcing their codes of conduct with respect to collateral conduct.

At the same time, the Department also notes that under § 106.44(b) of the final regulations a recipient must require its Title IX Coordinator to monitor for potential barriers to reporting information about conduct that reasonably may constitute sex discrimination under Title IX and take steps reasonably calculated to address these barriers. To the extent a Title IX Coordinator finds fear of discipline for alcohol-related infractions, for example, to be a barrier to reporting sex discrimination, a recipient may consider adopting an amnesty policy as one approach to address that barrier.

The Department acknowledges that the prohibition on retaliation could prevent a recipient from initiating a disciplinary process for alcohol or drug violations against any person (including a complainant, respondent, or witness), but only if the recipient initiates the disciplinary process for the purpose of interfering with that person's Title IX rights or because the person participated in Title IX grievance procedures. That is, a recipient may continue to enforce its code of conduct unless it has a retaliatory motive for initiating the disciplinary process.

The Department disagrees with commenters who said that proposed § 106.71(a) would negatively impact community standards or prevent a religious institution from enforcing its policies on sexual morality or religious observance. While the Department has removed the example in proposed § 106.71(a) in the final regulations, the Department confirms that the definition of retaliation in § 106.2 and the prohibition on retaliation in § 106.71 of the final regulations clearly restrict a recipient from initiating a disciplinary process only when it does so for the purpose of interfering with an individual's Title IX rights or because an individual participated in Title IX grievance procedures. The prohibition on retaliation would not prevent a recipient from enforcing its code of conduct for legitimate, nondiscriminatory reasons.

Moreover, the Department notes that Title IX does not apply to an educational institution that is controlled by a religious organization to the extent that application of Title IX would be inconsistent with the religious tenets of the organization. 20 U.S.C. 1681(a)(3); 34 CFR 106.12.

*Changes:* In the final regulations, the Department has removed the last sentence of proposed § 106.71 and paragraphs (a) and (b) in their entirety. The Department also added "including peer retaliation" after "retaliation" in the first sentence of § 106.71 of the final regulations. Additional changes to proposed § 106.71 are explained further below in the discussion of this provision (Other clarifications to regulatory text).

4. First Amendment

*Comments:* Several commenters objected to the proposed removal of the statement from § 106.71(b) of the 2020 amendments that the exercise of First Amendment rights is not a form of retaliation. Some commenters found inadequate the Department's rationale that § 106.71(b)(1) in the 2020 amendments is redundant of § 106.6(d)(1). Other commenters expressed concern that removal of this statement would chill speech on matters related to Title IX or would make Federal funding contingent on the restriction of First Amendment rights.

Commenters asserted that criticism of a recipient's Title IX policies or practices should not be considered retaliation as that approach would conflict with a party's right to defend their interests and would unconstitutionally restrict protected speech. Some commenters asserted that criticism of another student's decision

to report sex discrimination, make a complaint, or participate in a grievance procedure is constitutionally protected unless it amounts to harassment or falls under a First Amendment exception. Commenters urged the Department to clarify that the prohibition on retaliation does not require a recipient to punish students' protected speech and association, even when those First Amendment rights are exercised with retaliatory intent.

Some commenters argued that the removal of the statement that the exercise of First Amendment rights is not a form of retaliation could result in disciplining students or employees for simply choosing not to associate with an individual who made an accusation against them in violation of their First Amendment right of association. Commenters noted that, while school-sponsored student organizations may be required to comply with anti-discrimination policies as a condition of sponsorship, citing *Christian Legal Society Chapter of the University of California, Hastings College of Law* v. *Martinez,* 561 U.S. 661, 667, 682 (2010), purely private student groups may have strong associational interests against government-backed interference in their membership and leadership decisions. Commenters asserted, for example, that the right to association would protect an organization's right to exclude a person who made a complaint of sexual harassment against the leader of the organization. The commenter argued that this exclusion is protected by the right to freedom of association.

*Discussion:* The Department carefully considered commenters' opinions regarding protection of First Amendment rights to speech and association. The Department has long made clear that it enforces Title IX consistent with the requirements of the First Amendment, and nothing in Title IX regulations requires or authorizes a recipient to restrict any rights that would otherwise be protected from government action by the First Amendment. *See* 34 CFR 106.6(d); 2001 Revised Sexual Harassment Guidance, at 22; 2003 First Amendment Dear Colleague Letter; 2014 Q&A on Sexual Violence, at 43–44. Section 106.6(d), which was added in the 2020 amendments, appropriately and clearly states the breadth of these protections, which extend to but are not limited to the retaliation context. Further, including language regarding First Amendment protections in the retaliation provision may create the misimpression that such First Amendment protections are limited to the retaliation context. However, the

removal of this language from § 106.71 of the final regulations does not represent a substantive change.

The Department agrees with commenters who asserted that merely criticizing a recipient's Title IX policies or practices or an individual's decision to participate in a Title IX grievance procedure would not alone constitute retaliation under the final regulations and that the retaliation provisions do not require or authorize a recipient to punish students who exercise their First Amendment rights. The Department also agrees with commenters that Title IX appropriately requires a recipient to address sex discrimination in its education program or activity, including conduct that constitutes sex-based harassment or retaliation under §§ 106.2 and 106.71 of the final regulations. The Department notes that other provisions also require a recipient to protect the privacy and confidentiality of personally identifiable information it obtains in the course of complying with this part. *See* §§ 106.44(j), 106.45(b)(5).

The Department interprets and applies the final regulations consistent with the First Amendment and relevant case law, including *Christian Legal Society,* 561 U.S. at 667, 682, which permits a recipient to require school-sponsored student organizations to comply with reasonable, viewpoint-neutral nondiscrimination policies regarding access to the organization as a condition of sponsorship. The final regulations do not govern "purely private" groups that are not part of a recipient's education program or activity (*e.g.,* operated, sponsored, or officially recognized by a recipient).

Under the final regulations, a recipient-sponsored student organization must not exclude a student for the "purpose of interfering" with Title IX rights or "because" the person participated in the Title IX process, but such an organization may exclude a student to the extent it has another reason for the exclusion that is not a pretext for sex-based retaliation or another form of unlawful discrimination; the final regulations do not otherwise regulate student association. Whether any specific instance of exclusion from a student organization constitutes retaliation would require an examination of the individual facts and circumstances.

*Changes:* None.

5. Requests To Clarify or Modify

*Comments:* Several commenters asked for clarification as to who can make a complaint of retaliation. One commenter noted that the July 2022 NPRM indicates that retaliation

complaints may be made by any person "entitled to make a complaint of sex discrimination" and asked whether this is meant to exclude a respondent, an ally of a respondent, or a witness from making a claim of retaliation. Some commenters urged the Department to clarify that the prohibition on retaliation is intended to protect complainants from retaliation for filing a complaint and that a complainant should never be disciplined for retaliation.

One commenter asked the Department to revise proposed § 106.71 to remind recipients about their independent obligations to remedy any hostile environment related to retaliation (such as by enforcing no-contact orders) and not limit a recipient's obligation to initiate its grievance procedures. The commenter argued that this would help to keep the burden on recipients and avoid overreliance on complainants to seek enforcement.

Some commenters asked the Department to clarify what steps parents of elementary school and secondary school students can take when they fear retaliation.

*Discussion:* With respect to the question of who may make a retaliation complaint, as explained in the July 2022 NPRM, any of the persons specified in § 106.45(a)(2) has a right to make a retaliation complaint. 87 FR 41541. Under the final regulations, this includes a complainant; a parent, guardian, or other authorized legal representative with the legal right to act on behalf of the complainant; the Title IX Coordinator, after making the determination specified in § 106.44(f)(1)(v); or any student, employee, or person other than a student or employee who was participating or attempting to participate in the recipient's education program or activity at the time of the alleged retaliation. *See* § 106.45(a)(2). Anyone who has participated in any way in the Title IX process, including as a complainant, respondent, or a witness, may make a retaliation complaint if they believe the recipient or any other person, including a complainant, respondent, or witness, took adverse action against them because of their participation in Title IX grievance procedures. Further, any of the persons listed in § 106.45(a)(2), regardless of any participation in the Title IX process, may make a complaint of retaliation if they believe the recipient or another person has otherwise taken adverse action against them for the purpose of interfering with their Title IX rights. The Department disagrees with a commenter's suggestion that a complainant should never be

disciplined for engaging in retaliation. Each complaint of retaliation must be assessed under the relevant facts and circumstances to determine whether it meets the definition of retaliation in § 106.2.

The Department agrees with the comment that a recipient need not wait for a complaint alleging retaliation to be filed to take actions that would protect students from retaliation. Section 106.71 states: "When a recipient has information about conduct that reasonably may constitute retaliation under Title IX or this part, the recipient is obligated to comply with § 106.44." Under § 106.44(f) of the final regulations, a recipient's Title IX Coordinator must take certain actions, such as to "offer and coordinate supportive measures" (which may include no-contact orders), § 106.44(f)(1)(ii), "determine whether to initiate a complaint of sex discrimination" under certain circumstances, § 106.44(f)(1)(v), and "take other appropriate prompt and effective steps, in addition to steps necessary to effectuate the remedies provided to an individual complainant, if any, to ensure that sex discrimination does not continue or recur within the recipient's education program or activity," § 106.44(f)(1)(vii). The Department has determined that additional regulatory text is not necessary to further delineate this obligation.

With respect to the steps that parents of elementary school and secondary school students can take when they fear retaliation, the Department notes that they can make a complaint under the recipient's grievance procedures pursuant to § 106.45, file a complaint with OCR pursuant to § 100.7(b) (incorporated through § 106.81), or seek relief through the courts. *See Cannon,* 441 U.S. 677.

*Changes:* None.

## 6. Other Clarifications to Regulatory Text

*Comments:* None.

*Discussion:* The Department observed that the second sentence of proposed § 106.71, which would require a response when a recipient "receives" information about conduct that may constitute retaliation, could be read to refer only to those circumstances in which a recipient learns of retaliation from an outside source. Because that was not the Department's intent, the Department revised this sentence so that the provision accounts for any circumstances in which the recipient "has" information about retaliation. The Department further revised the reference

to "may constitute retaliation" to "reasonably may constitute retaliation under Title IX or this part" to align with parallel references throughout the final regulations. Lastly, the Department observed that proposed § 106.71 did not address whether a recipient may use an informal resolution process to resolve a retaliation complaint; the Department therefore added language clarifying that a recipient may, as appropriate and consistent with the requirements of § 106.44(k), offer the parties to a retaliation complaint the option of an informal resolution process. The Department also added "both" before "§§ 106.45 and 106.46" in the fourth sentence to clarify that a postsecondary recipient would have to comply with both provisions when consolidating a complaint of retaliation with a complaint of sex-based harassment involving a student party.

*Changes:* In addition to the changes explained above in the discussion of this provision (Examples of prohibited retaliation), the Department has revised the second sentence of proposed § 106.71 to change the term "receives" to "has," to add "reasonably" before "may constitute," and to add "under Title IX or this part" after "retaliation." The Department has revised the third sentence of proposed § 106.71 to add language clarifying that a recipient may, as appropriate, initiate an informal resolution process in response to a retaliation complaint. Finally, the Department added "both" before "§§ 106.45 and 106.46" in the fourth sentence.

## B. Section 106.2 Definition of "Retaliation"

### 1. Protected Activity

*Comments:* Some commenters urged the Department to clarify the activities that are protected under the definition of "retaliation" (*i.e.,* what constitutes a protected activity). Some commenters urged the Department to provide examples of retaliation, including retaliation against complainants, respondents, and others. One commenter noted that since "made a complaint" was specifically included in the proposed § 106.2, "responded to a complaint" should be added as well in order for the provision to be equitable to complainants and respondents.

Some commenters urged the Department to clarify that the proposed regulations would not prevent a recipient from lawfully compelling the good-faith participation of an employee or student of the recipient in a Title IX proceeding. Commenters noted that permitting an employee of a recipient to

refuse to participate in any manner in a Title IX grievance procedure would be at odds with the purpose of Title IX and other obligations under the proposed regulations. One commenter stated that the Department should consider exempting an employee complainant from compelled participation in an investigation. One commenter suggested clarifying that a recipient may compel participation on the part of a non-employee who is authorized by a recipient to provide aid, benefit, or service (such as a volunteer coach). One commenter noted that, because non-participation is not considered protected activity under Title VII, many employers have policies requiring employees to participate as witnesses in Title VII investigations. The commenter noted that many recipients changed similar requirements with respect to students in response to the 2020 amendments, which has led to recipients having inconsistent policies under Title VII and Title IX on this issue and has prevented institutions from being able to conduct as thorough an investigation as possible in the Title IX context.

*Discussion:* With respect to comments about what constitutes a protected activity, the Department notes that the definition of "retaliation" at § 106.2 includes an "interference" clause and a "participation" clause, which define two types of protected activity. The interference clause prohibits an adverse action taken "for the purpose of interfering with any right or privilege secured by Title IX" and protects any actions taken in furtherance of a substantive or procedural right guaranteed by Title IX and its regulations. The participation clause applies when an adverse action is taken because a person "has reported information, made a complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing" under the Department's Title IX regulations.

The participation and interference clauses are substantially similar to parallel clauses in the retaliation provision of the original regulations implementing Title VI, 29 FR 16301 (currently codified at 34 CFR 100.7(e)), which has been incorporated in the Department's Title IX regulations since they were originally issued in 1975. The Department's interpretation and application of these clauses is consistent with the "protected activity" element required to establish a prima facie case of retaliation and is informed by Federal case law. *See, e.g., Grabowski,* 69 F.4th at 1121 (reporting sex-based harassment

to school employees or otherwise speaking out against sex discrimination is "protected activity" for purposes of Title IX retaliation claim).

In response to a commenter's request for examples of protected activities, the Department notes that a protected activity includes the exercise of any rights under the final regulations, including, for example, a complainant's or respondent's procedural rights under §§ 106.45 and 106.46, or a pregnant student's right to seek a reasonable modification under § 106.40(b)(3)(ii). Thus, prohibited retaliation would include, for example, taking an adverse action against a complainant or respondent because either appealed a determination under § 106.46(i) or against a pregnant student based on a request for time off for a pregnancy-related medical appointment.

The Department disagrees with a commenter's suggestion to add "responded to a complaint" to the definition of "retaliation." The final regulations include "made a complaint" as an example because it is an action that initiates the grievance procedures. The final regulations further specify that a recipient may not retaliate against a person because "they participated or refused to participate in any manner" in the Title IX process, which includes responding to a complaint. The Department has therefore determined that the suggested revision would be redundant and is unnecessary.

The Department recognizes that the "refused to participate" clause in the proposed definition of "retaliation" could be read to prevent a recipient from requiring an employee to participate in Title IX grievance procedures. This language was added to the regulations as part of the 2020 amendments to protect complainants' autonomy over how their allegations are resolved. 85 FR 30122 n.547. However, the Department agrees with commenters that giving an employee of a recipient a right under Title IX to refuse to participate in Title IX grievance procedures would be at odds with the purpose of Title IX and other obligations under the final regulations. The Department has therefore revised the final regulations to clarify that the definition of "retaliation" does not preclude a recipient from requiring an employee or other person authorized by a recipient to provide aid, benefit, or service under the recipient's education program or activity to participate as a witness in, or otherwise assist with an investigation, proceeding, or hearing under this part. This change also resolves commenters' concerns about inconsistency with Title VII.

With respect to employee complainants, under the revised definition, an employee may decline to make a complaint under the recipient's Title IX grievance procedures and may not be penalized for that decision under §§ 106.2 and 106.71. However, the recipient's Title IX Coordinator may determine that the risk of additional acts of sex discrimination occurring if the grievance procedures are not initiated requires the Title IX Coordinator to initiate a complaint. *See* § 106.44(f)(1)(v). In such a case, the recipient may require an employee to testify as a witness in such grievance procedures.

The Department declines to extend this exception to permit a recipient to require students to participate, because students do not share the same obligation to support a recipient's compliance with Title IX as do employees and the regulations have always recognized that Title IX applies differently to students and employees because of their different roles within a recipient's education program or activity. Thus, for example, the final regulations require a recipient to require certain employees to notify the Title IX Coordinator when they have information about conduct that reasonably may constitute sex discrimination, § 106.44(c), and do not impose a similar requirement on students. Further, a recipient generally exercises control over its employees in ways that it does not with respect to students.

Under the final regulations, a recipient may not retaliate against a student (including an actual or potential complainant, respondent, or witness) for refusing to participate in Title IX grievance procedures. A recipient may, however, investigate and resolve a complaint consistent with its grievance procedures under § 106.45, and if applicable § 106.46, despite a student respondent's refusal to participate. *See, e.g.*, § 106.46(f)(4). In such a circumstance, imposing disciplinary sanctions on a respondent because the recipient determines, following the conclusion of its grievance procedures, that the respondent violated the recipient's prohibition on sex discrimination, is not itself retaliation.

*Changes:* In the definition of "retaliation" in the final regulations, we have added a sentence clarifying that nothing in the definition or this part precludes a recipient from requiring an employee or other person authorized by a recipient to provide aid, benefit, or service under the recipient's education program or activity to participate as a witness in, or otherwise assist with, an investigation, proceeding, or hearing under this part.

2. Adverse Action

*Comments:* Some commenters addressed what may constitute "intimidation, threats, coercion, or discrimination" under the "retaliation" definition in proposed § 106.2. Specifically, some commenters argued that terms like "intimidation" and "discrimination" could cover trivial acts of exclusion or incivility such as staring at someone. Some commenters asked whether particular actions would constitute "intimidation, threats, coercion, or discrimination," such as making a comment on social media, assigning a bad grade, exclusion from a recipient's programs, writing negative letters of recommendations or assessments, and adverse hiring and promotional decisions.

Some commenters noted that the risk of retaliatory disclosure of information about a complainant can chill reporting of discrimination and urged the Department to describe when such disclosure would constitute prohibited retaliation. One commenter asked the Department to clarify whether one party's disclosure of another party's identity (or failure to remedy such disclosure) would constitute retaliation. One commenter asked the Department to clarify that it could be considered retaliatory to disclose information related to an individual's status in a protected class, such as their gender identity or sexual orientation, because of the potential for further sex-based discrimination or harassment.

Commenters urged the Department to clarify that the Title IX regulations do not compel a recipient to punish student-journalists for the exercise of their First Amendment rights. Commenters also asked how the proposed retaliation provision would apply to media organizations, including the consequence of making materially false statements and acting in bad faith.

One commenter asked the Department to clarify that disclosure of information related to Title IX findings, as part of an employee reference check, is not retaliation.

One commenter urged the Department to clarify whether and when using additional investigation and adjudication processes could constitute retaliation by the complainant or the recipient, such as pursuing a Title IX process and a Title VII process based on the same conduct.

Some commenters asked the Department to clarify that requiring a complainant to enter a confidentiality agreement as a prerequisite to accessing

their rights under Title IX, including to obtain supportive measures or initiate an investigation or informal resolution, is a form of retaliation.

*Discussion:* With respect to comments seeking clarification as to what constitutes ''intimidation, threats, coercion, or discrimination'' as used in the definition of retaliation at § 106.2, the Department notes that substantially similar terms have been incorporated in the Department's Title IX regulations since they were originally issued in 1975, and these precise terms appeared in § 106.71 of the 2020 amendments. The Department's interpretation and application of these terms is consistent with the ''adverse action'' element required to establish a prima facie case of retaliation and is informed by Federal case law. *See, e.g., Ollier* v. *Sweetwater Union High Sch. Dist.,* 768 F.3d 843, 868 (9th Cir. 2014) (''Under Title IX, as under Title VII, the adverse action element is present when a reasonable person would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable person from making or supporting a charge of discrimination.'' (internal citations omitted)).

The Department disagrees that terms like ''discrimination'' or ''intimidation'' suggest trivial acts of exclusion or incivility. Courts have used those terms in describing prohibited retaliation, *see e.g., Jackson,* 544 U.S. at 173–74 (retaliation is a ''form of 'discrimination' because the complainant is being subjected to differential treatment''); *White* v. *Gaston Cnty. Bd. of Educ.,* No. 3:16cv552, 2018 WL 1652099, at *13 (W.D.N.C. Apr. 5, 2018) (''The record is replete with examples of intimidation''). The Department agrees with commenters that, depending on the facts, making adverse assessments or hiring and promotional decisions; lowering a student's grades, making threats or disclosing confidential information on social media; or excluding someone from an education program could constitute intimidation, threats, coercion, or discrimination that, if taken for the purpose of interfering with a person's Title IX rights or because of a person's participation in Title IX grievance procedures, would constitute retaliation under the final regulations. Whether a particular action is adverse in any given case would require a fact-specific analysis of how the action would affect a reasonable person in the complainant's position. *Cf. Burlington,* 548 U.S. at 71 (holding jury could reasonably conclude that the reassignment of responsibilities would have been materially adverse to a reasonable employee based on evidence that new position was ''more arduous and dirtier,'' required fewer qualifications, and original position ''was objectively considered a better job''). *Compare Polite* v. *Dougherty Cnty. Sch. Sys.,* 314 F. App'x 180, 183–84 (11th Cir. 2008) (transferring a teacher to another school where he had the same responsibilities, earned the same pay, and got along well with the principal was not sufficiently adverse), *with Johnson* v. *Watkins,* 803 F. Supp. 2d 561, 574 (S.D. Miss. 2011) (transferring a literacy coach from a middle school to an elementary school was adverse when it entailed more work, less independence, greater out-of-pocket expenses, and a younger age group that was outside the literacy coach's area of expertise).

In response to questions concerning when a disclosure of information may constitute retaliation, the Department agrees with commenters that disclosure of certain information, including, for example, information about a person's LGBTQI+ status or pregnancy or related condition, can be harmful and chill reporting of incidents of discrimination. Deliberately disclosing or threatening to disclose such confidential information about a person would therefore constitute an adverse action. Such disclosures may violate the prohibition on retaliation, including peer retaliation, when they are taken for the purpose of interfering with a person's Title IX rights or because of a person's participation in Title IX grievance procedures. The Department notes that other provisions also require a recipient to protect the privacy and confidentiality of personally identifiable information it obtains in the course of complying with this part. *See* §§ 106.44(j), 106.45(b)(5).

The Department agrees with commenters that the Title IX regulations do not require or authorize a recipient to punish students, including student-journalists, for the exercise of their First Amendment rights. *See* 34 CFR 106.6(d). The Department further notes that the Title IX regulations apply to education programs and activities that receive Federal financial assistance from the Department and generally would not apply to media organizations unless they are part of a recipient's education program or activity (*e.g.,* operated, sponsored, or officially recognized by a recipient).

The Department appreciates the opportunity to clarify that when a student or employee whom a recipient has determined engaged in sex discrimination transfers to another recipient institution, the final regulations do not prohibit the first recipient from informing the other recipient of the misconduct and doing so does not constitute retaliation if the recipient has a legitimate nondiscriminatory reason. *See* § 106.6(e) discussion of Interaction between Title IX and FERPA Regarding the Disclosure of Information that is Relevant to Allegations of Sex Discrimination and Not Otherwise Impermissible; § 106.44(j). A recipient does not, however, have an affirmative obligation to disclose such information under Title IX or this part.

The Department also appreciates the opportunity to clarify that initiation of a disciplinary process or filing of a complaint outside the Title IX context could constitute retaliation if these actions meet the standards in § 106.71 and the definition of ''retaliation'' or ''peer retaliation'' in § 106.2 in the final regulations. Such actions would only constitute retaliation if taken for the purpose of interfering with a person's rights under Title IX or because they participated in Title IX grievance procedures and the recipient lacks another reason for the action that is not a pretext for sex-based retaliation.

With respect to the comment on the permissibility of confidentiality agreements, § 106.45(b)(5) requires a recipient to take reasonable steps to protect the privacy of the parties and witnesses during the pendency of the grievance procedures, in recognition of the fact that a party's improper disclosure of information could compromise the fairness of the grievance procedures. Section 106.45(b)(5) also specifies, however, that those steps must not ''restrict the ability of the parties to: obtain and present evidence, including by speaking to witnesses, subject to § 106.71; consult with their family members, confidential resources, or advisors; or otherwise prepare for or participate in the grievance procedures.'' Further, requiring a student to sign a confidentiality agreement as a prerequisite to obtaining supportive measures, initiating an investigation or an informal resolution, resolving a complaint (formally or informally), or exercising any other rights under the final regulations could constitute retaliation if it is done for the purpose of interfering with Title IX rights or because the student participated in the Title IX process in any way.

*Changes:* None.

3. Causal Connection

*Comments:* One commenter asked the Department to clarify the phrase ''for the purpose of interfering with any right or

privilege secured by Title IX'' in both proposed §§ 106.2 and 106.71. Another commenter urged the Department to remove this phrase because students do not typically have access to evidence of a decisionmaker's state of mind to prove that the students were disciplined for this purpose. The commenter also noted that recipient officials who punish complainants may instead rely on sex stereotypes.

Another commenter argued that retaliatory motive is redundant because intimidation, threats, coercion, and discrimination against someone participating in Title IX grievance procedures would always violate Title IX.

*Discussion:* In response to commenters' request that the Department clarify or remove the phrase "for the purpose of interfering with any right or privilege secured by Title IX," the Department notes that this standard has been incorporated in the Department's Title IX regulations since they were originally issued in 1975. The requirement to establish retaliatory motive is a core element of a retaliation claim. *Jackson,* 544 U.S. at 173–74 (retaliation "is discrimination 'on the basis of sex' because it is an intentional response to the nature of the complaint: an allegation of sex discrimination"); *Mercy Cath. Med. Ctr.,* 850 F.3d at 564 (requiring proof of causal connection between recipient's adverse action and plaintiff's protected activity to establish retaliation).

Although a student may not have evidence of a decisionmaker's state of mind, a retaliatory motive may be established through either direct evidence (*e.g.,* a written or oral statement demonstrating the action was taken for the purpose of interfering with Title IX rights) or circumstantial evidence (*e.g.,* changes in the recipient's treatment of the complainant following the protected activity, the time span between when the individual engaged in a protected activity and when the recipient took the adverse action, different treatment of the complainant compared to other similarly situated individuals, deviation from established policies or practices). To the extent a recipient takes adverse action against a student based on sex stereotypes, the recipient violates the prohibition on sex discrimination based on sex stereotypes in § 106.10 and, depending on the context, may also violate the prohibition on bias and conflict of interest in § 106.45(b)(2) in the final regulations.

The Department disagrees with commenters who asserted that retaliatory motive is a redundant or unnecessary element of the definition of ''retaliation.'' Although intimidation, threats, coercion, and discrimination against a participant in a grievance procedure always raise concerns, to establish an adverse action constitutes retaliation, there must be a causal connection to the protected activity: the adverse action must have been taken ''because'' an individual engaged in a protected activity or for the purpose of interfering with a protected activity. For example, when a student participates in Title IX grievance procedures, and then an employee of the recipient denies that student's application to participate in a study abroad program, the student may believe the recipient took that action in retaliation for their participation in the grievance procedures. The denial would constitute retaliation if, for example, the employee knew the student had participated in Title IX grievance procedures and denied the student's application to punish them for participating. If, on the other hand, the employee was not aware of the student's participation in Title IX grievance procedures or the recipient had a legitimate, non-retaliatory reason for denying the application (*e.g.,* the program was already at capacity at the time the student applied), then the denial would not constitute retaliation.

*Changes:* None.

### 4. Other Clarifications to Regulatory Text

*Comments:* None.

*Discussion:* In the first sentence of the definition of ''retaliation'' in § 106.2, the Department reordered the list of persons or entities who can be alleged to have engaged in retaliation for clarity. The Department also revised a reference to ''other appropriate steps taken by a recipient in response to sex discrimination under § 106.44(f)(6)'' to align with revisions to the text and structure of § 106.44(f) in the final regulations. *Changes:* In the first sentence of the definition of ''retaliation'' in § 106.2, the reference to ''recipient'' has been moved to precede ''student'' and the reference to an ''employee'' has been combined with ''or other person authorized by the recipient to provide aid, benefit, or service under the recipient's education program or activity.'' The description of and reference to § 106.44(f)(6) has been revised to cover ''other actions taken by a recipient under § 106.44(f)(1).''

### C. Section 106.2   Definition of ''Peer Retaliation''

*Comments:* Some commenters appreciated that the proposed regulations would clarify that prohibited retaliation includes retaliation by students against other students. Other commenters asserted that a recipient should not be responsible for the actions of students or student groups that are not sponsored by the recipient. Some commenters argued that explicit coverage of peer retaliation is unnecessary, as it is covered by other provisions in the regulations. One commenter asked whether the Department intentionally excluded retaliatory harassment from the proposed definition of ''peer retaliation.'' Some commenters urged the Department to include a more detailed description of what constitutes ''peer retaliation'' and how it differs from ''retaliation'' by a recipient.

Some commenters asked the Department to consider broadening the proposed definition of ''peer retaliation'' to cover retaliation among a recipient's employees. Another commenter noted that coverage of peer retaliation by non-supervisory employees would differ from parallel legal obligations under Title VII.

One commenter suggested that the proposed definition of ''peer retaliation'' could also extend to adult agents acting on behalf of the student, such as parents or guardians.

One commenter worried that coverage of peer retaliation would be burdensome and unworkable if recipients are expected to monitor students' interactions, including on social media platforms.

One commenter warned that, absent a clear definition of peer ''coercion'' or ''discrimination,'' mere criticism against, or ostracism of, an individual filing a claim or participating in a Title IX procedure could be considered peer retaliation and violate students' First Amendment rights.

One commenter urged the Department to restrict a recipient's responsibility for addressing peer retaliation to instances when the recipient has actual knowledge of retaliation and responds with deliberate indifference.

*Discussion:* The Department agrees with commenters who stated that Title IX prohibits discrimination by recipients but disagrees that recipients have no responsibility to address retaliatory misconduct by students or student groups. As explained in more detail in the discussion of § 106.44(a), a recipient with knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity, whether engaged in by students, employees, or other individuals, must respond promptly and effectively. Also, as explained in the July 2022 NPRM, retaliation by peers could limit or deny a student's access to

the recipient's education program or activity on the basis of sex. 87 FR 41540. The Department determined it needed to clarify the standards applicable to student-to-student retaliation based on feedback received during the June 2021 Title IX Public Hearing, which highlighted the pervasiveness of peer retaliation against those who participate in a recipient's grievance procedures under Title IX. 87 FR 41540.

The Department recognizes that conduct that meets the definition of peer retaliation may sometimes also constitute sex-based harassment under the final regulations. The elements for establishing peer retaliation and sex-based harassment are not the same, even though both are ultimately forms of sex discrimination. To fully implement Title IX, a recipient must address such conduct whether it meets the definition of ''sex-based harassment,'' ''peer retaliation,'' or both. While the definitions of ''peer retaliation'' and ''sex-based harassment'' do not explicitly reference one another, if sex-based harassment between students is undertaken for the purpose of interfering with Title IX rights or because the person participated in the Title IX process, such conduct would also be peer retaliation. For example, to constitute ''peer retaliation'' under the final regulations, conduct must be undertaken for the purpose of interfering with Title IX rights or because the person participated in some way in Title IX grievance procedures. In contrast, hostile environment ''sex-based harassment'' between peers is unwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity. Under the final regulations, recipients have an obligation to address both.

With respect to requests to provide more detail about what constitutes peer retaliation, the Department notes that the definition of ''peer retaliation'' applies the longstanding understanding of retaliation (*i.e.,* actions taken for the purpose of interfering with any right or privilege secured by Title IX) to the specific context of retaliation by a student against another student. The July 2022 NPRM included examples of such conduct, such as teammates vandalizing a student's locker because he complained to school administrators about unequal opportunities for girls or a student council president threatening to remove a member from a committee if they serve as a witness in a Title IX

investigation of the president's friend. 87 FR 41540.

The Department acknowledges commenters' concern about employees who may retaliate against one another in ways that constitute sex discrimination. Although the Department determined it needed to clarify in the text of the regulations that the prohibition on retaliation applies to student-to-student retaliation, as discussed above, it is not necessary to do so for employee-to-employee retaliation, which is covered under the definition of ''retaliation'' in § 106.2 and prohibited by § 106.71, as well as under Title VII. The Department therefore declines the suggestion to revise the final definition of ''peer retaliation'' to cover employee-to-employee retaliation.

The Department declines to expressly extend the final definition of ''peer retaliation'' to adults acting on behalf of a student as a recipient may lack control over the context of retaliation that takes place between individuals who are not recipient employees, students, or applicants. To the extent a recipient is aware of anyone engaging in harassment or retaliation toward a student, the recipient must respond consistent with its obligation under final § 106.44, which may include providing supportive measures or investigating a complaint.

With respect to commenters' concern about the burden of monitoring for or responding to allegations of peer retaliation, the Department notes that recipients are not required to investigate allegations of peer retaliation that, even if proven, would not meet the definition of ''peer retaliation.'' *See* § 106.45(d)(iv). And, because retaliation is a form of sex discrimination, a recipient's duty with respect to peer retaliation is to respond only to conduct that ''reasonably may'' meet the definition. Further, the Department does not expect a recipient to monitor students' interactions on social media platforms. However, to the extent a recipient has information that students are threatening and intimidating each other to dissuade them from exercising their rights under Title IX a recipient must take action to address that conduct to preserve an educational environment free from sex discrimination.

The final definitions of ''retaliation'' and ''peer retaliation'' are not intended to restrict any rights that would otherwise be protected from government action by the First Amendment. *See* 34 CFR 106.6(d)(1). Any students, including complainants and respondents, may make a complaint of peer retaliation. The Department appreciates the opportunity to clarify

that merely criticizing another student's decision to participate in Title IX grievance procedures would not alone constitute peer retaliation under the final regulations. The final retaliation provisions do not require or authorize a recipient to punish students who exercise their First Amendment rights to speech and association.

The Department declines the suggestion to restrict a recipient's responsibility for addressing peer retaliation to instances when the recipient has actual knowledge of retaliation and responds with deliberate indifference. The Department similarly declined to apply the actual knowledge requirement to claims of retaliation in the 2020 amendments, because ''the Supreme Court [had] not applied an actual knowledge requirement to a claim of retaliation.'' 85 FR 30537. The Department agrees with that logic and also declines to apply the actual knowledge and deliberate indifference standards to retaliation for the same reasons it declines to apply those standards to sex-based harassment, as explained in more detail in the discussion of § 106.44(a).

*Changes:* None.

## VI. Outdated Regulatory Provisions

### A. Section 106.3(c) and (d) Self-Evaluation

*Comments:* While recognizing that the proposed regulations would eliminate the self-evaluation procedures in § 106.3(c) and (d) because they are outdated, some commenters noted that similar provisions for self-evaluation remain important options for future Title IX regulations or guidance.

*Discussion:* Although the Department appreciates that provisions requiring self-evaluation may be an option for future regulations, the Department did not propose such provisions in the July 2022 NPRM. The Department removed § 106.3(c) and (d) from the final regulations because they described requirements that are no longer operative.

*Changes:* None.

### B. Sections 106.2(s), 106.16, and 106.17 Transition Plans

*Comments:* While recognizing that the proposed regulations would eliminate the transition plan requirements in §§ 106.2(s), 106.16, and 106.17 because they are outdated, some commenters noted that similar provisions for transition plans remain important options for future Title IX regulations or guidance. Other commenters speculated that the removal of these provisions related to the Department's proposal to

clarify that Title IX prohibits gender identity discrimination.

*Discussion:* Although the Department does not disagree that provisions requiring transition plans may be an option for other Title IX regulations in the future, the Department maintains that the provisions requiring transition plans in §§ 106.2(s), 106.16, and 106.17 are outdated, and that no similar transition plan provisions are required by these final regulations.

The removal of these provisions does not relate to Title IX's coverage of gender identity discrimination. These provisions governed the transition of certain single-sex institutions to coeducational institutions in the years immediately following adoption of the original Title IX regulations in 1975. The Department removed §§ 106.16 and 106.17 from the final regulations because they describe requirements that are no longer operative or necessary. The Department removed § 106.2(s) from the final regulations because it defined a term that, with the removal of §§ 106.16 and 106.17, is no longer included in the regulations. In addition, the authority for Title IX's coverage of gender identity discrimination is explained in the discussion of § 106.10 above.

*Changes:* None.

### C. Section 106.41(d) Adjustment Period

*Comments:* One commenter was concerned that because the Department did not propose replacing § 106.41(d) with a different adjustment period, any interpretation of Title IX's application to athletics in the final regulations would take effect immediately.

*Discussion:* Current § 106.41(d) required recipients to come into compliance with the original athletic regulations within three years of the date those regulations became effective in 1975. The Department removed § 106.41(d) from the final regulations because that adjustment period has passed and so the provision it is no longer operative.

These final regulations do not include any changes to other provisions governing athletics.

The effective date for other provisions amended in these final regulations is addressed in the discussion of Effective Date and Retroactivity (Section VII.F).

*Changes:* None.

### VII. Miscellaneous

#### A. General Support and Opposition

*Comments:* Many commenters expressed overall support for the proposed regulations, stating that they are necessary to effectuate the broad purpose and goals of Title IX; would realign Title IX with its core tenets; would streamline, strengthen, standardize, and update Title IX protections; and would ensure equitable Title IX enforcement. Other commenters expressed support for the proposed regulations because they believed the regulations would improve the Title IX complaint process, including by providing more effective and equitable practices for responding to sex-based harassment. Commenters identified how the proposed regulations would protect students, especially students from vulnerable or marginalized groups, from the negative short- and long-term effects of sex discrimination, including by providing an optimal educational environment in which students and others feel safe, keeping students in school and improving their future livelihoods, improving students' mental, emotional, and physical health, and teaching students to be better citizens. Some commenters expressed the belief that the proposed regulations are necessary to protect civil rights from infringement by States and balance the need for oversight with the burden on recipients while also protecting freedom of expression and freedom of religion and respecting the separation of church and state.

Many commenters also expressed general opposition to the proposed regulations. For example, some commenters opposed the proposed regulations on the grounds that the regulations are unclear, vague, ambiguous, and impose open-ended standards on recipients.

Some commenters asserted that the proposed regulations would interfere with teacher-parent relationships and increase a teacher's role in a disproportionate way. Some commenters believed that the proposed regulations increased liability for recipients, for example, due to non-compliance by teachers and other staff, without increasing protections for employees. One commenter asserted that the open-ended nature of the proposed regulations incentivized recipients to err on the side of over-enforcing Title IX at the expense of students, faculty, and staff so recipients do not lose Federal funds.

Some commenters claimed that the Department should stay out of education policy, and instead let education be handled by State or local governments, including school boards. Some commenters believed that the proposed regulations would create hostility between recipients and their staff. Some commenters further characterized the proposed regulations

as distracting from what the commenters perceived as the traditional goals of education, like teaching core subjects and training students for future careers.

*Discussion:* The Department acknowledges the commenters' variety of reasons for expressing support for the proposed regulatory amendments. To the extent commenters expressed general support related to specific provisions of the regulations, those comments are addressed in the sections dedicated to those regulatory provisions in this preamble.

The Department similarly acknowledges commenters for sharing their diverse reasons for opposing the regulations. However, the Department has determined that the greater clarity and specificity of the final regulations will better equip recipients to create and maintain school environments free from sex discrimination. The Department developed the proposed and final regulations based on an extensive review of its prior regulations implementing Title IX, as well as the live and written comments received during a nationwide virtual public hearing and numerous listening sessions held with a wide variety of stakeholders on various issues related to Title IX. The Department understands the concerns voiced by some commenters that the proposed regulations were vague or unclear and the Department acknowledges commenters who shared feedback on proposed provisions that they believed required clarification. The Department considered those comments in the context of the specific provisions in which they were raised, and has, when appropriate, revised regulatory text or addressed commenters' concerns in the preamble. *See, e.g.,* discussion of Hostile Environment Sex-Based Harassment–First Amendment Considerations (Section I.C). The Department also acknowledges the numerous commenters during the virtual public hearing and listening sessions who described the need for students and recipients to have a clear understanding of their rights and obligations under Title IX, and the Department specifically considered these commenters' concerns while drafting the final regulations. To that end, the Department, among other things, has identified bases of prohibited sex discrimination, *see* § 106.10, has specifically articulated the duties of recipients' employees, *see* § 106.44, and has provided detailed grievance procedures for recipients to follow in addressing complaints, *see* §§ 106.45 and 106.46.

The final regulations do not interfere with teacher-parent relationships, and the Department further discusses parental rights in the section below on parental rights. Regarding the appropriate role for teachers and concerns about overenforcement, the Department notes that the final regulations at § 106.8(d) require annual Title IX training for employees so they can adhere to the regulations' requirements. Further, teachers' duties under § 106.44 are generally limited to reporting to the recipient's Title IX Coordinator information about conduct that reasonably may constitute sex discrimination under Title IX. Finally, the Department disagrees that the obligations placed on employees go beyond what Title IX requires. The statute broadly prohibits discrimination on the basis of sex in federally funded education programs and activities, and the Department—in an exercise of its authority to implement the statute under 20 U.S.C. 1682—has determined that requiring employees to identify and report sex discrimination is necessary to effectuate that prohibition.

Responding to concerns about the Department overstepping its role, the Department emphasizes that Congress, through the passage of Title IX, concluded that the Federal government must address sex discrimination in a recipient's education program or activity regardless of traditional local and State control of education policy in general. The Department is implementing that congressional mandate. 20 U.S.C. 1682. Nothing in the final regulations requires schools to teach particular subjects or use particular curricula. 34 CFR 106.42. In the Department's experience, recipients have been able to implement Title IX regulations without engendering hostility in their staff, and the commenter did not explain why this would change under the final regulations. Likewise, the Department disagrees that the regulations distract from what the commenters perceived as the traditional goals of education; to the contrary, as noted above and underscored throughout this preamble, the Department drafted these final regulations with the benefit of the input of hundreds of thousands of stakeholders through the public comment process and the final regulations are consistent with the Department's statutorily mandated role in effectuating Title IX.

*Changes:* None.

*B. Parental Rights—Generally*

*Comments:* Numerous commenters expressed opposition to the proposed

regulations because they believed that the proposals would negatively impact or eliminate parental rights. Commenters expressed various reasons, including that they believed the proposed regulations would: interfere with parents' rights to raise their children, keep them safe, and instill their moral values; interject the Department's values into family matters; erode the traditional family structure; prevent parents from deciding their children's curricula and accessing information about their children; usurp parental control over their children's off-campus conduct; give children too much autonomy to make major life decisions without parental input; and allow recipients to ignore parents' wishes. Some commenters asserted that the proposed regulations would disrupt their children's education because families would leave the public education system, and some commenters believed the proposed regulations would expose parents to investigations, reprimands, and criminal penalties.

Some commenters argued that the proposed regulations would be contrary to case law holding that parental rights are fundamental rights and would violate parents' liberty interests under the Due Process Clause of the Fourteenth Amendment. Some commenters also felt that the proposed regulations would exceed the scope and intent of Title IX because Congress did not authorize the Department to diminish parental rights.

Finally, many commenters objected to the proposed regulations on religious grounds and asserted that the proposed regulations would violate parents' First Amendment rights by preventing parents from instilling religious values in their children and by forcing parents to approve of behavior that violates their religious tenets.

*Discussion:* The Department disagrees with commenters' views that the final regulations diminish parental rights and appreciates the opportunity to emphasize the importance of strong and effective partnerships between recipients and parents, guardians, or caregivers and to clarify the ways the final regulations safeguard those interests. When developing these final regulations, the Department carefully considered commenters' input regarding parental rights. For example, § 106.6(g) affirms that the regulations do not interfere with a parent's right to act on behalf of their minor child, § 106.44(j)(2) permits disclosures of information obtained in the course of complying with this part to a minor student's parent, and § 106.40(b)(3) recognizes a

recipient's duty to take actions to prevent discrimination and ensure equal access upon notification by a parent of a minor student's pregnancy or related conditions.

The Department disagrees that the final regulations interfere with parents' rights to raise their children, keep their children safe, and instill their moral values; erode family structures; or interject the Department's values into family matters. To the contrary, the scope of these final regulations is limited to Title IX, and commenters' claims that these regulations will harm students, undermine or dictate family moral values, or erode traditional family structures are speculative and without supporting evidence. A nondiscriminatory and safe educational environment for all students and educators supports all students and their families. Further, the Department disagrees that these final regulations advance specific ideologies or moral values other than the broad nondiscrimination principle that Congress enacted in Title IX. Rather, the final regulations clarify the scope and application of Title IX's protections against sex discrimination. The Department acknowledges commenters' concerns about families potentially withdrawing students from school due to the final regulations, but this concern is speculative and would not necessarily be a direct consequence of the rule.

Commenters did not specify which proposed provisions would allegedly give children autonomy to make major life decisions without parental input or allow recipients to ignore parents' wishes. In any event, the Department notes that § 106.6(g), which, as explained in the discussion of that provision, only had a small number of clarifying revisions to the text of the 2020 amendments, states that these final regulations do not derogate legal rights of parents to act on behalf of their child and notes that nothing in these regulations confers parental rights to any person or recipient. The Department's final regulations do not impose criminal penalties on parents or include provisions related to investigations or reprimands of parents. Moreover, nothing in the regulations holds parents vicariously liable for the actions of their children or requires a recipient to investigate a parent whose student is a respondent in a grievance proceeding.

With regard to claims that the regulations undermine parents' rights to decide their children's curricula and to access information about their children, the Department does not regulate curricula and disagrees that the

regulations interfere with any established parental right to be involved in recipients' choices regarding curricula or instructional materials. The explicit limitation in the Title IX regulations regarding the Department regulating curricula remains unchanged: "Nothing in this regulation shall be interpreted as requiring or prohibiting or abridging in any way the use of particular textbooks or curricular materials." 34 CFR 106.42. Further, as explained with respect to § 106.6(g) and elsewhere in this preamble, nothing in these regulations derogates a parent's FERPA right to review and inspect the education records of their children or interferes with teacher-parent communication.

Additionally, the Department disagrees with commenters' assertion that the final regulations interfere with control over off-campus conduct, and some commenters' reliance on *Mahanoy* to support that assertion is misplaced. *Mahanoy* did not reach the issue of a recipient's authority to discipline students for online conduct that creates a sex-based hostile environment on campus. Indeed, the Court suggested that the longstanding *Tinker* standard that schools can regulate speech that materially disrupts classwork, creates substantial disorder, or invades the rights of others—including "harassment"—may apply to off-campus or online speech in certain circumstances. *Mahanoy,* 141 S. Ct. at 2045–46. Nonetheless, nothing in these final regulations derogates parental control over their child's off-campus conduct. *See* discussion of definition of Hostile Environment Sex-Based Harassment (Section I.C.).

The commenters cited several other cases that implicate various parental rights. For example, some commenters cited *Pierce* v. *Society of Sisters,* 268 U.S. 510 (1925), in which the Supreme Court recognized the "liberty of parents and guardians to direct the upbringing and education of children under their control." Id. at 534–35 (citing *Meyer* v. *Nebraska,* 262 U.S. 390 (1923)). Commenters likewise cited *Wisconsin* v. *Yoder,* 406 U.S. 205, 234 (1972), in which the Supreme Court concluded that a compulsory schooling law violated the Free Exercise Clause of the First Amendment because it conflicted with the religious beliefs of the Amish community to which it had been applied. Nothing in the final regulations prevents parents from sending their children to any particular educational institution or educating them in any particular subject, nor does anything in the final regulations otherwise violate the liberty interest recognized in *Meyer*

and *Pierce* or the Free Exercise rights recognized in *Yoder.* Likewise, commenters also cited *Cleveland Board of Education* v. *LaFleur,* 414 U.S. 632, 639–40 (1974), in which the Supreme Court held invalid a local school board requirement that pregnant schoolteachers take unpaid leave for a specific period of time, recognizing "freedom of personal choice in matters of marriage and family life" under the Due Process Clause of the Fourteenth Amendment. The Department emphasizes that nothing in the final regulations interferes with personal choice in matters of family life, and these final regulations support the personal choices of pregnant teachers. Indeed, parents remain free to send their children to institutions that, because of their religious tenets, are exempt from certain applications of the regulations, *see* 34 CFR 106.12, and the Department's regulations provide that they "shall [not] be interpreted as requiring or prohibiting or abridging in any way the use of particular textbooks or curricular materials," *see* 34 CFR 106.42. Thus, the Department maintains that these final regulations are consistent with the First and Fourteenth Amendments and throughout this preamble has reminded recipients of their obligations to respect rights protected by the U.S. Constitution.

Moreover, nothing in the final regulations encroaches on a parent's right to determine who is fit to obtain visitation rights with a parent's minor children. In contrast to the statute at issue in another case cited by commenters, *Troxel* v. *Granville,* 530 U.S. 57 (2000), the final regulations specifically protect parents' rights by providing that "[n]othing in Title IX or this part may be read in derogation of any legal right of a parent, guardian, or other authorized legal representative to act on behalf of a complainant, respondent, or other person," § 106.6(g). Thus, although the Department agrees with commenters that the Supreme Court has recognized that parents have a liberty interest in controlling their children's upbringing, the Department does not agree that the final regulations undermine that interest.

Finally, the Department disagrees that these final regulations exceed the Department's authority. As an initial matter, the Department disputes the underlying premise to the commenters' argument that the final regulations diminish parental rights. Further, as explained elsewhere in this preamble, Congress assigned to the Department the responsibility to ensure full implementation of Title IX and the Supreme Court has recognized the

Department's "authority to promulgate and enforce requirements that effectuate the statute's nondiscrimination mandate." *Gebser,* 524 U.S. at 292.

*Changes:* None.

### C. Religious Exemptions

#### 1. General Support and Opposition

*Comments:* Some commenters expressed general support for the Department's decision not to propose changes to § 106.12, arguing that § 106.12, as revised in 2020, allows religious schools to strive to eliminate sex discrimination in their communities while acting in accordance with their religious tenets.

Some commenters expressed concern about how the proposed regulations would interact with the religious exemption to the extent the regulations conflict with religious tenets on human sexuality, gender, and marriage. Several commenters urged the Department to clarify the extent to which religious educational institutions would be required to comply with various aspects of the proposed regulations, including with respect to discrimination based on sexual orientation or gender identity and sex-separate facilities and activities.

Some commenters argued that a religious exemption for provisions related to sexual orientation and gender identity is not justified and that eliminating the religious exemption would benefit campus climate, academic scores, and student mental health. Some commenters argued that the Title IX religious exemption should not allow recipients to punish students because they are LGBTQI+ or have sought an abortion and urged the Department to clarify that institutions eligible for the religious exemption must still protect students from sex-based harassment. One commenter noted that it is difficult to conceive of a religious tenet that would be inconsistent with prohibiting sexual assault.

*Discussion:* The Department declines to amend § 106.12, the provision governing religious exemptions, in these final regulations. Since 1972, Title IX has provided that its prohibition on sex discrimination "shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization." 20 U.S.C. 1681(a)(3). The Department acknowledges that some commenters opposed the religious exemption, but because Congress enacted the Title IX statute with the exemption, the authority to eliminate it also rests with Congress. As explained in more detail

below, the amendments the Department made to § 106.12 in 2020 codified longstanding agency practice.

The Department cannot opine on the extent to which a particular institution would be exempt from particular obligations, such as Title IX's prohibition on sex-based harassment, because such a determination requires a fact-specific analysis as to whether application of a particular provision would be inconsistent with specific tenets of an institution's controlling religious organization. *See* 20 U.S.C. 1681(a)(3); 34 CFR 106.12.

*Changes:* None.

## 2. Section 106.12(c)

*Comments:* Several commenters expressed concern that the 2020 amendments to § 106.12 set criteria for when a recipient is controlled by a religious organization that exceed the scope of the Department's statutory authority under Title IX. Many commenters urged the Department to rescind § 106.12(c) or narrow the evidence a recipient may offer to establish that it is controlled by a religious organization. Some commenters asserted that the religious exemption is inconsistent with Title IX's purpose and argued the Department must give the exemption a narrow interpretation.

*Discussion:* When the Department adopted § 106.12(c) in a rulemaking separate from the 2020 amendments, *see* 85 FR 59916 (Sept. 23, 2020) (Free Inquiry Rule), the Department stated that § 106.12(c) did not, and was not intended to, "create new exceptions to the Title IX statute." 85 FR 59949. In that rulemaking, the Department explained that § 106.12(c) would not make "a substantial number of educational institutions . . . newly eligible to assert a religious exemption under Title IX, where they could not before," 85 FR 59973, or "substantially change the number or composition of entities asserting the exemption." 85 FR 59977.

The Department also notes that some of the concerns expressed by the commenters about § 106.12(c) were addressed in the 2020 amendments and the Free Inquiry Rule.

First, recipients "are not entitled to any type of formal deference when invoking eligibility for a religious exemption, and recipients have the duty to establish their eligibility for an exemption, as well as the scope of any exemption." 85 FR 30479. The burden is not on a student or the Federal Government to disprove any claim for a religious exemption. *See* 85 FR 30475, 30480 ("The student does not bear the

burden with respect to the religious exemption."). Instead, a recipient must establish that it was eligible for an exemption at the time the alleged noncompliance occurred.

Second, although § 106.12(c) offers several different ways to show that the educational institution is controlled by a religious organization, it is not enough for recipients to show "tenuous relationships to religious organizations." 85 FR 59961. A recipient "that merely has loose ties to religious teachings or principles, without establishing 'control' by a religious organization, is not eligible to assert a religious exemption." 85 FR 59957.

Third, when an educational institution is controlled by a religious organization, the relevant tenets to examine are those of the religious organization, not the personal beliefs of an official or employee working for the recipient. 85 FR 30478.

Finally, even if a recipient shows it is an educational institution controlled by a religious organization and invokes the exemption, § 106.12 "does not prevent OCR from investigating or making a finding against a recipient if its religious tenets do not address the conduct at issue. In those cases, OCR will proceed to investigate, and if necessary, make a finding on the merits." 85 FR 30477. And "a recipient cannot invoke a religious exemption to retaliate against a person." 85 FR 30479.

These explanations issued in 2020 in conjunction with the adoption of § 106.12(c) make the scope of the provision and its operation clear.

*Changes:* None.

## 3. Section 106.12(b)

*Comments:* Some commenters urged the Department to continue the approach reflected in the 2020 amendments to § 106.12, permitting an educational institution to assert an exemption after OCR opens an investigation. Some commenters warned that any requirement of pre-approval of a recipient's religious exemption would be unlawful, lack statutory authority, and impose administrative and legal costs on religious schools, and require religious schools to expose internal documents that risk reputational and privacy harms. Some commenters encouraged the Department to urge other Federal agencies to adopt regulations similar to § 106.12. Some commenters suggested that the Department modify the Title IX regulations so that religious exemptions are granted automatically and the process for securing the Department's

assurance of an exemption is less burdensome.

Many commenters expressed concern about the impact of the 2020 amendments that schools may assert a religious exemption after they are already under investigation. Many commenters urged the Department to require schools to notify the Department in advance of asserting a religious exemption and bar schools from invoking the exemption retroactively. A few commenters argued that the 2020 amendments to § 106.12 had the effect of encouraging schools to be less clear regarding whether and how they intend to assert an exemption.

One commenter opined that seeking advance assurance can be considered as evidence of the sincerity of an exemption claim. One commenter expressed a concern that when schools can claim exemptions for the first time during investigations, schools may use religion as a pretext for unlawful discrimination. One commenter noted that a process for advance assurance of an exemption and the transparency it fosters is important to ensure that there is a genuine conflict between Title IX and a religious tenet.

Some commenters expressed concern that the 2020 amendments to § 106.12 do not require a school to identify any specific conflict with a tenet of its controlling religious organization. Some commenters urged the Department to amend § 106.12(b) to clarify that any claimed religious exemption must be sufficiently supported by a specific tenet of the religion.

*Discussion:* The Department acknowledges the view of commenters that a recipient should be able to more easily establish a religious exemption and of commenters who urged the Department to require a recipient to seek advance assurance of an exemption. Under § 106.12(b), and consistent with longstanding agency practice, a recipient may, but is not required to, submit a written statement to OCR seeking assurance of a religious exemption prior to invoking such exemption. A recipient may also assert a religious exemption in response to a pending OCR investigation. As noted previously, the Department did not propose changes to § 106.12(b) in the July 2022 NPRM, and the Department continues to believe that the process outlined in § 106.12(b) appropriately balances the requirements placed on an institution to establish an exemption and the need to ensure that asserted exemptions are consistent with the statutory requirements.

The Department acknowledges that § 106.12(b) uses different language than

the Title IX regulations of other Federal agencies and, therefore, other agencies may elect or be required to use different approaches in addressing the same issue. In 2020, the Department concluded that such interagency differences were acceptable, 85 FR 30504, and that comments ''regarding other agencies' regulations are outside the scope of this rulemaking process and the Department's jurisdiction.'' 85 FR 30072.

The Department notes that many of the comments appear to assume that, once a recipient receives an assurance from OCR that it has established its eligibility for a religious exemption, complainants are barred from filing Title IX complaints against that recipient. That is incorrect. In an OCR proceeding, an assurance does not always preclude OCR from investigating a complaint. Rather, even if a recipient shows it is controlled by a religious organization and invokes the exemption, § 106.12 ''does not prevent OCR from investigating or making a finding against a recipient if its religious tenets do not address the conduct at issue. In those cases, OCR will proceed to investigate, and if necessary, make a finding on the merits.'' 85 FR 30026, 30477.

Moreover, even when the allegations in a complaint seem to fall squarely within the scope of a religious exemption, as the Department repeatedly made clear in 2020, ''[i]f a complaint is filed, and the complaint alleges that a recipient improperly applied a religious exemption or any other exemption under Title IX, OCR will carefully consider the complaint, evaluate compliance with the statute and regulations, and respond accordingly.'' 85 FR 59948; *see also* 85 FR 59947; 85 FR 59973 (''If an individual feels the religious exemption under Title IX and these regulations does not apply to an educational institution, that individual may always file a complaint with OCR.''). If, in the context of a specific complaint of unlawful discrimination under Title IX, OCR determines that the complaint's allegations fall within any assurance of a religious exemption that OCR has previously provided, OCR may contact the controlling organization to verify those tenets. If the organization provides an interpretation of tenets that has a different practical impact than that described by the institution or if the organization denies that it controls the institution, OCR will not recognize the exemption.

With respect to comments on a recipient's obligation to identify a conflict with the tenets of its controlling organization, the Department notes that § 106.12(b) states that a recipient's statement seeking assurance of an exemption must ''identify[ ] the provisions of [the regulations] that conflict with a specific tenet of the religious organization.''

*Changes:* None.

4. Transparency

*Comments:* Some commenters stated that transparency about the existence and scope of a school's religious exemption is important for students and applicants to know whether they may be treated differently than their peers because of their sexual orientation, gender identity, reproductive history, or personal beliefs.

*Discussion:* The Department continues to believe, as it did in 2020, that letters exchanged with recipients regarding religious exemptions are subject to Freedom of Information Act requirements, *see* 85 FR 30480, ''including attendant rules regarding public disclosure of commonly requested documents.'' 85 FR 30481; *see* 5 U.S.C. 552(a)(2)(D). Those attendant rules require agencies to make available for public inspection in an electronic format copies of all records that have been requested three or more times or ''that because of the nature of their subject matter, the agency determines have become or are likely to become the subject of subsequent requests for substantially the same records.'' Consistent with these requirements, because the Department has received a significant number of requests for these documents, it posts correspondence regarding assurances of religious exemptions from Title IX on its website at *www.ed.gov/ocr/correspondence/ other.html* (last visited Mar. 12, 2024).

The Department believes its current practice of making OCR religious exemption letters available online or through FOIA requests is responsive to commenters' concerns. The Department further notes that nothing precludes a prospective student or other individual from asking a recipient whether it relies on any exemptions under Title IX and for information about the scope of any such exemptions, to the extent such information may inform their decision to apply to or attend such recipient.

Comments on transparency regarding religious exemptions in a recipient's notice of nondiscrimination are further addressed in the discussion of § 106.8(b).

*Changes:* None.

5. Religious Individuals

*Comments:* Some commenters expressed concern that although § 106.12 protects schools controlled by religious organizations, it does not protect individual students or employees who adhere to religious tenets. One commenter urged the Department to extend § 106.12 to individuals, particularly in schools that are not controlled by a religious organization.

Some commenters stated that the religious exemption does not offer a remedy for what the commenters believe to be a conflict with individuals' First Amendment rights to speak on topics such as gender identity or abortion. One commenter urged the Department to make clear that an employee may decline to provide medical care or services when doing so would conflict with their religious beliefs.

One commenter urged the Department to consider expanding application of Title IX's religious exemption to cover religious student groups and argued that the proposed regulations would create problems for student groups that seek to follow a statement of faith that could be deemed offensive.

*Discussion:* The Department acknowledges that commenters raised concerns about the application of the final regulations to individuals' speech about a variety of specific topics, such as gender identity and abortion. Consistent with § 106.6(d)(1), nothing in the final regulations requires or authorizes a recipient to infringe on individuals' First Amendment or other constitutional rights. The extent to which the final regulations' prohibition on sex-based harassment intersects with First Amendment rights is addressed in the discussion of the definition of sex-based harassment in § 106.2.

While the statute's religious exemption applies to educational institutions controlled by a religious organization, it does not exempt student organizations, individual employees or students, or educational institutions not controlled by religious organizations.

*Changes:* None.

6. 34 CFR 75.500(d) and 76.500(d)

*Comments:* Some commenters urged the Department to rescind 34 CFR 75.500(d) and 76.500(d), which prohibit public postsecondary institutions receiving Department grants from enforcing certain non-discrimination policies against religious student organizations, because those regulations undermine the purpose of Title IX, are redundant of constitutional protections, and were issued without congressional authority and in violation of the APA.

*Discussion:* The Department did not request comments in the July 2022

NPRM on 34 CFR 75.500(d) or 76.500(d), which are outside the scope of this rulemaking. The Department has proposed rescinding these regulations in a separate rulemaking. *See* 88 FR 10857 (Feb. 22, 2023).

*Changes:* None.

*D. Rulemaking Process*

*Comments:* One commenter asserted the Department developed the proposed regulations without employing a rulemaking process that involved a committee of nominated Title IX practitioners and experts to help the Department. One commenter suggested that the Department create a standing advisory group of representatives from various sectors to assist with considering policy issues and implementing the final regulations so that standards can be set based on input gathered from all sectors.

Some commenters argued that by proposing two separate notices of proposed rulemaking to amend the Title IX regulations, the Department deprived the public of proper notice and opportunity to consider the interrelated interests in the proposed regulations. Some commenters urged the Department to republish a comprehensive notice of proposed rulemaking addressing Title IX in its totality rather than moving forward with final regulations. Other commenters urged the Department to issue final regulations that address all the proposed regulations.

*Discussion:* The Department believes the commenter who mentioned a committee of nominated Title IX practitioners was referring to the negotiated rulemaking requirements in section 492 of the Higher Education Act (HEA). The requirements of section 492 apply exclusively to regulations that implement Title IV of the HEA. Title IX is not part of the HEA; rather, it is part of the Education Amendments of 1972. Although the Department was not required to conduct negotiated rulemaking for Title IX, the Department solicited live and written comments as part of a June 2021 Title IX Public Hearing and conducted listening sessions with stakeholders expressing a variety of views on the 2020 amendments and other aspects of Title IX prior to drafting the proposed regulations. *See* 87 FR 41390, 41395. Recommendations from practitioners and experts were among the hundreds of thousands of comments on the July 2022 NPRM received by the Department during the notice-and-comment rulemaking process for these final regulations. The comments received on the proposed regulations are posted for

the public to view on *Regulations.gov*. In addition, information regarding the live and written comments received during the July 2021 Title IX Public Hearing and at stakeholder meetings with the Department prior to issuing the proposed regulations is discussed in the July 2022 NPRM. *See* 87 FR 41390, 41395–96.

Consistent with the requirements of Executive Order 12866, the Department coordinated with other agencies by sharing the proposed regulations with the Office of Management and Budget (OMB) prior to their publication. Through the interagency review process, OMB provided other Federal agencies, including those that also administratively enforce Title IX, an opportunity to review and comment on the proposed regulations before they were published. In addition, in accordance with Executive Order 12250, the Assistant Attorney General for Civil Rights at the Department of Justice reviewed the proposed regulations and approved them for publication in the **Federal Register**.

The Department acknowledges the suggestion that it create a standing advisory group to assist with policy issues and implementing the final regulations, but the previously discussed public hearing, listening sessions, and notice-and-comment process provided a sufficient opportunity for affected entities and individuals to offer input on the final regulations. The Department also notes that nothing in the final regulations precludes recipients from creating their own advisory groups to help them with implementation. In addition, the Department will offer technical assistance, as appropriate, to promote compliance with the final regulations.

The Department considered all of the comments that were submitted in response to the July 2022 NPRM, including those that objected to the Department's decision to issue separate notices of proposed rulemaking. The Department disagrees with commenters who objected to the Department's issuance of two related notices of proposed rulemaking. The July 2022 NPRM made clear that proposed § 106.31(a)(2) would not apply in the context of eligibility criteria for sex-separate athletic teams because Congress recognized that athletics presents unique considerations and that the Department would issue a separate notice of proposed rulemaking to clarify Title IX's application to criteria recipients use to establish students' eligibility to participate on a particular male or female athletic team. 87 FR 41536–38.

The Department recognizes that participation in team sports is associated with many valuable physical, emotional, academic, and interpersonal benefits for students and that recipients seek greater clarity on how to comply with their Title IX obligations when determining students' eligibility to participate on a sex-separate athletic team consistent with their gender identity. Accordingly, on April 13, 2023, the Department issued its Athletics NPRM, which was approximately nine months after the Department issued its July 2022 NPRM. The Department received more than 150,000 detailed comments on the Athletics NPRM. In light of the volume and substance of comments, and to ensure full consideration of the range of views expressed in those comments, the Department intends to publish a notice of final regulations related to sex-related eligibility criteria for male and female athletic teams separate from these final regulations. The Department maintains its authority under the Javits Amendment to promulgate reasonable provisions governing athletics that consider the nature of particular sports, as detailed in the Athletics NPRM. *See* 88 FR 22862–63.

The Department declines commenters' suggestion to issue a new comprehensive notice of proposed rulemaking, as the public received proper notice and opportunity to comment, and these final regulations reflect the Department's careful consideration of those comments.

*Changes:* None.

*E. Length of Public Comment Period and Process for Submitting and Posting Comments*

*Comments:* Some commenters requested that the Department extend the comment period to December 30, 2022. Some commenters criticized the Department for what they perceived to be attempts to limit the solicitation of comments, including by phrasing the deadline for public comment as "due on," rather than "due before." Some commenters urged the Department to extend the comment period because they had difficulty submitting comments through the *Regulations.gov* website.

Some commenters expressed concern that thousands of public comments from *Regulations.gov* had been removed, citing a disparity between the number of comments posted on *Regulations.gov* and on the **Federal Register** website. Some commenters opposed the editing, redacting, or censoring comments posted on *Regulations.gov*.

*Discussion:* The Department published the July 2022 NPRM in the **Federal Register** on July 12, 2022 (87 FR 41390), for a 60-day comment period, stating specifically that comments must be received on or before September 12, 2022. The APA does not mandate a specific length for the comment period, but rather states that agencies must give interested persons an opportunity to participate in the proceedings. 5 U.S.C. 553(c). This provision has generally been interpreted as requiring a "meaningful opportunity to comment." *See, e.g., Asiana Airlines* v. *FAA,* 134 F.3d 393, 396 (D.C. Cir. 1998). Case law interpreting the APA generally concludes that comment periods should not be less than 30 days.[92] In this case, commenters had 60 days to submit their comments on the July 2022 NPRM.

When a commenter submits a comment on *Regulations.gov,* they receive a tracking number so they can use that number to locate their comment once it is posted. The Department responded to any requests it received for assistance with submitting comments via *Regulations.gov,* including by providing the member of the public with information regarding the *Regulations.gov* help desk and by accepting written comments via mail and email for members of the public who requested an accommodation or could not otherwise submit their comments via *Regulations.gov.* The Department also consulted with the U.S. General Services Administration (GSA), which administers *Regulations.gov,* during the comment period if a member of the public contacted the Department expressing difficulty submitting comments via *Regulations.gov.* GSA indicated to the Department that there were no widespread problems submitting comments through *Regulations.gov* during the comment period. In light of this, the Department did not extend the comment period.

The Department received more than 240,000 comments on the July 2022 NPRM, many of which addressed the substance of the proposed regulations in great detail. The volume and substance of comments on practically every facet of the proposed regulations confirms that the public had meaningful opportunity to comment, and that the public in fact did meaningfully participate in this rulemaking. *Cf.*

*Pangea Legal Servs.* v. *U.S. Dep't of Homeland Sec.,* 501 F. Supp. 3d 792, 820 (N.D. Cal. 2020) (small number of comments received on a rule relative to other, similar rules showed comment period was inadequate); *N.C. Growers' Ass'n, Inc.* v. *United Farm Workers,* 702 F.3d 755, 770 (4th Cir. 2012) (refusal to receive comments on or discuss the substance or merits of the rule did not allow for a meaningful opportunity to participate). The Department reviewed and considered all comments submitted during the comment period, including duplicate comments.

Concerns that the Department removed thousands of public comments on the July 2022 NPRM from *Regulations.gov,* on September 5, 2022, are mistaken. There was no loss of comments on the July 2022 NPRM. Rather, the Department corrected a commenter's erroneous assertion that the comment in question represented the hundreds of thousands of commenters. Specifically, a person who submits a comment on *Regulations.gov* with an attachment may indicate that they represent multiple individuals or organizations. This process allows individuals to upload a submission with multiple signatures or a single submission containing a number of comments from different individuals, and this self-reported number is then included automatically by the *Regulations.gov* system in the count of comments received. In this case, a single commenter submitted a comment with a self-reported number of 201,303 submissions. That comment consisted of a policy memorandum issued by the Consumer Financial Protection Bureau in 2013 and no other information or attachments.[93]

After the self-reported number of submissions for that comment was included in the total number of comments reflected on *Regulations.gov,* the Department determined that the self-reported number of submissions for that comment was inaccurate because the comment was actually submitted on behalf of a single commenter. Once the error was discovered, the Department informed GSA, and GSA corrected the number of submissions for that comment to one.

Further, comment tallies are generated by GSA's *Regulations.gov* and are publicly available on *Regulations.gov.* Neither the Department nor GSA's *Regulations.gov* eliminated comments or types of comments in the Department's tally count. With two

narrow exceptions consistent with Department policy, the Department made all material received from members of the public available for public viewing on *Regulations.gov* for the July 2022 NPRM. As explained in the July 2022 NPRM, the Department did not make publicly available (1) portions of comments that contained personally identifiable information about someone other than the commenter or (2) comments that contained threats of harm to another person or to oneself. *See* 87 FR 41390. Prior to making comments available for public viewing on *Regulations.gov,* the Department reviewed each comment for such content. Following this review, the comments without such content were posted for public viewing on *Regulations.gov.* The Department's review process takes time and therefore, there were instances of a lag between the time an individual submitted a comment via *Regulations.gov* and when it was posted publicly. All comments that did not contain personally identifiable information about a person other than the commenter or threats of harm to the commenter or another person were made available in their entirety for public viewing on *Regulations.gov.* In addition, comments that contained personally identifiable information about someone other than the commenter were made available for public viewing on *Regulations.gov* with the personally identifiable information redacted.

The Department does not track individuals who submit comments, including those who oppose the proposed regulations. The Department made comments available for public viewing and reviewed and considered all of the comments submitted during the comment period, including comments that contained threats of harm or personally identifiable information about someone other than the commenter.

*Changes:* None.

## F. Effective Date and Retroactivity

*Comments:* Some commenters, noting the scope and breadth of the requirements in the proposed regulations, asked the Department to give recipients adequate time to implement the final regulations, with many asking that the final regulations not take effect mid-year. Some commenters explained that the HEA's master calendar gives postsecondary institutions at least eight months to prepare for the adoption of new Federal regulations and requires the regulations to take effect at the start of an academic year.

---

[92] *See, e.g., Nat'l Lifeline Ass'n* v. *FCC,* 921 F.3d 1102, 1117 (D.C. Cir. 2019) ("When substantial rule changes are proposed, a 30-day comment period is generally the shortest time period sufficient for interested persons to meaningfully review a proposed rule and provide informed comment."); *Nat'l Retired Teachers Ass'n* v. *U.S. Postal Serv.,* 430 F. Supp. 141, 147 (D.D.C. 1977).

[93] The comment is available at *https://www.regulations.gov/comment/ED-2021-OCR-0166-43621* (last visited Mar. 12, 2024).

Some commenters noted the proposed regulations were silent on retroactivity and asked the Department to clarify the effective date. One commenter suggested that the Department state that the applicable grievance procedures are those that were in effect on the date a complaint was made and that the applicable substantive rules are those in effect at the time the alleged conduct occurred. One commenter explained that when the 2020 amendments were released, postsecondary institutions received many questions regarding whether recipients were required to implement the new Title IX grievance procedure requirements for complaints related to conduct that occurred prior to the effective date, but that were unresolved when the 2020 amendments became effective.

*Discussion:* Under the APA, the effective date for the final regulations cannot be fewer than 30 days after the final regulations are published in the **Federal Register** unless special circumstances justify a statutorily specified exception for an earlier effective date. 5 U.S.C. 553(d)(3). The Department has carefully considered commenters' concerns, including concerns regarding sufficient time to prepare for compliance and the requests to have these final regulations become effective at the start of an academic year.

The Department appreciates suggestions from commenters as to an appropriate length of time between publication of the final regulations and their effective date. The Department notes again that these final regulations are not promulgated under Title IV of the HEA and thus are not subject to the master calendar under the HEA. They also are not limited to institutions of higher education, but address civil rights protections for students and employees in the education programs and activities of all recipients.

For final regulations not subject to the HEA's master calendar, 60 days is generally sufficient for recipients to come into compliance with final regulations. Consistent with the preamble to the 2020 amendments, the Department recognizes the practical necessity of allowing recipients of Federal financial assistance time to plan for implementing these regulations, including to the extent necessary, time to amend their policies and procedures. *See* 85 FR 30026, 30534.

In response to commenters' concerns about the effective date, the Department has determined that the final regulations will be effective August 1, 2024. Recipients will thus have more than 90 days, far more time than the statutory minimum of 30 days, to prepare for compliance with these final regulations. The effective date of August 1, 2024 adequately accommodates the needs of recipients while fulfilling the Department's obligations to fully enforce Title IX's nondiscrimination mandate. The Department also notes that the effective date coincides with the summer break for many recipients, which will provide them time to finalize their Title IX policies and procedures prior to the start of the new academic year.

The Department will not enforce these final regulations retroactively.[94] Federal agencies authorized by statute to promulgate regulations may only create regulations with retroactive effect when the authorizing statute has expressly granted such authority, which is not the case here.[95] The final regulations apply only to sex discrimination that allegedly occurred on or after August 1, 2024. With respect to sex discrimination that allegedly occurred prior to August 1, 2024, regardless of when the alleged sex discrimination was reported, the Department will evaluate the recipient's compliance against the Title IX statute and the Title IX regulations in place at the time that the alleged sex discrimination occurred. The Department also notes that regardless of when the final regulations become effective, some reports regarding sex discrimination occurring in a recipient's education program or activity may be handled under these final regulations while others will be addressed under the requirements of the 2020 amendments; this is not arbitrary and occurs any time regulatory requirements are amended prospectively.

The Department understands that recipients may need technical assistance during the transition period between publication of these final regulations in the **Federal Register** and the effective date of August 1, 2024, and after the regulations become effective to assist them in fully implementing the regulations. The Department will offer technical assistance, as appropriate, to promote compliance with the final regulations.

*Changes:* The effective date of these final regulations is August 1, 2024.

*G. Prevention*

*Comments:* A number of commenters asked the Department to include regulations requiring student-facing education and prevention programming. Some commenters noted the previously recognized benefits of such programming for helping recipients fulfill their longstanding Title IX obligation to prevent future recurrence of harassment. Commenters also recommended a broad array of requirements, such as education regarding healthy relationships, relationship violence, sex education, self-defense, safety awareness training, child sexual abuse, and the role that drugs and alcohol play in sexual assault. In addition, commenters made specific recommendations regarding sex education in schools, which included comments advocating for more comprehensive sex education, comments advocating for abstinence-only sex education, and comments objecting to any form of sex education. One commenter asked the Department to emphasize the importance of physical safety and prevention measures, such as emergency call boxes, campus security officials, and secured doors and windows.

One commenter urged the Department to provide recipients with funding for prevention education because educating and training for students and employees about the attitudes and behaviors that enable sex discrimination and how to stop it would help recipients fulfill their Title IX obligations.

*Discussion:* The Department acknowledges commenters' suggestions regarding prevention training and sex education for students. However, the Department declines to require certain training practices aside from § 106.8(d), which relates directly to individuals responsible for implementing these regulations. Because the Department does not control school curricula, the Department declines to add requirements that a recipient instruct students on sex-based harassment prevention or sex education but notes that nothing in these final regulations would preclude a recipient from using its discretion to provide educational programming to students that it deems appropriate. *See* 85 FR 30026, 30125–26.

Regarding Department funding for prevention education, the authority to appropriate money for certain activities lies with Congress.

*Changes:* None.

---

[94] This position is consistent with the Department's general practice. *See* 85 FR 30026, 30061; U.S. Dep't of Educ., Office for Civil Rights, Questions and Answers on the Title IX Regulations on Sexual Harassment, at 10 (July 2021) (updated June 28, 2022), *https://www2.ed.gov/about/offices/list/ocr/docs/202107-qa-titleix.pdf.*

[95] *See* 5 U.S.C. 551 (Administrative Procedure Act provision defining a "rule" as an agency action with "future effect"); *Bowen,* 488 U.S. at 208 ("[A] statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms.).

## H. Tenth Amendment

*Comments:* Some commenters raised federalism concerns, stating that the primary responsibility for education rests with parents and at the State and local levels and that the proposed regulations would violate the Tenth Amendment.

*Discussion:* These final regulations do not violate the Tenth Amendment, which states: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. As explained in the 2020 amendments:

The Supreme Court's position is sufficiently clear on this topic. "[W]hile [the Federal government] has substantial power under the Constitution to encourage the States to provide for [a set of new rules concerning a national problem], the Constitution does not confer upon [the Federal government] the ability simply to compel the States to do so." The Tenth Amendment "states but a truism that all is retained which has not been surrendered." . . . The Supreme Court always has maintained that "[t]he States unquestionably do retai[n] a significant measure of sovereign authority . . . to the extent that the Constitution has not divested them of their original powers and transferred those powers to the Federal Government." . . . [T]here can be no dispute that the Federal government retains the authority to regulate sex discrimination . . . in education programs or activities that receive Federal financial assistance, even though the same matters also fall within the traditional powers of the States.

85 FR 30459 (footnotes omitted) (citing *New York* v. *United States,* 505 U.S. 144, 149 (1992); *United States* v. *Darby,* 312 U.S. 100, 124 (1941); *Garcia* v. *San Antonio Metro. Transit Auth.,* 469 U. S. 528, 549 (1985)).

The Department maintains its position from the 2020 amendments that "[t]he Department, through these final regulations, is not compelling the States to do anything. In exchange for Federal funds, recipients—including States and local educational institutions—agree to comply with Title IX and regulations promulgated to implement Title IX as part of the bargain for receiving Federal financial assistance, so that Federal funds are not used to fund sex-discriminatory practices. As a consequence, the final regulations are consistent with the Tenth Amendment." 85 FR 30459.

*Changes:* None.

## I. Exceeding Authority

*Comments:* Some commenters asserted that the Department lacked congressional authorization to issue the proposed regulations. Specifically, some commenters stated Congress did not authorize the Department to unilaterally implement Title IX regulations or to force recipients to end all forms of sexual harassment and provide remedies to survivors. Some commenters expressed that only Congress, rather than the executive branch, has the authority to amend Title IX. Some commenters stated the Supreme Court has ruled that areas such as education should be decided by the people or the States because such areas have not been specifically delegated to the Federal Government in the U.S. Constitution. Some commenters asserted that the proposed changes bypass the authority of State legislatures.

*Discussion:* The Department has the delegated authority to promulgate the final regulations.

Under 20 U.S.C. 1682, agencies are specifically empowered to effectuate section 1681 through regulations: each agency with the power to extend Federal financial assistance to education programs or activities "is authorized and directed to effectuate the provisions of section 1681 of this title . . . by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken." Further, such agencies may ensure compliance "by the termination of or refusal to grant or to continue assistance" to a noncompliant recipient's education program or activity. 20 U.S.C. 1682. Thus, as the Supreme Court has recognized, "[t]he express statutory means of enforcement [of Title IX] is administrative." *Gebser,* 524 U.S. at 280. Congress has validly delegated its power to implement Title IX to agencies such as the Department.

Moreover, the Department disagrees with commenters' assertion that this delegation does not extend to prohibitions on sex-based harassment. The Supreme Court has held that sexual harassment is a form of sex discrimination under Title IX. *See id.* at 283 (affirming "the general proposition that sexual harassment can constitute discrimination on the basis of sex under Title IX"). The Department thus has authority under 20 U.S.C. 1682 to implement the ban on sex discrimination in 20 U.S.C. 1681 by promulgating regulations prohibiting sex-based harassment and requiring recipients to address it. This authority extends to requiring recipients to provide remedies to complainants because such remedies eliminate the harm of sex-based harassment and prevent its recurrence. Contrary to the commenters' assertion, therefore, the regulations do not "amend" Title IX but rather are a key part of "effectuat[ing]" Title IX's requirement that recipients operate their education programs and activities free from sex discrimination. 20 U.S.C. 1682.

The Department has not bypassed the authority of State legislatures. In contrast to other statutes reflecting a cooperative federalism, such as the Clean Air Act, Congress provided for only Federal agencies, not State agencies, to adopt regulations implementing Title IX. *See* 20 U.S.C. 1682.

*Changes:* None.

## J. Views of Assistant Secretary Lhamon

*Comments:* Some commenters stated that Assistant Secretary Catherine Lhamon must be recused from the rulemaking process or be removed from her position, asserting that under her previous leadership, OCR created problems that the 2020 amendments were intended to solve, was biased, and overreached by conducting investigations into all aspects of recipients' adjudication processes and campus life. These commenters asserted that due to Assistant Secretary Lhamon's past public statements, her record as Assistant Secretary from 2013 to 2017, and statements made during her Senate confirmation hearing, neither OCR nor the Department can comply with the APA's reasoned decision-making requirement. The commenters explained that these concerns were expressed in two letters sent to the Department in 2022 but said that the Department failed to discuss these concerns in the proposed regulations, thus tainting the rulemaking process and rendering any final regulations arbitrary and capricious.

*Discussion:* The Department maintains that no statement on the part of Assistant Secretary Lhamon and no actions taken by OCR under Assistant Secretary Lhamon prevent the Department from engaging in reasoned decision making and rulemaking.

In the context of a rulemaking such as this one, an agency member should be "disqualified only when there has been a clear and convincing showing that the agency member has an unalterably closed mind on matters critical to the disposition of the proceeding." *Ass'n of Nat'l Advertisers, Inc.* v. *FTC,* 627 F.2d 1151, 1170 (D.C. Cir. 1979). This high standard recognizes that the "legitimate functions of a policymaker . . . demand interchange and discussion about important issues" and that, if an "agency official is to be effective he

must engage in debate and discussion about the policy matters before him.'' *Id.* at 1168–69. The D.C. Circuit in *Association of National Advertisers* thus concluded that ''mere discussion of policy or advocacy on a legal question . . . is not sufficient to disqualify an administrator.'' *Id.* at 1171.

Here, the remarks noted by commenters indicate that Assistant Secretary Lhamon advocated for robust procedural protections for students, but nothing suggests she had an ''unalterably closed mind'' regarding any particular issue involved in this rulemaking. Moreover, like the official in *Association of National Advertisers,* Assistant Secretary Lhamon ''made the challenged comments before the [agency] adopted its notice of proposed rulemaking.'' *Id.* at 1173. Indeed, she made them even before she assumed her position as Assistant Secretary in the current Administration. Nothing suggests that ''the interchange between rulemaker and the public should be limited prior to the initiation of agency action.'' *Id.* To the contrary, ''[t]he period before [an agency] first decides to take action on a perceived problem is, in fact, the best time for a rulemaker to engage in dialogue with concerned citizens'' because ''[d]iscussion would be futile . . . if the administrator could not test his own views on different audiences'' before initiating the action. *Id.* The same rationale applies to prospective government officials, who must be able to engage the public to determine the sorts of policies they ought to attempt to implement if they later become officials. Engaging in this process and advocating for certain changes does not violate the APA. *See id.* (''an expression of opinion prior to the issuance of a proposed rulemaking does not, without more, show that an agency member cannot maintain an open mind'').

Moreover, the July 2022 NPRM was, and the final regulations are, issued by the Secretary of Education, and the final sign-off comes from the Secretary of Education, not the Assistant Secretary. There is no contention that Secretary Cardona prejudged the issues or had a closed mind.

In addition, the proposed and final regulations differ, significantly in many respects, from the standards regarding sexual harassment that were enforced during Assistant Secretary Lhamon's tenure from 2013 to 2017. This further suggests that Assistant Secretary Lhamon did not have an unalterably closed mind regarding the contents of the updated regulations.

Finally, as this preamble indicates, the Department has engaged with the many commenters who raised questions about, or opposition to, the July 2022 NPRM. The final regulations reflect this engagement, including the full consideration of the significant number of comments received on the proposed regulations, and belies the notion that the Department prejudged any issue addressed in these final regulations.

*Changes:* None.

### K. Regulatory Action Not Necessary

*Comments:* Some commenters stated that the Department failed to comply with Executive Order 12866, which requires an agency to identify the problem it intends to address and assess the significance of the problem, and Executive Order 14021, which directs the Secretary to review existing regulations, orders, guidance, policies, and similar agency actions that may be inconsistent with the policy that all students should be guaranteed an educational environment free from sex discrimination, including discrimination on the basis of sexual orientation or gender identity. Other commenters asserted that the Department failed to provide substantial evidence that revisions to the 2020 amendments were necessary, particularly because recipients have had little time to assess the impact of the 2020 amendments.

One commenter asserted that the Department failed to cite adequate evidence that sex discrimination remains a serious problem to justify the proposed regulations, particularly in light of evidence that indicates a decrease in the number of Title IX investigations and a lack of data that indicates the prevalence of other forms of sex discrimination, including discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. One commenter said that the Department's fact sheet about the July 2022 NPRM did not provide information about how the proposed regulations would impact Americans and only addressed the intentions and goals of the Department.

*Discussion:* The Department complied with all legal requirements, including Executive Orders 12866 and 14021, in promulgating the proposed regulations. In the July 2022 NPRM, the Department explained the need for regulatory action based on its review of Federal case law under Title IX; its enforcement experience; and stakeholder feedback during the June 2021 Title IX Public Hearing, listening sessions, and the meetings held in 2022 under Executive Order 12866. *See* 87 FR 41545.

Notwithstanding commenters' concerns about revising the Title IX regulations given the recency of the 2020 amendments, as discussed below, the Department's experience with application of the 2020 amendments informs its belief that changes are necessary, and that the Department need not wait to compile additional data before addressing the problems it has identified in those rules. *See, e.g., Stilwell* v. *Off. of Thrift Supervision,* 569 F.3d 514, 519 (D.C. Cir. 2009) (''The APA imposes no general obligation on agencies to produce empirical evidence,'' and ''agencies can, of course, adopt prophylactic rules to prevent potential problems before they arise. An agency need not suffer the flood before building the levee.'').

Regarding commenters who questioned the lack or adequacy of data that shows sex discrimination is a serious problem, the Department acknowledged that ''there are limited data quantifying the economic impacts of sex discrimination, including sex-based harassment, on individuals.'' 87 FR 41546. However, the Department also acknowledged ''studies suggest[ing] that there is a cost associated with being subjected to sex discrimination,'' *id.,* and requested comment on these issues, *see id.* at 41548. In response, as discussed in more detail in the discussion of the definition of ''Sex-Based Harassment'' in § 106.2, commenters referred the Department to data and other information consistent with what the Department cited in the July 2022 NPRM, supporting the prevalence and negative effects of sex discrimination, especially with regard to sex-based harassment and sex stereotyping, including information about the effects in certain educational settings and among specific populations, such as LGBTQI+ students and Black girls.

Despite the prevalence of sex discrimination, including sex-based harassment, some recipients have reported a dramatic decline in Title IX complaints since the 2020 amendments went into effect. Heather Hollingsworth, *Campus Sex Assault Rules Fall Short, Prompting Overhaul Call,* Associated Press, June 16, 2022, *https://apnews.com/article/politics-sports-donald-trump-education-5ae8d4c03863cf98072e810c5de37048* (stating that the University of Michigan reported its number of Title IX complaints dropped from more than 1,300 in 2019 to 56 in 2021 and Title IX complaints at the University of Nevada, Las Vegas dropped from 204 in 2019 to 12 in 2021). In addition, the Department notes that Executive Order 12866

specifically directs that "qualitative measures" of benefits are "essential to consider." 58 FR 51735. OMB's guidance for implementation of Executive Order 12866 similarly directs agencies to consider qualitative benefits of proposed regulations. *See* Off. of Mgmt. & Budget, Executive Office of the President, OMB Circular A–4 (Sept. 17, 2003), *https://obamawhitehouse.archives.gov/omb/circulars_a004_a-4/*. The final regulations will have important qualitative benefits, such as improvements for the psychological wellbeing of students, that cannot be captured in the datasets that certain commenters expected the Department to provide. These benefits support the Department's conclusion that, under Executive Order 12866, regulatory action is warranted. For a detailed discussion of data sources as well as the costs and benefits of these final regulations, see the *Regulatory Impact Analysis.*

Further, we appreciate the opportunity to clarify that the fact sheet issued with the proposed regulations is not part of the proposed regulations themselves but was developed to provide the public with an overview of the requirements in the proposed regulations. The Department has provided information regarding the impact of the regulations, including costs and benefits, in the *Regulatory Impact Analysis* section of the proposed regulations and final regulations.

*Changes:* None.

### L. Need for Long-Lasting, Flexible Regulations

*Comments:* Some commenters expressed concerns about the shifting Title IX regulatory landscape and asked the Department to develop long-lasting regulations that can be maintained in future administrations. Commenters noted that Title IX requires settled expectations and expressed concern about the uncertainty arising from frequently changing regulations, which can lead to confusion and possible erosion of trust in postsecondary institutions' processes. One commenter explained that time and resources must be spent to update policies and procedures and train students and employees when Title IX regulations are updated, and asserted that this time would be better spent elsewhere. Some commenters expressed that when successive administrations make changes to the Title IX regulations, it undermines students' need for clarity about their rights and responsibilities or otherwise harms professionals who

work on Title IX compliance, students, and the larger community.

One commenter noted that the Title IX regulations must be viewed and applied in the context of a wide array of additional considerations, including applicable State law, case law, Federal laws, and institutional and system policies. In light of this, the commenter urged the Department to ensure that the final regulations are flexible enough to be implemented across a variety of postsecondary institutions, incorporate a sensible level of simplicity, and provide clarity regarding Federal expectations. One commenter stated that the regulations need to align with each postsecondary institution's expectations for its educational community, ensure accountability, and provide a safe and secure environment, not punishment.

*Discussion:* The Department shares the commenters' interest in long-lasting regulations that are balanced, widely acceptable, and that will be maintained over time, and the Department is committed to accomplishing this goal. As explained in the July 2022 NPRM, following an extensive review of the 2020 amendments, live and written comments received during the July 2021 Title IX Public Hearing, and information received during listening sessions with a variety of stakeholders, the Department issued the proposed regulations to provide greater clarity regarding the scope of sex discrimination and better account for the diversity of education programs or activities covered by Title IX. *See* 87 FR 41390. The Department also carefully considered the views expressed in the over 240,000 comments received on the July 2022 NPRM in developing these final regulations. The Department's view is that because the final regulations are balanced and provide needed flexibility for recipients, they are more likely to be long lasting, which will ensure stability in the enforcement of Title IX over time, aid recipients in setting expectations and ensuring accountability, and provide recipients with flexibility to address sex discrimination while ensuring that they will still meet their obligation to fully effectuate Title IX's nondiscrimination mandate.

Further, as noted in the July 2022 NPRM, the final regulations promote the goal of a well-understood regulatory regime and settled expectations by providing greater clarity and restore protections that the 2020 amendments did not address. *See* 87 FR 41459. These include, for example, provisions necessary to ensure the prompt and equitable resolution of complaints of sex

discrimination other than sex-based harassment, and recipient obligations to provide lactation space and reasonable modifications to prevent sex discrimination and ensure equal access for students who are pregnant or experiencing pregnancy-related conditions. *See* 87 FR 41458, 41513. The Department also notes the focus was on revising the 2020 amendments to the extent necessary to fully effectuate Title IX's nondiscrimination mandate. Some provisions from the 2020 amendments remain largely unchanged, including requiring recipients to offer and coordinate supportive measures for complainants and respondents; prohibiting bias and conflicts of interest; and permitting consolidation of complaints.

Regarding concerns about the costs associated with regulatory changes, the Department discusses the burden and benefits of the final regulations in more detail in the *Regulatory Impact Analysis.*

*Changes:* None.

### M. Intersection With Other Laws

*Comments:* A number of commenters expressed concern that the United States Department of Agriculture's (USDA) funding for school meal programs would be conditioned on compliance with the Department's Title IX regulations, while another commenter noted that the USDA issued its own interpretation of Title IX stating that sex discrimination included discrimination based on sexual orientation and gender identity. Other commenters, noting that Section 1557 incorporates sex as a prohibited ground of discrimination by referencing Title IX's prohibition on sex discrimination, suggested that the Department's proposed definition of sex discrimination would significantly impact medical professionals. These commenters stated that the Department must consider the impact on other nondiscrimination laws and must clearly state that the regulations do not apply to conduct covered by these or any other laws, unless that conduct is clearly covered by these Title IX regulations.

*Discussion:* The Department acknowledges that there are nondiscrimination laws other than Title IX that prohibit sex discrimination and that other Federal agencies have their own Title IX regulations or other regulations interpreting Title IX. For example, as commenters observed, the USDA enforces its own Title IX regulations, and HHS maintains regulations implementing Section 1557. The commenters did not identify any

particular conflict between the proposed regulations and the regulations of other Federal agencies. The Department confirms that the final regulations only apply to recipients of Federal financial assistance from the Department, regardless of whether other agencies' regulations may also apply to a given recipient. The Department has primary responsibility for enforcing Title IX with respect to its recipients. No other Federal agency's funding is conditioned on compliance with these final regulations. When a recipient receives Federal financial assistance from the Department and another Federal agency, the Department expects recipients to comply with the Department's regulations and that other Federal agency's implementing regulations interpreting Title IX. These final regulations are not intended to and do not create a situation in which a recipient cannot comply with all applicable Title IX regulations. Compliance with these final regulations is not related to other Federal agencies' Title IX regulations.

*Changes:* None.

### N. Family Policymaking Assessment

*Comments:* Some commenters noted that under Section 654 of the Treasury and General Government Appropriations Act of 1999, Federal agencies are required to assess the impact of proposed regulations on families and requested that the Department assess how the regulations will impact families.[96] Commenters stated that the proposed regulations failed to include a Family Policymaking Assessment, which would assess the proposed regulations' impact on family wellbeing, as required by the Treasury and General Government Appropriations Act of 1999, 5 U.S.C. 601 note.

*Discussion:* The provision of the Treasury and General Government Appropriations Act of 1999 cited by commenters pertains to "policies and regulations that may affect family well-being." 5 U.S.C. 601 note (Assessment of Federal Regulations and Policies on Families). The Department has reviewed and complied with all applicable requirements for promulgating the proposed regulations and these final regulations. These regulations apply to recipients of Federal financial assistance and therefore do not directly regulate families.

*Changes:* None.

### O. National Origin and Immigration Status

*Comments:* One commenter recommended that the Department remind recipients in the final regulations that Title IX protects all students regardless of national origin, immigration status, or citizenship status, and referenced Supreme Court case law holding that undocumented students have an equal right to public education in the elementary school and secondary school settings.[97] This commenter also recommended that the final regulations state that threatening students with deportation or invoking a student's immigration status to intimidate or deter a student or their parents or guardians from making a Title IX complaint constitutes retaliation under Title IX.[98]

*Discussion:* Although Title IX prohibits discrimination on the basis of sex, the Department has stated that the Title IX regulations protect individuals regardless of race, color, national origin, immigration status, or another protected characteristic. *See, e.g.,* 85 FR 30064, 30067. The final regulations clearly define retaliation in § 106.2 and § 106.71 and make clear that retaliation is prohibited. Threatening to take retaliatory action for purposes of interfering with any right or privilege secured by Title IX or its implementing regulations would constitute retaliation. Because threats of deportation and acts of intimidation based on invoking immigration status are covered by the definition of retaliation at § 106.2 if those actions are taken for the purpose of interfering with a protected activity under Title IX, additional language in the text of the final regulations is unnecessary.

*Changes:* None.

### P. Coverage of Employment

*Comments:* Some commenters objected to § 106.57 as unlawful and unauthorized and stated that the Department has no authority to include employment-related provisions in Title IX because it is an education statute.

*Discussion:* Title IX, 20 U.S.C. 1681, expressly states: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." As the Department stated in the 2020 amendments, Congress did not limit the application of

Title IX to students, and the regulations implementing Title IX have consistently prohibited discrimination based on sex in employment-related contexts that occur under a recipient's education program or activity. These final regulations accordingly apply to any person, including employees, in any education program or activity receiving Federal financial assistance. At the same time, nothing in these final regulations shall be read in derogation of any employee's rights under Title VII, as expressly stated in § 106.6(f). *See* 85 FR 30439. Similarly, nothing in these final regulations precludes an employer from complying with Title VII. *Id.* The Department recognizes that employers must fulfill their obligations under both Title VII and Title IX, and there is no inherent conflict between Title VII and Title IX. Nor is there any language in Title VII or Title IX preventing the Department from issuing regulations covering employment. *See* 85 FR 30439.

*Changes:* None.

### Q. Funding for Compliance

*Comments:* Some commenters were concerned that the proposed regulations would constitute an unfunded mandate for recipients. Some commenters requested that Congress allocate resources for school districts to implement the final regulations, while other commenters urged the Department to allocate funds for prevention and education programming.

*Discussion:* Title IX imposes certain requirements on recipients of Federal financial assistance, but Congress does not appropriate funding through Title IX itself. These final regulations do not, therefore, address how recipients may acquire the funding they deem necessary to comply with Title IX's requirements. The Department recognizes that, to the extent recipients or parties realize costs as a result of the final regulations, they will need to identify sources of funding to cover those costs. These final regulations are focused on clarifying recipients' legal obligations under Title IX. For a detailed discussion of data sources as well as the costs and benefits of these final regulations, see the *Regulatory Impact Analysis*

*Changes:* None.

### R. Technical Assistance

*Comments:* Some commenters urged the Department to provide technical assistance to school districts to assist them in implementing the final regulations, including sample policies, procedures, handbooks, training materials, checklists, and webinars to help reduce the implementation burden

---

[96] The commenters cited Public Law 105–277.

[97] The commenter cited *Plyler* v. *Doe,* 457 U.S. 202 (1982).

[98] The commenter cited the 2014 Q&A on Sexual Violence.

for recipients, especially for those that are smaller and less well-resourced, and for elementary schools and secondary schools. Some commenters urged the Department to supplement the final regulations with technical assistance resources addressing interactions between these regulations and FERPA, the Equal Access Act, Title VI, the IDEA, and Section 504.

*Discussion:* The Department acknowledges the recommendation to provide technical assistance and guidance on various topics. The Department agrees that supporting all stakeholders in implementing these final regulations is important and will offer technical assistance to recipients, including elementary schools and secondary schools, as appropriate, to promote compliance with these final regulations. Individuals, including Title IX Coordinators, may contact OCR at *https://ocrcas.ed.gov/contact-ocr* if they have questions about Title IX or the other civil rights laws that OCR enforces. In addition, the Equity Assistance Centers funded by the Department provide technical assistance and training, upon request by school boards and other responsible government entities, in the nondiscrimination assistance areas of race, sex, national origin, and religion to promote equitable education opportunities. Contact information for the Equity Assistance Centers is available at *https://oese.ed.gov/offices/office-of-formula-grants/program-and-grantee-support-services/training-and-advisory-services-equity-assistance-centers/equity-assistance-centers-training-and-advisory-services-contacts/* (last visited Mar. 12, 2024). Individuals seeking assistance regarding the application of FERPA can contact the Department's Student Privacy Policy Office at *https://studentprivacy.ed.gov/?src=fpco.*

*Changes:* None.

## S. Coordination

*Comments:* One commenter suggested establishing formal coordination within the Department for programs with similar and overlapping purposes as Title IX, including VAWA 2022, the Clery Act, and the Safe Schools Improvement Act, to provide consistency across programs and lead to more efficient and comprehensive implementation. The commenter also noted that many of these programs have data reporting requirements and that sharing this data would lead to more efficient enforcement. Some commenters encouraged the Department to work with the Department of Justice and other agencies to ensure that the

prohibitions in the regulations apply across agencies.

*Discussion:* The Department understands the importance of intra-agency and interagency coordination. In 1980, President Carter signed Executive Order 12250, which among other things, directs the Attorney General to coordinate the implementation and enforcement of Title IX. The Department is committed to working with our Federal agency partners—including the Department of Justice through their coordinating authority under Executive Order 12250—to promote consistent enforcement. These final regulations apply only to recipients of Federal financial assistance from the Department.

The Department has coordinated and will continue to coordinate, including sharing data when appropriate, among offices within the Department that have jurisdiction over programs that have similar and overlapping purposes as Title IX, as appropriate.

*Changes:* None.

## T. Terminology

*Comments:* Some commenters suggested the Department use the term "person" or "worker" rather than "student" or "employee" to describe the individuals Title IX protects. The commenters asserted these terms are consistent with the statutory text, which prohibits discrimination against "any person" under an education program or activity, including visitors and independent contractors, as well as other individuals who are either taking part or trying to take part in a recipient's education program or activity.

*Discussion:* While the Department acknowledges comments received about the terminology used to describe whom Title IX protects, it has determined that the language used in the final regulations is appropriate. The Department acknowledges that Title IX prohibits a recipient from discriminating on the basis of sex in its education program or activity and extends protections to any "person" but notes that this terminology in the Department's Title IX regulations has generally been consistent since the 1975 regulations. The final regulations similarly use "person" to ensure that Title IX's nondiscrimination mandate applies to anyone in a recipient's education program or activity. For example, in addition to covering students and employees, the definition of "complainant" also covers a person other than a student or employee who was participating or attempting to participate in the recipient's education program or activity at the time of the

alleged sex discrimination, and § 106.2 defines hostile environment sex-based harassment as conduct that limits or denies a person's ability to participate in or benefit from the recipient's education program or activity. The Department notes that where the final regulations use terms like "applicant," "student," or "employee" such terms are used not to narrow the application of Title IX's nondiscrimination mandate but to require particular actions by the recipient reasonably intended to benefit applicants, students, or employees, or to require a recipient's employees to take particular actions.

*Changes:* None.

## U. Discipline of Student Organizations

*Comments:* One commenter representing a trade association of men's fraternities asked the Department to clarify how a postsecondary institution must respond to allegations of sex discrimination that impact an entire student organization or group of student organizations. The commenter urged the Department to make clear that student organizations have due process rights, need a way to challenge allegations of sex discrimination, and should not be preemptively punished.

*Discussion:* Nothing in the final grievance procedure regulations under § 106.45, and if applicable § 106.46, confers due process rights on an organization because an organization cannot be a respondent subject to such a proceeding. *See* § 106.2 (definition of "respondent"). However, beyond grievance procedures, the Department notes that when a recipient is notified of conduct that reasonably may constitute sex discrimination under Title IX or this part, the recipient must also take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity, and that these steps may pertain to an organization or entity. *See* § 106.44(f)(1)(vii). While the final regulations do not require a recipient to afford due process rights and an opportunity to challenge allegations of sex discrimination to a student organization as part of its Title IX obligations, nothing in the final regulations precludes a recipient from doing so. A recipient might also act against an organization if the recipient concludes that the organization violated the recipient's code of conduct, but that would be an exercise of the recipient's own disciplinary authority independent of these final regulations. Finally, any individual, or group of individuals, who believes a recipient has discriminated against them on the basis of sex in a

manner prohibited under Title IX may file a complaint with OCR, which OCR would evaluate and, if appropriate, investigate and resolve consistent with the requirement under Title IX that a recipient operate its education or activity free from sex discrimination.

*Changes:* None.

*V. Contractors*

*Comments:* One commenter asked the Department to strengthen the requirements in §§ 106.4(c) and 106.51(a)(3) related to contractors to clarify that recipients are responsible for any discriminatory conduct by third-party contractors and vendors, including those that provide monitoring software that discriminates against LGBTQI+ students.

*Discussion:* The Department acknowledges the concern about discriminatory conduct by contractors. The Department did not propose changes to §§ 106.4(c) or 106.51(a)(3), but the Department appreciates the opportunity to clarify that a recipient may not absolve itself of its Title IX obligations by delegating, whether through express contractual agreement or other less formal arrangement, its operations to contractors. The current regulations require a recipient to provide assurance that its education program or activity will be operated in compliance with the Department's Title IX regulations and authorize OCR "to specify . . . the extent to which such assurances will be required of the applicant's or recipient's subgrantees, contractors, subcontractors, transferees, or successors in interest." 34 CFR 106.4(a), (c). OCR requires recipients to provide assurance that they "will ensure that all contractors, subcontractors, subgrantees, or others with whom it arranges to provide services or benefits are not discriminating in violation of [Title IX and other laws enforced by OCR]." U.S. Dep't of Educ., Office for Civil Rights, Assurance of Compliance—Civil Rights Certificate, *https:// www.ed.gov/ocr/letters/boy-scouts-assurance-form.pdf* (last visited Mar. 12, 2024).

The Department declines to opine on how Title IX may apply to monitoring software because its application may depend on a number of factors, including the specific software and how it is used. Anyone who believes a recipient or its contractors has engaged in sex discrimination, including through monitoring of students, may file a complaint with OCR.

*Changes:* None.

*W. Data Collection and Climate Surveys*

*Comments:* Some commenters asked the Department to strengthen the Civil Rights Data Collection (CRDC) by, for example, collecting and disaggregating data on harassment and discipline of students based on pregnancy, parental status, gender identity, sexual orientation status, disability, family status, and economic status.

Some commenters said that the Department should require recipients to conduct or improve campus climate surveys, or that the Department should provide guidance on how to conduct such surveys. One commenter encouraged the Department to require postsecondary institutions to maintain and publish data about their sex-based harassment cases to provide transparency and identify any illegal discrimination in how postsecondary institutions implement their sex-based harassment policies.

*Discussion:* The Department did not specifically request comments on OCR's CRDC or future data collections in the July 2022 NPRM, and it would be appropriate to specifically solicit public comment about any changes to data collection and publication practices before making such changes. The Department notes that nothing in the final regulations precludes a recipient from collecting demographic data relating to the recipient's Title IX complaints, including sex-based harassment complaints, and from disaggregating such data, provided that it does so consistent with its nondisclosure obligations under § 106.44(j) and other Federal, State, and local laws regarding dissemination of data.

Regarding climate surveys, these final regulations provide recipients with the discretion and flexibility to determine how best to assess their students' and employees' experiences with sex-based harassment or sex discrimination generally, including through a recipient's optional use of such surveys, which may be one way to assess obstacles to equal opportunity. *See* § 106.44(b) (barriers to reporting). In addition, VAWA 2022 requires the Secretary of Education, in consultation with other Federal agencies and experts, to develop an online survey tool regarding postsecondary student experiences with domestic violence, dating violence, sexual assault, sexual harassment, and stalking.[99] Following the development of the online survey tool, postsecondary institutions that receive Federal assistance must

administer the online survey and publish campus-level results of the online survey on their website. Although the requirements in VAWA 2022 regarding the creation and administration of an online survey tool are only applicable to postsecondary institutions, once the survey tool is developed, elementary schools and secondary schools may also find it useful to review and adapt for their own purposes. In addition, elementary schools and secondary schools may find it useful to review the information available from the Department's National Center on Safe Supportive Learning Environments at *https:// safesupportivelearning.ed.gov* (last visited Mar. 12, 2024) for assistance in conducting a climate survey.

*Changes:* None.

*X. OCR Enforcement Practices*

*Comments:* Some commenters expressed concern that OCR's voluntary resolution agreements are inadequate to deter a recipient from committing additional violations of Title IX and suggested additional penalties for recipients, including fines, lawsuits, referrals to the U.S. Department of Justice, suspension of eligibility for Federal contracts and financial aid, or direct accountability for a recipient's senior leadership and legal officers.

A group of commenters asked the Department to clarify what constitutes a violation of the regulations such that a postsecondary institution would be deemed ineligible for Federal student aid, including Pell grants; how that institution would be notified of the determination; and any review or appeal process for the decision. One commenter expressed concern that OCR's complaint processing procedures are too slow to be effective. One commenter recommended that the Department provide a safe harbor for recipients who lack sufficient resources for full compliance but demonstrate good faith through a variety of means, including maintaining best practices for addressing sex-based harassment and substantial compliance with the essential requirements of Title IX.

Some commenters urged the Department to publicize OCR case resolutions involving discrimination and harassment based on sexual orientation and gender identity. Some commenters asked the Department to collect and report disaggregated OCR complaint data related to complaints of discrimination and harassment based on sexual orientation, gender identity, sex characteristics, including intersex traits, and sex stereotypes.

---

[99] Public Law 117–103, sec. 153 (Mar. 15, 2022).

*Discussion:* In connection with suggestions regarding additional penalties for recipients for Title IX violations, the Department's enforcement authority under 20 U.S.C. 1682 and as set forth in 34 CFR 100.8 (incorporated in § 106.81) provides that the Department may seek compliance ''by the suspension or termination of or refusal to grant or to continue Federal financial assistance or by any other means authorized by law.'' Remedial action required of a recipient for violating Title IX or these final regulations may therefore include any action consistent with 20 U.S.C. 1682, and may include equitable and injunctive actions as well as financial compensation to a complainant, as necessary under the specific facts of a case.

The Department disagrees that voluntary resolution agreements are inadequate to deter recipients from committing additional Title IX violations. In the Department's experience, these resolution agreements have proven effective in correcting Title IX violations.[100] In addition, if a recipient fails to comply with a voluntary resolution agreement, the Department may take additional actions to address non-compliance with Title IX, including the initiation of administrative proceedings to suspend, terminate, or refuse to grant or continue Federal financial assistance or refer the case to the U.S. Department of Justice for judicial proceedings to enforce any rights of the United States. OCR details the entirety of its enforcement process, including the process the Department must follow prior to termination of Federal financial assistance, in its Case Processing Manual.

The Department clarifies that recipients are bound by Title IX and this part as a condition of their eligibility for Department funding. The Department emphasizes that it cannot pursue termination of Federal financial assistance or refer a matter to the Department of Justice unless a recipient refuses to voluntarily correct a violation after the Department has notified the recipient of the violation. *See* 20 U.S.C. 1682; 34 CFR 100.8.

Additionally, in response to the request for OCR to publicize its case resolutions, the Department notes that it already makes OCR's resolution agreements available to the public on its website in a database that can be searched by name of recipient or generally by protected category and that this is sufficient to inform the public of OCR's work. *See, e.g., https:// www2.ed.gov/about/offices/list/ocr/ frontpage/caseresolutions/sex-cr.html* (last visited Mar. 12, 2024). OCR will continue to highlight specific cases of note to the public through other means as appropriate to ensure awareness.

The Department acknowledges the commenter's concerns about timely resolution of complaints. While the Department strives to resolve cases efficiently and understands the importance of timeliness to the parties, OCR's necessary case processing time will vary based on many factors, including the allegations and facts presented. The Department declines to include a safe harbor for recipients that address sex-based harassment but do not comply with all of the requirements in the final regulations because it is important for all recipients to comply with the regulations in their entirety to ensure that statutory objectives are met.

In addition, the July 2022 NPRM did not specifically propose changes to OCR's complaint procedures generally, including with respect to additional penalties or other means of deterrence, publicizing cases, and collecting and reporting data. It would be appropriate to seek public comment on that issue before making changes.

*Changes:* None.

### Y. Severability

*Comments:* None.

*Discussion:* As discussed in the preambles to the 2020 amendments, 85 FR 30538, and the July 2022 NPRM, 87 FR 41398, it is the Department's position that each of the provisions of these final regulations discussed in this preamble serve an important, related, but distinct purpose. Each provision provides a distinct value to recipients (including elementary schools, secondary schools, and postsecondary institutions), other recipients of Federal financial assistance, students, employees, the public, taxpayers, and the Federal government separate from, and in addition to, the value provided by the other provisions. To best serve these purposes, the Department clarifies that the severability provisions in part 106, including §§ 106.9, 106.18 (redesignated in these final regulations as § 106.16), 106.24, 106.46 (redesignated in these final regulations as § 106.48), 106.62, 106.72, and 106.82 continue to be applicable. The Department also confirms that each of the provisions in the final regulations is intended to operate independently of each other and that the potential invalidity of one provision should not affect the other provisions. Thus, for example, the prohibition on retaliation (§ 106.71 of the final regulations) and the provision on application of Title IX to a sex-based hostile environment under a recipient's education program or activity even when some conduct that occurred outside of the recipient's education program or activity or outside of the United States contributed to the hostile environment (§ 106.11 of the final regulations), operate independently of each other and of each of the remaining regulatory provisions of these final regulations. Similarly, specific grievance procedure requirements in the final regulations, such as § 106.45(b)(6), which requires an objective evaluation of all evidence that is relevant and not otherwise impermissible and prohibits credibility determinations based on a person's status as a complainant, respondent, or witness, operate separately from the clarification of the scope of sex discrimination under § 106.10 of the final regulations. Further, as explained in the discussion of final § 106.10, that provision lists bases of discrimination that involve consideration of sex—sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity—which are distinct from the various forms of sex discrimination that may occur, including sex-based harassment, sexual violence, and the prevention of participation consistent with gender identity, which are addressed in §§ 106.2 and 106.31(a) of the final regulations, respectively. The Department believes that every provision of the final regulations is legally supportable, individually and in the aggregate, but includes this discussion to remove any ''doubt that [it] would have adopted the remaining provisions of the Final Rule'' without any of the other provisions, should any of them be deemed unlawful. *Mayor of Baltimore* v. *Azar,* 973 F.3d 258, 292 (4th Cir. 2020) (en banc) (citation and quotation marks omitted).

*Changes:* None.

### Z. Addressing Other Issues

*Comments:* Some commenters suggested broadening the scope of the proposed regulations to address other issues, for example: removing the regulatory provisions related to single-sex education; school discipline, including with respect to the intersection of sex and race and the disparate impact of discipline on girls of color; systemic discrimination in academia; requiring recipients to publish expenditures on athletic

---

[100] *See generally* U.S. Dep't of Educ., Office for Civil Rights, Fiscal Year 2022 Annual Report (2023), *https://www2.ed.gov/about/reports/annual/ ocr/report-to-president-and-secretary-of-education-2022.pdf* (highlighting key enforcement actions in each of OCR's jurisdictional areas).

programs and setting expenditure limits; balancing Federal financial assistance between men's and women's athletic programs; limitations on service of alcohol by on-campus organizations; mandatory availability of rape kits and drug tests in college health centers; advertisement of free legal resources for students and employees; issues impacting students with special needs, students who are immigrants, and students who are English learners; requiring individuals found responsible for sexual assault to register as sex offenders; suicidal ideation among individuals involved in Title IX matters; emphasis on science, technology, engineering, and math (STEM) and career and technical education (CTE); and stronger and more transparent connections between postsecondary administrations and the student body related to student advocacy on sex-based harassment issues, including discussions with community organizations and legal service providers.

*Discussion:* The July 2022 NPRM did not specifically propose changes related to these issues, including single-sex education; the intersection of sex and race in school discipline; systemic discrimination in academia; funding for athletic programs (including requirements to publish expenditures on these programs and set expenditure limits); alcohol availability on campus; advertising free legal resources; availability of rape kits and drug tests; issues related to students with special needs, immigrants, or English learners; sex offender registries; suicidal ideation; STEM and CTE; and the relationship between a postsecondary institution's administration and its student body related to student advocacy on sex-based harassment. The Department has determined it would be appropriate to specifically seek public comment before regulating on these issues. The Department also notes that, although not required, nothing in the final regulations precludes a recipient from advertising free legal resources or making rape kits and drug tests available in its health center. Similarly, although not required, nothing in the final regulations precludes a postsecondary institution from allowing students to bring representatives from community organizations and legal service providers to discussions with the postsecondary institution on sex-based harassment issues.

The Department notes that all recipients of Federal financial assistance from the Department, including institutions of vocational education and other recipients that operate STEM and CTE programs, must comply with the final regulations. The Department also clarifies that the final regulations do not alter existing regulations under the Department's other civil rights laws, including Title VI, Section 504, and the ADA. The Department will continue to enforce the Department's regulations under those laws. Anyone who believes that a recipient is discriminating on the basis of race, color, national origin, sex, or disability may file a complaint with OCR, which OCR would evaluate and, if appropriate, investigate and resolve consistent with the applicable statute and regulations. The Department also notes that the final regulations at § 106.44(g) require a recipient to offer and coordinate supportive measures as appropriate, which may include counseling for a party who is experiencing suicidal ideation. Additionally, the Department does not have the authority under Title IX to require individuals found responsible for sexual assault to register as sex offenders because sex offender registration is governed by other Federal, State, or local laws.

*Changes:* None.

### AA. Comments Outside the Scope of Title IX

*Comments:* The Department received a number of comments on issues and concerns that fall outside of the scope of Title IX.

*Discussion:* The Department does not address comments that raised concerns not directly related to the proposed regulations or Title IX, or that were otherwise outside the scope of the proposed regulations as published in the July 2022 NPRM.

*Changes:* None.

### Regulatory Impact Analysis (RIA)

The Department expects the final regulations to result in wide-ranging benefits for students, teachers, and other employees in federally funded schools and postsecondary institutions as it aims to fulfill Title IX's prohibition on sex discrimination. The final regulations address several topics, including the scope of sex discrimination; recipients' obligations not to discriminate based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity; and recipients' obligations to provide an educational environment free from discrimination on the basis of sex. When implemented, the final regulations will help ensure that all students experiencing sex discrimination receive appropriate support and that recipients' procedures for investigating and resolving complaints of sex discrimination are fair to all involved. The final regulations also embed discretion and flexibility for recipients to account for variations in school size, student populations, and administrative structures, which will minimize burdens.

Among other things, the provisions in the final regulations—in furtherance of the critical purposes of Title IX—protect student complainants who have been subjected to sex-based harassment, including sexual assault, and sex discrimination. They advance educational equity and opportunity and strengthen protections for students who face discrimination based on sexual orientation or gender identity. And they require fair, evenhanded school procedures for complaints of sex discrimination. These and other benefits discussed in this preamble significantly outweigh the modest costs imposed by the final regulations.

In response to its July 2022 NPRM, the Department received many comments on its estimates of the burden of the proposed regulations, principally regarding an anticipated increase in the number of complaints and/or the relative complexity of certain new complaints. In response to those comments, the Department has reviewed its assumptions and estimates, including making updates as discussed below. As a result of these updates, the Department estimates the final regulations will not impose substantial new burdens that are not justified by the significant benefits the Department expects from implementation of the final regulations. Below, the Department addresses comments related to the regulatory impact analysis.

### A. Comments on the Department's Model and Baseline Assumptions

#### 1. Regulatory Flexibility Act (Small Business Impacts)

*Comments:* Commenters offered a variety of opinions on the proposed regulations' potential effects on small entities. For example, some commenters asserted that the proposed regulations give recipients greater flexibility, which they said would benefit small recipients that will have options for compliance that better align with their resources and capacity. Other commenters expressed concern that small entities lack the capacity to handle costs associated with a potential increase in Title IX investigations due to the proposed regulations' requirements. Some commenters asserted that the Department failed to explain the methodology behind the alternative size standard it used, based on enrollment

data. One commenter stated their belief that the Department mischaracterized the Small Business Administration (SBA) threshold for small entities in the education sector as below $7,000,000 in revenue.

Another commenter noted the Department classified 44 percent of four-year educational institutions and 42 percent of two-year educational institutions as small entities under its alternative size standard, but asserted that under SBA size standards and 2017 Statistics of U.S. Businesses data, at least 61 percent of colleges, universities, and professional schools, and 81 percent of junior colleges had revenues below the SBA standard and so should be assessed as small entities.

Some commenters asserted the Department was required under the Regulatory Flexibility Act to analyze how the economic impact of its proposed regulations would differ across subsets of small entities, including small religious educational entities.

*Discussion:* The final regulations benefit small recipients because the regulations provide compliance options that better align with small recipients' resources and capacity. As discussed in the July 2022 NPRM, the Department's model accounts for this additional flexibility. *See* 87 FR 41546.

The Department acknowledges commenters' concerns that some small entities may lack the capacity to handle costs associated with an increase in Title IX complaints. The Department estimates that inclusion of the additional bases of sex discrimination within the scope of the Department's Title IX regulations may result in a 10 percent increase in the number of investigations conducted annually. *See* 87 FR 41548, 41550 & n.27. The Department carefully considered the potential increase in Title IX investigations in connection with the July 2022 NPRM and did not receive information that requires a change to that assumption or highlights circumstances in which the increase in the number of investigations would increase so dramatically that it would impose prohibitive burdens.

Nor did commenters submit data necessitating a change to the Department's cost estimates. Although one commenter asserted that the Department's projected net increase in costs of $3,090–$8,986 per year inaccurately assesses the impact of the regulations, the commenter did not provide information that would change that estimate. The estimated costs, moreover, may be lower for religious

educational entities that claim an exemption under § 106.12.

The Department previously explained the methodology behind the alternative size standard it used. 87 FR 41564. As in the 2020 amendments, for purposes of assessing the impacts on small entities, the Department proposed using enrollment as a basis for defining "small institutions of higher education (IHE)." *See* 85 FR 30570. As discussed in the preamble to the 2020 amendments, the Department did not purport to adopt the SBA revenue standard under 13 CFR 121.201 and declines to do so here. Therefore, the comparative percentages, which were based on SBA regulatory size standards, are inapposite. As explained in more detail in the discussion of the Regulatory Flexibility Act below, the Department is not using a $7,000,000 revenue threshold to define small LEAs in the final regulations. The Department acknowledges the suggestion to separately analyze the impact on the smallest entities, but notes that, as stated in the July 2022 NPRM, the Department's model assumes that each small IHE would conduct the same number of investigations per year, on average, as the total universe of all affected IHEs. 87 FR 41564. That assumption probably overstates the costs because it is much more likely that small IHEs will conduct fewer investigations per year and therefore, their actual realized costs will be less than estimated by the Department.

The Department also considered the impact of the final regulations on a subset of smaller entities, noting that, according to data from the Integrated Postsecondary Education Data System (IPEDS), approximately 175 IHEs had total reported annual revenues of less than $900,000, and those IHEs enrolled, on average, 36 students in Fall 2020. *Id.* Similarly, according to data from the National Center for Education Statistics (NCES), in 2018–2019, 123 LEAs had total revenues of less than $1,760,000 and enrolled, on average, 35 students each in the 2018–2019 school year. Based on the significantly lower enrollment at small IHEs and LEAs, the Department does not anticipate that the final regulations will place a substantial burden on smaller IHEs or LEAs because, in the Department's predictive judgment, it is "highly unlikely" that these recipients will conduct the number of investigations that would impose significant costs. *Id. See also* the discussion of the Regulatory Flexibility Act below.

While some commenters expressed concern that the Department underestimated the resources required

to implement the regulations and overestimated the administrative capacity that is available for recipients that are elementary schools or secondary schools, no new or additional data was provided that would change the Department's model or baseline assumptions on these points. Changes to the model related to nondiscrimination policies and grievance procedures are discussed below.

*Changes:* None.

### 2. Taxpayer Costs

*Comments:* Commenters asserted that the July 2022 NPRM ignores the cost of increased institutional compliance on State taxpayers, although they did not suggest any changes in the Department's cost estimates on that basis.

*Discussion:* Federal regulations often have a potential effect on State taxpayers, but commenters did not provide data that would change the Department's estimates. Moreover, the qualitative benefits of the final regulations in terms of fulfilling Title IX's mandate, which increases educational opportunities that have lasting, positive economic effects, more than justify any increase in cost.

*Changes:* None.

### 3. Cost Estimate

*Comments:* Some commenters asserted the Department's cost projections in the July 2022 NPRM mention a "cost estimate" but lack concrete figures and fail to identify the financial burden the proposed regulations would impose on recipients. Other commenters asserted that the Department underestimated the costs associated with the proposed regulations.

*Discussion:* The Department disagrees that the cost estimate lacks concrete figures. The July 2022 NPRM contains a detailed analysis of the estimated costs, starting at 87 FR 41551. Although the commenters did not provide any supplementary data upon which the Department could reasonably rely, the RIA of the final regulations includes a detailed analysis of estimated costs, including changes that the Department made in response to comments it received on some of the estimates in the RIA that was included in the July 2022 NPRM. The Department's overall cost estimates have not changed significantly; however, as a result of these changes and other factors outside of the Department's control, such as an increase in the number of affected entities and updated median hourly wage rates, the Department has revised its July 2022 NPRM estimated total monetary cost savings of between $9.8

million to $28.2 million, *see* 87 FR 41546, to an estimated total monetary cost of $4.6 million to $18.8 million over ten years.

*Changes:* As explained in greater detail below, the Department has revised its assumptions and estimates and made the following updates:

• Updated the number of affected entities to align with the most current data;

• Updated median hourly wage to the most recent Bureau of Labor Statistics data;

• Increased the Department's assumption regarding the number of incidents resulting in an offer of supportive measures; and

• Increased the Department's assumption regarding the number of hours required for Title IX Coordinators to review policies and procedures, revise grievance procedures, and assess related training requirements.

### 4. Definition of Sex-Based Harassment (§ 106.2)

*Comments:* Some commenters stated that the proposed definition of "sex-based harassment" would result in a significant increase in the volume of complaints and increased litigation and liability costs. One commenter stated the Department failed to consider more reasonable alternatives to its proposed changes to the definition of "sexual harassment." Some commenters were concerned that the proposed definition of hostile environment sex-based harassment would require recipients to address more complaints through their Title IX grievance procedures, which would impose an additional burden and expense on recipients who revised procedures to comply with the 2020 amendments. One of these commenters also noted that, especially at smaller postsecondary institutions, this would divert attention from sexual assault and quid pro quo harassment, which commenters said should be the priority under Title IX.

*Discussion:* In the July 2022 NPRM, the Department explained at length that it estimates that inclusion of the additional forms of sex discrimination, including sex-based harassment, may result in a 10 percent increase in the number of investigations conducted annually. *See* 87 FR 41550 & n.27. Commenters did not provide any data that would change the Department's estimates. The Department also acknowledged in the July 2022 NPRM that there may be some costs associated with litigation. *See* 87 FR 41561. But commenters did not provide any data that would change the estimates or the Department's recognition that there may

be some, but not extensive, costs associated with litigation due to the final regulations.

The Department disagrees that the definition of hostile environment sex-based harassment requires recipients to address significantly more complaints or detracts attention from sexual assault or quid pro quo harassment. At present, under the 2020 amendments, recipients are obligated to address multiple forms of sex-based harassment, including hostile environment, sexual assault, and quid pro quo harassment. Commenters did not provide an adequate basis to reject the estimates associated with the revised definition of hostile environment sex-based harassment, which has been carefully crafted to cover conduct that constitutes sex discrimination and fully effectuate Title IX's nondiscrimination mandate. With respect to the definition of hostile environment sex-based harassment, the Department carefully considered public comments, which are addressed in the discussion of the definition of "sex-based harassment" in § 106.2.

The Department considered several alternatives to the final definition of "sex-based harassment," including maintaining the definition of "sexual harassment" from the 2020 amendments and different wording options for the definition of hostile environment sex-based harassment and concluded that none captures the benefits of the final definition in § 106.2.

*Changes:* For explanation of the changes to the definition of "sex-based harassment," see the discussion of the definition of "sex-based harassment" in § 106.2.

### 5. Nondiscrimination Policy and Grievance Procedures (§ 106.8)

*Comments:* Some commenters asserted the Department underestimated the time and cost it will take recipients to review the regulations and revise their policies, procedures, and nondiscrimination statements.

Some commenters opposed as burdensome, duplicative, and impractical the proposed requirement that a recipient include its notice of nondiscrimination in each handbook, catalog, announcement, bulletin, application form, and recruitment material. One commenter said the Department failed to show there is a benefit that outweighs the costs of requiring a printed notice rather than a link on a recipient's website.

*Discussion:* The Department acknowledges that, as with any new regulations, it will take some time to review requirements and revise policies and procedures to align with those

requirements. The Department, exercising its expertise and applying its knowledge based on past experiences with regulated entities taking time to come into compliance with new requirements, provided detailed estimates of costs related to reading and understanding the regulations; revising policies; publishing notices of nondiscrimination; training Title IX Coordinators; updating training materials; and other compliance-based costs. *See, e.g.,* 87 FR 41563.

In response to commenters who asserted that the costs of implementing new Title IX procedures, and training on those procedures, might be especially burdensome in the elementary school and secondary school context and the vocational context, where the commenters assert that the existing infrastructure for Title IX compliance is not as robust, the Department has factored in those costs. *See* RIA, Cost Estimates (Section 4.C), Review of regulations and policy revisions. Although any predictive judgment about these types of compliance costs includes an element of uncertainty, no commenter provided any statement beyond speculation that the Department underestimated costs in any meaningful way. Out of an abundance of caution, however, and to address commenters' concerns, the model has been updated to reflect an increase from 6 to 12 hours for a recipient's Title IX Coordinator to review the regulations and revise policies, procedures, and notices of nondiscrimination, which increases costs by $14.3 million in the first year when revisions will be necessary.

Recognizing commenter concerns about burden, duplication, and impracticability regarding publication of the notice of nondiscrimination, the Department notes that the final regulations at § 106.8(c)(2) account for space and format limitations and provide recipients flexibility by giving recipients the option to provide a shorter version of the notice of nondiscrimination, if necessary. *See* discussion of § 106.8(c)(2). The short-form notice—a one-sentence statement that the recipient prohibits sex discrimination in any education program or activity that it operates and that individuals may report concerns or questions to the Title IX Coordinator, together with a link to the full notice of nondiscrimination on the recipient's website—provides the minimum information sufficient to ensure campus community member awareness of a recipient's Title IX obligations without unduly burdening recipient resources. In addition, a recipient may include its

notice of nondiscrimination in its handbooks, catalogs, announcements, bulletins, and application forms in the same manner it makes those materials available; in print if it distributes those materials in print, and electronically if it maintains those materials only electronically. This option supports the Department's cost estimate for publishing the notice of nondiscrimination. 87 FR 41563.

*Changes:* The Department has increased its estimate of the number of hours necessary for a recipient's Title IX Coordinator to review policies, revise grievance procedures as necessary, and assess related training requirements from 6 hours to 12 hours.

### 6. Training Requirements (§ 106.8(d))

*Comments:* Some commenters asserted that the Department underestimated the time and expenses related to training requirements in the final regulations.

*Discussion:* The Department factored in time for the Title IX Coordinator to assess training requirements as part of the estimates of time needed for the Title IX Coordinator to review and revise policies, grievance procedures, and notices of nondiscrimination. As discussed above, the Department increased its estimate for these Title IX Coordinator responsibilities from 6 hours to 12 hours. The Department disagrees that its model in the July 2022 NPRM underestimated time needed to provide training in the first year and in subsequent years. 87 FR 41552.

As explained in the discussion of § 106.8(d) related to frequency of training, several commenters asked the Department to clarify how often training must be conducted and whether a recipient would be required to retrain employees when their duties shift. In response to these comments, the Department has modified § 106.8(d) to require training promptly upon hiring or a change of position that alters an employee's duties under Title IX, and annually thereafter. Training employees is accounted for in the model and does not meaningfully change recipients' annual burden to provide training as compared to the 2020 amendments.

The training obligations with respect to the notification requirements in § 106.44(c) are not unduly burdensome because the information employees will have to learn and convey to students who approach them is straightforward and can be incorporated into already-required training sessions. The Department also reviewed the potential effects of the training requirements on small entities and has determined that the cost will not impose an unreasonable burden. *See* RIA, Cost Estimates (Section 4.C), Revisions to training.

While the Department understands that recipients will need to dedicate some additional resources for training under § 106.8(d), based on the Department's estimates, the benefits of comprehensive training outweigh the costs. *See* discussion of § 106.8(d) and the benefits, time, and expense of training.

*Changes:* As explained in the discussion of § 106.8(d) related to frequency of training, the Department modified § 106.8(d) to require training promptly upon hiring or a change in position that alters the employee's duties under Title IX, and annually thereafter.

### 7. Recordkeeping (§ 106.8(f))

*Comments:* Some commenters stated that proposed § 106.8(f) will significantly increase the administrative burden associated with recordkeeping and case management, arguing that the proposed regulations will cause an increase in reports, outreach, supportive measures, investigations, informal resolutions, and determinations, all of which will require recipients to create and maintain more records. One commenter observed that many K–12 and smaller postsecondary recipients do not have electronic recordkeeping systems.

*Discussion:* The Department acknowledges the commenters' concerns regarding recordkeeping costs and notes that its estimates acknowledged that not all recipients have electronic recordkeeping systems. *See* 87 FR 41558. In response to comments, and as explained in the discussion of § 106.8(f), the Department has removed the requirement in § 106.8(f) that recipients maintain all records documenting actions the recipient took to meet its obligations under §§ 106.40 and 106.57. In addition, the final regulations require a recipient to make its training materials available upon request for inspection by members of the public, as opposed to making them publicly available on the recipient's website. These changes will relieve some of the administrative burden associated with recordkeeping.

In order to ensure that the Department's estimates fully capture any burdens related to recordkeeping, the Department has not revised its estimate of the burden associated with the requirements of § 106.8(f). The Department believes that the revisions to § 106.8(f) combined with the retained burden estimate are sufficient to address commenters' concerns regarding underestimates of the burden of recordkeeping requirements.

*Changes:* As explained in more detail in the discussion of § 106.8(f), the Department has modified § 106.8(f) to remove the requirement that recipients maintain all records documenting actions the recipient took to meet its obligations under §§ 106.40 and 106.57 and no longer require a recipient to make its training materials publicly available on its website.

### 8. Application of Title IX (§ 106.11)

*Comments:* Some commenters asserted the Department underestimated the costs associated with investigating a hostile environment that may result from an incident that occurred outside of the United States.

*Discussion:* The Department acknowledges the commenters' feedback on the costs associated with investigating hostile environment sex-based harassment that may result from an incident that occurred outside of the United States. To be clear, § 106.11 does not require recipients to investigate conduct that occurred outside of the United States. That provision requires a recipient to address a sex-based hostile environment under its education program or activity, even when some conduct alleged to be contributing to the hostile environment occurred outside of the recipient's education program or activity or outside the United States. *See* § 106.11 and the accompanying discussion. As stated in the July 2022 NPRM, the Department does not have a basis upon which to develop estimates for this change. 87 FR 41554. Commenters did not provide additional data that would lead the Department to modify its cost projections. In light of the likely small number of investigations of hostile environment sex-based harassment resulting from extraterritorial conduct, the Department maintains its current cost estimates.

*Changes:* None.

### 9. Duty To Address Sex Discrimination (§ 106.44)

*Comments:* Some commenters argued that the Department did not adequately consider factors, explore sufficient data, and make necessary estimates in connection with its removal of the actual knowledge requirement for sexual harassment or allegations of sexual harassment. One commenter stated that the Department must evaluate the costs of removing the actual knowledge requirement together with broadening the requirement that a recipient's administrators report and act in response to "anything that 'may constitute sex discrimination.' " The

**Federal Register** / Vol. 89, No. 83 / Monday, April 29, 2024 / Rules and Regulations **33853**

commenter stated the costs of compliance the Department must consider would also include restrictions on speech to avoid liability.

*Discussion:* This preamble discusses the actual knowledge standard in connection with § 106.44(a), and the Department disagrees that it did not adequately consider its estimates in connection with these changes. As explained in the discussion of § 106.44(c), in response to comments, the notification requirements in § 106.44(c) have been modified to require an employee with notification duties to take action when the employee has information about conduct that reasonably may constitute sex discrimination under Title IX or this part. This change was made to address commenters' concerns that the scope of reportable conduct was unclear. In the Department's estimates, costs associated with these notification requirements are considered as part of training expenses. Other costs related to a recipient's duty to address sex discrimination in its education program or activity are considered in connection with the Title IX Coordinator's duties. Commenters did not provide additional data that would lead the Department to modify its cost projections related to its notification requirements.

The Department disagrees that the costs of compliance must include restrictions on speech to avoid liability. As discussed throughout this preamble, nothing in Title IX and the final regulations requires recipients to infringe on constitutionally protected speech.

*Changes:* None.

10. Title IX Coordinator Obligations: Duty To Monitor (§ 106.44(b) and (f))

*Comments:* Some commenters asserted that the Department underestimated the cost of implementing proposed § 106.44(b), in part because new provisions in VAWA 2022 require postsecondary institutions to conduct climate surveys, which the commenter stated will likely be administered by Title IX offices.

One commenter stated that while some recipients already monitor their education programs and activities for barriers to reporting sex discrimination, the Department's assessment that the costs of implementing proposed § 106.44(b) would be de minimis is wrong because it will take some recipients more time to perform tasks such as developing and conducting assessments, evaluating the results, and developing new initiatives or training to monitor and address barriers.

Other commenters stated that Title IX Coordinators would be unduly burdened because, for example, they would not be able to satisfy all the requirements that proposed § 106.44(f) and other proposed provisions would impose on them. In addition, they would not have the capacity to oversee each person or office of a recipient that might assist in performing the required steps and would not be permitted to delegate administrative tasks related to fulfilling these duties.

*Discussion:* The Department acknowledges commenters' concerns about potential compliance costs, including in light of other compliance obligations related to VAWA 2022, but provisions in statutes other than Title IX are beyond the scope of the final regulations. The Department notes that the July 2022 NPRM provided suggestions and examples of how a recipient could comply with § 106.44(b) while acknowledging that recipients vary in size and resources that may impact how they implement this provision. 87 FR 41436. The Department continues to believe that recipients should have the flexibility to determine which strategies would be most appropriate and effective in their educational setting.

In the July 2022 NPRM, the Department identified several low-cost methods recipients may use to monitor for barriers to reporting, such as incorporating questions designed to elicit information from students and employees about barriers to reporting into existing training materials and incorporating such questions into conversations with students, employees, and others during roundtable discussions or listening sessions with interested stakeholders. 87 FR 41558. The Department also identified steps with a de minimis cost that a recipient could take to remove these barriers, should they be identified, such as reminding students, employees, and others during trainings about the range of reporting options available at a particular recipient or reporting an employee who discourages students from reporting to human resources for violating the recipient's code of ethics standards. *Id.* Commenters did not provide additional data that would lead the Department to modify its cost projections related to monitoring for barriers to reporting.

The Department acknowledges commenters' concerns that § 106.44(f), alone and together with other provisions in the final regulations, impacts and expands the scope of a Title IX Coordinator's duties and responsibilities. The final regulations

provide a role for a recipient's Title IX Coordinator that centralizes duties, promotes accountability, and enables effective Title IX compliance. However, nothing in § 106.44(f) precludes a recipient from authorizing its Title IX Coordinator to delegate specific duties to one or more designees as long as one Title IX Coordinator retains ultimate oversight over the assigned duties. *See* § 106.8(a).

A comprehensive response to possible sex discrimination is essential to achieving Title IX compliance so that Title IX Coordinators can respond to patterns, trends, and risk factors. The Title IX Coordinator's oversight of a recipient's response to individual reports and required action to address and prevent future sex discrimination for all participants in a recipient's education program or activity will help recipients provide a nondiscriminatory educational environment as required by Title IX.

*Changes:* For an explanation of the changes to § 106.44(b) and (f), see the discussions of § 106.44(b) and (f).

11. Notification Requirements (§ 106.44(c))

*Comments:* Some commenters stated that what they characterized as the requirement that all employees in elementary schools and secondary schools report Title IX violations would be expensive and that the Department has not shown it is necessary.

One commenter asserted that recipients with significant research, volunteer, community outreach, or land-grant programs often employ individuals in temporary or cyclical positions and stated that such employees may shift positions and take on new roles that cause them to change from one notification category to another under proposed § 106.44(c). The commenter stated that the costs of training, re-training, and tracking the training status for all such employees on their notification obligations would be a significant burden.

Another commenter suggested an alternative to proposed § 106.44(c), which the commenter stated would be less costly for recipients to implement. The commenter suggested requiring a recipient to designate some of its employees as confidential employees and to designate all other employees except employees in administrative leadership positions as "mandatory referrers."

*Discussion:* As discussed above, the notification requirements in § 106.44(c) have been modified to require employees with notification duties to take action when the employee has

information about conduct that reasonably may constitute sex discrimination under Title IX or this part. An elementary school or secondary school recipient must require all employees who are not confidential employees to notify the Title IX Coordinator when the employee has information about conduct that reasonably may constitute sex discrimination under Title IX. This requirement provides greater benefits and lower burdens as compared to the 2020 amendments, which deemed a recipient to have ''actual knowledge'' when any employee of an elementary school or secondary school had notice of allegations of sexual harassment, but provided no clear indication of what they should do with that information.

Costs associated with the final regulations' notification requirements are considered as part of training expenses. The cost associated with an employee's notification of the Title IX Coordinator is de minimis. Costs related to the recipient's duty to address sex discrimination in its education program or activity once the Title IX Coordinator is notified of conduct that reasonably may constitute sex discrimination are considered in connection with the Title IX Coordinator's duties.

As explained in the discussion of § 106.44(c), the Department has modified and streamlined the notification requirements, which will make the training requirements related to notification easier for recipients. For recipients other than elementary schools and secondary schools for whom all employees are treated the same, there are two categories of non-confidential employees with notification requirements when they have information about conduct that reasonably may constitute sex discrimination: (1) employees who have authority to institute corrective measures on behalf of the recipient or who have responsibility for administrative leadership, teaching, or advising in the recipient's education program or activity; and (2) all other non-confidential employees. The first group must notify the Title IX Coordinator when the employee has information about conduct that reasonably may constitute sex discrimination under Title IX; the second group must either notify the Title IX Coordinator or provide the contact information of the Title IX Coordinator and information about how to make a complaint of sex discrimination when the employee has information about conduct that reasonably may constitute sex discrimination under Title IX. These

changes make notification less costly than what would have been required by the proposed regulations. Moreover, postsecondary recipients have the discretion to simplify training even further by training all non-confidential employees to notify the Title IX Coordinator.

With respect to the concern that recipients with significant research, volunteer, community outreach, or land-grant programs often employ individuals in temporary or cyclical positions that cause them to change from one notification category to another, the Department disagrees that the costs of training, re-training, and tracking the training status for all such employees on their notification obligations will be a significant burden under the final regulations. Under § 106.8(d)(1)(iii), a recipient must train all employees on all applicable notification requirements under § 106.44. A single training can notify all employees at such recipients of the two different notification requirements, so even if an employee were to move between categories, they would have the requisite information regarding their notification requirements. And, as mentioned above, a recipient can choose to train all employees to notify the Title IX Coordinator. In addition, the Department has revised § 106.8(d) to clarify that training must occur promptly when an employee changes positions that alters their duties under Title IX or the final regulations and annually thereafter so any changes in their notification responsibilities would be covered by this training.

The Department acknowledges the commenter's suggestion to make all non-confidential employees mandatory referrers, but the Department has determined that the final regulations appropriately balance complainant autonomy and a recipient's obligation to respond to sex discrimination. The final regulations, as modified, will more comprehensively protect students from conduct that reasonably may constitute sex discrimination under Title IX.

*Changes:* For an explanation of the changes to § 106.44(c), see the discussion of § 106.44(c).

**12. Provision of Supportive Measures (§ 106.44(f)–(g))**

*Comments:* Some commenters asserted that recipients are likely to provide significantly more supportive measures under the proposed regulations than they provide under the 2020 amendments because the Department proposed to broaden the scope of Title IX. The commenters asserted that the expansion of

supportive measures will result in increased costs related to the provision, coordination, and implementation of supportive measures, and, in some cases, litigation. One commenter stated that, under the 2020 amendments, many people preferred supportive measures over filing a complaint and that it is likely the number of individuals accessing supportive measures rather than pursuing the formal grievance process is closer to at least ten to one, and stated this number is likely to increase with additional reports. The commenter did not provide any data or other support for their estimation.

*Discussion:* Recipients have an obligation under Title IX to address sex discrimination covered by the statute, including ensuring that access to the recipient's education program or activity is not limited or denied by such sex discrimination. Supportive measures are designed to restore or preserve a party's access to the recipient's education program or activity. 87 FR 41421. As such, supportive measures are available for all forms of sex discrimination, which is consistent with the proposed and final definition of ''supportive measures'' in § 106.2 and with § 106.44(a). 87 FR 41448. The Department also clarifies that supportive measures include measures that a recipient deems to be ''reasonably available,'' consistent with the definition of ''supportive measures.''

The Department recognizes that the number of incidents in which the parties would be provided supportive measures would likely increase compared to the 2020 amendments because of the broader range of incidents triggering an offer of them under the final regulations relative to the 2020 amendments. As a result, the Department estimates increases in any related costs associated with providing supportive measures.

As described in Section 4.C of the RIA below, the Department estimates the number of incidents in which supportive measures are offered (and the resulting number of instances in which such measures are provided and their related costs). Specifically, in the July 2022 NPRM, 87 FR 41553–54, the Department estimated that there would be approximately 1.5 times as many incidents in which supportive measures are offered relative to the number of times a recipient initiated its grievance procedures (*e.g.,* if a recipient annually initiated its grievance procedures 10 times, there would be 15 additional instances in which a recipient would offer supportive measures, 90 percent of which would be accepted). In reviewing these assumptions in light of public

comment, the Department recognizes that this initial estimate may have failed to capture the full range of incidents in which supportive measures would be offered. The Department has therefore increased its estimated factor from 1.5 to 2.0, effectively increasing the number of instances in which supportive measures would be offered and, as a result, provided, by 33 percent. The Department has retained its initial estimate that individuals will accept 90 percent of the supportive measures offered to them and of the cost of providing such measures ($250 per incident). For additional explanation of supportive measures, see the discussion of § 106.44(g).

*Changes:* The Department has increased the assumptions related to the number of incidents in which the parties would be offered supportive measures by 33 percent.

### 13. Impartial Review of Supportive Measures (§ 106.44(g)(4))

*Comment:* One commenter asserted that proposed § 106.44(g)(4), which would require an appropriate, impartial employee to consider challenges to supportive measures, would be difficult to implement at small institutions where often the Title IX Coordinator is the only employee trained in the requirements of Title IX. The commenter asserted that the administrative burden imposed by this provision would not be justified in the context of providing supportive measures.

*Discussion:* The Department disagrees with the commenter's assumption that § 106.44(g)(4) would require recipients to develop an entire administrative structure; it only requires, at minimum, assigning one person to handle challenged decisions. The Department estimates that providing an impartial employee to consider such challenges would incur a negligible monetary cost per incident and that the cumulative annual costs to the recipient would therefore be at a de minimis level. The Department also anticipates that these costs will either be reduced in the long-term or be offset by savings from other proposed changes (*e.g.,* changes to the grievance procedure requirements) and from the anticipated reduction in instances of sex discrimination. Moreover, the importance of this independent review outweighs any burdens it may impose. For additional explanation of the impartial review of supportive measures, see the discussion of § 106.44(g)(4).

Changes: None.

### 14. Grievance Procedures (§§ 106.45 and 106.46)

*Comments:* Some commenters, including a system of State postsecondary institutions, supported the proposed regulations as more time- and cost-effective than the existing regulations.

Other commenters disagreed with the Department's cost estimates of the new grievance procedures. For example, some commenters expressed concern that the proposed requirements for grievance procedures would place unmanageable administrative burdens on a recipient. Some commenters suggested the regulations would detract from a recipient's efforts to identify, prevent, and remedy sex discrimination in its education program or activity. And some commenters expressed concern that having one set of grievance procedures to address sex-based harassment and another set for other forms of sex discrimination would create confusion for recipients as to which requirements apply to which complaints.

One commenter said the revised definition of "sex-based harassment" and the application of § 106.45 to all other sex discrimination complaints would be more burdensome than the 2020 amendments.

Other commenters argued that, in connection with changes to the grievance procedures, any short-term financial savings to recipients would be offset by costs associated with respondents' diminished due process rights and the lasting economic and intangible costs related to respondents who are erroneously found responsible for sexual misconduct and expelled or dismissed.

*Discussion:* The Department disagrees with some commenters' assertions that respondents have diminished due process rights under the requirements related to grievance procedures and that the grievance procedures result in respondents being erroneously found responsible for sexual misconduct. As discussed in more detail in the preamble, the final regulations appropriately and fairly safeguard the due process rights of both complainants and respondents and include requirements in grievance procedures that ensure fair, transparent, and reliable outcomes. Specifically, the final regulations provide for notice of the allegations; an opportunity for the parties to respond to the allegations; an adequate, reliable, and impartial investigation; and an objective evaluation of all relevant and not otherwise impermissible evidence.

Additional procedures are required for allegations of sex-based harassment involving a student party at postsecondary institutions.

The Department also observes that, under §§ 106.45 and 106.46, recipients retain significant flexibility and discretion, including regarding decisions to implement grievance procedures in a cost-effective manner. That flexibility and discretion extends to designating the reasonable timeframes that will apply to grievance procedures; using a recipient's own employees as investigators and decisionmakers or outsourcing those functions to contractors; using an individual decisionmaker or a panel of decisionmakers; offering informal resolution options; determining which disciplinary sanctions to impose following a determination that sex discrimination occurred; and selecting appeal procedures. The final regulations also remove requirements and prohibitions imposed by the 2020 amendments that stakeholders identified as overly prescriptive, restrictive, and time-consuming, including requirements related to written notice in elementary schools and secondary schools, the requirement to hold a live hearing (although recipients may still choose to hold a live hearing), the prohibition on the single-investigator model, and the requirement to create an investigative report (although recipients may still choose to create an investigative report).

For these reasons, the final regulations account for both the administrative concerns recipients have raised and the need to ensure a nondiscriminatory educational environment through procedures that are designed to promote fair, accurate outcomes in sex discrimination complaints. The 2020 amendments included requirements that applied only to sexual harassment complaints, which invited variations in the grievance procedures recipients implemented for other types of sex discrimination. The final regulations, which apply to all forms of sex discrimination and include discrete additional requirements for sex-based harassment complaints involving students at postsecondary institutions, provide greater clarity and more streamlining under one set of requirements for most of a recipient's Title IX compliance obligations than what is afforded under the 2020 amendments.

Although the streamlining and clarity that the final regulations afford will result in recipients addressing all sex discrimination complaints under § 106.45, and if applicable § 106.46, the

Department disagrees that this approach is unreasonably costly or burdensome in a manner that outweighs the benefits of ensuring that all sex discrimination complaints are resolved through grievance procedures that the Department determined are designed to ensure fair and reliable outcomes that meet the requirements of Title IX. *See* 87 FR 41546–47, 41554–58. In response to the commenter that stated that compliance with the requirements of the 2020 amendments necessitated additional staff and generated significant paperwork, the Department notes that the final regulations include specific changes to the requirements of the 2020 amendments that aim to make grievance procedures less burdensome without reducing their efficacy or fairness. For example, the final regulations leave to a recipient's discretion whether to provide a written notice of allegations outside the context of complaints of sex-based harassment involving a postsecondary student. *See* § 106.45(c). The final regulations also give postsecondary institutions the discretion to assess credibility through a live hearing or through another live questioning process when investigating complaints of sex-based harassment involving a postsecondary student. *See* § 106.46(f)(1). For further explanation of the costs and burdens related to live hearings with questioning by an advisor, see the discussions of § 106.46(f) and (g).

Further, §§ 106.45 and 106.46 provide the benefit of outlining clear requirements for grievance procedures to all parties and recipients. Additionally, the final regulations provide grievance procedures that ensure fair and reliable outcomes in all types of sex discrimination complaints, including sex-based harassment complaints that involve a postsecondary student party. Through its enforcement work, OCR has recognized that reasonably prompt timeframes and an adequate, reliable, impartial investigation, among other requirements in §§ 106.45 and 106.46, are essential to ensuring a prompt and equitable resolution for all sex discrimination complaints, including sex-based harassment. The Department also heard from a range of commenters, including recipients and entities that represent them, that the proposed grievance procedure requirements were well suited to address sex discrimination complaints in their settings. Accordingly, the Department has determined that the benefits of requiring recipients to institute grievance procedures consistent with § 106.45,

and if applicable § 106.46, to resolve sex discrimination complaints justify the minimal burdens of compliance.

The Department acknowledges that Title VII and Title IX impose different requirements in some respects and that some recipients will need to comply with both Title VII and Title IX. Although commenters have noted certain differences, they have not explained why it would be impossible or unduly burdensome for a recipient to comply with both standards. There is no inherent conflict between Title VII and Title IX, including in the final regulations. For further explanation, see the discussion of Framework for Grievance Procedures for Complaints of Sex Discrimination (Section II.C).

*Changes:* For an explanation of the changes to specific provisions of grievance procedures in §§ 106.45 and 106.46, see the discussions of the relevant provisions (Section II.D–E).

**15. Regulatory Stability and Reliance Interests**

*Comments:* Some commenters stated that the proposed regulations would be the third set of Title IX regulations in eleven years and that each revision requires a recipient to adopt new policies that students and employees must learn and understand.

*Discussion:* The Department shares commenters' concerns about the importance of regulatory stability and the need for recipients and members of their educational community to have clear information about their rights and responsibilities under Title IX. By retaining and enhancing many of the requirements in the 2020 amendments, the final regulations provide the regulatory stability that is necessary to promote broad understanding of Title IX's nondiscrimination mandate and the rights and responsibilities it confers in educational settings that receive Federal financial assistance.

The Department acknowledges that a recipient may have relied on or incorporated the 2020 amendments into its policies, practices, or procedures that affect students and employees, including collective bargaining agreements. The Department considered such reliance interests and ultimately determined that certain proposed changes were warranted; however, mindful of such reliance interests, the final regulations either maintain the requirements of the 2020 amendments or make certain provisions permissive rather than mandatory. *See, e.g.,* §§ 106.45(d)(1) and 106.46(g). The Department also notes that collective bargaining agreements generally recognize an entity's obligation to

comply with applicable laws and contain procedures for consulting with the union and renegotiating provisions that conflict with applicable laws.

While such negotiations may cause disruptions, the Department has determined that the benefits of the final regulations—both in terms of ensuring that recipients comply with Title IX's nondiscrimination mandate and ensuring that all participants in the grievance procedures receive the process they are due—justify the burdens caused by any renegotiation of a recipient's collective bargaining agreements. Moreover, commenters did not provide, and the Department does not have, data from which to estimate how many collective bargaining agreements would need to be renegotiated and therefore has not included the costs of such renegotiations in its cost projections.

*Changes:* None.

**16. Training for Decisionmakers (§ 106.46(f)(4))**

*Comments:* One commenter objected to proposed § 106.46(f)(4) and asserted it would require extra training for decisionmakers that would increase costs and outweigh any benefits.

*Discussion:* The Department disagrees that final § 106.46(f)(4) will result in an increase in recipient costs to implement required decisionmaker training. Recipients are already required to train decisionmakers under the 2020 amendments. While the content of the training will be adjusted, it is unlikely that the length of training would have to change for decisionmakers in connection with § 106.46(f)(4); therefore, any associated burden for these individuals would not change as a result of the final regulations. The benefits of training decisionmakers, including by ensuring that grievance procedures are equitable and ensure transparent and reliable outcomes, justify any administrative cost. For further explanation of required changes to the content of training and any associated costs and burdens, see the discussion of § 106.8(d).

*Changes:* None.

**17. Single-Investigator Model (§ 106.45(b)(2))**

*Comments:* Some commenters supported the single-investigator model permitted by § 106.45(b)(2) on the grounds that it would allow recipients to shorten grievance procedure timelines, allow the individual with the most knowledge of the investigation to make the determination, and increase efficiency in scheduling. One commenter stated that although the

Department and commenters asserted that small recipients struggle with the administrative capacity to handle grievance procedures, the Regulatory Impact Analysis in the 2020 amendments indicated that the regulatory changes adopted in 2020 would generate additional costs to small IHEs of only approximately 0.28 percent of annual revenue. The commenter further stated that the Department estimated the average amount of time for an IHE investigator to perform their duties as between 10 and 18 hours per complaint and between 2 and 8 hours for each decisionmaker, leading the commenter to question the Department's conclusion that the prohibition on the single-investigator model results in burdensome costs or elongated complaint resolution processes.

*Discussion:* The Department's decision to permit the single-investigator model was not based solely on the number of hours required for a decisionmaker to perform their tasks. As explained in the July 2022 NPRM, the single-investigator model supports quality grievance procedures and decision-making, and recipients expressed their belief that the single-investigator model resulted in more students seeking institutional support and resolution of complaints. 87 FR 41467. In light of these benefits, the Department determined that recipients should have the option of utilizing the single-investigator model to resolve complaints of sex discrimination under Title IX. For further explanation of the single-investigator model, see the discussion of § 106.45(b)(2).

*Changes:* None.

### 18. Pregnancy or Related Conditions (§§ 106.40 and 106.57(e))

*Comments:* Some commenters stated that the Department did not adequately estimate the costs of requiring recipients to provide reasonable modifications for students and lactation spaces to students and employees, which the commenters asserted would amount to significant costs for many recipients. One of these commenters stated the Department failed to identify how many schools currently offer a lactation space and reasonable modifications for lactation, or how many lactation spaces the proposed regulations would require. Another commenter stated that the Department must account for reasonable modifications that would be required for parents (other than those who are pregnant or experiencing pregnancy-related conditions). Some commenters raised concerns that the proposed regulations' requirements regarding notifying students of information

regarding pregnancy rights under § 106.40(b)(2) or (b)(3)(i) were unduly costly or burdensome because, for example, they would require additional staff time and training. Some commenters asked about the impact and costs, including litigation costs and costs related to abortion, of the proposed regulations on postsecondary institutions, medical schools, and hospitals.

*Discussion:* The Department views the final regulations regarding reasonable modifications for students and lactation spaces for students and employees as best effectuating Title IX by preventing sex discrimination and ensuring equal access to a recipient's education program or activity for students who are pregnant or experiencing pregnancy-related conditions. Although there are limited data quantifying the economic impacts of sex discrimination, the Department determined, based on its review of public comments, that barriers related to pregnancy or related conditions can prevent students from obtaining a high school diploma, pursuing higher education, or obtaining a postsecondary degree, which limits their economic opportunities and may have long-term or generational impacts.

The Department does not anticipate significant costs to recipients based on the final regulations related to reasonable modifications for students and lactation spaces for students and employees. For example, the Department points out that some costs noted by commenters are not new given recipients' obligation since 1975 to provide leave in connection with pregnancy, childbirth, termination of pregnancy, and related recovery. *See* 40 FR 24128. Given these existing obligations, some commenters are likely overstating the increased costs or burdens for implementing reasonable modifications. Recipients have existing obligations that are similar to those under § 106.40(b)(3)(ii), which require a recipient to make certain modifications to a policy, practice, or procedure, such as providing a student a larger desk, allowing more frequent bathroom breaks, or permitting temporary access to elevators. 87 FR 41560. As stated in the July 2022 NPRM, the requirement for reasonable modifications because of pregnancy or related conditions builds upon the former "reasonable and responsive" standard and sets a clearer framework for how to assess what must be provided. *Id.* As such, the Department does not anticipate that the required steps for compliance with the "reasonable modifications because of pregnancy or related conditions" requirement under § 106.40(b) would be

significantly more costly than under the prior OCR interpretation of a recipient's duties. Nor do the final regulations, which provide more clarity regarding a recipient's responsibilities in connection with reasonable modifications, change the cost estimates in the model. Even if a recipient were to incur some additional cost due to its new awareness of its previous responsibilities, the Department disagrees that any such minimal additional costs or burdens would outweigh the benefits of clarifying a recipient's obligation to provide, and ensuring that students are able to access, reasonable modifications for pregnancy or related conditions.

In connection with lactation spaces, the final regulations require the minimum acceptable standards for privacy, sanitation, and functionality necessary for students and employees to attend to their lactation needs at school, be free from discrimination, and maintain equal access to the recipient's education program or activity. *See* 87 FR 41522. In addition, nearly all recipients under Title IX are already required to provide a virtually identical physical space for employees under the PUMP Act, 29 U.S.C. 218d.[101] *Id.* Additionally, as explained below, many State and local laws also require recipients to provide lactation spaces. Although it is possible that the regulations' clarification that a lactation space must be available for both students and employees may result in an increase in demand for such a space, any such increase would likely result in a de minimis impact on costs as distributed over all recipients over time. The final regulations do not require recipients to make any particular changes to facilities. In particular, they do not dictate a precise number of spaces that every facility must have as this will be a fact-specific determination that may ebb and flow over time based on factors such as how many people need to use such a space, when, and where on the recipient's campus. As explained in the July 2022 NPRM, the Department anticipates that a recipient currently without a designated lactation space would likely be able to comply with § 106.40(b)(3)(v) using existing space at minimal cost, partly because there is no requirement that a lactation

---

[101] Although the PUMP Act, which expanded the types of employees entitled to lactation time and space under the FLSA, was signed into law on December 29, 2022 (Pub. L. 117–328), recipients have been subject to similar lactation time and space requirements since March of 2010 as part of the Affordable Care Act amendment to the FLSA that added (r)(1) to § 7. Public Law 111–148, 124 Stat 119 (2023).

space be a particular size, shape, or include features other than being private and clean, and not a bathroom. *See* 87 FR 41559–60. Lactation spaces do not need to be designated as such for 24 hours a day, so there is no need to create new space. If a recipient chose to retrofit a space, for example by adding keypad locks or a chair to an existing space, such costs are minimal. Further, it is the Department's view that these de minimis costs are outweighed by the benefits of requiring a recipient to provide an appropriate space for a student or employee who is lactating, including allowing them to remain in school or employment during the early months or years of a child's life, which helps eliminate a sex-based barrier to education or employment.

With respect to reasonable modifications required for parents (other than those who are pregnant or experiencing pregnancy-related conditions), the Department notes that the final regulations require that recipients provide reasonable modifications only to students who are pregnant or experiencing pregnancy-related conditions and not to their partners, family members, or others not pregnant or experiencing pregnancy-related conditions. Accordingly, the Department did not analyze the costs of modifications not imposed by the final regulations.

Costs associated with the final regulations' notification requirements under § 106.40(b)(2) and (b)(3)(i) are considered as part of the RIA below. *See* RIA, Cost Estimates (Section 4.C), Revisions to training. The cost associated with an employee or Title IX Coordinator informing a student of their rights is de minimis, and the latter is considered in connection with the Title IX Coordinator's duties. Training costs, including those that would address the employee actions required under § 106.40(b)(2) and (b)(3)(i), are explained above in the discussion of training requirements under § 106.40(d).

Sections 106.40 and 106.57(e) of the final regulations do not require a recipient to provide or pay for any benefit or service, including the use of facilities, related to abortion; therefore, commenters' concerns regarding abortion-related costs are unfounded. For further explanation, see the discussion of the definition of ''pregnancy or related conditions'' in § 106.2 (Section III). Other costs identified by the commenters, such as costs to taxpayers due to increased litigation were speculative or unrelated to any requirements of the pregnancy provisions.

*Changes:* None.

## 19. Scope of Sex Discrimination (§ 106.10)

*Comments:* Some commenters argued that the Department failed to calculate the financial, health, administrative, and legal costs to society that commenters asserted would result from the Department's proposed changes. For example, some commenters said the Department failed to consider the effects on recipients of expanding the scope of the regulations to include gender identity discrimination, including an increase in Title IX complaints.

Other commenters asserted that the Department must analyze the benefits and burdens of its proposed regulations with more granularity (*i.e.,* benefits and burdens on men versus women).

*Discussion:* Although the Department recognizes that clarifying the scope of Title IX could result in increased costs to recipients, especially those recipients that limited the application of their Title IX policies to those bases of discrimination explicitly referenced in the 2020 amendments, the non-monetary benefits of providing clarity and fulfilling the broad scope of Title IX's protections justify the costs associated with the implementation of these robust protections. *See* 87 FR 41562.

The Department has considered the benefits and burdens of the final regulations and their impact on all individuals on the basis of sex. While the Department strongly agrees that recipients have a legitimate interest in protecting all students from sex discrimination, it disagrees that such goals are inconsistent with § 106.10. The Department disagrees that by recognizing discrimination based on gender identity as sex discrimination, it has disregarded potential harms to students or employees and disagrees that additional granularity to quantify benefits and burdens is necessary. For further explanation, see the discussions of §§ 106.10 and 106.31(a)(2).

The Department estimates that inclusion of these bases of sex discrimination within the scope of the Department's Title IX regulations may result in a 10 percent increase in the number of investigations conducted annually. *See* 87 FR 41550 & n.27. In the July 2022 NPRM, the Department also acknowledged that there may be some costs associated with litigation and the Department disagrees with commenters who suggested that litigation costs would increase significantly due to the final regulations. 87 FR 41561. Commenters did not provide any data that would change the estimates or the Department's recognition that there may be some, but not extensive, costs associated with litigation due to the final regulations. It is the Department's view that the final regulations provide clear requirements for recipients to comply with Title IX.

*Changes:* None.

## 20. Menstruation or Related Conditions

*Comments:* The Department received many comments requesting that menstruation or related conditions be included within the scope of the Title IX regulations, as discussed elsewhere in this preamble.

*Discussion:* The Department clarifies in this preamble that menstruation or related conditions is included within the scope of Title IX as defined in § 106.10. The Department recognizes that clarifying the scope of Title IX could result in a marginal increase in costs to recipients, especially those recipients that limited the application of their Title IX policies to those forms of conduct explicitly referenced in the 2020 amendments, but the non-monetary benefits of providing clarity and fulfilling the broad scope of Title IX's protections justify the costs associated with the implementation of these robust protections. As noted in the discussion of § 106.10, these regulations do not require recipients to incur the cost of providing menstrual products.

*Changes:* None.

## 21. Other

*Comments:* Some commenters stated that, if the Department requires religious educational institutions to prepare a request for religious exemption, the Department would have to calculate the costs to religious educational institutions and to the Department. They also said that the Department should account for costs to religious educational institutions and their students if a request for a religious exemption is denied. One commenter stated that any proposed changes to the existing regulations would impose additional regulatory costs and paperwork burdens which would not justify making a change to the religious exemption.

Other commenters argued that the Department did not take into consideration the costs to religious students in non-religious institutions who will feel pressure to violate their religious beliefs, and who may choose not to attend or work at federally funded schools because of their sincerely held religious beliefs.

*Discussion:* The Department is not proposing any changes to § 106.12 related to religious exemptions, and nothing in the final regulations alters

assurances that specific religious institutions have already received from OCR. Religious institutions are not required to seek assurance of a religious exemption before asserting it, although they may do so voluntarily, and the Department does not envision an increase in such requests. The final regulations do not require religious students or employees to change their beliefs, because the regulations address conduct that constitutes sex discrimination, which is prohibited by Title IX, and not religious beliefs. Section 106.6(d) explicitly states that nothing in the regulations requires a recipient to restrict rights protected under the First Amendment or other constitutional provisions. The Department, likewise, must act in accordance with the U.S. Constitution. In addition, the Department notes that Title IV of the Civil Rights Act of 1964, which is enforced by the Department of Justice's Civil Rights Division, specifically prohibits public schools and higher education institutions from discriminating based on religion. For further information on the First Amendment and religious exemptions from Title IX, see the discussion of Hostile Environment Sex-Based Harassment—First Amendment Considerations (§ 106.2) (Section I.C) and the discussion of Religious Exemptions (Section VII).

*Changes:* None.

### B. Regulatory Impact Analysis (RIA)

Under Executive Order 12866,[102] as amended by Executive Order 14094, the Office of Management and Budget (OMB) must determine whether this regulatory action is "significant" and, therefore, subject to the requirements of the Executive Order and subject to review by OMB.[103] Section 3(f) of Executive Order 12866, as amended by Executive Order 14094, defines a "significant regulatory action" as an action likely to result in regulations that may—

(1) Have an annual effect on the economy of $200 million or more (as of 2023 but adjusted every 3 years by the Administrator of the Office of Information and Regulatory Affairs (OIRA) for changes in gross domestic product), or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, territorial, or Tribal governments or communities);

(2) Create serious inconsistency or otherwise interfere with an action taken or planned by another agency;

(3) Materially alter the budgetary impacts of entitlements, grants, user fees, or loan programs or the rights and obligations of recipients thereof; or

(4) Raise legal or policy issues for which centralized review would meaningfully further the President's priorities, or the principles stated in the Executive Order, as specifically authorized in a timely manner by the Administrator of OIRA in each case.

This final regulatory action is "significant" and therefore subject to review by OMB under section 3(f)(4) of this Executive Order because it raises legal or policy issues for which centralized review would meaningfully further the President's priorities, or the principles stated in the Executive Order.

The Department has also reviewed the regulations under Executive Order 13563,[104] which supplements and explicitly reaffirms the principles, structures, and definitions governing regulatory review established in Executive Order 12866. To the extent permitted by law, Executive Order 13563 requires that an agency—

(1) Propose or adopt regulations only on a reasoned determination that their benefits justify their costs (recognizing that some benefits and costs are difficult to quantify);

(2) Tailor its regulations to impose the least burden on society, consistent with obtaining regulatory objectives and taking into account—among other things and to the extent practicable—the costs of cumulative regulations;

(3) In choosing among alternative regulatory approaches, select those approaches that maximize net benefits (including potential economic, environmental, public health and safety, and other advantages; distributive impacts; and equity);

(4) To the extent feasible, specify performance objectives, rather than the behavior or manner of compliance a regulated entity must adopt; and

(5) Identify and assess available alternatives to direct regulation, including economic incentives—such as user fees or marketable permits—to encourage the desired behavior, or provide information that enables the public to make choices.

Executive Order 13563 also requires an agency "to use the best available techniques to quantify anticipated present and future benefits and costs as accurately as possible." OIRA has emphasized that these techniques may include "identifying changing future compliance costs that might result from technological innovation or anticipated behavioral changes."

Under Executive Order 13563, the Department determined that the benefits of the final regulations justify their costs. In choosing among alternative regulatory approaches, the Department selected those approaches that maximize net benefits. Based on the analysis that follows, the Department determined that the final regulations are consistent with the principles in Executive Order 13563.

The Department has also determined that this regulatory action would not unduly interfere with State, local, territorial, or Tribal governments in the exercise of their governmental functions.

This RIA discusses the need for regulatory action, the potential costs and benefits, assumptions, limitations, and data sources, as well as regulatory alternatives considered. Although most of the costs related to information collection are discussed within this RIA, under the Paperwork Reduction Act of 1995, this notice also identifies and further explains burdens specifically associated with information collection requirements.

### 1. Need for Regulatory Action

In 2021, the President directed the Department in both Executive Order 13988 [105] and Executive Order 14021 [106] to review its regulations implementing Title IX for consistency with Title IX's statutory prohibition on sex discrimination by a recipient of Federal financial assistance in its education program or activity. Consistent with those Executive Orders, the Department reviewed the regulations based on Federal case law under Title IX, its experience in enforcement, and feedback OCR received from stakeholders, including during the June

---

[102] *Executive Order on Regulatory Planning and Review,* Exec. Order. No. 12866, 58 FR 51735 (Oct. 4, 1993), *https://www.govinfo.gov/content/pkg/FR-1993-10-04/pdf/FR-1993-10-04.pdf.*

[103] Since the July 2022 NPRM, Executive Order 12866 has been amended and supplemented by *Executive Order on Modernizing Regulatory Review,* Exec. Order No. 14094, 88 FR 21879 (Apr. 6, 2023), *https://www.federalregister.gov/documents/2023/04/11/2023-07760/modernizing-regulatory-review.*

[104] *Executive Order on Improving Regulation and Regulatory Review,* Exec. Order No. 13563, 76 FR 3821 (Jan. 18, 2011), *https://www.govinfo.gov/content/pkg/FR-2011-01-21/pdf/2011-1385.pdf.*

[105] *Executive Order on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation,* Exec. Order No. 13988, 86 FR 7023 (Jan. 25, 2021), *https://www.govinfo.gov/content/pkg/FR-2021-01-25/pdf/2021-01761.pdf.*

[106] *Executive Order on Guaranteeing an Educational Environment Free from Discrimination on the Basis of Sex, Including Sexual Orientation and Gender Identity,* Exec. Order. No. 14021, 86 FR 13803 (Mar. 11, 2021), *https://www.govinfo.gov/content/pkg/FR-2021-03-11/pdf/2021-05200.pdf.*

2021 Title IX Public Hearing [107] and listening sessions. More than 280 students, parents, teachers, faculty members, school staff, administrators, and other members of the public provided live comments during the June 2021 Title IX Public Hearing, and OCR also received more than 30,000 written comments [108] in connection with the hearing. In addition, a wide variety of stakeholders participated in the listening sessions with OCR, including survivors of sexual violence, students accused of sexual misconduct, LGBTQI+ students, and advocates representing these groups of students; organizations focused on Title IX and athletics; organizations focused on free speech and due process; organizations representing elementary schools and secondary schools (or local educational agencies (LEAs)), as well as postsecondary institutions (or institutions of higher education (IHEs)), teachers, administrators, and parents; attorneys representing complainants, respondents, students, and schools; State attorneys general offices; Title IX Coordinators and other school administrators; individuals who provide training on Title IX to schools; individuals who work in campus law enforcement; and individuals who have participated in school-level Title IX proceedings. Based on this review, the Department concluded that it was necessary to amend its regulations to ensure that all aspects of its regulatory framework under Title IX are well suited to implementing Title IX's prohibition on sex discrimination in education programs or activities that receive Federal financial assistance. The Department intends these changes to improve and promote educational environments free of sex discrimination in a manner that recognizes fairness and safety concerns.

The Department considered feedback received from many stakeholders during the June 2021 Title IX Public Hearing and numerous OCR listening sessions, as well as comments received in response to the July 2022 NPRM, stating that the 2020 amendments include onerous requirements for sexual harassment grievance processes that are unnecessarily adversarial in nature—threatening to decrease students' willingness to make complaints or fully participate in the grievance process.

[107] The transcript from the June 2021 Title IX Public Hearing is available at *https://www2.ed.gov/about/offices/list/ocr/docs/202106-titleix-publichearing-complete.pdf*.

[108] The written comments that OCR received as part of the June 2021 Title IX Public Hearing are available at *https://www2.ed.gov/about/offices/list/ocr/public-hearing.html* (last visited Mar. 20, 2024).

These stakeholders also stated that the requirements in the 2020 amendments for sexual harassment grievance processes unduly increase administrative burden and intrude on a recipient's professional judgment and expertise regarding how best to respond to allegations of student misconduct without improving the recipient's ability to address sex discrimination within their educational environment. During the June 2021 Title IX Public Hearing, some stakeholders expressed support for the 2020 amendments, remarking that the requirements governing a recipient's sexual harassment grievance process should remain in place without change, while other stakeholders suggested the Department amend various provisions in the regulations that they deemed important (including the deliberate indifference standard, the actual knowledge requirement, and specific requirements related to the grievance process for formal complaints of sexual harassment). Many stakeholders expressed concerns regarding the scope of the regulatory definition of "sexual harassment" from the 2020 amendments, the requirement that a recipient need only respond to sexual harassment when it has actual knowledge, and that it need only respond in a manner that is not deliberately indifferent. Apart from addressing sexual harassment, many stakeholders asked the Department to clarify protections related to discrimination based on sexual orientation and gender identity, presenting a variety of positions that they urged the Department to adopt, while other stakeholders asked the Department to clarify Title IX's protections against discrimination based on pregnancy or related conditions.

The Department amends its Title IX regulations to address the concerns raised by stakeholders and anticipates that the final regulations will result in many benefits to recipients, students, employees, and others, including by:

• Requiring recipients to adopt grievance procedures that provide for the prompt and equitable resolution of complaints of sex discrimination and take other necessary steps to provide an educational environment free from sex discrimination;

• Clarifying the Department's view of the scope of Title IX's prohibition on sex discrimination, including related to a hostile environment under the recipient's education program or activity, as well as discrimination on the basis of sex stereotypes, sex characteristics, sexual orientation, pregnancy or related conditions, and gender identity;

• Clarifying a recipient's obligations to students and employees who are pregnant or experiencing pregnancy-related conditions;

• Clarifying that, unless otherwise permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations at §§ 106.12–106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b), a recipient must not carry out any otherwise permissible different treatment or separation on the basis of sex in a way that would cause more than de minimis harm, including by adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity.

As discussed in more detail in the following sections, it is the Department's belief that the regulatory changes will fulfill Title IX's overarching goal: to ensure that no person experiences sex discrimination in education. To that end, the Department aims to ensure that all recipients can implement Title IX's nondiscrimination mandate fully and fairly in their educational environments.

2. Discussion of Costs, Benefits, and Transfers

The Department has analyzed the costs and benefits of complying with the final regulations. Although many of the associated costs and benefits are not easily quantifiable, the Department concludes that the benefits derived from the final regulations justify the associated costs given that the objectives of the rulemaking are to ensure: (1) that sex discrimination does not take place in any education program or activity receiving Federal financial assistance, and (2) that sex discrimination is redressed promptly and effectively if it occurs.

Title IX, which applies to approximately 17,900 LEAs, more than 6,000 IHEs, and numerous other recipients such as libraries and museums, requires a recipient to provide an education program or activity that is free from sex discrimination. The final regulations introduce new obligations and clarify existing obligations of entities subject to the regulations to promote an educational environment free from sex discrimination. The final regulations require recipients to adopt grievance procedures that provide for fair, prompt, and equitable resolution of complaints of sex discrimination and take other necessary steps to provide an

educational environment free from sex discrimination; clarify that Title IX's prohibition on sex discrimination includes sex-based harassment in the form of quid pro quo harassment, hostile environment harassment, and four specific offenses; and clarify that sex discrimination includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. The Department expects that the final regulations will benefit recipients, as well as students, employees, and others by ensuring that students, employees, and others understand their rights and responsibilities under Title IX.

The final regulations will provide numerous important benefits some of which are difficult to quantify. Still, it is the Department's view that the changes just described, in addition to others discussed more fully throughout the RIA and preamble, will reduce the occurrence of sex discrimination in a recipient's education program or activity and facilitate a prompt and equitable resolution when sex discrimination occurs, thereby supporting a recipient's efforts to provide an educational environment free from sex discrimination. Although there are limited data quantifying the economic impacts of sex discrimination, including sex-based harassment, on individuals, studies suggest that there is a cost associated with being subjected to sex discrimination. *See, e.g.,* Ctrs. for Disease Control & Prevention, *Fast Facts: Preventing Sexual Violence, https://www.cdc.gov/ violenceprevention/sexualviolence/ fastfact.html* (last visited Mar. 20, 2024) (describing the economic burden of sexual violence involving physical contact on survivors within their lifetimes); Cora Peterson et al., *Lifetime Economic Burden of Intimate Partner Violence Among U.S. Adults,* 55 Am. J. Preventive Med. 433 (2018) (estimating the cost of intimate partner violence on survivors within their lifetimes). The Department recognizes that sex discrimination in all forms, including sex-based harassment and prohibited retaliation, may have both qualitative and quantitative costs for educational institutions, their students and employees, applicants for admission and employment, their families, and the American educational system and workforce in general, although the Department is unable to quantify reductions in these costs resulting from the final regulations.

Due to the large number of affected recipients (more than 24,000, as discussed more fully in the discussion of Developing the Model (Section 4.B)), the variation in likely responses to any regulatory change, and the limited information available about current practices, particularly at the LEA level, the Department is not able to precisely estimate the likely costs, benefits, and other effects of the final regulations. Despite these limitations, and based on the best available evidence as explained in the discussion of Establishing a Baseline (Section 4.A), the Department estimates that the final regulations will result in an estimated net cost of $18.8 million over ten years at a 7% discount rate and an estimated net cost of $4.6 million over ten years at a 3% discount rate. This is equivalent to an annualized cost of between $543,504 and $2,671,136 depending on the discount rate, over ten years. The final regulations are expected to result in estimated costs of $98,505,145 in the first year following publication of the final regulations, and $12,038,087 in cost savings each year in subsequent years.

| Year | Net annual cost |
|------|-----------------|
| Year 1 | $98,505,145 |
| Year 2 | (12,038,087) |
| Year 3 | (12,038,087) |
| Year 4 | (12,038,087) |
| Year 5 | (12,038,087) |
| Year 6 | (12,038,087) |
| Year 7 | (12,038,087) |
| Year 8 | (12,038,087) |
| Year 9 | (12,038,087) |
| Year 10 | (12,038,087) |
| Total Net Present Value (NPV), 7% | 18,760,944 |
| Annualized, 7% | 2,671,136 |
| Total NPV, 3% | 4,636,200 |
| Annualized, 3% | 543,504 |

As discussed in the Cost Estimates (Section 4.C), the Year 1 costs include both one-time costs associated with reviewing and making necessary changes to policies, procedures, and training to implement the final regulations, and on-going costs associated with requirements such as training for Title IX Coordinators, the provision of supportive measures, investigations and adjudications, appeals and informal resolutions, recordkeeping, and monitoring and addressing barriers to reporting sex discrimination. In addition to these estimated Year 1 costs, the Department estimated cost savings in Years 2 through 10, which arise largely from the additional flexibility that recipients will have to design and implement grievance procedures consistent with Title IX under § 106.45, and if applicable § 106.46.

The assumptions, data, methodology, and other relevant materials, as applicable, on which the Department relied in developing its estimates are described throughout this RIA.

3. Benefits of the Final Regulations

This final regulatory action will address the potential gaps in coverage within the regulatory framework that have been raised by stakeholders and commenters and observed by the Department. These include, but are not limited to, the steps a recipient must take with respect to sex discrimination, the requirements for a recipient's grievance procedures for sex discrimination other than sexual harassment, a recipient's obligations toward students and employees who are pregnant or experiencing pregnancy-related conditions, the scope of coverage related to discrimination based on gender identity and sexual orientation, and a recipient's obligation to address prohibited retaliation.

Although the Department cannot quantify in monetary terms the ancillary benefits the final regulations may provide to those who may have been subjected to sex discrimination in an educational setting, the Department recognizes that sex discrimination, including sex-based harassment, can have profound and long-lasting economic costs for students, employees, their families, and others who seek to participate in the recipient's education program or activity. Being subjected to sex discrimination in a recipient's education program or activity can affect an applicant's opportunity to enroll in a recipient's education program or activity, a student's ability to learn and thrive inside and outside of the classroom, a prospective or current employee's ability to contribute their talents to the recipient's educational mission, and the opportunity of all participants to benefit, on an equal basis, from the recipient's education program or activity. Likewise, barriers to reporting sex discrimination within a recipient's education program or activity can undermine the recipient's educational environment for the entire community. The final regulations offer a clear and fair framework for fulfilling Title IX's prohibition on sex discrimination in any education program or activity receiving Federal financial assistance.

The final regulations will reduce the long-term costs associated with providing an educational environment free from sex discrimination, thereby producing a demonstrable benefit for students, employees, and others participating or attempting to

participate in the recipient's education program or activity. The Department anticipates those benefits will be realized based on several changes to the regulations. First, the final regulations clarify the scope of Title IX's protection from sex discrimination for students, employees, and others participating or attempting to participate in a federally funded education program or activity and define terms integral to a recipient's obligations under Title IX. Second, the final regulations set out the contours of a recipient's obligation to take action to address sex discrimination, including requiring a recipient's Title IX Coordinator to monitor its education program or activity for barriers to reporting sex discrimination and take steps reasonably calculated to address those barriers. Third, the final regulations modify and strengthen existing training requirements by specifying the range of relevant persons that a recipient must train regarding the recipient's obligations under Title IX and this part. Fourth, the final regulations revise the notification requirements for a recipient, helping to ensure that specific employees notify the Title IX Coordinator when they have information about conduct that reasonably may constitute sex discrimination under Title IX or this part in the recipient's education program or activity. Fifth, the final regulations help ensure the effective provision and implementation of supportive measures, as appropriate, to all complainants and respondents and clarify that when a recipient determines that sex discrimination has occurred, the recipient must provide remedies, as appropriate, to a complainant and any person the recipient identifies as having their equal access to the recipient's education program or activity limited or denied by sex discrimination, and take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity. Sixth, the final regulations revise the requirements for grievance procedures to provide for the prompt and equitable resolution of complaints of any sex discrimination and allow a recipient the ability to adapt its grievance procedures to its size, population served, and administrative structure while ensuring equitable treatment of all parties. Seventh, the final regulations provide clarity on the rights of students and employees who are pregnant or experiencing pregnancy-related conditions including, for example, by requiring a recipient to inform students of the recipient's

obligations, making reasonable modifications to its policies, practices, or procedures as necessary to prevent sex discrimination and to ensure a student's equal access to its education program or activity, requiring a recipient to provide employees with reasonable break time to express breast milk or breastfeed as needed and, with respect to both students and employees, ensuring access to an appropriate space for lactation. Finally, the final regulations clarify that, unless otherwise permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations at §§ 106.12–106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1)(i), or § 106.41(b), a recipient must not carry out any otherwise permissible different treatment or separation on the basis of sex in a way that would cause more than de minimis harm, including by adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity.

The Department expects that the final regulations, when reviewed in their totality, will reduce the likelihood of sex discrimination and the overall prevalence of sex discrimination in recipients' educational settings. Although the Department cannot entirely quantify the economic impacts of these benefits, the benefits noted above are substantial and far outweigh the estimated costs of the final regulations.

### 4. Costs of the Final Regulations

The Department's analysis reviews the Department's data sources, describes the model used for estimating the likely costs associated with the final regulations, and sets out those estimated costs. Due to limited quantitative data, the Department emphasizes that the monetary estimates reflect only the likely costs of this regulatory action and do not seek to quantify, in monetary terms, the costs of sex discrimination, including sex-based harassment and prohibited retaliation.

As described in the Discussion of Costs, Benefits, and Transfers (Section 2), there are limited data quantifying the economic impacts of sex discrimination, including sex-based harassment, on individuals, and studies suggest that there is a cost associated with being subjected to sex discrimination. *See* Ctrs. for Disease Control & Prevention, *Fast Facts: Preventing Sexual Violence;* Peterson et al., *Lifetime Economic Burden of Intimate Partner Violence Among U.S. Adults,* 55 Am. J. Preventive Med. 433. Nonetheless, the

final regulations reduce the harms of sex discrimination in multiple ways, including the following:

First, final § 106.44 clarifies a recipient's obligation to take action to address sex discrimination, including sex-based harassment, and expressly covers more conduct than § 106.44 under the 2020 amendments. Specifically, the final regulations require a recipient with knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity to respond promptly and effectively, regardless of whether a complaint is made. Under the 2020 amendments, § 106.44 prescribes only how a recipient must respond to allegations of sexual harassment in its education program or activity when a report is made to certain employees and § 106.44 is silent with respect to a recipient's obligation to respond to other forms of sex discrimination. By prescribing the actions a recipient must take to operate its education program or activity free from sex discrimination, the implemented changes will aid the recipient in reducing—and ultimately eliminating—sex discrimination in its education program or activity. Any initial, short-term costs associated with the implemented change are expected to be both minimal and offset in the longer term by reduced incidence of sex discrimination. The final regulations will increase recipient responsiveness to all reports and complaints of sex discrimination and are also likely to deter or prevent some incidents of sex-based harassment and its associated harms; however, the Department cannot firmly quantify the potential reduction in incidents of sex-based harassment or other forms of sex discrimination.

Second, final § 106.44(f)(1)(ii) and (g) make clear that upon being notified of conduct that reasonably may constitute sex discrimination under Title IX, including sex-based harassment and prohibited retaliation, a Title IX Coordinator must offer and coordinate supportive measures, as appropriate, to the complainant or respondent. Final § 106.44(g) also clarifies that for allegations of sex discrimination other than sex-based harassment or retaliation, a recipient's provision of supportive measures does not require the recipient, its employee, or any other person authorized to provide aid, benefit, or service on the recipient's behalf to alter the alleged discriminatory conduct for the purpose of providing a supportive measure. As the final requirement regarding supportive measures covers prohibited retaliation as well as other forms of sex discrimination not addressed by the

2020 amendments, the Department recognizes that the number of incidents in which the parties will seek supportive measures will likely increase compared to the 2020 amendments, as will any related costs in providing those supportive measures. The Department includes costs associated with such an increase in its model below. As explained in the discussion of supportive measures below, the Department expects that there will be little impact on anticipated costs associated with the final provision requiring supportive measures to be offered to complainants and respondents in connection with forms of sex discrimination other than sex-based harassment because such discrimination will likely relate either to sex discrimination allegations arising out of alleged unequal access to resources or facilities or allegations arising out of alleged sex discrimination in an educational setting such as different treatment on the basis of sex. There will be few appropriate supportive measures for such discrimination, other than eliminating the source of the sex discrimination, which is not required under the definition of "supportive measures" and instead may only be provided as a remedy. *See* §§ 106.2, 106.44(g). The Department also anticipates that these costs will either be reduced in the long term or offset by other savings. Those savings may come from other final changes (*e.g.*, changes to the grievance procedure requirements) or from the anticipated reduction in instances of sex discrimination.

The Department expects that the final regulations will increase the use of a recipient's grievance procedures by students and others, thereby resulting in an increase in the prompt and equitable resolution of complaints of sex discrimination in a recipient's education program or activity. The Department has estimated a 10 percent increase in investigations annually. If this estimate holds, it is also reasonable to believe that the final regulations may reduce the prevalence of sex discrimination, including sex-based harassment, as well as the adverse academic, social, emotional, and economic effects of sex discrimination on individuals and recipient communities. Commenters did not provide additional high-quality comprehensive data about the status quo, and the specific choices that recipients will make regarding how to comply with the final regulations; therefore, the Department cannot estimate the effects of the final

regulations with absolute precision. However, as discussed below, we estimate the final regulations to result in a net cost of $4,636,200.

### 4.A. Establishing a Baseline

### 4.A.1. Data Sources

As discussed in the preamble to the 2020 amendments, the primary challenge associated with estimating the effects of any new regulatory action under Title IX is the lack of comprehensive data on the actions recipients are taking to comply with their current obligations.[109] As part of the comment process on the 2020 amendments and in the July 2022 NPRM, the Department requested information about data sources that would provide this information and which the Department could use to inform its estimates. *See* 83 FR 61484; 87 FR 41546, 41549. The Department did not receive such sources.

In the absence of a recent, high-quality, and comprehensive data source, the Department relies, as it did for the 2020 amendments, on a 2014 report titled Sexual Violence on Campus (2014 Senate Subcommittee Report) issued by the U.S. Senate Subcommittee on Financial and Contracting Oversight.[110] The report included survey data from 440 four-year IHEs regarding the number of investigations of sexual violence that had been conducted during the previous five-year period; however, this report did not address the prevalence of other bases of sex discrimination, including discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. As described in the discussion of Developing the Model (Section 4.B), the Department adjusted these data, using data from other sources such as data submitted under the Clery Act, to account for these exclusions and assumed that the final regulations may result in a 10 percent increase in the number of annual investigations by recipients that did not previously

address these bases of sex discrimination. For LEAs, the Department continues to rely on the publicly available data from OCR's Civil Rights Data Collection (CRDC) regarding sexual harassment incidents to estimate the annual number of investigations in those settings.

### 4.A.2. Estimates of Annual Investigations of Sexual Harassment Prior to the 2020 Amendments to the Title IX Regulations

To estimate the likely impact of the final regulations, the Department must consider the policies and practices of recipients in responding to sexual harassment prior to the promulgation of the 2020 amendments. This consideration is necessary because the 2020 amendments specified in the Department's Title IX regulations, for the first time, the definition of "sexual harassment" and the obligation of a recipient to respond to sexual harassment under Title IX. The final regulations require a recipient to take prompt and effective steps to ensure that sex discrimination, including sex-based harassment that creates a hostile environment based on sex, does not continue or recur in the recipient's education program or activity. This required use of a hostile environment standard encompasses conduct that was addressed in enforcement practice prior to the 2020 amendments; as a result, data regarding recipients' actions regarding sexual harassment prior to the 2020 amendments is helpful for estimating the likely effects of the final regulations. Note that the Department is not assuming that information relating to recipient behavior prior to the effective date of the 2020 amendments impacts the baseline (that is, behavior and burdens in the absence of the final regulations), but rather, several of the changes made by the final regulations remove some of the restrictions on recipient responses to sexual harassment imposed by the 2020 amendments. However, the Department notes that the final regulations create different requirements from those established in its enforcement practices prior to the 2020 amendments. As a result, recipient behavior prior to the effective date of the 2020 amendments, in the Department's view, provides some, but not complete, insight into what recipient behavior will be.

In the 2020 amendments, the Department assumed that the number of incidents reported under the Clery Act could be used as an instrument to estimate total incidents of sexual harassment, including those not captured in the 2014 Senate

---

[109] The Department's model estimates the total costs of the final regulations. While many of these costs would be borne by recipients, some costs estimated herein may be borne by other entities or individuals. Similarly, while many of the costs detailed herein are the result of requirements of the final regulations, the model also accounts for some non-required costs that are likely to result from this regulatory action (*i.e.*, costs likely to be voluntarily borne by recipients or other entities or individuals).

[110] Claire McCaskill, *S. Subcomm. on Financial Contracting Oversight—Majority Staff, Sexual Violence on Campus*, 113th Cong. (2014), *https://www.hsgac.senate.gov/imo/media/doc/2014-07-09 SexualViolenceonCampusSurveyReportwith Appendix.pdf.*

Subcommittee Report; as a result, the Department estimated that, prior to the issuance of the 2020 amendments, IHEs conducted approximately 5.7 Title IX investigations of sexual harassment per year per IHE. *See* 85 FR 30026, 30565. The Department based this estimate on an analysis of the 2014 Senate Subcommittee Report and data submitted by IHEs under the Clery Act.

At the LEA level, the Department does not have publicly reported data on the average number of investigations of sexual harassment occurring each year. The 2017–2018 data from the CRDC indicates an average of 3.23 incidents of sexual harassment per LEA per year.[111] The Department, therefore, assumes that this was the number of investigations of sexual harassment occurring, on average, each year in each LEA.

4.A.3. Lack of Data Following the Promulgation of the 2020 Amendments

Commenters did not provide the Department with reliable statistical data sources about actions taken by recipients following the promulgation of the 2020 amendments. As a result, it is difficult for the Department to conclusively estimate the number of investigations that have occurred since the issuance of the 2020 amendments or the number that would likely occur in later years in the absence of the Department's final regulations. This absence of data means the Department could not construct a baseline from which to estimate the likely effects of the final regulations. Instead, the Department has a reasonable framework for understanding the likely actions recipients would take to comply with the final regulations as well as a benchmark for generating baseline estimates of recipients' actions following the promulgation of the 2020 amendments, based on anecdotal information from experts in the field as well as anecdotal information received from comments in response to the July 2022 NPRM, and feedback from the June 2021 Title IX Public Hearing and in numerous OCR listening sessions. These

sources provide some reliable information about actions taken by recipients to comply with Title IX prior to the promulgation of the 2020 amendments. However, in using this anecdotal information, the Department is mindful that the 2020 amendments introduced requirements and definitions not previously promulgated and thus actions prior to the 2020 amendments will not capture all aspects of a recipient's actions following the issuance of the 2020 amendments.

The Department is not attempting to estimate the degree of sex discrimination at recipient institutions. Rather, the Department is attempting to estimate the number of times recipients will be required to engage in activities, such as conducting investigations or providing supportive measures. For instance, in the preamble to the 2020 amendments, the Department estimated that approximately 90 percent of LEAs and 50 percent of IHEs would reduce the number of investigations conducted each year. *See* 85 FR 30567. The Department estimated that, on average, these LEAs would conduct 1.29 fewer investigations per year under the 2020 amendments. The Department also estimated that the annual average reduction in investigations would be 2.84 for those IHEs that reduced their number of investigations. Since making those assumptions in the 2020 amendments, OCR has received feedback from a variety of stakeholders, through the June 2021 Title IX Public Hearing, in listening sessions, and from comments received in response to the July 2022 NPRM, that the actual reduction may have been higher due to the deterrent effect of the perceived burden associated with the sexual harassment grievance process requirements on a complainant's willingness to report sexual harassment or participate in a process to resolve a formal complaint of sexual harassment as required by the 2020 amendments. Further, based on anecdotal reports, the Department understands that many recipients that experienced a reduction in the number of sexual harassment complaints filed at their respective institutions after the 2020 amendments shifted their resolution processes away from what would have been a proceeding under § 106.45 of the 2020 amendments to an alternative disciplinary process, such as a general student conduct process outside of the scope of Title IX. Although this information from recipients and others confirms the Department's 2020 estimate related to the decrease in the number of investigations, it is anecdotal

and, as such, does not provide the Department with sufficient evidence on which to revise its 2020 estimate. Further, the Department recognizes that the COVID–19 pandemic resulted in many LEAs and IHEs operating remotely, which may have reduced the incidence or reporting of sexual harassment, the willingness of students and others to initiate a recipient's grievance process in response to alleged sexual harassment, or both. Again, however, the Department has not identified, nor have commenters provided, high-quality research studies to inform its analysis. Therefore, the Department continues to assume that the estimates of the 2020 amendments represent the baseline level of a recipient's actions to comply with Title IX in future years when considered in the absence of the final regulations.

Notwithstanding the estimates used for the 2020 amendments, for recipients that saw reductions in the number of investigations conducted each year under the 2020 amendments, the Department estimates, based on stakeholder feedback, comments it received on the July 2022 NPRM, and its enforcement experience, that many alleged incidents that were previously classified as sexual harassment under subregulatory guidance documents but did not meet the definition of "sexual harassment" under the 2020 amendments, were handled by a recipient in other disciplinary processes.

4.B. Developing the Model

After the effective date of the 2020 amendments, the Department assumes that recipients complied with the regulatory requirements and fell into one of three groups in how they handled complaints of sexual harassment that fell outside the scope of § 106.45 under the 2020 amendments:

• *Group A:* Recipients did not adopt a new process to handle complaints falling outside the § 106.45 grievance process in the 2020 amendments;

• *Group B:* Recipients handled complaints falling outside the § 106.45 grievance process in the 2020 amendments through a different grievance process; and

• *Group C:* Recipients handled complaints falling outside the § 106.45 grievance process in the 2020 amendments through a resolution process similar to that process.

The Department has not assumed a recipient would behave differently based on its public or private status. Further, the Department does not distinguish cost structures or burden hours based on public or private status,

---

[111] U.S. Dep't of Educ., Office for Civil Rights, Civil Rights Data Collection for the 2017–2018 School Year, *https://ocrdata.gov/assets/ocr/docs/2017-18-crdc-data.zip* (open "2017–18 Public Use Files"; then select "Data"; then select "SCH"; then select "CRDC"; then select "CSV"; then select the "Harassment and Bullying.csv" file) (last visited Feb. 20, 2024). The Department notes that CRDC data are now available for the 2020–2021 school year. However, because of the irregular nature of school attendance that year due to the COVID–19 pandemic, the Department continues to rely on data from the 2017–2018 school year, which the Department anticipates are more typical. The CRDC data for the 2020–2021 school year are available at *https://civilrightsdata.gov/data* (last visited Feb. 20, 2024).

but instead applied an average across all recipients in each analytical group. The Department also assumes recipients in all three groups generally complied with the requirements of the 2020 amendments. To the extent that a recipient did not comply with some or all of those requirements, the following estimates may overestimate or underestimate actual costs of the final regulations for that recipient.

To populate each of the three groups, the Department is using the same disbursement it used in the 2020 amendments' analysis. That is, the Department assumes that approximately 5 percent of LEAs, 5 percent of IHEs, and 90 percent of other recipients [112] fall into Group A. Generally, the Department does not anticipate that LEAs or IHEs, which usually have existing disciplinary processes and a history of compliance with Title IX, would adopt the minimal framework of Group A. In contrast, other recipients, as defined in footnote 112, are less likely to have alternative disciplinary processes and the Department assumes that it is unlikely that these other recipients would have established alternative processes based on the 2020 amendments. The Department assumes that a recipient in this group, in response to the final regulations, will experience an increase in the number of incidents investigated each year but would also be likely to revise its grievance procedures to fit the context of its educational environment under final § 106.45. As a result, although the number of investigations may increase, each investigation and adjudication would be less burdensome relative to investigations and adjudications under the 2020 amendments, due to the ability of a recipient under the final regulations to adopt procedures consistent with Title IX that are prompt, equitable, and specifically adapted to its unique circumstances, including its setting, size, and administrative structure. Recipients in this group will see burden increases associated with necessary revision of procedures and recordkeeping.

The Department assumes that approximately 90 percent of LEAs, 50 percent of IHEs, and 5 percent of other recipients fall into Group B. A recipient in this group generally experienced

some reduction in the number of sexual harassment investigations conducted under the grievance process requirements of the 2020 amendments, which would have been initiated only by a formal complaint of sexual harassment and, based on anecdotal evidence, would have also addressed at least some incidents that are no longer covered under the grievance process requirements in the 2020 amendments by using an alternative disciplinary process. In the preamble to the 2020 amendments, the Department did not account for such a shift in its estimates; however, the current model assumes such behavior as part of the baseline. The Department assumes that, in response to the final regulations, Group B will see an increase in the total number of investigations under Title IX due to the application of § 106.45 of the final regulations to more than sexual harassment complaints. It is assumed that Group B will benefit from some of the additional flexibilities offered under the final regulations, such as having the option to provide the parties with an equal opportunity to access the relevant and not otherwise impermissible evidence or a written investigative report that accurately summarizes the evidence under final § 106.46 (subject to the requirement to provide access to the underlying evidence upon the request of any party). A recipient in this group will likely retain many aspects of its current grievance procedures in response to the final regulations. As a result, the Department estimates that the increase in the number of investigations for Group B under the final regulations will be smaller than the increase in the number of investigations for Group A because of the number of investigations and adjudications already occurring under the auspices of an alternative student or employee conduct process. It is estimated that recipients in Group B will see burden increases associated with necessary revision of procedures and recordkeeping under the final regulations.

The Department assumes that approximately 5 percent of LEAs, 45 percent of IHEs, and 5 percent of other recipients fall into Group C. A recipient in this group is assumed to use the grievance process established under the 2020 amendments to also resolve conduct that was not required to be resolved under Title IX. As a result, it is estimated that a recipient in Group C will not see a large increase in the number of investigations conducted annually or a meaningful change in the burden per investigation. However, a recipient in Group C, like those in the

other two groups, may see burden increases associated with necessary revision of procedures and recordkeeping.

For recipients in both Groups A and B, the Department assumes that the final regulations' coverage of sex discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity, will result in an increase in the number of investigations conducted annually above the average encountered prior to the promulgation of the 2020 amendments. Although the Department has previously addressed a recipient's obligation to address these bases of sex discrimination, including harassment on these bases, in OCR's prior guidance, at least some recipients may not have fully addressed these incidents absent a more specific regulatory requirement.[113] The Department assumes that the inclusion of these areas in the final regulations may result in a 10 percent increase in the number of investigations conducted annually.[114]

---

[112] Other recipients include entities other than LEAs and IHEs which operate education programs or activities supported by the Department and may include libraries, museums, and cultural centers, among other types of organizations. This group represents an exceptionally small number of LEAs and IHEs, many of which are likely to be very small in size (*e.g.*, an LEA of fewer than 100 students or an IHE of fewer than 15 students).

[113] This is explained in greater detail in the discussions of Pregnancy and Parental Status (Section III) and Title IX's Coverage of Sex Discrimination (Section IV).

[114] As part of the 2017–2018 CRDC, schools reported 44,864 allegations of harassment and bullying on the basis of sex. That same year, they reported 18,414 allegations of harassment and bullying on the basis of sexual orientation, or approximately 33 percent of the number of allegations of harassment and bullying on the basis of sex. *See* U.S. Dep't of Educ., Office for Civil Rights, Civil Rights Data Collection for the 2017–2018 School Year, *https://ocrdata.ed.gov/assets/ocr/docs/2017-18-crdc-data.zip* (open "2017–18 Public Use Files"; then select "Data"; then select "SCH"; then select "CRDC"; then select "CSV"; then select the "Harassment and Bullying.csv" file) (last visited Mar. 20, 2024). The sum of the allegations of harassment on the basis of sexual orientation (18,414) is found in Column L of harassment and bullying.csv in the 2017–2018 CRDC data by excluding cells with reserve codes. Thirty-three percent represents a very high upper bound of the number of additional investigations conducted annually by recipients based on the inclusion of sexual orientation and gender identity in the final regulations. OCR has long recognized that "[w]hen students are subjected to harassment on the basis of their LGBT status, they may also . . . be subjected to forms of sex discrimination prohibited under Title IX. The fact that the harassment includes anti-LGBT comments or is partly based on the target's actual or perceived sexual orientation does not relieve a school of its obligation under Title IX to investigate and remedy overlapping sexual harassment or gender-based harassment. 2010 Harassment and Bullying Dear Colleague Letter, at 8, *https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201010.pdf*. It is extremely unlikely that the final regulations will result in such a large increase in the number of investigations occurring annually. First, such an assumption implies that no allegations of harassment and bullying on the basis of sexual orientation were also reported as allegations of harassment and bullying on the basis of sex, which is highly unlikely because the CRDC instructs

Continued

Although the Department notes that final § 106.45(a)(2) will allow a person other than a student or employee who is participating or attempting to participate in a recipient's education program or activity to make a complaint of sex discrimination, the Department assumes this change will result in a minimal increase in a recipient's overall number of complaints of sex discrimination. Specifically, the Department assumes that complaints from non-students and non-employees are somewhat uncommon (and would remain so), but that these complaints serve to inform recipients of at least some incidents of sex discrimination. In the case of a Group A recipient, the Department assumes that the recipient's treatment of information about conduct that reasonably may constitute sex discrimination received from a non-student or non-employee would solely depend on whether the reporting party made a complaint that initiated the recipient's grievance procedures. If the individual declined or was not permitted to make a complaint under the recipient's policy (for example if the individual was not participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination), the Department assumes that the Group A recipient would not take action to address the information. The Department assumes that in contrast to Group A recipients, Group B and Group C recipients would take steps to address a non-student or non-employee allegation of sex discrimination—whether by way of their Title IX grievance procedures, alternative disciplinary process, or other process depending on the circumstances and nature of the report. Thus, although the final regulations may change the process under which a non-student or non-employee allegation of sex discrimination is addressed, the

inclusion of such complaints will not meaningfully increase the overall number of complaints processed annually across recipients.

Unless otherwise specified, the Department's model uses median hourly wages for personnel employed in the education sector as reported by the Bureau of Labor Statistics [115] and a loading factor of 2.0 to account for the employer cost of employee compensation and indirect costs (*e.g.,* physical space, equipment, technology costs). In addition, throughout this RIA, some described calculations have results that are fractions (*e.g.,* the described analysis generates an estimate of 4.79655 incidents at LEAs in which supportive measures are offered). To improve readability, the Department presents these results rounded to two decimal places in the text (*e.g.,* 4.80), but retains the unrounded value for purposes of its underlying calculations.

LEAs, IHEs, and other recipients are subject to the final regulations. Estimates regarding the number of affected LEAs and IHEs are based on the most recent data available from the NCES [116] regarding the number of LEAs nationwide with operational schools and the number of IHEs participating in programs under Title IV of the HEA (such as Direct Loans, Federal Work Study, and Pell grants). The estimate regarding the number of other institutions is based on an internal review of the Department's grant portfolio.

• *LEAs:* It is assumed that 17,916 LEAs would be impacted by the final regulations. Among affected LEAs, total enrollment during the 2021–2022 school year ranged from fewer than 10 students to more than 435,000 students.

• *IHEs:* It is assumed that 6,003 IHEs would be impacted by the final regulations. Among IHEs, recipients range from small, private, professional schools with fewer than 5 full-time students enrolled during the 2022 year to large, public research universities with enrollments of more than 85,000 full-time students and institutions operating mostly virtually with enrollments exceeding 145,000 students.

• *Others:* It is assumed that 828 other recipients would be impacted by the final regulations. Other recipients include both small Tribal cultural centers located in remote rural areas and some of the largest and most well-funded arts centers and museums in the world. They also include State education agencies, State vocational rehabilitation agencies, local libraries, small parent organizations, and a range of other entities that receive Federal grant funds from the Department.

It is important to note that within each of these categories of recipients, there is wide variation in the number of students served, number of employees, administrative structure, and annual revenue. This wide variation has made estimating the effects of the final regulations challenging, and the Department notes that the estimates provided are intended to reflect the average burden across all affected entities. As a result, estimates may be lower than the actual burden realized by, for example, larger recipients or recipients with more complex administrative structures, and larger than those realized by smaller recipients with less complex administrative structures. The Department notes that the estimates in the discussion of Cost Estimates (Section 4.C) were developed based on the RIA from the 2020 amendments, as informed by comments in response to the 2018 NPRM, 83 FR 61462 (Nov. 29, 2018), as well as information received by OCR through the June 2021 Title IX Public Hearing, in listening sessions, and from comments received in response to the July 2022 NPRM. The estimates were further informed by the input of internal subject matter experts.

### 4.C. Cost Estimates

#### Review of Regulations and Policy Revisions

The Department assumes that all recipients will need to spend time reading and understanding the final regulations. The time necessary to complete this task across all recipients will likely vary widely, with some recipients opting for a close and time-consuming review of both the regulations and preamble, while others will rely on shorter third-party summaries targeted for specific audiences resulting in a less burdensome and more expedient process. The Department has developed on-average assumptions based on feedback provided by stakeholders in listening sessions and review of comments received in response to the July 2022 NPRM. On average, the

---

schools to count a single harassment allegation under multiple categories if it meets the definition of more than one category. In addition, such an assumption implies that no allegations of harassment and bullying on the basis of sexual orientation are currently investigated under a recipient's Title IX procedures, which is highly unlikely because harassment based on sexual orientation can be difficult to distinguish from other harassment based on sex and OCR guidance has previously asserted that many incidents of harassment that is based on sexual orientation or that targets LGBTQI+ students are prohibited by Title IX. However, it is unreasonable to assume that the express inclusion of sexual orientation and gender identity in the final regulations would have no effect on the number of investigations occurring annually. Based on the analysis set out here, the Department estimates that the additional clarity provided by the final regulations would result in a 10 percent increase in the number of investigations occurring annually.

[115] U.S. Dep't of Labor, Bureau of Labor Statistics, May 2022 National Industry-Specific Occupational Employment and Wage Estimates: Sector 61—Educational Services, *https://www.bls.gov/oes/current/naics2_61.htm* (last visited Mar. 20, 2024).

[116] U.S. Dep't of Educ., Institute of Education Sciences, National Center for Education Statistics, *http://nces.ed.gov/ccd/elsi/* (last visited Mar. 20, 2024); U.S. Dep't of Educ., Institute of Education Sciences, National Center for Education Statistics, IPEDS Data Center, *https://nces.ed.gov/ipeds/datacenter/InstitutionByName.aspx* (last visited Mar. 20, 2024).

Department assumes that it will take 4 hours each for a Title IX Coordinator ($96.46/hour) and lawyer ($146.58/hour) to complete this task. In total, the Department estimates that reading and understanding the final regulations will have a total one-time cost of approximately $24,058,044 in Year 1 across all recipients.

The Department assumes that all recipients will need to revise their grievance procedures based on the final regulations. At each recipient institution, the Department assumes that these revisions will take, on average, 12 hours for a Title IX Coordinator, 2 hours for an administrator ($96.46/hour), and 6 hours for a lawyer. In total, the Department estimates that revising grievance procedures will have a one-time cost of $55,183,830 in Year 1. This estimate includes the costs of a recipient's revisions to its grievance procedures associated with the Department's proposal to require recipients to comply with its final revisions to § 106.45 rather than § 106.45 of the 2020 amendments, and for IHEs to also comply with final § 106.46.

The final regulations provide substantial clarity on recipient obligations under Title IX. As such, some recipients may choose to engage in supplemental review of their existing policies to determine compliance and to make changes, if needed, in addition to the final changes that may impact a recipient's grievance procedures. The Department did not receive any data to contradict its estimates regarding such behavior, and therefore continues to believe these estimates are sufficient.

Although the 2020 amendments required a recipient to post nondiscrimination statements on the recipient's website, the Department assumes that approximately 40 percent of LEAs, 20 percent of IHEs, and 50 percent of other institutions will experience more than de minimis burden to modify their existing statements to comply with the requirements of the notice of nondiscrimination under final § 106.8(c). These estimates are based, in part, on how recently the 2020 amendments went into effect, potential impacts from the COVID–19 pandemic which likely delayed at least some recipients from complying with the requirement in the 2020 amendments, and any updates to existing content that may be necessary due to the final regulations. For a recipient that has not yet completed this requirement, the Department assumes doing so will take 1 hour from the Title IX Coordinator and 2 hours from a web developer ($67.16/hour).[117] In total, the Department estimates that posting nondiscrimination statements on websites will have a one-time cost of $2,032,842 in Year 1. The Department did not receive any data to contradict its estimates regarding the costs of posting nondiscrimination statements.

Revisions to Training

The final regulations will likely impact the annual training provided to Title IX Coordinators and designees, investigators, decisionmakers, and other persons who are responsible for implementing a recipient's grievance procedures or have the authority to modify or terminate supportive measures. For individuals other than the Title IX Coordinator and designees, it is unlikely that the length of training will have to change, and therefore any associated burden for these individuals will not change based on the final regulations. The Department assumes that Title IX Coordinators will revise existing training materials to incorporate any new content and adjust the remaining parts of the training accordingly to avoid extending the length and cost of administering the training.

Although the Department notes that the final regulations will require all employees to be trained promptly upon hiring or change of position that alters their duties under Title IX or this part, and annually thereafter on the scope of conduct that constitutes sex discrimination, including the definition of ''sex-based harassment,'' and all applicable notification requirements under final §§ 106.40(b)(2) and 106.44, this requirement will not significantly change the overall annual burden related to training requirements for recipient employees. As an initial matter, based on its enforcement experience and discussions with internal subject matter experts, the Department assumes that all employees of recipients receive required trainings each year and that recipients generally strive to ensure that employee trainings are as efficient as possible to avoid detracting employees from performing their core job responsibilities. The Department also assumes that recipients will not budget significant additional funds in response to the modification of the training requirement in the 2020 amendments, and thus will not experience an increased monetary burden that is more than de minimis due to this final change. The Department makes this assumption based on its understanding that recipients make purposeful decisions about the amount of time dedicated to each required training and will make adjustments, as needed, to ensure all required topics are covered. While the Department understands that recipients will need to dedicate resources to train employees, the benefits of comprehensive training justify the costs, which the Department considers to be de minimis. These benefits include ensuring that all employees receive training on aspects of Title IX that are relevant and critical to their specific roles, that those most likely to interact with students in their day-to-day work have the training necessary to understand their role in ensuring a recipient's Title IX compliance, and that all persons involved in implementing a recipient's grievance procedures and the informal resolution process are clearly designated and trained on conducting a fair process. Each of these benefits, in turn, will help ensure that members of a recipient's community are not discriminated against on the basis of sex and have equal access to its education program or activity.

Across all recipients, the Department estimates that updating training materials for individuals other than Title IX Coordinators will take 4 hours for the Title IX Coordinator for a total one-time cost of $9,548,382. In subsequent years, the Department assumes that the burden associated with the annual updating of training materials will be about the same as it would be in the absence of the final regulations.

In contrast, the Department anticipates that the final regulations will require more extensive, longer training for Title IX Coordinators compared to the 2020 amendments. As an initial matter, the Department assumes that a recipient will employ similar means by which to train its Title IX Coordinator in response to the final regulations as the recipient employed in response to the promulgation of the 2020 amendments; however, the Department acknowledges that the development and delivery method of the training varies among recipients. For example, the Department assumes that some recipients hired outside counsel, law firms, and professional organizations to train their Title IX Coordinators while other recipients relied upon internal stakeholders such as the recipient's general counsel. The Department has no reason to believe that a recipient will deviate from its current source of training because of the final regulations.

---

[117] Note that time burden estimates for this activity are unchanged from those used in the 2020 amendments. *See* 85 FR 30567.

The Department assumes that such trainings will be 2 hours longer for each Title IX Coordinator in Year 1, and 1 hour longer in future years. In total, the Department estimates that the training of Title IX Coordinators will have a cost of $4,774,191 in Year 1 and $2,387,096 in each succeeding year. Costs will also be incurred to update training materials for Title IX Coordinators. These materials may be developed in a variety of ways, depending on the preferences of individual recipients. These materials will be more comprehensive in nature, but certain entities may develop training materials that will be used across many recipients. As a result, the Department assumes training development costs for Title IX Coordinators equal to those estimated for other individuals, equaling a one-time cost of $9,548,382. The Department did not receive any supplementary data upon which it could reasonably rely to further revise its estimates regarding the costs to recipients of revising training materials to comply with the final regulations.

Supportive Measures

With respect to the provision of supportive measures, the Department's final regulations require a recipient to offer supportive measures, as appropriate, to complainants and respondents in response to information about conduct that reasonably may constitute sex discrimination, including sex-based harassment and prohibited retaliation. Although the 2020 amendments only required a recipient to offer supportive measures, as appropriate, to complainants and respondents in response to actual knowledge of sexual harassment, nothing in the 2020 amendments prohibited a recipient from also offering supportive measures in response to information about other types of sex discrimination. The Department assumes that any prohibited retaliation that occurs will most likely occur following a report or complaint of sex-based harassment (as opposed to other forms of sex discrimination) and that, in such instances, the types of supportive measures offered following the initial report or complaint of sex-based harassment will be largely indistinguishable from the types of supportive measures offered in response to prohibited retaliation and will not result in additional measurable cost to the recipient. Further, it is unlikely that there will be an increase in the number of individuals seeking and accepting supportive measures solely to address the impacts of ''prohibited retaliation'' as defined under amended § 106.71.

The Department notes that the final regulations state that for allegations of sex discrimination other than sex-based harassment or prohibited retaliation, the recipient will not be required to alter the conduct that is alleged to be sex discrimination for the purpose of providing a supportive measure. The Department expects that there will be little impact on anticipated costs to recipients associated with the final provision requiring supportive measures to be offered to complainants and respondents in response to information about conduct that reasonably may constitute other forms of sex discrimination. The Department's assumption is based on the belief that such information will likely fall into one of two categories. The first category consists of information a recipient will receive about sex discrimination related to unequal access to resources or facilities (*e.g.,* reports that boys' and girls' bathrooms are not maintained at the same level). In these instances, the Department anticipates that there are few, if any, appropriate supportive measures beyond eliminating the source of sex discrimination (*e.g.,* improving the quality of the facilities). Although it is the Department's belief that this type of information will not likely result in increased costs associated with the provision of supportive measures, there may be additional costs incurred when addressing these types of situations that are unrelated to providing supportive measures.

Likewise, the Department anticipates that complaints of and information about sex discrimination in educational settings (*e.g.,* a teaching assistant treating an individual student differently because of sex), the second category, will be the most likely reason for a request for supportive measures. In these instances, appropriate supportive measures will likely be academic in nature and have relatively minor costs (*e.g.,* allowing a student to attend a section of the same class taught by a different teaching assistant after a complaint of sex discrimination has been made and is proceeding, and/or counseling the teaching assistant).

For supportive measures related to sex-based harassment, the Department assumes that the final regulations will have a negligible effect on the burden per incident. Specifically, as the variety of supportive measures and need to adapt those measures to a particular situation makes estimating the full spectrum of costs impracticable, the Department used the cost of more commonly provided supportive measures when calculating cost estimates. Moreover, as it is likely that

many of the supportive measures available to individuals are already provided by recipients, the Department expects that the actual costs of each type of measure will be de minimis; however, the Department has added a flat cost of $250 per incident to account for any potential costs.[118] The Department cannot provide greater specificity regarding specific supportive measures given the wide range of possible measures that could be offered, the varying administrative structures of recipients, and the need to align any supportive measures to the specific facts of each case.

At the LEA level, the Department assumes that, per incident, the provision of supportive measures currently takes 2 hours from a Title IX Coordinator and 2 hours from an administrative assistant ($61.14/hour), with a flat additional cost of $250 per incident. As such, the Department assumes that, on average, the provision of supportive measures at an LEA costs approximately $565 per incident (staff time plus flat additional cost). At the IHE level and at other recipients, the Department assumes that, per incident, the provision of supportive measures currently takes 2 hours from a Title IX Coordinator and 1 hour from an administrative assistant with a flat additional cost of $250 per incident. Therefore, the Department estimates that, on average, the provision of supportive measures at an IHE or other recipient costs approximately $504 per incident. Commenters did not provide any supplementary data upon which the Department could reasonably rely to further modify the Department's estimates. The Department anticipates that the final regulations may increase the number of incidents for which supportive measures are provided per year.

The Department assumes that a recipient offers and potentially provides supportive measures in all instances that, prior to the 2020 amendments, would have triggered an investigation, as well as in many instances that previously would not have triggered an investigation. Across all recipient types, the Department assumes that under the

---

[118] This flat cost is intended to capture any non-staff time costs associated with the provision of supportive measures, including but not limited to fees for services covered by the recipient (such as for counseling) or foregone fees not collected by the recipient (such as a waiver of fees for housing reassignment). Note that, due to the wide variety of supportive measures that may be offered by recipients and the need to tailor any such measures to the specific circumstances of a particular individual, more precise estimation of the costs associated with the provision of supportive measures is not practicable.

final regulations, the number of incidents prompting an offer and provision of supportive measures will be approximately 100 percent higher than the number of investigations conducted under the 2020 amendments. For example, at LEAs, where the Department assumes an average of 3.23 investigations per year were conducted before the 2020 amendments, the Department assumes that there will be an average annual increase to 6.4 incidents prompting an offer and provision of supportive measures under the final regulations. The Department assumes that, across all recipient types, supportive measures are accepted in approximately 90 percent of the incidents in which they are offered. Thus, the Department assumes that LEAs provide supportive measures 5.81 times per year. At IHEs, the Department assumes 10.26 provisions of supportive measures per year and at other recipients, 3.60 provisions per year. Across all recipient types, the Department estimates that the provision of supportive measures based on pre-2020 amendments incident data costs approximately $91,424,553 per year.

The Department's estimates also reflect an anticipated change in the behavior of complainants across all recipient types due to the final regulations. Specifically, the Department has received anecdotal reports of complainants accepting supportive measures while declining to participate in a recipient's grievance process due to the perceived burden associated with initiating that process. The Department estimates that under the 2020 amendments the number of individuals accepting supportive measures exceeded the number of individuals choosing to pursue resolution through the recipient's grievance process. Under the final regulations, however, the Department estimates that the percentage of individuals who report an incident to a recipient and choose to make a complaint to initiate the recipient's grievance procedures under final § 106.45, and if applicable § 106.46, will increase. This change is also likely to result in large, unquantified benefits to complainants by providing increased opportunities for reporting sex discrimination and accepting supportive measures, as explained in the discussion of Benefits of the Final Regulations (Section 3). In response to the final regulations, the Department assumes, as described in the discussion of Developing the Model (Section 4.B), that all recipients will see an increase in the number of incidents in which a complainant accepts some supportive measures offered. The Department notes that this is not an assumption that the final regulations will increase the number of incidents that may initiate an offer of supportive measures, but rather, this increase likely will be driven by greater clarity regarding the scope of coverage created by the final regulations and enhanced training requirements which will inform individuals who are already eligible for such measures of the availability of these measures. The Department assumes that under the final regulations, each LEA will provide supportive measures 6.40 times per year, each IHE will do so 11.29 times per year, and other recipients will do so 3.96 times each per year. In all, the Department estimates that after the enactment of the final regulations, the provision of supportive measures will cost a total of $100,567,008, for a net increase of $9,142,455 per year.

Investigations and Adjudications

Under the 2020 amendments, the geographic location of an alleged incident affects whether the allegations will be covered under Title IX. As a result, the Department recognizes that recipients spend time investigating whether incidents took place in a location that requires the use of the Title IX grievance process to investigate and adjudicate allegations of sexual harassment. Final § 106.11 clarifies that Title IX applies to every recipient and all prohibited sex discrimination occurring under a recipient's education program or activity. This includes the obligation to address a sex-based hostile environment under a recipient's education program or activity in the United States, even when some conduct alleged to be contributing to the hostile environment occurred outside the recipient's education program or activity or outside the United States. The Department emphasizes that recipients do not have an obligation under Title IX to receive and process complaints or commence grievance procedures about or otherwise address conduct occurring outside of the United States, unless the conduct is alleged to have contributed to a sex-based hostile environment under the recipient's education program or activity in the United States. In some instances, such as when an alleged incident occurred outside of the United States and may have contributed to a sex-based hostile environment under the recipient's education program or activity domestically, the Department acknowledges that the resulting investigation may be more time consuming. Although a recipient may decide to investigate other conduct that occurred outside the United States under its existing code of conduct or other policies pertaining to, for example, study abroad programs, the costs associated with such an investigation are not required by the final regulations. Commenters did not provide high-quality data on these issues in response to a request in the July 2022 NPRM, 87 FR 41546, 41549; therefore, the Department does not have a basis upon which to develop estimates of this change.

As noted in the discussion of Developing the Model (Section 4.B), it is the Department's view that recipients will fall into three groups for purposes of categorizing their likely responses to the final regulations. A recipient in Group A will likely experience an increase in the number of Title IX investigations conducted under the final regulations, but it will also likely exercise flexibilities built into the final regulations which will reduce the burden per complaint. It is important to note that the Department assumes that the exercise of these flexibilities will not impact a recipient's ability to ensure fair investigations and adjudications but rather will allow it to develop and maintain prompt and equitable procedures tailored to its educational settings, reducing the burden on the recipient while ensuring the implementation of fair and equitable proceedings for the parties. A recipient in Group B also will likely experience an increase in the number of investigations conducted annually. However, a recipient in Group B will be more likely to maintain the structures required under the 2020 amendments, as these recipients likely already investigate and adjudicate the forms of conduct covered by the final regulations but excluded from the scope of the 2020 amendments, by way of an alternative disciplinary process. Likewise, a recipient in Group C, having complied with the 2020 amendments and having continued to respond to sex discrimination as it had prior to those amendments, will be unlikely to experience any burden changes associated with increased numbers of investigations or changes in the burden of such investigations.

As described in the discussion of Developing the Model (Section 4.B), the Department has a reasonable framework for understanding the likely actions of recipients, including how long it will take for a recipient to investigate a complaint of sex discrimination, including sex-based harassment, based on discussions with organizations that work directly with Title IX Coordinators

at LEAs and IHEs and with internal subject matter experts. For LEAs in Group A, the Department estimates that an investigation currently takes, on average, 3 hours from a Title IX Coordinator, 4 hours from an administrative assistant, 2 hours each from two lawyers/advisors ($146.58/ hour) when they are involved, 6 hours from an investigator ($52.10/hour), and 2 hours from an adjudicator ($63.84/ hour). Note that the Department assumes that lawyers/advisors will be involved in approximately 15 percent of cases. For IHEs in Group A, the Department assumes an investigation currently takes, on average, 6 hours from a Title IX Coordinator, 8 hours from an administrative assistant, 5 hours each from two lawyers/advisors, 10 hours from an investigator, and 2 hours from an adjudicator. For other recipients in Group A, the Department assumes an investigation currently takes, on average, 2 hours from a Title IX Coordinator, 4 hours from an administrative assistant, 2 hours each from two lawyers/advisors, 1 hour from an investigator, and 2 hours from an adjudicator. Across all recipients in Group A, the Department assumes a flat rate of $100 per adjudication for recording live hearings. The Department estimates that LEAs in Group A currently conduct, on average, 1.94 investigations per year. At the IHE level, the Department estimates that Group A institutions conduct 3.82 investigations per year, while other recipients in Group A conduct, on average, one investigation per year. In total, the Department estimates that investigations and adjudications for recipients in

Group A currently cost a total of approximately $6,746,684.

Under the final regulations, the Department estimates that recipients in Group A will develop revised procedures to ensure fair investigations tailored to their educational settings, which will reduce the burden associated with each investigation and adjudication. Removing LEAs from some of the obligations under § 106.45 of the 2020 amendments will mean Group A recipients will no longer be required to supplement the work of their own administrators with specialized individuals when investigating and making a determination on a complaint of sex-based harassment. The Department assumes investigations will require 4 hours from a Title IX Coordinator or other administrator (such as a building-level principal or assistant principal) and 2 hours from an administrative assistant. At the IHE level, the Department assumes each investigation and adjudication will take 5 hours from a Title IX Coordinator, 8 hours from an administrative assistant, 5 hours each from two lawyers/advisors, 10 hours from an investigator, and 2 hours from an adjudicator. For other recipients, the Department anticipates a need for 2 hours from a Title IX Coordinator, 4 hours from an administrative assistant, 2 hours each from two lawyers/advisors, 1 hour from an investigator, and 2 hours from an adjudicator.

The 2020 amendments require IHEs to create an "audio or audiovisual recording, or transcript" of all live hearings. As LEAs and other recipients that are not IHEs are not required to hold hearings under the 2020 amendments, the Department assumes

that few, if any, have chosen to do so. However, IHEs are required to hold hearings under the 2020 amendments. Now, the final regulations provide that IHEs may, but are not required to, hold live hearings. When a live hearing is conducted, an IHE must make an audio or audiovisual recording or transcript of the live hearing and make it available to the parties for inspection and review. In addition, § 106.46(f)(1)(i)(C) of the final regulations requires a postsecondary institution to create a recording or transcript of individual meetings with a party or witness conducted by the postsecondary institution to satisfy its obligations under § 106.46(f)(1)(i)(A), even if a recipient does not elect to hold a live hearing. The Department has accounted for this cost.

For IHEs and other recipients in Group A, the Department anticipates no change in the flat rate of $100 per investigation associated with meeting the recording requirements. The Department assumes no recording costs for LEAs in Group A. Under the final regulations, the Department assumes that LEAs in Group A will conduct, on average, 3.55 investigations per year; IHEs in Group A will conduct an average of 6.27 investigations per year, and other recipients will conduct, on average, 2.20 investigations per year. The Department therefore estimates that, under the final regulations, investigations and adjudications among recipients in Group A will cost approximately $9,747,693 per year, which represents a net burden increase of $3,001,009 per year. The Department did not receive any data to contradict its estimates regarding the costs of investigations and adjudications.

TABLE I—INVESTIGATIONS AND ADJUDICATIONS BURDEN ESTIMATES—GROUP A RECIPIENTS [119]

| Cost category | Baseline | | | After final regulations | | |
|---|---|---|---|---|---|---|
| *Sex Discrimination Grievance Procedures* | LEAs | IHEs | Other | LEAs | IHEs | Other |
| Title IX Coordinator | 3 hours | 6 hours | 2 hours | 4 hours | 5 hours | 2 hours. |
| Adm. Assistant | 4 hours | 8 hours | 4 hours | 2 hours | 8 hours | 4 hours. |
| Lawyer/Advisor [1] | 2 hours [2] | 5 hours | 2 hours | | 5 hours | 2 hours. |
| Investigator | 6 hours | 10 hours | 1 hour | | 10 hours | 1 hour. |
| Adjudicator | 2 hours | 2 hours | 2 hours | | 2 hours | 2 hours. |
| Recording | $100 | $100 | $100 | $0 | $100 | $100. |
| # of Investigations | 1.94 | 3.82 | 1.00 | 3.55 | 6.27 | 2.20. |

[1] When present, the Department assumes two lawyers/advisors per investigation and adjudication.
[2] The Department assumes lawyers/advisors are involved in only 15 percent of investigations and adjudications. This estimate is based on information from a professional organization.

For LEAs in Group B, the Department assumes an investigation under the 2020 amendments requires 3 hours of time from a Title IX Coordinator, 14 hours from an administrative assistant, 8 hours each from two lawyers/advisors

[119] Estimates were based on information provided by national professional organizations and discussions with internal subject matter experts.

in 15 percent of cases, 8 hours from an investigator, and 2 hours from an adjudicator. At the IHE level in Group B, the Department estimates that an investigation under the 2020 amendments requires 6 hours from a Title IX Coordinator, 20 hours from an administrative assistant, 20 hours each from two lawyers/advisors, 20 hours from an investigator, and 10 hours from an adjudicator. At other recipients in Group B, the Department assumes that an investigation under the 2020 amendments requires 8 hours from a Title IX Coordinator, 16 hours from an administrative assistant, 8 hours each from two lawyers/advisors, 5 hours from an investigator, and 2 hours from an adjudicator. At LEAs and other recipients in Group B, the Department estimates that it costs a flat rate of $100 per hearing under the 2020 amendments. At IHEs, the Department assumes a rate of $200 per hearing to account for the possibility that IHEs may want more extensive records of hearings, such as official transcripts, in addition to an audio recording. The Department assumes that under the 2020 amendments LEAs in Group B conduct, on average, 1.94 investigations per year; that IHEs in Group B conduct 3.82 investigations per year, and that other recipients in Group B conduct one investigation per year. In total, therefore, the Department estimates that under the 2020 amendments investigations and adjudications for a recipient in Group B cost approximately $176,459,489 per year.

As noted in the discussion of Lack of Data Following the Promulgation of the 2020 Amendments (Section 4.A.3) and the July 2022 NPRM, 87 FR 41549, the Department assumes that a recipient in Group B shifted approximately 90 percent of those incidents that involved complaints falling outside the § 106.45 grievance process into an alternative disciplinary process rather than not taking any action in response to incidents that were previously covered under their Title IX policies. As described in the discussion of Developing the Model (Section 4.B), the Department has determined, based on stakeholder feedback, comments it received on the July 2022 NPRM, and its enforcement experience, that many recipients developed alternative processes by which to address conduct that fell outside of the parameters of the

2020 amendments. As noted in that section, Group B and Group C recipients created alternative processes that either reflected the recipient's student or employee conduct processes (Group B recipients) or mirrored the § 106.45 grievance process under the 2020 amendments (Group C recipients). The Department assumes that resource and time expenditures for these alternative processes mirror those of the recipient's student conduct process for Group B recipients or the recipient's grievance process under the 2020 amendments for Group C recipients.

At the LEA level, the Department assumes that an alternative disciplinary process requires 3 hours from an administrator ($96.46/hour), 14 hours from an administrative assistant, 6 hours each from two lawyers/advisors in 5 percent of cases, and 6 hours from an investigator. The Department estimates that in 75 percent of LEAs, the process is adjudicated by an administrator for 3 additional hours, while in the other 25 percent of LEAs, an independent adjudicator is needed for 2 hours. At the IHE level, the Department assumes that the alternative disciplinary process requires 6 hours from an administrator, 20 hours from an administrative assistant, 10 hours each from two lawyers/advisors, and 15 hours from an investigator. The Department estimates that in 60 percent of IHEs, the process is adjudicated by an administrator for 6 additional hours, while in the other 40 percent of IHEs, an independent adjudicator is required for 8 hours. At other recipients, the Department assumes that the alternative disciplinary process requires 4 hours from an administrator and 8 hours from an administrative assistant. The Department estimates that LEAs in Group B, on average, shifted 1.16 investigations per year into alternative disciplinary processes in response to the 2020 amendments, while IHEs did the same with 1.70 investigations, and other recipients did so for 0.9 investigations. The Department therefore estimates that under the 2020 amendments a recipient spends approximately $59,998,354 per year on implementing alternative disciplinary processes for incidents that were previously covered under their grievance procedures prior to the 2020 amendments.

Under the final regulations, the Department assumes that all the

incidents previously covered under a recipient's grievance procedures prior to the 2020 amendments will be handled under the recipient's Title IX grievance procedures. At LEAs in Group B, the revised procedures will require approximately 4 hours from a Title IX Coordinator or other administrator (such as a building-level principal or assistant principal) and 2 hours from an administrative assistant. The Department assumes that, in approximately 25 percent of instances, LEAs will use an investigator and adjudicator other than the Title IX Coordinator or other administrator. In such instances, the Department assumes that those LEAs will need 2 hours from an investigator and 1 hour from an adjudicator. The Department assumes that, in 5 percent of instances, each party will have a lawyer/advisor each spending 4 hours on the incident. These LEA level estimates represent an assumption that most LEAs will return to their processes from prior to the 2020 amendments due to the removal of LEAs from some of the specific obligations under § 106.45 of the 2020 amendments. At the IHE level in Group B, the revised procedures will require 5 hours from a Title IX Coordinator, 13 hours from an administrative assistant, 15 hours each from two lawyers/advisors, 18 hours from an investigator, and 8 hours from an adjudicator. For other Group B recipients, revised procedures will require 2 hours from a Title IX Coordinator, 6 hours from an administrative assistant, 2 hours each from two lawyers/advisors in 5 percent of proceedings, 2 hours from an investigator, and 1 hour from an adjudicator.

Under the final regulations, Group B LEAs will conduct, on average, 3.55 investigations per year, while IHEs will conduct 6.27 investigations per year, and other recipients will conduct 2.20 investigations per year. Therefore, under the final regulations, investigations and adjudications at a recipient in Group B will cost a total of approximately $172,807,000 per year which represents a net decrease in the burden associated with investigations and hearings by $63,650,843 per year. The Department did not receive any data to contradict its estimates regarding the costs of investigations per year.

TABLE II—INVESTIGATIONS AND ADJUDICATIONS BURDEN ESTIMATES—GROUP B RECIPIENTS

| Cost category | Baseline | | | After final regulations | | |
|---|---|---|---|---|---|---|
| *Sex Discrimination Grievance Procedures* | LEAs | IHEs | Other | LEAs | IHEs | Other |
| Title IX Coordinator | 3 hours | 6 hours | 8 hours | 4 hours | 5 hours | 2 hours. |
| Adm. Assistant | 14 hours | 20 hours | 16 hours | 2 hours | 13 hours | 6 hours. |
| Lawyer/Advisor [1] | 8 hours [2] | 20 hours | 8 hours | 4 hours [3] | 15 hours | 2 hours. |
| Investigator | 8 hours | 20 hours | 5 hours | 2 hours [4] | 18 hours | 2 hours. |
| Adjudicator | 2 hours | 10 hours | 2 hours | 1 hour [4] | 8 hours | 1 hour. |
| Recording | $100 | $200 | $100 | | $200 | $100. |
| # of Investigations | 1.94 | 3.82 | 1.00 | 3.55 | 6.27 | 2.20. |
| Alternative Process | LEAs | IHEs | Other | | | |
| Administrator | 3 hours [5] | 6 hours [6] | 4 hours. | | | |
| Adm. Assistant | 14 hours | 20 hours | 8 hours. | | | |
| Lawyer/Advisor [1] | 6 hours [3] | 10 hours. | | | | |
| Investigator | 6 hours | 15 hours. | | | | |
| Adjudicator | 2 hours | 8 hours. | | | | |
| Recording | $100 | $200 | $100. | | | |
| # of Investigations | 1.16 | 1.70 | 0.90. | | | |

[1] When present, the Department assumes two lawyers/advisors per investigation and adjudication.
[2] The Department assumes lawyers/advisors are involved in 15 percent of investigations and adjudications.
[3] The Department assumes lawyers/advisors are involved in 5 percent of investigations and adjudications.
[4] The Department assumes investigators and adjudicators other than the Title IX Coordinator or another administrator will be used in approximately 25 percent of investigations and adjudications.
[5] The Department assumes administrators also serve as adjudicators in 75 percent of instances and their burden doubles in such cases.
[6] The Department assumes administrators also serve as adjudicators in 60 percent of instances and their burden doubles in such cases.

Appeals and Informal Resolution

The Department assumes that nothing in the final regulations will change the nature of the appeal process for fully adjudicated complaints. The Department notes that the final regulations require all recipients to offer an appeal of a dismissal of a sex discrimination complaint. This limited right to an appeal is an expansion of recipients' obligations under the 2020 amendments as it will apply to any dismissal of a sex discrimination complaint, not just to complaints of sex-based harassment. The final regulations no longer require LEAs and other recipients to offer the parties an appeal process for a determination in a sex-based harassment complaint; however, IHEs must continue to offer an appeal process for sex-based harassment complaints involving a student party. In addition, the final regulations require all recipients to offer the parties in a sex discrimination complaint an appeal process that, at a minimum, is the same as it offers in all other comparable proceedings, if any, including proceedings relating to other discrimination complaints. Although it is possible that at least some portion of recipients have an appeal process as part of their current procedures for resolving complaints of sex discrimination, the Department assumes that its current estimates may overestimate the costs of the final regulations in this area. Assuming that

there is a de minimis change regarding the number of recipients that offer an appeal because all recipients will need to offer an appeal from a dismissal of a complaint of sex discrimination, there may be additional costs to a recipient associated with appeals because of the estimated increase in the number of complaints brought under the final regulations and the proportion of decisions that could be appealed.

Across all recipients, the Department estimates that one or more parties in approximately half of all fully adjudicated complaints appeal the determination. This estimate is consistent with estimates from the 2020 amendments. 85 FR 30568. The Department assumes that at the LEA level, the appeal process will require 2 hours each from a Title IX Coordinator, administrative assistant, and two lawyers/advisors as well as an additional 6 hours from an adjudicator, while at the IHE level, the Department assumes that the appeal process requires 2 hours from a Title IX Coordinator, 4 hours from an administrative assistant, 5 hours each from two lawyers/advisors, and 8 hours from an adjudicator. Likewise, at other recipients, the Department assumes that the appeal process requires 2 hours each from a Title IX Coordinator, administrative assistant, and two lawyers/advisors, with an additional 8 hours from an adjudicator. Assuming that LEAs, on average, will handle an additional 1.33 appeals per year as a result of the final

regulations, IHEs, on average, will handle an additional 2.35 appeals per year, and other recipients, on average, will handle an additional 0.95 per year, the Department estimates that the increase in appeals stemming from the increase in complaints likely to be made under the final regulations will result in an additional cost of approximately $17,776,304 per year.

The Department expects that the final regulations will have a de minimis change on the proportion of complaints resolved through informal resolution and will not affect the general burden associated with each such resolution. Specifically, although the requirements for grievance procedures will be less burdensome under the final regulations than under the 2020 amendments, the Department expects that most complainants who have elected to proceed with informal resolution under the 2020 amendments will continue to do so under the final regulations because of the elimination of the formal complaint requirement prior to initiating the informal resolution process. Although it is possible that a complainant will decide to make a complaint and pursue an investigation because of the reduced burden under the final regulations, it is the Department's view that there is no basis to assume that a complainant who would have pursued informal resolution under the 2020 amendments is more or less likely to choose informal resolution under the final regulations because

individuals' rationales for choosing an informal resolution process vary widely.

Based on anecdotal reports from commenters, recipients, and other stakeholders, the Department assumes that informal resolutions require more time from a Title IX Coordinator and an administrative assistant than an investigative process. In contrast, the Department assumes that the informal resolution process will remove all costs associated with investigators, adjudicators, and recording at all levels and eliminate costs for lawyers/advisors at the LEA level. At the LEA level, informal resolution may require 1 additional hour from a Title IX Coordinator and 5 hours from an administrative assistant above the level needed for an investigation and adjudication; at the IHE level, the additional burden will be 2.5 hours from a Title IX Coordinator and 1 hour from an administrative assistant, while at other recipients, the additional burden is estimated to be 1 hour from a Title IX Coordinator and 3 hours from an administrative assistant. The Department assumes that, in instances of informal resolution, there will be no burden for investigators or adjudicators at LEAs, IHE, or other recipients, and no burden for lawyers/advisors at LEAs or other recipients. At the IHE level, the Department assumes that, even in instances of informal resolution, there will be a burden of 6 hours each for two lawyers/advisors (one working with each party), assuming that the individuals serving in those roles may become involved earlier in the process than at other educational levels or at other recipients. Based on the increase in complaints that the Department anticipates under the final regulations, the estimated increase in the cost of informal resolutions will be approximately $14,068,164 per year. The Department did not receive any supplementary data upon which it could reasonably rely to further modify its cost estimates.

Recordkeeping

The Department assumes that all recipients will need to modify their existing recordkeeping systems to comply with the final regulations. Specifically, the Department submits that final § 106.8(f) broadens the existing scope of the recordkeeping requirements under § 106.45(b)(10) of the 2020 amendments because the final recordkeeping requirement applies to all notifications to the Title IX Coordinator about conduct that reasonably may constitute sex discrimination and all complaints of sex discrimination. However, the Department assumes that

many recipients already maintain records related to sex discrimination under the auspices of State, local, or other requirements and established recordkeeping systems in response to the 2020 amendments. In these instances, final § 106.8(f) will not impose any additional burden on those recipients as their existing recordkeeping activity will likely address all pertinent requirements under the final regulations.

Alternatively, for recipients that only maintain records related to sexual harassment as required by § 106.45(b)(10) of the 2020 amendments and do not preserve information related to other forms of sex discrimination, the changes will increase their burden based on the volume of records they will need to maintain related to forms of sex discrimination other than sexual harassment, as is required by final § 106.8(f). The Department estimates that the final regulations, in general, will increase the recordkeeping burden for these recipients. At the LEA level, the Department estimates that necessary modifications to current practice will require 2 hours each from a Title IX Coordinator and an administrative assistant, whereas at the IHE level, where a recipient is more likely to maintain electronic systems for these records, these changes will require 4 hours from a Title IX Coordinator, 8 hours from an administrative assistant, and 4 hours from a database administrator ($77.54/hour). At other recipients, the Department estimates that modifications will require 2 hours each from a Title IX Coordinator and an administrative assistant. In total, the Department estimates that modifications to recipients' recordkeeping systems will cost approximately $13,022,034 in Year 1.

In future years, the Department assumes the final regulations will necessitate an ongoing increase, above the baseline year, in recordkeeping costs. Specifically, at the LEA level, the Department estimates that recordkeeping will require 1 additional hour each from the Title IX Coordinator and an administrative assistant; at the IHE level, 1 additional hour from the Title IX Coordinator and 5 hours from an administrative assistant; and at other recipients, 1 additional hour each from the Title IX Coordinator and an administrative assistant. In total, the Department estimates the ongoing recordkeeping burden to increase by approximately $5,237,728 per year. The Department did not receive any supplementary data upon which it could reasonably rely to further modify its estimates regarding such costs.

Monitoring the Recipient's Education Program or Activity for Barriers To Reporting Information About Conduct That Reasonably May Constitute Sex Discrimination

The Department's final regulations require a recipient to ensure that its Title IX Coordinator monitors the recipient's education program or activity for barriers to reporting conduct that reasonably may constitute sex discrimination and that the recipient take steps reasonably calculated to address such barriers. Although a recipient was neither required to nor prohibited from monitoring its environment for these barriers under the 2020 amendments, the Department assumes that many recipients, particularly IHEs, currently monitor their education programs or activities for such barriers to avoid potential legal liability because barriers to reporting limit a recipient's ability to ensure that its education program or activity is operating free from sex discrimination. The Department also assumes that Title IX Coordinators are motivated to proactively identify and address sex discrimination in the recipient's education program or activity. Although some recipients may need to create new mechanisms to monitor their environments, many of these recipients will select options with de minimis costs, such as incorporating questions designed to elicit information from students and employees about barriers to reporting into existing training materials, incorporating such questions into conversations with students, employees, and others during roundtable discussions or listening sessions with interested stakeholders, or through other means. The Department similarly assumes that the steps a recipient will need to take to remove these barriers, should they be identified, will likely have a de minimis cost as well (e.g., reminding students, employees, and others during trainings about the range of reporting options available at a particular recipient or reporting an employee who discourages their students from reporting to human resources for violating the recipient's code of ethics standards). That said, the Department recognizes that there is a wide range of possible recipient responses to this final requirement with potentially varying costs and benefits. The Department did not receive any supplementary data upon which it could reasonably rely to modify its estimates regarding such costs and benefits.

**4.D. Changes in the Final Regulations Not Estimated to Have Costs**

In addition to the changes explained in the discussion of Cost Estimates (Section 4.C) that are estimated to have costs, there are several final changes that the Department does not anticipate will generate costs for regulated entities above and beyond general costs described previously. Below the Department discusses some of these final changes to clarify the basis for that assumption.

**Lactation Space for Students and Employees**

Although the Title IX regulations since 1975 specifically prohibited discrimination against students and employees based on pregnancy, childbirth, termination of pregnancy, and recovery, the final regulations at §§ 106.2 (defining ''pregnancy or related conditions''), 106.21(c)(2)(ii), 106.40(b)(1), and 106.57(b) clarify that a recipient may not discriminate based on pregnancy or related conditions, including lactation. *See* 40 FR 24128 (codified at 45 CFR 86.21(c)(2), 86.40(b)(2), 86.57(b) (1975)); 34 CFR 106.21(c), 106.40(b)(1), 106.57(b) (current). The final regulations also require a recipient to ensure access to a lactation space for students and employees, as well as reasonable modifications for students and break time for employees to enable them to use of the space as needed. Specifically, final § 106.40(b)(3)(v) requires a recipient to ''[e]nsure that the student can access a lactation space, which must be a space other than a bathroom, that is clean, shielded from view, free from intrusion from others, and may be used by a student for expressing breast milk or breastfeeding as needed.'' Similarly, final § 106.57(e) requires a recipient to provide ''reasonable break time for an employee to express breast milk or breastfeed as needed'' and to ''ensure that an employee can access a lactation space, which must be a space other than a bathroom that is clean, shielded from view, free from intrusion from others, and may be used by an employee for expressing breast milk or breastfeeding as needed.'' Both measures are critical means for preventing discrimination and ensuring that students and employees can continue pursuing their education and employment, respectively, while taking brief breaks from their classes or job duties as needed to express breast milk or breastfeed.

The Department does not anticipate significant cost to recipients based on this final revision. Although it is possible that the final regulations' clarification that a lactation space must be available for both students and employees may result in an increase in demand for such a space, it is the Department's view that any such increase will likely result in a de minimis impact on costs as distributed over all recipients over time. The Department posits this for several reasons.

First, although it is unknown how many recipients presently offer lactation space for students or employees due to a lack of data, all or virtually all recipients are already required to comply with provisions for lactation time and space for employees covered under the Affordable Care Act's amendments to Section 7 of the FLSA.[120] The FLSA requires employers to provide reasonable break times and a private place, other than a bathroom, to employees covered under Section 7 of the FLSA who are breastfeeding to express milk for one year after their child's birth. 29 U.S.C. 207(r)(1). The space must be ''shielded from view and free from intrusion from coworkers and the public.'' *Id.* The Department of Labor (DOL) has explained that the space must also be ''functional'' and ''available when needed'' and that the ''frequency and duration of breaks needed to express milk will likely vary.'' U.S. Dep't of Labor, Fact Sheet #73: FLSA Protections for Employees to Pump Breast Milk at Work (Jan. 2023), *https://www.dol.gov/agencies/whd/fact-sheets/73-flsa-break-time-nursing-mothers.* DOL has also clarified that a temporary or converted space is sufficient if the space is available when needed, shielded from view, and free from any intrusion from co-workers and the public. *Id.* Employees who would be covered by the lactation time and space requirements of the FLSA include virtually all full-time and part-time workers in public and private education programs or activities. 29 U.S.C. 203(e). Although at the time of the July 2022 NPRM the FLSA exempted certain employees, such as professors, teachers, and certain academic administrative personnel from coverage, Congress has since amended the statute to cover these employees. 29 U.S.C. 207(r)(1) (FLSA

lactation time and space requirement). The Department does not have specific information about existing lactation spaces for employees due to a lack of relevant data. The Department assumes, however, that given the limited requirements for the lactation space itself, that most recipients will be able to locate such a space within their current property or maximize the use of an existing space. The Department's final requirements regarding lactation space are similar to those of the FLSA with the additional requirement that the space be clean. The Department assumes that most, if not all, recipients already clean their facilities, including any existing lactation space, and anticipates that the additional cost of cleaning associated with the final regulations will be negligible.

Second, some States also require a recipient either to provide lactation space to employees or to make reasonable attempts to do so. *See, e.g.,* Minn. Stat. Ann. § 181.939 (2014) (requiring employers to make a reasonable effort to provide a private location, other than a bathroom or toilet stall, in close proximity to the workplace that is shielded from view, free from intrusion, and has an electrical outlet); N.M. Stat. Ann. § 28–20–2 (2007) (requiring employers to provide a clean, private place, not a bathroom, for employees who are breastfeeding to pump); N.Y. Labor Law § 206–C (2007) (requiring that employers make a reasonable attempt to provide employees a private location for lactation); Okla. Stat. tit. 70, § 5–149.3 (2021) (requiring each school district board of education to make a reasonable effort to provide a private, secure, sanitary room or other location, other than a toilet stall, for an employee to express milk or breastfeed a child); R.I. Gen. Laws § 28–5–7.4 (2015) (prohibiting employers from refusing to reasonably accommodate an employee's or prospective employee's condition related to pregnancy, childbirth, or a related medical condition, including but not limited to the need to express breast milk for a nursing child; ''reasonable accommodation'' is defined to include a ''private non-bathroom space for expressing breast milk''); S.C. Code Ann. § 41–1–130 (2020) (requiring employers to make reasonable efforts to provide certain areas where employees may express breast milk; Tenn. Code Ann. § 50–1–305 (1999) (requiring employers to make a reasonable effort to provide a private location, other than a toilet stall, near the workplace for employees' lactation); Utah Code Ann. § 34–49–202 (2015) (requiring public

---

[120] Under the FLSA, a covered enterprise is ''the related activities performed through unified operation or common control by any person or persons for a common business purpose and . . . is engaged in the operation of . . . a preschool, an elementary or secondary school, or an institution of higher education (whether operated for profit or not for profit)'' or ''is an activity of a public agency.'' U.S. Dep't of Labor, Handy Reference Guide to the Fair Labor Standards Act (Sept. 2016), *https://www.dol.gov/agencies/whd/compliance-assistance/handy-reference-guide-flsa.*

employers to provide employees a clean, private room or location that is not a bathroom and that has an electrical outlet for lactation, as well as access to a refrigerator or freezer for the storage of breast milk); Vt. Stat. Ann. Tit. 21, § 305 (2008) (requiring employers to ''[m]ake a reasonable accommodation [for lactation] to provide appropriate private space that is not a bathroom stall''); Va. Code § 22.1–79.6 (2014) (requiring local school boards to designate private, non-restroom locations for employees and students to express breast milk); Wash. Rev. Code 43.10.005 (2017) (requiring employers to provide a private location, other than a bathroom, for employee lactation, or if no such space exists, work with the employee to identify a convenient location for lactation). As some States already require recipients to provide lactation spaces or make reasonable attempts to do so, the final regulations will be neither burdensome nor costly as many recipients may already be required to comply with similar provisions due to State law.

In addition, for some recipients, lactation space and break times may be the subject of local laws or separate employment agreements, such as collective bargaining agreements. Some recipients may simply provide lactation space and break time voluntarily. In short, the Department anticipates that its final regulations will impose de minimis cost on a recipient that is already providing lactation space and breaks to its staff.

The Department acknowledges that in some cases, the final regulations may result in increased demand for lactation space or break time. It is difficult to quantify the extent to which demand might increase or how demand might vary over time as the Department is not aware of any available data source that tracks the numbers of students or employees in need of lactation space. The Department anticipates that demand will vary across recipients, based on the composition of the student and employee population at any time, further reducing the impact to individual recipients.

When a recipient already has a lactation space, the Department anticipates that it is likely that the space will meet the Department's final requirements for the reasons already discussed. In addition, because a lactation space is only in use by any given person for a limited time period, it is possible that many recipients already have sufficient capacity to accommodate additional users; however, the Department anticipates that a recipient that does not currently

provide lactation space will be able to comply with the final regulations using existing space at minimal cost. For example, the final regulations do not require that a lactation space be of a particular size, shape, or include features other than being private and clean. Similarly, the Department anticipates that a recipient that currently provides lactation space will already have a system in place to administer use of the space (for example, through a sign-up system) to the extent needed and that this could be adapted to accommodate new demand with minimal cost.

With respect to the Department's final requirement that a recipient provide its employees with reasonable break time for lactation, the Department also anticipates that any increased demand could be managed through an existing system for coverage of employees who require brief breaks for other reasons. This is more likely to be necessary for LEA school teachers, whose breaks may require coverage because of the nature of school schedules, rather than employees at IHEs who may not require coverage during breaks needed for lactation because those employees do not typically have supervisory responsibility for children. The Department also recognizes that at some IHEs and other types of recipients, some employees will have access to a private office that is sufficient for lactation needs.

Finally, the Department anticipates that its final regulations regarding lactation time and space will also likely improve the recipient's retention of its students and employees. For example, a student-parent may be more comfortable remaining in an education program or activity in which the recipient is reducing barriers to remaining in school during the early months and years of a child's life. Likewise, an employee who has access to sufficient lactation time and space may also be more likely to return to the workplace or return earlier from parental leave than one who does not have such access because the employee knows that they can continue to breastfeed after returning to work. For these reasons, this provision will impose de minimis costs and will provide important benefits in terms of eliminating sex-based barriers to education and employment. The Department did not receive any supplementary data upon which it could reasonably rely to modify its estimates.

Reasonable Modifications for Students Because of Pregnancy or Related Conditions

The Department does not anticipate significant cost to a recipient based on final § 106.40(b)(3)(ii), which requires that a recipient make reasonable modifications because of a student's ''pregnancy or related conditions'' as defined by final § 106.2, because this requirement is similar to OCR's previous discussion of a recipient's obligations in this context. 2013 Pregnancy Pamphlet, at 9. The Title IX regulations since 1975 have also prohibited a recipient from discriminating against or excluding ''any student from its education program or activity, including any class or extracurricular activity, on the basis of the student's pregnancy, childbirth, false pregnancy, termination of pregnancy or recovery therefrom, unless the student requests voluntarily to participate in a separate portion of the program or activity of the recipient.'' *See* 40 FR 24128 (codified at 45 CFR 86.40(b)(1) (1975)); 34 CFR 106.40(b)(1) (current). Likewise, § 106.40(b)(4) since 1975 has required a recipient to treat pregnancy or related conditions similarly to other temporary disabilities ''with respect to any medical or hospital benefit, service, plan, or policy [the] recipient administers, operates, offers, or participates in with respect to students admitted to the recipient's educational program or activity.'' *See* 40 FR 24128 (codified at 45 CFR 86.40(b)(4) (1975)); 34 CFR 106.40(b)(4) (current).

OCR's 2013 Pregnancy Pamphlet clarified that to ''ensure a pregnant student's access to its educational program, when necessary, a school must make adjustments to the regular program that are reasonable and responsive to the student's temporary pregnancy status. For example, a school might be required to provide a larger desk, allow frequent trips to the bathroom, or permit temporary access to elevators.'' 2013 Pregnancy Pamphlet, at 9. As the requirement for reasonable modifications because of pregnancy or related conditions builds upon the former ''reasonable and responsive'' standard and sets a clearer framework for how to assess what must be provided, the Department does not anticipate that the required steps for compliance with the amended reasonable modifications standard under § 106.40(b)(3)(ii) will be more costly than under the prior OCR interpretation of a recipient's duties. The Department did not receive any supplementary data upon which it

could reasonably rely to modify its estimates regarding such costs.

Participation Consistent With Gender Identity

The Department does not anticipate significant cost to a recipient above and beyond the general costs described in the discussion of Costs of the Final Regulations (Section 4) to comply with final § 106.31(a)(2). Final § 106.31(a)(2) clarifies that in the limited circumstances in which different treatment or separation on the basis of sex is permitted, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations at §§ 106.12– 106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b). Final § 106.31(a)(2) also clarifies that adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with their gender identity causes more than de minimis harm on the basis of sex. As described in the discussion of Coverage of Sex Discrimination (Section IV), the final regulations' prohibition on preventing a person from participating in an education program or activity consistent with their gender identity is consistent with the analysis of some Federal courts that have addressed how Title IX protects students from discrimination based on sex stereotypes and gender identity. Some stakeholders have expressed concern about costs associated with permitting students to participate in a recipient's education program or activity consistent with their gender identity. Compliance with final § 106.31(a)(2) may require updating of policies or training materials, but will not require significant expenditures, such as construction of new facilities or creation of new programs. For the many schools that have long maintained policies and practices that generally permit students to participate in school consistent with their gender identity, the final regulations may not require any change. *See, e.g.,* Cal. Dep't of Educ., Legal Advisory regarding application of California's antidiscrimination statutes to transgender youth in schools (updated Sept. 16, 2021), *https://www.cde.ca.gov/ re/di/eo/legaladvisory.asp* (describing obligation under California and Federal law that schools afford students equal opportunity and access to the school's facilities, activities, and programs, in a manner that is consistent with each

student's gender identity); Washoe Cnty. Sch. Dist., Administrative Regulation 5161: Gender Identity and Gender Non-Conformity—Students (2019), *https:// www.wcsdpolicy.net/pdf_files/ administrative_regulations/5161_Reg-Gender_Identify-v2.pdf* (permitting students to participate in sex-separate activities in accordance with their gender identity). A recipient that maintains policies and practices that prevent students from participating in school consistent with their gender identity will be required to review and update those policies and practices under the final regulations; however, the Department anticipates that the costs of these modifications will be subsumed into the general costs of updating policies and procedures to comply with the final regulations, which is reflected in the costs described in the discussion of the Nondiscrimination Policy and Grievance Procedures (§ 106.8) section of the RIA.

The Department notes that some other costs associated with final § 106.31(a)(2) may be addressed elsewhere in the RIA. For instance, to the extent that a recipient's failure to comply with final § 106.31(a)(2) will lead to additional investigations of alleged discrimination, those costs are addressed in the discussion of costs associated with the proposal to clarify Title IX's coverage of gender identity discrimination. Similarly, to the extent that a recipient will take steps to train employees or students on gender identity discrimination, those costs are addressed in the discussion of costs associated with training. As this is an evolving area of the law, the Department anticipates there may be some costs associated with potential litigation. Litigation costs related to commenters' concerns about specific provisions in the final regulations, including the definition of "sex-based harassment" (§ 106.2), supportive measures (§ 106.44(g)), pregnancy or related conditions (§§ 106.40 and 106.57(e)), and the scope of sex discrimination (§ 106.10), are discussed above.

5. Regulatory Alternatives Considered

The Department reviewed and assessed various alternatives prior to issuing the final regulations, drawing from internal sources, as well as feedback OCR received from stakeholders, including during the June 2021 Title IX Public Hearing and numerous listening sessions, and from comments received in response to the July 2022 NPRM. In particular, the Department considered the following alternative actions: (1) leaving the 2020

amendments without amendment; (2) rescinding the 2020 amendments in their entirety and reissuing past guidance, including the 2001 Revised Sexual Harassment Guidance, the 2011 Dear Colleague Letter on Sexual Violence, and the 2014 Q&A on Sexual Violence; (3) rescinding the 2020 amendments, either in whole or in part, and issuing new guidance; (4) proposing narrower amendments to the 2020 amendments; or (5) issuing completely new final amendments to address significant areas (*e.g.,* clarifying that coverage includes gender identity, applying regulatory grievance procedure requirements to all sex discrimination complaints, and adding regulatory provisions regarding a recipient's obligation to students and employees who are pregnant or experiencing pregnancy-related conditions).

The Department determined that a combination of (4) and (5), which involves issuing final amendments, is the better alternative. The combination of these alternatives means amending the 2020 amendments to make noteworthy adjustments that will better achieve the objectives of the statute, are consistent with recent case law, and account for the feedback OCR received from stakeholders, including during the June 2021 Title IX Public Hearing and numerous listening sessions, and the comments received in response to the July 2022 NPRM. Based on its internal review, the Department's view is that the 2020 amendments did not fully address all prohibited sex discrimination in a recipient's education program or activity or offer sufficient safeguards to reduce—and ultimately remove—sex discrimination in the educational setting. The approach adopted in the 2020 amendments may have created a gap in implementing Title IX's prohibition on sex discrimination: a recipient may have information about possible sex discrimination in its education program or activity and yet may have no obligation to take any action to address it if a formal complaint is not filed and the recipient's Title IX Coordinator determines that the allegations do not warrant overriding a complainant's wishes and initiating a complaint. Numerous stakeholders and commenters shared their concerns with the Department, specifically that certain requirements in the 2020 amendments may impede a recipient from taking prompt and effective action in response to allegations of sexual harassment in the recipient's education program or activity. By creating extensive obligations related only to certain forms

of sexual harassment and leaving a recipient's obligations with respect to the necessary grievance procedures to respond to other forms of sex-based harassment and sex discrimination unaddressed, the 2020 amendments may have created a risk that Title IX's prohibition on sex discrimination would be underenforced. In addition, it is the Department's view that greater clarity is required than what is in the 2020 amendments with respect to the scope of sex discrimination, including with respect to discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. The Department is concerned that equal access to a recipient's education program or activity may be impaired absent this clarity.

For reasons explained in the RIA as well as throughout the preamble, and in light of stakeholder feedback received in 2021 and 2022 and comments in response to the July 2022 NPRM, alternative (1) was not a reasonable option. Alternatives (2) and (3) were rejected because the Department continues to believe that it is necessary to establish, through regulations, the legal obligations of a recipient to ensure that its education program or activity is free from sex discrimination; guidance documents, which are not legally binding on a recipient, will not serve that function.

After careful consideration of these alternatives, the Department determines that adopting alternatives (4) and (5) is the best approach for five reasons. Such an approach: (a) best fulfills Title IX's guarantee of nondiscrimination on the basis of sex by a recipient of Federal funds in its education program or activity; (b) ensures that a recipient understands its obligations to address sex discrimination in all forms, including sex-based harassment, so that students and others can participate in the educational environment free from discrimination based on sex; (c) safeguards fairness for all who participate in a recipient's grievance procedures for sex discrimination, including sex-based harassment; (d) protects a person's rights under Title IX by requiring a recipient to provide appropriate supportive measures to the complainant and the respondent and remedies to a complainant or any other person the recipient identifies as having their equal access to the recipient's education program or activity limited or denied by sex discrimination; and (e) ensures that a recipient understands its obligations to prevent discrimination against and ensure equal access for students and employees who are

pregnant or experiencing pregnancy-related conditions.

In addition to reviewing stakeholder feedback and comments in response to the July 2022 NPRM, the Department considered alternatives to the final regulations based upon its internal analysis of the costs and benefits of various options.

### Clarification of the Scope of Title IX

During its review of various alternatives to the final regulations, the Department considered whether to clarify and define the scope of Title IX. Specifically, although the 2020 amendments define "sexual harassment," they did not clarify the scope of Title IX's prohibition on sex discrimination. The Department considered several options to address this area and chooses to specify in the final regulations that Title IX's prohibition on sex discrimination includes discrimination on the basis of pregnancy or related conditions, sex stereotypes, sex characteristics, sexual orientation, and gender identity. Although the Department recognizes that clarifying the scope of Title IX could result in increased costs to recipients, especially those recipients that had not previously addressed discrimination on the bases explicitly referenced in the regulations, the non-monetary benefits of providing clarity and recognizing the broad scope of Title IX's protections justify the costs associated with the implementation of these robust protections.

### Clarification of the Geographic Scope of Title IX's Prohibition on Sex Discrimination

The Department also considered retaining the 2020 amendments' scope of coverage with respect to conduct that occurs off campus and off school grounds. Numerous stakeholders in OCR's June 2021 Title IX Public Hearing, OCR's listening sessions, and the comments received in response to the July 2022 NPRM requested that the Department explicitly include additional instances of off-campus conduct within the scope of its final regulations. Specifically, these stakeholders commented that excluding such conduct denied students, employees, and others equal access to a recipient's education program or activity and failed to fully implement Title IX. As explained in greater detail in the discussion of investigations and adjudications in Cost Estimates (Section 4.C), the Department acknowledges the potential cost increase for a recipient in addressing all sex discrimination that occurs under a recipient's education

program or activity, including conduct subject to a recipient's disciplinary authority, and also in addressing a sex-based hostile environment under the recipient's education program or activity even when some conduct alleged to be contributing to the hostile environment occurs outside of a recipient's education program or activity. However, the Department expects that many recipients are already addressing such conduct and incurring related costs through their creation and implementation of alternative disciplinary proceedings to address discriminatory conduct previously addressed through their Title IX procedures prior to the 2020 amendments. Moreover, the conduct excluded from the 2020 amendments may have profound and long-lasting economic impacts on students, employees, a recipient's educational environment, and the general public and that the benefits of addressing this conduct through the final regulations justifies any associated costs.

### Distinguishing Between Educational Levels

The Department also considered whether to distinguish between educational levels in the final regulations. Specifically, during the June 2021 Title IX Public Hearing, in listening sessions, and in comments received in response to the July 2022 NPRM, stakeholders associated with LEAs expressed concerns that certain requirements in the 2020 amendments impeded their ability to successfully address sexual harassment in their day-to-day school environment. Likewise, the Department considered whether all students and employees should remain subject to identical regulations or whether, for the reasons set out in the preamble, fair treatment under Title IX would be best ensured by amending the regulations in ways that require IHEs to be responsive to the unique needs of their students. For reasons explained in the discussions of Benefits of the Final Regulations (Section 3) and Costs of the Final Regulations (Section 4), the Department is unable to quantify the benefits or costs of enabling recipients to adapt fair grievance procedures to their educational environment; however, as discussed throughout the preamble, not doing so will result in continuing impediments to full implementation of Title IX's nondiscrimination guarantee. Alternatively, the final regulations create the benefit of enabling all recipients to respond promptly and effectively to sex discrimination in their program or activity, remedy that

discrimination as appropriate, and increase access and the opportunity to participate free from sex discrimination.

6. Accounting Statement

As required by OMB Circular A–4,[121] the following table is the Department's

accounting statement showing the classification of the expenditures associated with the provisions of the final regulations. The regulations are expected to result in estimated costs of $98,505,145 in the first year following publication of the final regulations, and

$12,038,087 in cost savings in subsequent years. This table provides the Department's best estimate of the changes in annualized monetized costs, benefits, and transfers as a result of the final regulations.

| Category | Benefits (calculated on an annual basis) | |
|---|---|---|
| Address gaps in coverage in 2020 amendments ................................................................ | Not quantified. | |
| Clarify scope of Title IX's protection ................................................................................ | Not quantified. | |
| Clarify responsibilities toward students and employees based on pregnancy or related conditions ............ | Not quantified. | |
| | Costs (calculated on an annual basis) | |
| Discount rate ..................................................................................................................... | 3% | 7% |
| Reading and Understanding the Regulations .................................................................... | $2,738,191 | $3,201,238 |
| Policy Revisions ................................................................................................................ | 6,280,804 | 7,342,931 |
| Publishing Notice of Nondiscrimination ........................................................................... | 231,370 | 270,496 |
| Training of Title IX Coordinators ...................................................................................... | 2,658,785 | 2,704,730 |
| Updating Training Materials .............................................................................................. | 2,173,518 | 2,541,074 |
| Supportive Measures ........................................................................................................ | 9,142,455 | 9,142,455 |
| Group A Investigations ..................................................................................................... | 3,001,009 | 3,001,009 |
| Group B Investigations ..................................................................................................... | (63,650,843) | (63,650,843) |
| Appeal Process ................................................................................................................. | 17,776,304 | 17,776,304 |
| Informal Resolutions ......................................................................................................... | 14,068,164 | 14,068,164 |
| Creation and Maintenance of Documentation ................................................................... | 6,262,994 | 6,591,433 |
| Total | 543,504 | 2,671,136 |

*C. Regulatory Flexibility Act (Small Business Impacts)*

1. Introduction

This analysis, required by the Regulatory Flexibility Act (RFA), presents an estimate of the effect of the final regulations on small entities. The SBA Size Standards for proprietary IHEs are set out in 13 CFR 121.201. Nonprofit IHEs are defined as small entities if they are independently owned and operated and not dominant in their field of operation. *See* 5 U.S.C. 601(4). ''Public institutions and LEAs'' are defined as small organizations if they are operated by a government overseeing a population below 50,000. *See* 5 U.S.C. 601(5).

2. Final Regulatory Flexibility Analysis

As explained in the discussion of Lack of Data Following the Promulgation of the 2020 Amendments (Section 4.A.3) of the RIA, there is a lack of high quality, comprehensive data about recipients' Title IX compliance activities and burdens following the implementation of the 2020 amendments. As a result, the Department could not definitively conclude that burdens on small entities, particularly among recipients other than

IHEs or LEAs, will be sufficiently low to justify certification under the RFA. If an agency is unable to make such a certification, it must prepare a Final Regulatory Flexibility Analysis (FRFA) as described in the RFA. Based on the data available, the Department has completed a FRFA.

The purpose of this analysis is to identify the number of small entities affected, assess the economic impact of the final regulations on those small entities, and consider alternatives that may be less burdensome to small entities that meet the Department's regulatory objectives. Specifically, the Department estimates the number of small entities potentially impacted by the final regulations in the discussion of the FRFA, Estimated Number of Small Entities (Section 2.B), assesses the potential economic impact of the final regulations on those small entities in the discussion of the FRFA, Estimate of the Projected Burden of the Final Regulations on Small Entities (Section 2.C), and examines and considers less burdensome alternatives to the final regulations for small entities in the FRFA, Discussion of Significant Alternatives (Section 2.D).

2.A. Reasons for Regulating

The Department's review of the 2020 amendments and of feedback received during and pursuant to the June 2021 Title IX Public Hearing, as well as stakeholder listening sessions and from comments received in response to the July 2022 NPRM, suggests that the 2020 amendments do not best fulfill the requirement of Title IX that recipients of Federal financial assistance eliminate discrimination based on sex in their education programs or activities. The Department has determined that more clarity and greater specificity will better equip recipients to create and maintain educational environments free from sex discrimination. This, in turn, will help recipients ensure that all persons have equal access to educational opportunities in accordance with Title IX's nondiscrimination mandate.

The goal of the Department's final regulations is to fully effectuate Title IX by clarifying and specifying the scope and application of Title IX's protections and recipients' obligation not to discriminate based on sex. Specifically, the final regulations focus on ensuring that recipients prevent and address sex discrimination, including but not limited to sex-based harassment, in their education programs and activities;

---

[121] As explained above, Executive Order 12866 has been amended and supplemented by Executive Order 14094 of April 6, 2023, which directs the

Director of the Office of Management and Budget to issue within one year of April 6, 2023, revisions

to OMB Circular A–4. Updated OMB Circular A–4 does not apply to the final regulations.

clarifying the scope of Title IX's protection for students and others who are participating or attempting to participate in a recipient's education program or activity; defining important terms related to a recipient's obligations under Title IX; ensuring the provision of supportive measures, as appropriate, to restore or preserve a complainant's or respondent's access to the recipient's education program or activity; clarifying a recipient's responsibilities toward students who are pregnant or experiencing pregnancy-related conditions; and clarifying that Title IX's prohibition on sex discrimination encompasses discrimination based on sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity. In addressing confusion about coverage of sex-based harassment in the 2020 amendments, the Department's final regulations also set out requirements that enable recipients to meet their obligations in settings that vary in size, student populations, and administrative structure. The final regulations will strengthen the current framework, clarify the scope and application of Title IX, and fully align the Title IX regulations with the nondiscrimination mandate of Title IX.

## 2.B. Estimated Number of Small Entities

As noted above, SBA defines small proprietary IHEs based on revenue. These regulations apply, however, to all postsecondary IHEs, which cannot be compared across IHEs and sectors using the SBA revenue size standard because non-profit and public sector IHEs are not measured based on revenue. As a result, for purposes of the final regulations, the Department defines ''small entities'' by reference to enrollment, as it has done in other rulemakings, to allow meaningful comparison of regulatory impact across all types of IHEs in the for-profit, non-profit, and public sectors.[122] The Department notes that enrollment and revenue are generally correlated for all IHEs and that IHEs with higher enrollment tend to have the resources and infrastructure in place to more easily comply with the Department's regulations in general and the final regulations in particular. Since enrollment data is more readily available to the Department for all IHEs, the Department has used enrollment as the basis to identify small IHEs in prior rulemakings and continues to use enrollment to identify small IHEs in the final regulations. This approach also allows the Department to use the same metric to identify small IHEs across the for-profit, non-profit, and public sectors. It also treats public IHEs operated at the behest of jurisdictions with a population of more than 50,000 but with low enrollment as small, which the SBA's standard would not treat as small. Lastly, the North American Industry Classification System (NAICS), under which SBA's revenue standards in 13 CFR 121.201 are generally established, set different revenue thresholds for IHEs that provide different areas of instruction (e.g., cosmetology, computer training, and similar programs) and there is no existing data that aligns those different revenue standards to the different types of regulated institutions. Similarly, where an IHE provides instruction in several of these areas, it is unclear which revenue threshold to apply for purposes of the Department's RFA analysis. The Department received several comments regarding its alternative size standard, which are addressed in the discussion of Comments on the Department's Model and Baseline Assumptions, Regulatory Flexibility Act (Small Business Impacts).

As explained above, the enrollment-based size standard remains the most relevant standard for identifying all IHEs subject to the final regulations. Therefore, instead of the SBA's revenue-based size standard, which applies only to proprietary IHEs, the Department has defined ''small IHE'' as (1) a less-than-two-year IHE with an enrollment of fewer than 750 students, or (2) an at-least-two-year-but-less-than-four-year IHE, or a four-year institution, with enrollment of fewer than 1,000 students.[123] As a result of discussions with the SBA, this is an update from the standard used in some prior rules, such as the July 2022 NPRM associated with the final regulations, ''Financial Value Transparency and Gainful Employment (GE), Financial Responsibility, Administrative Capability, Certification Procedures, Ability to Benefit (ATB),'' published in the **Federal Register** on May 19, 2023, 88 FR 32300, ''Improving Income Driven Repayment for the William D. Ford Federal Direct Loan Program and the Federal Family Education Loan (FFEL) Program, published in the **Federal Register** on July 10, 2023, 88 FR 43820, and the final regulations, ''Pell Grants for Prison Education Programs; Determining the Amount of Federal Education Assistance Funds Received by Institutions of Higher Education (90/10); Change in Ownership and Change in Control,'' published in the **Federal Register** on October 28, 2022. 87 FR 65426. Those prior regulations applied an enrollment standard for a small two-year IHE of less than 500 full-time-equivalent (FTE) students and for a small 4-year IHE, less than 1,000 FTE students.[124] The Department consulted with the SBA Office of Advocacy on the revised alternative standard for this rulemaking. The Department continues to believe this approach most accurately reflects a common basis for determining size categories that is linked to the provision of educational services and that it captures a similar universe of small entities as the SBA's revenue standard. We note that the Department's revised alternative size standard and the SBA's revenue standard identify a similar number of total proprietary IHEs, with greater than 93 percent agreement between the two standards. Using the Department's revised alternative size standard, approximately 61 percent of all IHEs would be classified as small for these purposes. Based on data from NCES, in 2022, small IHEs had an average enrollment of

---

[122] See the proposed 2020 amendments for more background on the Department's justification for using an enrollment-based size standard. 83 FR 61462 (Nov. 29, 2018). See, also, e.g., ''Student Assistance General Provisions, Federal Perkins Loan Program, Federal Family Education Loan Program, and William D. Ford Federal Direct Loan Program'' proposed rule, published in the **Federal Register** on July 31, 2018, 83 FR 37242, and final rule, published in the **Federal Register** on September 23, 2019, 84 FR 49788; and ''Gainful Employment'' (GE) final rule published in the **Federal Register** on July 1, 2019, 84 FR 31392. The Department notes that the alternative size standards that are used in the final regulations are identical to the alternative size standards used in the GE regulations published in the **Federal Register** on October 10, 2023. See 88 FR 70175.

[123] In regulations prior to 2016, the Department categorized small businesses based on tax status. Those regulations defined ''nonprofit organizations'' as ''small organizations'' if they were independently owned and operated and not dominant in their field of operation, or as ''small entities'' if they were institutions controlled by governmental entities with populations below 50,000. Those definitions resulted in the categorization of all private nonprofit organizations as small and no public institutions as small. Under the previous definition, proprietary institutions

were considered small if they were independently owned and operated and not dominant in their field of operation with total annual revenue below $7,000,000. Using FY 2017 IPEDs finance data for proprietary institutions, 50 percent of 4-year and 90 percent of 2-year or less proprietary institutions would be considered small. By contrast, an enrollment-based definition applies the same metric to all types of institutions, allowing consistent comparison across all types.

[124] In those prior rules, at least two but less-than-four-years institutions were considered in the broader two-year category. In this iteration, after consulting with the SBA Office of Advocacy, we separate this group into its own category. Based on this consultation, we have also increased the enrollment threshold for less-than-two-year institutions from 500 to 750 in order to treat a similar number of institutions as small under the alternative enrollment standard as would be captured under a revenue standard.

approximately 289 students. In contrast, all other IHEs had an average enrollment of approximately 5,509 students.

TABLE 1—NUMBER OF SMALL IHEs UNDER ENROLLMENT BASED DEFINITION

|  | 4-year | 2-year | Less than 2-year | Total |
|---|---|---|---|---|
| Not Small .......................................................... | 1,612 | 667 | 89 | 2,368 |
| Small ................................................................ | 1,155 | 908 | 1,572 | 3,635 |
| Total ........................................................... | 2,767 | 1,575 | 1,661 | 6,003 |

Source: 2022 IPEDS data reported to the Department.

In addition, the Department defines "small LEA" as either an LEA that is (1) a traditional public school district located in a county with a total population of less than 50,000, or (2) a charter school LEA. With regard to charter school LEAs, given their average size and their inherent geographic limitations, which limit their ability to be "dominant" in the field, it is reasonable to treat all charter school LEAs as small LEAs for purposes of this analysis. Under this analysis, 8,914 of all LEAs would be considered "small."

| Entity type | Small LEAs | | Not small LEAs | |
|---|---|---|---|---|
|  | Avg. revenue | Avg. enrollment | Avg. revenue | Avg. enrollment |
| Traditional LEA ........................................................ | $17,903,420 | 1,223 | $84,430,327 | 5,032 |
| Charter LEA ............................................................. | 8,750,165 | 730 |  |  |

2.C. Estimate of the Projected Burden of the Final Regulations on Small Entities

As discussed throughout the RIA, Group A IHEs are those most likely to see a net cost increase from the final regulations. As such, a Group A IHE will incur greater costs than an IHE in Group B or Group C. Based on the model described in the discussion of RIA, Developing the Model (Section 4.B), an IHE in Group A will see a net increase in costs of approximately $8,477 per year. For purposes of assessing the impacts on small entities, the Department defines a "small IHE" as a less than two-year IHE with an enrollment of less than 750 FTE and two-year or four-year IHEs with an enrollment of less than 1,000 FTE, based on official 2022 FTE enrollment. The Department notes that this estimate assumes that each small IHE will conduct the same number of investigations per year, on average, as the total universe of all affected IHEs. It is much more likely that small IHEs will conduct fewer investigations per year and therefore, their actual realized costs will be less than those estimated herein. According to data from the IPEDS, in FY 2022, small IHEs had, on average, total revenues of approximately $8,282,318.[125] Therefore, the Department estimates that the final regulations could generate a net cost for

small IHEs equal to approximately 0.10 percent of annual revenue. According to data from IPEDS, approximately 684 IHEs had total reported annual revenues of less than $847,700 for which the costs estimated above will potentially exceed 1 percent of total revenues. Those IHEs enrolled, on average, 60 students in 2022. For institutions of this size, it will be highly unlikely for the recipient to conduct 6.3 investigations per year, which represents a rate of investigations approximately 45 times higher than all other institutions, on average. The Department therefore does not anticipate that the final regulations will place a substantial burden on small IHEs.

For the purpose of assessing the impacts on small entities, the Department defines "small LEA" as either an LEA that is (1) a traditional public school district located in a county with a total population of less than 50,000, or (2) a charter school LEA. While the Department recognizes that governance structures with respect to traditional public school districts vary both across and within States, the Department's definition with respect to these entities is intended to serve as a reasonable proxy for the SBA's standard definition of a small government entity as one with a jurisdiction of less than 50,000 people. Based on the model described in the discussion of RIA, Developing the Model (Section 4.B), an LEA in Group A will see a net increase in costs of approximately $2,623 per year. The Department notes that these estimates assume small LEAs conduct

the same number of investigations per year, on average, as all other LEAs. To the extent that smaller LEAs conduct fewer investigations, on average, than all LEAs, these annual costs will be overestimated for small LEAs. Based on data from NCES, the average "small LEA," as defined above, had total annual revenues of approximately $13,565,288 during the 2019–2020 academic year. As such, the Department estimates that the proposed regulations would impose gross costs on small LEAs of approximately 0.02% of their total annual revenues. Of the small LEAs, approximately 117 reported total revenues in that year of $262,300 or less, where the estimated costs would potentially exceed 1% of total revenues. On average, these schools reported an enrollment of 45 students. For these exceptionally small LEAs, it is reasonable to assume that cost structures may be different than those estimated above in the RIA. For LEAs of this size, it is highly unlikely for the recipient to conduct 3.6 investigations per year, which represent a rate of investigations approximately 63 times higher than all other LEAs, on average. The Department, therefore, does not anticipate that the final regulations will place a substantial burden on small LEAs.

Based on the model described in the discussion of the RIA, Developing the Model (Section 4.B), "other" recipients in Group A will see a net increase in costs of approximately $3,754 per year. As explained in the discussion of small IHEs and small LEAs, the Department

---

[125] Based on data reported for FY 2022 for "total revenue and other additions" for public institutions and "total revenues and investment return" for private not-for-profit and private for-profit institutions.

notes that these estimates assume other small entities will conduct the same number of investigations per year, on average, as all other recipients in this category. To the extent that smaller entities conduct fewer investigations on average than all other recipients, these annual costs will be overestimated for small other recipients. Although the Department does not have revenue data for all other recipients, for purposes of this analysis, the Department will assume that, among other recipients with annual revenues of less than $7,000,000, the average annual revenue is approximately $3,500,000, which assumes that recipient revenues are normally distributed within the range of $0 to $7,000,000. At this level, the estimated cost will constitute approximately 0.08 percent of total revenues. The Department notes that, for estimated costs to exceed 1 percent of total revenues, ''other'' recipients will need total annual revenues of less than $375,400. Very few other recipients will fall into this category, in part, because in FY 2023, among other recipients receiving less than $1,000,000 in grant funds from the Department, the average grantee received approximately $358,976 in Federal grant funds. Among those receiving less than $500,000 in funding from the Department, the average other recipient received approximately $245,223 in grant funds in FY 2023. Even with very small amounts of non-Federal funding, it is unlikely that costs of compliance with the final regulations would exceed 1 percent of annual revenues for these recipients. The Department, therefore, does not expect that the final regulations will place a substantial burden on small other recipients.

2.D. Discussion of Significant Alternatives

The Department also considered alternatives that could potentially reduce the burden for small entities. One alternative would be to extend the effective date of the Title IX regulations for small entities such that they would have additional time to implement key components of the regulations. An extension of the effective date will delay the efforts of small entities to ensure that their education programs or activities are free from sex discrimination, thereby depriving students, employees, and others of their rights under Title IX. Another alternative would be to waive certain requirements for small entities to help facilitate their compliance with Title IX. The Department declines this approach because the final regulations are critical to ensuring that all education programs or activities that receive Federal funding do not discriminate based on sex. In addition, the final regulations are more adaptable than the 2020 amendments and will provide greater opportunities for small entities to tailor their compliance efforts to their settings. Finally, the Department considered proposing different requirements for smaller-sized recipients than for mid-sized or larger ones. The Department rejects this alternative because the Title IX rights of students, employees, and other members of a recipient's educational community do not depend on the size of a recipient, and the final regulations are sufficiently adaptable for small entities to adopt the approach that works best for them. Being subjected to sex discrimination in a recipient's education program or activity can affect an applicant's opportunity to enroll in a recipient's education program or activity, a student's ability to learn and thrive inside and outside of the classroom, a prospective or current employee's ability to contribute their talents to the recipient's educational mission, and the opportunity of all participants to benefit, on an equal basis, from the recipient's education program or activity. Thus, permitting a small entity the opportunity to delay implementation of the final regulations, waiving certain requirements for smaller entities, or having different requirements for small entities could jeopardize these important civil rights and harm students, employees, and others.

**Executive Order 12250 on Leadership and Coordination of Nondiscrimination Laws**

Pursuant to Executive Order 12250, the President's authority under 20 U.S.C. 1682 ''relating to the approval of rules, regulations, and orders'' implementing Title IX has been delegated to the Attorney General. Executive Order 12250 at § 1–102, 45 FR 72995 (Nov. 2, 1980). The final regulations were reviewed and approved by the Attorney General.

**Paperwork Reduction Act of 1995**

As part of its continuing effort to reduce paperwork and the burden of responding, the Department provides the general public and Federal agencies with an opportunity to comment on proposed and continuing collections of information in accordance with the Paperwork Reduction Act of 1995 (PRA) (44 U.S.C. 3506(c)(2)(A)). This requirement helps ensure that: (1) the public understands the Department's collection instructions; (2) respondents can provide the requested data in the desired format; (3) reporting burden (time and financial resources) is minimized; (4) collection instruments are clearly understood; and (5) the Department can properly assess the impact of collection requirements on respondents.

As discussed in the RIA, Cost Estimates (Section 4.C.), the Department estimates that all regulated entities will experience an increased recordkeeping burden under the final regulations as a result of the changes to recordkeeping requirements in final § 106.8(f). Specifically, in Year 1, the Department estimates that compliance would require an additional 4 hours of recordkeeping burden per LEA, 16 hours per IHE, and 4 hours per other recipient. In total, the Department estimates the Year 1 recordkeeping burden associated with the final regulations to be a net increase of 171,024 hours.

In subsequent years, the Department estimates that the final regulations will require an additional ongoing burden of 2 hours per LEA, 6 hours per IHE, and 2 hours per other recipient. In total, the Department estimates an ongoing annual recordkeeping burden increase of 73,506 hours. However, the Department's view is that final § 106.8(f) will not result in a change of disclosure requirements. Specifically, there are three main reasons for this assumption: (1) recipients were already required to maintain all records related to sexual harassment under the 2020 amendments; (2) many recipients (based on anecdotal reports) were already conducting and maintaining records related to alternative disciplinary proceedings addressing conduct outside of the coverage area of the 2020 amendments; and (3) based upon anecdotal reports, many recipients were already maintaining their records related to sex discrimination. As a result, recipients falling within one or more of these categories will experience a de minimis increase in the number of disclosures.

| Regulatory section | Information collection | OMB control No. and estimated change in burden |
|---|---|---|
| 106.8(f) ................. | This regulatory provision requires a recipient to maintain certain documentation related to Title IX activities. | OMB 1870–0505 Changes will increase burden over the first seven years by $44,448,753 612,060 hours. |

The Department prepared an Information Collection Request (ICR) for this collection. This collection was identified as proposed collection OMB control number 1870–0505.

**Assessment of Educational Impact**

In the July 2022 NPRM the Department requested comments on whether the proposed regulations would require transmission of information that any other agency or authority of the United States gathers or makes available. 87 FR 41566.

Based on the response to the July 2022 NPRM and on the Department's review, the final regulations do not require transmission of information that any other agency or authority of the United States gathers or makes available.

**Federalism**

Executive Order 13132 requires the Department to ensure meaningful and timely input by State and local elected officials in the development of regulatory policies that have federalism implications. "Federalism implications'' means substantial direct effects on the States, on the relationship between the National Government and the States, or on the distribution of power and responsibilities among the various levels of government.

In the July 2022 NPRM, the Department identified specific sections that could potentially have had federalism implications and encouraged State and local elected officials to review and provide comments on the proposed regulations. *Id.* In the preamble, the Department discusses any comments received on this subject.

**Accessible Format**

On request to the program contact person listed under **FOR FURTHER INFORMATION CONTACT**, individuals with disabilities can obtain this document in an accessible format. The Department will provide the requestor with an accessible format that may include Rich Text Format (RTF) or text format (txt), a thumb drive, an MP3 file, braille, large print, audiotape, or compact disc, or other accessible format.

**Electronic Access to This Document**

You may access the official edition of the **Federal Register** and the Code of Federal Regulations at *www.govinfo.gov*. At this site you can view this document, as well as all other documents of this Department published in the **Federal Register**, in text or Adobe Portable Document Format (PDF). To use PDF, you must have Adobe Acrobat Reader, which is available free at the site.

You may also access documents of the Department published in the **Federal Register** by using the article search feature at: *www.federalregister.gov*. Specifically, through the advanced search feature at this site, you can limit your search to documents published by the Department.

**List of Subjects in 34 CFR Part 106**

Civil rights, Education, Sex discrimination, Youth organizations.

**Miguel A. Cardona,**
*Secretary of Education.*

For the reasons discussed in the preamble, the Secretary amends part 106 of title 34 of the Code of Federal Regulations as follows:

**PART 106—NONDISCRIMINATION ON THE BASIS OF SEX IN EDUCATION PROGRAMS OR ACTIVITIES RECEIVING FEDERAL FINANCIAL ASSISTANCE**

■ 1. The authority citation for part 106 continues to read as follows:

**Authority:** 20 U.S.C. 1681 *et seq.,* unless otherwise noted.

■ 2. Section 106.1 is revised to read as follows:

**§ 106.1  Purpose.**

The purpose of this part is to effectuate Title IX, which is designed to eliminate (with certain exceptions) discrimination on the basis of sex in any education program or activity receiving Federal financial assistance, whether or not such program or activity is offered or sponsored by an educational institution as defined in this part. This part is also intended to effectuate section 844 of the Education Amendments of 1974, Public Law 93–380, 88 Stat. 484.

■ 3. Section 106.2 is revised to read as follows:

**§ 106.2  Definitions.**

As used in this part, the term:

*Administrative law judge* means a person appointed by the reviewing authority to preside over a hearing held under § 106.81.

*Administratively separate unit* means a school, department, or college of an educational institution (other than a local educational agency), admission to which is independent of admission to any other component of such institution.

*Admission* means selection for part-time, full-time, special, associate, transfer, exchange, or any other enrollment, membership, or matriculation in or at an education program or activity operated by a recipient.

*Applicant,* as used in the definition of educational institution in this section and as used in § 106.4, means one who submits an application, request, or plan required to be approved by a Department official, or by a recipient, as a condition to becoming a recipient.

*Assistant Secretary* means the Assistant Secretary for Civil Rights of the Department.

*Complainant* means:

(1) A student or employee who is alleged to have been subjected to conduct that could constitute sex discrimination under Title IX or this part; or

(2) A person other than a student or employee who is alleged to have been subjected to conduct that could constitute sex discrimination under Title IX or this part and who was participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination.

*Complaint* means an oral or written request to the recipient that objectively can be understood as a request for the recipient to investigate and make a determination about alleged discrimination under Title IX or this part.

*Confidential employee* means:

(1) An employee of a recipient whose communications are privileged or confidential under Federal or State law. The employee's confidential status, for purposes of this part, is only with respect to information received while the employee is functioning within the scope of their duties to which privilege or confidentiality applies;

(2) An employee of a recipient whom the recipient has designated as confidential under this part for the purpose of providing services to persons related to sex discrimination. If the employee also has a duty not associated with providing those services, the

employee's confidential status is only with respect to information received about sex discrimination in connection with providing those services; or

(3) An employee of a postsecondary institution who is conducting an Institutional Review Board-approved human-subjects research study designed to gather information about sex discrimination—but the employee's confidential status is only with respect to information received while conducting the study.

*Department* means the Department of Education.

*Disciplinary sanctions* means consequences imposed on a respondent following a determination under Title IX that the respondent violated the recipient's prohibition on sex discrimination.

*Educational institution* means a local educational agency (LEA) as defined by section 8101 of the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act (20 U.S.C. 7801(30)), a preschool, a private elementary or secondary school, or an applicant or recipient that is an institution of graduate higher education, an institution of undergraduate higher education, an institution of professional education, or an institution of vocational education.

*Elementary school* means elementary school as defined by section 8101 of the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act (20 U.S.C. 7801(19)), and a public or private preschool.

*Federal financial assistance* means any of the following, when authorized or extended under a law administered by the Department:

(1) A grant or loan of Federal financial assistance, including funds made available for:

(i) The acquisition, construction, renovation, restoration, or repair of a building or facility or any portion thereof; and

(ii) Scholarships, loans, grants, wages, or other funds extended to any entity for payment to or on behalf of students admitted to that entity, or extended directly to such students for payment to that entity.

(2) A grant of Federal real or personal property or any interest therein, including surplus property, and the proceeds of the sale or transfer of such property, if the Federal share of the fair market value of the property is not, upon such sale or transfer, properly accounted for to the Federal Government.

(3) Provision of the services of Federal personnel.

(4) Sale or lease of Federal property or any interest therein at nominal consideration, or at consideration reduced for the purpose of assisting the recipient or in recognition of public interest to be served thereby, or permission to use Federal property or any interest therein without consideration.

(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

*Institution of graduate higher education* means an institution which:

(1) Offers academic study beyond the bachelor of arts or bachelor of science degree, whether or not leading to a certificate of any higher degree in the liberal arts and sciences; or

(2) Awards any degree in a professional field beyond the first professional degree (regardless of whether the first professional degree in such field is awarded by an institution of undergraduate higher education or professional education); or

(3) Awards no degree and offers no further academic study, but operates ordinarily for the purpose of facilitating research by persons who have received the highest graduate degree in any field of study.

*Institution of professional education* means an institution (except any institution of undergraduate higher education) which offers a program of academic study that leads to a first professional degree in a field for which there is a national specialized accrediting agency recognized by the Secretary.

*Institution of undergraduate higher education* means:

(1) An institution offering at least two but less than four years of college level study beyond the high school level, leading to a diploma or an associate degree, or wholly or principally creditable toward a baccalaureate degree; or

(2) An institution offering academic study leading to a baccalaureate degree; or

(3) An agency or body which certifies credentials or offers degrees, but which may or may not offer academic study.

*Institution of vocational education* means a school or institution (except an institution of professional or graduate or undergraduate higher education) which has as its primary purpose preparation of students to pursue a technical, skilled, or semiskilled occupation or trade, or to pursue study in a technical field, whether or not the school or institution offers certificates, diplomas,

or degrees and whether or not it offers fulltime study.

*Parental status,* as used in §§ 106.21(c)(2)(i), 106.37(a)(3), 106.40(a), and 106.57(a)(1), means the status of a person who, with respect to another person who is under the age of 18 or who is 18 or older but is incapable of self-care because of a physical or mental disability, is:

(1) A biological parent;

(2) An adoptive parent;

(3) A foster parent;

(4) A stepparent;

(5) A legal custodian or guardian;

(6) In loco parentis with respect to such a person; or

(7) Actively seeking legal custody, guardianship, visitation, or adoption of such a person.

*Party* means a complainant or respondent.

*Peer retaliation* means retaliation by a student against another student.

*Postsecondary institution* means an institution of graduate higher education, an institution of undergraduate higher education, an institution of professional education, or an institution of vocational education that serves postsecondary school students.

*Pregnancy or related conditions* means:

(1) Pregnancy, childbirth, termination of pregnancy, or lactation;

(2) Medical conditions related to pregnancy, childbirth, termination of pregnancy, or lactation; or

(3) Recovery from pregnancy, childbirth, termination of pregnancy, lactation, or related medical conditions.

*Program or activity* and *program* means all of the operations of—

(1)(i) A department, agency, special purpose district, or other instrumentality of a State or local government; or

(ii) The entity of a State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;

(2)(i) A college, university, or other postsecondary institution, or a public system of higher education; or

(ii) A local educational agency (as defined in 20 U.S.C. 8801), system of vocational education, or other school system;

(3)(i) An entire corporation, partnership, other private organization, or an entire sole proprietorship—

(A) If assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

(B) Which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(ii) The entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

(4) Any other entity that is established by two or more of the entities described in paragraph (1), (2), or (3) of this definition, any part of which is extended Federal financial assistance.

*Recipient* means any State or political subdivision thereof, or any instrumentality of a State or political subdivision thereof, any public or private agency, institution, or organization, or other entity, or any person, to whom Federal financial assistance is extended directly or through another recipient and which operates an education program or activity which receives such assistance, including any subunit, successor, assignee, or transferee thereof.

*Relevant* means related to the allegations of sex discrimination under investigation as part of the grievance procedures under § 106.45, and if applicable § 106.46. Questions are relevant when they seek evidence that may aid in showing whether the alleged sex discrimination occurred, and evidence is relevant when it may aid a decisionmaker in determining whether the alleged sex discrimination occurred.

*Remedies* means measures provided, as appropriate, to a complainant or any other person the recipient identifies as having had their equal access to the recipient's education program or activity limited or denied by sex discrimination. These measures are provided to restore or preserve that person's access to the recipient's education program or activity after a recipient determines that sex discrimination occurred.

*Respondent* means a person who is alleged to have violated the recipient's prohibition on sex discrimination.

*Retaliation* means intimidation, threats, coercion, or discrimination against any person by the recipient, a student, or an employee or other person authorized by the recipient to provide aid, benefit, or service under the recipient's education program or activity, for the purpose of interfering with any right or privilege secured by Title IX or this part, or because the person has reported information, made a complaint, testified, assisted, or participated or refused to participate in any manner in an investigation,

proceeding, or hearing under this part, including in an informal resolution process under § 106.44(k), in grievance procedures under § 106.45, and if applicable § 106.46, and in any other actions taken by a recipient under § 106.44(f)(1). Nothing in this definition or this part precludes a recipient from requiring an employee or other person authorized by a recipient to provide aid, benefit, or service under the recipient's education program or activity to participate as a witness in, or otherwise assist with, an investigation, proceeding, or hearing under this part.

*Reviewing authority* means that component of the Department delegated authority by the Secretary to appoint, and to review the decisions of, administrative law judges in cases arising under this part.

*Secondary school* means secondary school as defined by section 8101 of the Elementary and Secondary Education Act of 1965, as amended by the Every Student Succeeds Act (20 U.S.C. 7801(45)), and an institution of vocational education that serves secondary school students.

*Secretary* means the Secretary of Education.

*Sex-based harassment* prohibited by this part is a form of sex discrimination and means sexual harassment and other harassment on the basis of sex, including on the bases described in § 106.10, that is:

(1) *Quid pro quo harassment.* An employee, agent, or other person authorized by the recipient to provide an aid, benefit, or service under the recipient's education program or activity explicitly or impliedly conditioning the provision of such an aid, benefit, or service on a person's participation in unwelcome sexual conduct;

(2) *Hostile environment harassment.* Unwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.,* creates a hostile environment). Whether a hostile environment has been created is a fact-specific inquiry that includes consideration of the following:

(i) The degree to which the conduct affected the complainant's ability to access the recipient's education program or activity;

(ii) The type, frequency, and duration of the conduct;

(iii) The parties' ages, roles within the recipient's education program or activity, previous interactions, and other

factors about each party that may be relevant to evaluating the effects of the conduct;

(iv) The location of the conduct and the context in which the conduct occurred; and

(v) Other sex-based harassment in the recipient's education program or activity; or

(3) *Specific offenses.* (i) Sexual assault meaning an offense classified as a forcible or nonforcible sex offense under the uniform crime reporting system of the Federal Bureau of Investigation;

(ii) Dating violence meaning violence committed by a person:

(A) Who is or has been in a social relationship of a romantic or intimate nature with the victim; and

(B) Where the existence of such a relationship shall be determined based on a consideration of the following factors:

(*1*) The length of the relationship;

(*2*) The type of relationship; and

(*3*) The frequency of interaction between the persons involved in the relationship;

(iii) Domestic violence meaning felony or misdemeanor crimes committed by a person who:

(A) Is a current or former spouse or intimate partner of the victim under the family or domestic violence laws of the jurisdiction of the recipient, or a person similarly situated to a spouse of the victim;

(B) Is cohabitating, or has cohabitated, with the victim as a spouse or intimate partner;

(C) Shares a child in common with the victim; or

(D) Commits acts against a youth or adult victim who is protected from those acts under the family or domestic violence laws of the jurisdiction; or

(iv) Stalking meaning engaging in a course of conduct directed at a specific person that would cause a reasonable person to:

(A) Fear for the person's safety or the safety of others; or

(B) Suffer substantial emotional distress.

Note 1 to the definition of sex-based harassment: The Assistant Secretary will not require a recipient to adopt a particular definition of consent, where that term is applicable with respect to sex-based harassment.

*Student* means a person who has gained admission.

*Student with a disability* means a student who is an individual with a disability as defined in the Rehabilitation Act of 1973, as amended, 29 U.S.C. 705(9)(B), (20)(B), or a child with a disability as defined in the Individuals with Disabilities Education Act, 20 U.S.C. 1401(3).

*Supportive measures* means individualized measures offered as appropriate, as reasonably available, without unreasonably burdening a complainant or respondent, not for punitive or disciplinary reasons, and without fee or charge to the complainant or respondent to:

(1) Restore or preserve that party's access to the recipient's education program or activity, including measures that are designed to protect the safety of the parties or the recipient's educational environment; or

(2) Provide support during the recipient's grievance procedures under § 106.45, and if applicable § 106.46, or during the informal resolution process under § 106.44(k).

*Title IX* means Title IX of the Education Amendments of 1972 (Pub. L. 92–318; 20 U.S.C. 1681, 1682, 1683, 1685, 1686, 1687, 1688, 1689), as amended.

### § 106.3 [Amended]

■ 4. Section 106.3 is amended by removing paragraphs (c) and (d).

■ 5. Section 106.6 is amended by:
■ a. Revising paragraphs (b), (e), and (g).
■ b. Removing paragraph (h). The revisions read as follows:

### § 106.6 Effect of other requirements and preservation of rights.

\*    \*    \*    \*    \*

(b) *Effect of State or local law or other requirements.* The obligation to comply with Title IX and this part is not obviated or alleviated by any State or local law or other requirement that conflicts with Title IX or this part.

\*    \*    \*    \*    \*

(e) *Effect of Section 444 of General Education Provisions Act (GEPA)/ Family Educational Rights and Privacy Act (FERPA).* The obligation to comply with Title IX and this part is not obviated or alleviated by FERPA, 20 U.S.C. 1232g, or its implementing regulations, 34 CFR part 99.

\*    \*    \*    \*    \*

(g) *Exercise of rights by parents, guardians, or other authorized legal representatives.* Nothing in Title IX or this part may be read in derogation of any legal right of a parent, guardian, or other authorized legal representative to act on behalf of a complainant, respondent, or other person, subject to paragraph (e) of this section, including but not limited to making a complaint through the recipient's grievance procedures for complaints of sex discrimination.

■ 6. Section 106.8 is revised to read as follows:

### § 106.8 Designation of coordinator; grievance procedures; notice of nondiscrimination; training; students with disabilities; and recordkeeping.

(a) *Designation of a Title IX Coordinator.* (1) *Title IX Coordinator.* Each recipient must designate and authorize at least one employee, referred to herein as a Title IX Coordinator, to coordinate its efforts to comply with its responsibilities under Title IX and this part. If a recipient has more than one Title IX Coordinator, it must designate one of its Title IX Coordinators to retain ultimate oversight over those responsibilities and ensure the recipient's consistent compliance with its responsibilities under Title IX and this part.

(2) *Delegation to designees.* As appropriate, a recipient may delegate, or permit a Title IX Coordinator to delegate, specific duties to one or more designees.

(b) *Adoption, publication, and implementation of nondiscrimination policy and grievance procedures.* (1) *Nondiscrimination policy.* Each recipient must adopt, publish, and implement a policy stating that the recipient does not discriminate on the basis of sex and prohibits sex discrimination in any education program or activity that it operates, as required by Title IX and this part, including in admission (unless subpart C of this part does not apply) and employment.

(2) *Grievance procedures.* A recipient must adopt, publish, and implement grievance procedures consistent with the requirements of § 106.45, and if applicable § 106.46, that provide for the prompt and equitable resolution of complaints made by students, employees, or other individuals who are participating or attempting to participate in the recipient's education program or activity, or by the Title IX Coordinator, alleging any action that would be prohibited by Title IX or this part.

(c) *Notice of nondiscrimination.* A recipient must provide a notice of nondiscrimination to students; parents, guardians, or other authorized legal representatives of elementary and secondary school students; employees; applicants for admission and employment; and all unions and professional organizations holding collective bargaining or professional agreements with the recipient.

(1) *Contents of notice of nondiscrimination.* (i) The notice of nondiscrimination must include the following elements:

(A) A statement that the recipient does not discriminate on the basis of sex and prohibits sex discrimination in any education program or activity that it operates, as required by Title IX and this part, including in admission (unless subpart C of this part does not apply) and employment;

(B) A statement that inquiries about the application of Title IX and this part to the recipient may be referred to the recipient's Title IX Coordinator, the Office for Civil Rights, or both;

(C) The name or title, office address, email address, and telephone number of the recipient's Title IX Coordinator;

(D) How to locate the recipient's nondiscrimination policy under paragraph (b)(1) of this section; and the recipient's grievance procedures under paragraph (b)(2) of this section; and

(E) How to report information about conduct that may constitute sex discrimination under Title IX; and how to make a complaint of sex discrimination under this part.

(ii) Nothing in this part prevents a recipient from including in its notice of nondiscrimination information about any exceptions or exemptions applicable to the recipient under Title IX.

(2) *Publication of notice of nondiscrimination.* (i) Each recipient must prominently include all elements of its notice of nondiscrimination set out in paragraphs (c)(1)(i)(A) through (E) of this section on its website and in each handbook, catalog, announcement, bulletin, and application form that it makes available to persons entitled to notice under paragraph (c) of this section, or which are otherwise used in connection with the recruitment of students or employees.

(ii) If necessary, due to the format or size of any publication under paragraph (c)(2)(i) of this section, the recipient may instead include in those publications a statement that the recipient prohibits sex discrimination in any education program or activity that it operates and that individuals may report concerns or questions to the Title IX Coordinator, and provide the location of the notice on the recipient's website.

(iii) A recipient must not use or distribute a publication stating that the recipient treats applicants, students, or employees differently on the basis of sex, except as such treatment is permitted by Title IX or this part.

(d) *Training.* The recipient must ensure that the persons described in paragraphs (d)(1) through (4) of this section receive training related to their duties under Title IX promptly upon hiring or change of position that alters their duties under Title IX or this part,

and annually thereafter. This training must not rely on sex stereotypes.

(1) *All employees.* All employees must be trained on:

(i) The recipient's obligation to address sex discrimination in its education program or activity;

(ii) The scope of conduct that constitutes sex discrimination under Title IX and this part, including the definition of sex-based harassment; and

(iii) All applicable notification and information requirements under §§ 106.40(b)(2) and 106.44.

(2) *Investigators, decisionmakers, and other persons who are responsible for implementing the recipient's grievance procedures or have the authority to modify or terminate supportive measures.* In addition to the training requirements in paragraph (d)(1) of this section, all investigators, decisionmakers, and other persons who are responsible for implementing the recipient's grievance procedures or have the authority to modify or terminate supportive measures under § 106.44(g)(4) must be trained on the following topics to the extent related to their responsibilities:

(i) The recipient's obligations under § 106.44;

(ii) The recipient's grievance procedures under § 106.45, and if applicable § 106.46;

(iii) How to serve impartially, including by avoiding prejudgment of the facts at issue, conflicts of interest, and bias; and

(iv) The meaning and application of the term ''relevant'' in relation to questions and evidence, and the types of evidence that are impermissible regardless of relevance under § 106.45, and if applicable § 106.46.

(3) *Facilitators of informal resolution process.* In addition to the training requirements in paragraph (d)(1) of this section, all facilitators of an informal resolution process under § 106.44(k) must be trained on the rules and practices associated with the recipient's informal resolution process and on how to serve impartially, including by avoiding conflicts of interest and bias.

(4) *Title IX Coordinator and designees.* In addition to the training requirements in paragraphs (d)(1) through (3) of this section, the Title IX Coordinator and any designees under paragraph (a) of this section must be trained on their specific responsibilities under paragraph (a) of this section, §§ 106.40(b)(3), 106.44(f) and (g), the recipient's recordkeeping system and the requirements of paragraph (f) of this section, and any other training necessary to coordinate the recipient's compliance with Title IX.

(e) *Students with disabilities.* If a complainant or respondent is an elementary or secondary student with a disability, the recipient must require the Title IX Coordinator to consult with one or more members, as appropriate, of the student's Individualized Education Program (IEP) team, 34 CFR 300.321, if any, or one or more members, as appropriate, of the group of persons responsible for the student's placement decision under 34 CFR 104.35(c), if any, to determine how to comply with the requirements of the Individuals with Disabilities Education Act, 20 U.S.C. 1400 *et seq.,* and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, throughout the recipient's implementation of grievance procedures under § 106.45. If a complainant or respondent is a postsecondary student with a disability, the Title IX Coordinator may consult, as appropriate, with the individual or office that the recipient has designated to provide support to students with disabilities to determine how to comply with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794.

(f) *Recordkeeping.* A recipient must maintain for a period of at least seven years:

(1) For each complaint of sex discrimination, records documenting the informal resolution process under § 106.44(k) or the grievance procedures under § 106.45, and if applicable § 106.46, and the resulting outcome.

(2) For each notification the Title IX Coordinator receives of information about conduct that reasonably may constitute sex discrimination under Title IX or this part, including notifications under § 106.44(c)(1) or (2), records documenting the actions the recipient took to meet its obligations under § 106.44.

(3) All materials used to provide training under paragraph (d) of this section. A recipient must make these training materials available upon request for inspection by members of the public.

■ 7. Section 106.10 is added to subpart B to read as follows:

### § 106.10  Scope.

Discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.

■ 8. Section 106.11 is revised to read as follows:

### § 106.11  Application.

Except as provided in this subpart, this part applies to every recipient and to all sex discrimination occurring under a recipient's education program or activity in the United States. For purposes of this section, conduct that occurs under a recipient's education program or activity includes but is not limited to conduct that occurs in a building owned or controlled by a student organization that is officially recognized by a postsecondary institution, and conduct that is subject to the recipient's disciplinary authority. A recipient has an obligation to address a sex-based hostile environment under its education program or activity, even when some conduct alleged to be contributing to the hostile environment occurred outside the recipient's education program or activity or outside the United States.

■ 9. Section 106.15 is amended by revising paragraph (b) to read as follows:

### § 106.15  Admissions.

\*    \*    \*    \*    \*

(b) *Administratively separate units.* For purposes only of this section and subpart C, each administratively separate unit shall be deemed to be an educational institution.

\*    \*    \*    \*    \*

### § 106.16  [Removed]

■ 10. Section 106.16 is removed.

### § 106.17  [Removed]

■ 11. Section 106.17 is removed.

### § 106.18  [Redesignated as § 106.16]

■ 12. Section 106.18 is redesignated as § 106.16 in subpart B.

■ 13. Section 106.21 is amended by revising paragraphs (a) and (c) to read as follows:

### § 106.21  Admissions.

(a) *Status generally.* No person shall, on the basis of sex, be denied admission, or be subjected to discrimination in admission, by any recipient to which this subpart applies.

\*    \*    \*    \*    \*

(c) *Parental, family, or marital status; pregnancy or related conditions.* In determining whether a person satisfies any policy or criterion for admission, or in making any offer of admission, a recipient to which this subpart applies:

(1) Must treat pregnancy or related conditions in the same manner and under the same policies as any other temporary medical conditions; and

(2) Must not:

(i) Adopt or implement any policy, practice, or procedure concerning the current, potential, or past parental, family, or marital status of a student or applicant that treats persons differently on the basis of sex;

(ii) Discriminate against any person on the basis of current, potential, or past pregnancy or related conditions, or adopt or implement any policy, practice, or procedure that so discriminates; and

(iii) Make a pre-admission inquiry as to the marital status of an applicant for admission, including whether such applicant is ''Miss or Mrs.'' A recipient may ask an applicant to self-identify their sex, but only if this question is asked of all applicants and if the response is not used as a basis for discrimination prohibited by this part.

## § 106.30 [Removed]

■ 14. Section 106.30 is removed.
■ 15. Section 106.31 is amended by revising paragraph (a) to read as follows:

## § 106.31 Education programs or activities.

(a) *General.* (1) Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or otherwise be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient that receives Federal financial assistance.

(2) In the limited circumstances in which Title IX or this part permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b). Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.

(3) This subpart does not apply to actions of a recipient in connection with admission of its students to an education program or activity of:

(i) A recipient to which subpart C does not apply; or

(ii) An entity, not a recipient, to which subpart C would not apply if the entity were a recipient.

\* \* \* \* \*

■ 16. Section 106.40 is revised to read as follows:

## § 106.40 Parental, family, or marital status; pregnancy or related conditions.

(a) *Status generally.* A recipient must not adopt or implement any policy, practice, or procedure concerning a student's current, potential, or past parental, family, or marital status that treats students differently on the basis of sex.

(b) *Pregnancy or related conditions.* (1) *Nondiscrimination.* A recipient must not discriminate in its education program or activity against any student based on the student's current, potential, or past pregnancy or related conditions. A recipient does not engage in prohibited discrimination when it allows a student, based on pregnancy or related conditions, to voluntarily participate in a separate portion of its education program or activity provided the recipient ensures that the separate portion is comparable to that offered to students who are not pregnant and do not have related conditions.

(2) *Responsibility to provide Title IX Coordinator contact and other information.* A recipient must ensure that when a student, or a person who has a legal right to act on behalf of the student, informs any employee of the student's pregnancy or related conditions, unless the employee reasonably believes that the Title IX Coordinator has been notified, the employee promptly provides that person with the Title IX Coordinator's contact information and informs that person that the Title IX Coordinator can coordinate specific actions to prevent sex discrimination and ensure the student's equal access to the recipient's education program or activity.

(3) *Specific actions to prevent discrimination and ensure equal access.* A recipient must take specific actions under paragraphs (b)(3)(i) through (vi) of this section to promptly and effectively prevent sex discrimination and ensure equal access to the recipient's education program or activity once the student, or a person who has a legal right to act on behalf of the student, notifies the Title IX Coordinator of the student's pregnancy or related conditions. The Title IX Coordinator must coordinate these actions.

(i) *Responsibility to provide information about recipient obligations.* The recipient must inform the student, and if applicable, the person who notified the Title IX Coordinator of the student's pregnancy or related conditions and has a legal right to act on behalf of the student, of the recipient's obligations under paragraphs (b)(1) through (5) of this section and § 106.44(j) and provide the recipient's notice of nondiscrimination under § 106.8(c)(1).

(ii) *Reasonable modifications.* (A) The recipient must make reasonable modifications to the recipient's policies, practices, or procedures as necessary to prevent sex discrimination and ensure equal access to the recipient's education program or activity. Each reasonable modification must be based on the student's individualized needs. In determining what modifications are required under this paragraph, the recipient must consult with the student. A modification that a recipient can demonstrate would fundamentally alter the nature of its education program or activity is not a reasonable modification.

(B) The student has discretion to accept or decline each reasonable modification offered by the recipient. If a student accepts a recipient's offered reasonable modification, the recipient must implement it.

(C) Reasonable modifications may include, but are not limited to, breaks during class to express breast milk, breastfeed, or attend to health needs associated with pregnancy or related conditions, including eating, drinking, or using the restroom; intermittent absences to attend medical appointments; access to online or homebound education; changes in schedule or course sequence; extensions of time for coursework and rescheduling of tests and examinations; allowing a student to sit or stand, or carry or keep water nearby; counseling; changes in physical space or supplies (for example, access to a larger desk or a footrest); elevator access; or other changes to policies, practices, or procedures.

(iii) *Voluntary access to separate and comparable portion of program or activity.* The recipient must allow the student to voluntarily access any separate and comparable portion of the recipient's education program or activity under paragraph (b)(1) of this section.

(iv) *Voluntary leaves of absence.* The recipient must allow the student to voluntarily take a leave of absence from the recipient's education program or activity to cover, at minimum, the period of time deemed medically necessary by the student's licensed healthcare provider. To the extent that a student qualifies for leave under a leave policy maintained by a recipient that allows a greater period of time than the medically necessary period, the recipient must permit the student to take voluntary leave under that policy instead if the student so chooses. When the student returns to the recipient's education program or activity, the student must be reinstated to the academic status and, as practicable, to the extracurricular status that the student held when the voluntary leave began.

(v) *Lactation space.* The recipient must ensure that the recipient can access a lactation space, which must be a space other than a bathroom, that is clean, shielded from view, free from intrusion from others, and may be used by a student for expressing breast milk or breastfeeding as needed.

(vi) *Limitation on supporting documentation.* A recipient must not require supporting documentation under paragraphs (b)(3)(ii) through (v) unless the documentation is necessary and reasonable for the recipient to determine the reasonable modifications to make or whether to take additional specific actions under paragraphs (b)(3)(ii) through (v). Examples of situations when requiring supporting documentation is not necessary and reasonable include, but are not limited to, when the student's need for a specific action under paragraphs (b)(3)(ii) through (v) is obvious, such as when a student who is pregnant needs a bigger uniform; when the student has previously provided the recipient with sufficient supporting documentation; when the reasonable modification because of pregnancy or related conditions at issue is allowing a student to carry or keep water nearby and drink, use a bigger desk, sit or stand, or take breaks to eat, drink, or use the restroom; when the student has lactation needs; or when the specific action under paragraphs (b)(3)(ii) through (v) is available to students for reasons other than pregnancy or related conditions without submitting supporting documentation.

(4) *Comparable treatment to other temporary medical conditions.* To the extent consistent with paragraph (b)(3) of this section, a recipient must treat pregnancy or related conditions in the same manner and under the same policies as any other temporary medical conditions with respect to any medical or hospital benefit, service, plan, or policy the recipient administers, operates, offers, or participates in with respect to students admitted to the recipient's education program or activity.

(5) *Certification to participate.* A recipient must not require a student who is pregnant or has related conditions to provide certification from a healthcare provider or any other person that the student is physically able to participate in the recipient's class, program, or extracurricular activity unless:

(i) The certified level of physical ability or health is necessary for participation in the class, program, or extracurricular activity;

(ii) The recipient requires such certification of all students participating in the class, program, or extracurricular activity; and

(iii) The information obtained is not used as a basis for discrimination prohibited by this part.

### § 106.41 [Amended]

■ 17. Section 106.41 is amended by removing paragraph (d).

■ 18. Section 106.44 is revised to read as follows:

### § 106.44 Recipient's response to sex discrimination.

(a) *General.* (1) A recipient with knowledge of conduct that reasonably may constitute sex discrimination in its education program or activity must respond promptly and effectively; and

(2) A recipient must also comply with this section to address sex discrimination in its education program or activity.

(b) *Barriers to reporting.* A recipient must require its Title IX Coordinator to:

(1) Monitor the recipient's education program or activity for barriers to reporting information about conduct that reasonably may constitute sex discrimination under Title IX or this part; and

(2) Take steps reasonably calculated to address such barriers.

(c) *Notification requirements.* (1) An elementary school or secondary school recipient must require all of its employees who are not confidential employees to notify the Title IX Coordinator when the employee has information about conduct that reasonably may constitute sex discrimination under Title IX or this part.

(2) All other recipients must, at a minimum, require:

(i) Any employee who is not a confidential employee and who either has authority to institute corrective measures on behalf of the recipient or has responsibility for administrative leadership, teaching, or advising in the recipient's education program or activity to notify the Title IX Coordinator when the employee has information about conduct that reasonably may constitute sex discrimination under Title IX or this part; and

(ii) All other employees who are not confidential employees and not covered by paragraph (c)(2)(i) of this section to either:

(A) Notify the Title IX Coordinator when the employee has information about conduct that reasonably may constitute sex discrimination under Title IX or this part; or

(B) Provide the contact information of the Title IX Coordinator and information about how to make a complaint of sex discrimination to any person who provides the employee with information about conduct that reasonably may constitute sex discrimination under Title IX or this part.

(3) A postsecondary institution must reasonably determine and specify whether and under what circumstances a person who is both a student and an employee is subject to the requirements of paragraph (c)(2) of this section.

(4) The requirements of paragraphs (c)(1) and (2) of this section do not apply to an employee who has personally been subject to conduct that reasonably may constitute sex discrimination under Title IX or this part.

(d) *Confidential employee requirements.* (1) A recipient must notify all participants in the recipient's education program or activity of how to contact its confidential employees, if any, excluding any employee whose confidential status is only with respect to their conducting an Institutional Review Board-approved human-subjects research study designed to gather information about sex discrimination as set out in the definition of confidential employee in § 106.2.

(2) A recipient must require a confidential employee to explain to any person who informs the confidential employee of conduct that reasonably may constitute sex discrimination under Title IX or this part:

(i) The employee's status as confidential for purposes of this part, including the circumstances in which the employee is not required to notify the Title IX Coordinator about conduct that reasonably may constitute sex discrimination;

(ii) How to contact the recipient's Title IX Coordinator and how to make a complaint of sex discrimination; and

(iii) That the Title IX Coordinator may be able to offer and coordinate supportive measures, as well as initiate an informal resolution process or an investigation under the grievance procedures.

(e) *Public awareness events.* When a postsecondary institution's Title IX Coordinator is notified of information about conduct that reasonably may constitute sex-based harassment under Title IX or this part that was provided by a person during a public event to raise awareness about sex-based harassment that was held on the postsecondary institution's campus or through an online platform sponsored by a postsecondary institution, the

postsecondary institution is not obligated to act in response to the information, unless it indicates an imminent and serious threat to the health or safety of a complainant, any students, employees, or other persons. However, in all cases the postsecondary institution must use this information to inform its efforts to prevent sex-based harassment, including by providing tailored training to address alleged sex-based harassment in a particular part of its education program or activity or at a specific location when information indicates there may be multiple incidents of sex-based harassment. Nothing in Title IX or this part obligates a postsecondary institution to require its Title IX Coordinator or any other employee to attend such public awareness events.

(f) *Title IX Coordinator requirements.* The Title IX Coordinator is responsible for coordinating the recipient's compliance with its obligations under Title IX and this part.

(1) A recipient must require its Title IX Coordinator, when notified of conduct that reasonably may constitute sex discrimination under Title IX or this part, to take the following actions to promptly and effectively end any sex discrimination in its education program or activity, prevent its recurrence, and remedy its effects:

(i) Treat the complainant and respondent equitably;

(ii) Offer and coordinate supportive measures under paragraph (g) of this section, as appropriate, for the complainant. In addition, if the recipient has initiated grievance procedures under § 106.45, and if applicable § 106.46, or offered an informal resolution process under paragraph (k) of this section to the respondent, offer and coordinate supportive measures under paragraph (g) of this section, as appropriate, for the respondent;

(iii)(A) Notify the complainant or, if the complainant is unknown, the individual who reported the conduct, of the grievance procedures under § 106.45, and if applicable § 106.46, and the informal resolution process under paragraph (k) of this section, if available and appropriate; and

(B) If a complaint is made, notify the respondent of the grievance procedures under § 106.45, and if applicable § 106.46, and the informal resolution process under paragraph (k) of this section, if available and appropriate;

(iv) In response to a complaint, initiate the grievance procedures under § 106.45, and if applicable § 106.46, or the informal resolution process under paragraph (k) of this section, if available

and appropriate and requested by all parties;

(v) In the absence of a complaint or the withdrawal of any or all of the allegations in a complaint, and in the absence or termination of an informal resolution process, determine whether to initiate a complaint of sex discrimination that complies with the grievance procedures under § 106.45, and if applicable § 106.46.

(A) To make this fact-specific determination, the Title IX Coordinator must consider, at a minimum, the following factors:

(*1*) The complainant's request not to proceed with initiation of a complaint;

(*2*) The complainant's reasonable safety concerns regarding initiation of a complaint;

(*3*) The risk that additional acts of sex discrimination would occur if a complaint is not initiated;

(*4*) The severity of the alleged sex discrimination, including whether the discrimination, if established, would require the removal of a respondent from campus or imposition of another disciplinary sanction to end the discrimination and prevent its recurrence;

(*5*) The age and relationship of the parties, including whether the respondent is an employee of the recipient;

(*6*) The scope of the alleged sex discrimination, including information suggesting a pattern, ongoing sex discrimination, or sex discrimination alleged to have impacted multiple individuals;

(*7*) The availability of evidence to assist a decisionmaker in determining whether sex discrimination occurred; and

(*8*) Whether the recipient could end the alleged sex discrimination and prevent its recurrence without initiating its grievance procedures under § 106.45, and if applicable § 106.46.

(B) If, after considering these and other relevant factors, the Title IX Coordinator determines that the conduct as alleged presents an imminent and serious threat to the health or safety of the complainant or other person, or that the conduct as alleged prevents the recipient from ensuring equal access on the basis of sex to its education program or activity, the Title IX Coordinator may initiate a complaint.

(vi) If initiating a complaint under paragraph (f)(1)(v) of this section, notify the complainant prior to doing so and appropriately address reasonable concerns about the complainant's safety or the safety of others, including by providing supportive measures

consistent with paragraph (g) of this section; and

(vii) Regardless of whether a complaint is initiated, take other appropriate prompt and effective steps, in addition to steps necessary to effectuate the remedies provided to an individual complainant, if any, to ensure that sex discrimination does not continue or recur within the recipient's education program or activity.

(2) A Title IX Coordinator is not required to comply with paragraphs (f)(1)(i) through (vii) of this section upon being notified of conduct that may constitute sex discrimination if the Title IX Coordinator reasonably determines that the conduct as alleged could not constitute sex discrimination under Title IX or this part.

(g) *Supportive measures.* Under paragraph (f) of this section, a recipient must offer and coordinate supportive measures, as appropriate, as described in paragraphs (g)(1) through (6) of this section. For allegations of sex discrimination other than sex-based harassment or retaliation, a recipient's provision of supportive measures does not require the recipient, its employee, or any other person authorized to provide aid, benefit, or service on the recipient's behalf to alter the alleged discriminatory conduct for the purpose of providing a supportive measure.

(1) Supportive measures may vary depending on what the recipient deems to be reasonably available. These measures may include but are not limited to: counseling; extensions of deadlines and other course-related adjustments; campus escort services; increased security and monitoring of certain areas of the campus; restrictions on contact applied to one or more parties; leaves of absence; changes in class, work, housing, or extracurricular or any other activity, regardless of whether there is or is not a comparable alternative; and training and education programs related to sex-based harassment.

(2) Supportive measures must not unreasonably burden either party and must be designed to protect the safety of the parties or the recipient's educational environment, or to provide support during the recipient's grievance procedures under § 106.45, and if applicable § 106.46, or during the informal resolution process under § 106.44(k). A recipient must not impose such measures for punitive or disciplinary reasons.

(3) A recipient may, as appropriate, modify or terminate supportive measures at the conclusion of the grievance procedures under § 106.45, and if applicable § 106.46, or at the

conclusion of the informal resolution process under paragraph (k) of this section, or the recipient may continue them beyond that point.

(4) A recipient must provide a complainant or respondent with a timely opportunity to seek, from an appropriate and impartial employee, modification or reversal of the recipient's decision to provide, deny, modify, or terminate supportive measures applicable to them. The impartial employee must be someone other than the employee who made the challenged decision and must have authority to modify or reverse the decision, if the impartial employee determines that the decision to provide, deny, modify, or terminate the supportive measure was inconsistent with the definition of supportive measures in § 106.2. A recipient must also provide a party with the opportunity to seek additional modification or termination of a supportive measure applicable to them if circumstances change materially.

(5) A recipient must not disclose information about any supportive measures to persons other than the person to whom they apply, including informing one party of supportive measures provided to another party, unless necessary to provide the supportive measure or restore or preserve a party's access to the education program or activity, or when an exception in § 106.44(j)(1) through (5) applies.

(6)(i) If the complainant or respondent is an elementary or secondary student with a disability, the recipient must require the Title IX Coordinator to consult with one or more members, as appropriate, of the student's Individualized Education Program (IEP) team, 34 CFR 300.321, if any, or one or more members, as appropriate, of the group of persons responsible for the student's placement decision under 34 CFR 104.35(c), if any, to determine how to comply with the requirements of the Individuals with Disabilities Education Act, 20 U.S.C. 1400 *et seq.,* and Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, in the implementation of supportive measures.

(ii) If the complainant or respondent is a postsecondary student with a disability, the Title IX Coordinator may consult, as appropriate, with the individual or office that the recipient has designated to provide support to students with disabilities to determine how to comply with Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, in the implementation of supportive measures.

(h) *Emergency removal.* Nothing in this part precludes a recipient from removing a respondent from the recipient's education program or activity on an emergency basis, provided that the recipient undertakes an individualized safety and risk analysis, determines that an imminent and serious threat to the health or safety of a complainant or any students, employees, or other persons arising from the allegations of sex discrimination justifies removal, and provides the respondent with notice and an opportunity to challenge the decision immediately following the removal. This provision must not be construed to modify any rights under the Individuals with Disabilities Education Act, 20 U.S.C. 1400 *et seq.,* Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, or the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 *et seq.*

(i) *Administrative leave.* Nothing in this part precludes a recipient from placing an employee respondent on administrative leave from employment responsibilities during the pendency of the recipient's grievance procedures. This provision must not be construed to modify any rights under Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. 794, or the Americans with Disabilities Act of 1990, 42 U.S.C. 12101 *et seq.*

(j) *Prohibited disclosures of personally identifiable information.* A recipient must not disclose personally identifiable information obtained in the course of complying with this part, except in the following circumstances:

(1) When the recipient has obtained prior written consent from a person with the legal right to consent to the disclosure;

(2) When the information is disclosed to a parent, guardian, or other authorized legal representative with the legal right to receive disclosures on behalf of the person whose personally identifiable information is at issue;

(3) To carry out the purposes of this part, including action taken to address conduct that reasonably may constitute sex discrimination under Title IX in the recipient's education program or activity;

(4) As required by Federal law, Federal regulations, or the terms and conditions of a Federal award, including a grant award or other funding agreement; or

(5) To the extent such disclosures are not otherwise in conflict with Title IX or this part, when required by State or local law or when permitted under FERPA, 20 U.S.C. 1232g, or its implementing regulations, 34 CFR part 99.

(k) *Discretion to offer informal resolution in some circumstances.* (1) At any time prior to determining whether sex discrimination occurred under § 106.45, and if applicable § 106.46, a recipient may offer to a complainant and respondent an informal resolution process, unless the complaint includes allegations that an employee engaged in sex-based harassment of an elementary school or secondary school student or such a process would conflict with Federal, State or local law. A recipient that provides the parties an informal resolution process must, to the extent necessary, also require its Title IX Coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity.

(i) Subject to the limitations in paragraph (k)(1) of this section, a recipient has discretion to determine whether it is appropriate to offer an informal resolution process when it receives information about conduct that reasonably may constitute sex discrimination under Title IX or this part or when a complaint of sex discrimination is made, and may decline to offer informal resolution despite one or more of the parties' wishes.

(ii) In addition to the limitations in paragraph (k)(1) of this section, circumstances when a recipient may decline to allow informal resolution include but are not limited to when the recipient determines that the alleged conduct would present a future risk of harm to others.

(2) A recipient must not require or pressure the parties to participate in an informal resolution process. The recipient must obtain the parties' voluntary consent to the informal resolution process and must not require waiver of the right to an investigation and determination of a complaint as a condition of enrollment or continuing enrollment, or employment or continuing employment, or exercise of any other right.

(3) Before initiation of an informal resolution process, the recipient must provide to the parties notice that explains:

(i) The allegations;

(ii) The requirements of the informal resolution process;

(iii) That, prior to agreeing to a resolution, any party has the right to withdraw from the informal resolution process and to initiate or resume the recipient's grievance procedures;

(iv) That the parties' agreement to a resolution at the conclusion of the informal resolution process would

preclude the parties from initiating or resuming grievance procedures arising from the same allegations;

(v) The potential terms that may be requested or offered in an informal resolution agreement, including notice that an informal resolution agreement is binding only on the parties; and

(vi) What information the recipient will maintain and whether and how the recipient could disclose such information for use in grievance procedures under § 106.45, and if applicable § 106.46, if grievance procedures are initiated or resumed.

(4) The facilitator for the informal resolution process must not be the same person as the investigator or the decisionmaker in the recipient's grievance procedures. Any person designated by a recipient to facilitate an informal resolution process must not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. Any person facilitating informal resolution must receive training under § 106.8(d)(3).

(5) Potential terms that may be included in an informal resolution agreement include but are not limited to:

(i) Restrictions on contact; and

(ii) Restrictions on the respondent's participation in one or more of the recipient's programs or activities or attendance at specific events, including restrictions the recipient could have imposed as remedies or disciplinary sanctions had the recipient determined at the conclusion of the recipient's grievance procedures that sex discrimination occurred.

■ 19. Section 106.45 is revised to read as follows:

### § 106.45 Grievance procedures for the prompt and equitable resolution of complaints of sex discrimination.

(a)(1) *General.* A recipient's grievance procedures for the prompt and equitable resolution of complaints of sex discrimination must be in writing and include provisions that incorporate the requirements of this section. The requirements related to a respondent apply only to sex discrimination complaints alleging that a person violated the recipient's prohibition on sex discrimination. When a sex discrimination complaint alleges that a recipient's policy or practice discriminates on the basis of sex, the recipient is not considered a respondent.

(2) *Complaint.* The following persons have a right to make a complaint of sex discrimination, including complaints of sex-based harassment, requesting that

the recipient investigate and make a determination about alleged discrimination under Title IX or this part:

(i) A complainant;

(ii) A parent, guardian, or other authorized legal representative with the legal right to act on behalf of a complainant;

(iii) The Title IX Coordinator, after making the determination specified in § 106.44(f)(1)(v);

(iv) With respect to complaints of sex discrimination other than sex-based harassment, in addition to the persons listed in paragraphs (a)(2)(i) through (iii) of this section,

(A) Any student or employee; or

(B) Any person other than a student or employee who was participating or attempting to participate in the recipient's education program or activity at the time of the alleged sex discrimination.

(b) *Basic requirements for grievance procedures.* A recipient's grievance procedures must:

(1) Treat complainants and respondents equitably;

(2) Require that any person designated as a Title IX Coordinator, investigator, or decisionmaker not have a conflict of interest or bias for or against complainants or respondents generally or an individual complainant or respondent. The decisionmaker may be the same person as the Title IX Coordinator or investigator;

(3) Include a presumption that the respondent is not responsible for the alleged sex discrimination until a determination is made at the conclusion of the recipient's grievance procedures for complaints of sex discrimination;

(4) Establish reasonably prompt timeframes for the major stages of the grievance procedures, including a process that allows for the reasonable extension of timeframes on a case-by-case basis for good cause with notice to the parties that includes the reason for the delay. Major stages include, for example, evaluation (*i.e.,* the recipient's decision whether to dismiss or investigate a complaint of sex discrimination); investigation; determination; and appeal, if any;

(5) Require the recipient to take reasonable steps to protect the privacy of the parties and witnesses during the pendency of a recipient's grievance procedures, provided that the steps do not restrict the ability of the parties to: obtain and present evidence, including by speaking to witnesses, subject to § 106.71; consult with their family members, confidential resources, or advisors; or otherwise prepare for or participate in the grievance procedures;

(6) Require an objective evaluation of all evidence that is relevant, as defined in § 106.2, and not otherwise impermissible under paragraph (b)(7) of this section—including both inculpatory and exculpatory evidence—and provide that credibility determinations must not be based on a person's status as a complainant, respondent, or witness;

(7) Exclude the following types of evidence, and questions seeking that evidence, as impermissible (*i.e.,* must not be accessed or considered, except by the recipient to determine whether an exception in paragraphs (i) through (iii) applies; must not be disclosed; and must not otherwise be used), regardless of whether they are relevant:

(i) Evidence that is protected under a privilege as recognized by Federal or State law or evidence provided to a confidential employee, unless the person to whom the privilege or confidentiality is owed has voluntarily waived the privilege or confidentiality;

(ii) A party's or witness's records that are made or maintained by a physician, psychologist, or other recognized professional or paraprofessional in connection with the provision of treatment to the party or witness, unless the recipient obtains that party's or witness's voluntary, written consent for use in the recipient's grievance procedures; and

(iii) Evidence that relates to the complainant's sexual interests or prior sexual conduct, unless evidence about the complainant's prior sexual conduct is offered to prove that someone other than the respondent committed the alleged conduct or is evidence about specific incidents of the complainant's prior sexual conduct with the respondent that is offered to prove consent to the alleged sex-based harassment. The fact of prior consensual sexual conduct between the complainant and respondent does not by itself demonstrate or imply the complainant's consent to the alleged sex-based harassment or preclude determination that sex-based harassment occurred;

(8) If a recipient adopts grievance procedures that apply to the resolution of some, but not all, complaints articulate consistent principles for how the recipient will determine which procedures apply.

(c) *Notice of allegations.* Upon initiation of the recipient's grievance procedures, a recipient must provide notice of the allegations to the parties whose identities are known.

(1) The notice must include:

(i) The recipient's grievance procedures under this section, and if

applicable § 106.46, and any informal resolution process under § 106.44(k);

(ii) Sufficient information available at the time to allow the parties to respond to the allegations. Sufficient information includes the identities of the parties involved in the incident(s), the conduct alleged to constitute sex discrimination under Title IX or this part, and the date(s) and location(s) of the alleged incident(s), to the extent that information is available to the recipient;

(iii) A statement that retaliation is prohibited; and

(iv) A statement that the parties are entitled to an equal opportunity to access the relevant and not otherwise impermissible evidence or an accurate description of this evidence as set out in paragraph (f)(4) of this section; and if the recipient provides a description of the evidence, the parties are entitled to an equal opportunity to access to the relevant and not otherwise impermissible evidence upon the request of any party.

(2) If, in the course of an investigation, the recipient decides to investigate additional allegations of sex discrimination by the respondent toward the complainant that are not included in the notice provided under paragraph (c) of this section or that are included in a complaint that is consolidated under paragraph (e) of this section, the recipient must provide notice of the additional allegations to the parties whose identities are known.

(d) *Dismissal of a complaint.* (1) A recipient may dismiss a complaint of sex discrimination made through its grievance procedures under this section, and if applicable § 106.46, for any of the following reasons:

(i) The recipient is unable to identify the respondent after taking reasonable steps to do so;

(ii) The respondent is not participating in the recipient's education program or activity and is not employed by the recipient;

(iii) The complainant voluntarily withdraws any or all of the allegations in the complaint, the Title IX Coordinator declines to initiate a complaint under § 106.44(f)(1)(v), and the recipient determines that, without the complainant's withdrawn allegations, the conduct that remains alleged in the complaint, if any, would not constitute sex discrimination under Title IX or this part even if proven; or

(iv) The recipient determines the conduct alleged in the complaint, even if proven, would not constitute sex discrimination under Title IX or this part. Prior to dismissing the complaint under this paragraph, the recipient must make reasonable efforts to clarify the allegations with the complainant.

(2) Upon dismissal, a recipient must promptly notify the complainant of the basis for the dismissal. If the dismissal occurs after the respondent has been notified of the allegations, then the recipient must also notify the respondent of the dismissal and the basis for the dismissal promptly following notification to the complainant, or simultaneously if notification is in writing.

(3) A recipient must notify the complainant that a dismissal may be appealed and provide the complainant with an opportunity to appeal the dismissal of a complaint on the bases set out in § 106.46(i)(1). If the dismissal occurs after the respondent has been notified of the allegations, then the recipient must also notify the respondent that the dismissal may be appealed on the bases set out in § 106.46(i)(1). If the dismissal is appealed, the recipient must:

(i) Notify the parties of any appeal, including notice of the allegations consistent with paragraph (c) of this section if notice was not previously provided to the respondent;

(ii) Implement appeal procedures equally for the parties;

(iii) Ensure that the decisionmaker for the appeal did not take part in an investigation of the allegations or dismissal of the complaint;

(iv) Ensure that the decisionmaker for the appeal has been trained as set out in § 106.8(d)(2);

(v) Provide the parties a reasonable and equal opportunity to make a statement in support of, or challenging, the outcome; and

(vi) Notify the parties of the result of the appeal and the rationale for the result.

(4) A recipient that dismisses a complaint must, at a minimum:

(i) Offer supportive measures to the complainant as appropriate under § 106.44(g);

(ii) For dismissals under paragraph (d)(1)(iii) or (iv) of this section in which the respondent has been notified of the allegations, offer supportive measures to the respondent as appropriate under § 106.44(g); and

(iii) Require its Title IX Coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the recipient's education program or activity under § 106.44(f)(1)(vii).

(e) *Consolidation of complaints.* A recipient may consolidate complaints of sex discrimination against more than one respondent, or by more than one complainant against one or more respondents, or by one party against another party, when the allegations of sex discrimination arise out of the same facts or circumstances. If one of the complaints to be consolidated is a complaint of sex-based harassment involving a student complainant or student respondent at a postsecondary institution, the grievance procedures for investigating and resolving the consolidated complaint must comply with the requirements of § 106.46 in addition to the requirements of this section. When more than one complainant or more than one respondent is involved, references in this section and in § 106.46 to a party, complainant, or respondent include the plural, as applicable.

(f) *Complaint investigation.* A recipient must provide for adequate, reliable, and impartial investigation of complaints. To do so, the recipient must:

(1) Ensure that the burden is on the recipient—not on the parties—to conduct an investigation that gathers sufficient evidence to determine whether sex discrimination occurred;

(2) Provide an equal opportunity for the parties to present fact witnesses and other inculpatory and exculpatory evidence that are relevant and not otherwise impermissible;

(3) Review all evidence gathered through the investigation and determine what evidence is relevant and what evidence is impermissible regardless of relevance, consistent with § 106.2 and with paragraph (b)(7) of this section; and

(4) Provide each party with an equal opportunity to access the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible, consistent with § 106.2 and with paragraph (b)(7) of this section, in the following manner:

(i) A recipient must provide an equal opportunity to access either the relevant and not otherwise impermissible evidence, or an accurate description of this evidence. If the recipient provides a description of the evidence, it must further provide the parties with an equal opportunity to access the relevant and not otherwise impermissible evidence upon the request of any party;

(ii) A recipient must provide a reasonable opportunity to respond to the evidence or to the accurate description of the evidence described in paragraph (f)(4)(i) of this section; and

(iii) A recipient must take reasonable steps to prevent and address the parties' unauthorized disclosure of information and evidence obtained solely through the grievance procedures. For purposes

of this paragraph, disclosures of such information and evidence for purposes of administrative proceedings or litigation related to the complaint of sex discrimination are authorized.

(g) *Questioning parties and witnesses to aid in evaluating allegations and assessing credibility.* A recipient must provide a process that enables the decisionmaker to question parties and witnesses to adequately assess a party's or witness's credibility to the extent credibility is both in dispute and relevant to evaluating one or more allegations of sex discrimination.

(h) *Determination whether sex discrimination occurred.* Following an investigation and evaluation of all relevant and not otherwise impermissible evidence under paragraphs (f) and (g) of this section, the recipient must:

(1) Use the preponderance of the evidence standard of proof to determine whether sex discrimination occurred, unless the recipient uses the clear and convincing evidence standard of proof in all other comparable proceedings, including proceedings relating to other discrimination complaints, in which case the recipient may elect to use that standard of proof in determining whether sex discrimination occurred. Both standards of proof require the decisionmaker to evaluate relevant and not otherwise impermissible evidence for its persuasiveness; if the decisionmaker is not persuaded under the applicable standard by the evidence that sex discrimination occurred, whatever the quantity of the evidence is, the decisionmaker must not determine that sex discrimination occurred.

(2) Notify the parties in writing of the determination whether sex discrimination occurred under Title IX or this part including the rationale for such determination, and the procedures and permissible bases for the complainant and respondent to appeal, if applicable;

(3) If there is a determination that sex discrimination occurred, as appropriate, require the Title IX Coordinator to coordinate the provision and implementation of remedies to a complainant and other persons the recipient identifies as having had equal access to the recipient's education program or activity limited or denied by sex discrimination, coordinate the imposition of any disciplinary sanctions on a respondent, including notification to the complainant of any such disciplinary sanctions, and require the Title IX Coordinator to take other appropriate prompt and effective steps to ensure that sex discrimination does not continue or recur within the

recipient's education program or activity under § 106.44(f)(1)(vii). A recipient may not impose discipline on a respondent for sex discrimination prohibited by Title IX unless there is a determination at the conclusion of the recipient's grievance procedures that the respondent engaged in prohibited sex discrimination;

(4) Comply with § 106.45, and if applicable § 106.46, before the imposition of any disciplinary sanctions against a respondent; and

(5) Not discipline a party, witness, or others participating in a recipient's grievance procedures for making a false statement or for engaging in consensual sexual conduct based solely on the recipient's determination whether sex discrimination occurred.

(i) *Appeals.* In addition to an appeal of a dismissal consistent with paragraph (d)(3) of this section, a recipient must offer the parties an appeal process that, at a minimum, is the same as it offers in all other comparable proceedings, if any, including proceedings relating to other discrimination complaints. For a complaint of sex-based harassment involving a student complainant or student respondent, a postsecondary institution must also offer an appeal on the bases set out in § 106.46(i)(1).

(j) *Additional provisions.* If a recipient adopts additional provisions as part of its grievance procedures for handling complaints of sex discrimination, including sex-based harassment, such additional provisions must apply equally to the parties.

(k) *Informal resolution.* In lieu of resolving a complaint through the recipient's grievance procedures, the parties may instead elect to participate in an informal resolution process under § 106.44(k) if provided by the recipient consistent with that paragraph.

(l) *Provisions limited to sex-based harassment complaints.* For complaints alleging sex-based harassment, the grievance procedures must:

(1) Describe the range of supportive measures available to complainants and respondents under § 106.44(g); and

(2) List, or describe the range of, the possible disciplinary sanctions that the recipient may impose and remedies that the recipient may provide following a determination that sex-based harassment occurred.

### § 106.46   [Redesignated as § 106.48]

■ 20. Section 106.46 is redesignated as § 106.48 in subpart D.

■ 21. Add a new § 106.46 to subpart D to read as follows:

### § 106.46   Grievance procedures for the prompt and equitable resolution of complaints of sex-based harassment involving student complainants or student respondents at postsecondary institutions.

(a) *General.* A postsecondary institution's written grievance procedures for prompt and equitable resolution of complaints of sex-based harassment involving a student complainant or student respondent must include provisions that incorporate the requirements of § 106.45 and this section.

(b) *Student employees.* When a complainant or respondent is both a student and an employee of a postsecondary institution, the postsecondary institution must make a fact-specific inquiry to determine whether the requirements of this section apply. In making this determination, a postsecondary institution must, at a minimum, consider whether the party's primary relationship with the postsecondary institution is to receive an education and whether the alleged sex-based harassment occurred while the party was performing employment-related work.

(c) *Written notice of allegations.* Upon the initiation of the postsecondary institution's sex-based harassment grievance procedures under this section, a postsecondary institution must provide written notice to the parties whose identities are known with sufficient time for the parties to prepare a response before any initial interview.

(1) The written notice must include all information required under § 106.45(c)(1)(i) through (iii) and also inform the parties that:

(i) The respondent is presumed not responsible for the alleged sex-based harassment until a determination is made at the conclusion of the grievance procedures under this section and that prior to the determination, the parties will have an opportunity to present relevant and not otherwise impermissible evidence to a trained, impartial decisionmaker;

(ii) They may have an advisor of their choice to serve in the role set out in paragraph (e)(2) of this section, and that the advisor may be, but is not required to be, an attorney;

(iii) They are entitled to an equal opportunity to access the relevant and not otherwise impermissible evidence or an investigative report that accurately summarizes this evidence as set out in paragraph (e)(6) of this section; and if the postsecondary institution provides access to an investigative report, the parties are entitled to an equal opportunity to access to the relevant and not otherwise impermissible

evidence upon the request of any party; and

(iv) If applicable, the postsecondary institution's code of conduct prohibits knowingly making false statements or knowingly submitting false information during the grievance procedure.

(2) If, in the course of an investigation, the recipient decides to investigate additional allegations of sex-based harassment by the respondent toward the complainant that are not included in the written notice provided under paragraph (c) of this section or that are consolidated under § 106.45(e), the recipient must provide written notice of the additional allegations to the parties whose identities are known.

(3) To the extent the postsecondary institution has reasonable concerns for the safety of any person as a result of providing this notice, the postsecondary institution may reasonably delay providing written notice of the allegations in order to address the safety concern appropriately. Reasonable concerns must be based on individualized safety and risk analysis and not on mere speculation or stereotypes.

(d) *Dismissal of a complaint.* When dismissing a complaint alleging sex-based harassment involving a student complainant or a student respondent, a postsecondary institution must:

(1) Provide the parties, simultaneously, with written notice of the dismissal and the basis for the dismissal, if dismissing a complaint under any of the bases in § 106.45(d)(1), except if the dismissal occurs before the respondent has been notified of the allegations, in which case the recipient must provide such written notice only to the complainant; and

(2) Obtain the complainant's withdrawal in writing if dismissing a complaint based on the complainant's voluntary withdrawal of the complaint or allegations under § 106.45(d)(1)(iii).

(e) *Complaint investigation.* When investigating a complaint alleging sex-based harassment and throughout the postsecondary institution's grievance procedures for complaints of sex-based harassment involving a student complainant or a student respondent, a postsecondary institution:

(1) Must provide, to a party whose participation is invited or expected, written notice of the date, time, location, participants, and purpose of all meetings or proceedings with sufficient time for the party to prepare to participate;

(2) Must provide the parties with the same opportunities to be accompanied to any meeting or proceeding by the

advisor of their choice, who may be, but is not required to be, an attorney, and not limit the choice or presence of the advisor for the complainant or respondent in any meeting or proceeding; however, the postsecondary institution may establish restrictions regarding the extent to which the advisor may participate in the grievance procedures, as long as the restrictions apply equally to the parties;

(3) Must provide the parties with the same opportunities, if any, to have persons other than the advisor of the parties' choice present during any meeting or proceeding;

(4) Has discretion to determine whether the parties may present expert witnesses as long as the determination applies equally to the parties;

(5) Must allow for the reasonable extension of timeframes on a case-by-case basis for good cause with written notice to the parties that includes the reason for the delay; and

(6) Must provide each party and the party's advisor, if any, with an equal opportunity to access the evidence that is relevant to the allegations of sex-based harassment and not otherwise impermissible, consistent with §§ 106.2 and 106.45(b)(7), in the following manner:

(i) A postsecondary institution must provide an equal opportunity to access either the relevant and not otherwise impermissible evidence, or the same written investigative report that accurately summarizes this evidence. If the postsecondary institution provides access to an investigative report, it must further provide the parties with an equal opportunity to access the relevant and not otherwise impermissible evidence upon the request of any party;

(ii) A postsecondary institution must provide the parties with a reasonable opportunity to review and respond to the evidence or the investigative report described in paragraph (e)(6)(i) of this section prior to the determination whether sex-based harassment occurred. If a postsecondary institution conducts a live hearing as part of its grievance procedures, it must provide this opportunity to review the evidence in advance of the live hearing; it is at the postsecondary institution's discretion whether to provide this opportunity to respond prior to the live hearing, during the live hearing, or both prior to and during the live hearing;

(iii) A postsecondary institution must take reasonable steps to prevent and address the parties' and their advisors' unauthorized disclosure of information and evidence obtained solely through the sex-based harassment grievance procedures. For purposes of this

paragraph, disclosures of such information and evidence for purposes of administrative proceedings or litigation related to the complaint of sex-based harassment are authorized; and

(iv) Compliance with paragraph (e)(6) of this section satisfies the requirements of § 106.45(f)(4).

(f) *Questioning parties and witnesses to aid in evaluating allegations and assessing credibility.* (1) *Process for questioning parties and witnesses.* A postsecondary institution must provide a process as specified in this subpart that enables the decisionmaker to question parties and witnesses to adequately assess a party's or witness's credibility to the extent credibility is both in dispute and relevant to evaluating one or more allegations of sex-based harassment. Questioning of the parties and witnesses must take place consistent with the following provisions before determining whether sex-based harassment occurred:

(i) When a postsecondary institution chooses not to conduct a live hearing under paragraph (g) of this section, the process for proposing and asking relevant and not otherwise impermissible questions and follow-up questions of parties and witnesses under §§ 106.2 and 106.45(b)(7), including questions challenging credibility, must:

(A) Allow the investigator or decisionmaker to ask such questions during individual meetings with a party or witness;

(B) Allow each party to propose such questions that the party wants asked of any party or witness and have those questions asked by the investigator or decisionmaker during one or more individual meetings, including follow-up meetings, with a party or witness, subject to the requirements in paragraph (f)(3) of this section; and

(C) Provide each party with an audio or audiovisual recording or transcript with enough time for the party to have a reasonable opportunity to propose follow-up questions.

(ii) When a postsecondary institution chooses to conduct a live hearing under paragraph (g) of this section, the process for proposing and asking relevant and not otherwise impermissible questions and follow-up questions of parties and witnesses under §§ 106.2 and 106.45(b)(7), including questions challenging credibility, must allow the decisionmaker to ask such questions, and either:

(A) Allow each party to propose such questions that the party wants asked of any party or witness and have those questions asked by the decisionmaker,

subject to the requirements under paragraph (f)(3) of this section; or

(B) Allow each party's advisor to ask any party or witness such questions, subject to the requirements under paragraph (f)(3) of this section. Such questioning must never be conducted by a party personally. If a postsecondary institution permits advisor-conducted questioning and a party does not have an advisor to ask questions on their behalf, the postsecondary institution must provide the party with an advisor of the postsecondary institution's choice, without charge to the party, for the purpose of advisor-conducted questioning. In those instances, the postsecondary institution must not appoint a confidential employee and may appoint, but is not required to appoint, an attorney to serve as an advisor.

(2) *Compliance with § 106.45(g).* Compliance with paragraph (f)(1)(i) or (ii) of this section satisfies the requirements of § 106.45(g).

(3) *Procedures for the decisionmaker to evaluate the questions and limitations on questions.* The decisionmaker must determine whether a proposed question is relevant under § 106.2 and not otherwise impermissible under § 106.45(b)(7), prior to the question being posed, and must explain any decision to exclude a question as not relevant or otherwise impermissible. If a decisionmaker determines that a party's question is relevant and not otherwise impermissible, then the question must be asked except that a postsecondary institution must not permit questions that are unclear or harassing of the party or witness being questioned. The decisionmaker must give a party an opportunity to clarify or revise a question that the decisionmaker has determined is unclear or harassing and, if the party sufficiently clarifies or revises a question to satisfy the terms of this paragraph, the question must be asked. A postsecondary institution may also adopt and apply other reasonable rules regarding decorum, provided they apply equally to the parties.

(4) *Refusal to respond to questions and inferences based on refusal to respond to questions.* A decisionmaker may choose to place less or no weight upon statements by a party or witness who refuses to respond to questions deemed relevant and not impermissible. The decisionmaker must not draw an inference about whether sex-based harassment occurred based solely on a party's or witness's refusal to respond to such questions.

(g) *Live hearing procedures.* A postsecondary institution's sex-based harassment grievance procedures may,

but need not, provide for a live hearing. If a postsecondary institution chooses to conduct a live hearing, it may conduct the live hearing with the parties physically present in the same geographic location. At the postsecondary institution's discretion the institution may, or upon the request of either party it must, conduct the live hearing with the parties physically present in separate locations, with technology enabling the decisionmaker and parties to simultaneously see and hear the party or the witness while that person is speaking. A postsecondary institution must create an audio or audiovisual recording or transcript, of any live hearing and make it available to the parties for inspection and review.

(h) *Written determination whether sex-based harassment occurred.* The postsecondary institution must provide the determination whether sex-based harassment occurred in writing to the parties simultaneously.

(1) The written determination must include:

(i) A description of the alleged sex-based harassment;

(ii) Information about the policies and procedures that the postsecondary institution used to evaluate the allegations;

(iii) The decisionmaker's evaluation of the relevant and not otherwise impermissible evidence and determination whether sex-based harassment occurred;

(iv) When the decisionmaker finds that sex-based harassment occurred, any disciplinary sanctions the postsecondary institution will impose on the respondent, whether remedies other than the imposition of disciplinary sanctions will be provided by the postsecondary institution to the complainant, and, to the extent appropriate, other students identified by the postsecondary institution to be experiencing the effects of the sex-based harassment; and

(v) The postsecondary institution's procedures for the complainant and respondent to appeal.

(2) The determination regarding responsibility becomes final either on the date that the postsecondary institution provides the parties with the written determination of the result of any appeal, or, if no party appeals, the date on which an appeal would no longer be considered timely.

(i) *Appeals.* (1) A postsecondary institution must offer the parties an appeal from a determination whether sex-based harassment occurred, and from a postsecondary institution's dismissal of a complaint or any

allegations therein, on the following bases:

(i) Procedural irregularity that would change the outcome;

(ii) New evidence that would change the outcome and that was not reasonably available when the determination whether sex-based harassment occurred or dismissal was made; and

(iii) The Title IX Coordinator, investigator, or decisionmaker had a conflict of interest or bias for or against complainants or respondents generally or the individual complainant or respondent that would change the outcome.

(2) A postsecondary institution may offer an appeal to the parties on additional bases, so long as the procedures and additional bases for appeal are equally available to all parties.

(3) As to all appeals, the postsecondary institution must comply with the requirements in § 106.45(d)(3)(i), (v), and (vi) in writing.

(j) *Informal resolution.* If a postsecondary institution offers or provides the parties to the grievance procedures under § 106.45 and under this section with an informal resolution process under § 106.44(k), the postsecondary institution must inform the parties in writing of the offer and their rights and responsibilities in the informal resolution process and otherwise comply with the provisions of § 106.44(k)(3) in writing.

■ 22. Section 106.47 is added to subpart D to read as follows:

**§ 106.47  Assistant Secretary review of sex-based harassment complaints.**

The Assistant Secretary will not deem a recipient to have violated this part solely because the Assistant Secretary would have reached a different determination in a particular complaint alleging sex-based harassment than a recipient reached under § 106.45, and if applicable § 106.46, based on the Assistant Secretary's independent weighing of the evidence.

■ 23. Section 106.51 is amended by revising paragraph (b)(6) to read as follows:

**§ 106.51  Employment.**

*       *       *       *       *

(b) * * *

(6) Granting and return from leaves of absence, leave for pregnancy or related conditions, leave for persons of either sex to care for children or dependents, or any other leave;

*       *       *       *       *

■ 24. Section 106.57 is revised to read as follows:

### § 106.57   Parental, family, or marital status; pregnancy or related conditions.

(a) *Status generally.* A recipient must not adopt or implement any policy, practice, or procedure, or take any employment action, on the basis of sex:

(1) Concerning the current, potential, or past parental, family, or marital status of an employee or applicant for employment, which treats persons differently; or

(2) That is based upon whether an employee or applicant for employment is the head of household or principal wage earner in such employee's or applicant's family unit.

(b) *Pregnancy or related conditions.* A recipient must not discriminate against any employee or applicant for employment on the basis of current, potential, or past pregnancy or related conditions.

(c) *Comparable treatment to other temporary medical conditions.* A recipient must treat pregnancy or related conditions as any other temporary medical conditions for all job-related purposes, including commencement, duration and extensions of leave; payment of disability income; accrual of seniority and any other benefit or service; and reinstatement; and under any fringe benefit offered to employees by virtue of employment.

(d) *Voluntary leaves of absence.* In the case of a recipient that does not maintain a leave policy for its employees, or in the case of an employee with insufficient leave or accrued employment time to qualify for leave under such a policy, a recipient must treat pregnancy or related conditions as a justification for a voluntary leave of absence without pay for a reasonable period of time, at the conclusion of which the employee shall be reinstated to the status held when the leave began or to a comparable position, without decrease in rate of compensation or loss of promotional opportunities, or any other right or privilege of employment.

(e) *Lactation time and space.* (1) A recipient must provide reasonable break time for an employee to express breast milk or breastfeed as needed.

(2) A recipient must ensure that an employee can access a lactation space, which must be a space other than a bathroom that is clean, shielded from view, free from intrusion from others, and may be used by an employee for expressing breast milk or breastfeeding as needed.

■ 25. Section 106.60 is revised to read as follows:

### § 106.60   Pre-employment inquiries.

(a) *Marital status.* A recipient must not make a pre-employment inquiry as to the marital status of an applicant for employment, including whether such applicant is "Miss or Mrs."

(b) *Sex.* A recipient may ask an applicant for employment to self-identify their sex, but only if this question is asked of all applicants and if the response is not used as a basis for discrimination prohibited by Title IX or this part.

■ 26. Section 106.71 is revised to read as follows:

### § 106.71   Retaliation.

A recipient must prohibit retaliation, including peer retaliation, in its education program or activity. When a recipient has information about conduct that reasonably may constitute retaliation under Title IX or this part, the recipient is obligated to comply with § 106.44. Upon receiving a complaint alleging retaliation, a recipient must initiate its grievance procedures under § 106.45, or, as appropriate, an informal resolution process under § 106.44(k). As set out in § 106.45(e), if the complaint is consolidated with a complaint of sex-based harassment involving a student complainant or student respondent at a postsecondary institution, the grievance procedures initiated by the consolidated complaint must comply with the requirements of both §§ 106.45 and 106.46.

■ 27. Section 106.81 is revised to read as follows:

### § 106.81   Procedures.

The procedural provisions applicable to Title VI of the Civil Rights Act of 1964 are hereby adopted and incorporated herein. These procedures may be found at 34 CFR 100.6 through 100.11 and 34 CFR part 101.

[FR Doc. 2024–07915 Filed 4–19–24; 8:45 am]

**BILLING CODE 4000–01–P**