# EXHIBIT C

### STATE OF TENNESSEE

# Office of the Attorney General



**Jonathan Skrmetti**
**Attorney General and Reporter**

P.O. Box 20207
Nashville, TN 37202
Telephone: (615) 741-3491
Facsimile: (615) 741-2009

September 12, 2022

**SUBMITTED ELECTRONICALLY**
**VIA REGULATIONS.GOV**

The Honorable Miguel Cardona
Secretary of Education
Department of Education Building
400 Maryland Ave., SW
Washington, D.C. 20202

Re:     Docket No. ED-2021-OCR-0166 ("Nondiscrimination on the Basis of Sex in Education
Programs or Activities Receiving Federal Financial Assistance")

Dear Secretary Cardona,

The People and State of Tennessee, joined by nineteen co-signing States, appreciate the opportunity
to comment on the U.S. Department of Education's recent proposal to amend the federal regulations
implementing Title IX.  *See* Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or
Activities Receiving Federal Financial Assistance* ("Proposal"), 87 Fed. Reg. 41,390 (July 12, 2022).  We share
the Department's interest in providing every primary, secondary, and post-secondary student an
educational environment free from harassment and incongruous discrimination.  Unfortunately, the
Department's proposed rule changes would force educators to pursue that end through unreasonable,
unlawful, and counter-productive means.

As you are doubtless aware, Title IX's general prohibition on sex-based discrimination, *see* 20 U.S.C.
§ 1681(a), applies to "all the operations" of nearly every school in the country, *id.* § 1687; *see* 34 C.F.R.
§ 106.2(g).  Read in that light, the Department's proposed amendments to 34 C.F.R. Part § 106 give
us pause.  In particular, the Department intends to expand the "scope" of Title IX by specifying that
"[d]iscrimination on the basis of sex" in 20 U.S.C. § 1681 includes "discrimination on the basis of …
gender identity," Proposal at 41,571 (proposed 34 C.F.R. § 106.10), despite Congress omitting the
term "gender identity" from all of Title IX's numerous provisions.

State of Tennessee Comments
ED-2021-OCR-0166
Page 2

The Department has also proposed equally atextual additions to 34 C.F.R. § 106.31(a).  At present, 34 C.F.R. § 106.31(a) largely tracks the language of Title IX itself, stating in relevant part that:

> Except as provided elsewhere in this part, no person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance.

To this, the Department proposes adding:

> In the limited circumstances in which Title IX or [34 C.F.R. pt. 106] permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, unless otherwise permitted by Title IX or this part.  Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.

Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)).

These new rules lack statutory foundation and will trench on constitutional rights.  They will also negatively impact countless students, teachers, and school administrators in ways the Department has failed to address — or even recognize.  We thus offer the following comments with the hope that the Department will reconsider the proposed rules and avoid potential litigation:

## I. The Department's proposed rules conflict with Title IX and violate the Constitution.

The Department has an obligation to "reasonably explain[]" how its rules fit within its lawful administrative authority.  *Advocs. for Highway & Auto Safety v. FMCSA*, 41 F.4th 586, 596 (D.C. Cir. 2022) (quoting *FCC v. Prometheus Radio Project*, 141 S. Ct. 1150, 1158 (2021)).  But because the Department has disregarded the text of Title IX and multiple constitutional restraints, there can be no reasonable explanation for its proposals.

### A. The Department has not grounded its proposed rules in the text, structure, or purpose of Title IX.

The Department cannot lawfully promulgate rules that conflict with Title IX.  *E.g.*, *Children's Health Def. v. FCC*, 25 F.4th 1045, 1052 (D.C. Cir. 2022).  Title IX's meaning comes from its terms, "read in context," and in light of "the problem Congress sought to solve."  *Goldstein v. SEC*, 451 F.3d 873, 878 (D.C. Cir. 2006) (quoting *PDK Labs. Inc. v. DEA*, 362 F.3d 786, 796 (D.C. Cir. 2004)).  On every level of analysis, however, the Department's proposed rules run counter to the statute.  *See Tennessee v. U.S. Dep't of Educ.*, No. 3:21-cv-00308, 2022 WL 2791450, at *21 (E.D. Tenn. July 15, 2022) (noting that the Department's proposed policies "create[] rights for students and obligations for regulated entities … that appear nowhere in … Title IX").

State of Tennessee Comments
ED-2021-OCR-0166
Page 3

To begin with, Title IX explicitly addresses "sex," not gender identity.  It starts by prohibiting discrimination "on the basis of sex" and "sex" alone.  20 U.S.C. § 1681.  It then identifies examples of "sex"-based discrimination to which the prohibition does *not* apply.  *See id.* § 1681(a).  Following this, the statute clarifies that discrimination "on the basis of sex" does *not* encompass the "maintain[ence of] separate living facilities for the different sexes."  20 U.S.C. § 1686.

These repeated references to "sex" must be read "in accord with the ordinary public meaning of ['sex'] at the time of [Title IX was] enact[ed]."  *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1738 (2020).  And at that time, "virtually every dictionary definition of 'sex' referred to the physiological distinctions between males and females."  *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 632 (4th Cir. 2020) (Niemeyer, J. dissenting), *cert. denied*, 141 S. Ct. 2878 (2021).  In 1961, the Oxford English Dictionary defined "Sex" as "[t]he sum of those differences in the structure and function of the reproductive organs on the ground of which beings are distinguished as male and female, and of the other physiological differences consequent on these."  9 Oxford English Dictionary 578 (1961).  In 1970, the American College Dictionary defined "Sex" to mean "the sum of the anatomical and physiological differences with reference to which the male and the female are distinguished."  The American College Dictionary 1109 (1970).  A year later, Webster's Third New International Dictionary defined "Sex" to mean "the sum of the morphological, physiological, and behavioral peculiarities of living beings that subserves biparental reproduction."  Webster's Third New International Dictionary 2081 (1971).  The year after Title IX became law, Random House defined "Sex" as "either the male or female division of a species, esp. as differentiated with reference to the reproductive functions."  The Random House College Dictionary 1206 (rev. ed. 1973).  And a few years after that, the American Heritage Dictionary defined "Sex" as "[t]he property or quality by which organisms are classified according to their reproductive functions."  American Heritage Dictionary 1187 (1976).  Each of these sources indicates that Title IX uses "sex" as a reference to the categories of "male" and "female," which "simply are not physiologically the same."  *Bauer v. Lynch*, 812 F.3d 340, 350 (4th Cir. 2016) (citing and discussing *United States v. Virginia*, 518 U.S. 515 (1996)).

Linguistic context and statutory structure both confirm that Congress meant "sex" as a reference to this biological dichotomy, not the abstruse concept of gender identity.  Advocates for gender-identity-based public policy often stress that a person's "innermost concept of" gender may fluctuate over time and defy biology's "male" or "female" binary.  *See, e.g., Sexual Orientation and Gender Identity Definitions*, Human Rights Campaign (last visited Sept. 8, 2022).[1]  Title IX, by contrast, speaks of permitting sex-based discrimination among "Men's" and "Women's" associations and organizations for "Boy[s]" and "Girls," "the membership of which has traditionally been limited to persons of one [or the other] sex."  20 U.S.C. § 1681(a)(6)(B).  The statute also describes how an institution may change "from ... admit[ting] only students of one sex" (that is, male *or* female) "to ... admit[ting] students of both sexes," (male *and* female).  20 U.S.C. § 1681(a)(2).  In addition to implying that "sex" means "sex," those provisions foreclose any reading of "sex" that incorporates gender identity.  It would make no sense to reference schools that "admit students of *both* [gender identities]," *id.*, if in fact such "identities" have "no fixed number" and populate an "infinite" spectrum of "possibilities,"

---

[1] https://www.hrc.org/resources/sexual-orientation-and-gender-identity-terminology-and-definitions (attached hereto as Exhibit A).

State of Tennessee Comments
ED-2021-OCR-0166
Page 4

Veronica Zambon, *What Are Some Different Types of Gender Identity?*, Medical News Today (Updated May 12, 2022) ("Medically reviewed by Francis Kuehnle, NSN, RN-BC").[2]

Clues from history cut against the Department as well. To begin with, "[t]he phrase 'gender identity' did not exist" in 1972 "outside of some esoteric psychological publications." Ryan T. Anderson, Ph.D, & Melody Wood, *Gender Identity Policies in Schools: What Congress, the Courts, and the Trump Administration Should Do* (Heritage Found. Backgrounder No. 3201, 2017).[3] In fact, "the word 'gender'" itself "had been coined only recently in contradistinction to sex." *Id.* It thus comes as no surprise that the earliest Title IX rulemaking codified sex-separated "toilet, locker room, and shower facilities" without a whiff of discussion about gender identity. HEW, *Nondiscrimination on Basis of Sex*, 40 Fed. Reg. 24,127, 24,141 (June 4, 1975) (now codified at 34 C.F.R. § 106.33); *see* HEW, *Education Programs and Activities Receiving or Benefiting from Federal Financial Assistance*, 39 Fed. Reg. 22,227, 22,230 (June 20, 1974) (proposing the rule without explanation); 40 Fed. Reg. at 24,141 (finalizing the rule without justification or response to commentary). And those same regulations (again) implied that "sex" would naturally differentiate athletes by virtue of "competitive skill" and raise safety issues when "the activity involved is a contact sport" — something that cannot be said of gender identity. 40 Fed. Reg. at 24,134 (discussing 45 C.F.R. § 86.41, predecessor to 34 C.F.R. § 106.41).

Finally, reading "sex" to mean "sex" neatly aligns with Title IX's indisputable aim: ending the "corrosive and unjustified discrimination against *women*" that was "overt and socially acceptable within the academic community" in the early 1970s. 118 Cong. Rec. 5803 (1972) (remarks of Senator Bayh) (emphasis added). *That* invidious, sex-based discrimination prompted a series of congressional hearings, which eventually inspired the legislation. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 696 n.16 (1979). And in recognition of this fact, the courts have long construed Title IX as conferring a "special benefit" on "persons discriminated against" because they are biologically female — not because they *identify* as women. *Id.* at 694; *see also id.* at 680 ("Petitioner's complaints allege that her applications for admission to medical school were denied by the respondents because she *is* a woman." (emphasis added)).

The Department nonetheless insists that discrimination "on the basis of sex" necessarily *includes* discrimination "on the basis of gender identity" under the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020). *See, e.g.*, Proposal at 41,530–32. That's wrong. The *Bostock* case concerned a funeral home employee who had been fired "simply for being … transgender." 140 S. Ct. at 1737. The question was whether that firing constituted discrimination "because of … sex" under Title VII. *Id.* at 1738 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Court "proceed[ed] on the assumption that 'sex'" was a "biological distinction[] between male and female," nothing more or less. *Id.* at 1739. In fact, it explicitly "agree[d]" with the defendants that "transgender status" is a "distinct concept[] from sex." *Id.* at 1747. Even so, the Court held that the firing violated Title VII specifically because a male employee was punished for behavior permitted for the employee's female colleagues. *Id.* at 1744.

In reaching that holding, however, the Court explicitly declined to address sex segregation at schools under Title IX. *See id.* at 1753; *see also Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021)

---

[2] https://www.medicalnewstoday.com/articles/types-of-gender-identity (attached hereto as Exhibit B).

[3] https://www.heritage.org/sites/default/files/2017-03/BG3201.pdf (attached hereto as Exhibit C).

(recognizing *Bostock*'s "narrow reach"). And for good reason: Title VII is *not* Title IX. *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021). Whereas Title VII prohibits any adverse employment action "because of … sex," full stop, 42 U.S.C. § 2000e-2, Title IX explicitly *permits* discrimination "on the basis of sex" in numerous circumstances, 20 U.S.C. § 1681(a)(1)–(9). More importantly, Title IX dictates that "maintaining separate living facilities for the different sexes" is *not* sex-based discrimination in the first place. 20 U.S.C. § 1686. The Department fails to account for those distinctions in its misapplication of *Bostock*.

Moreover, even if the Department had the correct reading of *Bostock*, its rules would still conflict with Title IX. Most strikingly, the Department wants to mandate accommodation of a person's gender identity *even* when "Title IX … permits different treatment or separation on the basis of sex." Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)). The Department has neither identified a textual basis for that rule nor explained how it follows from *Bostock* or any other precedent. And although the rule includes a carveout in cases where discrimination is "otherwise permitted by Title IX or [34 C.F.R. part 106]," *id.*, the Department has not explained how the rule's general prohibition and exception work together. The regulation seems to contemplate circumstances where "Title IX … permits different treatment … on the basis of sex" but does *not* "otherwise permit" a failure to accommodate "gender identity." *Id.* What are those circumstances? If the Department believes they exist, it should specify them now rather than cause "unfair surprise" through sporadic, after-the-fact applications. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2404 (2019) (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 159 (2007)).

Indeed, the Department's "erratic[]" and "inconsistent[]" approach to the gender-identity issue only heightens the need for a cogent and clearly articulated interpretation of Title IX, grounded in the statute's actual terms. *Nat'l Treasury Emps. Union v. FLRA*, 399 F.3d 334, 337 (D.C. Cir. 2005) (quoting *Am. Fed'n of Gov't Employees v. FLRA*, 712 F.2d 640, 643 n.17 (D.C.Cir.1983)). If the Department cannot provide that logical underpinning, it must abandon its rulemaking proposal.

Further, the Department repeatedly relies upon a 2021 Notice of Interpretation that the U.S. District Court for the Eastern District of Tennessee has preliminarily enjoined the Department from enforcing against twenty States, including Tennessee and several other signatories to this letter. *E.g.*, Proposal at 41,531–33 (citing Dep't of Educ., *Enforcement of Title IX with Respect to Discrimination Based on Sexual Orientation and Gender Identity in Light of* Bostock v. Clayton County, 86 Fed. Reg. 32,637 (June 22, 2021)); *see Tennessee*, 2022 WL 2791450, at *24. In its filings in that case, the Department has agreed that it may "not cite, reference, treat as binding, or otherwise rely upon" the 2021 Notice of Interpretation in any enforcement or administrative action against the twenty States. Notice of Compliance at 2, *Tennessee*, ECF No. 97. To comply with the preliminary injunction, the Department cannot continue to treat the enjoined 2021 Notice of Interpretation as binding. Further, if the Department insists on pursuing its rulemaking proposal, the Department must "make appropriate changes" to the proposed rule, *Mann Constr., Inc. v. United States*, 27 F.4th 1138, 1142 (6th Cir. 2022), that acknowledge how such proposed rulemaking "creates rights for students and obligations for regulated entities not to discriminate based on … gender identity that appear nowhere in *Bostock*, Title IX, or its [current] implementing regulations." *Tennessee*, 2022 WL 2791450, at *21.

State of Tennessee Comments
ED-2021-OCR-0166
Page 6

### B.     The proposed rules would infringe on the constitutional rights and interests of students, parents, school faculty, and the States.

The Department has also failed to account for the impact its proposed rules will have on fundamental constitutional rights and interests.  Attempting to expand the reach of its preferred policies, the Department says it will require schools to "take prompt and effective action to end any sex discrimination …, prevent its recurrence, and remedy its effects."  Proposal at 41,572 (proposed 34 C.F.R. § 106.44(a)).  In practice, that means policing interactions among students, parents, and faculty to compel public accommodation of each person's highly individualized, potentially fluid, and unverifiable gender identity.  *See id.* at 41,571 (proposed 34 C.F.R. §§ 106.10, 106.31(a)(2)).  This will trench on multiple constitutional rights and interests in ways that are easy to predict.

*First*, state-run public colleges will have to compel speech in violation of the First Amendment.  This issue will predictably arise from the forced used of certain pronouns and other referential terms. *Meriwether*, 992 F.3d at 498.  Advocates for transgender rights have repeatedly stressed that the language others use to refer to a person is "pivotal to [that person's] gender identity and how [he or she] relate[s] to the world," *Pronouns*, The Center (last visited Sept. 8, 2022),[4] and that referring to someone with language that does *not* fit that person's gender identity can thus cause feelings of "exhaust[ion]," "demoralize[ation]," and "invalidat[ion]," Sabra L. Katz-Wise, *Misgendering: What It Is and Why It Matters*, Harvard Health Blog (July 23, 2021).[5]  In light of this, the Department's rules suggest that any failure to police referential speech could be considered "sex discrimination" if it "prevents a person from participating in an education program or activity consistent with the person's gender."  Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)).  If that is the case, however, the new prohibitions will necessarily compel public schools to violate the First Amendment.  There can be no doubt that some college faculty will resist referring to students and colleagues by their "preferred pronouns."  *See, e.g.*, *Meriwether*, 992 F.3d at 498–503.  And whether motivated by faith, pedagogical theory, or simple disagreement, those speakers will have a right to express themselves under the First Amendment.  *See id.* at 506.  Indeed, "[i]f professors lacked free-speech protections when teaching, a university would wield alarming power to compel ideological conformity."  *Id.*  Yet the Department's rules *require* schools to wield such power without so much as acknowledging the ensuing First Amendment problem.

*Second*, school administrators may feel forced — or empowered — to insert themselves into constitutionally protected family affairs.  The Department must recognize that "[t]here [is] a 'private realm of family life which the state cannot enter,' that has been afforded both substantive and procedural protection[s]" under our Constitution.  *Smith v. Org. of Foster Fams. for Equal. & Reform*, 431 U.S. 816, 842 (1977) (quoting *Prince v. Massachusetts*, 321 U.S. 158, 166 (1944)) (citation and footnote calls omitted).  Those protections extend to cover the rights of parents to "bring up" their children as they deem fit, including through instruction on matters of behavior and ethics.  *See M.L.B. v. S.L.J.*, 519 U.S. 102, 116 (1996) (citing *Meyer v. Nebraska*, 262 U.S. 390 (1923)); *see also Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 822 (2011) (Thomas, J., dissenting) (explaining "the founding generation['s]" fundamental belief that "parents had absolute authority … to direct the proper development of their

---

[4] https://gaycenter.org/pronouns/#more (attached hereto as Exhibit D).
[5] https://www.health.harvard.edu/blog/misgendering-what-it-is-and-why-it-matters-202107232553 (attached hereto as Exhibit E).

State of Tennessee Comments
ED-2021-OCR-0166
Page 7

[minor] children"). All parents thus retain a constitutionally protected right to guide their own children on matters of identity, including the decision to adopt or reject various gender norms and behaviors.

The Department's proposed rules threaten that right by requiring school administrators to "take prompt and effective action" to accommodate the stated gender identity of each student — including very small children. Proposal at 41,571–72 (proposed 34 C.F.R. § 106.44(a)). At a minimum, those provisions bind school faculty to treat such children "consistent with [their] gender ident[ies]" on school grounds, even if that conflicts with a parent's preferences or nurturing judgment. *Id.* at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)). But the rules could go much further. For example, parents have already reported instances of school administrators, clothed in Title IX's auspices, taking extreme measures to ensure gender-identity "affirmance" in the *home*. *See* Kaylee McGhee White, *Biden's New Title IX Rules Deputize Teachers to Override Parents on Gender Identity*, Independent Women's Forum (Aug. 16, 2022).[6] Nothing could be more noxious to the "enduring American tradition" that grants parents the "primary role … in the upbringing of their children." *Barrett v. Steubenville City Sch.*, 388 F.3d 967, 972 (6th Cir. 2004) (quoting *Wisconsin v. Yoder*, 406 U.S. 205, 232 (1972)).

*Finally*, the Department's novel attempt to expand Title IX would push the statute beyond Congress's lawmaking authority. Congress does not have the ability to set education policy directly. Instead, it enacted Title IX through its broader power to tax and spend in pursuit of the "general Welfare." U.S. Const. art. I, § 8, cl. 1. But the exercise of that power comes with special limitations. Most notably, when Congress aims to direct State and local policy via the Spending Clause, it must do so through "clear[ ]statement[s]" in the legislation itself. *Haight v. Thompson*, 763 F.3d 554, 568 (6th Cir. 2014) ("Clarity is demanded *whenever* Congress legislates through the spending power …."); *see also Texas Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 361 (5th Cir. 2021) ("Relying on regulations to present the clear condition, therefore, is an acknowledgment that Congress's condition was not unambiguous …."). Only then can States "voluntarily and knowingly accept[]" or decline any obligations attached to federal funds. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). In this case, however, the Department wants to read new gender identity protections into Title IX without grounding them in clear statutory text. *See supra* Part I.A; *Tennessee*, 2022 WL 2791450, at *21. And the Department's reliance on *Bostock* provides no retort, for reasons already stated. *See supra* at 4–5. The upshot is that the new regulations would push Title IX beyond what the Constitution allows.

These constitutional concerns warrant greater attention if the Department intends to defend its new rules as anything other than arbitrary. The bedrock principles of administrative law require that all Title IX regulations reasonably fit the statute's language after the "ordinary tools of statutory construction" have been brought to bear. *Air Transp. Ass'n of Am., Inc. v. USDA*, 37 F.4th 667, 672 (D.C. Cir. 2022). One of those tools is the canon of constitutional avoidance, which requires that statutes "be construed to avoid serious constitutional doubts," whenever possible. *Brawner v. Scott Cnty.*, 14 F.4th 585, 592 (6th Cir. 2021) (quoting *FCC v. Fox Televisions Stations, Inc.*, 556 U.S. 502, 516 (2009)). Yet the constitutional issues just discussed receive scant, if any, consideration in the Department's rulemaking proposal. We urge the Department to consider and address those issues or else abandon this rulemaking exercise.

---

[6] https://www.iwf.org/2022/08/16/bidens-new-title-ix-rules-deputize-teachers-to-override-parents-on-gender-identity/ (attached hereto as Exhibit F).

State of Tennessee Comments
ED-2021-OCR-0166
Page 8

## II.    The Department has ignored crucial policy issues that undermine its proposed rules.

Even if the Department could fit its new regulations within the proper constitutional and statutory boundaries, it still has not grappled with several knotty issues of policy.  In wielding its rulemaking authority, the Department must "'reasonably consider[] the relevant issues' and factors" bearing on its course, *Advocates*, 41 F.4th at 586 (quoting *Prometheus*, 141 S. Ct. at 1158), and it must draw "rational connection[s] between the facts" and its proposed rules, *id.* (quoting *State Farm*, 463 U.S. at 43).  The Proposal fails to do so in multiple critical respects.

### A.    The Department has not considered or addressed the difficulties of authenticating gender identity.

The Department's first and most fundamental error is a failure to consider how school administrators can put these new rules into practice.  Specifically, although the Department wants students to "participat[e] in … education program[s and] activit[ies] consistent with th[ier] gender identit[ies]," Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)), it does not explain how school faculty should go about *determining* each student's gender identity.

That is no small feat.  As already mentioned, the proponents of transgender rights often stress that gender identity "differ[s] from sex" precisely because it cannot be "define[d]" or verified as a matter of "genetic[s]" or biology.  Zambon, *supra*.  Instead, gender identity comes from "the inside," and "only the person themselves can determine what their gender identity is."  *Id.*; *see also id.* ("The term gender identity refers to the personal sense of an individual's own gender."); Am. Psych. Ass'n, *Guidelines for Psychological Practice with Transgender and Gender Nonconforming People*, 70 Am. Psychologist 862 (Dec. 2015) ("[G]ender identity is internal ….").[7]    Although "[p]eople *may* use clothing, appearances, and behaviors to express the gender that they identify with," they also may not — it is up to them.  Zambon, *supra*.  In addition, and again unlike sex, gender identity cannot be "divided along the binary lines of 'man' and 'woman.'"  *Id.*  Instead, it is thought to exist on a "spectrum," from which a person may choose any number of gender identities — or none at all — and may alter that choice at a moment's notice, "shift[ing] between, or … outside of, society's expectations."  *Id.*; *accord* Jason Rafferty, *Ensuring Comprehensive Care & Support for Transgender & Gender-Diverse Children & Adolescents*, Pediatrics, Oct. 2018, at 2[8]; *see also* Zambon, *supra* (identifying and defining various gender identities, including "agender," "bigender," "omnigender," "polygender," "genderqueer," and "gender outlaw," to name just a few).

How, then, can teachers and school administrators determine and accommodate each student's gender identity?  Should students be required "to meet with … trained and licensed … counselors" and be assigned to sex-separated facilities, events, and activities on a "case-by-case basis"?  *Doe ex rel. Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 524 (3d Cir. 2018).  Or should faculty simply accept and rely on each student's own reporting of what it means to live "consistent with [that student's] gender identity"?  Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)).  If the Department proposes the latter, then how (if at all) should schools account for a student's mental and emotional maturity or possible ulterior motives?  More pointedly, if *outwardly* identifying as a girl grants access to the girls' locker room after gym class, what will stop pubescent males from taking advantage of that means of

---

[7] https://www.apa.org/practice/guidelines/transgender.pdf (attached hereto as Exhibit G)
[8] https://perma.cc/EE6U-PN66 (attached hereto as Exhibit H).

State of Tennessee Comments
ED-2021-OCR-0166
Page 9

access?  *Cf.* Expert Declaration and Report of Kenneth V. Lanning at 10, 13, *Carcaño v. McCrory*, 203 F. Supp. 3d 615 (M.D.N.C. 2016) (No. 1:16-cv-00236-TDS-JEP), ECF No. 149-14 [hereinafter "Lanning Report"] (attached hereto as Exhibit I) (noting that "some adolescent high school boys or college males … might want to get into the girls' locker room" without "realiz[ing] that such activity is illegal" or "consider[ing] its effect on victims," *id.* at 10).  The Department's proposed rules seem to require "prompt and effective action" to enable that very scenario.  Proposal at 41,572 (proposed 34 C.F.R. § 106.44(a)).

Unless the Department addresses this problem, it cannot claim to have "reasonably considered" every "relevant issue[]" arising from its Proposal.  *Advocates*, 41 F.4th at 586 (quoting *Prometheus*, 141 S. Ct. at 1158).  And until the Department can produce a cogent response, it should refrain from finalizing new rules.

### B. The Department's proposal dismisses well-founded concerns regarding student and faculty safety.

On a related note, the Department has not adequately accounted for the risks these new regulations could pose to student and faculty safety.  Schools at every level of the education system have long provided sex-separated facilities — including locker rooms, restrooms, and dormitories — as a means of protecting *all* students, staff, and visitors in their most vulnerable moments.  But what makes these places private also makes them susceptible to abuse by bad actors.  Public restrooms and locker rooms, in particular, have long been designed to feature deliberately obstructed sightlines, few entrances or exits, and a categorical exemption from most forms of surveillance.  Add the fact that most people using these facilities are partially or completely undressed, and the potential for voyeurism, harassment, and even violent crime should be obvious.

Contrary to the Department's apparent assumptions, last year's nationally recognized story of a "15-year-old [Virginia] boy" who "sexually assault[ed] a female classmate in a school bathroom" was no anomaly.  Laura Wainman & Nicole DiAntoniao, *Teen Boy Sexually Assaulted Classmate in a School Bathroom, Judge Says*, WUSA 9 (Oct. 26, 2021).[9]  News reports and court records have long illustrated the unfortunate truth "that public toilets … are often the locale of [numerous crimes]," *People v. Young*, 214 Cal. App. 2d 131, 135 (Cal. Dist. Ct. App. 1963), specifically because they provide offenders the opportunity to "seek out victims in a planned and deliberate way," Expert Opinion of Sheriff Tim Hutchinson (Retired) at 6, *Carcaño*, ECF No. 149-15 [hereinafter "Hutchinson Report"] (attached hereto as Exhibit K).  Take, for example, the recent report from Detroit of a fifteen-year-old male suspect "hid[ing] inside a stall" in a women's restroom "for about 20 minutes" before attacking a twenty-nine-year-old female.  *See, e.g.*, Amber Ainsworth, *15-Year-Old Boy Charged After Trying to Sexually Assault Woman in Downtown Plymouth Public Bathroom*, Fox 2 Detroit (Nov. 24, 2021).[10]  And the sixteen-year-old Michigan girl allegedly groped by "a man [who] came up behind her in the women's bathroom" at a bookstore.  Roxanne Werly, *Surveillance Video Released Following Alleged Bathroom Assault*,

---

[9] https://www.wusa9.com/article/news/legal/teen-found-guilty-loudoun-county-bathroom-sexual-assault/65-e383c241-afd1-4539-8fa3-4ccb01562ea9 (attached hereto as Exhibit J).

[10] https://www.fox2detroit.com/news/15-year-old-boy-charged-after-trying-to-sexually-assault-woman-in-downtown-plymouth-public-bathroom (attached hereto as Exhibit L).

State of Tennessee Comments
ED-2021-OCR-0166
Page 10

UpNorthLive (Nov. 9, 2017).[11]  And the seven-year-old San Francisco girl accosted by a male suspect "in the female restroom at [a public] park."  Nick Smith, *Young Girl Assaulted in SF Park Bathroom*, ABC 7 News (Nov. 22, 2014).[12]  And the Los Angeles man who reportedly "walked into the women's restroom" at a restaurant "and sexually assaulted" a ten-year-old "as she got out of a stall."  Juan Flores, *Man Sought in Sexual Assault of Girl, 10, in Denny's Restroom*, DTLA 5 Morning News (updated Jan. 7, 2014).[13]  And the nightmare experienced by the eight-year-old Oklahoma girl locked inside a restroom by "a mostly naked man" who reportedly "got between her and the door[,] … wrapped a … coat around her neck[,] and began choking her."  *Update: Homeless Man Suspected of Attacking Child in Gas Station Bathroom*, Oklahoma's News 4 (Sept. 16, 2013).[14]  In each of those instances, and countless others, *see, e.g.*, Hutchinson Report at 7–8, 20–23, a male perpetrator exploited a bathroom's privacy-enhancing features to prey on a vulnerable female victim.

The Department nonetheless fails to recognize that its new rules will *enable* this nefarious conduct.  At present, a woman encountering a male in a "sex-segregated space … do[es] not have to wait until the man has already assaulted her before she can fetch security."  Cambridge Radical Feminist Network, *There Is Nothing Progressive About Removing Women-Only Bathrooms*, Medium (Jan. 13, 2019) [hereinafter "CRFM"].[15]  But if a person's self-report (and potentially multifaceted or shifting) gender identity can determine the bathrooms he may use, that safety valve will be bolted shut.  *See id.*  Some women may not even have recourse *following* abuse if their male perpetrators had every right to be present, expose themselves, or witness others changing in a restroom or locker room space.  *See, e.g.*, *Man in Women's Locker Room Cites Gender Rule*, King 5 Seattle (Feb. 16, 2016).[16]  In fact, the victims of voyeurism might not even realize when it has occurred or have any hope of identifying a suspect afterwards.  *See, e.g.*, *Man Dressed as Woman Arrested for Spying into Mall Bathroom Stall, Police Say*, 4 Washington (last updated Nov. 18, 2015).[17]

Given that "children often delay reporting of sexual abuse until adulthood" and "only about 30% of sex crimes are reported overall," Hutchinson Report at 10, the Department cannot credibly dismiss these security concerns as "unsubstantiated," Proposal at 41,535; *see also* Hutchinson Report at 11 (noting additional reasons why schools and localities may not observe "an increase in reported offenses" following implementation of a gender-identity-based bathroom policy, including the ever-

---

[11] https://upnorthlive.com/news/local/gallery/surveillance-video-released-following-bathroom-assault (attached hereto as Exhibit M).

[12] https://abc7news.com/sfpd-search-suspect-man/407219/ (attached hereto as Exhibit N).

[13] https://ktla.com/news/man-sought-in-sexual-assault-of-girl-10-in-palmdale-restroom/ (attached hereto as Exhibit O).

[14] https://kfor.com/news/police-okc-homeless-man-attacks-8-year-old-girl-in-bathroom/ (attached hereto as Exhibit P).

[15] https://medium.com/@camradfems/there-is-nothing-progressive-about-removing-women-only-bathrooms-37729064cfb7 (attached hereto as Exhibit Q).

[16] https://www.king5.com/article/news/local/seattle/man-in-womens-locker-room-cites-gender-rule/281-65533111 (attached hereto as Exhibit R).

[17] https://www.nbcwashington.com/news/local/man-dressed-as-woman-arrested-for-spying-into-mall-bathroom-stall-police-say/1979766/#:~:text=Richard%20Rodriguez%2C%2030%2C%20filmed%20a,been%20filming%20her%2C%20police%20said (attached hereto as Exhibit S).

State of Tennessee Comments
ED-2021-OCR-0166
Page 11

present incentive "to minimize the appearance of a sex offense problem"); Lanning Report at 10–11 (explaining the many reasons why "nuisance" sex offenses go unreported, unrecorded, uninvestigated, and unprosecuted). Rather, they are the factually grounded and predictable outgrowth of an all-comers approach to bathrooms and other living facilities. And although "many women and young children would choose to leave a facility without reporting a sex offense, the scars from the crime would live on forever with these victims." Hutchinson Report at 11.

The Department will doubtless respond that these crimes can occur with or without sex-segregated living spaces. It may even note that most sexual crimes and offenses against children occur at home, not in public restrooms or locker rooms. Respectfully, that is no response at all. The problem with the Proposal is *not* that it fails to prevent these crimes in all instances; the problem with the Proposal is that it demonstrably *facilitates* these crimes in at least *some* instances by stripping away crucial safeguards. "[E]xisting trespassing, indecent exposure, peeping and other laws deter at least some" of the abovementioned offenses if and when facilities have clear and enforced sex designations. *Id.* But "[i]f someone c[an] enter a public facility based entirely upon their 'internal sense of gender,' then law enforcement personnel, bystanders, and potential victims would have to be able to read minds … to determine whether a man entering a women's facility was really transgender or was instead there to commit a sex offense." *Id.* And even after an incident — particularly voyeurism or exposure — has occurred, "offenders aren't as likely to be observed by or reported to police." *Id.*; *see id.* at 12.

Nor can the Department counter with any hard, contradictory data to allay these concerns. The law requires the Department to identify "the most critical factual material … used to support" its new rules *before* they are finalized, specifically for the purpose of "expos[ing]" such material "to refutation" in the public comment process. *Chamber of Com. of U.S. v. SEC*, 443 F.3d 890, 900 (D.C. Cir. 2006) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 745 F.2d 677, 684 (D.C. Cir. 1984)). "An agency commits serious procedural error when it fails to reveal … the technical basis for a proposed rule in time to allow for meaningful commentary." *Connecticut Light & Power Co. v. NRC*, 673 F.2d 525, 530–31 (D.C. Cir. 1982). In this instance, the Department has declined to provide any credible empirical analysis supporting its new policies. That silence speaks volumes. Indeed, how can the Department conclude that "the benefits" of these new rules "far outweigh [their] estimated costs," Proposal at 41,547, when it fails to account for even the possibility that abolishing sex-separated facilities could increase crime and deter students and faculty from using public accommodations? *See id.* at 41,561.

C.  **The Department has not adequately accounted for the sex-based discrimination that will *result* from its proposed rule.**

Finally, the Department has all but ignored the discrimination its new rules will visit on Title IX's primary intended beneficiaries: female students. Despite generally prohibiting invidious sex-based discrimination, the law has long preserved certain female-only spaces and activities precisely because they *benefit* female students and enrich their educational experiences. *See* 20 U.S.C. § 1681(a)(1)–(9); *id.* § 1686; *see also* Proposal at 41,534 ("The Department's regulations have recognized limited contexts in which recipients are permitted to employ sex-specific rules or to separate students on the basis of sex because the Department has determined that in those contexts such treatment does not generally impose harm on students." (citing 34 CFR §§ 106.33, 106.34(a)(3))). If male students can nonetheless enter those same spaces and engage in those same activities by merely professing a particular gender identity, female students will necessarily be harmed.

State of Tennessee Comments
ED-2021-OCR-0166
Page 12

*First*, female students will suffer mental, emotional, and developmental harm from the loss of female-only dormitories, bathrooms, locker rooms, and showers.  "[L]eaving aside the risk of assault, sex-segregated bathrooms give women the peace of mind of knowing they can use the bathroom, attend to their menstrual needs and to small children, with a degree of privacy and dignity that would otherwise not exist."  CRFM, *supra*.  And the loss of that private space will fall most heavily on "those individuals who — due to having a history of sexual assault, or for religious reasons — do not feel comfortable using a shared intimate space with male strangers."  *Id.*  Some female students may thus feel compelled to avoid certain bathrooms and other facilities, or even school altogether, which would undermine Title IX's principal aim.  This concern is not hypothetical.  By way of example, a group of young female students in Nebraska recently walked out of their high school classes to protest the loss of their sex-segregated bathrooms under a policy inspired by the statements of this Department.  *See* Tara Campbell, *Transgender Rights Clash Prompts Walkout at CB Abraham Lincoln High*, 6 News WOWT (Apr. 11, 2019).[18]  Yet the Department's proposal does not acknowledge this issue, much less explain why the purported interest of transgender students should take precedence over the interest of the female students that Title IX was enacted to serve.

*Second*, female students will be deprived of opportunities to participate in safe and fair athletics.  The Department once championed those opportunities, *see, e.g.*, U.S. Dep't of Ed., *Athletics* (last visited Sept. 8, 2022),[19] and its Proposal apparently contemplates a separate rulemaking on "the question of what criteria, if any, [schools] should be permitted to use to establish students' eligibility to participate on a particular male or female athletics team," Proposal at 41,537.  Nevertheless, an overarching policy allowing all students to "participat[e] in" school "program[s and] activit[ies] consistent with th[eir] gender identity" could effectively guarantee male students an absolute right to play women's sports.  Proposal at 41,571.  That is not fair to female athletes.

Following puberty, in particular, the androgenized bodies of male athletes give them "categorically different strength, speed, and endurance" as measured by both elite and average performance.  Doriane Lambelet Coleman & Wickliffe Shreve, Comparing Athletic Performances the Best Women to Boys and Men (last visited Sept. 9, 2022)[20]; *see also* Lydia C. Hallam & Fabiano T. Amorim, *Expanding the Gap: an Updated Look into Sex Differences in Running Performance*, Frontiers in Physiology, Jan. 2022, at 2 (explaining that "[t]he sex gap in sports performance is primarily rooted in biological differences between the sexes, namely in relation to male[s'] superior skeletal muscle mass, oxidative capacities and lower fat mass").[21]  To illustrate, the Olympic gold medalist Tori Bowie — an incredible female sprinter — has run the one-hundred-meters in a lifetime-best 10.78 seconds.  *Id.*  In 2017, no fewer than 15,000 male runners beat that mark in recorded competition.  *Id.*  That example "is far from the exception.  It's the rule."  *Id.*  In fact, "the sex gap is smaller between elite males and females compared to sub-elite and recreational runners."  Hallam & Amorim, *supra*.  And it persists "across sporting

---

[18] https://www.wowt.com/content/news/Transgender-rights-clash-prompts-walkout-at-CB-Abraham-Lincoln-High-508449271.html (attached hereto as Exhibit T).
[19] https://www2.ed.gov/about/offices/list/ocr/frontpage/pro-students/issues/sex-issue04.html (attached hereto as Exhibit U).
[20] https://law.duke.edu/sites/default/files/centers/sportslaw/comparingathleticperformances.pdf (attached hereto as Exhibit V).
[21] https://www.frontiersin.org/articles/10.3389/fphys.2021.804149/full (attached hereto as Exhibit W).

State of Tennessee Comments
ED-2021-OCR-0166
Page 13

events," with "the best male athletes consistently outperform[ing] their female peers" by anywhere "between 5 and 17%, depending on the sporting discipline, event duration and competitive standard." *Id.* Both the National Collegiate Athletic Association and the U.S. Olympic and Paralympic Committee have recognized this, which is why those organizations seek to "balanc[e] fairness, inclusion and safety for all who compete" by limiting the participation of transgender athletes based on testosterone levels. *Board of Governors Updates Transgender Participation Policy*, NCAA Media Center (Jan. 19, 2022).[22]

The Department's rules, by contrast, could push schools to allow students to choose their sports and teams based on self-reported gender identity alone. *See* Proposal at 41,571 (proposed 34 C.F.R. § 106.31(a)(2)). The result would threaten decades worth of gains in women's athletics and all the character-building benefits that have come along with those gains. For every male athlete permitted in women's competition, a female athlete is denied that same opportunity. *See* Editorial Staff, *16 Penn Swim Team Members Ask School, Ivy League to Refrain from Litigation to Allow Lia Thomas to Race at NCAAs*, Swimming World (Feb. 3, 2022).[23] For every male athlete who sets a new women's performance record, a female predecessor is robbed of a signature achievement. *See id.* And for every new policy implemented to ensure these results, legions of female athletes are affirmed in their belief that speaking out for their own rights and interests will only invite hostility and ridicule. *See id.*

Again, the Department has not delineated clear limits to its new policies. *See supra* at 5. But if its past pronouncements are any indication, it would rather dictate orthodoxy with respect to gender identity than actually prohibit discrimination in education on the basis of sex. Be that as it may, the law requires the Department to reason through the abovementioned issues before promulgating its new rules. To do any less would be an arbitrary and capricious exercise of administrative power and would have no legitimacy in our constitutional system.

*     *     *

Thank you, again, for your consideration of these concerns. Any further failure to "clearly disclose[]" or "adequately sustain[]" the new rules, especially in light of the deficiencies detailed above, will justify Tennessee and the co-signing States in taking further action to protect their citizens' rights and interests under the Administrative Procedure Act. *Oncor Elec. Delivery Co. LLC v. NLRB*, 887 F.3d 488, 493 (D.C. Cir. 2018) (quoting *SEC v. Chenery Corp.*, 318 U.S. 80, 94 (1943)); *see also Cytori Therapeutics, Inc. v. FDA*, 715 F.3d 922, 926 (D.C. Cir. 2013) (noting that agency action must be both "reasonable and reasonably explained" (citing *Motor Vehicle Manufacturers Assn. v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29 (1983)). We therefore urge the Department to comply with the law or else abandon this misguided rulemaking.

---

[22] https://www.ncaa.org/news/2022/1/19/media-center-board-of-governors-updates-transgender-participation-policy.aspx (attached hereto as Exhibit X).

[23] https://www.swimmingworldmagazine.com/news/penn-swim-team-members-ask-school-ivy-league-to-refrain-from-litigation-to-allow-lia-thomas-to-race-at-ncaas/ (attached hereto as Exhibit Y).

State of Tennessee Comments
ED-2021-OCR-0166
Page 14

Sincerely,

Jonathan Skrmetti
Tennessee Attorney General & Reporter

Steve Marshall
Alabama Attorney General

Treg R. Taylor
Alaska Attorney General

Mark Brnovich
Arizona Attorney General

Leslie C. Rutledge
Arkansas Attorney General

Chris Carr
Georgia Attorney General

Todd Rokita
Indiana Attorney General

Derek Schmidt
Kansas Attorney General

Daniel Cameron
Kentucky Attorney General

Jeff Landry
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

Austin Knudsen
Montana Attorney General

Douglas J. Peterson
Nebraska Attorney General

State of Tennessee Comments
ED-2021-OCR-0166
Page 15


John M. O'Conner
Oklahoma Attorney General

Alan Wilson
South Carolina Attorney General

Mark Vargo
South Dakota Attorney General

Ken Paxton
Texas Attorney General

Sean D. Reyes
Utah Attorney General

Jason S. Miyares
Virginia Attorney General

Patrick Morrisey
West Virginia Attorney General