EXHIBIT D



Administration
Office 614-466-8980
Fax 614-466-5087

September 12, 2022

Secretary Miguel A. Cardona
United States Department of Education
Lyndon Baines Johnson Building
400 Maryland Ave, SW
Washington, DC 20202

Docket No: ED-2021-OCR-0166

>    *Re:  Ohio and 18 States' comments regarding proposed rulemaking RIN 1870-
>    AA16, as set forth in 34 CFR Part 106, 87 Federal Register 41390.*

Dear Secretary Cardona:

Ohio, Alabama, Alaska, Arkansas, Florida, Georgia, Indiana, Kansas, Kentucky, Louisiana, Mississippi, Montana, Nebraska, Oklahoma, South Carolina, South Dakota, Utah, West Virginia, and Wyoming submit these comments in opposition to the notice of proposed rulemaking entitled, "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," set forth at 87 Fed. Reg. 41,390 (July 12, 2022).

Title IX of the Education Amendments of 1972 was, and is today, among the "major achievements" of the women's equality movement.[1]  This law prohibits schools that take federal funds from discriminating "on the basis of sex."[2]  With these words, Title IX ensures that women are treated as full members of the schools they attend; it ensures that women have the same opportunities as men.  No longer may schools look the other way when women are subjected to sexual harassment.  Nor may schools deny women "an equal opportunity to participate in sports."[3]  Title IX, in short, works in service of the principle that all citizens—men and women alike—

---

[1] *Bostock v. Clayton Cnty.*, 140 S. Ct. 1731, 1779 (2020) (Alito, J., dissenting).
[2] 20 U.S.C. §1681(a).
[3] *Bostock*, 140 S. Ct. at 1779 (Alito, J., dissenting).

1

deserve an "equal opportunity to aspire, achieve, participate in and contribute to society based on their individual talents and capacities."[4]

The Proposed Rule rewrites Title IX. And it does so in a way that will undermine public support for the law, threatening many hard-won gains. The law recognizes that men and women are different. Because of those differences, giving women equal educational opportunities sometimes requires women's-only facilities and organizations. For example, to ensure women's dignity and safety, Title IX specifically permits schools to offer single-sex living facilities and restrooms. And to ensure that women have a meaningful opportunity to compete in athletics, Title IX permits single-sex athletic teams.[5] The Proposed Rule undermines all this, *forbidding* schools from drawing distinctions based on biological sex. That prohibition may be well-intentioned—it presumably springs from a desire to respect the dignity of all students, without regard to their sexual orientation or gender identities. The signatories to this letter share that desire. But the precise means of protecting everyone's dignity implicates difficult tradeoffs. Those tradeoffs must be made by elected representatives in Congress and state legislatures and by schools themselves. The tradeoffs are not to be made by federal bureaucrats who seek to impose their preferred policies without regard to the many and regional complexities these issues raise. And the proposed policy offers no tradeoffs regardless, but instead demands that women and girls—and only women and girls—bear the burden of the changes the agency envisions.

In addition to contravening the text of Title IX, the Proposed Rule will deny students basic fairness. For example, the Proposed Rule would permit a sexual harassment investigator to discover evidence and privately screen it (as irrelevant or otherwise unusable) from the accused, and then allow that same investigator to double as decisionmaker. Parties would have no opportunity to challenge or contextualize such information. As another example, the Proposed Rule would allow an investigator to individually assess party or witness credibility, instead of allowing individuals to challenge their accuser's credibility (through an advisor) in a live hearing. The cloaked process that the rule envisions is egregiously unfair. The investigator is fundamentally biased against the accused student. After all, the school could lose federal funds by challenging the complainant's narrative, but faces no similar repercussions by accepting the accuser's story. Due process, along with basic fairness, requires live hearings with cross examination, at least when the case boils down to

---

[4] *United States v. Virginia*, 518 U.S. 515, 532 (1996).
[5] *See, e.g.*, 20 U.S.C. §1686; 34 C.F.R. §106.41(b).

assessing "he-said, she-said" credibility.  No one's life should be turned upside down based on something he did not do.  The Proposed Rule fails to account for this.

In light of these and other problems, the agency should rescind the Proposed Rule.

## I.     The Proposed Rule exceeds the scope of Title IX and creates more problems than it solves

Title IX announces the following prohibition, which binds every school that accepts federal funds:

> No person in the United States shall, *on the basis of sex*, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.[6]

For almost fifty years, Title IX been understood to mean what it says.  Relevant here, the phrase "discrimination on the basis of sex" has been interpreted to forbid schools that take federal money from denying equal treatment to either men or women.  The Proposed Rule announces a sharp break from this longstanding interpretation.  It announces that discrimination "on the basis of sex" includes discrimination on the basis of "sex stereotypes, … sexual orientation, and gender identity."[7] Even in contexts (like housing or athletic teams) where Title IX *expressly permits* schools to separate men and women, the Proposed Rule prohibits drawing sex-based distinctions that will hinder anyone's ability to live in a manner "consistent with that person's gender identity."[8]

This change is neither legal nor prudent.  The States are dedicated to providing the highest-quality education to all children and young adults, no matter their background—and no matter their sexual orientation or gender identity.  But the Department cannot pursue the laudable goal of ending discrimination by rewriting federal laws to mean things they do not say.  And even if it could, the Proposed Rule's approach to protecting students threatens more harm than good.  The Department should abandon this approach.

---

[6] 20 U.S.C. §1681(a) (emphasis added).
[7] 87 Fed. Reg. 41,390, 41,571 (proposed §106.10).
[8] *Id.* (proposed §106.31(a)(2)).

### A.    The Proposed Rule is inconsistent with Title IX

**1.** To understand the problems, return to the text of Title IX.

> No person in the United States shall, on the basis of sex, be ex-
> cluded from participation in, be denied the benefits of, or be sub-
> jected to discrimination under any education program or activity
> receiving Federal financial assistance.[9]

Title IX, like any other statute, must be interpreted "in accord with the ordinary
public meaning of its terms at the time of its enactment."[10]  And the original public
meaning of Title IX is clear.  The law prohibits unequal treatment—exclusion, denial
of benefits, and discrimination—"on the basis of sex."  At the time of Title IX's
enactment, this was understood to mean exactly what it means today:  schools may
not provide unequal opportunities or treatment to either of the two biological sexes.
Just consider what an everyday English speaker would understand a woman to mean
if she proclaimed:  "My school discriminated against me on the basis of sex."  She
would be understood to mean that the school, motivated by the fact that the student
is a woman, treated her worse than a similarly situated man.

Critically, Title IX has never been understood to forbid schools from drawing dis-
tinctions between men and women.  Equal treatment under Title IX does not mean
treatment blind to the realities of sex-based differences—it means treatment that,
notwithstanding sex-based differences, leaves education equally open to both sexes.
Thus, schools may provide separate bathrooms and locker rooms for men and
women.  While sex-segregated bathrooms draw distinctions on the basis of sex, they
ensure that both sexes (and women in particular) can take advantage of educational
opportunities without worrying about having their privacy threatened by the oppo-
site sex.  Along the same lines, while schools distinguish between the sexes when
they host men's and women's sports teams, these distinctions ensure equal oppor-
tunities.  Because males are (on average) bigger, stronger, and faster than women,
failing to offer separate teams for men and women—defined in biological terms—
would mean *denying* women an equal chance to compete.  Thus, schools violate Title
IX when they do not create a sufficient number of women's-only athletic teams or
positions.[11]

---

[9] 20 U.S.C. §1681(a).
[10] *Bostock*, 140 S. Ct. at 1738 (majority op.).
[11] 34 C.F.R. §106.41(b)–(c); *Biediger v. Quinnipiac Univ.*, 691 F.3d 85, 91, 105–06 (2d Cir. 2012).

**2.**  The foregoing establishes the Proposed Rule's illegality.  In relevant part, the Proposed Rule says:

> Discrimination on the basis of sex includes discrimination on the basis of *sex stereotypes*, sex characteristics, pregnancy or related conditions, *sexual orientation, and gender identity*.[12]

Expanding Title IX's protections to cover these italicized characteristics is contrary to law.  After all, the ordinary English speaker would not use the phrase "discrimination on the basis of sex" to describe discrimination based on "sex stereotypes," "sexual orientation," or "gender identity."  There may be some overlap—discrimination based on a characteristic associated with one sex, for example, may be evidence of discrimination based on sex.  But no one would describe every instance of discrimination based on a sex stereotype, sexual orientation, or gender identity to constitute "discrimination on the basis of sex."

In concluding otherwise, the Department relies heavily on *Bostock v. Clayton County*[13] and *Price Waterhouse v. Hopkins*.[14]  Both cases interpreted a different statute, Title VII, that contains different language: whereas Title IX prohibits schools from discriminating against students "on the basis of sex," Title VII prohibits employers from taking adverse employment actions "because of [an] individual's race, color, religion, sex, or national origin."[15]  Neither decision is relevant.

**Bostock.**  In *Bostock*, the Supreme Court held that Title VII prohibits employers from taking adverse employment actions because of an individual's sexual orientation or gender identity.  It reasoned as follows.  Title VII prohibits employers from firing, refusing to hire, or otherwise punishing employees "because of … sex."  The Court determined that "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.'"[16]  "In the language of law, this means that Title VII's 'because of' test incorporates the simple and traditional standard of but-for causation."[17]  *Bostock* reasoned that, when an employer takes an adverse action against a current or

---

[12] 87 Fed. Reg. at 41571 (proposed §106.10) (emphasis added).

[13] 140 S. Ct. 1731 (2020).

[14] 490 U.S. 228 (1989).

[15] 42 U.S.C. §2000e-2(a).

[16] *Bostock*, 140 S. Ct. at 1739 (majority op.) (quotation omitted).

[17] *Id*. (quotation marks omitted).

prospective employee because that individual is gay or transgender, the employee's sexual orientation or gender identity *necessarily* plays a but-for role in the decision. Consider, for example, a company that fires a lesbian woman for being attracted to women.  It would not fire a heterosexual man for being attracted to women.  Therefore, the Court reasoned, sex is a but-for cause of the adverse action.  For the same reason, the Court concluded that, if a company fires a transgender woman (biological male) for dressing as a woman but would not fire a biological female from doing these things, sex would play a but-for role in the decision.  Because *Bostock* determined that sex necessarily plays a but-for role in adverse actions resting on sexual orientation or gender identity, and because Title VII prohibits adverse actions with respect to which sex is a but-for cause, *Bostock* concluded that adverse actions resting on these characteristics violate Title VII.

*Bostock* does not alter the natural meaning of Title IX.  *Bostock* expressly refused to even consider whether its reasoning extended to other laws.[18]  And for several reasons, Title IX cannot be understood to incorporate the but-for test that *Bostock* read into Title VII.

*First,* Title IX expressly allows schools to draw sex-based distinctions.  For example, Title IX permits schools to host "father-son" or "mother-daughter" activities, so long as comparable activities are "provided for students of the other sex."[19]  It permits schools to award scholarships based on "pageant[s]" open "to individuals of one sex only."[20]  And it permits schools to "maintain[] separate living facilities for the different sexes."[21]  Thus, Title IX itself draws distinctions with a but-for relation to biological sex.

*Second*, and perhaps more important, Title IX has long been understood to permit distinctions that the but-for test would prohibit.  For example, longstanding regulations permit schools to host separate men's and women's sports teams.[22]  Other regulations allow schools to "provide separate toilet, locker room, and shower facilities on the basis of sex," provided they are "comparable" in quality.[23]  If the but-for test were right, those regulations would be illegal.  But they have existed for decades with

---

[18] *Id*. at 1753.
[19] 20 U.S.C. §1681(a)(8).
[20] *Id.* §1681(a)(9).
[21] 20 U.S.C. §1686.
[22] 34 C.F.R. §106.41(b).
[23] 34 C.F.R. §106.33.

little to no controversy. The absence of controversy is critically important: the fact that these well-known sex-based distinctions emerged immediately after Title IX's enactment, and remained in place for decades without causing controversy, establishes that Title IX was not understood to prohibit all distinctions with some but-for relation to biological sex.[24]

*Third,* and most important of all, Title IX's language is distinct from Title VII's.[25] *Bostock* determined that Title VII's use of the phrase "because of" incorporated a but-for standard. But Title IX does not use the phrase "because of." It prohibits discrimination "on the basis of sex." That phrase *could* encompass but-for causation.[26] But the phrase more naturally incorporates a motive-based analysis. On this understanding, to say that "Person A acted on the basis of characteristic X" can mean "characteristic X motivated Person A to act."[27] This is the better way to understand a law that prohibits discrimination. Again, if a student accused a school of "discriminating against me on the basis of my sex," that would most naturally suggest that the accuser's sex motivated the action in question. In contrast, this would be a very unnatural way to describe discrimination motivated by a characteristic, like sexual orientation, that is related to, but distinct from, sex.

In sum, context, longstanding regulations, and textual differences all suggest that Title IX does not incorporate the but-for standard that *Bostock* read into Title VII.

But even if the Department disagrees—even if it concludes that Title IX prohibits all differential treatment with a but-for relationship to biological sex—the Proposed Rule is *still* invalid. Remember, *Bostock* did not hold that sexual orientation or gender identity are "sex." Instead, it held that discrimination because of sexual orientation or gender identity *necessarily* result from discrimination because of sex, since sex always plays a but-for causal role. The Proposed Rule claims to embrace the same reasoning. It claims that the forms of discrimination it prohibits necessarily constitute discrimination "based on sex," as each requires "consideration of a person's sex."[28]

---

[24] *See Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014).

[25] *Meriwether v. Hartop*, 992 F.3d 492, 510 (6th Cir. 2021).

[26] *See, e.g.*, *Natofsky v. City of New York*, 921 F.3d 337, 349 (2d Cir. 2019).

[27] *See, e.g.*, *Wolfe v. Fayetteville, Arkansas Sch. Dist.*, 648 F.3d 860, 867 (8th Cir. 2011).

[28] 87 Fed. Reg. at 41,532.

The trouble for the Department is that the Proposed Rule extends to categories that *do not* require consideration of sex. For example, the rule forbids discrimination on the basis of "nonbinary" gender status.[29] Sex has no but-for relation to nonbinary status, because one need not know an individual's sex to know if that person is nonbinary—it is enough to know that the person identifies as neither male nor female. Similarly, the Proposed Rule prohibits discrimination against people who identify as "bisexual." But discrimination based on bisexual status does not require knowledge of anyone's sex—it is enough to know that the person is attracted to members of both sexes. Thus, even assuming the Department has Title IX regulatory authority over "classifications" that "depend ... on consideration of a person's sex" (like pregnancy), the Department's regulations governing gender identity and sexual orientation go beyond sex-based distinction. So even if *Bostock*'s but-for causation standard is read into Title IX, the Proposed Rule is too broad and therefore unlawful.

*Price Waterhouse*. The Department cites *Price Waterhouse* for the proposition that "sex stereotyping" constitutes discrimination "on the basis of sex." *Price Waterhouse* interpreted a different statute, Title VII. As just discussed, context, evidence of original public understanding, and textual differences between Title VII and Title IX make it impossible to assume that what is true of one statute is true of the other. *Price Waterhouse* is, moreover, unsupportive on its own terms. The plurality in that case determined that sex stereotyping can be "*evidence* that gender played a part" in an employer's decision.[30] Still, a plaintiff who proves sex stereotyping "must show that the employer actually relied on her gender in making its decision."[31] In other words, *Price Waterhouse*'s plurality deemed sex stereotyping to be probative of sex discrimination, but not to constitute sex discrimination in and of itself. In contrast, the Proposed Rule says that sex stereotyping *is* discrimination "on the basis of sex." *Price Waterhouse* cannot support that absolutist conclusion, and neither can Title IX's text.

**3.** In the end, the Proposed Rule vastly exceeds the scope of Title IX. It is therefore invalid.

---

[29] 87 Fed. Reg. at 41,532 (emphasis added).
[30] 490 U.S. at 251.
[31] *Id.*

**B.** **The Proposed Rule, by requiring that students be allowed to participate in programs in a manner consistent with their gender identities, will harm girls and women**

The Proposed Rule's mandate that federal funding recipients allow participation "consistent with the person's gender identity," runs contrary to the purpose of Title IX.

**1.** What we call Title IX of the Education Amendments of 1972 was initially introduced as a standalone bill: the Women's Equality Act of 1971.[32]  Senator Birch E. Bayh, who introduced the legislation in the Senate, sought to "eradicate the pervasive, divisive, and unwarranted discrimination against a majority of our citizens, *the women of this country*."[33]  As to privacy-invading practices like integrating dormitories or contact sports, Senator Bayh emphasized, "I do not read [the phrase 'any program or activity'] as requiring integration of dormitories between the sexes, nor do I feel it mandates the desegregation of football fields.  What we are trying to do is provide equal access for *women and men* students to the educational process and the extracurricular activities in a school, where there is not a unique facet such as football involved."[34]

The Proposed Rule ensures that the law will cease to serve these purposes.  It first unlawfully narrows Title IX by stating that, although sex-based distinctions are permitted by the statute and long-standing regulations, the distinctions must not be "carr[ied] out" in a manner that "subject[s] a person to more than de minimis harm."[35]  The preamble explains:

> prohibited harm may result when a recipient applies a *generally permissible* sex-based policy, or makes an otherwise permissible sex-based distinction, *in a manner that discriminates* against one or more protected individuals by subjecting them to more than de minimis harm on the basis of sex. In these situations, even when a recipient's sex-specific treatment or separation does not materially harm *most* students to whom it applies, and therefore

---

[32] *See* Paul C. Sweeney, *Abuse Misuse & Abrogation of the Use of Legislative History: Title IX & Peer Sexual Harassment*, 66 UMKC L. Rev. 41, 54 (1997).

[33] *Id*. (quotation omitted) (emphasis added).

[34] *Id*. at 59 (citing 117 Cong. Rec. 30399, 30406 (1971)) (emphasis omitted).

[35] 87 Fed. Reg. at 47,571 (proposed §106.31(a)(2)).

> may generally be maintained by a recipient, Title IX prohibits its application to those individual students who would suffer more than de minimis harm on the basis of sex.[36]

In sum, the Proposed Rule imposes the following command:  while schools may continue to draw statutorily and administratively permitted sex-based distinctions, these otherwise-permissible distinctions (like separate bathrooms or teams) may be impermissible if they cause more-than-*de-minimis* harm to people who wish not to abide by the sex-based distinctions.  (The Proposed Rule seems to flip on itself and say that more-than-*de-minimis* harm might be okay sometimes, maybe just for living arrangements and sports.[37]  The Rule embraces a logic so internally inconsistent that the States request clarification as to what constitutes "circumstances in which Title IX … permits different treatment or separation on the basis of sex"[38]—which the Department reads to *prohibit* harm—versus sex-based distinctions "permitted by Title IX"[39]—which the Department reads to *allow* harm.)

One searches Title IX in vain for any textual hook for this *de minimis* rule—it is pulled from thin air.  Indeed, it will have the effect of blue-penciling the sex-based distinctions that Title IX permits.  For example, suppose a university, relying on the statute that permits sex-segregated fraternities, sororities, and service organizations,[40] permits sororities to accept only female members.  The Proposed Rule permits that policy as a general matter.  But perhaps a *particular* man—who identifies and presents as a man—wants to join a sorority (given its numerous benefits).  Due to the female-only policy, he is forced to find private, off-campus housing at greater financial cost.  Moreover, his walk to campus is substantially longer, so he can no longer take an on-campus job or do homework during the middle of the day, as he could were he allowed to join the sorority.  Under the Proposed Rule, while sex-based sorority membership is *generally* permissible, it would *not* be permissible applied to this man, who has been subjected to more than *de minimis* harm "on the basis of sex."  The school would be in an even tougher position if the man identified as a woman.  He may have all the male attributes that led Congress to expressly permit sex-segregated Greek life.  Nonetheless, the school would have to let him rush sororities, provided that refusing to do so causes more than *de minimis* psychological or financial harm.

---

[36] 87 Fed. Reg. at 41,535 (emphasis added).

[37] *Id.* at 41,536.

[38] *Id.* at 41,571 (proposed §106.31(a)(2)).

[39] *Id.*

[40] 20 U.S.C. §1681(a)(6).

As all this shows, under the Proposed Rule, provisions allowing sex-based distinctions will cease to apply whenever they inconvenience or cause displeasure to members of the class they affect. Put differently, every time a student (sincerely) experienced discomfort as a result of the school's compliance with a provision in Title IX that permits sex-based distinctions, the school would have to relax its compliance for the student in question. The result? The laws allowing these distinctions, which exist primarily to protect the privacy and physical safety of women, will cease to do so.

The agency's definition of *de minimis* harm drives home how misguided this regime will be. The Proposed Rule says:

> Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.[41]

This provision denies women and girls the benefits of education programs or activities by granting anyone who identifies as a "woman" the entitlement to enter spaces and join activities (like sports) designated for women alone. (Although the Proposed Rule purports to leave the athletics question for another day, the Rule's text straightforwardly applies to individuals who seek to participate in activities, which would include sports, consistent with their gender identity.) Title IX, by allowing (and at times requiring) women's-only extracurricular activities, has generated significant benefits for women and girls. In the years since the law's passage, girls' high school sports-participation rate increased by more than 1,000 percent, from 294,015 girls to 3,402,733.[42] The same story can be told about collegiate competitive athletics. While only 64,390 women participated in 1982, 221,212 women participated in 2020.[43]

Women's and girls' participation in sports provides benefits far beyond the field. According to the Women's Sports Foundation:[44]

---

[41] 87 Fed. Reg. at 47,571 (proposed §106.31(a)(2)).

[42] *Title IX 50th Anniversary: The State of Women in College Sports*, NCAA (2022) at 15, https://perma.cc/LD2P-HQZW.

[43] *Id*. at 17.

[44] *Benefits – Why Sports Participation for Girls and Women*, Women's Sports Foundation (Aug. 30, 2016), https://perma.cc/9F49-8FF3.

- High school girls who play sports are less likely to be involved in an unintended pregnancy; more likely to get better grades in school and more likely to graduate than girls who do not play sports.

- Girls and women who play sports have higher levels of confidence and self-esteem and lower levels of depression.

- Girls and women who play sports have a more positive body image and experience higher states of psychological well-being than girls and women who do not play sports.

Eliminating longstanding sex-based distinctions threatens to hinder this progress. Today, we take for granted that women will have athletic and educational opportunities on par with men.  But we ought not forget that women obtained this parity in a system that drew sex-based classifications.  "Chesterton reminds us not to clear away a fence just because we cannot see its point.  Even if a fence doesn't seem to have a reason, sometimes all that means is we need to look more carefully for the reason it was built in the first place."[45]  The Department is embarking on a nationwide experiment in eliminating sex-based distinctions without adequately considering why those distinctions were drawn in the first place.

The nationwide nature of Title IX makes the Department's conduct especially improper.  The States will always protect the rights of gay and transgender Americans.  Those individuals have the same inalienable rights to life, liberty, and the pursuit of happiness as everyone else.  But precisely because the States take seriously their obligation to protect all their citizens, there is no need to assume that the tradeoffs posed by sex-segregated spaces are best assessed on a nationwide level.  As with many difficult issues, it may well be that the best solutions vary from place to place.  The citizens of Utah and Massachusetts might have different views on the need to place men and women in different living quarters.  Texans and New Yorkers may not see eye to eye on the wisdom of letting biological males play contact sports, like wrestling, against biological females.  "A healthy society should have free rein" to debate these issues.[46]  "A mark of a healthy society, it might even be said, is that it remains

---

[45] *Artis v. D.C.*, 138 S. Ct. 594, 608 (2018) (Gorsuch, J., dissenting).
[46] *Preterm-Cleveland v. McCloud*, 994 F.3d 512, 535 (6th Cir. 2021) (*en banc*) (Sutton, J., concurring).

relentlessly ill at ease about the ethical, moral, medical, liberty, and faith-based considerations that inform these debates."[47]  If nothing else, State experimentation may point the way to a better solution—a solution that no one will ever find if the States are prohibited from looking.

Add this problem to the ones discussed above:  the Proposed Rule contravenes the existing Title IX regulations regarding athletics.  The regulations require schools to provide "equal athletic opportunity for members of both sexes."[48]  The school must offer sports in a manner that "effectively accommodate[s] the interests and abilities" of women.[49]  These regulations make good sense.  After puberty, a biological male athlete, irrespective of later use of hormonal treatments, retains massive and unbridgeable physiological advantages over females.[50]  A school that requires female athletes to compete against biological men in certain sports does not effectively accommodate the interests or abilities of women.  To the contrary, it assures that women will miss out on opportunities they would otherwise have had.

The Proposed Rule will hurt women in other ways, too.  Take scholarships.  Most universities offer women-specific scholarships, particularly in STEM fields (science, technology, engineering and math).[51]  While that practice can be controversial (if a school disadvantages men), under the Proposed Rule, a school would be *unable* to preserve scholarships to benefit either women or men.  That may affect women's long-term earning and career potential.  Women make up only 21 percent of engineering majors and 19 percent of computer science majors.  If opportunities for women are reduced by the Proposed Rule, that gap will only widen.[52]

To the extent Title IX prohibits discrimination against an individual because the individual is "cisgender," as the Department claims it does, the Proposed Rule itself violates that prohibition.  Under proposed §106.31(a)(2), transgender individuals

---

[47] *Id.*

[48] 34 C.F.R. §106.41(c).

[49] *Id.* at §106.41(c)(1).

[50] Emma N. Hilton & Tommy R. Lundberg, *Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage*, 51 Sports Med. 2, p. 199–214 (2021), https://perma.cc/332S-2K7F; Laura Geggel, *Why Do Men Run Faster Than Women?*, Live Science (May 27, 2017), https://perma.cc/L5KZ-9WCZ.

[51] *Colleges and Universities are Failing to Meet their Title IX Obligations to Male Students*, SAVE (Aug. 20, 2019), https://perma.cc/3F3Y-B4LT.

[52] *See The STEM Gap: Women and Girls in Science, Technology, Engineering and Mathematics*, American Association of University Women, https://perma.cc/7N6U-KB74 (last visited Aug. 2, 2022).

may participate in *more* opportunities than non-transgender individuals, thereby treating transgender individuals more favorably. For example, a transgender individual is able to compete in the entire array of sports offered, for men *and* women, while non-transgender individuals may compete only in the sports offered to their biological sexes. Transgender individuals may use bathrooms that non-transgender individuals cannot access. And, transgender individuals may compete for scholarships, attend events, and receive awards that non-transgender individuals cannot. By providing access to additional education programs and activities consistent with one's gender identity, the Department discriminates in precisely the manner it says it cannot.

**2.** As the foregoing suggests, the Department failed to consider important aspects of the problem before it. We will address some of those ignored issues now.

*First*, the Department failed adequately to consider the privacy and reliance interests of women and girls. The Proposed Rule does acknowledge that "members of the public" believe that permitting biological males to enter women's-only spaces will harm women's privacy.[53] But rather than treating the public's perception as dispositive—and it is, because what privacy requires turns on the degree of privacy that Americans demand—the Department fails to give *any* weight to these interests. It instead dismisses them by asserting (without evidence) that schools "can and do" protect privacy interests while permitting biological males to enter women's-only spaces.[54] It calls women's privacy interests "unsubstantiated."[55] But that is objectively false. Just last year, in Loudon County, Virginia, a "pansexual" biological male assaulted a girl in a girl's restroom—a restroom he had access to because the school had a policy of resisting sex-based bathroom distinctions.[56] And female athletes, like college swimmer Riley Gaines, experience "extreme discomfort" in sharing locker rooms with biological men.[57]

The States are not suggesting that transgender individuals pose a heightened threat of sexual misconduct relative to non-transgender individuals. Instead, when it comes to sexual assault, the main problem with failing to separate the sexes is that it

---

[53] 87 Fed. Reg. at 41,535.

[54] *Id.*

[55] *Id.*

[56] Yaron Steinbuch, *Mom of Virginia teen convicted of sex assault says he doesn't identify as female despite wearing skirt*, N.Y. Post (Nov. 2, 2021), https://perma.cc/T6GG-AZ6K.

[57] Allie Griffin, *Lia Thomas competitor says she felt 'extreme discomfort' sharing locker room*, N.Y. Post (July 27, 2022), https://perma.cc/HK9B-U67S.

becomes easier for *non-transgender* sexual predators to infiltrate women's-only spaces where women are likely to be vulnerable. After all, if the women's locker room allows male entrants, would-be witnesses are not likely to think much of biological men entering the room. And that makes it easier for non-transgender sex criminals to enter areas where women are vulnerable. There is a reason that humans, for millennia, have seen fit to separate the sexes with respect to certain activities. It is passing arrogant to assume these barriers can be torn down without consequence.

In addition to having privacy interests worth protecting, women and girls have reliance interests the Department never acknowledges. For example, women have accepted sports scholarships, joined women's organizations, engaged in after-school programming, attended college, or joined a team based on an understanding that they, as women, will be protected and treated as such. These women will soon be forced to engage in sorority outings with men, attend STEM women's retreats with men, urinate alongside men, and compete in sports against men. This has the possibility of deterring women's participation—a possibility that the Department never acknowledges.

*Second*, the Proposed Rule never defines "gender identity." The requirements within the Proposed Rule seem to assume that "gender identity" is either male or female and remains static. The Proposed Rule would thus require a male who identifies as female be treated as a female with respect to the bathroom, soccer field, admissions, maternity policy, healthcare needs, and so on. But gender identity, absent a definition, could extend far more broadly. How must a school treat a nonbinary, gender fluid, or third-gender individual? If an individual identifies as male one day (requiring his admission into a fraternity), female the next (permitting his removal), third-gender the next (in which case the fraternity is unsure of its responsibility), and male the next, must the fraternity adapt to each of these stages to allow for participation consistent with the individual's gender-fluid identity?

*Finally*, the Department's eradication of sex-based distinctions for primary education is harmful and confusing to the point of abuse, particularly without parental consent. The Proposed Rule would require participation "consistent with the person's gender identity" in *all* education programs or activities that receive federal financial assistance, not just secondary or postsecondary activities. This means male students who identify as girls, and female students who identify as boys, *must* be permitted to so identify at school. But parents, not schools, are responsible for the upbringing of their young children, particularly when it comes to deeply personal and emotional questions. The Proposed Rule strips parents of their right to raise their boys as boys

15

and girls as girls—it bars schools from respecting a parent's wish to treat their children in accord with their biological sexes.

### C. The Proposed Rule wrongly disregards costs associated with proposed §106.10 and §106.31

Although the Department says that the benefits of the Proposed Rule "are substantial and far outweigh the estimated costs," the Department has failed to adequately assess the costs, particularly of proposed §106.10, which redefines sex discrimination to add sexual orientation and gender identity, and §106.31(a)(2), which prohibits even permissible sex-based distinctions that cause *de minimis* harm.[58]  According to the Department, "[c]ompliance with proposed § 106.31(a)(2) may require updating of policies or training materials, but would not require significant expenditures, such as construction of new facilities or creation of new programs."[59]

This flippant response is egregiously off-base.  What are the costs of fewer women participating in sports and other women's-only organizations?  What are the costs of parents surrendering some degree of ability to influence their children on issues pertaining to sexual orientation and gender identity?  What are the costs of retrofitting women's spaces to accommodate privacy and inclusion?  What are the costs of misleading children into a lifetime of gender-related confusion, untested drugs, or painful surgeries?  The Department makes no effort to measure any of this, evincing a complete failure to consider countervailing interests.

### D. Consideration of technical concerns

Consistent with the concerns the States have raised above, the following language should not be adopted.

*§106.21(c):*  The Department proposes to remove the phrase "both sexes," which has existed since the initial Title IX regulations.  This phrase is vital to understanding the discrimination that Title IX prohibits.  Moreover, Title IX itself uses the phrase.  The removal of the phase additionally creates a grammatical error in the sentence.  The Department should maintain the text as currently written (which has not prevented any institution of higher education from asking whether an individual applicant identifies as something besides male or female).

---

[58] 87 Fed. Reg. at 41,547.
[59] *Id.* at 41,561.

*§106.57(d):*  The Department proposes to remove the word "she" in reference to whether a woman should be reinstated to her old status upon returning from childbirth.  The Title IX statute does not refer to pregnancy as a protected category, though there is no doubt that the condition affects only women.  De-linking sex and pregnancy is scientifically inaccurate and insulting to women—the only sex capable of becoming pregnant or giving birth.

## II.    The proposed procedural changes invite liability in overbroad and nebulous circumstances

The text of Title IX is simple: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."[60]  The goal is equally simple:  to provide men and women equal opportunities in education.

But the Proposed Rule goes beyond requiring schools to provide equal opportunities or stop discrimination.  Instead, it requires schools to prevent and punish non-offensive activity—no matter where it occurs and without any formal complaint—if the activity creates a hostile-enough environment.  Not only does the proposal mandate that schools take punitive actions in unclear circumstances, it also waters down procedural protections for students accused of acting improperly.

Because the Department's proposal exceeds the conditions Congress unambiguously placed on federal funds, and because it imposes unfair and often-unconstitutional processes on students accused of wrongdoing, the following provisions should be withdrawn or amended.

### A.    §106.11: The expansion of Title IX to apply to discrimination outside the school's control creates an unworkable test that will prevent schools from engaging with the community

Congress passed Title IX under the Spending Clause.[61]  Pursuant to the Spending Clause, Congress can "attach conditions on the receipt of federal funds."[62]  And

---

[60] 20 U.S.C. §1681(a).

[61] U.S. Const. art. I, §8, cl.1.

[62] *S. Dakota v. Dole*, 483 U.S. 203, 206 (1987).

Congress, the Supreme Court has held, may attach conditions pertaining to matters it could not otherwise regulate.  Put differently, by attaching conditions to offers of federal funds, Congress may purchase compliance with rules it could not impose directly.[63]

But this power comes with important constraints.  One stands out here:  Congress must clearly state its conditions so that would-be recipients can make an informed decision whether to accept the funds and the strings to which they are attached.[64] *Arlington*, 548 U.S. at 296.  In other words, spending conditions are enforceable only to the extent they are clear.[65]  Stated in the negative, when it is not clear that a condition in Spending Clause legislation requires something, the legislation must be understood not to require it.[66]

These principles inform any proper interpretation of Title IX.  Remember, the law prohibits recipients of federal funds from "subject[ing]" students "to discrimination" on the basis of sex.[67]  The word "subject" connotes action by the school itself; "we wouldn't say that the school had 'subjected' its students to harassment if the students never experienced any harassment *as a result of the school's conduct*."[68]  Consistent with all this, the Supreme Court has held that students may sue schools under Title IX only for the schools' own conduct.  This means a school is liable for misconduct by school employees or students only in circumstances where the school "exercises substantial control over both the harasser and the context in which the known harassment occurs."[69]  Where, for example, sexual misconduct "occurs during school hours and on school grounds," "the misconduct is taking place 'under' an 'operation' of the funding recipient."[70]  Only this type of employee or peer behavior—misconduct the school is essentially overseeing—can give rise to a Title IX violation.

The current regulations mirror the language that the Supreme Court said Congress offered and the schools accepted:

---

[63] *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006).

[64] *Id.*

[65] *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).

[66] *See, e.g.*, *id.*; *Arlington*, 548 U.S. at 296.

[67] 20 U.S.C. §1681(a).

[68] *Kollaritsch v. Michigan State Univ. Bd. of Trustees*, 944 F.3d 613, 628–29 (6th Cir. 2019) (Thapar, J., concurring) (emphasis added).

[69] *Davis v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 645 (1999).

[70] *Id.* at 646.

> "education program or activity" includes locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs.[71]

But the Proposed Rule adopts a new test, at §106.11, with three problematic features worth highlighting. First, the Proposed Rule says: "conduct that occurs under a recipient's education program or activity" broadly includes "conduct that is subject to the recipient's disciplinary authority."[72] Second, "[a] recipient has an obligation to address a sex-based hostile environment under its education program or activity, even if sex-based harassment contributing to the hostile environment occurred outside the recipient's education program or activity."[73] Finally, the preamble indicates that a school's "education program[s]" and "activit[ies]" include programs "sponsored by the recipient at another location."[74]

Whether read alone or in tandem, these features make schools responsible for conduct occurring *outside* their programs if the people committing the misconduct in question are subject to their disciplinary authority. That illegally expands the scope of Title IX beyond what the statute will bear—and certainly beyond what the statute can be read to *clearly* require. It also contradicts Supreme Court precedent. The relevant precedent holds that schools bear responsibility for discriminatory misconduct only if it occurs in circumstances where the school has control "over *both* the harasser *and* the context in which the known harassment occurs."[75] The Proposed Rule, in contrast, would punish schools whenever they have control over the harasser. Put differently, the Proposed Rule makes schools liable for conduct that does not occur "under" an education activity as long as it broadly involves an individual the school has the power to reprimand. That expansion is at odds with the statute.

Now consider the second feature in particular: the "obligation to address a sex-based hostile environment under [an] education program or activity, even if sex-based harassment contributing to the hostile environment occurred outside the recipient's education program or activity."[76] As just discussed, this unlawfully imposes

---

[71] 34 C.F.R. §106.44.
[72] 87 Fed. Reg. at 41,571 (proposed §106.11).
[73] *Id.*
[74] *Id.* at 41,401.
[75] *Davis*, 526 U.S. at 645.
[76] 87 Fed. Reg. at 41,571 (proposed §106.11).

obligations with respect to harassment that occurs outside a school's control.  The problem is magnified by the fact that the Proposed Rule makes the question whether the on-campus environment is "hostile" a "fact-specific inquiry" with respect to which the Rule provides no guidance.[77]  An off-campus women's-only wine night, if the women exclude biological males, might be deemed to constitute harassment.  Must the school respond if the exclusion creates a "hostile" environment in a class an excluded male shares with participating women?  The only honest answer is "maybe," which means schools will have an incentive to discourage students from attending or hosting such events.  That is not what the drafters of Title IX intended.  Nor is it *clear* from Title IX's text that this is what the law requires.

One final point on this topic.  The Department mentions that schools' educational programs include events they "sponsor[]."[78]  This also goes beyond the conditions to which the schools agreed when they accepted federal funds.  Schools "sponsor" a vast array of events to build goodwill in the community, but in many instances they have little oversight or participation.  For example, universities might sponsor rural 4-H chapters, though no university representative attends the chapters' meetings.  While there may be circumstances in which a sponsored event *is* within the university's substantial control, imposing liability for conduct at all sponsored events will cause universities to end their sponsorships.  It will, in other words, deter universities from engaging with the broader community.

### B.    §106.30 and §106.45: The Proposed Rule's acceptance of oral, as compared to written, complaints creates fairness problems

Under the current regulations, a person alleging discrimination must submit a written complaint before a school may initiate investigatory proceedings.  The Proposed Rule would eliminate the written-complaint requirement.[79]

This creates two serious problems.  First, oral requests are not always easy to identify.  This means a school may engage in a grievance procedure too early (without the complainant's consent) or too late (by waiting for details or confirmation that the complainant does not know she must provide).  Confusion is bad for the complainant and bad for the school.  A written-complaint requirement alleviates the confusion by providing a bright-line test for triggering the review process.

---

[77] *Id*. at 41,403.
[78] *Id*. at 41,401.
[79] 87 Fed. Reg. at 41,567 (proposed §106.2).

Second, the contours of an accusation can be hard to decipher when provided orally. Thus, a school presented with an oral complaint is often unable to provide adequate written notice to the accused.  This leaves the accused unable to effectively understand the charges and prepare a response.

The existing regulations strike the right balance by allowing a school to implement supportive measures without a written complaint or any other formal process.  But when it comes to initiating a procedure that may result in stripping a student of his right to pursue an education, schools should be required to both know that an accusation is being made and understand what that accusation contains.  All that is best assured through a written-complaint requirement.

### C.    §106.2: The Proposed Rule's dilution of "sexual harassment" leaves schools liable for immature actions and protected speech

Elementary schools are full of children, and children engage in child-like behavior. They call each other names.  They chase each other around the playground.  And they poke, prod, touch, and pull.  Much of this is just part of being a kid, unavoidable in any normal social environment—even though some of the same conduct would be disturbing, and constitute obvious sexual harassment, if performed by an adult.

Title IX accounts for this reality.  The Supreme Court has explained that, to constitute "discrimination" under the statute, sexual harassment must be "so severe, pervasive, and objectively offensive, and … so undermine[] and detract[] from the victims' educational experience, that the victim-students are effectively denied equal access to an institution's resources and opportunities."[80]  Thus, "simple acts of teasing and name-calling among school children" or a victim's "decline in grades" do not constitute a Title IX violation.[81]

The Proposed Rule says otherwise.  It would require that sexual harassment be *either* severe *or* pervasive, and it eliminates any requirement that the conduct be "objectively offensive."[82]  This would be unworkable in the elementary-school context. For example, a child might engage in one "severe" activity—maybe pulling down someone's pants in gym class.  The pantsed student may be subjectively (and quite

---

[80] *Davis*, 526 U.S. at 651.
[81] *Id*. at 652 (quotation omitted).
[82] 87 Fed. Reg. at 41,569 (proposed §106.2).

reasonably) horrified, but the offending student might never re-offend. Has the *school* discriminated on the basis of sex? Under Title IX, no; under the Proposed Rule, maybe. Now consider behavior that is pervasive but not severe. A boy flies a paper airplane to a girl one day, chases her on the playground the next, and moves her coat down the rack the next. Annoying behavior, certainly, but has the *school* discriminated on the basis of sex? Under Title IX, no; under the Proposed Rule, maybe.

The Proposed Rule indicates that such behavior will only constitute discrimination if the victimized student is less able to participate in an education program or activity. But the Proposed Rule requires schools conducting this inquiry to look at a constellation of considerations, some of which seem entirely off-base. For example, in deciding whether a student is enduring pervasive or severe sexual harassment, schools must consider *other* sex-based harassment involving *other students* at the school.[83] It is unclear why a boy picking on a sixth-grade girl has any effect on whether a kindergartner boy faces a hostile environment when a female peer calls him fat. The Rule essentially assumes that schools will know a hostile environment when they see it. And anyone with elementary-school-aged children—indeed, anyone who *was once* a child—knows how unworkable that test will be. Schools need a much clearer line between annoying, immature behavior on the one hand, and pervasive, punishable behavior on the other. Title IX should be triggered only when a child's behavior is severe, pervasive, *and* objectively offensive. Anything else risks triggering a Title IX investigation every time a third grader does something foolish.

Outside the elementary-school context, the "severe or pervasive" test risks requiring schools to censor speech protected by the First Amendment. An individual's perspectives on gay marriage, abortion, family structure, gender roles, or gender ideology may be sex-based and pervasive, and may objectively cause listeners discomfort. But a public school would run headlong into First Amendment problems if it tried to silence these perspectives in the name of Title IX.[84] The Department should retain the current standard—it should continue holding that Title IX prohibits only severe, pervasive, and objectively offensive behavior—to avoid trapping high schools and colleges into picking whether to comply with Title IX or the First Amendment. Moreover, pervasive and uncomfortable speech should be *welcomed* by our institutions of higher education—students will learn to think critically, disagree articulately and civilly, and our nation will be made better for it. Teaching young adults that

---

[83] *Id.*
[84] *Meriwether*, 992 F.3d at 510–511.

censoring ideas is the preferred approach will create a nation of close-minded, sheltered adults.

### D.   §106.2: The Proposed Rule would permit schools to punish accused students without any process

Students claiming to face danger or harassment ought to receive interim, supportive measures while the school investigates their accusations.  But supportive measures are exactly that—supportive, not adjudicatory.  Schools must not be encouraged to punish the accused *before* determining what happened.  Doing so would undermine even the most elementary principles of fairness.

The existing regulations strike the right balance.  They require schools to provide "supportive measures" to all complainants, whether they file a formal complaint or not.[85] These supportive measures must be "non-disciplinary" and "non-punitive," and "designed to restore or preserve equal access to the recipient's education program or activity without unreasonably burdening the other party."[86]  The existing process is sensitive to sexual-harassment victims, but does not assign blame prematurely.

The Proposed Rule, however would specifically permit schools to take measures that "*burden* a respondent," so long as the supportive measures are "imposed for non-punitive and non-disciplinary reasons."[87]  For example, a school might bar an accused student from visiting campus in order to protect the alleged victim—and it may do so even before determining whether the accused did anything improper or providing any process whatsoever.  This invitation is problematic.  Because the Proposed Rule's redefinition of "supportive measures" concerningly invites schools to deny students process owed under the Constitution and Title IX, it should be rescinded.

---

[85] 34 C.F.R. §106.44(a).
[86] 34 C.F.R. §106.30(a).
[87] 87 Fed. Reg. at 41,569 (proposed §106.2) (emphasis added).

**E.    §106.44: The proposed liability standard, which eliminates a school's "actual knowledge" of discrimination, imposes liability beyond what Title IX permits**

Title IX prohibits federal agencies, including the Department, from penalizing a school "until the department or agency concerned has advised the appropriate person or persons of the failure to comply with [Title IX] and has determined that compliance cannot be secured by voluntary means."[88]   The Supreme Court has held that a similar standard applies in lawsuits when plaintiffs seek damages for sexual harassment in violation of Title IX.   In particular, plaintiffs must show that the school:  (1) had actual knowledge of sexual harassment (by the employee or peer); and (2) responded with deliberate indifference.[89]   The Court created this test to mirror the test that Title IX requires the Department to apply before stripping a school of federal funding.

Given these statutory requirements and judicial interpretations, Title IX is best understood to prohibit schools from purposefully discriminating on the basis of sex, with full awareness they are doing so.  The Proposed Rule, however, imposes what amounts to a strict-liability standard.  It replaces the current actual-knowledge and deliberate-indifference requirements,[90] with a mandate to act without knowledge:

> A recipient must take prompt and effective action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects.[91]

The Department tries to justify this approach by arguing that a school has a duty to operate its education program or activity free from sex discrimination.[92]  That is true in a sense.  Schools cannot "subject[]" students to discrimination.  But again, a school "subjects" students to harassment only when the school itself bears responsibility for the discrimination.  That is why Title IX has long been understood to make schools liable for harassment only once they learn of it and respond with deliberate indifference.  That understanding cannot be squared with a strict-liability standard.

---

[88] 20 U.S.C. §1682.

[89] *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 289–91 (1998).

[90] 34 C.F.R. §106.44(a).

[91] 87 Fed. Reg. at 41,572 (proposed §106.44(a)).

[92] *Id.* at 41,432.

The Proposed Rule rejects any knowledge requirement, and turns professors and advisors into harassment police.  It requires almost every employee "to notify the Title IX Coordinator when the employee has information about a student being subjected to conduct that *may* constitute sex discrimination under Title IX."[93]  Then, if the would-be complainant does *not* file a complaint or request informal resolution, the Title IX Coordinator must blaze forward regardless.[94]  Failing to do so means the school will not have met its obligation to "end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects."[95]

Given the Proposed Rule's vague definitions of sex-based discrimination, just about every classroom discussion about a controversial sex-related topic will involve statements that "*may* constitute sex discrimination."[96]  And on high-school and college campuses, where students are pursuing dates and relationships, many routine interactions "*may* constitute sex discrimination" on the Proposed Rule's hazy definition of that term.[97]  Requiring professors and school employees to report every such instance will trigger constant investigations, chill free discussion, retard social development, and leave just about everyone worse off.

Bear in mind, this monitoring duty is not limited to in-school behavior.  The preamble clarifies that "when an employee *has information* about sex-based harassment among its students that took place on *social media* or other online platforms and created a hostile environment in the recipient's education program or activity, the recipient would have an obligation to address that conduct."[98]  To be sure, social media is an unfortunate development for children and schools, and the circulation of pictures, rumors, and attacks can derail a young person's self-esteem and focus.  But the Proposed Rule creates vast uncertainty around a school's duty every time a teacher comes across a rude TikTok comment posted from a child's home.  The Supreme Court has explained that "the leeway the First Amendment grants to schools" to control speech is "diminished" when it comes to off-campus speech, in part because "off-campus speech will normally fall within the zone of parental, rather than school-related, responsibility."[99]  Schools likely cannot enforce the

---

[93] *Id*. at 41,572 (proposed §106.44(c)(2)(ii)) (emphasis added).

[94] *Id*. at 41,573 (proposed §106.44(f)(5)).

[95] *Id*. at 41,571 (proposed §106.44(a)).

[96] *Id*. at 41,572 (proposed §106.44(c)(2)(ii)) (emphasis added).

[97] *Id*. (proposed §106.44(c)(2)(ii)) (emphasis added).

[98] 87 Fed. Reg. at 41,440 (emphasis added).

[99] *Mahanoy Area Sch. Dist. v. B. L.*, 141 S. Ct. 2038, 2046 (2021).

Proposed Rule without violating, or facing lawsuits accusing the school of violating, the First Amendment, or invading the privacy of students at home.

And why would we want them to?  Parents (and students themselves) are perfectly well-suited—almost always *better* suited—to monitoring and correcting out-of-school misconduct.  In more serious cases, the police fill that role.  But in no event should Title IX be used to turn schools and universities into roving police forces for all sex- or gender-related conduct by the many millions of students they are charged with educating.  That is not the job of a school.

### F.   The disciplinary procedures envisioned by the Proposed Rule are completely inadequate

The States have already explained that discrimination "on the basis of sex," under Title IX, does not include discrimination on the basis of sexual orientation or gender identity.  But to the extent the Department concludes otherwise, students may soon discover that their existing behavior—like calling a teammate by a now-abandoned male name rather than a new transgender name—has unintentionally launched them into a grievance process.  And the Proposed Rule envisions grievance processes that look more like kangaroo courts than American justice.

### 1.   §106.45(f)(4): A school should provide parties with evidence, not merely a description, regarding allegations of sex discrimination, given the proposed expansion of sex discrimination

The Proposed Rule requires schools to "[p]rovide each party with a *description* of the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible."[100]  This description may be oral.[101]  In contrast, the existing regulations for sexual-harassment cases require schools to provide "both parties an equal opportunity to inspect and review *any evidence* obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination."[102]

---

[100] 87 Fed. Reg. at 41,576 (proposed §106.45(f)(4)) (emphasis added).
[101] *Id.* at 41,481.
[102] 34 C.F.R. §106.45(b)(5)(vi) (emphasis added).

The proposed standard may be appropriate for blatant claims of mistreatment of women or men as such—grading women poorly, preferring female over male flutists, *et cetera*. But where accusations involve discrimination against an individual because the individual is or is "perceived" to be, for example, nonbinary, cisgender, or asexual, the accused individual may be unable to defend himself or herself based on a description alone. Given the expansive scope of sex discrimination under the Proposed Rule, the Department should permit parties in disciplinary proceedings to review the breadth of relevant evidence in the school's possession, consistent with existing regulations.

> **2. §106.45(h): Respondents need appeal rights, should the Department finalize its new, uncharted definition of discrimination "on the basis of sex"**

Again, the Department's proposed redefinition of discrimination "on the basis of sex," which covers discrimination that the Department has *repeatedly* said is not covered by Title IX, will lead to a tumultuous implementation. Some elementary schools will create pronoun codes and punish students for failing to abide by them. Some high schools will effectively end women's sports and punish coaches for failing to go along. Some will not take these steps. Others will arrive at a place somewhere in the middle. But the common theme will be that a single investigator at a single school may not clearly understand her school's new obligation.

The losers will be accused students, administrators, teachers, and coaches, who find themselves punished for behavior they reasonably believe to be non-discriminatory and non-sex-based. These individuals are at *least* owed the right to appeal internally. The Proposed Rule argues that appeals would be too onerous (except for complaint dismissals and sexual harassment at postsecondary institutions). Even if some particular appeal processes would be overly burdensome, the Department's novel experiment requires a second, independent judgment before punishing an individual who aligned his or her behavior with what Title IX required for the first half-century of its existence.

> **3. §106.46(e)(6): Parties must be allowed to review "related" evidence in sexual harassment disputes, not just "relevant" evidence**

Under the current scheme, during a sexual-harassment investigation, schools must "[p]rovide both parties an equal opportunity to inspect and review any evidence

obtained as part of the investigation that is *directly related to the allegations* raised in a formal complaint."[103]  This obligation extends beyond evidence that the school will ultimately rely upon in determining responsibility.  The Proposed Rule, however, shrinks the evidence schools must share.  In particular, it says they must share evidence only if it is "relevant to the allegations of sex-based harassment and not otherwise impermissible."[104]  This means the Title IX Coordinator will privately screen information he or she does not believe is relevant or admissible.  For two reasons, this destroys even the appearance of fair process.

*First*, the Title IX Coordinator—who is likely to be an activist[105] rather than an impartial adjudicator—may withhold important information on the misguided view that the information is irrelevant or inadmissible.  The party affected deserves the opportunity to request that the Coordinator share pertinent evidence not relied upon so that the accused can argue that evidence *should be* relied upon.

*Second*, because the Proposed Rule allows the decisionmaker and the Title IX Coordinator to be the same person (in proposed §106.45(b)(2)), the decisionmaker may know about information related to the complaint and, given human nature, consider that information without openly acknowledging she is doing so.  And because the information was never turned over, the parties will not have the chance to contextualize or challenge it.  Even if it were fair for the Title IX Coordinator to privately eliminate irrelevant evidence and present remaining evidence to a separate decisionmaker, the proposed policy of permitting the decisionmaker to see certain information without the parties' knowledge would subject parties to the decisionmaker's inferences without the parties' knowledge or opportunity to respond.

### 4.   §106.46(f): Credibility determinations at postsecondary institutions require live hearings

The U.S. Constitution requires public postsecondary institutions to "afford students minimum due process protections before issuing significant disciplinary decisions."[106]  Private institutions can be held liable for sex discrimination under Title IX for railroading respondents.[107]   No matter the public or private status of a

---

[103] 34 C.F.R. §106.45(b)(5)(vi) (emphasis added).

[104] 87 Fed. Reg. at 41,577.

[105] *See, e.g.*, *Doe v. Oberlin Coll.*, 963 F.3d 580, 582, 584–85 (6th Cir. 2020).

[106] *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 399 (6th Cir. 2017).

[107] *Doe v. Univ. of Denver*, 1 F.4th 822, 834 (10th Cir. 2021).

university, students are entitled to challenge the credibility of accusations made against them.

And yet, the Proposed Rule seeks to avoid the single best device designed to do that: live hearings with cross examination.[108] Instead, the Proposed Rule would allow "the decisionmaker to ask the parties and witnesses, *during individual meetings with the parties* or at a live hearing, relevant and not otherwise impermissible questions under §§ 106.2 and 106.45(b)(7) and follow-up questions, including questions challenging credibility."[109]

This dilution of process seems to be driven by a few concerns. The Department says that following the 2020 amendments, which required live hearings and confrontation, "some postsecondary institutions reported that they experienced a decrease in the number of complaints filed," which those institutions insinuated was "likely due to the live hearing and advisor-conducted cross-examination requirements in the 2020 amendments."[110] And, some institutions felt cross-examination procedures were "overly burdensome and prescriptive for recipients."[111]

These are woefully insufficient reasons to discard a respondent's *right* to due process and nondiscrimination.

First, a reduction in complaints is a good thing. It most likely means a lack of sexual harassment on campus. The 2020 amendments were promulgated during the COVID-19 pandemic when several institutions implemented virtual-only learning or limited student interaction, which mitigated *all* types of interactions, including problematic ones. And, even if the lack of complaints was due to concerns that a complainant's story might be questioned, that too appears to do more good than harm, by preventing the filing of inaccurate complaints.

Second, while cross-examination may be somewhat tedious for a postsecondary institution to facilitate, the accused student faces a far greater burden. The Sixth Circuit has examined the competing burdens to the university and the student and found

---

[108] *See Doe v. Baum*, 903 F.3d 575, 581 (6th Cir. 2018).
[109] 87 Fed Reg. at 41,578 (proposed §106.46(f)(i)) (emphasis added).
[110] 87 Fed. Reg. at 41,505.
[111] *Id.*

that the student's interest outweighs the college's process burden.[112]  The constitutional right to this process cannot be evaded on the ground that it is just too hard.

The Department claims that an accused student's right to be heard is adequately protected when the Title IX Coordinator asks a complainant credibility questions privately.  Absurd.  Consider the Tenth Circuit's decision in *Doe v. University of Denver*.[113]  In that case the university interviewed eleven witnesses proposed by the female complainant, but initially refused to interview any of the five witnesses proffered by the male respondent.  (It eventually interviewed one but declined to consider the responses.)  It found the female complainant's story to be credible despite numerous inconsistencies in her story as told to friends or classmates.  And it entirely failed to mention the female complainant's potential motives for making a false report.[114]  What good would it have done to allow investigators to ask credibility questions to the complainant?  None at all, as those investigators already had reason to doubt her credibility and declined to pursue the weaknesses in her story.  Universities have less incentive than accused students to seek the truth if the truth is the accused's innocence.  The best way to address the mismatched incentives is to embrace them:  allow the accused and the accuser both a full and fair opportunity to develop the facts.

When a student's future depends on "he said/she said" assessments, a "failure to provide any form of confrontation of the accuser" renders proceedings "fundamentally unfair."[115]

*   *   *

The Department should withdraw its Proposed Rule now, so that the States and other parties do not have to secure a judicial order vacating it later.

---

[112] *Doe v. Baum*, 903 F.3d 575, 582 (6th Cir. 2018).
[113] 1 F.4th 822 (10th Cir. 2021).
[114] *Id*. at 832–33.
[115] *Doe v. Univ. of Cincinnati*, 872 F.3d at 396.

Yours,

DAVE YOST
Attorney General
State of Ohio

STEVE MARSHALL
Attorney General
State of Alabama

LYNN FITCH
Attorney General
State of Mississippi

TREG TAYLOR
Attorney General
State of Alaska

AUSTIN KNUDSEN
Attorney General
State of Montana

LESLIE RUTLEDGE
Attorney General
State of Arkansas

DOUGLAS J. PETERSON
Attorney General
State of Nebraska

ASHLEY MOODY
Attorney General
State of Florida

JOHN M. O'CONNOR
Attorney General
State of Oklahoma

CHRISTOPHER M. CARR
Attorney General
State of Georgia

ALAN WILSON
Attorney General
State of South Carolina

TODD ROKITA
Attorney General
State of Indiana

MARK VARGO
Attorney General
State of South Dakota

33

JEFF LANDRY
Attorney General
State of Louisiana

DANIEL CAMERON
Attorney General
State of Kentucky

DEREK SCHMIDT
Attorney General
State of Kansas

BRIDGET HILL
Attorney General
State of Wyoming

PATRICK MORRISEY
Attorney General
State of West Virginia

SEAN REYES
Attorney General
State of Utah