# EXHIBIT E



OFFICE OF THE ATTORNEY GENERAL
STATE OF INDIANA

302 W. WASHINGTON ST. IGCS 5TH FLOOR
INDIANAPOLIS, IN 46204-2770

TODD ROKITA
ATTORNEY GENERAL

September 12, 2022

Dr. Miguel Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Avenue, SW
Washington, DC 20202

*Re: Title IX Notice of Proposed Rulemaking Docket ID ED-2021-OCR-0166*

Dear Secretary Cardona:

    As you are aware, State Attorneys General play a critical role in preserving federalism and the constitutionally prescribed balance of power between the States and the federal government. The threat of federal overreach is particularly acute with statutes such as Title IX that regulate education, where, as Congress recognized when enacting the Department of Education Organization act, "parents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role." 20 U.S.C.A. § 3401(3) (Pub. L. 96–88, title I, § 101(3), Oct. 17, 1979, 93 Stat. 669). To that end, we have steadfastly fought to protect the rights of girls and women under Title IX against attacks from this Administration, including by obtaining an injunction against your efforts to weaken Title IX through administrative "guidance." *Tennessee et al. v. United States Dep't of Educ.*, No. 3:21-CV-308, 2022 WL 2791450, at *1 (E.D. Tenn. July 15, 2022).

    Rather than protect the rights of girls and women, your Notice of Proposed Rulemaking (hereinafter, "Proposed Rule") redefining the term "sex" in Title IX from "biological sex" to mean "gender identity" harms the rights of women and girls. Your erroneous reliance on the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), destroys the progress made to protect the rights of girls and women under Title IX over the past fifty years. Worse, your misguided and illegal efforts seek to preempt protections afforded girls and women by individual States. Just as we are successfully fighting your gross violation and disregard of federalism and the law in courts, so too will we fight the overreach in your Proposed Rule.

    The Proposed Rule is unlawful for many reasons, but this letter will address only three specific legal defects:

1

   1. The Proposed Rule's reliance on *Bostock v. Clayton County* is erroneous and contradicts the Department of Education's General Counsel's prior guidance on the subject.

   2. The Proposed Rule's attempt to preempt State laws protecting the rights of girls and women lacks grounding in a clear statement of authority by Congress.

   3. The Proposed Rule's restriction of the role of parents in directing their children's education violates parents' constitutional rights.

**1. *Bostock* does not apply to Title IX.**

In seeking to expand the definition of "discrimination on the basis of sex" from biological sex, which was the meaning intended by Congress when it passed Title IX in 1972, to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity,"[1] the Proposed Rule ignores fifty years of precedent limiting the term to biological sex. Indeed, the Proposed Rule attempts to rewrite Title IX's fifty-year-old definition of "sex" to mean gender identity, a 180-degree change from the position taken by the Department on the exact same issue one year earlier.

The Proposed Rule cites *Bostock v. Clayton County*. as the legal basis for reinterpreting the term "sex" to mean gender identity,[2] but that misconstrues and improperly extends *Bostock*, which did not redefine the term "sex." As noted by The Department's General Counsel in 2021, the Supreme Court expressly limited its decision in *Bostock* to Title VII and merely held that under Title VII, discrimination on the basis of "sexual orientation," "gender identity," or "transgender" status was prohibited because discrimination involving these characteristics "necessarily and intentionally applies sex-based rules."[3] *Bostock* "assum[ed]" that the term "sex" means "biological distinctions between male and female." 140 S. Ct. at 1739, 1746–47.

   *Bostock* also narrowly addressed employment termination and explicitly refrained from addressing key items under Title IX, such as "sex-segregated bathrooms, locker rooms, and dress codes."[4] Indeed, *Bostock* expressly stated that its decision did not "sweep beyond Title VII to other federal or state laws that prohibit sex discrimination" or address other issues not before the Court. 140 S. Ct. at 1753. *Bostock*'s holding thus "extends no further than Title VII." *Pelcha v. MW Bancorp.*, 988 F.3d 318, 324 (6th Cir. 2021); *see Tennessee v. U.S. Dep't of Educ.*, No. 3:21-CV-308, 2022 WL 2791450, at *21 (E.D. Tenn. July 15, 2022) ("in applying *Bostock* to Title IX, the Department overlooked the caveats expressly recognized by the Supreme Court and created new law").

In addition, Title IX expressly recognizes the biological differences between male and female students. Its text explicitly states that, "[n]otwithstanding anything to the contrary in this chapter, nothing contained herein shall be construed to prohibit any educational

---

[1] 87 Fed. Reg. at 41398.

[2] 140 S. Ct. 173 (2020).

[3] *Id.* at 1745.

[4] *Id.* at 1753; *see also U.S. Dep't of Justice, Application of Bostock*, at 4 ("*Bostock* does not require any changes to . . . sex-specific facilities or policies.").

2

institution receiving funds under this Act, from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. Regulations embrace the same understanding when they provide that Title IX recipients "may operate or sponsor separate teams for members of each sex where selection for such teams is based upon competitive skill or the activity involved is a contact sport." 34 C.F.R. § 106.41(b).

The Proposed Rule departs most significantly from *Bostock* when it protects gender identity at the expense of biological sex, saying that "adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than *de minimis* harm on the basis of sex" and therefore violates Title IX.[5] The Proposed Rule undermines Title IX: Schools cannot "provide equal athletic opportunity for the [members of both] sexes" if the Department functionally forbids them from acknowledging two biologically distinct sexes.[6]

Since Title IX's enactment in 1972, participation of girls and women in sports has exploded. In 2021, 3.4 million girls played high school sports, and 219,000 women played NCAA sports.[7] The Proposed Rule's departure from the sex dichotomy ignores science. The athletic performance advantage of men over women is typically 10-50% depending on the sport.[8] The reason for male athletic advantage is biology: males on average have 45% higher lean body mass, 33% higher lower body muscle mass, 40% higher upper body muscle mass, 54% higher knee extension strength, and 30% higher maximum cardiac output.[9] The result is that by the age of 14-15, many adolescent males athletes have surpassed the best measurable elite (i.e., Olympic and world-championship level) female performances in nearly all sports.[10]

Male athletic advantages, which begin with surges in testosterone in the womb and during a mini-puberty stage during the first six months after birth, cannot be suppressed to an extent that would allow meaningful competition between males who identify as women and biological females.[11] Early surges of testosterone lead, for instance, to higher bone density in

---

[5] 87 Fed. Reg. at 41571.
[6] 87 Fed. Reg. at 41537; *See* NPRM § 106.41(c).
[7] NCAA Sports Sponsorship and Participation Rates Database, https://www.ncaa.org/sports/2018/10/10/ncaa-sports-sponsorship-and-participation-rates-database.aspx. In fact, NCAA statistics show that since 1982 (when the NCAA began separating male and female participation rates), female participation rates rose from 43% of the male participation rate (74,329 to 169,800) to 78% (219,177 to 278,988) in 2021—almost doubling.
[8] Hilton, E.N., Lundberg, T.R., Transgender Women in the Female Category of Sport: Perspectives on Testosterone Suppression and Performance Advantage, *Sports Med*. 2021 Feb;51(2): 199-214.
[9] *Id.*
[10] *Id.*
[11] *Id.*; Wiik, A., Lundberg, T.R., Rullman, E., Andersson, D.P., Holmberg, M., Mandic, M., Brismar, T.B., Dahlqvist Leinhard, O., Chanpen, S., Flanagan, J.N., Arver, S., Gustaffson, T., Muscle Strength, Size, and Composition Following 12 Months of Gender-affirming Treatment in Transgender Individuals, *J. Clin. Endocrinol. Metab*. 2020 Mar 1;105(3):dgz247. *See*, *e.g.*, Pedersen, Ultrasound evidence of sexual difference in fetal size in first trimester, *Br. Med. J.* 1980 281(6250): 1253; Persson et al., Impact of fetal and maternal factors on the normal growth of the biparietal diameter, *Scandinavian Association of Obstetricians and Gynaecologists* 1978 78: 21-27; Schwartzler et al., Sex-specific antenatal reference growth charts for uncomplicated singleton pregnancies at 15—40 weeks of gestation, *Ultrasound in Obstetrics and Gynaecology* 2004 23(1): 23-29; Broerre-Brown, et al., Sex-specific differences in fetal and infant growth patterns: a prospective population-based cohort study, *Biology of Sex Differences* 2016 7: 65; Galjaard, et al., Sex differences in fetal growth and immediate birth outcomes in a low-risk Caucasian population, 2019 *Biology of Sex Differences* 10: 48; Gilsanz, et al., Differential

3

the spine and larger axial skeletons in infant males.[12] Male athletic-performance advantages are observable well before adolescence.[13] Even with pre-puberty hormone suppression, biological males who identify as women will still have a height advantage, among other advantages, over biological females.[14] Of course, height is a key factor in athletic success in many sports.

In short, females and males are biologically distinct, and those key biological differences cannot be undone, leaving females at an enormous competitive disadvantage when facing biological males in sports. Permitting males who identify as women to compete against biological females would subject biological females to far more than *de minimis* harm on the basis of sex.

### 2. The Proposed Rule's attempt to preempt State laws protecting the rights of girls and women confuses spending conditions for law, undermines representative government, and violates the *Pennhurst* clear-statement rule.

The Proposed Rule also seeks to preempt State laws that protect the rights of girls and women based on biological sex. "The Department proposes eliminating § 106.6(h) entirely and simplifying § 106.6(b) to clarify that all Title IX regulations preempt State or local law."[15]

The Supremacy Clause, which authorizes federal preemption in some circumstances, provides that "the Laws of the United States . . . shall be the supreme Law of the Land." U.S. Const. art. VI. Title IX and its implementing regulations, however, simply impose conditions on federal grants. And conditions on federal grants are not "law" under the Supremacy Clause. Historically, "regulation was traditionally a matter of public congressional enactment" and Congress was "reluctan[t] . . . to use conditions as a means of national domestic regulation." Philip Hamburger, *Purchasing Submission: Conditions, Power, and Freedom* 91 n.* (2021). Attaching conditions to federal grants affords a way to incent desired behavior without commanding it. "Unlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation operates based on consent," *i.e.*,

---

Effect of Gender on the Sizes of the Bones in the Axial and Appendicular Skeletons, *J. of Clin. Endocrin. And Metabol*. 1997 21(3): 415-430; Lanciotti, et al., Up-To-Date Review About Minipuberty and Overview on Hypothalamic-Pituitary-Gonadal Axis Activation in Fetal and Neonatal Life, *Frontiers in Endocrinology* 2018 9:410; Boas, et al., Postnatal penile length and growth rate correlate to serum testosterone levels: a longitudinal study of 1962 normal boys, *Eur. J. of Endocrin*. 2006 154(1): 125-129; Kiviranta, et al., Transient Postnatal Gonadal Activation and Growth Velocity in Infancy, *Pediatrics* 2016 138(1): e20153561; Becker, et al., Hormonal 'minipuberty' influences the somatic development of boys but not of girls up to the age of 6 years, *Clin. Endocrin*. 2015 83: 694-701.

[12] *Id.*

[13] Catley, M.J., Tomkinson, G.R., Normative health-related fitness values for children: analysis of 85347 test results on 9-17-year-old Australians since 1985. *Br. J. Sports Med*. 2013 Jan;47(2):98-108 (showing 9-yr. old males 9.8% faster in short sprints, 16.6% faster in mile run, 9.5% better standing long jump, completed 33% more push-ups in 30 seconds and had a 13.8% stronger grip); Tambalis K.D., Panagiotakos, D.B., Psarra, G., Daskalakis, S., Kavouras, S.A., Geladas, N., Tokmakidis, S., Sidossis, L.S., Physical fitness normative values for 6-18-year-old Greek boys and girls, using the empirical distribution and the lambda, mu, and sigma statistical method, *Eur. J. Sport Sci*. 2016 Sep;16(6):736-46 (6-yr. old boys when compared to 6-yr. old girls completed 16.6% more shuttle runs in a given time and could jump 9.7% further from a standing position).

[14] Boogers, L.S., Wiepjes, C.M., Klink, D.T., Hellinga, I., van Trotsenburg, A.S.P., de Heijer, M., Hannema, S.E., Trans girls grow tall: adult height is unaffected by GnRH analogue and estradiol treatment, *J. Clin. Endocrinol. Metab*. 2022 Jun 6:dgac349. Doi: 10.1210/cinlnem/dgac349.

[15] 87 Fed. Reg. at 41404.

the consent of the individual accepting a federal grant, as opposed to the consent of the people writ large. *Cummings v. Premier Rehab Keller*, 142 S. Ct. 1562, 1570 (2022) (quoting *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 16–17 (1981)).

The distinction is critical to a proper understanding of the spending power and its limits. In sum, "the 'legitimacy of Congress' power' to enact Spending Clause legislation rests not on its sovereign authority to enact binding laws, but on 'whether the [recipient] voluntarily and knowingly accepts the terms of th[at] contract.'" *Id.* (quoting *Barnes v. Gorman*, 536 U.S. 181, 186 (2002)). In other words, "Congress' *legislative* powers *cannot be avoided* by simply opting out," but "Congress' power to spend money is *not* a *legislative* power." David Engdahl, *The Contract Thesis of the Federal Spending Power*, 52 S.D. L. Rev. 496, 498 (2007). That limitation protects critical state interests. Thus, "unlike statutory provisions that are grounded in Congress' *legislative* powers, spending terms and conditions are obligatory and enforceable only if voluntarily accepted." *Id.* at 500. The "knowing acceptance" standard preserves the vertical balance of power between States and the federal government, "ensuring that Spending Clause legislation does not undermine the status of the States as independent sovereigns in our federal system." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 577 (2012) (opinion of Roberts, C.J., joined by Breyer and Kagan, JJ.).

For this reason, the Supreme Court has set limits on the conditions that Congress may impose on federal funding. For instance, Congress may impose "conditions that define the limits of the government spending program" but not "conditions that seek to leverage funding to regulate speech outside the contours of the program itself." *United States Agency for Int'l Dev. v. Alliance for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013). And while Congress may financially induce States to accept policy changes, it may not impose conditions "so coercive as to pass the point at which pressure turns into compulsion." *NFIB*, 567 U.S. at 580 (quoting *South Dakota v. Dole*, 483 U.S. 203, 211 (1987)).

Critically, a grantee need not accept a federal contract in the first instance, and if it does, the remedy for violation of its terms is a matter between the grantee and the United States. Thus, "when a federal statute does not directly require adherence to its provisions, but instead proposes them as terms of a contractual promise, it is not giving them the obligation of law." Hamburger, *supra*, at 132. Because "conditions do not purport to bind . . . in the manner of law," "[n]o federal condition, by whatever means adopted, should be understood to defeat the obligation of contrary state law." *Id.* at 131. Otherwise, "[i]n shifting legislative power to . . . private decisions, conditions displace public representative self-government . . . with private barter." *Id.* at 92. Treating grant conditions as "law" that trumps a generally applicable state exercise of the police power thus threatens a fundamental alteration of the relationships among citizens, their States, and the federal government, whereby the federal government may induce citizens and political subdivisions to violate state law with impunity.

The Supreme Court has never countenanced such a capacious understanding of congressional spending power, and the Department should not attempt to exercise such power here. It is worth observing that neither of the two existing Title IX regulations that purport to preempt state law, 34 CFR § 106.6(b) & (h), have been contested and upheld. And indeed, when the Department promulgated § 106.6(h) in 2020, it did not cite any Supreme Court cases upholding its authority to use spending conditions to preempt state law. Each of the cases it cited upheld preemption under Commerce Clause legislation, not spending power legislation. *See* 85 Fed. Reg. 97,30454 fn. 1653 (May 19, 2020) (codified at 34 C.F.R. § 106.6 (2020)) (citing *Hillsborough Cnty., Fla. v. Automated Med. Labs., Inc.*, 471 U.S. 707, 713 (1985) (FDA regulations authorized by the Public Health Service Act); *Geier v. Am. Honda*

5

*Motor Co., Inc.*, 529 U.S. 861, 873 (2000) (National Traffic and Motor Vehicle Safety Act); *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 396 (1986) (FCC regulations authorized by the Communications Act); *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (National Traffic and Motor Vehicle Safety Act).

Furthermore, unlawful coercion occurs in violation of the Tenth Amendment where Congress uses its taxing-and-spending power to enter the arena of general police power and override contrary state laws. So, for example, in *Linder v. United States*, 268 U.S. 5 (1925), the Court rejected use of the power to tax for the general welfare to regulate the practice of medicine. It said that "[o]bviously, direct control of medical practice in the states is beyond the power of the federal government," which meant that "[i]ncidental regulation of such practice by Congress through a taxing act cannot extend to matters plainly inappropriate and unnecessary to reasonable enforcement of a revenue measure." *Id.* at 18; *see also United States v. Doremus*, 249 U.S. 86, 93 (1919) (invalidating a federal regulation of physicians predicated on the taxing power because it invaded the police power of States and observing, "[o]f course Congress may not in the exercise of federal power exert authority wholly reserved to the states").

The Proposed Rule's preemption threat constitutes just such an invasion of core state police power. As the Supreme Court has observed, "States traditionally have been accorded the widest latitude in ordering their internal governmental processes, and school boards, as creatures of the State, obviously must give effect to policies announced by the state legislature." *Washington v. Seattle Sch. Dist. No. 1*, 458 U.S. 457, 476 (1982) (citation omitted). Congress noted in the Department of Education Organization Act that "in our Federal system, the primary public responsibility for education is reserved respectively to the States and the local school systems and other instrumentalities of the States." 20 USC § 3401(4); *see also* 20 USC § 3403(a)&(b) ("The establishment of the Department of Education shall not increase the authority of the Federal Government over education or diminish the responsibility for education which is reserved to the States and the local school systems and other instrumentalities of the States"). Indeed, the Department's own website acknowledges that "[e]ducation is primarily a State and local responsibility in the United States." The Federal Role in Education," U.S. Department of Education, June 15, 2021, https://www2.ed.gov/about/overview/fed/role.html.

Moreover, because the Proposed Rule would suspend state police power regulations without the State's consent, it undermines state sovereignty in a way that implicates the Republican Form of Government Clause. While the federal government may "induce the states to adopt policies that the Federal Government itself could not impose," it cannot induce citizens (corporate or otherwise) or political subdivisions to violate state law. A "republican form of government" is one where the people are governed by legislatively enacted laws, not one where a different sovereign tempts some citizens or political subdivisions to exempt themselves from state laws. Manifestly, "the purchase of submission is not what traditionally was understood as a republican form of government." Hamburger, *supra*, at 147. That observation is particularly apt where the submission is not undertaken by the State itself, but by a citizen or political subdivision being paid by the federal government to violate state law. And while the Supreme Court has never directly enforced the Guarantee Clause against the United States, it has observed that "perhaps not all claims under the Guarantee Clause present nonjusticiable political questions." *New York v. United States*, 505 U.S. 144, 185 (1992). Where Congress (or the Executive Branch) "actively interfere[s] in the states' republican self-governance," courts do not face unanswerable questions about how the United States itself should "guarantee" republican government. Hamburger, *supra*, at 147.

6

Even assuming that the Department could theoretically use spending conditions to preempt state law, any attempt to do so would run afoul of basic preemption doctrine, including the presumption against preemption, which is grounded in the structural disfavor of preemption. *See e.g., Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947). "In all preemption cases, and particularly in those in which Congress has 'legislated ... in a field which the States have traditionally occupied,' ... we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). "[W]here a statute regulates [a] field traditionally occupied by states, such as health, safety, and land use, a 'presumption against preemption' adheres.*" Atay v. Cnty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 n.3 (2009)). Courts "assume that a federal law does not preempt the states' police power absent a clear and manifest purpose of Congress." *Atay*, 842 F.3d at 699; *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 885 (2000). The presumption against preemption is particularly strong in areas of core state responsibility, including (as described above) education.

Next, under the clear-statement rule of *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1 (1981), the Department cannot change the conditions attached to federal funds without statutory text expressly authorizing it to do so. No one takes seriously the idea that, from the get-go, grant recipients understood Title IX to make a clear statement that gender identity discrimination was prohibited. *See Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 295–96 (2006) (observing that the Court must consider conditions on federal grants "from the perspective of a state official who is engaged in the process of deciding" whether to accept grant funds and "ask whether such a state official would clearly understand" the asserted condition). Put another way, preempting state and local laws protecting girls and women based on biological sex would breach the contractual agreement by which States and their educational entities accepted federal funds under Title IX and other federal statutes.

The Proposed Rule erroneously relies on *Bostock* to claim falsely that the term "sex" has always meant gender identity, and that States and their officials "would clearly understand" as much. But when Title IX was enacted in 1972, "sex" carried a "narrow, traditional interpretation." *Ulane v. E. Airlines, Inc.*, 742 F.2d 1081, 1085–86 (7th Cir. 1984). The Supreme Court did not apply Title VII to transgender employees until 2020. And even then, the majority stopped short of holding that its reasoning would condemn "sex-segregated bathrooms," "locker rooms," "dress codes," or "anything else of the kind" under Title VII. *Bostock*, 140 S. Ct. at 1753. So recent a decision under Title VII cannot be the basis for invaliding separate-sex sports policies under Title IX, especially given the differences between the two statutes.

When Title IX was enacted, the term "sex," scientific in nature, referred to the "two divisions" of organisms, "designated *male* and *female*," classified "according to their reproductive functions." *The American Heritage Dictionary of the English Language* 1187 (1980). Title IX reflects Congress's understanding that "sex" refers to a binary, biological characteristic. It even distinguishes between institutions, organizations, and activities open to "only students of one sex" and those open to "students of both sexes." 20 U.S.C. § 1681(a)(2); *see also* § 1681(a)(5), (a)(6), (a)(7), (a)(8), (a)(9), (b). And as examples of organizations and activities open to "one sex," Title IX lists the "Young Men's Christian Association, Young Women's Christian Association, Girl Scouts, Boy Scouts, Camp Fire Girls," "father-son" activities, "mother-daughter" activities, and "beauty pageants." § 1681(a)(6)(B), (a)(7), (a)(8), (a)(9). Title IX also speaks of "separate living facilities for the different sexes," authorizing separate

7

showers, bathrooms, and bunks. § 1686. All of these provisions presume two discrete sexes with different anatomies and physiologies—not "gender identity," *i.e.*, an "individual's self-identification as being male, female, neither gender, or a blend of both genders." *The American Heritage Dictionary of the English Language* (5th ed. 2022).

Preempting state laws governing education would unlawfully "diminish the responsibility for education which is reserved to the States" and thereby violate a host of constitutional limits and doctrines. Preemption should therefore be removed from the Proposed Rule.

### 3. The Proposed Rule would sharply restrict a parent's right to direct their child's education and thereby violate parents' constitutional rights.

The Proposed Rule would allow school officials to provide counseling to any student about gender identity issues, to allow the child to choose a gender identity without regard to biological sex, and even to refer a child for medical attention, all without parental notice. By requiring public elementary and secondary schools to affirm a child's gender identity without parental approval or knowledge, the Proposed Rule would strip parents of the right to direct education decisions relating to their children, as protected by a century of Supreme Court precedent and the Department of Education's own Organization Act.

The right of parents to direct the education and upbringing of their children is deeply rooted in our Nation's history and traditions, as the Supreme Court recently reaffirmed. *See Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2257 (2022) (reaffirming "the right to make decisions about the education of one's children"). In *Pierce v. Society of Sisters*, 268 U.S. 510 (1925), where the Court upheld the right of parents to educate their children in a private religions school, the Court observed that "[t]he child is not the mere creature of the state; those who nurture him and direct his destiny have the right, coupled with the high duty, to recognize and prepare him for additional obligations." Congress embraced this conception of parental rights in the Department's organizing act, where it found that "parents have the primary responsibility for the education of their children, and States, localities, and private institutions have the primary responsibility for supporting that parental role."[16]

Many cases apply this right. *See Meyer v. Nebraska*, 262 U.S. 390 (1923) (affirming the right of parents to teach their children German); *Wisconsin v. Yoder*, 406 U.S. 205, 233 (1972) (permitting parents to educate children at home); *Parham v. J. R.*, 442 U.S. 584, 621 (1979) (upholding a juvenile civil commitment process that depended substantially on parental judgment because, "[f]or centuries it has been a canon of the common law that parents speak for their minor children" and "[t]he statist notion that governmental power should supersede parental authority in all cases because some parents abuse and neglect children is repugnant to American tradition."); *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (invalidating presumption of grandparent visitation over parental objection because "the liberty interest at issue in this case—the interest of parents in the care, custody, and control of their children—is perhaps the oldest of the fundamental liberty interests recognized by this Court"); *Zelman v. Simmons-Harris*, 536 U.S. 639, 680 n. 5 (2002) (upholding school choice scholarships in part because "[t]his Court has held that parents have the fundamental liberty to choose how and in what manner to educate their children.").

---

[16] 20 U.S.C.A. § 3401(3).

8

Ignoring this "fundamental liberty," the Proposed Rule strips parents of their rights by requiring public elementary and secondary schools to affirm a child's gender identity without the approval or knowledge of parents. It even goes so far as to encourage school officials, without prior parental knowledge or consent, to provide counseling to children about gender identity issues and even refer a child for medical attention and procedures such as sex change surgery. The concern seems to be that many parents will discourage their children from adopting a gender identity at odds with biological sex. And the solution is to keep the parents in the dark and permit federally funded schools to do the work of raising the children. The Constitution does not permit such parental bypass.

The Court's decision in *Parham v. J. R.*, 442 U.S. 584 (1979), is particularly instructive on this point, as it addressed methods of treating children with mental health issues. The Court permitted the juvenile commitment procedures at issue over the objections of children committed to mental hospitals principally because those procedures required parental assent. Of critical importance here, the Court observed that, "[s]imply because the decision of a parent is not agreeable to a child, or because it involves risks, does not automatically transfer the power to make that decision from the parents to some agency or officer of the state." *Id*. at 603. As if anticipating the Proposed Rule, the Court recognized that "[m]ost children, even in adolescence, simply are not able to make sound judgments concerning many decisions, including their need for medical care or treatment. Parents can and must make those judgments." *Id*. Even more to the point: "The fact that a child may . . . complain about a parental refusal to provide cosmetic surgery does not diminish the parents' authority to decide what is best for the child." *Id. at* 604. In the end, "[n]either state officials nor federal courts are equipped to review such parental decisions." *Id*. The Proposed Rule, however, proceeds as if the opposite were true by preventing parents from making decisions for their children.

Perhaps even worse, the Proposed Rule requires schools to hide information relating to a child's professed gender identity from parents even as it disclaims any obligation of a grant recipient to "[r]estrict any other rights guaranteed against government action by the U.S. Constitution."[17] The Department needs to concern itself with everyone's constitutional rights, not merely those that it prefers.

***

The Proposed Rule threatens to destroy Title IX. Our States will ensure that American women and girls are treated with more respect than this Administration offers in the proposed rule.

Respectfully,

Todd Rokita
Attorney General of Indiana

---

[17] 34 C.F.R. §106.6(d).

9

STEVE MARSHALL  
Attorney General of Alabama

MARK BRNOVICH  
Attorney General of Arizona

LESLIE RUTLEDGE  
Attorney General of Arkansas

CHRIS CARR  
Attorney General of Georgia

DEREK SCHMIDT  
Attorney General of Kansas

DANIEL CAMERON  
Attorney General of Kentucky

JEFF LANDRY  
Attorney General of Louisiana

LYNN FITCH  
Attorney General of Mississippi

AUSTIN KNUDSEN  
Attorney General of Montana

DOUGLAS J. PETERSON  
Attorney General of Nebraska

JOHN M. O'CONNOR  
Attorney General of Oklahoma

ALAN WILSON  
Attorney General of South Carolina

10

MARK VARGO
Attorney General of South Dakota

JONATHAN SKRMETTI
Attorney General of Tennessee

KEN PAXTON
Attorney General of Texas

SEAN REYES
Attorney General of Utah

JASON MIYARES
Attorney General of Virginia

PATRICK MORRISEY
Attorney General of West Virginia

11