## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
## MONROE DIVISION

The State of LOUISIANA,
By and through its Attorney General,
Elizabeth B. Murrill; et al.,

PLAINTIFFS,

v.

U.S. DEPARTMENT OF EDUCATION; et al.,

DEFENDANTS.

Civil Action No. 3:24-CV-00563-TAD-KDM

Chief Judge Terry A. Doughty
Magistrate Judge Kayla D. McClusky

## MEMORANDUM IN SUPPORT OF MOTION FOR A POSTPONEMENT OR STAY UNDER 5 U.S.C. § 705 OR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF CONTENTS ..................................................................................................................i

TABLE OF AUTHORITIES ..........................................................................................................iii

INTRODUCTION ...........................................................................................................................1

BACKGROUND ..............................................................................................................................2

I.    CONGRESS ENACTED TITLE IX TO PROMOTE EQUAL EDUCATIONAL OPPORTUNITIES FOR BOTH SEXES BY IMPOSING CONDITIONS ON FEDERAL FUNDING. ...........................................................................................................2

II.    LONGSTANDING REGULATIONS CONFIRMED THAT BIOLOGICAL DIFFERENCES OCCASIONALLY DEMAND DIFFERENTIATION BETWEEN THE TWO SEXES TO PROMOTE EQUAL OPPORTUNITIES AND RESPECT FOR BOTH UNDER TITLE IX. .............................................................................................5

III.    FOR DECADES, TITLE IX HAS BEEN INTERPRETED AS PROHIBITING DISCRIMINATION BASED ON BIOLOGICAL SEX THAT BARS ACCESS TO EDUCATIONAL OPPORTUNITIES. ..................................................................................7

IV.    THE FINAL RULE TRANSFORMS AND SUBVERTS TITLE IX. ..........................................9

ARGUMENT ..................................................................................................................................12

I.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS. ............................12

    A.    The Rule Is Contrary to Law and Exceeds Statutory Authority.......................................12

        1.    The Rule's interpretation of "sex" and its requirement that recipients treat self-professed "gender identity" as if it were biological sex flouts Title IX. ..............................................................12

        2.    The Rule's harassment standard that turns recipients into federal-commandeered censors is contrary to Title IX and violates the First Amendment. .................................................16

        3.    Defendants have no authority to rewrite Title IX and decide major questions...........................................................................................18

    B.    The Rule's Conditions Violate the Spending Clause.......................................................19

    C.    The Rule Is an Unconstitutional Exercise of Legislative Power. ....................................21

    D.    The Rule Is Arbitrary and Capricious..............................................................................22

II.     PLAINTIFFS WILL SUFFER IRREPARABLE HARM WITHOUT RELIEF. ..........................................25

III.    PRELIMINARY RELIEF WOULD NOT HARM DEFENDANTS OR DISSERVE
THE PUBLIC INTEREST. ......................................................................................................28

IV.    THE COURT SHOULD POSTPONE THE RULE'S EFFECTIVE DATE OR
STAY THE RULE UNDER 5 U.S.C. § 705 OR, ALTERNATIVELY, ISSUE A
PRELIMINARY INJUNCTION. ...............................................................................................29

CONCLUSION.......................................................................................................................30

## TABLE OF AUTHORITIES

**Cases**

*Abbott v. Perez,*
  585 U.S. 579 (2018) ...................................................................................................27

*Adams v. Sch. Bd. of St. Johns Cnty.,*
  57 F.4th 791 (11th Cir. 2022) (en banc) .............................................7, 13, 14, 20

*Bostock v. Clayton County,*
  590 U.S. 644 (2020) ..........................................................................................4, 8, 15

*Brown v. Gardner,*
  513 U.S. 115 (1994) ...................................................................................................14

*BST Holdings L.L.C. v. OSHA,*
  17 F.4th 604 (5th Cir. 2021) ...........................................................................26, 27, 28

*Cannon v. University of Chicago,*
  441 U.S. 677 (1979) .....................................................................................................3

*Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.,*
  98 F.4th 220 (5th Cir. 2024) .....................................................................................26

*Cascabel Cattle Co., L.L.C. v. United States,*
  955 F.3d 445 (5th Cir. 2020) .....................................................................................13

*Chisholm v. St. Mary's City Sch. Dist. Bd. of Educ.,*
  947 F.3d 342 (6th Cir. 2020) .......................................................................................8

*City of Chicago v. Fulton,*
  592 U.S. 154 (2021) ...............................................................................................3, 14

*Davis v. Monroe Cnty. Bd. of Educ.,*
  526 U.S. 629 (1999) ..........................................................................................8, 9, 16, 19

*Elrod v. Burns,*
  427 U.S. 347 (1976) ...................................................................................................29

*Franklin v. Gwinnett Cnty. Pub. Sch.,*
  503 U.S. 60 (1992) .......................................................................................................8

*Frontiero v. Richardson,*
  411 U.S. 677 (1973) .....................................................................................................3

*Grove City Coll. v. Bell,*
  465 U.S. 555 (1984) .....................................................................................................5

*Indus. Union Dep't, AFL-CIO v. API,*
    448 U.S. 607 (1980) ....................................................................................................21

*Jackson v. Birmingham Bd. of Educ.,*
    544 U.S. 167 (2005) ................................................................................................ 4, 31

*Jarkesy v. SEC,*
    34 F.4th 446 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023) ........................21

*Kentucky v. Biden,*
    23 F.4th 585 (6th Cir. 2022) ......................................................................................27

*Keyishian v. Bd. of Regents of Univ. of State of N. Y.,*
    385 U.S. 589 (1967) ..................................................................................................29

*King v. St. Vincent's Hosp.,*
    502 U.S. 215 (1991) ..................................................................................................13

*Kisor v. Wilkie,*
    139 S. Ct. 2400 (2019) ..............................................................................................14

*Louisiana v. Biden,*
    55 F.4th 1017 (5th Cir. 2022) ....................................................................................28

*Louisiana v. DOE,*
    90 F.4th 461 (5th Cir. 2024) ................................................................................ 22, 23

*Meriwether v. Hartop,*
    992 F.3d 492 (6th Cir. 2021) .............................................................................. 16, 17

*Mexican Gulf Fishing Co. v. U.S. Dep't of Comm.,*
    60 F.4th 956 (5th Cir. 2023) ......................................................................................18

*Michigan v. EPA,*
    576 U.S. 743 (2015) ..................................................................................................23

*N. Haven Bd. of Educ. v. Bell,*
    456 U.S. 512 (1982) ....................................................................................................5

*Nat'l Fed'n of Indep. Bus. v. OSHA,*
    595 U.S. 109 (2022) ..................................................................................................18

*Nat'l Parks Conservation Ass'n v. EPA,*
    788 F.3d 1134 (9th Cir. 2015) ..................................................................................24

*Neese v. Becerra,*
    No. 2:21-cv-163-Z, 2022 WL 1265925 (N.D. Tex. Apr. 26, 2022) ............................4

*NFIB v. Sebelius,*
    567 U.S. 519 (2012) .................................................................................................. 20, 21

*Nken v. Holder,*
    556 U.S. 418 (2009) .................................................................................................. 12, 30

*Oncale v. Sundowner Offshore Servs., Inc.,*
    523 U.S. 75 (1998) ............................................................................................................ 8

*Paul v. United States,*
    140 S. Ct. 342 (2019) ............................................................................................... 21, 31

*Pelcha v. MW Bancorp, Inc.,*
    988 F.3d 318 (6th Cir. 2021) .......................................................................................... 16

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) ............................................................................................................ 20

*Perlot v. Green,*
    609 F. Supp. 3d 1106 (D. Idaho) .................................................................................... 17

*Perrin v. United States,*
    444 U.S. 37 (1979) .......................................................................................................... 13

*Price Waterhouse v. Hopkins,*
    490 U.S. 228 (1989) .......................................................................................................... 8

*Rest. Law Ctr. v. U.S. Dep't of Labor,*
    66 F.4th 593 (5th Cir. 2023) ........................................................................................... 25

*Sambrano v. United Airlines, Inc.,*
    No. 21-11159, 2022 WL 486610 (5th Cir. Feb. 17, 2022) (per curiam) .......................... 27

*South Dakota v. Dole,*
    483 U.S. 203 (1987) .................................................................................................. 19, 21

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) ....................................................................................... 17

*Speech First, Inc. v. Fenves,*
    979 F.3d 319 (5th Cir. 2020) .......................................................................................... 18

*Sw. Airlines Co. v. Saxon,*
    596 U.S. 450 (2022) ........................................................................................................ 13

*Tennessee v. Dep't of Educ.,*
    615 F. Supp. 3d 807 (E.D. Tenn. 2022) ......................................................................... 27

*Tex. Educ. Agency v. U.S. Dep't of Educ.,*
   992 F.3d 350 (5th Cir. 2021) ................................................................................20

*Texas v. Biden,*
   10 F.4th 538 (5th Cir. 2021) ................................................................................28

*Texas v. EPA,*
   829 F.3d 405 (5th Cir. 2016) ..............................................................12, 25, 28

*Texas v. Johnson,*
   491 U.S. 397 (1989) ................................................................................................17

*Texas v. United States,*
   787 F.3d 733 (5th Cir. 2015) ................................................................................28

*Texas v. Yellen,*
   No. 2:21-CV-079-Z, 2022 WL 989733 (N.D. Tex. Mar. 4, 2022) ..................27

*United States v. Lopez,*
   514 U.S. 549 (1995) ................................................................................................19

*United States v. Varner,*
   948 F.3d 250 (5th Cir. 2020) ................................................................................17

*United States v. Virginia,*
   518 U.S. 515 (1996) ..................................................................................................3

*Util. Air Regulatory Grp. v. EPA,*
   573 U.S. 302 (2014) ........................................................................................12, 18

*Voting for Am., Inc. v. Andrade,*
   488 F. App'x 890 (5th Cir. 2012) (per curiam) ..............................................12

*W. Virginia State Bd. of Educ. v. Barnette,*
   319 U.S. 624 (1943) ................................................................................................17

*Wages & White Lion Invs. L.L.C. v. FDA,*
   16 F.4th 1130 (5th Cir. 2021) ..............................................................12, 22, 25

*West Virginia v. Dep't of Treasury,*
   59 F.4th 1124 (11th Cir. 2023) ............................................................................20

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ........................................................................................18, 19

*Williams v. Sch. Dist. of Bethlehem,*
   998 F.2d 168 (3d Cir. 1993) ....................................................................................7

*Wis. Cent. Ltd. v. United States*,
   585 U.S. 274 (2018) ..................................................................................................13

*Wittmer v. Phillips 66 Co.*,
   915 F.3d 328 (5th Cir. 2019) ......................................................................................7

**Statutes**

5 U.S.C. § 705 ............................................................................................................*passim*

5 U.S.C. § 706 ..........................................................................................................12, 18

20 U.S.C. § 1681 ........................................................................................................*passim*

20 U.S.C. § 1686 ...................................................................................................4, 10, 14

20 U.S.C. § 1689 ............................................................................................................14

General Education Provisions Act, Pub. L. 93-380, 88 Stat. 567 .....................................5

Idaho Code §§ 33-6201–6203 ........................................................................................26

Idaho Code §§ 33-6701–6707 ........................................................................................26

Idaho Code § 73-114(2) .................................................................................................26

La. Rev. Stat. § 4:442 .....................................................................................................26

La. Rev. Stat. § 4:444 .....................................................................................................26

Miss. Code Ann. § 37-97-1 .............................................................................................26

Miss. Code Ann. § 37-97-3 .............................................................................................26

Mont. Ann. § 1-1-201 .....................................................................................................26

Mont. Ann. § 20-7-1306 .................................................................................................26

Mont. Ann. § 40-6-704 ...................................................................................................26

Pub. L. No. 93-380, Title VIII, Part D, § 844, 88 Stat. 612 .............................................5

**Other Authorities**

118 Cong. Rec. 5803 (Feb. 28, 1972) .............................................................................2

118 Cong. Rec. 5807 (Feb. 28, 1972) .............................................................................4

*American Heritage Dictionary* (1969) ............................................................................3

Equality Act, H.R. 5, 117 Cong. § 9(2) (2021) ........................................................19

H.B. 121, 2024 Leg. Reg. Sess. (La. 2024) ..............................................................26

H.B. 610, 2024 Leg. Reg. Sess. (La. 2024) ..............................................................26

Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L. J. 1490 (2021) .............21

Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933 (2018) ...............................29, 30

Ronald M. Levin, *Federal Courts, Practice & Procedure: History of the Administrative Procedure Act
   & Judicial Review: Vacatur, Nationwide Injunctions, and the Evolving APA*,
   98 Notre Dame L. Rev. 1997(2023) ......................................................................30

S.B. 2753, 2024 Leg. Reg. Sess. (Miss. 2024) .........................................................26

Title IX Take Responsibility Act of 2021, H.R. 5396, 117 Cong. (2021) ................19

U.S. Dep't of Health, Educ., & Welfare, *Title IX of the Education Amendments of 1972;
   a Policy Interpretation; Title IX and Intercollegiate Athletics*, 44 Fed. Reg. 71,413 (Dec. 11, 1979) ............6

U.S. Equal Emp. Opportunity Comm'n, *Sexual Orientation and Gender Identity
   (SOGI) Discrimination*, (last accessed May 1, 2024),https://tinyurl.com/mrxmwtsf .......................11

*Webster's New World Dictionary* (1972) ....................................................................3

*Webster's Third New International Dictionary* (1966) ................................................3

**Rules and Regulations**

34 C.F.R. § 106.30 ...................................................................................................9

34 C.F.R. § 106.33 .................................................................................................14

34 C.F.R. § 106.41 ....................................................................................10, 14, 24

Federal Rule of Civil Procedure 65 ..................................................................12, 30

U.S. Dep't of Educ., *Establishment of Title and Chapters*, 45 Fed. Reg. 30,802 (May 9, 1980) ...................7

U.S. Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or
   Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026 (May 19, 2020) .............................9

U.S. Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or
   Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) .....................*passim*

U.S. Dep't of Health, Educ., & Welfare, *Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities*, 40 Fed. Reg. 24,128 (Jun. 4, 1975).........5, 6, 14, 24

## INTRODUCTION

By unilateral executive action, the U.S. Department of Education upended Title IX in a 423-page final rule that will transform the classrooms, lunchrooms, bathrooms, and locker rooms of American schools. *See Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 89 Fed. Reg. 33,474 (Apr. 29, 2024) (to be codified at 34 C.F.R. pt. 106) (the "Rule"). This Rule is not just typical federal government overreach, but rather an Orwellian attempt to restructure our society, prohibit speech, chill the exercise of religious beliefs, and ultimately control our children's thoughts on existential questions—and to coerce Plaintiffs and their institutions into being the federal government's agents in those efforts.

To promote equal opportunity for both sexes, Title IX prohibits entities that receive federal funding from discriminating on the basis of sex in their education programs. Title IX also promotes dignity and respect for both sexes by recognizing (as do longstanding regulations) that differentiation between the two sexes is sometimes necessary to promote equal opportunities, preserve privacy, and advance safety. The Rule guts it all. One of the Rule's central features is to transform Title IX's prohibition of discrimination based on "sex" to include discrimination based on "gender identity"— a term that itself is never defined in the Rule but that is described as a person's subjective and internal "sense" of gender. And the Rule interferes with schools' ability to verify a person's self-professed "sense" that can be changed at will, including prohibiting schools from requiring documentation of a medical diagnosis that could confirm a person's sincerity. Other key features of the Rule include redefining prohibited harassment to include protected speech and increasing Plaintiffs' obligations, compliance costs, and liability risks in myriad ways.

The consequences of the Rule's rewrite of Title IX are extensive and shocking. To name just a few examples: Boys and girls will be forced to share bathrooms, locker rooms, and lodging on overnight field trips with members of the opposite sex, including adults. Teachers will be forced to

1

use whatever pronouns or "neopronouns" are demanded based on a student's self-professed "gender identity" and must force students to do so as well. School boards (including Plaintiff School Boards) will be forced to revise policies, ensure schools are complying with the Rule, and undertake costly construction projects. All recipients of Title IX funding (including Plaintiffs) will be forced to face increased compliance costs and increased liability when they are inevitably sued by (1) Rule objectors (*e.g.*, parents and students) for violating constitutional rights in an effort to comply with the Rule, and (2) Rule proponents for failing to adequately comply with the Rule's impossible obligations. Finally, recipients (including Plaintiffs) who wish to resist the Rule will run into Defendants' coercive power to withhold significant federal funding on which they rely.

The Rule is unlawful across the board. It ignores the text, structure, and context of Title IX— not to mention departs from early and longstanding agency regulations—to advance Defendants' political and ideological agenda. Defendants have no authority, much less clear authority, to rewrite Title IX and decide major questions as the Rule does. The Rule also violates the Spending Clause, is an unconstitutional exercise of legislative power, and fails arbitrary-and-capricious review several times over. And to top it off, the Rule causes Plaintiffs immediate irreparable harm and will cause additional irreparable harm, including unrecoverable compliance costs, if this Court does not grant relief quickly. Therefore, Plaintiffs respectfully urge this Court to postpone the Rule's effective date, stay the Rule, or issue a preliminary injunction, and request the Court to grant such relief by June 21, 2024.

## BACKGROUND

## I.     CONGRESS ENACTED TITLE IX TO PROMOTE EQUAL EDUCATIONAL OPPORTUNITIES FOR BOTH SEXES BY IMPOSING CONDITIONS ON FEDERAL FUNDING.

Motivated by the "corrosive and unjustified discrimination against women" in "all facets of education—admissions, scholarship programs, faculty hiring and promotion, professional staffing, and pay scales," 118 Cong. Rec. 5803 (Feb. 28, 1972) (Statement of Sen. Bayh)—Congress enacted Title IX of the Education Amendments "to avoid the use of federal resources to support [such]

discriminatory practices," *Cannon v. University of Chicago*, 441 U.S. 677, 704 (1979). To that end, Title IX provides that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance [with statutory exceptions]." 20 U.S.C. § 1681(a). Title IX expressly allows a subset of institutions and programs receiving federal funds, such as traditional single-sex schools and certain religious schools, to remain limited to males or females. *Id.* § 1681(a)(3), (5). It also permits single-sex groups like sororities and fraternities, and it permits single-sex activities like "Boys State" and "Girls State" conferences and "father-son or mother-daughter activities at an educational institution" as long as "opportunities for reasonably comparable activities" are "provided for students of the other sex." *Id.* § 1681(a)(6)-(7), (8).

At the time of Title IX's enactment, the term "sex" meant a person's biological sex—male or female—which "is an immutable characteristic determined" at "birth." *Frontiero v. Richardson*, 411 U.S. 677, 686 (1973) (plurality op.); *see, e.g.*, *Sex*, *Webster's Third New International Dictionary* 2081 (1966) ("one of the two divisions of organic esp. human beings respectively designated male or female"); *Sex*, *Webster's New World Dictionary* (1972) ("either of the two divisions, male or female, into which persons, animals, or plants are divided, with reference to their reproductive functions"); *Sex*, *American Heritage Dictionary* 1187 (1969) ("a. The property or quality by which organisms are classified according to their reproduction functions. b. Either of two divisions, designated *male* and *female*, of this classification.").[1] Title IX uses this ordinary meaning of "sex," as reflected throughout its statutory provisions. *See, e.g.*,

---

[1] During this same time period (and in the ensuing decades), gender could be used as a synonym for sex, *see Sex, Webster's Third New International Dictionary* 944 (1966), including in Supreme Court opinions, *see United States v. Virginia*, 518 U.S. 515, 532–33 (1996) (using the terms "gender classifications" and "sex classifications" when referring to laws and policies that treat people differently depending on whether they are "women" or "men"); *see also id.* at 533 (discussing how "[i]nherent differences between men and women . . . remain cause for celebration, but not for denigration of the members of either sex or for artificial constraints on an individual's opportunity" (quotations omitted)).

*Neese v. Becerra*, No. 2:21-cv-163-Z, 2022 WL 1265925, at *12 (N.D. Tex. Apr. 26, 2022) ("Title IX presumes sexual dimorphism in section after section, requiring equal treatment for each 'sex.'"); 20 U.S.C. §§ 1681(a)(2) (discussing institutions that were "changing from being an institution which admits only students of one sex to being an institution which admits students of both sexes"); 1681(a)(8) (referring to "students of one sex" and "students of the other sex"). Title IX's prohibition on sex discrimination in education programs and activities thus promotes equal educational opportunities—and dignity and respect for men and women—by generally prohibiting recipients of federal funds from discriminating against a person based on his or her biological sex.

At the same time, Title IX recognizes the biological differences between men and women that occasionally demand differentiation between the two sexes to promote respect for both. Title IX instructs, for example, that "nothing contained herein shall be construed to prohibit" institutions receiving federal funds "from maintaining separate living facilities for the different sexes." 20 U.S.C. § 1686. This demonstrates the congressional understanding that separating the sexes "where personal privacy must be preserved" is not discrimination. *See* 118 Cong. Rec. 5807 (Feb. 28, 1972) (Statement of Sen. Birch Bayh) (explaining Title IX "permit[s] differential treatment by sex" when necessary, such as "in sport facilities or other instances where personal privacy must be preserved"). Title IX accordingly prohibits recipients of federal funds from discriminating on the basis of sex in their educational programs or activities and indicates that not all differential treatment based on sex constitutes such prohibited discrimination. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005) ("discrimination means 'less favorable' treatment"); *Bostock v. Clayton County*, 590 U.S. 644, 657 (2020) (discriminating "would seem to mean treating that individual worse than others who are similarly situated").

4

II. **LONGSTANDING REGULATIONS CONFIRMED THAT BIOLOGICAL DIFFERENCES OCCASIONALLY DEMAND DIFFERENTIATION BETWEEN THE TWO SEXES TO PROMOTE EQUAL OPPORTUNITIES AND RESPECT FOR BOTH UNDER TITLE IX.**

This understanding that Title IX generally prohibits discrimination based on biological sex and does not prohibit non-discriminatory differentiation that is necessitated by biological differences is confirmed in longstanding Title IX regulations—including ones published shortly after Title IX's passage. In 1974, Congress enacted another statute requiring the publication of Title IX regulations, including "with respect to intercollegiate athletic activities reasonable provisions considering the nature of particular sports." Pub. L. No. 93-380, Title VIII, Part D, § 844, 88 Stat. 612. The Department's predecessor agency accordingly published Title IX regulations in 1975. *See* U.S. Dep't of Health, Educ., & Welfare, *Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities*, 40 Fed. Reg. 24,128 (Jun. 4, 1975) (codified at 45 C.F.R. pt. 86) (the "1975 Regulations"). The 1975 Regulations were subject to a statutory "laying before" provision, under which Congress could disapprove them by resolution within 45 days if it found them inconsistent with Title IX. *See* General Education Provisions Act, Pub. L. 93-380, 88 Stat. 567.

During that time period for congressional review, "[r]esolutions of disapproval were introduced in both Houses of Congress." *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 532 & n.32 (1982). One subcommittee "held six days of hearings to determine whether the [1975 Regulations] were 'consistent with the law and with the intent of the Congress in enacting the law.'" *Id.* at 532. The resolutions failed, and the regulations went into effect. *Id.* at 533. Given the special congressional scrutiny that the 1975 Regulations endured, the Supreme Court has repeatedly "recognized the probative value" of the 1975 Regulations in light of "Title IX's unique post enactment history." *Grove City Coll. v. Bell*, 465 U.S. 555, 567 (1984). So too has the Department itself. *See, e.g.*, Ex. 1 at 7–8.

The 1975 Regulations emphasize key aspects of Title IX's general prohibition on discrimination based on sex in education programs and activities. *First*, the 1975 Regulations further

demonstrate that sex discrimination means discrimination against someone based on his or her biological sex.[2] *Second*, the 1975 Regulations underscore that not all separation based on sex is prohibited discrimination, which is why, among other things, they permit funding recipients to "separate toilet, locker room, and shower facilities on the basis of sex" as long as "such facilities provided for students of one sex" are "comparable to such facilities provided for students of the other sex." 40 Fed. Reg. at 24,141.[3] *Third*, the 1975 Regulations acknowledge that sometimes biological differences make differential treatment based on sex necessary to provide equal opportunities under Title IX. That is why, for example, the 1975 Regulations "requir[e] the use of standards for measuring skill . . . in physical education which do not impact adversely on members of one sex." *Id.* at 24,132.[4]

The 1975 Regulations thus confirm what is plain in Title IX's text and structure: Title IX promotes equal educational opportunities for both sexes while not overlooking biological differences or mandating identical treatment of males and females in all circumstances. And Title IX has been implemented accordingly for decades. *See, e.g.*, U.S. Dep't of Health, Educ., & Welfare, *Title IX of the Education Amendments of 1972; a Policy Interpretation; Title IX and Intercollegiate Athletics*, 44 Fed. Reg. 71,413, 71,414 (Dec. 11, 1979) ("[A]thletic interests and abilities of male and female students must be equally effectively accommodated."); *id.* (noting most institutions would need to develop "athletic

---

[2] *See, e.g.*, 40 Fed. Reg. at 24,132 ("women" and "men"); *id.* at 24,135 ("male and female teams"); *id.* at 24,135 (contrasting payment rates between "one sex" and the "opposite sex"); *id.* at 24,134 (prohibiting discrimination "against members of either sex").

[3] *See, e.g.*, *id.* at 24,141 (allowing the "separation of students by sex within physical education classes or activities during participation in wrestling, boxing, rugby, ice hockey, football, basketball and other sports the purpose or major activity of which involves bodily contact"); *id.* (allowing "[p]ortions of classes in elementary and secondary schools which deal exclusively with human sexuality" to be "conducted in separate sessions for boys and girls").

[4] *See id.* at 24,132 (explaining this requirement is necessary because certain standards "may be virtually out-of-reach for many more women than men because of the difference in strength between the average person of each sex"); *id.* at 24,141 ("Where use of a single standard of measuring skill or progress in a physical education class has an adverse effect on members of one sex, the recipient shall use appropriate standards which do not have such effect.").

programs that substantially expand opportunities for women to participate and compete at all levels"); *id.* at 71,415 ("Some aspects of athletic programs may not be equivalent for men and women because of unique aspects of particular sports or athletic activities."); U.S. Dep't of Educ., *Establishment of Title and Chapters*, 45 Fed. Reg. 30,802, 30,960 (May 9, 1980) (reissuing regulations, including those allowing "separate housing on the basis of sex" and "separate toilet, locker room, and shower facilities on the basis of sex"); *id.* at 30,962 (allowing sex-specific teams and requiring "equal athletic opportunity for members of both sexes"); Ex. 2 at 1 ("an education to all students, male and female, free of discrimination").[5] This approach—mandated by the statutory text—has proven immensely successful as female college attendance and athletic participation have skyrocketed. *See, e.g.*, Ex. 2; *Adams v. Sch. Bd. of St. Johns Cnty.*, 57 F.4th 791, 818–19 (11th Cir. 2022) (en banc) (Lagoa, J., concurring).

## III.   FOR DECADES, TITLE IX HAS BEEN INTERPRETED AS PROHIBITING DISCRIMINATION BASED ON BIOLOGICAL SEX THAT BARS ACCESS TO EDUCATIONAL OPPORTUNITIES.

In accordance with Title IX's plain language and regulations, the Department, its predecessor agency, and courts interpreted Title IX for decades as prohibiting only discrimination based on biological sex. *See, e.g.*, *id.* at 811, 815 (explaining Title IX's "purpose, as derived from its text, is to prohibit sex discrimination in education" and "sex" "mean[s] 'biological sex'"); Ex. 1 at 1 (describing "the Department's longstanding construction of the term 'sex' in Title IX to mean biological sex"); Ex. 3 ("Title IX does not prohibit discrimination on the basis of sexual orientation"); *cf. Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 328–36 (5th Cir. 2019) (Ho, J. concurring) ("For four decades, it has been the uniform law of the land, affirmed in eleven circuits, that Title VII of the 1964 Civil Rights Act prohibits sex discrimination—not sexual orientation or transgender discrimination."). In interpreting

---

[5] *See also Williams v. Sch. Dist. of Bethlehem*, 998 F.2d 168, 175 (3d Cir. 1993) (explaining "'[a]thletic opportunities' means real opportunities, not illusory ones," which is why school districts make the effort "to equalize the numbers of sports teams offered for boys and girls" as opposed to only allowing "girls to try out for the boys' teams").

statutes that prohibit sex discrimination, courts recognized that evidence of sexual harassment or mistreatment based on sex-related characteristics, such as failure to conform to sex stereotypes, could be used to prove discrimination based on biological sex. *See, e.g., Franklin v. Gwinnett Cnty. Pub. Sch.,* 503 U.S. 60, 75 (1992); *Chisholm v. St. Mary's City Sch. Dist. Bd. of Educ.,* 947 F.3d 342, 350–52 (6th Cir. 2020). But courts recognized that the relevant statutory inquiry remained whether "the conduct at issue . . . actually constituted '*discrimina[tion]* . . . because of sex,'" *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81 (1998), or "on the basis of sex," 20 U.S.C. § 1681(a).[6]

Moreover, in the Title IX context, courts recognized that not all harassing behavior based on sex violates the statute. When it comes to student-on-student sexual harassment, the Supreme Court concluded that harassment must be "so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit" to constitute discrimination. *Davis v. Monroe Cnty. Bd. of Educ.,* 526 U.S. 629, 633 (1999). The Court explained that Title IX's "provision that the discrimination occur 'under any education program or activity' suggests that the behavior be serious enough to have the systemic effect of denying the victim equal access to an educational program or activity," and the Court further noted that teasing and offensive names that cause a student to skip school would not qualify. *Id.* at 651–52; *see id.* at 653 (emphasizing that the harassment at issue "was not only verbal," but also "included numerous acts of objectively offensive touching" that led to a conviction for "criminal sexual misconduct"); *id.* at 667 (Kennedy, J., dissenting) (noting that

---

[6] *See, e.g., Price Waterhouse v. Hopkins,* 490 U.S. 228, 251 (1989) ("In making this showing, stereotyped remarks can certainly be *evidence* that gender played a part."); *Bostock,* 590 U.S. at 699 (Alito, J., dissenting) (explaining Title VII does not "forbid[] discrimination based on sex stereotypes," but "discrimination based on sex stereotypes" is "relevant to prove discrimination because of sex," especially where a trait "would be tolerated and perhaps even valued in a person of the opposite sex"); *Chisholm,* 947 F.3d at 350–52 (reasoning that "an offensive, gendered insult," even if intended to be "an assault on their masculinity," was not sex discrimination where "targeted to a fundamental requirement for football players—toughness"—that the coach would presumably demand of any female player).

attempts to curb allegedly harassing speech could violate the First Amendment).

The Department subsequently issued regulations adopting the *Davis* formulation of sexual harassment for "purely verbal harassment" to address First Amendment concerns. U.S. Dep't of Educ., *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30,026, 30,142 (May 19, 2020). Under current regulations (that the challenged Rule will replace) verbal harassment can constitute discrimination under Title IX only when it is "so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity." 34 C.F.R. § 106.30(a)(2).

## IV.    THE FINAL RULE TRANSFORMS AND SUBVERTS TITLE IX.

On April 29, 2024, the Department published the Final Rule, which redefines "sex" in Title IX to embrace "gender identity" (and other concepts that are distinct from sex) and expands the definition of harassment to include protected speech. *See* 89 Fed. Reg. at 33,884, 33,886. Citing its "authority to issue rules effectuating [Title IX's] prohibition on sex discrimination consistent with the objectives of the statute," *id.* at 33,476, the Rule proceeds to upend the entire Title IX framework.

Although 20 U.S.C. § 1681 prohibits Title IX funding recipients from subjecting a person "to discrimination under any education program or activity" based on "sex," the Rule expands Title IX to include "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation and gender identity." *Id.* at 33,476. The Department refuses to define "sex" or "gender identity," *id.* at 33,802, notwithstanding its claimed "expertise on what constitutes sex discrimination," *id.* at 33,815. However, the Department does say it "understands" "gender identity" to mean "an individual's sense of their gender, which may or may not be different from their sex assigned at birth." *Id.* at 33,809.

Despite this acknowledgement that "sex" and "gender identity" are different, the Rule largely requires recipients to treat "sex" and "gender identity" as synonymous. The Rule provides:

9

> In the limited circumstances in which Title IX or this part permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, except as permitted by 20 U.S.C. 1681(a)(1) through (9) and the corresponding regulations §§ 106.12 through 106.15, 20 U.S.C. 1686 and its corresponding regulation § 106.32(b)(1), or § 106.41(b). Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.

*Id.* at 33,887. In short, this means that any person's claimed gender identity must generally be treated as if it were his or her sex.[7] For example, the Rule mandates that recipients allow persons to use whichever single-sex bathroom or locker room corresponds with their claimed gender identity at that particular time.[8] And the Rule warns that recipients cannot impose documentation requirements, such as evidence of a valid gender-dysphoria diagnosis, before allowing a male claiming a female gender identity to use a girls' bathroom or locker room.[9]

The Rule's general mandate that a person must be treated consistently with whatever gender identity he or she claims extends to speech. When a person claims a gender identity that differs from biological sex, recipients must compel staff and students to use whatever pronouns are demanded by that person.[10] That is because the Rule defines prohibited discrimination to include harassment based

---

[7] *See id.* at 33,816 (applying the de minimis standard to "any 'person,' including students, employees, applicants for admission or employment, and . . . could include parents of minor students, students from other institutions participating in events on a recipient's campus, visiting lecturers, or other community members whom the recipient invites to campus").

[8] *See id.* at 33,818 ("[A] recipient must provide access to sex-separate facilities, including bathrooms, in a manner that does not cause more than de minimis harm."); *id.* ("[S]tudents experience sex-based harm that violates Title IX when a recipient bars them from accessing sex-separate facilities or activities consistent with their gender identity.").

[9] *See id.* at 33,819 ("[R]equiring a student to submit to invasive medical inquiries or burdensome documentation requirements to participate in a recipient's education program or activity consistent with their gender identity imposes more than de minimis harm.").

[10] *See, e.g., id.* at 33,516 (noting that "verbal . . . hostility based on the student's . . . gender identity" can be impermissible discrimination); *id.* (citing U.S. Equal Emp. Opportunity Comm'n, *Sexual Orientation and Gender Identity (SOGI) Discrimination*, (last accessed May 1, 2024), https://tinyurl.com/mrxmwtsf

on any of the "bases described in § 106.10," *id.* at 33,884—that is, "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," *id.* at 33,886—and to include creation of a "hostile environment," *id.* at 33,884. The Rule then adopts an expansive definition of "[h]ostile environment harassment" as "[u]nwelcome sex-based conduct that . . . is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id.* The Department's new "severe or pervasive" standard would require recipients to monitor and censor speech on myriad topics to avoid creating a hostile environment,[11] including speech expressing views critical of the concept of "gender identity" and even speech occurring *outside* of the recipients' education programs or *outside* of the United States that could allegedly contribute to a hostile environment. *See id.* at 33,516, 33,530.

The Rule states it is not changing the current regulations regarding athletics (until a separate, currently pending proposed rule is finalized), and that its prohibition on "prevent[ing] a person from participating . . . consistent with the person's gender identity" does not apply in the context of athletics. *See id.* at 33,817, 33,887. But the Rule interprets the term "sex" in Title IX to include "gender identity," *see id.* at 33,886, so the Department (and male athletes who are self-professed females) will inevitably argue, consistent with the Rule's interpretation of Title IX, that the current regulations prohibit recipients from having a categorical ban on boys (including boys claiming to have a female gender identity) playing on girls' teams, *see* Ex. 5 (reflecting the Administration's current litigating position).

---

("SOGI Guidance")); SOGI Guidance ("[I]ntentionally and repeatedly using the wrong name and pronouns to refer to a transgender employee could contribute to an unlawful hostile work environment.") (attached as Ex. 4).

[11] *See, e.g.*, *id.* at 33,514, 33,516 (refusing to use pronouns based on self-professed gender identity, derogatory comments about gender identity or pregnancy, or multiple students calling someone "girly" could "create a hostile environment"); *id.* at 33,570 ("academic discourse of students or teachers *generally* would not meet this standard") (emphasis added).

**ARGUMENT**

Plaintiffs seek a postponement of the Rule's effective date or stay of the Rule under 5 U.S.C. § 705 or, in the alternative, a preliminary injunction under Federal Rule of Civil Procedure 65. The Administrative Procedure Act authorizes courts to "issue all necessary and appropriate process . . . to preserve status or rights pending [judicial review]." 5 U.S.C. § 705. This includes the power to "suspend *administrative* alteration of the *status quo.*" *Wages & White Lion Invs. L.L.C. v. FDA*, 16 F.4th 1130, 1144 (5th Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418, 430 n.1 (2009)); *see also, e.g.*, *Texas v. EPA*, 829 F.3d 405, 411, 435 (5th Cir. 2016). In deciding whether to grant relief under § 705 or a preliminary injunction, courts apply the same basic factors. *See Texas*, 829 F.3d at 405, 424–36 (applying the *Nken* factors when staying an agency's action under § 705); *see also Voting for Am., Inc. v. Andrade*, 488 F. App'x 890, 893 (5th Cir. 2012) (per curiam). Those factors are (1) plaintiffs' likelihood of success on the merits; (2) the threat of irreparable harm absent relief; (3) whether relief "will substantially injure the other parties"; and (4) the public interest. *Texas*, 829 F.3d at 424.

**I.      PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR CLAIMS.**

    **A.      The Rule Is Contrary to Law and Exceeds Statutory Authority.**

Because the Rule is contrary to Title IX's text and structure and Defendants have no statutory authority to subvert Title IX or decide major questions, Plaintiffs are likely to succeed in showing that the Rule is "not in accordance with law" and exceeds statutory authority. 5 U.S.C. § 706(2)(A), (C).

    *1.      The Rule's interpretation of "sex" and its requirement that recipients treat self-professed "gender identity" as if it were biological sex flouts Title IX.*

The Department does not have the authority to "rewrite clear statutory terms," much less rewrite terms in a way that undercuts a statute's purpose. *Util. Air Regulatory Grp. v. EPA*, 573 U.S. 302, 328 (2014). Yet that is exactly what the Rule does by interpreting "sex" in Title IX to embrace "gender identity" and other concepts that are distinct from biological sex when the term "sex" in Title IX means biological sex. The Rule is therefore contrary to law and exceeds statutory authority.

Title IX provides:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance [with statutory exceptions].

20 U.S.C. § 1681(a). This prohibition on sex discrimination means recipients generally cannot discriminate based on someone's biological sex; it does not prohibit discrimination based on "gender identity" or other grounds. And where Title IX allows differentiation based on sex due to biological differences, such as for bathrooms, locker rooms, and sports teams, recipients may treat persons in accordance with their biological sex without regard to their self-professed gender identity. The Rule's requirement that recipients consider gender identity and treat people consistent with their self-professed gender identity (in most contexts) is thus at odds with Title IX.

When construing a statute, a court's "job is to interpret the words consistent with their 'ordinary meaning' . . . at the time Congress enacted the statute." *Wis. Cent. Ltd. v. United States*, 585 U.S. 274, 277 (2018) (quoting *Perrin v. United States,* 444 U.S. 37, 42 (1979)). That means "look[ing] to dictionary definitions for help in discerning a word's ordinary meaning," *Cascabel Cattle Co., L.L.C. v. United States*, 955 F.3d 445, 451 (5th Cir. 2020), and reading the word in context, "not in isolation," *Sw. Airlines Co. v. Saxon*, 596 U.S. 450, 455 (2022).

Contemporary dictionaries show "sex" had an unambiguous meaning in 1972 and referred to a person's biological sex as a male or a female. *See supra* p. 3; *e.g.*, *Adams*, 57 F.4th at 812 ("Reputable dictionary definitions of 'sex' from the time of Title IX's enactment show that when Congress prohibited discrimination on the basis of 'sex' in education, it meant biological sex, i.e., discrimination between males and females."). And this ordinary meaning is further confirmed by following the "cardinal rule" of reading the statute "as a whole." *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991). The statute indicates that "sex" means biological sex and refers to the two divisions of male or female.

13

*See* 20 U.S.C. §§ 1681(a)(2) (referring to "one sex" and "both sexes"); 1681(a)(8) (referring to "father-son or mother-daughter activities," "one sex," and "the other sex"). Moreover, the statute refers to "sexual orientation" and "gender identity" not as "sex" but as a separate "status." *See id.* § 1689(a)(6) (directing that a sexual-violence task force be established and "develop recommendations on . . . inclusive approaches to supporting survivors, which include consideration of . . . lesbian, gay, bisexual, or transgender (commonly referred to as 'LGBT') status").

Furthermore, longstanding regulations—including regulations adopted soon after Title IX's enactment and with congressional approval—have consistently interpreted "sex" in Title IX to mean biological sex. *See, e.g.*, 40 Fed. Reg. at 24,132 ("either sex"); *id.* at 24,135 ("male and female"); *id.* (referring to "one sex" and "the opposite sex"); 34 C.F.R. §§ 106.33 (referring to "one sex" and "the other sex"); *id.* 106.41(c) (referring to "both sexes" and "male and female teams"). This is additional "powerful evidence" of the "original public meaning" of Title IX. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2426 (2019) (Gorsuch, J., concurring) (emphasis omitted). So too is the fact that adopting a more expansive definition of "sex" renders other provisions of IX meaningless. *See City of Chicago v. Fulton*, 592 U.S. 154, 159 (2021) ("The canon against surplusage is strongest when an interpretation would render superfluous another part of the same statutory scheme."). After all, if a recipient must treat a man who claims a female gender identity as a woman, then that man must be allowed to live in women's dormitories, which would render Title IX's provision allowing for sex-specific dormitories meaningless. *See Adams*, 57 F.4th at 813 (discussing § 1686). Defendants try to avoid this problem by making dormitories an exception to the Rule's requirement that persons must be treated according to their gender identity; however, this inconsistency demonstrates the Rule's interpretation of "sex" is untenable. *See id.* at 817. Defendants cannot overcome the presumption that "sex" means "the same thing throughout [the] statute." *Brown v. Gardner*, 513 U.S. 115, 118 (1994). If "sex" in § 1686 means biological sex, then the general prohibition on sex discrimination in § 1681 means only discrimination

based on biological sex is prohibited under Title IX. And adverse treatment based on other grounds is not necessarily discrimination because of biological sex (even though it can be evidence that prohibited sex discrimination occurred). *See supra* p. 8; *see also* 89 Fed. Reg. at 33,811 ("[N]ot all conduct one might label 'sex stereotyping' necessarily violates Title IX.").

The Rule's contrary claim that discrimination based on "sexual orientation or gender identity . . . always demands consideration of sex" is wrong. 89 Fed. Reg. at 33,807. For example, a religious student group would not be considering sex at all if it excluded students who are bisexual or students who claim a nonbinary[12] gender identity from membership. And that is not contrary to *Bostock*, which simply held that firing a male employee for being homosexual or transgender is sex discrimination, because the employer fired that employee because of "traits or actions" (being attracted to men or presenting as a woman) that the employer tolerates in female employees. 590 U.S. at 660–61; *see id.* at 660 (explaining "Title VII stands silent" if an employer fires a woman for traits that it also "would not have tolerated" in a man).[13] Indeed, the *Bostock* Court assumed "sex" in Title VII meant "biological distinctions between male and female" and agreed that "homosexuality and transgender status are distinct concepts from sex." *Id.* at 655, 669. The Rule's rewrite of Title IX therefore cannot be justified by *Bostock* even if it applies.

In any event, *Bostock* does not apply. The Supreme Court not only expressly limited its opinion to Title VII, but it also refused to even "prejudge" whether sex-specific bathrooms were permissible

---

[12] *See* Ex. 6 at S80 ("The term nonbinary includes people whose genders are comprised of more than one gender identity simultaneously or at different times (e.g., bigender), who do not have a gender identity or have a neutral gender identity (e.g., agender or neutrois), have gender identities that encompass or blend elements of other genders (e.g., polygender, demiboy, demigirl), and/or who have a gender that changes over time (e.g., genderfluid)."); *id.* ("Nonbinary also functions as a gender identity in its own right."); *id.* at S88 (explaining some people identify as "eunuchs" and view it as a "distinct gender identity").

[13] Regardless, it is not sex discrimination for religious groups to decline membership to those who maintain beliefs and practices inconsistent with the group's tenets. And *Bostock* does not say otherwise.

under Title VII. *Id.* at 681; *see Pelcha v. MW Bancorp, Inc.*, 988 F.3d 318, 324 (6th Cir. 2021) (explaining "the rule in *Bostock* extends no further than Title VII"). Moreover, "Title VII differs from Title IX in important respects," *Meriwether v. Hartop*, 992 F.3d 492, 510 n.4 (6th Cir. 2021), and the workplace differs from the educational context. Plaintiffs will therefore likely succeed on their claim that the Rule conflicts with Title IX.

### 2.   The Rule's harassment standard that turns recipients into federal-commandeered censors is contrary to Title IX and violates the First Amendment.

The Rule is also contrary to law because its harassment standard is unmoored from Title IX and would require recipients to violate First Amendment rights. Harassment becomes discrimination "'*under*' the recipient's programs" in § 1681 only when it "is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit" and when "the recipient exercises substantial control over both the harasser and the context." *Davis*, 526 U.S. at 633, 645 (emphasis added); *see Meriwether*, 992 F.3d at 511. The Rule's new broad "severe or pervasive" standard, which considers speech or other expressive conduct that "limits" a person's ability to participate in a program to be discriminatory harassment, thus cannot be squared with Title IX. 89 Fed. Reg. at 33,884. Nor can the Rule's requirement that a recipient consider conduct that occurred *outside* of its program or *outside* of the United States in determining whether a hostile environment has been created *in* its education program and activity. *Id.* at 33,530.

Moreover, the Rule's harassment standard (particularly when combined with its expansion of "sex" to include other concepts) chills and punishes protected speech—an effect that is amplified by the requirement that teachers report any speech that could be considered harassment and that recipients must respond to what may be prohibited harassment. *See* 89 Fed. Reg. at 33,563, 33,888.

The Rule would compel staff and students to use whatever pronouns a person demands[14]—even when those pronouns are grammatically incorrect and express a viewpoint with which the speaker disagrees—and prohibits students from expressing their views, including their religious views, on numerous topics. *See, e.g.*, 89 Fed. Reg. 33,514–16, 33,570; Ex. 4.

The Rule therefore conflicts with the "fixed star in our constitutional constellation" that the government cannot "prescribe what shall be orthodox" or "force citizens to confess by word or act their faith therein," *W. Virginia State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943), and "may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable," *Texas v. Johnson*, 491 U.S. 397, 414 (1989). Indeed, courts have disapproved of similar attempts to police speech under the guise of preventing discrimination, finding that expansive harassment policies violate Free Speech and Free Exercise rights. *See, e.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125–27 (11th Cir. 2022) (concluding harassment policy is likely both "impermissibly overbroad" and "a content- and viewpoint-based restriction of speech"); *id.* at 1129–30 (Marcus, J., concurring) (explaining that treating unpopular ideas that offend people as prohibited harassment "is plainly at odds with the First Amendment and our notion of free speech"); *Meriwether*, 992 F.3d at 498, 512 (holding that requiring a professor to use students "preferred pronoun[s]" violated his free-speech rights and the Free Exercise Clause); *cf. Perlot v. Green*, 609 F. Supp. 3d 1106, 1118–21 (D. Idaho). Accordingly, even if Title IX's "provisions could mean what the Government says they mean," the Court must construe those provisions more narrowly "because to do otherwise would raise grave constitutional concerns." *Mexican Gulf Fishing Co. v. U.S. Dep't of Comm.*, 60 F.4th 956, 966 (5th Cir.

---

[14] *See United States v. Varner*, 948 F.3d 250, 256–57 (5th Cir. 2020) (recognizing that gender dysphoric people claim gender identities other than male or female and use pronouns such as (f)ae, e/ey, per, they, ve, xe, or ze/zie); Ex. 6 at S80 (giving examples of neopronouns that may be used "e/em/eir, ze/zir/hir, er/ers/erself among others"); Ex. 7 (explaining neopronouns are less common pronouns and providing examples while noting the options are "limitless").

2023); *see Speech First, Inc. v. Fenves*, 979 F.3d 319, 337 n.16 (5th Cir. 2020) (noting that the Supreme Court has not decided whether allowing "purely verbal harassment claims" is constitutional and that it "seems self-evidently dubious"). This is yet another reason to conclude the Rule is contrary to law.

### 3.  *Defendants have no authority to rewrite Title IX and decide major questions.*

The Rule exceeds statutory authority under 5 U.S.C. § 706(2)(C), because the Department has no authority—much less clear authority—to issue regulations that subvert Title IX or require recipients to violate constitutional rights as the Rule does. *See supra* pp. 12–18, Am. Compl. at 27–28. The Department, as an administrative agency, is a "creature[] of statute," and "possess[es] only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. OSHA*, 595 U.S. 109, 117 (2022). It is a "core administrative-law principle that an agency may not rewrite clear statutory terms to suit its own sense of how the statute should operate." *Util. Air Regulatory Grp.*, 573 U.S. at 328. Because Congress provided authority only to implement Title IX in § 1682, not to rewrite it and render statutory provisions meaningless, the Department exceeded its authority in issuing the Rule.

This lack of statutory authority is especially egregious here, because the Rule decides major questions—such as whether to force schools, administrators, teachers, and students to treat someone's self-professed, unverifiable, potentially ever-changing gender identity as akin to biological sex—that must be decided by "Congress itself" or, at the very least, by "an agency acting pursuant to a clear delegation from that representative body." *West Virginia v. EPA*, 597 U.S. 697, 735 (2022). The Rule answers major questions that belong to Congress or require a clear authorization for at least four reasons. *First*, the Rule has enormous social and political significance. *See id.* at 721. How to address and treat people claiming a gender identity that differs from their biological sex has prompted state legislation and sparked numerous nationwide and international controversies. *See* Exs. 8–11; *infra* p.26. *Second*, the Rule has significant economic consequences. It threatens millions of dollars of funding for Plaintiff School Boards and billions of dollars of funding for Plaintiff States, *e.g.*, Exs. 12–13, not to

mention imposes enormous compliance costs on Plaintiff School Boards that will need to modify their schools' facilities.[15] *Third*, the Rule is "novel" and "transformative," and Congress "has consistently rejected proposals" to expand Title IX to prohibit discrimination based on sexual orientation and gender identity. *West Virginia*, 597 U.S. 716, 724, 731–32; *see, e.g.*, Equality Act, H.R. 5, 117 Cong. § 9(2) (2021); Title IX Take Responsibility Act of 2021, H.R. 5396, 117 Cong. (2021); *see also* Ex. 25 (touting the proposed rule as "historic"). *Fourth*, the Rule intrudes on education, which is an area "where States historically have been sovereign," *United States v. Lopez*, 514 U.S. 549, 564 (1995), implicating not only the major questions doctrine, but also the federalism canon, *see West Virginia*, 597 U.S. at 744 (Gorsuch, J., concurring). The Department's inability to point to any statutory authority for the transformative Rule, much less clear authority, is therefore fatal to the Rule's validity.

**B.    The Rule's Conditions Violate the Spending Clause.**

In addition, the Rule (and Title IX, assuming, arguendo, the Rule is a permissible interpretation of it) violates Spending Clause limits. Title IX was passed under Congress's power to impose conditions on federal funds under the Spending Clause, *Davis*, 526 U.S. at 640, and that "power is of course not unlimited, but is instead subject to several general restrictions," *South Dakota v. Dole*, 483 U.S. 203, 207 (1987). These restrictions include requirements that: (1) conditions must be "unambiguous[]" so States can "exercise their choice knowingly, cognizant of the consequences

---

[15] *See* Ex. 14 at 7 (explaining cost to "redesign restrooms and showers on 11 campuses" would "be significant"); Ex. 15 at 7–8 (estimating it would cost approximately $1.2 million to construct or renovate gender-neutral facilities, plus the cost of renting portable toilets); Ex. 16 at 7–8 (describing costs as "astronomical"); Ex. 17 at 7 (estimating costs exceeding $2.1 million); Ex. 18 at 8 (describing costs as "significant"); Ex. 19 at 8 ("substantial expense to our district"); Ex. 20 at 7–8 (estimating it would cost between $20.3 million to $27.7 million to renovate or construct new facilities); Ex. 21 at 8 (describing construction process as "lengthy and costly"); Ex. 22 at 8 (estimating it would "cost[] hundreds of millions of dollars"); Ex. 23 at 7 (describing construction projects as "expensive"); *see also* Ex. 24 (describing a pilot program to build new bathrooms to accommodate transgender and nonbinary students at five schools in Loudoun County, Virginia will cost $11 million and noting it could cost over $211.2 million if the program was expanded to each school in the district).

of their participation," (2) conditions must be related to the "federal interest in the project," (3) spending must not "induce the States to engage in activities that would themselves be unconstitutional," and (4) spending must not "be so coercive as to pass the point at which 'pressure turns into compulsion.'" *Id.* at 207–11. Each requirement is "equally important" and must be "equally" satisfied for a spending condition to be constitutional. *West Virginia v. Dep't of Treasury*, 59 F.4th 1124, 1142 (11th Cir. 2023).

The Rule's conditions flunk these four requirements. *First*, the Rule imposes conditions that are not "unambiguously" clear. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Plaintiffs did not "voluntarily and knowingly" agree to police and punish speech; ignore the difference between biological sex and self-professed gender identity; abolish sex-specific bathrooms, locker rooms, rooming assignments, and sports; or violate staff and students' constitutional rights in exchange for federal funds under Title IX. *NFIB v. Sebelius*, 567 U.S. 519, 577 (2012); *see Adams*, 57 F.4th at 816 ("The notion that the School Board could or should have been on notice that its policy of separating male and female bathrooms violates Title IX and its precepts is untenable."). Moreover, the Department cannot usurp Congress's spending power by imposing conditions that are unauthorized by the statutory text, *see Tex. Educ. Agency v. U.S. Dep't of Educ.*, 992 F.3d 350, 362 (5th Cir. 2021), and even if it could, the Rule's conditions are still not unambiguously clear as the Department refuses to answer multiple questions about how the Rule will apply, *see, e.g.*, 89 Fed. Reg. at 33,821–22 (failing to answer questions, including "whether it would be a potential violation of Title IX for a recipient to treat a student according to their sex assigned at birth if requested by the parents to do so"). *Second*, the Rule's conditions are contrary to the federal interest in promoting equal opportunities to both sexes, because it will deprive women of opportunities, *see Adams*, 57 F.4th at 819–21; Ex. 26 at 11–13, and increase the risk of sexual assault, Ex. 26 at 9–11; Ex. 27. *Third*, the Rule will impermissibly induce recipients "to engage in activities that would themselves be

unconstitutional," *Dole*, 483 U.S. at 210, including infringing on Free Speech, Free Exercise, Due Process, and parental rights. *See, e.g.*, *supra* pp. 16–18; Am. Compl. at 27–28; Ex. 26 at 6–7; Exs. 28–30. *Fourth*, the "threatened loss" of a significant percentage of Plaintiffs' education funding "is economic dragooning that leaves the States with no real option but to acquiesce," *Sebelius*, 567 U.S. at 582, especially when even offering federal financial aid to college students triggers Title IX. Plaintiffs are thus likely to succeed on their Spending Clause claim as well.

### C.   The Rule Is an Unconstitutional Exercise of Legislative Power.

If Congress delegated the authority to issue the Rule—which it did not—the delegation violates Article I and separation-of-powers principles. As described above, the Rule embodies major policy decisions, including interpreting "sex" to include a person's self-professed gender identity, abolishing sex-specific facilities, and treating girls and women as similarly situated to males who claim to be females. Such major policy decisions that go to fundamental beliefs about our humanity and will restructure our society are "the very essence of legislative authority under our system" and "must be made by the elected representatives of the people." *Indus. Union Dep't, AFL-CIO v. API*, 448 U.S. 607, 687 (1980) (Rehnquist, J., concurring); *see Paul v. United States*, 140 S. Ct. 342, 342 (2019) (Kavanaugh, J., statement regarding denial of certiorari) (indicating "congressional delegations . . . to decide major policy questions" may be impermissible); *see also* Ilan Wurman, *Nondelegation at the Founding*, 130 Yale L. J. 1490, 1502-03, 1538, 1554 (2021). At the very least, Congress must have provided "an intelligible principle" so it can be said that "the agency exercises only executive power." *Jarkesy v. SEC*, 34 F.4th 446, 461 (5th Cir. 2022), *cert. granted*, 143 S. Ct. 2688 (2023). If the Rule, which subverts the purpose of Title IX and destroys the consistency of the statutory scheme, is authorized by statute, then there was no true intelligible principle guiding the Department's discretion. The Rule is therefore an impermissible exercise of legislative power.

### D. The Rule Is Arbitrary and Capricious.

The Rule is also arbitrary and capricious under 5 U.S.C. § 706(2)(A). That is because, although deferential, arbitrary-and-capricious review "has 'serious bite.'" *Louisiana v. DOE*, 90 F.4th 461, 470 (5th Cir. 2024). It "requires that agency action be reasonable and reasonably explained," meaning that the agency "has reasonably considered the relevant issues and reasonably explained the decision." *Wages & White Lion*, 16 F.4th at 1136 (quotations omitted). "[B]are acknowledgement" of concerns and "conclusory statements" are "no substitute for reasoned consideration." *Louisiana*, 90 F.4th at 473. And when an agency changes its position, the agency must "recognize[] the change, reason[] through it without factual or legal error, and balance[] all relevant interests affected by the change," *id.* at 469, including reliance interests on the longstanding prior policy, *Wages & White Lion*, 16 F.4th at 1139.

The Rule fails arbitrary-and-capricious review several times over. *See* Am. Compl. at 46–50. For starters, the Department failed to adequately consider important aspects of the problem. In response to concerns the Rule would undermine a recipient's "legitimate interest" in protecting students' privacy and safety, the Department simply stated it "disagree[s]" the Rule would undermine that interest. 89 Fed. Reg. at 33,820. And the Department responded the same way to "evidence that transgender students pose a safety risk" in girls-only spaces; again, it simply stated it "does not agree." *Id.* The Rule is unreasonable for dismissing commenters' safety and privacy concerns out of hand, *see, e.g.*, Ex. 26 at 8–11, Ex. 27, especially when it does not take any steps to mitigate the concerns. Instead, the Rule allows any male, including "other community members," who claims a female gender identity to use girls-only bathrooms and locker rooms without providing any method for recipients to verify the sincerity of a claimed gender identity or to prevent sexual predators from entering girls-only bathrooms and locker rooms. *See* 89 Fed. Reg. at 33,809, 33,816, 33,819.

The Department similarly failed to consider and address concerns that the Rule violates

parents' right to direct the upbringing of their children. *See, e.g.*, Ex. 28 at 5; Ex. 30. The Department merely paid lip service to parental rights, failed to articulate its view regarding the scope of those rights, and refused to answer basic questions like whether "a recipient should comply with a request by a minor student to change their name or pronouns used at school if their parent opposes the change." 89 Fed. Reg. at 33,821–22. Accordingly, the Rule is full of the type of "bare acknowledgement[s]" and "conclusory statements" that "do not constitute adequate agency consideration of an important aspect of a problem." *Louisiana*, 90 F.4th at 473.

Moreover, the Rule's pretense of leaving the current Title IX athletics regulations undisturbed until a separate proposed rule is finalized further demonstrates the Rule is arbitrary and capricious. Although Defendants except athletic teams from the general rule that "preventing a person from participating in an . . . activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex," 89 Fed. Reg. at 33,817, 33,887, the Rule's interpretation of sex discrimination to include discrimination based on "gender identity" still applies, *id.* at 33,886, which will impact the continued viability of sex-specific teams. As will the requirement that persons be allowed to use whatever locker room corresponds to their self-professed gender identity at that particular time. *Id.* at 33,816. Indeed, the Biden Administration's own litigation position confirms that Defendants do not believe a recipient can have a categorical ban on biological males playing on girls-only athletic teams. *See* Ex. 5.

The Rule's inconsistencies likewise show it is not a product of "reasoned decisionmaking" and a "logical and rational" process. *Michigan v. EPA*, 576 U.S. 743, 750 (2015). For example, the Rule states, without explanation, that "sex separation . . . in the context of bathrooms or locker rooms . . . is not presumptively unlawful sex discrimination." *Id.* at 33,818. But the self-evident reason that justifies separating the sexes in those contexts is biological differences that necessitate separation to preserve personal privacy, dignity, and safety. Because the Department ignores the

23

biological differences whenever a person claims a gender identity of the opposite sex, the Department loses any basis to conclude that sex-specific bathrooms are presumptively nondiscriminatory in the first place. And this is far from the only instance where the Rule is "internally inconsistent," and thus "arbitrary and capricious." *Nat'l Parks Conservation Ass'n v. EPA*, 788 F.3d 1134, 1141 (9th Cir. 2015), *compare, e.g.*, 89 Fed. Reg. at 33,819 (explaining "regulations have always recognized that recipients can separate students on the basis of sex in contexts where separation is generally not harmful"), *with id.* at 33,815 (noting "there are injuries, including stigmatic injuries, associated with treating individuals differently on the basis of sex").

To take another example, the Rule states that "a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to legally cognizable injury—*i.e.,* more than de minimis harm—unless there is a *statutory* basis for allowing otherwise." *Id.* at 33,814 (emphasis added). But the Rule then turns around and says that a *regulatory* basis alone is sufficient to allow sex-separate athletic teams even when that sex separation allegedly causes more than de minimis harm, because the regulations regarding athletics are longstanding. *See id.* at 33,816–17 (citing 34 C.F.R. § 106.41(b)–(c)). (Of course, the Rule fails to mention that the sex-specific bathroom and locker room regulation that it overhauls is equally longstanding, 40 Fed. Reg. at 24,141, or that the Department believes those longstanding regulations do not actually authorize recipients to exclude all males from girls-only teams based on its new interpretation of Title IX that is reflected in the Rule, Ex. 5.). As yet another example of inconsistency, the Rule states recipients are not required to "provide gender-neutral or single-occupancy facilities," but that cannot be right if, as the Rule states, (1) students must generally be treated consistently with their gender identity, including bathroom access, and (2) some students do not identify as male or female. *Id.* at 33,818, 33,820, 33,887. That means, at the very least, recipients must provide gender-neutral bathrooms and may be required to provide a different restroom for every claimed gender identity or expressly

designate all bathrooms as being for all genders. *See* Exs. 6–7 (listing various types of nonbinary gender identities).

These flaws highlight additional problems with the Rule: It misstates its effects and its costs, rendering its cost-benefit analysis wholly deficient. For example, the Department refused to acknowledge the Rule will require recipients to incur significant costs to construct new bathroom and locker room facilities or to modify existing ones. *See* 89 Fed. Reg. at 33,876. It likewise underestimated the time and costs it will take to review and understand such a lengthy and contradictory Rule, to revise policies, and to train employees. *Compare id.* at 33,867–68, *with* Ex. 18 at 6, *and* Ex. 20 at 6, *and* Ex. 22 at 6–7. And separate from the Rule's faulty monetary cost estimates, it improperly weighs "the non-monetary benefits" and costs because it fails to properly account for the harms to privacy interests, the increased risks of sexual assault, the loss of opportunities for women athletes, and the constitutional harms (infringement of Free Speech rights, Free Exercise rights, parental rights, and Due Process rights). *Id.* at 33,877; *see, e.g.*, Ex. 26 at 6–13; Exs. 27–30. Plaintiffs are therefore likely to succeed on the merits of several claims.

## II.    Plaintiffs Will Suffer Irreparable Harm Without Relief.

Not only is the Rule unlawful across the Board, but it has also caused—and will continue to cause—Plaintiffs to suffer irreparable harm absent preliminary relief. *See Texas*, 829 F.3d at 433–34; Am. Compl. at 31–42. Under well-established precedent, "the nonrecoverable costs of complying with a putatively invalid regulation typically constitute irreparable harm." *Rest. Law Ctr. v. U.S. Dep't of Labor*, 66 F.4th 593, 597 (5th Cir. 2023). That is because the "key inquiry" is not the magnitude of the costs, but whether they "cannot be recovered in the ordinary course of litigation," *id.*, and "federal agencies generally enjoy sovereign immunity for any monetary damages," *Wages & White Lion*, 16 F.4th at 1142.

Plaintiffs have incurred and will continue to incur unrecoverable compliance costs absent preliminary relief. That is because all Plaintiffs are recipients of federal funds subject to Title IX

regulations, which means they have increased regulatory burdens and compliance costs under the Rule. *See, e.g.*, 89 Fed. Reg. 33,490, 33,541; Exs. 12–13. Indeed, the Rule acknowledges that it will impose immediate costs on recipients, including time and resources to review and understand the Rule, revise policies, and train employees on the changes before the August 1, 2024 effective date. *See* 89 Fed. Reg. at 33,548–49, 33,866–87. This acknowledgement is correct as detailed in the attached declarations. *See* Exs. 14–23; Ex. 31–33. Although some of these costs have already been incurred, the bulk of these upfront costs will be incurred in late June and July absent preliminary relief. *See* Ex. 14 at 6; Ex. 15 at 6; Ex. 16 at 6; Ex. 17 at 6; Ex. 18 at 6; Ex. 19 at 6; Ex. 20 at 6; Ex. 21 at 6; Ex. 22 at 7; Ex. 23 at 6. Plaintiff School Boards must also secure funding and begin the onerous process of designing, modifying, and constructing bathrooms and locker rooms to comply with the Rule and lessen its harmful effects on privacy and safety, which will cost millions and cannot possibly be completed by the Rule's effective date. *See supra* n.15. These types of harms—"increased costs of compliance, necessary alterations in operating procedures," etc.—are exactly the sort of irreparable harm that warrant preliminary relief. *Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 235 (5th Cir. 2024); *see, e.g.*, *BST Holdings L.L.C. v. OSHA*, 17 F.4th 604, 618 (5th Cir. 2021).

Furthermore, the Rule conflicts with Plaintiff States' duly enacted laws (and soon-to-be enacted laws) designed to safeguard female sports, safety, privacy, and parental rights. *See, e.g.*, La. Rev. Stat. §§ 4:442, 4:444; Miss. Code Ann. §§ 37-97-1, 37-97-3, Mont. Ann. §§ 1-1-201, 20-7-1306, 40-6-704, Idaho Code §§ 73-114(2), 33-6201–6203, 33-6701–6707; S.B. 2753, 2024 Leg. Reg. Sess. (Miss. 2024); *see also* H.B. 610, 2024 Leg. Reg. Sess. (La. 2024); H.B. 121, 2024 Leg. Reg. Sess. (La. 2024); 89 Fed. Reg. at 33,885.[16] This interference with Plaintiff States' sovereign authority to enforce its laws

---

[16] *See also* Ex. 14 at 3; Ex. 15 at 3; Ex. 16 at 2–3; Ex. 17 at 3–4; Ex. 18 at 3; Ex. 19 at 3; Ex. 20 at 3; Ex. 21 at 3; Ex. 22 at 3–4; Ex. 23 at 3 (showing Plaintiff School Boards have sex-specific teams, which they believe increases opportunities for girls).

"clearly inflicts irreparable harm." *Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018); *see BST Holdings*, 17 F.4th at 618 (recognizing States are harmed by "federal overreach" that interferes with "their constitutionally reserved police power over public health policy"); *Tennessee v. Dep't of Educ.*, 615 F. Supp. 3d 807, 841 (E.D. Tenn. 2022) ("Plaintiffs suffered an immediate injury to their sovereign interests when Defendants issued the challenged guidance, as Defendants' guidance and several of Plaintiffs' statutes conflict.").

Relatedly, Plaintiff States are facing the irreparable harm of "substantial pressure to change their state laws," *Tennessee*, 615 F. Supp. 3d at 841; Ex. 31, and Plaintiff School Boards are similarly being pressured into revising policies and practices that they believe are in the best interests of their students, schools, and communities, *e.g.*, Ex. 20 at 6. The Rule forces Plaintiffs into making a lose-lose choice: (1) lose a significant amount of federal funding or (2) comply with the Rule by revising state laws, policies, and practices and by violating the constitutional rights of students, parents, and employees. Because these intangible harms—"invasions of state sovereignty and coerced compliance"—likely cannot be quantified or "monetarily redressed," they too constitute irreparable harm that merits preliminary relief. *Kentucky v. Biden*, 23 F.4th 585, 611 n.19 (6th Cir. 2022); *see Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *7, *9 (5th Cir. Feb. 17, 2022) (per curiam) (recognizing a "coercive choice" can "impose[] a distinct and irreparable harm" beyond "other tangible and remediable losses"); *Texas v. Yellen*, No. 2:21-CV-079-Z, 2022 WL 989733, at *5 (N.D. Tex. Mar. 4, 2022) (concluding plaintiffs were injured "by being put in the position of having to choose between being injured by the loss of a substantial amount of federal funds or the invasion of their constitutional authority to tax").

If preliminary relief is not granted and the Rule goes into effect, Plaintiffs will suffer additional irreparable harm, including increased recordkeeping obligations, complaints, administrative investigations, and private litigation, not to mention decreased enrollment of students and loss of

teachers. *See, e.g.,* 89 Fed. Reg. at 89 Fed. Reg. at 33,858, 33,868–73; Exs. 14–23.[17] Plaintiffs therefore are currently suffering and will continue to suffer irreparable harm, making it both proper and necessary for this Court to grant preliminary relief.

## III.   Preliminary Relief Would Not Harm Defendants or Disserve the Public Interest.

Plaintiffs likewise satisfy the third and fourth preliminary-relief factors because postponing or staying the Rule, or alternatively enjoining its enforcement, is in the public interest and would not harm Defendants. *See Texas*, 829 F.3d at 424. As a threshold matter, Defendants will not be harmed by the requested preliminary relief that will simply "maintain[] the status quo while the court considers the issue." *Texas v. United States*, 787 F.3d 733, 768 (5th Cir. 2015). Nor can Defendants plausibly argue otherwise when they delayed the issuance of the Rule multiple times. *See* Ex. 25.

In any event, "any interest" Defendants "may claim in enforcing an unlawful" and unconstitutional Rule "is illegitimate." *BST Holdings*, 17 F.4th at 618. That is because "[t]here is generally no public interest in the perpetuation of unlawful agency action." *Louisiana v. Biden*, 55 F.4th 1017, 1035 (5th Cir. 2022). And the inverse is true: the public interest is served by forcing Defendants to comply with statutory and constitutional limits on their authority. *See BST Holdings*, 17 F.4th at 618 ("The public interest is also served by maintaining our constitutional structure."); *Texas v. Biden*, 10 F.4th 538, 559 (5th Cir. 2021): ("[T]he 'public interest [is] in having governmental agencies abide by the federal laws that govern their existence and operations.'").

Moreover, granting preliminary relief furthers the public's interest in the enforcement of duly

---

[17] *See also* Ex. 17 at 7, 9 (explaining that 35 teachers are considering resigning due to the Rule and several families have expressed a "desire to use homeschooling or private school for their students if the district implements the Rule"); Ex. 18 at 7, 9 (similar); Ex. 21 at 7, 9 (noting that some teachers expressed concerns that using biologically inaccurate pronouns or neopronouns would create "chaos" or create "a moral dilemma" and that parents were expressing concerns about the Rule); Ex. 22 at 7, 9–10 (describing Facebook conversations on parents' pages indicating parents intend to fight the Rule or homeschool their children).

enacted state laws, academic freedom, and in preventing the violation of constitutional rights of students, parents, and teachers. *See, e.g.*, *Keyishian v. Bd. of Regents of Univ. of State of N. Y.,* 385 U.S. 589, 603 (1967) ("The classroom is peculiarly the 'marketplace of ideas.' The Nation's future depends upon leaders trained through wide exposure to that robust exchange of ideas which discovers truth 'out of a multitude of tongues, [rather] than through any kind of authoritative selection.'"); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *supra* p. 25; Exs. 34–35 (illustrating public support). Preliminary relief is also in the best interest of children struggling with gender identity, especially given evidence that social transitioning can be harmful to a child's mental health and is a pathway to dangerous medical procedures that a growing number of experts now publicly acknowledge "will not be the best way to manage their gender-related distress." Ex. 8; *see, e.g.*, Exs. 36–40. And preliminary relief is in the best interest of families who do not want their children to share bathrooms and disrobe in locker rooms with the opposite sex and are scrambling to try to find alternative options to public schools. *See supra* p.28 & n.17.

**IV.    The Court Should Postpone the Rule's Effective Date or Stay the Rule under 5 U.S.C. § 705 or, Alternatively, Issue a Preliminary Injunction.**

The Court should postpone the Rule's effective date (or stay the Rule) until resolution of this case on the merits under 5 U.S.C. § 705. Section 705 specifically authorizes courts to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. A postponement or stay operates on the Rule itself, which "differs from a preliminary injunction, which merely thwarts the enforcement . . . but does not suspend . . . or delay its effective start date." Jonathan F. Mitchell, *The Writ-of-Erasure Fallacy*, 104 Va. L. Rev. 933, 951 (2018) (emphasis omitted); *see* Ronald M. Levin, *Federal Courts, Practice & Procedure: History of the Administrative Procedure Act & Judicial Review: Vacatur,*

29

*Nationwide Injunctions, and the Evolving APA*, 98 Notre Dame L. Rev. 1997, 2009 (2023) ("A stay of a rule necessarily applies to the rule as a whole, not merely to named parties."); *cf. Nken*, 556 U.S. at 428 ("[I]nstead of directing the conduct of a particular actor, a stay operates upon the judicial proceeding itself.").

Accordingly, a postponement or stay is necessary to mitigate irreparable harm here. That is because, unlike an injunction, a postponement or stay "under section 705 will immunize those who violate the challenged agency action from subsequent penalties—even if the courts wind up approving the agency's action in the end—because the agency action is formally suspended by the court's preliminary relief." Mitchell, 104 Va. L. Rev. at 1016 (emphasis omitted). Without a postponement or stay, Plaintiffs could face private lawsuits alleging violations of Title IX and regulations while this litigation is pending and could face enforcement actions at the end of these proceedings if they are ultimately unsuccessful on the merits. In the alternative, the Court should grant a preliminary injunction under Federal Rule of Civil Procedure 65 and enjoin Defendants from enforcing the Rule (or Title IX in accordance with Defendants' flawed statutory interpretation that is reflected in the Rule) pending resolution of this case on the merits.

## CONCLUSION

For the foregoing reasons, this Court should postpone the Rule's effective date and stay the Rule under 5 U.S.C. § 705 pending the resolution of this case on the merits, or in the alternative, enjoin Defendants from enforcing the Rule. The Court should grant that relief as soon as possible and no later than June 21, 2024, before Plaintiffs incur even more unrecoverable compliance costs.

Dated: May 13, 2024

Respectfully Submitted,

**ELIZABETH B. MURRILL**
**Attorney General of Louisiana**

Donald A. Daugherty, Jr.*
 *Senior Counsel, Litigation*
Paul Zimmerman*
 *Policy Counsel*
Martha A. Astor*
 *Associate Counsel*
DEFENSE OF FREEDOM INSTITUTE FOR
POLICY STUDIES
1455 Pennsylvania Avenue, NW, Suite 400
Washington, DC 20004
(414) 559-6902
Don.Daugherty@dfipolicy.org
Paul.Zimmerman@dfipolicy.org
Martha.Astor@dfipolicy.org

*Counsel for Plaintiff States*

*/s/ Tracy Short*
J. Benjamin Aguiñaga*
 *Solicitor General*
Tracy Short (La # 23940)
 *Assistant Chief Deputy Attorney General*
Autumn Hamit Patterson*
 *Special Assistant Solicitor General*
OFFICE OF THE LOUISIANA ATTORNEY GENERAL
1885 North Third Street
Baton Rouge, Louisiana 70802
(225) 326-6705
aguinagab@ag.louisiana.gov
shortt@ag.louisiana.gov

*Counsel for Plaintiff State of Louisiana, Plaintiff*
*Louisiana Department of Education, and Plaintiff School*
*Boards*

**LYNN FITCH**
**Attorney General of Mississippi**

Scott G. Stewart*
 *Solicitor General*
Justin L. Matheny*
 *Deputy Solicitor General*
MISSISSIPPI ATTORNEY GENERAL'S OFFICE
P.O. Box 220
Jackson, Mississippi 39205
(601) 359-3680
scott.stewart@ago.ms.gov
justin.matheny@ago.ms.gov

*Counsel for Plaintiff State of Mississippi*

**AUSTIN KNUDSEN**
**Attorney General of Montana**

Christian B. Corrigan*
 *Solicitor General*
Peter Torstensen*
 *Deputy Solicitor General*
MONTANA DEPARTMENT OF JUSTICE
215 N. Sanders Street
Helena, Montana 59601
(406) 444-2707
Christian.Corrigan@mt.gov
Peter.Torstensen@mt.gov

*Counsel for Plaintiff State of Montana*

31

**RAÚL LABRADOR**
**Attorney General of Idaho**
Alan Hurst*
  *Solicitor General*
Josh Turner*
  *Chief of Constitutional Litigation and Policy*
OFFICE OF THE ATTORNEY GENERAL OF IDAHO
700 W. Jefferson Street, Suite 201
P.O. Box 83720
Boise, Idaho 83720
(208) 334-2400
Alan.Hurst@ag.idaho.gov
Josh.Turner@ago.idaho.gov

*Counsel for Plaintiff State of Idaho*

*\*Admitted Pro Hac Vice or Pro Hac Vice admission application forthcoming*