# Exhibit 20

# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF LOUISIANA
### MONROE DIVISION

The State of LOUISIANA,
By and through its Attorney General,
Elizabeth B. Murrill; et al.,

PLAINTIFFS,

v.

U.S. DEPARTMENT OF EDUCATION; et al.,

DEFENDANTS.

Civil Action No. 3:24-cv-00563

Chief Judge Terry A Doughty
Magistrate Judge Kayla D. McClusky

## DECLARATION OF OUACHITA PARISH SCHOOL BOARD

Under 28 U.S.C. § 1746, I, Todd Guice, hereby declare under penalty of perjury that the following is true and correct to the best of my knowledge, information, and belief:

### BACKGROUND

1.      I am the Superintendent of the Ouachita Parish School Board ("School Board" or "the Board"). Under Louisiana law, the School Board is elected and has policymaking, financial, and administrative power over schools within its district ("Ouachita Parish Schools" or the "school district").

2.      Among its powers and responsibilities, the School Board secures funds for the school district, including by applying for grants, levying authorized taxes, and issuing bonds, and administers those funds. The School Board is also responsible for all school facilities within the district, including determining whether improvements are necessary, authorizing construction projects, and overseeing those projects.

3.      The School Board oversees 37 schools, which provide education for approximately 18,000 students in pre-kindergarten through 12th grade.

4.      The School Board receives federal funding, including funds distributed under the Individuals with Disabilities Education Act and Title I of the Elementary and Secondary Education Act. Because it is a recipient of federal funds, the School Board is subject to Title IX and Title IX regulations and has a Title IX coordinator.

5.      During the last fiscal year (from July 2022 to June 2023) the School Board received $49.2 million of federal funding subject to Title IX. It has received approximately $46.4 million of federal funding so far this fiscal year (July 2023 to June 2024) that is subject to Title IX, and estimates it will receive at least $56 million of federal funding next fiscal year (July 2024 to June 2025) that is subject to Title IX.

6.      Ouachita Parish Schools does not keep a record of staff or students that claim a gender identity other than one that corresponds with their biological sex. The district is aware that some students claim a gender identity that does not correspond with their biological sex.

### CURRENT POLICIES AND PRACTICES

7.      Consistent with Title IX and current Title IX regulations, the School Board recognizes that biological differences between boys and girls demand differentiation based on sex in some circumstances to preserve privacy and promote respect, dignity, and equal opportunity for both sexes.

8.      Ouachita Parish Schools accordingly have sex-specific bathrooms and locker rooms. Only biological males are allowed in bathrooms and locker rooms designated for "men" or "boys," and only biological females are allowed in bathrooms and locker rooms designated for "women" or "girls."

9.      Locker room facilities in Ouachita Parish Schools include individual bathroom stalls and a group shower area. For individuals who do not wish to change in a large open locker room,

girls' locker rooms feature 10 individual stalls, while three individual stalls are available in boys' locker rooms.

10.     When students and employees claim a gender identity that differs from their biological sex, those students and employees may use a single-user bathroom. Ouachita Parish Schools would incur a cost of approximately $22.2 million to provide a single-user bathroom on each wing of our 37 schools.

11.     Ouachita Parish Schools also have some sex-specific classes and activities. Physical education classes in the district are separated by biological sex.

12.     Ouachita Parish Schools provide students with enriching extracurricular opportunities, including interscholastic athletics for junior high and high school levels. Many of the athletic teams are designated as being for boys or girls. For example, Ouachita Parish Schools have separate girls' teams for volleyball, cross country, basketball, tennis, track, swimming, softball and golf and boys' teams for football, cross country, basketball, tennis, swimming, golf, track and baseball.

13.     Ouachita Parish Schools follow Louisiana's Fairness in Women's Sports Act, which "promote[s] sex equality" by "providing opportunities for female athletes to demonstrate their skill, strength, and athletic abilities while also providing them with opportunities to obtain recognition, accolades, scholarships, better physical and mental health, and the numerous other long-term benefits that flow from success in athletic endeavors." La. Rev. Stat. § 4:442(9).

14.     Accordingly, Ouachita Parish Schools' teams designated for girls are not "open to students who are not biologically female." *Id.* § 4:444(B). The School Board believes this policy advances equal athletic opportunities for girls, increases girls' participation in athletics, and reduces the chances that girls will be seriously injured by competing in contact sports with biological boys.

15.     Ouachita Parish Schools occasionally have overnight field trips. On those field trips, Ouachita Parish Schools assigns chaperones and students to rooms based on sex. Exceptions have

3

been made for family members. For example, a male student is allowed to share a room with his

biological mother. The district prefers for each student have their own bed, but if that request cannot

be accommodated, students of the same sex can share a bed if the parents have given their permission.

16.     The School Board does not have a policy that requires students and staff to use

biologically inaccurate pronouns or neopronouns based on an individual's claimed gender identity.[1]

17.     The School Board believes its policies and practices are in the best interest of students,

staff, community, and its educational mission.

THE RULE'S IMPACT

18.     On April 29, 2024, the U.S. Department of Education published a final rule titled

"Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal

Financial Assistance," 89 Fed. Reg. 33,474 (Apr. 29, 2024) (the "Rule"). Although the Rule has an

effective date of August 1, 2024, *see id.* at 33,549, the Rule has already caused and will continue to

cause the School Board and school district irreparable harm well before that date.

19.     The Rule harms the school district by dramatically increasing its federal obligations,

compliance costs, and litigation risks. It does so by, among other things, (1) revising Title IX's

prohibition on sex discrimination to include discrimination based on other grounds,[2] such as "gender

identity,"[3] (2) generally requiring persons to be treated consistently with his or her claimed gender

---

[1]   *See Understanding Neopronouns*, Human Rights Campaign (last updated May 18, 2022), https://www.hrc.org/resources/understanding-neopronouns ("Neopronouns are also pronouns, and include those pronouns besides the ones most commonly used in a particular language. As one's pronouns are ultimately a reflection of their personal identity, the number and types of (neo)pronouns a person may use is limitless. Examples of neopronoun sets include: xe/xir/xirs, ze/zir/zirs and fae/faer/faers.").

[2]   *See* 89 Fed. Reg. at 33,886 ("Discrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity.").

[3]   *See id.* at 33,809 (disagreeing that the term "gender identity" needs to be defined in the regulations and "understand[ing] gender identity to describe an individual's sense of their gender, which may or may not be different from their sex assigned at birth" or "subjective, deep-core sense of self as being a particular gender"); *id.* at 33,818 (recognizing that someone can have a gender identity other than "male or female"); *see also What Are the 72 Other Genders?*, MedicineNet (medically reviewed on Feb. 9, 2024), https://www.medicinenet.com/what_are_the_72_other_genders/article.htm (explaining that there are 72 other genders "[b]eside male and female," and "[t]he idea is to make everyone feel comfortable in their skin irrespective of what gender they were assigned at birth"); *What you need to know about xenogender*, LGBTQNation (updated on July 26, 2022), https://www.lgbtqnation.com/2022/03/need-know-xenogender/ (explaining that "xenogender" "describes

4

identity,[4] which includes allowing persons to use bathrooms and locker rooms that are inconsistent with their biological sex,[5] and (3) expanding prohibited discrimination to include allegedly harassing speech that limits educational opportunities,[6] which can include a refusal to refer to a student by whatever pronouns that student demands.[7]

20.     The Rule thus conflicts with many of the school district's policies and practices, including the ones detailed above that provide for sex-specific facilities, classes, and athletic teams. It will also require the school district to adopt a policy ("New Speech Policy") that, among other things, (1) prohibits students and staff from using accurate pronouns for persons who claim a gender identity that is different from their biological sex and (2) requires students and staff to use biological inaccurate pronouns or neopronouns based on an individual's claimed gender identity.

---

someone who doesn't' feel like their gender identity fits into any of the traditional categories of male or female," "[x]enogender identities . . . fill a 'lexical gap' . . . by comparing their gender identities to certain concepts – pre-existing or imaginary," and that "[t]here dozens of different types of xenogenders out there").

[4] *See* 89 Fed. Reg. at 33,809 ("To comply with the prohibition on gender identity discrimination, a recipient[,] . . . as described in more detail in the discussion of § 106.31(a)(2), generally may not prevent a person from participating in its education program or activity consistent with the person's gender identity."); *id.* at 33,887 (§ 106.31(a)(2)) ("In the limited circumstances in which Title IX or this part permits different treatment or separation on the basis of sex, a recipient must not carry out such different treatment or separation in a manner that discriminates on the basis of sex by subjecting a person to more than de minimis harm, [with limited exceptions.] Adopting a policy or engaging in a practice that prevents a person from participating in an education program or activity consistent with the person's gender identity subjects a person to more than de minimis harm on the basis of sex.").

[5] *See id.* (denying "a transgender student access to a sex-separate facility or activity consistent with that student's gender identity . . . would violate Title IX's general nondiscrimination mandate"); *id.* (agreeing that "students experience sex-based harm that violates Title IX when a recipient bars them from accessing sex-separate facilities or activities consistent with their gender identity"); *id.* ("a recipient must provide access to sex-separate facilities, including bathrooms, in a manner that does not cause more than de minimis harm").

[6] *See id.* at 33,882, 33,884 (defining "[s]ex-based discrimination" to include harassment based on "sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity"); *id.* at 33,884 (defining "[h]ostile environment harassment" as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity (*i.e.*, creates a hostile environment)").

[7] *See id.* at 33,516 (discussing "unwelcome conduct based on gender identity" and citing U.S. Equal Emp. Opportunity Comm'n, *Sexual Orientation and Gender Identity (SOGI) Discrimination, https://www.eeoc.gov/sexualorientation-and-gender-identity-sogidiscrimination* ("SOGI Guidance")); *see also* SOGI Guidance ("Although accidental misuse of a transgender employee's name and pronouns does not violate Title VII, intentionally and repeatedly using the wrong name and pronouns to refer to a transgender employee could contribute to an unlawful hostile work environment.").

21.     That means, as a threshold matter, the Rule imminently harms the school district by interfering with the authority of the duly elected School Board to set policies and establish practices that it believes are in the best interest of its students, staff, community, and its educational mission. The Rule will require the School Board to start taking steps to change its current policies and practices, which the School Board does not wish to do.

22.     Moreover, requiring the School Board to change policies and implement new procedures across Ouachita Parish Schools will impose the following imminent and irreparable compliance costs:

    a.  Costs and time to review and understand the Rule, which will cost approximately $25,000 to provide an outside company to facilitate training. Some of these costs have already been incurred; however, the bulk of these costs will be incurred by Aug. 1.

    b.  Costs and time to revise school district policies, which will take at least 2 hours of employee time for each member of a 14-person committee and cost approximately $1,288. The school district policies will need to be completed and approved by no later than Aug. 1, so that the school district has time to revise employee training materials and train employees before the Rule's effective date.

    c.  Costs and time to revise employee training, which take at least 2 hours of employee time for each member of a 14-person committee and cost approximately $1,288. This will need to be completed by Aug. 1.

    d.  Costs and time to train employees regarding new obligations under the Rule and changes to school district policies and practices, which will take at least 8 hours of employee time for the district's 2,600 employees and cost approximately $676,000. This training will need to be completed by Aug. 1.

23.     Furthermore, the specific policy changes that are required by the Rule will impose additional costs on the school district. For example, the New Speech Policy will chill academic discourse and detract from the school district's ability to teach students to be critical thinkers who can engage with ideas from a variety of viewpoints. Teachers will be conscripted into enforcing this policy and to report any speech that "reasonably may" constitute harassment under the Rule, 89 Fed. Reg. at 38,888, which could include students expressing a religious belief about humanity or using accurate pronouns for a classmate who demands everyone use neopronouns, *see id.* at 33,514–16. This would

hurt the school district (and the students) from diverting teachers' time and attention away from teaching and would likely lead some teachers to resign. This policy will also likely lead to private litigation. Some teachers and parents (on behalf of their children) would likely sue the school district claiming infringement of Free Speech and Free Exercise rights.

24.     To take another example, the school district will need to change its policy and practices so that men or boys who claim to have a female gender identity can use girls' bathrooms and locker rooms. The Rule warns that "requiring a student to submit to invasive medical inquiries or burdensome documentation requirements" before treating a student consistently with claimed gender identity "imposes more than de minimis harm" and would be discrimination. *Id.* at 33,819. The school district therefore cannot prevent male predators from insincerely asserting a female gender identity to access girls' bathrooms and locker rooms. They cannot, for example—without risking enforcement proceedings and liability under the Rule—require a diagnosis of gender dysphoria (previously referred to as gender identity disorder) before allowing a male to enter a girls' bathroom or locker room.

25.     In an effort to lessen the harms caused by the Rule (and possibly to comply with the Rule itself),[8] the school district would be compelled to undertake expensive construction projects to convert all bathroom and locker rooms into single-user facilities or to otherwise make modifications to increase students' privacy and safety.

26.     Ouachita Parish Schools follows all State laws and requirements for construction projects. The district will contract an architecture firm to design each new facility or building update at 37 schools. The design process takes two weeks at a cost of 8% of the total project cost. Design for bathrooms and locker rooms at 37 schools would cost the district between $1.6 million and $2.2 million. Once

---

[8] The Rule requires school districts to provide "nondiscriminatory access to facilities" to students who "do not identify as male or female." *See id.* at 33,818. If school districts designate certain bathrooms as "girls" bathrooms and certain bathrooms as "boys" bathrooms, they may need to likewise designate other bathrooms in accordance with multiple other gender identities.

the facilities have been designed to the district's satisfaction, the school board must approve bidding for the project. The bidding process lasts for one month and is subject to the State's low-bid law. Construction will last at least 120 days at 37 schools, with a cost of approximately $20.3 million for renovations and approximately $27.7 million to construct additional bathrooms and locker rooms. The district will employ a consultant for these projects to mitigate any other logistical issues at a total cost of approximately $185,000.

27.     The Rule also will create conflicts between Ouachita Parish Schools and parents, such as by requiring school districts to take steps to address purported harassment even when that child's parents do not wish to file a complaint and believe that no harassment occurred. *See, e.g., id.* at 33,821–22 (refusing to answer "whether a recipient should comply with a request by a minor student to change their name or pronouns used at school if their parent opposes the change"); *id.* at 33,596–97 (noting that even where the Title IX coordinator defers to the parent about whether to file a complaint, "the Title IX Coordinator may still be required to, as necessary, take other steps," such as training about harassment). This harms the school district that believes in partnering with parents and could lead to lawsuits alleging the school district has violated parental rights.

28.     Additionally, the Rule limits what information Ouachita Parish Schools can share with parents and warns that schools could be guilty of harassment if they disclose someone's gender identity (such as informing parents that a biological boy identifies as a girl). *See id.* at 33,622 (explaining that schools could violate the Rule if they "disclose personally identifiable information about a student's sexual orientation or gender identity broadly to other students or employees, which resulted in the student experiencing sex-based harassment"); *id.* at 33,5366 (emphasizing that, "[t]o the extent that a conflict exists between a recipient's obligations under Title IX and under FERPA [the Family Educational Rights and Privacy Act], § 106.6(e) [of the Rule] expressly states that the obligation to comply with the Title IX regulations is not obviated or alleviated by the FERPA statute or regulations" and "that

a recipient must not use FERPA as a shield from compliance with Title IX"). This places Ouachita Parish Schools in an untenable position, especially when it comes to overnight field trips. The Rule seems to both require Ouachita Parish Schools to assign boys who claim to be girls to a girls-only room and to prohibit the Ouachita Parish Schools from informing those girls' parents of the biological sex of their children's roommate.

29.     The Rule will likely harm the school district by reducing enrollment. Many parents in our community will not want their children to have to share bathrooms, locker rooms, and overnight accommodations with members of the opposite sex or have their children's speech and religious exercise to be chilled. Accordingly, the Rule will cause an increased number of families to decide to homeschool their children or enroll them in a religious school.

30.     Additionally, the Rule will increase the School Board's obligations and risks of liability related to the Ouachita Parish Schools' compliance with Louisiana law prohibiting boys from playing on girls' teams. Because the Rule defines "[d]iscrimination on the basis of sex" to include "gender identity" and generally requires schools to treat children according to their claimed gender identity, *id.* at 33,815, 33,886, the school district's refusal to allow a boy who identifies as a girl from playing on a girls' team would be conduct that "reasonably may be sex" discrimination under the Rule that will trigger the school district's obligations to "respond promptly and effectively" and increase liability risks, *id.* at 33,563, 33,888; *see* Brief of U.S. Dep't of Justice, Civil Rights Division, *B.P.J. v. West Va. State Bd. of Educ.*, No. 23-1078, ECF No. 68-1 at 12–13 (4th Cir. Apr. 3, 2023) (arguing that categorically prohibiting boys who claim a female gender identity from "participating on girls' sports teams because their sex assigned at birth was male . . . discriminates on the basis of sex").

31.     The Rule will also impose ongoing costs on the school as a result of increased Title IX complaints, investigations, and private lawsuits based on, among other things, the (1) expanded scope of what constitutes discrimination on the basis of sex, (2) expanded definition of harassment, and

(3) application of Title IX to conduct that occurs outside of the school district's programs and activities.

32.       Other provisions of the Rule will also require the school district to expend more time and resources. For example, the Rule increases monitoring and recordkeeping requirements. *See id.* at 33,886 (requiring recipient to keep "each notification" "about conduct that reasonably may constitute discrimination" and "actions the recipient too" in response for seven years); 33,888 (requiring Title IX Coordinator to monitor recipient's programs and activities "for barriers to reporting").

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this _____ 9th _____ day of May, 2024 in West Monroe, Louisiana.

_____

Todd Guice, Superintendent