Exhibit 27

# Exhibit I

*Carcaño v. McCrory,* U.S. District Court for the Middle District of North Carolina,

No. 1:16-cv-00236-TDS-JEP, ECF No. 149-14

EXHIBIT M

# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

UNITED STATES OF AMERICA,

      Plaintiff,

      v.

STATE OF NORTH CAROLINA et al.,

      Defendants.

Case No. 1:16-cv-00425-TDS-JEP

## EXPERT DECLARATION AND REPORT OF KENNETH V. LANNING

    This is a preliminary report. As discovery is still underway, there may be a need for this report to be amended or supplemented. I am including a portion of my Curriculum Vitae in this report detailing my education, qualifications, law enforcement training and experience in the public safety field. I have been retained as an expert for the defense in this litigation. A list of materials I reviewed while making this opinion is attached as Exhibit A.

### Summary of Opinions

1. Multi-occupant public facilities present a special class of public safety risks in connection with the activities of male sex offenders. These public safety risks are magnified substantially by the imposition of gender-identity based access policies or social norms ("GIBAPs") that purport to create access rights to showers, locker rooms, and restrooms based solely upon patrons' unverifiable self-declarations of their gender identities. It is not because transgender individuals use facilities that do not correspond with their biological sex that GIBAPs increase public safety risks, but rather because GIBAPs offer increased opportunities for improper and illegal conduct to both situational and preferential sex offenders.

2. By providing a clear objective criterion for who is legally entitled to use women-only facilities, Part I of North Carolina's HB2 makes it more difficult for male sex offenders to access female victims in public facilities without detection, and makes it more feasible for law enforcement personnel to report, investigate, and prosecute those offenses. Part I of HB2 also sends a clear message to society about what is unlawful in public facilities designated for women and girls and what kinds of activities should be reported to law enforcement officials.

coprophilia (feces), klismaphilia (enemas), urophilia (urine), infantilism (baby-related behaviors), hebephilia (acts involving female youth), and ephebophilia (acts involving male youth) and many others.

29. As previously noted, sexual behavior related to paraphilias sometimes results in what law enforcement refers to as "nuisance" (*i.e.,* high volume, low physical harm) sex offenses—but which can inflict psychological and emotional trauma on their victims. Many of these sex offenses take place in public areas where preferred and vulnerable victims are easily found. An issue in such sex offense investigations is often the possibility of progression to more serious offenses. Some nuisance sex offenders progress little over the years in their criminal sexual behavior. Some progress to more serious sex crimes and some move back and forth. In addition, depending on such things as social and economic status, some "nuisance" sex offenders might be more likely to resort to violence to avoid identification.

30. Such "nuisance" cases are usually given a low investigative priority and not solved because

- Most incidents are not reported to law enforcement.
- The sexual nature is often not recognized.
- When they are reported they are either not recorded or recorded in a way that makes retrieval difficult.
- Little, if any, manpower and resources are committed to the investigation.
- Law-enforcement agencies frequently do not communicate and cooperate with each other concerning these cases.
- The specific crimes often involve comparatively minor and hard to prove violations of the law.

Although these cases are often given a low investigative priority, they should be taken seriously, as they can inflict psychological and emotional damage upon their victims.

31. As mentioned, sexual activity involving things such as rubbing, peeping, exposure, urination, and defecation is bizarre and repulsive for most to contemplate and discuss. Many are not aware that such behavior could even be sexual in nature. Society struggles to pass laws to deal with behavior it is not prepared to admit goes on. It is hard to pass laws to define, enforce, track, and count such questionable and distasteful behavior. It is these types of sex offenses that are most likely to increase as a result of expanded access to previously gender-isolated public facilities, whether as a result of an express policy or GIBAP, or as a result of changing social norms.

32. The risk that allowing biological males into facilities reserved for women and girls is real, and is illustrated by behavior already engaged in by some male sex offenders in facilities reserved for men. In my career, I have been involved in cases in which male sex offenders:

- Went into male public restrooms with a video camera hidden in a bag to surreptitiously record partially dressed and urinating boys
- Arranged to meet male partners, including children, in the male public restroom to engage in sexual activity
- Went into male restrooms to get sexually aroused from the sound of males urinating

10

- ▪ Used "horseplay" in male locker rooms and showers as part of their grooming of male victims
- ▪ Touched and rubbed males napping at male athletic facilities
- ▪ Set up cameras in dressing rooms to record people changing clothing
- ▪ Stole women's or children's underwear from locker rooms
- ▪ Joined youth-serving organizations to use showers, restrooms, and sleeping arrangements to groom and sexually victimize boys
- ▪ Exposed their genitals for sexual gratification in male athletic facilities

33. Most of the above-described activity was learned not from reports of this activity to law enforcement, but from corroborative evidence seized from offenders during investigations into other criminal activity. If women's facilities become available to heterosexual males who merely claim or pretend to be transgender, I would reasonably expect similar sexual offenses to occur in those facilities as well.

**Normal but Immature Males**

34. Even ignoring sex offenders, we as a society have traditionally and typically separated people by sex in certain sensitive situations (e.g., rest rooms, dressing rooms, locker rooms, showers, and sleeping arrangements). These situations are clearly sensitive for many pubescent individuals and are the reason sex separation rules have traditionally been applied to Multi-Occupant Public Facilities. To help establish social customs and limit inappropriate behavior, application to young prepubescent children is also common.

35. These rules and social customs are not only because of potential deviant or criminal abuses, but also due to the "normal" sexual interest and attraction of the vast majority of society. For example, some adolescent high school boys or college males (who are not abnormal or sexual predators) might want to get into the girls' locker room. They may or may not realize that such activity is illegal, and they may or may not consider its effect on victims. The raging hormones and immaturity of young males drive the activity.

36. This interest is reflected in modern media. Movies particularly targeted at young males often have scenes focusing on males finding clever ways to observe females in various stages of undress in restrooms, locker rooms, and dorm rooms because these types of behaviors occur in real life. This is fiction based on reality. Co-educational schools, swimming pools, summer camps, and similar facilities have never been eager to gather or publicize data on the frequency with which such behavior is reported internally, but the phenomena are well known to those who operate such facilities and to those who have perpetrated or been victimized by such activity.

37. For these reasons, changes in access policies made to accommodate a very small minority of society ignore the reality of the sex drive of a very large majority. Allowing a man to use woman's rest room, locker room, dressing room, shower, or dormitory room simply because he says he *feels* like a woman would seem to be reckless, to ignore thousands of years of human experience, and to ignore potential criminal activity.

11

## Opinions

### 1. Sexual Offenses In and Around Multi-User Public Facilities Would Likely Increase as a Result of GIBAPs or Similar Social Customs

38. As someone with over forty years experience investigating, consulting about, studying, and teaching about sex crimes and sex offenders, I have been following the debate regarding revised access to Multi-occupant Public Facilities for some time.  I observed the polarizing emotion that dominated much of the discourse (discrimination/hate vs. enabling sexual predators) and the lack of clear and consistent definitions of terms.

39. I am aware that many advocates for new access guidelines based on gender identity argue that the claimed fear of GIBAP opponents--of male sexual predators now entering women's or girl's rest rooms--is absurd or blown out of proportion.  They sometimes follow up this argument with the claim no transgendered person has sexually assaulted someone in a restroom or changing facility.  But the problem with potential sex offenses is not crimes by transgendered persons.  The problem, rather, is offenses by males who are not really transgendered but who would exploit the entirely subjective provisions of a GIBAP—or even changed social norms about facility access-- to facilitate their sexual behavior or offenses.  A list of recent media-reported incidents of this nature is attached as Exhibit C.

40. As an example, the NY Times reported on 7/14/16 that a "transgender woman" was charged with secretly taking pictures of an 18-year-old woman changing in a Target fitting room.  The national retail chain had announced in April that it would allow customers to use the restroom or fitting room corresponding to their gender identity.  The suspect told a detective that he (or she) had made videos in the past of women undressing for the "same reason men go online to look at pornography."   This admission makes clear that the suspect acted for sexual gratification, thereby satisfying that element of a peeping sex crime.

41. Most of those dismissing the possibility of the access guidelines being exploited by sex offenders neither define "sexual assault" nor consider the wide diversity of sexual behavior engaged in by sex offenders.  Much of it is too repulsive to openly discuss.  They certainly do not want to hear graphic details of sexually motivated public lewdness, surreptitious filming, or listening to people urinate or defecate—even though these are all significant violations of the victims' privacy, at a minimum.

42. Those dismissing the possibility of GIBAPs being exploited by sex offenders also overlook the reality that many serious sex offenses are not committed in an overt and violent manner by individuals fitting common stereotypes.  Referring to all sex offenders as "sexually violent predators" fuels inaccurate stereotypes and denies the diversity of such offenders.  Looking for "evil sexual predators" can hinder recognizing many serious sex offenders.  Many such offenders seem to be nice guys because, in other respects, they are nice guys.

43. Although I cannot precisely quantify it, based on my more than 40 years of studying sex offender behavior, I know that males have for a long time repeatedly used male rest rooms and other similar facilities (*e.g.,* YMCA, athletic clubs) to sexually interact (contact & non-

contact behavior) with male partners and victims.  Since most male sex offenders against adults prefer female victims, the problem until now was somewhat limited and dealt with on a case-by-case basis.  A few male (non-transgendered) sex offenders have even dressed as females to facilitate their crimes.  I am aware of some unlucky few who were so identified.

44. The risk of these and other behaviors will be substantially higher if GIBAPs or similar social conventions are adopted.  In my opinion, allowing a man, based only on his claim to be transgendered woman, to have unlimited access to women's rest rooms, locker rooms, changing rooms, showers, etc. will make it easier for the type of sex offense behavior previously described to happen to more women and children.  Such access would create an additional risk for potential victims in a previously protected setting and a new defense for a wide variety of sexual victimization, especially so-called nuisance sex offenses related to compulsive paraphilic disorders.

45. One reason for this conclusion is the fact that some sex offenders take advantage of the types of behavior (e.g., adding, removing, changing clothing) that typically occur in Multi-Occupant Public Facilities.  Although sex separation in such Multi-Occupant Public Facilities often focuses on individuals who are pubescent, by definition, pedophiles are adults with a preference for prepubescent children.  Child molesters, in particular, often work toward situations in which the target child has to change clothing, spend the night, or both.  Such situations are described in my presentations and publications as "high-risk."  If the child molester achieves either of these two objectives, the success of the seduction is almost assured.  The objective of changing clothes can be accomplished by such ploys as squirting with the garden hose, turning up the heat in the house, exercising, taking a bath or shower, physical examination of the child, or swimming in a pool.

46. Such activity can be part of the grooming process to lower inhibitions as well as placing a focus on sexual activity.  By itself, grooming activity can sometimes also provide sexual gratification for the adult.  In addition, the goal of the grooming is not always to eventually engage in sexual intercourse with a child.  Some offenders are content with or even prefer other types of sexual activity (e.g., paraphilias).  Touching that might be foreplay (fondling) for most offenders can be the ultimate objective for some offenders (e.g., those with a preference for frotteurism).

47. As the term indicates, multi-user public facilities are *public*.  While violent sexual assaults are possible in such facilities, the ruse of falsely claiming to be a transgendered person would be less useful to a violent rapist attempting to escape prosecution.

48. GIBAPs are more likely to be exploited by sex offenders in order to act out their paraphilic disorders and by immature males who consider it fun to look at naked girls and women or to expose themselves to girls and women in these settings.  They will use the cover of gender-identity-based rules or conventions to engage in peeping, indecent exposure, and other offenses and behaviors in which the connection to sex is less obvious.

49. I recognize that many of the behaviors involved in so-called "nuisance" sex offenses may already be against the law but they are typically a low investigative priority and difficult to

13

identify and prove in court.  As they have been for over a hundred years, such crimes are now at least limited to some degree by restricted access to women and girls in certain vulnerable situations, especially bathroom, locker room and shower facilities.  The kinds of access now being demanded by those seeking to adopt GIBAPs or encourage similar social customs would, to some extent, decriminalize some of these crimes (*e.g.,* peeping indecent exposure, and lewd and lascivious conduct) by making it even harder to prove intent.  Sex offenders are often good at effectively using deception, trickery, and ruses to facilitate their sexual activity.

50. For example, the enactment of GIBAPs or the adoption of similar social customs makes it even more difficult to catch those who would otherwise be clearly violating laws prohibiting indecent exposure or peeping.  Under such policies, the very real victims of such conduct—women deliberately exposed to the male genitals of an exhibitionist, for example—would be forced to consider whether the exposure was merely the innocent or inadvertent act of a transgendered individual.  Moreover, because GIBAPs and similar social conventions link facility access to self-reported gender *identity*, a victim may be unwilling to report an exhibitionist appearing to be a male for fear of being accused of bigotry or gender identity discrimination.  As a result, reporting of public-facility sex crimes is likely to *decrease* as a result of GIBAPs and similar social conventions, even as the actual number of offenses *increases*.

51. I am already aware of male sex offenders who have dressed as women only to reduce suspicion when touching and rubbing against women in crowded public places for sexual gratification (*i.e.,* frotteurism).  In addition, as mentioned, some so-called "nuisance" sex offenders progress to more violent activity or become violent to avoid identification and discovery.  One problem in evaluating escalation of such sexual behavior is the fact that cases an investigator believes are the first, second, and third, may actually be the tenth, sixteenth, and twenty-second.

52. It is also my opinion that if these new guidelines and social customs become more widespread and well known, the risk of such sex offenses will increase.

### 2. Current Laws Will Have Limited Effect in Preventing This Increase

53. Current laws are not up to the task of preventing or prosecuting many of the sex offenses—especially so-called "nuisance" offenses—that will likely result from adoption of a GIDAP or even a similar social convention allowing biological men access to women's facilities.  For example, sex offenses that require proof of the defendant's intent can be difficult to investigate and prosecute.  As stated, in my experience, sex offenders charged with such offenses routinely admit committing the act, but deny that they had the requisite intent.

54. Moreover, sex offenses that require proof of intent are also often extremely difficult to detect.  Many victims of such crimes may not ever learn that a sex offender targeted them.  Or they may realize they have been targeted only later, after reflecting on a particular interaction with someone they encountered in a women-only facility.  And it is then that the victim may feel the emotional and psychological sensation of realizing that sexual privacy was violated.

14

## Exhibit C: List of Relevant Incidents

| Year (Press Report) | State/Province | City/County | Offender Name | Description | Source |
|---|---|---|---|---|---|
| 2016 | TX | Cedar Park | Roel Anthony Vasquez | Indecent exposure to child in Target store (appears to have been in men's room) | Austin American Statesman |
| 2016 | WA | Seattle | Unknown | Just after NDO goes into effect, man uses women's locker room at public pool | NY Daily News; King 5 News |
| 2016 | VA | Prince William County | Richard Rodriguez | Man dressed as woman arrested for filming women at Potomac Mills Mall | NBC Washington |
| 2016 | TN | Smyrna | William Ted Davis | Man arrested for filming in women's restroom at public park/softball complex | WKRN |

| 2016 | CA | Fullerton | Jihwhoo Ahn | Man arrested for placing cell phone to record video in women's restroom on University campus | Orange County Register |
|------|----|-----------|-------------|-------------------------------------------------------------------------------------------------|------------------------|
| 2016 | CA | San Jose | Andrew Donahue | Man arrested for recording others in his bathroom | Mercury News |
| 2016 | NJ | Pitman | Thomas Guzzi, Jr. | Man nabbed in child pornography ring sting operation also placed tablet computer in theater rehearsal space restroom | Courier-Post |
| 2016 | WA | Colfax | Michael A. Novak | Man arrested for filming women in bathrooms in his home, their homes | KHQ |
| 2016 | FL | Miami | Hajime Maruyana | Restaurant manager arrested for installing camera in women's restroom. | WPLG |

| | | | | | |
|---|---|---|---|---|---|
| 2016 | OH | Perrysburg | Undisclosed | Junior high boy tapes junior high girl in school restroom; distributes video to others | [Cleveland Plain Dealer](#) |
| 2016 | MD | Prince Georges County | Deonte Carraway | Volunteer teacher and choir leader directed children in sexually explicit videos filmed in school bathroom | [WPGC](#) |
| 2016 | FL | Wilton Manors | Marek Amann | Man tapes women using his restroom | [Local10 (ABC affiliate)](#) |
| 2016 | IN | Martinsville | Justin Carl Behnke | Former Chili's manager charded with videotaping 8 women changing clothes/using restroom | [WBIW](#) |
| 2016 | OK | Logan County | James Curt Rose | Man videotapes 13-year-old taking a shower with cell phone (saw lens poking out through a sleeve that was hanging in bathroom) | [KFOR](#) |

| 2016 | IA | Iowa City | Undisclosed | Police locate "person of interest" in connection with man videotaping woman while showering in residence hall | KCRG |
|------|-----|-----------|-------------|-----------------------------------------------------------------------------------------------------|------|
| 2016 | PA | Lancaster | James Thomas Shoemaker | Man arrested after being caught hiding in stall of women's bathroom, taking photos of young girls | WGAL |
| 2016 | ID | Ammon | Sean/Shauna Smith | Man dressed as woman accused of taking photos of women undressing in Target changing room | East Idaho News |
| 2016 | CT | Stamford | Isaiah Johnson | Transvestite Johnson and two other transvestites arrested for luring special needs teen into bathroom and sexually assaulting him | The Hour |
| 2016 | NY | Huntington | Jose Rivas | Dishwasher places cellphone camera in employee restroom | Bryan-College Station Eagle |

| 2016 | LA | Baton Rouge | Michael Lee Jackson | Man arrested for placing mirror and cell phone under stall in women's restroom. | The Advocate |
| 2016 | IL | Alton | Matthew Banks | Man arrested for photographing woman up her dress and watching group of children at swimming class (already registered sex offender) | KSDK |
| 2015 | NJ | Lyndhurst | Mitchell Morreale | Former fire captain/youth football coach videotaped girls as they used his restroom during pool party | The Record |

| 2015 | AL | Marshall County | David Barrow | Former girls' soccer coach pled guilty to human trafficking and producing pornography with minors.  Used hidden cameras in locker room and restroom. | WAFF |
|------|-----|-----------------|--------------|-----------------------------------------------------------------------------------------------------------------------------------------------------|------|
| 2015 | CA | Brea | Melcher Carillo Alvarado | Man arrested for placing hidden camera in Starbucks unisex bathroom | NBC Los Angeles |
| 2015 | Ont. | Toronto | Unknown | Two separate incidents of voyeurism in gender neutral restrooms cause U of T to retreat from hardline gender neutrality | The Varsity |
| 2015 | CA | La Habra | Unknown | Camera found in Del Taco restaurant restroom | NBC Los Angeles |

| 2015 | NY | New York | Sean Shaynak | Crossdressing high school teacher charged with preying on 6 female students. | NY Daily News |
|------|-----|----------|--------------|-------------------------------------------------------------------------------|---------------|
| 2014 | CA | Clairemont | Gregory Philip Schwartz | Schwartz dressed in a Barbie costume before entering a women's restroom and attempting to rape a female occupant. | NBC San Diego |
| 2014 | PA | Halifax Township | Austin Christopher Wikels | Crossdresser accused of taking part in luring woman to hotel room and taking part in group sexual assault | Pennlive |
| 2014 | AK | Anchorage | Travis Felder | Crossdressing man charged with sexual and other assault, burglary, etc. | ADN.com |

| 2013 | CA | Palmdale | Jason Pomare | Man dressed as woman arrested for filming women in Antelope Valley Mall Macy's restroom | NBC Los Angeles |
| 2013 | CA | San Bernadino County | Rodney Kenneth Petersen | Man dressed as woman arrested after attempting to take cell phone photos of women in women's-only areas of college campuses | LA Times |
| 2013 | OK | Oklahoma City | Christopher Todd Gard | Man wearing only women's panties assaulted 8-year-old girl inside convenience store bathroom | News9 |
| 2013 | AR | Bergman | Carl Dahn | Man arrested for child pornography and internet stalking of child wearing women's clothing when police arrive | Harrison Daily |

| 2013 | MI | Onsted | Sean Gossman | Crossdresser appears in court to face child pornography charges dressed as woman | [ClickOnDetroit](ClickOnDetroit) |
|------|----|--------|--------------|-----------------------------------------------------------------------------------|--------------|
| 2013 | OR | Portland | Michael Leroy Moore | Crossdresser accused of placing sexually explicit ad about little girl on Craigslist | [Oregon Live](Oregon Live) |
| 2013 | VA | Falls Church | Carlos Guillermo Suarez Diaz | Man dressed as woman sexually assaulted 17-year old girl | [Washington Post](Washington Post) |
| 2013 | FL | Fort Myers | John Maatsch | Married man with master's degree and good job attacks woman in apartment, stabbing her three times.  Later returns to scene dressed in women's clothing (plea deal for 15 year sentence) | [nbc-2.com](nbc-2.com) |

| 2013 | Ont. | Toronto | Darren Cottrelle | Man dressed as woman arrested for using mirror to peer under bathroom stall | Toronto Star |
|---|---|---|---|---|---|
| 2012 | Ont. | Toronto | Christopher Hambrook | Man claiming to be transgendered assaulted two women at shelters | Toronto Sun |
| 2012 | WA | Everett | Taylor J. Buehler | Man in bra and wig found in women's restroom; later admitted to officers he was suspect in earlier voyeurism incident at Everett Community College | Seattle Post-Intelligencer |
| 2012 | WA | Olympia | Undisclosed | 45-year-old transgender college student with male genitalia exposes self in women's locker room and sauna | ABC |

| 2012 | OH | Lisbon | Aaron L. LaGrand | Crossdressing man gained trust of Ohio family, then molested children | Review Online |
|------|----|--------|-------------------|--------------------------------------------------------------------------|---------------|
| 2012 | CA | Thousand Oaks | Unknown | Man dressed as woman approaches children playing; exposes self to them. | CBS Los Angeles |
| 2011 | OR | Milwaukie | Thomas Lee Benson | Convicted sex offender dressed as woman went into women's locker room at public pool and talked to several children before being chased down | Oregon Live |
| 2011 | CA | La Mesa | Unknown | Middle-aged man dressed as woman enters women's restroom asking to shake hands with women | Patch.com |

| 2011 | CA | Sacramento | Renell Thorp | Crossdressing man arrested for rape after home invasion | CBS Local Sacramento |
| 2010 | CA | Berkeley | Gregorio Hernandez | Man dressed as woman to access Berkeley locker room, used cell phone to photgraph women | Boston.com |
| 2010 | GA | Duluth | Donnie Lee | Crossdressing man arrested for looking into apartment windows; second arrest | WSBTV |
| 2010 | GA | Calhoun | Norwood Smith Burnes | Man dressed as woman in Wal-Mart arrested for taking clothes off in front of children | Northwest Georgia News |

| 2010 | CO | Boulder | Wesley Francis Cox | Serial sex offender admits to "decades" of offenses including photographing teenagers, videotaping couples having sex and stealing women's panties | Daily Camera |
| 2009 | CA | San Jose | Richard Rendler | Man dressed as woman arrested for wearing fake breasts and wig while loitering in women's restroom. Previously arrested on child molestation and indecent exposure charges | Mercury News |
| 2009 | AR | North Little Rock | Scotty Vest | Man dressed as woman masturbates in public, attempts to lure 10 and 12 year old girls into restroom | Fox16 |

| | | | | | |
|---|---|---|---|---|---|
| 2009 | OK | Oklahoma City | Philip John Ortega | Crossdressing man exposes himself to woman on street | News9.com |
| 2008 | IN | West Lafayette | Unknown | Man dressed as woman takes photos in women's restroom on Purdue campus (flip phone camera under stall door | Purdue University News |
| 2004 | PA | Greensburg | Robert Domasky | Man dressed as cheerleader enters girls locker room at high school | Tribune-Review |

# Exhibit K

*Carcaño v. McCrory,* U.S. District Court for the Middle District of North Carolina,

No. 1:16-cv-00236-TDS-JEP, ECF No. 149-15

EXHIBIT N

# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOAQUIN CARCANO; PAYTON GREY
MCGARRY; H.S., by her next friend and
mother, KATHRYN SCHAFER; ANGELA
GILMIORE; KELLY TRENT; BEVERLY
NEWELL; and AMERICAN CIVIL
LIBERTIES UNION OF NORTH
CAROLINA,

No. 1:16-cv-00236-TDS-JEP

    *Plaintiffs,*

  v.

PATRICK MCCRORY, in his official
capacity as Governor of North Carolina;
UNIVERSITY OF NORTH CAROLINA;
BOARD OF GOVERNORS OF THE
UNIVERSITY OF NORTH CAROLINA;
and W. LOUIS BISSETTE, JR., in his
official capacity as Chairman of the Board
of Governors of the University of North
Carolina,

    *Defendants.*

## EXPERT OPINION OF SHERIFF TIM HUTCHISON (RETIRED)

### Introduction

I have been retained as an expert for the defense in this litigation to provide opinions relating to
the public safety and privacy effects of what defendants describe as "GIBAPs"—"gender-
identity"-based access policies for public facilities—and regarding the public safety and privacy
implications of the North Carolina General Assembly's response to GIBAPs in H.B.2. I have
enclosed my Curriculum Vitae (attached as Exhibit A) as well. That document details my

1

8.  The Department of Justice demanded that North Carolina ensure that transgender persons were entitled to use multiple occupancy bathrooms and changing facilities based on their "gender identity," and threatened to take enforcement action against North Carolina if the state refused to comply.

9.  The United States Department of Justice and private plaintiffs working with the ACLU filed separate federal lawsuits against North Carolina officials and institutions. The plaintiffs claim that H.B.2 intentionally discriminates against the transgendered.

10.  I have reviewed the Complaints in both the ACLU and DOJ cases and am aware that the plaintiffs claim that "gender identity" (which they define as someone's "internal sense" of what gender they are) should be the only thing that matters in determining who can use which public facilities (restrooms, changing rooms, locker rooms, etc.). I am also aware that the U.S. Department of Education and Department of Justice have recently issued guidelines for schools receiving public funds in which they make the same argument.

## OPINIONS AND BASIS FOR OPINIONS

My opinion is based upon the 17 years I spent as the Chief Law Enforcement Officer in Knox County, Tennessee, and upon my experience as the primary public safety policy maker for the county while in that position. It is also based upon on my 33 total years of experience as a Certified Policeman, and on the law enforcement and public safety training I received during my law enforcement career. In addition, I have personally been on the scene of sexual assaults and have personally arrested and helped prosecute male sex offenders, and those experiences have helped develop my opinions as well.

I have also considered various materials in forming my opinions, including the Complaints in the captioned cases and several other documents. All material I considered in forming my opinions is listed in Exhibit B and is attached as an appendix to this report.

I have formed the following opinions regarding the public safety effects of policies like the Charlotte Ordinance and the DOJ/DOE guidance, and the passage of North Carolina General Assembly House Bill 2 on March 23, 2016:

A. **Gender-Identity-Based Access Policies (GIBAPs) Pose a Genuine and Serious Public Safety and Privacy Threat**

1.  H.B. 2 was made necessary when the City of Charlotte passed its "gender identity" ordinance ("GIBAP"). Public restrooms are crime attractors, and have long been well-known as areas in which offenders seek out victims in a planned and deliberate

6

way. Access policies to restrooms based on "gender identity" create real and significant public safety and privacy risks, especially in women's and children's restrooms/dressing rooms. These incidents are already occurring.  For example, shortly after Target Corporation announced that it would adopt a GIBAP for its stores, two men were caught filming women in the women's dressing rooms. These criminal acts were committed in two different states, North Dakota and New Hampshire,

2.  Specifically, GIBAPs increase the risk of the full range of sex offenses in and near public facilities, from relatively minor offenses like peeping and indecent exposure to major offenses like forcible rape.

3.  The Charlotte Ordinance and other similar GIBAPs (like the recently-announced DOJ and DOE access policy for schools) consider only one side of the equation. But by focusing completely on the transgendered, they totally ignore the safety and privacy risks these policies inevitably create. The Charlotte Ordinance and other GIBAPs provide fertile ground for those individuals already seeking ways to commit abuses against women and children. For example, on July 13, 2016, police arrested a man who identified as a transgender woman, after he was discovered taking pictures of women changing clothes in a Target dressing room in Idaho.

4.  Anyone with responsibility for setting public safety policy has to consider all sides of every public safety problem.  For example, as Sheriff, I was constantly having to balance the jail population under crowded conditions while creating a safe environment for the citizens.  People pushing for the adoption of GIBAPs are downplaying or dismissing serious and legitimate public safety concerns because they do not see (or maybe do not want to see) the problem.

5.  Once you see all sides of the problem in this case, a law like H.B.2 makes perfect sense from a law enforcement and public safety perspective.

6.  The North Carolina Sheriffs Association agrees.  Just before the General Assembly passed H.B.2, the NCSA Executive Committee issued a unanimous statement indicating that they "support legislation that would overturn local ordinances that allow persons of one gender to use the restroom of the other gender."

7

**B. Transgender Individuals Are Not the Source of This Threat**

7. The risks of GIBAPs do not come from transgender use of public facilities that do not line up with birth certificates. Rather, non-transgender male sex offenders who prefer female victims will use GIBAPs to obtain better access to their victims for different types of sex crimes.

8. In my experience, male sex offenders will take every opportunity they can to gratify their desires. They manipulate and abuse existing rules to gain access to their victims, and to keep their activities from being discovered whenever possible. Rape survivor Kaeley Triller captures the essence of my experiences and expectations perfectly: "They can't be serious. Let me be clear: I am not saying that transgender people are predators. Not by a long shot. What I am saying is that there are countless deviant men in this world who pretend to be transgender as a means of gaining access to the people they want to exploit, namely women and children". She further writes: "Don't they know that one in every four little girls will be sexually abused during childhood, and that's without giving predator's free access to them while in the shower?" Kaeley Triller, "A Rape Survivor Speaks Out About Transgender Bathrooms," *The Federalist*, November 23, 2015.

**C. GIBAPs Threaten Public Safety Because They Embolden Non-Transgender Male Sex Offenders Attracted to Women and Children**

9. Under GIBAPs like the Charlotte Ordinance (or like the DOJ/DOE policy in many educational settings), pedophiles, sex offenders and voyeurs would now have a free "ticket" to enter spaces that should be private and safe.

10. They would no longer fear the local laws that currently help keep them out of women's public facilities.

**D. GIBAPs Will Increase Sex Offenses Ranging from "Nuisance" Offenses to Violent Sexual Assault**

11. By some conservative estimates, 96% of single-victim assaults are committed by males. And the overwhelming majority of male sex offenders prefer female victims.

12. Women and girls using public facilities are often in a vulnerable location and position. These areas are already a target for sex crime predators.

13. "Gender-identity"-based access policies would allow non-transgender men, who are now forbidden by law to go into a women's restroom, to walk in and commit sex offenses without being as concerned about being confronted or arrested because of their apparent self-identified gender. There are numerous publicly-reported examples of that

8

happening in jurisdictions and facilities with GIBAPs in place.  A partial list of such incidents is attached to this report as Exhibit B, but it is just the tip of the iceberg.

14. Sex offenders have to be good liars in order to avoid punishment, and they always have an excuse to explain what they are doing and why they are where they should not be.

15. My experience and training have taught me that many sex offenders start by peeping, stealing female under clothing, and other similar low-level offenses. But some start graduating to more serious sexual crimes and many move on to actual rape if they are not stopped early.

16. I have personally worked on complaints where an individual begins with lower-level sex crimes and escalates to rape/sexual assault over a period of a few years. For example, while I was a patrol officer, I started receiving multiple calls about a "peeping Tom" in a subdivision. We caught this individual numerous times. Then we started getting calls of exhibition by the same person, then eventually received rape complaints. This escalation of crime and increase in sexual assault violations took place over about a 3-year period. He was convicted and is still in prison. This person would target many of these people around women's restroom/changing rooms, but even he was afraid of trespassing by going in those public facilities for fear of being caught.

17. Sadly, even if caught early, many offenders still will move up to actual rape, in my experience.

18. Like most criminals, sex offenders know that U.S. jails and prison systems are at or over capacity. As a result, sex offenders face less deterrence that they otherwise would face, since they know that, for the most part, they will not spend a day behind bars for anything other than a serious offense.

19. As crowding in correctional facilities creates an atmosphere of them not likely to be jailed for most offenses, it minimizes current laws that keep them from trying to gain entrance into women's restroom and locker rooms.

20. Incentives for offending are also increasing along with improvements in technology. Small, easily hidden handheld electronic devices like smartphones have excellent cameras and video capture capabilities.  The images captured by a sex offender on a modern smartphone are extremely high-quality, and can be uploaded to the internet almost instantly.  This increases sex offenders' interest in accessing women's facilities.

21. These technological advances also increase the amount of potential harm GIBAPs cause women and children, both short term and long term.

22. With a GIBAP in place it opens the door to male sex offenders by handing them a target rich environment.

9

### E. Contentions that GIBAPs Have No Effect on Sex Offenses Are Highly Speculative and Almost Certainly Incorrect

23. Some law enforcement personnel have claimed that the adoption of a GIBAP in their jurisdiction had no effect on the underlying rate of sex offenses. This is highly speculative and almost certainly untrue. In 2006 there were 300,000 college women raped. Among College women only 12% of rapes were reported to law enforcement.

24. According to the federal government's own statistics, only about 30% of sex crimes are reported overall. And many of those that *are* reported are serious sexual assaults. The reporting rate for so-called "nuisance offenses" (which are certainly not nuisances to the victims) is almost certainly even lower.

25. Many women do not report sex crimes for fear of being labeled in some way, because of the hassle of dealing with the court system, and/or because they do not want to testify publicly while having to face the sex offender again (even in the safety of the courtroom).

26. With a GIBAP in effect, sex crimes would increase, but an even larger percentage of those crimes would go unreported. In fact, children often delay reporting of sexual abuse until adulthood.

27. The decrease in reporting would not just be because victims and bystanders would be less certain that a violation had occurred. Most women are already afraid to report suspected crime or suspicious activity if they think that people will label them for making a report.

28. Even without formal GIBAPs in place, changing social norms have made people much less certain about gender issues, and more reluctant to report behavior that seems suspicious, like seeing a man in a women's facility. While it is good that society is becoming more accepting of different people, the fear of being accused of bigotry creates a public safety risk.

29. Non-transgender male sex offenders take advantage of every opportunity to increase their chances of successfully committing an offense. With a formal GIBAP in place, people will be even more worried about being accused of bias or bigotry if they report an offense.

30. Many of the offenses that are committed, including many that police do investigate—never result in charges being filed.

31. In some jurisdictions, if law enforcement doesn't charge an individual on a sex offense, they don't record it as a crime occurring. This further skews the reported statistics.

32. Some jurisdictions do not report crimes in their statistics if they are not solvable.

33. Though many women and young children would choose to leave a facility without reporting a sex offense, the scars from the crime would live on forever with these victims.

34. All of this explains in part why jurisdictions that have implemented GIBAPs might not see an increase in reported offenses.

35. Jurisdictions and organizations that have implemented GIBAPs also sometimes have incentives to understate their sex crime statistics, and will make reporting decisions designed to minimize the appearance of a sex offense problem.  For example, colleges and universities interested in recruiting women for diversity purposes have an incentive to avoid reporting sex offenses whenever possible. In addition, if too many offenses are reported, enrollment would go down from parents not letting their daughters attend there.

36. Municipalities in which the police chief is an employee of an elected mayor may also underreport offenses, especially if accurate reporting would not line up with the mayor's politics.

**F.  Current Laws Are Inadequate to Prevent Abuse of GIBAPs by Non-Transgender Male Sex Offenders**

37. In a world without GIBAPs, existing trespassing, indecent exposure, peeping and other laws deter at least some non-transgender male sex offenders (but not all) from entering women's facilities to commit offenses. It is really the only deterrent standing between the offenders entering the women's public facilities or not.

38. Some people who favor the adoption of GIBAPs claim that existing laws prohibiting trespassing, indecent exposure, peeping, and other sex offenses will keep problems from happening.  That just isn't true.  If someone could enter a public facility based entirely upon their "internal sense of gender," then law enforcement personnel, bystanders, and potential victims would have to be able to read minds in order to determine whether a man entering a women's facility was really transgender or was instead there to commit a sex offense.

39. To prove trespassing, you generally have to prove that the offender intentionally entered an area without permission.  To prove trespassing based upon someone's presence in a public facility of the opposite sex, you have to prove that they were in fact the wrong sex, such that the signage outside the facility served as a "no trespassing" sign for that person.  With a GIBAP in place, this becomes almost impossible to do, because the non-transgender male sex offender would simply have to claim that his "gender identity" was female to make successful prosecution difficult if not practically impossible.

40. And successful prosecution isn't the only problem.  Another huge problem is that with a GIBAP in place, offenders aren't as likely to be observed by or reported to police in

11

the first place. Bystanders, victims, and even police will not have any reliable way of determining whether someone who appears to be male has a right to be in a female-only facility—even someone dressed in men's clothing can claim a female "gender identity."

41. The same is true for laws like peeping and indecent exposure. With a GIBAP in place, bystanders and victims will be less certain that offenders were actually getting sexual gratification from their acts. Is a biological male who displays his private parts to a woman while coming out of a women's restroom stall a flasher or transgendered? What about the biological male whose eyes wander while in a women's locker room?

42. Because the laws prohibiting indecent exposure and peeping also require proof of intent, it gets much harder to prove violations when a jurisdiction has adopted a GIBAP. And it gets much harder for victims and bystanders to be certain that an offense has been committed, and that their privacy has been violated.

43. While I was Sheriff, I saw an increasing number of sex crimes, and an increasing need for resources dedicated to sex crime investigations and sex offender monitoring. I started a Sex Crimes Task Force unit dedicating investigators assigned to that unit full time. Most agencies assign an investigator to sex crimes as a crime occurs and do not have those investigators working on that problem full time. They also carry a workload of other crime investigations.   In the countless jurisdictions without the resources or political ability to create a dedicated sex crimes unit, sex offenses of all types will remain even more difficult to detect, prosecute, punish, and deter.  This would make the problems caused by a GIBAP even worse.

## G.  H.B.2 Was a Reasonable and Important Public Safety Response

44. Laws like North Carolina H.B.2 are a reasonable and much needed response to the public safety issues created by policies like Charlotte's ordinance and the DOJ and DOE guidance letters.

45. These laws create an objective baseline for facility access, as opposed to GIBAPs, which instead require law enforcement officers, potential victims, and bystanders to be mind-readers.

46. Consistent and clear definitions are extremely important to effective law enforcement. It is very important for law enforcement to have a clear definition of when someone who was born a biological male should be treated as a female. H.B.2 helps law enforcement and others who might be responsible for securing safe environment by creating an objective standard.

12

# Exhibit Q

*Available at*

https://medium.com/@camradfems/there-is-nothing-progressive-about-removing-women-only-bathrooms-37729064cfb7

Case 3:24-cv-00563-TAD-KDM   Document 18-29   Filed 05/13/24   Page 33 of 44 PageID #: 1423



Cambridge Radical Feminist Network



Jan 13, 2019

·

13 min read

# There is nothing progressive about removing women-only bathrooms

The importance of giving women a space in which they have privacy and freedom from the risk of sexual violence has, over recent years, been overtaken by a new political narrative: 'gender neutrality'. Arising broadly from (or at least gaining traction due to) a liberal commitment to formal equality, this narrative has shunted feminist concerns over women's dignity and safety, so much so that the Conservative Party — which previously committed to the abolition of mixed-sex wards following a series of highly publicised sexual assaults against women — has felt comfortable in apparently abandoning this promise entirely. Meanwhile, supposedly progressive circles on Twitter are re-tweeting comments like this, suggesting that women's concerns are a product of silliness, hysteria and paranoia:

On multiple fronts, feminists are finding themselves having to re-litigate battles that previously might have been thought done and dusted, many of which will no doubt be the subject of future blog posts. Here, we will lay out the feminist case for women-only bathrooms.

The risk of sexual assault

As most of us as now aware, the majority of sexual assaults are carried out in a private space by someone the victim knows. Unfortunately, enough assaults against women and girls are indeed carried out in public that women both have reason to fear them and do take precautions against them. A recent report by the House of Commons Women and Equalities Committee on sexual harassment and sexual violence in schools found that it is endemic in public schools, and often considered — by both students and teachers — as simply a part of daily life. Almost a third of 16–18 year old girls have reported having experienced unwanted sexual touching at school, and far more so had been victims of or witnesses to verbal sexual slurs and harassment.

Is a single-sex bathroom or changing room sufficient to guard against a man or boy who wants to physically assault a girl in such a facility? One common refrain heard against women expressing concern about gender neutral toilets is: if a man was determined to rape you, he isn't going to care about whether the bathroom is female only or not. But, the numbers say otherwise.

Just under 90% of sexual assault complaints in public changing rooms took place in unisex facilities [1]. One obvious conclusion to be drawn from this is that single-sex spaces at the very least provide a reduction of opportunity for would-be predators. If we see someone in a bathroom who shouldn't be there, for example, security can be alerted without first having to wait for an assault to take place.

Such arguments have resurfaced over recent days after a female patient who had been in a persistent vegetative state for ten years suddenly gave birth in her hospital bed. The facility in that case has now reportedly implemented a new policy under which male staff are no longer allowed in female patients' rooms unless they are accompanied by a female staff member. Similar opportunistic abuse has also been seen, for example, at the University of Toronto in September 2015, after two reported instances of voyeurism in a single week resulted in the University reducing its gender neutral bathroom provision. This is the state of the world in which women still live: women in positions of vulnerability are seen as targets by predatory men.

Finally, leaving aside the risk of assault, sex-segregated bathrooms give women the peace of mind of knowing they can use the bathroom, attend to their menstrual needs and to small children, with a degree of privacy and dignity that would otherwise not exist.

Architecture and structural issues: what toilets are we discussing?

Women face an issue of unequal bathroom provision versus men generally. While architects generally allocate equal space for male and female bathrooms, women — for reasons of biology, child-care responsibilities, and clothing — will need to use them both more frequently and for longer; and fewer stalls than urinals can be fitted into the same square footage.

These issues have sometimes been a result of old design — women were previously not part of public life to anywhere near the same degree, and thus buildings did not have to include equal toilet provision — and sometimes a result of male architectures not taking into account women's different usage of bathrooms.[2] This is also partly an issue of space. A greater number of urinals can be fitted into a given area than stalls. It has not gone without notice, therefore, that many 'gender neutral bathrooms' are effectively taking the place of women's bathrooms, not men's, because women will not use the urinals.

The de facto result in any event is a smaller toilet provision for women, with both men and women using women's facilities without women having the ability to use men's facilities. Indeed, men are able to use both stalls and urinals — and with no increased risk of assault.

Luc Bovens and Alexandru Marcoci have written that if *all* bathrooms were to be made gender neutral — and not only the women's — *and* if urinals were removed and replaced with stalls, then waiting times for all would be equalised. That would absolutely be an improvement upon the sexist implementation of gender-neutral toilets in places such as the Barbican.[3] But the 'stalls' question raises its own issues.

One difficulty with this debate is that participants can have very different things in mind. Some people, when imagining 'gender neutral bathrooms' imagine enclosed, lockable rooms, similar to the way in which disabled toilets are often organised — an extra addition to standard male-female stalls. This is what now a handful of US States have mandated — that single-occupancy bathrooms be converted to gender-neutral facilities. Where enclosed bathrooms are the *only* facilities available, one assumes that this could somewhat protect against the risk of immediate sexual violence — though not only does this not address the unequal need by men and women of those facilities, it also fails to address the growing epidemic of crimes such as those that women in South Korea have marched against (discussed below): voyeurism by spy camera. In fact, an enclosed bathroom would likely be the absolute ideal place for such an offender to work.

Nonetheless, enclosed stalls are often inevitably the only available facilities in certain locations for reasons of space and expense, such as restaurants, small to medium cafes, and petrol stations. But such locations are very different environments for women compared to — say — shopping centres, town centres and parks, not to mention pubs and nightclubs. A bathroom in a small cafe is unlikely to have heavy foot traffic, while almost always having bystanders in close proximity (other customers and staff). A shopping centre bathroom, by contrast, is publicly accessible, and may frequently lack bystanders and security throughout the day. Despite this, shopping centres (and town centres, parks, pubs and nightclubs, the latter two posing the addition risk of having inebriated clientele) likely utilise not enclosed bathrooms, but *stalls*. It is such facilities which pose a particularly high risk for women. The University of Toronto's experience of gender neutral toilets mentioned above is a case in point. However, by simply searching 'bathroom voyeurism' on any search engine, the full scale and frequency of the problem becomes clear. [4]

The impact upon women is compounded for those individuals who — due to having a history of sexual assault, or for religious reasons — do not feel comfortable using a shared intimate space with male strangers. The result is that these groups of women are themselves less able to engage in public life.

If gender neutral toilets are implemented, it should therefore only be in a similar manner to disabled toilets — as an *option* for those who feel the need to use it, without removal of sex-segregated toilets for women generally. If an additional enclosed room is not possible, then it is the men's facilities which should be converted *only*, not the women's.

## Inconsistent narratives for home and abroad

Curiously, the need for women's toilets is often freely recognised in regards to countries other than one's own. Amnesty International has called sex-segregated toilets a human rights issue in respect of women housed in refugee facilities, who are leered at, verbally and sexually abused by the men — including security staff — in European camps. [5] In India, inadequate access to private bathrooms for women is similarly regarded. Indian women face the single greatest risk of rape and sexual abuse outside the home when they are forced to go out to use the toilet at night. Women will avoid drinking water, even during heatwaves, out of fear they will need to urinate, because predatory men use the opportunity to assault women in a position of vulnerability. 30,000 women in South Korea marched in June to protest against the epidemic of spy camera technology being used by predatory men to create "molka" porn — an increasingly popular genre involving the filming of women without their consent.

In certain developing countries, the UN Special Rapporteur on the human right to safe drinking water and sanitation has reported that the absence of sex-segregated bathroom facilities constitutes one of the 'primary barriers preventing young girls from claiming their right to education'[6]. An absence of privacy for girls in dealing with menstruation can be a major factor in determining whether those girls stay in school or drop out entirely. Beyond the toilet issue, there are famous examples of sex-segregated facilities that Western media still (so far) passively accepts as a necessary fact of life in patriarchal societies. From 2000 and 2010, Women in Tokyo and New Delhi (amongst numerous other cities throughout the world) have had the option of taking women-only carriages to protect them from the risk of sexual assault when travelling.

In regards to the assertion that 'if men want to sneak into women's bathrooms, they already can', one doubts whether this would be dared against those women who support the above initiatives. The rebuttal is so obvious — in a sex-segregated space, the women do not have to wait until the man has already assaulted her before she can fetch security — that one has reason to doubt whether the criticism is honestly made. Sex offenders thrive on opportunity. Not only do the numbers (mentioned earlier) not lie, but proponents of liberalising bathroom regulations occasionally let the cat out of the bag with regards to their own motivations. A certain Canadian activist[8] had social media conversations leaked in which he mused about whether he could help a 10 year old girl put in a tampon, and asked whether women in changing rooms have their "vaginas and tits" out. Those who claim, like Paris Lees, that women's fear of sexual predators is 'all in the mind', rather than borne from a life-time of living as a woman in a patriarchal society, would do well to read the news more often.

Inconsistent narratives with mixed-sex wards

It is interesting also to compare gender-neutral bathrooms with the issue of mixed-sexed hospital wards. In the UK, the issue of sex-segregated wards has long been regarded as a matter of securing the safety and dignity of female patients. It is worth noting however that it has not *always* been the case. Louise Hide, examining mixed-sex wards in psychiatric hospitals between 1950 and 1990 found that hospitals allowed mixing for male patients' benefit, and ignored the reality of sexual abuse until the rise

of feminist and patient activism from the 1960s onwards . <u>Mixed-sex wards were condemned by a judge in 2008 after a 81 year old woman was subjected to a horrifying sexual assault by the man in the bed next to her</u>[7], and were formally banned in 2010 (although today, ironically, <u>their prevalence remains higher than ever</u>, thanks to a consistent shortage of beds across an underfunded NHS). Reported sexual assaults in hospital wards rose 17% between 2010–11 and 2016–17, and health charities such as Rethink Mental Illness have in response <u>reiterated the importance of eliminating mixed wards</u>.

It is curious, therefore, that when the issue of bathrooms is raised by feminist campaigners in the UK, even by sexual assault survivors themselves, it is dismissed as a matter of female hysteria, or as Lees called it, "panicking about imaginary fears". Another popular response is to ask whether these silly women have a gender neutral bathroom in their own homes, like the tweet quoted in the introduction. Of course, this involves brushing over the glaringly obvious fact that the bathrooms in our own homes are used exclusively by our family and invited guests. Not random, unknown members of the public. As the Conservatives have faced criticism over their abandonment of the single-sex ward policy by rival parties, one wonders whether the left's growing impatience with single-sex spaces might present them with something of an opportunity. <u>As Catherine Bennett has asked</u>: "What if [then Health Secretary] Hunt reimagined his privacy-free wards, washrooms and lavatories, as not so much a system in collapse as a success for the concerned, gender aware progressives who used to be called the Tory party?"

Why the inconsistency?

I suspect a significant reason is simply the fact that it is far easier for Westerners to accept that sex inequality is an issue for *other* countries. It is far easier for one to suppose that the largely theoretical group of women who live 'overseas' might base criticisms of their own country on good sense and lived experience, than it is for many to suppose that women in one's immediate vicinity (and white, especially Anglosphere countries we see as being 'like us') who express concern about the risk of sexual assault *they too* face might actually have a point.[9] When a woman's criticisms hit too close to home, they risk challenging the listener's *own* impression of the state of the world. Worse still, they challenge the prevailing power structure that situates predominantly

white male violence as an 'overblown', 'lied about' problem, and one which — to the extent it *is* admitted — is one that women must put up with and shut up about. The emotional damage caused to the male half of society by women saying 'no' is simply too great. The debate surrounding gender neutral toilets follows this dynamic closely. Women's fear of violence is inherently suspect, automatically doubted, and women's insistence upon their boundaries is recast as 'cruelty'.

Then again, if the above is all true, how can it be that so many people accusing women of engaging in a 'moral panic' claim themselves to be fighting for a 'progressive' cause?

The other contributing aspect is the increasing tendency of popular progressive narratives to start with a set of 'socially acceptable conclusions', and work backwards, ignoring any and all facts that don't fit the correct narrative — even resorting to misogynist tropes in order to do so. While feminists of previous generations might have begun with an undesirable fact — such as women's economic position — and worked on possible solutions to that, much political discourse in Western 'socially progressive' circles today seems to reverse that. It begins instead with a series of *substantive policy demands* (for example: bathrooms *should* be gender neutral), any deviation from which is automatically suspect, *no matter what* the factual basis is for doing so. If reaching the 'wrong conclusion' is not an option (say, because of a risk of ostracisation), facts become less and less relevant to the discussion — ex ante justifications rather than starting points. Another likely contribution, of course, is the fact that a disregard for women's safety and concerns permeates society generally, even those circles that regard themselves as socially liberal. It is notable that the only risk of violence mentioned by CUSU LGBT+ in its 'Implementation Guide' is the risk "AMAB" (male) students may be the *victims* of violence. Safeguarding women against male violence is not even paid lip service to.

A common feature of responses to women who are *too* challenging (even *within* the left) is for their detractors to retreat back to old-fashioned misogyny as a quick and easy way to dismiss them. The temptation to leverage structures of social power to win a battle that one — genuinely — believes to be morally right is often too strong to resist. It is a phenomenon faced by other marginalised groups as well, not simply women. It is important, however, for us to be alive to that phenomenon, and not to allow narratives

Case 3:24-cv-00563-TAD-KDM   Document 18-29   Filed 05/13/24   Page 42 of 44 PageID #: 1432

of hysteria and 'over-emotionalism' to act as excuses not to engage with the substance of what women are saying.

Needless to say, an aversion to the facts surrounding male violence is neither progressive nor is it feminist. Instead, it is a reflection of a developing culture in which people adopt political positions to avoid censure and achieve social acceptability as an end in itself, rather than as principled responses to actual material injustices in the world.

Conclusion

Sex segregation in spaces where women are in positions of vulnerability is a legitimate and important precaution for women. Women exist in society where the risk of sexual assault is a simple reality of their lives — even young girls within UK schools are experiencing what has been described as an 'epidemic' of sexual violence *from young boys*. I could go into these statistics in more detail if it had not already been done countless times before. But the fact it *has* been done countless times before is the disturbing thing about the entire gender neutral toilets issue. Supposedly progressive commentators and politicians have seemingly decided that publicly supporting a postmodernist view of gender is more important even than these facts. Perhaps it is cowardice in the face of a vitriolic social-media 'take down' culture.

But perhaps it is something more simple, and depressing, than that: feminism — and other equality movements — have to deal with the difficult problem of 'latent prejudice'. It can be tricky to tell when there is a true change of popular attitudes, or when instead there is a understanding that some attitudes cannot be expressed *explicitly*. Sometimes we only find out once people feel they have been *given permission* to express those attitudes. We saw that to some degree with the Bernie-Bro phenomenon — certain US leftists felt that their support for a 'progressive' Bernie Sanders meant they were able to criticise 'not-as-progressive' Hillary Clinton in sometimes violently sexist terms. The gender neutral and gender identity debates seem to represent something similar in the UK. Blatantly misogynistic tropes and a lazy disregard for women's safety and concerns are being overlooked because it is in the service of a supposedly progressive cause.

.  .  .

*The above article was written by a member of the Cambridge Radical Feminist Network. If you would like to write an article for the Network, please get in touch, and please follow us on social media.*

Notes

1. In addition, '[i]n 2009, Channel 4 discovered that almost two-thirds of sexual assaults by patients in hospitals (21 out of 33 in 2007/8), occurred in mixed-sex wards': https://www.theguardian.com/commentisfree/2017/jul/30/mixed-sexed-wards-endanger-and-humiliate-women

2. https://www.theguardian.com/lifeandstyle/shortcuts/2018/mar/21/why-women-face-longer-toilet-queues-and-how-we-can-achieve-potty-parity.
See more specifically: https://americanrestroom.org/potty-parity/;
See also: http://time.com/3653871/womens-bathroom-lines-sexist-potty-parity/

3. The CUSU LGBT+ 'Guide for the Implementation of Gender-Neutral Toilets' recommends a similarly flawed implementation: https://www.lgbt.cusu.cam.ac.uk/wp-content/uploads/2018/05/GN-Bathrooms-Guide.pdf

4. A couple of examples, among many: https://www.harrogateadvertiser.co.uk/news/crime/harrogate-man-jailed-for-filming-girls-and-women-as-they-got-undressed-in-bathrooms-and-cubicles-1-9451417
https://www.pressandjournal.co.uk/fp/news/scotland/1599842/nightclub-voyeur-spared-jail-after-being-caught-filming-women-in-a-toilet-cubicle/

5. Amnesty also recommends separate sleeping facilities for women refugees, for the same reason.

6. See p. 153, Discussion Box 3.13

7. There were also a number of other cases which made national news. For example: https://www.dailymail.co.uk/news/article-124838/Second-woman-raped-mixed-sex-NHS-ward.html

8. JY. Even the mention of his name has resulted in posts being taken down on Medium and Twitter, but a quick internet search will allow you to find him.

9. An example of this phenomenon is discussed by Reni Eddo-Lodge in *Why I am No Longer Talking to White People About Race* (pp.174–175) The 'surprising' mention by David Cameron of 'patriarchal societies' was — less surprisingly — mentioned in regards to Muslim countries 'described in direct opposition to our own advanced, so-called egalitarian and meritocratic British sense of self.'

--



More from Cambridge Radical Feminist Network



Love podcasts or audiobooks? Learn on the go with our new app.    Try Knowable

Recommended from Medium



Camping With a Cause

**A note of gratitude and the road ahead.**



ShaRhonda Knott-Dawson

**Feminism and Racism: White Women, Race, and Work.**





Joshua Scott Hotchkin

**Policing, Racism & Black Lives Matter**