Exhibit 28



Hon. Miguel Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Avenue SW
Washington, DC 20202

September 12, 2022

**Re: Docket ID ED-2021-OCR-0166, RIN 1870-AA16**

**Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance**

Dear Secretary Cardona:

We submit these formal comments to duly note our opposition to the Department of Education's proposed rulemaking on Title IX of the Education Amendments of 1972 ("Title IX"). As a general matter, the Department has not provided sufficient reasoning for why it's embarking on a new Title IX rulemaking less than two years after the 2020 regulations went into effect. In May 2020, after thoroughly considering over 124,000 public comments, the Department issued its historic Title IX Regulations, *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance*, 85 Fed. Reg. 30026 (May 19, 2020) ("2020 Rule"), to better align the Title IX regulations with the text and purpose of 20 U.S.C. § 1681, Supreme Court precedent and other case law, and to address the practical challenges facing students, employees, and schools with respect to sexual harassment allegations. For the first time in history, regulations regarding sexual harassment under Title IX were codified into law. The Department has not presented sufficient evidence that the current Title IX system requires modification. In many instances, moreover, the Department's Proposed Rule conflicts with the text, purpose, and longstanding interpretation of Title IX. It also negatively impacts free speech, academic freedom, and campus life. We also once again call for Assistant Secretary Lhamon to recuse herself from the rulemaking process.

Several of the states have enacted legislation to protect athletic opportunities for women by prohibiting biological males from competing in female athletics. *See, e.g.*, H.B. 112, 2021 Leg. (Mt. 2021); H.B. 25, 87th Sess. (Tx. 2021); H.B. 3293, 2021 Leg., H.B. 500, 65th Leg., 2d Sess. (*Id.* 2020).  Those laws undoubtedly conflict with the Department's Proposed Rule.  *Cf. City of L.A. v. Barr*, 929 F.3d 1163, 1174 (9th Cir. 2019) ("[I]f Congress decides to impose conditions on the allocation of funds to the states, it 'must do so unambiguously … enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation.'") (quoting *South Dakota v. Dole*, 483 U.S. 203, 207 (1987)).

### D. The Proposed Rule infringes on parental rights.

Even more pernicious, the Proposed Rule would federally coerce schools to indoctrinate children into gender identity theories that are heavy on political asperity and light on scientific corroboration.  This would require everyone in the school environment to accept that being a boy, girl, both, or neither is only a matter of subjective identity.  Under this Proposed Rule, schools would have to treat any skepticism of "gender identity" as discrimination/harassment, which would effectively override the fundamental rights of parents to rear their own children in matters of reason, morality, and faith.  Because it treats failure to affirm gender identity the same as traditional forms of discrimination (*e.g.*, excluding girls from the debate team), a school wouldn't need to obtain parental consent before pushing "gender affirmation" of whatever self-declared identity a child announces in school; the school would never have to disclose that affirmation program to the child's parents, and must—at any rate—pursue it even over parents' objections.

## II. THE PROPOSED RULE WILL INFRINGE UPON AND CHILL FREE SPEECH BY VASTLY EXPANDING THE DEFINITION OF SEXUAL HARASSMENT IN 34 C.F.R § 106.30.

The Department proposes changing the current definition of "sexual harassment" contained in 34 C.F.R § 106.30.  The Department's new definition of hostile environment sexual harassment not only conflicts with Supreme Court precedent, but will have a detrimental impact on free speech, campus life, and the free exchange of ideas.  When combined with the Department's proposed changes to the current due process protections, the proposed rule will chill protected speech—allowing unscrupulous students and ideologically biased bureaucrats to weaponize Title IX against those with whom they disagree on hotly contested issues of political, societal, religious, and moral importance.  At private schools, where the First Amendment does not apply, the Department still lacks the power to compel schools to suppress speech that would violate the First Amendment.

5

participate in or benefit from the recipient's education program or activity (i.e., creates a hostile environment).

87 Fed. Reg. at 41410.  The Department's "tentative view" that this proposed hostile environment framework appropriately captures the key concepts articulated by the Supreme Court in *Davis* and protects the First Amendment rights and interests of students and employees is sorely mistaken.  *Id*. at 41413.

The Department should withdraw its proposal to change the definition of hostile environment sexual harassment.

### 2. The proposed definition of sexual harassment lowers the threshold for what counts as "harassment."

Title IX prohibits *discrimination*—not offensive speech. The *Davis* standard forces recipients to punish true harassment under Title IX while leaving lesser disciplinary matters to school conduct codes (and applicable legal requirements such as the First Amendment).  Incidents such as so-called "microaggressions," offensive jokes, and social media banter are not *per se,* or even putative, federal civil rights violations.  But the proposed new definition radically lowers the threshold for what counts as "harassment."  This will allow schools to investigate speech that is subjectively offensive to anyone—even if it is neither severe, nor pervasive, or nor objectively offensive.   This will massively chill academic and campus debates over sex, gender identity, and other issues implicated by the Proposed Rule.[5]

Offensive speech is protected in many instances and contexts.  Indeed, the preamble to the current regulations emphasizes that offensive speech is protected, particularly at the postsecondary level:

> The Supreme Court has also rejected the idea that "because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, 'the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.'" *Healy v. James*, 408 U.S. 169, 180 (1972) (internal citations omitted). Further, these protections apply even to highly offensive speech on campus: "[T]he mere dissemination of ideas—no matter how offensive to good taste—on a state university campus may not be shut off in the name alone of 'conventions of decency.'" *Papish v. Bd. of Curators*, 410 U.S. 667, 670 (1973) (internal citations omitted).

---

[5] *See, e.g.*, Cantu and Jussim, *Microaggressions, Questionable Science, and Free Speech*, TEX. REV. L. & POL. (Feb. 2021), *available at* https://ssrn.com/abstract=3822628.

85 Fed. Reg. at 30141 n. 623.  Higher education institutions differ from the workplace. In workplaces, it may be natural to ban offensive speech to maximize efficiency or prevent a hostile or offensive environment.  Colleges, however, exist for the very purpose of exchanging ideas and pursuing the truth—even if words and ideas offend listeners.  *See, e.g.*, *Dambrot v. Cent. Mich. Univ.*, 55 F.3d 1177 (6th Cir. 1995) (holding hostile environment harassment code was unconstitutionally vague and overbroad and was not a valid prohibition of fighting words).  The Proposed Rule's new lower threshold will no doubt stifle the airing of controversial (but protected) ideas on campus.

As for elementary and secondary education, the *Davis* Court expressly required that conduct be severe *and* pervasive for Title IX liability.  This is because, unlike workplace conduct under Title VII, elementary and secondary school students frequently behave in ways that would be unacceptable among adult workers.  *Davis*, 526 U.S. at 651–52 (citing *Meritor*, 477 U.S. at 67).

### 3.  The Department has failed to provide adequate reasoning for the definition change to sexual harassment in § 106.30.

The Proposed Rule recognizes that the new definition of hostile environment sexual harassment abandons the verbatim *Davis* standard used in the current regulations, but reasons that that caselaw allows the Department to promulgate rules requiring conduct that—in its absence—would not constitute sex discrimination. 87 Fed. Reg. at 41413. The Department then adopts its new standard "because the [new] definition of 'sex-based harassment' covers a broader range of sexual misconduct than that covered … in the current regulations," and because "Title IX's plain language prohibits any discrimination on the basis of sex." *Id.* To be sure, the Department may adopt prophylactic requirements that are broader than the requirement to refrain from discrimination on the basis of sex.  But such prophylaxis must be designed to prevent *discrimination on the basis of sex*—not some other undefined classification.  Here, instead, the Department is attempting to redefine sex discrimination itself, broadening that discernable concept beyond recognition.  Because the NPRM neither defines the concept nor explains why it must be expanded so dramatically, the Proposed Rule reveals its own arbitrariness.

Next, the Department fails to explain why it dropped the "objectively offensive" element from the current definition.  *See* 34 C.F.R. 106.30 ("(2) Unwelcome conduct determined by a reasonable person to be so severe, pervasive, and objectively offensive that it effectively denies a person equal access to the recipient's education program or activity"). The objectively offensive element is important because it judges the content by the standards of what a reasonable person would observe. Thus, in order for speech to create a hostile environment, it must offend a reasonable person. The Department has no good reason for dropping this crucial element of the *Davis* standard.

10

Finally, the Department fails to adequately explain why its new definition is tied to the Title VII framework.  In fact, the only insight provided is the Department's tentative assertion that "this alignment will better facilitate recipients' ability to comply with their obligations" under both statutes.  87 Fed. Reg. at 41415.  But elsewhere, the Department also admits that the analysis of whether a hostile environment exists is necessarily fact-specific and, among other things, must consider how a student—versus an employee—reasonably perceives the environment.  Since the analyses differ for students and employees, it's unclear what benefits accrue to schools from similarity between the Title VII and Title IX formulations (especially where analysis of peer-on-peer discrimination is at issue).  In contrast, the Preamble to the current regulations explained that aligning the Title VII and Title IX definitions of sexual harassment didn't further the purpose of Title IX or benefit students and employees participating in education programs or activities. 85 Fed. Reg. at 30151 (citing, *e.g.*, Azhar Majeed, *The Misapplication of Peer Harassment Law on College and University Campuses and the Loss of Student Speech Rights*, 35 J. COLL. & UNIV. L. 385, 449 (2009) (arguing that restrictions on workplace speech "ultimately do not take away from the workplace's essential functions—to achieve the desired results, make the client happy, and get the job done" and free expression in the workplace "is typically not necessary for that purpose" such that workplaces are often "highly regulated environments" while "[o]n the other hand, freedom of speech and unfettered discussion are so essential to a college or university that compromising them fundamentally alters the campus environment to the detriment of everyone in the community" such that free speech and academic freedom are necessary preconditions to a university's success.).

The Department must provide a sufficient explanation.

## B. The proposed change to the definition of sexual harassment in § 106.30 will violate First Amendment rights and chill the free exchange of ideas.

The NPRM pays lip service to free speech in its preamble.  *See* 87 Fed. Reg. at 41415 ("Title IX protects individuals from sex discrimination and does not regulate the content of speech as such. OCR has expressed this position repeatedly in discussing Title IX in prior guidance. See 2001 Revised Sexual Harassment Guidance at 22; 2003 First Amendment Dear Colleague Letter; 2014 Q&A on Sexual Violence at 43-44. The Department emphasizes that in cases of alleged sex-based harassment, the protections of the First Amendment must be considered if, for example, issues of speech or expression.").

The Department has failed to heed the warnings of the past and account for the reasons why the current regulations were put into place. In the preamble to the 2020 regulations, the Department stated:

The "Sexual Harassment" subsection of the "Section 106.30 Definitions" section of this preamble discusses in greater detail how the *Davis* definition of sexual harassment as "severe, pervasive, and objectively offensive" comports with First Amendment protections, and the way in which a broader definition, such as severe, persistent, or pervasive (as used in the 1997 Guidance and 2001 Guidance), has led to infringement of rights of free speech and academic freedom of students and faculty.

85 Fed. Reg. at 30036 n.88; *see also id.* at 30130 ("Failure to recognize and respect principles of free speech and academic freedom has led to overly broad anti-harassment policies that have resulted in chilling and infringement of constitutional protections."). The current definition contained in § 106.30 captures categories of misconduct likely to impede educational access while avoiding a chill on free speech and academic freedom. The failure to recognize and respect free speech principles and academic freedom has led to overly broad anti-harassment policies in the past that have resulted in chilling and infringement of constitutional protections. Several provisions in the Proposed Rule tread the same, anti-speech path.

> ### 1. The Proposed Rule would modify 34 C.F.R. § 106.44 to require schools to respond to sex discrimination, regardless of whether schools know about it, and impose monitoring duties on Title IX coordinators, which would chill speech.

The current regulations require that a recipient must possess "actual knowledge" in order to be held liable under Title IX. *See* 34 CFR § 106.44(a) ("A recipient with actual knowledge of sexual harassment in an education program or activity of the recipient against a person in the United States, must respond promptly in a manner that is not deliberately indifferent."); see also 85 Fed. Reg. at 30038 ("These final regulations adopt the actual knowledge condition from the *Gebser/Davis* framework so that these final regulations clearly prohibit a recipient's own intentional discrimination, but adapt the *Gebser/Davis* condition of actual knowledge to include notice to more recipient employees than what is required under the Gebser/Davis framework, in a way that takes into account the different needs and expectations of students in elementary and secondary schools, and in postsecondary institutions, with respect to sexual harassment and sexual harassment allegations."); *id.* at 30035 ("The withdrawn 2011 Dear Colleague Letter continued to recommend that schools act upon constructive notice (rather than actual knowledge) and to hold schools accountable under a strict liability standard rather than deliberate indifference.").

The NPRM proposes modifying 34 C.F.R. 106.44(a) and (b) to say:

(a) A recipient must take prompt and effective action to end any sex discrimination that has occurred in its education program or activity, prevent its recurrence, and remedy its effects.

(b) A recipient must …. Require its Title IX Coordinator to monitor the recipient's education program or activity for barriers to reporting information about conduct that may constitute sex discrimination under Title IX.

87 Fed. Reg. at 41572.

This new duty will lead to Title IX coordinators zealously policing protected speech as a prophylactic measure to avoid Title IX violations. Unsurprisingly, this will have a detrimental effect on campus culture and campus life.

## 2. Schools are expected to counter "derogatory" speech.

Under the Proposed Rule, schools must *counter* "derogatory opinions," making a non-response to any such opinions a potential Title IX violation. The NPRM says:

> For instance, although the First Amendment may prohibit a recipient from restricting the rights of students to express opinions about one sex that may be considered derogatory, the recipient can affirm its own commitment to nondiscrimination based on sex and take steps to ensure that competing views are heard. The age of the students involved and the location or forum in which such opinions are expressed may affect the actions a recipient can take consistent with the First Amendment.

87 Fed. Reg. at 41515. Institutions of higher education cannot suppress student thought on controversial issues simply because some students find it "offensive." Under the proposed rule (particularly in light of the lower threshold for hostile environment claims), cancel culture will become the norm on K-12 and college campuses, as students, teachers, and professors are threatened or punished for engaging in protected First Amendment speech on sex or LGBT issues. *See W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943) ("If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein.). And, even without official action to enforce these new rules, the threat of Title IX investigations will intimidate students and faculty into keeping quiet on controversial issues. Schools are likely to ostracize students who express disfavored political, moral, and social opinions, including on gender identity. But, as the Supreme Court has said:

Probably no deeper division of our people could proceed from any provocation than from finding it necessary to choose what doctrine and whose program public educational officials shall compel youth to unite in embracing. Ultimate futility of such attempts to compel coherence is the lesson of every such effort from the Roman drive to stamp out Christianity as a disturber of its pagan unity, the Inquisition, as a means to religious and dynastic unity, the Siberian exiles as a means to Russian unity, down to the fast failing efforts of our present totalitarian enemies. Those who begin coercive elimination of dissent soon find themselves exterminating dissenters. Compulsory unification of opinion achieves only the unanimity of the graveyard.

*Id.* at 641.  This principle has even more teeth at institutions of higher learning.  *See Healy v. James*, 408 U.S. 169, 180 (1972) ("[T]he precedents of this Court leave no room for the view that, because of the acknowledged need for order, First Amendment protections should apply with less force on college campuses than in the community at large. Quite to the contrary, the vigilant protection of constitutional freedoms is nowhere more vital than in the community of American schools.") (cleaned up).

The Department should withdraw this proposed change to protect free speech.

### 3. The NPRM Removes the current prohibition in § 106.44(a) on using speech suppression to prevail in OCR investigations.

The current regulations provide that: "The Department may not deem a recipient to have satisfied the recipient's duty to not be deliberately indifferent under this part based on the recipient's restriction of rights protected under the U.S. Constitution, including the First Amendment, Fifth Amendment, and Fourteenth Amendment."  34 CFR § 106.44(a).  This means that institutions—public and private—cannot use Title IX as an excuse for suppressing protected student or faculty speech.  The Proposed Rule removed this provision. See 87 Fed. Reg. at 41432, 41572-41575.  The Department has not explained why it removed this provision and must do so.  The Department should withdraw this proposal to prevent schools from using their obligations under federal civil rights law to shut down protected speech.

### 4. The Proposed Rule's gender identity provisions turn protected speech into harassment.

As discussed above, the proposed rule defines sex-based harassment to include offensive conduct on the basis of "gender identity."  The proposed Rule effectively requires schools to micromanage and control the speech of all students, teachers, and staff.  This now includes things like (1) compelling the use of each person's preferred

14

pronouns that may contradict the person's sex; and (2) characterizing as punishable harassment any objection to allowing male participation on girls sports teams.

The Proposed Rule vaguely defines both the hostile environment standard and the obligation of the school to provide "supportive measures." Under this paradigm, an accusation by a student or teacher of "sex-based harassment" could arise from any other student or teacher refusing to "validate" or "affirm" the person's "gender identity." This could happen when a student refuses to use another student's neo-pronoun or if a lesbian turns down a date with a man, who has "identified" as a woman and tells the man the objective fact that she doesn't date men.

This clearly violates students' and teachers' First Amendment rights to express their views on scientific, moral, and religious issues. *See Janus v. AFSCME*, Council 31, 138 S. Ct. 2448, 2464 (2018) ("Forcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and … a law commanding involuntary affirmation of objected-to beliefs would require even more immediate and urgent grounds than a law demanding silence) (internal quotations omitted); *Reed v. Town of Gilbert*, 576 U.S. 155, 168 (2015) ("Government discrimination among viewpoints—or the regulation of speech based on the specific motivating ideology or the opinion or perspective of the speaker—is a more blatant and egregious form of content discrimination.")  (internal quotations omitted)).

Even worse, it compels students and faculty to deny objective truth.[6]

> ### 5. The Proposes Rule removes the provision in 34 C.F.R. § 106.71(b)(1) that makes clear that exercise of rights protected under the First Amendment does not constitute retaliation

34 C.F.R. § 106.71 prohibits recipients or individuals from retaliating against individuals who participate in the Title IX process:

> No recipient or other person may intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by title IX or this part, or because the individual has made a report or complaint, testified, assisted, or participated or refused to participate in any manner in an investigation, proceeding, or hearing under this part. Intimidation, threats, coercion, or discrimination, including charges against an individual for code of conduct violations that do not involve sex discrimination or sexual harassment, but arise out of the same facts or circumstances as a report

---

[6] Legend has it that when Galileo was put on trial for his heretic belief that the Earth revolved the Sun and eventually forced to recant, he muttered under his breath "*Eppur si muove*" or "it still moves."

or complaint of sex discrimination, or a report or formal complaint of sexual harassment, for the purpose of interfering with any right or privilege secured by title IX or this part, constitutes retaliation. The recipient must keep confidential the identity of any individual who has made a report or complaint of sex discrimination, including any individual who has made a report or filed a formal complaint of sexual harassment, any complainant, any individual who has been reported to be the perpetrator of sex discrimination, any respondent, and any witness, except as may be permitted by the FERPA statute, 20 U.S.C. 1232g, or FERPA regulations, 34 CFR part 99, or as required by law, or to carry out the purposes of 34 CFR part 106, including the conduct of any investigation, hearing, or judicial proceeding arising thereunder. Complaints alleging retaliation may be filed according to the grievance procedures for sex discrimination required to be adopted under § 106.8(c).

34 C.F.R. § 106.71(a).  The regulations also, however, make clear that "the exercise of rights protected under the First Amendment does not constitute retaliation prohibited under paragraph (a) of this section."   34 C.F.R. § 106.71(b)(1).

The Proposed Rule eliminates § 106.71(b)(1).  The NPRM reasons that "106.71(b)(1) is redundant and its removal would be appropriate" because "[a]s explained in the discussion of the definition of prohibited "sex-based harassment" (proposed § 106.2), the Department has long made clear that it enforces Title IX consistent with the requirements of the First Amendment." This discussion and rationale are wholly inadequate.  Removal of § 106.71(b)(1) will chill free speech and infringe on First Amendment rights.

The NPRM fails to take into account the real-life examples of Title IX's retaliation provisions being abused to chill free speech.  For example, the saga of Northwestern Professor Laura Kipnis is instructive:

In 2015, she published a polemic in *The Chronicle of Higher Education* titled "Sexual Paranoia Strikes Academe." Kipnis argued that students' sense of vulnerability on campus was expanding to an unwarranted degree, partly owing to new enforcement policies around Title IX, which prohibits sex discrimination at educational institutions that receive federal funds. The new Title IX policies on sexual misconduct which were then sweeping campuses perpetuated "myths and fantasies about power," Kipnis wrote, which enlarged the invasive power of institutions while undermining the goal of educating students in critical thinking and resilience. "If you wanted to produce a pacified, cowering citizenry, this would be the method," she concluded. Kipnis wrote of a philosophy

16

professor, Peter Ludlow, whom Northwestern disciplined for sexual harassment; Kipnis questioned the logic of the accusations against him. One of Ludlow's accusers, a graduate student (unnamed in Kipnis's essay), then joined a fellow graduate student in the philosophy department in filing Title IX complaints against Kipnis, under Northwestern's sexual-misconduct policy. Through her essay and a subsequent tweet about the essay, Kipnis was alleged to have violated the part of the sexual-misconduct policy prohibiting "retaliation"; additionally, she was alleged to have created a "hostile environment" and a "chilling effect" on complaints. Northwestern launched a formal Title IX investigation of Kipnis.

Most people under Title IX investigation don't speak publicly about it, even to defend themselves. But Kipnis responded by publishing a follow-up essay in the Chronicle, called "My Title IX Inquisition," decrying the investigation as a misuse of Title IX that allowed "intellectual disagreement to be redefined as retaliation." On the same day, Northwestern cleared Kipnis of wrongdoing, finding that "viewpoint expression" is not retaliation, and that a "reasonable person" in the complainant's position "would not suffer a hostile environment on account of" the essay and the tweet.[7]

The Department demonstrates absolutely no awareness of harmful instances such as this—and its effects on free speech and weaponization of the Title IX process. The Department fails to provide a reasoned explanation for eliminating § 106.71(b)(1).

### 6. *The Proposed Rule plainly ignores the mountain of evidence demonstrating that it will chill free speech on campus.*

The Proposed Rule is arbitrary and capacious because it wrongly believes its new definition of sexual harassment will not chill free speech. The Department claims that "Title IX protects individuals from sex discrimination and does not regulate the content of speech as such. OCR has expressed this position repeatedly in discussing Title IX in prior guidance. *See* 2001 Revised Sexual Harassment Guidance at 22; 2003 First Amendment Dear Colleague Letter; 2014 Q&A on Sexual Violence at 43-44." 87 Fed. Reg. at 41415. But this proclamation is contradicted by a mountain of public evidence and the Department's past statements.

---

[7] Jeanie Suk Gersen, Laura Kipnis's Endless Trial by Title IX, THE NEW YORKER (Sept. 20, 2017); see also Laura Kipnis, *My Title IX Inquisition*, THE CHRONICLE OF HIGHER EDUCATION, May 29, 2015, http://laurakipnis.com/wp-content/uploads/2010/08/My-Title-IX-Inquisition-The-Chronicle-Review-.pdf.

Free speech was routinely suppressed or punished from 2011 to 2017 under Title IX. Through sub-regulatory guidance and administrative enforcement OCR created an expansive definition of sexual harassment that included "verbal conduct" (i.e., speech) such as "making sexual comments, jokes or gestures," "spreading sexual rumors," and "creating e-mails or Web sites of a sexual nature."[8] The environment became so precarious that Harvard Law School professor Jeannie Suk Gersen wrote in 2014 that law school faculty were increasingly reluctant to teach rape law for fear of offending or upsetting their students.[9] When the University of Montana sensibly incorporated the *Davis* standard into its sexual harassment policy, OCR objected.[10] OCR insisted in 2013 that the university establish policies to "encourage students to report sexual harassment early, before such conduct becomes severe or pervasive, so that it can take steps to prevent the harassment from creating a hostile environment."[11] The broad definition of sexual harassment was a so-called "national blueprint" for schools[12] and led OCR to regulate conduct that was not covered under Title IX.[13] Two scholars wrote that OCR's guidance required schools to regulate student conduct "that is not creating a hostile environment and therefore is not sexual harassment and therefore not sex discrimination."[14]

The Department itself recognized this in 2020. *See, e.g.*, 85 Fed. Reg. at 20036 ("The 'Sexual Harassment' subsection of the 'Section 106.30 Definitions' section of this preamble discusses in greater detail how the *Davis* definition of sexual harassment as 'severe, pervasive, and objectively offensive' comports with First Amendment protections, and the way in which a broader definition, such as severe, persistent, or pervasive (as used in the 1997 Guidance and 2001 Guidance), has led

---

[8] *Id.*

[9] THE NEW YORKER, Dec. 15, 2014, http://www.newyorker.com/news/news-desk/trouble-teaching-rape-law.; *see also* Jacob Gersen and Jeannie Suk, The Sex Bureaucracy, The Chronicle of Higher Educ. (Jan. 6, 2017) (https:// www.chronicle.com/article/The-College-Sex-Bureaucracy/238805) (OCR's "broad definition" of sexual harassment has "grown to include most voluntary and willing sexual contact").

[10] U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to University of Montana, May 8, 2013, https://www2.ed.gov/documents/press-releases/montana-missoula-letter.pdf.

[11] BROOKINGS INSTITUTION, Jan. 24, 2019, https://www.brookings.edu/blog/brown-center-chalkboard/2019/01/24/the-department-of-educations-proposed-sexual-harassment-rules-looking-beyond-the-rhetoric/.

[12] FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, Departments of Education and Justice: National "Blueprint" for Unconstitutional Speech Codes, https://www.thefire.org/cases/departments-of-education-and-justice-national-requirement-for-unconstitutional-speech-codes/.

[13] *See, e.g.*, Jacob Gersen and Jeannie Suk, *The Sex Bureaucracy*, 104 CALIF. L. REV. 881, 902–03 (2016) (Asserting that the Obama OCR's guidance required schools to regulate student conduct "that [was] not creating a hostile environment and therefore is not sexual harassment and therefore not sex discrimination" and concluding that OCR's guidance overstep[ped] OCR's jurisdictional authority).

[14] *E.g.*, Jacob Gersen and Jeannie Suk, The Sex Bureaucracy, 104 CALIF. L. REV. 881, 902–03 (2016).

to infringement of rights of free speech and academic freedom of students and faculty.").

The Department's failure to recognize these incontrovertible facts renders its explanation insufficient, arbitrary, and capricious.

### III. THE PROPOSED RULE REMOVES KEY DUE PROCESS PROTECTIONS FROM THE CURRENT REGULATIONS.

Due process is a fundamental constitutional principle in American jurisprudence. Due process is a legal principle which has been shaped and developed through the process of applying and interpreting a written constitution. "Fair process" or "procedural justice" increases outcome legitimacy. Indeed, "[r]esearch demonstrates that people's views about their outcomes are shaped not solely by how fair or favorable an outcome appears to be but also by the fairness of the process through which the decision was reached. A fair process provided by a third party leads to higher perceptions of legitimacy; in turn, legitimacy leads to increased compliance with the law."[15]

As a result, due process protections are a critical part of a Title IX. Fair grievance procedures benefit both complainants and respondents, as well as recipients. Both parties benefit from equal opportunities to participate by setting forth their own views of the allegations. Everyone benefits from processes geared toward reaching factually accurate outcomes. The grievance process prescribed in the current regulations provides a fair process rooted in due process protections that improves the accuracy and legitimacy of the outcome for the benefit of both parties.

---

[15] Rebecca Holland-Blumoff, *Fairness Beyond the Adversary System: Procedural Justice Norms for Legal Negotiation*, 85 FORDHAM L. REV. 2081, 2084 (2017) (internal citations omitted).

19

Any Title IX grievance procedure mandated by the Department must comport with due process guarantees[16] as well as fundamental fairness.[17]

### A. The Proposed Rule removes or modifies important due process safeguards in the Title IX grievance process.

#### 1. The Proposed Rule violates due process because it removes the provisions in 34 CFR § 106.45 requiring evidence to be provided to both parties.

The Department should withdraw its proposal to modify the provisions of 34 CFR § 106.45 relating to the opportunities of parties to inspect and review evidence during the grievance process.  The current regulations require the recipient to:

> Provide both parties an equal opportunity to inspect and review any evidence obtained as part of the investigation that is directly related to the allegations raised in a formal complaint, including the evidence upon which the recipient does not intend to rely in reaching a determination regarding responsibility and inculpatory or exculpatory evidence whether obtained from a party or other source, so that each party can meaningfully respond to the evidence prior to conclusion of the investigation.

34 CFR § 106.45.

---

[16] *See Goss v. Lopez*, 419 U.S. 565, 583–84 (1975) ("On the other hand, requiring effective notice and informal hearing permitting the student to give his [or her] version of the events will provide a meaningful hedge against erroneous action. At least the disciplinarian will be alerted to the existence of disputes about facts and arguments about cause and effect. He may then determine himself to summon the accuser, permit cross-examination, and allow the student to present his own witnesses. In more difficult cases, he may permit counsel. In any event, his discretion will be more informed and we think the risk of error substantially reduced."); Nicola A. Boothe-Perry, *Enforcement of Law Schools' Non-Academic Honor Codes: A Necessary Step Towards Professionalism?*, 89 NEB. L. REV. 634, 662–63 (2012) ("Thus, while well-settled that there is no specific procedure required for due process in school disciplinary proceedings, the cases establish the bare minimum requirements of: (1) adequate notice of the charges;  (2) reasonable opportunity to prepare for and meet them; (3) an orderly hearing adapted to the nature of the case; and (4) a fair and impartial decision .... Where disciplinary measures are imposed pursuant to non-academic reasons (e.g., fraudulent conduct), as opposed to purely academic reasons, the courts are inclined to reverse decisions made by the institutions without these minimal procedural safeguards.") (internal citations omitted).

[17] *E.g.*, Kathryn M. Reardon, *Acquaintance Rape at Private Colleges and Universities: Providing for Victims' Educational and Civil Rights*, 38 SUFFOLK UNIV. L. REV. 395, 406–07 (2005) ("Courts around the nation have taken a relatively consistent stance on what type of process private colleges and universities owe to their students .... Courts expect that schools will adhere to basic concepts of fairness in dealing with students in disciplinary matters. Schools must employ the procedures set out in their own policies, and those policies must not be offensive to fundamental notions of fairness.").

The Department proposes allowing parties to be given, instead, an "oral description" of the evidence: "(4) Provide each party with a description of the evidence that is relevant to the allegations of sex discrimination and not otherwise impermissible, as well as a reasonable opportunity to respond." 87 Fed. Reg. at 41481. To maintain a transparent process, however, the parties need a complete understanding of the evidence obtained by the recipient and how a determination regarding responsibility is made. A written description places parties—particularly respondents—at a severe disadvantage, forcing them to trust that a school has provided a complete and accurate description of every piece of relevant evidence. We know from experience that the single-investigator model has a tremendous potential for abuse. *See* Part III(B), *infra*.

Additionally, this puts educational institutions in the position to pre-judge important issues such as relevance. It would, thus, permit these institutions to make a determination regarding relevance and then withhold evidence on that basis.

The Department should withdraw the proposal.

### 2. The Department should require schools to maintain a consistent evidentiary standard in 34 CFR 106.45.

The current regulations provide:

> Schools must use either "the preponderance of the evidence standard or the clear and convincing evidence standard, [and] apply the same standard of evidence for formal complaints against students as for formal complaints against employees, including faculty, and apply the same standard of evidence to all formal complaints of sexual harassment."

34 CFR § 106.45. The Proposed Rule tweaks the current evidentiary rule in 34 C.F.R. § 106.45: "Schools must "[u]se the preponderance of the evidence standard of proof to determine whether sex discrimination occurred, unless the recipient uses the clear and convincing evidence standard of proof in all other comparable proceedings, including proceedings relating to other discrimination complaints, in which case the recipient may elect to use that standard of proof in determining whether sex discrimination occurred." 87 Fed. Reg. at 41576.

First, this creates an internal contradiction. One reason the NPRM gives for this provision is that "a singular imposition of a higher standard for sex discrimination complaints would impermissibly discriminate on the basis of sex." 87 Fed. Reg. at 41486. But the Proposed Rule permits using a lower standard for sex discrimination than for other complaints, including racial discrimination complaints.

So by the Rule's own logic, schools may discriminate on the basis of race by imposing a lower standard for racial than for sex discrimination.  That makes no sense.

And, the Department fails to offer a justification for mandating that sex discrimination complaints be addressed under no higher standard than other complaints but—at the same time—refusing to mandate that they also be addressed under no lower a standard.

The Department should maintain the current evidentiary standard requirements set forth in 34 CFR 106.45.  If it, however, does wish to change the current standard, it should not deviate further from the Proposed Rule.  It's important that (1) recipients not use an evidentiary standard below the preponderance of the evidence; (2) a recipient's grievance process state up front which of the two permissible standards of evidence the recipient has selected and (3) apply that selected standard to all formal complaints of sexual harassment, including those against employees.

### 3.   The Proposed Rule modifies 34 CFR § 106.45 to bring back the biased and unfair single-investigator model

The current regulations flatly prohibit the single investigator model.  *See* 34 CFR § 106.45 ("The role of Title IX Coordinator and the role of the Title IX investigator must be distinct from the role of Title IX adjudicator.").  This is because fundamental fairness to both parties requires that the intake of a report and formal complaint, the investigation (including party and witness interviews and collection of documentary and other evidence), drafting of an investigative report, and ultimate decision about responsibility should not be left in the hands of a single person (or team of persons each of whom performed all those roles).  Rather, after the recipient has conducted its impartial investigation, a separate decision-maker must reach the determination regarding responsibility; that determination can be made by one or more decision-makers (such as a panel), but no decision-maker can be the same person who served as the Title IX Coordinator or investigator.

The Proposed Rule eliminates this prohibition and expressly permits the decision-maker to be the same person as the Title IX coordinator.  Integrating the investigative and decision-making functions will (1) substantially impair the overall fairness of the grievance process; (2) decrease the reliability of fact-finding and the accuracy of outcomes; (3) lower party and public confidence in outcomes; and (4) decrease the accuracy of the determination regarding responsibility in Title IX cases because individuals who perform both roles may have confirmation bias and other prejudices that taint the proceedings, whereas separating those functions helps prevent bias and prejudice from impacting the outcome.

Prior to the current regulations, Both OCR and the White House pressured schools to employ the single investigator model.[18]   Schools housed these investigators/adjudicators in their Title IX offices, which had strong incentives to ensure the school stayed compliant with the DCLs to avoid losing federal funding. Many Title IX offices assumed every role in the process, acting as prosecutor, judge, jury, and appeals board

The biases of individuals in the single-investigator role had disastrous consequences. *See, e.g.*, Laura Kipnis, UNWANTED ADVANCES 33 (2017) ("The reality is that a set of incomprehensible directives, issued by a branch of the federal government, are being wielded in wildly idiosyncratic ways, according to the whims and biases of individual Title IX officers operating with no public scrutiny or accountability. Some of them are also all too willing to tread on academic and creative freedom as they see fit"). Even proponents of a strong role for Title IX coordinators acknowledged that corruption existed in the process.[19]

Indeed, courts have called the fairness of this model into question over the last few years. *See, e.g.*, *Doe v. Claremont McKenna Coll.*, 25 Cal. App. 5th 1055, 1072–73 (Cal. App. 2018) (all decision makers "must make credibility determinations, and not simply approve the credibility determinations of the one Committee member who was also the investigator."); *Doe v. Miami Univ.*, 882 F.3d 579, 601, 605 (6th Cir. 2018) (court found "legitimate concerns" raised by the investigator's "alleged dominance on the three-person [decision-making] panel" because "she was the only one of the three with conflicting roles."); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 573 (D. Mass. 2016) (referring to the "obvious" "dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review"); *Doe v. Allee*, 30 Cal. App. 5th 1036, 1068 (Cal. App. 2019) ("As we have explained, in USC's system, no in-person hearing is ever held, nor is one required. Instead, the Title IX investigator interviews witnesses, gathers other evidence, and prepares a

---

[18] *See Doe v. Univ. of Scis.*, 961 F.3d 203, 213 (3d Cir. 2020) (describing the pressure universities faced as a result of the Dear Colleague Letter).  In the "single investigator" model, there is no hearing. One person conducts interviews with each party and witness, and then makes the determination whether the accused is responsible. No one knows what the investigator hears or sees in the interviews except the people in the room at the time. This makes the investigator all-powerful. Neither accuser nor accused can guess what additional evidence to offer, or what different interpretations of the evidence to propose because they are completely in the dark about what the investigator is learning and are helpless to fend off the investigator's structural and personal biases as they get cooked into the evidence-gathering.

[19] *See, e.g.*, Association of Title IX Administrators (ATIXA), *ATIXA Position Statement: Why Colleges Are in the Business of Addressing Sexual Violence* 3–4 (Feb. 17, 2017) (acknowledging that due process has been denied in some recipients' Title IX proceedings but insisting that "Title IX isn't the reason why due process is being compromised .... Due process is at risk because of the small pockets of administrative corruption ... and because of the inadequate level of training currently afforded to administrators. *College administrators need to know more about sufficient due process protections and how to provide these protections in practice*.") (emphasis added).

written report in which the investigator acts as prosecutor and tribunal, making factual findings, deciding credibility, and imposing discipline. The notion that a single individual, acting in these overlapping and conflicting capacities, is capable of effectively implementing an accused student's right of cross-examination by posing prepared questions to witnesses in the course of the investigation ignores the fundamental nature of cross-examination: adversarial questioning at an in-person hearing at which a neutral fact finder can observe and assess the witness' credibility.").

The Proposed Rule pays lip service to the concerns of the 2020 rule in ensuring that a person's experience investigating a claim of harassment does not bias him or her in a subsequent role of determining whether harassment occurred. It somehow concludes, however, that unifying the investigatory and adjudicatory roles does not raise a substantial risk of bias because "the recipient is not in the role of prosecutor seeking to prove a violation of its policy," but rather "the recipient's role is to ensure that its education program is free of unlawful sex discrimination, a role that does not create an inherent bias or conflict of interest in favor of one party or another." 87 Fed. Reg. at 41467.

Perhaps most shockingly, the Department wrongly claims that a separate adjudicator would not help the reliability of the grievance process. 87 Fed. Reg. at 41466–41467. It cites no evidence in support of this claim. *Id.* This rationale is inadequate and fails to account for the real-world evidence that led to the 2020 Regulations.

A separate, neutral adjudicator is also necessary because of the Title IX incentive structure. The incentive structure pushes recipients toward findings of fault. That is, if there is discrimination that a recipient fails to redress, they could lose federal funding, so they are incentivized to stamp out as many Title IX violations as possible. On the other hand, however, if there is non-discriminatory conduct that schools redress, it often costs the recipient nothing. It's common sense, moreover, that an investigator may come to hold views that favor one party or another during an investigation. A neutral decisionmaker is one of the best ways to ensure a fair process.

The Department's proposed change would return to the flawed and highly unfair system that led to the enactment of the 2020 Regulations.

### 4. The Proposed Rule violates Due Process by removing written notice provisions in 34 C.F.R. 106.45(b)(2)(i)(B).

The current regulations require the recipient to provide written notice of a formal complaint to a respondent. In that written notice, a respondent must be

provided with (1) presumption of innocence statement; (2) right to advisor of choice; (3) penalty for false statements:

> The written notice must include a statement that the respondent is presumed not responsible for the alleged conduct and that a determination regarding responsibility is made at the conclusion of the grievance process. The written notice must inform the parties that they may have an advisor of their choice, who may be, but is not required to be, an attorney, under paragraph (b)(5)(iv) of this section, and may inspect and review evidence under paragraph (b)(5)(vi) of this section. The written notice must inform the parties of any provision in the recipient's code of conduct that prohibits knowingly making false statements or knowingly submitting false information during the grievance process.

34 CFR 106.45(b)(2)(i)(B).  The Proposed Rule removes those three requirements from the written notice:

> (c) Notice of allegations. Upon initiation of the recipient's grievance procedures, a recipient must provide notice of the allegations to the parties whose identities are known.  (1) The notice must include: (i) The recipient's grievance procedures under this section, and if applicable § 106.46, and any informal resolution process under § 106.44(k); (ii) Sufficient information available at the time to allow the parties to respond to the allegations. Sufficient information includes the identities of the parties involved in the incident, the conduct alleged to constitute sex discrimination under Title IX, and the date and location of the alleged incident, to the extent that information is available to the recipient; and (iii) A statement that retaliation is prohibited.

87 Fed. Reg. at 41575.  The Department has failed to provide any justification for why it removed the requirements that recipients inform accused students about the presumption of innocence, the right to counsel, or the penalties for false statements.

### 5. The Proposed Rule removes the due process protection of mandating live hearings for postsecondary settings.

The Title IX regulations currently require a live hearing at the postsecondary level.  34 CFR § 106.45(b)(6)(i) ("For postsecondary institutions, the recipient's grievance process must provide for a live hearing.").  The Proposed Rule removes that requirement.  87 Fed. Reg. at 41462, 41497, 41498.  "A postsecondary institution's sex-based harassment grievance procedures may, but need not, provide for a live hearing."

Relatedly, under the current regulations the parties must be allowed at live hearings to ask questions directly through their advisors:

At the live hearing, the decision-maker(s) must permit each party's advisor to ask the other party and any witnesses all relevant questions and follow-up questions, including those challenging credibility. Such cross-examination at the live hearing must be conducted directly, orally, and in real time by the party's advisor of choice and never by a party personally, notwithstanding the discretion of the recipient under paragraph (b)(5)(iv) of this section to otherwise restrict the extent to which advisors may participate in the proceedings.

34 C.F.R. § 106.45(b)(6)(i).

 At the postsecondary level, live hearings are key to seeking truth and determining responsibility.  Because most parties and witnesses are adults there, grievance procedures' live cross-examination at a hearing is both appropriate and worthwhile. The current regulations require institutions to provide a live hearing, and to allow the parties' advisors to cross-examine the other party and witnesses.

The current regulations balance the importance of cross-examination with any potential harm from personal confrontation between the complainant and the respondent by requiring questions to be asked by an advisor aligned with the party. Further, they allow either party to request that the recipient facilitate the parties being located in separate rooms during cross-examination while observing the questioning live via technological means.  The current regulations thereby provide the benefits of cross-examination while avoiding any unnecessary trauma that could arise from personal confrontation between the complainant and the respondent.[20]

The Proposed Rule obviously doesn't require a live hearing.  But it also now appears to only require schools to let parties submit written questions to each other on the limited topic of "credibility":

This assessment of credibility includes either (i) Allowing the decisionmaker to ask the parties and witnesses, during individual

---

[20] *Cf. Baum*, 903 F.3d at 583 ("Universities have a legitimate interest in avoiding procedures that may subject an alleged victim to further harm or harassment.  And in sexual misconduct cases, allowing the accused to cross-examine the accuser may do just that. But in circumstances like these, the answer is not to deny cross-examination altogether.  Instead, the university could allow the accused student's agent to conduct cross-examination on his behalf.  After all, an individual aligned with the accused student can accomplish the benefits of cross-examination— its adversarial nature and the opportunity for follow-up—without subjecting the accuser to the emotional trauma of directly confronting her alleged attacker.").

> meetings with the parties or at a live hearing, relevant and not otherwise impermissible questions under §§ 106.2 and 106.45(b)(7) and follow-up questions, including questions challenging credibility, before determining whether sex-based harassment occurred and allowing each party to propose to the decisionmaker or investigator relevant and not otherwise impermissible questions under §§ 106.2 and 106.45(b)(7) and follow-up questions, including questions challenging credibility, that the party wants asked of any party or witness and have those questions asked during individual meetings with the parties …

87 Fed. Reg. at 41577–41578.  The wording of this provision is vague, but it appears that recipients can exclude questions between parties as long as credibility isn't in dispute.  **We request further clarification as to when a recipient may exclude questions between the parties.**  If the Department does not provide clarification, the Proposed Rule is arbitrary and capricious.

Finally, at the postsecondary level, the Proposed Rule imagines that college students will mostly "self-advocate" in harassment proceedings. Although students would be entitled to an advisor, postsecondary institutions would not have to permit parents to be involved in the process.  The Department has failed to give any meaningful reason for excluding parents from these proceedings.  Students in higher education would undoubtedly benefit from a parent's counsel and the Proposed Rule fails to provide a single reason for excluding parents from the process.

### 6. The Proposed Rule's "Supportive Measures" provision is internally inconsistent.

The proposed rule allows "supportive measures" that temporarily burden a respondent only during the pendency of the proceedings. 87 Fed. Reg. at 41421.  This provision is internally contradictory because, elsewhere in the NPRM, it emphasizes the need for equitable treatment in the Title IX process between complainants and respondents. *Id.* at 41453.  Here, however, both are not subject to the same rules and the Department has not acknowledged or explained that departure.  This is also irrational because there's no basis for distinguishing between complainants and respondents on the basis of their conduct.  Since respondents are afforded the presumption of innocence by the NPRM, *id.* at 41488, 41508, this makes no sense.

This provision is also flawed because there are no limits to how burdensome the supportive measures may be. In theory, a respondent could be suspended from all classes and dismissed from campus on the basis of an unproven allegation. A school wouldn't even need to find that the complainant is likely to prevail on his or her claim of discrimination to impose that *de facto* sanction.

27

**B. The totality of the Proposed Rule returns to the problematic paradigm from the 2011–17 era and fails to adequately consider the mountain of evidence that strong due process protections are necessary for Title IX grievances procedures.**

The current regulations in 34 CFR § 106.45 (and elsewhere) set forth clear legal obligations that require schools to promptly respond to allegations of sexual harassment, follow a fair grievance process to resolve those allegations, and provide remedies to victims.  It guarantees victims and accused students strong, clear procedural rights in a predictable, transparent process designed to reach reliable outcomes.[21]  When taken as a whole, the current regulations were enacted following regulatory and constitutional mess from 2011 to 2017.  The proposed rule would re-institute many of those flawed policies.

OCR's 2011 *Dear Colleague Letter: Sexual Violence* ("2011 DCL") wreaked havoc on campuses across the country (The 2011 DCL was expanded upon by a 2014 *Questions and Answers on Title IX and Sexual Violence*).  It was a Kafkaesque disciplinary disaster that resulted in hundreds of successful lawsuits against schools and widespread criticism from across the ideological spectrum.  The 2011 DCL compelled schools to adopt the lowest standard of proof for proving sexual harassment and sexual assault claims—preponderance of the evidence—and pressured schools to find accused students responsible for sexual misconduct even where there was significant doubt about culpability.[22]

A laundry list of due process violations—reminiscent of Star Chamber—stacked the deck against accused students: schools failed to give students the complaint against them, or notice of the factual basis of charges, the evidence gathered, or the identities of witnesses; schools fail to provide hearings or to allow

---

[21] *See, e.g.*, U.S. Dep't of Educ. YouTube Channel, *OCR Webinar on Due Process Protections under the New Title IX Regulations* (July 21, 2020), https://youtu.be/48UwobtiKDI; U.S. Dep't of Educ. YouTube Channel, *OCR Title IX Webinar: Bias and Conflicts of Interest* (Jan 15, 2021), https://www.youtube.com/watch?v=vHppcOdrzCg.

[22] OCR found numerous institutions in violation of Title IX for failing to adopt the preponderance of the evidence standard in its investigations of sexual harassment, even though the notion that the preponderance of the evidence standard is the only standard that might be applied under Title IX was set forth in the 2011 Dear Colleague Letter and not in the Title IX statute, current regulations, or other guidance. *E.g.*, U.S. Dep't. of Education, Office for Civil Rights, Letter of Findings to Harvard Law School 7, Dec. 10, 2014, https://www2.ed.gov/documents/press-releases/harvard-law-letter.pdf ("[I]n order for a recipient's grievance procedures to be consistent with the Title IX evidentiary standard, the recipient must use a preponderance of the evidence standard for investigating allegations of sexual harassment, including sexual assault/violence."); *see also* Blair A. Baker, *When Campus Sexual Misconduct Policies Violate Due Process Rights*, 26 CORNELL J. L. & PUB. POL'Y 533, 542 (2016) (The 2011 DCL "forced universities to change their former policies drastically, with regards to their specific procedures as well as the standard of proof, out of fear that the Department of Education will pursue their school for a violation of Title IX.").

the accused student's lawyer to attend or speak at hearings; schools barred the accused from putting questions to the accuser or witnesses, even through intermediaries; schools denied parties the right to see the investigative report or get copies for their lawyers for preparing an appeal; schools allowed appeals only on very narrow grounds such as new evidence or procedural error, providing no meaningful check on the initial decisionmaker. A study by the Foundation for Individual Rights in Education found that 73% of the top universities in America did not guarantee the presumption of innocence in campus proceedings.[23]

By 2014, OCR had stopped using the terms complainant/alleged victim and alleged perpetrator and replaced them with victim/survivor and perpetrator. OCR then began keeping a public list of the schools at which it was investigating possible Title IX violations, putting schools under a cloud of suspicion.

This resulted in a Title IX system that quite literally resembled Kafka's *The Trial*.[24] Here are just a few examples of the infamous system created during the 2011–17 paradigm:

- An athlete of color at Colorado State University-Pueblo was accused of sexually assaulting a female trainer, but not by her. Despite the trainer saying that she had not been raped, University officials pointed out that according to Title IX, they got to decide the accused student's fate and the student was found guilty and expelled.[25]

- At USC, a student-athlete was kicked out of school for abusing his girlfriend— despite the fact his girlfriend never reported any abuse and vehemently denied any abuse ever took place—after a neighbor saw the couple playfully roughhousing in the front yard.[26]

- A Howard University law professor was punished, following a 16-month investigation, because an exam question he wrote involving a bikini wax was deemed to have created an unsafe environment after a student "allegedly

---

[23] FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, Dec. 18, 2018, https://www.thefire.org/report-as-changes-to-title-ix-enforcement-loom-americas-top-universities-overwhelmingly-fail-to-guarantee-fair-hearings-for-students/.

[24] *See, e.g.*, COMMENTARY MAGAZINE, June 2017, https://www.commentarymagazine.com/articles/kc-johnson/kafka-u/.

[25] REASON, Apr. 19, 2016, https://reason.com/2016/04/19/female-student-said-im-fine-and-i-wasnt/.

[26] REASON, Aug. 2, 2017, https://reason.com/2017/08/02/student-athletes-torn-apart-by-title-ix/.

believed the question's premise somehow required her to reveal to the class whether she'd had a Brazilian wax."[27]

- A judge rebuked Brandeis University for denying fundamental due process rights to a student who was found guilty of sexual misconduct for a variety of non-violent offenses: most notably, because he had awakened his then-boyfriend with nonconsensual kisses.[28]

- Northwestern University Professor Laura Kipnis (herself a liberal feminist) faced a Title IX complaint and investigation simply for writing an essay about sex on campus and criticizing sexual harassment policies (the complaint alleged she created a "chilling environment" for reporting sexual harassment or assaults).[29]

- Carleton College suspended a student for drunken sex and then expelled the student as soon as he appealed the suspension, with the Dean writing to him that "the fact you continue to assert that it was okay to engage in sexual activity with a person in [Jane Doe's] condition is deeply troubling."[30]

- A University of Tennessee student was investigated for sexual harassment because he wrote his instructor's name wrong.[31]

- Resident Advisors at University of Massachusetts-Amherst told students that making jokes about Harambe, the dead gorilla and internet meme, could constitute a violation of Title IX.[32]

---

[27] FOUNDATION FOR INDIVIDUAL RIGHTS IN EDUCATION, July 6, 2017, https://www.thefire.org/a-sticky-situation-at-howard-university-brazilian-wax-test-question-nets-professor-a-504-day-title-ix-investigation-sanctions/.

[28] REASON, Apr. 1, 2016, https://reason.com/2016/04/01/judge-sides-with-gay-brandeis-student-gu/; https://www.washingtonexaminer.com/federal-judge-rebukes-lack-of-due-process-in-campus-sex-assault-procedures.

[29] THE CHRONICLE OF HIGHER EDUCATION, May 29, 2015, http://laurakipnis.com/wp-content/uploads/2010/08/My-Title-IX-Inquisition-The-Chronicle-Review-.pdf.

[30] REASON, Aug. 1, 2019, https://reason.com/2019/08/01/carleton-college-title-ix-expelled-football-student-lawsuit/.

[31] REASON, Oct. 12, 2016, https://reason.com/2016/10/12/ut-student-now-being-investigated-for-se/.

[32] REASON, Sept. 6, 2016, https://reason.com/2016/09/06/umass-amherst-harambe-jokes-are-racist-m/.

One of the more tragic ironies is that the 2011 DCL resulted in a disproportionate number of expulsions and scholarship losses for Black male students.[33]

The criticisms of the 2011–17 system spanned the ideological spectrum.  Here are just a few examples:

- Four feminist law professors at Harvard wrote that the Biden/Lhamon Title IX system "put pressure on [schools] to stack the system so as to favor alleged victims over those they accuse and that "procedures for enforcing [definitions of sexual harassment] are frequently so unfair as to be truly shocking."[34]

- More than two dozen other Harvard Law School professors wrote a letter in 2014 objecting to the school's Title IX process as unfair.[35]

- A group of 16 law professors from the University of Pennsylvania argued "we believe that OCR's approach exerts improper pressure upon universities to adopt procedures that do not afford fundamental fairness."[36]

- Janet Halley, a self-described feminist and professor at Harvard Law School told Congress that "the rate of complaints and sanctions against male (including transitioning to male) students of color is unreasonably high."[37]

---

[33] REALCLEAREDUCATION, Jan. 21, 2019, https://www.realcleareducation.com/articles/2019/01/21/black_men_title_nine_and_the_disparate_impact_of_discipline_policies_110308.html.

[34] Elizabeth Bartholet et al., *Fairness For All Students Under Title IX*, Aug. 21, 2017, https://dash.harvard.edu/bitstream/handle/1/33789434/Fairness%20for%20All%20Students.pdf?sequence=1&isAllowed=v.

[35] BOSTON GLOBE, Oct. 14, 2014, https://www.bostonglobe.com/opinion/2014/10/14/rethink-harvard-sexual-harassment-policy/HFDDiZN7nU2UwuUuWMnqbM/story.html ("Harvard has adopted procedures for deciding cases of alleged sexual misconduct which lack the most basic elements of fairness and due process").

[36] Open Letter from Members of the Penn Law School Faculty, *Sexual Assault Complaints: Protecting Complainants and the Accused Students at Universities*, WALL ST. J., Feb. 18, 2015, http://online.wsj.com/public/resources/documents/ 2015_0218_upenn.pdf (statement of 16 members of the University of Pennsylvania Law School faculty).

[37] THE COLLEGE FIX, Aug. 4, 2015, https://www.thecollegefix.com/shut-out-of-sexual-assault-hearing-critics-of-pro-accuser-legislation-flood-senate-committee-with-testimony/ ; Additionally, Harvard Law Professor Jeannie Suk Gersen wrote in The New Yorker in 2015 that the administrators and faculty members she'd spoken with who "routinely work on sexual-misconduct cases" said that "most of the complaints they see are against minorities." The New Yorker, Dec. 11, 2015, https://www.newyorker.com/news/news-desk/argument-sexual-assault-race-harvard-law-school.

- The past President of the American Civil Liberties Union remarked in 2015 that "OCR's distorted concept of sexual harassment actually does more harm than good to gender justice, not to mention to free speech."[38]

- The American College of Trial Lawyers issued a report concluding that OCR had imperiled due process and free speech.[39]

The due-process deficiencies in the 2011 DCL and 2014 Q&A led to over 600 lawsuits by accused students against their academic institutions.[40]  These lawsuits, more often than not,[41] resulted in victories for accused students across the country in state and federal court, including key wins at the appellate level.  *See, e.g.*, *Doe v. Oberlin Coll.,* 963 F.3d 580, 581 (6th Cir. 2020); *Doe v. Univ. of the Scis.*, 961 F.3d 203, 205 (3d Cir. 2020); *Doe v. Purdue Univ.*, 928 F.3d 652, 656 (7th Cir. 2019); *Haidak v. Univ. of Mass.-Amherst*, 933 F.3d 56, 60 (1st Cir. 2019); *Doe v. Miami Univ.*, 882 F.3d 579 (6th Cir. 2018); *Doe v. Baum*, 903 F.3d 575 (6th Cir. 2018); *Doe v. Univ. of Cincinnati*, 872 F.3d 393 (6th Cir. 2017); *Doe v. Claremont McKenna Coll.*, 25 Cal. App. 5th 1055, 1070 (2018); *Doe v. Regents of Univ. of Cal.*, 28 Cal. App. 5th 44, 61 (2018).

The Department has proposed returning—in large part—to the problematic Title IX grievance system from the 2011–17 era.  It has utterly failed to reconcile these past failures of OCR policy with its Proposed Rule.

---

[38] Shorenstein Center, *Nadine Strossen: "Free Expression: An Endangered Species on Campus?" Transcript*, https://shorensteincenter.org/nadine-strossen-free-expression-an-endangered-species-on-campus-transcript/.

[39] American College of Trial Lawyers, *Task Force on the Response of Universities and Colleges to Allegations of Sexual Violence, White Paper on Campus Sexual Assault Investigations*, 2017, https://www.actl.com/docs/defaultsource/defaultdocumentlibrary/positionstatementsandwhitepapers/task_force_allegations_of_sexual_violence_white_paper_final.pdf.

[40] *See Milestone: 600+ Title IX/Due Process Lawsuits in Behalf of Accused Students*, TITLE IX FOR ALL, Apr. 1, 2020, https://www.titleixforall.com/milestone-600-title-ix-due-process-lawsuits-in-behalf-of-accused-students; *see also* Diane Heckman, *The Assembly Line of Title IX Mishandling Cases Concerning Sexual Violence on College Campuses*, 336 WEST'S EDUC. L. REP. 619, 631 (2016) (stating that since 2014 "there has been an influx of lawsuits contending post-secondary schools have violated Title IX due to their failure to properly handle sexual assault claims. What is unusual is that both sexes are bringing such Title IX mishandling cases due to lack of or failure to follow proper process and due process from each party's perspective. A staggering number of cases involve incidents of alcohol or drug usage or intoxication triggering the issue of the negating a voluntary consent between the participants.") (internal citations omitted).

[41] *See* Samantha Harris & KC Johnson, *Campus Courts in Court: The Rise in Judicial Involvement in Campus Sexual Misconduct Adjudications*, 22 N.Y.U. J. LEGIS. & PUB. POL'Y 49 (2019).

(5) Any other contract, agreement, or arrangement which has as one of its purposes the provision of assistance to any education program or activity, except a contract of insurance or guaranty.

34 C.F.R. § 106.2(g).

Two federal district courts have now determined that an entity's tax-exempt status under Section 501(c)(3) of the Internal Revenue Code, 26 U.S.C. § 501(c)(3), constitutes federal financial assistance.  *See E.H. v. Valley Christian Acad.*, 2022 U.S. Dist. LEXIS 132893, at *17 (C.D. Cal. July 25, 2022); *Buettner-Hartsoe v. Balt. Lutheran High Sch. Ass'n*, 2022 U.S. Dist. LEXIS 130429, at *15 (D. Md. July 21, 2022).  Both decisions held that 501(c)(3) status made private high schools indirect recipients of federal financial assistance, therefore, subjected them to Title IX.

Prior to these decisions, 501(c)(3) had never been considered federal financial assistance.  Income tax exemptions are "conspicuously absent from [the] laundry list" of examples in 34 C.F.R. § 106.2(g).  *Johnny's Icehouse, Inc. v. Amateur Hockey Ass'n*, 134 F. Supp. 2d 965, 971 (N.D. Ill. 2001); see also *Zimmerman v. Poly Prep Country Day Sch.*, 888 F. Supp. 2d 317, 332 n.2 (E.D.N.Y. 2012) (citing, *e.g.*, *Stewart v. New York Univ.*, 430 F. Supp. 1305, 1314 (S.D.N.Y. 1976)).

The Department should clarify in 34 C.F.R. § 106.2(g) that 501(c)(3) status does not constitute federal financial assistance.  Extending Title IX to schools because of 501(c)(3) status would be a drastic extension of Title IX.  It would force every private school enjoying tax-exempt status to comply with Title IX.

## VI. THE DEPARTMENT MUST ASSESS THE IMPACT OF THE PROPOSED REGULATIONS ON FAMILIES AND PARENTAL RIGHTS PURSUANT TO 5 U.S.C § 601.

Section 654 of the Treasury and General Government Appropriations Act, 1999, Pub. L. 105-277, codified at 5 U.S.C § 601, provides:

Before implementing policies and regulations that may affect family well-being, each agency shall assess such actions with respect to whether … the action strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children.

5 U.S.C § 601 (statutory notes). As discussed in Part I(D), the Proposed Rule infringes on parental rights because it treats failure to "affirm[] gender identity" the same as traditional forms of discrimination (*e.g.*, excluding girls from the debate team), a school wouldn't need to obtain parental consent before pushing "gender affirmation" of whatever self-declared identity a child announces in school; the school would never

35

have to disclose that affirmation program to the child's parents, and must—at any rate—pursue it even over parents' objections.  The statute clearly provides that the Department must evaluate its proposed actions with respect to whether the "action strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children."  *Id.*

The Department must conduct the impact analysis as required by Pub. L. 105-277, codified at 5 U.S.C § 601, or the Proposed Rule is arbitrary, capricious, and not in accordance with law.

Sincerely,

AUSTIN KNUDSEN
ATTORNEY GENERAL OF MONTANA

STEVE MARSHALL
ATTORNEY GENERAL OF ALABAMA

LESLIE RUTLEDGE
ATTORNEY GENERAL OF ARKANSAS

CHRISTOPHER M. CARR
ATTORNEY GENERAL OF GEORGIA

THEODORE E. ROKITA
ATTORNEY GENERAL OF INDIANA

DEREK SCHMIDT
ATTORNEY GENERAL OF KANSAS

DANIEL CAMERON
ATTORNEY GENERAL OF KENTUCKY

JEFF LANDRY
ATTORNEY GENERAL OF LOUISIANA

LYNN FITCH
ATTORNEY GENERAL OF MISSISSIPPI

DOUG PETERSON
ATTORNEY GENERAL OF NEBRASKA

JOHN M. O'CONNOR
ATTORNEY GENERAL OF OKLAHOMA

ALAN WILSON
ATTORNEY GENERAL OF SOUTH
CAROLINA

MARK VARGO
ATTORNEY GENERAL OF SOUTH DAKOTA

JONATHAN SKRMETTI
ATTORNEY GENERAL OF TENNESSEE

KEN PAXTON
ATTORNEY GENERAL OF TEXAS

SEAN D. REYES
ATTORNEY GENERAL OF UTAH

JASON MIYARES
ATTORNEY GENERAL OF VIRGINIA