Exhibit 29



September 11, 2022

Miguel A. Cardona
Secretary of Education
U.S. Department of Education
VIA REGULATIONS.GOV

RE:   Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance
Docket ID ED-2021-OCR-0166

*The Rule Violates the Freedom of Speech, Imperils the Free Exercise of Religion, and Harms Federally Funded Schools*

Dear Secretary Cardona,

Fifty years ago, Congress acted to protect equal opportunity for women by passing Title IX. Now, by radically rewriting federal law, the Biden administration is threatening the advancements that women have long fought to achieve in education and athletics. Along with denying women a fair and level playing field in sports, this new rule seeks to impose widespread harms, including threatening the health of adults and children, denying free speech on campus, trampling parental rights, violating religious liberty, and endangering unborn human life.

Alliance Defending Freedom (ADF) submits these comments on the Notice of Proposed Rulemaking (NPRM) on Title IX of the Education Amendments of 1972, Docket ID ED-2021-OCR-0166. ADF is an alliance-building legal organization that advocates for the right of all people to freely live out their faith. It pursues its mission through litigation, training, strategy, and funding. Since its launch in 1994, ADF has handled many legal matters involving Title IX, the First Amendment, athletic fairness, student privacy, and other legal principles addressed by the Notice of Proposed Rulemaking.

ADF strongly opposes any effort to redefine sex in federal regulations inconsistent with the text of Title IX itself, or otherwise impair the First Amendment, due process, or parental rights. ADF thus urges the Department of Education to withdraw and abandon the NPRM.

These comments focus on the negative impact of the proposed rule on the freedoms of speech, free exercise of religion, and federally-funded schools. The proposed rule threatens to censor and compel speech, trample religious exercise,

U.S. Department of Education
September 11, 2022
Page 2

subject students and faculty to campus kangaroo-court procedures, and imperil the educational mission of schools nationwide.

I. **Redefining "sex discrimination" under Title IX threatens constitutionally-protected faculty and student speech.**

   A. **By redefining "sex discrimination" and sex stereotypes to include sexual orientation and gender identity, the Department mandates messages about sex and gender.**

Under the proposed rules, 34 C.F.R. § 106.10 would provide, "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." This expansion in the context of Title IX itself jeopardizes free speech throughout America's schools, and it is constitutionally flawed when applied in any educational setting to daily conversations.

First, the inclusion of "sexual orientation" in the meaning of "sex" will lead to improper restrictions on protected speech. Just seven years ago, the Supreme Court emphasized the "good faith" in which "reasonable and sincere people here and throughout the world" have held that marriage is a permanent, monogamous, heterosexual union.[1] Despite that assurance, governments now treat the refusal to express messages in support of same-sex marriage as an act of discrimination on the basis of sexual orientation,[2] and at least one school has issued several no-contact orders under Title IX because of students' religious expression in support of traditional marriage.[3] Opinions on marriage, sexual morality, and human identity raised by the issue of sexual orientation are the sort of "things that touch the heart of the existing order" over which the Constitution guarantees "the right to differ," especially in American schools.[4] The Department should not depart from the statutory text by redefining "sex" to include "sexual orientation." At the very least, it should ensure that the regulations expressly preserve the full range of protected expression on this issue and expressly exclude such expression from the definition of "sex-based harassment" in 34 C.F.R. § 106.2.

Second, the inclusion of "gender identity" in the meaning of "sex" will lead to improper restrictions on speech and improper compulsion of speech. Students who

---

[1] *Obergefell v. Hodges*, 576 U.S. 644, 657 (2015).

[2] *See, e.g., 303 Creative LLC v. Elenis*, 6 F.4th 1160, 1178 (10th Cir. 2021)*, cert. granted in part*, 142 S. Ct. 1106 (2022) (Mem.).

[3] *See Perlot v. Green*, No. 3:22-CV-00183-DCN, 2022 WL 2355532, at *3–4 (D. Idaho June 30, 2022).

[4] *West Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943).

U.S. Department of Education
September 11, 2022
Page 3

identify as transgender commonly request to be addressed by different names and pronouns. The use of pronouns inconsistent with a person's sex communicates a message: that what makes a person a man or a woman is solely that person's sense of being a man or a woman.[5] Students who take a contrary view of the relationship between biological sex and personal identity (for religious, philosophical, scientific, or other reasons) may be reluctant to use those terms because using them contradicts their own deeply held views. The Department already interprets refusal to use pronouns as the sort of activity it will investigate and punish.[6] Schools around the country are also punishing students and faculty for refusal to use names or pronouns inconsistent with a student's biological sex, often invoking Title IX as their basis for doing so.[7]

Policies compelling staff to use students' preferred names and pronouns have been met with legal challenge.[8] As is evident from these lawsuits, school staff members may hold religious beliefs that prevent them from personally affirming or communicating views about human nature and gender identity that are contrary to their religious beliefs, particularly for those who believe that using "preferred pronouns" communicates a message to and about the child that is untrue.[9] Such teachers are committed to respectfully addressing all students in a way that does not require them to violate their sincerely held religious beliefs, including a commitment

---

[5] See *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2471–73 (2018) (discussing the essential First Amendment protections for issues of public concern).

[6] *See* U.S. Dep't of Educ., Office for C.R., *Confronting Anti-LGBTQI+ Harassment in Schools* (June 2021), https://www2.ed.gov/about/offices/list/ocr/docs/ocr-factsheet-tix-202106.pdf.

[7] *See Meriwether v. Hartop*, 992 F.3d 492, 511 (6th Cir. 2021); *Kluge v. Brownsburg Cmty. Sch. Corp.*, 548 F. Supp. 3d 814, 824 (S.D. Ind. 2021); *Ricard v. USD 475 Geary Cty., Kan. Sch. Bd.*, No. 5:22-cv-0415-HLT-GEB (D. Kan. May 9, 2022); *Loudoun Cty. Sch. Bd. v. Cross*, No. 210584 (Va. Aug. 30, 2021); *see also* Emily Matesic, *Middle Schoolers Accused of Sexual Harassment for Not Using Preferred Pronouns, Parents Say*, KKTV.com (May 15, 2022), https://www.kktv.com/2022/05/16/middle-schoolers-accused-sexual-harassment-not-using-preferred-pronouns-parents-say; Madeline Fox, *Kiel School Board Closes Title IX Investigation Over Wrong Pronouns that Prompted Threats of Violence*, Wis. Pub. Radio (June 3, 2022), https://www.wpr.org/kiel-school-board-closes-title-ix-investigation-over-wrong-pronouns-prompted-threats-violence.

[8] *See, e.g.*, Complaint filed in *D.F. v. Harrisonburg City Pub. Sch. Bd.*, Case No. CL22-1304 (Va. Cir. Ct. June 1, 2022), https://adflegal.org/sites/default/files/2022-06/DF-v-Harrisonburg-City-Public-Schools-2022-06-01-Complaint.pdf; Complaint filed in *Ricard v. USD 475 Geary Cnty., Kan. Sch. Bd.*, Case No. 5:22-cv-0415-HLT-GEB, (D. Kan. Mar. 7, 2022), https://adfmedialegalfiles.blob.core.windows.net/files/RicardComplaint.pdf.

[9] *See* Complaint filed in *D.F. v. Harrisonburg City Pub. Sch. Bd.*, Case No. CL22-1304, at ¶ 72–78.

U.S. Department of Education
September 11, 2022
Page 4

to not lie to or intentionally deceive parents about how a student is being addressed at school, but are prevented from doing so by the imposition of such policies.[10]

The United States Court of Appeals for the Sixth Circuit recently held that such compulsion, as applied to a university professor, violates the First Amendment.[11] Shawnee State University officials punished a philosophy professor, Dr. Nicholas Meriwether, because he declined a male student's demand to be referred to as a woman with feminine titles and pronouns ("Miss," "she," etc.). Dr. Meriwether offered to use the student's preferred first or last name instead. Initially, the University accepted that compromise, only to reverse course days later. Ultimately, it punished him by putting a written warning in his personnel file and threatened "further corrective actions" unless he spoke contrary to his own philosophical and Christian convictions.[12]

In November 2018, ADF filed a lawsuit on Dr. Meriwether's behalf. Initially, a federal judge dismissed the case, but ADF appealed the decision to the U.S. Court of Appeals for the 6th Circuit. In March 2021, the 6th Circuit ruled in ADF's favor, upholding Dr. Meriwether's First Amendment rights. The 6th Circuit explained that if "professors lacked free-speech protections when teaching, a university would wield alarming power to compel ideological conformity. A university president could require a pacifist to declare that war is just, a civil rights icon to condemn the Freedom Riders, a believer to deny the existence of God, or a Soviet émigré to address his students as 'comrades.' That cannot be."[13]

In April 2022, Dr. Meriwether's case concluded with a favorable settlement, in which the university agreed to pay $400,000 in damages and attorney's fees, rescind the written warning it issued in June 2018, and affirm his right to address students consistent with his beliefs.[14]

> B.   **The proposed rule's mandatory use of pronouns inconsistent with sex is unconstitutional.**

As with sexual orientation, the Department should not proceed with the express redefinition of "sex" to include "gender identity." But in any event, it should

---

[10] Complaint filed in *D.F. v. Harrisonburg City Pub. Sch. Bd.*, Case No. CL22-1304, at ¶ 81.

[11] *See Meriwether*, 992 F.3d at 511–12.

[12] *Id.* at 501.

[13] *Id.* at 506.

[14] ADF, Meriwether v. The Trustees of Shawnee State University, https://adflegal.org/case/meriwether-v-trustees-shawnee-state-university (last visited Sept. 7, 2022).

U.S. Department of Education
September 11, 2022
Page 5

clarify that refusal to use names or pronouns inconsistent with sex is not prohibited discrimination, is not "sex-based harassment" as defined in 34 C.F.R. § 106.2, and does not create a hostile environment. Were the Department to fail to clarify this application of the proposed rule, the rule would be fatally vague. And were the Department to finalize the proposed rule without change, it would create conflicts with the First Amendment's free speech clause.

As written, the Department's proposed rule seeks to regulate speech by content and viewpoint, and so its enforcement is overbroad, as well as subject to strict scrutiny, with its compelling interest and narrow tailoring requirements.[15] Content- or viewpoint-based restrictions are "subject to strict scrutiny regardless of the government's benign motive."[16]

Any speech on these topics receives strong protection,[17] and the Department could not satisfy strict scrutiny to justify burdening this speech. After all, "regulating speech because it is discriminatory or offensive is not a compelling state interest."[18] The government lacks any legitimate objective "to produce speakers free" from purported bias,[19] and so any non-discrimination "interest is not sufficiently overriding as to justify compelling" speech.[20] Far from being "always" a "compelling interest," this interest is "comparatively weak" in the context of education and pronouns.[21] And any interest could be achieved in more narrow ways.

## II.     Redefining "sexual harassment" will harm students and restrict speech.

In the United States, colleges and universities have traditionally been bastions of free speech. People with diverse religious, political, and philosophical beliefs have been able to come together for a free and robust debate in the marketplace of ideas in university classrooms, lecture halls, quads, and dorms. And without question, students should be able to participate in the life of school and universities free of sex-based harassment.

---

[15] *Reed*, 135 S. Ct. at 2227–30.

[16] *Id.* at 2228.

[17] *Loudoun Cty. Sch. Bd. v. Cross*, No. 210584, slip op. at *9–10 (Va. Aug. 30, 2021).

[18] *Telescope Media Grp. v. Lucero*, 936 F.3d 740, 755 (8th Cir. 2019).

[19] *Hurley v. Irish-Am. Gay, Lesbian & Bisexual Grp. of Bos.*, 515 U.S. 557, 578–79 (1995).

[20] *Brush & Nib Studio, LC v. City of Phx.*, 448 P.3d 890, 914–15 (Ariz. 2019).

[21] *Meriwether*, 992 F.3d at 509–10.

U.S. Department of Education
September 11, 2022
Page 6

The proposed rule's redefinition of "sexual harassment," however, does not advance that goal. Instead, it threatens to make universities hostile toward religious, political, and philosophical beliefs that university officials or students disfavor.

### A. The proposed rule improperly lowers the threshold for sexual harassment.

All can agree that harassment based on sex is anathema to human dignity. It should not be tolerated in the educational environment, or anywhere else. But by altering the definition of "sex" and by stripping away basic due process protections, the rule creates the conditions where baseless charges of discrimination can be weaponized against objectively non-offensive speech pertaining to commonly debated political and social issues.

As noted above, the proposed rule mandates messages about sex and gender that conflict with many American's deeply held religious and conscientious beliefs. By expanding the definition of sex to require this speech, the rule places in the Title IX crosshairs those whose speech on oft-discussed and frequently debated questions revolving around sex and gender departs from the viewpoint mandated by the rule.

In addition to dramatically expanding the scope of speech and conduct that may be construed as harassment by expanding the definition of "sex," the proposed regulations compound this problem by lowering the threshold for sexual harassment. The proposed regulations define the hostile environment category of sex-based harassment as "[u]nwelcome sex-based conduct that is sufficiently severe *or* pervasive, that, based on the totality of the circumstances and evaluated subjectively *and* objectively, denies *or limits* a person's ability to participate in or benefit from an education program or activity."[22] In contrast, the Supreme Court has held that, under Title IX, "a plaintiff must establish sexual harassment of students that is so severe, pervasive, and objectively offensive . . . that the victim-students are effectively denied equal access to an institution's resources and opportunities."[23] The proposed regulations depart from the Supreme Court's definition in (at least) two ways.

First, the proposed regulations insert a totality of circumstances test that will assess the offensiveness of the allegedly unlawful conduct both "subjectively and objectively," while the Supreme Court requires a demonstration of objective offensiveness. There is, of course, "no categorical 'harassment exception' to the First

---

[22] NPRM at 657–58 (emphasis added).

[23] *Davis v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 651 (1999).

U.S. Department of Education
September 11, 2022
Page 7

Amendment's free speech clause," even for objectively offensive expression.[24] The expansion of "harassment" to include even the subjectively offensive speech would create unconstitutional restrictions on speech in the name of prohibiting harassment even more likely[25] and would place recipient institutions between the Scylla of Title IX and the Charybdis of Section 1983. The Department should not expand harassment to include subjective offense. Alternatively, it should explain how recipient institutions can avoid deliberate indifference liability on the one hand without engaging in unconstitutional speech restrictions on the other.

Second, the proposed regulations would find a hostile environment where the harassment "denies or limits" participation or receipt of benefits, while the Supreme Court requires harassment that is "so severe" that a student is "effectively denied equal access to an institution's resources and opportunities."[26] Combined with the ability to consider the totality of circumstances and evaluate offensiveness subjectively, finding liability where there is any limitation, rather than outright denial, will again dramatically expand the scope of actionable harassment and again put recipients in the untenable position of either violating Title IX or restricting too much speech and violating Section 1983. The Department should adhere to the *Davis v. Monroe County Board of Education* standard for harassment, should expressly clarify that constitutionally protected speech is not harassment, and should jettison the totality of circumstances inquiry (or at least explain how this inquiry does not confer unbridled discretion on enforcing officials).

B. **The proposed rule authorizes use of supportive measures and other enforcement actions to an unconstitutional degree.**

The proposed rule authorizes supportive measures that directly restrict students' constitutional rights to freedom of speech.[27] At the same time, the rules define supportive measures as "non-punitive and non-disciplinary"—an apparent contradiction.[28] At least one school has imposed a no-contact order as a result of the content and viewpoint of a student's speech and then claimed there was no First Amendment violation because of the nominally non-disciplinary character of the

---

[24] *Rodriguez v. Maricopa Cty. Comm. Coll. Dist.*, 605 F.3d 703, 708 (9th Cir. 2010) (quotation omitted).

[25] *See Texas v. Johnson*, 491 U.S. 397, 414 (1989) ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.").

[26] *Davis*, 526 U.S. at 651.

[27] *See* NPRM at 677 (including "restrictions on contact between the parties" as an approved "supportive measure").

[28] *Id.* at 659.

U.S. Department of Education
September 11, 2022
Page 8

order.[29] Direct restrictions on speech have a punitive effect even if the recipient institution's *purpose* is to protect one student rather than to discipline or punish another.[30]

Therefore, the Department should remove no-contact orders from the set of authorized non-disciplinary or non-punitive supportive measures. In the alternative, it should at the very least clarify that no-contact orders qualify as "[s]upportive measures that burden a respondent" under Section 106.44(g)(2) and, as such, must be no more restrictive of the respondent than is necessary to restore or preserve the complainant's access to the recipient's education program or activity."[31] Additionally, if the Department decides to retain no-contact orders as a supportive measure, in recognition of the grave constitutional concerns at stake, including Free Speech and Due Process, the proposed rule should afford an immediate opportunity to appeal the decision.

Because no-contact orders impose a prior restraint on speech, they may not "delegate overly broad . . . discretion to a government official" responsible for implementing them.[32] As drafted, the proposed rules authorize use of no-contact orders where the coordinator subjectively finds sex discrimination *may* have occurred "as appropriate" within the coordinator's discretion.[33] In addition, the coordinator is empowered to take "other appropriate prompt and effective steps to ensure that sex discrimination does not continue . . . in addition to remedies provided to an individual complainant."[34] These broad provisions, as applied to any supportive measures that restrict a respondent's speech, do not satisfy the constitutional requirements for prior restraints on speech. In essence, this approach eviscerates any noble intentions of due process. The Department should either modify these provisions, exclude any supportive measures that restrict speech from their scope, or otherwise explain how these do not allow (or even require) coordinators to unconstitutionally restrict speech.

Further, the current rules authorize removal from campus as an emergency measure after a finding that a person's physical health and safety is at risk. The proposed rules notably remove the word "physical," which (1) dramatically expands the circumstances under which a student may be removed from campus, and (2)

---

[29] *See Perlot*, No. 3:22-CV-00183-DCN, 2022 WL 2355532, at *13.

[30] *Id.*

[31] NPRM at 677.

[32] *Forsyth Cty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992).

[33] *See* NPRM at 676.

[34] *Id.*

U.S. Department of Education
September 11, 2022
Page 9

directly extends this sanction to a student's words rather than actions.[35] The Department should either require the basis for emergency removal to be a finding of a threat to the *physical* health and safety of a student or clarify that the *source* of the threat cannot be the constitutionally protected speech of another student.

As an example of the kinds of free speech restrictions students already face on many campuses, as a result of this mistaken over-application of Title IX to supportive measures, the University of Idaho censored three law students earlier this year for speaking in accordance with their religious beliefs.[36] The students are members of the University of Idaho College of Law's Christian Legal Society (CLS) chapter.

The situation began when a student asked the chapter members why they believed that marriage is between a man and a woman. Members of CLS respectfully engaged with the question, and one of them explained that this view is the only view of marriage affirmed by the Bible. Another of the CLS members followed up with a handwritten note, offering further discussion so that they could understand one another's views better.

Biblical views, no matter how respectfully expressed, are often unwelcome on public campuses, however. A few days later, the student publicly denounced the CLS members at a panel with members of the American Bar Association. A third CLS member was present and spoke out, explaining that the student's characterization was inaccurate and sharing that from his perspective, religious freedom on campus was in danger.

A few days later, with no warning and no chance for the CLS members to defend themselves, the university issued no-contact orders prohibiting them from having any contact with the student who asked them a question about their religious beliefs. Shortly after, the university issued a no-contact order against one of the student's professors after he reached out to the student to see if she wanted to discuss her concerns.

Consider another example. While a graduate student in Southern Illinois University Edwardsville's Art Therapy program, Maggie DeJong, like many other students, posted materials to her social media accounts, sent messages to fellow students, and engaged in class discussions on an array of topics. But because DeJong's views often differed from those of other students in the program—views informed by her Christian faith and political stance—several of her fellow students

---

[35] *Id.* at 679.

[36] Christiana Kiefer, *Title IX Proposed Changes Threaten Free Speech*, Townhall (Aug 02, 2022), https://townhall.com/columnists/christianakiefer/2022/08/02/draft-n2611108.

U.S. Department of Education
September 11, 2022
Page 10

reported her speech to university officials. The officials then issued no-contact orders against DeJong, prohibiting her from having "any contact" or even "indirect communication" with three fellow graduate students who complained that her expression of religious and political viewpoints constituted "harassment" and "discrimination." Maggie wasn't given a chance to defend herself. When they issued the orders, university officials didn't even disclose the allegations against her, and they did not identify a single law, policy, or rule that she had violated. That's because she hadn't violated any. Despite all this, university officials threatened "disciplinary consequences" if Maggie violated the no-contact orders and copied the school's police lieutenant on each order. DeJong is suing the university for violating her civil and constitutional rights because of her viewpoint.[37]

These incidents may seem like campus squabbles, but they have a significant impact on students' future prospects and on culture as a whole. Being denounced before a panel of the Bar Association and then receiving a no-contact order from your university are not good marks to have on your track record as a law student. The mere threat of such retaliation is enough to chill free speech on campus.

Beyond that, however, what happens on campus does not stay on campus. If students learn in college that holding a traditional view—or even exploring that view—of marriage and sexuality amounts to harassment, they will carry that lesson into their lives as adults. If the Department makes its proposed changes, all such views could be seen as harassment and discrimination on campus, starting in preschool. While biblical views on sexuality may be increasingly at odds with elite cultural orthodoxy, government enforced coercion is anathema to a free society. All speech must be protected if civil discourse is to survive. If the Department implements these changes to Title IX, future professionals, politicians, artists, teachers, doctors, and scientists will all learn, from day one in a K-12 public school setting, that speech isn't really free.

Of all places, public colleges and universities should be open forums where multiple viewpoints and opinions can be freely heard, debated, and discussed. Students on a school campus should not fear violation of their free speech rights or face retaliation because their views are disliked by other students or school officials. And likewise, education officials deserve better clarity on when to defer to First

---

[37] ADF, Southern Illinois University Silenced Student Maggie DeJong for her 'Harmful' Beliefs, https://adflegal.org/blog/southern-illinois-university-silenced-student-maggie-dejong-her-harmful-beliefs (last visited Sept. 7, 2022); ADF, DeJong v. Pembrook, https://adflegal.org/case/dejong-v-pembrook (last visited Sept. 7, 2022).

U.S. Department of Education
September 11, 2022
Page 11

Amendment free speech concerns in the course of Title IX proceedings, lest confusion and inconsistency of application spur a proliferation of lawsuits across the country.

On free speech, in its notice, the Department makes the generic claim that its proposed rule will not violate the First Amendment but will merely delete "redundant" provisions from the rule. In 2020, the Department added three references to the First Amendment's primacy in the event of conflict with Title IX's regulations to address "concerns for protecting academic freedom and free speech."[38] The 2022 proposed rule deletes two of the three references. The provision retained is the most prominent and broad reference of the three, indicating that the deleted references might be benign. However, these deletions, coupled with the Department's subdued discussion of the First Amendment in the preamble, and its move away from the *Davis* standard are potential cause for concern. The Department should reverse course and modify its rule to insert even stronger clarity concerning the supremacy of constitutional concerns when they conflict with Title IX. If not, costly, time-consuming, and otherwise avoidable lawsuits are likely to drain public schools' already limited resources and detract from their primary goal of educating America's students.

      C.    **The Department *should* provide a remedy where enforcement unconstitutionally restricts students' protected expression.**

In addition to correcting the substantive provisions, the Department should include a procedural mechanism to mitigate the harm of any unconstitutional restrictions on speech that do occur. One special harm resulting from Title IX enforcement actions (both disciplinary and non-disciplinary) is the record of the alleged misconduct. Schools will occasionally claim that, even when an act has been found unlawful, other rules prohibit them from correcting those records. Therefore, the Department should expressly authorize either (1) deletion (where consistent with law) or (2) correction of records (including records dealing with charges, discipline, or non-disciplinary supportive measures) whenever (a) a complaint is dismissed, (b) an informal resolution concludes without a finding or admission of fault, or (c) there's any judicial determination that punishment was unlawfully imposed. The Department should include a section expressly authorizing such action with respect to all records of enforcement, discipline, or non-disciplinary supportive measures.

**III.    The changes to Title IX grievance procedures are arbitrary, capricious, and reflect a failure of reasoned decision making.**

The proposed rule makes a series of related changes to the Title IX grievance procedures, many of which are internally contradictory, fail to show awareness of the

---

[38] 85 Fed. Reg. 30026, 30373 (May 19, 2020).

U.S. Department of Education
September 11, 2022
Page 31

schools and countless other nonprofits will now face a no-win choice: either give up their tax-exempt status or take on the burdensome obligation of complying with a host of federal laws and regulations for the first time. Being subject to Title IX, Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act of 1973, and the Age Discrimination Act of 1975 is no small thing. Schools and other nonprofits newly subject to these statutes would face comprehensive regulation of their activities—including both student and employee relations. They will incur significant and potentially crippling compliance costs. And they could encounter aggressive enforcement efforts by federal bureaucrats and agenda-driven activist organizations.

America's nonprofits need the Department to restore the certainty they've long enjoyed. Title IX isn't just about avoiding discrimination; it imposes a host of affirmative obligations. America's nonprofits need to know whether they must comply for the first time with these elaborate requirements. And Title IX's religious exemption does nothing to protect secular schools that historically have not accepted federal financial assistance and that object on reasonable grounds to the new notion of allowing males to participate in female sports or to access girls' private spaces.

The Department should thus make clear that it does not agree with these two recent court decisions that conflict with its existing regulation, and it should expressly state that it will not enforce Title IX against schools whose only alleged federal financial assistance is their tax-exempt status. It should also clarify that the Department of Education has never taken the view that federal financial assistance subjecting an entity to Title IX includes the federal recognition of tax-exempt status.

> B. **The Department should make clear that it does not extend Title IX to impose any constitutionally conflicting requirements on religious student groups who meet on or off campus.**

Religious student groups comprise a vibrant part of almost every collegiate or postsecondary institution across America. Take, for instance, Northwestern University, which boasts that it's "religious diversity is reflected in its rich offering of student-led religious and spiritual groups," including:

- 1 Baha'i club,
- 23 Christian groups,
- 2 Hindu student groups,
- 1 Interfaith initiative,
- 5 Jewish organizations,
- 1 Mormon student organization,
- 2 Muslim student associations, and

U.S. Department of Education
September 11, 2022
Page 32

- 1 Sikh student association.[61]

The university encourages its students to contact the school's Chaplain to explore starting a new religious group if they don't find one that's a good fit.

Northwestern is not alone. Many other colleges celebrate, promote, and encourage the rich diversity of student-led religious groups on their campuses. Moreover, some of these groups have purchased or lease a building in which to congregate, whether on or off campus. It would not be uncommon for one of the above-type of religious student groups—along with religious sororities and fraternities—to own or rent a building where they live in community with one another or regularly meet for fellowship and organizational activities that further their religious mission.

While the NPRM is silent as to the subject of religious student groups on campus, certain proposed changes may have disastrous consequences in particular for religious student groups that lawfully meet on or off public school campuses.[62] Therefore, the Department should expressly state that religious student groups are exempt from any application of Title IX, and the rule should not be altered in such a way as to reach religious student groups either on or off campus.

Particularly concerning is the Department's emphasis in proposed § 106.11 addressing the expansive jurisdictional scope of Title IX. The Department takes pains to reiterate Title IX's coverage in such a manner as to reach "conduct that occurs *in a building owned or controlled by a student organization that is officially recognized by a postsecondary institution* . . . ."[63] In its preamble, the Department offers its intention to "clarif[y] that Title IX obligates a recipient to respond to sex discrimination within the recipient's education program or activity in the United States, *even if it occurs off-campus*, including but not limited to conduct that occurs in a building owned or controlled by a student organization that is officially recognized by a postsecondary institution."[64]

---

[61] *See* Religious Student Organizations, https://www.northwestern.edu/religious-life/find-a-community/religious-student-organizations.html (last visited Sept. 7, 2022).

[62] Religious student groups have well-established constitutional rights to congregate and freely exercise their faith on public school campuses. *See Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993); *Good News Club v. Milford Cent. Sch.*, 533 U.S. 98 (2001).

[63] NPRM at 666 (emphasis added).

[64] *Id.* at 30 (emphasis added).

U.S. Department of Education
September 11, 2022
Page 33

The Department further describes its intention of the new proposed rules to "more clearly and completely describe the circumstances in which Title IX applies."[65]

In that same spirit of transparency, we urge the Department to be equally and abundantly clear as to the circumstances in which Title IX does *not* apply. Should the Department seek to impose application of Title IX to religious student groups—whether Muslim, Jewish, Christian, or any other faith that unifies the group—then a collision course with constitutional rights is inevitable. For example, a Christian sorority that lives together in a building off-campus could be forced under the new rules to open their housing accommodations to a male who identifies as a woman or to a lesbian couple that seeks to share a room, since doing so would contradict the sorority's sincerely held religious beliefs.

This conflict is especially prone to arise in the context of the Department's expanded definitions of the term "sex," which naturally conflict with age-old traditional beliefs on the topics of marriage and sexuality, across various faith groups and religions. Would the statement of faith itself of a religious student group be deemed hostile and offensive under the new Title IX rules? A public school's investigation into a religious group's core theological doctrine implicates church autonomy concerns, as discussed further as related to the religious exemption.

The predictable and inescapable conflict between Title IX application and First Amendment rights under the Religion Clauses is one that can be easily avoided by inserting clarification into the new rules. One way to achieve such clarification would be for the Department to expand application of Title IX's religious exemption to expressly cover religious student groups in addition to religious educational institutions. Another way would be to carve out an express exception for religious student groups from proposed § 106.11.

Either way, students of faith across America who have affiliated with one another in religious student organizations deserve clarity and peace of mind that they are free to continue exercising their First Amendment rights to gather under a unifying set of religious convictions, without fear of reprimand or censorship by their colleges or schools. The First Amendment guarantees these students that their government will not coerce them to compromise on their sincerely held beliefs.

---

[65] *Id.* at 43.