# Exhibit 38



September 12, 2022

**Via Federal eRulemaking Portal**

Miguel A. Cardona
Secretary of Education
U.S. Department of Education
400 Maryland Ave. SW
Washington, DC 20202

Re:   EPPC Scholars Comment Opposing "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance," RIN 1870-AA16, Docket ID ED-2021-OCR-0166

Dear Secretary Cardona:

We are scholars at the Ethics and Public Policy Center (EPPC), and we write in strong opposition to the Department of Education's ("ED" or "the Department") proposed rule "Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance" ("Proposed Rule").[1] Rachel N. Morrison is an EPPC Fellow, member of the HHS Accountability Project, and former attorney at the Equal Employment Opportunity Commission. Mary Hasson is the Kate O'Beirne Senior Fellow at EPPC, an attorney, and co-founder of EPPC's Person and Identity Project, an initiative that equips parents and faith-based institutions to counter gender ideology and promote the truth of the human person.

The Proposed Rule radically rewrites Title IX of the Education Amendments of 1972, landmark federal civil rights law that prohibits sex discrimination in education. As proposed, the rule is arbitrary and capricious, exceeds statutory authority, and is unlawful and unconstitutional. The rationale for the proposed changes is unsupported by substantial evidence. The Proposed Rule contradicts long-standing scientific understandings of the human person and places ideology ahead of sound policy. It turns the clock back on girls' and women's rights, tramples parental rights, harms children's interests, and ignores religious freedom and free speech of students, employees, and religious educational institutions. We urge the Department to withdraw and abandon the Proposed Rule.

**1. ED has failed to provide substantial evidence that a revision of the current Title IX regulations is warranted.**

EO 12866, section 1(b) establishes the principles of regulation, including that "Each agency shall identify the problem that it intends to address (including, where applicable, the failures of private markets or public institutions that warrant new agency action) as well as assess the significance of that problem." To justify replacing current regulations, including the 2020 Rule, ED must provide specific evidence as to how those regulations are causing harms or burdens. ED has failed to meet that standard.

---

[1] 87 Fed. Reg. 41390.

test scores are falling, but schools are doubling down on ideological content and goals. Gender identity policies have no place in schools; Title IX cannot protect both sex-based rights and "gender identity" claims at the same time.

### B. School to clinic pipeline.

Backed by government support for "gender-affirming care," schools in some cities are enmeshed with the business side of adolescent gender clinics.[88] Clinicians provide trainings for teachers on "transgender" youth, "gender affirmation," social transition, and medical/surgical transition. Teachers and school staff, in turn, follow the advice of gender clinicians, validate children's "gender identities" (no matter how young or troubled), facilitate their "gender transitions" (often behind parents' backs) and refer them (and sometimes their parents) to gender clinics for medical interventions.

The "gender-affirming" climate in schools, fueled by policies that teach and privilege "gender identity" explorations, has been described by some parents as a school-to-gender-clinic-pipeline. This is another reason why we oppose the injection of "gender identity" into the school environment. Gender-affirming medical and surgical interventions cause serious harm to the developing bodies and vulnerable psyches of children.

Across the globe, gender specialists and whistleblowers have raised alarm over the scant evidence supporting gender-affirming protocols and the mounting evidence that gender affirmation causes harm to minors. In the wake of extensive evidence reviews, several leading European gender clinics recently ended or curtailed gender-affirming interventions for minors. Extensive psychotherapy, open to exploring alternative diagnoses and non-invasive ways of managing gender dysphoria, is emerging as the first-line response to adolescent identity distress.

The number of children and adolescents diagnosed with gender dysphoria or identifying as "transgender" has risen dramatically over the past decade, becoming "an international phenomenon, observed all across North America, Europe, Scandinavia, and elsewhere."[89] The typical patient profile also has changed markedly: until recently, patients seeking treatment for gender dysphoria were usually either adult males or very young children, mostly boys. Today, the typical patient is an adolescent, usually female.[90]

Alongside the explosive growth in gender-dysphoric or transgender-identified children and adolescents, the worlds of psychology and medicine have witnessed a sea change in the dominant clinical approach towards these issues—changes which raise serious ethical questions.[91] For years, gender dysphoria in children was addressed through "watchful waiting" or with psychotherapy for the child and family. In most (up to 88%) of these situations, the child's gender dysphoria (identity distress) would resolve by puberty.[92] In contrast, nearly all minors who begin gender-affirming social and medical

---

[88] The gender clinics at Lurie Children's Hospital (IL) and Seattle Children's Hospital (WA), for example, have collaborative relationships with local public school districts.
[89] Kenneth J. Zucker., *Adolescents with Gender Dysphoria: Reflections on Some Contemporary Clinical and Research Issues*, 48 Archives of Sexual Behavior 1983, n.3 (2019), https://link.springer.com/article/10.1007%2Fs10508-019-01518-8.
[90] *Id.*
[91] Lucy Griffin et al., *Sex, Gender and Gender Identity: A Re-Evaluation of the Evidence*, 45 BJPsych Bulletin 291 (2021), https://pubmed.ncbi.nlm.nih.gov/32690121/.
[92] Devita Singh et al., *A Follow-Up Study of Boys with Gender Identity Disorder*, 12 Frontiers in Psychiatry 632784 (2021), https://www.frontiersin.org/articles/10.3389/fpsyt.2021.632784/full.

transitions today persist in transgender identification.[93] Based on the belief that "gender variations are not disorders, gender may be fluid and not binary," the gender-affirming approach insists that children and adolescents who identify as transgender should be permitted "to live in the gender that feels most real or comfortable to that child and to express that gender with freedom from restriction, aspersion, or rejection."[94]

According to gender therapist Laura Edwards-Leeper, gender affirmation means "the gender identity and related experienced asserted by a child, an adolescent, and/or family members" should be accepted as "true" and "the clinician's role in providing affirming care to that family is to empathetically support such assertions."[95] Consequently, the gender-affirming model rejects "therapeutic approaches that encourage individuals to accept their given body and assigned gender," and contends that alternative approaches "may inadvertently cause psychological harm."[96]

Despite the "absence of empirical data" to support them, the gender affirming model and gender affirming medical and surgical interventions have been heavily promoted by transgender activists, allied clinicians, and several establishment medical organizations.[97] Even so, the rapid swing from the "watchful waiting" therapeutic paradigm to a "gender affirmative" protocol that validates all asserted "gender identities" and puts adolescents on a path towards "gender-affirming" medical interventions is unprecedented. So too is the number of transgender-identified adolescents seeking irreversible "transgender" body modifications—drastic measures that some come to regret.[98]

Clinical concerns over the outcomes of gender affirmation have escalated.[99] Gender affirmation has a domino effect, beginning with psycho-social transition.[100] Although it is not physically invasive, once begun, psycho-social transition is psychologically difficult to walk back. Children who socially transition are more likely to persist in a transgender-identification than children who do not socially transition. This raises serious ethical questions.[101] The Dutch gender-affirming protocol never supported

---

[93] See, for example, this study from the Tavistock and Portman NHS Gender Identity Development Service (UK), which found 98% of adolescents who underwent puberty suppression continued on to cross-sex hormones. Polly Carmichael, et al., *Short-Term Outcomes of Pubertal Suppression in a Selected Cohort of 12 To 15 Year Old Young People with Persistent Gender Dysphoria in the UK*, 16 PloS one e0243894 (2021), https://doi.org/10.1371/journal.pone.0243894.

[94] Laura Edwards-Leeper et al., *Affirmative Practice with Transgender and Gender Nonconforming Youth: Expanding the Model*, 3 Psychology of Sexual Orientation & Gender Diversity 165 (2016), https://www.apa.org/pubs/journals/features/sgd-sgd0000167.pdf.

[95] *Id.* at 165.

[96] *Id.* at 166 (citing Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth, Substance Abuse and Mental Health Services Administration (2015), https://store.samhsa.gov/sites/default/files/d7/priv/sma15-4928.pdf).

[97] *Id.*

[98] Lisa Littman, *Individuals Treated for Gender Dysphoria with Medical and/or Surgical Transition Who Subsequently Detransitioned: A Survey of 100 Detransitioners*, 50 Arch Sex Behav 3353 (2021), https://pubmed.ncbi.nlm.nih.gov/34665380/.

[99] For example, see the following recent publications: William Malone et al., *Puberty Blockers for Gender Dysphoria: The Science Is Far From Settled*, 5 The Lancet Child & Adolescent Health e33 (2021), https://doi.org/10.1016/S2352-4642(21)00235-2; Kirsty Entwistle, *Debate: Reality Check—Detransitioner's Testimonies Require Us to Rethink Gender Dysphoria*, Child & Adolescent Mental Health (2020), https://doi.org/10.1111/camh.12380; Paul W. Hruz, *Deficiencies in Scientific Evidence for Medical Management of Gender Dysphoria*, 87 The Linacre Quarterly 34 (2020), https://doi.org/10.1177/0024363919873762.

[100] When a minor's desired identity is affirmed, the minor initiates external "social" changes to express the desired identity (name, pronouns, hair, clothing, etc.).

[101] Kenneth J. Zucker, *The Myth of Persistence: Response to "A Critical Commentary on Follow-Up Studies & 'Desistance' Theories about Transgender & Gender Non-Conforming Children" by Temple Newhook et al.*, 19 Int'l

social transition for pre-pubertal children, over concerns that it would tip the scales towards persistence in transgender identification.[102] Social transition sets the child on a path toward medical transition before the child is mature enough to appreciate the long-term physical and psychological consequences.

For pre-pubertal children, social transition also creates an impetus for the next step in gender affirming care: puberty blockers. A pre-pubertal child who presents as a member of the opposite sex views puberty with extreme anxiety, as the growth of secondary sex characteristics will reveal the child's true sexual identity. Puberty blockers interrupt the child's natural development and preserve the child's secret, if only for a time.

Puberty is a whole-body developmental process. Preventing its normal course, for an indeterminate time, has unknown long-term consequences beyond the "pause" in development of secondary sex characteristics: The child's social and cognitive maturation (including advances in executive functioning and other brain functions) is suspended along with other developmentally appropriate growth, including bone growth. Stopping the puberty blockers will allow the development of secondary sex characteristics to resume, but the time lost from the unnatural delay in biological maturation cannot be recaptured. No longer described as "fully reversible," puberty blockers have negative effects on bone density, social and emotional maturation, and other aspects of development. Further, puberty blockers generally fail to lessen the child's gender dysphoria and results are mixed in terms of effects on mental health.[103] Long-term effects remain unknown.[104]

Multiple studies show that the vast majority of children who begin puberty blockers go on to receive cross-sex hormones, the next step in gender-affirming care, with life-altering consequences.[105] Blocking a child's natural puberty (preventing maturation of genitals and reproductive organs) and then introducing cross-sex hormones renders the child permanently sterile.[106] Gender clinicians now admit that puberty blocking may impair the child's later sexual functioning as an adult as well.[107] These losses cannot be fully comprehended by a child, precluding the possibility of informed consent.

Cross-sex hormones carry numerous health risks and cause many irreversible changes in adolescents' bodies, including genital or vaginal atrophy, hair loss (or gain), voice changes, and impaired

---

J. of Transgenderism 231 (2018). Michael Biggs, *Revisiting the Effect of GnRH Analogue Treatment on Bone Mineral Density in Young Adolescents with Gender Dysphoria*, 34 J. of Pediatric Endocrinology & Metabolism 937 (2021), https://doi.org/10.1515/jpem-2021-0180.

[102] Annelou L. C. de Vries, & Peggy T. Cohen-Kettenis, *Clinical Management of Gender Dysphoria in Children and Adolescents: The Dutch Approach*, 59 J. of Homosexuality 301 (2012), https://doi.org/10.1080/00918369.2012.653300.

[103] Annelou L. C. de Vries et al., *Puberty Suppression in Adolescents with Gender Identity Disorder: A Prospective Follow-Up Study*, 8 J. Sex Med. 2276 (2011), https://www.jsm.jsexmed.org/article/S1743-6095(15)33617-1/pdf.

[104] There are no long-term, rigorous studies on the safety and outcomes of using puberty blockers to disrupt natural puberty in healthy but dysphoric children for an extended time.

[105] Polly Carmichael, et al., *Short-Term Outcomes of Pubertal Suppression in a Selected Cohort of 12 To 15 Year Old Young People with Persistent Gender Dysphoria in the UK*, 16 *PloS one* e0243894 (2021), https://doi.org/10.1371/journal.pone.0243894.

[106] Stephen B. Levine, *Ethical Concerns About Emerging Treatment Paradigms for Gender Dysphoria*, 44 J. Sex Marital Ther. 29 (2018), https://pubmed.ncbi.nlm.nih.gov/28332936/.

[107] Abigail Shrier, *Top Trans Doctors Blow the Whistle on "Sloppy Care,"* Common Sense (Oct. 4, 2021), https://bariweiss.substack.com/p/top-trans-doctors-blow-the-whistle.

fertility. They also increase cardiovascular risks and cause liver and metabolic changes.[108] The flood of opposite sex hormones has variable emotional and psychological effects as well. Females who take testosterone experience an increase in gender dysphoria, particularly regarding their breasts, creating heightened demand for double mastectomies on teens as young as 13.[109] The gender affirming model recommends performing mastectomies on the healthy breasts of adolescent girls in order to address emotional discontent. This is an unethical practice described by psychotherapist Alison Clayton as nothing less than "dangerous medicine."[110]

The gender-affirming approach continues to push ethical boundaries. The World Professional Association for Transgender Health (WPATH) recently released its proposed "Standards of Care Version 8," which lower the recommended ages for adolescents to receive cross-sex hormones to age 14, double mastectomy ("chest masculinization") to age 15, male breast augmentation and facial surgery to age 16, and removal of testes, vagina, or uterus to age 17, with flexibility to provide these gender affirming interventions at even younger ages.[111] This is unethical human experimentation—on *children*. A Swedish teen who underwent medical transition and then de-transitioned after suffering substantial bodily harm describes the "gender affirming" medical protocol this way: "They're experimenting on young people ... we're guinea pigs."[112]

Schools that promote "gender identity" exploration and "gender transitions" are the gateway to medical and surgical "transgender" interventions. Protecting "gender identity" under Title IX, as the Proposed Rule intends, will put countless numbers of children on the transgender assembly line—and lead to irreversible harm.

### C. ED must conduct a Family Policymaking Assessment.

The Treasury and General Government Appropriations Act of 1999 requires Federal agencies to issue a Family Policymaking Assessment for any rule that may affect family well-being.[113] As explained above, this rule would negatively affect family well-being, requiring ED to provide an assessment of the Proposed Rule'.

---

[108] *Gender-Affirming Hormone in Children and Adolescents*, BMJ EBM Spotlight Blog (Feb. 25, 2019), https://blogs.bmj.com/bmjebmspotlight/2019/02/25/gender-affirming-hormone-in-children-and-adolescents-evidence-review/.

[109] Johanna Olson-Kennedy et. al. *Chest Reconstruction and Chest Dysphoria in Transmasculine Minors and Young Adults: Comparisons of Nonsurgical and Postsurgical Cohorts*. JAMA Pediatr. 2018 May 1;172(5):431-436. doi: 10.1001/jamapediatrics .2017.5440. PMID: 29507933; PMCID: PMC5875384.

[110] Alison Clayton, *The Gender Affirmative Treatment Model for Youth with Gender Dysphoria: A Medical Advance or Dangerous Medicine*?. Arch Sex Behav (2021), https://doi.org/10.1007/s10508-021-02232-0.

[111] WPATH Standards of Care, Version 8, Draft for Public Comment, December 2021, "Adolescent" Chapter, p. 3.

[112] Mission: Investigate. Trans Children ("Trans Train 4") (Nov. 26, 2021), https://www.svtplay.se/video/33358590/uppdrag-granskning/mission-investigate-trans-children-avsnitt-1.

[113] Pub. L. 105-277 ("(c) FAMILY POLICYMAKING ASSESSMENT.—Before implementing policies and regulations that may affect family well-being, each agency shall assess such actions with respect to whether—(1) the action strengthens or erodes the stability or safety of the family and, particularly, the marital commitment; (2) the action strengthens or erodes the authority and rights of parents in the education, nurture, and supervision of their children; (3) the action helps the family perform its functions, or substitutes governmental activity for the function; (4) the action increases or decreases disposable income or poverty of families and children; (5) the proposed benefits of the action justify the financial impact on the family; (6) the action may be carried out by State or local government or by the family; and (7) the action establishes an implicit or explicit policy concerning the relationship between the behavior and personal responsibility of youth, and the norms of society.").