# Exhibit 1

ARCHIVED AND NOT FOR RELIANCE
This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE OF THE GENERAL COUNSEL**

**Date:  January 8, 2021**

**MEMORANDUM FOR KIMBERLY M. RICHEY**
**ACTING ASSISTANT SECRETARY**
**OF THE OFFICE FOR CIVIL RIGHTS**

*Re: Bostock v. Clayton Cty., 140 S. Ct. 1731 (2020)*

The U.S. Department of Education's (Department) Office for Civil Rights (OCR) enforces Title IX of the Education Amendments of 1972 (Title IX), as amended, 20 U.S.C. § 1681, *et seq*., and its implementing regulations at 34 C.F.R. Part 106, prohibiting discrimination on the basis of sex in any education program or activity receiving Federal financial assistance.  You have asked the Office of the General Counsel a series of questions regarding the effect of the Supreme Court's decision in *Bostock v. Clayton County*, 140 S. Ct. 1731 (2020), with respect to Title IX.  Our answers are presented below.

**Question 1:    Does the *Bostock* decision construe Title IX?**

**Answer:**  No.  *Bostock v. Clayton Cty.,* 140 S. Ct. 1731 (2020) construes the prohibition on sex discrimination in Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* (Title VII). The Court decided the case narrowly, specifically refusing to extend its holding to Title IX and other differently drafted statutes.  *Id.* at 1753.  The Department does not have authority to enforce Title VII.  Our understanding is OCR occasionally receives cases alleging discrimination filed by employees.  OCR's <u>Case Processing Manual</u> describes OCR's views on its jurisdiction over employment-related complaints.

Title IX, which the Department does have authority to enforce, prohibits sex discrimination in education programs or activities receiving Federal financial assistance. But Title IX text is very different from Title VII text in many important respects.  Title IX, for example, contains numerous exceptions authorizing or allowing sex-separate activities and intimate facilities to be provided separately on the basis of biological sex or for members of each biological sex.  *Compare* 42 U.S.C. §§ 2000e-1, 2000e-2 *with* 20 U.S.C. §§ 1681(a), 1686.  However, Title VII and Title IX both use the term "sex", and it is here *Bostock* may have salience.  *Bostock* compels us to interpret a statute in accord with the ordinary public meaning of its terms at the time of its enactment.  *Bostock*, 140 S. Ct. at 1738 (citations omitted).  And as explained below, specifically in the answer to Question 2, the Department's longstanding construction of the term "sex" in Title IX to mean biological sex, male or female, is the only construction consistent with the ordinary public meaning of "sex" at the time of Title IX's enactment.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness by fostering educational excellence and ensuring equal access.*

ARCHIVED AND NOT FOR RELEASE. This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

§§ 106.32(b)(1), 106.33, 106.34, 106.40, 106.41, 106.43. 106.52, 106.59, 106.61; *see also Brown & Williamson Tobacco Corp.*, 529 U.S. at 133; *Yates*, 574 U.S. at 537-38; *Davis*, 489 U.S. at 809.

A.    Athletics

We believe the ordinary public meaning of controlling statutory and regulatory text requires a recipient providing separate athletic teams to separate participants solely based on their biological sex, male or female, and not based on transgender status or homosexuality, to comply with Title IX.

Under Title IX and its regulations, a person's biological sex *is* relevant for the considerations involving athletics, and distinctions based thereon are permissible and may be required because the sexes are not similarly situated. 34 CFR § 106.41. Biological females and biological males are different in ways that are relevant to athletics because of physiological differences between males and females. *See United States v. Virginia*, 518 U.S. 515, 533 (1996) ("Physical differences between men and women, however, are enduring."); *Frontiero*, 411 U.S. at 686 (plurality opinion) ("[S]ex, like race and national origin, is an immutable characteristic determined solely by the accident of birth"). Accordingly, schools must consider students' biological sex when determining whether male and female student athletes have equal opportunities to participate. *See McCormick*, 370 F.3d at 287 ("[I]dentical scheduling for boys and girls is not required. Rather, compliance is assessed by first determining whether a difference in scheduling has a negative impact on one sex, and then determining whether that disparity is substantial enough to deny members of that sex equality of athletic opportunity."); *Clark v. Ariz. Interscholastic Ass'n*, 886 F.2d 1191, 1192 (9th Cir. 1989) (quoting *Clark v. Ariz. Interscholastic Ass'n*, 695 F.2d 1126, 1131 (9th Cir. 1982) ("The record makes clear that due to average physiological differences, males would displace females to a substantial extent if they were allowed to compete for positions on the volleyball team. Thus, athletic opportunities for women would be diminished")).

*Bostock* does not diminish the relevance of biological sex in athletics, and does not address the validity of the Department's historic measures to ensure biological females (girls and women) have equal opportunities to participate in athletics because males and females are not similarly situated with respect to athletic competition.[5] Unlike Title VII, one of Title IX's crucial purposes is protecting women's and girls' athletic opportunities. Indeed, Title IX was enacted, and its regulations promulgated, to prohibit discrimination on the basis of sex in education programs and activities and to protect equal athletic opportunities for students who are biological females, including by providing for sex-segregated athletics.

The fact is, Congress specifically mandated that the Department consider promulgating regulations to address sports. After first enacting Title IX, Congress subsequently passed another

[5]Although the Department does not address Equal Protection Clause claims regarding separate athletic teams for biological females and biological males, the Department's position on such claims is stated in its Brief for the United States as Amicus Curiae Supporting Appellants and Urging Reversal in *Hecox v. Little*, Nos. 20-35813, 20-35815, U.S. Court of Appeals for the Ninth Circuit (filed Nov. 19, 2020).

This document expresses policy that is inconsistent in many respects with Executive Order 13988 on Preventing and Combating Discrimination on the Basis of Gender Identity or Sexual Orientation and was issued without the review required under the Department's Rulemaking and Guidance Procedures, 85 Fed. Reg. 62597 (Oct. 5, 2020).

statute, entitled the Javits Amendment, instructing the Secretary of Health, Education, and Welfare to publish regulations "implementing the provisions of Title IX . . . which shall include with respect to intercollegiate activities reasonable provisions considering the nature of the particular sports." Public Law 93–380 (HR 69), § 844, 88 Stat 484, 612 (August 21, 1974).  Congress reserved the right to review the regulations following publication to determine whether they were "inconsistent with the Act from which [they] derive[] [their] authority."  *Id.*

The Secretary of Health, Education, and Welfare subsequently published Title IX regulations, including regulatory text identical to the current text of the Department's athletics regulations.  *Compare* Nondiscrimination on the Basis of Sex Under Federally Assisted Education Programs and Activities, 40 Fed. Reg. 24,128, 21,142–43 (June 4, 1975) (promulgating § 86.41 Athletics) *with* 34 C.F.R. § 106.41.  After Congressional review, including over six days of hearings, Congress allowed the regulations to go into effect. *See McCormick*, 370 F.3d at 287 (laying out the history of the Javits Amendment, and the response from Congress to the regulations promulgated thereunder).  Consequently, the regulations validly and authoritatively clarify the scope of a recipient's non-discrimination duties under Title IX in the case of sex-specific athletic teams.  *See Cohen v. Brown Univ.*, 991 F.2d 888, 895 (1st Cir. 1993) ("The degree of deference [to the Department of Education] is particularly high in Title IX cases because Congress explicitly delegated to the agency the task of prescribing standards for athletic programs under Title IX.").

34 C.F.R. § 106.41 prohibits a recipient from discriminating on the basis of sex with respect to providing athletic programs or activities, permits a recipient to provide sex-segregated teams for competitive activities or contact sports, and obligates a recipient to provide equal athletic opportunity for members of both sexes.[6]  As it has for over forty years, the Department must interpret 34 C.F.R. § 106.41(b), regarding operation of athletic teams "for members of *each sex*," and 34 C.F.R. § 106.41(c), regarding equal athletic opportunity for "members of *both sexes*" (emphasis added), to mean operation of teams and equal opportunity for biological males, and for biological females.  Based on statutory text and regulatory history, it seems clear that if a recipient chooses to provide "separate teams for members of each sex" under 34 C.F.R. § 106.41(b), then it must separate those teams solely on the basis of biological sex, male or female, and not on the basis of transgender status or sexual orientation, to comply with Title IX.[7]

---

[6] Specifically, 34 C.F.R. § 106.41(a) provides a general rule that recipients shall not provide athletics separately based on sex.  However, 34 C.F.R. § 106.41(b) permits a recipient to operate or sponsor separate teams for members of each sex where selection for the teams is based on competitive skill, or the activity is a contact sport, and also provides that where a recipient operates or sponsors a team in a particular sport for members of one sex with no such team for members of the opposite sex, then members of the excluded sex must be allowed to try out for the team unless it is for a contact sport.  Finally, 34 C.F.R. § 106.41(c) obligates a recipient to provide "equal athletic opportunity for members of both sexes" by taking into account specified factors in deciding what athletic programs to offer.

[7] Different treatment based on transgender status or homosexuality would generally constitute unlawful sex discrimination because students who do not identify as transgender or homosexual cannot generally be treated worse than students who identify as transgender or homosexual.  *See*