# Exhibit 37

September 11, 2022

Department of Education
Office for Civil Rights
400 Maryland Ave SW
Washington, DC 20202

        Re:    *Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance;*
              RIN: 1870-AA16; Docket ID No. ED-2021-OCR-0166

To the Office for Civil Rights:

We submit this comment on behalf of GETA, the Gender Exploratory Therapy Association (https://genderexploratory.com) to express our concerns about the United States Department of Education's proposed amendments to the regulations implementing Title IX of the Education Amendments of 1972 (the "proposed amendments"). In particular, we are concerned about the proposed amendments' treatment of the concept of "gender identity" in the regulation, and the implementation of that concept in the K-12 setting.

GETA members are practitioners and trainees in the psychotherapy professions who believe that people who are exploring their gender identity or struggling with their biological sex should have access to therapists who will provide thoughtful care without pushing an ideological or political agenda. Skilled, ethical exploratory therapy is appropriate for those with gender dysphoria, their families, and detransitioners. We reject treatments that set out to change sexual orientation or gender identity; practices that use coercive techniques have no place in health care. As GETA members, we respect client autonomy and do not impose our own beliefs, values, opinions, ideology, religion, or goals onto our clients. Although we applaud and support the DOE's efforts to ensure that gender-nonconforming students are treated with respect and dignity in schools, the proposed amendments require schools to engage in powerful psychotherapeutic interventions with gender-nonconforming children for which school personnel are not trained. As therapists, we believe that psychological approaches should be the first-line treatment for all cases of gender dysphoria, and that immediate social transition by school personnel is contrary to an effective therapeutic approach intended to explore the various possible causes of a young person's psychological distress. A holistic therapeutic approach avoids the risks of woefully premature social and medical transition and supports children's autonomy by facilitating deeper self-understanding. If implemented, the proposed amendments will curtail such an approach and, as a consequence, will harm children.

1

We describe five principal concerns in this comment:

(1) The proposed amendments' failure to define the concept "gender identity."

(2) The proposed amendments' creation of a system that allows the child to "self-identify" as the opposite sex, and mandates that the school "socially transition" the child without any input from mental health professionals or the child's parents. Mandatory social transition by schools is a powerful psychotherapeutic intervention by teachers and school administrators who are not trained in this area.

(3) The tendency of social affirmation within school settings to support the "affirmative care" model of psychotherapy and thereby lead to experimental medical interventions that have potentially harmful and lifelong side effects.

(4) The harmful impact on many families caused by the proposed amendments.

(5) The harm caused by this system to the mental health of other students, especially female students.

1. <u>The Proposed Amendments Fail to Define "Gender Identity"</u>

The principal shortcoming of the DOE's proposed amendments is that they fail to define "gender identity." There are many definitions of "gender identity" currently available in legal sources, psychological literature, cultural criticism, and popular culture. The proposed amendments simultaneously fail to define "gender identity" and at the same time create serious penalties for school officials, teachers, and other students who fail to treat a student according to that identity, thus leaving the proposed amendments hopelessly ambiguous and ripe for misuse. In this section we describe four common meanings of the term "gender identity." This list is not exhaustive, but it demonstrates that leaving that term undefined in the proposed amendments will give rise to substantial confusion and disagreement over the regulations' scope and purpose.

First, "gender identity" – and especially "gender identity" that is not aligned with one's biological sex – is often associated with the psychological condition of "gender dysphoria." "Gender dysphoria" is defined in the *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5") as a "marked incongruence between one's experienced/expressed gender and [one's biological sex], lasting at least 6 months."[1] Although the proposed amendments do not use the term "gender dysphoria," we infer that the inclusion of the term "gender identity" in the proposed amendments is intended to protect those children whose perceived "gender identity" is different from their biological sex, and hence would include children with gender dysphoria.

If this is the intended meaning of "gender identity," then the proposed amendments are setting out policies concerning how school officials, teachers, and other students should respond to a child who has a very serious mental health disorder. We identify the potentially harmful

---

[1] American Psychiatric Association, "Gender Dysphoria," Diagnostic and Statistical Manual of Mental Disorders, at 452 (5th ed., 2013).

also maintains that "Under Title IX, there is no medical diagnosis or treatment requirement that students must meet as a prerequisite to being treated consistent with their gender identity."[9] Although some state laws add the caveat that school officials need not recognize a students' self-proclaimed "gender identity" if it appears that the student is asserting a sex-incongruent gender identity for an "improper purpose,"[10] the *2016 Dear Colleague Letter* provides no similar limitation. The proposed amendments to the regulations implementing Title IX also provide no limitation.

Fourth, if one moves beyond definitions of "gender identity" provided in legal and policy documents, the term becomes even more difficult to define. In addition to the now well-known concept of a "nonbinary" gender identity, other gender identities have proliferated in popular culture, including agender, bigender, demigender, pangender, omnigender, polygender, and gender-fluid. As the term "gender-fluid" suggests, these "identities" are not necessarily fixed. As explained by one popular magazine, "[g]ender-fluid typically refers to someone who prefers to express either or both maleness or femaleness, and that can vary, perhaps from day to day."[11] Given the incredible proliferation of "gender identities" in popular culture today, the proposed amendment's failure to define "gender identity" places K-12 schools in the impossible position of formally recognizing, and making significant policy accommodations for, self-proclaimed identities that are neither stable nor, in some cases, comprehensible by others.

In short, the proposed amendments fail to define the key concept of "gender identity." At a minimum, this failure leaves teachers and other school personnel in the unenviable position of trying to implement a punitive regulation that provides civil rights protections and remedies for a characteristic that has multiple, fluctuating definitions in law and society.

2. <u>Mandatory Social Transition by Schools is a Powerful Psychotherapeutic Intervention by Untrained Teachers and School Administrators</u>

---

*Protections*) ("schools are expected to treat students consistent with the student's stated gender identity"); *N.Y. Guidance to Schools*, *supra*, at 5 ("It is recommended that schools accept a student's assertion of his/her/their own gender identity."); *Chicago Guidelines*, *supra,* at 4 ("At all times, the Support Coordinator and the Student Administrative Support Team shall respect the self-determination of the student.").

[9] *2016 Dear Colleague Letter*, *supra*, at 2.

[10] *See, e.g., Conn. Civil Rights Protections, supra,* at 4; *Guidance for Massachusetts Public Schools, supra.*

[11] Perri O. Blumberg and Emily Becker, *Here's Your Comprehensive Gender Identity List, as Defined by Psychologists and Sex Experts,* Women's Health (July 6, 2022), https://www.womenshealthmag.com/relationships/a36395721/gender-identity-list/. *See also* Julie L. Nagoshi, et al., *Deconstructing the Complex Perceptions of Gender Roles, Gender Identity, and Sexual Orientation Among Transgender Individuals*, 22(4) Feminism & Psychology 405, 408 (2012) (discussing theories of "gender identity" that insist on the "the fluidity of gender identity").

Although the proposed amendments do not define "gender identity," as explained in the previous section there are several indications that the amendments effectively require K-12 schools to implement a self-identification ("self-ID") system – that is, a system that determines a child's "gender identity" based solely on the child's assertions. In a self-ID system, society is required to treat a person according to the gender identity that person declares, regardless of outward expression and regardless of reasonable concerns that the child asserting a transgender identity may be doing so because of other mental health issues or for improper purposes. In a self-ID system, no mental health professional is required to verify the authenticity of the child's assertion. And, significantly, no meeting is held with the child's parents. In addition, once the child has declared a new gender identity, the proposed regulation effectively mandates that the K-12 school recognizes that identity and treat it as a legally protected characteristic, thereby implementing what is called "social transition" by using new pronouns, a new name, and allowing the child to use single-sex facilities for the opposite sex.

As mental health professionals who have worked with thousands of gender-nonconforming children, we believe that a system of self-ID combined with mandatory social transition can be very harmful to a child's psychological well-being and development. For example, for a student who may be struggling with gender dysphoria, social transition may be more harmful than helpful. Gender dysphoria can have many causes, including a traumatic experience such as sexual abuse or rape.[12] Social transition may afford a child an immediate sense of relief, but the trauma remains unidentified and unaddressed. Instead of immediate social transition, the first step in working with a child who claims a new gender identity should be a meeting with a psychotherapist who is trained to diagnose or treat mental health disorders. Teachers and school counselors can certainly be part of a team of supportive professionals who, along with the child's parents, provide gender dysphoric children with support and therapeutic options. But teachers and school administrators are not mental health professionals and may not fully understand that:

- Gender and sexuality are complex, develop unpredictably over time, and are influenced by many factors (biological, psychological, social, etc.).
- Personal identity is not static. Identity exploration is a normal part of adolescent and young adult development.
- It is extremely difficult to determine if a gender identity experienced during childhood and adolescence will remain fixed into adulthood. Because identity remains in flux during adolescence, teachers and administrators should be very circumspect about implementing social interventions with far-reaching effects.
- Young people may not have the capacity to fully comprehend the impact of gender transition.
- Same-sex attracted youth are often gender nonconforming and may experience distress as they come to terms with their sexual orientation. Gay, lesbian, and bisexual youth may need help and support to accept themselves as they are.

---

[12] United Kingdom, *The Cass Review, Independent Review of Gender Identity Services for Children and Young People: Interim Report*, at 5-7 (February 2022) (hereinafter *The Cass Review*), Ex. A.

In sum, by requiring schools to socially transition children solely on the basis of the child's self-declared "gender identity," the proposed amendments require school personnel to embark on a powerful psychotherapeutic intervention for which they are not trained.

3. <u>Social Affirmation in School Settings Harms Children by Interfering with Exploratory Psychotherapy and Putting them on a Pathway to Experimental Medical Interventions</u>

First, when children who suffer from gender dysphoria come to believe that adopting an alternate gender identity will relieve their distress, and when teachers and administrators immediately endorse that belief, it prevents the exploration of other unrecognized factors that may be fueling the children's suffering. Given that gender dysphoric children so often present with other serious mental health and neurological issues,[13] instant social affirmation by school personnel often distracts attention away from those other issues and severely undermines the goals of exploratory therapy. This harms children. When a young person is socially affirmed as a first resort, rather than being helped to explore their gender identity through exploratory psychotherapy, it forecloses a pathway toward self-acceptance – that is, it may prevent them from coming to terms with their sexed body and/or with their developing sexual orientation.[14] This harms children.

Those advocating the importance of social transition and the "affirmation" approach often maintain it is necessary to prevent suicide among transgender youth <u>and that the suicide rate among transgender youth is 41% (much higher than non-transgender youth)</u>. Suicide is obviously a serious concern for any child in mental or psychological distress. However, the studies often relied on by advocates of the gender affirmation model to justify automatic social transition and medicalization of minors have been discredited due to the selection bias in the methods used.[15] Moreover, intense focus on gender dysphoria as a singular cause of suicidal ideation or attempt is not only misleading given that so many gender dysphoric individuals present with other mental health problems that are also strongly associated with suicidal tendencies, it is also dangerous

---

[13] *See* Gary Butler, et al., *Assessment and Support of Children and Adolescents with GenderDysphoria*, 103(7) Archives of Disease in Childhood 631 (2018), Ex. B; John F. Strang, et al., *Increased Gender Variance in Autism Spectrum Disorders and Attention Deficit Hyperactivity Disorder*, 43(8) Archives of Sexual Behavior 1525 (2014), Ex. C.

[14] One study found that 63.7% of boys with early onset gender dysphoria, who received 'watchful waiting' treatment and no pre-pubertal social transition, grew up to be gay or bisexual. Devita Singh, et al., *A Follow-Up Study of Boys with Gender Identity Disorder*, 12 Frontiers in Psychiatry 1, 14 (2021), Ex. D.

[15] The frequently repeated claim that 41% of 6,450 transgender respondents said they had attempted suicide at some point in their lives is taken from the National Transgender Discrimination Survey. Jack L. Turban, et al., *Association Between Recalled Exposure to Gender Identity Conversion Efforts and Psychological Distress and Suicide Attempts Among Transgender Adults,* 77(1) JAMA Psychiatry 68-76 (2020), https://jamanetwork.com/journals/jamapsychiatry/fullarticle/2749479. However, a 2021 paper notes that the participants were recruited through transgender advocacy organizations and subjects were asked to "pledge" to promote the survey among friends and family. This recruiting method yielded a large but highly skewed sample. Roberto D'Angelo, et al., *One Size Does Not Fit All: In Support of Psychotherapy for Gender Dysphoria*, 50 Archives of Sex Behavior 7-16 (2021), Ex. E.

given the "Werther effect." This is the well-known phenomenon that certain kinds of reporting on suicide tends to generate imitation suicide attempts.[16] Finally, even when social affirmation is deemed the appropriate approach for a particular young person, the individual's holistic mental health and well-being must also be taken into account, including the possibility that he or she has physical/mental disabilities or conditions that need to be addressed *in addition to gender dysphoria*.

Second, by socially affirming a child's gender transition, school personnel often harm rather than help the children involved by pushing them down a pathway to medical transition. A recent study demonstrates that early social transition (i.e., changing the names and pronouns of young people, and then treating them as the opposite sex) tends to concretize an opposite sex or nonbinary identity in the person's mind,[17] leading them to believe that medical transition is necessary to alleviate their distress. When a young person embarks on medical transition, interventions may include puberty blockers, cross-sex hormones, or surgical procedures aimed at making the child's body look more like that of a person of the opposite sex or, in some cases, to appear "nonbinary." Insufficient quality evidence exists to understand all of the short-term and long-term consequences of these medical interventions to physical and mental health. There is no high-quality evidence demonstrating that such medical interventions are beneficial or effective in resolving gender dysphoria and improving mental health.[18] Long-term studies of the serious physical side effects of such medical interventions do not exist, but there is growing evidence that the commonly-prescribed medical interventions, especially the administration of puberty blockers, can leave children permanently infertile and unable to achieve orgasm.[19]

For these reasons, several European countries have recently pulled back from medical transitioning of minors. Earlier this year, Sweden's National Board of Health and Welfare released new guidelines for treating young people with gender dysphoria, holding that "the risks of puberty suppressing treatment with GnRH-analogues and gender-affirming hormonal treatment currently outweigh the possible benefits." The Board urged that "the treatments should

---

[16]    Francisco J. Acosta, et al., *Suicide Coverage in the Digital Press Media: Adherence to World Health Organization Guidelines and Effectiveness of Different Interventions Aimed at Media Professionals*, 35(13) Health Communication (2020).

[17]    Kristina R Olson, et al., *Gender Identity 5 Years After Social Transition*, 150(2) Pediatrics (Aug. 2022), Ex. F.

[18]    *Cass Review*, *supra*, at 63.

[19]    *See, e.g.,* Shira Baram, et al., *Fertility Preservation for Transgender Adolescents and Young Adults: A Systematic Review*, 25(5) Human Reproduction Update 694 (2019) Ex. G. During a recent conference at Duke University, noted vaginoplasty surgeon Marci Bowers (a transwoman herself) reported that: "Every single child or adolescent who was truly blocked at Tanner Stage 2 [when puberty begins] has never experienced orgasm. I mean, it's really about zero." Https://gript.ie/adolescents-who-change-sex-will-never-be-able-to-achieve-sexual-satisfaction-leading-surgeon.

be offered only in exceptional cases."[20] Likewise, Finland's Council for Choices in Health Care came to almost the exact same conclusion a year earlier, noting (in translation): "The first-line intervention for gender variance during childhood and adolescent years is psychosocial support and, as necessary, gender-explorative therapy and treatment for comorbid psychiatric disorders." Finland's Council also found that "[i]n light of available evidence, gender reassignment of minors is an experimental practice"; such an intervention "must be done with a great deal of caution, and no irreversible treatment should be initiated."[21]

In the United Kingdom, following release of Dr. Hilary Cass's interim report evaluating the Tavistock's Gender Identity Development Service (GIDS), as well as her subsequent interim letter, the National Health Service recently announced that it would be closing GIDS in Spring 2023, transferring gender services to regional centers operating on a multidisciplinary model. The interim report noted, in particular, that "[t]here is lack of agreement, and in many instances a lack of open discussion, about the extent to which gender incongruence in childhood and adolescence can be an inherent and immutable phenomenon for which transition is the best option for the individual, or a more fluid and temporal response to a range of developmental, social, and psychological factors."[22] Dr. Cass stressed that "[i]t is essential that [gender dysphoric children and young people] can access the same level of psychological and social support as any other child or young person in distress."[23]

In August 2022, the UK law firm of Pogust Goodhead announced that it will be filing a class action lawsuit for damages against GIDS on behalf of children (and their families) whose new gender identity was quickly affirmed without exploratory therapy and who were then rushed onto puberty blockers and cross-sex hormones.[24] The law firm of Girard Sharp is currently soliciting clients to explore bringing a similar class action suit here in the United States.[25]

Third, social transition by school personnel may harm children by exacerbating the phenomenon of peer-group transition. The proposed regulations fail to acknowledge a difference between the cohort of youth experiencing actual gender dysphoria, and the cohort of youth adopting a gender identity without experiencing gender dysphoria. Recent evidence suggests that there is a peer conformist aspect of young people identifying as transgender or nonbinary and desiring social

---

[20] National Board of Health and Welfare, Sweden, *Care of Children and Adolescents with Gender Dysphoria: Summary*, 3 (2022), Ex. H.

[21] PALKO / COHERE Finland, *Medical Treatment Methods for Dysphoria Related to Gender Variance in Minors* (2020), Ex. I.

[22] *The Cass Review*, supra, at 16.

[23] *Id.* at 20.

[24] Samuel Lovett, *Tavistock Gender Clinic Facing Legal Action over 'Failure of Care' Claims*, The Independent, Aug. 11, 2022, https://www.independent.co.uk/news/health/tavistock-gender-clinic-lawyers-latest-b2143006.html.

[25] *See* https://www.girardsharp.com/work-investigations-puberty-blockers.

9

and medical transition.[26] School policies that require *all* students to be affirmed, without question and without reference to any therapeutic diagnosis, result in some students undergoing a serious psychological intervention (social transition) without benefit of mental health treatment for their gender dysphoria, and others undergoing the same social transition without a therapeutic basis for doing so. Both cohorts are then susceptible to progressing from social transition to medical transition.

While high quality studies do not yet exist demonstrating the precise rates, sizeable numbers of youth who socially or medically transition in adolescence later come to regret such transition when they reach young adulthood.[27] School policies that affirm anyone who questions their gender identity, or who adopts an alternate gender identity, without individualized psychotherapy, will increase that number. More and more young people will come to regret their transition and suffer because they were affirmed without appropriate therapeutic exploration of the reasons or alternatives to transition.

In sum, the proposed amendments require schools to socially transition children, thus interfering with vital exploratory psychotherapy and pushing children into experimental and in many cases harmful medical interventions.

### 4. Families of Gender-Nonconforming Children are Harmed by Undisclosed Social Transition of Children

If implemented, the proposed amendments will also harm many families of gender-nonconforming children. As explained in Section 2 above, the proposed amendments almost certainly codify a system of self-ID and mandatory social affirmation. The proposed amendments say nothing about consultation with a child's parents before a school socially transitions a child. Indeed, many school systems in states that recognize gender identity in law now have explicit policies that bar teachers and other school personnel from notifying the child's parents about these very consequential changes without first obtaining the child's permission. For example, guidance provided to teachers in the Chicago Public School system makes clear that school personnel are required to socially transition children who assert transgender identities

---

[26] Lisa Littman, *Parent Reports of Adolescents and Young Adults Perceived to Show Signs of a Rapid Onset of Gender Dysphoria,* 13(8) PLoS One (2018), Ex. J. Supporters of the self-ID and mandatory affirmation model attempted to have the *PLoS One* journal editors retract Dr. Littman's article, and activists have claimed that Dr. Littman's study has been discredited. This is incorrect. The *PLoS One* editors asked Dr. Littman to make minor changes to clarify the study design, methods, and limitations, which she did. *See* https://journals.plos.org/plosone/article?id=10.1371/journal.pone.0214157.

[27] Numerous websites devoted to detransition stories can be found online. *See*, *e.g.*, https://www.detransvoices.org, https://post-trans.com, and https://www.transgendertrend.com/detransition. On March 12, 2022, Genspect.org hosted the first annual Detrans Awareness Day conference devoted to the stories of those who regretted their gender transition and returned to living as their biological sex. The full video of that conference can be viewed at https://www.youtube.com/watch?v=AnvZvqwIR7o. The r/detrans Reddit (with 38K+ members) also contains many such first-person accounts: https://www.reddit.com/r/detrans/.

without consulting the child's parents. "Parent(s)/guardian(s) [sic] consent is not required to address a student by their affirmed name and pronouns."[28] These guidelines also require "school staff" to hide the fact that a child has socially transitioned at school from parents unless the child gives permission. "It is not required for parents to participate" in the "Student Administrative Support Team" meetings concerning their child's "gender transition."[29] School staff are told that they "shall comply" with the Support Team's "recommendations in communicating with parents."[30] The U.S. Department of Education and Justice's *2016 Dear Colleague Letter* also indicates that parental consent is unnecessary: "The Departments interpret Title IX to require that when a student or the student's parent or guardian, *as appropriate*, notifies the school administration that the student will assert a gender identity that differs from previous representations or records, the school will begin treating the student consistent with the student's gender identity."[31] Lawsuits have been filed by parents who are justifiably angry that a school would socially transition their children without consulting them.

The legality of these practices under U.S. constitutional and statutory law is now being tested in the courts.[32] Our focus is on the consequences of covert social transition for the mental health of children and their parents. Based on our work with thousands of families, we are of the opinion that social transition of K-12 children without the consent of and discussion with the child's parents is an enormous overreach by schools that has destabilized many families and disrupted otherwise healthy parent-child relationships that are the foundation for the child's mental health.

We are aware that, in some situations, family relationships are not healthy and child abuse is a very real concern. We are also aware that some parents are intolerant of gender-nonconforming behavior and expression by their children. The concern is that if a child who claims an opposite-sex gender identity is "outed" to the parents, the parents will reject the child or the child's proclaimed identity, just as happened to many gay adults in their childhoods. In our experience, however, today the norm is not parental rejection of a gender-nonconforming child. Most parents are very supportive of their gender-nonconforming children. But parental support does not require unquestioning affirmation of their child's newly-disclosed gender identity. In the vast majority of cases, parents have a much deeper understanding of the child's life experiences and other mental health challenges, including recent traumas and other neurological conditions (e.g., Autism, ADHD, Anxiety Disorder). The parents may very well, and accurately, believe that their

---

[28]   *Chicago Guidelines*, *supra*, at 5.

[29]   *Id.* at 3.

[30]   *Id.* at 5. *See also, N.Y. Guidance to School Districts*, *supra*, at 7 ("School personnel should speak with the student first before discussing a student's gender nonconformity or transgender status with the student's parent or guardian. For the same reasons, school personnel should discuss with the student how the school should refer to the student, e.g., appropriate pronoun use, in written communication to the student's parent or guardian.").

[31]   *2016 Dear Colleague Letter*, *supra*, at 2.

[32]   *See, e.g.,* Compl. John Doe et al. v. Madison Metropolitan School District, 20-CV-454 (Cir. Ct. Dane Cty., Wisc., Feb. 18, 2020); D.F. v. The School Bd. of the City of Harrisonburg, VA, CL22-1304 (Cir. Ct. Rockingham Cty., VA, Jun. 1, 2022).

For the reasons stated above, we urge the U.S. Department of Education to abandon the sections of the proposed amendments that address "gender identity." The proposed amendments will be harmful to students, both those questioning their gender identities and those who are not. Students questioning their gender identities, or who are diagnosed with gender dysphoria, can be protected from abusive treatment and aided in their struggles without facing the risks posed by a policy that requires schools to affirm and validate students' gender identities based solely on the individual student's self-declarations.

## The Gender Exploratory Therapy Association

Lisa Marchiano, LCSW
Stella O'Malley, MA
Sasha Ayad, M.Ed., LPC
Roberto D'Angelo, PsyD, M.Med.
Joseph Burgo, PhD
Joanne Sinai, MD, MEd
Stephanie Winn, MA, LMFT
Temple Morris, LCSW-C
Rachel Carlson MA
Julie P. Reimann, M. Coun.
Rosie Campbell, MA Art Psychotherapy
Terry Patterson Mac's Psychodynamic Counselling
Heather A Mullin
Robert Withers, Jungian Analyst
David Clarke Pruden, MS
Thomas Preston, PhD, ABPP
Sarah Edmonds, PhD
Lynne Glover
Louise Clara
Lisa Duval
Mari Dickerson, LCSW
David M. Haralson, PhD, LMFT
Dina Critel-Rathje, MS, LIMHP
Michelle Peixinho, LCSW
Brooke Laufer, PsyD.
Tammy Carvalho MS Professional Counseling
Jerry T. Lawler, PhD, Clinical Psychologist
Jill Edelstein, MSW, LCSW
Mary M Kennedy, PsyD
Tania Marshall, M.Sc. (App. Psych), B.A. (Psych)
Susan Evans SRN, RMN Psychoanalytic Psychotherapist
Sophie Frost-MA Psychoanalytic Psychotherapy
Andrew B. Clark, MD

14

Anya S Dashevsky, Psy.D.
Dr Harriette Parnes
Cindy Eades, MAC, LPC
Kristen Farrell-Turner, PhD
F.R. Robinson, LPC, MA in Professional Counseling
Michelle Mackness, MC
Bret Alderman, PhD in Depth Psychology
Susanne Navas, MA & MEd Clinical Mental Health Counseling (May 2023)
Heather Gilley, Grad Student for School Counseling
Kathryn Hingle, BS
Judith Heppner, MSW, RSW
Jan Horner MS, LPC
Marcus Evans
Aaron Kimberly, BScN, RN