**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF LOUISIANA**
**MONROE DIVISION**

| | |
|---|---|
| STATE OF LOUISIANA et al., <br><br> *Plaintiffs*, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION et al., <br><br> *Defendants*. | No. 24-cv-563 |
| RAPIDES PARISH SCHOOL BOARD, <br><br> *Plaintiff*, <br><br> v. <br><br> U.S. DEPARTMENT OF EDUCATION et al., <br><br> *Defendants*. | No. 24-cv-567 |

**DEFENDANTS' CONSOLIDATED OPPOSITION TO**
**LOUISIANA'S AND RAPIDES PARISH SCHOOL BOARD'S MOTIONS FOR A**
**PRELIMINARY INJUNCTION AND § 705 STAY**

# TABLE OF CONTENTS

Table of Contents ............................................................................................................ i

Table of Authorities ........................................................................................................ ii

Introduction ..................................................................................................................... 1

Background ...................................................................................................................... 3

   I.    Title IX, Implementing Regulations, and Guidance ........................................... 3

   II.   Procedural History ............................................................................................... 5

Legal Standard ................................................................................................................. 5

Argument ......................................................................................................................... 6

   I.    Plaintiffs Are Unlikely to Succeed on the Merits. ............................................. 6

      A.    The Final Rule's Clarification that Title IX Prohibits Discrimination on the Basis of Gender Identity Is Compelled by the Statutory Text. ....................................... 6

      B.    The Final Rule's Limitations on Sex Separation and Differentiation Properly Account for Congressional Direction on Title IX's Coverage and Application to Different Contexts. 11

      C.    The Final Rule's Definition of Hostile Environment Sex-Based Harassment Is a Lawful Exercise of the Department's Statutory Authority and Consistent with the Requirements of the First Amendment. ................................................................. 21

      D.    The Final Rule's Explanation of the Scope of Title IX's Unambiguous Prohibition on Sex Discrimination Poses No Spending Clause Issue. ....................................... 27

      E.    The Rule Does Not Violate the Major Questions or Nondelegation Doctrine. .......... 31

      F.    The Final Rule Adequately Addressed Commenters' Concerns about Parental Rights. 32

      G.    The Department Adequately Considered Recipients' Reliance Interests. ................... 33

   II.   Plaintiffs Have Not Established Irreparable Harm. ........................................... 34

   III.  The Equities and Public Interest Weigh Against Preliminary Relief. ............... 36

   IV.  Any Relief Afforded by the Court Should Be Limited in Accordance with the APA and Equitable Principles. ....................................................................................... 37

Conclusion ..................................................................................................................... 40

# TABLE OF AUTHORITIES

## CASES

*A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville,*
    75 F.4th 760 (7th Cir. 2023) ........................................................................ 8

*Air Transp. Ass'n v. FAA,*
    169 F.3d 1 (D.C. Cir. 1999) ........................................................................ 20

*Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.,*
    724 F.3d 243 (D.C. Cir. 2013) .................................................................... 20

*Ams. for Prosperity Found. v. Bonta,*
    594 U.S. 595 (2021) .................................................................................... 23

*Anibowei v. Morgan,*
    70 F.4th 898 (5th Cir. 2023) ........................................................................ 34

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) ........................................................................ 38

*Athletics, Inc. v. ED,*
    675 F. Supp. 2d 660 (W.D. Va. 2009) .......................................................... 29

*Ayotte v. Planned Parenthood of N. New England,*
    546 U.S. 320 (2006) .................................................................................... 40

*Benning v. Georgia,*
    391 F.3d 1299 (11th Cir. 2004) .................................................................... 28

*Big Tyme Invs., L.L.C. v. Edwards,*
    985 F.3d 456 (5th Cir. 2021) ........................................................................ 37

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ............................................................................ *passim*

*Califano v. Aznavorian,*
    439 U.S. 170 (1978) .................................................................................... 13

*Califano v. Yamasaki,*
    442 U.S. 682 (1979) .................................................................................... 38

*Cannon v. Univ. of Chi.,*
    441 U.S. 677 (1979) .................................................................................... 36

*Cargill v. Garland,*
    57 F.4th 447 (5th Cir.) ................................................................................ 38

*Cent. & S.W. Servs., Inc. v. EPA,*
    220 F.3d 683 (5th Cir. 2000) ........................................................................... 38

*Chacon v. Granata,*
    515 F.2d 922, (5th Cir. 1975) ......................................................................... 37

*Cherokee Pump & Equip., Inc. v. Aurora Pump,*
    38 F.3d 246 (5th Cir. 1994) ............................................................................. 5

*Cornish v. Dudas,*
    540 F. Supp. 2d 61 (D.D.C. 2008) ................................................................... 36

*Creative v. Elenis,*
    600 U.S. 570 (2023) ........................................................................................ 25

*Davis ex rel. LaShonda D. v. Monroe County Board of Education,*
    526 U.S. 629 (1999) ............................................................................. 21, 22, 27

*DHS v. New York,*
    140 S. Ct. 599 (2020) ...................................................................................... 38

*DHS v. Regents of the Univ. of Cal.,*
    140 S. Ct. 1891 (2020) .................................................................................... 20

*Distributed v. U.S. Dep't of State,*
    838 F.3d 451 (5th Cir. 2016) ........................................................................... 37

*EEOC v. Bass Pro Outdoor World, L.L.C.,*
    826 F.3d 791 (5th Cir. 2016) ........................................................................... 36

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021) ................................................................................. 20, 34

*Fla. Bankers Ass'n v. U.S. Dep't of Treas.,*
    19 F. Supp. 3d 111 (D.D.C. 2014) ................................................................... 20

*Franklin v. Gwinnett Cnty. Pub. Sch.,*
    503 U.S. 60 (1992) ............................................................................................ 8

*Frontiero v. Richardson,*
    411 U.S. 677 (1973) ........................................................................................ 14

*Garcetti v. Ceballos,*
    547 U.S. 410 (2006) ........................................................................................ 25

*Gebser v. Lago Vista Indep. Sch. Dist.,*
    524 U.S. 274 (1998) ........................................................................................ 22

*Grabowski v. Ariz. Bd. of Regents*,
    69 F.4th 1110 (9th Cir. 2023) ................................................................. 8

*Grimm v. Gloucester Cnty. Sch. Bd.*,
    972 F.3d 586 (4th Cir. 2020) ............................................................. 8, 12

*Gross v. FBL Fin. Servs., Inc.*,
    557 U.S. 167 (2009) ........................................................................... 7, 9

*Harris v. Forklift Sys., Inc.*,
    510 U.S. 17 (1993) .......................................................................... 21, 24

*Hippocratic Med. v. FDA*,
    78 F.4th 210 (5th Cir. 2023) .................................................................. 6

*Jackson v. Birmingham Bd. of Educ.*,
    544 U.S. 167 (2005) ......................................................................... 3, 14

*Jordan v. Fisher*,
    823 F.3d 805 (5th Cir. 2016) ................................................................. 6

*Kentucky v. Yellen*,
    54 F.4th 325 (6th Cir. 2022) ................................................................ 27

*Lakoski v. James*,
    66 F.3d 751 (5th Cir. 1995) ................................................................... 8

*Louisiana v. Biden*,
    55 F.4th 1017 (5th Cir. 2022) .............................................................. 34

*Lowrey v. Texas A&M Univ. Sys.*,
    117 F.3d 242 (5th Cir. 1997) ................................................................. 8

*Maryland v.* King,
    567 U.S. 1301 (2012) .......................................................................... 35

*Massachusetts v. Mellon*,
    262 U.S. 447 (1923) ............................................................................ 30

*Mayo v. United States*,
    319 U.S. 441 (1943) ............................................................................ 35

*Meritor Sav. Bank, FSB v. Vinson*,
    477 U.S. 57 (1986) ............................................................................... 8

*Meriwether v. Hartop*,
    992 F.3d 492 (6th Cir. 2021) ........................................................... 9, 25

*Mistretta v. United States,*
    488 U.S. 361 (1989) ........................................................................................ 32

*Muldrow v. City of St. Louis,*
    144 S. Ct. 967 (2024) ............................................................... 12, 14, 15

*Munaf v. Geren,*
    553 U.S. 674 (2008) .......................................................................................... 5

*Nat'l Ass'n of Home Builders v. EPA,*
    682 F.3d 1032 (D.C. Cir. 2012) .............................................................. 20

*NetChoice, L.L.C. v. Paxton,*
    49 F.4th 439 (5th Cir. 2022) ................................................... 23, 26, 27

*New York v. United States,*
    505 U.S. 144 (1992) ........................................................................................ 31

*NFIB v. Sebelius,*
    567 U.S. 519 (2012) ........................................................... 28, 29, 30

*Nken v. Holder,*
    556 U.S. 418 (2009) .......................................................................... 6, 36

*Nuziard v. Minority Bus. Dev. Agency,*
    2024 WL 965299 (N.D. Tex. Mar. 5, 2024) .................................... 39

*Pelcha v. MW Bancorp, Inc.,*
    988 F.3d 318 (6th Cir. 2021) ..................................................................... 9

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) ........................................................................................... 28

*Planned Parenthood of Hous. & Sw. Tex. v. Sanchez,*
    403 F.3d 324 (5th Cir. 2005) ................................................................... 31

*Port Auth. Trans-Hudson Corp. v. Feeney,*
    495 U.S. 299 (1990) ........................................................................................ 29

*Rest. L. Ctr. v. U.S. Dep't of Lab.,*
    66 F.4th 593 (5th Cir. 2023) .................................................................... 34

*Safeco Ins. Co. of Am. v. Burr,*
    551 U.S. 47 (2007) ........................................................................................... 8

*Sampson v. Murray,*
    415 U.S. 61 (1974) ......................................................................................... 38

*South Dakota v. Dole,*
    483 U.S. 203 (1987) ............................................................................. 27, 29, 30

*Speech First, Inc. v. Cartwright,*
    32 F.4th 1110 (11th Cir. 2022) ................................................................ 24, 25

*Taylor-Travis v. Jackson State Univ.,*
    984 F.3d 1107 (5th Cir. 2021) ........................................................................ 8

*Texas v. EPA,*
    829 F.3d 405 (5th Cir. 2016) ........................................................................ 35

*Tinker v. Des Moines Indep. Cmty. Sch. Dist.,*
    393 U.S. 503 (1969) ...................................................................................... 25

*United States v. Salerno,*
    481 U.S. 739 (1987) ...................................................................................... 23

*United States v. Texas,*
    599 U.S. 670 (2023) ................................................................................ 37, 39

*Virginia v. Hicks,*
    539 U.S. 113 (2003) ................................................................................ 23, 24

*Wash. State Grange v. Wash. State Republican Party,*
    552 U.S. 442 (2008) ...................................................................................... 23

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ...................................................................................... 31

*West Virginia v. HHS,*
    289 F.3d 281 (4th Cir. 2002) ........................................................................ 29

*Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.,*
    F.3d 1034 (7th Cir. 2017) ............................................................................. 12

*White v. Carlucci,*
    862 F.2d 1209 (5th Cir. 1989) ...................................................................... 34

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ...................................................................................... 5, 34

*Wittmer v. Phillips 66 Co.,*
    915 F.3d 328 (5th Cir. 2019) .......................................................................... 8

**STATUTES**

5 U.S.C. § 705 ............................................................................................. *passim*

20 U.S.C. § 1681(a) ................................................................................... *passim*

20 U.S.C. § 1681(a)(1) ....................................................................................... 3

20 U.S.C. § 1681(a)(6) ..................................................................................... 13

20 U.S.C. § 1682 ................................................................................... 29, 36, 37

20 U.S.C. § 1686 ............................................................................................... 14

29 U.S.C. § 623(a)(1) ......................................................................................... 9

42 U.S.C. § 2000e-2(a)(1) ............................................................................. 4, 7

## <u>REGULATIONS</u>

34 C.F.R. § 106.10 ........................................................................................ 6, 11

34 C.F.R. § 106.2 ............................................................................................. 24

34 C.F.R. § 106.31(a)(2) .............................................................................. 2, 11

34 C.F.R. § 106.31(b)(4) ................................................................................. 11

34 C.F.R. § 106.33 ....................................................................................... 12, 13

34 C.F.R. § 106.41(a) ............................................................................. 16, 17, 18

34 C.F.R. §§ 100.7–100.11 .............................................................................. 29

62 Fed. Reg. 12,034 ......................................................................................... 22

85 Fed. Reg. 30,026 ........................................................................................... 4

86 Fed. Reg. 13,803 ........................................................................................... 4

87 Fed. Reg. 41,390 ........................................................................................... 5

88 Fed. Reg. 22,860 ......................................................................................... 16

89 Fed. Reg. 33,474 ...................................................................................... 1, 26

Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual
   Orientation or Gender Identity,
    Exec. Order No. 14,021 ............................................................................. 4

## INTRODUCTION

Title IX prohibits recipients of federal funds from discriminating on the basis of sex in their education programs or activities. 20 U.S.C. § 1681(a). The Department of Education is charged with issuing rules to effectuate this prohibition. *See id.* § 1682. Pursuant to that authority, the Department recently issued a rule titled Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 89 Fed. Reg. 33,474 (Apr. 29, 2024) [hereinafter Final Rule or Rule]. Among other things, the Final Rule clarifies that "discrimination on the basis of sex" includes "discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity," and that the definition of hostile environment sex-based harassment includes "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." *Id.* at 33,884.

Plaintiffs, a group of states and local school boards, now move to preliminarily enjoin or stay the effective date of the Final Rule. *See* Louisiana's Mot. Postponement or Stay under 5 U.S.C. § 705 or a Prelim. Inj., ECF No. 24; Rapides Parish Sch. Bd.'s Mot. Delay Effective Date & for Prelim. Inj., ECF No. 11. The Court should deny their Motions because they have not made a clear showing of the relevant factors.

First, Plaintiffs have failed to demonstrate a likelihood of success on the merits. The Department's interpretation of discrimination "on the basis of sex" straightforwardly applies the Supreme Court's reasoning in *Bostock v. Clayton County*, 590 U.S. 644 (2020). *Bostock* concluded that Title VII's prohibition against sex discrimination encompasses discrimination on the basis of sexual orientation and gender identity "because it is impossible to discriminate against a person

for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660. That same reasoning applies to the nearly identical prohibition of sex discrimination in Title IX. Even if one assumes that sex is binary, neither *Bostock* nor the Final Rule relies on defining "sex" to mean "gender identity" or "sexual orientation."

Further, Plaintiffs fail to demonstrate that the Final Rule is arbitrary or capricious based on the distinctions that it recognizes between contexts in which Congress has specified exceptions to Title IX's prohibition on sex discrimination and other contexts (e.g., restrooms) in which it has not. The Department's recognition that separate or different treatment based on sex is permissible under Title IX in some circumstances, through the provision to be codified at 34 C.F.R. § 106.31(a)(2), does not somehow render the rest of the Rule unreasonable. To the contrary, the Rule's adherence to the lines drawn by Congress—which specified only a handful of contexts where separation or different treatment based on sex is permitted even when it may subject a person to harm—was proper and lawful.

Plaintiffs are also incorrect that the Rule establishes an unworkable harassment standard. The Department used a similar standard in its enforcement of Title IX for decades prior to regulatory changes made in 2020 and continues to use a similar standard in its enforcement of both Title VI (prohibiting discrimination on the basis of race, color, national origin including shared ancestry and ethnic characteristics) and Section 504 of the Rehabilitation Act (prohibiting discrimination based on disability). *See* Final Rule, 89 Fed. Reg. at 33,642. And courts and the Equal Employment Opportunity Commission (EEOC) have used a similar standard to identify harassment under Title VII's analogous provisions for decades. Plaintiffs nowhere address this context. Nor do Plaintiffs demonstrate that the challenged harassment standard threatens freedom of speech or free exercise of religion.

Plaintiffs are unlikely to succeed on their other claims as well. Plaintiffs fail to show that the Final Rule requires an interpretation of Title IX that would violate the Spending Clause or that the Rule implicates the major questions doctrine. And they do not demonstrate that any provision of the Rule is arbitrary or capricious, including based on the assertion that the Department failed to adequately address concerns about parental rights or reliance interests.

Plaintiffs have not clearly shown the other requirements for a stay or preliminary injunction either. Plaintiffs' alleged harms are speculative at best, or otherwise not legally cognizable. Plaintiffs thus cannot establish irreparable injury justifying preliminary relief. Moreover, the public interest and balance of equities weigh against granting Plaintiffs' motion, as enjoining the Rule would substantially harm the federal government's interests in preventing discrimination in federally funded education programs and activities.

Accordingly, the Court should deny the motions for a preliminary injunction or § 705 stay.

## BACKGROUND

## I.     Title IX, Implementing Regulations, and Guidance

Title IX's anti-discrimination provision states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). There are only a small number of "specific, narrow exceptions to that broad prohibition." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005); *see* 20 U.S.C. § 1681(a)(1)–(9) (listing educational institutions, organizations, or programs that are exempt or partly exempt from Title IX's prohibition on sex discrimination); *id.* § 1686 (permitting maintenance of sex-separate living facilities).

Title IX directs the Department to "issu[e] rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing

the financial assistance in connection with which the action is taken." *Id.* § 1682. Title IX also sets forth an administrative enforcement scheme, which allows the Department to obtain voluntary compliance from or, failing that, terminate the federal funds of a recipient that fails to comply with the statute or the Department's implementing regulations. *Id.*

Over the years, the Department has promulgated regulations effectuating Title IX, including in 2020, when it specified how recipients of federal funds must respond to allegations of sexual harassment in their education programs or activities. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 85 Fed. Reg. 30,026 (May 19, 2020) [hereinafter 2020 Amendments].

One month after publication of the 2020 Amendments, the Supreme Court held that the prohibition on discrimination "because of . . . sex" in Title VII of the Civil Rights Act of 1964 (Title VII), 42 U.S.C. § 2000e-2(a)(1), necessarily encompasses discrimination because of sexual orientation and gender identity. *See Bostock*, 590 U.S. at 660. Following *Bostock*, President Biden directed the Department of Education to review the 2020 Amendments and existing agency guidance "for consistency with governing law." Guaranteeing an Educational Environment Free From Discrimination on the Basis of Sex, Including Sexual Orientation or Gender Identity, Exec. Order No. 14,021, § 2, 86 Fed. Reg. 13,803 (Mar. 8, 2021).

In June 2021, the Department's Office for Civil Rights ("OCR") held a nationwide virtual public hearing on Title IX. Final Rule, 89 Fed. Reg. at 33,480. OCR also received more than 30,000 written comments in connection with the hearing, in addition to over 280 live comments. *Id.* at 33,835, 33,860. In addition, OCR held listening sessions with a wide variety of stakeholders. *Id.* at 33,480. During these engagements seeking public input, stakeholders described the harms students suffer when they are restricted from participating in school consistent with their gender

identity and expressed concern that the definition of sexual harassment in the 2020 amendments allowed schools to ignore conduct that could deny educational opportunities based on sex. *Id.* at 33,478–80; *see also*, Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance, 87 Fed. Reg. 41,390, 41,396 (proposed July 12, 2022) [hereinafter NPRM]. In July 2022, the Department issued an NPRM. *See* 87 Fed. Reg. 41,390. Following extensive review of the more than 240,000 public comments, the Department published the Final Rule, which goes into effect on August 1, 2024. *See* 89 Fed. Reg. at 33,476–77.

As relevant to this case, the Final Rule clarifies (1) the scope of sex discrimination under Title IX, *id.* at 33,476; (2) the limits of permissible different or separate treatment on the basis of sex under Title IX, *id.* at 33,477; and (3) the definition of sex-based harassment under Title IX, *id.* at 33,476.

## II.    Procedural History

The *Louisiana* Plaintiffs filed their Complaint on April 29, 2024, ECF No. 1, which they amended on May 3, 2024, ECF No. 11. They filed their Motion for a Postponement or Stay under § 705 or a Preliminary Injunction on May 15, 2024.

Rapides Parish School Board (RPSB) filed its Complaint on April 30, 2024. ECF No. 1. It filed its Motion to Delay Effective Date and for Preliminary Injunction on May 14, 2024.

The Court consolidated the cases on May 15, 2024. Order, ECF No. 25.

### LEGAL STANDARD

"A preliminary injunction is an extraordinary and drastic remedy" that should "never be awarded as of right." *Munaf v. Geren*, 553 U.S. 674, 689–90 (2008) (citation omitted); *see Cherokee Pump & Equip., Inc. v. Aurora Pump*, 38 F.3d 246, 249 (5th Cir. 1994). A plaintiff may obtain this "extraordinary remedy" only "upon a clear showing" that it is "entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The party seeking a preliminary

injunction bears the burden to show "a substantial likelihood of success on the merits," "a substantial threat of irreparable injury," "that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted," and "that the grant of an injunction will not disserve the public interest." *Jordan v. Fisher*, 823 F.3d 805, 809 (5th Cir. 2016) (citation omitted). When the federal government is the defendant, the last two factors merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009). The movant bears the same burden when seeking a stay under § 705. *See All. for Hippocratic Med. v. FDA*, 78 F.4th 210, 242 (5th Cir. 2023).

## ARGUMENT

### I.    Plaintiffs Are Unlikely to Succeed on the Merits.

#### A.    The Final Rule's Clarification that Title IX Prohibits Discrimination on the Basis of Gender Identity Is Compelled by the Statutory Text.

Once again, Title IX states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The Final Rule clarifies that "[d]iscrimination on the basis of sex includes discrimination on the basis of sex stereotypes, sex characteristics, pregnancy or related conditions, sexual orientation, and gender identity." 89 Fed. Reg. at 33,886 (to be codified at 34 C.F.R. § 106.10). As the Department explained, "discrimination on each of those bases is sex discrimination because each necessarily involves consideration of a person's sex, even if that term is understood to mean only physiological or 'biological distinctions between male and female.'" *Id.* at 33,802 (quoting *Bostock*, 590 U.S. at 655).

Plaintiffs argue that the Department's interpretation of Title IX is inconsistent with the statutory text and contrary to law. *See* Louisiana's Mem. in Supp. of Mot. for Postponement or Stay under 5 U.S.C. § 705 or a Prelim. Inj. 12–16, ECF No. 24 [hereinafter Louisiana's Mem.];

RPSB's Mem. in Supp. of Mot. to Delay Effective Date & for Prelim. Inj. 9–16, ECF No. 11-1 [hereinafter RPSB's Mem.]. In fact, the Department faithfully interpreted the statutory text in light of *Bostock*, which interpreted Title VII's provision making it unlawful, in relevant part, "for an employer . . . to discriminate against any individual . . . because of such individual's . . . sex," 590 U.S. at 655 (quoting 42 U.S.C. § 2000e-2(a)(1)). The Supreme Court explained that Title VII's "because of" language "incorporates the 'simple' and 'traditional' standard of but-for causation." *Id.* at 656–57 (citation omitted). "[S]ex is necessarily a but-for cause" of discrimination on the basis of sexual orientation or gender identity "because it is impossible to discriminate against a person for being homosexual or transgender without discriminating against that individual based on sex." *Id.* at 660, 661 (emphasis omitted). If, for example, an employer "fires a transgender person who was identified as a male at birth but who now identifies as a female," but "retains an otherwise identical employee who was identified as female at birth, the employer intentionally penalizes a person identified as male at birth for traits or actions that it tolerates in an employee identified as female at birth." *Id.* at 660. "[T]he individual employee's sex plays an unmistakable and impermissible role in the discharge decision." *Id.* That is so even if "sex" in Title VII "refer[s] only to biological distinctions between male and female." *Id.* at 655.

*Bostock*'s reasoning applies with equal force to Title IX's prohibition on discrimination "on the basis of sex," 20 U.S.C. § 1681(a), which employs a causation standard indistinguishable from Title VII's "because of . . . sex" language, 42 U.S.C. § 2000e-2(a)(1). The Supreme Court has long used the phrase "on the basis of" interchangeably with Title VII's "because of" language when discussing Title VII's causation standard, including in *Bostock* itself. *See* 590 U.S. at 650 ("[I]n Title VII, Congress outlawed discrimination in the workplace on the basis of . . . sex."); *see also Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009) (explaining statutory phrase, "based

on" has the same meaning as the phrase "because of" (citing *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 63–64 & n.14 (2007))). Courts—including the Fifth Circuit—consistently rely on interpretations of Title VII's prohibition against discrimination "because of . . . sex" to interpret Title IX's textually similar provision. *See, e.g.*, *Franklin v. Gwinnett Cnty. Pub. Sch.*, 503 U.S. 60, 75 (1992) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57 (1986)); *Lowrey v. Texas A&M Univ. Sys.*, 117 F.3d 242, 248 (5th Cir. 1997); *Lakoski v. James*, 66 F.3d 751, 756 (5th Cir. 1995). Indeed, the Fifth Circuit has emphasized "Title IX's similarity to Title VII," explaining that "the prohibitions of discrimination on the basis of sex [in] Title IX and Title VII are the same." *Lakoski*, 66 F.3d at 756 & n.3; *see also Taylor-Travis v. Jackson State Univ.*, 984 F.3d 1107, 1119 (5th Cir. 2021) (explaining that "the causation standard for Title IX [retaliation] claims" under 20 U.S.C. 1681(a) "should be the same as the causation standard for Title VII claims"); *Wittmer v. Phillips 66 Co.*, 915 F.3d 328, 337 (5th Cir. 2019) (Ho, J., concurring) ("[F]ederal statutes governing educational institutions employ language indistinguishable from Title VII[.]"). And as to the specific question at hand, several courts have already held that there is no difference between the two statutes that would permit a different result. *See, e.g.*, *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616 (4th Cir. 2020), *as amended* (Aug. 28, 2020); *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 769 (7th Cir. 2023); *Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023). Title IX no more permits a school to bar a student from band practice on the basis of the student being transgender than Title VII permits an employer to fire an employee because the employee is transgender.

Plaintiffs rely on two Sixth Circuit opinions to argue that *Bostock*'s reasoning does not apply to Title IX. *See* Pls.' Mot. 15–16. But neither of these cases identifies a persuasive ground to conclude that *Bostock*'s analysis of Title VII's prohibition of discrimination "because of" sex is

inapplicable to Title IX's nearly indistinguishable prohibition.

*Meriwether v. Hartop* was a fact-specific free-speech case, which held that a university lacked a sufficient interest in disciplining a professor for certain classroom statements regarding transgender students. 992 F.3d 492 (6th Cir. 2021). The court explained that the university's Title IX interests were "not implicated" because there was "no indication at this stage of the litigation" that the professor's speech inhibited students' "education or ability to succeed in the classroom." *Id*. at 511. The court also noted that "Title VII differs from Title IX in important respects," pointing to Title IX's provisions allowing for consideration of sex in athletic scholarships and maintenance of separate living facilities for different sexes. *See id.* at 510 & n.4. *Meriwether*, however, nowhere suggests that discrimination "because of . . . sex" in Title VII imposes a different causal standard or means something different than discrimination "on the basis of sex" in Title IX.

*Pelcha v. MW Bancorp, Inc.*, an Age Discrimination in Employment Act (ADEA) case, is similarly inapposite, and did not even touch on the question of whether a prohibition on discrimination "because of" sex is materially distinguishable from Title IX's prohibition on discrimination "on the basis of" sex. 988 F.3d 318 (6th Cir. 2021). The court merely declined to rely on *Bostock* in light of binding Supreme Court precedent interpreting the ADEA's causality requirement. *See Pelcha*, 988 F.3d at 323–24 (citing *Gross*, 557 U.S. 167). In any event, the court recognized that the ADEA's prohibition on terminating employees "because of such individual's age," 29 U.S.C. § 623(a)(1), imposed no more than "but for" causation, *Pelcha*, 988 F.3d at 324, which is the same causal standard the Court applied in *Bostock* to hold that discrimination "because of sex" necessarily includes discrimination "for being homosexual or transgender," *Bostock*, 590 U.S. at 656–57, 660.

Plaintiffs lean heavily on their view that sex is binary and "biological," Louisiana' Mem.

12–15; RPSB's Mem. 9–13, but fail to acknowledge that *Bostock* "proceed[ed] on the assumption that 'sex' . . . referr[ed] only to biological distinctions between male and female." 590 U.S. at 655. Regardless of how one defines the word, "it is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex." *Id.* at 660. The Final Rule operates equally well under the same assumption. *See* Final Rule, 89 Fed. Reg. at 33,802, 33,804–05, 33,807. As *Bostock* underscores, discriminating against someone based on their gender identity necessarily constitutes discrimination "on the basis of" the sex that they were assigned at birth. *See Bostock*, 590 U.S. at 660–61 (explaining "transgender status [is] inextricably bound up with sex").

Relying on this same misapprehension of *Bostock*, the *Louisiana* Plaintiffs assert that *Bostock* permits discrimination against bisexual and nonbinary students. *See* Louisiana's Mem. 15. But *Bostock*'s reasoning clearly forecloses discrimination against bisexual and nonbinary students as well. It is impossible to define bisexuality without reference to sex—bisexuality necessarily entails consideration of "the sex of the person to whom they should be attracted." *See* Final Rule, 89 Fed. Reg. at 33807. And it is impossible to discriminate against someone for being nonbinary without considering their nonconformity to sex stereotypes associated with their sex assigned at birth. *See id.* To the extent that Plaintiffs mean to suggest that discrimination against bisexual or nonbinary students is acceptable because it can be accomplished by discriminating equally against men and women, *Bostock* directly rejected this argument, holding that it is no "defense for an employer to say it discriminates against both men and women because of sex." 590 U.S. at 659. As the Supreme Court explained, "an employer who fires a woman, Hannah, because she is insufficiently feminine and also fires a man, Bob, for being insufficiently masculine may treat men and women as groups more or less equally. But in both cases the employer fires an

individual in part because of sex. Instead of avoiding Title VII exposure, this employer doubles it." *Id*.

As set forth above, the Department properly applied *Bostock*'s straightforward textual analysis in interpreting the plain language of Title IX's anti-discrimination provision. Plaintiffs thus are unlikely to succeed on the merits of their claims that the interpretation of sex discrimination to be codified at 34 C.F.R. § 106.10 is inconsistent with Title IX or exceeded the Department's authority.

     **B.**    **The Final Rule's Limitations on Sex Separation and Differentiation Properly Account for Congressional Direction on Title IX's Coverage and Application to Different Contexts.**

The Final Rule's adherence to the limited scope of Title IX's exceptions to the statute's general prohibition on sex discrimination follows naturally from Title IX's text and is not arbitrary or capricious. Plaintiffs take issue with the Final Rule's provision that, with limited exceptions, a recipient may not carry out otherwise permissible different or separate treatment on the basis of sex in a manner that prevents a person from participating in an education program or activity consistent with the person's gender identity. *See* Final Rule, 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). Plaintiffs assert that this provision is contrary to statute and unreasonable. Louisiana's Mem. 22–25; RPSB's Mem. 10–15, 21, 22–23. These arguments fail.

     **1.**    **Section 106.31(a)(2) Is Consistent with the Statutory Text and Longstanding Regulations.**

The Department's regulations have long specified that separate or different treatment on the basis of sex is generally prohibited under Title IX because such treatment is presumptively discriminatory. Final Rule, 89 Fed. Reg. at 33,814 (citing NPRM, 87 Fed. Reg. at 41,534; 34 C.F.R. § 106.31(b)(4), (7)). The regulations have also long recognized limited contexts in which sex separation or differentiation is allowed. *Id.* The provision to be codified at 34 C.F.R.

§ 106.31(a)(2) explains how recipients may carry out such separate or different treatment without running afoul of the statute's nondiscrimination mandate. In short, the Rule provides, consistent with Supreme Court precedent, that save for limited instances allowed by statute, Title IX prohibits "distinctions or differences in treatment [on the basis of sex] that injure protected individuals." *Id.* at 33,814 (brackets in original) (quoting *Bostock*, 590 U.S. at 681); *see Muldrow v. City of St. Louis*, 144 S. Ct. 967, 974 (2024) ("The words 'discriminate against,' we have explained, refer to 'differences in treatment that injure' employees." (quoting *Bostock*, 590 U.S. at 681)).

As compelled by that natural reading of the statutory text, which prohibits "discrimination," 20 U.S.C. § 1681(a), the Department explained that, except in limited contexts explained below, a recipient must not provide sex-separate facilities or activities in a manner that subjects any person to legally cognizable injury (i.e., more than de minimis harm). Final Rule, 89 Fed. Reg. at 33,814. The Department has long recognized that sex "separation in certain circumstances, including in the context of bathrooms or locker rooms, is not presumptively unlawful sex discrimination" because such sex-separate facilities generally impose no more than de minimis harm on students. *Id.* at 33,818; *see generally* 34 C.F.R. § 106.33. But consistent with federal court decisions and guidelines published by respected medical organizations, the Department explained that sex separation that prevents a person from participating in a program or activity consistent with their gender identity *does* cause more than de minimis harm—a conclusion that Plaintiffs do not dispute. *See* 89 Fed. Reg. at 33,816 (citing *Grimm*, 972 F.3d at 617–18; *Whitaker*, 858 F.3d at 1045-46); *id.* at 33,819 n.90 (citing guidelines published by medical organizations). Because preventing a student from using sex-separate restrooms or participating in single-sex classes consistent with their gender identity causes more than de minimis harm on the

basis of sex, *id.* at 33,814, it is prohibited by Title IX.[1]

At the same time, the Department recognized that Congress specified a few limited contexts in which more than de minimis harm is permitted by the statute—contexts in which Congress has defined exemptions from Title IX's general prohibition on sex discrimination, thus permitting sex separation without regard to harm. *Id.* at 33,819; *see, e.g.*, 20 U.S.C. § 1681(a)(6) (membership practices of certain social fraternities or sororities); *id.* § 1681(a)(4) (institutions focused on military training); *id.* § 1686 (educational institution's maintenance of "separate living facilities for the different sexes").

Plaintiffs are incorrect that the Final Rule's attention to the distinction between regulations that mirror an express statutory exception (as listed at § 106.31(a)(2)) and those that address sex separation in other contexts not specifically exempted by Congress is somehow contradictory. *See, e.g.*, RPSB's Mem. 10, 12. To the contrary, as explained by the Department, this distinction follows directly from the statute itself. *See* Final Rule, 89 Fed. Reg. at 33,814, 33,819. The Final Rule "clearly effectuates this basic congressional decision." *Califano v. Aznavorian*, 439 U.S. 170, 178 (1978). Although Congress did not except "toilet, shower, and locker room facilities" from the general prohibition on sex discrimination, RPSB's Mem. 14 (quoting 34 C.F.R. § 106.33), the Department reasonably determined that sex separation in such contexts can be consistent with Title

---

[1] Contrary to RPSB's contention, RPSB Mem. 22, the standard set forth in § 106.31(a)(2) is not based on a premise that "schools discriminate based on 'sex stereotypes' when requiring students to access sex-specific facilities and programs based on their sex." RPSB appears to be misconstruing the Department's response to a comment suggesting that the Department needed to narrowly define "sex" to "avoid overbroad application of a prohibition on discrimination based on sex stereotypes." Final Rule, 89 Fed. Reg. at 33,811. In addressing that concern, the Department explained that "not all conduct one *might label* 'sex stereotyping' necessarily violates Title IX," and that, pursuant to § 106.31(a)(2), "otherwise permissible sex separation is consistent with Title IX as long as it is carried out in a manner that does not impose more than de minimis harm on affected students." *Id.* (emphasis added).

IX, but only to the extent that any sex-based harm imposed is de minimis (i.e., not discriminatory). 89 Fed. Reg. at 33,816; *see id.* at 33,821 (explaining that the statutory living facilities "carve-out" in 20 U.S.C. § 1686 is inapplicable to "other aspects of a recipient's education program or activity for which Title IX permits different treatment or separation on the basis of sex, such as bathrooms, locker rooms, or shower facilities," and noting that the latter are "regulations that the Department adopted under different statutory authority [20 U.S.C. §§ 1681–1682], and which have long been addressed separately from 'living facilities'").

Thus, contrary to RPSB's argument, RPSB's Mem. 10–12, 14–15, the de minimis harm provision at § 106.31(a)(2) follows directly from the text and structure of Title IX. It explains how Title IX's prohibition of discrimination—which is premised on a concept of harm—places limitations on the sex-based separate or different treatment permitted in certain contexts by Department regulations. That is, in these contexts, separate or different treatment on the basis of sex is permitted to the extent it does not cause more than de minimis harm. This does not mean that "facilities and classes . . . must be separated by *gender identity*," as RSPB suggests. RPSB's Mem. 12. Rather, in contexts that Congress did not exempt from Title IX's general prohibition on sex discrimination, a person cannot be prevented from using a sex-separate facility consistent with the person's gender identity because doing so would cause more than de minimis harm. 89 Fed. Reg. at 33,816–18. RPSB argues at length that differentiation based on sex (i.e. sex-separated facilities) is discriminatory only when it "treats a person *worse* because of sex." RPSB's Mem. 11 (quoting *Muldrow*, 144 S. Ct. at 974); *see generally id.* (citing *Frontiero v. Richardson*, 411 U.S. 677, 686–87 (1973); *Jackson*, 544 U.S. at 174). But, indeed, this is the very point captured by the de minimis harm standard set forth in § 106.31(a)(2), which, consistent with Supreme Court precedent, recognizes that Title IX does not prohibit all sex-based distinctions, and only prohibits

different or separate sex-based treatment that causes harm. *See* 89 Fed. Reg. at 33,814–20; *Muldrow*, 144 S. Ct. at 974.

### 2.    Section 106.31(a)(2) Is Consistent with the Rest of the Final Rule and the Department's Other Regulations.

The *Louisiana* Plaintiffs' contention that § 106.31(a)(2) is somehow "internally inconsistent," Louisiana's Mem. 23–24, is also wrong. Rewriting the language of the Rule, the *Louisiana* Plaintiffs claim that if the Rule is correct that preventing a person from using a sex-separate facility consistent with the person's gender identity causes more than de minimis harm, "the Department loses any basis to conclude that sex-specific bathrooms are presumptively nondiscriminatory." *Id.* at 24. But there is no inconsistency in recognizing both that Title IX permits sex separation in the restroom context because it is "not presumptively unlawful sex discrimination," Final Rule, 89 Fed. Reg. at 33,818, and also prohibits a recipient from carrying out such separation in a manner that imposes more than de minimis harm, such as by denying a transgender student access consistent with that student's gender identity. *Id.* at 33,814–16. That is, there is no inconsistency between the Rule's recognition that in certain contexts, sex separation is generally not harmful, *id.* at 33,819, and its observation that in other contexts "there are injuries, including stigmatic injuries, associated with treating individuals differently on the basis of sex," *id.* at 33,815.

Nor does the Department's decision to address athletics through a separate rulemaking and to specify that the de minimis harm rule in § 106.31(a)(2) does not apply to sex-separated athletic teams that a recipient offers under § 106.41(b), *see id.* at 33,816, lend support to Plaintiffs' contention that the Rule is unreasonable. Plaintiffs' challenges to § 106.31(a)(2) at points appear to assume that this provision has implications for sex-separate athletic teams. *See* Louisiana's Mem. 23; RPSB's Mem. 2, 5–6, 8, 15, 21, 23. To the contrary, § 106.31(a)(2) expressly does *not*

apply to the criteria recipients use to determine students' eligibility to participate on male and female athletic teams. Final Rule, 89 Fed. Reg. at 33,816–17 ("Consistent with the longstanding athletics regulations, § 106.31(a)(2) does not apply to permissible sex separation of athletic teams."). Indeed, the Department revised the proposed regulation to identify the specific contexts in which § 106.31(a)(2) does not apply, including with respect to § 106.41(b). *Id.* In April 2023, the Department issued a separate notice of proposed rulemaking regarding the athletics regulations, which will be finalized in a separate rulemaking. *See* Nondiscrimination on the Basis of Sex in Education Programs or Activities Receiving Federal Financial Assistance: Sex-Related Eligibility Criteria for Male and Female Athletic Teams, 88 Fed. Reg. 22,860 (proposed Apr. 13, 2023). As the Department has explained, "[u]ntil that rule is finalized and issued, the current regulations on athletics continue to apply." Final Rule, 89 Fed. Reg. at 33,817. In other words, the Rule makes explicit that it in no way alters the status quo regarding eligibility for sex-separate athletic teams.

Moreover, the Department's decision to address athletics through a separate rulemaking is consistent with the fact that Congress recognized by statute that athletics is a special context. *Id.*; *see* Education Amendments of 1974, section 844. And the Department's athletics regulations have always tracked Congress's determination that the unique circumstances of athletics merit a different approach, "governed by an overarching nondiscrimination mandate and obligation to provide equal athletic opportunities for students regardless of sex." Final Rule, 89 Fed. Reg. at 33,816 (citing 34 C.F.R. § 106.41(a), (c)).[2] This approach allows individual students to be excluded from a particular male or female team based on their sex, even when doing so imposes

---

[2] Because the Department's treatment of athletics is based on congressional direction in the Education Amendments of 1974, the *Louisiana* Plaintiffs' argument that the Department's allowance of sex separation in athletics inconsistently relies on regulatory authority alone, Louisiana's Mem. 24, is plainly incorrect. Regardless, as the Department explained, athletics have always been treated as a special context and are to be addressed in a separate rulemaking.

more than de minimis harm. *Id.* at 33,817. Contrary to Plaintiffs' suggestions, Louisiana's Mem. 23; RPSB's Mem. 10–11, the Rule thoroughly and logically explains why the de minimis harm standard in § 106.31(a)(2) does not apply to the athletics regulations, and why this is consistent with the Department's longstanding approach to athletics. Final Rule, 89 Fed. Reg. at 33,816–19.

Further, Plaintiffs have not shown that, in promulgating § 106.31(a)(2), the Department "failed to adequately consider important aspects of the problem," Louisiana's Mem. 22; *see also* RPSB's Mem. 21, 22–23. The Department thoroughly considered and addressed commenters' concerns, including reported concerns regarding safety, privacy, and compliance. The Department "strongly agrees that recipients have a legitimate interest in protecting all students' safety and privacy," and explained that, under § 106.31(a)(2), "a recipient can make and enforce rules that protect all students' safety and privacy without also excluding transgender students from accessing sex-separate facilities and activities consistent with their gender identity." Final Rule, 89 Fed. Reg. at 33,820; *see also id.* ("nothing in Title IX or the final regulations prevents a recipient from offering single occupancy facilities, among other accommodations, to any students who seek additional privacy for any reason"). The Department reasonably concluded, however, that there is no "evidence that transgender students pose a safety risk to cisgender students, or that the mere presence of a transgender person in a single-sex space compromises anyone's legitimate privacy interest." *Id.* Nor have Plaintiffs identified any evidence contradicting that conclusion, Louisiana's unsupported and baseless reference to "sexual predators" notwithstanding. Louisiana's Mem. 22. As the Final Rule notes, federal courts have rejected "unsubstantiated and generalized concerns that transgender persons' access to sex-separate spaces infringes on other students' privacy or safety." Final Rule, 89 Fed. Reg. at 33,820 (citing cases).

The Department also addressed concerns regarding compliance, including "questions about

17

how a recipient should determine a person's gender identity for purposes of § 106.31(a)(2)." Final Rule, 89 Fed. Reg. at 33,819 (noting that "many recipients rely on a student's consistent assertion to determine their gender identity, or on written confirmation of the student's gender identity by the student or student's parent, counselor, coach, or teacher"). Contrary to Louisiana's characterization, Louisiana's Mem. 10, the Rule does not bar recipients from having "documentation requirements" to confirm gender identity; rather, the Rule acknowledges that "many recipients rely on . . . written confirmation . . . by the student or student's parent, counselor, coach, or teacher." Final Rule, 89 Fed. Reg. at 33,819. The Rule merely explains that recipients may not "require[e] a student to submit to invasive medical inquiries or *burdensome* documentation requirements" because doing so "imposes more than de minimis harm." *Id.* Plaintiffs do not meaningfully dispute that conclusion, and the Rule's recognition that some compliance mechanisms are unduly invasive or burdensome does not render the Rule arbitrary and capricious.

To the extent that Plaintiffs argue that the Rule fails to adequately address how § 106.31(a)(2) applies to nonbinary individuals, Louisiana's Mem. 24–25; RPSB's Mem. 11, they are incorrect. The Department explained that "that "[f]or nonbinary students, a recipient may, for example, coordinate with the student, and the student's parent or guardian as appropriate, to determine how to best provide the student with safe and nondiscriminatory access to facilities, as required by Title IX." Final Rule, 89 Fed. Reg. at 33,818. Plaintiffs identify no way in which this explanation is unreasonable.[3]

---

[3] The *Louisiana* Plaintiffs assert that the Rule is arbitrary and capricious in not requiring recipients to maintain any gender-neutral facilities, because that is the only option that would allow nonbinary students to access bathrooms consistent with their gender identity. Louisiana Mem. 24. But contrary to the *Louisiana* Plaintiffs' assertion, the Rule does not mean that "recipients must

Finally, Plaintiffs do not demonstrate that the Department failed to adequately address reliance interests and alternative policies, or that it engaged in an unreasonable cost-benefit analysis with respect to § 106.31(a)(2). RPSB argues that the Rule fails to take into account "reliance interests" because schools built communal restrooms and locker rooms, rather than single-occupant facilities, "based on [the Department's] prior positions." RPSB's Mem. 22–23. Louisiana, similarly, argues that the Department failed "to acknowledge the Rule will require recipients to incur significant costs" associated with construction or modification of bathroom and locker room facilities. Louisiana's Mem. 25. But no provision in the Rule requires recipients to modify their restroom or locker room facilities. *See, e.g.*, Final Rule, 89 Fed. Reg. at 33,876 ("Compliance with final § 106.31(a)(2) may require updating of policies or training materials, but will not require significant expenditures, such as construction of new facilities or creation of new programs."). As Louisiana admits, Louisiana's Mem. 24, the Rule states explicitly that recipients are not required to "provide gender-neutral or single-occupancy facilities." Final Rule, 89 Fed. Reg. at 33,820. In considering potential costs to recipients of compliance with the Final Rule, it was not unreasonable for the Department to assume that most recipients would not choose to incur construction costs, where they are not required to do so by the Rule.

To the extent Louisiana alleges that the Department did not accurately assess other costs—such as time necessary to review the Rule, revise policies, and train employees—it fails to explain how such alleged errors render § 106.31(a)(2) or any other specific provision of the Rule arbitrary and capricious. Indeed, any claim relating to the Department's cost-benefit analysis is not subject to review. The Department did not undertake a cost-benefit analysis to comply with Title IX, but

---

provide gender-neutral bathrooms and may be required to provide a different restroom for every claimed gender identity or designate all bathrooms as being for all genders." *Id.* at 24–25.

rather only to comply with Executive Orders 12866 and 13563. 89 Fed. Reg. at 33,843, 33,859. Alleged violations of these "Executive Orders cannot give rise to a cause of action" under the Administrative Procedure Act (APA). *Fla. Bankers Ass'n v. U.S. Dep't of Treas.*, 19 F. Supp. 3d 111, 118 n.1 (D.D.C. 2014), *vacated on other grounds*, 799 F.3d 1065 (D.C. Cir. 2015); *see Air Transp. Ass'n v. FAA*, 169 F.3d 1, 8–9 (D.C. Cir. 1999). Nor is this a case where the Department "decide[d] to rely on a cost-benefit analysis as part of its rulemaking," thus creating the possibility that "a serious flaw undermining that analysis can render the rule unreasonable." *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1040 (D.C. Cir. 2012). Even if the Department's cost-benefit analysis were reviewable, it would readily withstand scrutiny. Courts "review an agency's cost-benefit analysis deferentially," *Am. Trucking Ass'ns, Inc. v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 254 (D.C. Cir. 2013), and Plaintiffs do not demonstrate any serious flaw in that analysis, which was based on reasoned consideration of the issues Plaintiffs reference. *See, e.g.*, 89 Fed. Reg. at 33,851–52, 33,866–68.

RPSB faults the Department for "fail[ing] to consider alternative policies," RPSB's Mem. 23 (citing *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020)), but does not explain how the purported alternatives it imagines were "within the ambit of the existing policy," *Regents*, 140 S. Ct. at 1913. Indeed, one of these supposed "alternatives"—"rules to protect privacy and girls' equal access to athletic programs and physical education," RPSB's Mem. 23, would clearly fall outside the scope of the regulations addressed by the Rule, which explicitly does not take up athletics. *See* Final Rule, 89 Fed. Reg. at 33,816–19.

In sum, the Final Rule's application of the de minimis harm standard in § 106.31(a)(2) is supported and logical, and, in promulgating this provision, the Department neither failed to consider an important aspect of the problem nor ignored relevant evidence. *See FCC v. Prometheus*

20

*Radio Project*, 592 U.S. 414, 423 (2021) (noting that judicial review under arbitrary-and-capricious standard is "deferential" and "simply ensures that the agency has acted within a zone of reasonableness").

    **C.    The Final Rule's Definition of Hostile Environment Sex-Based Harassment Is a Lawful Exercise of the Department's Statutory Authority and Consistent with the Requirements of the First Amendment.**

Plaintiffs are also unlikely to succeed on their claim that the Rule's harassment definition is unlawful. The Final Rule defines hostile environment sex-based harassment, in relevant part, as "[u]nwelcome sex-based conduct that, based on the totality of the circumstances, is subjectively and objectively offensive and is so severe or pervasive that it limits or denies a person's ability to participate in or benefit from the recipient's education program or activity." Final Rule, 89 Fed. Reg. at 33,884. The definition in the Final Rule is consistent with "relevant judicial precedent, and . . . with congressional intent and the Department's longstanding interpretation of Title IX and resulting enforcement practice prior to the 2020 amendments." *Id.* at 33,490. In addition, this language "closely tracks longstanding case law defining sexual harassment," *id.* at 33,494 (citing *Harris v. Forklift Sys., Inc.*, 510 U.S. 17 (1993)), and aligns with the definition used by the EEOC. 89 Fed. Reg. at 33,516. The *Louisiana* Plaintiffs argue that the definition is inconsistent with the standard set forth in *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999), Louisiana's Mem. 16. And all Plaintiffs argue that the Rule violates the First Amendment by compelling or failing to protect speech. Louisiana's Mem. 16-17; RPSB's Mem. 19-20. These arguments are incorrect.

*First*, the *Louisiana* Plaintiffs' reliance on *Davis* is misplaced. *Davis* addressed a standard that a plaintiff must meet to bring a private action for damages, 526 U.S. at 650; it did not limit the Department's administrative enforcement authority. The Supreme Court's articulation of the scope of the private cause of action in Title IX focused on the fact that this cause of action is

implied, rather than an express creation of Congress. *See Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 284 (1998). Explaining that "[t]he requirement that recipients receive adequate notice of Title IX's proscriptions . . . bears on the proper definition of 'discrimination' in the context of a private damages action," *Davis* thus held that "funding recipients are properly held liable in damages only where they are deliberately indifferent to sexual harassment, of which they have actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." 526 U.S. at 650.

The *Louisiana* Plaintiffs do not explain why the *Davis* standard must apply in the distinct administrative enforcement context. Title IX permits the Department to enforce its nondiscrimination mandate through "'any . . . means authorized by law,' including ultimately the termination of federal funding." *Gebser*, 524 U.S. at 280–81, 287 (quoting 20 U.S.C. § 1682). The Department's administrative enforcement proceedings differ in many ways from private lawsuits for monetary damages, and *Davis*'s analysis of when to allow recovery of damages on theories of *respondeat superior* and constructive notice is thus inapposite. Indeed, after observing that Congress "entrusted" Federal agencies to "promulgate rules, regulations, and orders to enforce the objectives" of Title IX, 526 U.S. at 638, *Davis* repeatedly and approvingly cited the Department's then-recently published guidance regarding sexual harassment, *see id.* at 647–48, 651 (citing 1997 Sexual Harassment Guidance, 62 Fed. Reg. 12,034 (Mar. 13, 1997)). That guidance specifically stated that schools could be found to violate Title IX if the relevant harassment "was sufficiently severe, persistent, or pervasive to create a hostile environment." 1997 Sexual Harassment Guidance, 62 Fed. Reg. at 12,040.

The *Louisiana* Plaintiffs also incorrectly argue that the Department exceeded the scope of

its statutory authority by clarifying that a recipient's obligations to address sex-based harassment apply even when some conduct contributing to a hostile environment in the recipient's program or activity occurred off campus or outside the United States. Louisiana's Mem. 16; *see* Final Rule, 89 Fed. Reg. at 33,886. As the Rule states clearly, Title IX applies to every recipient and to all sex discrimination occurring under a recipient's education program or activity in the United States. Final Rule, 89 Fed. Reg. at 33,576 (citing § 106.11). Conduct occurring outside of a recipient's education program or activity, or abroad, is implicated only insofar as it "contributes to a hostile environment in the United States," *id.*, and in the recipient's program or activity, *id.* at 33,528. If such conduct occurs, for instance, in a study-abroad program, "that conduct may be relevant and considered by the recipient so that it can address the sex discrimination occurring within its program in the United States." *Id*. at 33,576.

*Second*, Plaintiffs fail to show that the Final Rule's definition of hostile environment sex-based harassment runs afoul of the First Amendment. *See* Louisiana's Mem. 16–18; RPSB's Mem. 19–21. Plaintiffs assert a pre-enforcement facial challenge to the Rule, but do not "even try to show that [the Rule] is 'unconstitutional in all of its application.'" *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)). Although in the First Amendment context "a law may be invalidated as overbroad if a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep," *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 615 (2021), courts "have insisted that a law's application to protected speech be 'substantial,' not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the 'strong medicine' of overbreadth invalidation," *Virginia v. Hicks*, 539 U.S. 113, 119–20 (2003) (internal citations omitted). *See NetChoice, L.L.C. v. Paxton*, 49 F.4th 439, 450 (5th Cir. 2022)

23

(citing *Hicks*, 539 U.S. at 119). Plaintiffs cannot satisfy this standard. Nothing in the Rule raises overbreadth concerns. The definition "covers only sex-based conduct that is unwelcome, both subjectively and objectively offensive, and so severe or pervasive that it limits" a person's ability to participate in the recipient's education program or activity. Final Rule, 89 Fed. Reg. at 33,503. The Supreme Court has upheld Title VII's anti-harassment provisions that apply a similar standard "without acknowledging any First Amendment concern." *Id.* at 33,505 (citing *Harris*, 510 U.S. at 23).

Indeed, Plaintiffs cite no case in which a court has held unconstitutional a definition of harassment analogous to the hostile environment sex-based harassment definition to be codified at 34 C.F.R. § 106.2. Further narrowing the Rule's scope, the harassment definition "only prohibit[s] conduct that meets all the elements" set forth in the definition and is evaluated based on the "totality of the circumstances . . . to ensure that no element or relevant factual consideration is ignored." Final Rule, 89 Fed. Reg. at 33,506. When evaluated against the "plainly legitimate sweep" of preventing sex-based harassment, the Rule in no way sweeps in such a substantial proportion of protected speech to justify "the strong medicine' of overbreadth invalidation," *Hicks*, 539 U.S. at 119–20.

The cases that Plaintiffs rely on to argue that "such policies present First Amendment problems" are inapposite. Louisiana's Mem. 17; RPSB's Mem. 20. *Speech First, Inc. v. Cartwright* involved a policy that, among other things, prohibited "a wide range of 'verbal, physical, electronic, and other' expression concerning any of (depending on how you count) some 25 or so characteristics," and "reache[d] not only a student's own speech, but also her conduct 'encouraging,' 'condoning,' or 'failing to intervene' to stop another student's speech." 32 F.4th 1110, 1125 (11th Cir. 2022). In contrast to the Final Rule, "[t]he policy, in short, [was] staggeringly

24

broad," *id.*, and it was not "tailored to harms that have long been covered by hostile environment laws." Final Rule, 89 Fed. Reg. at 33,505 (discussing *Speech First*, 32 F.4th 1110). Neither does Meriwether support Plaintiffs' claims; that court did not hold that the university's particular hostile environment definition ran afoul of the First Amendment. *See* 992 F.3d at 498. Rather, the policy flatly ordered faculty—on threat of discipline—to "refer to students by their "preferred pronoun[s]." *Id.*

Plaintiffs cite a number of cases addressing the interplay between the First Amendment and public accommodations law. *See* RPSB Mem. 20. But different First Amendment doctrines apply in the context of education. *See, e.g.*, *Garcetti v. Ceballos*, 547 U.S. 410, 419-20 (2006) (although public employees may speak on matters "of public concern," employers may also limit speech where "necessary . . . to operate efficiently and effectively"); *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 507 (1969) ("the Court has repeatedly emphasized the need for affirming the comprehensive authority of the States and of school officials, consistent with fundamental constitutional safeguards, to prescribe and control conduct in the schools."). The question of whether a government may require expressive conduct or speech from adults, in the general population, running or engaging with a business open to the public is inapposite to the question here. The Department explained its decision not to reopen the comment period on the Final Rule to address one of these cases—*303 Creative v. Elenis*, 600 U.S. 570 (2023)—"because the decision did not address the education context and would not change the final regulations, which already specify that nothing in these regulations requires a recipient to restrict rights protected under the First Amendment." 89 Fed. Reg. at 33,803. Plaintiffs' cited cases do not control whether the Department's definition of hostile environment sex-based harassment is lawful in the distinct context of the Department's administrative enforcement of its nondiscrimination mandate

under Title IX. For the reasons discussed above, the definition is lawful, and by its own terms, the Rule does not infringe on anyone's protected speech in violation of the First Amendment.

The Department's decision not to independently define "gender identity, sex stereotypes, and sex characteristics" does not, as RPSB asserts, somehow render the harassment definition vague and overbroad. *Contra* RPSB's Mem. 20. First, the Department has in fact offered its understanding of these terms, which are consistent with courts' and lawmakers' usage. *See* Final Rule, 89 Fed. Reg. at 33,809 (gender identity); *id.* at 33,810 (sex characteristics); *id.* at 33,811 (sex stereotypes). The Department's explanations are thus no less precise than these terms' accepted usage in those other contexts. And crucially, RPSB does not explain how these definitions, any more than the case law that they track, would cause a recipient to "refrain from protected speech," RPSB's Mem. 20.

*Third*, Plaintiffs allege—without support—that the Rule somehow "calls for schools to punish speech expressing views. . . that the [Biden] administration dislikes," RPSB's Mem. 20, or that the Rule "prohibits students from expressing their views, including their religious views, on numerous topics." Louisiana's Mem. 17. By its plain terms, the Final Rule does no such thing. "Nothing in the Final [Rule] limits any rights that would otherwise be protected by the First Amendment," Final Rule, 89 Fed. Reg. at 33,505, and "nothing in the regulations requires or authorizes a recipient to violate anyone's First Amendment rights." *Id*. at 33,516. In the event discipline is meted out, that too must be consistent with Due Process principles and the First Amendment. *Id*. at 33,500-01. And the Department clearly stated that, contrary to Plaintiffs' suggestions, "a stray remark, such as a misuse of language, would not constitute harassment under [the applicable] standard." *Id.* at 33,516. At bottom, Plaintiffs' First Amendment arguments boil down to "speculat[ion] about the most extreme hypothetical applications" of the Rule, *NetChoice*,

49 F.4th at 451–52, but "[s]uch whataboutisms further exemplify why it's inappropriate to hold the [Rule] facially unconstitutional in a pre-enforcement posture." *Id.*

Accordingly, Plaintiffs cannot show that the Rule's definition of sex-based harassment is unlawful, and their claim is unlikely to succeed.

### D.   The Final Rule's Explanation of the Scope of Title IX's Unambiguous Prohibition on Sex Discrimination Poses No Spending Clause Issue.

The Spending Clause grants Congress the power "to pay the Debts and provide for the . . . general Welfare of the United States." U.S. Const., art. I, § 8, cl. 1. Congress has broad power to set conditions on such funds so long as those conditions (1) are "unambiguous[]," (2) are not unduly coercive, (3) relate "to the federal interest" in the project, and (4) are consistent with "other constitutional provisions." *See South Dakota v. Dole*, 483 U.S. 203, 207–08, 211 (1987). Plaintiffs argue that if the Rule properly effectuates Title IX, the Rule's alleged infirmities would render it invalid under the Spending Clause because all four of the above conditions would be violated. *See* Louisiana's Mem. 19–21; RPSB's Mem. 16–18. They are wrong.

The focus of a Spending Clause inquiry is typically on a statute, not an implementing regulation, because the Spending Clause limits Congress's authority to condition federal funds. *See Kentucky v. Yellen*, 54 F.4th 325, 353 (6th Cir. 2022). Plaintiffs rightfully do not suggest (or contend) that Title IX violates the Spending Clause; that statute has long been held to be consistent with the Spending Clause. *See Davis*, 526 U.S. at 640 (noting that the Supreme Court has "repeatedly treated Title IX as legislation enacted pursuant to Congress' authority under the Spending Clause"). Rather, Plaintiffs focus on the Rule, claiming that its alleged faults render Title IX ambiguous, coercive, unrelated to a federal interest, and inconsistent with other constitutional provisions. But in focusing on the Rule, Plaintiffs merely restate their other merits arguments. For the same reason that those arguments are unlikely to succeed, so too is Plaintiffs' Spending Clause

claim unlikely to succeed.

1.      There is no issue with ambiguity, *contra* Louisiana's Mem. 20, because the relevant

provision in the Final Rule merely delineates the scope of Title IX's unambiguous prohibition on

sex discrimination, based on the statutory language's plain meaning. *See* 89 Fed. Reg. at 33,802,

*cf. Bostock*, 590 U.S. at 688 (Alito, J., dissenting) (noting that the Court found similar language in

Title VII "unambiguous"). "Congress may attach appropriate conditions to federal taxing and

spending programs to preserve its control over the use of federal funds," *NFIB v. Sebelius*, 567

U.S. 519, 579 (2012), so long as it does so "unambiguously," *Pennhurst State Sch. & Hosp. v.

Halderman*, 451 U.S. 1, 17 (1981). The requirement of unambiguity requires that Congress "make

the existence of the condition itself" "explicitly obvious," not that Congress list all ways in which

a recipient could fail to comply. *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) (citation

omitted).

Here, this condition is met because Title IX unambiguously prohibits sex-based

discrimination. *See, e.g.*, 20 U.S.C. § 1681(a) ("No person . . . shall, on the basis of sex, be

excluded from participation in, be denied the benefits of, or be subjected to discrimination under

any education program or activity receiving Federal financial assistance."). Louisiana claims not

to have anticipated that Title IX addresses, for example, discrimination concerning gender identity,

Louisiana's Mem. 20, but "the fact that a statute has been applied in situations not expressly

anticipated by Congress does not demonstrate ambiguity; instead, it simply demonstrates the

breadth of a legislative command." *Bostock*, 590 U.S. at 674 (cleaned up).[4]

---

[4] RPSB notes that *Bostock* was addressing Title VII, which was not enacted under the Spending Clause, RPSB's Mem. 18, but that in no way diminishes the force of the Supreme Court's conclusion in *Bostock* that the meaning of discrimination on the basis of sex was clear. *Cf. Bostock*, 590 U.S. at 688 (Alito, J., dissenting) ("According to the Court, the text is unambiguous."). Indeed,

2.      Title IX as effectuated by the Rule is not unduly coercive either. *Contra* Louisiana's Mem. 20–21; RPSB's Mem. 17. A statute may be unconstitutionally coercive if it "pass[es] the point at which 'pressure turns into compulsion.'" *NFIB*, 567 U.S. at 580 (quoting *South Dakota*, 483 U.S. at 211). And, when "mounting a facial challenge" under the Spending Clause (as with other facial challenges), the plaintiff "has a very heavy burden to carry, and must show that the [statute] cannot operate constitutionally under any circumstance." *West Virginia v. HHS*, 289 F.3d 281, 292 (4th Cir. 2002).

Plaintiffs have not met this heavy burden. They cite no authority suggesting that Title IX and its implementing regulations are unduly coercive. As an initial matter, Plaintiffs ignore the administrative enforcement process that must occur before any funding is withheld. *See* 20 U.S.C. § 1682 (requiring, *inter alia*, that the Department notify Congress and wait at least 30 days before any termination of funding could take effect); 34 C.F.R. §§ 100.7–100.11 (incorporated by 34 C.F.R. § 106.81). And Plaintiffs' fears of funding loss are pure speculation. The *Louisiana* Plaintiffs offer no explanation as to why they believe their funding to be imperiled. Louisiana's Mem. 21. RPSB points to alleged pressure "to adopt the Rule's new gender-identity mandate." RPSB's Mem. 17. But under *Bostock*, Title IX's prohibition on sex-based discrimination necessarily includes discrimination because of gender identity, *Bostock*, 590 U.S. at 660, and thus that "mandate" stems directly from Title IX. Particularly in the context of this facial challenge, Plaintiffs cannot show that they have been unduly coerced. *See Equity in Athletics, Inc. v. ED*, 675 F. Supp. 2d 660, 674 (W.D. Va. 2009) (holding that Title IX and certain implementing regulations

---

the sole case RPSB cites for the proposition that *Bostock* does not apply to Title IX for this reason is *Port Auth. Trans-Hudson Corp. v. Feeney*, 495 U.S. 299, 305 (1990), which addresses only the unrelated topic of the standard for waivers *of a state's sovereign immunity*—it does not discuss the standard for conditions on federal spending, nor does it address the application of *Bostock*.

did not violate the Spending Clause because of the enforcement process and that there are penalties "less drastic than the withholding of federal funding").

Moreover, the bar to establish economic coercion is high—"[i]n the typical case [courts] look to the States to defend their prerogatives by adopting 'the simple expedient of not yielding' to federal blandishments." *NFIB*, 567 U.S. at 579 (quoting *Massachusetts v. Mellon*, 262 U.S. 447, 482 (1923)). The *Louisiana* Plaintiffs refer to a "significant percentage" of education funding that could be lost without evidence or explanation of what portion of the overall budgets that would constitute. *See* Louisiana's Mem. 21. And RPSB states without citation that it believes "10% of its budget" is at issue, again without evidence or explanation—in particular how much of this funding is determined by Louisiana (and not the federal government). *See* RPSB's Mem. 17. At any rate, even if RPSB's speculation were to manifest and a hypothetical enforcement process resulted in total funding withdrawal, RPSB does not explain how a 10 percent loss to a school board budget is substantially different from a 5 percent loss of state highway funding, which the Supreme Court held to be "relatively mild encouragement to the States" in *South Dakota*, 483 U.S. at 211.

3.      The *Louisiana* Plaintiffs' remaining Spending Clause theories—that the Rule is contrary to federal interests and is otherwise unconstitutional, Louisiana's Mem. 20–21—restate their other merits arguments. For the same reasons that the Rule is consistent with Title IX and the First Amendment, there also is no Spending Clause violation on these bases.

RPSB claims that the Rule violates the Spending Clause because it "preempts state law." RPSB's Mem. 17–18. Crucially, however, RPSB has not identified a state law that plausibly conflicts with Title IX or the Rule. At most, RPSB vaguely references state laws "that prohibit schools from opening girls' athletic teams to biological males." RPSB's Mem. 17. But the Rule expressly states that it does not govern eligibility criteria for male and female athletic teams (which

30

is a separate topic that remains subject to a pending rulemaking), stating that "[u]ntil that [athletics] rule is finalized and issued, the current regulations on athletics continue to apply." Final Rule, 89 Fed. Reg. at 33,817. In any event, it is not uncommon for a state's choice of accepting Spending Clause funds to include the choice of what laws to enact. *See New York v. United States*, 505 U.S. 144, 167 (1992) (concluding in addressing the Spending Clause that "[w]here the recipient of federal funds is a State . . . the conditions attached to the funds by Congress may influence a State's legislative choices."). That influence can be considered a type of preemption and is unproblematic. *See, e.g.*, *Planned Parenthood of Hous. & Sw. Tex. v. Sanchez*, 403 F.3d 324, 337 (5th Cir. 2005) (observing, in the context of a conflict preemption analysis between a state law and federal funding conditions, that "State participation in federal funding programs is voluntary, but once a state has accepted federal funds, it is bound by the strings that accompany them").

Accordingly, the Final Rule does not raise any Spending Clause concerns, and Plaintiffs' claim is unlikely to succeed on the merits.

### E.     The Rule Does Not Violate the Major Questions or Nondelegation Doctrine.

Contrary to Plaintiffs' assertions, this case does not implicate the major questions doctrine. *See* Louisiana's Mem. 18–19; RPSB's Mem. 18–19. That doctrine is reserved for only "extraordinary" cases, "in which the history and breadth of the authority that the agency has asserted, and the economic and political significance of that assertion, provide a reason to hesitate before concluding that Congress meant to confer such authority." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). This is not such a case. The Department does not contend that Congress gave it the authority to decide as a matter of policy whether Title IX prohibits discrimination based on gender identity. Instead, like the Supreme Court's decision in *Bostock*, the relevant portions of the rule reflect "policy decisions" made by "Congress . . . itself" in the unambiguous text of the statute. *Id.* at 723. Accordingly, just as the Supreme Court did not invoke the major-questions doctrine

when it endorsed the EEOC's interpretation of Title VII in *Bostock*, there is no basis for invoking it here.

This Rule does not create a delegation problem either. *Contra* Louisiana's Mem. 21. Congress may lawfully delegate decision-making authority if it "lay[s] down by legislative act an intelligible principle to which the person or body authorized to [act] is directed to conform." *Mistretta v. United States*, 488 U.S. 361, 372 (1989) (citation omitted). That section's instruction to "effectuate the provisions of" § 1681 "by issuing rules, regulations, or orders of general applicability" is a commonly phrased delegation with a straightforward "intelligible principle"— effectuating Title IX's antidiscrimination provision—for the Department to follow.[5] For decades, the Department has promulgated regulations pursuant to § 1682, and no court has suggested that Congress violated the separation of powers by delegating such rulemaking authority to the Department.

**F.    The Final Rule Adequately Addressed Commenters' Concerns about Parental Rights.**

Plaintiffs do not demonstrate that the Department failed to adequately address concerns about parental rights. *See* Louisiana's Mem. 23; RPSB's Mem. 22. The Department thoroughly considered parental rights and drafted the Final Rule with the utmost respect for the fundamental role of parents in bringing up their children, and without disturbing any existing parental rights. *See, e.g.*, Final Rule, 89 Fed. Reg. at 33,821 (explaining that "nothing in Title IX or the final regulations may be read in derogation of any legal right of a parent . . . to act on behalf of a minor child"); *see also id.* at 33,835–36, 33,531. Responding to the specific concern highlighted by the *Louisiana* Plaintiffs—regarding school policies on notifying parents of a student's requests to be

---

[5] Likewise, RPSB is also incorrect to argue that the Rule lacks congressional authorization. *See* RPSB's Mem. 16.

treated consistent with a specific gender identity, Louisiana's Mem. 22—the Rule explains that "nothing in these final regulations prevents a recipient from disclosing information about a minor child to their parent who has the legal right to receive disclosures on behalf of their child." Final Rule, 89 Fed. Reg. at 33,822. The Rule's several pages of discussion of concerns related to parental rights belie Plaintiffs' accusations that the Department "entirely failed to consider" this issue, Louisiana's Mem. 22, or "merely paid lip service to parental rights," RPSB's Mem. 23.

### G.   The Department Adequately Considered Recipients' Reliance Interests.

RPSB also erroneously argues that the Rule is arbitrary and capricious because the Department failed to consider the schools' reasonable reliance interest. *See* RPSB's Mem. 22–23. Despite claiming that the Department "glossed over the changes to longstanding policies, practices, and facilities that schools would need to undertake to comply with the Rule while respecting the privacy and safety of all students," *id.* at 22, RPSB provides no support for this assertion—nor could it. To the extent that RPSB argues that the Rule undermines its reliance interest in building "expensive facilities based on ED's prior positions—for example, building communal restrooms and locker rooms rather than single-occupant facilities," RPSB's Mem. 22–23, it is plainly wrong. No provision in the Rule requires recipients to modify their restroom or locker room facilities. Nor does RPSB explain why compliance with the Rule would require it to incur such construction costs, which the Rule expressly disclaims. *See* Final Rule, 89 Fed. Reg. at 33,876 ("Compliance with final § 106.31(a)(2) may require updating of policies or training materials, but will not require significant expenditures, such as construction of new facilities or creation of new programs."). At bottom, the Department adequately considered the recipients' relevant reliance interest on past policies and practices and ultimately concluded that "the final regulations will not impose substantial new burdens that are not justified by the significant benefits the Department expects from implementation of the final regulations." *Id.* at 33,849; *see also*

*Prometheus Radio Project*, 592 U.S. at 423 (noting that judicial review under arbitrary-and-capricious standard is "deferential" and "simply ensures that the agency has acted within a zone of reasonableness").

## II.    Plaintiffs Have Not Established Irreparable Harm.

Plaintiffs also fail to establish the imminent irreparable harm needed to justify a preliminary injunction. "A plaintiff seeking a preliminary injunction must 'demonstrate that irreparable injury is likely in the absence of an injunction.'" *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023) (quoting *Nat. Res. Def. Council, Inc.*, 555 U.S. at 22). "Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with [the Supreme Court's] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Nat. Res. Def. Council, Inc.*, 555 U.S. at 22. Moreover, "the irreparable harm element must be satisfied by independent proof, or no injunction may issue." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989).

Both the *Louisiana* Plaintiffs and RPSB claim that they will suffer irreparable harm in the form of unrecoverable compliance costs in the lead up to the Final Rule's August 1, 2024 effective date. In order for compliance costs to qualify as irreparable harm, they "must be based on more than 'speculat[ion]' or 'unfounded fears.'" *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023) (quoting *Louisiana v. Biden*, 55 F.4th 1017, 1034 (5th Cir. 2022)). Here, Plaintiffs' evidence in support of the alleged compliance costs fails to meet that standard.

As for RPSB, in support of its claim of compliance costs, it provides a single declaration that merely identifies the type of routine and standard costs that would be associated with any new federal regulation. *See, e.g.*, Ex. A ¶ 5 ("[T]he school board would have to train its staff on the agency's new rule and resulting changes to school board policies and practices."). *Louisiana* Plaintiffs also provide declarations that identify similarly routine and standard compliance costs.

*See, e.g.*, Ex. 14 ¶ 20(a)-(d) (identifying "[c]osts and time" needed "to review and understand the Rule," "revise school district policies," "revise employee training," and "train employees"). Thus, at most, the evidence provided by both Plaintiffs states the obvious: a new regulation will likely require regulated parties to undertake *some* activities to assure compliance. Such assertions do not justify the extraordinary relief in the form of a preliminary injunction, or else nearly all regulations would produce irreparable harm. *Cf. Texas v. EPA*, 829 F.3d 405, 433 (5th Cir. 2016) (compliance with the regulation would lead to permanent closure of power plants).

The *Louisiana* Plaintiffs also argue that the Rule conflicts with Plaintiff States' laws, and relatedly that the Rule will cause irreparable harm to Plaintiff States and Plaintiff School Boards by "pressur[ing]" them into changing their conflicting laws and policies. Louisiana's Mem. 27. But regardless of whether the *Louisiana* Plaintiffs' laws or policies conflict with the Final Rule, a "corollary [of the Supremacy Clause] is that the activities of the Federal Government are free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). Accordingly, it is the federal government, not the *Louisiana* Plaintiffs, that faces significant irreparable harm, if it is prevented from administrating the Rule. *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (reasoning that if the Government "is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury").

Lastly, the *Louisiana* Plaintiffs argue that they will suffer irreparable harm in the form of "private litigation, not to mention decreased enrollment of students and loss of teachers." Louisiana's Mem. 27–28. The *Louisiana* Plaintiffs' only evidence for these alleged fears is a handful of unsupported and speculative statements by their declarants. *See, e.g.*, Ex. 18 ¶ 23 ("Around 35 teachers have indicated that they would consider resigning."); *id.* ("This policy will

also likely lead to private litigation."). The *Louisiana* Plaintiffs have thus failed to provide support that these fears are concrete and imminent, rather than speculative and hypothetical. These fears are at most a "possibility," which is insufficient to establish irreparable harm. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## III.   The Equities and Public Interest Weigh Against Preliminary Relief.

The balance of equities and the public interest "merge when the Government is the opposing party." *Id*. Here, these combined factors strongly counsel against issuing the requested preliminary relief. The Final Rule implements the Department's authority to enforce the statutory objectives of Title IX. *See* 20 U.S.C. § 1682. "There is inherent harm to an agency in preventing it from enforcing regulations that Congress found it in the public interest to direct that agency to develop." *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C. 2008). The public interest favors allowing the Department to fulfill these responsibilities.

Moreover, granting preliminary relief would significantly harm the Government's interests in preventing discrimination in educational programs and activities. Sex discrimination in educational environments has devastating consequences, including the effects of harassment based on sexual orientation and gender identity. *See*, *e.g.*, Final Rule, 89 Fed. Reg. at 33,478–80 (summarizing personal stories submitted by commenters). The Final Rule therefore effectuates Title IX's important goals of "avoid[ing] the use of federal resources to support discriminatory practices [and] provid[ing] individual citizens effective protection against those practices." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 704 (1979). Needless to say, preventing sex discrimination is in the public interest. *See EEOC v. Bass Pro Outdoor World, L.L.C.*, 826 F.3d 791, 798 (5th Cir. 2016).

Conversely, Plaintiffs have failed to show they face significant imminent and irreparable harm. At most, both Plaintiffs identify standard compliance costs. RPSB also argues that the

balance of equities tips in favor of a preliminary injunction because the Final Rule threatens to strip it of federal funding. RPSB's Mem. 23–25. But RPSB fails to identify how any such loss of funding is "imminent." *Chacon v. Granata*, 515 F.2d 922, 925 (5th Cir. 1975). Indeed, even if an administrative enforcement action were to occur once the Rule goes into effect, recipients could at that time raise challenges to any administrative enforcement proceedings, which would necessarily precede any termination of funds. 20 U.S.C. § 1682. Moreover, any adverse administrative determination would be subject to judicial review. *Id.* § 1683. But regardless, compelling non-monetary government interests measure up against even serious economic harm. *See, e.g.*, *Big Tyme Invs., L.L.C. v. Edwards*, 985 F.3d 456, 470 (5th Cir. 2021) (allowing the state government's restrictions with respect to the operations of bars in response COVID-19 despite financial harms to the bars).

In sum, the balance of the equities and the public interest both weigh in favor of denying the requests for a preliminary injunction, and the Court may deny the motion on this basis alone. *See Def. Distributed v. U.S. Dep't of State*, 838 F.3d 451, 460 (5th Cir. 2016).

## IV.    Any Relief Afforded by the Court Should Be Limited in Accordance with the APA and Equitable Principles.

While Defendants dispute that any relief is necessary for the reasons explained above, any relief afforded must be appropriately limited to the parties and consistent with the APA and equitable principles.

The Court should not issue preliminary relief that extends beyond Plaintiffs or beyond portions of the Rule as to which the Court has found that Plaintiffs have established a likelihood of success. The better view is that the APA does not itself authorize any specific remedies, including vacatur—remedies are addressed in § 703 of the APA, which says nothing about "set aside" but refers to the existing forms of relief. *Cf. United States v. Texas*, 599 U.S. 670, 693–99

(2023) (Gorsuch, J., concurring in the judgment).

But in any event, relief—including any "set aside"—should be limited by traditional equitable principles, including that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also, e.g.*, *Cargill v. Garland*, 57 F.4th 447, 472 (5th Cir.) (en banc) (plurality opinion) (concluding without contradiction from any other member of the Court that the district court could consider on remand "a more limited remedy" than universal vacatur, and instructing the district court to "determine what remedy . . . is appropriate to effectuate" the judgment), *cert. granted*, 144 S. Ct. 374 (2023); *Cent. & S.W. Servs., Inc. v. EPA*, 220 F.3d 683, 692 (5th Cir. 2000) (declining to enter vacatur in favor of remand). That means the Court should not issue preliminary relief that extends beyond Plaintiffs or that reaches provisions of the Rule beyond those as to which the Court has found that plaintiffs have established a likelihood of success. "At a minimum, a district court should think twice—and perhaps twice again—before granting universal anti-enforcement injunctions against the federal government." *Arizona v. Biden*, 40 F.4th 375, 395–96 (6th Cir. 2022) (Sutton, C.J., concurring).

And while Plaintiffs appear to refer to a § 705 stay as an interim measure, Proposed Order, a sweeping § 705 stay would raise all the same problems as nationwide injunctions. *See DHS v. New York*, 140 S. Ct. 599, 599–601 (2020) (Gorsuch, J., concurring in the grant of stay). Moreover, Section 705 (like other APA provisions) "was primarily intended to reflect existing law," not "to fashion new rules of intervention for District Courts." *Sampson v. Murray*, 415 U.S. 61, 68 n.15 (1974). Plaintiffs do not identify, and the Government has not found, any pre-APA practice of district courts granting universal stays of agency regulations. Consistent with that backdrop, Congress contemplated that any relief under Section 705 "would normally, if not always, be

limited to the parties," Administrative Procedure Act, S. Doc. No. 248, 79th Cong., 2d Sess. 277 (1946). And even if Section 705 did authorize universal preliminary relief, such an "extraordinary remedy" would at minimum "demand truly extraordinary circumstances to justify it." *Texas*, 599 U.S. at 702 (Gorsuch, J., concurring in the judgment). Especially where, as here, parallel challenges are pending in courts around the country, universal relief threatens to "stymie the orderly review of important questions," "render meaningless rules about joinder and class actions," and "sweep up nonparties who may not wish to receive the benefit of the court's decision." *Id.* at 703. There is no sound basis for imposing those costs where, as here, party-specific relief could fully remedy any cognizable injury Plaintiffs may face.[6]

In this case, under traditional equitable principles, the Court should decline to vacate the challenged portions of the Final Rule because declaratory judgment as to the parties or a more limited injunction as to the parties would suffice. *See Nuziard v. Minority Bus. Dev. Agency*, 2024 WL 965299, at *40–44 (N.D. Tex. Mar. 5, 2024) (rejecting universal vacatur for equitable reasons where injunction would suffice).

Finally, the Final Rule is severable. *See* 89 Fed. Reg. at 33,848 ("[R]emov[ing] any 'doubt that it would have adopted the remaining provisions of the Final Rule' without any of the other provisions, should any of them be deemed unlawful."). Plaintiffs have challenged only certain portions of the Rule as discussed above; and if the Court grants preliminary relief as to any of those portions, the remainder of the Rule should be permitted to go into effect, as intended, on

---

[6] The *Louisiana* Plaintiffs gesture to concerns about lawsuits brought by third parties, Louisiana's Mem. 30, but these concerns are entirely speculative. Making the concern further speculative, the *Louisiana* Plaintiffs offer no reason to think such hypothetical suits would relate to the Rule as opposed to another source of law. *See supra* Part 1.C Sexual Harassment (correcting a misapprehension regarding the distinction between the Department's regulatory authority and the standard for a judicially-implied private right of action).

August 1, 2024. As the Supreme Court explained, courts should "enjoin only the unconstitutional applications of a statute while leaving other applications in force, . . . or . . . sever its problematic portions while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328–29 (2006) (citation omitted).

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motions for a § 705 stay or preliminary injunction.

Dated: June 4, 2024                          Respectfully submitted,

                                             BRIAN M. BOYNTON
                                             Principal Deputy Assistant Attorney General

                                             EMILY B. NESTLER
                                             Assistant Branch Director

                                             *Benjamin Takemoto*
                                             ELIZABETH TULIS
                                             REBECCA KOPPLIN
                                             BENJAMIN TAKEMOTO
                                             HANNAH SOLOMON-STRAUSS
                                             PARDIS GHEIBI
                                             Trial Attorneys
                                             United States Department of Justice
                                             Civil Division, Federal Programs Branch
                                             P.O. Box No. 883, Ben Franklin Station
                                             Washington, DC 20044
                                             Phone: 202-532-4252
                                             Fax: (202) 616-8470
                                             E-mail: benjamin.takemoto@usdoj.gov

                                             *Attorneys for Defendants*