# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

| | |
|---|---|
| **State of Louisiana**, et al.<br><br>*Plaintiff,*<br><br>v.<br><br>**U.S. Department of Education**, et al.,<br><br>*Defendants.* | **No.** 3:24-cv-00563-TAD-KDM (LEAD)<br>**No.** 1:24-cv-00567-TAD-JPM (MEMBER)<br><br>**Judge Terry A. Doughty**<br><br>**Magistrate Judge Kayla D. McClusky** |
| **Rapides Parish School Board**,<br><br>*Plaintiff,*<br><br>v.<br><br>**U.S. Department of Education**, et al.,<br><br>*Defendants.* | |

**RAPIDES PARISH SCHOOL BOARD'S REPLY IN SUPPORT OF MOTION TO DELAY EFFECTIVE DATE AND FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

Table of Authorities ................................................................................................................iii

Introduction ................................................................................................................................ 1

Argument .................................................................................................................................... 2

I. Plaintiff is likely to succeed on the merits. ........................................................ 2

    A. The Rule's gender-identity mandate is contrary to law. ........................ 2

        1. *Bostock*'s rule is not a permissible interpretation of Title IX, much less compelled by the statute. ............................................... 3

        2. The de-minimis-harm rule for gender identity is not a permissible interpretation of the statute. ..................................... 5

        3. Constitutional canons of statutory construction foreclose the gender-identity mandate. ............................................................. 7

    B. The Rule infringes on First Amendment Rights. .................................... 9

    C. The Rule is arbitrary and capricious. ..................................................... 11

II. The other preliminary injunction factors favor relief. .................................... 12

III. Complete relief requires delaying the Rule's effective date and enjoining its enforcement. ................................................................................................ 14

Conclusion ................................................................................................................................ 14

**TABLE OF AUTHORITIES**

**Cases**

*A.C. ex rel. M.C. v. Metropolitan School District of Martinsville,*
    75 F.4th 760 (7th Cir. 2023) ............................................................................... 4

*Adams ex rel. Kasper v. School Board of St. Johns County,*
    57 F.4th 791 (11th Cir. 2022) ............................................................................. 3

*Arlington Central School District Board of Education v. Murphy,*
    548 U.S. 291 (2006) ........................................................................................... 8

*Bostock v. Clayton County,*
    590 U.S. 644 (2020) ................................................................................... 1, 3, 7

*Career Colleges & Schools of Texas v. United States Department of Education,*
    98 F.4th 220 (5th Cir. 2024) ............................................................................. 14

*Davis ex rel. LaShonda D. v. Monroe County Board of Education,*
    526 U.S. 629 (1999) ......................................................................................... 10

*Department of Homeland Security v. Regents of the University of California,*
    140 S. Ct. 1891 (2020) ....................................................................................... 7

*Eknes-Tucker v. Governor of Alabama,*
    80 F.4th 1205 (11th Cir. 2023) ........................................................................... 3

*Gibson v. Collier,*
    920 F.3d 212 (5th Cir. 2019) .............................................................................. 6

*Grabowski v. Arizona Board of Regents,*
    69 F.4th 1110 (9th Cir. 2023) ............................................................................. 4

*Griffin v. HM Fla.-ORL, LLC,*
    144 S. Ct. 1 (2023) ........................................................................................... 14

*Grimm v. Gloucester County School Board,*
    972 F.3d 586 (4th Cir. 2020) .............................................................................. 4

*Jackson v. Birmingham Board of Education,*
    544 U.S. 167 (2005) ........................................................................................... 3

*Kentucky v. Yellen,*
    54 F.4th 325 (6th Cir. 2022) ............................................................................... 8

*L.W. ex rel. Williams v. Skrmetti*,
    83 F.4th 460 (6th Cir. 2023) ............................................................................... 3, 6

*MedImmune, Inc. v. Genentech, Inc.*,
    549 U.S. 118 (2007) ............................................................................................. 14

*Mexican Gulf Fishing Company v. United States Department of Commerce*,
    60 F.4th 956 (5th Cir. 2023) ............................................................................... 10

*Motor Vehicle Manufacturers Association v. State Farm Mutual Automobile
    Insurance Company*,
    463 U.S. 29 (1983) ............................................................................................... 11

*Muldrow v. City of St. Louis*,
    144 S. Ct. 967 (2024) ............................................................................................ 5

*National Federation of Independent Business v. Sebelius*,
    567 U.S. 519 (2012) ............................................................................................... 9

*Neese v. Becerra*,
    640 F. Supp. 3d 668 (N.D. Tex. 2022) ................................................................ 3

*Saxe v. State College Area School District*,
    240 F.3d 200 (3d Cir. 2001) ............................................................................... 10

*Sierra Club, Lone Star Chapter v. Federal Deposit Insurance Corporation*,
    992 F.2d 545 (5th Cir. 1993) ............................................................................... 9

*Sossamon v. Texas*,
    563 U.S. 277 (2011) ........................................................................................... 7–8

*South Dakota v. Dole*,
    483 U.S. 203 (1987) ............................................................................................... 9

*Speech First, Inc. v. Cartwright*,
    32 F.4th 1110 (11th Cir. 2022) .......................................................................... 10

*Texas v. Cardona*,
    No. 4:23-cv-00604, Doc. No. 37 (N.D. Tex. June 11, 2024) ...................... 1, 3, 7

*Texas v. United States Environmental Protection Agency*,
    829 F.3d 405 (5th Cir. 2016) ............................................................................. 13

*Wages & White Lion Investments, LLC v. United States Food & Drug
    Administration*,
    16 F.4th 1130 (5th Cir. 2021) ............................................................................ 13

*West Virginia ex rel. Morrisey v. United States Department of the Treasury*,
    59 F.4th 1124 (11th Cir. 2023) ........................................................................... 8

**<u>Statutes</u>**

20 U.S.C. § 1681(a) .................................................................................................. 3, 4, 6, 11

20 U.S.C. § 1686 .............................................................................................................. 1, 3, 5

5 U.S.C. § 705 .......................................................................................................................... 14

5 U.S.C. § 706 .......................................................................................................................... 14

**<u>Other Authorities</u>**

Brief for the United States as Amicus Curiae Supporting Plaintiff-Appellant
    and Urging Reversal, *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*,
    No. 15-2056, 2015 WL 6585237 (4th Cir. Oct. 28, 2015) ................................. 12

Cal. Dep't of Educ., *School Success and Opportunity Act (Assembly Bill 1266)
    Frequently Asked Questions*,
    https://www.cde.ca.gov/re/di/eo/faqs.asp ........................................................ 12

En Banc Brief for the United States as Amicus Curiae in Support of Plaintiff-
    Appellee and Urging Affirmance, *Adams v. Sch. Bd. of St. Johns Cty.*,
    No. 18-13592, 2021 WL 5630400 (11th Cir. Nov. 26, 2021) ........................... 12

Mila Sohoni, *The Power to Vacate A Rule*,
    88 Geo. Wash. L. Rev. 1121 (2020) ................................................................... 14

The Women's Safety and Protection Act, No. 436,
    Louisiana House Bill 608 (June 3, 2024) ....................................................... 8–9

**<u>Regulations</u>**

34 C.F.R. § 106.34(a)(1) ................................................................................................. 11

34 C.F.R. § 106.34(a)(2) ................................................................................................. 11

34 C.F.R. § 106.41(a) .................................................................................................. 2, 11

34 C.F.R. § 106.41(b) ........................................................................................................ 2

87 Fed. Reg. 41,390 (proposed July 12, 2022) ........................................................... 12

89 Fed. Reg. 33,474 (Apr. 29, 2024) ................................................................ passim

## INTRODUCTION

Title VII is not the same as Title IX, and firing an employee is not equivalent to assigning P.E. classes. *Bostock v. Clayton County*, 590 U.S. 644 (2020), was decided based on the view that *firing* based on sex is discrimination under Title VII. That does not mean every action based on sex is discrimination under Title IX, which requires equality in education for girls. As a sister court put it just this morning, "[r]ecognition of innate biological differences is permissable—encouraged even—under Title IX." *Texas v. Cardona*, No. 4:23-cv-00604, Doc. No. 37 at 66 (N.D. Tex. June 11, 2024) (*Texas*).[1] Yet under the Department of Education's new Title IX rule, 89 Fed. Reg. 33,474 (Apr. 29, 2024), gender identity will overshadow biological sex in locker rooms, showers, and physical education classes (among other things).

These are not contexts where considering sex is discriminatory, and the textual differences between Title IX and Title VII bar such a conclusion. Title IX instructs that an individual's sex *can* be a proper but-for cause of sex-based distinctions, 20 U.S.C. § 1686, and longstanding regulations allow sex to control numerous educational classifications and distinctions, from P.E. classes and sex-ed lessons to locker rooms and dormitories. Yet the Rule holds *any* consideration of sex is presumptively harmful—though only the Department of Education (ED) can say whether it is harmful enough to be "legally cognizable." Conveniently, the only type of injury ED finds sufficient is prioritizing biology over "an individual's sense of their [sic] gender." 89 Fed. Reg. at 33,809. That is not a lawful exercise of its regulatory authority.

---

[1] *Texas v. Cardona* involves the Interpretation and Fact Sheet that Defendants issued to impose a gender-identity mandate even before the Rule. *See* Compl. (No. 1:24-cv-00567, Doc. 1) ¶¶ 74–80. The court vacated those agency actions without addressing the Rule. *Texas*, Doc. No. 37 at 101–02, 108.

1

The Rule is also arbitrary and capricious. Even though the regulations will continue to refer to distinctions based on "sex," and the Rule accepts that "sex" means biological differences, the Rule prevents schools from having sex-specific classes or restroom, locker room, and shower facilities. And the Rule entirely failed to consider how its gender-identity mandate will harm girls in athletics. Redefining "sex" to include "gender identity" across Title IX necessarily impacts women's sports. To be sure, ED proposed a separate rulemaking for amending 34 C.F.R. § 106.41(b), but the Rule's new provisions apply to "athletics offered by a recipient," 34 C.F.R. § 106.41(a). The Government has not said otherwise. Its silence is deafening. Regardless, the mandate undisputedly applies to P.E. classes, which also jeopardizes girls' safety, but the Government's consolidated response to plaintiffs' motions for preliminary injunction and stay (Doc. No. 38, hereinafter "Resp.")—like the Rule—ignores P.E. For these and other reasons, the Rule is contrary to law and arbitrary and capricious, and preliminary injunctive relief is warranted. The Court should grant Plaintiff Rapides Parish School Board's motion for preliminary relief.

## ARGUMENT

### I. Plaintiff is likely to succeed on the merits.

The Rule rewrites Title IX to favor "gender identity" over the biological differences between boys and girls that have been respected for decades. The school board is likely to show that the Rule is unlawful.

#### A. The Rule's gender-identity mandate is contrary to law.

The Rule is inconsistent with Title IX's text and structure and exceeds constitutional limits on the agency's rulemaking authority.

### 1. *Bostock*'s rule is not a permissible interpretation of Title IX, much less compelled by the statute.

The Government argues that Title IX "employs a causation standard indistinguishable from Title VII's 'because of … sex' language," so the statute "compels" ED to transplant *Bostock v. Clayton County*, 590 U.S. 644 (2020), to Title IX. (Resp. at 7) That's wrong. The two statutes define and prohibit "discrimination" differently. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 175 (2005). As the Eleventh Circuit recently explained, "Title IX, unlike Title VII, includes express statutory and regulatory carve-outs for differentiating between the sexes when it comes to separate living and bathroom facilities, among others." *Adams ex rel. Kasper v. Sch. Bd. of St. Johns Cty.*, 57 F.4th 791, 811 (11th Cir. 2022) (en banc); *accord Meriwether v. Hartop*, 992 F.3d 492, 510 & n.4 (6th Cir. 2021); *Neese v. Becerra*, 640 F. Supp. 3d 668, 680–81 (N.D. Tex. 2022). Other courts agree that *Bostock* controls only in the statutory context it addressed. *See L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 484 (6th Cir. 2023) (*Bostock*'s "text-driven reasoning applies only to Title VII"); *accord Eknes-Tucker v. Governor of Ala.*, 80 F.4th 1205, 1228 (11th Cir. 2023); *Texas*, Doc. No. 37 at 78–79.

The Government does not so much as mention *Adams*, much less explain how the Rule's *Bostock*-to-Title IX transplant can survive Title IX's rule of construction. Title IX cannot "be construed to prohibit … separate living facilities for the different sexes." 20 U.S.C. § 1686. Contrary to the Government's characterization, that is not just another "exempt[ion]" from Title IX's antidiscrimination rule. (Resp. at 13.) It is a rule of construction that informs the meaning of Title IX. And it precludes transplanting *Bostock*'s reasoning to section 1681(a). A school necessarily considers sex when assigning "separate living facilities for the different sexes." 20 U.S.C. § 1686. And it necessarily considers sex when assigning "sex-separated athletic teams," as the Government recognizes (at 15–17). The Rule's conclusion that

3

Congress intentionally subjected individuals to discrimination in housing and sports, *see* 89 Fed. Reg. at 33,819, is not a permissible interpretation of Title IX.

The only reasonable reading of Title IX is that separating dormitories and sports teams based on sex is not discrimination at all. Indeed, Congress's direction regarding intercollegiate athletics, which the Government cites as evidence that "athletics is a special context," (Resp. at 16), illustrates that no one thought Title IX required ignoring sex when biological differences are germane. If considering an individual's sex in athletics programs were discrimination, the long-standing athletics regulations would be unlawful. No one in 1972 would have understood that the sex distinctions recognized since the 1975 regulations are actually unlawful "discrimination" barred by section 1681(a). Indeed, such distinctions are sometimes necessary to giving women equal access to education. *See* RPSB's Mem. Supp. (Case No. 1:24-cv-567, Doc. No. 11-1) at 13–15 (hereinafter "Mem.").

Instead of grappling with *Adams* and the differences between Title VII and Title IX, the Government cites, without discussion, three courts that have grafted *Bostock* onto Title IX. (Resp. at 8). This Court should reject that approach. The Ninth and Fourth Circuits do not even mention section 1686's rule of construction or recognize that Title IX allows consideration of sex in many contexts. *See Grabowski v. Ariz. Bd. of Regents*, 69 F.4th 1110, 1116 (9th Cir. 2023); *Grimm v. Gloucester Cnty. Sch. Bd.*, 972 F.3d 586, 616–17 (4th Cir. 2020). And though the Seventh Circuit does cite section 1686 and the regulations allowing sex-specific private facilities, it adopts an interpretation that the Rule has disclaimed: ambiguity when it comes to sex and gender identity. *A.C. ex rel. M.C. v. Metro. Sch. Dist. of Martinsville*, 75 F.4th 760, 770 (7th Cir. 2023); *see* 89 Fed. Reg. at 33,807.

Beyond citing *Bostock* and unpersuasive out-of-circuit decisions, the Government says that "[t]he Final Rule operates equally well under the … assumption"

4

that sex refers to biological differences. (Resp. at 10). The school board has explained the numerous reasons that is not so. (Mem. at 9–15).

### 2. The de-minimis-harm rule for gender identity is not a permissible interpretation of the statute.

Turning to the Rule's "de minimis harm" provision (to be codified at 34 C.F.R. § 106.31(a)(2)), the Government says that "Title IX prohibits 'distinctions or differences in treatment [based on sex] that injure protected individuals.'" (Resp. at 12 (citing 89 Fed. Reg. at 33,814)). In one sense, this provision is circular—the Rule says, "more than de minimis harm" is "legally cognizable injury," 89 Fed. Reg. at 33,814, and an injury is cognizable under Title IX if it "impose[s] more than de minimis harm," *id.* at 33,811. Of course it is unlawful to cause legally cognizable injury. The provision might simply be redundant. *Cf. Muldrow v. City of St. Louis*, 144 S. Ct. 967, 980 (2024) (Kavanaugh, J., concurring) ("[T]he text … does not require a separate showing of some harm. The discrimination is harm.")

But the Rule goes further, declaring that Congress *intended* schools to cause legally cognizable injury in the circumstances listed as exemptions to section 106.31(a)(2). *See* 89 Fed. Reg. at 33,816–17. That is nonsensical. How can an injury be legally cognizable if it is allowed by law? Then, in section 106.31(a)(2)'s closing sentence, the Rule turns to gender-identity-based injury. The only example the Rule gives of "more than de minimis harm" is a policy that "prevents a person from participating in [school] consistent with the person's gender identity." 89 Fed. Reg. at 33,887 (to be codified at 34 C.F.R. § 106.31(a)(2)). In that context alone, the Rule says, sex-based distinctions are legally cognizable discrimination as a matter of law—except when they are not. None of that makes any sense.

Instead, 20 U.S.C. § 1686 and the regulatory provisions permitting sex-specific programs are part of the definition of what is legally cognizable injury—in other words, they are part of the definition of discrimination prohibited by section

5

1681(a). *See, e.g., Adams*, 57 F.4th at 811. Sex-based distinctions permitted by law cannot be a legally cognizable injury. ED's contrary interpretation is not a permissible reading of the statute.

To be clear, the de-minimis-harm provision is not "compelled" by the statute—it is a policy determination by the agency that seeks to usurp Congress's role. Congress in 1972 did not require ED to adopt the views of the World Professional Association on Transgender Health. *See* 89 Fed. Reg. at 33,819. This organization's publications are "medically controversial," to put it mildly. *Gibson v. Collier*, 920 F.3d 212, 221 (5th Cir. 2019); *see L.W.*, 83 F.4th at 467–68, 488 (describing the cited guidelines). It is ED's choice to declare (as it does in section 106.31(a)(2)'s closing sentence) that a gender-identity-based injury is "more than de minimis" as a matter of law, while leaving other injuries that might be caused by sex distinctions to case-by-case analysis. *E.g.*, 89 Fed. Reg. at 33,815–16 (referring to its "expertise" in making such "policy judgments"), 33,818–19. In contrast to its expanded definition of "sex" in section 106.10, *e.g., id.* at 33,493, the Rule does not claim the de-minimis-harm provision is required by the statutory text—and it is not. Nor does the Rule claim that *Bostock* resolved whether sex-specific restrooms and other private spaces are discrimination in this context—and *Bostock* did not. *Id.* at 33,818. The Government does not now ask for deference to its policy choice.

The Rule's gender-identity mandate would not warrant deference anyway. Contrary to the Government's characterization, the school board *does* dispute that "preventing a student from using sex-separate restrooms or participating in single-sex classes consistent with their gender identity causes more than de minimis harm on the basis of sex." (Resp. at 12–13 (citing 89 Fed. Reg. at 33,814)). Distinguishing based on biological sex in long-recognized contexts like privacy and athletics is not legally cognizable harm or "discrimination" for all the reasons discussed above.

### 3. Constitutional canons of statutory construction foreclose the gender-identity mandate.

Even if there were doubt, constitutional canons of construction would foreclose ED's interpretation. The clear-notice rule for Spending Clause legislation applies, the major-questions doctrine bars the gender-identity mandate, and the Rule exceeds ED's delegated power under the Spending Clause.

**a.** The gender-identity mandate created by section 106.31(a)(2) is not found in unambiguous statutory text, and the Rule does not claim otherwise. *See supra* at 5–6. So the Government cannot now argue that the Rule merely "reflect[s] … the unambiguous text of the statute." (Resp. at 31). The agency must stand on the reasons stated in the Rule. *DHS v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1908–09 (2020). That requires rejecting the Government's clear-notice rule and major-questions doctrine arguments. (Resp. at 27–28, 31–32)

But even if ED claimed its de-minimis-harm rule is compelled by Congress, it would be wrong. The Government contends that Title IX must be unambiguous as to gender identity in schools because *Bostock* found Title VII to unambiguously prohibit firing an employee because of transgender status. (*Id.*) That is wrong for all the reasons discussed above. Moreover, *Bostock* did not involve Spending Clause legislation, so it did not take into account the heightened clarity required for conditions on funding. *See Texas*, Doc. No. 37 at 86–92. Indeed, *Bostock* acknowledged that "many, maybe most, applications of Title VII's sex provision were 'unanticipated' at the time of the law's adoption." *Bostock*, 590 U.S. at 679; *see id.* at 649 ("unexpected consequences"), 660 (calling its holding "momentous"). That too forecloses transplanting *Bostock*'s rule to Spending Clause legislation like Title IX.

The Government claims Congress merely needs to "make the existence of the condition itself" "explicitly obvious." (Resp. at 28). That frames the required notice at too high a level of generality. It is not enough to "unambiguously notif[y]"

7

recipients that a condition exists; recipients must have clear notice of what they are obliged to do to satisfy it. *Sossamon v. Texas*, 563 U.S. 277, 283 (2011). For example, a statute allowing "reasonable attorney's fees as part of the costs"—which plainly creates *some* condition for the funding recipient—did not give clear notice that recipients would be required to pay an opposing party's expert fees. *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). Similarly, in a statute with a condition prohibiting using funds to "directly or indirectly offset a reduction in [a State's] net tax revenue," which everyone agreed imposed *some* condition on the fund recipient, clear notice was lacking because the statute "le[ft] the [recipients] in the dark about when [the agency] may deem them to have violated the [condition]." *Kentucky v. Yellen*, 54 F.4th 325, 328 (6th Cir. 2022); *accord W. Va. ex rel. Morrisey v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1143 (11th Cir. 2023).

**b.** The Constitution also constrains the federal government from using Spending Clause legislation to coerce compliance with preferred policies. The Government responds in two ways. (Resp. at 35–39). Both fail.

*First*, the Government says (at 29) that "fears of funding loss are pure speculation." But many of the school board's policies and practices do not meet the Rule's conditions, and adopting policies that do meet the Rule's conditions would put the school board in violation of Louisiana law. So the school board is coerced.

The Government observes (at 31) that States can voluntarily enact laws that allow compliance with Spending-Clause conditions. True enough, but Louisiana has not done that. Even if the Government were correct that there is no conflict with Louisiana's Fairness in Women's Sports Act, an additional state law now conflicts with the Rule. The Women's Safety and Protection Act, No. 436, H.B. 608 (June 3, 2024) (to be codified at La. Rev. Stat. Ann. §§ 9:55–65), which takes effect on August 1, 2024, will require public schools to designate multi-occupancy restrooms and changing rooms by sex (defined by biology) and provides that these spaces "shall be

8

used only by members of that same sex." That conflicts with the Rule's gender-identity mandate. The Government does not dispute that Spending Clause legislation does not absolve the school board of state-law obligations. To be sure, ED or DOJ would have to initiate enforcement action before withdrawing all funding. That it might take ED some time to fully act on schools' noncompliance does not make the threat any less coercive. Ultimately, schools must comply or lose all funds.

*Second*, the Government claims (at 30) that the money at stake is not enough to be coercive. That ignores both precedent and the record. The federal funds at risk make up approximately 10 percent of the school board's budget[2]—the very percentage that has been described as "economic dragooning that leaves … no real option but to acquiesce." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 582 (2012) (opinion of Roberts, C.J.). Five percent of federal highway funding was not improper in *South Dakota v. Dole*, 483 U.S. 203, 211 (1987), but this case is about 100 percent of federal education funding. Conditioning all federal education funding on a gender-identity mandate that even the *Bostock* Court called "unanticipated" and "unexpected" is unconstitutionally coercive.

### B. The Rule infringes on First Amendment Rights.

The Rule also infringes on First Amendment rights for two reasons. *First*, the gender-identity mandate says that speech relating to "gender identity" will often be harassing or create a hostile environment. 89 Fed. Reg. at 33,886. The mandate doesn't define "gender identity," except to say it "describe[s] an individual's sense of their [sic] gender." *Id.* at 33,809. *Second*, the Rule creates an amorphous, "broader

---

[2] The Government says this figure is "without evidence or explanation." (Resp. at 30). Perhaps the Government missed the school board's declarations establishing that federal funding is approximately 10 percent of its annual budget. *See* No. 1:24-cv-567, Doc. Nos. 1-1, 11-2. In any event, at the preliminary injunction stage, a plaintiff must show only that it is likely to succeed under "relaxed" evidentiary rules. *Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993).

9

standard" for hostile-environment claims. *Id.* at 33,498. A complainant need not "demonstrate any particular harm" or denial of access to an educational program. *Id.* at 33,511. Harassment can be anything that the student considers "unwelcome" or that "limits" the student's benefit. *Id.* at 33,884 (to be codified at 34 C.F.R. § 106.2). Courts regularly reject definitions of harassment like this one. *E.g.*, *Speech First, Inc. v. Cartwright*, 32 F.4th 1110, 1125–27 (11th Cir. 2022); *Saxe v. State Coll. Area Sch. Dist.*, 240 F.3d 200, 217 (3d Cir. 2001).

The Government argues (at 21–23) that the Rule can eschew *Davis ex rel. LaShonda D. v. Monroe County Board of Education*, 526 U.S. 629 (1999), because it "addressed a standard that a plaintiff must meet to bring a private action for damages." True, but *Davis* was interpreting Title IX's prohibition on sex-based discrimination. *Davis*, 526 U.S. at 650. There is no reason the same words mean one thing in a private lawsuit and another for agency enforcement. An agency cannot replace the Court's authoritative construction of the text with its own.

Even if the statute were ambiguous as to sex-based harassment, the Court must reject an agency interpretation that causes "grave constitutional concerns." *Mexican Gulf Fishing Co. v. U.S. Dep't of Com.*, 60 F.4th 956, 966 (5th Cir. 2023).[3] That dooms the Rule. The *Davis* Court crafted its standard to fit with First Amendment protections. *See* 526 U.S. at 649. ED's disclaimers notwithstanding, the Rule will chill protected speech. The Rule applauded punishing a student for wearing a t-shirt saying, "THERE ARE ONLY TWO GENDERS," because that speech "invades the rights of others." 89 Fed. Reg. at 33,504. As the school board has explained, reasonable people will feel compelled to endorse ED's gender ideology because to do otherwise risks a harassment claim—even for using a standard

---

[3] To be clear, the school board is not bringing a standalone overbreadth claim to "invalidate" Title IX or the Rule, as the Government suggests. (Resp. at 23–24). It is asking the Court to interpret the statute as a matter of constitutional avoidance.

10

English pronoun. (Mem. at 19–21). ED cannot lawfully require the school board to adopt and enforce policies like the EEOC "misgendering" prohibition that the Rule endorses, 89 Fed. Reg. at 33,516, and the Government cites here, (Resp. at 29). In short, the Rule means nearly any statement about gender identity could subject a student or employee to a harassment claim. That violates the First Amendment.

### C. The Rule is arbitrary and capricious.

The Government does not even argue that ED considered how its gender-identity mandate applies to sex-specific P.E. classes and sex education, 34 C.F.R. § 106.34(a)(1), (2), or to 34 C.F.R. § 106.41(a), the provision addressing athletics programs. "[E]ntirely fail[ing] to consider [these] important aspect[s] of the problem," *Motor Vehicle Mf'rs Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), is an absence of reasoned decisionmaking. The most the Government offers is to point to the Rule's exception from section 106.31(a)(1)'s gender-identity mandate for "the criteria recipients use to determine students' eligibility to participate on male and female athletic teams." (Resp. at 15–16, 20). But the gender-identity mandate applies to 20 U.S.C. § 1681(a), the general antidiscrimination rule, and to 34 C.F.R. § 106.41(a), the antidiscrimination rule for athletics programs. Adding gender identity to the definition of sex-based discrimination and stating that prohibiting "participation" consistent with gender identity is a legally cognizable injury puts males in women's sports.

The Government claims the Rule adequately accounts for safety and privacy concerns because "a recipient can make and enforce rules that protect all students' safety and privacy," such as by "offering single occupancy facilities." (Resp. at 17). But ED and DOJ both claim singling out a student with such facilities is itself discriminatory. If that causes "more than de minimis harm" to a transgender student, it must limit access to education for others too. Under the Rule, then, the

11

only surefire way to protect privacy while avoiding liability is to convert *all* restrooms, locker rooms, and showers to single-user facilities. But that imposes the significant construction costs that the Government insists (at 19) the Rule does not require. In this respect, too, the Rule is arbitrary and capricious.[4]

The Rule is also arbitrary and capricious for failing to consider the parental exclusion policies it has cited with approval.[5] To be sure, the Rule repeatedly says it should not be read "in derogation of any legal right of a parent," as the Government observes (at 32–33). The problem is not that the Rule recognizes schools *may* release information to parents, but that it conspicuously fails to say whether refusing to do so is lawful. If ED meant to condemn the kind of parental exclusion policies it elsewhere cited, the Rule unreasonably fails to say so.[6]

## II. The other preliminary injunction factors favor relief.

**A.** The school board has shown that it will have to incur compliance costs before the Rule goes into effect on August 1, 2024. (Mem. at 23). The Government does not dispute that these costs cannot be recovered in damages. Instead, it suggests the costs of compliance do not count as irreparable harm. (Resp. at 34–35).

---

[4] *See* NPRM, 87 Fed. Reg. 41,390, 41,529 (proposed July 12, 2022); En Banc Brief for the United States as Amicus Curiae in Support of Plaintiff-Appellee and Urging Affirmance, *Adams v. Sch. Bd. of St. Johns Cty.*, No. 18-13592, 2021 WL 5630400, at *25 (11th Cir. Nov. 26, 2021); Brief for the United States as Amicus Curiae Supporting Plaintiff-Appellant and Urging Reversal, *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, No. 15-2056, 2015 WL 6585237, at *14–15 (4th Cir. Oct. 28, 2015).

[5] 89 Fed. Reg. at 33,876; *see* Cal. Dep't of Educ., *School Success and Opportunity Act (Assembly Bill 1266) Frequently Asked Questions*, https://www.cde.ca.gov/re/di/eo/faqs.asp (last reviewed Feb. 29, 2024) ("May a student's gender identity be shared with the student's parents[?]").

[6] The school board has also argued that the Rule is arbitrary and capricious in that it treats biological differences between the sexes as "sex stereotypes." (Mem. at 22). The Government's response disclaims that rationale (Resp. at 13 n.1), so the discussion of "sex stereotypes" in section 106.10 is not a basis for 106.31(a)(2).

12

*First*, the Government suggests (at 34) that compliance costs don't count because "any new federal regulation" has some cost. It cites no support for why that means regulatory costs do not constitute irreparable harm. To the contrary, in the Fifth Circuit, "nonrecoverable compliance costs" are irreparable harm. *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (cleaned up).

*Second*, the Government says compliance costs do not count unless they threaten the movant's very existence. That is wrong. Showing that compliance costs "threaten[] the very existence of [its] business," *Texas v. EPA*, 829 F.3d 405, 434 (5th Cir. 2016) (cleaned up), is a distinct—but not necessary—way to establish irreparable harm, *Wages & White Lion*, 16 F.4th at 1142 (citing *Texas v. EPA*, 829 F.3d at 433). But even if that independent showing were necessary, the school board has shown that the Rule would upend its long-established programs, which respect biological differences between boys and girls in contexts involving personal privacy and athletics, and force it to violate state law or give up 10 percent of its budget. (Mem. at 7–8, 23–25). That is irreparable harm.

**B.** The balance of the equities also favors preliminary relief. The Government first argues that the Rule is urgently needed to prevent sex discrimination. (Resp. at 36). Title IX and existing regulations already do that, and schools will maintain the status quo of the last 50 years. The Government's claim to urgency should be rejected. It has been four years since *Bostock*—the foundation of the Rule's gender-discrimination mandate—and ED took nearly two years to promulgate the Rule. A delay of the August 1 effective date would be immaterial.

*Second*, the Government claims that the equities favor it because the school board's "loss of funding is [not] imminent." (Resp. at 37). Even assuming imminence is relevant to the equities, it exists here. As discussed above, the school board's existing policies and practices do not comply with the Rule. It must either adopt new policies or be out of compliance with funding conditions. The school board is not

required to "bet the farm, so to speak," before it may seek injunctive relief. *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 129 (2007).

Federal funds make up approximately 10 percent of the school board's budget and aid its most underserved students, such as children experiencing homelessness and with disabilities. (Mem. at 24–25). The equities favor relief.

### III. Complete relief requires delaying the Rule's effective date and enjoining its enforcement.

The Government asks the Court to limit relief to Plaintiffs in this case. That does not comport with governing law. Temporary relief under 5 U.S.C. § 705 is not "party-restricted." *Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024). Contrary to the Government's claim, vacatur under section 706 and its temporary equivalent in section 705 are supported by pre-APA practice. *See* Mila Sohoni, *The Power to Vacate A Rule*, 88 Geo. Wash. L. Rev. 1121, 1146–47, 1151 (2020). Section 705 provides for delaying the effective date of an agency's "action," which in this case is the Rule. It says nothing about delay for only some.

"[P]arty-specific relief" would not "fully remedy" the school board's injuries. (*Contra* Resp. at 39). If other schools have males playing on girls' sports teams or using girls' locker rooms, the school board's students will be harmed during competition and when away from their own campuses. And unless the Rule is delayed, the gender-identity mandate could be invoked in private lawsuits even after ED and DOJ are enjoined from enforcing it. Complete relief requires treating the Rule "as though it had never happened." *Griffin v. HM Fla.-ORL, LLC*, 144 S. Ct. 1, 2 (2023) (Kavanaugh, J., statement respecting the denial of application).

## CONCLUSION

The Court should grant the school board's motion for delay of effective date and for a preliminary injunction.

Respectfully submitted this 11th day of June, 2024.

s/ Michael T. Johnson
**Michael T. Johnson**
LA Bar No. 14401
**Johnson, Siebeneicher & Ingram**
2757 Highway 28 East
Pineville, Louisiana 71360
Telephone: (318) 484-3911
Facsimile: (318) 484-3585
mikejohnson@jslawfirm.com

s/ Natalie D. Thompson
**Natalie D. Thompson** **(Lead Attorney)**
WDLA Temp. Bar No. 918095
**Matthew S. Bowman***
WDLA Temp. Bar No. 913956
**Alliance Defending Freedom**
440 First Street NW, Suite 600
Washington, DC 20001
Telephone: (202) 393-8690
Facsimile: (202) 347-3622
nthompson@ADFlegal.org
mbowman@ADFlegal.org

**Julie Marie Blake***
WDLA Temp. Bar No. 918094
**Alliance Defending Freedom**
44180 Riverside Parkway
Lansdowne, VA 20176
Telephone: (571) 707-4655
Facsimile: (571) 707-4790
jblake@ADFlegal.org

\*   *Admitted pro hac vice*
\**  *Admitted pro hac vice; practice supervised by members of the D.C. Bar while application is pending*

*Counsel for Plaintiff Rapides Parish School Board*

15